Dimitrios P. Biller (SBN: 142730)
15113 West Sunset Blvd. #9
Pacific Palisades, California 90272
(310) 459-9870
biller_ltdconsulting@verizon.net

Marcia L. Daley (SBN:146579)
1516 Westwood Blvd., #102
Los Angeles, California 90024
(310) 985-2808
marciad@daleyandsackslaw.com

Attorneys for Paula Thomas

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>PDTW, LLC<br><br>Debtor | Case No.: 6:16-bk-15889 SY<br><br>**DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION FOR ENTRY OF ORDER: (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR, IN THE ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION OF CONCURRENT COURT ACTIONS** |
| | Date: August 3, 2017<br>Time: 1:30 p.m.<br>Crtm: 302<br>3420 Twelfth Street<br>Riverside, CA 92501 |

DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION FOR ENTRY OF ORDER: (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR, IN THE ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION OF CONCURRENT COURT ACTIONS      - 1

## EXHIBIT LIST

1. Professional Biography of Paula Thomas;

2. California Secretary of State Records – PDTW, LLC;

3. Photographs of A-Level Talent Wearing Thomas Wylde Styles;

4. Anatomic Pathology Report – City of Hope;

5. Thomas Wylde 2013 Valuation Report by Santli, Pastore & Hill;

6. Attachment II to Security Agreement, Grant of Security Interest (Trademarks and Copyrights), with attachments; Release of Intellectual Property Security Interest, with attachments; Certificate of Trademark Assignment dated October 24, 2013, with attachments; and Certificate of Trademark Assignment Dated January 13, 2015, with attachments;

7. Operating Agreement of Thomas Wylde, LLC, dated July 22, 2014;

8. E-mail Correspondence Dated December 23, 2014 from Andrew Apfelberg;

9. Agreement to Purchase Membership Interest Executed December 31, 2014;

10. Thomas Employment Agreement Executed December 31, 2014;

11. Defamatory E-mail and Text Correspondence;

12. Indemnity Agreement Executed December 2014;

13. California Secretary of State Records – Thomas Wylde Holdings, LLC;

14. Congratulatory E-Mails and Industry Reviews;

15. E-Mail Correspondence from Kate Green, Givaudan Fragrances, Corp.;

16. E-Mail Correspondence from Tony Jay;

17. Text Correspondence from Jene Park;

18. E-Mail Correspondence Between Giselle Limtao and John Hanna;

19. Note Dated April 20, 2015 from Dr. Gordon Van Tassel;

20. E-Mail Correspondence Dated April 20, 2015 from David Schneider;

21. Correspondence Dated May 14, 2015 from Richard B. Peddie;

22. E-Mail Correspondence Dated July 1, 2015 from Tom Fore;

23. Notice from Thomas Wylde, LLC Regarding Dilution of Equity Share;

24. Correspondence Dated December 4, 2015, January 11 and January 14, 2016 from EDD;

25. Thomas Wylde, LLC Web Postings;

26. Notes from Doctors Gordon Van Tassel and Paul H. Crane;

27. .Com – E-Commerce Sites; and

28. Transcript Dated March 1, 2017 of Stephen Choi's Deposition.

DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION TO DISMISS          - 3

## DECLARATION OF PAULA THOMAS

1.    I, Paula Dorothy Thomas, hereby attest and declare that the following facts, events, situations, circumstances and documents discussed in this Declaration are based on my personal knowledge and experience. If called to testify as a witness, I would provide competent testimony regarding the facts, events, situations, circumstances and documents discussed in this Declaration. **Exhibit "1"** is a true and correct copy of my professional biography. I, with the assistance of Los Angeles Times journalist, Rose Apodaca, personally prepared my professional biography for business purposes. I have stored my professional biography in a safe and secure place as part of my required business practice. Exhibit "1" is a true and correct copy of the original.

2.    I was born in Birmingham, England, where, at the age of 17, I was discovered and cast as a "Bond" girl in "A View to a Kill".

3. After having gained recognition as a "Bond" girl, I launched a career as a high-fashion model, quickly gaining a global presence including runways in London; Japan; Milan; and Paris, among others. I was an haut-couture fashion model in high demand from 1984 through 2000, and was often photographed – appearing in print on such fashion magazines as Vogue; Harper's Bazaar; I.D.; The Face; and Elle, among others.

4.      I retired from modeling in or about 2000, returning to London where I worked with famed designer, Julien McDonald, successfully re-establishing his popular fashion line. It was during this time, from 2000 to 2004, that I learned, and grew to love, the art of fashion-design. At this time, I focused on learning how to design clothes; the techniques, skills, abilities and attributes of physically designing garments from the images that I created based on my imagination and creativity. Every designer of fashion has a unique approach based on distinct and impacting life experiences that are personal to the designer. A brand's design, shapes, prints and patterns are that brand's DNA, as unique and identifiable as the designer's own DNA.

5.      After approximately four years of working together, Julien McDonald and I we were sought out by Givenchy to work in their Paris office. After helping establish Julien McDonald at Givenchy, I returned to Los Angeles and worked as a freelance stylist and designer in Los Angeles and Milan, Italy.

6.      While freelancing from 2004 to 2006, I started to develop my own line of haute-couture fashion, which I named Thomas Wylde, "Thomas" in honor of my father's family, and "Wylde" in honor of my great-grandmother, Catherine Wylde. I incorporated Thomas Wylde in 2005 and launched the brand "Thomas Wylde" in 2006 with only two employees, myself and one other, working with a freelance pattern maker and seamstress in a garage in Alhambra, California.

7.      Thomas Wylde, Inc., my first attempt at going solo in the fashion design industry as a business, a very fickle and unpredictable industry, successfully participated in both seasons of its first year.

8.      My designs, often described as unique, sexy, edgy and avant-garde, caused Thomas Wylde, Inc. to explode, going from a $500,000 angel investment to grossing approximately $9.5M by its third season. The garments and accessories that Thomas Wylde, Inc. produced and sold were distinctly and uniquely associated with the brand name "Thomas Wylde" and with me as the brand's creator and sole designer.

9.      Notwithstanding its success, I was compelled to freeze Thomas Wylde, Inc. after its second season due to legal issues with an investor, whose ownership interests I eventually acquired in settling out the dispute.

10.      Despite the freezing of Thomas Wylde, Inc., which I eventually dissolved in April of 2008, I continued to design to further pursue my passion and entrench my designs and my brand in the global fashion industry. On advice of counsel, and without hereby waiving any attorney client privilege, I organized PDTW, LLC ("Paula Dorothy, Thomas, Wylde"); incorporated Paula Thomas, Inc.; and entered into my third fashion season as "Paula Thomas for TW" [Thomas Wylde].

11.    Despite my dissolving Paula Thomas, Inc., I have maintained PDTW, LLC active, of which I own 99.5% and my daughter owns the remaining .5%. That company continues to be active today. **Exhibit "2"** is a true and correct copy of the status information concerning PDTW, LLC., which information is maintained by the California Secretary of State, and which I, in the normal course of my business practice, obtained online from the California Secretary of State - Business Search service. **Exhibit "2"** is a true and correct copy of the original and I have not modified, changed or altered this copy.

12.    In or about the end of 2006 and beginning of 2007, around the third or fourth fashion season for my Thomas Wylde designs, I hired Jene Park to help me with the Thomas Wylde line of fashion as an administrator. Her duties and responsibilities included: (a) overseeing production;(b) staff management;(c) day-to-day office management; (d) pick-and-pack; (e) sales; (f) distribution; and (g) shipping. At the time of her being hired, Jene Park was a fabric distributor from whom I had purchased fabric in the past. Jene Park is not a fashion designer, nor did I hire Jene Park to design fashion for Thomas Wylde. I continued to be the creative director and ambassador of the brand, having all design responsibilities, which included creating the concept or look of the garment; selecting the fabric and color for the garment; and directing/supervising my design teams in the creation of the pattern/designs, which I then would edit until readied for production

of the garment. All Thomas Wylde designs and prints are my concepts, my visions that borrow from my culture, my heritage, my passions and my life experiences, all of which combine to create the designs and patterns that capture my personality and creative spirit. My considerable experience in the fashion industry, both as a model and a designer, is what enabled me to create and launch a highly successful and popular chic line of fashion, with an original brand that rivaled Dior, Givenchy, Channel, and Valentino.

13.    A fashion designer must have a creative thought process that is continually evolving, an imagination and the ability to put pencil to paper and/or operate computers with various specialized software programs to give a visual and tangible life to the conceptual designs and shapes. The fabrics, prints, colors and shapes must be consistent with the designs and the message that the designs are intended to convey, i.e., the DNA of the brand. A designer who is also a creative director is able to effectively communicate her concepts and visions to her design team(s), who then are charged to give a visual life to those designs under her supervision and guidance, which visual renderings and sketches the designer then will edit. I have a natural gift of design, but my 16 years as a model has given me the experience necessary to hone my natural talent and develop the skills of an innovative, creative designer, learning from such A-list designers like John Galliano; Alexander McQueen; Kathryn Hammett; Chantelle Thomas; Issey

Miyake; Jean Paul Gautier; and Dior, among others, as well as such notable photographers like Rankin; Nick Knight; Gilles Bensimon; and Jean Lou Sieff. In short, I learned by being in the "trenches" with some of the greats in their respective fields.

14.    My brand, the henna skull, the name and words "Thomas Wylde", specific fabric prints, and my other marks and designs, whether registered for protection or protected in common-law, rapidly gained so much popularity, it soon became a fashion favorite for some influencers and A-level talent, such as Heide Klum; Madonna; Jennifer Lopez; Angelina Jolie; and Charlisse Theron, to name a few. **Exhibit "3"** is a collection of photographs depicting A-level talent wearing Thomas Wylde. I have collected these photographs as part of my business as a designer soon after publication in the ordinary course of business. I have stored these photographs in a safe and secure location as is my routine. I have not modified, changed or alter the images in the photographs.

15.    Jene Park, while appearing to be hard working and diligent, did cause me some concern. Aside from a few negative incidents, including Jene Park's attempt to launch a fashion line in direct competition with Thomas Wylde, which competing fashion line replicated my original designs and fabric combinations without my knowledge or permission, as well as her conversion of PDTW assets and funds, I continued her employment, trusting the person I mistakenly thought

she was; she would address my concerns regarding her questionable activities and conduct. After discussing these issues with her, Jene Park convinced me there would be no further problems – I trusted her.

16.    About the same time that I engaged Jene Park, I also hired Joel Keyser as the CFO of PDTW, LLC. Joel Keyser's duties and responsibilities included: paying company bills; managing the company books; and negotiating company contracts such as lease agreements, among other things.

17.    In or about 2007 or 2008, Joel Keyser introduced Dr. Michael Schiffman as a possible source of funds for PDTW, LLC, either by way of a loan or an investment. Dr. Michael Schiffman eventually loaned $500,000 dollars to PDTW, LLC, at an interest rate of 18%, an unusually high interest rate that legal experts I've consulted have characterized as 'usurious', and with a security interest in my intellectual property.

18.    In May of 2008 I was diagnosed with stage 1 breast cancer and commenced radiology treatment immediately after having undergone two major surgeries within a two-week period, which radiology treatment continued for nine weeks. **Exhibit "4"** is a true and correct copy of the Anatomic Pathology Report from the City of Hope. I have kept this report in a safe and secure place. I have kept this document as my personal business record because the information

contained in this document may be important for future medical treatment of my cancer. The report has not been changed, altered, or modified in any way.

19.    Thomas Wylde is so much my passion, that I would be at the radiology group at 6:00 am for treatment, only to go straight from there to the office and work until I became too tired. In fact, I wasn't able to go to the office on only one or two occasions, because of how debilitating the treatment had been on that particular day. Jene Park was administering my brand, Thomas Wylde, when I was diagnosed with breast cancer and was well aware of my medical condition and the treatment I was undergoing.

20.    In 2009, Jene Park approached me, requesting my approval of her launching a t-shirt design company, Haute Tee, with her ex-husband, David Fuchs, which I approved with the understanding that she would design only t-shirts.

21.    Soon after having approved Jene Park's t-shirt line, I traveled to Paris to sell my Thomas Wylde collection, where a friend congratulated me for the second Thomas Wylde line I had launched. I advised my friend I had not launched a second line, which led my friend to investigate on my behalf, only to find out that Jene Park's line was not for t-shirts only, but also included my designs, such as crystals on cashmere – elements so identifiable with me and Thomas Wylde that a close friend and colleague believed it to be Thomas Wylde's second line of design.

22.     I confronted Jene Park about her "t-shirt line", informing her that she had to either close her "t-shirt line" or she would have to leave Thomas Wylde. She elected to close her t-shirt line and remain with Thomas Wylde, a choice I mistakenly took as a sign of loyalty;

23.     In 2012, after having observed enough of Joel Keyser's dealings and suspecting that he was laundering money through PDTW, LLC, and after he had gotten PDTW, LLC in a heated lawsuit with a third-party client of *his*, I ordered PDTW, LLC's books to be audited, which provided me with sufficient cause to terminate Joel Keyser's employment;

24.     In early 2013, while on a sales trip in Paris, Jene Park introduced me to John Hanna. It was shortly before meeting John Hanna that I had engaged Vendome Global Partners to represent my brand, Thomas Wylde, in raising investments. Having shared my disappointment in Vendome Global Partners' performance with him, John Hanna introduced me to the firm of Santli, Pastore & Hill to conduct a valuation of the brand, which valuation report was delivered in September 17, 2013. At that time, I was the only designer of fashion for garments sold under my brand, Thomas Wylde.

25.     Shortly after my receipt of the valuation report, John Hanna became a consultant for PDTW, LLC and my brand, Thomas Wylde, with regard to raising investment(s) using said valuation report. **Exhibit "5"** is a true and correct copy of

DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION TO DISMISS        - 12

the valuation report that Santli, Pastore & Hill prepared. I received this valuation

in the ordinary course of my business shortly after it was finalized. I have kept the

valuation report in a safe and secure place. The valuation report has not been

changed, altered, or modified in any way.

26. On October 16, 2013, upon advice of in-house counsel, David Schnider,

to whom I was introduced by Jene Park and whom I hired on her recommendation

only a few months earlier, I formed Thomas Wylde Holdings, LLC, to which I was

directed by David Schnider and John Hanna to assign my intellectual property

rights. As a non-lawyer, I was confused as to why Thomas Wylde Holdings, LLC

had to be formed, but I followed David Schinder's advise because he was a

licensed attorney and in-house counsel for PDTW, LLC. **Exhibit "6"** are true and

correct copies of: (i) Attachment II to Security Agreement, Grant of Security

Interest (Trademarks and Copyrights), with attachments; (ii) Release of Intellectual

Property Security Interest, with attachments; (iii) Certificate of Trademark

Assignment dated October 24, 2013, with attachments; and (iv) Certificate of

Trademark Assignment Dated January 13, 2015, with attachments. These are

documents created for business purposes and I have maintained copies in a safe

and secure place. I have not modified, altered or changed the copies from the

originals. I was the sole member of Thomas Wylde Holdings, LLC. I continued to

own these copyrights and trademarks through my ownership of Thomas Wylde Holdings, LLC.

27.    On October 22, 2013, Thomas Wylde Holdings, LLC., using the intellectual property identified in **Exhibit "6"** as a security instrument, accepted a loan from CBC Partners 1, LLC in the amount of $1,625,000.00, an arrangement orchestrated by John Hanna.

28.    Without having discussed this ahead of time, and only after the loan agreements were ready for signature, John Hanna demanded $100,000 as a "finder's fee", all the while asking that I tell no one about his getting this "finder's fee."

29.    Shortly after the valuation was done and delivered, John Hanna and I agreed that he would come on as CEO of Thomas Wylde, LLC when organized. Once it had been agreed that he would be CEO of Thomas Wylde, LLC, John Hanna brought Stephen Choi to the table as an investor in August of 2014. Once we had received confirmation that Hillshore Investments, S.A. would be injecting funds in Thomas Wylde, LLC, and while I was on holiday, John Hanna again demanded a "finder's fee" of $50,000.

30.    On July 22, 2014, Thomas Wylde, LLC was organized by Jene Park; John Hanna; Doug Lee; and Roger Kuo; I was completely excluded from ownership of my own company. **Exhibit "7"** is a true and correct copy of the

Operating Agreement dated July 22, 2014.  It is a document created for business

purposes and I have maintained a copy in a safe and secure place. I have not

modified, altered or changed the copy from the original.  The members of Thomas

Wylde, LLC, under the July 22, 2014 Articles of Organization, intentionally

excluded me completely from the organization, of which I was aware and to which

agreed on advise of John Hanna and David Schnider, whom I trusted implicitly.

However, the garments I had designed, in effect PDTW, LLC assets, were

marketed and sold under the new company --- Thomas Wylde, LLC.

      31.    Several months after the organization of Thomas Wylde, LLC in July

22, of 2014, negotiations on several documents were commenced in earnest

between David Schnider for Thomas Wylde, LLC, on the one hand, and Andrew

Apfelberg of Greenberg Glusker for me, on the other hand, which documents John

Hanna insisted be fully executed before the end of calendar year 2014, and which

included the Agreement to Purchase Membership Interests through which I was

compelled to purchase ownership interest in my own company.  David Schnider,

who would be representing Thomas Wylde, LLC and who had in the past

represented both me and PDTW, LLC, had previously referred me to Andrew

Apfelberg of the Greenberg Glusker firm to represent me in other personal and

business matters, and he represented me in these negotiations with Thomas Wylde,

LLC. David Schnider never informed or advised me to seek independent advice

from other attorneys.  David Schnider never gave me any advice on the conflict of

interests that existed between his representation of Thomas Wylde, LLC, PDTW,

LLC and me.   I don't recall David Schnider ever explaining the importance of

identifying conflict of interests, nor my ever having signed a written consent to

have David Schnider represent Thomas Wylde, LLC in any legal matters that

involved me and/or PDTW, LLC.

32.    On or about December 23, 2014, while I was on holiday, Andrew

Apfelberg sent me a series of 'redlined' documents for approval, requesting my

permission allowing him to sign on my behalf pending my return.  **Exhibit "8"** is

a true and correct copy of the email dated December 23, 2014 from Andrew

Apfelberg.  I received **Exhibit "8"** in the ordinary course of my business and I

have stored the e-mail in a safe and secure place as part of my routine and business

practice.  I have not changed, modified or altered the e-mail in any way from the

time I received it.

33.    On December 31, 2014, I signed the Thomas Employment Agreement

and the Agreement to Purchase Membership Interest, the last documents in the

long string of agreements rapidly negotiated for my signature.  **Exhibit "9"** is a

true and correct copy of the Agreement to Purchase Membership Interest I signed

in the ordinary course of my business.  I have maintained the original that I

received in a safe and secure place as part of my routine and practice.  I have not

DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION TO DISMISS          - 16

changed, modified or altered **Exhibit "9"** in any way. From my understanding of the Agreement to Purchase Membership Interest, I was purchasing 64 Units of Membership in Thomas Wylde, LLC for $3,200 and an Employment Agreement between me and Thomas Wylde, LLC.

34.  The Thomas Employment Agreement was an essential part of the Agreement to Purchase Membership Interest; without the Thomas Employment Agreement, the Agreement to Purchase Membership Interest was not valid and I would remain the sole owner of all trademarks and copyrights. **Exhibit "10"** is a true and correct copy of the Thomas Employment Agreement I signed in the ordinary course of my business. I have maintained the original that I received in a safe and secure place as part of my routine and practice. I have not changed, modified or altered **Exhibit "10"** in any way.

35.  Once I had executed all documents, Jene Park and John Hanna then felt secure enough to begin a campaign of hostility and harassment, thereby subjecting me to a hostile work environment. John Hanna began to freely berate me at the work place, making untruthful and offensive statements about me to my staff, colleagues and friends, calling me a "whore" and my work "shit." Jene Park began to criticize my work product, stating that I had lost my edge and could no longer design. While many of these comments were made in staff meetings; some were put in print by way of e-mails and texts. **Exhibit "11"** is a collection of true

and correct copies of untruthful and offensive statements that were texted and e-mailed to me by friends who had received these texts and e-mails from Jene Park and/or John Hanna. I have kept these texts and e-mails in a safe and secure place. These e-mails and texts have not been changed, altered, or modified in any way.

36.    I was being subjected to such mental and verbal abuse at the hands of John Hanna and Jene Park that I would often sit in my car outside of the showroom I built and cry before mustering up the courage to walk through the doors, not knowing what to expect. The situation became so bad, that my health started to suffer, worsening progressively such that, by April 15, 2105, my personal physician suggested I have an MRI taken to help diagnose my loss of balance. Though my stress and anxiety were very high, and I was becoming progressively sicker, I continued to work as hard as I could to meet delivery deadlines, prepare and execute Thomas Wylde's first fashion show, a show that was well received and which garnered great reviews, as well as the other tasks that were asked of me. Jene Park and John Hanna were aware of my declining health

37.    Thomas Wylde, LLC, through David Schnider, terminated my employment without cause on or about April 20, 2015 (four months after my signing the Agreement to Purchase Membership Interest and Thomas Employment Agreement, and only five days after Hillshore Investments, S.A. acquired the majority interest in the company for an aggregate investment of $5.5M). Thomas

Wylde, LLC failed to give me the contractually agreed severance package of $300,000.00 per year for three years and/or the annual bonus, if any, as required under the Employment Agreement. See Clause 9, **Exhibit "10."**

38.     I was not terminated for "Cause", as that term is defined in the Employment Agreement, because I never engaged in any of the acts or made any of the statements that would fall into one of the five "for Cause" categories:

> **"Termination.** The Company shall have the right to terminate Employee's employment under this Agreement at any time for Cause, which termination shall be effective immediately. Termination for Cause shall mean the commission of the following acts by Employee that are not reasonably cured within thirty days of Employee's receipt of written notice from the Company detailing the specifics the alleged acts or omissions of the Employee that Company believes fit the definition of Cause:
>
> (i)     material breach of this Agreement
>
> (ii)    intentional non-performance or mis-performance of her duties, or refusal to abide by or comply with the reasonable directives of her superior officers, or the Corporation's policies and procedures;
>
> (iii)   willful dishonesty, fraud, or misconduct with respect to the business or affairs of the Company, that in the reasonable

judgment of the Manager or a Supermajority of the Membership

Interest materially and adversely affects the Company;

(iv)    conviction of, or a plea of nolo contendere to a felony or

other crime involving moral turpitude; or

(v)    the commission of any act that is a conflict of interests (as

defined above).

39.  Thomas Wylde, LLC failed to give me: (i) proper written notice of any

"Cause" for which I could be terminated; and (ii) the contractual 30-day period

within which to cure any such "Cause." I now believe that Thomas Wylde, LLC

never had any intention to fulfil its obligations under any of the agreements,

especially under either the Thomas Employment Agreement or the Agreement to

Purchase Membership Interest, and only led me to believe that they would act in

good faith in order to induce my execution of these documents.

40.    After having been terminated, and having been subjected to a hostile

and harassing work environment, one where I was insulted daily, both personally

and professionally, by John Hanna and Jene Park, I fell into a very deep depression

– a sense of shock and isolation.  I had been completely cut off from my only

source of income and any health care, further compounding the stress and

depression I was then experiencing, and continue to experience today.  I was not

allowed to collect my personal belongings from my office, belongings that I have,

to date, not been able to recover, and which continue to be in Thomas Wylde,

LLC's and Jene Park's possession.

41.     After my having signed all Thomas Wylde, LLC documents,

including the Thomas Employment Agreement, the Agreement to Purchase

Membership Agreement, and the Indemnity Agreement (**Exhibit "12"**), on January

7, 2015 John Hanna issued payment to CBC Partners I, LLC, satisfying the

applicable loan agreement and causing CBC Partners I, LLC to release the security

interest in my intellectual property back to Thomas Wylde Holdings, Inc., which

was then dissolved on January 27, 2015, causing the intellectual property to revert

back to me. John Hanna and David Schnider arranged for the dissolution of

Thomas Wylde Holdings, LLC, which dissolution documents I signed at their

instruction, trusting their judgment and misrepresentations. **Exhibit "13"** is a true

and correct copy of the status information concerning Thomas Wylde Holdings,

LLC., which information is maintained by the California Secretary of State, and

which I, in the normal course of my business practice, obtained online from the

California Secretary of State - Business Search service.

42.     From January 1, 2015 through February 17, 2015, I, along with my

design teams, designed a line of fashion to be premiered in the first ever Thomas

Wylde fashion show during Fashion Week in New York City, a show that I was

not prepared to execute so soon and on such short notice.

43.    Notwithstanding the unreasonably short period of time within which I was expected to organize and plan a fashion show, I, with a lot of help from good friends and colleagues in the industry, was able to coordinate and, on February 18, 2015, successfully execute a fashion show on a modest budget of approximately $120,000.00, a fashion show that was received extremely well. **Exhibit "14"** consists of congratulatory e-mails from friends and colleagues as well as industry reviews. Upon my receipt of any correspondence, whether print or electronic, I store such material in a safe and secure place for reference in the future. This is part of my ordinary business practice. I have not changed, altered or modified any of this material since having received it.

44.    After the fashion show, Jene Park, John Hanna and I were expected to attend a meeting with Givaudan Fragrances, Corp, an haute-couture fragrance house, to explore the possibility of launching a signature fragrance for the "Thomas Wylde" brand. Despite my understanding that Jene Park and/or John Hanna would provide me with the details for this meeting, I had to contact them to inquire of the time and place. Upon my arriving at the meeting, I was complimented for the fashion show by Kate Green, Vice President Fine Fragrance Marketing for Givaudan, and I led the meeting for Thomas Wylde, LLC. **Exhibit "15"** is a true and correct copy of the e-mail I received from Kate Green on February 19, 2015 in the ordinary course of my business. I have maintained the

original that I received in a safe and secure place as part of my routine and practice, and have not changed, modified or altered **Exhibit "15"** in any way.

45.    In the evening of February 18, 2015, Thomas Wylde, LLC hosted an after party, which I attended for a brief period. Upon my arrival at the party, John Hanna gave me a hug and complimented me on the strength and success of the show. Upon my leaving the party, however, John Hanna approached Tony Jay, my agent, and began to yell and make untruthful and offensive statements about me, calling me a 'whore' and a 'failure', and promising to destroy me. **Exhibit "16"** is a true and correct copy of an e-mail dated October 9, 2015 that I received from Tony Jay informing me of what John Hanna had said to him. I have kept this e-mail in the ordinary course of my business as part of my business records. I have maintained this e-mail in a safe and secure place. I have not changed, modified or altered the contents of this e-mail.

46.    On February 23, 2015, only five days after my Thomas Wylde fashion show, Jene Park and John Hanna hosted a dinner at Cecconi's on Melrose, to which they invited friends and business associates of mine, Ramona Agruma; Diana Pistalu; and Elna Margret Zu Bentheim. Jene Park told these ladies not to mention my name or bring me up at the dinner, that it was very important and that she would explain later. **Exhibit "17"** is a true and correct copy of a text message from Jene Park to Ramona Agruma, which was forwarded to me, and which I have

kept in the ordinary course of my business as part of my business records. I have

maintained this text message in a safe and secure place. I have not changed,

modified or altered the contents of this text message.

47.    Notwithstanding my health, the hostile environment to which I was

being subjected at Thomas Wylde, LLC, or the resulting stress I experienced, I

continued to do my job, showing up to work when my health allowed or working

from home. It was about this time that Jene Park and John Hanna directed me to

no longer design, in effect prohibiting me from doing my job, pursuing my

passion. **Exhibit "18"** are true and correct copies of emails from John Hanna and

Giselle Limtao, a member of my Thomas Wylde design team, which were

forwarded to me, and which I have kept in the ordinary course of my business as

part of my business records. I have maintained these e-mails in a safe and secure

place. I have not changed, modified or altered the contents of this e-mail.

48.    On April 20, 2015, my personal physician, Dr. Gordon Van Tassel,

having, on April 8, 2015, diagnosed me with insomnia and stress, which conditions

had only worsened due to the hostile work environment to which I was being

subjected, placed me on a two-week leave of absence from work. **Exhibit "19"** is

a true and correct copy of the note dated April 20, 2015 from Dr. Gordon Van

Tassel of the Citizen's Medical Group. I have kept this note in a safe and secure

place. The note has not been changed, altered, or modified in any way. In

response to my attorney's advising David Schnider of Dr. Van Tassel's note,

David Schneider sent my attorney an e-mail advising that they did not care about

my doctor's note and that I should not show up to work – in effect terminating my

employment. **Exhibit "20"** is a true and correct copy of the e-mail dated April 20,

2015 sent to my attorney, Olivia Goodkin, of the Greenberg Glusker firm, by

David Schnider. I have kept this e-mail in a safe and secure place. This e-mail has

not been changed, altered, or modified in any way

49.    On or about May 16, 2015, my attorneys received a follow-up letter

from Richard B. Peddie, outside counsel for Thomas Wylde, LLC, attempting to

re-characterize the situation, claiming that I had not been terminated, but, rather,

had abandoned my job, among other untruthful statements and gross

mischaracterizations. **Exhibit "21"** is a true and correct copy of the letter dated

May 14, 2015 from Richard B. Peddie. I received this letter in the ordinary course

of my business. I have kept this letter in a safe and secure place. The letter has not

been changed, altered, or modified in any way.

50.    In or about July 2015, I attempted to exercise my contractual right of

first negotiation for the acquisition of additional ownership interest, which attempts

were frustrated by Thomas Wylde, LLC., who failed to respond to my repeated

requests for the documents required by my investor to conduct his due diligence.

**Exhibit "22"** is a true and correct copy of the e-mail dated July 1, 2015 from Tom

Fore, the individual interested in investing in Thomas Wylde, LLC. I received this

e-mail in the ordinary course of by business. I have kept this e-mail in a safe and

secure place. The e-mail has not been changed, altered, or modified in any way.

51.    On or about August 2015, I engaged the firm of Kring & Chung, LLP,

to represent me and PDTW, LLC against Thomas Wylde, LLC; Jene Park; John

Hanna; Stephen Choi; Hillshore Investments, S.A.; and anyone else who had been

complicit in my company and legacy being, in effect, stolen from me. Without

hereby waving the attorney-client privilege and privilege of confidentiality, Kring

& Chung filed this Chapter 7 Petition for bankruptcy relief on behalf or PDTW,

LLC, a filing to which I agreed on their recommendation. Kring & Chung, LLC

also filed a claim with the Bankruptcy Court for me as a creditor. Kring & Chung,

LLC then withdrew as counsel in the bankruptcy matter, leaving me to represent

myself in pro per, until I retained Marcia Daley and Dimitrios P. Biller. Prior to

filing the bankruptcy action, Kring & Chung, LLP had filed a state court complaint

in August of 2015 for numerous state law employment and contract claims. That

case is set for trial on October 10, 2017 in the Superior Court of Los Angeles

County, though the state case involving PDTW, LLC has been stayed pending

resolution of the Chapter 7 proceedings. Without hereby waving the attorney-

client privilege or the privilege of confidentiality, at no time did Kring & Chung,

LLP advise me of my right to pursue my and PDTW, LLC's claims in Federal

Court.

52.    On or about September 23, 2015, I was notified that my ownership

interest in Thomas Wylde, LLC had been unilaterally diluted from 32% to 1.8%

Exhibit "23" is a true and correct copy of the Thomas Wylde, LLC notice advising

of the supra-majority vote approving the dilution of my ownership interest, which

notice I received in the ordinary course of my business. I have maintained the

notification in a secure and safe place. I have not changed, modified or altered the

notification in any way.

53.    Having been left with no source of income or medical insurance – I

could not even afford my treatment or medically-required follow-ups and exams,

and facing mounting bills, personal/medical and professional, I applied for

unemployment benefits in or about November of 2015, which application was

objected to by Thomas Wylde, LLC. The EDD office investigated Thomas Wylde,

LLC's allegations, finding them to be meritless, and continued my benefits.

Thomas Wylde, LLC then appealed the EDD board's findings, only to then

abandon their appeal on the eve of the hearing. Exhibit "24" are true and correct

copies of correspondence I received from the EDD, which I received in the

ordinary course of my business. I have kept this correspondence in a safe and

secure place. This correspondence has not been changed, altered, or modified in any way.

54.    PDTW, LLC did not merge with Thomas Wylde, LLC, nor did Thomas Wylde, LLC acquire PDTW, LLC. Rather, Thomas Wylde, LLC was formed as a wholly new and separate entity without my participation, to sell the garments and accessories that I designed and that included fabric prints, names, words and symbols that I own and are protected under the copyright and trademark laws of the state of California and the United States. Thomas Wylde, LLC did not acquire any assets, tangible or otherwise, from PDTW, LLC or from me.

55.    Upon organizing Thomas Wylde, LLC, Hanna was engaged as the Chief Executive Officer of Thomas Wylde, LLC. I never hired Hanna in any capacity, in any way, regarding PDTW, LLC, nor was he ever designated an authorized signatory with the power to bind PDTW, LLC.

56.    All dealings between me, PDTW, LLC and Thomas Wylde were always at arm's length, such that on or about September of 2014, shortly after the formation of Thomas Wylde, LLC, negotiations were commenced between me and/or PDTW, LLC, on the one hand, and Thomas Wylde, LLC, on the other hand. Among the agreements being negotiated concurrently and all executed in December of 2014, were an Employment Agreement, pursuant to which I was employed as the Chief Creative Director of the company.

DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION TO DISMISS        - 28

57.  To this day, Thomas Wylde, LLC continues to infringe on my trademarks and copyrights by using the registered mark "Thomas Wylde" and the various skulls that I, with the help of graphic designers, personally designed, with which marks and prints I am associated and for which I am recognized, and for which I obtained trademark and copyright protection.  Jene Park and Thomas Wylde, LLC have, since their termination of my employment, repeatedly: (i) re-issued my original designs and shapes, as well as my marks and prints; (ii) sold, domestically and internationally, my designs and shapes at an exaggerated discount; and/or (iii) produced garments that, though based on my original work, are of a grossly inferior quality and, consequently, not representative of the Thomas Wylde brand and style I established.  This infringement and abusive attempt to replicate the original Thomas Wylde brand has resulted in a dilution and devaluation of the name, my marks, and the brand, including the good will once strongly associated with my marks and designs.  This intentional infringement and resulting dilution has also damaged my professional integrity and reputation, as it is well known and established in the fashion industry that I am Thomas Wylde. Thomas Wylde, LLC has been selling garments replicating my designs, prints and shapes throughout the United States and internationally.

58.    More recently, Thomas Wylde, LLC has expanded its reach into the footwear and handbag industries, industries into which I had taken the Thomas

Wylde brand, again, resulting in a dilution and devaluation of my designs, my brand, and my name in those markets as well.  Additionally, Thomas Wylde, LLC recently announced an e-commerce arrangement, launched a line of menswear, something I had been planning to do under my brand of Thomas Wylde when I had control of my company.   The one thing that is consistent in the current operations of Thomas Wylde, LLC today, aside from the intentional devaluation and dilution of my brand and the absence of any good will with respect to my intellectual property, is that Jene Park, Thomas Wylde, LLC, and others associated with Thomas Wylde, LLC continue to infringe my intellectual property rights by their misusing the brand name Thomas Wylde, as well as my trademarked logo and copyrighted prints throughout the United States and internationally without my permission or authority. **Exhibit "25"** is a true and correct copy of pictures from Thomas Wylde, LLC postings of designs and shapes that are replicas of my original designs and shapes from the earlier seasons of the Thomas Wylde brand, or which are based on my original shapes, designs and or prints/designs. The images have not been changed, altered, or modified in any way

59.  Thomas Wylde, LLC; Jene Park; John Hanna; Stephen Choi; Eniluz Gonzalez; David Schnider; Doug Lee; Roger Kuo and Hillshore Investments, S.A., among others, have caused me irreparable harm, personally, professionally, medically, and financially, and will continue to do so by selling clothes under the

brand name Thomas Wylde and using my trademark-protected marks, including the henna skull, as well my copyrighted prints. By designing and selling grossly inferior clothes under my brand and with my mark, Defendants are destroying my reputation as a world-famous fashion designer, who has worked with and stood shoulder-to-shoulder with Dior and Valentino, among others. The substantially inferior quality of the clothes Thomas Wylde, LLC is currently producing and placing into the market is seriously diluting the brand name and value of "Thomas Wylde", so much so that the public will now associate poor quality clothes with the once chic and haute couture brand name of "Thomas Wylde". Thomas Wylde, LLC's flooding the market with cheap, low quality clothing under the brand once described as haute couture, edgy and chic will negatively affect my future presence and activities in the fashion industry. Their continued sales of low-quality garments using my marks, brand, prints and designs, whether domestically or globally, is being done without my authorization or permission and will only continue to dilute and devalue the marks; diminish the good will once associated with my name and my brand "Thomas Wylde"; and place blemish on both my reputation and professional integrity, two traits that I value highly and of which I am very protective.

60.    Aside from the negative effects Thomas Wylde, LLC has had and will continue have on me professionally, I also continue to suffer from compromised

health and associated medical conditions resulting from the stress and depression

to which I was subjected by the hostile environment, both professional and

personal, imposed upon me by Jene Park; John Hanna and David Schneider, and

the clinical depression and related post traumatic distress syndrome resulting from

the termination of my employment and theft of what I regard as my legacy.

**Exhibit "26"** are true and correct copies of doctors' notes and related e-mails

pertaining to my medical symptoms and conditions, all which are related to the

hostile environment; my wrongful termination; and illegal conversion of my

property. I have kept these notes and e-mails in a safe and secure place. These

notes and e-mails have not been changed, altered, or modified in any way

61.  Despite my having been abruptly terminated without cause on April 20,

2015 and locked out from my company and computer, and notwithstanding my

having founded the company and having created the recognizable brand, Thomas

Wylde, LLC refused, and continues to refuse, to turn over items that do not belong

to Thomas Wylde, LLC but, rather, belong to PDTW, LLC or are my personal

assets, including, but not limited to furniture; books; artwork; photographs (some

rare photographs of me as a model); records; patterns; molds; archives of 10-years'

work – my legacy; my assets and designs/samples, as well as PDTW, LLC

documents and my personal files.

62.   I, as an interior designer, am the individual who selected, acquired, designed and/or commissioned all the furniture, artwork, literary work, and fashion design that comprise my and PDTW, LLC's assets, am the best suited to identify those assets that are PDTW's, those that are mine, and those that are Thomas Wylde, LLC's.

63.   In short, based on the Operating Agreement dated July 22, 2014 with the attached Schedule of Capital Contributions; the Amended Operating Agreement dated December 22, 2014 with the attached amended Schedule of Capital Contributions; the Second Amended Schedule of Capital Contributions dated April 15, 2015, all of which are business records of Thomas Wylde, LLC; Hillshore Investments, S.A.; Stephen Choi; Eniluz Gonzalez (wife of Stephen Choi and Managing Director of Hillshore Investments, S.A.); Doug Lee; Roger Kuo; John Hanna; and Jene Park, Hillshore Investments, S.A. has invested an approximate total of $9.5M in Thomas Wylde, LLC. in accordance with the following schedule: (i) a total of $5.5M received by Thomas Wylde, LLC in periodic wire transfers from banks located offshore in Panama or Spain received by Thomas Wylde, LLC from in or about August 2014 through in or about April 15, 2015; and (ii) an additional sum of at least an approximate $4M in periodic wire transfers from banks located offshore in Panama or Spain, which were

received by Thomas Wylde, LLC from on or about April 15, 2015 through the present.  These periodic payments currently total an approximate $9.5M.

64.    Although I was, at the time, the supra-majority shareholder of Thomas Wylde, LLC, I was never made aware of Jene Park's; Stephen Choi's; and/or Eniluz Gonzalez' intention of taking over the control of Thomas Wylde, LLC.  I was, at all times, led to believe that Hillshore Investments, S.A., was merely an investor, not interested in controlling the operations of the Thomas Wylde, LLC. It has, however, become perfectly clear that their intention was always to remove me from the picture, so that they – all of the named defendants – could use my name; my brand; my legacy for their own personal purposes, one a self-glorified want-to-be designer; the other to hide or launder off-shore funds.

65.    I would never have sold or divested my ownership interest in Thomas Wylde, LLC because the brand and product it represented was me, my history, my legacy.  Nobody ever informed me that Thomas Wylde, LLC would dilute my Units of Membership from 32% to 1.8% by selling off those Units to Hillshore Investments, S.A., Stephone Choi and his wife Eniluz Gonzalez.  The investment of approximately $9.5 M by Hillshore Investment, S.A. is inconsistent with the terms and conditions of the Agreement to Purchase Membership Interest.

66.    Thomas Wylde, LLC never paid me the severance package described in the Employment Agreement, i.e., the $300,000.00 per year severance for three

years and annual bonuses, if any.  Thomas Wylde, LLC also acted in bad faith, offering me compensation and other benefits (such as the Units I acquired in my company), only to deprive me of any such compensation within four months by terminating my employment without Cause after my execution of the agreements and depriving me of all other benefits, including my medical coverage when I most needed it; my sole source of income; and my ownership in my company, which they then promptly diluted from 32% to 1.8% within five months of my being terminated without Cause and Hillshore Investments, S.A.'s increased investment to a total of $5.5M.

67.     I now know that Thomas Wylde, Jene Park, John Hanna, Stephen Choi, Eniluz Gonzalez, David Schnider, Doug Lee, Roger Kuo, Hillshore Investments, S.A., and others intended to cause me irreparable harm, both personally and professionally, by taking advantage of a period in my life when I was most vulnerable dealing with life-changing medical issues, to remove me from my own company in order to use my copyright and trademark-protected marks, designs, words, prints, and names to sell not just my goods, but also to sell their attempts to replicate my designs and shapes.  I never knew and could never have known that these individuals intended to not abide by the terms and conditions of the Thomas Employment Agreement and Agreement to Purchase Membership

Interest, terms and conditions they presented to me in order to induce my

cooperation and execution of these documents.

68.    Thomas Wylde, LLC currently is selling garments and accessories

bearing my mark and brand name domestically and internationally through e-

commerce and brick-and-mortar outlets. **Exhibit "27"** are copies of .com sites in

e-commerce through which Thomas Wylde, LLC has sold and/or continues to sell

not just my original designs and assets belonging both to me and to PDTW, LLC,

but their counterfeit garments and accessories, sub-quality items of clothing and

accessories that are either based on, or replicating my original designs and shapes.

In my professional experience, when selling product through foreign outlets and/or

on e-commerce, e.g., through .com outlets, the products purchased are mailed out

via U.S. mail service, and monetary payment is then wired in electronically, either

directly from the purchasing party's bank or through the use of services such as

PayPal or Square.   Thomas Wylde, LLC is a business and sells goods in exchange

for money to make a profit.  Investors such as Hillshore Investment, S.A., Stephen

Choi and his wife, Eniluz Gonzales, expect to make a return on their investment

through the sale of goods, unless, of course, they are using Thomas Wylde, LLC as

a business to hide and/or launder money obtained through questionable means.  In

fact, Stephen Choi has admittedly engaged in and been involved with online

gambling as the former managing director of Sporting Bet, LLC, an offshore

company. **Exhibit "28"** is a true and correct copy of Stephen Choi's deposition transcript dated March 1, 2017. Jene Park, John Hanna and David Schneider received compensation from proceeds derived from funds invested by Hillshore Investments, S.A. or from the sale of goods.

69.    For the last two years, I have been living a terrifying emotional, mental and financial nightmare. My depression, which borders on the clinical, has been compounded by the burden of having no money and being forced to sell my personal belongings. After running through my savings, as well as of the money I received for the sale of my belongings, I was forced to borrow money from friends and maxed out my credit cards, which has ruined my credit rating. At present, I am carrying a debt that approximates $300,000.00 and am about to lose my final, and most treasured possession, my home.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Palm Springs, California on July 5, 2017.

By: /S/ Paula Thomas
    Paula Thomas

# EXHIBIT "1"

# PAULA THOMAS

Style arbiter. Entrepreneur. Creative director. Fashion and interior designer. Celebrated model. Bond Girl. Producer. Business adviser. Maverick.

Paula Thomas stakes her ground among the elite of multi-hyphenate global influencers whose fearless and manifold creative forays give life to a body of work that is as electrifying as it is singular.

Like the homegrown rock stars who define the spirit of her native Britain, Miss Thomas' heritage—specifically its refinement and contrasting raw bravura—informs her work. Even her most successful venture to date, the fashion house Thomas Wylde, owes more than its aesthetic vernacular to Miss Thomas's DNA: the name combines her grandfather Robert Thomas and great-grandmother Catherine Wylde.

Angelina Jolie, Charlize Theron and Cameron Diaz are among the women who have turned to Miss Thomas for life, red carpet and film. Her original designs in clothing, handbags, footwear and fine jewelry convey the kind of cosmopolitan, confident, and chic essence that embodies these Hollywood glamazons—and resonates with the legion of fans that sought her eponymous label from the world's most highly regarded retailers.

Marketing and sales insight from a career on either side of the lens and design and boardroom tables has also made Miss Thomas a formidable player in the high-stakes fashion arena. Industry insiders have long called on her for her erudite, instinctual and decisive take.

When the fledgling business of the exalted designer Julian MacDonald needed rebuilding in 1998, Ms. Thomas stepped in. Within two years, the pair transformed the company into a success with retail buyers, editors and celebrities.
Two years later, when the Paris haute couture house of Givenchy appointed MacDonald as chief designer, Ms. Thomas declined an invitation to join him in-house, her eye already fixed toward other challenges. Consulting lead to another collaborative venture with former Versace designer Stefano Guerriero, and business between Milan and her new home base of Los Angeles would establish the foundation for her own company.

That time came in 2006 with the launch of Thomas Wylde. Miss Thomas expounded on a storied career in fashion with a ready-to-wear collection as sophisticatedly edgy as it was luxurious. Within two breakneck seasons, Thomas Wylde tripled its distribution to 60 of the most influential retailers worldwide and was featured alongside Balenciaga, Azzedine Alaïa, Celine, John Galliano and Alexander McQueen. Life had come full circle: less than two decades earlier, the now-former model had been a fixture on Galliano and McQueen's runway.

Thomas Wylde Home Furnishings and the photographic monograph *Death Valley* directed and designed by Miss Thomas followed, as did a brand campaign with Heidi Klum for the Autumn/Winter 2008 collection. For her second coffee-table book, Miss Thomas collaborated with renowned photographer Rankin and, at the cusp of stardom, the model/actress Rosie Huntington-Whiteley. Entitled "Ten Times Rosie," the book and accompanying exhibition made the rounds from London to Moscow to Tokyo. Miss Thomas' fashion designs and imagery were subsequently featured at the Taiwan Museum of Contemporary Art.

As Miss Thomas further developed her fashion house in 2013, creating a fine jewelry collection and the first lifestyle concept store for the brand, located in Los Angeles, Oscar-winning director Ridley Scott tapped her to design the wardrobe for lead Cameron Diaz's femme fatale turn in *The Counselor*. Yet, again, came an evolution in her career, this time in film: as a teen in her hometown of Birmingham, England, Miss Thomas was discovered and cast as a Bond Girl in the commercially successful "A View to A Kill."

Under Ms. Thomas' vision and leadership through 2015, Thomas Wylde became a critically-acclaimed global enterprise, complete with a ready-to-wear collection of dresses, pants, tops and outerwear distinguished by innovative fabrications and impeccable tailoring; a rapidly growing accessories category with a focused identity that included handbags, footwear and small leather goods; and a marquee flagship in Los Angeles which she completely designed, from the mammoth marble skulls at the entrance to the custom settees swathed in the iconic, beautifully strange patterns that became a coveted and collected feature of the Thomas Wylde brand.

In fashion, interiors, film and publishing, Miss Thomas' images, products and projects convey a potent message of hard-edged elegance rooted in modern luxury, of enduring craftsmanship and a trend-resistant aesthetic. It is why Miss Thomas is heralded by critics, retailers and a devoted clientele worldwide. And it is why she continues to push for new avenues for expressing her vision with each new enterprise she sets in motion.

Paula Thomas currently resides in Palm Springs and Los Angeles.

### #

# EXHIBIT "2"



## Business Search - Results

| Entity Number | Registration Date | Status | Entity Name | Jurisdiction | Agent for Service of Process |
|---|---|---|---|---|---|
| 200613110151 | 05/09/2005 | ACTIVE | PDTW, LLC | CALIFORNIA | PAULA THOMAS |



| Document Type | File Date | PDF |
|---|---|---|
| SI-COMPLETE | 04/04/2016 | |
| SI-COMPLETE | 07/17/2013 | |
| REGISTRATION | 05/09/2006 | |



**State of California**

**Secretary of State**

79

STATEMENT OF INFORMATION
(Limited Liability Company)

Filing Fee $20.00. If this is an amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

FILED
Secretary of State
State of California

APR 04 2016

1. LIMITED LIABILITY COMPANY NAME

PDTW, LLC

This Space For Filing Use Only

**File Number and State or Place of Organization**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION (if formed outside of California) |
|---|---|
| 200613110151 | CALIFORNIA |

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no Statement of Information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 15.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | STREET ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL OFFICE | 2514 S. TOLEDO AVE | PALM SPRINGS | CA | 92264 |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | | | |
| 7. STREET ADDRESS OF CALIFORNIA OFFICE | 2514 S. TOLEDO AVE | PALM SPRINGS | CA | 92264 |

**Name and Complete Address of the Chief Executive Officer, if Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| PAULA THOMAS | 2514 S. TOLEDO AVE | PALM SPRINGS CA | | 92264 |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| | NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 9. | PAULA THOMAS | 2514 S. TOLEDO AVE | PALM SPRINGS CA | | 92264 |
| 10. | | | | | |
| 11. | | | | | |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

| 12. NAME OF AGENT FOR SERVICE OF PROCESS | | | | |
|---|---|---|---|---|
| PAULA THOMAS | | | | |
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | | STATE | ZIP CODE |
| 2514 S. TOLEDO AVE | PALM SPRINGS | | CA | 92264 |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

MANUFACTURE - APPAREL

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 04/01/2016 | PAULA THOMAS | MEMBER | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

| LLC-12 (REV 01/2014) | APPROVED BY SECRETARY OF STATE |
|---|---|



# State of California
## Secretary of State

**L**

(Limited Liability Company)

Filing Fee $20.00. If this is an amendment, see instructions.

**IMPORTANT -- READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FILED**
Secretary of State
State of California

**JUL 17 2013**

This Space For Filing Use Only

1. LIMITED LIABILITY COMPANY NAME

PDTW, LLC

## File Number and State or Place of Organization

2. SECRETARY OF STATE FILE NUMBER  **200613110151**
3. STATE OR PLACE OF ORGANIZATION (If formed outside of California)  **CALIFORNIA**

## No Change Statement

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of Information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 15.

## Complete Addresses for the Following (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE  3231 S. LA CIENEGA BLVD. #A | | LOS ANGELES | CA | 90016 |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | CITY | STATE | ZIP CODE |
| 7. STREET ADDRESS OF CALIFORNIA OFFICE  3231 S. LA CIENEGA BLVD. #A | | LOS ANGELES | CA | 90016 |

## Name and Complete Address of the Chief Executive Officer, If Any

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| PAULA THOMAS | 3231 S. LA CIENEGA BLVD. #A | LOS ANGELES | CA | 90016 |

## Name and Complete Address of Any Manager or Managers, or If None Have Been Appointed or Elected, Provide the Name and Address of Each Member (Attach additional pages, if necessary.)

| | NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 9. | PAULA THOMAS | 3231 S. LA CIENEGA BLVD. #A | LOS ANGELES | CA | 90016 |
| 10. | NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 11. | NAME | ADDRESS | CITY | STATE | ZIP CODE |

## Agent for Service of Process

If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

| 12. NAME OF AGENT FOR SERVICE OF PROCESS | | | | |
|---|---|---|---|---|
| PAULA THOMAS | | | | |
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | | CITY | STATE | ZIP CODE |
| 3231 S. LA CIENEGA BLVD. #A | | LOS ANGELES | CA | 90016 |

## Type of Business

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

MANUFACTURING - APPAREL

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT

| 7/12/2013 | PAULA THOMAS | CEO | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

LLC-12 (REV 01/2013)  APPROVED BY SECRETARY OF STATE

2006 1 3 1 7 0 1 5 1



State of California
Secretary of State

LIMITED LIABILITY COMPANY
ARTICLES OF ORGANIZATION

**FILED**
in the office of the Secretary of State
of the State of California

MAY 0 9 2006

A $70.00 filing fee must accompany this form.

IMPORTANT -- Read instructions before completing this form.

This Space For Filing Use Only

ENTITY NAME (End the name with the words "Limited Liability Company," "Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.")

1  NAME OF LIMITED LIABILITY COMPANY

PDTW, LLC

PURPOSE (The following statement is required by statute and may not be altered.)

2  THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT

INITIAL AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).)

3  NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

JOSHUA GRODE, ESQ.

4  IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA   CITY   STATE   ZIP CODE

1100 GLENDON AVE, 14TH FLOOR        LOS ANGELES        CA    90024

MANAGEMENT (Check only one)

5  THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY

☐ ONE MANAGER

☐ MORE THAN ONE MANAGER

☑ ALL LIMITED LIABILITY COMPANY MEMBER(S)

ADDITIONAL INFORMATION

6  ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE

EXECUTION

7  I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

_Zachary Smith_                          MAY 8, 2006
SIGNATURE OF ORGANIZER                    DATE

ZACHARY SMITH, ESQ.
TYPE OR PRINT NAME OF ORGANIZER

RETURN TO (Enter the name and the address of the person or firm to whom a copy of the filed document should be returned.)

8  NAME        ⌈ZACHARY SMITH, ESQ.                    ⌉

FIRM        LINER YANKELEVITZ SUNSHINE & REGENSTREIF

ADDRESS     1100 GLENDON AVE, 14TH FLOOR

CITY/STATE/ZIP  ⌊LOS ANGELES, CA 90024                  ⌋

LLC-1 (REV 03/2005)                              APPROVED BY SECRETARY OF STATE

# EXHIBIT "3"



NOTEY    HOME    MY PAGES ⌄    UNITED STATES ⌄    MORE ⌄    THE LA    ✎ PUBLISH IN THOMAS WYLDE ⌄    SIGN IN / UP    🔍 SEARCH

THOMAS WYLDE



FEATURED

14

JENE PARK TALKS FASHION AND HER 10 YEARS WITH THOMAS WYLDE

"THOMAS A RICH AND DEEP CONVERSATION THAT FULFILLS" – JENE

THOMAS WYLDE RESORT 2017 LOOKBOOK

highfashionliving.com | 26 Jul 2017

TOP STORIES                                        LATEST STORIES



Style    Fashion

## THOMAS WYLDE FALL 2016 LOOKBOOK

Thomas Wylde is an American luxury brand that for one reason or another doesn't get talked about as much some of the major European brands. That being said Thomas Wylde is one of the premiere brands in the industry and one of our favorites. Their

 highfashionliving.co...



### DESIGNER DISNEY COUTURE - ALICE THROUGH THE LOOKING

Alice Through the Looking Glass is Given a Chic Makeover by Thomas Wylde By: Malika Renee Butss -

trendhunter.co...

News    Fashion

### DISNEY & THOMAS WYLDE TEAM UP FOR ALICE CAPSULE COLLECTION

Disney and Los Angeles-based designer firm Thomas Wylde have teamed up to create a capsule

hauteliving.co...



**Thomas Wylde**



"There's a rich and deep conversation that happens" – Jene Park



**Thomas Wylde Resort 2017 Lookbook**



**Thomas Wylde Fall 2016 Lookbook**



**Designer Disney Couture - Alice Through the Looking**



**Disney & Thomas Wylde Team Up for Alice Capsule**

See all

THE BEST OF THOMAS WYLDE



**Top McDonald's Burgers From Around**



**Worst Countries**



 Jewelry   Red Carpet

### TEYONAH PARRIS IN GAURI & NAINIKA AT THE AAFCA AWARDS 2016

Home » Fashion » Teyonah Parris in Gauri & Nainika at the... Posted on February 11, 2016 "Chi-Raq" and

 tomandlorenzo.co...

2/11/2016



Fashion   Carrie Underwood

### CARRIE UNDERWOOD IN THOMAS WYLDE ~ 2015 CMT AWARDS

Carrie Underwood made her first public appearance at the 2015 CMT Music Awards held at the Bridgestone

 www.redcarpet-fashionawards.co...

6/10/2015

lacoste   msgm

### CONSTRUCT

Kouka Dress / DKNY Opposite Bibi Dress / Lacoste Models Kouka and Bibi step into an architectural

 schonmagazine.co...

12/28/2015



Jimmy Choo   awards

### CARRIE UNDERWOOD IN THOMAS WYLDE AT THE 2015 CMT MUSIC AWARDS

Home » Fashion » Carrie Underwood in Thomas Wylde at the 2015... Posted on June 11, 2015 You guys, it's

 tomandlorenzo.co...

6/11/2015





### Millennials' Top Travel Destinations



### Best College Quarterbacks 2016-



### All the Hottest Asian Models at the

See all

FEATURED PUBLISHERS



### redcarpet-fashionawards.com



### upscalehype.com

### fashiongonerogue.c...



### tvsmacktalk.com
We provide the latest in celebrity gossip, movie news and all things to do with

### styleblazer.com







### GUNN AT THE 2015 CLIO AWARDS | TOM &

Heidi Klum and Tim Gunn at the 2015... Heidi Klum and Tim Gunn attend the 2015 CLIO Awards at The

tomandlorenzo.co...

*5/7/2015*

### DENIM ... THOMAS WYLDE AND J BRAND

was spotted arriving at LAX Airport to catch a flight out. The supermodel palled together a denim jacket with


www.denimblog.co...

*5/6/2015*


**What Is Your Split Animal?**
21.5 k Plays


**Which City Should You Really Live In?**
28.4k Plays


**Which Meow-velous Internet Celebrity Cat**
3.6k Plays

See all



### #NYFW RUNWAY RECAP: THOMAS WYLDE'S FALL 2015 SECRET AGENTS

Photo: M. Cardin Paula Thomas, founder and Creative Director of Thomas Wylde, is a former Bond Girl and successful model. Her


styleblazer.co...

*2/20/2015*



### THOMAS WYLDE SPRING/SUMMER 2015 ADVERTISING CAMPAIGN

Looks like Cara is not the only one who can model. Her sister, Poppy Delevingne, stars as the face of Thomas Wylde's spring-summer


thetrendspotter.net

*1/30/2015*



### POPPY DELEVINGNE LANDS THOMAS WYLDE SPRING 2015 CAMPAIGN

Looks like Cara is not the only one who can model. Her sister, Poppy Delevingne, stars as the face of Thomas Wylde's spring-summer


Fashion Gone Rog...

*1/29/2015*





### & OSCAR DE LA RENTA - LATE
### NIGHT WITH SETH MEYERS - RED

Uzo Aduba made a guest appearance on 'Late
Night with Seth Meyers' on Thursday evening
(December 11) in New York City where she

 www.redcarpet-fashionawards.co

*12/22/2014*



### JENNIFER LOPEZ IN CÉDRIC
### CHARLIER AND THOMAS WYLDE
### AT 'AMERICAN IDOL XIV' RED

a Jennifer Lopez In Cédric Charlier and
Thomas Wylde... For J Lo, this is a laundry day
outfit. ennifer Lopez attends Fox's "American

 tomandlorenzo.co...

*12/10/2014*



### JENNIFER LOPEZ IN CÉDRIC
### CHARLIER & THOMAS WYLDE -
### 'AMERICAN IDOL XIV' RED

Jennifer Lopez attended Fox's 'American Idol
XIV' Red Carpet event held at CBS Television
City on Tuesday (December 9) in Los Angeles.

 www.redcarpet-fashionawards.co...

*12/10/2014*



### 'THE HUNGER GAMES:
### MOCKINGJAY - PART 1 LA
### PREMIERE & AFTER-PARTY

The Hunger Games: Mockingjay — Part 1 LA
Premiere & After-Party 'The Hunger Games:
Mockingjay — Part 1 LA Premiere & After-Party

 becauseiamfabulous.co...    *11/18/2014*



### NOOT SEEAR WEARS VIXEN
### STYLE FOR THOMAS WYLDE
### FALL 2014 ADS

Into the Wylde--Canadian model Noot Seear





 Fashion Gone Rog...

9/11/2014



### SCHÖN! VIDEO PRESENTS | #SELFIE

Schön! Video presents | #selfie Head behind the scenes of our online editorial with this exclusive video. Schön! channels the latest

 schonmagazine.co...

3/30/2014



### #SELFIE

This online exclusive editorial for Schön! is channelling the latest #selfie craze that has taken the world by storm. Photographer

 schonmagazine.co...

3/18/2014



### IAN FRONTS THOMAS WYLDE SPRING 2014 CAMPAIGN BY IAN MORRISON

In The Future – Photographer Ian Morrison shoots fashion model Ian (Wilhelmina) for fashion label Thomas Wylde's spring 2014

 Fashion Gone Rog...

10/4/2013

See More

ABOUT US          LEGAL          Get In Touch          Download



# EXHIBIT "4"

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

Patient: TUCKER, CARLA                                        MRN: 187787-3

Sex: F     Age: 50     Birthdate: 20-Feb-1966                 Account #: 6129928

| Report Type: | Surgical Pathology | | | Pathologist: | GAAL, KARL |
| Filler #: | S06-17940COPATH | | | Specimen Date: | 23-Oct-2008 |
| Accession #: | S06-17940 | Status: | Final | Report Date: | 23-Oct-2008 |

Specimen
     A SLIDES RECEIVED
Slide Block Description
     OT-9417-08    1 Slide
          Collection date: 10/15/08
          Sign out date: 10/16/08

Final Diagnosis

     RIGHT BREAST NODULE, 12:30-1:00, NEEDLE CORE BIOPSY (O-9417-08, 1
     SLIDE; 10/15/08):
        - INFILTRATING DUCTAL CARCINOMA, WELL DIFFERENTIATED, GRADE
     1 OF 3 (5 OF 9 POINTS ON MODIFIED
        BLOOM-RICHARDSON SCALE: NUCLEI 2/3; TUBULES 2/3; MITOSES
        1/3) (SEE NOTE)
Diagnosis Comments
     Thank you for sending these slides for our review. I agree with
     the original diagnosis. Grading may change with evaluation of
     whole tumor on excisional specimen. No prognostic marker studies
     are reported.

Clinical Diagnosis/History
     Breast carcinoma

Signature:

GAAL, KARL
Sign-out Date: 23-Oct-2008

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

MRN: 157787-3

Sex: F      Age: 50      Birthdate: 20-Feb-1958

Account #: 0143481

| | | | |
|---|---|---|---|
| Report Type: | Surgical Pathology | Pathologist: | CHU, PEIGUO |
| Filer #: | S08-19771COPATH | Specimen Date: | 19-Nov-2008 |
| Accession #: | S08-19771 | Status:   Corrected | Report Date: | 24-Nov-2008 |

Specimen

A SENTINEL NODE #1 1050
B RIGHT BREAST SEGMENTAL RESECTION
C NEW INFERIOR MEDIAL MARGIN
D RIGHT BREAST IMPLANT
E EXTENDED DEEP MARGIN

Final Diagnosis

MACROSCOPIC
Specimen Type: Excision
Lymph Node Sampling: Sentinel lymph node(s) only
Specimen Size: Greatest dimension: 3.7 cm
Additional dimensions: 3.5 X 0.8 cm
Laterality: Right
Tumor Site: Upper inner quadrant

MICROSCOPIC
Size of Invasive Component: Greatest dimension: 0.7 cm
Additional dimensions: 0.6 X 0.5 cm
Histologic Type: Invasive ductal carcinoma
Histologic Grade: Nottingham Histologic Score-Tubule formation:
Moderate 10% to 75%
Nottingham Histologic Score-Nuclear pleomorphism: Moderate
increase in size, etc
Nottingham Histologic Score-Mitotic count for a 25x objective
with a field area of 0.274 mm\S\2 - Less than 10 mitoses per 10
HPF
Total Nottingham Score-Grade 1:  3-5 points
Pathologic Staging (pTMN): pT1:  Tumor 2.0 Cm or Less in Greatest
Dimension - pT1b. Tumor more than 0.5 cm but not more than 1.0 cm
in greatest dimension
pN0:  No regional lymph node metastasis histologically (ie, none
greater than 0.2 mm), no additional examination for isolated
tumor cells
Number of nodes examined: 1
Number of nodes involved: 0

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

Patient: TUCKER, DALE A                                          MRN: 157767-3

Sex: F     Age: 50     Birthdate: 20-Feb-1966                    Account #: 6143481

| | | | |
|---|---|---|---|
| Report Type: | Surgical Pathology | Pathologist: | CHU, PEIGUO |
| Filer #: | S08-19771COPATH | Specimen Date: | 19-Nov-2008 |
| Accession #: | S08-19771 | Status: Corrected | Report Date: 24-Nov-2008 |

pMX: Distant metastasis cannot be assessed
Margins: Margins uninvolved by invasive carcinoma
Venous/Lymphatic (Large/Small Vessel) Invasion (V/L): Absent
Microcalcifications: Not identified
SENTINEL NODE #1 (COUNT 1050), RIGHT AXILLA, RESECTION (A):
   - ONE (0/1) LYMPH NODE NEGATIVE FOR METASTATIC CARCINOMA
(SEE COMMENT)

BREAST, RIGHT, SEGMENTAL RESECTION (B):
   - INFILTRATING DUCTAL CARCINOMA, WELL DIFFERENTIATED (SEE
SYNOPTIC REPORT)
   - ATYPICAL DUCTAL HYPERPLASIA
   - INFILTRATING DUCTAL CARCINOMA IS POSITIVE FOR ER AND PR
AND NEGATIVE FOR HER-2/neu BY
   IMMUNOHISTOCHEMISTRY

BREAST, NEW INFERIOR MEDIAL MARGIN, RESECTION (C):
   - BOTH BENIGN BREAST TISSUE
   - NO EVIDENCE OF MALIGNANCY

IMPLANT, RIGHT BREAST, REMOVAL (D):
   - BREAST IMPLANT IDENTIFIED (GROSS ONLY)

BREAST, EXTENDED DEEP MARGIN, RESECTION (E):
   - FRAGMENTS OF SKELETAL MUSCLE
   - NO EVIDENCE OF MALIGNANCY

Diagnosis Comments
   RESULT-PARAFFIN IMMUNOHISTOCHEMISTRY:

   (A1):

   PANCYTOKERATIN   -   ONE (0/1) NODE NEGATIVE FOR METASTATIC
   CARCINOMA

   (BFS):

   ER       -   POSITIVE (STRONG; 95%)
   PR       -   POSITIVE (STRONG; 85%)
   HER-2/neu   -   NEGATIVE (0+)

   Appropriate positive and negative controls were used for each

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D. Director

MRN: 157787-3

Sex: F    Age: 50    Birthdate: 20-Feb-1968    Account #: 8168493

| | | | |
|---|---|---|---|
| Report Type: | Surgical Pathology | Pathologist: | CHU, PEIGUO |
| Filler #: | S08-20462COPATH | Specimen Date: | 2-Dec-2008 |
| Accession #: | S08-20462 | Status:    Final    Report Date: | 4-Dec-2008 |

Specimen
    A LEFT BREAST IMPLANT
    B LEFT BREAST IMPLANT CAPSULE
    C LEFT BREAST SKIN
    D RIGHT BREAST SKIN

Final Diagnosis
    IMPLANT, LEFT BEAST, REMOVAL (A):
      - BREAST IMPLANT IDENTIFIED (GROSS ONLY)

    IMPLANT CAPSULE, LEFT BREAST, REMOVAL (B):
      - DENSE FIBROUS TISSUE
      - NO EVIDENCE OF MALIGNANCY

    SKIN, LEFT BREAST, PLASTIC REPAIR (C):
      - MILD CHRONIC INFLMMATION
      - NO EVIDENCE OF MALIGNANCY

    SKIN OF RIGHT BREAST, PLASTIC REPAIR (D):
      - MILD CHRONIC INFLAMMATION
      - NO EVIDENCE OF MALIGNANCY

Gross Description
    A. LEFT BREAST IMPLANT: Specimen labeled with the patient's
    name, designated "left breast implant" and received without
    fixative is a ruptured 8.0 x 8.0 x 2.5 cm. textured silicone
    implant. Along one aspect is a 0.6 x 0.2 cm. open defect with
    extruded silicone. There is the inscription: 120. No soft
    tissue is received. No section submitted. Gross examination
    only.
    CASSETTE SUMMARY:
    No section submitted.

    B. LEFT BREAST IMPLANT CAPSULE: Specimen labeled with the
    patient's name, designated "left breast implant capsule"
    received fresh and subsequently fixed in formalin is a 5.2 x 5.3
    x 2.1 cm. saccular portion of shaggy, tan-pink, membranous
    capsular tissue. The external surface is diffusely roughened
    while the internal surface is smooth with a <0.1 cm. average wall

City of

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

Patient: THOMAS DALILA                                    MRN: 107787-5

Sex: F    Age: 50    Birthdate: 20-Feb-1956                Account #: 6168496

| Report Type: | Surgical Pathology | | | Pathologist: | CHU, PEIGUO |
| Filler #: | S08-20462COPATH | | | Specimen Date: | 2-Dec-2008 |
| Accession #: | S08-20462 | Status: | Final | Report Date: | 4-Dec-2008 |

thickness. Representative sections.
CASSETTE SUMMARY:
B1)    Capsule 2.

C. LEFT BREAST SKIN: Specimen labeled with the patient's name,
designated "left breast skin" received fresh and subsequently
fixed in formalin is a 12.4 x 1.2 x 0.2 cm. irregular portion of
wrinkled tan-white skin. No epidermal mass lesions are
identified. Representative sections.
CASSETTE SUMMARY:
C1)    Skin 2.

D. RIGHT BREAST SKIN: Specimen labeled with the patient's
name, designated "right breast skin" received fresh and
subsequently fixed in formalin are two irregular portions of
wrinkled tan-white skin which are 10.2 x 0.6 x 0.4 cm. and 4.5 x
1.4 x 0.2 cm. No epidermal mass lesions are identified.
Representative sections.
CASSETTE SUMMARY:
D1)    Skin 2.

Examination of histologic sections was performed and contributed
to the final diagnosis.
Clinical Diagnosis/History
   Clinical History. Right breast cancer

Signature:

CHU, PEIGUO

Sign-out Date: 4-Dec-2008

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

Patient: TUFILAS PAIPA

Account #: 6143481

Sex: F    Age: 50    Birthdate: 20-Feb-1958

| Report Type: | Surgical Pathology | | Pathologist: | CHU, PEIGUO |
| Filler #: | S08-19771COPATH | | Specimen Date: | 19-Nov-2008 |
| Accession #: | S08-19771 | Status:   Corrected | Report Date: | 24-Nov-2008 |

immunohistochemical stain. This test was developed and its
performance characteristics determined by the City of Hope
National Medical Center, Department of Anatomic Pathology. It
has not been cleared or approved by the U.S. Food and Drug
Administration. The FDA has determined that such clearance or
approval is not necessary. This test is used for clinical
purposes. It should not be regarded as investigational or for
research. This Laboratory is certified under the Clinical
Laboratory Improvement Amendments of 1988 ('CLIA') as qualified
to perform high complexity clinical laboratory testing.

The immunohistochemistry test(s) that provide independent
predictive/prognostic information are estrogen receptor (ER)
(clone 1D5), progesterone receptor (PR) (clone PR88), Her-2/neu
(polyclonal), epidermal growth factor receptor (EGFR) (31G7),
KI-67 (clone MIB-1), and C-kit (CD117) (polyclonal). The
immunohistochemistry is performed on 10% formalin-fixed and
paraffin-embedded tissue, using a polymer detection kit (Dako
EnvisionTM). ER, PR, and KI-67 immunostaining is scored as
percent tumor cells with 1+ (weak), 2+ (moderate), and 3+
(strong) positive nuclear staining. Her-2/neu and EGFR
immunostaining is scored as 0+ (negative), 1+ (weak and
incomplete membrane staining), 2+ (weak and complete
circumferential membrane staining), and 3+ (strong and complete
circumferential membrane staining). C-kit immunostaining is
scored as percent tumor cells with weak or strong
cytoplasmic/membrane staining.

Amendment comment (11/24/08): The purpose of this amendment is to
add immunohistochemical staining results

Gross Description
   A. SENTINEL NODE #1 1050: Specimen labeled with the patient's
name, designated "sentinel node #1, 1050" received fresh for
frozen section consultation and subsequently fixed in formalin is
a 2.0 x 1.5 x 0.8 cm, ovoid, firm, blue dye stained lymph node.
Entirely submitted.
CASSETTE SUMMARY:
AFS1)    Frozen section remnant half 1
A1)    Formalin-fixed half 1.

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

MRN: 137757-3

Sex: F    Age: 50    Birthdate: 20-Feb-1968

Account #: 6143481

| Report Type: | Surgical Pathology | | | Pathologist: | CHU, PEIGUO |
|---|---|---|---|---|---|
| Filler #: | S08-19771COPATH | | | Specimen Date: | 19-Nov-2008 |
| Accession #: | S08-19771 | Status: | Corrected | Report Date: | 24-Nov-2008 |

B. RIGHT BREAST SEGMENTAL RESECTION: Specimen labeled with the
patient's name, designated "right breast segmental resection",
received fresh for gross consultation and subsequently fixed in
formalin is an elliptical portion of fibroadipose breast tissue
with needle localization wire in place. A short stitch indicates
the superior margin, a long stitch indicates the lateral margin,
and double stitch along the deep margin. The specimen is 3.7 cm.
from superior to inferior, 3.5 cm. from medial to lateral, and
0.8 cm. from superficial to deep. The superficial-lateral margin
is inked blue, the superficial-medial margin is inked black, and
the entire deep margin is inked green. The specimen is serially
sectioned and submitted from inferior to superior. On
sectioning, in the inferior half of the specimen is a partly
circumscribed 0.7 x 0.6 x 0.5 cm, irregular, firm, tan-white
tumor which extends to within <0.1 cm. of the nearest (deep)
margin. The remaining cut surfaces consist of predominantly of
soft yellow lobulated adipose tissue and minimal fibrous tissue.
No additional mass lesions are identified. Entirely submitted.
CASSETTE SUMMARY:
BFS1)    Frozen section remnant 1.
B1)    Inferior end 4.
B2)    Remainder of tumor mass to deep margin 1.
B3-B6)    Cross sections 1 each.
B7)    Superior end 5.

C. NEW INFERIOR MEDIAL MARGIN: Specimen labeled with the
patient's name, designated "new inferior medial margin" received
fresh and subsequently fixed in formalin is a 3.3 x 1.7 x 1.6 cm.
irregular portion of fibroadipose tissue with a stitch which will
arbitrarily designate the new true margin of resection. This
margin is inked and the specimen is serially sectioned. On
sectioning, the cut surfaces consist predominantly of dense white
fibrous tissue and moderate soft yellow lobulated adipose tissue.
No mass lesions are grossly identified. Representative
sections.
CASSETTE SUMMARY:
C1)    End 1.
C2,C3)    Alternating cross sections 2 each.
C4)    Opposing end 1

D. RIGHT BREAST IMPLANT: Specimen labeled with the patient's
name, designated "right breast implant" and received without

1500 East Duarte Road Duarte, CA 91010-0269
Department of Anatomic Pathology
Lawrence M. Weiss M.D., Director

Patient: THOMAS GAIL A                                           MRN: 157767-2

Sex: F    Age: 80    Birthdate: 20-Feb-1966                    Account #: 6143461

| | | | |
|---|---|---|---|
| **Report Type:** | Surgical Pathology | **Pathologist:** | CHU, PEIGUO |
| **Filer #:** | S08-19771COPATH | **Specimen Date:** | 19-Nov-2008 |
| **Accession #:** | S08-19771 | **Status:** Corrected | **Report Date:** | 24-Nov-2008 |

fixative is an implant measuring 8.5 x 8.5 x 1.5 cm, textured
silicone implant which contains approximately 80 cc. of tenacious
material. There is an inscription: 80. No soft tissue is
received. No sections submitted. Gross examination only.
CASSETTE SUMMARY:
No section submitted.

E. EXTENDED DEEP MARGIN: Specimen labeled with the patient's
name, designated "extended deep margin" received fresh and
subsequently fixed in formalin is a 2.1 x 1.3 x 1.1 cm, irregular
portion of firm, tan-brown striated muscle with a surgical stitch
designating the superficial margin. The deep surface opposing
this stitch is inked and the specimen is serially sectioned. On
sectioning, the cut surfaces consist of homogeneous, firm, brown
striated muscle. No mass lesions are grossly identified.
Entirely submitted.
CASSETTE SUMMARY:
E1)    End 1.
E2)    Cross sections 4.
E3)    Opposing end 1.

Examination of histologic sections was performed and contributed
to the final diagnosis.
Clinical Diagnosis/History
   Clinical History: Right breast carcinoma


Signature:


CHU, PEIGUO

Sign-out Date: 24-Nov-2008

# EXHIBIT "5"

# Will be Produced at a Later Time

# EXHIBIT "6"

ATTACHMENT II TO SECURITY AGREEMENT

GRANT OF SECURITY INTEREST
(TRADEMARKS AND COPYRIGHTS)

This GRANT OF SECURITY INTEREST, dated as of October 29, 2013, is executed by THOMAS WYLDE HOLDINGS, LLC, a California limited liability company ("**Grantor**"), in favor of CBC PARTNERS I, LLC ("**CBC**").

A.    Pursuant to a Secured Promissory Note dated as of October 29, 2013 (as may be amended, restated, supplemented, and modified from time to time, the "**Note**"), by and between PDTW, LLC ("**Borrower**") and CBC, CBC has agreed to lend to Borrower the sum of One Million Six Hundred Twenty Five Thousand Dollars ($1,625,000.00) (the "**Loan**").

B.    As a condition precedent to making the Loan, CBC requires that Borrower obtain the execution of a Guaranty by Grantor, secured by all intellectual property owned by Grantor, and receipt by CBC of this Security Agreement duly executed by Grantor.

C.    The making of the Loan by CBC to Borrower is of value to Grantor, is reasonably expected to benefit Grantor, directly or indirectly, and is in furtherance of Grantor's personal and business interests.

D.    Grantor owns the trademarks, copyrights, applications for trademarks, and/or applications for copyrights, of the United States, more particularly described on Schedules 1-A and 1-B annexed hereto as part hereof (collectively, the "**Intellectual Property**");

E.    Grantor has entered into an Intellectual Property Security Agreement dated the date hereof (the "**Security Agreement**") in favor of CBC; and

F.    Pursuant to the Security Agreement, Grantor has granted to CBC a security interest in all right, title, and interest of Grantor in and to the Intellectual Property, together with any reissue, continuation, continuation-in-part, or extension thereof, and all proceeds thereof, including any and all causes of action that may exist by reason of infringement thereof for the full term of the Intellectual Property (collectively, the "**Collateral**"), to secure the prompt payment, performance, and observance of the Liabilities, as defined in the Note;

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby further grant to CBC a security interest in the Collateral to secure the prompt payment, performance, and observance of the Liabilities.

Grantor does hereby further acknowledge and affirm that the rights and remedies of CBC with respect to the security interest in the Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.

II-1

**TRADEMARK**
**REEL: 005147 FRAME: 0618**

CBC's address is.

CBC Partners I, LLC
305 108th Avenue NE, Suite 101
Bellevue, WA 98004
Attn: Alan Hallberg

With a copy to:

Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Attn: Stephanie Stephens

IN WITNESS WHEREOF, Grantor has caused this Grant of Security Interest to be executed as of the day and year first above written.

THOMAS WYLDE HOLDINGS, LLC

By: _____
Name: Paula Thomas
Its: Member

IP Security Agreement

TRADEMARK
REEL: 005147 FRAME: 0619

ALL-PURPOSE ACKNOWLEDGMENT

STATE OF _CALIFORNIA_ )
                                              ) ss.
COUNTY OF _LOS ANGELES_ )

On October 28, 2013 , before me,  A. Sheikh,  NOTARY PUBLIC
                                                                                  (Name and Title of Officer)

personally appeared  PAULA THOMAS

☒  ~~personally known to me~~
      -or-
☒  proved to me on the basis of satisfactory evidence to be the person(s) whose
      name(s) is/are subscribed to the within instrument and acknowledged to me that
      ~~he/she/they~~ executed the same in his/her/their authorized capacity(ies), and that
      by his/her/their signature(s) on the instrument the person(s), or the entity upon
      behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_A. Sheikh_
Signature Of Notary

[Notary Seal:
A. SHEIKH
Commission # 2005399
Notary Public - California
Los Angeles County
My Comm. Expires Jan 27, 2017]

---

OPTIONAL

Though the data below is not required by law, it may prove valuable to persons relying on
the document and could prevent fraudulent reattachment of this form.

CAPACITY CLAIMED BY SIGNER                    DESCRIPTION OF ATTACHED DOCUMENT

☒ Individual
☒ Corporate Officer

_____                              _____
        Title(s)                                                          Title Or Type Of Document

☒ Partner(s)        ☒ Limited
                          ☒ General
☒ Attorney-In-Fact                                        _____
☒ Trustee(s)                                                    Number Of Pages
☒ Guardian/Conservator
☒ Other

Signer is representing:
Name Of Person(s) Or Entity(ies)                    _____
                                                                       Date Of Document
_____

_____                              _____
                                                                       Signer(s) Other Than Named Above

IP Security Agreement

TRADEMARK
REEL: 005147 FRAME: 0620

SCHEDULE 1.4 TO GRANT OF SECURITY INTEREST

TRADEMARKS

| Mark | Jurisdiction | Owner | Serial No. / Reg. No. | Status |
|------|-------------|-------|----------------------|--------|
|  | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 4,045,284 | Registered 10/25/11 |
|  | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 3,283,944 | Registered 8/21/07 |
| THOMAS WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 78/778,668 | Abandoned 5/15/08 |
| THOMAS WYLDE | International Registration via Madrid Protocol (designated countries: Australia, Azerbaijan, Bulgaria, Bahrain, Kyrgyzstan, Norway, Oman, Singapore, Switzerland, Turkey, Ukraine, Uzbekistan, Vietnam) | Thomas Wylde Holdings, LLC (California limited liability company) | 1049884 | Registered 8/19/10 |

I-A-1

| [MARK] | [JURISDICTION] | [OWNER] | [REGISTRATION/SERIAL NUMBER] | [STATUS] |
|---|---|---|---|---|
| | Registration via Madrid Protocol (designated countries: China, European Union, North Korea, South Korea, Russian Federation) | Holdings, LLC (California limited liability company) | | 1/27/10 |
| THOMAS WYLDE | Japan | Thomas Wylde Holdings, LLC (California limited liability company) | 5150811 | Registered 7/11/08 |
| THOMAS WYLDE | Japan | Thomas Wylde Holdings, LLC (California limited liability company) | 5302128 | Registered 2/19/10 |
| THOMAS WYLDE | South Korea | Thomas Wylde Holdings, LLC (California limited liability company) | 40-2013-11821 | Filed 2/25/13 |
| WYLDE BY THOMAS WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 77/737,583 | Abandoned 1/14/13 |
| TW FOR THOMAS WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | United States | Thomas Wylde Holdings, LLC (California limited liability company) | 78/379,441 | Abandoned 3/22/05 |

TRADEMARK
REEL: 005147 FRAME: 0622

SCHEDULE A (LIST) OR ANNEX OF COLLATERAL INTEREST

## COPYRIGHTS

| Title | Registration Number | Registration Date | Owner |
|---|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 | Thomas Wylde Holdings, LLC |
| Henna Skull | VA 1-813-811 | 03/30/2011 | Thomas Wylde Holdings, LLC |
| Skull Flower | VAu 691-713 | 04/14/2006 | Thomas Wylde Holdings, LLC |
| Skull Pattern | VA 1-344-483 | 04/14/2006 | Thomas Wylde Holdings, LLC |
| Money Print | VA 1-853-563 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Goth Moth | VA 1-853-573 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 | Thomas Wylde Holdings, LLC |
| Samona Print | VA 1-853-569 | 10/24/2012 | Thomas Wylde Holdings, LLC |

1-A-1

SCHEDULE I.B TO GRANT OF SECURITY INTEREST

COPYRIGHT APPLICATIONS

| Title | Application Date | Owner |
|-------|-----------------|-------|
| Cyclops | 09/11/2013 | Thomas Wylde Holdings, LLC |
| Spinal Tap | 09/11/2013 | Thomas Wylde Holdings, LLC |

I-A-2

RECORDED: 11/06/2013

TRADEMARK
REEL: 005147 FRAME: 0625

## RELEASE OF INTELLECTUAL PROPERTY SECURITY INTEREST

CBC PARTNERS I, LLC, a Washington limited liability company, with an address of 777 108th Avenue NE, Suite 1895, Bellevue, WA 98004 ("Secured Party"), for and in consideration of the fulfillment of the obligations of THOMAS WYLDE HOLDINGS, LLC a California limited liability company, with an address of 3231 S. La Cienega Blvd., Unit A, Los Angeles, CA 90016 ("Borrower"), to Secured Party, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, fully releases and discharges any security interest held by Secured Party securing any indebtedness of Borrower to Secured Party, including without limitation, those security interests in the trademarks and copyrights listed on Schedule A attached hereto, and the goodwill associated with the same.

The Secured Party authorizes and requests that the Commissioner of Patents and Trademarks record and note the existence of the release hereby given. The Secured Party agrees to execute any and all documents necessary for the recordation of this release with applicable governmental offices.

DATED: January 7, 2015

Secured Party:
CBC PARTNERS I, LLC

By: _____
Name: ALAN E. HALLBERG
Title: CHIEF CREDIT OFFICER

STATE OF Washington        )
                           ) ss.
COUNTY OF King             )

I certify that I know or have satisfactory evidence that Alan Hallberg is the person who appeared before me, a duly authorized representative of CBC PARTNERS I, LLC and said person acknowledged that (s)he signed this instrument and acknowledged it to be a free and voluntary act for the uses and purposes mentioned in this instrument.

DATED: 1/7/2015

JODI PAULSON
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
01-03-18

Print Name: Jodi A. Paulson
My appointment expires: 1/3/2018

126390.0011/6243265.1

## SCHEDULE A

TRADEMARKS

| Mark | Jurisdiction | Serial No. / Reg. No. | Status |
|---|---|---|---|
|  | United States | 4,045,284 | Registered 10/25/11 |
|  | United States | 85/282,535 | Abandoned 5/5/14 |
| THE WYLDE | United States | 86/003,488 | Notice of Allowance 6/10/14 |
| THOMAS WYLDE | United States | 3,283,944 | Registered 8/21/07 |
| THOMAS WYLDE | United States | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | United States | 78/778,668 | Abandoned 5/15/08 |
| THOMAS WYLDE | International Registration via Madrid Protocol (designated countries: Australia, Azerbaijan, Bulgaria, Bahrain, Kyrgyzstan, Norway, Oman, Singapore, Switzerland, Turkey, Ukraine, Uzbekistan, Vietnam) | 1049884 | Registered 8/19/10 |
| THOMAS WYLDE | International Registration via Madrid Protocol (designated countries: China, European Union, North Korea, South Korea, Russian Federation) | 1028583 | Registered 1/27/10 |
| THOMAS WYLDE | Japan | 5150811 | Registered 7/11/08 |
| THOMAS WYLDE | Japan | 5302128 | Registered 2/19/10 |
| THOMAS WYLDE | South Korea | 4010118180000 | Registered 12/9/13 |
| WYLDE BY THOMAS WYLDE | United States | 85/020,665 | Abandoned 1/6/14 |
| DOGS GONE WYLDE | United States | 77/737,583 | Abandoned 1/14/13 |
| TW FOR THOMAS WYLDE | United States | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | United States | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | United States | 78/379,441 | Abandoned 3/22/05 |
| WYLDE BY THOMAS WYLE | United States | 86/134,119 | Notice of Allowance 7/15/14 |
| THOMAS WYLDE | United States | 86/258,860 | Notice of Allowance 11/4/14 |

126390.0011/6243265.1

TRADEMARK
REEL: 005441 FRAME: 0926

SCHEDULE A

COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 09/11/2013 |
| Sinal Tap | VA 1-907-688 | 09/11/2013 |

{26390.0011/6243265.1}

## CERTIFICATE OF TRADEMARK ASSIGNMENT

Thomas Wylde Holdings, LLC, a  ("Assignor") a California company with its principal place of business located at 1241 S. La Cienega Blvd., Unit A, Los Angeles, CA 90016 and FDTW, LLC, a California company with its principal place of business located at 1241 S. La Cienega Blvd., Unit A, Los Angeles, CA 90016 ("Assignee") hereby certify that pursuant to a Trademark Assignment Agreement executed by them, effective October 22, 2013, Assignor has assigned all right, title, and interest in and to the trademark registrations and applications listed on Schedule A to Assignor, including all goodwill associated therewith (the "Marks"). Assignor agrees that Assignee may file this Certificate with the United States Patent and Trademark Office to record the assignment of the Marks.


Dated:  10·24·13                       Dated:  10/24/13

Thomas Wylde Holdings, LLC            FDTW, LLC




Paula Thomas, Managing Member         Jene Park, COO


Page 1 of 3

**TRADEMARK**
**REEL: 005139 FRAME: 0776**

Schedule A

| Mark | Jurisdiction | Serial No. / Reg. No. | Status |
|---|---|---|---|
|  | United States | 4,045,284 | Registered 10/25/11 |
|  | United States | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | United States | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | United States | 3,283,944 | Registered 8/21/07 |
| THOMAS WYLDE | United States | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | United States | 78/778,668 | Abandoned 5/15/08 |
| WYLDE BY THOMAS WYLDE | United States | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | United States | 77/737,583 | Abandoned 1/14/13 |
| TW FOR THOMAS WYLDE | United States | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | United States | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | United States | 78/379,441 | Abandoned 3/22/05 |

Page 2 of 2

RECORDED: 10/25/2013

## CERTIFICATE OF TRADEMARK ASSIGNMENT

business located at 3231 S. La Cienega Blvd., Unit A, Los Angeles, CA 90016, Paula Thomas, an individual residing in the State of California, and Thomas Wylde, LLC, a California company with its principal place of business located at 3231 S. La Cienega Blvd., Unit A, Los Angeles, CA 90016 ("Assignee") hereby certify that pursuant the Articles of Dissolution of Assignor and an Agreement to Purchase Membership Interest executed by Paula Thomas and Assignee, effective December 22, 2014, Assignee has assigned to Paula Thomas and Paula Thomas has assigned to Assignor all right, title, and interest in and to the trademark registrations and applications listed on Schedule A, including all goodwill associated therewith (the "Marks"). Assignor and Paula Thomas agree that Assignee may file this Certificate with the United States Patent and Trademark Office to record the assignment of the Marks.

Dated: _1·13·2015_                   Dated: _1·13·2015_

Thomas Wylde Holdings, LLC

_____            _____
Paula Thomas, Managing Member        Paula Thomas


Dated: _Jan. 6/2015_

Thomas Wylde, LLC

_____
John Hanna, Manager

Schedule A

| Mark | Jurisdiction | Serial No. / Reg. No. | Status |
|------|-------------|----------------------|--------|
|  | United States | 4,045,294 | Registered 10/25/11 |
|  | United States | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | United States | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | United States | 3,283,944 | Registered 8/21/07 |
| THOMAS WYLDE | United States | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | United States | 78/778,668 | Abandoned 5/15/08 |
| WYLDE BY THOMAS WYLDE | United States | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | United States | 77/737,583 | Abandoned 1/14/13 |
| TW FOR THOMAS WYLDE | United States | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | United States | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | United States | 78/379,441 | Abandoned 3/22/05 |

RECORDED: 01/20/2015

TRADEMARK
REEL: 005447 FRAME: 0236

# EXHIBIT "7"

| LLC-1 | Articles of Organization of a Limited Liability Company (LLC) |
|---|---|

To form a limited liability company in California, you can fill out this form.

A separate, non-refundable $15 service fee also must be included, if you drop off the completed form.

**Important!** LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

**Note:** Before submitting the completed form, you should consult with a private attorney for advice about your specific business needs.

FILED
Secretary of State
State of California

JUL 2 2 2014

ICC

This Space For Office Use Only

For questions about this form, go to www.sos.ca.gov/business/be/filing-tips.htm.

**LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

① Thomas Wylde, LLC

*Proposed LLC Name*

The name must include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and may not include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company. For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**LLC Addresses**

③ a. 3231 S. La Cienega Blvd., Unit A          Los Angeles          CA    90016

*Initial Street Address of Designated Office in CA - Do not list a P.O. Box*      City (no abbreviations)    State    Zip

b. _____

*Initial Mailing Address of LLC, if different from 3a*      City (no abbreviations)    State    Zip

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

④ a. David Schnider

*Agent's Name*

b. 15165 Ventura Blvd., Ste. 245          Sherman Oaks          CA    91403

*Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box*      City (no abbreviations)    State    Zip

**Management** (Check only one.)

⑤ The LLC will be managed by:

☐ One Manager    ☒ More Than One Manager    ☐ All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

▶ _/s/_____          David Schnider

*Organizer - Sign here*      *Print your name here*

| Make check/money order payable to: Secretary of State. Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | By Mail Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | Drop-Off Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |
|---|---|---|

Corporations Code §§ 17701.04, 17701.08, 17701.13, 17702.01; Revenue and Taxation Code § 17941.
LLC-1 (REV 01/2014)

2014 California Secretary of State
www.sos.ca.gov/business/be



I hereby certify that the foregoing
transcript of _____/_____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

JUL 2 2 2014

Date:_____

DEBRA BOWEN, Secretary of State

## OPERATING AGREEMENT OF THOMAS WYLDE, LLC

This Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company, a California limited liability company formed under the laws of the State of California (the "Company"), is entered into as of July 22, 2014 by John Hanna, Jene Park, Doug Lee, and Roger Kuo (each a "Member," and collectively the "Members")

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

## ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "Act" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "Affiliate" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    "Capital Account" shall mean the account maintained for a Member or Assignee pursuant to Section 2.1 of Exhibit C. Each Member's initial Capital Account balance as of the date of this Agreement is set forth in Exhibit A.

1.5.    "Capital Contribution" means a Member's capital contribution to the Company in exchange for Units.

1.6.   "**Cause**" shall mean, with respect to the Manager, any Officer of the Company, and any Executive Officer serving on the Company's Executive Committee, fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct with respect to matters relating to the affairs of the Company.

1.7.   "**Confidential Information**" means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of or relating to the Company.

1.8.   "**Corporations Code**" means the California Corporations Code.

1.9.   "**Electronic transmission by the Company**" and "electronic transmission to the Company" have the meanings set forth in Corporations Code § 17701.02(i)(1)-(2).

1.10.   "**Encumber**" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.   "**Encumbrance**" means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.   "**Executive Committee**" means the Company's Executive Committee, as described in Article V.

1.13.   "**Executive Officer**" means an Officer of the Company that serves on the Company's Executive Committee.

1.14.   "**Involuntary Transfer**" means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15.   "**IRC**" or "**Code**" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.16   "**Member**" means any of the four initial Members listed herein - John Hanna, Jene Park, Doug Lee, and Roger Kuo - or a Person who subsequently acquires a Membership Interest in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.17.   "**Membership Interest**" means a Member's entire interest and rights in the Company, collectively, including the Member's economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

2

1.18.   "**Net Profits**" and "**Net Loss**" shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

1.19.   "**Notice**" means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.20.   "**Person**" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.21.   "**Proxy**" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.22.   "**Regulations**," "**Reg**," or "**Treasury Reg**" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.23.   "**Reserves**" means the aggregate of reserve accounts that the Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.24.   "**Successor in Interest**" means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.25.   "**Supermajority of Members**" means a Member or Members whose aggregate Unit Percentage represents at least sixty-five percent (65%) of the Unit Percentages of all non-Defaulting Members.

3

1.26.    "**Transfer**" means any sale, assignment, gift, involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, including such transfers as are set forth upon a purchaser's order form, register, etc.

1.27.    "**Unit(s)**" means the unit(s) of Membership Interest in the Company.

1.28.    "**Unit Percentage**" means, with respect to a Member, the percentage obtained by dividing the total number of Units held by such Member by the total number of Units outstanding.

1.29.    "**Vote**" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.30.    "**Voting Interest**" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Unit Percentage.

1.31.    "**Writing**" includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code §17701.02(i).

1.32.    "**Written**" or "**in writing**" includes facsimile and other electronic communication authorized by the Corporations Code.

## ARTICLE II: ORGANIZATION

2.1.    **Articles of Organization**.  The Articles of Organization were filed with the California Secretary of State on July 22, 2014, File Number 201420310399.

2.2.    **Company Name**.  The name of the Company is Thomas Wylde, LLC.  The business of the Company may be conducted under that name, or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

2.3.    **Company Offices**.  The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.    **Company Agent**.  The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.  The Manager may from time to time change the Company's agent for service of process. If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

4

2.5.    **Business.**  The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may be organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the lawful acts or business.

2.6.    **Taxation.**  The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.    **Term.**  The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.    **Members.**  The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.    **Managed by One Manager.**  The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.

2.10.    **Consent of Spouse or Domestic Partner.**  Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.    **Capital Contributions of the Members.**  The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement.  Units may only exist in positive, whole integer quantities and not in fractional amounts.

3.2    **Members' Initial Capital Contribution.**  On the Effective Date, each Member shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto, which shall thereafter constitute the Capital Contribution for each Member.  The 46 Units issued to the Members constitute 100% of all Membership Interest in the Company.  Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

3.3.    **Failure to Make Initial Capital Contributions.**  If a Member fails to make the required Capital Contribution set forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting

Interest of the Defaulting Member.  A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's voting interest shall be reinstated. In any event and in holding harmless shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

3.4.    **No Withdrawals.**  A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5.    **No Interest On Capital.**  No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.6.    **Members and Manager Not Liable.**  The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.  The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

3.7    **Right of Participation.**  Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such newly-issued Membership Interest.  For purposes of clarification, the foregoing participation right is intended to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1.    **Allocation.**  After giving effect to the special allocation provisions of Exhibit C attached hereto, Net Profits and Net Losses for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

4.2.    **Distributions.**  Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members in accordance with their respective Unit Percentages.  By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members.  All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3.    **Tax Distribution.**  Notwithstanding Paragraph 4.2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year an amount equal to 50% of the Net Profits (and items of income and gain) for such fiscal year allocated to such Member, less the aggregate amount of prior Distributions by the Company

to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

5.1.  **Managed by Manager.**  The business of the Company shall be managed by one Manager, who may also be a Member.  Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager. The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company. The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO.  The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.  **Officers.**  Subject to Section 7.3, the Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer. Such Officers may, but need not, be employees of the Company or Members of the Company. Each appointed Officer shall hold such office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager (subject to Section 7.3). All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.  **Executive Committee.**  The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company.   Executive Officers may, but need not be, employees of the Company or Members of the Company.

5.3.1.  **Executive Officers.**  Executive Officers shall have the duties, functions, and powers described herein.  Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members.  Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)  **Chief Creative Officer and Creative Director.**  The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company. The CCOD shall also be the Chairperson of the Executive Committee.  The CCOD for the Company as of the Effective Date shall be Paula Thomas.

(b)  **Chief Operating Officer and Chief Commercial Officer.**  The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's

7

commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.   **Manager's Powers and Limitations**.  The Manager of the Company shall have all powers and authority provided by this Agreement and the Act.   Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.   **Compensation**.   Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.   **Company Assets**.  The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.   **Company Funds**.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.   **Removal and Replacement of Manager**.  The Manager shall serve until the earlier of (a) the Manager's resignation, retirement, death, or disability, or (b) the Manager's removal for Cause by Vote of a Supermajority of Members. A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.   **Books of Account**.   Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.   **Accounting Method**.  Financial books and records of the Company shall be kept based on the Manager's choice of accounting method.  The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.   **Content of Books**.   At all times during the term of existence of the Company, and beyond that term, if reasonably necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)   A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

8

(b)    A copy of the Articles of Organization, as amended;

(c)    A copy of the Company's federal, state, and local income tax or
information returns and reports, if any, for the six most recent taxable years;

(d)    An original executed copy or counterparts of this Agreement, as amended;

(e)    Any powers of attorney under which the Articles of Organization or any
amendments to said articles were executed;

(f)    Financial statements of the Company for the six most recent fiscal years;
and

(g)    The books and records of the Company as they relate to the Company's
internal affairs for the current and past four fiscal years.

(h)    If the Manager deems that any of the foregoing items shall be kept beyond
the term of existence of the Company, the repository of those items shall be as designated by the
Manager.

6.4.    **Financial Statements**.  From time to time as determined by the Manager and at
the end of each fiscal year, the books of the Company shall be closed and examined, statements
reflecting the financial condition of the Company and its profits or losses shall be prepared, and a
report about those matters shall be issued by the Company's accountants. Copies of the financial
statements shall be given to all Members.  In addition, all Members shall receive, not less
frequently than at the end of each month, copies of such financial statements regarding the
previous calendar month as may be prepared in the ordinary course of business by the Manager
or accountants selected by the Manager.  The Manager shall cause an annual report to be sent to
each Member within 120 days after the end of the fiscal year of the Company.  The annual report
may be sent by electronic transmission by the Company and shall include:

(a)    A balance sheet, income statement, and a statement of cash flows of the
Company for and as of the close of the fiscal year; and

(b)    A statement showing the Capital Account of each Member as of the close
of the fiscal year and the distributions, if any, made to each Member during the fiscal year.

6.5.    **Tax Information**.  Within 90 days after the end of each taxable year of the
Company, the Company shall send to each of the Members all information necessary for the
Members to complete their federal and state income tax or information returns and a copy of the
Company's federal, state, and local income tax or information returns for that year.

6.6.    **Tax Matters Partner**.  The Manager shall act as Tax Matters Partner of the
Company under IRC § 6231(a)(7).  The Tax Matters Partner is authorized to do the following:

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223 and the implementing regulations.

(b)    Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

(c)    On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States of the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)    File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)    Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP AND UNITS

### 7.1    Membership Interest and Units

7.1.1    **Membership and Units**.  There shall be only one class of Membership Interest and one class of Units.  Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action.  Each Member shall vote in proportion to the Member's then-existing Voting Interest.

7.1.2.    **Units**.  The Company has issued 46 (Forty-Six) Units to the Members as set forth in Exhibit B.

7.2.    **Certificates**.  All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.  The Company may, but is not required to, issue certificates evidencing

Units ("Unit Certificates") to Members of the Company. Once Unit Certificates have been issued, they shall continue to be issued as necessary to reflect current Units held by Members. Unit Certificates shall be in a form approved by the Manager, shall be manually signed by the Managers and shall bear conspicuous legends referencing the restrictions on transfer and the purchase rights of the Units and Members set forth in this Agreement, including the following:

> THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF THE COMPANY, AS AMENDED FROM TIME TO TIME. THE UNITS MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH SUCH OPERATING AGREEMENT.

> THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION THEREFROM AND THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS LEGAL COUNSEL THAT SUCH SALE, PLEDGE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

7.3.    **Acts Requiring Member Vote**. Except as otherwise provided in this Agreement or by the Act, all of the following acts shall require the consent by Vote of a Supermajority of Members:

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The filing of a petition in bankruptcy or entering into an assignment for the benefit of the Company's creditors;

(h)     The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company;

(g)     The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(h)     The issuance or redemption of any Membership Interest (including the terms thereof);

(i)     Making operating or liquidating distributions to Members;.

(j)     The Transfer of any Membership Interest (other than to a Permitted Transferee);

(k)     The admission of any new Member (other than a Permitted Transferee);

(l)     Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)     Any transaction between the Company and an Affiliate of a Member or a Manager;

(n)     Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget; and

(o)     Paying any officer or employee more than $200,000 per year.

7.4.    **Record Date.**  The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action.  In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.    **Meetings.**

7.5.1.  **General.**  Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote.  If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager.  Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager.  Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting.  The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general

12

nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a Supermajority of Members, represented in person or by Proxy. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2.  **Quorum**.  A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3.  **Waiver of Notice**.  The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4.  **Proxies**.  At all meetings of Members, a Member may Vote in person or by Proxy.    Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5.  **Video Attendance**.  A meeting of the Members may be conducted, in whole or in part, by electronic means (audio or video with audio) so long as the Company implements reasonable measures to provide participating Members a full opportunity to hear and be heard and otherwise concurrently participate in the meeting. The permanent record of any such meeting shall consist of the minutes of such meeting and/or the electronic recording of such meeting, if recorded..

7.5.6.  **Written Consent**.  Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted.  Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

7.5.7. **No Authority.** No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Each Member shall indemnify, defend, and hold the other Members harmless from and the Company to hold against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1. **Dissociation.** A Member may not dissociate from the Company without the written consents of all of the Members. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.

8.2. **Transfers.** Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved by the Members by Vote of a Supermajority of Members. Approval may be granted or withheld in the Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void. Notwithstanding the foregoing, (x) any Member may Transfer such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and family member(s), and (iii) any revocable trust created for the benefit of the Member and/such Member's spouse and family member(s) (each such transferee, a "Permitted Transferee"), (y) the Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Transfer to a Permitted Transferee, and (z) the Members shall approve a Permitted Transferee's admission as a substitute Member. A Permitted Transferee of a Member may transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the Company's and other Members' right of first refusal.

8.3. **No Release on Transfer.** A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

8.4. **Agreement Binds New Members.** Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5. **Voluntary Lifetime Transfers.** No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section. Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both

14

home and office), and business or occupation of the proposed transferee, and any other facts that
are, or would reasonably be deemed to be, material to the proposed Transfer.  The Member
is going to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her
Membership Interest to the Company and the other Members as described in
Section 8.7.  A "Voluntary Lifetime Transfer" means any Transfer made during a Member's
lifetime, which is not an Involuntary Lifetime Transfer (as defined in Section 8.6).

8.6    **Involuntary Lifetime Transfer.**  Any Member who has any information that
would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable,
including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company
and each other Member.  Such notice shall include a description of the expected Transfer, the
name, address (both home and office), and business or occupation of the expected transferee, and
any other facts that are, or would reasonably be deemed to be, material to the involuntary
Transfer. The Member who may be making an Involuntary Lifetime Transfer shall be deemed to
have offered to sell his or her Membership Interest otherwise to be transferred to the Company
and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means
any Transfer made on account of a court order or otherwise by operation of law, including any
Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer
pursuant to applicable community property, quasi-community property or similar state law.

8.7    <u>**Right of First Refusal of the Company and Non-Transferring Members.**</u>

8.7.1    **General.**  Each Member shall be deemed to have offered to sell his or her
Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an
Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other
Members (i) at the price and payment terms offered by a proposed transferee set forth in the
Member Notice or (ii) if there is no price or payment terms offered by a proposed transferee
(e.g., in the case of an Involuntary Lifetime Transfer), at the Agreement Price (as defined below)
and Agreement Terms (as defined below).

8.7.2.    **Company's Right.**  Within the later of (i) thirty (30) days following
receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement
Price, the Company shall send a written notice ("Company Notice") to the Members stating the
portion of the Offered Membership Interest the Company wishes to purchase.

8.7.3.    **Members' Right.**  Unless the Company Notice specifies all of the Offered
Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member
who desires to purchase a portion of the Offered Membership Interest shall give a written notice
to the Company specifying the maximum portion of the Offered Membership Interest that the
Member wishes to purchase.  If the aggregate Offered Membership Interest to be purchased by
the Members exceeds the total amount of the Offered Membership Interest, the Offered
Membership Interest shall be allocated to the exercising Members based on their respective Unit
Percentages.

8.7.4    **Remaining Offered Membership Interest.**  If the Company and the
other Members do not agree to buy all of the Offered Membership Interest, any remaining

Offered Membership Interest may be sold to a non-Member within thirty (30) days after the expiration of the Company's and Members' option period. If such Transfer does not occur within thirty (30) days, the provisions of this Agreement will continue to apply to such Offered Interest as if such Transfer had never been made and its offered and terms had been given. A Transfer is consummated when the Company has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

8.8    **Agreement Price.** The Agreement Price will be the fair market value of the Membership Interest being Transferred and shall initially be determined in good faith by the Company. If any Member objects to the Company's determination of the fair market value, the Company and the objecting Member shall attempt to jointly appoint a qualified appraiser. If the parties cannot agree on a single appraiser, they shall each appoint one appraiser and the two appraisers appointed by the parties shall choose a third appraiser. In the event that three appraisers are used, the Agreement Price shall be the average of the two closest fair market values proposed by the three appraisers. The cost of appraisal shall be borne and paid by the objecting Member, unless the Company's proposed fair market value is at least twenty percent (20%) less than the Agreement Price determined by appraisal.

8.9    **Agreement Terms.**

8.9.1    **Installment Note.** If there are no payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

8.9.2    **Closing.** The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree. At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred. If the seller does not appear at the closing, then:

(a)    The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

(b)    The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

(c)    The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

...... Transferee or Transferred, and the death of any Member or the distributing party, each family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest). If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1.    **Dissolution**.  The Company shall be dissolved on the first to occur of the following events:

(a)    The Vote of a Supermajority of Members to dissolve the Company;

(b)    The sale or other disposition of substantially all of the Company's assets; or

(c)    Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

9.2.    **Winding Up**.  On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.  After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)    To pay the expenses of liquidation;

(b)    To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

(c)    To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

(d)    To the Members in accordance with their respective positive Capital Account balances.

17

9.3.    **No Recourse.**  Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, that Member shall have no recourse against any other Members or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X: CONFIDENTIALITY

10.1.    **Confidentiality.**  Each Member covenants with the Company and each other Member that for so long as a Member holds any Units in the Company, and for a two-year period following the Transfer of a Member's Units, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, a Member shall not, directly or indirectly, through an Affiliate or otherwise use or disclose in any manner any Confidential Information.

10.2.    **Money Damages Inadequate.**  Each Member agrees that a breach of Section 10.1 shall result in irreparable damage and injury to the Company that no money damages could adequately compensate. If the Member breaches Section 10.1, in addition to all other remedies to which the Company may be entitled to, and notwithstanding the arbitration provisions of Article XI, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction. Each Member expressly waives any claim or defense that an adequate remedy at law exists for any such breach.

10.3.    **Reformation.**  If any provision of Section 10.1 is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that provision shall be deemed reformed in that jurisdiction to the extent necessary to permit enforcement.

## ARTICLE XI: INDEMNIFICATION AND ARBITRATION

11.1.    **Indemnification.**  The Company shall indemnify any Person who was or is a party, or who is threatened to be made a party, to any legal proceeding by reason of the fact that the Person was or is a Member, Manager, Officer, Executive Officer, employee, or other agent of the Company against expenses including reasonable attorneys' fees, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if (a) that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and (b) in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

11.2.    **Advancement of Expenses.**  Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a

18

legal proceeding shall be paid by the Company in advance of the final disposition of that proceeding, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.3.  **Arbitration.**  Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to (or arising out of) this Agreement or the Company among or between any of the Company, a current or former Member, or the current or a former Manager shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association.  The place of arbitration shall be Los Angeles, California.  The award of the arbitrator shall be final, binding, and conclusive on all parties.  Judgment may be entered on any such award in any court of competent jurisdiction.

## ARTICLE XII: GENERAL PROVISIONS

12.1.  **Integration.**  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein.  No party is relying on any representations or warranties not expressly contained in this Agreement.  This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

12.2.  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail.  The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

12.3.  **Choice of Law.**  This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

12.4.  **Severability.**  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

12.5  **Binding Effect.**  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.6.  **Representation.**  Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

12.7.  **Additional Instruments.**  The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.8.  **Independent Activities.**  Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members or the Manager in the carrying on of their own respective businesses or activities.

12.9.  **Capacity and Authority.**  Each Member represents and warrants to the other Members that he, she, or it has the capacity and authority to enter into this Agreement.

12.10.  **Interpretation.**  The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.  Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

12.11.  **Time of the Essence.**  Time is of the essence for every provision of this Agreement that specifies a time for performance.

12.12.  **Exhibits.**  The exhibits referenced herein are expressly incorporated into and made part of this Agreement.

12.13.  **No Third Party Beneficiaries.**  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and there are no intended third-party beneficiaries.

12.14.  **Amendment.**  This Agreement may be amended only by the written approval of all of the Members.

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EXTRA COPIES THAT MAY EXIST FOR THE PURPOSES OF SIGNATURE FROM SUCH MEMBER OR OTHER MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement as of the day and year first written ab...

_____

JOHN HANNA, Manager, Member, and Chief
Executive Officer

_____

JENE PARK, Member, Chief Operations Officer
and Chief Commercial Officer

_____

DOUG LEE, Member

_____

ROGER KUO, Member

EXHIBIT A

## CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____
("Member"), and acknowledges that he or she has read the foregoing Operating Agreement of
Thomas Wylde, LLC (the "Agreement") and understands its provisions.  The undersigned is
aware that, by the provisions of the Agreement, Member and the undersigned have consented to
sell or transfer all Units in the Company, including any community property interest or quasi-
community property interest therein, only in accordance with the terms and provisions of the
Agreement.  The undersigned expressly approves of and agrees to be bound by the provisions of
the Agreement in its entirety, including, but not limited to, those provisions relating to the sales
and transfers of Units and the restrictions on them.  If the undersigned predeceases Member
while Member owns any Units therein, the undersigned agrees not to devise or bequeath any
community property interest or quasi-community property interest in such Units in contravention
of the Agreement.

Date: _____        _____
                                      Signature

                                      _____
                                      Name

## EXHIBIT B

MEMBERS AND CAPITAL CONTRIBUTIONS

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 December 15, 2014 | 14 | $700 |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900 December 15, 2014 | 18 | $900 |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350 December 15, 2014 | 7 | $350 |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350 December 15 2014 | 7 | $350 |

24

## EXHIBIT C
## TAX PROVISIONS

CERTAIN DEFINITIONS

1.1    "**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

1.1.1    Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

1.1.2    Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

1.1.3    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3    "**Company Minimum Gain**" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4    "**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5    "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6    "**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

25

1.7     "**Net Profits**" and "**Net Losses**" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section _____ (for this purpose, all items of income, gain, loss, or deduction required to be _____ separately pursuant to Code Section _____ shall be included in taxable income or loss), with the following adjustments:

1.7.1    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3    In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6    Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8     "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(h)(1).

1.9    "**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

**ARTICLE II: CAPITAL ACCOUNT**

2.1    **Capital Accounts.** The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2    To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3    In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4    In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

**ARTICLE III: SPECIAL ALLOCATIONS**

3.1    **Adjusted Capital Account Deficit.** An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

5.2    **Special Allocations.**

3.2.1    **Member Nonrecourse Deductions.**  Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

3.2.2    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members.**  Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

3.2.3    **Member Minimum Gain Chargeback.**  Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.2.4    **Minimum Gain Chargeback.**  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

3.2.5   **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or if any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.2.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 3.2.5 were not in the Agreement.

3.3     **Curative Allocations**.  The allocations set forth in Sections 3.1 and 3.2 of this Exhibit C (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.3.  Therefore, notwithstanding any other provision of the Agreement (other than the Regulatory Allocations), the Members, by Vote of a Supermajority of Members, shall  make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.1 of the Agreement.  In exercising their discretion under this Section 3.3, the Members, by Vote of a Supermajority of Members, shall take into account any future Regulatory Allocations under Sections 3.2.3 and 3.2.4 of this Exhibit C that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.2.1 and 3.2.2 of this Exhibit C.

3.4     **Code Section 704(c) Allocations**.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Agreement:  (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).

3.5     **Allocations in Respect of a Transferred Membership Interest**.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year shall be allocated among the Members, as determined by the Members, by Vote of a Supermajority of Members, in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such fiscal year.

# EXHIBIT "8"

**Date:** Sunday, April 16, 2017 at 9:01:07 AM Pacific Daylight Time

**From:** Paula Thomas



Begin forwarded message:

**From:** "Goodkin, Olivia" <ogoodkin@greenbergglusker.com>
**Date:** May 4, 2015 at 1:44:02 PM PDT
**To:** "Paula Thomas (paulathomas@me.com)" <paulathomas@me.com>,
"mccrain@crainlawgroup.com" <mccrain@crainlawgroup.com>
**Cc:** "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com>
**Subject**



Olivia Goodkin **| Chair, Employment Group |** Biography
D: 310.201.7446 | F: 310.201.2334 | OGoodkin@greenbergglusker.com
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

We inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

Sent: Monday, May 04, 2015 1:00 PM
To: Goodkin, Olivia
Subject: ███████████
Importance ███

█████████████████████

From: Apfelberg, Andrew M.
Sent: Tuesday, December 23, 2014 10:08 AM
To: Paula Thomas (paulathomas@me.com)
Cc: Tran, Kim; David Schnider (david@thomaswylde.com)
Subject: Thomas Docs
Importance: High

Paula -- attached are clean .pdf versions of the redline documents David sent yesterday. Please confirm you are ok with them and that I am authorized to sign on your behalf (until you get back to LA when you will personally sign them all).

Thanks,
Andrew

# EXHBIT "9"

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

individual ("Purchaser"), effective December 22, 2014 (the "Effective Date").

## RECITALS

A.      Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). Other than as set forth herein, all Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, and Doug Lee (the "Members").

B.      Purchaser seeks to invest $3,200 and certain assets and liabilities into Seller in exchange for 64 membership Units in the Seller.

C.      Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.      Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, a 64 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.  Instruments of Conveyance. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.  Consideration. In consideration for the Membership Interest, Purchaser shall make a capital

Membership Purchase Agreement                                                    Page 1

84616-00003/2311643.2

contribution to Seller in the amount of Three Thousand Two Dollars ($3,200) and shall transfer to Seller those assets and liabilities set forth on Exhibit "A" hereto.

. . . . . . . . . . . . . . . . . . . . . . . . . . . follows.

   a. This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

   b. Purchaser is acquiring the Membership Interest for her own account, for investment purposes, and not with a view to the distribution thereof.

   c. Purchaser has firsthand knowledge of the business and affairs of Seller, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

5. <u>Seller Representations and Warranties</u>. Seller represents and warrants to Purchaser as follows:

   a. Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

   b. Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

   c. Seller has received fair equivalent value under the terms of this Agreement.

   d. Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

   e. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

   f. Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

   g. Subsequent to the purchase contemplated hereby, the fully diluted capitalization of Company is as set forth in Exhibit "B" to the Amended Agreement (defined below).

Membership Purchase Agreement            Page 2

6.   Conditions Precedent. Purchaser's obligations hereunder are conditioned upon:

a. [illegible text] ("Amended Agreement");

      b.    The Members' execution and delivery of that certain Clawback Agreement in the form attached as Exhibit "C" hereto;

      c.    Hillsboro Investments funding of a Two Million Dollar ($2,000,000) loan to the Company;

      d.    The Company's use of the proceeds of such loan in the manner set forth in that certain Use Of Proceeds Agreement in the form attached as Exhibit "D" hereto (a fully executed copy of which must be delivered to Purchaser);

      e.    The Company and the Members' execution and delivery of that certain Indemnity Agreement in the form attached as Exhibit "E"; and

      f.    The Company's execution and delivery of an employment agreement for Paula in a form mutually agreed to by the parties.

7.   Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8.   Necessary Actions. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.   Waiver And Amendment. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10. Entire Agreement. This Agreement and the exhibits hereto constitute the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11. Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12. Governing Law And Venue. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's

H4915-00001/2311643.2

fees.

... ... ...

shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

14. Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC

_____
John Hanna, Manager

_____
Paula Thomas

84016-0000/2311643 2

## Exhibit "A" to Agreement to Purchase Membership Interest

List of Asset Being Transferred from Paula Thomas to Thomas Wylde, LLC

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, or any other rights therein but specifically excluding Paula Thomas' name, image, likeness, biography and moral rights ("IP"). The IP includes the following:

### TRADEMARKS

| Mark | Serial No. / Reg. No. | Status |
|------|------------------------|--------|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |

84026-0000/2831643 2

COPYRIGHTS

| Titles | Registration Number | Registration Date |
|--------|--------------------|--------------------|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

Agreement to Purchase Membership Interest                    Exhibit A-2

R4845-0000/2312643.2

List of Liabilities Being Transferred from Paula Thomas to Thomas Wylde, LLC

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

# Exhibit "B"

Amended and Restated Operating Agreement

# Exhibit "C"

Membership Agreement

# Exhibit "D"

Agreement to Purchase Membership Interest

# Exhibit "E"

Indemnity Agreement

EXHBIT "10"

# THOMAS EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is entered into by and between [illegible company name], a California limited liability company with its principal place of business at [illegible], CA 90016 ("Company"), and Paula Thomas, an individual residing at 2514 S. Toledo Ave., Palm Springs, CA 92264 ("Employee"), effective January 1, 2015 ("Effective Date").

1. **Employment.** Employee shall serve as the Company's Chief Creative Officer and Creative Director and shall be in charge of the Company's brand image, product and service design, function, look, feel, materials, marketing, advertising, promotion and all such other activities that could affect the goodwill of the Company and/or its products and services, as well as such other title or position as may be mutually agreed by the parties. In addition, Employee shall have the rights and responsibilities relative to her title set forth in the Company's Operating Agreement as in existence as of the date hereof. Employee shall devote all of her working time, attention, knowledge, and skills to Employer's business interests and shall do so in good faith, with best efforts, and to Employer's reasonable satisfaction. During the term of this Agreement, Employee agrees that she will not, without the knowledge and express written consent of the Company's Manager (not unreasonably to be withheld, delayed or conditioned): (i) engage in any form of activity that produces a "conflict of interest" with Employer; or (ii) have any interest in or engagement with any business directly competitive to Employer's. The Company acknowledges and agrees that Employee's activities set forth in Schedule 1 hereto, as it may be amended from time to time, is not a conflict of interest. Employee is expected to comply with Company's policies, procedures and work rules as they now exist or may be modified or adopted by the Company in the future as set forth in any written policy, handbook, or otherwise. These policies include but are not limited to policies against violence in the workplace, discrimination, harassment, and retaliation.

2. **Term of Employment.** This Agreement shall be binding upon full execution and shall be effective as of the Effective Date and shall continue until the earlier of (i) three years from the Effective Date or (ii) termination of the Agreement in accordance with Section 9, below. Unless the Agreement is terminated pursuant to Section 9, below, at the end of the first three-year term, Employee's employment with the Company shall continue on the terms and conditions set forth herein on an "at-will" basis, meaning that either the Company or the employee may terminate the employment relationship at any time, with or without cause, and with or without notice.

3. **Compensation.** For the services to be rendered by Employee during the term of employment, the Company shall pay the Employee a base salary in the amount of $300,000 per year. Employee's wages shall be paid in accordance with the Company's normal payroll practices. All compensation payable to the Employee pursuant hereto shall be subject to the customary income tax withholding and such other Employee deductions as are required by law with respect to compensation paid by a company to an employee. Employee's compensation and employee benefits are subject to increase in accordance with the Company's policies and procedures, as determined from time to time in the reasonable discretion of the Company, upon written notice to Employee. Employee shall contemporaneously receive increases in her base salary in the same amounts as the largest increase to the base salary of any other member of the Company's senior management team.

4.    Bonuses. In addition to the compensation set forth in Section 3 above, the Company may, in its sole and exclusive discretion, pay Employee bonuses from time to time. Bonus amounts [illegible] as set forth in Section 9, Employee must be employed at the time of payment to receive any such bonuses. Notwithstanding anything contained herein, Employee shall receive a bonus that is not less than 10% less than the largest bonus or aggregate bonuses paid to any member of the Company's senior management team, excluding any sales commissions or similar sales based incentives. Such mandatory bonus shall be paid in amounts and type of consideration equivalent to such largest bonus.

5.    Vacation and Holidays. Employee is entitled to four weeks of vacation in accordance with the Company's standard policies, provided that such vacation shall be taken in commercially reasonable increments and is subject to the notification and approval of the CEO, which approval shall not be unreasonably withheld.

6.    Other Benefits. Employee shall be eligible for all other benefits generally provided by Company for exempt employees; provided, that, the Company shall provide Employee with all health, dental and vision insurance equivalent to which she had as a PDTW LLC employee. In the event that Company obtains key person insurance on any of the lives of Company's senior management, it shall do so on Employee's life in at least the same amounts.

7.    Expense Reimbursement. Employee shall be entitled to reimbursement of any or all expenses authorized and reasonably incurred in the performance of the functions and duties under this Agreement. In order to receive reimbursement, Employee must timely provide Employer with an itemized account of all expenditures, along with suitable receipts therefore in accordance with the Company's standard policies. Any expenditure over the dollar amount of $2,000 requires prior written authorization of the Company's Manager

8.    Exempt Status. Employee is employed as a salaried/exempt employee and, is not entitled to overtime wages. Employee shall not receive overtime compensation for the services performed under this Agreement.

9.    Termination. The Company shall have the right to terminate Employee's employment under this Agreement at any time for Cause, which termination shall be effective immediately. Termination for "Cause" shall mean the commission of the following acts by Employee that are not reasonably cured within thirty days of Employee's receipt of written notice from Company detailing in specifics the alleged acts or omissions of Employee that Company believes fit the definition of Cause:

(i)    material breach of this Agreement;

(ii)    intentional nonperformance or mis-performance of her duties, or refusal to abide by or comply with the reasonable directives of her superior officers, or the Corporation's policies and procedures;

(iii)    willful dishonesty, fraud, or misconduct with respect to the business or affairs of the Company, that in the reasonable judgment of the Manager or a Supermajority of the [illegible];

(iv)    conviction of, or a plea of nolo contendere to, a felony or other crime involving moral turpitude; or

(v)    the commission of any act that is a conflict of interest (as defined above).

Employee shall have the right to terminate her employment under this Agreement by giving the Company at least thirty (30) days written notice. In the event that Employer terminates this Agreement without Cause or Employee terminates this Agreement for Good Reason, the Company shall pay her severance in the amount of her base salary, bonus and reimbursement of COBRA expenses until the later of: (a) December 31, 2017 or (b) one year after her last day of employment. For purposes hereof, "Good Reason" shall mean (1) material diminishment or reduction of Employee's compensation, benefits, expense reimbursement, authority, responsibilities, title or to whom she reports, (2) the hiring or engagement of any person to perform substantially the same services as Employee without Employee's prior written consent (which may be withheld in her sole discretion), (3) the appointment of any officer that is superior in rank to her other than the CEO, (4) relocation of Employee's principal place of providing services by more than twenty miles, or (5) material breach by Company or its members of this Agreement or any other agreement between Company or one or more of its members on the one hand and Employee on the other hand.

The Agreement shall terminate automatically upon Employee's death. Upon termination due to death, Company shall pay to Employee's beneficiaries or estate, as appropriate and upon any proper showing or order required by law, any compensation then due and owing including without limitation a pro-rata portion of any bonuses that may accrue for such fiscal year. Thereafter, all obligations of the Company under this Agreement (including but not limited to salary and any other benefits) shall cease. Nothing in this Section shall affect any entitlement of Employee's heirs to the benefits of any life insurance plan or other applicable benefits.

Employee acknowledges and agrees that her obligations under the Confidentiality and Intellectual Property Agreement set forth in Addendum A survive termination of this Agreement so long as the mandatory bonus set forth in Section 4 and the severance set forth above (as applicable) is actually paid.

10.    **Non-Solicitation Covenant.** Employee agrees that for a period of one year following termination of employment, for any reason whatsoever, Employee will not solicit customers or clients of Employer. By agreeing to this covenant, Employee acknowledges that her contributions to Employer are unique to Employer's success and that she has significant access to Employer's trade secrets and other confidential or proprietary information regarding Employer's customers or clients. A general advertisement, marketing efforts or attendance at trade shows and other industry events that is not targeted to Company's customers or clients shall not be deemed to be solicitation.

11.   Non-Recruit Covenant. Employee agrees not to recruit any of Employer's employees for the purpose of any outside business either during the term or for a period of one year following ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... not specifically directed to Company's employees shall not be deemed to be recruitment.

12.   "Key Man" Life Insurance. Employee acknowledges that Company may purchase, own and maintain, at Company's expense, a "key man" life insurance policy on Employee. Employee agrees, as long as this Agreement is in effect, to cooperate with any other requirements (such as physicals or execution of documents) for maintaining any such insurance policy. If Company elects to terminate such policy, to the extent legally possible it will permit Paula to assume all rights and obligations under the policy instead.

13.   Intellectual Property and Confidentiality. By signing below, you agree and acknowledge that your execution of the Intellectual Property and Confidentiality Agreement attached hereto as Addendum A is a material condition of this Agreement.

14.   Audit Rights. During the term of this Agreement and for a period of three years thereafter, Employee shall have unfettered access to the books and records of the Company and any successor and assign solely to confirm the Company's compliance with the terms of this Agreement. Such audit shall be at Employee's sole expense except to the extent that the audit report shows an underpayment of Employee of more than five percent (5%) of the applicable component of her consideration (in which instance Company shall be solely responsible for all expenses related to such audit).

15.   Integration Clause. This Agreement supersedes and replaces any and all conflicting representations, agreements, understandings, or policies (whether oral or written) between Company and Employee that were in effect prior to the Effective Date of this Agreement. Employee acknowledges and agrees that no representations or promises have been made to her regarding her employment with the Company other than as stated in this Agreement.

16.   Assignment. This Agreement is personal in nature and Employee may not assign it without the Company's written consent and any attempt to do so is void. Company may not assign, transfer or delegate this Agreement without Employee's prior written consent which shall not unreasonably be withheld, delayed or conditioned. Any such assignment, transfer or delegation shall not relieve Company of its obligations hereunder and is conditioned upon the assignee agreeing in writing to be bound by all of the terms and conditions hereof.

17.   Modification. Except as otherwise set forth herein, the terms of this Agreement may only be amended or modified in a written agreement signed by both parties.

18.   Severability. This Agreement is severable. If any part of this Agreement is found invalid or unenforceable in any jurisdiction, that provision, as to that jurisdiction, will not render invalid or unenforceable the other remaining provisions of this Agreement.

19.    Governing Law And Venue. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts ...

20.    Waiver. No consent or waiver, expressed or implied, by either party to or of any breach or default by the other in the performance by the other of its obligations hereunder shall be deemed or construed to be a consent or waiver of any other breach or default in the performance by such other party, or a consent or waiver to complain of any act or failure to act of any of the other party, or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver of such party of its rights hereunder.

21.    Attorney Review. Employee warrants and represents that Employee in executing his Agreement has had the opportunity to rely on legal advice from an attorney of Employee's choice, so that the terms of this Agreement and their consequences could have been fully read and explained to Employee by an attorney and that Employee fully understands the terms of this Agreement

22.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

Thomas Wylde, LLC


By: _____    December 2_ 2014
    John Hanna, Manager


## EMPLOYEE'S ACKNOWLEDGMENT

I acknowledge that I have carefully read, understand and agree to the provisions of this Agreement.


_____    December 31, 2014
Paula Thomas

## Addendum A— Confidentiality and Intellectual Property Agreement

performance of your duties, your duty of loyalty to Company, and dealing with confidential information of Company and its clients.

In the course of your work for the Company, you have gained access and will gain access to certain information of a confidential, proprietary or trade secret nature relating to the business of the Company and/or its clients, all of which information is collectively referred to in this Agreement as "Confidential Information." The Confidential Information includes any valuable, competitively sensitive data and information related to the Company's business (and/or that of its clients) that are not generally known or readily available to the Company's competitors, including without limitation: customer information such as pricing, names and addresses, preferences, habits and methods of contacting, servicing, and methods of soliciting customers, customer lists, business plans, methods of operation and financial information not generally known to the public, personnel files, computer codes and access information, service techniques, advertising and promotional ideas and strategy, unpublished designs, manufacturing techniques, sales forecasting and planning procedures, warehouse organization and technology, packaging procedures, importing and shipping techniques, and strategic or marketing information or plans, and other trade secrets, inventions, or pending patents. Information and documents constitute Confidential Information whether or not marked as "confidential" or "proprietary," and whether or not in electronic or documentary form, and whether or not the information or documents were created or obtained by you while performing services for the Company. Confidential Information shall not include items generally available to the public, those disclosed to the public by Company, general industry knowledge, expertise and contacts and those items independently developed by Employee without reference to Company's Confidential Information.

You covenant that in the future you will keep, strictly confidential all of the Confidential Information. You agree that you will not, directly or indirectly, use or disclose to any third party any of the Confidential Information, either during your employment or at any time thereafter, except as required in the course of performing services for the Company or with the express written consent of the Managing Member of the Company, or as otherwise required by law.

You further agree to return to the Company immediately upon resignation or termination of your employment all Confidential Information and any other property or documents belonging to the Company in your possession, custody or control, whether in hard copy or electronic form and together with all copies. You will not at any time, during or after your employment, directly or indirectly use the Confidential Information for your benefit or the benefit of any other person or entity other than the Company, nor will you publish or allow to be published or disclosed any Confidential Information to any person who is not an employee of the Company.

The non-disclosure obligations set forth in this Paragraph shall not be applicable to any information which:  (i) the Company has authorized you in writing to publicly disclose, copy or use, to the extent of such authorization; (ii) is generally known or becomes part of the public domain through no fault of your own; (iii) is disclosed to the Company by third parties without restrictions

or disclosure; or (iv) is required to be disclosed in the context of any administrative or judicial proceedings; provided that, if you are requested or legally compelled to disclose any Confidential [illegible]

You further acknowledge and agree that a breach of the provisions of this Agreement relating to Confidential Information would cause the Company to suffer irreparable damage that could not be adequately remedied by an action at law. Accordingly, you agree that the Company or its Affiliates shall be entitled to injunctive relief to enforce these provisions in an action filed in any court of competent jurisdiction, in addition to recovery of its reasonable attorneys' fees and costs and any other remedies provided by law.

Except with respect to "moral rights," in consideration for the compensation and benefits set forth in this Agreement you hereby irrevocably and unconditionally assign and agree to assign in the future to the Company all rights, title and interest in any intellectual property (trademarks, copyrights, patents), discoveries, inventions, works of authorship, improvements and innovations, and other information/data that relates to any of the Company's business operations, products or services (including all electronic data, other data, and records pertaining thereto), whether or not patentable, trademarkable and/or copyrightable material and whether or not reduced to writing, developed in whole or in part by you in the course of your employment with the Company, even if developed prior to the date of this Agreement (collectively, the "Work Product"). All Work Product shall be deemed to be and shall remain "a work made for hire" under the United States Copyright Act and the sole and exclusive property of the Company. To the extent that any such Work Product is ever determined not to fall within the scope of "works made for hire" or otherwise not to belong to the Company, you hereby irrevocably, absolutely and perpetually assign and agree to assign, transfer and convey to Company all of your right, title and interest worldwide in and to the Work Product.

If you have any rights in Work Product (other than "moral rights"), that cannot be assigned, you agree to unconditionally and irrevocably waive enforcement worldwide of such rights against Company and all claims and causes of action of any kind against Company with respect to such rights, and agree, at Company's sole expense and request, to consent to an join in any action to enforce such rights. If such rights are not waivable, you hereby grant to Company a sole, exclusive, royalty-free, irrevocable, perpetual, transferable, assignable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to such non-waivable rights so that Company may fully exploit those retained rights in such Work Product, including to make, have made, import, modify, use, copy, perform, display, sell and otherwise distribute such rights in connection with its current and future business, in any medium or format, whether now know or later developed.

You agree to keep, maintain and make available to Company adequate and current records (in the form of notes, sketches, reports, correspondence, lists, specifications, or other information), in any form that may be required by Company, of all Confidential Information developed by you and all "works made for hire" and "Work Product" made by you during your employment by the Company, whether before or after you executed this Agreement. You must return to the Company upon resignation or termination of employment all Confidential Information and other property of the Company, whether in document or electronic form, together with all copies.

You further agree to execute and have notarized any additional documents reasonably requested by Company to effect or evidence the assignment described above and those documents reasonably requested by Company to apply for and obtain any patent, copyright or other intellectual property rights related to any of the Work Product and to transfer, effect, confirm, perfect, record, preserve, protect and enforce all rights, title and interest transferred hereunder (collectively, "Supporting Documents"). If you fail or refuse to execute any Supporting Documents within thirty business days after receipt of written request, you hereby agree, for yourself and your successors and assigns, to the fullest extent permitted by law, that the Company is hereby irrevocably appointed as your attorney-in-fact with full authority to execute, verify and file any Supporting Documents requested by Company, and to perform all other acts necessary to effect, perfect or evidence the assignments set forth above. You hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which you now or may hereafter have for infringement of any proprietary rights in Work Product assigned hereunder to Company.

You acknowledge and agree that your obligations under this Addendum survive termination of this Agreement and/or your termination of employment with the Company for any reason.

I acknowledge that I have carefully read, understand and agree to the provisions of this Agreement.

Paula Thomas

Date: 12·31·2014

## SCHEDULE 1

Personal Stylist

Designer/stylist for hospitality, transportation, film, TV and music

EXHIBIT "11"



**Date:** Wednesday, April 5, 2017 at 6:41:23 PM Pacific Daylight Time

**From:** Paula Thomas

**Begin forwarded message:**

**From:** Chrisso Collins <chrisso@artofthewilling.com>
**Date:** April 21, 2015 at 11:41:43 AM PDT
**To:** paulathomas@me.com
**Subject: Congratulations xx**

Hey Paula,

Hope you are doing well. I really haven't had the proper opportunity to let you know that I wanted to first congratulate you on your fashion week show it was spectacular. And the after party was super fun too.

Second I wanted to ask you for a job.

Being the Australian charmer I am (haha). I have an extensive network of celebrities, editors and key opinion leaders that I am sure TW can benefit from.
I can also offer my services in design, sales, marketing, events, press & strategy.

Not only this I would be an honor to work with you.

Please have a think about where you might be able to fit me into your organization. I am currently in the process of figuring out where myself and my lovely Dutch lady are going to live for the next few years.

P.S. I have had something on my mind that I haven't had the time to tell you.
When I was at the TW after party I thought your CEO was rather inappropriate.

He said " He loved being the only straight man in fashion "

I asked why ?

He said " because I get to bang as many bitches as I like "

Not something you would expect to come out of the mouth of a CEO from a woman's fashion company. Maybe you should ask your employees how he is with them. Just a thought !!

Miss you love you.

**Chrisso Collins || Art of the Willing**
p: + 1 347 575 0220
chrisso@artofthewilling.com

www.artofthewilling.com

Date:       Friday, April 14, 2017 at 7:42:07 PM Pacific Daylight Time
From:       Paula Thomas



Begin forwarded message:

From: Luis B <luis@flauntmagazine.com>
Date: April 17, 2015 at 1:07:03 PM PDT
To: "paulathomas@me.com" <paulathomas@me.com>
Subject: <no subject>

Dear Paula
I am emailing you because I can not believe what happen today
After John Hanna spoke to me and asked me to extend the payment terms of the 45k invoice ( you still
owe 30k over 1 year ago ) another 6 months due to the company not able to pay due to the lack of
funds (I agreed base on my previous conversations and agreement with Jene ) I got a notice Form
American express that they had requested and got a charge back ( of 10k )on the originally paid 15k
that was done last december. This has put me on a incredible bad situation
I tried calling him but he is not answering the phone . I need you to understand that this has never
happen and is such a Bad way to handle someone that you have had a great relationship and had
supported the brand above and beyond
I send this to my lawyers
I hope we can find a resolution asap
Much love
Luis

# FLAUNT

Luis Barajas *Chief Executive Officer*
1422 N. Highland Ave. Los Angeles. CA 90028
+1 323 836 1000
[flaunt.com]

From: Luis B <luis@fabalogiazine.com>
Date: April 8, 2015 at 9:19:05 AM PDT

Dear Paula

I can not believe what is going on in your office
Jen truly is trying to undermine you in front of your Ceo
She said you force her to run the pages in the magazine after she told you not to do it which is a complete lie
She also said she was not aware what so ever of the cover initiative
She is the one that ask me to factor and pay it in quotes and totally denied all in front of john
She has also convince john that all the choices of fabrics are all your doing and that you made such a bad choices
John said you made him do the show in NYC and that was a fiasco
No sales from it and you spend all the $$$$
It terrible what is happening there


Sent from my iPhone



Date:   Wednesday, April 5, 2017 at 8:10:07 AM Pacific Daylight Time
From:   Paula Thomas

**Begin forwarded message:**

From: Paula Thomas <paulathomas@me.com>
Date: July 2, 2015 at 2:42:30 PM PDT
To: "Michael O. Crain" <mocrain@crainlawgroup.com>
Cc:
Subject: Fwd:



Begin forwarded message:

**From:** Ramona Agruma <r.agruma@delys-joaillerie.com>
**Subject:** Re: Ramona
**Date:** July 1, 2015 at 6:18:49 PM PDT
**To:** "Stephen A. Silverman" <silverman@sjmillaw.com>
**Cc:** "PaulaThomas@Me.com" <paulathomas@me.com>, "emmamur@me.com"
<emmamur@me.com>

Alex (Korean man, turned out to be owner of the factory in Korea, where Thomas Wylde is
produced) was introduced together with John Hanna to me and my friends on February 23 by
Jene Park as new CEO and owners of the company Thomas Wylde with words said by Jene
quote: "welcome to our mafia"

Ramona Agruma
DeLys joaillerie Creative
Director/Founder



Stephen A. Silverman
Silverman & Milligan LLP
10877 Wilshire Blvd., Suite 1606
Los Angeles, CA 90024
direct (310) 586-2424
mobile (310) 488-0960
fax (310) 496-3164
Skype: attysas

Stephen A. Silverman
Silverman & Milligan LLP
10877 Wilshire Boulevard, Suite 1606
Los Angeles, CA 90024
Direct Phone: 310-586-2424
Cell: 424-339-3900

[text illegible]

[text illegible]

Use the PDF Cube Reader on your mobile phone or iPad for directions to our office.

[text illegible]

And to download my Outlook business card:

<image002.jpg>

CONFIDENTIALITY NOTICE: This message is confidential and may be privileged. If you believe that this email has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

DISCLAIMER OF ELECTRONIC TRANSACTION: This communication does not reflect an intention by the sender or the sender's client to conduct a transaction or make any agreement by electronic means. Nothing contained herein shall constitute an electronic signature or a contract under any law, rule or regulation applicable to electronic transmissions.

To reply to our email administrator directly, please send an email to [text illegible]



Date:          Wednesday, April 5, 2017 at 7:49:18 AM Pacific Daylight Time

From:          Paula Thomas

Begin forwarded message:



**From:** Ramona Agruma [mailto:ragruma@dolceisolabella.com]
**Sent:** Monday, August 31, 2015 8:45 AM
**To:** Allyson K. Thompson
**Subject:** Screenshots

Dear Allyson,



her ..

I suggest let her know that she should
mention anything to Paula ..

John Hanna

I do see a big problem especially
when she knows all about what we
are doing  We have legal issues with

●●●○○ Telekom.de  LTE      10:21

**Elna Alexis Dressline**

‹ Chats

filmlink- tell me your feedback;-))

:((( okay darling I will

Heute

Wow check Ramona darling.. She is in



This is a screenshots from what's was messages sent from John Hanna and
Jene Park to my best friend Elna regarding me seeing Paula

# Elna Alexis Dressline



...her know that it does I will come so
fucking hard on her she would not
know what the fuck hit her ..

Calm down guys- Ramona is still
friends with Paula- you know tha
don't see a problem when she m
her....

## John Hanna

I do see a big problem especially
when she knows all about what we
are doing .. We have legal issues with
Paula ..
This is wrong on every level .. The fact
we to care of her while she was in
LA .. One should ask one self what did
Paula do for her ..  For Romana to
speak to Paula first that shows
loyalty ..  She does have to call me
she should call Jene .. I bit you she

busy enough to hang out with Paula....
Amazing I don't need this

Okay... John will be NOT happy to see that...

I value a friend with loyalty... I am certainly not happy with that.

John Hanna

Let her know that after the number of times I took care of her she does not have the decency to call and say hello .. Please gave her a message not call me ever again .. I hope she does not talk to Paula about our deals .. Let her know that if does I will come so fucking hard on her she would not know what the fuck hit her ..




Ramona Agruma
DeLys joaillerie Creative
Director/Founder



Date:    Wednesday, April 5, 2017 at 6:28:49 PM Pacific Daylight Time

From:    Paula Thomas

To:      . . . .

Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
Date: February 24, 2016 at 5:38:55 PM PST
To: Laura Cell Hess <lhess@kringandchung.com>, "Allyson K. Thompson"
<athompson@kringandchung.com>
Subject: ▓▓▓▓▓▓▓▓▓▓▓



From: ezequiel jay <Tony@jaycme.com>
Date: October 9, 2015 at 1:08:37 AM PDT
To: Paula Thomas Personal <paulathomas@me.com>
Subject: My letter

Hi Paula,

Please see this letter I wrote declaring on what happened to
me.

On February 18, 2015 at the celebration party for the New
York Fashion Week runway show for Thomas Wylde, I was
approached at first in a freindly manner by John Hanna, CFO
of the brand. He invited me to join him in a shot of tequila at
the bar. I quickly realized that he was already inebriated but
he was very forceful and insistent that we talk. John
launched into an aggressive barrage of hatred aimed at Paula
Thomas. He believed that Paula had talked about him

success of the brand was due to his work and ingenuity, not
Paula's. He became more and more belligerent and began
threatening in a vicious manner to "destroy her" (Paula) and
that "she won't even see it coming". He was so enraged that

and embarrassed - for myself and him - by this exchange and
tried to diffuse the situation. Later in the evening he
approached me again in the same aggressive manner, this
time I was with my girlfriend, who he attempted to kiss (with
his wife standing nearby) and I was forced to push him away.
His behavior was witnessed by other guests of the party and
was completely out of line for anyone, let alone a major
representative of the company everyone was there to
celebrate. It became clear to me that he had a vengeful plan
to ruin Paula Thomas and destroy her stake in the company
and her reputation.


JAY
C.M.G.
TONY JAY
T. + 917.974.3833
E. TONY@JAYCMG.COM


WWW.PAULATHOMAS.WORLD

paulathomas@me.com



Date:    Friday, April 14, 2017 at 9:07:42 PM Pacific Daylight Time

From:    Paula Thomas

**Begin forwarded message:**

From: Elena Davidyants <edavidyants@mail.ru>
Date: November 17, 2015 at 7:41:06 AM PST
To: "paulathomas@me.com" <paulathomas@me.com>

Dear Paula,

How are you? I would like to share some very unpleasant accident happened to me during my visit to Paris fashion week in October.

I went to dinner with my colleagues and friends to hotel Costes in Paris after my long day of work. Jene Park came to me during my dinner and asking to come to the showroom to see the collection.She acted as we would be friends, very unprofessional. I told her that I am not going to see the collection, because Thomas Wylde is not the same without you-Paula Thomas. I also said that you are my friend and that I would not support something if you are not there anymore.

10 min later, Jene Park brought John Hanna to the table. He started to scream and shout on me in front of other people and telling you are a "bitch mother fucker", "horrible person". That was so unexceptable, his vocabulary and voice. I am a buyer and not his friend or girlfriend. I was shocked that a man would talk to me like that. He was abusing you with his words in front of everybody.

When he finished to scream, I just said to him "you finished? I got it. Now please let me just enjoy my dinner.

I respect you very much as a designer, creative person and a friend. I am very proud of your achievements in the industry, because I know how hard it is and I am very sad to share this information with you. I've been knowing you for so many years. I decided you have to know about this, what happened.

Yours sincerely,
Elena Davidyants

Отправлено с iPhone



Subject:

Date:     Wednesday, April 5, 2017 at 8:18:05 AM Pacific Daylight Time

From:     Paula Thomas



Begin forwarded message:

From: Diana Pistalu <dianap@lmm-models.com>
Date: February 11, 2016 at 12:50:37 PM PST
To: paulathomas@me.com
Subject: Dear Paula

Dear Paula,

I am truly sorry for the trouble you are having with John Hanna and Jene Park.

I just want to let you know the following things because i was shocked about the attitude of John
Hanna and Jene Park, after we met at the Fashion week in New York in February 2015.

I met both of them after the NYFW at Cecconis's in West Hollywood again, because they invited us for
dinner. Already that night, they were very rude towards you, especially John Hana.
I met them several times during that trip to Los Angeles and was annoyed about the gossip about you.
John Hanna told us, because there were more people around, that you asked your daughter to carry
out your child, because you were not able to do it, due to your disease. Also he mentioned several
times that you were not able to run a company, to design new collections and continue your work as a
designer.

In April 2015 during my next trip to Los Angeles, both John Hanna and Jene Park were still telling
horrible things about you. Most of the times regarding your health and that you were not able to work
in a team, that you got paid to leave the company and would not be able to design anymore.

I am truly sorry to send you this email but I think that these things should be revealed.

All the best,

Diana Pistalu



**Date:** Wednesday, April 5, 2017 at 8:20:55 AM Pacific Daylight Time
**From:** Paula Thomas

**From:** Eina Margret zu Bentheim und Steinfurt <erbprinzessin@fuerstbentheim.de>
**Date:** February 16, 2016 at 10:25:22 AM PST
**To:** "paulathomas@me.com" <paulathomas@me.com>
**Cc:** Ramona Agruma <r.agruma@delys-joaillerie.com>
**Subject:** John & Jene

Dear Paula,

I want to inform you about all the details were said and happend to me since I've met John Hanna and Jene Park in February 2015. First of all I'm shocked about the fact how John Hanna was lying and telling very bad things about you as a person, but besides that Hanna and Park were trying to make me do business with them, I'm glad I didn't!
I've met Hanna on February 23, 2015 at Cecconis in LA for the first time. I was invited there by Jene Park through Ramona. Both Ramona and Diana were at the dinner too, Alex Park was at the dinner with us and was introduced by Jene Park as the new investor for Thomas Wylde. Before that dinner, the girls and I were told by Park not to mention anything about you during the dinner, which I found very strange.

Since that dinner Hanna and Park were acting as if you are no longer in the company. First they would say you are just out of the office whenever I've asked about you, but worse things began in April from April 7 to April 20, 2015 during my second trip to LA.

Hanna and Park were constantly proposing to me do business with them on a dress line under Thomas Wylde, they proposed to do a TV show with them and even filmed a teaser with me for a production company. The teaser was filmed at Jene Parks house and Thomas Wylde office on April 17 to April 19, 2015 by son of Hanna.
Around April 12, 2015, Hanna told me that he bought you out of the company for 2 or 3 million dollars and that you're never gonna come back. Hanna and Park also introduced me to all employees at Thomas Wylde and told to employees that they gonna work with me soon.

Hanna was really bad in his vocabulary using horrible words calling you "bitch", "whore", "mentally sick" and the list goes on.

mentally sick, that you wanted to impregnant your daughter with a child from your boyfriend, because you can't have kids after having cancer. Both Hanna and Park were very manipulative and tried hard to make you a monster in everybody's eyes.

Next trip, when Ramona went alone to LA, she met you and you both went to Hollywood bowl with friends. After your friend Emma posted a picture on social media, immediately Hanna and Park started texting me that I should warn Ramona not to tell anything about their deals – otherwise he said he will kick her ass. They were nasty in their wordings, especially Hanna. That's when I realize that all what they said and done was behind your back and was a lie.
I was totally shocked because I did not hear from them so often regarding our business but because of a facebook post they both kept texting me!!

I am so sorry Paula, I have to deliver this information to you, it must be devastating. As I know how hard you've worked to build this brand and how you are loved within the fashion community. Ever since I've interviewed you for my show in early 2014 during Paris fashion week, I was inspired by you and adore you as an empowering woman who build the big fashion brand by herself.
I'm so sorry that this all happend, if I would have known what really is going on I would not even come close to these people.
Whatever you need from me, just know I am here to help.

Yours Sincerely,

Herzlichst
Elna-Margret zu Bentheim

I.D.
Elna-Margret Prinzessin zu Bentheim und Steinfurt
Burgstr. 16
48565 Steinfurt

+49 151 172 00 510
elna.margret@fuersibentheim.de
www.elnamargretzubentheim.de

Subject: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Date: Tuesday, April 4, 2017 at 10:21:49 AM Pacific Daylight Time
From: Paula Thomas



Begin forwarded message:

From: Ramona Agruma <ragruma@delys-joaillerie.com>
Date: February 17, 2016 at 1:14:07 PM PST
To: Paula Thomas <paulathomas@me.com>
Subject: Hanna and Park

Dear Paula,

I'm writing you this email with all details in one letter. So I can be sure nothing has been missed.
I was introduced to John Hanna by Jene Park on February 23, 2015 in Los Angeles at Cecconis
restaurant 5 days after Thomas Wylde show in New York which I've attended. There were 6 people at
the dinner table including me, Diana Pistalu, Elna-Margret Zu Bentheim, Jene Park, John Hanna, Alex
Park. Dinner was organized by Park and Hanna to introduce my friends Diana and Elna and myself to
new investor and CEO of Thomas Wylde. Before the dinner, I've received a text message from Park with
asking me not to mention anything about you during the dinner and also ask my friends to do the
same. Park wrote that she would explain me later why.
As soon as my friends and I came to the dinner table, Park said: "Welcome to the Mafia!" After she
introduced Alex as an investor and Hanna as a new Ceo.
I went outside to have a cigarette and Hanna was following me, though he is not smoking. At this point
Hanna proceeded to defame and spoke very badly about you.
He said:
1-Paula is a whore
2-TW employees hate Paula and it's very difficult to work with her
3-Paula is the ugliest person from inside and out
I was shocked by this and told him I'm friends with you and I don't want him talking bad about you. The
moment he told me these things, I knew they are not true, because I've been knowing you for so long.
And I always new how generous and great, loving person you are.
He also was complaining that you have a nice house in Palm Springs.
Things went more ugly during my second trip to LA from April 7 to 21, 2015
One of these days was lunch at Nobu in Malibu on April 12
Hanna said again:
1-Paula is an ugly person-inside out
2-Paula could not have children-quote "Imagine how mentally sick is Paula-she can't have children

her movements!!!! This is so sick." Then Hanna repeated several times "Imagine Paula wants her daughter to carry Paula's child"

Hanna told me that he bought you out for 3 million dollars and he let you keep the house in Palm Springs.

Hanna she said couple of times that he kicked you out of the company and you signed some papers on this subject and you will never be allowed to come back.

He called you a bitch.

I was so shocked and I asked him to stop talking about you and so did Diana and Elna, but he would keep speak badly when ever he had a chance.

Hanna and Park also tried to make Elna do business with them–new dress line and reality TV show, they were filming teaser in Parks house and also in Thomas Wylde store and office. Rosetta Bain supposed to be producer of the show, she was there while son of John Hanna was a camera man.

Jene Park was acting as a victim, tried to give an impression how hard it was for her working with you and that you are ungrateful person. She also told me that she wants to have own brand, that her daughters gonna own when they will turn 16, so they will be famous like Olsen sisters.

As you know I've tried to reach out to you and tell you all this going on behind your back, but you were not responding and now I know why. I know you for many years and you've been and you are my friend. I was frustrated. Then finally I came back to LA in June 2015 and Emma and her husband invited you and me to Hollywood Bowl on June 21, 2015. Emma posted one picture of 4 of us on Instagram and Facebook. After this picture was posted, the same day Hanna and Park started to attack my best friend Elna with text messages (you have the screenshots of these). Elna was not even here, she was in Germany. Hanna wrote to Elna that he would go fucking hard on me that I will not know what the fuck hit me if I will tell you anything about their deals. I'm sorry for this vocabulary but that's how Hanna worded it. Of course Elna as my friend forwarded me all text messages. Buy the way Hanna and Park didn't try to reach out to me, but then Park started to call Diana to Germany and complaining to her about what a bad person I am that I went to Hollywood bowl with you and I am friends with you.

I've never experienced such a pressure from someone in my life. I was so scared of Hanna's and Parks threats that at one point I even went to the lawyer and asked him to write down everything in case something happens to me. I didn't know what to expect from these two individuals.

All I can say John Hanna and Jene Park are the most evil people I have ever met and I saw you struggling and being depressed for so long. They were trying to destroy you in anyway they could, to steal and take credit of everything you've built, done and designed with your hard work.

Be strong and you know I'm gonna go to trial if needed to tell everything in front of the judge.

Yours truly,
Ramona


Ramona Agruma

EXHIBIT "12"

This Indemnity Agreement (the "Agreement") is entered into by and between Thomas Wylde, LLC ("Company"), the undersigned members of the Company ("Members") and Paula Thomas ("Paula"), effective December 22, 2014 (the "Effective Date").

A.    Prior to or contemporaneous with this Agreement, Paula has made a capital contribution to Company of cash and intellectual property.

B.    As a material inducement to Paula to make such capital contribution, the Company agrees indemnify Paula and hold her harmless from any personal liability for certain obligations of PDTW, LLC.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Indemnity. Company agrees to indemnify, defend, and hold Paula harmless from and against any personal liability arising from or related to: (a) any loans from CBC Partners I, LLC and/or its affiliates to PDTW, (b) any advances or terms provided to PDTW by Da Da Trading Co., Ltd and/or its affiliates, (c) any advances by Finance 1 and/or its affiliates to PDTW, (d) any loans to PDTW from Steven John Prestemon and/or his affiliates, (e) any obligations under the lease agreement between LCCP Blackwelder Fee Owner LLC, as amended, for the space commonly known as 3237 La Cienega Blvd. and 3233 La Cienega Blvd. (the "Lease") and those arising out of or related thereto, and (f) any obligations of PDTW LLC to its employees and trade vendors incurred as of the date of this Agreement.

2.    Lease Assignment. It is the intention of the parties to attempt to negotiate an assignment of the Lease from PDTW to the Company. Company agrees to make reasonable and good faith efforts to obtain such as assignment. If such assignment is not possible due to the landlord's actions, then Company shall attempt to sublease the premises from PDTW for the sum of all payments that PDTW is required to make under the Lease.

3.    Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

4.    Necessary Actions. Each party shall execute and deliver any documents or instruments and take any action reasonably required to effectuate the transaction contemplated by this Agreement.

5.    Waiver and Amendment. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

6.    Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

7.    Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision,

nor its severance and hereof, shall affect the validity of the remaining provisions of this Agreement.

8.    Governing Law And Venue. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

9.    Drafting. All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

10.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

THOMAS WYLDE, LLC

_____    _____
John Hanna    John Hanna, Manager

_____    _____
Jene Park    Doug Lee

_____    _____
Roger Kuo    Paula Thomas

competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, ... ... ... ... ... deletion ... shall affect the validity of the remaining provisions of this Agreement.

... ... ...

for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.    Drafting.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

10.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

THOMAS WYLDE, LLC

_____          _____
John Hanna                        John Hanna, Manager

_____          _____
Jene Park                         Doug Lee

_____          _____
Roger Kuo                         Paula Thomas

# EXHIBIT "13"



## Business Search - Results

| Entity Number | Registration Date | Status | Entity Name | Jurisdiction | Agent for Service of Process |
|---|---|---|---|---|---|
| 201328900269 | 10/16/2013 | CANCELED | THOMAS WYLDE HOLDINGS, LLC | CALIFORNIA | PAULA THOMAS |



| Document Type | File Date | PDF |
|---|---|---|
| CANCELLATION | 05/27/2015 | |
| SI-COMPLETE | 11/18/2013 | |
| REGISTRATION | 10/18/2013 | |

| LLC-1 | Articles of Organization of a Limited Liability Company (LLC) | 2 0 1 3 2 8 9 1 0 2 8 2 |

The form is a limited liability company ... the law ... company fill out this form.

- A $70 filing fee.

- A separate, non-refundable $15 service fee also must be included, if you drop off the completed form or document.

**Important!** LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

Note: *Before submitting the completed form, you should consult with a private attorney for advice about your specific business needs.*

**FILED**
**Secretary of State**
**State of California**

**OCT 1 6 2013**

ICC      This Space For Office Use Only

For questions about this form, go to www.sos.ca.gov/business/be/filing-tips.htm.

**LLC Name**

① Thomas Wylde Holdings, LLC
   *Proposed LLC Name*
   The name must end with "LLC," "L.L.C.," "Limited Liability Company," "Limited Liability Co.," "Ltd. Liability Co." or "Ltd. Liability Company" and may not include: "bank," "trust," "trustee," "incorporated," "inc.," "corporation," or "corp.," "insurer," or "insurance company." For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act.

**LLC Addresses**

③ a. 3231 S. La Cienega Blvd, Unit A, Los Angeles, CA 90016
      *Initial Street Address of LLC*                City (no abbreviations)        State    Zip

   b. _____
      *Initial Mailing Address of LLC, if different from 3a*      City (no abbreviations)      State    Zip

**Service of Process** (List a California resident or an active 1505 corporation in California that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. Do not list an address if the agent is a 1505 corporation.)

④ a. Paula Thomas
      *Agent's Name*

   b. 3231 S. La Cienega Blvd, Unit A            Los Angeles            CA  90016
      *Agent's Street Address (if agent is not a corporation)*    City (no abbreviations)    State   Zip

**Management** (Check only one.)

⑤ The LLC will be managed by:

   [✓] One Manager    [ ] More Than One Manager    [ ] All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

Organizer - Sign here

PAULA THOMAS
*Print your name here*

Make check/money order payable to: **Secretary of State**
Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee.

**By Mail**
Secretary of State
Business Entities, P.O. Box 944228
Sacramento, CA 94244-2280

**Drop-Off**
Secretary of State
1500 11th Street, 3rd Floor
Sacramento, CA 95814

Corporations Code §§ 17051, 17052, 17375; Revenue and Taxation Code § 17941
LLC-1 (REV 01/2013)

2013 California Secretary of State
www.sos.ca.gov/business/be

**State of California**

## Secretary of State

68

FILED
State of California

NOV 1 2 2013

21/PC

This Space For Filing Use Only

Filing Fee $20.00. If this is an amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. LIMITED LIABILITY COMPANY NAME

Thomas Wylde Holdings, LLC

**File Number and State or Place of Organization**

2. SECRETARY OF STATE FILE NUMBER  201328910282

3. STATE OR PLACE OF ORGANIZATION (if formed outside of California)

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 15.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 3231 S. La Cienega Blvd., Unit A | Los Angeles | CA | 90016 |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | CITY | STATE | ZIP CODE |
| 7. STREET ADDRESS OF CALIFORNIA OFFICE | 3231 S. La Cienega Blvd., Unit A | Los Angeles | CA | 90016 |

**Name and Complete Address of the Chief Executive Officer, if Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| Paula Thomas | 3231 S. La Cienega Blvd., Unit A | Los Angeles | CA | 90016 |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| | NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 9. | Paula Thomas | 3231 S. La Cienega Blvd., Unit A | Los Angeles | CA | 90016 |
| 10. | NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 11. | NAME | ADDRESS | CITY | STATE | ZIP CODE |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

12. NAME OF AGENT FOR SERVICE OF PROCESS
Paula Thomas

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3231 S. La Cienega Blvd., Unit A | Los Angeles | CA | 90016 |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

Intellectual Property Development and Management

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |
|---|---|---|---|
| 10/29/13 | Paula Thomas | CEO | |

LLC-12 (REV 01/2013)  APPROVED BY SECRETARY OF STATE

**LLC-4/7**

# Certificate of Cancellation
## of a Limited Liability Company (LLC)

To cancel the Articles of Organization of a California LLC, or the Certificate of Registration of a registered foreign LLC, you can fill out this form, and

- Be included, if you drop off the completed form.
- To file this form, the status of your LLC must be active on the records of the California Secretary of State. To check the status of the LLC, go to kepler.sos.ca.gov.

**Important!** California LLCs only: This form must be filed after or together with a Certificate of Dissolution (Form LLC-3). However, if the vote to dissolve was made by all of the members and that fact is noted in Item 4 below, Form LLC-3 is not required.

**Note:** *Before submitting the completed form,* you should consult with a private attorney for advice about your specific business needs. It is recommended for proof of submittal that if this form is mailed, it be sent by Certified Mail with Return Receipt Requested.

FILED
Secretary of State
State of California

**JAN 27 2015**

*This Space For Office Use Only*

For questions about this form, go to *www.sos.ca.gov/business-programs/business-entities/filing-tips*

① **LLC's Exact Name in CA** (on file with CA Secretary of State)

THOMAS WYLDE HOLDINGS, LLC

② **LLC File No.** (issued by CA Secretary of State)

**201328910282**

**Tax Liability** (The following statement should not be altered. For information about final tax returns, go to https://www.ftb.ca.gov or call the California Franchise Tax Board at (800) 852-5711 (from within the U.S.) or (916) 845-6500 (from outside the U.S.).)

③ All final returns required under the California Revenue and Taxation Code have been or will be filed with the California Franchise Tax Board.

**Dissolution** (California LLCs ONLY: Check the box if the vote to dissolve was made by the vote of all the members.)

④ ☑ The dissolution was made by the vote of all of the members.

**Additional Information** (If any, list any other information the persons filing this form determine to include.)

⑤ _____

_____

**Cancellation** (The following statement should not be altered.)

⑥ Upon the effective date of this Certificate of Cancellation, this LLC's Articles of Organization (CA LLCs) or Certificate of Registration (registered foreign LLCs) will be cancelled and its powers, rights and privileges will cease in California.

**Read and sign below:** For California LLCs: This form must be signed by a majority of the managers, unless the LLC has had no members for 90 consecutive days, in which case the form must be signed by the person(s) authorized to wind up the LLC's affairs. For registered foreign LLCs: This form must be signed by a person authorized to so do under the laws of the foreign jurisdiction. If the signing person is a trust or another entity, go to www.sos.ca.gov/business-programs/business-entities/filing-tips for more information. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are part of this document.

| | | |
|---|---|---|
| Sign here | Paula Thomas | Manager |
| | *Print your name here* | *Your business title* |
| Sign here | | |
| | *Print your name here* | *Your business title* |

**Make check/money order payable to:** Secretary of State
To get a copy of the filed document, include a separate request and payment for copy fees when the document is submitted. Copy fees are $1 for the first page and $.50 for each additional page. For certified copies, there is an additional $5 certification fee, per copy.

**By Mail**
Secretary of State
Business Entities, P.O. Box 944228
Sacramento, CA 94244-2280

**Drop-Off**
Secretary of State
1500 11th Street, 3rd Floor
Sacramento, CA 95814

Corporations Code §§ 17707.03, 17707.04, 17707.05, 17708.06
LLC-4/7 (REV 12/2014)

2014 California Secretary of State
www.sos.ca.gov/business-programs

# EXHIBIT "14"

Subject:

Date:    Wednesday, May 17, 2017 at 8:10:52 AM Pacific Daylight Time

From:    Paula Thomas



Begin forwarded message:

**From:** Roger Kuo <roger@z1ber.com>
**Date:** February 21, 2015 at 11:40:29 PM PST
**To:** Paula Thomas <paula@thomaswylde.com>, Doug Lee <dlee@lpdirect.com>, Stephen
Choi <stephen@choisite.com>, John Hanna <johnhanna@thomaswylde.com>, Jene Park
<jene@thomaswylde.com>
**Subject:** Re: Happy birthday

Dear Paula,
Happy Belated Birthday! I want to second what Doug said about the show. It
was an amazing experience and you and the team pulled it off perfectly.
The styling, the music, the models, everything was incredible. One of the
wives said that it made her really emotional - she actually teared up as
the show came to a close. That's high praise and a testament to the hard
work that you and the team put into our first runway show. Congratulations
to all!

Cheers,
Roger

ZTHER INTERACTIVE
ROGER KUO, PARTNER

office: 714 237 9990 | cell: 714 293 6739 | fax: 714 237 9991

http://zther.com <http://zther.com/>

The information contained in this message may be privileged and/or
confidential. If the reader of this message is not the intended recipient,
or an employee or agent responsible for delivering this message to the
intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If
you have received this message in error, please notify us immediately by
replying to this message and then deleting it from your computer.

On 2/21/15, 10:04 AM, "Paula Thomas" <paula@thomaswylde.com> wrote:

Dear Doug

Firstly thank you for your lovely birthday message


Dear All


Just wanted to take the time to reach out and say what a great show and I

know you all had a great experience - I feel we are now on our way to a

very prosperous future

Our teams we had were incredible they worked so hard to give us an

amazing event that the whole fashion world saw and embraced


I only wished I would have had a little more time to hang out with you

guys but these kind of shows take your full focus and attention

amazing by the way please let them know I said that

i saw and heard how much you guys enjoyed it and i want to say thank you

From casting to styling and production we could not have had better

people

New York is the hardest city to crack but I feel they  embraced us in an

amazing way setting us up for future success

I am personally so proud of what we accomplished the whole world saw
the

brand for the first time the way it should be seen that was amazing and

the press loved it !!

I am so excited to see what the sales team do now after all the great

press we have

Congratulations to all we did it

Have a great day

Paula

Sent from my iPhone

> On Feb 20, 2015, at 4:53 PM, Doug Lee <dlee@lpdirect.com>
> wrote:

Happy birthday!! I also wanted to congratulate you on a

It was correct - Stephen, shared model and the wives were all very

impressed.  Look forward to meeting up soon.

Sent from my iPhone



Subject:

Date:    Monday, May 29, 2017 at 6:21:03 PM Pacific Daylight Time

From:    Paula Thomas

To:



Begin forwarded message:

> **From:** Chrisso Collins <chrisso@artofthewilling.com>
> **Date:** April 21, 2015 at 11:41:43 AM PDT
> **To:** paulathomas@me.com
> **Subject: Congratulations xx**

Hey Paula,

Hope you are doing well. I really haven't had the proper opportunity to let you know that I wanted to first congratulate you on your fashion week show It was spectacular. And the after party was super fun too.

Second I wanted to ask you for a job.

Being the Australian charmer I am (haha). I have an extensive network of celebrities, editors and key opinion leaders that I am sure TW can benefit from.
I can also offer my services in design, sales, marketing, events, press & strategy.

Not only this I would be an honor to work with you.

Please have a think about where you might be able to fit me into your organization. I am currently in the process of figuring out where myself and my lovely Dutch lady are going to live for the next few years.

P.S. I have had something on my mind that I haven't had the time to tell you.
When I was at the TW after party I thought your CEO was rather inappropriate.

He said " He loved being the only straight man in fashion "

I asked why ?

He said " because I get to bang as many bitches as I like "

company. Maybe you should ask your employees how he is with them. Just a thought. It

Miss you love you.

--
Chrisso Collins ii Art of the Willing
p: + 1 347 575 0220
chrisso@artofthewilling.com

www.artofthewilling.com

**Subject:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Date:** Monday, May 29, 2017 at 7:21:51 PM Pacific Daylight Time

**From:** Paula Thomas

**To:** ▓▓▓▓▓▓ ▓▓▓▓▓

Begin forwarded message:

> **From:** Paula Thomas <paulathomas@me.com>
> **Date:** August 13, 2015 at 10:06:51 AM PDT
> **To:** Charles J Wisch <cjwisch@wischlaw.com>
> **Subject:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
**Subject:** 
Date: February 23, 2015 at 12:54:16 PM PST
To: OGoodkin@GreenbergGlusker.com

Begin forwarded message:

> **From:** Kate Greene <kate.greene@givaudan.com>
> **Subject: Bravo Team TWM!**
> **Date:** February 19, 2015 at 4:47:25 PM PST
> **To:** <john@thomaswylde.com>,
> <jene@thomaswylde.com>,
> <paula@thomaswylde.com>, <karenioli@aol.com>
> **Cc:** Rose Eckert <rose.eckert@givaudan.com>
>
> Dear Paula, Jene, John and Karen:
> Thank you so much for a very special day that started with a
> very special show and ended with a very special meeting!
> And yes, with some very special people!
>
> Paula and team- Congratulations on the great coverage on
> your debut in today's WWD- "Rock 'n' Roll Chic is what Paula
> Thomas does best"!
> You certainly enchanted all of us!
>
> We were so honored to be your guests at the show and to
> host your visit to our studio. We LOVED our conversation
> and look forward to exploring fragrance opportunities with
> you all! Thank you Karen for the introduction!
>
> Rose and I were just so impressed by you all and so inspired
> by your beautiful brand full of storytelling and beauty!
>
> HOPE TO SEE YOU ALL SOON!
> WARMEST
> Kate
>
>
> --
> Kate Greene
> VP Fine Fragrance Marketing
>
> Phone: +12126498639, Mobile: +12018036341

Givaudan Fragrances Corp., 40 W. 57th Street, 11th
Floor, NY-10019 New York, United States


Paula Thomas
paula.thomas@ffis.com

WWW.PAULATHOMAS.WORLD



0 Comments

Sort by   Olde





# INDUSTRY STANDARDS

# Will be Produced at a Later Time

# EXHIBIT "15"



Subject:

Date:

From: Paula Thomas

Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
Date: August 13, 2015 at 10:06:51 AM PDT
To: Charles J Wisch <cjwisch@wischlaw.com>
Subject:

Begin forwarded message:

**Subject:** ████████████
Date: February 23, 2015 at 12:54:16 PM PST
To: OGoodkin@GreenbergGlusker.com

Begin forwarded message:

> **From:** Kate Greene <kate.greene@givaudan.com>
> **Subject: Bravo Team TWM!**
> **Date:** February 19, 2015 at 4:47:25 PM PST
> **To:** <john@thomaswylde.com>,
> <jene@thomaswylde.com>,
> <paula@thomaswylde.com>, <karenioli@aol.com>
> **Cc:** Rose Eckert <rose.eckert@givaudan.com>
>
> Dear Paula, Jene, John and Karen:
> Thank you so much for a very special day that started with a
> very special show and ended with a very special meeting!
> And yes, with some very special people!
>
> Paula and team- Congratulations on the great coverage on
> your debut in today's WWD- "Rock 'n' Roll Chic is what Paula
> Thomas does best"!
> You certainly enchanted all of us!
>
> We were so honored to be your guests at the show and to
> host your visit to our studio. We LOVED our conversation
> and look forward to exploring fragrance opportunities with
> you all! Thank you Karen for the introduction!
>
> Rose and I were just so impressed by you all and so inspired
> by your beautiful brand full of storytelling and beauty!
>
> HOPE TO SEE YOU ALL SOON!
> WARMEST
> Kate
>
>
> Kate Greene
> VP Fine Fragrance Marketing
>
> Phone: +12126498839. Mobile: +12018036341

Givaudan Fragrances Corp., 40 W. 57th Street, 11th
Floor, NY-10019 New York, United States

Paula Thomas

paulathomas@me.com

WWW.PAULATHOMAS.WORLD

# EXHIBIT "16"



Date:    Monday, May 29, 2017 at 6:18:58 PM Pacific Daylight Time
From:    Paula Thomas





Begin forwarded message:

From: ezequiel jay <Tony@jaycmg.com>
Date: October 9, 2015 at 1:08:37 AM PDT
To: Paula Thomas Personal <paulathomas@me.com>
Subject: My letter

Hi Paula,

Please see this letter I wrote declaring on what happened to me.

On February 18, 2015 at the celebration party for the New York Fashion Week runway show for Thomas Wylde, I was approached at first in a freindly manner by John Hanna, CFO of the brand. He invited me to join him in a shot of tequila at the bar. I quickly realized that he was already inebriated but he was very forceful and insistent that we talk. John launched into an aggressive barrage of hatred aimed at Paula Thomas. He believed that Paula had talked about him behind his back and called him a moron. He felt that the success of the brand was due to his work and ingenuity, not Paula's. He became more and more belligerent and began threatening in a vicious manner to "destroy her" (Paula) and that "she won't even see it coming". He was so enraged that he was spitting in my face and causing a scene that was noticed by the other guests. I was completely taken aback and embarrassed - for myself and him - by this exchange and tried to diffuse the situation. Later in the evening he approached me again in the same aggressive manner, this time I was with my girlfriend, who he attempted to kiss (with his wife standing nearby) and I was forced to push him away. His behavior was witnessed by other guests of the party and was completely out of line for anyone, let alone a major representative of the company everyone was there to celebrate. It became clear to me that he had a vengeful plan to ruin Paula Thomas and destroy her stake in the company and her reputation.

JAY
C.M.G.
TONY JAY
T. + 917.974.3933
E. TONY@JAYCMG.COM
Sent from my T-Mobile 4G LTE Device

# EXHIBIT "17"



Date:          Thursday, April 6, 2017 at 1:01:58 PM Pacific Daylight Time

From:          Paula Thomas

Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
Date: August 19, 2015 at 5:16:00 PM PDT
To: "Allyson K. Thompson" <athompson@krimandchung.com>
Subject:

Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
Subject:
Date: July 14, 2015 at 1:48:26 PM PDT
To: Ramona Agruma <ragruma@delys-jcallerie.com>



*** Vodafone.de 🖤 01:03

‹ Phone     **Jene park**

I would love to invite all of you
to dinner and meet my CEO

Oh darling!!!

What time?

We have a reservation at
craigs but I think we can
cancel it

Ok just come to Cecconis my
CEO really want to meet you
guys

7:00 

We will wine and dine you

Please tell the girls not to talk
about Paula tonight. Don't ask







Miss Paula Thomas
paulathomas@me.com

WWW.PAULATHOMAS.WORLD

Paula Thomas
paulathomas@me.com

WWW.PAULATHOMAS.WORLD

EXHIBIT "18"

**Date:**  Wednesday, April 12, 2017 at 5:45:19 PM Pacific Daylight Time

**From:**  Paula Thomas



**From:** "Goodkin, Olivia" <ogoodkin@greenbergglusker.com>
**Date:** April 2, 2015 at 10:27:15 AM PDT
**To:** Paula Thomas <paulathomas@me.com>
**Subject:**

**From:** Paula Thomas [mailto:paulathomas@me.com]
**Sent:** Thursday, April 02, 2015 10:19 AM
**To:** Goodkin, Olivia
**Subject:**



Sent from my iPhone

On Apr 2, 2015, at 10:13 AM, Goodkin, Olivia <ogoodkin@greenbergglusker.com> wrote:

Olivia Goodkin | **Chair, Employment Group** | **Biography**
D: 310.201.7446 | F: 310.201.2334 | OGoodkin@greenbergglusker.com
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

We inform you that any U.S. tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (i)
avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or
recommending to another party any tax-related matters addressed herein.

and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email messags along with all attachments. Thank you.

Sent: Thursday, April 02, 2015 8:08 AM
To: Goodkin, Olivia
Subject: ████████████████████████████████████████

Begin forwarded message:

> **From:** Paula Thomas <paula@thomaswylde.com>
> **Date:** April 2, 2015 at 8:03:47 AM PDT
> **To:** "paulathomas@me.com" <paulathomas@me.com>
> **Subject:**

Please help save the trees, print this email only if necessary.

This E-mail and any of its attachments may contain THOMAS WYLDE proprietary information, which is privileged, confidential, and/or subject to copyright law, belonging to THOMAS WYLDE, its affiliates or clients. This E-mail is intended solely for the use of the individual or entity to which it is addressed.   If you are not the intended recipient of this E-mail, any dissemination, distribution, copying, or action taken in relation to this E-mail is strictly prohibited. If you have received this E-mail in error, please notify the sender immediately

Begin forwarded message:

**From: John Hanna <johnhanna@thomaswylde.com>**
**Subject: Re: Regarding extra 15 styles for Maison and**
**TW Los Angeles**
**Date: April 2, 2015 at 7:06:51 AM PDT**
**To: Giselle Limtao <giselle@thomaswylde.com>**
**Cc: John Hanna <johnhanna@thomaswylde.com>**

Giselle.. please go ahead and do it .. do not consult with any one
but Jene .. thank you
Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

phone:        310 559 5549
mobile:       310 770 3741

email:        info.hanna@ThomasWylde.com

On Apr 1, 2015, at 11:47 PM, Giselle Limtao
<giselle@thomaswylde.com> wrote:

Hi John,

I just wanted to double check, but in regards to the 15 additional
styles that i can add to each collection.
I know I'm not supposed consult Paula about the styles, however
should I still keep her in the loop that I will be doing this?

I was going to make a separate section with the sketches I want to
add on the board.

Thank you!

Best Regards,

GISELLE LIMTAO
Director of Design

## THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

phone:      +1 310 559 5549
email:      giselle@thomaswylde.com

www.thomaswylde.com
www.facebook.com/thomaswylde
www.twitter.com/thomas_wylde
www.youtube.com/thomaswyldeofficial

Date:   Sunday, May 14, 2017 at 9:31:00 AM Pacific Daylight Time

From:   Paula Thomas



Begin forwarded message:

**From:** David Schnider <david@schniderlaw.com>
**Date:** February 13, 2015 at 3:39:02 PM PST
**To:** Paula Thomas <paulathomas@me.com>
**Subject:** Re: SS 16 / concept

Paula:

I don't want to downplay your concern, but this reads as Giselle went to Jene with the concept and Jene gave feedback, as you would expect your sales department to do. Regardless, this isn't something that can be solved immediately or by email. I think you have to stick with exactly what you told John, which is that you have concerns and they need to be addressed in a meeting when you are all back from New York. I think this is ripe for a discussion, but it will likely need to be a long meeting in person. I think it is reasonable at that meeting to voice your feelings and to have Jene do the same. If the business is going to survive, you, John, and Jene need to come to some understandings about how it is going to work and we need to put everything on the table. But I don't think that can be done until the show is over and we are all back here.

David


SCHNIDERLAW

15165 Ventura Blvd., Ste. 245
Sherman Oaks, CA 91403

david@schniderlaw.com
www.schniderlaw.com
(818) 207-5134


On Feb 13, 2015, at 3:07 PM, Paula Thomas <paulathomas@me.com> wrote:

This needs to stop - what do I do !!!!!

Thank you David I am furious

Begin forwarded message:

From: "Giselle Limtao" <giselle@thomaswylde.com>
To: "Paula Thomas" <paula@thomaswylde.com>
Subject: FW: SS 16 / concept

---

From: Amy Liu
Sent: Thursday, February 12, 2015 7:46 PM
To: Giselle Limtao
Cc: Jene Park
Subject: Re: SS 16 / concept

Hi Giselle,

maybe we can expand the porcelain idea with below?

* draws inspiration from middle eastern culture influences, egyptian
stone inlay, marrakech architecture and Islamic , turkish tiles
* juxtapose with the the phenomena of sexism and misogyny,
stereotypical depictions from the Arab women
* historically influenced, yet clearly distilled through a contemporary
filter

[cid:D8CD5394-00D8-44A2-9A93-15048C39063A][cid:AA2F8C30-929E-
4400-93D1-324C481B4296]
[Sarah-Ryan-Fraterna-Collection-4][Sarah-Ryan-Fraterna-Collection-10]
http://irfi.org/articles/articles_401_450/women_in_the_middle_east.htm

Kind Regards,

Amy Liu
Director of Design Diffusion collection

THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

On Feb 12, 2015, at 8:44 PM, Amy Liu
<amy@thomaswylde.com<mailto:amy@thomaswylde.com>> wrote:

Hi Giselle,

I spoke to Jene, she gave some feedback on the SS 16 concept... i will text
you the detail, but she is open for us to see artwork studios.
I will book studios for us to meet when you get back... pls remind me when
you are coming back again?

Kind Regards,

Amy Liu
Director of Design Diffusion collection

T H O M A S   W Y L D E

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

phone:          +1 310 559 5549
email:          amy@thomaswylde.com<mailto:amy@thomaswylde.com>

<PastedGraphic-1.png>

<PastedGraphic-2.png>

# EXHIBIT "19"

# Citizens Medical Group

1300 North La Brea Avenue

Los Angeles, CA 90028

Tel: (323) 464-1330

Fax: (323) 464-2163

## RELEASE TO RETURN TO WORK OR SCHOOL

Patient Name Thomas, Paula

D.O.B. 2-20-60                                   MR#

To: Employer / School

This Patient Is Under Our Care And:

☐ May Return To        Regular Duties/        Light Duties        School On

☒ Requires A Medical Leave Of Absence From 4/20    To    5/4/15

☒ Was First Seen For Problem On    4/20/15

☒ Is Restricted From    Working                        Until    5/4/15

☒ Received Treatment At Our Office On                    2:30    In AM/PM

Condition

Comments

☐ JOEL JAFFE, M.D.

☐ LARRY S. BRANDIS, M.D.                    _____

☐ GORDON VAN TASSELL, D.O.            SIGNATURE Health Care Provider    Date

Dr. Gordon Van Tassell
Citizens Medical Group
1300 N. La Brea Avenue
Hollywood, CA 90028
(323) 464-1336

# EXHIBIT "20"

From:      David Johnson
To:        Goodkin, Olivia
Cc:        kmiller@greenbergglusker.com
Subject:   Re: Paula's absence and update; confidential settlement discussions

Olivia:

Though I'm not sure we discussed it specifically, Paula should no longer be coming in and should do no further work on behalf of the company. The company will be removing access to her corporate email. A doctor's note is not necessary.

With respect to the PDTW property, the company would first like to compile a list of what that is before we decide what happens to all of it. With respect to the items in the Palm Springs warehouse, the company intends to stop paying for that storage facility and will need to move any company items out of it. If Paula wishes to maintain the warehouse for her own personal belongings at her own cost then that is her prerogative. In the short term though, we need to arrange to get the company access to that facility and to move any company items like inventory. Please advise when that can be done.

On the insurance, I have checked with our accounting department and they have advised that Paula's monthly costs are:

Medical              $ 523.94
Dental               $   4.77
Total Insurance Premium  $ 528.71

The company will agree to payments being due on the 1st of every month, but will not accept a lien or consent judgment. Furthermore, the mutual releases must be effective upon execution of the agreement. If the company fails to pay, Paula will still have a claim for breach of contract and will be able to assert a claim in court or in bankruptcy. The company is not prepared to enter into this agreement only to have further litigation and claims if it has financial issues arise in the future. This must be a full resolution on both sides so that each can move on cleanly with only a monetary obligation remaining. The company is also concerned by the statement that Paula has heard from other creditors and vendors that the company may be unable to pay. So far as John is aware, Paula has not been meeting with any creditors or vendors. To the extent that she is aware of any that have expressed concerned about being paid, John needs to know who those are so that he can resolve their concerns and we need Paula to identify them immediately so that the can do so.

Regards,
David

On Apr 20, 2015, at 2:10 PM, Goodkin, Olivia
<ogoodkin@greenbergglusker.com> wrote:

Dear David,

This confirms that you agreed that Paula should not come into the office during the

[illegible] and instead she will rest. Since she has a medical on bed rest order, which is
confidential and not to speculate or speak poorly of her. I will send you a doctor's
note as soon as it is available if you would like.

Regarding the furniture and other issues we discussed, Paula is okay with all personal
property staying where it is, but we need an inventory of what belongs to PDTW and
she thinks there may be such an inventory. She is also willing to forego the Rosie books
(but I believe she still would like the TCPs).

She is willing to forego having COBRA covered, but will you please let us know how
much the monthly insurance payment is for Paula individually?

In exchange for the above, we do insist on the severance payments being made every
month on the first of the month. We are quite concerned that although the company
may agree to the severance, it will not be paid, based on what Paula has heard from
other creditors and vendors, which is why we wanted a lien. In addition to the
alternative Consent Judgment concept, we ask that the settlement agreement provide
that during the time that the severance is being paid, the parties forebear from
pursuing any claims against each other (and those claims are tolled), and that the
releases go into effect only after the severance is paid in full. It would not be fair or
appropriate for Paula to agree to reduce her claims, be paid one month, and then only
have a breach of settlement agreement claim. However, we are being fair by proposing
that both sides retain their rights until the payment obligations under the contract are
completed.

I look forward to hearing back from you.

Best regards,

Olivia

Olivia Goodkin | **Chair, Employment Group** | **Biography**
D: 310.201.7446 | F: 310.201.2934 | OGoodkin@greenbergglusker.com
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

We inform you that any U.S. tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (i)
avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential under the attorney client privilege. If you have received this message in error

# EXHIBIT "21"

LAW STUDIOS RICHARD BYRON PEDDIE, P. C.

3051 Euclid Avenue
Boulder, Colorado 80305-2851

RICHARD BYRON PEDDIE
Admitted: CA, CO, FL, NY

*New York:*
140 Beekman – Third Floor
New York, New York 10038

Tel.: 303.444.5447
Fax: 720.222.4766
lawstudios@comcast.net

## TELECOPIER TRANSMITTAL SHEET

Fax Number: 310.201.2334          Client Number: 00150-001

Page 1 of 5 (includes cover)

TO:   Olivia Goodkin, Esq., c/o Greenberg Glusker Fields Claman & Machtinger LLP

FROM: Richard Byron Peddie, Esq.

Re:   *Notice – Paula Thomas*

ADDITIONAL INFORMATION/MESSAGE: *Please deliver to Olivia Goodkin, Esq. Thanks!*
*Richard Byron Peddie*

### TO REPORT ERRORS IN TRANSMISSION:
### 303.444.5447 (voice)
### 720.222.4766 (facsimile)

The information contained in this transmission may be attorney privileged or contain attorney
work product. In any event, the contents of this communication are CONFIDENTIAL, intended
only for the designated recipient. If you are not the intended recipient, you are notified that any
review, dissemination, distribution, or copying of this communication is strictly prohibited. If you
have received this transmission in error, please notify us immediately by telephone and return the
original message to us, at the address listed above, via postal service. We will reimburse you for
your postal charges upon request.

LawStudios™ | Richard Ryan Pedde, P.C.

*[illegible]*
5651 Euclid Avenue
Boulder, Colorado 80303-2841

*COLORADO OFFICE PLEASE
ADMITTED: CA, CO, FL, NY*

*New York:*
140 Beekman — Third Floor
New York, New York 10038

Tel.: 303.444.5447
Fax: 720.222.4766
lawstudios@comcast.net

May 14, 2015

*Via Facsimile* – 310.201.2334
Olivia Goodkin, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars -- 21st Floor
Los Angeles, CA 90067

Re:    **NOTICE**: Paula Thomas – Company Position; Termination of Employment

Dear Ms. Goodkin:

This firm has been engaged as litigation counsel to Thomas Wylde, LLC ("Company"). I have been instructed to communicate the following:

As far as the Company is concerned, Paula Thomas quit her position without justification and without "Good Reason" as that term may be defined in any applicable contract. This she did through a series of breaches and wrongful acts culminating in what is, essentially, an abandonment of her post. While she later changed her mind, and while the Company entertained proposals to reincarnate Ms. Thomas' role in one form or the other, and while, more recently, the Company also engaged in talks with a view towards amicably settling matters with Ms. Thomas, those talks have not borne fruit. In the meantime, Ms. Thomas has only continued to act in ways that harm both the Company and its brand -- and therefore its prospects for returning value to its members.

Thus, to be clear: The Company's position is that Ms. Thomas quit her post without justification – albeit under circumstances in which she could easily have been terminated. None of what has happened since that time has had anything to do with any real belief that she did not do so or that she had any claims whatsoever against the Company or anyone affiliated with it. Those discussions have been for the sole purpose of parting amicably, avoiding even vexatious claims, and, initially, a notion that it was better to retain Paula Thomas in some capacity for company good will

[illegible]
[illegible]
[illegible]
Page 2 of 4

As will be made clearer below, the Company no longer perceives any value in any affiliation with Ms. Thomas; nor does it believe that Ms. Thomas will truly abide by any terms designed to protect Company value; nor does it believe that any monetary inducements offered to Ms. Thomas would not be wholly offset by damages suffered by the Company, present and future.

In the alternative – and in the unlikely event that any contract between Paula Thomas and the Company somehow survives – the Company terminates any and all such surviving contracts with Paula Thomas or with any entity affiliated with her, effective immediately. This termination is for cause generally, and, specifically, pursuant to section 9 of that employment agreement executed by Paula Thomas on Dec. 31, 201 – in the unlikely event that agreement survives.

Because Ms. Thomas quit, the Company will make no severance payments. In the alternative, because this termination is for cause, the Company will likewise make no severance payments.

All negotiations, whether for a settlement and termination agreement or otherwise, are also hereby terminated, save only those that we may now initiate.

You will no doubt wonder why it is that the Company has cut short negotiations:

Paula Thomas materially breached her employment agreement, refused to comply with the reasonable directives of her superior officer, refused or otherwise failed to abide by Company policies and procedures, and engaged in willful misconduct affecting Company affairs. These acts and omissions have had a materially adverse effect upon, and otherwise damaged, the Company, its members, and its management. To make matters worse, while the Company was busy negotiating in good faith with you – and therefore justifiably expected a *detente* of sorts – these malfeasances did not stop. To the contrary: Some of the most egregious transgressions occurred only quite recently.

For example, the Company was recently informed by Siim Kohv, a public relations representative retained by the Company, that Paula Thomas contacted him and requested that he forward all emails from Company CEO John Hanna regarding press releases. She did this despite the fact that the Company had already instructed her to stand down and revoked any authorization she had to speak for it. Mr. Kohv further stated that Ms. Thomas repeatedly advised him that Mr. Hanna and Company COO Jene Park were "not good people" and that he should "be careful" when dealing with them. Mr. Kohv also indicated that Ms. Thomas admitted to making similar disparaging and defamatory remarks about the Company and its management to Yann Weber at Antidote Magazine.

This is utterly unacceptable. The Company is shocked and hurt that its good faith

Oliver Goodrich, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
May 14, 2015
Page 3 of 4

attempts to come to amicable arrangements had precisely zero effect on Ms. Thomas' conduct. Frankly, we are puzzled that Paula Thomas should expect to receive financial benefits from the Company with one hand while secretly undermining and harming it with the other.

These personal attacks on Company management, and upon Mr. Hanna and Ms. Park personally, are not only contrary to Company policies and Ms. Thomas' duty of loyalty; they are also in direct violation of Mr. Hanna's explicit admonishment not to speak ill of Company officers to outside parties. Such remarks are clearly intended to damage the Company and its officers both in their official and personal capacities and to diminish the Company's reputation within the industry.

As already disclosed to you, Ms. Thomas had, after all, already been admonished in the past for similar conduct after admitting her wrongdoing. For example, during the Company's latest fashion show in New York, Ms. Thomas told a representative of the Company's PR firm, BPCM, that Mr. Hanna was "a moron" and that he was "running the Company into the ground." When confronted, Ms. Thomas was admonished in no uncertain terms to cease and desist from disparaging the Company or its personnel. She acknowledged the wrongdoing and promised to stop. Nevertheless, as we have seen, she has blatantly continued to denigrate the Company and its officers in her conversations with Mr. Kohv and others.

Furthermore, the Company recently discovered that Ms. Thomas breached obligations under its Confidentiality and Intellectual Property Agreement:

Earlier this year, Ms. Thomas obtained passwords to access the company's file server. She secretly disclosed these passwords to Messrs. Tony Jay and Joshua Sophrin with neither prior authorization nor justification to do so. The confidentiality provisions require that Ms. Thomas keep the data on that server "strictly confidential" and not disclose it to any third party without the express written consent of the Managing Member.

While Mr. Jay did work as a contractor for the company and assisted with the February fashion show and website launch, he had no need for access to the Company's servers nearly a full month later. The Company is not even aware of who Joshua Sophrin is, much less why he would need access to Company servers. Ms. Thomas' surreptitious disclosure of Company passwords to these two individuals constitutes a significant breach of security, a violation of Company policy, a breach of fiduciary duties, and a material breach of the employment agreement.

Based upon these circumstances and others that have already been discussed with Ms. Thomas in the past, the Company exercises its right to terminate her employment for cause — in case this is at all necessary, because again, the Company's position is that she quit her post. Ms. Thomas has been given ample warning and every opportunity to change her conduct, yet failed to

do so. The more recent breaches in particular are not amenable to cure. That these breaches occurred precisely while the Company was engaged in good faith attempts to resolve matters amicably is particularly hurtful.

I will therefore request now that you instruct your client to cease and desist all further defamatory conduct and stop disseminating confidential information and otherwise cease all other forms of wrongful conduct. After all, Ms. Thomas has ongoing duties as a Company member and former officer, as well as under the Company's confidentiality agreement. These duties run not only to the Company, but also, in certain instances, to its other members and management.

Please accept Mr. Schnider's apologies for not responding to you: The Company has put matters into my hands and prefers that further communications go through me.

I have sent this notice letter to you directly, and not to Ms. Thomas. I have done so under the assumption that you will continue to represent her in this matter, however altered the picture may now be. Still, as a courtesy, I ask that you confirm not only receipt but also confirm that receipt by you is indeed receipt by Ms. Thomas for all purposes – for the obvious reasons.

Finally, please advise whether you are authorized to accept service of process on Paula Thomas' behalf. The Company intends to sue for its damages and to enjoin further defamatory conduct and breaches of its confidentiality policies. Thank you.

Very truly yours,
RICHARD BYRON PEDDIE, P.C.

By: Richard Byron Peddie

RBP:rko

# EXHIBIT "22"

**Subject:** TOM FORE CONSIDERING BUYING SHARES IN TW TO PARTNER WITH ME

**Date:** Sunday, May 14, 2017 at 9:17:27 AM Pacific Daylight Time

**From:** Paula Thomas

**To:** Marcia Dolan



Begin forwarded message:

**From:** Tom Fore <TFore@soradevelopment.com>
**Date:** July 1, 2015 at 3:43:10 AM PDT
**To:** Paula Thomas <paulathomas@me.com>
**Subject: My thoughts**

Paula, here are some of the things that I would consider:

Current business accounting books & records. I'm assuming there is a requirement that "all" company data is kept at the office & available for member inspection at any time. AR & AP, bank statements for all accounts (including credit cards, wires & check copies), detailed reimbursements with receipts, tax returns, etc. I'd be curious as to where all the investment $ went.

Are there phantom accounts which have been set up by Hanna or Park in a name similar to the company under the control of others which are unknown to all of the shareholders?

Are there phantom service provider entities which have been set up by them to bill the company?

Are there loans to them or an unaffiliated entity?

You may consider a forensic accounting if you have the right.

Are they are using corporate resources to run or to promote side business as you have heard. If they are trying to do license deals and entertain on the corporate credit card, it's a start. You will need more than one or two events.

Again, this may be an opportunity to detail your complaint in a letter which will inform the investor of suspected wrong doing including the slanderous & defaming comments to clients.

You want to have as much solid evidence of misdeeds as possible. The defamation is not likely your focus.

enough to dilute everyone down for another bridge which ultimately will be money wasted if mismanaged.

money. if there is truly theft, or misuse of funds, the lack of dialogue between you and the investor might put your interests in greater jeopardy.  Perhaps he will join you in a forensic accounting effort & in taking control.

I'm standing by to help.

T


Sent from my iPhone

# EXHIBIT "23"

# Will be Produced at a Later Time

# EXHIBIT "24"

State of California

Mail Date: 12/04/2015

EDD TELEPHONE NUMBERS.
English          1-800-300-5616
Spanish          1-800-326-8937
Cantonese        1-800-547-3506
Mandarin         1-866-303-0706
Vietnamese       1-800-547-2058
TTY (non-voice)  1-800-815-9387
website:         www.edd.ca.gov

PAULA D THOMAS
2514 S TOLEDO AVE
PALM SPRINGS CA  92264-9534

## NOTICE OF UNEMPLOYMENT INSURANCE CLAIM FILED

You filed a claim for Unemployment Insurance (UI) benefits effective **11/22/2015**. When you filed your claim you stated:

1.  Your last employer was:  **THOMAS WYLDE LLC
    3231 S. LA CIENEGA BLVD
    LOS ANGELES, CA  90016**

2.  The last day you worked for that employer was **04/10/2015**.

3.  The reason you are no longer working for the above employer is:
    **I WAS WRONGFULLY TERMINATED BECAUSE OF A DISABILITY**

4.  You are not receiving a pension or other income that may be deductible from your UI benefits.

5.  You are able and available to accept full-time work.

6.  You have the legal right to work in the United States.

Please review the above information carefully. No action is required by you if the information is correct. The EDD considers this information correct unless you report other information within 10 (ten) days from the mailing date of this notice. Any response after 10 days may result in delay of benefits. To report other information, you may call the EDD or mail your response to the EDD address above. Remember to include your name and Social Security number in all correspondence with the EDD.

Although federal and state laws prohibit the revealing of information about your employment and your UI claim to your spouse, relatives, friends, non-interested parties, and private interest groups, federal legislation requires that such information be made available to state and federal welfare, medical assistance, CalFresh (formerly food stamps), housing, and child support enforcement agencies. Confidentiality is the responsibility of agencies using the information.

You have the option of cancelling a regular California UI claim (refer to your Notice of Unemployment Award for the cancellation requirements). If you do decide you want to cancel your claim, **do not certify for benefits** because once you are paid benefits, the law does not allow you to cancel your claim.

Benefit payments are issued to the EDD Debit Card(SM). You should refer to your Guide to Benefits and Employment Services handbook for information about the EDD Debit Card(SM). If you were previously issued a card and need a replacement, you must contact Bank of America EDD Debit Card Customer Service toll-free at 1-866-692-9374.

DE 1101CLMT Rev. 6 (3-13)

Mail Date: 12/04/2015

SSN: 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

PAULA D THOMAS
2514 S TOLEDO AVE
PALM SPRINGS CA 92264-9534

| EDD Phone Numbers | |
|---|---|
| English | 1-800-300-5616 |
| Spanish | 1-800-326-8937 |
| Cantonese | 1-800-547-3506 |
| Mandarin | 1-866-303-0706 |
| Vietnamese | 1-800-547-2058 |
| TTY (nonvoice) | 1-800-815-9387 |
| website: | www.edd.ca.gov |

## NOTICE OF UNEMPLOYMENT INSURANCE AWARD

1. Claim Beginning Date:          11/22/2015
2. Claim Ending Date:          11/19/2016
3. Maximum Benefit Amount:          $11,700.00
4. Weekly Benefit Amount:          $450
5. Total Wages:          $66,666.67
6. Highest Quarter Earnings:          $50,000.00
7. This item does not apply to your claim. For more information, see item 7 on the reverse.
8. You must look for full time work each week. For more information, refer to the handbook, *A Guide to Benefits and Employment Services*, DE 1275A, available online at www.edd.ca.gov/forms/.
9. This item does not apply to your claim.
10. This Claim Award is calculated based on the Standard Base Period.

| 11. Employee Name: | 12. Employee Wages for the Quarter Ending: | | | | 13. Employer Name: |
|---|---|---|---|---|---|
| | SEP 14 | DEC 14 | MAR 15 | JUN 15 | |
| P THOMAS | $    0.00 | $    0.00 | $ 50,000.00 | $ 16,666.67 | THOMAS WYL |
| 14. TOTALS: | $    0.00 | $    0.00 | $ 50,000.00 | $ 16,666.67 | |

THE FOLLOWING IS ADDITIONAL INFORMATION REGARDING THE ITEMS ON THE REVERSE OF THIS PAGE

3. Maximum Benefit Amount: The total amount of money you can receive from this claim.

4. Weekly Benefit Amount: The maximum amount you can be paid each week, if you meet the weekly eligibility requirements.

5. Total Wages: The total amount of earnings reported by the employer(s) during the quarters listed on the reverse page in item 12. These earnings were used to compute your maximum benefit amount.

6. Highest Quarter Earnings: The calendar quarter listed on the reverse page in item 12 with the highest amount of earnings. These earnings determine your weekly benefit amount.

7. The award listed on the reverse page in item 2 is your award without the wages earned from a public or nonprofit school. If you worked for a public or nonprofit school during any of the quarters listed on the reverse page in item 12, you may not be able to use those wages in your claim during a school recess period.

8. You must follow the instructions on the reverse page in item 8 to be eligible for benefits. By law you must make all reasonable efforts to find work when claiming benefits.

9. The Unemployment Insurance Code (Section 1277) requires that you work between the beginning and the ending dates of a prior claim to have a valid claim the next year. If this applies to your claim you will receive additional instructions.

10. The type of base period used to establish your claim; it will be either the Standard Base Period or the Alternate Base Period. If you do not have sufficient wages in the Standard Base Period to establish a valid claim, you may be eligible to use the Alternate Base Period. For more information, review the handbook, *A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES, DE 1275A*, available at www.edd.ca.gov/forms/.

11. Employee's Name: The name used by your employer(s) to report your earnings to the Employment Development Department (EDD) during each calendar quarter listed on the reverse page in item 11

12. Employee's Wages for the Calendar Quarter Ending: These are the potentially usable wages for unemployment insurance purposes that your employer(s) reported you earned during each calendar quarter listed. These earnings determine the amount of your Unemployment Insurance (UI) award.

13. Employer Name: The name(s) of the employer(s) you worked for during the calendar quarters listed on the reverse page on item 13.

14. Totals: The total amount of earnings reported by all employer(s) in each calendar quarter listed on the reverse page in item 12.

**YOUR CLAIM IS INVALID IF:**

a. Your earnings were not enough to meet the minimum requirements.

b. You had a prior UI claim and did not meet the requirements for working and earning wages necessary to have a later valid claim.

**IMPORTANT:**

Check this notice carefully to make sure that all employers you worked for in the calendar quarters shown, (on the reverse page in item 12) are listed and that the wages you earned are shown. If an employer is listed and you did not work for them, or if an employer is not listed, or your wages are incorrect, contact an EDD office immediately to protest the accuracy of the computation. You may be subject to disqualifications, overpayments, and/or criminal penalties for failure to notify the EDD immediately of any inaccurate employment and wage information displayed in item 12.

If you worked for a federal agency your wages must be requested from that federal agency. You will receive a *Notice of Amended Unemployment Insurance Award* with these wages added.

If this notice or amended notice is incorrect and you want to protest the accuracy of the computation or recomputation, you must contact the EDD within 30 days after the mail date of the notice or amended notice. Otherwise, a wage investigation or recomputation of wages may be denied. The 30-day period may be extended for good cause. If you need to contact the EDD, you will need to provide your full name, address, and Social Security number and, if necessary, any wage and employment information you would like to add to your claim, or to remove any employers for whom you did not work and earn wages.

**YOU ARE RESPONSIBLE FOR KNOWING THE CONTENT OF THE *UNEMPLOYMENT INSURANCE BENEFITS: WHAT YOU NEED TO KNOW, DE 1275B,* AND THE CONTENT OF THE HANDBOOK, *A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES, DE 1275A.* BOTH PUBLICATIONS EXPLAIN YOUR UNEMPLOYMENT RIGHTS AND RESPONSIBILITIES AND ARE AVAILABLE AT WWW.EDD.CA.GOV/FORMS/.**

**TO RECEIVE UI BENEFITS, YOU MUST CERTIFY FOR BENEFITS USING ONE OF THE FOLLOWING METHODS: UI ONLINE[SM], EDD TELE-CERT[SM], OR SUBMIT A PAPER *CONTINUED CLAIM FORM, DE 4581.* FOR MORE INFORMATION ON CERTIFYING FOR BENEFITS, REFER TO THE DE 1275A HANDBOOK WHICH IS AVAILABLE ONLINE AT WWW.EDD.CA.GOV/FORMS/.**

**HOW TO CANCEL A UI CLAIM**

You have an option of cancelling a regular California UI claim after you have been mailed your *Unemployment Insurance Award* notice. If you want to cancel your claim, you need to contact the EDD right away. Do not certify for UI benefits using UI Online[SM], EDD Tele-Cert[SM], or by submitting a paper *Continued Claim Form, DE 4581.* The law only allows you to cancel a UI claim if no benefits have been paid, no notice of disqualification has been mailed to you, no overpayment has been established on the claim, and the benefit year of your claim has not ended. If the claim is cancelled, it cannot be reopened. You must file a claim with a later date.

DE 429Z Rev. 9 (9-15)

**PAYCHEX**

80-a80p1745
3091671

(562) 654-811?

January 11, 2016

Employment Development Department
San Jose
PO Box 49004
San Jose CA 95161-9004

**RE: Paula Thomas**
**SOCIAL SECURITY NUMBER: 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**
**ID NUMBER: 040-9629-3**

Dear Sir/Madam,

Paychex has been granted Power of Attorney to act on behalf of **Thomas Wylde LLC.**

The employer disagrees with the Determination mailed on **12/21/2015** and is requesting an appeal hearing. The employer feels that they should not be charged for unemployment benefits in this matter.

Claimant was an executive and employed as the employer's "Creative Director". She announced that she was unwilling to perform the duties associated with that role any longer. In addition, she was insubordinate: On various occasions she acted in direct contravention of the directives of the company's chief executive officer. In addition, she spoke badly of other company officers and of the company and continued to do so after being admonished to stop. Claimant also violated company policy by giving out the company password, allowing certain third parties access to the company's confidential information.

Claimant's last day worked was likely no later than 4/10/2015. (Her date of separation was not Nov. 1, 2015, in any event.)

Employer's position in pending litigation is that Claimant quit her job well before that date. At that time, however, Employer was in negotiations with Claimant with a view towards offering her a different, part-time position when it discovered the above-described malfeasances and, for clarity, made it clear that her employment was terminated. Thus, Employer's position is that Claimant either quit or was discharged for cause. Employer therefore requests a hearing.

Sincerely,

*Shalyn Pizzillo*

**Shalyn Pizzillo**
PAYCHEX State Unemployment Insurance Services



SAN JOSE      CA 95161-9004

State of California

EMPLOYER: THOMAS WYLDE LLC

DATE MAILED      12/21/15
BENEFIT YEAR BEGAN 13/22/15

PAYCHEX, INC              1450
PO BOX 2000
W. HENRIETTA     NY 14467

EDD TELEPHONE NUMBERS:
ENGLISH     1-800-300-5616
SPANISH     1-800-326-8937
CANTONESE   1-800-547-3506
MANDARIN    1-866-303-0706
VIETNAMESE  1-800-547-2058
TTY         1-800-815-9387

CONCERNING THE UNEMPLOYMENT INSURANCE CLAIM OF:

P D THOMAS
SSN 615 34 0198

YOU PROVIDED INFORMATION REGARDING THE ELIGIBILITY OF THE CLAIMANT NAMED
ABOVE UNDER CALIFORNIA UNEMPLOYMENT INSURANCE CODE (CUIC) SECTION 1256.  WE
HAVE CONSIDERED ALL OF THE AVAILABLE FACTS AND REACHED THE CONCLUSION
STATED BELOW.   PLEASE DO NOT RESUBMIT THE SAME ELIGIBILITY INFORMATION IN
REPLY TO ANY FUTURE CLAIMS NOTICES.   THIS DECISION IS FINAL UNLESS
MODIFIED, RECONSIDERED, OR APPEALED.

YOU DISCHARGED THE CLAIMANT FOR NOT PERFORMING THE DUTIES OF HIS OR HER JOB
AS REQUIRED.  AFTER CONSIDERING THE AVAILABLE INFORMATION,  THE DEPARTMENT
FINDS THE REASONS FOR DISCHARGE DO NOT MEET THE DEFINITION OF MISCONDUCT
CONNECTED WITH THE WORK.

YOUR RESERVE ACCOUNT WILL BE SUBJECT TO CHARGES.

SEPARATION DATE: 11/01/15
RESERVE ACCOUNT NUMBER: 0409629-3

APPEAL:

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART
OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION. WRITE THE

Department
State of California

CLAIMANT'S NAME AND SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO
THE DEPARTMENT (TITLE 22, CALIFORNIA CODE OF REGULATIONS, SECTION 5218).

B. MAIL THE DE 1080R OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON
THE FIRST PAGE OF THIS DECISION.

C.    FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS
NOTICE OR NO LATER THAN 01/20/16.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION
REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF
APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR
THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD
CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT
HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE
DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME
OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT
THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE
FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE
HELP YOU DURING THE HEARING.

DE1080 EZ  REV. 1 (06-05)                    (TNE)

EMPLOYMENT DEVELOPMENT DEPT
SAN JOSE
P.O. BOX 48004

N O T I C E   O F   D E T E R M I N A T I O N / R U L I N G

EMPLOYER: THOMAS WYLDE LLC

DATE MAILED        12/21/15
BENEFIT YEAR BEGAN 11/22/15

PAYCHEX, INC                    1450
PO BOX 2000
W. HENRIETTA     NY 14467

EDD TELEPHONE NUMBERS:
ENGLISH       1-800-300-5616
SPANISH       1-800-326-8937
CANTONESE     1-800-547-3506
MANDARIN      1-866-303-0706
VIETNAMESE    1-800-547-2058
TTY           1-800-815-9387

CONCERNING THE UNEMPLOYMENT INSURANCE CLAIM OF:

P D THOMAS
SSN 615 34 0198

YOU PROVIDED INFORMATION REGARDING THE ELIGIBILITY OF THE CLAIMANT NAMED
ABOVE UNDER CALIFORNIA UNEMPLOYMENT INSURANCE CODE (CUIC) SECTION 1256.  WE
HAVE CONSIDERED ALL OF THE AVAILABLE FACTS AND REACHED THE CONCLUSION
STATED BELOW.  PLEASE DO NOT RESUBMIT THE SAME ELIGIBILITY INFORMATION IN
REPLY TO ANY FUTURE CLAIMS NOTICES.  THIS DECISION IS FINAL UNLESS
MODIFIED, RECONSIDERED, OR APPEALED.

YOU DISCHARGED THE CLAIMANT FOR NOT PERFORMING THE DUTIES OF HIS OR HER JOB
AS REQUIRED.  AFTER CONSIDERING THE AVAILABLE INFORMATION,  THE DEPARTMENT
FINDS THE REASONS FOR DISCHARGE DO NOT MEET THE DEFINITION OF MISCONDUCT
CONNECTED WITH THE WORK.

YOUR RESERVE ACCOUNT WILL BE SUBJECT TO CHARGES.

SEPARATION DATE: 11/01/15
RESERVE ACCOUNT NUMBER: 0409629-3

APPEAL:
YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART
OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION. WRITE THE
CLAIMANT'S NAME AND SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO
THE DEPARTMENT (TITLE 22, CALIFORNIA CODE OF REGULATIONS, SECTION 5009).

B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON
THE FIRST PAGE OF THIS DECISION.

NO LATER THAN 30 DAYS

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION
REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF
APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR
THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD
CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT
HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE
DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME
OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT
THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE
FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE
HELP YOU DURING THE HEARING.


DE1080 EZ   REV. 1 (06-05)                    (TNE)



**MC**

# RECORD OF CLAIM STATUS INTERVIEW  MISCONDUCT (MC)

1. SSN: 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 _____  2. Claimant's Last Name: THOMAS, PAULA 10-12

3. BYB: 11-22-15 _____  4. Affected Week(s): 112815

5. Potentially Disqualifying Facts: MC Reason **F: I WAS WRONGFULLY TERMINATED BECAUSE OF A DISABILITY.**

6. **Check if Applicable**

   ☐ Unscheduled Issue/Verbal Due Process Provided   ☐ Information Only   ☐ Pre-Appeal   ☐ Re-Det

7. **Documents Made Part of Record**

   ☒ ER Pro Dated 121015   ☐ 1173 Dated _____   ☐ Other **N/A**

8. **ATTEMPTS TO REACH EMPLOYER/AGENT**
   Er name: **THOMAS WYLDE LLC** _____   Agent Name _____

   Phone No. ER _____   Agent _____   Date _____   Time Called: _____
   **Results of Final Call:**
   ☐ Reached ER/Agent  ☐ Busy  ☐ Disconnected/Wrong No.  ☐ No Answer

   **Or Left Message:**
   ☐ Answering Machine or
   ☐ with  Name _____   Title _____

   for ER/Agent to return call by  Date _____   Time _____

   ☐ ER/Agent did not return call  Date _____   Time _____   ☐ DE 4463 Suspense Date _____

9. **EMPLOYER/AGENT INFORMATION**
   Spoke with
   ☒ ER
   ☒ Agent Name **Paychex**  Title _____

   Date _____  Time _____  Clmt's. Job Title _____
   Duration _____  Rate of Pay $ _____  Per _____

   **WHEN** was clmt terminated? Date 110115 _____  LDW 041015 _____

   **WHO** terminated the clmt? Name _____  Title _____

   **HOW** was clmt terminated? ☐ In Person  ☐ By Phone  ☐ Other _____

   **WHY** was clmt terminated? Document specific dates and facts of FINAL INCIDENT. Include dates of and reasons for warnings.
   clmt was terminated for not doing clmt job. er/s the notes state : clmt quit job due
   to clmt refused to do her job and er terminated clmt for not doing clmt job.
   _____

   **WAS** clmt warned? ☐ Yes  ☐ No If yes, document dates and reasons for warnings. _____

   **WHAT** reason was given to the clmt for the discharge? _____

   If none, **WHY NOT?** _____

   If delay between the final incident and discharge, explain: _____

**10. ATTEMPTS TO REACH CLAIMANT**

Phone No. 310 962 6566 _____ Time Called 11:40 _____ , ☐ Will Call  Time Clmt Called _____

Results of Final Call:

☐ Reached Clmt      ☐ Busy      ☐ Disconnected/Wrong No.   ☐ No Answer

Or Left Message:

☐ Answering Machine or
☐ with a Responsible Party: Name _____  Relationship _____

☐ For clmt to refer to the Notice Of Appointment, DE 4800 and a decision will bases on available information.

☐ for clmt to return call by  Date _____  Time _____ or decision will be made on available information.

Call returned?

☐ No  as of Date _____  Time _____
☐ or  Yes, Date: _____  Time call returned: _____.
☐ DE 4365 sent on: Date _____  Suspense date: _____   ☐ No response

**11. CLAIMANT INFORMATION**

☒ Verified  last employer – Name THOMAS WYLDE LLC _____

LDW 04/10/15   Job Title CHIEF CREATIVE DIRECTOR _____

Duration 2006  THRU  04-10-15 _____ Rate of Pay $ 300,000.00 ____ Per ANNUALLY

WHEN was clmt terminated? Date 042015 _____

WHO terminated the clmt? Name JOHN HANNA   Title CEO _____

HOW was clmt terminated?  ☐ In Person  ☐ By Phone  ☐ Other N/A _____

WHY was clmt terminated?  What reason(s) were given to the clmt?  Include FINAL INCIDENT and date.  I AM NO LONGER
EMPLOYED DUE TO: I WAS WRONFULLY TERMINATED WITH A DR'S NOTE.
1. SO WHAT HAPPENED WITH THAT? I WAS VERY SICK, I WAS HAVING DIZZY SPELLS AND I WAS
DIZZY. I WAS UNABLE TO GO TO WORK. I WAS NOT GIVEN A TERM NOTICE AND NO 30 DAY
ADVANCE NOTICE AND I HAD TO FILE A LAW-SUIT AND I WAS NOT AA FOR FT WRK UNTIL 10-
2015. IT WAS DUE TO WORK STRESS.
2. YOU DRS NOTE PUT YOU OUT OF WRK FOR HOW LONG? APRIL TO OCTOBER
3. SO YOU ARE AA NOW? YES
4. DID YOU REQ LOA WHEN YOU SHOWED THEM THE NOTICE? YES, BUT THEY SAID THEY DID NOT
CARE, I FOUNDED THE COMPANY IN 2006 AND THE PPL WHO CAME IN GAVE ME THE BOOT. IT WAS
MY CO, IT'S LIKE TERMINED RALPH LAUREN. I WAS INCREDIBLY I'LL DUE TO THEIR BEHAVIOR
c/s er did not give clmt a reason.
c/s er sent clmt termination notice to clmt Lawyer. c/s letter stated clmt did not
want clmt back. c/s received a termination Email in April stating for clmt do not
rtn.

DID clmt know or should have known his/her actions could result in termination?  ☐ Yes  ☐ No  If yes, Explain (i.e.,
dates/reasons for warnings, know er policy) N/A _____

**12. ATTEMPTS TO RESOLVE CONFLICTING INFORMATION OR OBTAIN INFORMATION FROM OTHER SOURCES:**

☐ Clmt  ☐ ER  ☐ Other(Name /Title/Ph #): _____

Date called: _____  Time _____

Results of Final Call:

☐ Reached Clmt      ☐ Busy      ☐ Disconnected/Wrong No.   ☐ No Answer

Or Left Message:

[ ] On Machine or [ ] with a Responsible Party: Name _____ Time/Relationship _____

[ ] To return call by: Date _____    Time _____ or decision will be made on available information

Call returned?

[ ] No as of Date _____ Time _____

[ ] or Yes, Date: _____ Time call returned: _____

[ ] DE 4463 or [ ] _____ sent on: Date _____ Suspense date: _____ [ ] No response

13. SUMMARY OF MATERIAL FACTS AND REASON FOR DECISION:

er/s clmt was terminated for Refusing to do clmt job. LDW 041015 sep date 110115. c/s
was wrongfully terminated. c/s er did not say anything that clmt refused to do her
job. c/s er emailed clmt 042015 and sent clmt lawyer a letter stating clmt was
terminated and no to Return.  er has clmt termination Date as 110115. c/s gave er a
note Re: clmt health issues.
with the information available er has not shown willful misconduct re: clmt work
performance or insubordination for refusing to do clmt job therefore clmt is elig

LEGAL RESULTS Under Section 1256 of the UI Code clmt is [X] MC Eligible [ ] MC Disqualified  RD MC310AA

ER/Agent Address 3231 S. LA CIENEGA BLVD LOS ANGELES   CA 90016

ER Acct. No. _____

Decision Made On Date: _____    At Time: _____

_____
Department Representative



 Development
Department
State of California

NOTICE OF APPEAL AND TRANSMITTAL
OF APPEALED DETERMINATION

PAULA D THOMAS
2514 SOUTH TOLEDO AVE
PALM SPRINGS   CA   92264

Date: 01/14/2016

SSA No.: 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

**Field Office Address:**

Sacramento Adjudication Cent
P.O. Box 599000
Elk Grove CA 95759-9906

Your former employer, THOMAS WYLDE LLC _____ has appealed the
Department's decision finding you eligible for unemployment insurance benefits. If you are
otherwise eligible, you will continue to receive benefits for each week you are unemployed and
submit a claim form. If the Administrative Law Judge who presides over your employer's
appeal hearing finds you are not eligible, your benefits will stop. You may be required to repay
to the Department benefits received after the date this notice is issued. Enclosed is a copy of
the Notice of Determination your employer is appealing.

The employer's appeal has been sent to the San Francisco _____ Office of Appeals.
Their telephone number is (415) 357-3801 _____. The Office of Appeals
will send you a copy of the appeal and a notice showing the date, time, and place of the
hearing. Make every effort to attend the hearing. The judge bases his or her decision about
your eligibility on the evidence presented at the hearing. During the hearing, you, your
employer and any witness will be allowed to explain the facts and present written support of
the facts. **Please direct questions regarding this appeal to the Office of Appeals.**

Appeal Specialist
DEPARTMENT REPRESENTATIVE

Enclosure

B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON
THE FIRST PAGE OF THIS DECISION.

C.  FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS
WITHIN IF NO LATER THAN 12 17 16

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION
REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF
APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR
THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD
CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT
HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE
DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME
OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT
THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE
FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE
HELP YOU DURING THE HEARING.


DE1080 BZ   REV. 1 (06-05)              (TNE)

# EXHIBIT "25"

Subject: Designs - logo - same designs just copied

Date: Monday, May 29, 2017 at 3:29:29 PM Pacific Daylight Time

From: Paula Thomas

IMG_9560.PNG





















INSTAGRAM - misspaulathomas

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

paulathomas@me.com

This websites use cookies. By continuing to browse the site you are agreeing    ✓ Accept
to our use of cookies.

More information (https://www.daad-
dantone.com/privacy-policy-cookie-
restriction-mode/)

Home (https://www.daad-dantone.com/)  >  Woman (https://www.daad-dantone.com/woman.html)  >
SUMMER 2017 (https://www.daad-dantone.com/woman/shoponline/summer-2017.html)  >
Thomas Wylde (https://www.daad-dantone.com/woman/shoponline/thomas-wylde.html)  >
Dress (https://www.daad-dantone.com/woman/shoponline/dress.html)  >  Thomas Wylde dress



{https://www.daad-
dantone.com/media/product/8ad/thomas-wylde-
dress-shop-online-a29.jpg)

# THOMAS WYLDE DRESS

Thomas Wylde dress
100% sik twill printed

*Henna Skull print AND Paula's Original Shape/Design*

Code: 37029380

Availability: Out of stock

♥ ADD TO WISHLIST

✉ EMAIL TO A FRIEND (HTTPS://WWW.DAAD-
DANTONE.COM/SENDFRIEND/PRODUCT/SEND/ID/27108/)

0



(https://www.daad-
dantone.com/media/product/01f/thomas-wylde-
dress-shop-online-bcf.jpg)



{https://www.daad-
dantone.com/media/product/5c7/thomas-wylde-
dress-shop-online-803.jpg}



(https://www.daad-
dantone.com/media/product/54a/thomas-wylde-
dress-shop-online-b67.jpg)



(https://www.daad-
dantone.com/media/product/3d9/thomas-wylde-
dress-shop-online-1a8.jpg)

| DESCRIPTION | TAGS | REVIEWS |
| --- | --- | --- |

## Details - Thomas Wylde dress

Thomas Wylde dress 100% sik twill printed

Buy Thomas Wylde Dress for P/E 2017 online. Our Fashion Boutique is the right store for you. Shop online now!

Subject:     MY DESIGNS BEING RE USED

Date:        Thursday, May 25, 2017 at 11:19:17 AM Pacific Daylight Time

From:        Paula Thomas

To:          

See below a pack of leather pants I designed in 2014 and pack is using them in the present collection of TW 2017





INSTAGRAM - misspaulathomas

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

paulathomas@me.com

**Subject:** PAULA THOMAS DESIGNS ANS PRINTS PLUS LOGO AND TRADEMARK

**Date:** Monday, May 29, 2017 at 3:21:34 PM Pacific Daylight Time

**From:** Paula Thomas

**To:** Marcia Daley

IMG_9519.PNG















INSTAGRAM - misspaulathomas

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

paulathomas@me.com



Ruffles are Paula's design
the dress is not.

Pictures in background
are taken by Rankin of
Rankin.
Part of POTW assets
@ worth about $5K+
Table + chairs = TW



Photo



Thomaswyldeofficial

# N E W   A R R I V A L S

  



458 likes

**thomaswyldeofficial** Thomas Wylde is launching e-commerce tomorrow 🖤 Make sure to head over to www.thomaswylde.com ! ENJOY 🖤🖤

## Apparel News

### Thomas Wylde's Luxe Rock 'n' Roll Chic

*By Alison A. Nieder | Tuesday, March 21, 2017*

595 likes

**thomaswyldeofficial** Creative director Jene Park sat down with Alison Nieder to discuss details about the show. Click the link in our bio to learn more.



**Apparel** News

**Thomas Wylde's Luxe Rock 'n' Roll Chic**

474 likes

**thomaswyldeofficial** Creative director Jene Park sat down with Alison Nieder to discuss details about the show. Click the link in our bio to learn more

















thomaswyldeofficial







466 likes

**thomaswyldeofficial** Creative Director Jene Park shares her beauty tips. 💄
Interviewed by: @caucuoususe ▸

   

593 likes

**thomaswyldeofficial** Jene Park talks fashion with Buro 24/7 Magazine! ▸











# EXHIBIT "26"

Subject: 

Date:   Monday, May 29, 2017 at 6:28:02 PM Pacific Daylight Time

From:   Paula Thomas

To:     Marcia Daley

On Feb 19, 2016, at 5:14 PM, Paula Thomas <paulathomas@me.com> wrote:

Dr V i really need to see you next week i am not good at all - i am crying all the time and cannot sleep - i think i have pTsd - i had an anxiety attack the other day and could not stop shacking - i have never experienced anything like it before
what day can i see you ?

paula

Wednesday, February 24, 2016   5:46:38 PM Pacific Daylight Time

Subject: 
Date:
From:
To:

Begin forwarded message:

**From:** Paula Thomas <paulathomas@me.com>
**Date:** February 22, 2016 at 8:24:44 AM PST
**To:** DR VAN TASSLE  CITIZENS MEDICAL CENTER <drvt@drvt.net>
**Subject: Paula Thomas**

Dear Dr V
I am coming in to see you tomorrow but I want to let you know I have been loosing blood as if I were having a period - due to the radiation treatment I had for my breast cancer it forced me into early menopause two years ago and last week I started bleeding very heavily I am incredibly stressed and very worried

See u tomorrow

Paula

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

paulathomas@me.com

Subject: ███████████████████████████████████

Date:    Monday, May 29, 2017 at 6:24:46 PM Pacific Daylight Time

From:    Paula Thomas

To:      Marcia Daley



Begin forwarded message:

From: Paula Thomas <paulathomas@me.com>
Date: May 6, 2016 at 5:28:19 PM PDT
To: DR VAN TASSLE  CITIZENS MEDICAL CENTER <drvt@drvt.net>
Subject: Paula Thomas

Dear Dr Van Tassle

I am struggling Terribly with my mental health I do not know what to do - I feel maybe I should see the
therapist you spoke of - can u please send me her information

I desperately need help - I am falling into a depression that is so dark I am worried for my well being

Thank you for you help

Paula

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

paulathomas@me.com

PAULA CRAMER, M.D.

INSTRUCTIONS

Paula Thames is under my care. She has had extreme stress which has led to gynecological abnormalities. I will follow but assume her seriousness can be watched and managed.

Paul Rutt

Larry S. Brandis, M.D.
Lic.#G29636 DEA#AB6573554

Joel Jaffe, M.D.
Lic.#G21950 DEA#AJ4987561
Gordon E. Van Tassell, D.O.
Lic.#28A6929 DEA#BV5038509

# CITIZENS MEDICAL GROUP

1500 St La Brea Ave  Hollywood CA 90028
Phone: (323) 464-1336  Fax: (323) 464-2103

11560 W. Pico Blvd.  W. Los Angeles, CA 90064
Phone: (310) 477-8285  Fax: (310) 477-9642

NAME _____ Thomas, Pavla _____

ADDRESS _____  DATE 2/23/16

R  Pavla is suffering

from severe anxiety

PTSD,

Depression

Stemming from stressful

employment situation

; loss of jobs

_____ M.D.

☐ Refill _____ Times _____ PRN NR
☐ DO NOT SUBSTITUTE  ☐ LABEL

# Citizens Medical Group
### 1300 North La Brea Avenue
Los Angeles, CA 90028
Tel: (323) 464-1356
### Fax: (323) 464-2163

## RELEASE TO RETURN TO WORK OR SCHOOL

Patient Name **Thomas, Paula**

D.O.B **2-20-66**                                        MR# _____

To: Employer / School

This Patient Is Under Our Care And:

☐ May Return To    Regular Duties/    Light Duties/    School On _____

☒ Requires A Medical Leave Of Absence From **4/20** To **5/4/15**

☒ Was First Seen For Problem On **4/20/15**

☒ Is Restricted From **Working** Until **5/4/15**

☒ Received Treatment At Our Office On _____ **2:30** In AM/**PM**

Condition _____

Comments _____

☐ JOEL JAFFE, M.D.

☐ LARRY S. BRANDIS, M.D.

☐ GORDON VAN TASSELL, D.O.          SIGNATURE Health Care Provider          Date

Dr. Gordon Van Tassell
Citizens Medical Group
1300 N. La Brea Avenue
Hollywood, CA 90028
(323) 464-1356

# Citizens Medical Group
### 1300 North La Brea Avenue
### Los Angeles, CA 90028
### Tel: (323) 464-1336
### Fax: (323) 464-2163

## RELEASE TO RETURN TO WORK OR SCHOOL

Patient Name: Thomas, Pauk

D.O.B. 2 / 20 / 66                                    MR# _____

To: Employer / School

This Patient Is Under Our Care And:

☐ May Return To    Regular Duties/    Light Duties/    School On _____

☐ Requires A Medical Leave Of Absence From _____ To _____

☒ Was First Seen For Problem On April 08, 2015

☐ Is Restricted From _____ Until _____

☒ Received Treatment At Our Office On 9:29 Is AM/PM.

Condition: Insomnia + Stress

Comments _____

☐ JOEL JAFFE, M.D.

☐ LARRY S. BRANDIS, M.D.

☒ GORDON VAN TASSELL, D.O.          SIGNATURE Health Care Provider     4 / 8 / 15 Date

Dr. Gordon Van Tassell
Citizens Medical Group
1300 N. La Brea Avenue
Hollywood, CA 90028
(323) 464-1336

# EXHIBIT "27"

Subject:     PDTW INVENTORY S/S 2014 - being sold by TW

Date:        Thursday, May 25, 2017 at 4:06:39 PM Pacific Daylight Time

From:        Paula Thomas

To:          Marcia Daley

Attachments: IMG_9241.PNG, IMG_9222.PNG

Being sold on very bad discounted site - de valuing the brand in a major way and selling my assets of PDTW LLC
without my consent





INSTAGRAM - misspaulathomas

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

- *,* ::
- Lookbook
- Articles & Studies
- Fashion News
- *,* ::



# Thomas Wylde Sample Sale Markdowns More than 90% OFF!

Posted by Handbag Honey on Aug 15th, 2015 in Shop News & Reviews | 2 comments



Thomas Wylde is another Los Angeles local favorite with a real rock star, celebrity clientele. They were one of the first to really take skull-print fashion and make it beautiful and elegant. We stopped by their sample sale today at their gorgeous showroom in Mid-City and were overjoyed to see additional markdowns on their already super-low prices! **All dresses on the wall racks are only $50 (retail $750-$2610!), all tops $25 (retail $500-$1200!), and pants and skirts $30. There is one lone rack of individually marked shirts for $25 (Retail $200-$300), dresses for $125-$150 (Retail $1,500), cotton and silk scarves for $25 and $30, respectively.**

Unfortunately, sizes are mostly smalls and x-smalls, with a few mediums and larges mixed in but even the larges run kind of small. We'd say size 6 and under would do well at this sale. However, there are TW signature leather, studded heels and boots on offer and their leather skull clutch is only $100! Also, there are larger zebra print scarves going for only $40 (retail $800).

omas Wylde Sample Sale Markdowns More than 90% OFF! | Handbag Honey



Silk print dresses now just $50



Pencil skirt dresses $50



Blouses and tops $25



Ruched, form-fitting gowns orig
$2610, now only $50!



Spring pieces individually marked
from $25-$150





kull clutch $100



tudded leather boots

 you're a fan of Thomas Wylde, the skull-print purveyor, this sale is not to be missed! Sale started yesterday and **ends today at PM. Thomas Wylde sample sale (look for the signs), 3231 S La Cienega Blvd, Los Angeles, CA 90016** (near Target and See's andies). Limited parking (do NOT park in the reserved spots, you will get towed).  Community dressing room. Good luck!

*Handbag Honey*

## Responses to "Thomas Wylde Sample Sale Markdowns More than 90% OFF!"

1.        *Jessie* says:
        September 3, 2015 at 9:55 am

        I would like to be on ur mailer to find out about upcoming sample sales or any sales lol thanks

        Reply

○   *Handbag Honey* says:
September 4, 2015 at 10:23 am

... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... just follow us on Instagram for upcoming sales! We ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... them when we get word, and then post our reviews of the sales on the website. See you on Instagram!

Reply

# Leave a Reply

Your email address will not be published.

Comment

Name

Email

Website

Submit Comment

# Connect on Instagram

 @thehandbaghoney
Searching high and low for the best bargains out there. Check out our sale reviews and must-have favorite items!

   



## Recent Posts

* Liquidation or RVM Malholm Center is ON in LIVE
* Kenya's H&M Lands at Beverly Center Today!
* Is This the End of Internet Couponing at Victoria's Secret?
* Sports Authority on Pico Blvd is DUNZO
* Boo Hoo Boutique Does Boho Just in Time for Coachella!
* Beyonce's IVY PARK for Topshop Dropped TODAY!
* Stone Cold Fox Moving Sale Was a True BUST!
* REVIEW: L'Agence Sample Sale, Everything $10!
* Spring Is Here and So Are the Sales!

## Recent Comments

* Handbag Honey on REVIEW: BCBG Maxazria Warehouse Sale
* Handbag Honey on REVIEW: BCBG Maxazria Warehouse Sale
* Handbag Honey on REVIEW: Clare Vivier First Ever Sample Sale
* Handbag Honey on REVIEW: BCBG Maxazria Warehouse Sale
* Handbag Honey on REVIEW: BCBG Maxazria Warehouse Sale

## About Handbag Honey

Handbag Honey was born and raised in Los Angeles, CA. Her career is in the music industry where she gets to work with many musicians, bands, other celebrities and industry folk, many of whom share her love of fashion and shopping. She has a stock broker's attitude to shopping - get the best price out there. Just like everybody else, she works too hard for her money to waste it paying retail.

With this blog, Handbag Honey sets out to tip you off to the best sales and finds she comes across, whether she's just cruising the neighborhoods of Los Angeles, road-tripping to Coachella or scouring outlets throughout the country. She hopes you'll do the same.

To share any shopping tips or for general comments or questions, please visit Handbag Honey's Contact page.

Powered by WordPress | Designed by Elegant Themes

**Subject:** PDTW INVENTORY S/S 2015 being sold by TW without my consent

**Date:** Thursday, May 25, 2017 at 4:10:57 PM Pacific Daylight Time

**From:** Paula Thomas

**To:** Marcia Daley

**Attachments:** IMG_0222.PNG, IMG_0243.PNG

See below blue version on the rack of the back dress in photo - also included on this sale rack is some of my pre fall
PDTW inventory also





INSTAGRAM - misspaulathomas

PAULA THOMAS
CREATIVE DIRECTOR

WWW.PAULATHOMAS.WORLD

AUTHENTICITY        100% QUALITY CHECKED      SECURE PAYMENT            HELP & SUPPORT
GUARANTEED                                                              Log in          Sign up

# VESTIAIRE
# [ COLLECTIVE ]

Search

Shopping bag [0]

JUST IN   READY TO SHIP   WOMEN   MEN   VINTAGE   KIDS   LIFE & LIVING   BRANDS   LE JOURNAL   **SELL**

ABOUT US

## BUY AND SELL PRE-OWNED LUXURY FASHION

Home Page  >  THOMAS WYLDE

# THOMAS WYLDE



## 🌸 COMMUNITY

## ▦ CATALOG

MY SELECTION
288 item(s)

**🔔 CREATE AN ALERT**

All                              ⌄

▾ **WOMEN**

☐ Bags

☐ Handbags

☐ Clutch bags

☐ Shoes

☐ Boots

☐ Sandals

Selling PDTW Assets
Without Paula's Knowledge
or permission.

☐ Very good condition
☐ Good condition
☐ Fair condition

## ▼ PRICE

| 0 | 1450 |
|---|---|
| $ 0 | $ 1450 |

## ▼ AND ALSO ...

☐ We LOVE
☐ Further reductions
☐ Ready To Ship
☐ Remove sold items
☐ U.S. Ready To Ship only
☐ U.S. items only
☐ Remove items with
   shipping restrictions

IAS WYLDE                                    SORT BY ▼







**S WYLDE**
ther handbag                          4
ıld ! Friday, 14 March, 2014

**THOMAS WYLDE**              15
Black leather clutch bag
**Oops sold !** Saturday, 21 November,
2015

**THOMAS WYLDE**              7
Clutch bag / hand-held bag, in genuine
leather
**Oops sold !** Sunday, 9 February, 2014



**WYLDE**
mmetric see-through dress

ld ! Friday, 13 June, 2014



**THOMAS WYLDE**
Grey silk dress
Size: XS
Oops sold ! Friday, 3 July, 2015



**THOMAS WYLDE**
Silk foulard scarf
Oops sold ! Tuesday, 28 January,
2014



**WYLDE**
ack leather handbag
ld ! Saturday, 30 November,



**THOMAS WYLDE**
Skull clutch
Oops sold ! Thursday, 17 July, 2014



**THOMAS WYLDE**
Black leather handbag
Oops sold ! Sunday, 14 December,
2014



**WYLDE**

old ! Sunday, 5 January, 2014



**THOMAS WYLDE**
Studded bag
**Oops sold ! Sunday, 19 October, 2014**



**THOMAS WYLDE**
Barolo skull clutch
**Oops sold ! Friday, 8 November, 2013**



**WYLDE**
top

old ! Saturday, 22 March, 2014



**THOMAS WYLDE**
Black cotton dress
Size: XS
**Oops sold ! Sunday, 9 August, 2015**



**THOMAS WYLDE**
Black leather bag
**Oops sold ! Sunday, 13 October, 2013**



**WYLDE**
scarf
old | Wednesday, 11 March.



**THOMAS WYLDE**
Long thomas wilde tunic
Size: One Size FR
**Oops sold |** Sunday, 13 October, 2013



**THOMAS WYLDE**
Black leather bag
**Oops sold |** Sunday, 1 September, 2013



**WYLDE**

old | Sunday, 4 October, 2015



**THOMAS WYLDE**
Scorpion clutch
**Oops sold |** Saturday, 2 November, 2013



**THOMAS WYLDE**
Grey handbag
**Oops sold |** Monday, 7 July, 2014



WYLDE
scarf
old ! Sunday, 15 September,



**THOMAS WYLDE**
Brown silk scarf
**Oops sold ! Wednesday, 4 June, 2014**

2



**THOMAS WYLDE**
Scarf
**Oops sold ! Thursday, 30 May, 2013**

2



WYLDE
in belt
cm
old ! Thursday, 14 May, 2015

4



**THOMAS WYLDE**
Skull bag
**Oops sold ! Monday, 20 October, 2014**

8



**THOMAS WYLDE**
Black leather skull bag
**Oops sold ! Monday, 1 July, 2013**

11



; WYLDE

ld ! Monday, 20 May, 2013



**THOMAS WYLDE**
Silk scarf
**Oops sold !** Monday, 16 September, 2013



READY TO SHIP

**THOMAS WYLDE**
Black leather clutch bag
**Oops sold !** Wednesday, 20 March, 2013



. WYLDE
ther jacket
UK
ld ! Thursday, 29 August,



READY TO SHIP

**THOMAS WYLDE**
Silk top
Size: S
**Oops sold !** Saturday, 2 March, 2013



**THOMAS WYLDE**
Multicolour silk scarf
**Oops sold !** Tuesday, 21 May, 2013

By continuing to use this site you agree to the use of cookies designed to personalise our offers and services according to your interests, so that you do not have to enter your username every time you log on, or so that we can analyse visitor traffic. More

OK







WYLDE
scarf
ld | Thursday, 13 August,    3

THOMAS WYLDE    6
Grey silk scarf
Oops sold | Tuesday, 30 October, 2012

THOMAS WYLDE    7
Grey patent leather handbag
Oops sold | Wednesday, 28 October, 2015



READY TO SHIP



READY TO SHIP

WYLDE    10
ag
ld | Thursday, 19 July, 2012

THOMAS WYLDE    6
Purple top
Size: XS
Oops sold | Tuesday, 8 May, 2012

THOMAS WYLDE    1
Grey leather handbag
Oops sold | Saturday, 10 November, 2012



**; WYLDE**
ag
ld ! Friday, 16 March, 2012



**THOMAS WYLDE**
Skull bag
Oops sold ! Thursday, 12 January, 2012



**THOMAS WYLDE**
Brown leather handbag
Oops sold ! Monday, 6 August, 2012



**i WYLDE**
lher handbag
ld ! Sunday, 18 December,



**THOMAS WYLDE**
Leather handbag
Oops sold ! Friday, 25 January, 2013



**THOMAS WYLDE**
Brown leather clutch bag
Oops sold ! Monday, 3 October, 2011







S WYLDE
eather clutch bag
old ! Tuesday, 23 August, 2011

THOMAS WYLDE
Purple patent leather clutch bag
**Oops sold !** Wednesday, 21
September, 2011

THOMAS WYLDE
Black leather jacket
Size: 34/36 FR
**Oops sold !** Thursday, 19 July, 2012

PER PAGE

◀ Previous | 1 | 2 | 3 | 4 | **5** | Next ▶

Become a member
## PREMIUM
Subscribe to PREMIUM today for
fast-track access to new items from
our community

> SUBSCRIBE

# WEAR NOW, PAY LATER
Split your purchase into easy
monthly installments

> LEARN MORE>

Streamline your wardrobe
## Sell with us
What are you waiting for? Start
selling now to our community of
fashion lovers

> START SELLING

  Apps



· United States / en / $ USD

Vestiaire Collective is *the* leading online marketplace to buy and sell pre-owned luxury fashion. Choose from 5 million products, right across a range of brands and even luggage, shoes and accessories. Payment is valid within the US only.

© 2017 Copyrights VestiaireCollective.com · All the brands presented belong to their owners.

*Legal Information* · *General conditions of use and sale.* · *Affiliate Program*

*~Vestiaire Collective in French~ ~Vestiaire Collective in German~ ~Vestiaire Collective in Italian~ ~Vestiaire Collective in spanish~*



# EXHIBIT "28"



1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

3

4   DAVID SCALI, et al.,                    CERTIFIED

                                             TRANSCRIPT

5                 Plaintiffs,        )

                                     )

6         vs.                        ) Case No. BC596495

                                     )

7   THOMAS WYLDE, LLC, et al.,       )

                                     )

8                 Defendants.        )

    _____ )

9

10

11

12

13              DEPOSITION OF STEPHEN CHOI

14                 Irvine, California

15                  March 1, 2017

16

17

18

19

20

21   Reported by:

22   DENISE HERFT

23   CSR No. 12983

24

25

              Hahn & Bowersock. A Veritext Company
                        800.660.3187

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

POPULAR STANDS, INC., :

　　　　　　　　Plaintiffs,　　　）

　　　　　　　　　　　　　　　）

　vs.　　　　　　　　　　)Case No. BC596495

　　　　　　　　　　　　　　　）

THOMAS WYLDE, LLC, et al.,　　）

　　　　　　　　　　　　　　　）

　　　　　　　　Defendants.　　）

　─────────────────────────）

15　　　　DEPOSITION OF STEPHEN CHOI, taken on
16　behalf of the Plaintiffs at 38 Corporate Park,
17　Irvine, California, commencing at 10:04 a.m. on
18　March 1, 2017, reported by DENISE HERFT, CSR No.
19　12983, pursuant to Notice.

Page 2

For the Plaintiffs:

58 Corporate Park
Irvine, California  92606
(949) 261-7700
(949) 261-8800  Facsimile
lbooth@kringandchung.com

For the Defendants:

RICHARD BYRON PEDDIE P.C.
BY:  RICHARD BYRON PEDDIE, ESQ. (Telephonic Appearance)
5051 Euclid Avenue
Boulder, Colorado  80303
(303) 444-5447
(720) 222-4766  Facsimile.
lawstudios@comcast.net

For the STEPHEN CHOI:
LAW OFFICES OF JOHN D. WILSON
BY:  JOHN D. WILSON, ESQ.
1900 Avenue of the Stars
Suite 960
Los Angeles, California  90067-4310
(310) 277-2323
(310) 556-2308  Facsimile
johnw@jdwilsonlaw.net

Also Present:
Paula Thomas

Amber Valles, Student Reporter

Page 3

Q   What high school did you go to?

A   The Asheville School.

Q   The what?

A   The Asheville School.

Q   Asheville?                                    10:19:00

A   The A-s-h-e-v-i-l-l-e.

Q   What year did you graduate?

A   1985.

Q   Did you attend any college?

A   In 1986 I went to NC State for a year, and    10:19:15
then I graduated from the University of Colorado,
Boulder in 1994.

Q   What was your degree in?

A   Biochemistry and molecular biology.

Q   Do you have any post-graduate education?      10:19:37

A   I have an M.B.A. from USC 1999.

Q   Anything else?

A   No.

Q   Are you currently employed?

A   No.                                           10:19:48

Q   When's the last time you were employed?

A   The last time I received a paycheck from a
company 2006, 2006, I believe.  It's 2005, 2006,
something around that period of time.

Q   Going back quickly, was that North            10:20:15

Page 18

A    Yes.

Q    ...

... ...

A    Sporting Bet PLC.                                    10:20:24

Q    Sporting Vet?

A    Sporting Bet, it's a UK Company.

Q    What kind of business was it?

A    Online gambling company.

Q    What was your position with Sporting Bet?    10:20:38

A    I was the managing director of the

Americas, which is North America --

      MR. PEDDIE:  I hate to keep interrupting.

I'm going to call back in again to see if it works

better.  You can guys carry on.                        10:20:57

BY MS. BOOTH:

Q    How long did you work for Sporting Bet?

A    Four years.

Q    Did you have any employment prior to

Sporting Bet?                                          10:21:16

A    Previous to that I was working in the

pharmaceutical business.  I was working for a

company called LabCorp, L-a-b, C-o-r-p, before that.

I worked for a company called Steris, S-t-e-r-i-s.

Q    What was your position with LabCorp?        10:21:36

Page 19

exact term, something like that.  That's what we
were doing

BY MS. BOOTH:                                                      10:21:55

    Q    How long did you work for Steris?

    A    Each of those companies was probably a
year or so.

    Q    What was your position with Steris?

    A    Research.                                                 10:22:02

    Q    Are you currently a member or officer in
any LLC or corporation?

        MR. WILSON:  You can answer yes to that or
no but not give any details.

        THE WITNESS:  I -- actually, yes, I think,   10:22:21
yes.

BY MS. BOOTH:

    Q    And how many LLCs or corporations or
partnerships are you a member or officer of?

    A    Okay.  So a member and/or officer, is that   10:22:50
the question?

    Q    Correct.

        MR. WILSON:  Remember, you don't give any
details.  Just a give number here.

        THE WITNESS:  Okay, yes.  I don't actually   10:23:03

                                                    Page 20

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**1516 WESTWOOD BLVD. #102, LOS ANGELES, CA 90024**

A true and correct copy of the foregoing document entitled (specify): **DECLARATION OF PAULA THOMAS IN SUPPORT OF HER MOTION FOR ENTRY OF AN ORDER (i) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE ALTERNATIVE, (ii) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION OF RELATED COURT ACTIONS;** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) **July 6, 2017,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Richard B. Peddie (Attorney for Thomas Wylde and Jene Park):** lawstudios@comcast.net;
**Misty A. Perry Isaacson (Attorney for Debtor):** misty@ppilawyers.com
**Nancy Zamora (Attorney for Trustee):** zamora3@aol.com
**Larry D. Simons (Chapter 7 Trustee)** larry@simonslaw.com
**OUST-Riverside (US Trustee):** ustpregion16.rs.ecf@usdoj.gov
**Andrey Haley (Attorney for Landlord)** ahaley@shoreline-law.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (date) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) **July 6, 2017,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**The Honorable Scott H. Yun, 3420 Twelfth Street, Suite 345, Riverside, CA 92501**

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 6, 2017 | Janet Grundfest | /s/ Janet Grundfest |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-6
Case 6:16-bk-15889-SY
Central District of California
Riverside
Tue Jun 20 14:37:36 PDT 2017

LCCF Blackwelder Fee Owner LLC
730 East Colorado Blvd 5th Floor
Pasadena, CA 91101-2193

Hahn Fife & Company, LLP
790 E. Colorado Blvd., 9th Fl.
Pasadena, CA 91101-2193

LCCF Blackwelder Fee Owner LLC
1243 N. La Cienega Blvd.
Los Angeles, CA 90035-3312

PDTH, LLC
3514 S. Toledo Avenue
Palm Springs, CA 92264-9534

Thomas Wylde, LLC
Thomas Wylde, LLC
235 W 31st Street
Los Angeles, CA 90007-3805

Riverside Division
3420 Twelfth Street,
Riverside, CA 92501-3819

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO, CA 95812-2952

Franchise Tax Board
Bankruptcy Section MS A340
PO BOX 2952
Sacramento CA 95812-2952

Greenwald Pauly & Miller
Attn: Andrew J Haley Esq
1299 Ocean Ave Ste 400
Santa Monica CA 90401-1007

Jean Burk
17114 Dewey St
Los Angeles CA 90066-1023

Kring & Chung LLP
38 Corporate Park
Irvine CA 92606-5105

LCCF Blackwelder Fee Owner LLC
Attn: Managing Agent
One Post Office Square Ste 3150
Boston MA 02109-2109

Lincoln Property Company
1243 S La Cienga Blvd
Los Angeles CA 90016-3123

Murphy and Rosen
Attn: Paul Murphy
100 Wilshire Blvd., #1300
Santa Monica, CA 90401-1191

Office of the U.S. Trustee
3801 University Avenue
Suite 720
Riverside, CA 92501-3255

Paula Thomas
Allyson Thompson Esq
Kring & Chung
38 Corporate Park
Irvine CA 92606-5105

Richard L. Puddie, Esq.
5051 Euclid Avenue
Boulder, CO 80303-2021

Southern California Land Use
Attn: Doren Laureano
899 W Pacific Coast Hwy #351
Redondo Beach CA 90277-6053

Thomas Wylde, LLC
Attn: Jean Burk
1331 S. La Cienga
Los Angeles, CA 90016-3312

United States Trustee (RS)
3801 University Avenue, Suite 720
Riverside, CA 92501-3255

Larry B Sizemore (TR)
7121 Magnolia Ave
Riverside, CA 92504-3805

Misty & Perry Isaacson
Dagter and Perry Isaacson, APLC
535 N Cabrillo Park Dr Ste 104
Santa Ana, CA 92701-5027

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Courtney LLP

(u)Paula Thomas

End of Label Matrix
Mailable recipients    22
Bypassed recipients    3
Total    26