1  Dimitrios P. Biller (SBN: 142730-)
2  Marcia L. Daley (SBN;146579)
   15113 West Sunset Blvd. #9
3  Pacific Palisades, California 90272
4  (310) 459-9870
   biller_ltdconsulting@verizon.net
5  marciad@daleyandsackslaw.com
6
7  Attorneys for Paula Thomas

8            UNITED STATES BANKRUPTCY COURT

9        CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION
10

11  In re                              Case No.: 6:16-bk-15889 SY
    PDTW, LLC
12                                     CREEDITOR'S NOTICE OF
13                                     WITHDRAW PAULA THOMAS'
              Debtor                   MOTION (I) DISMISSING THE
14                                     DEBTOR'S CHAPTER 7 CASE; OR
15                                     IN THE ALTERNATIVE, (II)
                                       STAYING DEBTOR'S CHAPTER 7
16                                     PROCEEDINGS AND LIFTING THE
17                                     BANKRUPTCY STAY PENDING
                                       RESOLUTION OF RELATED COURT
18                                     ACTIONS; DECLARATION OF
19                                     DIMITRIOS P. BILLER

20

21        COMES NOW CREDITOR PAULA THOMASD (hereinafter "Ms.

22
    Thomas"), and by and through her undersigned counsel hereby files this Notice of
23

24  Withdrawal of Ms. Thomas Motion for Entry of an Order (I) Dismissing the

25  Debtor's Chapter 7 Case, or, In the Alternative (II) Staying Debtor's Chapter 7
26
27  Case and Lifting the Bankruptcy Stay Pending Resolution of Related Court

28  CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
    ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
    OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER          - 1

Actions. The Notice of Withdraw is submitted because on July 31, 2017 Ms.

Thomas discovered for the first time that the alleged $2,000,000.00 that Thomas

Wylde, LLC is seeking as a Creditor is a fraud on Ms. Thomas and the United

States Bankruptcy Court. Furthermore, the evidence proves that the Trustee and

counsel for the Trustee have colluded with Thomas Wylde, LLC and Richard

Peddie.

## I.

## INTRODUCTION

### A. Investments by "Hillshore Investments, S.A."

The testimony of Eniluz Gonzalez and her failure to produce any documents

to substantiate a S2,000,000.00 proves the "Hillshore Investment, S.A", the alleged

lender of the alleged *$2,000,000.00 loan,* is a complete "shell corporation" and

does not exist. An Account Transaction document that Stephen Choi produced at

his deposition in the State Court action clearly shows that "Hillshore Investment,

S.A." *invested $2.3 million* into Thomas Wylde, LLC in 2014 in return for

*"equity"* in Thomas Wylde, LLC. Bank statements for Thomas Wylde, LLC

indicate an **additional $3.1 million was invested in Thomas Wylde, LLC** by

"Hillshore Investment" to obtain 90 units of membership and to become the

majority membership holder without Paula Thomas knowledge.    "Hillshore

1  Investment, S.A." did not invest any money in Thomas Wylde, LLC in 2015, and

2  invested an additional *$3.2 million in 2016*. The $5.5 million investment was

3

4  made so "Hillshore Investment, S.A." could become a majority membership holder

5  with 90 units and dilute Ms. Thomas' interests from 38% interest in the company

6

7  to 1.8% interest in September, 2015.

8      Although the Trustee and Nancy Zamora have taken a very aggressive

9

10 position against Ms. Thomas, and have sided with Thomas Wylde, LLC in legal

11 and factual positions, the Trustee and Nancy Zamora apparently have not even

12

13 searched for or read any documents that clearly show that the $2 million loan was

14 actually a $2.3 million investment to purchase equity. As their United States

15 Bankruptcy Court knows, Counsel for Ms. Thomas, Dimitrios P. Biller, has

16

17 repeatedly stated that there is collusion between Richard Peddie/ Thomas Wylde,

18 LLC and the Trustee/Nancy Zamora. Richard Peddie received the Account

19 Transaction document at the deposition of Stephen Choi in March 2017 that clearly

20

21 shows "Hillshore Investments, S.A." invested, not loan, $2.3 million in 2014 (not

22 $2,000,000.00 as stated in the Agreement to Purchase Membership Units) into

23 Thomas Wylde, LLC. Yet, Richard Peddie continued forward with the Thomas

24

25 Wylde, LLC claims based on the $2,000,000.00 alleged loan that was used to pay

26 debts. The Trustee and Nancy Zamora did not ask for any documents that would

27

28 CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER                    - 3

support the existence of a $2,000,000.00 loan. Thomas Wylde, LLC received $2.3 million in 2014 and an additional $3.2 in 2015 in return of putting Hillshore Investment, S.A. Thomas Wylde, LLC made the business decision to use those funds to pay debt that PDTW, LLC incurred and that was absorbed by Thomas Wylde, LLC. When Hillshore Investment, LLC paid the $2.3 million in 2014 and an additional $3.2 in 2015, "Hillshore Investment" knew that it was buying into a company that had substantial debt and the $2.3 million invested in 2014 was used to pay that debt. If anyone has a claim it is "Hillshore Investment, S.A." against Thomas Wylde, LLC.

**B. Complaints of Collusion**

As this Court records, Larry Simons abruptly interfere Dimitrios P. Biller's argument that Nancy Zamora was colluding with Thomas Wylde's, LLC, and Richard Peddie. The Court instructed Larry Simons to allowed Mr. Biller to make a record. Larry Simons then submitted a [PROPOSED] Order stating that the Court made a finding that there was not collusion. Ms. Thomas objected to that language and the Court struck that paragraph from the [PROPOSED] Order. Ms. Thomas maintains that both the unprofessional interruption of Mr. Biller oral argument stating that where is *not collusion,* and the submission of a [PROPOSED] Order, violated *Rule 5-200 of the Rules of Professional Conduct.*

CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE, OR IN THE ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER                    - 4

1    Ms. Thomas will call Richard Peddie as a witness on August 28, 2017 to

2

3    prove up that Thomas Wylde, LLC retained Mr. Peddie as its attorney to assist

4    Thomas Wylde, LLC to commit crimes/frauds or to actually commit those crimes

5    and frauds based on non-privileged documents. Ms. Thomas served the deponent

6

7    Eniluz Gonzalez on July 31, 2017 to appear in the United States Bankruptcy Court

8    and testify before this Court and to produce documents that were subpoenaed for

9

10   production at her deposition but she does not produce.

11   **C. The Evidence**

12   Ms. Thomas has submitted exhibits to the Declaration of Dimitrios P. Biller

13

14   to support the statements set forth *infra*. This Declaration and attached exhibits

15   are also submitted in support of Ms. Thomas' *Ex Parte Application* for an Order

16

17   (1) that Thomas Wylde, LLC return her personal tax returns, (2) consider any

18   pleadings that contain any information obtained from the tax returns, (3) stay the

19

20   auction by RL Spears, Co. Inc., (4) hold an evidentiary hearing for the Court to

21   evaluate the evidence and consider the fraud/fraud exception to the attorney-client

22   privilege that will allow Paula Thomas to cross examine Richard Peddie.

23

24   **D. The Fraud on the Court and Thomas Wylde, LLC.**

25   Paula Thomas would never sign the Purchase Agreement if she knew that

26   Hillshore Investment, S.A. for the majority of her company. Thomas Wylde, LLC

27

28   CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
     ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
     OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER                        - 5

present the Purchase Agreement of proof of a $2,000,000 "loan" to Thomas

Wylde, LLC when the $2.3 million injected into Thomas Wylde, LLC in 2014 was

an investment.

## II.

## DECLARATION OF DIMITRIOS P. BILLER

1.     I am one of the attorneys representing Paul Thomas in these

Bankruptcy proceedings, the State Court action and the Federal Court action. I

prepared the complaint filed in the United States District Court for the Central

District of California. I have personal knowledge of the facts, statements,

documents, and circumstances described in this Declaration and I would provide

competent testimony on these issue.

2.     I personally prepared and cause to be served the subpoena duces

tecum that is attached as **Exhibit "1"** to compel the appearance of Eniluz Gonzalez

at a deposition and produce documents. The deposition took place on July 31,

2017. I prepared the subpoena duces tecum as part of my law practice and I have

maintained the original in a safe and secure place as is my regular business

practice. I served the subpoena duces tecum because Ms. Gonzalez appears to be

the "*President*" and "*General Manager*" for "Hillshore Investments, S.A." Ms.

Gonzalez did not produce any documents that were requested in the subpoena

CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER       - 6

duces tecum related to any loan between Hillshore Investments, S.A. and Thomas

Wylde, LLC. Attached as **Exhibit "2"** are some of the records that I relied upon to

cause me to prepare and issue the subpoena duces tecum on Ms. Gonzalez. I

obtain **Exhibit "2"** through the internet as part of my law practice and I have

maintained the original I received in a safe and secure place as is my regular

business practice.

3.      Ms. Gonzalez testified that she does not know if "Hillshore

Investment, S.A." has a physical location to conduct business, employees,

telephone number, banks accounts, the names of any directors and officers. She

claims she is the 100% shareholder in "Hillshore Investment, S.A.", but she does

not have any shares of certificates of shares. She does not have knowledge of a

$2,000,000.00 loan allegedly given to Thomas Wylde, LLC. She does not have

any documents proving a $2,000,000.00 were given to Thomas Wylde, LLC. She

lives at 317 17th Manhattan Beach, California and later claimed that "Hillshore

Investment, S.A." operates out of that location, but there are no documents related

to "Hillshore Investment, S.A." She also testified there are not any minutes of any

Broad of Director meetings, and she has never had a Shareholder's Meeting.

4.      Stephen Choi, the person who allegedly caused $2,300,000.00 to be

transferred from "Hillshore Investment, S.A." to Thomas Wylde, LLC in 2014 for

1    an "investment" not a "loan" is the husband of Mrs. Gonzalez.   Ms. Thomas' prior

2    counsel noticed the deposition of Mr. Choi and included a substantial demand for

3

4    production of documents.  I have read the deposition testimony of Stephen Choi

5    and the Notice of Deposition/Production of Documents.  **Exhibit "3"** is a true and

6

7    correct copy of the Notice of Taking Deposition and Production of Documents that

8    was attached to the transcript.  Mr. Choi testified that he did not retrieve any of the

9    documents actually produced from "Hillshore Investment, S.A." but obtained at

10

11   least one document from Thomas Wylde, LLC.  He produced the Account

12   Transaction document showing all the transactions between "Hillshore Investment,

13   S.A." and Thomas Wylde, LLC from 2014 to 2017.  This document clearly shows

14

15   that $2.3 million was transferred allegedly from "Hillshore Investment, S.A" to

16   Thomas Wylde, LLC as "investments" not "loans."  **Exhibit "4"** is a true and

17   correct copy of the Account Transaction document that Mr. Choi produced at his

18   deposition.  There is an entry for $500,000.00 of the $2,300,000.00 for equity in

19

20   Thomas Wylde, LLC.  There is clearly a notation that the "loan" should be

21   converted to "equity" in Thomas Wylde, LLC on December 31, 2014.

22

23        5.    There is a big difference between a "loan" and an "investment."

24   Wikipedia defines a "loan" as:

25

26

27

28   CREEDITOR'S NOTICE OF WITHDRAW PAELA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
     ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
     OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER        - 8

1   In finance, a **loan** is the lending of money from one individual,

2   organization or entity to another individual, organization or entity. A

3

4   loan is a debt provided by an entity (organization or individual) to

5   another entity at an interest rate, and evidenced by a promissory

6   note which specifies, among other things, the principal amount of

7

8   money borrowed, the interest rate the lender is charging, and date of

9   repayment. A loan entails the reallocation of the subject asset(s) for a

10

11   period of time, between the lender and the borrower.

12   In a loan, the borrower initially receives or *borrows* an amount

13   of money, called the *principal*, from the lender, and is obligated

14

15   to *pay back* or *repay* an equal amount of money to the lender at a later

16   time.

17

18   The loan is generally provided at a cost, referred to as interest on

19   the debt, which provides an incentive for the lender to engage in the

20

21   loan. In a legal loan, each of these obligations and restrictions is

22   enforced by contract, which can also place the borrower under

23   additional restrictions known as loan covenants. Although this article

24   focuses on monetary loans, in practice any material object might be

25

26   lent.

27

28   CREDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P BILLER                     - 9

Acting as a provider of loans is one of the principal tasks for financial institutions such as banks and credit card companies. For other institutions, issuing of debt contracts such as bonds is a typical source of funding.

6.    Wikipedia defines "invest" as:

When starting a business, the owners fund the business to finance various operations. Under the model of a private limited company, the business and its owners are separate entities, so the business is considered to owe these funds to its owners as a liability in the form of share capital. Throughout the business's existence, the equity of the business will be the difference between its assets and debt liabilities; this is the accounting equation.

When a business liquidates during bankruptcy, the proceeds from the assets are used to reimburse creditors. The creditors are ranked by priority, with secured creditors being paid first, other creditors being paid next, and owners being paid last. Owner's equity (also known as risk capital or liable capital) is this remaining or residual claim against assets, which is paid only after all other creditors are paid. In such cases where even creditors could not get enough money to pay their

bills, the owner's equity is reduced to zero because nothing is left to reimburse it.

7.      Prior to July 2014, Ms. Thomas sold her designs of clothes through PDTW, LLC, and Ms. Thomas was the 100% owner of that business. For some unknown reason that I have not been able to discover, David Schnider (in-house counsel or PDTW, LLC), John Hanna, Jene Park decided to start up "Thomas Wylde, LLC", and the Operating Agreement shows Doug Lee, Roger Kou, John Hanna, and Jene Park as the only members of that new company; Paula Thomas was not given any units of membership. **Exhibit "5"** is a true and correct copy of the Operating Agreement that I received from prior counsel.

8.      On December 22, 2014 Ms. Thomas signed a document named "Agreement to Purchase Membership Interests (Purchase Agreement) in which Ms. Thomas purchased her 64 units of membership of Thomas Wylde, LLC for $3,200.00 and an Employment Agreement in return for Ms. Thomas agreeing that her intellectual property rights would transfer to Thomas Wylde, LLC. As a "condition precedent." First, "Hillshore Investments funding of a Two Million Dollar ($2,000,000.00) loan to the Company." Second, "The Company's execution and delivery of an employment agreement for Paula in a form mutually agreed to by the parties." **Exhibit "6"** is a true and correct copy of the

1  "Agreement to Purchase Membership Interest" that Paul Thomas signed and John

2
3  Hanna signed for Thomas Wylde, LLC. The Transaction Account document does

4  not show any transactions or wire transfers from Thomas Wylde, LLC to Hillshore

5
6  Investments, S.A. from August 2014 to the present time (three years and no

7  payment on an alleged loan). Since "Hillshore Investment, S.A" did not make a

8  $2,000,000.00 loan to Thomas Wylde, LLC, Hillshore Investment/Thomas Wylde,

9
10  LLC breach that agreement and none of Thomas Wylde, LLC intellectual property

11  transfer; it still belongs to her.

12       9.    The evidence will conclusively show that Stephen Choi through
13
14  "Hillshore Investments, S.A.", Thomas Wylde, LLC, John Hanna, Jene Park, and

15  Richard Peddie conspired to take all of Ms. Thomas' interest in Thomas Wylde,

16
17  LLC, sell her intellectual property, and wrongful terminate her employment.

18       10.   April 15, 2015 was a significant day for reasons other than the last day

19  to file tax returns for most people. On that day, the fraud was completed. First, the
20
21  evidence will show that is the last day Thomas Wylde, LLC paid Paula Thomas as

22  an Employee under the alleged Employment Agreement for the last time –

23
24  termination of employment. **Exhibit "7"** is a chart of payments to Paula Thomas

25  indicating Paula Thomas only received a portion of her monthly salary on April 15,

26  2015. Second, Thomas Wylde, LLC apparently amended the Members and Capital

27

28

1  Contributions on that day to show for the first time Hillshore Investments owned

2
3  90 units of membership to 64 units of membership for Paula Thomas. Ms.

4  Gonzalez testified that she is unfamiliar with the address given to "Hillshore

5  Investment, S.A." with an "investment" of *$5.5 million* on the Amended Operating
6
7  Agreement. **Exhibit "8"** is a true and correct copy of the "**AMENDED EXHIB**

8  **B**" of the MEMBERS AND CAPITAL CONTRIBUTIONS" dated April 15,

9
10  2015." Third, it will be Ms. Thomas' position that she was clearly terminated on

11  April 15, 2015 when Thomas Wylde, LLC stopped paying her the monthly salary

12  of $25,000.00 and only paid her salary up to April 15, 2015 in the amount of
13
14  $16,666.67. There is not any evidence that I have identified that proves the

15  termination of employment was for "Cause" as required by the Employment

16
17  Agreement.

18      11.    Then Richard Peddie joins the conspiracy to compete the fraud. I

19  believe the evidence will show, and the above evidence does show, the goal of the
20
21  conspiracy to commit fraud was to remove Paula Thomas from any business

22  operations that involved selling the clothes she designed and Thomas Wylde, LLC.

23
24  On May 14, 2015 (less than 30 days after April 15, 2015), Richard Peddie prepared

25  a letter and sent the letter to Ms. Thomas' attorney stating Paula Thomas has been

26  terminated and she will not receive her severance package as described in the

27
28  CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE, OR IN THE
ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER                - 13

1    Employment Agreement. **Exhibit "9"** is a true and correct copy of the May 14,

2

3    2014 letter that Richard Peddie wrote and that in referred to and incorporated in

4    John Hanna Reponses to Form Interrogatories and Special Interrogatories.

5    Apparently, Richard Peddie prepared and signed those responses to authenticate

6

7    the letter as the basis for termination. **Exhibit "10"** is a true and correct copy of

8    John Hanna's Responses to Special Interrogatories and Form Interrogatories.

9

10        12.    The Employment Agreement clearly states:

11            **Termination.** The Company shall have the right to

12    **terminate Employee's employment under this Agreement at any**

13

14    **time for Cause,** which termination shall be effective immediately.

15    **Termination for Cause shall mean the [1] commission of the**

16

17    **following acts by Employee [2] that are not reasonably cured [3]**

18    **within thirty days of Employee's receipt of [4] written notice from**

19    **the Company [5] detailing the specifics the alleged acts or**

20

21    **omissions of the Employee that Company believe fit the definition**

22    **of Cause:**

23

24            (i) material breach of this Agreement

25            (ii) intentional non-performance or mis-performance of

26    her duties, or refusal to abide by or comply with the reasonable

27

28    CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE
ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER                     - 14

1   directives of her superior officers, or the Corporation's policies and

2   procedures;
3

4                    (iii) willful dishonesty, fraud, or misconduct with respect

5   to the business or affairs of the Company, that in the reasonable
6
7   judgment of the Manager or a Supermajority of the Membership

8   Interest materially and adversely affects the Company;
9

10                   (iv)  conviction or, a plea of nolo contendere to, a
11  felony or other crime involving moral turpitude; or

12                   (v) the commission of any act that is a conflict of
13
14  interests (as defined above).

15      13.    **Exhibit "11"** is a true and correct copy of the Employment
16
17  Agreement. There is not any admissible evidence that the first notice of

18  termination was sent 30 days before the date of termination, and that Ms. Thomas

19  was give written notice as required by the Employment Agreement before May 14,
20
21  2015. The May 14, 2015 letter did not give Paula Thomas 30 days to cure any

22  conduct or actions that served as "Cause." The May 14, 2017 letter did not detail
23
24  what constituted "Cause." The May 14, 2015 letter did not identify any conduct or

25  actions that specifically was a material breach of the Employment Agreement.

26  Thomas Wylde, LLC retained Richard Peddie to write this May 14, 2015 to
27

28  CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE, OR IN THE
    ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION
    OF RELATED COURT ACTIONS: DECLARATION OF DIMITRIOS P. BILLER.                         - 15

1  commit the fraud of termination. Perhaps that is why Richard Peddie does not

2  appear in person before this Court in person.

3

4      14.    The submission of claims by Thomas Wylde, LLC to the United

5  States Bankruptcy Court is just another fraudulent act because there was never a

6  $2,000,000.00 loan made to Thomas Wylde, LLC by "Hillshore Investment, S.A."

7  

8  The evidence produced in the State Court action does not prove up any "loans", but

9  "investments" to get "equity" in Thomas Wylde, LLC. "Hillshore Investment,

10  S.A." gave Thomas Wylde, LLC $2.3 million in 2014 in return for equity, so it

11  

12  does not own "Hillshore Investment S.A." anything. As of 2017, Thomas Wylde,

13  LLC have invested at least $5.1 million according to the Account Transition

14  

15  document, but over $9,000,000.00 according to the Notice of Issuance of Now

16  Membership as of February 22, 2016. **Exhibit "12"** is a true and correct copy of

17  the Notice. Mrs. Gonzalez did not have any knowledge of this document. There is

18  

19  no evidence attached to the Thomas Wylde, LLC claims proving it has paid any

20  portion of the $2.3 million back to "Hillshore Investment, S.A."; there are not any

21  

22  Transaction Account documents showing payment of a loan from Thomas Wylde,

23  LLC to "Hillshore Investment, S.A." The only Transaction Account document

24  

25  proves NO payments have been made on an alleged "loan."

26

27

28

15.    On July 11, 2017 I caused to be served on David Spear a Notice of Deposition, for his deposition to be taken on August 4, 2017, and a Notice of Inspection regarding the PDTW, LLC assets on August 24 – August 28, 2017. This Notice of Deposition and Notice of Inspection were issued and served in furtherance of discovery in the Superior Court action presently pending before the Honorable Judge Michael Raphael, currently set to begin trial on October 10, 2017.

16.    On January 2, 2017, Thomas Wylde, LLC filed an additional Proof of Claim, Claim No. 10, which is an unsecured claim for an unsubstantiated $2,000,000 (hereinafter, **"Unsubstantiated Claim"**). This Unsubstantiated Claim was submitted in addition to its other unsubstantiated Claim Nos. 3, 4, 6, and 9, as well as Jene Park's unsubstantiated Claim No. 5, all of which are vehemently disputed. There may be other additional claims of which I have not been made aware, which will be disputed as well.

17.    After having reviewed the basis for the Unsecured Claim and the accompanying documentation, I find that it, much like all other claims and documents Thomas Wylde, LLC has, through its counsel and/or authorized agent, Richard Peddie (hereinafter, **"Mr. Peddie"**), filed as a creditor in this Chapter 7 case, as well as in the related State and Federal actions, are fraudulent, and, as

CREEDITOR'S NOTICE OF WITHDRAW PAULA THOMAS' MOTION (I) DISMISSING THE DEBTOR'S CHAPTER 7 CASE; OR IN THE ALTERNATIVE, (II) STAYING DEBTOR'S CHAPTER 7 PROCEEDINGS AND LIFTING THE BANKRUPTCY STAY PENDING RESOLUTION OF RELATED COURT ACTIONS; DECLARATION OF DIMITRIOS P. BILLER    - 17

such, meritless, invalid and unenforceable. The documents upon which Thomas

Wylde, LLC bases its Unsubstantiated Claim are:

a. **Agreement to Purchase Membership Interest**, dated December 22, 2014,

b. **Amended and Restated Operating Agreement** (not attached to the Proof of Claim),

c. **Clawback Agreement** (not attached to the Proof of Claim),

d. **Use of Proceeds Agreement**, dated December 22, 2014,

e. **Indemnity Agreement**, dated December 22, 2014,

f. **Action by Written Consent of the Members of PDTW, LLC**, dated December 22, 2014,

g. Thomas Wylde, LLC bank statement from Bank of Manhattan, for the month of December 2014,

h. Instagram postings from Thomas Wylde, LLC with commentary from Paula Thomas, and

i. select and limited excerpts from the Santi, Pastore and Hill valuation of the brand, Thomas Wylde.

19.     Aside from the documents to which Mr. Peddie points, documents that are in themselves fraudulent, and which form the basis for a string of illicit events and fraudulent actions by Thomas Wylde, LLC, Jene Park and Hillshore Investments, S.A., Thomas Wylde, LLC has failed to provide any substantiation for its various claims, but especially for Claim No. 10. The only indication of a perceived debt is Mr. Peddie's factual misrepresentations and faulty application of the law to the facts and events here before this Court.

20.     On two separate occasions now, once on July 28, 2017 and again on August 1, 2017, Trustee's counsel, Nancy Zamora, has demanded that I withdraw both the Notice of Deposition and the Notice of Inspection, in violation of and interfering with Paula Thomas' right to conduct discovery in preparation for the Superior Court trial (hereinafter "**State Proceedings**"). Exhibit **"13"** and Exhibit **"14"** are true and correct copies of Nancy Zamora's e-mail demands and my response thereto. Ignoring that the PDTW, LLC aspect of the State Proceedings has been stayed, and that neither she nor the Trustee have substituted in, or made an appearance as attorneys of record for PDTW, LLC in the State Proceedings, Ms. Zamora has served me with the Trustee's "meet-and-confer" via e-mail correspondence dated August 1, 2017, again demanding that I withdraw my Notice of Deposition and Notice of Inspection. See Exhibit "14".

21.    Given that Trustee, Larry Simon, clearly has expressed no desire to become involved in the State Proceedings, I must question Ms. Zamora's motives/reasons for twice now demanding my withdrawal of Mr. Spear's deposition and the related Notice of Inspection, when said deposition and inspection are to be conducted in connection with the State Proceedings, and which are vital to the discovery proceedings to which Paula Thomas has an inalienable right.

22.    I, Dimitrios P. Biller, declare under the penalty of perjury under the laws of the State of California, that the foregoing is true and correct. I executed this Declaration on August 1, 2017 in Pacific Palisades, California.


                              /S/ Dimitrios P. Biller

## PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On August 1, 2017, I caused to be served, via e-mail, the following pleadings:

### PAULA THOMAS' NOTICE TO WITHDRAW THE MOTION TO DIMISS; MEMORANDUM OF POINT & AUTHORITIES; DECL OF BILLER, EXHIBITS

Will be served or was served (a) on the judge in chambers in the form and (b) the

interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 5051 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants
>
> Richard B. Peddie: lawstudios@comcast.net
> Andrew Haley: ahaley@shoreline-law.com
> Misty A. Perry Isaacson: misty@ppilawyers.com
> Nancy J. Zamora: zamora3@aol.com
> OUST-Riverside: ustpregion16.rs.ecf@usdoj.gov

**XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California. I am aware that on motion of the party served, service is

presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

BY FEDERAL EXPRESS – I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express. Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business. The envelope was sealed and placed for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.

_____ BY PERSONAL SERVICE – I caused such envelope to be delivered by hand to the offices of the addressee.

_____ : E-mail at the above e-mail addresses.

**XXX** (State) I declare **under penalty of perjury under the laws of the State of California** that the foregoing is true and correct.

Executed on **August 1, 2017**, at Pacific Palisades, California.

/S/ Dimitrios P. Biller
Dimitrios P. Biller

# EXHIBIT "1"

Dimitrios P. Biller (142730)
LDT Consulting, Inc., Suite "9"
Pacific Palisades, CA 90272

TELEPHONE NO.: (310) 459-0970    FAX NO. (Optional):
E-MAIL ADDRESS (Optional): biller_consulting@verizon.net
ATTORNEY FOR (Name): Plaintiff Paula Thomas

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90017
BRANCH NAME: Central District

PLAINTIFF/PETITIONER: Paula Thomas

DEFENDANT/RESPONDENT: Thomas Wylde, LLC, et. al

| DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS | CASE NUMBER: BC596495 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO (name, address, and telephone number of deponent, if known):
Eniluz Gonzalez, 317 17th Street, Manhattan Beach, CA 900266

1. YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:

Date: July 25    Time: 9:00 a.m.    Address: 2049 Century Park East, # 2450, LA, CA 90067

a. ☐ As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc., § 2025.230.)

b. ☑ You are ordered to produce the documents and things described in item 3.

c. ☑ This deposition will be recorded stenographically ☐ through the instant visual display of testimony and by ☐ audiotape ☐ videotape.

d. ☐ This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
   See Attachment
   ☑ Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

   ☐ Continued on Attachment 4.

5. IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, AND CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.

6. At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: June 12, 2017

▶

Dimitrios P. Biller                    Dimitrios P. Biller
(TYPE OR PRINT NAME)                   (SIGNATURE OF PERSON ISSUING SUBPOENA)
(Proof of service on reverse)          (TITLE)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-020 [Rev. January 1, 2009]

DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE
AND PRODUCTION OF DOCUMENTS AND THINGS

Code of Civil Procedure §§ 2020.510,
2789, 722, 2025.930, 2025.250, 2025.620;
Government Code, § 68097.1
www.courtinfo.ca.gov

| PLAINTIFF/PETITIONER: Paula Thomas | BC596495 |
|---|---|
| DEFENDANT/RESPONDENT: Thomas Wylde, LLC, et. al | |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE
AND PRODUCTION OF DOCUMENTS AND THINGS

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things* by personally delivering a copy to the person served as follows:

   a. Person served (name):

   b. Address where served:

   c. Date of delivery:

   d. Time of delivery:

   e. Witness fees and mileage both ways (check one):

      (1) ☐     were paid. Amount: . . . . . . . . . . . $ _____
      (2) ☐     were not paid.
      (3) ☐     were tendered to the witness's
                 public entity employer as
                 required by Government Code
                 section 68097.2. The amount
                 tendered was (specify): . . . . . . . $ _____

   f. Fee for service: . . . . . . . . . . . . . . . . . . . . . . . $ _____

2. I received this subpoena for service on (date):

3. Person serving:

   a. ☐   Not a registered California process server
   b. ☐   California sheriff or marshal
   c. ☐   Registered California process server
   d. ☐   Employee or independent contractor of a registered California process server
   e. ☐   Exempt from registration under Business and Professions Code section 22350(b)
   f. ☐   Registered professional photocopier
   g. ☐   Exempt from registration under Business and Professions Code section 22451
   h. Name, address, telephone number, and, if applicable, county of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____

                             (SIGNATURE)

(For California sheriff or marshal use only)
I certify that the foregoing is true and correct.

Date:

▶ _____

                             (SIGNATURE)

DIMITRIOS P. BILLER (142730)
LDT Consulting, Inc.
15113 West Sunset Blvd., Suite "9"
Pacific Palisades, California 90272
Telephone (310) 459-9870
E-mail Address: biller_ldtconsulting@verizon.net

MARCIA DALEY (146,579)
DALEY & SACKS LAW RLLP
516 Westwood Boulevard, Suite 102
Los Angeles, California 90024
Telephone: (310) 985-2808
E-mail: marcia@daleyandsackslaw.com

CALIFONIA SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| PAULA THOMAS, INDIVIDUALLY AND IN THE RIGHT OF AND FOR THE BENEFIT OF THOMAS WYLDE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, AND PDTW [PAULA DOROTHY THOMAS WYLDE], LLC, A CALIFRONIA LIMITED COMPANY,<br><br>        Plaintiffs,<br><br>vs.<br><br>THOMAS WYLDE, LLC, A CALIFORNIA LIMITED LIABILTY COMPANY, JOHN HANNA, AN INDIVIDUAL, JENE PARK, AN | Case No.: BC596495<br><br>PLAINTIFF'S **AMENDED** NOTICE OF DEPOSITION OF ENILUZ GONZALEZ AND DEMAND FOR PRODUCTION OF DOCUMENTS PURSUANT TO *CALIFORNIA CODE OF CIVIL PROCEDURE §§2025.010 AND 2031.010, 1985.1 AND 1985.3* |

1  INDIVIDUAL, SHOT IN THE
2  ARMOIRE, LLC, A FLORIDA
   LIMITED LIABILTY COMPANY,
3  AND H&H FASHION, LLC, A
4  FLORIDA LIMITED LIABILTIY
   COMPANY, AND DOES 1 THROUGH
5  50,
6
7
8              Defendants
9
10      **NOTICE IS HEREBY GIVEN** that Plaintiff Paula Thomas shall take the

11  deposition of Eniluz Gonzalez (Managing Director of Hillshore Investment, S.A.)
12
13  on **August 7, 2017**, commencing at 9:00 a.m. at Veritext, located at 2049 Century
14  Park East, Suite 2450, Los Angeles, CA 90067; (310) 284-9000. *California Code*
15
16  *of Civil Procedure §2025.010*. The deposition shall be recorded by a
17  licensed/certified stenographic reporter. The deposition shall continue day to day
18  until completed, except for holidays and weekends. The deponent/witness is a
19
20  non-party to this lawsuit, but has been name a party in a case filed in the United
21  States District Court for the District of California. The deponent has substantial
22
23  personal knowledge regarding facts that are relevant to the State Claims, Cross-
24  Claims and Defenses because she was in control and ownership of Hillshore
25  Investment, S.A. and that corporation invested $9.5 million in Thomas Wylde,
26
27  LLC a Defendant in this action.
28

2

PLAINTIFF ALSO GIVES NOTICE that Plaintiff Paula Wylde, LLC shall demand the production of DOCUMENTS as defined below at the time of the Deposition on July 25, 2017. The demand for production is made pursuant to *California Code of Civil Procedure §§2025.010 and 2031.01.* A list of the DOCUMENTS is set forth below after the **DEFINITION SECTION.**

## DEFINITIONS

1. **"YOU"**, **"YOUR"**, and **"YOU'RE"** are defined as David Schnider.

2. **"DOCUMENT"** or **"DOCUMENTS"** includes "handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." California Evidence Code §250. DOCUMENT AND DOCUMENTS also include any writing, letter, correspondence, electronically stored information ("ESI"), meta data, e-mails, attachments to e-mails, including pdf copies, spread sheets, word documents, reports, records, statements, materials containing any writing and written data, forms, policies, any tangible items containing any form of images,

3

communications, voices mail recordings, tape records, photographs, videotapes, digital images, declarations, signed statements, and correspondence.

3. **GARMENTS** is defined to be any tangible object that can be worn on a human to cover any part of the human body including but not limited to articles of clothing, suits, pants, pant suits, dresses, skirts, shirts, t-shirts, shoes, bags, sweaters, overalls, jackets, coats, boots, jewelry, hats, scarfs, gloves, accessories, swim suits, fabric, buttons, stitching, materials used to create **GARMENTS** and anything that Plaintiff Paula Thomas designed.

4. **"COMMUNICATIONS"** includes the use of written words, electronic words, digital words, oral words to convey information, thoughts, ideas, data, concepts, notions, designs, beliefs, opinions viewpoints, mindsets, point of views, facts, notes, background via letter, speech, e-mail, voicemail, text, telephone, cell-phone and any other means of devices.

## DAMAND FOR PRODUCTION FOR DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1:

Produce all **DOCUMENTS** regarding **COMMUNICATIONS** between Hillshore Investment, S.A. and Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 2:

Produce any and all **DOCUMENTS** related to any loans Hillshore

4

Investment, S.A. provided to Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 3:**

Produce any and all **DOCUMENTS** related to any investment Hillshore Investment, S.A. made in Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 4:**

Produce any and all **DOCUMENTS** related any returns on any investment Hillshore Investment, S.A. received from Thomas Wylde, LLC and any person associated with Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 5:**

Produce any and all **DOCUMENTS** related to a transfer of money from any bank accounts in the name of Hillshore Investment, S.A. and Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 6:**

Produce any and all **DOCUMENTS** related to the Units of Membership Hillshore Investment, S.A. owns in Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 7:**

Produce any and all **DOCUMENTS** related to any and all ownership interests in Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 8:**

Produce any and all **DOCUMENTS** related to the by-laws of Hillshore

Investment, S.A.

**REQUEST FOR PRODUCTION NO. 9:**

Produce any and all **DOCUMENTS** related the articles of incorporations of

Hillshore Investment, Inc.

**REQUEST FOR PRODUCTION NO. 10:**

Produce any and all **DOCUMENTS** related to any and all minutes of the

Board of Directors from 2014 to the present time.

**REQUEST FOR PRODUCTION NO. 11:**

Produce any and all **DOCUMENTS** regarding the Purchase Agreement

between Hillshore Investment, S.A. and Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 12:**

Produce any and all **DOCUMENTS** that relate Employment Agreement

between Thomas Wylde, LLC and Paula Thomas.

**REQUEST FOR PRODUCTION NO. 13:**

Produce any and all **DOCUMENTS** that relate to the address of the physical

location of Hillshore Investment, S.A.

**REQUEST FOR PRODUCTION NO. 14:**

Produce any and all **DOCUMENTS** related the business purposes of

Hillshore Investment, S.A.

**REQUEST FOR PRODUCTION NO. 15**

Produce any and all **DOCUMENTS** related any and all advertising

Hillshore Investment, S.A. authorizes for business purposes.

**REQUEST FOR PRODUCTION NO. 16**

Produce any and all **DOCUMENTS** related to organizational charts for

Hillshore Investment, S.A. used between 2014 and the present time.

**REQUEST FOR PRODUCTION NO. 17:**

Produce any and all **DOCUMENTS** related bank statements reflecting any

transfer of money between any accounts in the name of Hillshore Investment, S.A.

and bank accounts in the name of Thomas Wylde, LLC.

**REQUEST FOR PRODUCTION NO. 18:**

Produce any and all **DOCUMENTS** regarding the names, addresses, e-mail

addresses and telephone number of any agents, employee, directors and officers of

Hillshore Investment, S.A.

**REQUEST FOR PRODUCTION NO. 19:**

Produce any and all **DOCUMENTS** related to the number of shares issued

by Hillshore Investment, S.A.

**REQUEST FOR PRODUCTION NO. 20:**

Produce any and all **DOCUMENTS** regarding the names, addresses, e-mail

1  addresses, and telephone numbers of the shareholders.

2  **REQUEST FOR PRODUCTION NO. 21:**

3

4      Produce any and all **DOCUMENTS** related to the number of shares each

5  shareholder has in his/her/its name.

6  **REQUEST FOR PRODUCTION NO. 22:**

7

8      Produce any and all **DOCUMENTS** related to the value of shares as of the

9  present time.

10

11  Dated: July 7, 2017

12

13

14                              Respectfully submitted,

15

16

17                              By: /S/ Dimitrios P. Biller
                                Dimitrios P. Biller, Counsel for
18                              Plaintiff

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On July 7, 2017, I caused to be served, via e-mail, the following pleadings:

**PLAINTIFF PAULA THOMAS' NOTICE OF DEPOSITION OF RECORDS ENILUZ GONZALEZ**

on the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 5051 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants

_____BY MAIL — I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY FEDERAL EXPRESS — I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express. Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business. The envelope was sealed and placed for collection and delivery by Federal Express with delivery fees paid or provided for in accordance with ordinary business practices.

9

_____BY PERSONAL SERVICE — I caused such envelope to be delivered by hand to the offices of the addressee.

**XXX**: E-mail at the above e-mail addresses.

**XXX (State) I declare under penalty of perjury under the laws of the State of California** that the foregoing is true and correct.

Executed on **July 7, 2017**, at Pacific Palisades, California.

/S/ Dimitrios P. Biller
Dimitrios P. Biller

10

## ATTACHMENT "A" TO GONZALEZ SUBPEONA

### REQUEST FOR PRODUCTION NO. 1:

Produce all **DOCUMENTS** regarding **COMMUNICATIONS** between

Hillshore Investment, S.A. and Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 2:

Produce any and all **DOCUMENTS** related to any loans Hillshore

Investment, S.A. provided to Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 3:

Produce any and all **DOCUMENTS** related to any investment Hillshore

Investment, S.A. made in Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 4:

Produce any and all **DOCUMENTS** related any returns on any investment

Hillshore Investment, S.A. received from Thomas Wylde, LLC and any person

associated with Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 5:

Produce any and all **DOCUMENTS** related to a transfer of money from any

bank accounts in the name of Hillshore Investment, S.A. and Thomas Wylde, LLC.

### REQUEST FOR PRODUCTION NO. 6:

Produce any and all **DOCUMENTS** related to the Units of Membership

Hillshore Investment, S.A. owns in Thomas Wylde, LLC.

## REQUEST FOR PRODUCTION NO. 7:

Produce any and all **DOCUMENTS** related to any and all ownership

interests in Thomas Wylde, LLC.

## REQUEST FOR PRODUCTION NO. 8:

Produce any and all **DOCUMENTS** related to the by-laws of Hillshore

Investment, S.A.

## REQUEST FOR PRODUCTION NO. 9:

Produce any and all **DOCUMENTS** related the articles of incorporations of

Hillshore Investment, Inc.

## REQUEST FOR PRODUCTION NO. 10:

Produce any and all **DOCUMENTS** related to any and all minutes of the

Board of Directors from 2014 to the present time.

## REQUEST FOR PRODUCTION NO. 11:

Produce any and all **DOCUMENTS** regarding the Purchase Agreement

between Hillshore Investment, S.A. and Thomas Wylde, LLC.

## REQUEST FOR PRODUCTION NO. 12:

Produce any and all **DOCUMENTS** that relate Employment Agreement

between Thomas Wylde, LLC and Paula Thomas.

## REQUEST FOR PRODUCTION NO. 13.

Produce any and all **DOCUMENTS** that relate to the address of the physical

location of Hillshore Investment, S.A.

## REQUEST FOR PRODUCTION NO. 14

Produce any and all **DOCUMENTS** related the business purposes of

Hillshore Investment, S.A.

## REQUEST FOR PRODUCTION NO. 15:

Produce any and all **DOCUMENTS** related any and all advertising

Hillshore Investment, S.A. authorizes for business purposes.

## REQUEST FOR PRODUCTION NO. 16:

Produce any and all **DOCUMENTS** related to organizational charts for

Hillshore Investment, S.A. used between 2014 and the present time.

## REQUEST FOR PRODUCTION NO. 17:

Produce any and all **DOCUMENTS** related bank statements reflecting any

transfer of money between any accounts in the name of Hillshore Investment, S.A.

and bank accounts in the name of Thomas Wylde, LLC.

## REQUEST FOR PRODUCTION NO. 18:

Produce any and all **DOCUMENTS** regarding the names, addresses, e-mail

addresses and telephone number of any agents, employee, directors and officers of

Hillshore Investment, S.A.

## REQUEST FOR PRODUCTION NO. 19:

Produce any and all **DOCUMENTS** related to the number of shares issued

by Hillsbore Investment, S.A.

## REQUEST FOR PRODUCTION NO. 20:

Produce any and all **DOCUMENTS** regarding the names, addresses, e-mail addresses, and telephone numbers of the shareholders.

## REQUEST FOR PRODUCTION NO. 21:

Produce any and all **DOCUMENTS** related to the number of shares each shareholder has in his/her/its name.

## REQUEST FOR PRODUCTION NO. 22:

Produce any and all **DOCUMENTS** related to the value of shares as of the present time.

1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 West Sunset Blvd., Suite "9"
3  Pacific Palisades, California 90272
4  Telephone (310) 459-9870
   E-mail Address: biller_ldtconsulting@verizon.net
5

6  MARCIA DALEY (146,579)
7  DALEY & SACKS LAW RLLP
   516 Westwood Boulevard, Suite 102
8  Los Angeles, California 90024
9  Telephone: (310) 985-2808
   E-mail: marcia@daleyandsackslaw.com
10

11

12        CALIFONIA SUPERIOR COURT OF THE STATE OF CALIFORNIA

13             COUNTY OF LOS ANGELES, CENTRAL DISTRICT

14

15

16  PAULA THOMAS, INDIVIDUALLY          Case No.: BC596495
17  AND IN THE RIGHT OF AND FOR
    THE BENEFIT OF THOMAS WYLDE,
18  LLC, A CALIFORNIA LIMITED
19  LIABILITY COMPANY, AND PDTW         PLAINTIFF PAULA THOMAS
    [PAULA DOROTHY THOMAS             HEREBY SERVES A *NOTICE TO*
20  WYLDE], LLC, A CALIFRONIA          *CONSUMER* RELATED TO THE
21  LIMITED COMPANY,                   SUBPEONA DUCES TECUM
                                       SERVED ON DAVID SCHIDER, NOT
22        Plaintiffs,                  A PARTY TO THIS ACTION, AND
                                       ENILUZ GONZALEZ
23

24  vs.

25  THOMAS WYLDE, LLC, A
26  CALIFORNIA LIMITED LIABILTY
    COMPANY, JOHN HANNA, AN
27  INDIVIDUAL, JENE PARK, AN

28

                                    1

1    INDIVIDUAL, SHOT IN THE
2    ARMOIRE, LLC, A FLORIDA
     LIMITED LIABILTY COMPANY,
3    AND H&H FASHION, LLC, A
4    FLORIDA LIMITED LIABILTIY
     COMPANY, AND DOES 1 THROUGH
5    50,
6
7
8                    Defendants
9
10
11        ***NOTICE TO CONSUMER IS HEREBY PROVIDED*** that records and
12   documents have been requested from David Schnider and Eniluz Gonzalez that
13   may result in the produce of records related to Defendant Jene Park, Defendant
14
15   John Hanna, and Stephon Choi. Plaintiff does not believe a Notice to Consumer is
16   regarding to obtain the documents identified in the *Subpoena Duces Tecum* and
17
18   Notice of Deposition served on David Schnider and Defendants in this action. The
19   Notice to Consumer is only served as a precautionary measure to avoid any
20
21   discovery disputes that may arise from the service of the *Subpoena Duces Tecum*.
22        Under *California Code of Civil Procedure §1985,*
23
24        (a)  The process by which the attendance of a witness is required is
25        the subpoena. It is a writ or order directed to a person and requiring
26
27        the person's attendance at a particular time and place to testify as a
28

                                    2

witness. It may also require a witness to bring any books,

documents, electronically stored information, or other things under

the witness's control which the witness is bound by law to produce

in evidence. When a county recorder is using the microfilm system

for recording, and a witness is subpoenaed to present a record, the

witness shall be deemed to have complied with the subpoena if the

witness produces a certified copy thereof.

**(b)** A copy of an affidavit shall be served with a subpoena duces

tecum issued before trial, showing good cause for the production

of the matters and things described in the subpoena, specifying the

exact matters or things desired to be produced, setting forth in full

detail the materiality thereof to the issues involved in the case, and

stating that the witness has the desired matters or things in his or

her possession or under his or her control.

(c) The clerk, or a judge, shall issue a subpoena or subpoena duces

tecum signed and sealed but otherwise in blank to a party

requesting it, who shall fill it in before service. An attorney at law

who is the attorney of record in an action or proceeding, may sign

and issue a subpoena to require attendance before the court in

3

which the action or proceeding is pending or at the trial of an issue

therein, or upon the taking of a deposition in an action or

proceeding pending therein; the subpoena in such a case need not

be sealed. An attorney at law who is the attorney of record in an

action or proceeding, may sign and issue a subpoena duces tecum

to require production of the matters or things described in the

subpoena.

## AFFIDAVIT OF DIMITRIOS P. BILLER

I, Dimitrios P. Biller, was recently retained as trial counsel in this case. In

addition to preparing for trial in this case in which David Schnider is not a

Defendant, I prepared and cause to be filed a complaint in the United States

District Court for the Central District of California naming David Schnider as one

of the main Defendants for violations of fraud, fraud by concealment, infringement

of copyrights, infringement of trademarks, and various criminal violations under

*RICO Act*. I filed this complaint because I believe there are more than sufficient

facts to hold David Schnider and Eniluz Gonzalez liable for all the claims, tremble

damages, punitive damages, and attorney fees/costs.

The state court action is proceeding to trial on October 11, 2017 and I

consider David Schnider and Eniluz Gonzalez are critical witnesses and a

4

custodians of highly relevant documents. For some unknown reason Plaintiff's prior counsel did not name David Schnider or Eniluz Gonzalez as a Defendant in the state court case; there are substantial facts to hold David Schnider liable in the state court action.

I did not prepare the *Subpoena Duces Tecum* served on David Schnider and Eniluz Gonzalez for any improper purpose such as to harass, cause unwarranted annoyance, or embarrass the witness. The only reason David Schnider and Eniluz Gonzalez have been served with a *Subpoena Duces Tecum* is to obtain their testimony before trial and obtain relevant document in order to prepare for trial.

This Notice to Consumer is being served on all Defendants with the actual Subpoena Duces Tecum and Notice of Deposition.

I, Dimitrios P. Biller, declare under the penalty of perjury under the laws of the State of California that the forgoing is true and corrected. Executed in Pacific Palisades on July 7, 2017.


/S/ Dimitrios P. Biller

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On July 7, 2017, I caused to be served, via e-mail, the following pleadings:

**PLAINTIFF PAULA THOMAS' NOTICE TO CONSUMER REGARDING THE SUBPEONA DUCES TECUM SERVED ON DAVID SCHNIDER**

on the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 5051 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants

_____ BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY FEDERAL EXPRESS – I am familiar with the practice at my place of business for collection and processing of correspondence for overnight delivery maintained by Federal Express. Such correspondence will be deposited with a facility regularly maintained by Federal Express for receipt on the same day in the ordinary course of business. The envelope was sealed and placed for collection

6

1    and delivery by Federal Express with delivery fees paid or provided for in
2    accordance with ordinary business practices.

3    ____ BY PERSONAL SERVICE – I caused such envelope to be delivered by hand
     to the offices of the addressee.

4

5    **XXX**: E-mail at the above e-mail addresses.

6    **XXX** (State) I declare **under penalty of perjury under the laws of the State of**
7    **California** that the foregoing is true and correct.

8        Executed on **July 7, 2017**, at Pacific Palisades, California.

9

10

11   /S/ Dimitrios P. Biller
     Dimitrios P. Biller
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                7

# EXHIBIT "2"

## 1. Principal Data

| Identification Data | |
|---|---|
| Company name | HILLSHORE INVESTMENTS S.A. |
| Other company names | HILLSHORE INVESTMENTS 5 A |
| Unique Taxpayer Registry (RUC) | 1703835-1-686976 |
| Trade Register | Quinta del Circulo |
| Trade Register Address | Calle 50 y Calle 54 Este, Panama Quinta del Circulo |
| Trade Register Phone number | (507) 223-2974 |
| Registry Data | Volume: 2010, Book: 581, Guarantee Status (Estado de la prenda): (DEF-DEFINITIVA, PRE-PRELIMINAR), Currency: Dólares americanos, Duration: PERPETUA, Entry (Asiento): 1, Resident Agent: FDM CORPORATE & LEGAL SERVICES, Document Number: 1703835 |
| Operations start date | Jan 4, 2010 |
| Company situation | Valid |
| Resident Agent | FDM CORPORATE & LEGAL SERVICES |
| Sector information | |
| Purpose | - |
| Principal sector (Description -) | - |
| Financial data | |
| Subscribed Capital | 10,000.00 Dólares americanos (Usd) |

CONFIDENTIAL: NOT FOR DISTRIBUTION OR PUBLICATION (C)2017 Data Capital, a service provided by NETAMO SYSTEMS SL . Europe
VAT Number: ESB85120725. Inscribed in the Madrid Mercantil Registry. Volume: 17.037, Sheet: 197, Section 8, Page: 201 338.

Page 2

## 2. Incorporation Deeds & Other Deeds

Continued on next page

Continued on next page

## 3. Deed 2010/581 Jan 4, 2010

581
2010



# REPÚBLICA DE PANAMÁ
### PROVINCIA DE PANAMÁ

## NOTARIA QUINTA DEL CIRCUITO

## *Lic. Diomedes Edgardo Cerrud*
### NOTARIO

TELEFONOS. 223-2514
223-2579
TELEFAX. 223-2582

E-mail: doca_je@cyvision.net

COPIA    Auténtica

ESCRITURA No. _____ 42 _____ de _____ 4 _____ de _____ Enero _____ de _____ 2010

POR LA CUAL: ...coliza el Certificado de Constitución de la sociedad anónir...nominada **HILLSHORE INVESTMENTS S.A.**, con dr...en la República de Panamá.

MIGUEL MORENO
Cédula 8-530-1705

ALEMAN, CORDERO, GALINDO & LEE.



ESCRITURA PÚBLICA NUMERO CUARENTA Y DOS

----------------------------(42)----------------------------

POR LA CUAL se protocoliza el Certificado de Constitución de la sociedad anónima denominada HILLSHORE INVESTMENTS S.A., con domicilio en la República de Panamá.

----------------------Panamá, 4 de enero de 2010.----------------------

En la Ciudad de Panamá, Capital de la República y Cabecera del Circuito No. del mismo nombre, hoy cuatro (4) de enero de dos mil diez (2010) ante mí, Lic. DIDMEDES EDGARDO CERRUD, Notario Público Quinto del Circuito de Panamá, portador de la cédula de identidad personal número ocho-ciento setenta y uno, os uno (8-171-301), comparecieron personalmente los señores EDGARDO EL... AZ, varón, mayor de edad, panameño, abogado, casado, vecino de esta ciudad, c... .a de identidad personal número siete-ochenta y cuatro-mil doscientos treinta y cuat... -1234), y FERNANDO ANTONIO GIL, varón, mayor de edad, panameño, ejecutiv... ...o, vecino de esta ciudad, con cédula de identidad personal número ocho-setecie... ...cuenta y cinco-doscientos treinta y ocho (8-755-238), a quienes conozco y en sus p... ...ombres me presentaron para su protocolización en esta Escritura Pública; y al efec... ...ocolizo, el Certificado de Constitución de la sociedad HILLSHORE INVESTMEN... con domicilio en la República de Panamá, el cual se encuentra escrito en e... ...en su correspondiente texto en idioma inglés.

----Queda hecha... protocolización solicitada y se expedirán las copias que soliciten los interesados.

----En... ...ado, compareció personalmente ANÍBAL GALINDO NAVARRO, varón, mayor de ed... ...ameño, casado, abogado, vecino de esta ciudad, con cédula de identidad personal ...ro ocho-doscientos cuarenta-ciento noventa (8-240-190), en su calidad de socio de la firma de abogados ALEMÁN, CORDERO, GALINDO & LEE, a quien conozco y por este medio me pidió que hiciera constar en esta Escritura Pública, como en efecto lo hago, que acepta la designación que se hace de dicha firma de abogados como agente registrado de la sociedad cuyo Certificado de Constitución se protocoliza mediante la presente Escritura Pública.

-----El Notario advierte a los comparecientes que una copia de esta Escritura debe ser inscrita, y leída como les fue en presencia de los testigos instrumentales los señores MAYLA CASTRELLON DE BOCANEGRA, con cédula de identidad personal número cinco-doce-mil cuatrocientos

sesenta y seis (5-12-1466) y LUIS MORALES con cédula de identidad personal número cuatro-

ciento cuarenta y cuatro-ochocientos veintidós (4-144-822) mayores de edad, panameños y

vecinos de esta ciudad, a quienes conozco y son hábiles para el cargo, la encontraron conforme,

le impartieron su aprobación, y la firman todos para constancia, por ante mí, el Notario que doy

fe.—————————————————————————————————————————

Esta Escritura en el protocolo del presente año lleva el número CUARENTA Y DOS ———————

————————————————————(42)———————————————————————

(Firmados) EDGARDO E. DÍAZ ——FERNANDO A. GIL—— ANÍBAL ARMANDO NAVARRO—

MAYLA CASTRELLON DE BOCANEGRA—LUIS MORALES—DA ——— ES EDGARDO CERRUD.

Notario Público Quinto del Círculo de Panamá.———————————————————————

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

————————————————CERTIFICADO DE CONSTITUCIÓN DE——————————————

————————————————————HILLSHORE INVESTMENTS S.A.——————————————

————————————De conformidad con la Ley General de Sociedades—————————

————————————Anónimas de la República de Panamá———————————————

——Nosotros, los suscritos, deseosos formar una sociedad anónima por acciones de conformidad

con las disposiciones de la Ley General de Sociedades Anónimas de la República de Panamá, por

el presente entramos en convenio de organización de tal sociedad anónima como sigue:————

——1. El nombre de la sociedad es: HILLSHORE INVESTMENTS S.A. —————————————

——2. Los objetos de la sociedad son: establecer, tramitar y llevar a cabo los negocios de una

compañía comisionista; comprar, vender y negociar en todas las clases de artículos de consumo,

acciones, bonos y valores de todas clases; comprar, vender, arrendar o de otro modo adquirir o

enajenar bienes raíces; solicitar y dar dinero en préstamo, con o sin garantía; celebrar, extender,

cumplir y llevar a cabo contratos de toda clase; constituirse en fiador o garantizar la realización

y cumplimiento de todos y cualesquiera contratos; dedicarse a cualquier negocio lícito que no

esté vedado a las sociedades anónimas; y hacer cualesquiera de los actos que preceden como

principales, agentes o en cualquier otro carácter representativo, sea el que fuere.——————

——3. Capital. El capital de la sociedad es de DIEZ MIL DÓLARES ($10,000.00, moneda legal

de los Estados Unidos de América, dividido en DIEZ MIL (10,000) acciones de un valor nominal

de UN DÓLAR ($1.00 moneda legal de los Estados Unidos de América) cada una.—————————



----- Cada acción tendrá derecho a un voto en todas las reuniones de accionistas -----

-----Las acciones podrán ser emitidas al portador o como nominativas, según disponga la Junta Directiva, y la Junta podrá permitir el canje de certificados al portador por certificados en el nombre del dueño y vice-versa. Las acciones al portador sólo podrán ser emitidas si están totalmente pagadas y liberadas.-----

-----4. El Registro de Acciones que la ley requiere se llevará en el lugar que fije la Directiva. El traspaso de las acciones se efectuará en el Registro de Acciones por el dueño registrado de las acciones o por su apoderado, debidamente autorizado al efecto por un poder de representación otorgado por escrito y presentado al Secretario de la compañía; y mediante la entrega del certificado o certificados representativos de tales acciones. El traspaso de las acciones al portador se verificará por la sola tradición del título.-----

-----Los demás accionistas tendrán derecho preferente a comprar las acciones que otro accionista desee traspasar, de acuerdo con la proporción de acciones, que posean dichos accionistas. Para este efecto, el accionista que desee traspasar sus acciones habrá de comunicar a los demás accionistas su propósito por escrito con treinta (30) días de anticipación; y dentro de este término los demás accionistas podrán comprar estas acciones según los porcentajes que respectivamente le correspondan. Si alguno o algunos de los accionistas dejan de ejercer su derecho preferente, su porcentaje se ofrece proporcionalmente entre los demás accionistas. Cualesquiera acciones que todavía queden por vender podrán ser vendidas por el accionista vendedor a cualquier persona, pero únicamente en términos no más favorables que aquéllos a los cuales dichas acciones hayan sido ofrecidas de acuerdo con el presente a los otros accionistas.-----

-----5. El domicilio de la sociedad será en la Ciudad de Panamá, República de Panamá, pero la sociedad podrá según la Junta Directiva disponga, dedicarse a negocios y abrir sucursales en cualquier parte del mundo y tener sus archivos y haberes en cualquier parte del mundo.-----

-----6. La duración de la sociedad será perpetua, pero podrá ser disuelta con anterioridad de conformidad con la Ley.-----

-----7. Las reuniones de accionistas, con cualquier objeto, podrán tener lugar en la República de Panamá, o en cualquier otro país.-----

----- La citación a las reuniones de accionistas se hará mediante entrega personal o por correo de la citación a cada accionista registrado y con derecho a voto, no menos de diez días ni más de

sesenta años de la fecha de la junta. Si la sociedad ha emitido acciones al portador dichos accionistas serán notificados mediante publicación en un diario de la República de Panamá, no menos de treinta (30) ni más de sesenta (60) días antes de la fecha de la junta.——————————

————8. La Junta Directiva consistirá de no menos de tres (3) ni más de siete (7) miembros. Dentro de dicho máximo y mínimo, el número podrá ser fijado por resolución de la junta. Si ante en cualquier reunión de los accionistas para elegir Directores, los accionistas dirán, por resolución, determinar el número de Directores a elegir en ella, y el número que se determina será entonces elegido.——————

————Las reuniones de los Directores podrán tener lugar en la República de Panamá, o en cualquier otro país, y cualquier Director podrá estar representado y votar por mandatario o mandatarios en cualquiera y todas las reuniones de Directores.————————

————En caso de vacantes en la Junta Directiva, la mayoría de los Directores entonces en ejercicio, aunque fuere menos que el quórum, podrá elegir los Directores para ocupar dichas vacantes.————

————Las facultades de la sociedad serán ejercidas por la Junta Directiva, excepto las que estuvieren conferidas o reservadas a los accionistas. La Junta Directiva, por consiguiente, tendrá control absoluto y administración total de los negocios de la sociedad y podrá vender, arrendar, permutar o de cualquiera otra manera enajenar todos o parte de los bienes de la sociedad, incluyendo su clientela y privilegios, franquicias y derechos de acuerdo con los términos y condiciones que la junta Directiva crea conveniente a su juicio sin necesidad de que para ello sea autorizada en forma alguna por los accionistas de la sociedad. No se necesitará el voto ni el consentimiento de los accionistas para el traspaso de los bienes en fideicomiso o para gravarlos en prenda o hipoteca, en garantía de las deudas de la sociedad o de terceros, bastando para ello una resolución dada por la junta Directiva.————————

————9. Los dignatarios de la sociedad serán un Presidente, un Secretario y un Tesorero. La junta de Accionistas o la junta Directiva podrá elegir de cuando en cuando uno o más Vice-Presidentes, Sub-Tesoreros, o Sub-Secretarios y otros dignatarios, agentes y empleados que a bien tenga. Cualquier dignatario podrá desempeñar más de un cargo. El Presidente será el Representante Legal de la sociedad.————————

————Las facultades de los dignatarios y su autorización para representar a la compañía las fijará

Copia fiel del original para fines informativos solamente

COPIA INFORMATIVA. Con fines informativos solamente

la Junta Directiva.----------

----Agente Registrado.  La Junta Directiva podrá nombrar un Agente Registrado en la Ciudad de

Panamá, República de Panamá, y reemplazar a dicho Agente en cualquier momento.------------

----10.  Ningún contrato u otra transacción entre la sociedad y cualquier otra sociedad anónima

será afectado o invalidado por el hecho de que cualquier uno o más de los Directores de esta

sociedad esté o estén interesados en, o es Director o dignatario, o son Directores o dignatarios,

de la tal otra sociedad anónima, y cualquier Director o cualesquiera Directores, individual o

conjuntamente, podrán ser parte o partes de, o estar interesados en cualquier contrato o

transacción de esta sociedad, o en que esta sociedad esté interesada; ningún contrato, acto o

transacción de esta sociedad con cualesquiera persona o personas, firmas o sociedades anónimas,

será afectado o invalidado por el hecho de que cualquier Director o cualesquiera Directores de

esta sociedad es parte o son partes de, o están interesados en dicho contrato, acto o transacción,

o de cualquier modo relacionados con dicha persona o personas, firma o asociación y toda y

cada persona que llegue a ser Director de esta sociedad es por el presente relevado de cualquier

responsabilidad que por otra parte pudiera existir por contratar con la sociedad en beneficio de

sí misma o de cualquier firma o sociedad anónima en la cual pueda de cualquier modo estar

interesada.------------

----11.  Indemnización.  Cualquier persona que llegue a ser parte en cualquier acción, pleito o

procedimiento en virtud de que él, su testador o causahabiente, es o fue Director, dignatario

o empleado de esta sociedad o de cualquier sociedad anónima a la cual él sirva en tal carácter

a solicitud de esta sociedad, será indemnizada por esta sociedad contra los gastos razonables,

incluyendo honorarios de abogado, en que efectiva y necesariamente incurra en relación con la

defensa de dicha acción, pleito o procedimiento, o en relación con cualquier apelación en los

mismos, excepto en relación con asuntos respecto a los cuales se decretare en dicha acción,

pleito o procedimiento que dicho dignatario, Director o empleado es responsable de negligencia

o mala conducta en el desempeño de sus atribuciones.  Dicho derecho de indemnización no se

considerará como exclusivo de cualesquiera otros derechos que dicho Director, dignatario o

empleado tenga, independiente de las disposiciones legales. --------------

----12.  Enmienda del Pacto.  Este Certificado de Constitución podrá ser enmendado por

resolución en que conste dicha enmienda o enmiendas, adoptada por las dos terceras partes por

o menos de todas las acciones representadas en una reunión extraordinaria convocada con tal fin, o en una reunión ordinaria si se hubiere dado aviso oportuno de ella.——————

————————————— DISPOSICIONES TRANSITORIAS.———————————

——A. Primeros Directores. El número de los primeros Directores será de tres (3) y sus nombres y direcciones son como sigue:——————————————————————

| NOMBRE | DIRECCION |
|--------|-----------|
| EDGARDO E. DÍAZ | Calle 53 Este, Urb. Marbell |
| | Torre MMG, Piso 2, A |
| | Panamá, R. de Par |
| GINA A. MARTÍNEZ G. | Calle 53 Este ... urbella, |
| | Torre M... n 2, |
| | Pa... de Panamá |
| FERNANDO A. GIL | ...53 Este, Urb. Marbella, |
| | ...rre MMG, Piso 2, |
| | Panamá, R. de Panamá |

———B. Los Dignatarios de la s... y los cargos respectivos que ellos desempeñan son como sigue:——

| N... | CARGO |
|------|-------|
| ED...DO E. DÍAZ | Presidente |
| ...A. MARTÍNEZ G. | Secretaria |
| ...RNANDO A. GIL | Tesorero |

...l Agente Registrado de la sociedad en la República de Panamá, hasta que la junta ...ctiva disponga otra cosa será, la firma de Abogados ALEMÁN, CORDERO, GALINDO & LEE, con domicilio en Calle 53 Este, Urb. Marbella, Torre MMG, 2do. Piso, Panamá, República de Panamá.——————————————————————————————

——D. Suscripción. El número de acciones que cada suscriptor de este Certificado de Constitución conviene en tomar es como sigue:——————————————————————

| NOMBRE | DIRECCION | NO. DE ACCIONES |
|--------|-----------|-----------------|
| EDGARDO ELOY DÍAZ | Calle 53 Este, Urb. Marbella | |
| | Torre MMG - Piso 2 | |



---------------------------------Panamá, R. de P.-----------------------------------1------

FERNANDO ANTONIO GIL-----------Calle 53 Este, Urb. Marbella-----------

---------------------------------Torre MMG - Piso 2-----------------------------

---------------------------------Panamá, R. de P.-------------------------1-------

--EN FE DE LO CUAL, hemos extendido y firmado este Certificado de Constitución ... ...dad

de Panamá, República de Panamá, hoy cuatro (4) de enero de dos mil diez. (2...---------

(Firmados) EDGARDO E. DÍAZ-------------------------FERNANDO /

=============================================          ==========

----------------------------CERTIFICATE OF INCORPORATION----------

--------------------------HILLSHORE INVESTMENT---------------

--------------------Pursuant to the General Corp ... Law of the-----------

--------------------------------Republic of ... ---------------------------

------We, the undersigned, desiring to organi... ... ck corporation pursuant to the provisions of

the General Corporation Law of the Re... ...of Panamá, hereby enter into an agreement of

organization of such corporation as f...

----1. The name of the corpora... ... HILLSHORE INVESTMENTS S.A. -------------

----2. The purposes of th... ... ...ation are to establish, transact and carry on the business of an

investment compan... ... ...rchase, sell and deal in all kinds of commodities, shares of stock,

bonds and securit... ...all kinds; to purchase, sell, lease or otherwise acquire or dispose of real

estate; to b... ... ...nd loan money, with or without security; to enter into, make, perform and

carry o... ... ...acts of all kinds; to become surety or guarantee the carrying out and performance

of ... ...d all contracts; to engage in any lawful business not prohibited to a corporation; and

... ...o any of the foregoing as principals, agents or in any other representative capacity

whatever.-----------

----3. Capital. The capital of the corporation is TEN THOUSAND DOLLARS ($10,000.00, legal

currency of the United States of America), divided into TEN THOUSAND (10,000) shares of a par

value of ONE DOLLAR ($1.00, legal currency of the United States of America), each;-----------

----Each share shall be entitled to one vote at all meetings of the stockholders.-----------

----Shares may be issued to bearer or in registered form, as the Board of Directors shall

determine, and the Board may permit certificates to bearer to be exchanged for certificates in the



name of the owner and vice-versa. Shares may be issued to bearer only if fully paid and non-assessable.

4. The Stock Register required by law shall be kept at the place fixed by the Board of Directors. The transfer of shares shall be recorded in the Stock Register by the registered holder of the shares or by his proxy duly authorized for such purposes by written power of attorney presented to the Secretary of the company, and by presenting the respective share certificate or certificates. The transfer of shares issued to bearer requires only delivery of the certificate.

Any shareholder shall have a preferential right to purchase the shares of the corporation that another shareholder wishes to sell, in accordance with the percentage of shares that the respective shareholder owns. For these purposes, any shareholder who wants to sell his shares shall give thirty (30) days written notice of his intent to the rest of the shareholders, during which time the rest of the shareholders may purchase these shares in accordance with the percentage to which they are entitled. If any or some of the shareholders does not exercise his preferential right, his percentage shall be offered proportionally to the rest of the shareholders. Any shares that may then remain unsold, may be sold by the selling shareholder to a third party, but only on terms not less favorable than had been offered to the other shareholders.

5. The domicile of the corporation shall be in the City of Panama, Republic of Panama, but the corporation may, as the Board of Directors determine, engage in business and establish branches anywhere in the world, and keep its records and assets anywhere in the world.

6. The duration of the corporation shall be perpetual, but it may be dissolved sooner in accordance with the law.

7. Meetings of the Stockholders, for any purpose, may be held in the Republic of Panama, or any other country.

Notice of stockholders' meetings shall be given personally or by mail to each stockholder of record entitled to vote at such meeting not less than ten or more than sixty days before such meeting. If the corporation has issued shares to bearer, notice to these stockholders shall be published in a daily newspaper of the Republic of Panama, not less than thirty (30) or more than sixty (60) days prior to the meeting.

8. The Board of Directors shall consist of not less than three (3) nor more than seven (7) members. Within said maximum and minimum, the number may be fixed by resolution of the

Board.  However, at any meeting of the stockholders for the election of Directors, the stockholders may, by resolution, determine the number of Directors to be elected thereat, and the number so determined then elected.——————————————————————

———Meetings of Directors may be held in the Republic of Panama or in any other country and any Director may be represented and vote by proxy or proxies at any and all meetings of Directors.——————————————————————————

———In case of vacancies in the Board of Directors, a majority of the Directors then in office, though less than a quorum, may elect the Directors to fill such vacancy.————————

———The powers of the Corporation shall be exercised by the Board of Directors, except such as are conferred or reserved to the stockholders.  The Board of Directors, consequently, shall have complete control and total administration of the business of the corporation and may sell, lease, exchange or otherwise dispose of all or part of the corporate assets, including its good will and its corporate franchise, upon such terms and conditions as the Board of Directors may deem expedient, without the need of any authorization therefor by the stockholders of the company.  No vote or consent of the stockholders shall be required for the transfer of property in trust or to pledge or mortgage the same, to secure obligations of the company or of third parties, for which a resolution of the Board of Directors shall suffice.————————————————

———9.  The Officers of the Corporation shall be a President, a Secretary and a Treasurer.  The Stockholders or the Board of Directors may elect from time to time one or more Vice-Presidents, Assistant Treasurers or Assistant Secretaries and other officers, agents and employees as it may deem necessary.  Any officer may hold more than one office.  The President will be the Legal Representative of the company.——————————————————

———The powers of the officers and their authority to represent the company shall be fixed by the Board of Directors.————————————————————————

———Registered Agent.  The Board of Directors may appoint a Registered Agent in the City of Panama, Republic of Panama, and replace such agent at any time.—————————————

———10.  No contract or other transaction between the corporation and any other corporation shall be affected or invalidated by the fact that any one or more of the Directors of this corporation is or are interested in, or is a Director or officer, or are Directors or officers of such other corporation, and any Director or Directors, individually or jointly, may be a party or parties to,

or interested in any contract or transaction of this corporation or in which this corporation is interested, and no contract, act or transaction of this corporation with any person or persons, firms or corporations, shall be affected or invalidated by the fact that any Director or Directors of this corporation is a party or are parties to, or are interested in such contract, act or transaction, or in any way related to such person or persons, firms or corporation, and each and every person who may become a Director of this corporation is hereby relieved from any liability that might otherwise exist from contracting with the corporation for the benefit of him or of any firm or corporation in which he might in any way be interested.———————————————

———11. Indemnity. Any person who may become a party in any action, suit or proceeding by reason of the fact that he, his testator or intestate, is or was a director, officer or employee of this corporation or of any corporation which he serves as such at the request of this corporation, shall be indemnified by this corporation against reasonable expenses, including attorney's fees, actually and necessarily incurred by him in connection with the defense of such action, suit or proceeding, or in connection with any appeal thereof, except in relation to matters as to which it shall be adjourned in such action, suit or proceeding that such officer, director or employee is liable for negligence or misconduct in the performance of his duties. Such right of indemnification shall not be deemed to be exclusive of any other rights to which such Director, officer or employee may be entitled, apart from statute.————————————————

———12. Amendment of Charter. This Certificate of incorporation may be amended by resolution setting forth such amendment or amendments, adopted by two thirds at least of all shares represented in a special meeting called for such purpose, or at a regular meeting if due notice has been given.——————————————————————————————

————————————TRANSITORY PROVISIONS————————————

———A. First Directors. The number of the first Directors shall be three (3) and their names and addresses are as follows:——————————————————————————

| NAME | ADDRESS |
|---|---|
| EDGARDO E. DIAZ | East 53rd Street, Marbella, MMG Building, 2nd Floor, Panama, R. of Panama |
| GINA A. MARTINEZ G. | East 53rd Street, Marbella, MMG Building, 2nd Floor, Panama, R. of Panama |

Copiaronse los informativos solamente



NOTARIA DUODECIMA PANAMA POSTAL A 665,767

-------- FERNANDO A. GIL -------- East 53rd Street, Marbella, MMG --------

-------- Building, 2nd Floor, Panama, R. of Panama --------

---- B. The Officers of the corporation and the respective offices held by them are as follows: ----

| NAME | OFFICE |
|------|--------|
| EDGARDO E. DIAZ | President |
| GINA A. MARTINEZ G. | Secretary |
| FERNANDO A. GIL | Treasurer |

---- C. The Registered Agent of the corporation in the Republic of P... until the Board of Directors otherwise provides, shall be the law firm ALEMAN, C... O, GALINDO & LEE, domiciled at East 53rd Street, Marbella, MMG Building ... oor, Panama, Republic of Panama.

---- D. Subscription. The number of shares wh... ch subscriber to this Certificate of Incorporation agrees to take is as follows: ----

| NAME | A... | NO. OF SHARES |
|------|------|---------------|
| EDGARDO ELOY DIAZ | ...rd Street, Marbella | |
| | ...MG Building, 2nd Floor | |
| | Panama, R. of P. | 1 |
| FERNANDO ANTONI... | East 53rd Street, Marbella | |
| | MMG Building, 2nd Floor | |
| | Panama, R. of P. | 1 |

---- IN W... S WHEREOF, we have executed and signed this Certificate of Incorporation, in the ... anama, Republic of Panama, this fourth (4th) day of January in the year two thousand ... (10).

---- (Signed) EDGARDO E. DIAZ -------- FERNANDO A. GIL --------

Concuerda con su original esta copia que expido, sello y firmo, en la Ciudad de Panamá, República de Panamá, el día cuatro (4) de enero de dos mil diez (2010).

Lcda. Diana ... Edgardo Cernud
Notario Público Quinto

COPIA para fines de informativos solamente

INGRESADO EN EL REGISTRO PÚBLICO DE PANAMÁ

Provincia: Panamá                    Fecha y Hora: 2010/01/04 14:41:55.7
Tomo: 2810                           Asiento: 000581
Presentante: MIGUEL MORENO           Cédula: 8-530-1785
Liquidación No.: 7010519447          Total Derechos:    65.00
Ingresado Por: BERIPA03

*Esmeralda Pimentosa*

Jefe de Diario

Copia para propósitos informativos solamente.

**REPÚBLICA DE PANAMÁ**
MINISTERIO DE ECONOMÍA Y FINANZAS
DIRECCIÓN GENERAL DE INGRESOS

No. 1468700

TASA UNICA ANUAL A LAS SOCIEDADES ANONIMAS Y FUNDACIONES DE INTERES PRIVADO
(ART. 318-a DEL CÓDIGO FISCAL)

**NUMERO DE INSCRIPCION.**

| DOCUMENTO ROLLO TOMO | IMAGEN FOLIO | FICHA ASIENTO | DV |
|---|---|---|---|
| 9999 | 999 | 999999 | 0  3 |

0001-98    20-37583    269-2500

**RAZON SOCIAL**

HILLSHORE INVESTMENTS S.A.

ALEMAN, CORDERO, GALINDO Y LEE    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  DV  30

PRIMERA TASA UNICA    LEY    30/DIC/2009

**NOMBRE DEL REPRESENTANTE LEGAL**    **CEDULA o No. de R.U.C.**

**NOMBRE DEL AGENTE RESIDENTE**    **CEDULA o No. de R.U.C.**
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  DV  30

**CONSTITUIDA BAJO LAS LEYES DE**    **FECHA DE INSCRIPCION EN EL REGISTRO PUBLICO**

PANAMA

**PERIODO QUE CUBRE EL PAGO**    **Pago Válido Hasta**

| Periodo | Recargo | Total | Total |
|---|---|---|---|
| 2009 | | 250.00 | 250.00 |

SELLO DE RECIBIDO DGI

COPIA — Documento con fines informativos solamente

# EXHIBIT "3"

1  Allyson K. Thompson, Bar No. 235933
   athompson@kringandchung.com
2  Laura M. Booth, Bar No. 179857

3  Alex M. Moon, Bar No. 293897
   amoon@kringandchung.com
4  KRING & CHUNG, LLP
   38 Corporate Park
5  Irvine, CA 92606-5105
   Telephone: (949) 261-7700
6  Facsimile: (949) 261-8800

7  Attorneys for Plaintiffs and Cross-Defendants
   PAULA THOMAS and PDTW, LLC
8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10            COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

12 PAULA THOMAS, et al.,                  )  Case No: BC596495
                                          )
13          Plaintiffs,                   )  Date:   March 1, 2017
        vs.                               )  Time:   10:00 a.m.
14                                        )  Loc.:   Kring & Chung
   THOMAS WYLDE, LLC, et al.,             )          38 Corporate Park
15                                        )          Irvine, CA 92606
          Defendants.                     )
16                                        )  AMENDED NOTICE OF DEPOSITION
                                          )  OF STEPHEN CHOI AND REQUEST
17                                        )  FOR PRODUCTION OF DOCUMENTS
                                          )
18                                        )  Judge:  Hon. Michael J. Raphael
                                          )  Dept:   51
19                                        )
                                          )  Action Filed:  October 1, 2015
20 _____)  Trial Date:    April 11, 2017

21      TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:

22      PLEASE TAKE NOTICE that Plaintiffs and Cross-Defendants PAULA THOMAS will

23 take the deposition of third party witness STEPHEN CHOI on March 1, 2017 at 10:00 a.m.

24 (previously scheduled for January 18, 2017), at Kring & Chung, LLP, 38 Corporate Park, Irvine,

25 CA 92606, before a notary public authorized by law to administer oaths, pursuant to stenography,

26 and will be subject to real-time transcription services providing instant visual display. The

27 deposition will continue day to day except Saturdays, Sundays and holidays until completed.

28 ///



AMENDED NOTICE OF DEPOSITION OF STEPHEN CHOI
F:\9306\0354\disc\Deposition Notices\Amended NOD - Stephen Choi 003.docx

1    NOTICE IS FURTHER GIVEN that under Code of Civil Procedure §§ 2025.220(a) and

2    2025.220(a)(6), the deposition may be recorded by videotape, and that under Code of Civil Procedure

3    ...tion, the video-taped and the depositions may be used at trial. If an interpreter is

4    required to translate testimony, notice of the same must be given at least five (5) working days

5    before the deposition date, and the specific language and/or dialect thereof designated.

6         NOTICE IS FURTHER GIVEN that the deponent is hereby requested, pursuant to Code of

7    Civil Procedure § 2025.280, to produce the documents described in Exhibit "A" attached hereto and

8    incorporated herein by reference at the deposition.

9    Dated:  January 20, 2016                    KRING & CHUNG, LLP

10

11                                        By: _____
                                              Laura M. Booth
12                                            Allyson K. Thompson
                                              Alis M. Moon
13                                            Attorneys for Plaintiffs and Cross-
                                              Defendants
14                                            PAULA THOMAS and PDTW, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28



<u>**EXHIBIT "A"**</u>

**DEFINITIONS:**

A.       The term "DOCUMENTS" means any "writing" as defined in California Evidence Code § 250, however produced or reproduced, and includes, by way of example only and without limitation, the following: contracts, proposals, letters, memoranda, telegrams, cables, purchase orders, receipts, invoices, notes, reports, recordings, tape recordings, drawings, labels, tags, pleadings, calendars, diaries, minutes, orders appointment books, pamphlets, brochures, photographs, moving pictures, and memorials or oral communications (whether by telephone or face to face).

B.       The terms "YOU" or "YOUR" shall refer to the deponent, STEPHEN CHOI.

**REQUESTS FOR PRODUCTION**

**DEMAND FOR PRODUCTION NO. 1:**

All check images for checks written from Hillshore Investments to Thomas Wylde, LLC's from August 2014 to the present.

**DEMAND FOR PRODUCTION NO. 2:**

All check images for checks written by YOU to Thomas Wylde, LLC from August 2014 to the present.

**DEMAND FOR PRODUCTION NO. 3:**

All check images for checks written by YOU to Jene Park from August 2014 to the present.

**DEMAND FOR PRODUCTION NO. 4:**

All check images for checks written by Hillshore Investments to Jene Park from August 2014 to the present.

**DEMAND FOR PRODUCTION NO. 5:**

All check images for checks written by YOU to John Hanna from August 2014 to the present.

**DEMAND FOR PRODUCTION NO. 6:**

All check images for checks written by Hillshore Investments to John Hanna from August 2014 to the present.



1  **DEMAND FOR PRODUCTION NO. 7**

2     All loan agreements entered into by and between Hillshore Investments to Thomas Wylde.

3  [illegible text]

4  **DEMAND FOR PRODUCTION NO. 8**

5     All DOCUMENTS regarding capital contributions made by you to any member of Thomas

6  Wylde, LLC.

7  **DEMAND FOR PRODUCTION NO. 9**

8     All DOCUMENTS regarding capital contributions made by Hillshore Investments to any

9  member of Thomas Wylde, LLC.

10  **DEMAND FOR PRODUCTION NO. 10:**

11     All DOCUMENTS regarding the repayment of loans obtained by Thomas Wylde, LLC

12  from Hillshore Investments.

13  **DEMAND FOR PRODUCTION NO. 11:**

14     All DOCUMENTS regarding the repayment of loans obtained by Thomas Wylde, LLC

15  from YOU.

16  **DEMAND FOR PRODUCTION NO. 12:**

17     All DOCUMENTS supporting your contention that the current value of Thomas Wylde,

18  LLC is in excess of $10 million dollars.

19  **DEMAND FOR PRODUCTION NO. 13:**

20     All DOCUMENTS regarding checks that Hillshore Investments or any of its members

21  wrote from Hillshore Investment bank accounts to pay for Thomas Wylde, LLC's debts.

22  **DEMAND FOR PRODUCTION NO. 14:**

23     All DOCUMENTS regarding checks that YOU from any of YOUR bank accounts used to

24  pay for Thomas Wylde, LLC's debts.

25  **DEMAND FOR PRODUCTION NO. 15:**

26     All DOCUMENTS regarding monies that Hillshore Investments or any of its members paid

27  from any of its bank accounts to any companies owned in whole or in part by either Jene Park or

28  any of her friends or family.

1   **DEMAND FOR PRODUCTION NO. 16:**

2       All DOCUMENTS regarding monies that YOU paid from any of YOUR bank accounts to

3   any companies owned in whole or in part by either John Hanna or any of his friends or family.

4   **DEMAND FOR PRODUCTION NO. 17:**

5       Produce the Severance Agreement between Thomas Wylde, LLC and John Hanna.

6   **DEMAND FOR PRODUCTION NO. 18:**

7       Produce any and all DOCUMENTS bearing YOUR signature regarding anything that

8   pertains, refers or relates to Thomas Wylde, LLC.

9   **DEMAND FOR PRODUCTION NO. 19:**

10      Produce any and all DOCUMENTS bearing the signature of any members of Hillshore

11  Investments as it pertains, refers or relates to Thomas Wylde, LLC.

12  **DEMAND FOR PRODUCTION NO. 20:**

13      All DOCUMENTS regarding monies that Hillshore Investments or any of its members paid

14  from its bank accounts to any employee of Thomas Wylde, LLC other than Paula Thomas,

15  including but not limited to John Hanna and Jene Park.

16  **DEMAND FOR PRODUCTION NO. 21:**

17      All DOCUMENTS regarding monies that YOU paid from any of your bank accounts to any

18  employee of Thomas Wylde, LLC other than Paula Thomas, including but not limited to John

19  Hanna and Jene Park.

20  **DEMAND FOR PRODUCTION NO. 22:**

21      Any and all text messages by and between YOURSELF and John Hanna that pertains,

22  refers or relates to Paula Thomas in any way.

23  **DEMAND FOR PRODUCTION NO. 23:**

24      Any and all text messages by and between YOURSELF and Jene Park that pertains, refers

25  or relates to Paula Thomas in any way.

26  **DEMAND FOR PRODUCTION NO. 24:**

27      Any and all text messages by and between YOURSELF and any current or former

28  employee of Thomas Wylde, LLC that pertains, refers or relates to Paula Thomas in any way.



**DEMAND FOR PRODUCTION NO. 25:**

Any and all text messages by and between YOURSELF and John Hanna that pertain, refer

or relate to Thomas Wylde, LLC in any way.

**DEMAND FOR PRODUCTION NO. 26:**

Any and all text messages by and between YOURSELF and Jene Park that pertain, refer or

relate to Thomas Wylde, LLC in any way.

**DEMAND FOR PRODUCTION NO. 27:**

Any and all text messages by and between YOURSELF and any current or former

employee of Thomas Wylde, LLC that pertains, refers or relates to Thomas Wylde, LLC in any

way.

**DEMAND FOR PRODUCTION NO. 28:**

Any and all emails by and between YOURSELF and John Hanna that pertains, refers or

relates to Paula Thomas in any way.

**DEMAND FOR PRODUCTION NO. 29:**

Any and all emails by and between YOURSELF and Jene Park that pertains, refers or

relates to Paula Thomas in any way.

**DEMAND FOR PRODUCTION NO. 30:**

Any and all emails by and between YOURSELF and any current or former employee of

Thomas Wylde, LLC that pertains, refers or relates to Paula Thomas in any way.

**DEMAND FOR PRODUCTION NO. 31:**

Any and all text messages by and between YOURSELF and any member of Hillshore

Investments that pertains, refers or relates to Paula Thomas in any manner.

**DEMAND FOR PRODUCTION NO. 32:**

Any and all text messages by and between YOURSELF and any member of Hillshore

Investments that pertains, refers or relates to Thomas Wylde, LLC in any manner.

**DEMAND FOR PRODUCTION NO. 33:**

All DOCUMENTS in your possession regarding the value of Thomas Wylde, LLC from the

date of the company's inception to the present.



6

1   **DEMAND FOR PRODUCTION NO. 34:**

2       All DOCUMENTS reflecting consideration that YOU paid for YOUR membership units in

3   Thomas Wylde, LLC.

4   **DEMAND FOR PRODUCTION NO. 35:**

5       All DOCUMENTS reflecting consideration that Hillshore Investments paid for its

6   membership units in Thomas Wylde, LLC.

7   **DEMAND FOR PRODUCTION NO. 36:**

8       All DOCUMENTS in YOUR possession regarding the sale of membership units in Thomas

9   Wylde, LLC at any time.

10  **DEMAND FOR PRODUCTION NO. 37:**

11      All DOCUMENTS in YOUR possession regarding payments made by YOU to vendors of

12  Thomas Wylde, LLC located in South Korea from the date the company was formed until the

13  present, including but not limited to copies of checks and wire transfers made, purchase orders, and

14  invoices.

15  **DEMAND FOR PRODUCTION NO. 38:**

16      All DOCUMENTS in YOUR possession regarding payments made by Hillshore

17  Investments to vendors of Thomas Wylde, LLC located in South Korea from the date the company

18  was formed until the present, including but not limited to copies of checks and wire transfers made,

19  purchase orders, and invoices.

20  **DEMAND FOR PRODUCTION NO. 39:**

21      All DOCUMENTS regarding payments made by YOU to companies that John Hanna or

22  any of his friends or family owns in whole or in part, including but not limited to H&H Fashion,

23  LLC.

24  **DEMAND FOR PRODUCTION NO. 40:**

25      All DOCUMENTS regarding payments made by Hillshore Investments to companies that

26  John Hanna or any of his friends or family owns in whole or in part, including but not limited to

27  H&H Fashion, LLC.

28  ///



7

**DEMAND FOR PRODUCTION NO. 41:**

All DOCUMENTS regarding payments made by YOU to companies that Tasha Hess or any of her friends or family owns in whole or in part, including but not limited to Shot in the Armoire, LLC.

**DEMAND FOR PRODUCTION NO. 42:**

All DOCUMENTS regarding payments made by Hillshore Investments to companies that Tasha Hess or any of her friends or family owns in whole or in part, including but not limited to Shot in the Armoire, LLC.

**DEMAND FOR PRODUCTION NO. 43:**

All DOCUMENTS regarding payments made by YOU to companies that Jene Park or any of her friends or family owns in whole or in part.

**DEMAND FOR PRODUCTION NO. 44:**

All DOCUMENTS regarding payments made by Hillshore Investments or any of its members to companies that Jene Park or any of her friends or family owns in whole or in part.

**DEMAND FOR PRODUCTION NO. 45:**

All DOCUMENTS regarding any advances made by Hillshore Investments or any of its members to any of its officers, directors or employees, and regarding any repayment of the same.

**DEMAND FOR PRODUCTION NO. 46:**

All DOCUMENTS regarding any advances made by YOU to any of its officers, directors or employees, and regarding any repayment of the same.

**DEMAND FOR PRODUCTION NO. 47:**

All DOCUMENTS in your possession that refer, relate or pertain to John Hanna's termination from Thomas Wylde, LLC.

**DEMAND FOR PRODUCTION NO. 48:**

All DOCUMENTS in your possession that refer, relate or pertain to Jene Park's potential termination from Thomas Wylde, LLC.

**DEMAND FOR PRODUCTION NO. 49:**

All DOCUMENTS in your possession that refer, relate or pertain to Paula Thomas'



1   termination from Thomas Wylde, LLC.

2   **DEMAND FOR PRODUCTION NO. 50:**

3       All DOCUMENTS supporting your or Thomas Wylde, LLC's contention that Paula

4   Thomas was terminated for cause.

5   **DEMAND FOR PRODUCTION NO. 51:**

6       All DOCUMENTS in your possession regarding the decision to terminate Paula Thomas

7   from Thomas Wylde, LLC.

8   **DEMAND FOR PRODUCTION NO. 52:**

9       All DOCUMENTS demonstrating payments made by YOU to Richard Peddie for services

10   rendered to date by Richard Peddie in his representation of Thomas Wylde, LLC in the Paula

11   Thomas v. Thomas Wylde, LLC et. al matter.

12   **DEMAND FOR PRODUCTION NO. 53:**

13       All DOCUMENTS demonstrating payments made by Hillshoro Investments or any of its

14   members to Richard Peddie for services rendered to date by Richard Peddie in his representation of

15   Thomas Wylde, LLC in the Paula Thomas v. Thomas Wylde, LLC et. al matter.

16   **DEMAND FOR PRODUCTION NO. 54:**

17       All DOCUMENTS in your possession between you and David Schnider that refer, relate or

18   pertain to Paula Thomas in any manner.

19   **DEMAND FOR PRODUCTION NO. 55:**

20       All DOCUMENTS in your possession between you and David Schnider that refer, relate or

21   pertain to John Hanna in any manner.

22   **DEMAND FOR PRODUCTION NO. 56:**

23       All DOCUMENTS in your possession between you and David Schnider that refer, relate or

24   pertain to Jene Park in any manner.

25   **DEMAND FOR PRODUCTION NO. 57:**

26       All DOCUMENTS supporting your contention that Paula Thomas' conduct during her

27   employment with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC, its members,

28   and/or management.

1  **DEMAND FOR PRODUCTION NO. 58:**

2     All DOCUMENTS supporting your contention that Paula Thomas' conduct after her

3  employment ended with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC's

4  members, and/or management.

5  **DEMAND FOR PRODUCTION NO. 59:**

6     All DOCUMENTS that Thomas Wylde, LLC provided to YOU potential including but not

7  limited to any and all financial reports and business plans or projections.

8  **DEMAND FOR PRODUCTION NO. 60:**

9     All DOCUMENTS that Thomas Wylde, LLC provided to Hillshore Investments, including

10  any of its members, including but not limited to any and all financial reports and business plans or

11  projections.

12  **DEMAND FOR PRODUCTION NO. 61:**

13     All DOCUMENTS that John Hanna provided to YOU including but not limited to any and

14  all financial reports and business plans or projections for Thomas Wylde, LLC.

15  **DEMAND FOR PRODUCTION NO. 62:**

16     All DOCUMENTS that John Hanna provided to Hillshore Investments, including any of its

17  members including but not limited to any and all financial reports and business plans or projections

18  for Thomas Wylde, LLC.

19  **DEMAND FOR PRODUCTION NO. 63:**

20     All DOCUMENTS in your possession that refer or relate to the conversation and/or

21  discussion you had with Jene Park about ceasing paying Thomas Wylde, LLC any more monies

22  after February 2017.

23  **DEMAND FOR PRODUCTION NO. 64:**

24     All DOCUMENTS in your possession regarding how Thomas Wylde, LLC and/or Jene

25  Park plans to become cash flow positive in the future, including but not limited to any recent

26  business development and marketing plans.

27  ///

28  ///



10

1  <u>DEMAND FOR PRODUCTION NO. 65:</u>

2      Any and all insurance policies held by Hillshore Investments, under which coverage may

3  [illegible]

4  <u>DEMAND FOR PRODUCTION NO. 66:</u>

5      All DOCUMENTS that PDTW provided to Hillshore Investments, including any of its

6  members, including but not limited to any and all financial reports and business plans or

7  projections.

8  <u>DEMAND FOR PRODUCTION NO. 67:</u>

9      All DOCUMENTS that PDTW provided to YOU including but not limited to any and all

10  financial reports and business plans or projections.

11  <u>DEMAND FOR PRODUCTION NO. 68:</u>

12      All DOCUMENTS regarding payments made by YOU to Paul Murphy.

13  <u>DEMAND FOR PRODUCTION NO. 69:</u>

14      All DOCUMENTS regarding payments made by Hillshore Investments to Paul Murphy.

15  <u>DEMAND FOR PRODUCTION NO. 70:</u>

16      All DOCUMENTS in your possession regarding settlement agreements entered into

17  between THOMAS WYLDE, LLC and any other party.

18  <u>DEMAND FOR PRODUCTION NO. 71:</u>

19      All check images for checks written from Hillshore Investments to Thomas Wylde, LLC's

20  from August 2014 to the present.

21  <u>DEMAND FOR PRODUCTION NO. 72:</u>

22      All check images for checks written by YOU to Thomas Wylde, LLC from August 2014 to

23  the present.

24  <u>DEMAND FOR PRODUCTION NO. 73:</u>

25      All check images for checks written by YOU to Jene Park from August 2014 to the present.

26  <u>DEMAND FOR PRODUCTION NO. 74:</u>

27      All check images for checks written by Hillshore Investments to Jene Park from August

28  2014 to the present.

11

1  **DEMAND FOR PRODUCTION NO. 75:**

2      All check images for checks written by YOU to John Hanna from August 2014 to the

3  present.

4  **DEMAND FOR PRODUCTION NO. 76:**

5      All check images for checks written by Hillshore Investments to John Hanna from August

6  2014 to the present.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



12

AMENDED NOTICE OF DEPOSITION OF STEPHEN CHOI

FA2306003 Choi/Deposition Notices/Amended NOD - Stephen Choi 003.docx

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I, the undersigned, am employed in the County of Orange, State of California. I am over the age of eighteen (18) years and not a party to the within action. My business address is 26 Corporate Park, Irvine, CA 92606-5105.

On January 20, 2017, I served true copies of the foregoing document(s) described as **AMENDED NOTICE OF DEPOSITION OF STEPHEN CHOI** on the interested parties in this action, addressed as follows:

**SEE ATTACHED SERVICE LIST**

[X]   BY U.S. MAIL: The documents were placed in sealed, addressed envelopes on the above date and placed for collection and mailing at my place of business. I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   BY E-MAIL: By transmitting a true copy of the foregoing document(s) to the e-mail addresses set forth on the attached mailing list.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 20, 2017, at Irvine, California.

_____
SAUNDRA WUN



PAULA THOMAS V. THOMAS WYLDE, et al.

K&C CLIENT:    Paula Thomas
CLIENT NO.:    930000354

## SERVICE LIST

| Counsel of Record | Phone/Fax Nos./Email | Party(ies) Represented |
|---|---|---|
| Richard Byron Peddie, Esq. Richard Byron Peddie, P.C. 5051 Euclid Avenue Boulder, CO 80303-2893 | 303-444-5447 720-222-4766 lawstudios@comcast.net | Defendants |
| John D. Wilson, Esq. Law Offices of John D. Wilson 1900 Avenue of the Stars, Suite 960 Los Angeles, CA 90067 | 310-277-2323 310-556-2308 johnw@jdwilsonlaw.net | Personal Counsel for Steven Choi |

14

AMENDED NOTICE OF DEPOSITION OF STEPHEN CHOI

F:\930000354\disc\Deposition Notices\Amended NOD - Stephen Choi-003.docx

# EXHIBIT "4"

4:11 AM

12/11/17

Cash Basis

# THOMAS WYLDE LLC
## Transactions by Account
### All Transactions

| Type | Date | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|
| **Notes Payable - Long Term** | | | | | |
| **Notes Payable - Hilshore Contr** | | | | | |
| Deposit | 08/25/2014 | INCOMING DOMESTIC WIRE WIRE IN | | 609,000.00 | (609,000.00) |
| Deposit | 09/15/2014 | INCOMING DOMESTIC WIRE WIRE IN | | 250,000.00 | (250,000.00) |
| Deposit | 10/15/2014 | Fund Imported from TW Holdings, Inc. | | 250,000.00 | (500,000.00) |
| Deposit | 11/13/2014 | $500K loan for Thomas Wylde LLC to be converted to Equity la... | | 393,360.00 | (893,360.00) |
| Deposit | 11/21/2014 | December Funding 2014 | | 500,000.00 | (1,393,360.00) |
| Deposit | 12/12/2014 | | | 500,000.00 | (2,100,400.00) |
| General J... | 12/31/2014 | to reclass Hilshore loan to Equity | 2,300,000.00 | | 0.00 |
| Transfer | 02/31/2016 | Funds transfer | | 246,975.00 | (246,975.00) |
| Transfer | 02/23/2016 | bank fee | | 5.00 | (246,980.00) |
| Deposit | 03/23/2016 | Deposit | | 250,000.00 | (500,983.00) |
| Deposit | 04/15/2016 | Deposit | | 230,000.00 | (733,980.00) |
| Deposit | 04/20/2016 | Deposit | | 230,000.00 | (963,980.00) |
| Deposit | 05/16/2016 | Deposit | | 378,000.00 | (1,574,980.00) |
| Deposit | 05/26/2016 | Deposit | | 277,000.00 | (1,551,980.00) |
| Deposit | 06/15/2016 | Deposit | | 69,000.00 | (1,531,980.00) |
| Deposit | 06/27/2016 | Deposit | | 100,000.00 | (1,731,980.00) |
| Deposit | 06/30/2016 | Deposit | | 280,000.00 | (2,011,980.00) |
| Deposit | 07/13/2016 | Deposit | | 375,000.00 | (2,385,980.00) |
| Deposit | 08/12/2016 | 375K | | 200,000.00 | (2,585,980.00) |
| Deposit | 09/02/2016 | Deposit | | 200,000.00 | (2,785,980.00) |
| General J... | 09/30/2016 | $5,091.12 | 99,091.12 | | (3,285,980.00) |
| Deposit | 11/03/2016 | Deposit | | 28,000.00 | (2,913,980.00) |
| General J... | 11/03/2016 | pay off MURPHY ROSEN Friday, November 4, 2016 3:57:55 | | 200,000.00 | (3,113,980.00) |
| Deposit | 12/02/2016 | Deposit | | 100,000.00 | (3,206,980.00) |
| Deposit | 12/14/2016 | Deposit | | 70,000.00 | (3,305,980.00) |
| Deposit | 12/20/2016 | Deposit | | 554,000.00 | (3,421,980.00) |
| Deposit | 01/14/2017 | Deposit | | 145,000.00 | (3,456,980.00) |
| Deposit | 01/17/2017 | Deposit | | 89,000.00 | (3,945,980.00) |
| Deposit | 02/01/2017 | Deposit | | 55,000.00 | (3,011,980.00) |
| Deposit | 02/13/2017 | Deposit | | (91,000.00) | (3,611,980.00) |
| | | | | | |
| **Total Notes Payable - Hilshore Contr** | | | 2,399,091.12 | 5,971,999.00 | (3,611,980.00) |
| | | | | | |
| **Total Notes Payable - Long Term** | | | 2,399,091.12 | 5,971,999.00 | (3,611,980.00) |
| | | | | | |
| **TOTAL** | | | 2,399,091.12 | 5,974,999.00 | (3,611,980.00) |



# EXHIBIT "5"

## OPERATING AGREEMENT OF THOMAS WYLDE, LLC

This Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company, formed under the California Revised Uniform Limited Liability Company Act (the "Company"), is entered into as of July 22, 2014 by John Hanna, Jene Park, Doug Lee, and Roger Kuo (each a "Member," and collectively the "Members").

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

## ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "Act" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "Affiliate" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    "Capital Account" shall mean the account maintained for a Member or Assignee pursuant to Section 2.1 of Exhibit C. Each Member's initial Capital Account balance as of the date of this Agreement is set forth in Exhibit A.

1.5.    "Capital Contribution" means a Member's capital contribution to the Company in exchange for Units.

1.6.    "Cause" shall mean, with respect to the Manager, any Officer of the Company, and any Executive Officer serving on the Company's Executive Committee, fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct with respect to a material matter relating to the affairs of the Company.

1.7    "Confidential Information" means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of or relating to the Company.

1.8.    "Corporations Code" means the California Corporations Code.

1.9.    "Electronic transmission by the Company" and "electronic transmission to the Company" have the meanings set forth in Corporations Code § 17701.02(i)(1)-(2).

1.10.    "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.    "Encumbrance" means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.    "Executive Committee" means the Company's Executive Committee, as described in Article V.

1.13.    "Executive Officer" means an Officer of the Company that serves on the Company's Executive Committee.

1.14.    "Involuntary Transfer" means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15.    "IRC" or "Code" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.16    "Member" means any of the four initial Members listed herein - John Hanna, Jene Park, Doug Lee, and Roger Kuo - or a Person who subsequently acquires a Membership Interest in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.17.    "Membership Interest" means a Member's entire interest and rights in the Company, collectively, including the Member's economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

2

1.18.    "Net Profits" and "Net Loss" shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

1.19.    "Notice" means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or, for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.20.    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.21.    "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.22.    "Regulations," "Reg," or "Treasury Reg" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.23.    "Reserves" means the aggregate of reserve accounts that the Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.24.    "Successor in Interest" means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.25.    "Supermajority of Members" means a Member or Members whose aggregate Unit Percentage represents at least sixty-five percent (65%) of the Unit Percentages of all non-Defaulting Members.

3

1.26.    "Transfer" means any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.27.    "Unit(s)" means the unit(s) of Membership Interest in the Company.

1.28.    "Unit Percentage" means, with respect to a Member, the percentage obtained by dividing the total number of Units held by such Member by the total number of Units outstanding.

1.29.    "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.30.    "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Unit Percentage.

1.31.    "Writing" includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code §17701.02(i).

1.32.    "Written" or "in writing" includes facsimile and other electronic communication authorized by the Corporations Code.

## ARTICLE II: ORGANIZATION

2.1.    **Articles of Organization.**  The Articles of Organization were filed with the California Secretary of State on July 22, 2014, File Number 201420310399.

2.2.    **Company Name.**  The name of the Company is Thomas Wylde, LLC. The business of the Company may be conducted under that name; or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

2.3.    **Company Offices.**  The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.    **Company Agent.**  The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016. The Manager may from time to time change the Company's agent for service of process. If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

2.5.    **Business.** The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may be organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the luxury fashion industry.

2.6    **Taxation.** The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.    **Term.** The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.    **Members.**    The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.    **Managed by One Manager.** The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.

2.10.    **Consent of Spouse or Domestic Partner.** Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

### ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.    **Capital Contributions of the Members.** The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement.  Units may only exist in positive, whole integer quantities and not in fractional amounts.

3.2    **Members' Initial Capital Contribution.** On the Effective Date, each Member shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto, which shall thereafter constitute the Capital Contribution for each Member.  The 46 Units issued to the Members constitute 100% of all Membership Interest in the Company.  Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

3.3.    **Failure to Make Initial Capital Contributions.** If a Member fails to make the required Capital Contribution set forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting

Interest of the Defaulting Member. A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's Voting Interest shall be restored. In any event, any Defaulting Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense; including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

3.4.    **No Withdrawals.** A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5.    **No Interest On Capital.** No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.6.    **Members and Manager Not Liable.** The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement. The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

3.7    **Right of Participation.** Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such newly-issued Membership Interest. For purposes of clarification, the foregoing participation right is intended to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1.    **Allocation.** After giving effect to the special allocation provisions of Exhibit C attached hereto. Net Profits and Net Losses for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

4.2.    **Distributions.** Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members in accordance with their respective Unit Percentages. By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members. All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3.    **Tax Distribution.** Notwithstanding Paragraph 4.2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year an amount equal to 50% of the Net Profits (and items of income and gain) for such fiscal year allocated to such Member, less the aggregate amount of prior Distributions by the Company

to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

## ARTICLE V: MANAGEMENT AND EXECUTIVE COMMITTEE

5.1.    **Managed by Manager**.  The business of the Company shall be managed by one Manager, who may also be a Member.  Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager. The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company.  The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO.  The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.    **Officers**.  Subject to Section 7.3, the Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer.  Such Officers may, but need not, be employees of the Company or Members of the Company. Each appointed Officer shall hold such office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager (subject to Section 7.3).  All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.    **Executive Committee**.  The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company.    Executive Officers may, but need not be, employees of the Company or Members of the Company.

5.3.1.    **Executive Officers**.  Executive Officers shall have the duties, functions, and powers described herein.  Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members.  Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)    **Chief Creative Officer and Creative Director**.  The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company.  The CCOD shall also be the Chairperson of the Executive Committee.  The CCOD for the Company shall be as of the Effective Date shall be Paula Thomas.

(b)    **Chief Operating Officer and Chief Commercial Officer**.  The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's

commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.    **Manager's Powers and Limitations.**    The Manager of the Company shall have all powers and authority provided by this Agreement and the Act.    Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.    **Compensation.**    Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.    **Company Assets.**    The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.    **Company Funds.**    All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager.    Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.    **Removal and Replacement of Manager.**    The Manager shall serve until the earlier of (a) the Manager's resignation, retirement, death, or disability, or (b) the Manager's removal for Cause by Vote of a Supermajority of Members.    A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.    **Books of Account.**    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.    **Accounting Method.**    Financial books and records of the Company shall be kept based on the Manager's choice of accounting method.    The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.    **Content of Books.**    At all times during the term of existence of the Company, and beyond that term, if reasonably necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

8

(b)  A copy of the Articles of Organization, as amended;

(c)  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)  An original executed copy or counterparts of this Agreement, as amended;

(e)  Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(f)  Financial statements of the Company for the six most recent fiscal years; and

(g)  The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(h)  If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Manager.

6.4.  **Financial Statements.**  From time to time as determined by the Manager and at the end of each fiscal year, the books of the Company shall be closed and examined, statements reflecting the financial condition of the Company and its profits or losses shall be prepared, and a report about those matters shall be issued by the Company's accountants. Copies of the financial statements shall be given to all Members. In addition, all Members shall receive, not less frequently than at the end of each month, copies of such financial statements regarding the previous calendar month as may be prepared in the ordinary course of business by the Manager or accountants selected by the Manager. The Manager shall cause an annual report to be sent to each Member within 120 days after the end of the fiscal year of the Company. The annual report may be sent by electronic transmission by the Company and shall include:

(a)  A balance sheet, income statement, and a statement of cash flows of the Company for and as of the close of the fiscal year; and

(b)  A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year.

6.5.  **Tax Information.**  Within 90 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for that year.

6.6.  **Tax Matters Partner.**  The Manager shall act as Tax Matters Partner of the Company under IRC § 6231(a)(7). The Tax Matters Partner is authorized to do the following:

(a)     Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223(g) and the Implementing Regulations;

(b)     Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

(c)     On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)     File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)     Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP AND UNITS

### 7.1    Membership Interest and Units

7.1.1    **Membership and Units.**  There shall be only one class of Membership Interest and one class of Units.  Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action.  Each Member shall vote in proportion to the Member's then-existing Voting Interest.

7.1.2.    **Units.**  The Company has issued 46 (Forty-Six) Units to the Members as set forth in Exhibit B.

7.2.    **Certificates.**  All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.  The Company may, but is not required to, issue certificates evidencing

Units ("Unit Certificates") to Members of the Company.  Once Unit Certificates have been issued, they shall continue to be issued as necessary to reflect current Units held by Members. Unit Certificates shall be in a form approved by the Manager, shall be manually signed by the Manager, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Units and Members set forth in this Agreement, including the following:

> *THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF THE COMPANY, AS AMENDED FROM TIME TO TIME.  THE UNITS MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH SUCH OPERATING AGREEMENT.*

> *THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS.  THE UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION THEREFROM AND THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS LEGAL COUNSEL THAT SUCH SALE, PLEDGE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.*

7.3.    **Acts Requiring Member Vote**.  Except as otherwise provided in this Agreement or by the Act, all of the following acts shall require the consent by Vote of a Supermajority of Members:

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The filing of a petition in bankruptcy or entering into an assignment for the benefit of the Company's creditors;

(h)    The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company.

(g)    The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(h)    The issuance or redemption of any Membership Interest (including the terms thereof);

(i)    Making operating or liquidating distributions to Members;.

(j)    The Transfer of any Membership Interest (other than to a Permitted Transferee);

(k)    The admission of any new Member (other than a Permitted Transferee);

(l)    Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)    Any transaction between the Company and an Affiliate of a Member or a Manager;

(n)    Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget; and

(o)    Paying any officer or employee more than $200,000 per year.

7.4.    **Record Date**.    The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action. In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.    **Meetings**.

7.5.1.    **General**.    Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote. If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager. Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general

12

nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a Supermajority of Members, represented in person or by Proxy. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2. **Quorum**. A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3. **Waiver of Notice**. The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4. **Proxies**. At all meetings of Members, a Member may Vote in person or by Proxy. Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5. **Video Attendance**. A meeting of the Members may be conducted, in whole or in part, by electronic means (audio or video with audio) so long as the Company implements reasonable measures to provide participating Members a full opportunity to hear and be heard and otherwise concurrently participate in the meeting. The permanent record of any such meeting shall consist of the minutes of such meeting and/or the electronic recording of such meeting, if recorded.

7.5.6. **Written Consent**. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted. Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

73

7.5.7. **No Authority.** No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1. **Dissociation.** A Member may not dissociate from the Company without the written consents of all of the Members. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.

8.2. **Transfers.** Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved by the Members by Vote of a Supermajority of Members. Approval may be granted or withheld in the Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void. Notwithstanding the foregoing, (x) any Member may Transfer such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and family member(s), and (iii) any revocable trust created for the benefit of the Member and/such Member's spouse and family member(s) (each such transferee, a "Permitted Transferee"), (y) the Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Transfer to a Permitted Transferee, and (z) the Members shall approve a Permitted Transferee's admission as a substitute Member. A Permitted Transferee of a Member may transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the Company's and other Members' right of first refusal.

8.3. **No Release on Transfer.** A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

8.4. **Agreement Binds New Members.** Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5 **Voluntary Lifetime Transfers.** No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section. Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both

14

home and office), and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer. The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest to be transferred to the Company and the other Members as described in Section 8.7. A "Voluntary Lifetime Transfer" means any Transfer made during a Member's lifetime, which is not an Involuntary Lifetime Transfer (as defined in Section 8.6).

8.6    **Involuntary Lifetime Transfer.** Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable, including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company and each other Member. Such notice shall include a description of the expected Transfer, the name, address (both home and office), and business or occupation of the expected transferee, and any other facts that are, or would reasonably be deemed to be, material to the Involuntary Transfer. The Member who may be making an Involuntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest otherwise to be transferred to the Company and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law.

8.7    **Right of First Refusal of the Company and Non-Transferring Members.**

8.7.1   **General.** Each Member shall be deemed to have offered to sell his or her Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other Members (i) at the price and payment terms offered by a proposed transferee set forth in the Member Notice or (ii) if there is no price or payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), at the Agreement Price (as defined below) and Agreement Terms (as defined below).

8.7.2.   **Company's Right.** Within the later of (i) thirty (30) days following receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement Price, the Company shall send a written notice ("Company Notice") to the Members stating the portion of the Offered Membership Interest the Company wishes to purchase.

8.7.3.   **Members' Right.** Unless the Company Notice specifies all of the Offered Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member who desires to purchase a portion of the Offered Membership Interest shall give a written notice to the Company specifying the maximum portion of the Offered Membership Interest that the Member wishes to purchase. If the aggregate Offered Membership Interest to be purchased by the Members exceeds the total amount of the Offered Membership Interest, the Offered Membership Interest shall be allocated to the exercising Members based on their respective Unit Percentages.

8.7.4   **Remaining Offered Membership Interest.** If the Company and the other Members do not agree to buy all of the Offered Membership Interest, any remaining

Offered Membership Interest may be sold to a non-Member within thirty (30) days after the expiration of the Company's and Members' option period. If such Transfer does not occur within thirty (30) days, the provisions of this Agreement will continue to apply to such Offered Membership Interest as if no such Transfer had been contemplated and no notice had been given. A Transfer is consummated when the Company has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

8.8    **Agreement Price.**  The Agreement Price will be the fair market value of the Membership Interest being Transferred and shall initially be determined in good faith by the Company. If any Member objects to the Company's determination of the fair market value, the Company and the objecting Member shall attempt to jointly appoint a qualified appraiser. If the parties cannot agree on a single appraiser, they shall each appoint one appraiser and the two appraisers appointed by the parties shall choose a third appraiser. In the event that three appraisers are used, the Agreement Price shall be the average of the two closest fair market values proposed by the three appraisers. The cost of appraisal shall be borne and paid by the objecting Member, unless the Company's proposed fair market value is at least twenty percent (20%) less than the Agreement Price determined by appraisal.

8.9    **Agreement Terms.**

8.9.1    **Installment Note.**  If there are no payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

8.9.2    **Closing.**  The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree. At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred. If the seller does not appear at the closing, then:

(a)    The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

(b)    The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

(c)    The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

8.10    Transfers at Death. Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest). If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1.    **Dissolution.** The Company shall be dissolved on the first to occur of the following events:

(a)    The Vote of a Supermajority of Members to dissolve the Company;

(b)    The sale or other disposition of substantially all of the Company's assets; or

(c)    Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

9.2.    **Winding Up.** On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)    To pay the expenses of liquidation;

(b)    To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

(c)    To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

(d)    To the Members in accordance with their respective positive Capital Account balances.

9.3.    **No Recourse.**  Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, the Member shall have no recourse against any other Member or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement

## ARTICLE X: CONFIDENTIALITY

10.1.    **Confidentiality.**  Each Member covenants with the Company and each other Member that for so long as a Member holds any Units in the Company, and for a two-year period following the Transfer of a Member's Units, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, a Member shall not, directly or indirectly, through an Affiliate or otherwise use or disclose in any manner any Confidential Information.

10.2.    **Money Damages Inadequate.**  Each Member agrees that a breach of Section 10.1 shall result in irreparable damage and injury to the Company that no money damages could adequately compensate.  If the Member breaches Section 10.1, in addition to all other remedies to which the Company may be entitled to, and notwithstanding the arbitration provisions of Article XI, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction.  Each Member expressly waives any claim or defense that an adequate remedy at law exists for any such breach.

10.3.    **Reformation.**  If any provision of Section 10.1 is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that provision shall be deemed reformed in that jurisdiction to the extent necessary to permit enforcement.

## ARTICLE XI: INDEMNIFICATION AND ARBITRATION

11.1.    **Indemnification.**  The Company shall indemnify any Person who was or is a party, or who is threatened to be made a party, to any legal proceeding by reason of the fact that the Person was or is a Member, Manager, Officer, Executive Officer, employee, or other agent of the Company against expenses including reasonable attorneys' fees, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if (a) that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and (b) in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful.  The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

11.2.    **Advancement of Expenses.**  Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a

legal proceeding shall be paid by the Company in advance of the final disposition of that proceeding, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.5.   **Arbitration.**  Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to (or arising out of) this Agreement or the Company among or between any of the Company, a current or former Member, or the current or a former Manager shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association.  The place of arbitration shall be Los Angeles, California.  The award of the arbitrator shall be final, binding, and conclusive on all parties.  Judgment may be entered on any such award in any court of competent jurisdiction.

## ARTICLE XII: GENERAL PROVISIONS

12.1.   **Integration.**  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein.  No party is relying on any representations or warranties not expressly contained in this Agreement.  This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

12.2.   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail.  The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

12.3.   **Choice of Law.**  This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

12.4.   **Severability.**  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

12.5   **Binding Effect.**  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.6.   **Representation.**  Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

12.7.   **Additional Instruments.**  The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.8.   **Independent Activities**.   Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members or the Manager in the carrying on of their own respective businesses or activities.

12.9.   **Capacity and Authority**.   Each Member represents and warrants to the other Members that he, she, or it has the capacity and authority to enter into this Agreement.

12.10.   **Interpretation**.   The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.  Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

12.11.   **Time of the Essence**.   Time is of the essence for every provision of this Agreement that specifies a time for performance.

12.12.   **Exhibits**.   The exhibits referenced herein are expressly incorporated into and made part of this Agreement.

12.13.   **No Third-Party Beneficiaries**.   This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and there are no intended third-party beneficiaries.

12.14.   **Amendment**.   This Agreement may be amended only by the written approval of all of the Members.

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EVERY OTHER PERSON WHO EXECUTES THIS AGREEMENT OR OTHERWISE THEREAFTER BECOMES A MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first written above

JOHN GANNA, Manager, Member and Chief Executive Officer

JENE PARK, Member, Chief Operations Officer and Chief Commercial Officer

DOUG LEE, Member

ROGER KUO, Member

22

## EXHIBIT A

### CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____ ("Member"), and acknowledges that he or she has read the foregoing Operating Agreement of Thomas Wylde, LLC (the "Agreement") and understands its provisions.   The undersigned is aware that, by the provisions of the Agreement, Member and the undersigned have consented to sell or transfer all Units in the Company, including any community property interest or quasi-community property interest therein, only in accordance with the terms and provisions of the Agreement.  The undersigned expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Units and the restrictions on them.   If the undersigned predeceases Member while Member owns any Units therein, the undersigned agrees not to devise or bequeath any community property interest or quasi-community property interest in such Units in contravention of the Agreement.

Date: _____

_____

Signature

_____

Name

23

# EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|------|--------------------|-----------------------------------|-----------|--------------------------------|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 December 15, 2014 | 14 | $700 |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900 December 15, 2014 | 18 | $900 |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350 December 15, 2014 | 7 | $350 |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350 December 15 2014 | 7 | $350 |

24

**EXHIBIT C**
**TAX PROVISIONS**

**ARTICLE I: DEFINITIONS**

1.1     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

1.1.1     Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

1.1.2     Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

1.1.3     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2     "Code" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3     "Company Minimum Gain" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4     "Member Nonrecourse Debt" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5     "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6     "Member Nonrecourse Deductions" means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

1.7     "**Net Profits**" and "**Net Losses**" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.7.1     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3     In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6     Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8     "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1).

1.9      "Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

## ARTICLE II: CAPITAL ACCOUNT

2.1      **Capital Accounts.** The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1      To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2      To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3      In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4      In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

## ARTICLE III: SPECIAL ALLOCATIONS

3.1      **Adjusted Capital Account Deficit.** An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

27

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

### 3.2    Special Allocations.

3.2.1    **Member Nonrecourse Deductions.**  Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

3.2.2    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members.**  Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

3.2.3    **Member Minimum Gain Chargeback.**  Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.2.4    **Minimum Gain Chargeback.**  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

3.2.5  **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company Income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.2.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 3.2.5 were not in the Agreement.

3.3     **Curative Allocations**.  The allocations set forth in Sections 3.1 and 3.2 of this Exhibit C (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.3.  Therefore, notwithstanding any other provision of the Agreement (other than the Regulatory Allocations), the Members, by Vote of a Supermajority of Members, shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.1 of the Agreement.  In exercising their discretion under this Section 3.3, the Members, by Vote of a Supermajority of Members, shall take into account any future Regulatory Allocations under Sections 3.2.3 and 3.2.4 of this Exhibit C that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.2.1 and 3.2.2 of this Exhibit C.

3.4     **Code Section 704(c) Allocations**.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Agreement; (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).

3.5     **Allocations in Respect of a Transferred Membership Interest**.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year shall be allocated among the Members, as determined by the Members, by Vote of a Supermajority of Members, in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such fiscal year.

# EXHIBIT "6"

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Paula Thomas, an individual ("Purchaser"), effective December 22, 2014 (the "Effective Date").

### RECITALS

A.     Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). Other than as set forth herein, all Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, and Doug Lee (the "Members").

B.     Purchaser seeks to invest $3,200 and certain assets and liabilities into Seller in exchange for 64 membership Units in the Seller.

C.     Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.     Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, a 64 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.   Instruments of Conveyance. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.   Consideration. In consideration for the Membership Interest, Purchaser shall make a capital

contribution to Seller in the amount of Three Thousand Two Dollars ($3,200) and shall transfer to seller their express and terms more set forth on Exhibit "A" provide.

4. Purchaser Representations and Warranties. Purchaser represents and warrants to Seller as follows.

        a.      This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

        b.      Purchaser is acquiring the Membership Interest for her own account, for investment purposes, and not with a view to the distribution thereof.

        c.      Purchaser has firsthand knowledge of the business and affairs of Seller, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

5. Seller Representations and Warranties. Seller represents and warrants to Purchaser as follows:

        a.      Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

        b.      Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

        c.      Seller has received fair equivalent value under the terms of this Agreement.

        d.      Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

        e.      The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

        f.      Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

        g.      Subsequent to the purchase contemplated hereby, the fully diluted capitalization of Company is as set forth in Exhibit "B" to the Amended Agreement (defined below).

Membership Purchase Agreement                                             Page 2

e.    Conditions Precedent. Purchaser's obligations hereunder are conditioned upon

Amended and Restated Operating Agreement of Company in the form attached as Exhibit "B" hereto ("Amended Agreement");

b.    The Members' execution and delivery of that certain Clawback Agreement in the form attached as Exhibit "C" hereto;

c.    Hillshore Investments funding of a Two Million Dollar ($2,000,000) loan to the Company;

d.    The Company's use of the proceeds of such loan in the manner set forth in that certain Use Of Proceeds Agreement in the form attached as Exhibit "D" hereto (a fully executed copy of which must be delivered to Purchaser);

e.    The Company and the Members' execution and delivery of that certain Indemnity Agreement in the form attached as Exhibit "E"; and

f.    The Company's execution and delivery of an employment agreement for Paula in a form mutually agreed to by the parties.

7.    Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8.    Necessary Actions. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.    Waiver And Amendment. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10.    Entire Agreement. This Agreement and the exhibits hereto constitute the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11.    Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12.    Governing Law And Venue. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's

13. Drafting. All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

14. Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC


_____
John Hanna, Manager


_____
Paula Thomas

## Exhibit "A" to Agreement to Purchase Membership Interest

<u>List of Asset Being Transferred from Paula Thomas to Thomas Wylde, LLC</u>

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, or any other rights therein but specifically excluding Paula Thomas' name, image, likeness, biography and moral rights ("IP"). The IP includes the following:

### TRADEMARKS

| Name | Serial No./ Reg. No. | Status |
|---|---|---|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/820,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 7/22/05 |

## COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-311-191 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

List of Liabilities Being Transferred from Paula Thomas to Thomas Wylde, LLC

October 15, 2013 in the amount of $1,000,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

## Exhibit "B"

### Amended And Restated Operating Agreement

# Exhibit "C"

Clawback Agreement

# Exhibit "D"

## Use Of Proceeds Agreement

## Exhibit "E"

Indemnity Agreement

# EXHIBIT "7"

**PAULA THOMAS**

| Month | Gross Amount Paid | |
|-------|------------------|---|
| Jul-14 | 25,000.00 | Base on annual pay of $300K |
| Aug-14 | 25,000.00 | |
| Sep-14 | 25,000.00 | |
| Oct-14 | 25,000.00 | |
| Nov-14 | 25,000.00 | |
| Dec-14 | 25,000.00 | |
| | 150,000.00 | Total 2014 |
| | | |
| Jan-15 | 25,000.00 | |
| Feb-15 | 25,000.00 | |
| Mar-15 | 25,000.00 | |
| Apr-15 | 16,666.67 | 1/3 paycut effected - $200K/pa |
| May-15 | - | |
| Jun-15 | - | |
| Jul-15 | - | |
| Aug-15 | - | |
| Sep-15 | - | |

# EXHIBIT "8"

## AMENDED EXHIBIT B

### MEMBERS AND CAPITAL CONTRIBUTIONS
April 15, 2015

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700<br><br>December 15, 2014 | 14 | $700 |
| The Palliative, LLC | 12114 Dewey St., Los Angeles, CA 90066 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900<br><br>December 15, 2014 | 18 | $900 |
| Stanley Ducks, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350<br><br>December 15, 2014 | 7 | $350 |
| DSRB Group, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350<br><br>December 15, 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Springs, CA 92264 Email: paulathomas@me.com<br><br>*With a copy to:*<br>*Andrew Apfelberg*<br>*Greenberg Glusker*<br>*1900 Avenue of the Stars*<br>*21st Floor*<br>*Los Angeles, CA 90067*<br>*Email: aapfelberg@ggfirm.com* | $3,200 + intellectual property and certain liabilities<br><br>December 22, 2014 | 64 | $3,200 |
| Hillshore Investments | Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá. Attn: Enilsa Gonzalez, General Manager. | $5,500,000<br><br>January 1, 2015 | 90 | $5,500,000 |

# EXHIBIT "9"

LAWSTUDIOS™ | RICHARD BYRON PEDDIE, P.C.
*a Colorado professional corporation*
5051 Euclid Avenue
Boulder, Colorado 80303-2831

RICHARD BYRON PEDDIE
ADMITTED: CA, CO, FL, NY

*New York:*
140 Beekman – Third Floor
New York, New York 10038

Tel.: 303.444.5447
Fax: 720.222.4766
lawstudios@comcast.net

## TELECOPIER TRANSMITTAL SHEET

Fax Number:  310.201.2334          Client Number: 00150-001

Page 1 of 5 (includes cover)

TO:    Olivia Goodkin, Esq., c/o Greenberg Glusker Fields Claman & Machtinger LLP

FROM: Richard Byron Peddie, Esq.

Re:    *Notice – Paula Thomas*

ADDITIONAL INFORMATION/MESSAGE: *Please deliver to Olivia Goodkin, Esq. Thanks!
Richard Byron Peddie*

### TO REPORT ERRORS IN TRANSMISSION:
303.444.5447 (voice)
720.222.4766 (facsimile)

The information contained in this transmission may be attorney privileged or contain attorney
work product. In any event, the contents of this communication are CONFIDENTIAL, intended
only for the designated recipient. If you are not the intended recipient, you are notified that any
review, dissemination, distribution, or copying of this communication is strictly prohibited. If you
have received this transmission in error, please notify us immediately by telephone and return the
original message to us, at the address listed above, via postal service. We will reimburse you for
your postal charges upon request.

LAWSTUDIOS™ | RICHARD BYRON PEDDIE, P.C.
*a Colorado professional corporation*
5051 Euclid Avenue
Boulder, Colorado 80303-2831

RICHARD BYRON PEDDIE
ADMITTED: CA, CO, FL, NY

*New York:*
140 Beekman – Third Floor
New York, New York 10038

Tel.: 303.444.5447
Fax: 720.222.4766
lawstudios@comcast.net

May 14, 2015

*Via Facsimile* – 310.201.2334
Olivia Goodkin, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
1900 Avenue of the Stars -- 21st Floor
Los Angeles, CA 90067

Re:    **NOTICE**: Paula Thomas – Company Position; Termination of Employment

Dear Ms. Goodkin:

This firm has been engaged as litigation counsel to Thomas Wylde, LLC ("Company"). I have been instructed to communicate the following:

As far as the Company is concerned, Paula Thomas quit her position without justification and without "Good Reason" as that term may be defined in any applicable contract. This she did through a series of breaches and wrongful acts culminating in what is, essentially, an abandonment of her post. While she later changed her mind, and while the Company entertained proposals to reincarnate Ms. Thomas' role in one form or the other, and while, more recently, the Company also engaged in talks with a view towards amicably settling matters with Ms. Thomas, those talks have not borne fruit. In the meantime, Ms. Thomas has only continued to act in ways that harm both the Company and its brand – and therefore its prospects for returning value to its members.

Thus, to be clear: The Company's position is that Ms. Thomas quit her post without justification – albeit under circumstances in which she could easily have been terminated. None of what has happened since that time has had anything to do with any real belief that she did not do so or that she had any claims whatsoever against the Company or anyone affiliated with it. Those discussions have been for the sole purpose of parting amicably, avoiding even vexatious claims, and, initially, a notion that it was better to retain Paula Thomas in some capacity for company good will

O??? C???? ???
Greenberg Glusker Fields Claman & Machtinger LLP
May 14, 2015
Page 2 of 4

As will be made clearer below, the Company no longer perceives any value in any affiliation with Ms. Thomas; nor does it believe that Ms. Thomas will truly abide by any terms designed to protect Company value; nor does it believe that any monetary inducements offered to Ms. Thomas would not be wholly offset by damages suffered by the Company, present and future.

In the alternative – and in the unlikely event that any contract between Paula Thomas and the Company somehow survives – the Company terminates any and all such surviving contracts with Paula Thomas or with any entity affiliated with her, effective immediately. This termination is for cause generally; and, specifically, pursuant to section 9 of that employment agreement executed by Paula Thomas on Dec. 31, 201 – in the unlikely event that agreement survives.

Because Ms. Thomas quit, the Company will make no severance payments. In the alternative, because this termination is for cause, the Company will likewise make no severance payments.

All negotiations, whether for a settlement and termination agreement or otherwise, are also hereby terminated, save only those that we may now initiate.

You will no doubt wonder why it is that the Company has cut short negotiations.

Paula Thomas materially breached her employment agreement, refused to comply with the reasonable directives of her superior officer, refused or otherwise failed to abide by Company policies and procedures, and engaged in willful misconduct affecting Company affairs. These acts and omissions have had a materially adverse effect upon, and otherwise damaged, the Company, its members, and its management. To make matters worse, while the Company was busy negotiating in good faith with you – and therefore justifiably expected a *detente* of sorts – these malfeasances did not stop. To the contrary: Some of the most egregious transgressions occurred only quite recently.

For example, the Company was recently informed by Siim Kohv, a public relations representative retained by the Company, that Paula Thomas contacted him and requested that he forward all emails from Company CEO John Hanna regarding press releases. She did this despite the fact that the Company had already instructed her to stand down and revoked any authorization she had to speak for it. Mr. Kohv further stated that Ms. Thomas repeatedly advised him that Mr. Hanna and Company COO Jane Park were "not good people" and that he should "be careful" when dealing with them. Mr. Kohv also indicated that Ms. Thomas admitted to making similar disparaging and defamatory remarks about the Company and its management to Yann Weber at ??????? ??????.

This is utterly unacceptable. The Company is shocked and hurt that its good faith

Olivia Goodkin, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
May 14, 2015
Page 3 of 4

attempts to come to amicable arrangements had precisely zero effect on Ms. Thomas' conduct. Frankly, we are puzzled that Paula Thomas should expect to receive financial benefits from the Company with one hand while secretly undermining and harming it with the other.

These personal attacks on Company management, and upon Mr. Hanna and Ms. Park personally, are not only contrary to Company policies and Ms. Thomas' duty of loyalty; they are also in direct violation of Mr. Hanna's explicit admonishment not to speak ill of Company officers to outside parties. Such remarks are clearly intended to damage the Company and its officers both in their official and personal capacities and to diminish the Company's reputation within the industry.

As already disclosed to you, Ms. Thomas had, after all, already been admonished in the past for similar conduct after admitting her wrongdoing. For example, during the Company's latest fashion show in New York, Ms. Thomas told a representative of the Company's PR firm, BPCM, that Mr. Hanna was "a moron" and that he was "running the Company into the ground." When confronted, Ms. Thomas was admonished in no uncertain terms to cease and desist from disparaging the Company or its personnel. She acknowledged the wrongdoing and promised to stop. Nevertheless, as we have seen, she has blatantly continued to denigrate the Company and its officers in her conversations with Mr. Kohy and others.

Furthermore, the Company recently discovered that Ms. Thomas breached obligations under its Confidentiality and Intellectual Property Agreement:

Earlier this year, Ms. Thomas obtained passwords to access the company's file server. She secretly disclosed these passwords to Messrs. Tony Jay and Joshua Sophrin with neither prior authorization nor justification to do so. The confidentiality provisions require that Ms. Thomas keep the data on that server "strictly confidential" and not disclose it to any third party without the express written consent of the Managing Member.

While Mr. Jay did work as a contractor for the company and assisted with the February fashion show and website launch, he had no need for access to the Company's servers nearly a full month later. The Company is not even aware of who Joshua Sophrin is, much less why he would need access to Company servers. Ms. Thomas' surreptitious disclosure of Company passwords to these two individuals constitutes a significant breach of security, a violation of Company policy, a breach of fiduciary duties, and a material breach of the employment agreement.

Based upon these circumstances and others that have already been discussed with Ms. Thomas in the past, the Company exercises its right to terminate her employment for cause. Indeed, this is at all necessary, because again The Company's position is that she quit her post. Ms. Thomas has been given ample warning and every opportunity to change her conduct, yet failed to

Oliver Goodbit, Esq.
Greenberg Glusker Fields Claman & Machtinger LLP
May 14, 2015
Page 4 of 4

do so. The more recent breaches in particular are not amenable to cure. That these breaches occurred precisely while the Company was engaged in good faith attempts to resolve matters amicably is particularly hurtful.

I will therefore request now that you instruct your client to cease and desist all further defamatory conduct and stop disseminating confidential information and otherwise cease all other forms of wrongful conduct. After all, Ms. Thomas has ongoing duties as a Company member and former officer, as well as under the Company's confidentiality agreement. These duties run not only to the Company, but also, in certain instances, to its other members and management.

Please accept Mr. Schnider's apologies for not responding to you. The Company has put matters into my hands and prefers that further communications go through me.

I have sent this notice letter to you directly, and not to Ms. Thomas. I have done so under the assumption that you will continue to represent her in this matter, however altered the picture may now be. Still, as a courtesy, I ask that you confirm not only receipt but also confirm that receipt by you is indeed receipt by Ms. Thomas for all purposes -- for the obvious reasons.

Finally, please advise whether you are authorized to accept service of process on Paula Thomas' behalf. The Company intends to sue for its damages and to enjoin further defamatory conduct and breaches of its confidentiality policies. Thank you.

Very truly yours,
RICHARD BYRON PEDDIE, P.C.

By: Richard Byron Peddie

RBP:rko



1  Richard Byron Peddie, SBN 193770
   Law Studios & Consultants, Inc.
2  Lawstudios | Richard Byron Peddie, P.C.
   5051 Euclid Avenue
3  Boulder, CO 80303-2831
   Tel.: 303.111.5117
4  Fax: 720.222.4766
   *Attorney for Defendants*

5

6

7

8                  SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                          COUNTY OF LOS ANGELES

10                             CENTRAL DISTRICT

11  PAULA THOMAS, individually and in          Case No. BC 596 495
    the right of and for the benefit of
12  THOMAS WYLDE, LLC, a California            THOMAS WYLDE, LLC'S COMBINED
    limited liability company, and             RESPONSES TO FORM
13  PDTW, LLC, a California limited liability   INTERROGATORIES, FORM
    company,                                    INTERROGATORIES — EMPLOYMENT,
14                                              SPECIAL INTERROGATORIES, SET ONE,
                                                REQUESTS FOR PRODUCTION OF
15          Plaintiffs,                         DOCUMENTS, SET ONE, AND
                                                REQUESTS FOR ADMISSION, SET ONE
16  v.

17  THOMAS WYLDE, LLC, a California            Hon. Michael J. Raphael
    limited liability company,                 Department 51 — Room 511
18  JOHN HANNA, an individual,
    JENE PARK, an individual,
19  SHOT IN THE ARMOIRE, LLC, a
    Florida limited liability company, and
20  H&H FASHION, LLC, a Florida limited
    liability company, and DOES 1-50,
21  inclusive,

22          Defendants.

23            THOMAS WYLDE, LLC'S COMBINED RESPONSES TO
      FORM INTERROGATORIES, FORM INTERROGATORIES — EMPLOYMENT,
24                  SPECIAL INTERROGATORIES, SET ONE,
        REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE, AND
25                 REQUESTS FOR ADMISSION, SET ONE

26      THOMAS WYLDE, LLC ("Respondent") responds to Plaintiff PAULA THOMAS' form

27  interrogatories, requests for production of documents, and requests for admission, thusly:

28

## GENERAL STATEMENT

Respondent has not completed its investigation of the facts relating to this case, nor has it completed discovery or preparation for trial. Discovery is ongoing. These responses are made on the basis of information presently available to Respondent. There may be further information of which Respondent is unaware. Therefore, Respondent reserves the right to offer or rely at trial on subsequently discovered information.

These responses are made solely for the purpose of this action. Respondent reserves the right to object to the use of any response in any other action or for any other purpose. Each response is given subject to all appropriate objections, including, but not limited to, objections concerning competency, relevancy, materiality, propriety, admissibility, the attorney-client privilege and the work product doctrine, or any other objections, including those which would require the exclusion of any statements contained herein where made by a witness present and testifying in court. All such objections and grounds therefore are reserved and may be interposed at the time of trial or any other time.

No incidental or implied admissions are intended by these responses. Respondent's responses or objections to any request or interrogatory are not intended as an admission of any purported facts set forth or assumed by such request or interrogatory. Respondent's response to any request or interrogatory is not intended as a waiver by it of any objection to that request or any other request.

Respondent objects and/or responds to each interrogatory (form or special) or request for production of documents (and/or tangible things) or request for admission herein on the basis of its understanding and interpretation of each interrogatory or request. Respondent reserves the right to supplement any of these responses with additional objections or information or otherwise if the requesting party interprets these requests differently.

## I. RESPONSES TO FORM INTERROGATORIES — GENERAL

### 1.0 Identity of Persons Answering These Interrogatories

1.1 State the name, ADDRESS, telephone number, and relationship to you of each PERSON who prepared or assisted in the preparation of the responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.)

| -counsel of record- | John Hanna | Meldy Rafols |
|---|---|---|
| | c/o Thomas Wylde, LLC | c/o Thomas Wylde, LLC |
| | 3231 S. La Cienega Blvd. | 3231 S. La Cienega Blvd. |
| | Suite A | Suite A |
| | Los Angeles, CA 90016 | Los Angeles, CA 90016 |
| | 310.559.5549 | 310.559.5549 |
| Yoonsung Bae | Jene Park | David Schnider, Esq. |
| c/o Thomas Wylde, LLC | c/o Thomas Wylde, LLC | c/o Thomas Wylde, LLC |
| 3231 S. La Cienega Blvd. | 3231 S. La Cienega Blvd. | 3231 S. La Cienega Blvd, |
| Suite A | Suite A | Suite A |
| Los Angeles, CA 90016 | Los Angeles, CA 90016 | Los Angeles, CA 90016 |
| 310.559.5549 | 310.559.5549 | 310.559.5549 |

### 3.0 General Background Information — Business Entity

3.1 [unclear]

3.2 Are you a partnership? No.

3.3 Are you a limited liability company?

Yes. The name stated in the correct caption of the respondent is Thomas Wylde, LLC. The company has used no other names during the past 10 years, but is loosely referred to as "Thomas Wylde" sometimes. The articles of organization were filed on July 22, 2014, with the California Secretary of State. The address of the principal place of business for this company is 3221 S. La Cienega Blvd. — Suite A, Los Angeles, CA 90016. As a California limited liability company the company needs no separate qualification to do business in the State of California.

3.4 Are you a joint venture? No.

3.5 Are you an unincorporated association? No.

3.6 Have you done business under a fictitious name during the past 10 years?

No. The company "Thomas Wylde, LLC" however may loosely be referred to as "Thomas Wylde", however.

3.7 Within the past five years has any public entity registered or licensed your business?

Yes. That City of Los Angeles Tax Registration Certificate already supplied to Plaintiffs may be responsive to this interrogatory. Plaintiffs may refer to it for any remaining details. There is also a U.S. Federal Fish & Wildlife Permit, No. LE13622-0, copy supplied. There is also a California State Board of Equalization Seller's Permit, No. 102-692838, copy supplied. Respondent knows of nothing else responsive apart from generic things such as the company's EIN/TIN issued from the United States Department of the Treasury.

## 4.0 Insurance

4.1 At the time of the INCIDENT, was there in effect any policy of insurance through which you were or might be insured in any manner (for example, primary, pro-rata, or excess liability coverage or medical expense coverage) for the damages, claims, or actions that have arisen out of the INCIDENT? No.

4.2 Are you self-insured under any statute for the damages, claims, or actions that have arisen out of the INCIDENT? No.

## 15.0 Denials and Special or Affirmative Defenses

15.1 Identify each denial of a material allegation and each special or affirmative defense in your pleadings and for each:

Respondent has not answered yet and so cannot identify each denial of a material allegation or each special or affirmative defense at this time.

## 17.0 Responses to Request for Admissions.

17.1 Is your response to each request for admission served with these interrogatories an unqualified admission?

Yes except where in the line responding

as we as in responding

50.1 For each agreement alleged in the pleadings:

(a) Identify each DOCUMENT that is part of the agreement and for each state the name, ADDRESS, and telephone number of each PERSON who has the DOCUMENT.

Respondent will identify those DOCUMENTS constituting an agreement alleged in the pleadings, and also list some, but not necessarily all, of the other DOCUMENTS that may constitute agreements that bear upon these proceedings.

1. Employment agreement between Paula Thomas and Thomas Wylde, LLC. THOMAS already appears to have this document with its exhibits and attachments and has appended it to her complaint.

2. Operating agreement for Thomas Wylde, LLC. THOMAS already appears to have this document with all of its exhibits and attachments, and now has the latest amended exhibits as well.

3. Documents related to THOMAS acquisition of membership interest in Thomas Wylde, LLC. THOMAS already appears to have any documents related to (2) above and how she acquired her membership interest in Thomas Wylde, LLC, such as a membership purchase agreement, a clawback agreement, an indemnification agreement, an assumption of liabilities document, and articles of dissolution for Thomas Wylde Holdings, LLC. These may or may not be responsive or relevant although not directly referred to in the pleadings.

(b) State each part of the agreement not in writing, the name, ADDRESS, and telephone number of each PERSON agreeing to that provision, and the date that part of the agreement was made.

Portions of the THOMAS employment agreement not in writing include obligations implied by law or otherwise imposed by law. These duties include the duty of good faith and fair dealing. These also include those duties of loyalty and fiduciary duties THOMAS assumed when, as part of her contract, and as part of the company operating agreement, she undertook to act as a company officer. THOMAS agreed to such things and THOMAS has all of the other required information relating to the duties she agreed to her employment agreement and the company operating agreement, and otherwise her contract duties. In addition, THOMAS, together with other executives, agreed to a 1/3 cut in salary in or around April, 2015 in order to free up cash to help assure the company's survival. Also, THOMAS agreed that, as part of the overall reorganization transaction, she would cause PDTW, LLC, to transfer all things of value and chattels to Thomas Wylde, LLC, in exchange for Thomas Wylde, LLC's payment of certain liabilities, sometimes through liquidating PDTW property (e.g., inventory). In addition, THOMAS agreed that PDTW would remain liable to Thomas Wylde, LLC, for monies lent to it. The pay cut agreement was confirmed in writing but no signature was required of any member/officer as each had decided to forego that much pay in exchange for the others' agreement to do so, and all did, ratifying it. The agreement to transfer chattels was left unwritten because the two companies were being operated in tandem by the same personnel, and also because of certain liabilities PDTW has to third parties, and, in particular, to Dr. Michael Schiffman, who is a secured creditor. In particular this was done to protect management and, in particular, Plaintiff THOMAS, from any claims of fraud or fraudulent conveyances/ transfers in obtaining the Schiffman loan and/or in treatment of secured assets once the loan had been made.

(c) Identify all DOCUMENTS that evidence any part of the agreement not in writing and for each state the name, ADDRESS, and telephone number of each PERSON who has the DOCUMENT.

[illegible line]

e-mail from Meldy Rafols to THOMAS from Mar. 30, 2015, confirming the payout. One e-mail from Olivia Goodkin, Esq., from April 5, 2015, confirming THOMAS' agreement to take a payout. Those emails are in the possession of defendant Thomas Wylde, LLC but are

also in THOMAS' possession as a recipient. There are also bank statements and payroll records indicating that officers, including THOMAS, [illegible] and accepted the reduced pay and them they performed and ratified the modification. In addition bank statements and payment records exist demonstrating payments made by Thomas Wylde, LLC, to Dr. Schiffman and other creditors to pay down PDTW, LLC's liability. These DOCUMENTS also show monies lent by Respondent to PDTW. These documents are in the possession of respondent and are also believed to be in THOMAS' possession now through discovery.

(d) Identify all DOCUMENTS that are part of any modification to the agreement, and for each state the name, ADDRESS, and telephone number of each PERSON who has the DOCUMENT.

Two emails between Meldy Rafols and John Hanna sent on March 26, 2015 confirming that John Hanna, Jens Park, and Paula Thomas each agreed to take a 33% cut in their salary as well as an e-mail from THOMAS' counsel, Olivia Goodkin, on April 5, 2015, also referring to the agreed-to reduction. There also exists an e-mail from Meldy Rafols to THOMAS from Mar. 30, 2015, confirming the paycut. Those emails are in the possession of defendant Thomas Wylde, LLC. See also responses to (b) & (c). Inasmuch as recent issuance of additional equity may be deemed a "modification" of the agreement, the amended Exhibit B to the operating agreement may be responsive and is in the possession of THOMAS.

(e) State each modification not in writing, the date, and the name, ADDRESS, and telephone number of each PERSON agreeing to the modification, and the date the modification was made.

As noted above, the executives agreed to reduce their salaries by 1/3 starting April, 2015. THOMAS agreed to this, as did John Hanna and Jens Park. See also responses to (b) & (c), immediately above. The agreements related to advances made by Thomas Wylde, LLC, to PDTW, were not really modifications but instead part of the overall reorganization plan created in mid-2014.

(f) Identify all DOCUMENTS that evidence any modification of the agreement not in writing and for each state the name, ADDRESS, and telephone number of each PERSON who has the DOCUMENT.

Two emails between Meldy Rafols and John Hanna sent on March 26, 2015 confirming that John Hanna, Jens Park, and Paula Thomas each agreed to take a 33% cut in their salary. As noted above, there also exists an April 5, 2015 email between Olivia Goodkin, Esq. and David Schnider, in which THOMAS acknowledges the agreements to take reduced pay. There also exists an e-mail from Meldy Rafols to THOMAS from Mar. 30, 2015, confirming the paycut. Those emails are in the possession of defendant Thomas Wylde, LLC

50.2 Was there a breach of any agreement alleged in the pleadings? If so, for each breach describe and give the date of every act or omission that you claim is the breach of the agreement.

Yes. THOMAS breached her employment agreement with Thomas Wylde, LLC. Between November 2014 and April 2015, THOMAS engaged in numerous breaches of her employment agreement with Thomas Wylde, LLC, including: failing to adequately perform her job duties as Chief Creative Officer and Creative Director; failing to use her best efforts to perform those services to Thomas Wylde, LLC's reasonable satisfaction; refusing to abide by, or comply with the reasonable directives of her superior officers, or the company's policies and procedures; disclosing confidential information to third parties without [illegible] ... [illegible]

Form Interrogatories, which responses are incorporated fully herein by this reference, as if fully restated. Breaches of the company's operating agreement are implicit in Plaintiff THOMAS' conduct. Breaches of yet other agreements (i.e., those not alleged in the

pleadings) will be asserted. Inasmuch as breach and THOMAS' resignation/termination are related, the denials of the resignation should not in the main be given short shrift but should be considered breaches of her contract all the same and are incorporated by this reference. In addition, both plaintiffs have breached and/or committed an anticipatory repudiation of their duty to repay Thomas Wylde, LLC, funds borrowed from it.

50.3 Was performance of any agreement alleged in the pleadings excused? If so, identify each agreement excused and state why performance was excused.

Yes. Thomas Wylde, LLC's performance was excused under its employment agreement with THOMAS because THOMAS announced that she would no longer perform her obligations under that agreement and otherwise repudiated her obligations under it. In addition, performance was excused through THOMAS' material breach and/or anticipatory breach of her employment agreement and the company operating agreement. By way of example and not limitation, THOMAS breached her employment agreement, in turn frustrating the expectations under the operating agreement, and also by breaching inter-member agreements and understandings regarding each voluntarily agreeing to a pay cut, something to which each other member/officer also agreed, each in reliance upon the promise of the other, and each to his or her detriment; while THOMAS instead now disavows that agreement. THOMAS also disavows that agreement to transfer certain chattels from PDTW to Thomas Wylde, LLC, once certain liabilities were cleared; Plaintiffs also disavow their agreement to repay Thomas Wylde, LLC, for monies lent to them — literally millions of dollars paid to cleanse THOMAS of personal liabilities for prior debts and to pay down PDTW, LLC's existing debts. These breaches and disavowals and repudiations excuse performance.

50.4 Was any agreement alleged in the pleadings terminated by mutual agreement, release, accord and satisfaction, or novation?

Yes. On or about April 5, 2015, THOMAS formally announced that she would not design the Spring/Summer 2016 line, in breach of her employment agreement and the operating agreement. This repudiation of her duties terminated the employment agreement and divested her, under the operating agreement, of the right to any particular title or office. In addition, she committed material breach, as described elsewhere. Thereafter the company sought unsuccessfully to negotiate with THOMAS a new agreement with her to employ her in a different capacity that would be acceptable to her and would accommodate her stated desires for a different position with different duties. She failed to accept the offer to accommodate her desires. (The other circumstances in which THOMAS informally communicated her refusal to continue designing are described elsewhere herein.)

50.5 Is any agreement alleged in the pleadings unenforceable?

Yes. THOMAS' rights under her employment contract and the operating agreement are wholly or partially unenforceable inasmuch as they were induced by fraud: THOMAS knew that she either could not or was unwilling to perform those functions expected of her as a member, as an officer, and also as Creative Director of Thomas Wylde, LLC. THOMAS' rights under these agreements are unenforceable because of her material breach. She is entitled to no severance and must disgorge all things of value conveyed to her, and PDTW, LLC must do the same.

50.6 Is any agreement alleged in the pleadings ambiguous?

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

contingency. Nor is every agreement affecting these matters alleged in the pleadings; nor is every agreement affecting matters in writing.

## II. RESPONSES TO FORM INTERROGATORIES — EMPLOYMENT

200.0 Contract Formation

200.1 Do you contend that the EMPLOYMENT relationship was "at will"?

The original employment relationship once the transition of business from PDTW, LLC to Thomas Wylde, LLC, was mostly complete, and for the period Jan. 1, 2015 until approximately April 5, 2015, when THOMAS' counsel confirmed THOMAS' refusal to continue to design, was not "at will".

For periods both before and after this period, however, the relationship may have been "at will" inasmuch as no employment agreement existed. Before Jan. 1, 2015, there was no contract of employment, the agreement being signed on Dec. 31, 2014. After THOMAS' refusal to design future collections, the relationship may have been "at will" — assuming there was any employment relationship at all. This is because her resignation and refusal to perform terminated the contract of employment.

PERSONS with knowledge include; John Hanna, Jene Park, Olivia Goodkin, David Schnider, Meldy Rafols, and THOMAS. DOCUMENTS include that April 5, 2015 e-mail in which Olivia Goodkin repeats that THOMAS will no longer be designing and discussing the negotiations for a new position and role for THOMAS, as well as similar e-mail exchanges from April 10-15, 2015, in which THOMAS, through her counsel, instead indicates that a "complete 'divorce'" is desired by THOMAS.

200.2 Do you contend that the EMPLOYMENT relationship was not "at will"? If so:

(a) State all facts upon which you base this contention.

THOMAS signed the Thomas Employment Agreement which she has annexed to her complaint. This would suggest a period in which the relationship was not "at will".

Discovery is ongoing and Respondent reserves the right to state more fully its position as to whether or not the relationship was not "at will" even after Dec. 31 and until resignation or abandonment given THOMAS' non-performance and given her repudiation of the agreement and her frustration of its purposes through disavowing other written and oral obligations and agreements under the overall plan of transition, only part of which involved an agreement to employ THOMAS (e.g., apparent refusal to acknowledge sale of certain assets to Thomas Wylde, LLC, by herself and/or PDTW, LLC, apparent disavowal of Thomas Wylde, LLC's ownership interest in its domain names, Thomas Wylde, LLC's interest in the leasehold for its space, Thomas Wylde, LLC's succession to ownership of assets such as computers, artwork, furniture, and equipment, through payment of PDTW, LLC's debts, and disavowal of PDTW, LLC's debts to Thomas Wylde, LLC).

(b) State the name, ADDRESS, and telephone number of each PERSON who has knowledge of those facts.

THOMAS; John Hanna; Jene Park; Meldy Rafols; Yoonsung Bae; David Schnider; Olivia Goodkin (addresses and other contact data already supplied).

(c) Identify all DOCUMENTS that support your contention.

denominated as follows: Dec. 22, 2014, Articles of Dissolution or Thomas Wylde Holdings, LLC; Certificate of Cancellation of a Limited Liability Company for Thomas Wylde Holdings, LLC; Dec. 22, 2014 "Clawback Agreement" between THOMAS and Thomas

1   Wylde, LLC members. Dec. 22, 2014 Indemnity Agreement indemnifying THOMAS against
    certain PDTW, LLC debts. Dec. 22, 2014 Agreement to Purchase Membership Interest
2   between THOMAS and Thomas Wylde, LLC, and Dec. 22, 2014 Use of Proceeds
    Agreement between THOMAS and Thomas Wylde, LLC members.
3
    200.3 Do you contend that the EMPLOYMENT relationship was governed by any agreement —
4   written, oral, or implied? If so:

5   (a) state all facts upon which you base this contention.

6       EMPLOYER and EMPLOYEE entered into that contract identified as "Thomas Employment
    Agreement" and appended by Plaintiff as Exhibit B to her complaint in this action, with its
7   own exhibits, which include a confidentiality agreement. In addition, EMPLOYEE agreed,
    along with other company officers, to reduce her salary by 1/3 effective April 2015. In
8   addition, it was understood that, as a precondition of any employment contract (or even
    membership interest, or even third party investment, or even for the very formation of
9   Thomas Wylde, LLC) THOMAS would cause certain PDTW, LLC assets to transfer to
    Thomas Wylde, LLC, in exchange for Thomas Wylde, LLC's payment of certain debts, and
10  that PDTW, LLC would acknowledge its debts to Thomas Wylde, LLC. Implicit in all
    agreements or contracts was the duty of good faith and fair dealing. The company operating
11  agreement may also be relevant.

12  (b) State the name, ADDRESS, and telephone number of each PERSON who has knowledge
    of those facts.
13
        Paula Thomas; John Hanna; Jene Park; Maldy Rafols; Yoonsung Bae; David Schnider
14  Olivia Goodkin

15  (c) Identify all DOCUMENTS that support your contention.

16      Thomas Employment Agreement, in THOMAS' possession; operating agreement, already
    identified; e-mails concerning voluntary salary reduction of core management team by 1/3;
17  Olivia Goodkin April 5, 2015 e-mail also confirming agreement to reduced salaries; bank
    statements and payroll records indicating acceptance and ratification by all officers of 1/3 pay
18  reduction and performance under that agreement; bank statements indicating loans to PDTW
    as well as payments to Dr. Michael Schiffman or to other PDTW creditors. There also exists
19  an e-mail from Maldy Rafols to THOMAS from Mar. 30, 2015, confirming the payout. Bank
    records indicate acceptance and ratification of the payout arrangement through acceptance
20  and performance under it.

21  200.4 Was any part of the parties' EMPLOYMENT relationship governed in whole or in part by any
    written rules, guidelines, policies, or procedures established by the EMPLOYER? If so, for each
22  DOCUMENT containing the written rules, guidelines, policies, or procedures:

23  (a) state the date and title of the DOCUMENT and a general description of its contents;
    (b) state the manner in which the DOCUMENT was communicated to employees; and
24  (c) state the manner, if any, in which employees acknowledged either receipt of the DOCUMENT
    or knowledge of its contents.

25
        1   Thomas Employment Agreement, appended to THOMAS' complaint, negotiated by
26  THOMAS

27  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    by e-mail. THOMAS was already aware of the contents of this handbook and its general
28  expectations as she had input in its creation and its policies were based, in part, upon those
    practices and usages she herself established for PDTW, LLC.

Do you contend that EMPLOYEE and the EMPLOYER were in a business relationship other than an EMPLOYMENT relationship?

PAULA THOMAS and THOMAS WYLDE, LLC are parties to a business relationship. The relationship is: THOMAS has a relationship with TW as one of its members and also as one of its officers. EMPLOYEE and EMPLOYER also have a form of business relationship inasmuch as EMPLOYEE, as the 99.5% owner of PDTW, LLC, and with control of PDTW, LLC, has a direct impact upon what PDTW, LLC, does and does not do, and therefore controls the business relationship between the two entities.

**201.0 Adverse Employment Action**

State all reasons for EMPLOYEE's TERMINATION.

In essence, EMPLOYEE had already resigned and otherwise communicated her resignation by way, and to, her office or employing in particular stated therein. Apparently she later changed her mind. EMPLOYER could not continue with what had already become a burdensome, strife-filled, back-and-forth process with EMPLOYEE and therefore, to clarify, and after offering her alternative employment, and after learning of EMPLOYEE's ongoing negative remarks to third parties (notwithstanding prior warnings to desist) and sharing of confidential company information with third parties, ended further talks of a new position and terminated EMPLOYEE to make it clear that EMPLOYER did not and would not recognize any attempts by EMPLOYEE to claw her way back into that position from which she had resigned.

Even before resignation, EMPLOYEE had a disapproval of direction and notwithstanding admonishment, that would have merited termination. There too, played a major in EMPLOYER's negotiation because they intended and would have ensured, which she could be deduced that EMPLOYEE simply would not, over all the by the direction of her superiors, or exercise knowledge her superiors, or otherwise successfully make the transition from 99.5% owner and CEO of her own company with full powers over nearly everything, to a minority position in the new company, with a CBO over her. These include, but are not limited to, the following:

A general pattern of poor judgment and poor decisionmaking and general inability to work with others and insubordination. For example, EMPLOYEE, traveled to New York on Nov. 10, 2014, returning on Nov. 13, 2014. With EMPLOYEE's selections of airfare and hotel, this trip cost the company over $4,000.00 (airfare of $1,817.98 and at least $2,025.00 in hotel expense alone, not to mention meals and hotel taxes). In another situation, EMPLOYEE discharged Roger Koz — affiliated with one of Thomas Wylde, LLC's investors — as well

Delevangne for an ad campaign initiated in late 2014 for EMPLOYEE. This increased the expense for modelling for that campaign by more than 500% and EMPLOYEE experienced no real additional benefit from use of this model, especially considering that EMPLOYEE

eviscerated much of any celebrity value by misspelling the model's name in approximately 25 [illegible] — something which also made EMPLOYER look foolish and unprofessional in the marketplace.

All of these incidents -- which are merely examples -- would have demonstrated bad judgment in any company under any circumstances, but particularly under the circumstances in which the company was performing poorly and desperately needed every last dollar for survival. Other examples of poor judgment involve self-dealing and include the use of company employees for personal errands, like setting hair appointments or taking pets to the veterinarian, with instructions to lie to management about their whereabouts or activities if asked.

Such things demonstrated an absolute disregard for the company's objectives and duties owed to those who had recently invested substantial sums — millions of dollars — in the company's future at a time when the predecessor company, PDTW, LLC, and therefore EMPLOYEE, was on the brink of failure and collapse. In sum, EMPLOYEE demonstrated absolutely no cognizance whatsoever that, by late 2014, EMPLOYER'S very existence depended upon the receipt of substantial amounts of new investor money and that the company's chances for survival depended upon making sound decisions and no longer acting whimsically in financial matters, especially with other people's money.

As yet another example, Hanna finally reprimanded EMPLOYEE verbally on or about March 20, 2015, for those things above-described, as well as yet others, directing her to make no decisions whatsoever anymore without first consulting with Hanna. Then, almost immediately thereafter, EMPLOYEE was contacted by representatives for the artist Sia who were interested in having the company dress Sia for her appearances on the UK version of the television show *The Voice*. EMPLOYEE, notwithstanding the extremely recent admonition, and consulting with no one, turned down this opportunity on behalf of the company. This led to the March 24, 2015 written e-mail warning and admonishment sent to her by David Schnider.

As yet another example, EMPLOYEE secretly requested that the company IT tech automatically forward the e-mails of at least one company employee — Jean Johnston — to her. This occurred on or about April 10, 2015. Given that April 7, 2015, was EMPLOYEE'S last day reporting to work, this action, with its secrecy, can only be viewed as a form of spying.

As yet another example, EMPLOYEE flatly refused, without consulting with the company CEO, to accommodate the stated market needs of customers in certain key foreign markets. In particular, EMPLOYEE refused to furnish garments not using silk, leather, or cashmere for Japan where such things are essentially unsellable for spring and summer purposes. EMPLOYEE had done so in her prior company and continued to do so at the company. This came to a head on or about Mar. 7, 2015 when company CEO John Hanna had to admonish EMPLOYEE to create products suitable for these markets, yet EMPLOYEE refused to do so, telling John Hanna "Tell the Japanese to get used to it. I'm not changing anything."

As yet another example, EMPLOYEE, without consulting with anyone, would tell sales personnel not to sell to certain willing store buyers for whimsical reasons or simply because she took a dislike to those buyers.

As yet another example, on or about Feb. 27, 2015, EMPLOYEE issued directives to the [illegible] [illegible] causing confusion amongst the sales representatives.

In addition, at the February, 2015 New York fashion show, EMPLOYEE disparaged

management, telling industry players, including the company's PR firm BPCM (Vanessa Von
B... that John Hanna was a "tyrant" who was "running the company into the ground."
Other BPCM representatives at the fashion show also indicated that THOMAS was speaking
poorly of management. Similarly, and after being admonished to stop disparaging her co-
officers, who are also her co-members in ownership, she later told Siim Kohv and Yann
Weber that Hanna and Park were essentially "bad people", and not to be trusted.

Otherwise, EMPLOYEE's behavior in the months leading up to her separation fell short of
the mark in many, many ways. While no employees thought it proper to bring pets to work,
EMPLOYEE, during the period leading up to the transition to handling off operations fully
to Thomas Wylde, LLC, regularly brought her dogs to work. The dogs urinated on company
property, vomited, and otherwise made such a nuisance of themselves that, finally, at least
one employee felt compelled to complain. This occurred in late November, 2014. While it
was not itself a reason for terminating EMPLOYEE, the fact that EMPLOYEE continued
with absolutely thoughtless behavior after the handoff and after being asked to be more
considerate demonstrates EMPLOYEE's overall view that she was above the rules and
demonstrates her unwillingness to accept the reality of no longer being within her own
private fiefdom in which she could always just do as she pleases, but instead a senior
executive reporting to a superior collaborating with others in a company in which she has
only a minority stake.

And otherwise, EMPLOYEE used extremely harsh and vulgar language regularly, jokingly
claiming a special right to do so because of being "British", but still exposing management
and employees to regular streams of vulgarities which included angry unprofessional tirades
directed at others. EMPLOYEE also thought it proper at times to change in front of others
and would simply strip down naked and change in full sight of whomever was nearby. She
also thought it proper to share her complaints about her sex life, or lack thereof, with a
certain amount of graphic language, a fact which takes on meaning when placed in
juxtaposition with her current claims of sexual harassment. (It is also ironic that
EMPLOYEE should accuse others of using the words "bitch" and "whore" which are
precisely the words she used to describe PARK to HANNA at various times.) As an example,
EMPLOYEE subjected John Hanna to a discussion of her sexual thoughts, describing her
desire to locate someone who would "bend [her] over the sink and fuck [her]". While some
of these antics eventually stopped and were not direct reasons for terminating EMPLOYEE,
(who actually resigned first), they do illustrate EMPLOYEE's general attitude that she was
somehow above the rules of conduct expected of everyone. They further illustrate her
inability to perceive herself as part of a team and to participate as such and demonstrate why,
considering her other actions, EMPLOYEE lost hope that she might moderate her behavior
and be able to fulfill her job functions.

A small factor in the decision was EMPLOYEE's attitude towards her job as demonstrated
by her actions. The official hand-off of operations from PDTW, LLC, to Thomas Wylde,
LLC, was, for tax purposes at least, and for all other purposes wherever possible, Jan. 1,
2015, and thus this was the start date under EMPLOYEE's Employment Agreement. But
Employee had taken a vacation and was in the Caribbean from approximately December 19,
2014, until approximately January 10, 2015 (all at a time when preparations for the pre-
spring collection were already woefully late). Thus, EMPLOYEE's only history of actually
working at the company consists of the period from approximately January 10, 2015, until
April 7, 2015 — and thus consists of just a little less than three months. Yet even by late
February of 2015, EMPLOYEE was apparently planning her exit from the company. Park
and Hanna and Kohv, and others besides, all noticed that she had, by that time, begun
... the work relationship which had already so deteriorated that EMPLOYEE had sought
counsel's intervention.

1. EMPLOYEE's short tenure at the company can only be described as one of strife. Over time
2. it became clear that she course of this strife was EMPLOYEE herself. Almost immediately
3. upon her return from vacation, the design team presented her with what they had prepared
   for the pre-spring collection. In EMPLOYEE's absence, the team had been led by Gisela
4. Limtao. After a nearly two hour presentation, EMPLOYEE flatly stated that she didn't like
   anything the team had done in her absence. Ms. Limtao left the building, and EMPLOYEE
5. followed her and engaged her in conversation in the parking lot. Hanna approached the two,
   and EMPLOYEE turned to him and blamed Park for the collection. (Ms. Limtao would later
6. inform Hanna that Park in no way had any effect upon the collection or in obstructing the
   design team or was to blame for anything, especially since Limtao approved of the new
7. designs.) This vignette is supplied as just one example of EMPLOYEE's behavior in seeking
   constantly to undermine others or blame them for things or falsely accuse them, or otherwise
8. to describe EMPLOYEE's childish and tedious campaign of constantly disparaging HANNA
   to PARK, but then also PARK to HANNA, or otherwise to sow dissension in the ranks. In
9. one instance, HANNA was traveling with PARK by car in South Korea while speaking with
   EMPLOYEE by telephone. After disparaging PARK severely, EMPLOYEE next
10. immediately called PARK, who was seated next to HANNA, and feigned great affection and
    friendship.

11. These childish, unproductive, two-faced antics and the strife they generated were becoming
    an intolerable burden to the company which needed to devote its entire energies to reversing
12. the poor performance of the brand in 2014 under PDTW, LLC, and thereafter in the initial
    chapters of Thomas Wylde, LLC. The company simply could not have, in its midst, one who
13. apparently could not or would not work with or for anyone else without constantly
    undermining and sabotaging the efforts of others.

14. (b) state the name, ADDRESS, and telephone number of each PERSON who participated in the
    TERMINATION decision.

15.

16.     John Hanna, Jane Park

17. (c) state the name, ADDRESS, and telephone number of each PERSON who provided any
    information relied upon in the TERMINATION decision.

18. *The below listed persons furnished information either relied upon in the TERMINATION decision
    and/or in supplying those details set forth in (a), above:*

19.

20. John Hanna          Jane Park          Donald Schneider          Olivia Goodkin
    Jean Johnson        Elsa Chavez        Gisela Limtao
21. 4800 Bonvue Ave     4764 BROADVIEW DRIVE   2861 EFFIE ST.
    Los Angeles, Ca 90027   GLENDALE, CA 91208   LOS ANGELES, CA 90026
    Jeanejohnston1      Elsa@thomaswylde.com   glimtao@gmail.com
22. @gmail.com          323-000-3164           626-673-7158
    949-903-9773

23.

24. (d) identify all DOCUMENTS relied upon in the TERMINATION decision.

25.     *See* response to Special Interrogatory No. 83, below, which response, together with all
26.     cross-referenced responses therein, are incorporated herein by this reference as if set forth
        and stated fully here and now.

27.

28. 201.2 Are there any facts that would support the EMPLOYEE'S TERMINATION that were first
    discovered after the TERMINATION? If so:

Fraudulent medical note: At no time did THOMAS ever furnish any medical note to EMPLOYER signed by any doctor on April 20, 2015. The first time she noted ever coerced one in this litigation. Thus, all claims based upon this note's presentation are patently false and groundless. The only doctor's note received during EMPLOYEE's period of employment is the one dated April 8, 2015. The only one received thereafter pre suit was the Aug. 31, 2015 doctor's note sent via e-mail to Maldy Rafols and well after EMPLOYER's separation.

Dishonesty and false accusations brought against company officers and the company would support termination. For example, THOMAS has, in both the complaint and first amended complaint, accused John Hanna of sexual harassment. As THOMAS has pointed out in her own pleadings, she founded the original company, was its CEO and leader, and herself set the tone and atmosphere at whatever company was producing the brand. She herself used the very foulest language of all and would do things like dress and undress in front of others or at least within their view. That she should now try to confect a sexual harassment claim over invented conversations demonstrates dishonesty. That she should do so for use of the words "bitch" and "whore" — words she herself used to describe Jene Park — makes the whole claim laughable. Yet the fact that she would confect such a claim demonstrates character defects and a lack of professionalism unacceptable in a company fiduciary. The other false claims of utterances made by John Hanna likewise demonstrate reasons for terminating EMPLOYEE.

THOMAS' refusal to acknowledge that all chattels and other things of value within PDTW and necessary for continued operation under the THOMAS WYLDE mark were to transfer to Thomas Wylde, LLC, either directly or in exchange for the payment of certain PDTW obligations over time. This disavowal and breaking of one's word and attempt at mulcting the company for a money claim demonstrates disloyalty, a breach of fiduciary duty, and is conduct undesired in either an employee or officer. This was first learned of on or about mid October, 2015 when the Complaint was received, which document is that document that evidences this, as does the First Amended Complaint. Certain letters from THOMAS' counsel also evidence this. Persons with knowledge include THOMAS and her counsel. THOMAS appears even to assert ownership over the domain names in use by EMPLOYER. Such frivolity in disavowing obligations and asserting baseless claims and breaching agreements is a basis for termination.

THOMAS' refusal to acknowledge that Thomas Wylde, LLC, had lent and was continuing to lend money to PDTW and her disavowal of that obligation. This disavowal and breaking of one's word and attempt at mulcting the company for a money claim demonstrates disloyalty, a breach of fiduciary duty, and is conduct undesired in either an employee or officer. This was first learned of on or about mid October, 2015 when the Complaint was received, which document is that document that evidences this, as does the First Amended Complaint. Certain letters from THOMAS' counsel also evidence this. Persons with knowledge include THOMAS and her counsel.

THOMAS' disavowal of that agreement made between all Thomas Wylde, LLC, officers, voluntarily to cut their pay by 1/3 each if every other officer would do so. This disavowal and breaking of one's word and attempt at mulcting the company for a money claim demonstrates disloyalty, a breach of fiduciary duty, and is conduct undesired in either an employee or officer. This was first learned of on or about Feb. 5, 2016 when the First Amended Complaint was received, which document is that document that evidences this. Persons with knowledge include THOMAS and her counsel.

well as her attempts to disrupt in-progress transactions, encourage third parties to breach their contracts with the company and cancel orders, and otherwise to divert business away from the company would also warrant termination and are, in addition, gross breaches of

1   the duty of loyalty and fiduciary duties.

2   The persons who know of these facts are the same as those listed above for reasons for
termination. The DOCUMENTS are also the same but, in addition, include the pleadings
3   and all other papers on file in this case plus all correspondence from counsel for
EMPLOYEE.

4

5   201.4 Was the TERMINATION or any other ADVERSE EMPLOYMENT ACTIONS referred to
in Interrogatories 201.1 through 201.3 based in whole or in part on the EMPLOYEE'S job
performance? If so, for each action:

6

7   (a) The adverse action was termination. As stated above, EMPLOYEE actually resigned
or abandoned her post or at least declared that she would no longer perform her duties.
The termination was for clarification.

8   (b) EMPLOYEE'S specific job performance that played a role in the ADVERSE
EMPLOYMENT ACTION is described in response to Interrogatories 201.1 through
9   201.3, above; as well as the response to Special Interrogatory No. 55, below, but also
includes resignation or abandonment of her post.

10   (c) EMPLOYEE'S Employment Agreement, the company operating agreement, and, to a
lesser extent, the company Employee Handbook were used to evaluate the
11   EMPLOYEE'S specific job performance, whether for their explicit content or for their
spirit.

12   (d) The PERSONS who had responsibility for evaluating the specific job performance of
the EMPLOYEE include HANNA and PARK.

13   (e) The PERSONS who have knowledge of EMPLOYEE'S specific job performance that
played a role in that ADVERSE EMPLOYMENT ACTION include THOMAS, HANNA,
14   PARK, Meldy Rafols, Yoonsang Bae, Ed Smith, Sina Kohv, Yann Weber, Vanessa Von
Bismarck, Tony Jay, one "Joshua" and Olivia Goodkin.

15   (f) On or about Feb. 26, 2015, a meeting occurred with EMPLOYEE's counsel present. At
that meeting, EMPLOYEE was warned to stop making negative comments to third parties
16   about other company officers and implored to demonstrate leadership and otherwise
rectify her conduct. The substance of that meeting is memorialized in an e-mail exchange
17   between Olivia Goodkin and David Schrider starting on Feb. 27, 2015, and ending on
Mar. 3, 2015.

18

19   On or about March 20, 2015, CEO John Hanna gave EMPLOYEE a verbal warning that
EMPLOYEE was not to make decisions on behalf of the company without talking to him
20   first and obtaining his approval.

21   Almost immediately afterwards, EMPLOYEE was contacted about an opportunity for the
company to dress the celebrity Sia for her appearances on the UK version of the television
22   program *The Voice*. EMPLOYEE, acting on behalf of the company, and without
consulting with its CEO, turned down this opportunity.

23   EMPLOYEE was again warned, this time in writing, on March 24, 2015, via an e-mail
from in-house counsel David Schrider, that she was to refrain from making any company
24   decisions at all. These warnings are further described elsewhere in responses to
discovery.

25

26   201.5 Was any PERSON hired to replace the EMPLOYEE after the EMPLOYEE'S
TERMINATION or demotion? If so, state the PERSON'S name, job title, qualification,
26   [illegible line]

28   No. Eventually, however, Jene Park was assigned EMPLOYEE's duties and given the
title of Creative Director. Jene Park was employed by EMPLOYER from inception.

1  201.6 Has any PERSON performed any of the EMPLOYEE'S former job duties after the
2  EMPLOYEE'S TERMINATION or demotion? If so:

3  Jene Park has been assigned EMPLOYEE's former job duties and started to perform some
or all of them since even before EMPLOYEE's termination or even her resignation, due to
EMPLOYEE's absence and hence, non-performance, and the overall need for the company
4  to move forward.

5  **204.0 Disability Discrimination**

6  204.3 Were there any communications between the EMPLOYEE (or the EMPLOYEE'S
7  HEALTH CARE PROVIDER) and the EMPLOYER about the type or extent of any disability of
EMPLOYEE?

8  No.

9  204.4 Did the EMPLOYER have any information about the type, existence, or extent of any
disability of EMPLOYEE other than from communications with the EMPLOYEE or the
10  EMPLOYEE'S HEALTH CARE PROVIDER? If so, state the sources and substance of
11  that information and the name, ADDRESS, and telephone number of each PERSON who
provided or received the information.

12  No.

13  204.5 Did the EMPLOYEE need any accommodation to perform any function of the
EMPLOYEE'S job position or need a transfer to another position as an accommodation? If so,
14  describe the accommodations needed.

15  Accommodations needed, if any, were unknown to EMPLOYER. Nevertheless,
EMPLOYER attempted to "accommodate" EMPLOYEE's stated preferences for a
16  different role in the company post-resignation. These accommodations, however, were
not based upon knowledge of any physical or mental or other disability, temporary or
17  permanent, but instead upon EMPLOYEE's stated refusal to continue in her role and
stated preference for a different role in the company.

18
204.6 Were there any communications between the EMPLOYEE (or the EMPLOYEE'S
19  HEALTH CARE PROVIDER) and the EMPLOYER about any possible accommodation of
20  EMPLOYEE?

No.

21
204.7 What did the EMPLOYER consider doing to accommodate the EMPLOYEE? For each
22  accommodation considered:

23  The EMPLOYER had no knowledge of any illness or physical or mental condition or
disability. Thus, EMPLOYER can only answer as to "accommodations" it offered in
24  order to accommodate EMPLOYEE'S stated desire to work for EMPLOYER in a
different capacity with different duties.

25
(a) describe the accommodation considered.

26
27  . . .

appear essentially at promotional events and otherwise participate in other opportunities
28  to promote EMPLOYER'S brand and trademark. The offer included a job working part
time for $120,000.00 per year.

1  (b) state whether the accommodation defined in ___ offered to the EMPLOYEE

2       Yes.

3  (c) state the EMPLOYEE'S response

4       EMPLOYEE declined the offer through a failure to accept or otherwise respond.

5  (d) or IF the accommodation was not offered, state all the reasons why this decision was made.

6       N/A

7  (e) state the name, ADDRESS, and telephone number of each PERSON who on behalf of
8  EMPLOYER made any decision about what accommodations, if any, to make for the
   EMPLOYEE.

9       John Hanna, Jene Park

10

11 (f) state the name, ADDRESS, and telephone number of each PERSON who on behalf of the
   EMPLOYER made or received any communications about what accommodations, if any, to
12 make for the EMPLOYEE.

13      John Hanna, Jene Park, David Schnider

14 **207.0 Internal Complaints**

15 207.1 Were there any internal written policies or regulations of the EMPLOYER that apply to the
   making of a complaint of the type that is the subject matter of this lawsuit? If so:

16 (a) state the title and date of each DOCUMENT containing the policies or regulations and a
   general description of the DOCUMENT'S contents.

17
18      Thomas Wylde Employee Handbook, April 1, 2015, generally describes the company
        policies.

19 (b) state the manner in which the DOCUMENT was communicated to EMPLOYEES;

20      The employee handbook was distributed to employees on or about its date of issuance.

21 (c) state the manner, if any, in which EMPLOYEES acknowledged receipt of the DOCUMENT
   or knowledge of its contents, or both.
22
        Employees were requested to sign a document acknowledging receipt.
23
24 (d) state, if you contend that the EMPLOYEE failed to use any available internal complaint
   procedures, all facts that support that contention.

25      To the extent EMPLOYEE failed to advise EMPLOYER of any disability, temporary or
        otherwise, and to the extent she also failed to continue with those attempts to
26      accommodate her needs, but instead cut off communication, EMPLOYEE failed to use

27

28 (e) state, if you contend that the EMPLOYEE'S failure to use internal complaint procedures was
   excused, all facts why the EMPLOYEE's use of the procedures was excused.

EMPLOYER contends that there was no excuse for failure to engage in that particular interactive process, in fact offered or otherwise to explore those recommendations in fact offered to her.

207.2 Did the EMPLOYEE complain to the EMPLOYER about any of the unlawful conduct alleged in the PLEADINGS?

No. At no point did EMPLOYEE complain of any unlawful conduct whatsoever; nor did she, at any point, advise that she had any mental or physical condition or disability.

**208.0 Governmental Complaints**

208.2 Did the EMPLOYER respond to any claim, complaint, or charge identified in Interrogatory 208.1? If so, for each claim, complaint, or charge:

EMPLOYEE did not request a response to Form Interrogatory 208.1.

**209.0 Other Employment Claims by Employee or Against Employer**

209.2 Except for this action, in the past 10 years has any employee filed a civil action against the EMPLOYER regarding his or her employment?

No.

**211.0 Loss of Income—Interrogatories to Employer [See Instruction 2(d).]**

211.1 Identify each type of BENEFIT to which the EMPLOYEE would have been entitled, from the date of the ADVERSE EMPLOYMENT ACTION to the present. If the ADVERSE EMPLOYMENT ACTION had not happened and the EMPLOYEE had remained in the same job position. For each type of benefit, state the amount the EMPLOYER would have paid to provide the benefit for the EMPLOYEE during this time period and the value of the BENEFIT to the EMPLOYEE.

EMPLOYEE is in possession of her employment contract which sets forth any and all benefits to which she was entitled. EMPLOYEE was entitled to four weeks of paid vacation per year. *See* Thomas Employment Agreement ¶ 5 (Exhibit B to Complaint). EMPLOYEE was entitled to health, vision, and dental insurance equivalent to what she had had at PDTW, LLC. *Id.* ¶ 6. EMPLOYEE was initially entitled to $300,000.00 in salary per year, but this amount was amended temporarily to $200,000.00 in salary per year when other company officers similarly agreed to a pay cut of 1/3. *Id.* ¶ 3.

211.2 Do you contend that the EMPLOYEE has not made reasonable efforts to minimize the amount of the EMPLOYEE'S lost income?

Yes.

If so:

(a) describe what more EMPLOYEE should have done.

EMPLOYEE should not have resigned, quit, and abandoned her post. EMPLOYEE [illegible line] EMPLOYEE disobeyed directives of management. EMPLOYEE should not have denigrated management and EMPLOYER to third parties. EMPLOYEE should not have disclosed confidential company information. EMPLOYEE should have accepted that

"accommodation" offered to her, EMPLOYEE should have mitigated her damages by
getting a job or, that she is generating income through self-employment.

(c) state the names, ADDRESSES, and telephone numbers of all PERSONS who have
knowledge of the facts that support your contention.

John Hanna, Jene Park, Meldy Rafols, Yoonsung Bae, David Schnider, Olivia Goodkin.

(d) identify all DOCUMENTS that support your contention and state the name, ADDRESS, and
telephone number of the PERSON who has each DOCUMENT.

In addition to all DOCUMENTS identified above with respect to breach or non-
performance or reasons for termination, EMPLOYEE's application for unemployment
insurance benefits as well as the EDD file in her unemployment insurance claim matter.

2.11.3 Do you contend that any of the lost income claimed by the EMPLOYEE, as disclosed in
discovery thus far in this case, is unreasonable or was not caused by the ADVERSE
EMPLOYMENT ACTION?

(a) state the amount of claimed lost income that you dispute;

All of it.

(b) state all facts upon which you base your contention.

EMPLOYEE resigned, failed to accept a reasonable offer conforming to her stated desires
for a new job continued with those malfeasances described above, and was, for clarity,
terminated for cause. She has also failed to mitigate her damages. She also failed to
perform while employed, and any damages she may claim are wholly offset by damages
owed to EMPLOYER. Furthermore, the only period for which EMPLOYEE arguably had
any history of a salary of $300K / year is under the contract of employment at issue and
thus for short period of employment from Jan. 1, 2015 until EMPLOYEE resigned or
abandoned her post on or about April 5, 2015. During that period, EMPLOYEE
materially breached that agreement and failed to perform and from the very outset of
contract performance sought to frustrate the purposes of that contract. Thus,
EMPLOYEE has no history whatsoever of entitlement to a salary of $300K / year in any
position in which she actually performed and gave value.

(c) state the names, ADDRESSES, and telephone numbers of all PERSONS who have
knowledge of the facts.

THOMAS, John Hanna, Jene Park, Meldy Rafols, David Schnider, Yoonsung Bae, Olivia
Goodkin

(d) identify all DOCUMENTS that support your contention and state the name,
ADDRESS, and telephone number of the PERSON who has each DOCUMENT.

Company operating agreement; Thomas Employment Agreement; EDD unemployment
insurance file, e-mail exchanges between Olivia Goodkin and David Schnider from late
March and early April, 2015, negotiating a new position for EMPLOYEE.

[illegible line]

2.14.1 At the time of the ADVERSE EMPLOYMENT ACTION, was there in effect any policy of
insurance through which you were or might be insured in any manner for the damages, claims, or
actions that have arisen out of the ADVERSE EMPLOYMENT ACTION?

214.2 Are you self-insured under any statute for the damages, claims, or actions that have arisen out of the ADVERSE EMPLOYMENT ACTION?

No,

## 215.0 Investigation

215.1 Have YOU OR ANYONE ACTING ON YOUR BEHALF interviewed any individual concerning the ADVERSE EMPLOYMENT ACTION?

Counsel of record has interviewed the following concerning either the ADVERSE EMPLOYMENT ACTION or general background and history of EMPLOYER or PDTW, LLC or THOMAS. Any and all notes taken are claimed as work product and protected from discovery;

| | | | |
|---|---|---|---|
| *John Parno* | *Jane Park* | *Meldy Rafols* | *Yoonsung Bae* |
| *Giselle Limtao* | *Joel Keyser* | *Allison Lee* | *Elsa Chavez* |
| *2061 EFFIS ST.* | *17033 Ventura Blvd.* | *3435 Wilshire Blvd.* | *4784 BROADVIEW DRIVE* |
| *LOS ANGELES, CA 90026* | *Suite 207* | *Suite 1970* | *GLENDALE, CA 91208* |
| *glimtao@gmail.com* | *Encino, CA 91316* | *Los Angeles, CA 90010* | *Elsa@thomaswylde.com* |
| *626-673-7158* | *Tel.: 310.310.7109* | *Tel.: 213.381.3537* | *323-600-3104* |
| | *Tel.: 818.654.6132* | *allisonatax@gmail.com* | |
| | *joelkeyser@jdlicpa.com* | | |

215.2 Have YOU OR ANYONE ACTING ON YOUR BEHALF obtained a written or recorded statement from any individual concerning the ADVERSE EMPLOYMENT ACTION?

No.

## 216.0 Denials and Special or Affirmative Defenses

216.1 Identify each denial of a material allegation and each special or affirmative defense in your PLEADINGS and for each:

EMPLOYER has not answered the complaint yet.

## 217.0 Response to Request for Admissions

217.1 Is your response to each request for admission served with these interrogatories an unqualified admission? If not, for each response that is not an unqualified admission:

Yes, except where noted.

## III. RESPONSES TO SPECIAL INTERROGATORIES, SET ONE

SPECIAL INTERROGATORY NO. 1: Identify all loan agreements entered into by Thomas Wylde, LLC regarding loans obtained by Thomas Wylde, LLC, by date, name and contact information of lender, amount and purpose of the loan.

[illegible] LLC. The purpose of the loan was to finance operations. Offshore is a company member, contact information already in THOMAS' possession.

On August 19, 2014, Thomas Wylde, LLC, borrowed $225K from Consumer Resource
Network LLC. The purpose of the loan was to finance operations until equity investment
could be received. The contact information for Consumer Resource Network LLC is c/o
Alex Kim, akim@ipdirect.com [no other contact data available other than what is on the
note].

On Dec. 1, 2014, Thomas Wylde, LLC borrowed $2M from Khondker Shoeb Ahmed and
Eniluz Gonzalez. The purpose of the loan was to finance operations. The contact
information is as follows: For Mr. Ahmed — Puerto de Hierro #93, Santa Ana, San Jose,
Costa Rica, and for Mr. Eniluz — Puerto de Hierro #5, Santa Ana, San Jose, Costa Rica.

On August 4 and 7, 2015, Thomas Wylde, LLC, borrowed $15K and $75K respectively
from The Palliative, LLC, c/o Jene Park. The purpose of these loans was to fund
operations. These loans were paid back, without interest, shortly before Thomas Wylde,
LLC, borrowed the additional $100K from The Palliative, LLC, on November 11, 2015.

On Nov. 11, 2015, Thomas Wylde, LLC, borrowed $100,000.00 from The Palliative,
LLC, an entity controlled by Steve Preatemon, husband to Jene Park. The purpose of this
loan was to finance operations. This was essentially a bridge loan deemed necessary by
management to permit operations to continue until funds could be obtained from recent
investment commitments made by member Hillshore Investments.

**SPECIAL INTERROGATORY NO. 2:** Identify all loan agreements entered into by Thomas
Wylde, LLC regarding loans made by Thomas Wylde, LLC, by date, name and contact
information of borrower, amount and purpose of the loan.

None.

**SPECIAL INTERROGATORY NO. 3:** Identify all regarding distributions made by Thomas
Wylde, LLC to any of its members by date, name and contact information of member, and
amount of distribution.

*Objection:* The interrogatory is vague and unintelligible.

In any event, Respondent will respond by indicating that no distributions have been made
to any LLC members since the company's inception, nor could any have been made in
accordance with the company operating agreement and California law.

**SPECIAL INTERROGATORY NO. 4:** Identify the current value of the capital accounts of
each of the members of Thomas Wylde, LLC.

*Objection:* THOMAS is already in possession of the company operating agreement,
including Exhibit B, which sets forth the capital account balances. THOMAS is already
in possession of Third Amended Exhibit B as well, reflecting changes due to recent unit
issuances, from which she may ascertain percentage interests and capital contributions.
In addition, the "value" of the capital accounts in terms of any market value cannot easily
be ascertained. Thus, whatever is available only indicates partner-style capital account
balances, and not "value" in any sense.

**SPECIAL INTERROGATORY NO. 5:** Identify the dates and amounts of all capital
contributions made by each member of Thomas Wylde, LLC.

| | | | |
|---|---|---|---|
| 12.31.2014 | John Hanna | John Hanna | 700.00 |
| 12.31.2014 | Hillshore Investment | Contribution from Aug to Dec 2014 initially booked as loans | 2,300,000.00 |
| 02/02/201 | Tewi, Doug, Roger | Jane $900, Doug $250, Roger $350 | 1,502.00 |

| 01/28/2015 | Nishore Investment | Jan 2015 Funds contribution | 900,000.00 |
| | | | |
| | | funds 2015 Contribution | 950,000.00 |
| 04/01/2015 | THOMAS, PAULA D | Contribution - partial payment | 1,600.00 |
| 04/14/2015 | Shishore Investment | Contribution | 100,000.00 |
| 04/17/2015 | Nishore Investment | Contribution | 100,000.00 |
| 05/14/2015 | Nishore Investment | Contribution | 100,000.00 |
| 05/20/2015 | PAULA THOMAS | Contribution - full payment | 1,600.00 |
| 05/31/2015 | Nishore Investment | Contribution | 100,000.00 |
| 05/28/2015 | Nishore Investment | Contribution | 100,000.00 |
| 05/29/2015 | Nishore Investment | Contribution | 100,000.00 |
| 06/30/2015 | Nishore Investment | Contribution | 300,000.00 |
| 07/10/2015 | Nishore Investment | Contribution | 200,000.00 |
| 09/14/2015 | Nishore Investment | Balance on Contribution of 5.5M | 332,000.00 |
| 11/23/2015 | Nishore Investment | Contribution | 250,000.00 |
| 12/03/2015 | Nishore Investment | Contribution | 300,000.00 |
| 12/31/2015 | Nishore Investment | Contribution from Aug-Oct 2015 initially booked as loans | 1,500,013.00 |
| 01/06/2016 | Nishore Investment | Contribution | 500,000.00 |
| 01/26/2016 | Nishore Investment | Contribution | 250,000.00 |
| 02/10/2016 | Nishore Investment | Contribution | 250,000.00 |

Balance as of Feb 15, 2016                                                8,505,913.00

**SPECIAL INTERROGATORY NO. 6:** Identify the dates and amount of each payment Thomas Wylde, LLC has made to Michael L. Schiffman, M.D.

| 04/27/2015 | Michael L Schiffman Trust | 30,000.00 |
| 09/15/2015 | Michael L Schiffman Trust | 12,000.00 |
| 10/15/2015 | Michael L Schiffman Trust | 13,000.00 |
| 11/13/2015 | Michael L Schiffman Trust | 12,000.00 |
| 12/31/2015 | Michael L Schiffman Trust | 12,000.00 |
| 1/14/2016 | Michael L Schiffman Trust | 12,000.00 |
| 2/12/2016 | Michael L Schiffman Trust | 12,000.00 |

**SPECIAL INTERROGATORY NO. 7:** State all facts supporting Thomas Wylde, LLC's contention that PDTW, LLC owes Thomas Wylde, LLC any money.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

Thomas Wylde, LLC, has made payments for the benefit of PDTW, LLC, to pay down and/or extinguish various liabilities to trade creditors and general creditors as well as Michael L. Schiffman, M.D. These amounts are shown as advances or loans on the books of Thomas Wylde, LLC and PDTW, LLC. With the QuickBooks file supplied to THOMAS under HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY protection under the existing protective order, THOMAS should be able to ascertain "all facts" reasonably desired. None of these payments would have been made but for the

................................................ and ... plus ... of PDTW, LLC's business under the THOMAS WYLDE mark, and all things appurtaining to the legacy of that mark, would continue under Thomas Wylde, LLC and belong to it. Nor would these payments have been made without the acknowledgment by PDTW, LLC, and

1       THOMAS, of the intercompany loans and their amounts.

2   **SPECIAL INTERROGATORY NO 8:** Identify all persons by name, address, and contact
    information who have knowledge of the facts supporting Thomas Wylde, LLC's contention that
3   PDTW, LLC owes Thomas Wylde, LLC any money.

4       Paula Thomas, Plaintiff; John Hanna; David Schnider; Jene Park; Meldy Rafols;
        Yoonsung Bae; Elsa Chavez
5
    **SPECIAL INTERROGATORY NO. 9:** Identify all DOCUMENTS supporting Thomas Wylde,
6   LLC's contention that PDTW, LLC owes Thomas Wylde, LLC any money.
        The term "DOCUMENT" or "DOCUMENTS" shall mean any documents, tangible
7   things, and property of any kind, as referred to in Code of Civil Procedure §§ 2031.010, and any
    tangible thing bearing a writing as that term is defined in Evidence Code §§ 250, in your
8   possession, custody or control, including the originals and all non-identical copies thereof,
    whether different from the originals by reason of any notation made on such copies or otherwise,
9   including, without limitation emails, letters, minutes, agendas, contracts, agreements, reports,
    summaries, inter-office and intra-office communications, offers, notations of any sort of
10  conversations, diaries, appointment books or calendars, teletypes, telefax, thermafax,
    confirmations, computer data (including information or programs stored in a computer, whether
11  or not ever printed out or displayed) and all drafts, alterations, modifications, changes and
    amendments of any of the foregoing, and all graphic or manual records or representations of any
12  kind, including, without limitation, photographs, microfiche, microfilm, videotapes, records, and
    motion pictures, and electronic, mechanical or electrical records or representations of any kind,
13  including, without limitation tapes, cassettes, discs, magnetic cards and recordings.

14      All documents related to the PDTW, LLC, litigation with Dr. Michael Schiffman, from
        the original promissory note to the security agreement to the pleadings to the settlement
15      agreement. All accounting records and bank statements demonstrating that Thomas
        Wylde, LLC, has made payments to Dr. Michael Schiffman. The accounting records and
16      banking records of PDTW, LLC, in Plaintiff Paula Thomas' possession, indicating
        monies lent and debts incurred and acceptance of the benefit of Thomas Wylde, LLC's
17      payments.

18  **SPECIAL INTERROGATORY NO. 10:** For each check that Thomas Wylde, LLC or any of its
    employees wrote from PDTW, LLC's bank accounts to pay for Thomas Wylde, LLC's debts,
19  identify the date, amount, and purpose of the check, and the person who signed the check.

20      *Objection:* The request is unduly burdensome given that Plaintiffs THOMAS and PDTW,
        LLC, are in possession of information related to checks written from PDTW, LLC's
21      accounts or have superior or at least equal access to it. In addition, neither Thomas
        Wylde, LLC, nor any of its employees wrote any checks from PDTW, LLC's bank
22      accounts to pay for Thomas Wylde, LLC's debts: First, any persons involved in issuing
        checks drawn upon PDTW, LLC's bank accounts did so as representatives of PDTW,
23      LLC, and as part of the transition of operations from PDTW, LLC to Thomas Wylde,
        LLC, all with the explicit or implicit authorization of THOMAS and/or PDTW, LLC.
24      Second, any checks issued were for PDTW, LLC's debts, and not for Thomas Wylde,
        LLC's debts, except where such amounts were fully used to offset amounts already owed
25      by PDTW, LLC to Thomas Wylde, LLC. For this reason, any following interrogatories
        that imply that "Thomas Wylde, LLC or any of its employees wrote [any check[s]] from
26      PDTW, LLC's bank accounts" or otherwise took or controlled monies to Thomas Wylde,

27

28  **SPECIAL INTERROGATORY NO. 11:** For each check that Thomas Wylde, LLC or any of its
    employees wrote from PDTW, LLC's bank accounts to pay for Thomas Wylde, LLC's debts,

1  identify all persons by name, address, and telephone number with knowledge of the facts
2  regarding each such payment.

3  None. *See* response to Special Interrogatory No. 10, above, incorporated fully by this
   reference, including its objection.

4  **SPECIAL INTERROGATORY NO. 12:** For each instance where Thomas Wylde, LLC or any
   of its employees took money from PDTW, LLC's bank accounts and paid it to any companies
5  owned in whole or in part by either John Hanna or any of his friends or family, including but not
6  limited to H&H Fashion, LLC, identify the date, amount, and purpose of the check, and the
   person who signed the check.

7  *Objection:* Plaintiffs Paula Thomas and PDTW have equal or better access to this
   information. The request is therefore unduly burdensome and interposed solely to harass
8  and increase the cost of this litigation.

9  As explained above in response to Interrogatory No. 10, neither Thomas Wylde, LLC, nor
   any of its employees took money from PDTW, LLC. Duly authorized representatives of
10 PDTW, LLC, paid amounts to H&H Fashion. LLC, as part of the agreed-to compensation
   for John Hanna, much in the same way that Paula Thomas at times took her compensation
11 in the form of payments to Lock-n-Load, LLC.

12 *See* response to Special Interrogatory No. 10, above, incorporated fully by this reference,
   including its objection.

13

14 **SPECIAL INTERROGATORY NO. 13:** For each instance where Thomas Wylde, LLC or any
   of its employees took money from PDTW, LLC's bank accounts and paid it to any companies
15 owned in whole or in part by either John Hanna or any of his friends or family, including but not
   limited to H&H Fashion, LLC, identify all persons by name, address, and telephone number with
16 knowledge of the facts regarding each such payment.

17 None. *See* response to Special Interrogatory No. 10, above, incorporated fully by this
   reference, including its objection. Those with knowledge of payments made by PDTW
18 representatives include THOMAS, Meldy Rafols, John Hanna, David Schnider, and Jene
   Park.

19 **SPECIAL INTERROGATORY NO. 14:** For each instance where Thomas Wylde, LLC or any
   of its employees took money from PDTW, LLC's bank accounts and paid it to any companies
20 owned in whole or in part by either Tasha Hess or any of her friends or family, including but not
   limited to Shot in the Armoire, LLC, identify the date, amount, and purpose of the check, and the
21 person who signed the check.

22 None. *See* response to Special Interrogatory No. 10, above, incorporated fully by this
   reference, including its objection.

23

24 **SPECIAL INTERROGATORY NO. 15:** For each instance where Thomas Wylde, LLC or any
   of its employees took money from PDTW, LLC's bank accounts and paid it to any companies
   owned in whole or in part by either Tasha Hess or any of her friends or family, including but not
25 limited to Shot in the Armoire, LLC, identify all persons by name, address, and telephone
   number with knowledge of the facts regarding each such payment.

26

27

28 **SPECIAL INTERROGATORY NO. 16:** For each instance where Thomas Wylde, LLC or any
   of its employees took money from PDTW, LLC's bank accounts and paid it to any companies

1   owned in whole or in part by either Jene Park or any of her friends or family, identify all persons
2   by name, address, and telephone number with knowledge of the facts regarding each such payment.

3       None. *See* response to Special Interrogatory No. 10, above, incorporated fully by this
        reference, including its objection.

4

5   **SPECIAL INTERROGATORY NO. 17:** For each instance where Thomas Wylde, LLC or any
    of its employees took money from PDTW, LLC's bank accounts and paid it to any companies
6   owned in whole or in part by either Jene Park or any of her friends or family, identify all persons by
    name, address, and telephone number with knowledge of the facts regarding each such payment.

7       None. *See* response to Special Interrogatory No. 10, above, incorporated fully by this
        reference, including its objection.

8

9   **SPECIAL INTERROGATORY NO. 18:** For each instance where Thomas Wylde, LLC or any
    of its employees paid money from Thomas Wylde, LLC's bank accounts and paid it to any
10  companies owned in whole or in part by either John Hanna or any of his friends or family,
    including but not limited to H&H Fashion, LLC, identify the date, amount, and purpose of the
    check, and the person who signed the check.

11

12      *Objection:* The interrogatory is overly burdensome and interposed to harass and annoy.
        THOMAS now, through discovery, has equal access to bank and accounting records from
13      which to ascertain this information.

14      The only payments possibly responsive involve payments to H&H Fashion, LLC, as part
        paying John Hanna his agreed-to compensation. THOMAS herself is familiar with
15      payments made to loan-out companies as she did the same thing, directing that certain
        payments for her compensation be made to Lock-n-Load, LLC. Thus, the purpose of all
16      such payments was compensation.

17  **SPECIAL INTERROGATORY NO. 19:** For each instance where Thomas Wylde, LLC or any
    of its employees took money from Thomas Wylde, LLC's bank accounts and paid it to any
18  companies owned in whole or in part by either John Hanna or any of his friends or family,
    including but not limited to H&H Fashion, LLC, identify all persons by name, address, and
19  telephone number with knowledge of the facts regarding each such payment.

20      THOMAS, John Hanna, Meldy Rafols, Yoonsung Bae, David Schrider, Jene Park.

21  **SPECIAL INTERROGATORY NO. 20:** For each instance where Thomas Wylde, LLC or any
    of its employees paid money from Thomas Wylde, LLC's bank accounts and paid it to any
22  companies owned in whole or in part by either Tasha Hess or any of her friends or family,
    including but not limited to Shot in the Armoire, LLC, identify the date, amount, and purpose of
    the check, and the person who signed the check.

23

24      None.

25  **SPECIAL INTERROGATORY NO. 21:** For each instance where Thomas Wylde, LLC or any
    of its employees took money from Thomas Wylde, LLC's bank accounts and paid it to any
26  companies owned in whole or in part by either Tasha Hess or any of her friends or family,
    including but not limited to Shot in the Armoire, LLC, identify all persons by name, address, and
27  telephone number with knowledge of the facts regarding each such payment.

28      None.

    **SPECIAL INTERROGATORY NO. 22:** For each instance where Thomas Wylde, LLC or any

of its employees paid money from Thomas Wylde, LLC's bank accounts and paid it to any
company ... and in what is or is out by either Jene Park or any of her friends or family, identify
the date, amount, and purpose of the check and the person who signed the check.

> *Objection:* The interrogatory is overly burdensome and interposed to harass and annoy.
> THOMAS has equal access to bank and accounting records from which to ascertain this
> information.

The only payments possibly responsive involve either: (a) payments to Park and/or her
husband, Steve Prestemon, and/or Mr. Prestemon's company The Palliative, LLC, for
monies lent to Thomas Wylde, LLC; or (b) payments to B2 International, a company
controlled by Park's brother that supplies pick-and-pack services to Thomas Wylde, LLC.
Thus, in the former instances, the purpose was to pay back monies lent, and in the latter
to pay for services rendered in South Korea.

**SPECIAL INTERROGATORY NO. 23:** For each instance where Thomas Wylde, LLC or any
of its employees took money from Thomas Wylde, LLC's bank accounts and paid it to any
companies owned in whole or in part by either Jene or any of her friends or family, identify all
persons by name, address, and telephone number with knowledge of the facts regarding each
such payment.

THOMAS, John Hanna, Jene Park, Meldy Rafols, David Schnider, Yoonsung Bae

**SPECIAL INTERROGATORY NO. 24:** If you contend that Paula Thomas authorized any
money to be paid out of PDTW, LLC's bank accounts for Thomas Wylde, LLC's debts, state all
facts supporting your contention.

> *Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to
> scope particularly when calling for "all facts." *See Ritchie Risk-Linked Strategies
> Trading (Ireland), Ltd. v. Coventry First*, 273 FRD 367, 369 (SDNY 2010); *Lucero
> v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D.
> Kan. 2006).

In order to save the brand THOMAS WYLDE from certain failure and extinction and to
protect her own interest in the mark and its history, THOMAS participated in a structured
transition of business operations from PDTW, LLC, to Thomas Wylde, LLC. As part of
this transition, THOMAS understood and authorized all things to allow a seamless
handing off of operations from PDTW, LLC to Thomas Wylde, LLC. THOMAS well
understood that persons, including herself, would at one and the same time be acting as
and for PDTW, LLC, and then as and for Thomas Wylde, LLC, in order to accomplish
the transition. THOMAS' complete cooperation in this regard was, *inter alia*, an
inducement to investors to come in with millions of dollars of desperately needed capital
and to put that capital at risk. In no scenario was it ever envisioned that PDTW, LLC,
would continue operating, or that it or THOMAS would retain assets necessary to the
continued operations of Thomas Wylde, LLC under the brand THOMAS WYLDE, or
hold hostage such things as the domain names and items that are part of the THOMAS
WYLDE brand legacy. Nor was there any scenario in which THOMAS, after having been
relieved of millions of dollars of personal liability and being given nearly 1/3 of Thomas
Wylde, LLC, would yet retain PDTW, LLC with full indirect rights to its accounts
receivable, its assets, its lease, and any other things of value necessary to Thomas Wylde,
LLC's operations or appertaining to the brand and its history. Thus, it was at all time...
... ... and her ... ... ... ... was, to ... ... ... ... ... with ... ...
participate in, and cooperate with, the structured transition.

**SPECIAL INTERROGATORY NO. 25:** If you contend that Paula Thomas authorized any

1   money to be paid out of PDTW, LLC's bank accounts for Thomas Wylde, LLC's debts, identify
2   all persons by name and address and telephone number with knowledge of the facts supporting your contention

3       THOMAS. Jene Park, John Hanna, David Schnider, Meldy Rafols, Yoonsung Bae

4   **SPECIAL INTERROGATORY NO. 26:** If you contend that Paula Thomas authorized any
    money to be paid out of PDTW, LLC's bank accounts for Thomas Wylde, LLC's debts, identify
5   all DOCUMENTS supporting your contention.

6       *See* response to Special Interrogatory No. 10, above, incorporated fully by this reference,
        including its objection.
7
        Documents that support respondent's position, however, include at least the following:
8
9       1. Articles of Organization of Thomas Wylde, LLC;
        2. Operating Agreement of Thomas Wylde, LLC, as amended, with all exhibits, as
        amended;
10      3. Employment contract between Paula Thomas and Thomas Wylde, LLC, and all
        exhibits;
11      4. "Clawback Agreement" between Paula Thomas and other Thomas Wylde, LLC
        members;
12      5. "Agreement to Purchase Membership Interest" from Nov. 2014;
        6. December, 2014 Articles of Dissolution of Thomas Wylde Holdings, LLC;
13      7. December 2014 Action by Written Consent of the Members of PDTW, LLC
        (delegating liabilities to THOMAS).
14      8. All PDTW accounting records.
        9. PDTW bank statements.
15      10. Thomas Wylde, LLC accounting records.
        11. Thomas Wylde, LLC bank statements.
16      12. All paychecks issued to THOMAS directly or to Lock-n-Load, LLC.
        13. Dec. 2014 Indemnification Agreement.
17
    **SPECIAL INTERROGATORY NO. 27:** Identify all assets that Thomas Wylde, LLC
18  purchased from PDTW, LLC and/or Paula Thomas, including but not limited to tangible assets,
    website domain names, intellectual property, furniture, computers, artwork, inventory,
19  equipment, and accounts receivable.

20      Thomas Wylde, LLC granted Paula Thomas a Membership Interest in exchange for
        certain assets as set forth in the Agreement to Purchase Membership Interest. That
21      agreement speaks for itself as do those other documents set forth in response to Special
        Interrogatory No. 26, above. All other assets were understood to belong to Thomas
22      Wylde, LLC, after completion of the transition as well as elimination of any secured
        creditors or other creditors of PDTW, LLC. In other words, it was agreed that certain
23      assets would temporarily remain inside of PDTW, LLC in order to avoid any accusation
        of a fraudulent conveyance, in particular by Dr. Michael Schiffman. All PDTW assets
24      necessary to the continued operations of Thomas Wylde, LLC under the THOMAS
        WYLDE brand name were understood to be part of the transaction; all other assets were
25      understood to be collateral for the mounting debt owed by PDTW, LLC, to Thomas
        Wylde, LLC, and thus to be given transferred to Thomas Wylde, LLC. *See also* response
26      to Special Interrogatory No. 24, above. Thus, from Paula Thomas, Thomas Wylde, LLC
        [illegible line]

28      names and anything else held by her relating to the brand. From PDTW, LLC, Thomas
        Wylde, LLC, purchased, or received the future right to, all assets, as indicated when it
        obtained possession and use of all assets.

SPECIAL INTERROGATORY NO. 28: Identify all debts or liabilities that Thomas Wylde, LLC assumed from PDTW, LLC and/or Paula Thomas.

Thomas Wylde, LLC did not explicitly assume any debts from PDTW, LLC. Thomas Wylde, LLC assumed certain debts from Paula Thomas in connection with granting her a Membership Interest as set forth in the Agreement to Purchase Membership Interest. Again, as described above Thomas Wylde, LLC, has paid certain liabilities not explicitly assumed by it under the agreement that all remaining assets would transfer to it.

Those liabilities assumed *from THOMAS* include the following:

Secured Promissory Note executed by PDTW, LLC in favor of CBC Partners I, LLC, dated October 15, 2013 in the approximate amount of $1,625,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestenon, dated March 27, 2011 in the approximate amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestenon, dated January 1, 2013 in the approximate amount of $131,337

While Thomas Wylde, LLC, has made payments on certain debts owed by PDTW, LLC, it has done so under the tacit arrangement discussed elsewhere under which PDTW, LLC, borrowed those sums and that its mounting debt to Thomas Wylde, LLC, would, in part, be satisfied by transfer of all remaining assets held by it.

SPECIAL INTERROGATORY NO. 29: Identify all inventory that Thomas Wylde, LLC obtained from PDTW, LLC, and state where the inventory is currently located.

*Objection:* The interrogatory is compound. The term "obtained" is vague and ambiguous. Thomas Wylde, LLC has possession of some inventory. Some of his inventory has been sold and applied to PDTW, LLC's debts to Thomas Wylde, LLC (or to PDTW, LLC's debt to Michael Schiffman). This has been true and was done with THOMAS' approval since approximately August of 2014.

SPECIAL INTERROGATORY NO. 30: Identify the consideration that John Hanna and Jene Park paid for their membership units in Thomas Wylde, LLC.

The monetary consideration is listed on Exhibit B to the company operating agreement, a copy of which THOMAS has, original and as amended.

SPECIAL INTERROGATORY NO 31: State the name, address, telephone number, and email address of Stephen Choi.

Stephen Choi                          [address also c/o Hillshore Investments]
317 17th Street
Manhattan Beach, CA 90266-4635
310.819.5000
stephen@choislle.com

SPECIAL INTERROGATORY NO. 32: Identify the name, address, and account number for all ... accounts ... security ... or ... liquidation held ...

*Objection:* This request is for information that is not relevant and is not calculated to lead to admissible evidence. This information will be supplied, if at all, only when an appropriate protective order is in place. In any event, in other discovery Plaintiffs have received copies

1    of all bank account statements for any and all accounts and may, on an HIGHLY
     CONFIDENTIAL -- ATTORNEYS' EYES ONLY basis, ascertain this information.
2
     SPECIAL INTERROGATORY NO. 33: Identify the name, address, telephone number, and email
3    address of all tax professionals who have prepared tax returns for Thomas Wylde, LLC.

4    Allison Lee                    NORMAN KO & JOSEPH
     3435 Wilshire Blvd.            FOSTER
5    Suite 1970                     KF PROFESSIONAL GROUP
     Los Angeles, CA 90010          100 N 1ST ST STE 105
6    Tel.: 213.381.3557             BURBANK, CA 91502
     allison4tax@gmail.com          818-736-5960
7                                   KFPG@KFPGCPH.COM
                                    (2014 return)
8
9    SPECIAL INTERROGATORY NO. 34: Identify the name, address, telephone number, and
     account number of all credit cards held by Thomas Wylde, LLC at any time, including for any
10   credit cards that Thomas Wylde, LLC has issued to John Hanna and/or Jene Park.

11        Objection: This request is for information that is not relevant and is not calculated to lead
          to admissible evidence. This information will be supplied, if at all, only when an
12        appropriate protective order is in place. In any event, in other discovery Plaintiffs have
          received copies of all credit card statements for any and all accounts and may, on an
13        HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY basis, ascertain this
          information.
14
     SPECIAL INTERROGATORY NO. 35: Identify the date, amount, and purpose of each
15   payment that Thomas Wylde, LLC has made to John Hanna, including but not limited to for
     wages, bonus, commission, expense reimbursement, loan or advance.
16
          Objection: The interrogatory is unduly burdensome. THOMAS' counsel may ascertain
17        whatever THOMAS may require from materials already being supplied to THOMAS
          under Attorneys' Eyes Only protection under the existing protective order.
18
     SPECIAL INTERROGATORY NO. 36: Identify the date, amount, and purpose of each
19   payment that Thomas Wylde, LLC has made to Jene Park, including but not limited to for wages,
     bonus, commission, expense reimbursement, loan or advance.
20
          Objection: The interrogatory is unduly burdensome. THOMAS' counsel may ascertain
21        whatever THOMAS may require from materials already being supplied to THOMAS
          under Attorneys' Eyes Only protection under the existing protective order.
22
     SPECIAL INTERROGATORY NO. 37: Identify the name, address, telephone number, and
23   email address of all outside payroll services that Thomas Wylde, LLC has used at any time.

24   Allison Lee                    Paychex, Inc.
     3435 Wilshire Blvd.            P.O. Box 2000
25   Suite 1970                     Henrietta, NY 14467
     Los Angeles, CA 90020          Tel.: 800.472.0072
     Tel.: 213.381.3557
26   allison4tax@gmail.com

     SPECIAL INTERROGATORY NO. 38: Identify the name, address, telephone number,
     address, contact person, and type of goods or services sold for each vendor Thomas Wylde, LLC
28   has used at any time.

*Objection:* The interrogatory is compound and also requests information that is communication between business information and experts in great information and therefore protected and/or privileged. Given Plaintiff Thomas' history of abuse of such information, it will be provided, it at all, only under a suitable protective order offering 'Attorneys- Eyes Only' protection. Respondent otherwise objects because the interrogatory is unduly burdensome and seeks irrelevant material and otherwise is not calculated to lead to admissible evidence. In any event, in other discovery THOMAS' attorneys have received copies of materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 39:** Identify the name of vendor, address, telephone number, date of payment, amount of payment, and reason for payment for each payment Thomas Wylde, LLC has made to any vendor located in South Korea at any time.

*Objection:* The interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to admissible evidence. Plaintiff Paula Thomas already knows the names of key vendors used by PDTW, LLC, and later by Thomas Wylde, LLC. In any event, in other discovery THOMAS' attorneys have received copies of materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 40:** Identify all DOCUMENTS which set forth Thomas Wylde, LLC's expense reimbursement policies, guidelines, and procedures.

The Thomas Wylde Employee Handbook, April 1, 2015 Rev.

**SPECIAL INTERROGATORY NO. 41:** Identify all employees on payroll at Thomas Wylde, LLC at any time, including name, address, telephone number, job title, and rate of pay.

*Objection:* The interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to admissible evidence. THOMAS' attorneys have received copies of materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 42:** Identify all employees at Thomas Wylde, LLC that received commissions as part of their compensation package at any time by name, address, telephone number, and job title.

None.

**SPECIAL INTERROGATORY NO. 43:** Identify all persons and companies by name, address, and telephone number that received any gifts from Thomas Wylde, LLC, as reflected on Thomas Wylde, LLC's profit and loss statements.

*Objection:* The interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to admissible evidence. THOMAS' attorneys have received copies of materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY basis, they may ascertain this information. (*See* public relations expense item detail, QuickBooks file.)

**SPECIAL INTERROGATORY NO. 44:** State the total amount of travel expenses that Thomas Wylde [illegible] ... date, description of expense, amount, and business purpose for each expense.

*Objection:* The interrogatory is overly broad, unduly burdensome, irrelevant, and not

reasonably calculated to lead to admissible evidence. THOMAS' attorneys have received
copies of materials from which, on a HIGHLY CONFIDENTIAL — ATTORNEYS'
EYES ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 45:** State the total amount of travel expenses that Thomas
Wylde, LLC has incurred to date for Jene Park and her guests, including but not limited to for
airfare, hotel, and transportation, and explain how the amount was calculated by setting forth the
date, description of expense, amount, and business purpose for each expense.

> *Objection:* The interrogatory is overly broad, unduly burdensome, irrelevant, and not
> reasonably calculated to lead to admissible evidence. THOMAS' attorneys have received
> copies of materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS'
> EYES ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 46:** State the total amount of meals and entertainment
expenses that Thomas Wylde, LLC has incurred to date, including but not limited to for dining,
entertaining guests, staff, and bars and alcohol, and explain how the amount was calculated by
setting forth the date, description of expense, who incurred the expense, amount, and business
purpose for each expense.

> *Objection:* The interrogatory is overly broad, unduly burdensome, and not reasonably
> calculated to lead to admissible evidence. THOMAS' attorneys have received copies of
> materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
> ONLY basis, they may ascertain this information.

**SPECIAL INTERROGATORY NO. 47:** Explain what the "pick & pack" money spent by
Thomas Wylde, LLC was for, as reflected on its profit and loss statements, including the date,
amount, and business purpose of each such payment.

> *Objection:* Plaintiffs Paula Thomas and PDTW, LLC, are aware of both PDTW, LLC's
> and Thomas Wylde, LLC's history of having goods manufactured in South Korea. They
> are also aware that these goods, once manufactured, require proper packaging, shipping,
> and handling. They are also aware that both companies have historically used B2
> International as their designated vendor for such purposes in Korea. The interrogatory is
> therefore interposed solely to harass and annoy and increase the cost of litigation. The
> interrogatory is also compound. Furthermore, Plaintiffs can ascertain whatever they wish
> to know from discovery materials already supplied to them.

**SPECIAL INTERROGATORY NO. 48:** If Thomas Wylde, LLC has made any advances to
any of its officers, directors or employees, identify the date, amount, person who received the
advance, reason for the advance, who authorized the advance, the date the advance was repaid, or
if it has not been repaid, how much is still owing.

> *Objection:* The interrogatory is overly broad, unduly burdensome, and not reasonably
> calculated to lead to admissible evidence. THOMAS' attorneys have received copies of
> materials from which, on an HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
> ONLY basis, they may ascertain this information.

> The reason for any minor advances made to any officer or employee is for the
> convenience of such officer or employee.

**SPECIAL INTERROGATORY NO. 49:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> *Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to
> scope particularly when calling for "all facts", *See Ritchie Risk-Linked Strategies*

*Trading (Ireland), Ltd. v. Coventry First, LLC*, 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D. Kan. 2006).

By March 24, 2015, the company was already approximately 90 days behind in conceptualizing the pre-Spring 2016 collection due to THOMAS' apparent disinterest in her work. This work should have been completed by Dec. 23, 2014. On March 26, 2015, David Schnider spoke with Olivia Goodkin, THOMAS' attorney. During that call, Goodkin conveyed that the company should hire a new Creative Director to replace THOMAS for the spring/summer 2016 collection. In that call, Goodkin suggested that THOMAS would continue to work on the pre-spring 2016 collection. On March 31, 2015, THOMAS issued instructions to have almost all of her personal property removed from the company premises and in that period — and even earlier — herself removed items belonging to her. On April 5, 2015, Olivia Goodkin wrote David Schnider by e-mail. In this e-mail, Goodkin indicated that THOMAS claimed to have "completed pre-Spring 2016 and *will not* design Spring/Summer 2016 . . ." THOMAS therefore declared that she would not perform the function of Creative Director any longer which is the functional equivalent of a resignation from that position.

**SPECIAL INTERROGATORY NO. 50:** Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Paula Thomas resigned from Thomas Wylde, LLC.

Paula Thomas; John Hanna; Jene Park; Meldy Rafols; David Schnider; Olivia Goodkin

**SPECIAL INTERROGATORY NO. 51:** Identify all DOCUMENTS supporting your contention that Paula Thomas resigned from Thomas Wylde, LLC.

March 26, 2015 e-mail from David Schnider to John Hanna; April 5, 2015 e-mail from Olivia Goodkin to David Schnider; THOMAS June 1, 2015 press release announcing her departure from Thomas Wylde, LLC; DRAFT settlement documents from late April and early May, 2015 and their cover correspondence.

**SPECIAL INTERROGATORY NO. 52:** State all facts supporting your contention that Paula Thomas abandoned her job at Thomas Wylde, LLC.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC*, 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D. Kan. 2006).

*See* response to Interrogatory No. 49, above.

**SPECIAL INTERROGATORY NO. 53:** Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Paula Thomas abandoned her job at Thomas Wylde, LLC.

Paula Thomas; John Hanna; Jene Park; Meldy Rafols; David Schnider; Olivia Goodkin

**SPECIAL INTERROGATORY NO. 54:** Identify all DOCUMENTS supporting your

*See* response to Special Interrogatory No. 51 above.

**SPECIAL INTERROGATORY NO. 55:** State all facts supporting your contention that

1    Thomas Wylde, LLC terminated Paula Thomas for cause.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for all facts. *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

Reasons for EMPLOYER's termination include those reasons set forth in this Interrogatory Response Form. Further, PCM's EMPLOYER's counsel (Mr. Geoffrey Neri) on May 18th, 2017, sent a copy of which EMPLOYER alleges a fact. That letter incorporated herein by reference in its entirety. Refuting the same set forth in response to Interrogatory Response #1 NRC 207(A)(2)(a)(1), and that response is also incorporated in this response in its entirety.

Thomas Wylde, LLC, was created to permit the THOMAS WYLDE brand to survive. By mid-2014 both PDTW, LLC, and THOMAS were hopelessly insolvent and the brand was performing poorly. As part of the organization of Thomas Wylde, LLC, the company needed capital and took in over $6M (by 3/2015) of combined capital investment and loan monies. Part of this new arrangement required that THOMAS relinquish that control she had previously enjoyed while at PDTW, LLC, and put herself under a CEO. THOMAS did many things demonstrating that she was, ultimately, either unwilling or unable to take direction or relinquish actual control. For example:

1. THOMAS denigrated management on certain occasions. For example, in late April she called Siim Kohv, the company's global PR director, and said repeatedly that John Hanna and Jene Park are "not good people" and not to trust them. She further indicated that she had already called Yann Weber at Antidote magazine to express similar opinions about company management. (All of this occurred during a period in which the company was negotiating in good faith to hire THOMAS for a new position.)

2. In late February or early March THOMAS instructed the company's IT contractor, Ed Smith, to give passwords for access to Thomas Wylde, LLC's servers, including access to all company designs, e-mails, intellectual property, etc., to Tony Jay and one "Joshua". Full virtual private network ("VPN") and file transfer protocol ("FTP") access was provided. This was discovered on May 12, 2015.

3. On Feb. 13 John Hanna and Jene Park went to New York for Fashion Week. THOMAS was already there. On Feb. 17, 2015, John Hanna had breakfast with Vanessa Von Bismarck. During this meeting, Von Bismarck, President of BPCM, indicated that THOMAS was bad-mouthing the company management team. When confronted about this, THOMAS apologized and promised to desist from denigrating other members of the management team.

4. On March 23, John Hanna emphasized to THOMAS that she must not unilaterally make company decisions at all. One day later, on March 24, THOMAS instructed company employee Sohini Khakhria to reject an opportunity offered by the singer Sia to allow the company to dress her and the company lost this opportunity.

5. On a number of occasions John Hanna asked that THOMAS refrain from bringing her dogs to the company. THOMAS kept bringing her dogs to the company premises, and required that personnel be assigned to walk them, care for them, etc.

6. On various occasions, THOMAS made use of company staff for personal errands or for such things as setting hair appointments, etc. She continued doing so after admonitions

not to  These occasions at times involved instructions by THOMAS to company staff to [illegible] their whereabouts and activities.

7. On various occasions John Hanna requested that THOMAS exhibit leadership and set an example for the design team. For example, on Feb. 26, 2015, at THOMAS' attorney Olivia Goodkin's office, Hanna requested that THOMAS turn things around, exhibit leadership, and lead the design team. THOMAS failed or refused to do so and failed to cooperate with Jene Park in achieving company objectives.

8. On many occasions THOMAS said negative things about John Hanna and Jene Park within the company, to company employees, or about Hanna to Park, or about Park to Hanna, or otherwise said things that had a negative impact upon morale or were intended to undermine certain people.

9. Abandonment of her post or resignation: The company could no longer afford to maintain someone on its payroll who was not productive, had apparently abandoned her post, and who had refused to perform her stated functions and refused to accept having anyone above her, and refused to accept alternative positions offered to her.

10. THOMAS demonstrated a lack of due care or good judgment in performing her job functions. For example, she insisted upon repeating the same old designs essentially. As set forth elsewhere, she refused to accommodate the requests from the Japanese markets to avoid using silk, cashmere, or leather in summer designs for them, leading to loss of that market. EMPLOYEE did absurd things, like compelling the design team to stay late on one occasion, directing them to write postive reviews of her. EMPLOYEE insisted upon the wasteful Poppy Delevingne ad campaign described elsewhere and thereafter mishandled its publicity. EMPLOYEE mishandled or mistreated customers and clients, or treated them with disdain or rudeness. EMPLOYEE caused production issues by insisting upon using herself for sizing and fit issues instead of a fitting model conforming to consumer/market needs.

**SPECIAL INTERROGATORY NO. 56:** Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Thomas Wylde, LLC terminated Paula Thomas for cause.

Paula Thomas; John Hanna; Jene Park; David Schnider; Sim Kohv; Yann Weber; Sia Meidy Rafols; Sohini Khakhria; Vanessa Von Bismarck

**SPECIAL INTERROGATORY NO. 57:** Identify all DOCUMENTS supporting your contention that Thomas Wylde, LLC terminated Paula Thomas for cause.

Richard Byron Peddie, P.C., letter of termination dated May 14, 2015; all documents listed in response to Special Interrogatory No. 51, above. Sim Kohv's April 29, 2015 e-mail. Jean Johnston's April 10, 2015 e-mail; Ed Smith March 3, 2015 e-mail regarding furnishing company server passwords to Tony Jay and "Joshua". David Schnider/Olivia Goodkin e-mail exchanges Feb. 26 — Mar. 3, 2015.

**SPECIAL INTERROGATORY NO. 58:** Identify every provision of the employment agreement that you contend Paula Thomas materially breached, and state all facts regarding how said contend Paula Thomas materially breached each such provision.

[illegible] [illegible] [illegible] [illegible]

*See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

1   Section 8, by failing and/or refusing to and/or the duties listed in Section 8 with due
2   care, and by breaching in material ways; Section 9, and by failing to follow those rules,
3   policies, and procedures set forth therein, all as described above in responses to Prime
    Interrogatory — Employment No 201.1(a) and Special Interrogatory No. 55.

4   Section 9, by committing material breaches of the agreement, by intentionally not
5   performing her duties, and by her refusal to abide by or comply with the directives of her
    superiors or company policies or procedures; by her willful dishonesty, fraud, and
6   misconduct with regard to the affairs of the company in ways that adversely affect the
    company in material ways; and by conflict of interest in the solicitation of vendors or
7   customers and/or recruitment of employees, in violation of Sections 10 & 11.

8   Sections 10 & 11, as described immediately above.

9   Addendum A — Through providing access to the company's entire server contents to
    outside third parties without the consent of management.

10  **SPECIAL INTERROGATORY NO. 59:** Identify all persons by name, address, and telephone
11  number with knowledge of the facts supporting your contention that Paula Thomas materially
    breached the employment agreement.

12  Paula Thomas; John Hanna; Jene Park; Meldy Rafols; Siim Kohv; Ed Smith; Vanessa
13  Von Bismarck; Tony Jay; "Joshua"; Jean Johnston; Yoonsung Bae; Sohini Khakhria;
    David Schnider

14  **SPECIAL INTERROGATORY NO. 60:** Identify all DOCUMENTS supporting your
15  contention that Paula Thomas materially breached the employment agreement.

16  All documents listed in response to Special Interrogatories Nos. 51 & 57, above.

17  **SPECIAL INTERROGATORY NO. 61:** State all facts supporting your contention that Paula
    Thomas committed insubordination.

18  *Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to
19  scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies
    Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero
20  v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D.
    Kan. 2006).

21  On or about March 23, 2015, John Hanna, as CEO of Thomas Wylde, LLC, instructed
22  Paula Thomas to stop making company decisions without consulting the CEO. On or
    about March 24, 2015, Paula Thomas, in direct contravention of this instruction, turned
23  down an opportunity for the company to dress popular artist Sia. In late April, 2015,
    Paula Thomas, in a conversation with Siim Kohv, said that John Hanna and Jene Park are
24  "bad people" and suggested that Siim Kohv should be careful dealing with them. These
    were just the final straws in what was actually a history of insubordination. As recounted
25  elsewhere, THOMAS had bad-mouthed company management at the New York Fashion
    Show in February, 2015. In addition, the constant disregard of the directives of the
26  company CEO were insubordinate, as recounted elsewhere herein.

    **SPECIAL INTERROGATORY NO. 62:** Identify all persons by name, address, and telephone
27  insubordination.

28  Paula Thomas; John Hanna; Jene Park; Meldy Rafols; Siim Kohv; Ed Smith; Vanessa

Von Bismarck, Tony Jay, "Joshua"; Jean Johnston; Yoonsung Bae; David Schnider

**SPECIAL INTERROGATORY NO. 63:** Identify all DOCUMENTS supporting your contention that Paula Thomas committed insubordination.

All documents identified in response to Special Interrogatories 51, 57 & 60, above.

**SPECIAL INTERROGATORY NO. 64:** Identify all company written rules, guidelines, policies or procedures that you contend Paula Thomas failed to comply with, and state all facts supporting your contention that Paula Thomas failed to comply with them.

*Objection:* The interrogatory is compound. The interrogatory is also overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moser v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

Thomas Wylde, LLC, Employee Handbook, Rev. April 1, 2015.

**SPECIAL INTERROGATORY NO. 65:** Identify all persons by name, address and telephone number with knowledge of the facts supporting your contention that Paula Thomas failed to comply with the company's written rules, guidelines, policies or procedures.

THOMAS; John Hanger; Jene Park; David Schnider; Meldy Rafols; Yoonsung Bae; Jean Johnston; Ed Smith; Tony Jay; "Joshua"

**SPECIAL INTERROGATORY NO. 66:** Identify all DOCUMENTS supporting your contention that Paula Thomas failed to comply with the company's written rules, guidelines, policies or procedures.

All documents identified in response to Special Interrogatories 51, 57, 60 & 63, above. Documents for trip expenses occurred, trip to NYC, Nov. 10-13, 2014, in THOMAS' possession.

**SPECIAL INTERROGATORY NO. 67:** State all facts supporting your contention that Paula Thomas' conduct during her employment with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC, its members, and/or management.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moser v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

The failure to design the pre-spring collection by late December, 2014 and resulting rush and bottlenecking through March of 2015 and ultimate failure to finish designing that collection was costly and caused damage to the company. THOMAS' failure and later refusal to perform her duties damaged the company. The constant strife created by THOMAS and her campaign to undermine persons at the company, or to create dissension between them, while not effectively doing her own job, diverted company resources and damaged the company. Creation of an intimidating and hostile work environment to

**SPECIAL INTERROGATORY NO. 68:** Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Paula Thomas' conduct

1  during her employment with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC, its
   members, and/or management.

   THOMAS: John Hanna; Jene Park, David Schacler; Meldy Rahilis; Yoonsung Bae; Sion
3     Kohv; Yann Weber; Vanessa Von Bismarck; Elena Davidyants

4  **SPECIAL INTERROGATORY NO. 69:** Identify all DOCUMENTS supporting your
   contention that Paula Thomas' conduct during employment with Thomas Wylde, LLC caused
5  damage to Thomas Wylde, LLC, its members, and/or management.

6     All documents identified above in response to Special Interrogatories 51, 57, 60, 63 & 66.
      Documents related to the Poppy Delevingne ad campaign's expense and the hash-tagging;
7     documents related to THOMAS' Nov. 10-13 trip to NYC and its expense; documents
      related to website design expense after Roger Kuo was dismissed by THOMAS.
8     Discovery is ongoing and not all documents have been identified that could possibly
      indicate damage.
9
   **SPECIAL INTERROGATORY NO. 70:** State the amount of damages that you contend Paula
10 Thomas caused to Thomas Wylde by her conduct during her employment with Thomas Wylde,
   LLC to Thomas Wylde, LLC, its members or management, and explain how you calculated the
11 same.

12    *Objection:* The interrogatory is compound and unintelligible. Discovery is ongoing and
      Respondent has not had the opportunity to calculate its damages.
13
   **SPECIAL INTERROGATORY NO. 71:** State all facts supporting your contention that Paula
14 Thomas' conduct after her employment with Thomas Wylde, LLC ended caused damage to
   Thomas Wylde, LLC, its members, and/or management.
15
      *Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to
16    scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies
      Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero
17    v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D.
      Kan. 2006).
18
19    THOMAS attempted to solicit company sales agents.

20    THOMAS caused at least one customer, Just One Eye, to cancel an existing order and
      ship back product already delivered. The company was not paid in full for that order.
21    THOMAS' apparent interference with other customers and stores and her role in causing
      them not to order or cancel orders is still under investigation.
22
      THOMAS published many company images on Instagram, claiming sole credit for
23    company designs and implying that the company had nothing to do with what was shown.
      This caused damage to the company inasmuch as it falsely disregarded the ability of the
24    company's design team to keep designing in THOMAS' absence. Use of these images was
      not authorized and must be viewed as a potential violation of copyright.
25
      THOMAS told falsehoods to Elena Davidyants at TSUM in Russia and created a false
26    impression of occurrences at the company such that TSUM refused to do business with
      the company.

      groundless claims, damaging this company and diverting its energies and monies to
26    defending against the same.

**SPECIAL INTERROGATORY NO. 72:** Identify all persons by name, address, and telephone number, with knowledge of the facts supporting your contention that Paula Thomas' conduct after her employment with Thomas Wylde, LLC ended caused damage to Thomas Wylde, LLC, its members, and/or management.

THOMAS, John Hanna; Jene Park; David Schnider; Meldy Rafols; Yoonsung Bae; Elena Davidyants; representatives of Just One Eye; THOMAS' Instagram recipients

**SPECIAL INTERROGATORY NO. 73:** Identify all DOCUMENTS supporting your contention that Paula Thomas' conduct after her employment with Thomas Wylde, LLC ended caused damage to Thomas Wylde, LLC, its members, and/or management.

All papers filed in this action. TW company accounting files. Evidence of returns by Just One Eye. Documents evidencing sales history to customers who suddenly did not order anymore. Documents to be retrieved from THOMAS in discovery. THOMAS' e-mails and social media communications to be retrieved in discovery.

**SPECIAL INTERROGATORY NO. 74:** State the amount of damages that you contend Paula Thomas caused to Thomas Wylde by her conduct after her employment with Thomas Wylde, LLC ended to Thomas Wylde, LLC, its members or management, and explain how you calculated the same.

*Objection:* The interrogatory is compound and unintelligible. Discovery is ongoing and Respondent has not had the opportunity to calculate its damages.

**SPECIAL INTERROGATORY NO. 75:** State all facts supporting your contention that Paula Thomas slandered or defamed Thomas Wylde, LLC, its members, and/or any of its management.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D. Kan. 2006).

As described above, THOMAS made negative remarks to Vanessa Von Bismarck at the Feb. 2015 NYC Fashion Show or during that week. As described above, THOMAS told Slim Kohv and Yann Weber that Jene Park and John Hanna are "bad people" and untrustworthy and urged them not to do business with the company. Apparently similar remarks were made to Elena Davidyants at TSUM and representatives of Just One Eye. Discovery is ongoing and defamatory remarks were also the apparent causes of yet other cancellations of orders or refusals by vendors or suppliers or customers or stores to fulfill their obligations to the company or to make anything resembling their customary orders.

**SPECIAL INTERROGATORY NO. 76:** Identify all persons by name, address, and telephone number that have knowledge of the facts supporting your contention that Paula Thomas slandered or defamed Thomas Wylde, LLC, its members and/or its management.

THOMAS; John Hanna; Jene Park; David Schnider; Meldy Rafols; Yoonsung Bae; Vanessa Von Bismarck, Elena Davidyants; Yann Weber; Slim Kohv.

**SPECIAL INTERROGATORY NO. 77:** Identify all DOCUMENTS supporting your contention that Paula Thomas slandered or defamed Thomas Wylde, LLC, its members and/or its management.

*See* all documents listed in response to Special Interrogatories 51, 57, 60, 63, 69 & 73, above.

SPECIAL INTERROGATORY NO. 78: State all facts supporting your contention that Paula Thomas breached her duty of loyalty to Thomas Wylde, LLC.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC*, 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D. Kan. 2006).

See responses to Special Interrogatories 55, 61, 67 & 71 above; *see* response to Employment Form Interrogatory 2014(n), above.

SPECIAL INTERROGATORY NO. 79: Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Paula Thomas breached her duty of loyalty to Thomas Wylde, LLC.

THOMAS; John Hanna; Jene Park; Moldy Rafols; Yann Weber; Sam Kohv; Vanessa Von Bismarck; Elena Davidyants at TSUM; representatives of JUST ONE EYE

SPECIAL INTERROGATORY NO. 80: Identify all DOCUMENTS supporting your contention that Paula Thomas breached her duty of loyalty to Thomas Wylde, LLC.

*See* all documents listed in response to Special Interrogatories 51, 57, 60, 63, 69, 73 & 77, above.

SPECIAL INTERROGATORY NO. 81: State all facts supporting your contention that Paula Thomas breached her obligations under a Confidentiality and Intellectual Property Agreement.

*Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC*, 273 FRD 367, 369 (SDNY 2010); *Lucero v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D. Kan. 2006).

On or about March 3, 2015, Paula Thomas gave access to TW's servers to Tony Jay and one "Joshua". In addition, since her separation, THOMAS has made use of confidential company information to contact at least two purchasers of company product, and perhaps others, and to dissuade them from completing or making orders or otherwise doing business with the company. These include representatives of JUST ONE EYE and also Elena Davidyants at TSUM, and others yet to be identified. In addition, THOMAS has attempted to recruit away at least one sales representative or employee. In addition, THOMAS has taken and made use of images belonging to the company in her social media, laying claims to authorship for the items depicted, but also violating copyright and making use of company information and data.

SPECIAL INTERROGATORY NO. 82: Identify all persons by name, address, and telephone number with knowledge of the facts supporting your contention that Paula Thomas breached her obligations under a Confidentiality and Intellectual Property Agreement.

Jene Park; John Hanna; David Schnider; Moldy Rafols; THOMAS; Elena Davidyants; [illegible] 54 [illegible]

SPECIAL INTERROGATORY NO. 83: Identify all DOCUMENTS supporting your contention that Paula Thomas breached her obligations under a Confidentiality and Intellectual Property Agreement.

      6 ... 'd t .... or fi ted in response to Special Interrogatories 51, 57, 60, 63, 69, 73, 77 &
80, above. See Employment Agreement with all addenda and exhibits; see also operating
agreement with all exhibits and addenda. See Ed Smith March 3, 2015 email relating to
furnishing passwords to Tony Jay and one "Joshua".

**SPECIAL INTERROGATORY NO. 84:** State all facts supporting your contention that Paula
Thomas gave passwords to the company server to unauthorized persons.

    *Objection:* The interrogatory is overly broad and overly burdensome and oppressive as to
scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies
Trading (Ireland), Ltd. v. Coventry First, LLC,* 273 FRD 367, 369 (SDNY 2010); *Lucero
v. Valdez,* 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead,* 236 FRD 667, 674 (D.
Kan. 2006).

    On March 3, 2015, Paula Thomas instructed the company's outside IT specialist Ed Smith
to furnish the passwords to Tony Jay and one "Joshua".

**SPECIAL INTERROGATORY NO. 85:** Identify all persons by name, address, and telephone
number with knowledge of the facts supporting your contention that Paula Thomas gave
passwords to the company server to unauthorized persons.

    Paula Thomas; John Hanna; Jene Park; Meldy Rafols; Ed Smith; Tony Jay; "Joshua"

**SPECIAL INTERROGATORY NO. 86:** Identify all DOCUMENTS supporting your
contention that Paula Thomas gave passwords to the company server to unauthorized persons.

    Ed Smith's March 3, 2015 e-mail to Tony Jay and Joshua (last name unknown)

**SPECIAL INTERROGATORY NO. 87:** Identify each unauthorized person by name, address,
and telephone number to whom you contend Paula Thomas gave passwords to the company
server, and the dates on which each such incident occurred.

    Tony Jay and Joshua (last name unknown).

**SPECIAL INTERROGATORY NO. 88:** Identify all contracts that you contend Thomas
Wylde, LLC and Paula Thomas entered into including all alleged written, oral and implied in
fact contracts, and the dates each such contract was made.

    Thomas Wylde, LLC company operating agreement could possibly be deemed a contract
for the purposes of this interrogatory. The Thomas Employment Agreement, with its
attachments, and which Plaintiff Thomas already has, is a contract between these parties.
The oral agreement of all officers, including Paula Thomas, to reduce voluntarily their
salaries by 1/3 is yet another contract. There were also various agreements including a
clawback agreement, a membership interest purchase agreement, articles of dissolution
for Thomas Wylde Holdings, LLC, and a written consent to assumption of PDTW's
liabilities by THOMAS that may also be relevant. THOMAS has each of these and may
refer to them for any additional information.

    Attending each of these were duties of good faith and fair dealing. In this particular
context in which millions of dollars of investor money were solicited and received, Paula
... ... ... W ... d d... d ... ... ... ... ... ... ...
transition of business from PDTW, LLC to Thomas Wylde, LLC by, far example,
making vexatious claims to ownership of domain names, or veiled threats concerning the
leasehold, or claims to things allegedly inside PDTW, LLC, that are necessary to the

1  continuation of the brand under Thomas Wylde, LLC.

2  Respondent's responses to Form Interrogatories Nos. 50.1 -- 50.6 inclusive are
   incorporated herein by this reference.

3  **SPECIAL INTERROGATORY NO. 89:** Identify all persons by name, address, and telephone
4  number who participated in the decision to terminate Paula Thomas.

5  John Hanna, Jene Park

6  **SPECIAL INTERROGATORY NO. 90:** Identify all reasons why you terminated Paula
   Thomas' employment.
7
8  *See* response to Employment Form Interrogatory No. 201.1(a) in particular but also all
   other responses to the series 201 Employment Form Interrogatories above, *see also*
9  Special Interrogatory No. 55, above, which responses are incorporated herein by this
   reference as if fully set forth.

10 **SPECIAL INTERROGATORY NO. 91:** Identify all DOCUMENTS that you relied upon in
   deciding to terminate Paula Thomas' employment.
11
12 *See* response to Employment Form Interrogatory No. 201.1(d) in particular but also all
   other responses to the series 201 Employment Form Interrogatories and documents
13 identified, *see also* response to Special Interrogatory No. 83, above, which responses are
   incorporated herein by this reference as if fully set forth.

14 **SPECIAL INTERROGATORY NO. 92:** State all facts supporting your contention that Paula
   Thomas was not disabled during her employment with Thomas Wylde, LLC.
15
16 **Objection:** The interrogatory is overly broad and overly burdensome and oppressive as to
   scope particularly when calling for "all facts". *See Ritchie Risk-Linked Strategies*
17 *Trading (Ireland), Ltd. v. Coventry First, LLC*, 273 FRD 367, 369 (SDNY 2010); *Lucero*
   *v. Valdez*, 240 FRD 591, 594 (DNM 2007); *Moses v. Halstead*, 236 FRD 667, 674 (D.
18 Kan. 2006).

19 At no time during THOMAS' employment with the company has the company been in
   possession of any facts to indicate that she was disabled. If THOMAS was secretly
20 disabled during any period in which she was employed by the company, she kept that fact
   to herself. The impression given was that of an obstinate refusal to accept a new situation
21 in which she would have anyone above her and instead would insist upon continuing with
   those behavioral patterns which drove PDTW, LLC and herself, into insolvency and the
22 brink of failure. Having no facts to suggest that Paula Thomas was disabled during her
   period of employment, the company therefore contends that she was not disabled during
23 that period. The first time Respondent ever heard of any alleged disability was when
   served with the complaint in this action. Not even those draft settlement documents
24 prepared by THOMAS' prior counsel in late April and early May mention disability. No
   communication from any of her prior counsel asserts a disability. No communication
25 from present counsel asserts a disability until it is asserted in the original complaint in
   this action.

26 **SPECIAL INTERROGATORY NO. 93:** Identify all persons by name, address, and telephone
   [illegible faded line]

28 *See* response to Special Interrogatory No. 92. John Hanna, Jene Park, Meldy Rafols,
   David Schrader, Yoonsung Bae.

SPECIAL INTERROGATORY NO. 94: Identify all DOCUMENTS supporting your contention that Paula Thomas was not disabled during her employment with Thomas Wylde, LLC.

> *Objection:* The interrogatory asks respondent to prove a negative, essentially. It is the absence of documents as to THOMAS' disability during any time period that is relevant. Otherwise, respondent can only answer that the universe of documents suggesting no disability is vast and necessarily includes such things as documents involving THOMAS' vacation from mid-December to mid-January, documents to be discovered demonstrating what she said to third parties during relevant time periods, her medical records, what she did at and outside of work during the relevant time periods, etc. Thus, the interrogatory is unduly burdensome and overly broad. Discovery is ongoing and Respondent expects to receive proofs of whatever sort that THOMAS is not now and never was during her period of employment suffering from a disability
>
> Among the documents responsive will be draft settlement documents prepared by THOMAS' counsel in late April and early May as well as all correspondence from Olivia Goodkin and Michael Crain, none of which mentions disability, like any other document anywhere to Respondent's knowledge during that time period.

SPECIAL INTERROGATORY NO. 95: Identify all employment benefits provided for Paula Thomas by Thomas Wylde, LLC, including but not limited to retirement plan, car allowance, cellphone allowance and insurance benefits, and identify the monthly value of each such benefit.

> *Objection:* The interrogatory is compound. In addition, THOMAS' attorneys are already in possession of materials from which they can ascertain the desired information. The interrogatory is therefore unduly burdensome and interposed solely to harass or annoy or to increase the cost of litigation.

SPECIAL INTERROGATORY NO. 96: Identify all employment benefits provided for John Hanna by Thomas Wylde, LLC, including but not limited to retirement plan, car allowance, cellphone allowance, and insurance benefits, and identify the monthly value of each such benefit.

> *Objection:* The interrogatory is compound. In addition, THOMAS' attorneys are already in possession of materials from which they can ascertain the desired information. The interrogatory is therefore unduly burdensome and interposed solely to harass or annoy or to increase the cost of litigation.

SPECIAL INTERROGATORY NO. 97: Identify all employment benefits provided for Jene Park by Thomas Wylde, LLC, including but not limited to retirement plan, car allowance, cell phone allowance, and insurance benefits, and identify the monthly value of each such benefit.

> *Objection:* The interrogatory is compound. In addition, THOMAS' attorneys are already in possession of materials from which they can ascertain the desired information. The interrogatory is therefore unduly burdensome and interposed solely to harass or annoy or to increase the cost of litigation.

SPECIAL INTERROGATORY NO. 98: Identify all inventory of the archive pieces designed by Paula Thomas that are in storage.

a design team. Paula Thomas led the design team but cannot be said to have single-handedly designed anything. In addition, THOMAS is in possession of PDTW, LLC's books and records and thus has at least as good, if not better, access to any and all lists of

1        archive pieces and can ascertain the desired information.

2    **SPECIAL INTERROGATORY NO. 99:** Identify all stores in which Thomas Wylde brand
     clothing is now carried by name, address, and telephone number.

3

4        *Objection:* The interrogatory calls for confidential business information and/or trade
         secret information protected by privilege or other law. It is possible that the company will
5        turn this material over to counsel for plaintiffs once an appropriate protective order is in
         place providing for "Attorneys' Eyes Only" protection. However, the request asks for
6        material that is irrelevant and the request is not reasonably calculated to lead to
         admissible evidence.

7    **SPECIAL INTERROGATORY NO. 100:** Identify all distributors of Thomas Wylde, LLC
     products by name, address, and telephone number.

8

9        *Objection:* The interrogatory calls for confidential business information and/or trade
         secret information protected by privilege or other law. It is possible that the company will
10       turn this material over to counsel for plaintiffs once an appropriate protective order is in
         place providing for "Attorneys' Eyes Only" protection. However, the request also asks for
11       material that is irrelevant and the request is not reasonably calculated to lead to
         admissible evidence.

12   **SPECIAL INTERROGATORY NO. 101:** Identify all existing and prospective licensing
     agreements for Thomas Wylde, LLC for both first line and second line products, including but
13   not limited to clothing, eyewear, denim, fragrance, jewelry, and furniture.

14       *Objection:* The interrogatory calls for confidential business information and/or trade
         secret information protected by privilege or other law. It is possible that the company will
15       turn this material over to counsel for plaintiffs once an appropriate protective order is in
         place providing for "Attorneys' Eyes Only" protection. However, the interrogatory also
16       asks for material that is irrelevant and the request is not reasonably calculated to lead to
         admissible evidence.

17

18   **SPECIAL INTERROGATORY NO. 102:** Identify all of PDTW, LLC's customers by name,
     address, telephone number, and contact person, including but not limited to stores and private
19   clients.

20       *Objection:* This information is in the hands of Plaintiff PDTW, LLC which is controlled
         by Plaintiff THOMAS. The information can be obtained more easily and more cheaply by
21       the plaintiffs. The request is therefore unduly burdensome and interposed nearly to harass
         and annoy and otherwise increase the costs of litigation.

22   **SPECIAL INTERROGATORY NO. 103:** Identify all of PDTW, LLC's vendors at any time by
     name, address, phone number, email address, name of contact person, and type of services
23   performed and/or goods sold.

24       *Objection:* This information is in the hands of Plaintiff PDTW, LLC which is controlled
         by Plaintiff THOMAS. The information can be obtained more easily and more cheaply by
25       the plaintiffs. The request is therefore unduly burdensome and interposed nearly to harass
         and annoy and otherwise increase the costs of litigation.

26

27   D. RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS
     AND TANGIBLE THINGS. GENERAL

28   *General Objection to Place of Production:* Each and every request for production is objected to
     inasmuch as the place of production is designated as the offices of Kring & Chung, LLP.

1 | Whatever will be made available will be made available at that place designated by Respondent.

2 | **REQUEST NO. 1:** All of Thomas Wylde, LLC's monthly bank statements from the date each
account was opened until the present date.

3 |

4 | *Objection:* The request calls for confidential business information inasmuch as vendors,
suppliers, and customers are indicated. This material will be supplied only under an
5 | appropriate protective order, especially given plaintiff Thomas' history of contacting the
company's trading partners and attempting to disrupt company business. The protective
6 | order must provide for "Attorneys' Eyes Only" ("AEO") protection. Most or all of these
materials have now been provided as Highly Confidential — AEO material.

7 | **REQUEST NO. 2:** All check images for checks written from Thomas Wylde, LLC's bank
account from the date each account was opened until the present date.

8 |

9 | *Objection:* The request is unduly burdensome, cumulative, and redundant and interposed
to harass and annoy the company and otherwise to increase the costs of this litigation. The
10 | company will reconsider its position once an appropriate protective order is in place, but
only to the extent Paula Thomas limits her requests to those checks having a bearing upon
11 | these proceedings. Many check images have nonetheless been furnished already to
THOMAS' counsel.

12 | **REQUEST NO. 3:** All financial statements of Thomas Wylde, LLC from the date the company
was formed until the present date, including but not limited to monthly and yearly profit and loss
13 | statements, monthly and yearly income and expense statements, and monthly and yearly balance
sheets.

14 |

15 | The company will supply its latest QuickBooks file once THOMAS indicates that she
agrees that it will be treated as "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
16 | ONLY" material under the protective order, whether signed by the court yet or not. From
this THOMAS may ascertain the desired information. It is understood that the
17 | QuickBooks file may not be finalized and may be subject to adjustments, corrections, and
revisions. To the extent the request calls for documents that do not exist, Respondent
18 | *OBJECTS.*

19 | **REQUEST NO. 4:** All checking account ledgers for Thomas Wylde, LLC from the date each
account was opened until the present date.

20 | *Objection:* The request calls for confidential business information inasmuch as vendors,
suppliers, and customers are indicated. This material will be supplied only under an
21 | appropriate protective order, especially given plaintiff Thomas' history of contacting the
company's trading partners and attempting to disrupt company business. The protective
22 | order must provide for "Attorneys' Eyes Only" protection.

23 | The company will supply its latest QuickBooks file once THOMAS indicates that she
agrees that it will be treated as "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
24 | ONLY" material under the protective order, whether signed by the court yet or not. From
this THOMAS may ascertain the desired information. It is understood that the
25 | QuickBooks file may not be finalized and may be subject to adjustments, corrections, and
revisions.

26 |

27 | REQUEST NO. 5: [illegible]

28 | *Objection:* The request calls for confidential business information inasmuch as vendors,
suppliers, and customers are indicated. This material will be supplied only under an

appropriate protective order, especially given plaintiff Thomas' history of contacting the
_____ to discompany and attempting to disrupt its search business. The protective
order must provide for "Attorneys' Eyes Only" protection.

The company will supply its latest QuickBooks file once THOMAS indicates that she
agrees that it will be treated as "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES
ONLY" material under the protective order, whether signed by the court yet or not. From
this, THOMAS may ascertain the desired information. It is understood that the
QuickBooks file may not be finalized and may be subject to adjustments, corrections, and
revisions

**REQUEST NO. 6:** All loan agreements entered into by Thomas Wylde, LLC regarding loans
obtained by Thomas Wylde, LLC.

The requested material will be made available for copying and inspection. It is believed
that these materials have already been furnished -- Bates 00805 -- 00821.

**REQUEST NO. 7:** All loan agreements entered into by Thomas Wylde, LLC regarding loans
made by Thomas Wylde, LLC.

None.

**REQUEST NO. 8:** All DOCUMENTS regarding distributions made by Thomas Wylde, LLC to
any of its members.

None. The company has never made distributions to its members in its approximately 12
months of existence.

**REQUEST NO. 9:** All DOCUMENTS regarding the capital accounts of the members of
Thomas Wylde, LLC.

The requested material will be made available for copying and inspection.

**REQUEST NO. 10:** All lease agreements for the premises that Thomas Wylde, LLC currently
occupies.

These will be made available for inspection and copying.

**REQUEST NO. 11:** All sublease agreements for the premises that Thomas Wylde, LLC
currently occupies.

The requested material will be made available for copying and inspection, if any such
materials exist.

**REQUEST NO. 12:** All DOCUMENTS regarding capital contributions made by any member of
Thomas Wylde.

Plaintiff Thomas is already in receipt of the company operating agreement and its exhibits
which indicate original monetary capital contributions as well as amendments to the same
showing later capital contribution and unit issuance activity. She likewise has bank
statements indicating deposits of capital contributions as well as the later Amended
_____

**REQUEST NO. 13:** All DOCUMENTS regarding the repayment of loans obtained by Thomas
Wylde, LLC.

The requested material will be made available for copying and inspection. It is believed that THOMAS already has sufficient documentary evidence of loan repayments from bank statements supplied.

**REQUEST NO. 13:** All DOCUMENTS regarding the repayment of loans made by Thomas Wylde, LLC.

None.

**REQUEST NO. 15:** All DOCUMENTS regarding Thomas Wylde, LLC's payment of money to Michael L. Schiffman, M.D.

*Objection:* As phrased the request is overly burdensome. With the bank statements and other materials supplied, including answers to Special Interrogatories, plaintiff will have the ability to ascertain whatever it is they need. Otherwise, inasmuch as the obligation to Schiffman originates from a note signed by PDTW, LLC, and inasmuch as the litigation and settlement documents are readily accessible by PDTW, LLC, which is controlled by THOMAS, the request calls for material just as easily obtained by THOMAS from her own sources.

**REQUEST NO. 16:** All DOCUMENTS regarding Thomas Wylde, LLC's contention that PDTW, LLC owes Thomas Wylde, LLC, any money.

The requested material will be made available for copying and inspection.

**REQUEST NO. 17:** All DOCUMENTS regarding Thomas Wylde, LLC's contention that PDTW, LLC borrowed any money from Thomas Wylde, LLC.

The requested material will be made available for copying and inspection.

**REQUEST NO. 18:** All DOCUMENTS regarding Thomas Wylde, LLC's contention that PDTW, LLC agreed to repay any money to Thomas Wylde, LLC.

The requested material will be made available for copying and inspection.

**REQUEST NO. 19:** All DOCUMENTS regarding checks that Thomas Wylde, LLC or any of its employees wrote from PDTW, LLC's bank accounts to pay for Thomas Wylde, LLC's debts.

None. Respondent will answer "none" to all such questions inasmuch as they posit Thomas Wylde, LLC or any of its employees as writing checks or taking or paying money from PDTW, LLC's bank accounts. Any current employees of Thomas Wylde, LLC who participated in any financial transaction involving a PDTW, LLC, account, did so as a representative of PDTW, LLC, and as part of an agreed-upon plan involving a transition of business operations from PDTW, LLC to Thomas Wylde, LLC, and with the explicit approval and participation of THOMAS. In any event, PDTW, LLC, has the greater access to its own accounts and banks and therefore bank statements and check images, and thus Respondent *OBJECTS* to the request.

**REQUEST NO. 20:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from PDTW, LLC's bank accounts to any companies owned in whole or in part [illegible]

None. *See* response to Request No. 19, *supra.*

**REQUEST NO. 21:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from PDTW, LLC's bank accounts to any companies owned in whole or in part by either Tasha Hess or any of her friends or family, including but not limited to Shot in the Armoire, LLC.

None. See response to Request No. 19, *supra*, and note that, to Respondent's knowledge, there are no payments to Tasha Hess or any of her friends or family or to Shot in the Armoire, LLC, from PDTW, LLC.

**REQUEST NO. 22:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from PDTW, LLC's bank accounts to any companies owned in whole or in part by either Jene Park or any of her friends or family.

None. *Objection:* To the extent current employees of Thomas Wylde, LLC may have participated in paying PDTW, LLC's creditors, they did so as representatives of PDTW, LLC. See response to Request No. 19, *supra*. In addition, plaintiff are themselves in possession of adequate documents allowing them to ascertain whatever it is that they wish to know.

**REQUEST NO. 23:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from PDTW, LLC's bank accounts to any employee of Thomas Wylde, LLC other than Paula Thomas, including but not limited to John Hanna and Jene Park.

None. *See* response to Request No. 19, *supra*.

**REQUEST NO. 24:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from Thomas Wylde, LLC's bank accounts to any companies owned in whole or in part by either John Hanna or any of his friends or family, including but not limited to H&H Fashion, LLC.

The requested material will be made available for copying and inspection. It is believed that THOMAS has already received responsive documents.

**REQUEST NO. 25:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from Thomas Wylde, LLC's bank accounts to any companies owned in whole or in part by either Tasha Hess or any of her friends or family, including but not limited to Shot in the Armoire, LLC.

None.

**REQUEST NO. 26:** All DOCUMENTS regarding money that Thomas Wylde, LLC or any of its employees paid from Thomas Wylde, LLC's bank accounts to any companies owned in whole or in part by either Jene Park or any of her friends or family.

The requested material will be made available for copying and inspection.

**REQUEST NO. 27:** All DOCUMENTS regarding correspondence between Paula Thomas and any employee of Thomas Wylde, LLC regarding writing checks or making payments out of PDTW, LLC's bank account for any reason, including but not limited to emails and texts.

*Objection:* The request is overly burdensome inasmuch as it requests to reveal to which . . . . . . . . . . . . . . . . . . . . . . . . . .

*See* response to Request No. 19, *supra*.

**REQUEST NO. 28:** All DOCUMENTS provided by Thomas Wylde, LLC to its members from

1.  the date of the company's inception to the present.

2.      *Objection:* The request is overly burdensome inasmuch as it requests material to which
        THOMAS herself has equal access. All such things have been supplied to THOMAS as a
3.      member. Inspection and copying will be permitted of company books, however.

4.  **REQUEST NO. 29:** All DOCUMENTS regarding the value of the membership units of Thomas
    Wylde, LLC at all times from the date of the company's inception to the present.

5.

6.      The requested material will be made available for copying and inspection. It is believed
        that THOMAS is already in possession of all such DOCUMENTS. It is not believed that
7.      no such documents exist save only those establishing capital account balances for tax
        purposes. No known documents establish any sort of "value" of membership units.

8.  **REQUEST NO. 30:** All DOCUMENTS regarding the value of Thomas Wylde, LLC at all times
    from the date of the company's inception to the present.

9.

10.     *Objection:* There are no current appraisals, and Plaintiff Thomas already is in possession
        of whatever documents she may need to make rough estimations of value under one or
        more of the various business appraisal methods.

11.

12. **REQUEST NO. 31:** All federal and state tax returns of Thomas Wylde, LLC from the date of
    the company's inception to the present.

13.     *Objection:* These materials have already been supplied to THOMAS.

14.     To the extent not already provided, the requested material will be made available for
        copying and inspection. It is believed that THOMAS is already in possession of all such
15.     DOCUMENTS.

16. **REQUEST NO. 32:** All DOCUMENTS regarding Thomas Wylde, LLC's purchase of assets
    from PJTW, LLC and/or Paula Thomas, including but not limited to tangible assets, website
17. domain names, intellectual property, furniture, computers, artwork, inventory, equipment, and
    accounts receivable.

18.

19.     The requested material will be made available for copying and inspection. It is believed
        that THOMAS is already in possession of all such DOCUMENTS.

20. **REQUEST NO. 33:** All DOCUMENTS regarding Thomas Wylde, LLC's formation, including
    but not limited all versions of the operating agreement and initial sale of membership units.

21.

22.     *Objection:* These DOCUMENTS are either already in THOMAS' possession or, in the
        case of the articles of organization, are easily and immediately available to her via the
        California Secretary of State's website.

23.

24. **REQUEST NO. 34:** All DOCUMENTS reflecting consideration that John Hanna and Jene Park
    paid for their membership units in Thomas Wylde, LLC.

25.     *Objection:* A requirement that Respondent produce the universe of "all DOCUMENTS"
        conceivably responsive is unduly burdensome and interposed merely to harass or annoy
26.     or increase the costs of this litigation.

27.     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Exhibit B to the company operating agreement, which she has, verify the monetary
28.     amounts paid in by each member in exchange for their membership units.

**REQUEST NO. 35:** All DOCUMENTS regarding the sale of membership units in Thomas Wylde, LLC at any time.

THOMAS is in possession of the company's operating agreement as well as those indices and consent forms relating to the company's recent issuance of an additional 3,300 membership units. THOMAS is also in possession of the final documents, including the Amended Exhibit B, showing post-transaction holdings.

To the extent not already in THOMAS' possession, the requested material (if any) will be made available for copying and inspection.

**REQUEST NO. 36:** All K-1 statements issued by Thomas Wylde, LLC to its members from the date the company was formed to the present.

The requested material will be made available for copying and inspection.

**REQUEST NO. 37:** All credit card statements for credit cards held by Thomas Wylde, LLC from the date the company was started to the present.

The requested material will be made available for copying and inspection.

**REQUEST NO. 38:** All DOCUMENTS regarding expense reimbursements submitted by John Hanna to Thomas Wylde, LLC, including but not limited to all expense reimbursement forms, all supporting documentation submitted therewith (including but not limited to credit card statements, invoices, hotel folios, and receipts), and all payments made by Thomas Wylde, LLC for the same.

The requested material will be made available for copying and inspection.

**REQUEST NO. 39:** All DOCUMENTS regarding expense reimbursements submitted by Jene Park to Thomas Wylde, LLC, including but not limited to all expense reimbursement forms, all supporting documentation submitted therewith (including but not limited to credit card statements, invoices, hotel folios, and receipts), and all payments made by Thomas Wylde, LLC for the same.

The requested material will be made available for copying and inspection.

**REQUEST NO. 40:** All DOCUMENTS regarding payroll at Thomas Wylde, LLC from the date the Company was formed until the present, including but not limited to copies of checks or direct deposits made for officer, director and employee compensation and reflecting the dates of each such payment.

The requested material will be made available for copying and inspection to the extent Thomas Wylde, LLC, is in possession of the same. It is believed that THOMAS is already in possession of sufficient accounting and bank statement information from which to ascertain whatever information is desired.

**REQUEST NO. 41:** All DOCUMENTS regarding payments made by Thomas Wylde, LLC to vendors located in South Korea from the date the company was formed until the present, including but not limited to copies of checks and wire transfers made, purchase orders and invoices.

that THOMAS is already in possession of sufficient accounting and bank statement information from which to ascertain whatever information is desired.

1  **REQUEST NO. 42:** All supporting DOCUMENTS regarding the "advertising and promotion"
2  money spent by Thomas Wylde, LLC from the date the company was formed until the present as
   reflected on its profit and loss statements.

3      The requested material will be made available for copying and inspection.

4  **REQUEST NO. 43:** All supporting DOCUMENTS regarding the "website" money spent by
5  Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
   profit and loss statements.

6      The requested material will be made available for copying and inspection.

7  **REQUEST NO. 44:** All supporting DOCUMENTS regarding the "commission" money spent by
8  Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
   profit and loss statements.

9      The requested material will be made available for copying and inspection.

10  **REQUEST NO. 45:** All supporting DOCUMENTS regarding the "other employee benefits"
11  money spent by Thomas Wylde, LLC from the date the company was formed until the present, as
    reflected on its profit and loss statements.

12     The requested material will be made available for copying and inspection.

13  **REQUEST NO. 46:** All supporting DOCUMENTS regarding the "gifts" money spent by
14  Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
    profit and loss statements.

15     The requested material will be made available for copying and inspection.

16  **REQUEST NO. 47:** All supporting DOCUMENTS regarding the "photoshoot" money spent by
17  Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
    profit and loss statements.

18     The requested material will be made available for copying and inspection.

19  **REQUEST NO. 48:** All supporting DOCUMENTS regarding the "samples" money spent by
20  Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
    profit and loss statements.

21     The requested material will be made available for copying and inspection.

22  **REQUEST NO. 49:** All supporting DOCUMENTS regarding the "reference and materials"
23  money spent by Thomas Wylde, LLC from the date the company was formed until the present, as
    reflected on its profit and loss statements.

24     The requested material will be made available for copying and inspection.

25  **REQUEST NO. 50.** All supporting DOCUMENTS regarding the "meals and entertainment"
26  money spent by Thomas Wylde, LLC from the date the company was formed until the present, as
    reflected on its profit and loss statements.

27     The requested material will be made available for copying and inspection.

28  **REQUEST NO. 51:** All supporting DOCUMENTS regarding the "pick & pack" money spent by
    Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its

1    profit and loss statements.

2         The requested material will be made available for copying and inspection.

3    **REQUEST NO. 52:** All supporting DOCUMENTS regarding the "outside services" money
     spent by Thomas Wylde, LLC from the date the company was formed until the present, as
4    reflected on its profit and loss statements.

5         The requested material will be made available for copying and inspection. Materials may
     be redacted under where they contain attorney-client communications or attorney work
6    product.

7    **REQUEST NO. 53:** All supporting DOCUMENTS regarding the "professional fees" money
     spent by Thomas Wylde, LLC from the date the company was formed until the present, as
8    reflected on its profit and loss statements.

9         The requested material will be made available for copying and inspection. Materials may
     be redacted under where they contain attorney-client communications or attorney work
10   product.

11   **REQUEST NO. 54:** All supporting DOCUMENTS regarding the "public relations" money spent
     by Thomas Wylde, LLC from the date the company was formed until the present, as reflected on
12   its profit and loss statements.

13        The requested material will be made available for copying and inspection.

14   **REQUEST NO. 55:** All supporting DOCUMENTS regarding the "rent expense" money spent by
     Thomas Wylde, LLC from the date the company was formed until the present, as reflected on its
15   profit and loss statements.

16        The requested material will be made available for copying and inspection.

17   **REQUEST NO. 56:** All supporting DOCUMENTS regarding the "payroll – salaries" money
     spent by Thomas Wylde, LLC from the date the company was formed until the present, as
18   reflected on its profit and loss statements, including but not limited to the "management fee"
     money spent by Thomas Wylde under the "payroll – salaries" section.
19
          The requested material will be made available for copying and inspection.
20
     **REQUEST NO. 57:** All supporting DOCUMENTS regarding the "showroom expense" money
21   spent by Thomas Wylde, LLC from the date the company was formed until the present, as
     reflected on its profit and loss statements.
22
          The requested material will be made available for copying and inspection.
23
     **REQUEST NO. 58:** All supporting DOCUMENTS regarding the "fashion show" money spent
24   by Thomas Wylde, LLC from the date the company was formed until the present, as reflected on
     its profit and loss statements.
25
          The requested material will be made available for copying and inspection.
26

27   REQUEST ... profit and loss statements.

28
          The requested material will be made available for copying and inspection.

1
REQUEST NO. 60: All supporting DOCUMENTS regarding the "other expense-interest
2  expense" money spent by Thomas Wylde, LLC from the date the company was formed until the
present, as reflected on its profit and loss statements.
3
The requested material will be made available for copying and inspection.
4
REQUEST NO. 61: All DOCUMENTS regarding payments made by Thomas Wylde, LLC to
5  companies that John Hanna or any of his friends or family owns in whole or in part, including but
not limited to H&H Fashion, LLC.
6
The requested material will be made available for copying and inspection. It is believed
7  that THOMAS is already in possession of all such DOCUMENTS.

8  REQUEST NO. 62: All DOCUMENTS regarding payments made by Thomas Wylde, LLC to
companies that Tasha Hess or any of her friends or family owns in whole or in part, including but
9  not limited to Shot in the Armoire, LLC.

10     None.

11  REQUEST NO. 63: All DOCUMENTS regarding payments made by Thomas Wylde, LLC to
companies that Jene Park or any of her friends or family owns in whole or in part.
12
The requested material will be made available for copying and inspection. It is believed
13  that THOMAS is already in possession of all such DOCUMENTS.

14  REQUEST NO. 64: All DOCUMENTS regarding any advances made by Thomas Wylde, LLC
to any of its officers, directors or employees, and regarding any repayment of the same.
15
The requested material will be made available for copying and inspection. It is believed
16  that THOMAS is already in possession of all such DOCUMENTS.

17  REQUEST NO. 65: Paula Thomas' entire personnel file.

18     The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.
19
REQUEST NO. 66: All DOCUMENTS supporting your contention that Paula Thomas resigned
20  from Thomas Wylde, LLC.

21     The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.
22
REQUEST NO. 67: All DOCUMENTS supporting your contention that Paula Thomas
23  abandoned her job at Thomas Wylde, LLC.

24     The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.
25
REQUEST NO. 68: All DOCUMENTS supporting your contention that Thomas Wylde, LLC
26  terminated Paula Thomas for cause.

27     The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.
28
REQUEST NO. 69: All DOCUMENTS regarding the decision to terminate Paula Thomas from

1    Thomas Wylde, LLC.

2        The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
3

4    REQUEST NO. 70: All DOCUMENTS supporting your contention that Paula Thomas
     materially breached her employment agreement.

5        The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
6

7    REQUEST NO 71: All DOCUMENTS supporting your contention that Paula Thomas
     committed insubordination.

8        The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
9

10   REQUEST NO. 72: All DOCUMENTS supporting your contention that Paula Thomas refused
     to comply by company written rules, guidelines, policies or procedures.

11       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
12

13   REQUEST NO. 73: All DOCUMENTS reflecting written rules, guidelines, policies and
     procedures that were in effect at Thomas Wylde, LLC during Paula Thomas' employment,
14   including but not limited to all versions of the employee handbook, all revisions and addendums
     thereto, and all expense reimbursements guidelines, policies and procedures.

15       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
16

17   REQUEST NO. 74: All DOCUMENTS reflecting Paula Thomas' acknowledgment of receipt of
     Thomas Wylde, LLC's written rules, guidelines, policies and procedures.

18       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
19

20   REQUEST NO. 75: All DOCUMENTS supporting your contention that Paula Thomas' conduct
     during her employment with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC, its
21   members, and/or management.

22       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
23
     REQUEST NO. 76: All DOCUMENTS supporting your contention that Paula Thomas' conduct
     after her employment ended with Thomas Wylde, LLC caused damage to Thomas Wylde, LLC,
24   its members, and/or management.

25       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.
26

27   REQUEST NO.

28       The requested material will be made available for copying and inspection. It is believed
         that THOMAS is already in possession of all such DOCUMENTS.

REQUEST NO. 78: All DOCUMENTS supporting your contention that Paula Thomas breached her duty of loyalty to Thomas Wylde, LLC.

The requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

REQUEST NO. 79: All DOCUMENTS supporting your contention that Paula Thomas breached her obligation under a Confidentiality and Intellectual Property Agreement.

The requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

REQUEST NO. 80: All DOCUMENTS supporting your contention that Paula Thomas gave passwords to the company server to unauthorized persons.

The requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

REQUEST NO. 81: All DOCUMENTS regarding contracts entered into between Thomas Wylde, LLC and Paula Thomas, including all alleged written, oral, and implied in fact contracts.

THOMAS is already in possession of the Thomas Employment Agreement as well as the company operating agreement. The operating agreement may or may not be responsive but is already in THOMAS' possession, as amended, with all exhibits, as amended. It is believed that THOMAS is already in possession of these and all other contracts and contract modification DOCUMENTS. Any other responsive material will be made available for copying and inspection.

REQUEST NO. 82: All DOCUMENTS regarding contracts entered into between Thomas Wylde, LLC and PDTW, LLC. including all alleged written, oral, and implied in fact contracts.

The requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

REQUEST NO. 83: All DOCUMENTS regarding communications between attorneys Richard Byron Peddie and Olivia Goodkin regarding the facts giving rise to this lawsuit.

Objection: THOMAS has equal access to all such communications inasmuch as Olivia Goodkin is her attorney. The request is therefore unduly burdensome and interposed solely to harass and to increase the cost of this litigation. In addition, the request is vague and incomprehensible. Respondent cannot possibly know what "facts and circumstances" give rise to this lawsuit because respondent did not initiate this lawsuit and is not clairevoyant.

REQUEST NO. 84: All DOCUMENTS regarding communications between Paula Thomas and Jene Park regarding the facts and circumstances giving rise to this lawsuit, including but not limited to emails and texts.

Objection: THOMAS has equal access to all such communications inasmuch as she was a party to it. The request is therefore unduly burdensome and interposed solely to harass and to increase the cost of this litigation. In addition, the request is vague and incomprehensible. Respondent cannot possibly know what "facts and circumstances" give rise to this lawsuit because respondent did not initiate this lawsuit and is not clairevoyant.

1  **REQUEST NO. 85:** All DOCUMENTS regarding communications between Paula Thomas and
2  John Hanna regarding the facts and circumstances giving rise to this lawsuit, including but not
   limited to emails and texts.

3      *Objection:* THOMAS has equal access to all such communications inasmuch as she was a
       participant. The request is therefore unduly burdensome and interposed solely to harass
4      and to increase the cost of this litigation. In addition, the request is vague and
       incomprehensible. Respondent cannot possibly know what "facts and circumstances"
5      gave rise to this lawsuit because respondent did not initiate this lawsuit and is not
       clairvoyant.

6
   **REQUEST NO. 86:** All DOCUMENTS regarding communications between John Hanna and
7  Jene Park regarding the facts and circumstances giving rise to this lawsuit, including but not
   limited to emails and texts.

8
       *Objection:* The request is vague and incomprehensible. Respondent cannot possibly
9      know what "facts and circumstances" gave rise to this lawsuit because respondent did not
       initiate this lawsuit and is not clairvoyant.

10
   **REQUEST NO. 87:** All DOCUMENTS regarding communications made by Thomas Wylde,
11 LLC or any of its agents, representatives, officers, directors, or employees regarding Paula
   Thomas' separation of employment from the company, including but not limited to the press,
12 media, Thomas Wylde, LLC's members, employees, vendors, customers, social media, potential
   investors, and third parties.

13
       The requested material will be made available for copying and inspection. It is believed
14     that THOMAS is already in possession of all such DOCUMENTS. To the extent the
       request seeks material protected by the attorney-client privilege or work product doctrine,
15     Respondent *OBJECTS.*

16 **REQUEST NO. 88:** All DOCUMENTS that Thomas Wylde, LLC provided to potential
   investors, including but not limited to Stephen Choi, including but not limited to any and all
17 financial reports and business projections.

18     The requested material will be made available for copying and inspection. It is believed
       that THOMAS is already in possession of all such DOCUMENTS.
19
   **REQUEST NO. 89:** All DOCUMENTS regarding how Thomas Wylde, LLC plans to become
20 cash flow positive in the future, including but not limited to business development and marketing
   plans.
21
       The requested material will be made available for copying and inspection. It is believed
22     that THOMAS is already in possession of all such DOCUMENTS.

23 **REQUEST NO. 90:** John Hanna's entire personnel file.

24     The requested material will be made available for copying and inspection.

25 **REQUEST NO. 91:** Jene Park's entire personnel file.

26     The requested material will be made available for copying and inspection.

27 **REQUEST NO. 92:** All DOCUMENTS regarding accounts receivable of Thomas
   Wylde, LLC, including but not limited to an aged receivable ledger (over 90 days old).
28
       *Objection:* The request calls for confidential business information inasmuch as vendors,

suppliers, and customers are indicated. This material will be supplied only under an
appropriate protective order, especially given plaintiff Thomas' history of contacting the
company's trading partners and attempting to disrupt company business. The protective
order must provide for "Attorneys' Eyes Only" protection.

The company will supply its latest QuickBooks file once THOMAS indicates that she
agrees that it will be treated as "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
ONLY" material under the protective order. From this, THOMAS may ascertain the
desired information. It is understood that the QuickBooks file may not be finalized and
may be subject to adjustments, corrections, and revisions.

**REQUEST NO. 93:** All DOCUMENTS reflecting any aged accounts payable currently owed by
Thomas Wylde LLC (over 90 days old).

*Objection:* The request calls for confidential business information inasmuch as vendors,
suppliers, and customers are indicated. This material will be supplied only under an
appropriate protective order, especially given plaintiff Thomas' history of contacting the
company's trading partners and attempting to disrupt company business. The protective
order must provide for "Attorneys' Eyes Only" protection.

The company will supply its latest QuickBooks file once THOMAS indicates that she
agrees that it will be treated as "HIGHLY CONFIDENTIAL — ATTORNEYS' EYES
ONLY" material under the protective order. From this, THOMAS may ascertain the
desired information. It is understood that the QuickBooks file may not be finalized and
may be subject to adjustments, corrections, and revisions.

**REQUEST NO. 94:** All DOCUMENTS that reflect or refer to performance appraisals,
evaluations, and reviews of Paula Thomas by Thomas Wylde, LLC.

None.

**REQUEST NO. 95:** Any and all organizational charts (or the functional equivalent) that show
the chain of command at Thomas Wylde, LLC during Paula Thomas' employment.

The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.

**REQUEST NO. 96:** Any and all DOCUMENTS between Thomas Wylde, LLC's Human
Resources Department and Paula Thomas.

The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.

**REQUEST NO. 97:** Any and all DOCUMENTS that reflect or refer to Paula Thomas'
termination, separation from or discharge from Thomas Wylde, LLC.

The requested material will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS. To the extent the
request seeks material protected by the attorney client privilege or work product doctrine,
Respondent *OBJECTS.*

REQUEST NO. 98: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
off requests, requests for medical leave of absence, and doctor's notes

None.

1

REQUEST NO. 99: Any and all DOCUMENTS that reflect or refer to Paula Thomas' disability,
2 physical or mental health condition, medical issue, need for medical treatment, and/or need for
reasonable accommodation for the same, including but not limited to Paula Thomas'
3 communications with Thomas Wylde, LLC regarding the same, and including but not limited to
health care providers' communications with Thomas Wylde, LLC regarding the same.

4
None.
5

**REQUEST NO. 100:** Any and all DOCUMENTS that reflect or refer to any engagement of an
6 interactive process by Thomas Wylde, LLC with Paula Thomas.

7
The requested material will be made available for copying and inspection. It is believed
8 that THOMAS is already in possession of all such DOCUMENTS. That "interactive"
process" engaged in by Thomas Wylde, LLC, was an interactive negotiation involving
9 THOMAS and her counsel, Olivia Goodkin, on the one hand, and the company, on the
other, in order eventually to create a new position for her after she stated she would no
10 longer design and abdicated her position as Creative Director. (The process indeed
essentially began on or around Feb. 26, 2015, when company officers first met with
11 THOMAS and her counsel in an attempt to work out emerging issues related to
THOMAS.) The company engaged in this process to accommodate THOMAS' stated
12 desires and needs for a different position. It is believed THOMAS already has all such
DOCUMENTS as they involve e-mail communications and e-mail memorializations of
13 conversations between the parties and THOMAS was either copied or has access to all
such documents through her prior counsel Olivia Goodkin.

14 **REQUEST NO. 101:** All DOCUMENTS that Thomas Wylde, LLC relied upon to support Paula
Thomas' termination.
15
The requested material will be made available for copying and inspection. It is believed
16 that THOMAS is already in possession of all such DOCUMENTS.

17 **REQUEST NO. 102:** Any and all DOCUMENTS that reflect or refer to Paula Thomas' job
description and/or job duties with Thomas Wylde, LLC.
18
Plaintiff THOMAS is already in possession of the Thomas Employment Agreement and
19 also the company operating agreement, each with all attachments and exhibits. These
documents may be thought to "reflect or refer to" Thomas' job description or duties.
20 These documents are already in THOMAS' possession.

21 **REQUEST NO. 103:** Any and all DOCUMENTS that reflect or refer to any employment
benefits provided for Paula Thomas by Thomas Wylde, LLC, including but not limited to
22 retirement plan, car allowance, cellphone allowance, and insurance benefits.

23
Plaintiff THOMAS is already in possession of the Thomas Employment Agreement as
well as all documents related to benefits received. Respondent knows of no other
24 documents that are responsive. To the extent any such documents exist, they will be made
available for inspection and copying.
25

**REQUEST NO. 104:** Any and all non-privileged DOCUMENTS that reflect or refer to an
26 investigation conducted by Thomas Wylde, LLC in response to any of the claims made by Paula
27 . . . . . . . . . .

None.
28

**REQUEST NO. 105:** Any and all DOCUMENTS regarding notifications sent by Thomas

Wylde, LLC to its members of meetings to vote on matters requiring a vote of a supermajority of members for the terms of the operating agreement.

Plaintiff THOMAS is already in possession of the notice sent to company members requesting consent to issue additional membership units.

The requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

**REQUEST NO. 106:** Any and all DOCUMENTS reflecting the votes cast by Thomas Wylde, LLC's members regarding any matters requiring a vote of a supermajority of members under the terms of the operating agreement.

Plaintiff THOMAS is already in possession of the notice sent to company members requesting consent to issue additional membership units as well as all subsequent notices or other documents indicating that consent was granted by a supermajority of company members.

To the extent not already provided, the requested material will be made available for copying and inspection. It is believed that THOMAS is already in possession of all such DOCUMENTS.

**REQUEST NO. 107:** Any and all DOCUMENTS that reflect or refer to any communications made by Paula Thomas or anyone on her behalf to Thomas Wylde, LLC regarding the status of her ability or inability to return to work relating to a disability or physical or mental health condition.

None.

**REQUEST NO. 188:** Any and all DOCUMENTS that reflect or refer to any accommodation Thomas Wylde, LLC offered to Paula Thomas due to her disability or physical or mental health condition.

There are no such documents. The company did not know that THOMAS claimed or had a disability or mental health condition. Nevertheless, as described above the company sought to accommodate her stated desires for changes to her role within the company. Related documents were sent to THOMAS' counsel, Olivia Goodkin, from whom they may be obtained if not already in THOMAS' possession.

**REQUEST NO. 109:** Any and all DOCUMENTS that reflect or refer to any steps Thomas Wylde, LLC took to determine whether a reasonable accommodation could be provided for Paula Thomas' disability or physical or mental health condition.

*See* response to Request No. 108, above. It is not believed that there are any additional documents other than those documents already furnished under Request No. 108.

**REQUEST NO. 110:** Any and all DOCUMENTS that evidence or show that allowing Paula Thomas to take a temporary medical leave of absence would have caused an undue hardship on Thomas Wylde, LLC's operations.

Objection. The request is vague as to timeframes. Also, the request is irrelevant.

**REQUEST NO. 111:** Any and all DOCUMENTS that relate to, refer to or memorialize any assessment of Paula Thomas' performance of her job duties, including any DOCUMENTS containing praise or criticism of her job performance.

They _ _ _ _ _ will be made available for copying and inspection. It is believed
that THOMAS is already in possession of all such DOCUMENTS.

**REQUEST NO. 112:** Any and all insurance policies held by Thomas Wylde, LLC, under which
coverage may exist for the claims alleged in this lawsuit.

None.

**REQUEST NO. 113:** Any and all DOCUMENTS Thomas Wylde, LLC identified in response to
Plaintiffs First Set of Form Interrogatories served concurrently here with.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 114:** Any and all DOCUMENTS Thomas Wylde, LLC identified in response to
Plaintiffs First Set of Employment Form Interrogatories served concurrently herewith.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 115:** Any and all DOCUMENTS Thomas Wylde, LLC identified in response to
the First Set of Special Interrogatories served concurrently here with.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 116:** Any and all DOCUMENTS regarding correspondence between Giselle
Limtao and Jene Park between February 1 and April 30, 2015, including but not limited to
emails.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 117:** Any and all DOCUMENTS regarding correspondence between Giselle
Limtao and John Hanna between February 1 and April 30, 2015, including but not limited to
emails.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 118:** Any and all DOCUMENTS regarding correspondence between Amy Liu
and Jene Park between February 1 and April 30, 2015, including but not limited to emails.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 119:** Any and all DOCUMENTS regarding correspondence between Amy Liu
and John Hanna between February 1 and April 30, 2015, including but not limited to emails.

To the extent such materials exist and are in the possession of respondent, they will be
made available for inspection and copying.

**REQUEST NO. 120:** All invoices and purchase orders between Thomas Wylde, LLC and a
Korean vendor by the name of Sun Moon.

1    To the extent such materials exist and are in the possession of respondent, they will be
   made available for inspection and copying.
2

3 REQUEST NO. 121: All invoices and purchase orders between Thomas Wylde, LLC and a
   Korean vendor by name of Dada.

4    To the extent such materials exist and are in the possession of respondent, they will be
   made available for inspection and copying.
5

6 REQUEST NO. 122: All DOCUMENTS regarding correspondence between Jene Park and a
   Korean vendor by the name of Sun Moon of any of Sun Moon's officers, managers, employees or
7    agents (including but not limited to Eric Won), including but not limited to emails and texts.

8    To the extent such materials exist and are in the possession of respondent, they will be
   made available for inspection and copying.

9 REQUEST NO. 123: All DOCUMENTS regarding correspondence between Jene Park and a
   Korean vendor by the name of Dada or any of Dada's officers, managers, employees or agents
10    (including but not limited to Alex Park), including but not limited to emails and texts.

11    To the extent such materials exist and are in the possession of respondent, they will be
   made available for inspection and copying.
12

13 REQUEST NO. 124: All invoices and purchase orders between Thomas Wylde, LLC and a
   Korean vendor by the name of The Pic and Pac Company.

14    None.

15 REQUEST NO. 125: All DOCUMENTS regarding correspondence between Jene Park and a
   Korean vendor by the name of The Pic and Pac Company or any of The Pic and Pac Company's
16    officers, managers, employees or agents (including but not limited to Jene Park's brother),
   including but not limited to emails and texts.
17

   None. Respondent knows of no company called "The Pic and Pac Company".
18

19 REQUEST NO. 126: Any and all press or media materials on Thomas Wylde, LLC, Paula
   Thomas, and/or Jene Park.

20    *Objection:* These third party materials that have been published are just as easily
   obtainable by THOMAS as by respondent. The request is therefore overly burdensome.
21

22    To the extent not readily obtainable elsewhere, and to the extent in Respondent's
   possession, the requested material will be made available for copying and inspection. It is
   believed that THOMAS is already in possession of all such DOCUMENTS.
23

24 REQUEST NO. 127: Any and all campaign images created by or on behalf of Thomas Wylde,
   LLC.

25    To the extent such materials exist and are not readily obtainable elsewhere and are in
   Respondent's possession, they will be made available for inspection and copying.
26

27 REQUEST NO. 128: Any and all press or public group of the material contained in the

   *Objection:* These materials are already in the hands of THOMAS.
28

   To the extent such materials exist that cannot be accessed readily by THOMAS through

other avenues and are also in Respondent's possession, they will be made available for
inspection on less onerous terms as THOMAS identifies them with reasonable particularity
such that the burden in locating them is reasonable.

**REQUEST NO. 129:** All DOCUMENTS reflecting inventory lists of the archive pieces
designed by Paula Thomas that are in storage.

None. The company knows of no archive pieces "designed by Paula Thomas" that are in
storage. The company knows only of archive pieces designed by design teams led by
THOMAS while at PDTW, LLC and Thomas Wylde, LLC. To the extent the request
asks for a list of things that THOMAS now claims were created by her while at PDTW,
LLC, Respondent OBJECTS: THOMAS would have at least as convenient access to such
things because she has the PDTW records.

**REQUEST NO. 130:** All DOCUMENTS reflecting a list of all vendors used by Thomas Wylde,
LLC, including names, addresses, contact information, and description of services.

*Objection:* THOMAS has utilized such information abusively since separation. This
information also is not relevant and consists of confidential business information and/or
trade secret information subject to privilege and/or protection. This information will be
provided, if it exists, under a suitable protective order affording "Attorneys' Eyes Only"
protection.

**REQUEST NO. 131:** All DOCUMENTS reflecting a list of all stores in which Thomas Wylde
brand clothing is now carried.

*Objection:* THOMAS has utilized such information abusively since separation. This
information also is not relevant and consists of confidential business information and/or
trade secret information subject to privilege and/or protection. This information will be
provided, if it exists, under a suitable protective order affording "Attorneys' Eyes Only"
protection.

**REQUEST NO. 132:** All DOCUMENTS regarding correspondence between John Hanna and
Meldy Raffia from the date of formation of Thomas Wylde, LLC to the present, including but
not limited to emails and text messages.

To the extent they exist, these materials will be made available for inspection and
copying.

**REQUEST NO. 133:** All DOCUMENTS regarding correspondence between Jene Park and
Yonhsing Bae from the date of formation of Thomas Wylde, LLC to the present, including but
not limited to emails and text messages.

To the extent they exist, these materials will be made available for inspection and
copying.

**REQUEST NO. 134:** All DOCUMENTS regarding existing and prospective licensing
agreements for Thomas Wylde, LLC for both first line and second line products, including but
not limited to clothing, eyewear, denim, fragrance, jewelry, and furniture.

*Objection:* THOMAS has utilized such information abusively since separation. This
information also is not relevant and consists of confidential business information and/or
provided, if it exists, under a suitable protective order affording "Attorneys' Eyes Only"
protection.

REQUEST NO. 135: All DOCUMENTS regarding existing and prospective distribution ............ for Thomas Wylde, LLC

Objection: THOMAS has utilized such information abusively since separation. This information also is not relevant and consists of confidential business information and/or trade secret information subject to privilege and/or protection. This information will be provided, if it exists, under a suitable protective order affording "Attorneys' Eyes Only" protection.

REQUEST NO. 136: PDTW, LLC's entire customer list, including but not limited to stores and private clients, and including but not limited to name, address, phone number, email address, and name of contact person.

Objection: THOMAS is herself in control of PDTW, LLC, and has this information or has at least as good access to it as respondent. The request is therefore unduly burdensome and interposed merely to harass and increase the cost of this litigation.

REQUEST NO. 137: PDTW, LLC's entire vendor list, including but not limited to name, address, phone number, email address, name of contact person, and type of services performed and/or goods sold.

Objection: THOMAS is herself in control of PDTW, LLC, and has this information or has at least as good access to it as respondent. The request is therefore unduly burdensome and interposed merely to harass and increase the cost of this litigation.

## V. RESPONSES TO REQUESTS FOR ADMISSION, SET ONE

REQUEST FOR ADMISSION NO. 1: Admit that PDTW, LLC does not owe Thomas Wylde, LLC any money.

Denied.

REQUEST FOR ADMISSION NO. 2: Admit that Paula Thomas does not owe Thomas Wylde, LLC any money.

Denied. At the very least, THOMAS has failed to pay for certain contractors involved in moving furniture to her place of residence in Palm Springs for a photo shoot. THOMAS agreed to pay for this expense and has not done so. Nor has she returned certain company items. In addition, Thomas Wylde, LLC, has damages claims against THOMAS. Furthermore, having brought, in her own name, litigation that is totally frivolous, vexatious, and groundless, Paula Thomas is liable for damages. Thomas Wylde, LLC, also has veil-piercer or alter ego or civil conspiracy claims against THOMAS for how she has manipulated PDTW, LLC, into making false or frivolous, vexatious, and/or groundless claims and otherwise into disavowing its debts to Thomas Wylde, LLC and otherwise into claiming that things that, by agreement, were to pass to Thomas Wylde, LLC, somehow still belong to PDTW, LLC.

REQUEST FOR ADMISSION NO. 3: Admit that Thomas Wylde, LLC used money from PDTW, LLC's bank accounts to pay for Thomas Wylde, LLC's debts.

Denied. As noted above in responses to other discovery requests, certain individuals ........................................................................
Wylde, LLC, from PDTW, LLC's accounts for any purpose. Rather, those individuals authorized under the plan of transition — and specifically authorized by THOMAS or other PDTW, LLC officers — fulfilled their functions and paid debts in the ordinary

1    course. Any Thomas Wylde, LLC debts that were effectively paid for out of PDTW,
     LLC's accounts (if any) were paid as partial repayment to Thomas Wylde, LLC of those
2    loans and other debts owed by PDTW, LLC, to Thomas Wylde, LLC. Thus, all further
     requests for admission that suggest that Thomas Wylde (or any employee or other
3    representative of it), paid or took money or issued checks from PDTW, LLC's bank
     accounts will be denied.

4

**REQUEST FOR ADMISSION NO. 4:** Admit that Paula Thomas did not authorize Thomas
5    Wylde, LLC to use money from PDTW, LLC's bank accounts to pay for Thomas Wylde, LLC's
     debts.

6

         Denied.
7

**REQUEST FOR ADMISSION NO. 5:** Admit that Thomas Wylde, LLC paid money from
8    PDTW, LLC's bank accounts to companies owned in whole or in part by either John Hanna or
     his friends or family, including but not limited to H&H Fashion, LLC.
9

         Denied. As noted elsewhere any monies paid to H&H Fashion, LLC, were paid as part of
10   Ms. Hanna's agreed-to compensation. THOMAS also caused her own compensation to be
     paid at times to her own loan out company, Lock-n-Load, LLC, and THOMAS is thus
11   familiar with this practice.

12   **REQUEST FOR ADMISSION NO. 6:** Admit that Thomas Wylde, LLC paid money from
     Thomas Wylde, LLC's bank accounts to companies owned in whole or in part by either John
13   Hanna or his friends or family, including but not limited to H&H Fashion, LLC.

14       Denied. It is admitted, however, that Thomas Wylde paid money from its accounts
     to H&H Fashion, LLC but to no other "companies" whether owned by John Hanna or his
15   friends or family members. Any payments made to H&H Fashion, LLC, were made as
     part of Hanna's agreed-to compensation. See response to Request for Admission No. 5,
16   above.

17   **REQUEST FOR ADMISSION NO. 7:** Admit that Thomas Wylde, LLC paid money from
     PDTW, LLC's bank accounts to companies owned in whole or in part by Tasha Hess or her
18   friends or family, including but not limited to Shot in the Armoire, LLC.

19       Denied.

20   **REQUEST FOR ADMISSION NO. 8:** Admit that Thomas Wylde, LLC paid money from
     Thomas Wylde, LLC's bank accounts to companies owned in whole or in part by Tasha Hess or
21   her friends or family, including but not limited to Shot in the Armoire, LLC.

22       Denied.

23   **REQUEST FOR ADMISSION NO. 9:** Admit that Thomas Wylde, LLC paid money from
     PDTW, LLC's bank accounts to companies owned in whole or in part by Jene Park or her friends
24   or family, including but not limited to The Pick and Pack Company.

25       Denied.

26   **REQUEST FOR ADMISSION NO. 10:** Admit that Thomas Wylde, LLC paid money from

27   ...

28       Admitted in part only and otherwise denied.  There is no "The Pick and Pack Company".
     Payments were made to B2 International, a company supplying pick-and-pack services

1    controlled by Jane Park's brother. It is also admitted that payments were made to Jane
     Park and/or Steve Prestemon and/or The Palliative, LLC, but were either for: (a) Park's
2    compensation, whether paid directly to her or to The Palliative, LLC, as her loan-out
     company; or (b) to her or Steve Prestemon of The Palliative, LLC, as repayment of
3    various sizeable loans made by them to Thomas Wylde, LLC to sustain operations. The
     request is otherwise denied.

4

5    **REQUEST FOR ADMISSION NO. 11:** Admit that Thomas Wylde, LLC gave advances to
     John Hanna.

6        Admitted.

7    **REQUEST FOR ADMISSION NO. 12:** Admit that Thomas Wylde, LLC did not purchase any
     tangible assets from PDTW, LLC, such as furniture, computers, artwork, inventory, and
8    equipment.

9        Denied. It was understood that Thomas Wylde, LLC, would receive ownership of all
         such things relating to continuing business under the THOMAS WYLDE mark in
10       exchange for paying off certain PDTW, LLC debts. By way of example, and not
         limitation, Thomas Wylde, LLC, agreed to pay off, and did make payments towards,
11       those debts owing by PDTW, LLC, to Dr. Michael Schiffman, all in reliance, to its
         detriment, upon Plaintiff THOMAS' and PDTW's covenant to convey all things of value
12       to Thomas Wylde, LLC. In the alternative, Thomas Wylde, LLC, has self-help remedies,
         if not actual, secured remedies, and lien interests, against any and all furniture, computers,
13       artwork, inventory and equipment allegedly owned by PDTW, LLC or otherwise by
         Plaintiff THOMAS. THOMAS, on behalf of PDTW, LLC, agreed to and understood all
14       of this. The only reason why these particular provisions were never put in writing was to
         avoid any appearance of a fraudulent conveyance or attempt to cheat Schiffman and other
15       secured creditors, and also because, the two companies being operated in tandem, it was
         not thought necessary.

16

17   **REQUEST FOR ADMISSION NO. 13:** Admit that Thomas Wylde, LLC has been using
     furniture belonging to PDTW, LLC since Thomas Wylde, LLC was formed.

18       Denied. *See* response to Request for Admission No. 12, above. In the alternative, any
         furniture retained is collateral for amounts owed by PDTW, LLC to Thomas Wylde, LLC.
19

20   **REQUEST FOR ADMISSION NO. 14:** Admit that Thomas Wylde, LLC has been using
     computers belonging to PDTW, LLC since Thomas Wylde, LLC was formed.
21

22       Denied. *See* response to Request for Admission No. 12, above. In the alternative, any
         computers retained are collateral for amounts owed by PDTW, LLC to Thomas Wylde,
23       LLC.

24   **REQUEST FOR ADMISSION NO. 15:** Admit that Thomas Wylde, LLC has been using
     artwork belonging to PDTW, LLC since Thomas Wylde, LLC was formed.

25       Denied. *See* response to Request for Admission No. 12, above. In the alternative, any
         artwork retained is collateral for amounts owed by PDTW, LLC to Thomas Wylde, LLC
26

27   REQUEST FOR ADMISSION NO. 16: Admit that Thomas Wylde, LLC has been using
     inventory belonging to PDTW, LLC since Thomas Wylde, LLC was formed.

28       Denied. *See* response to Request for Admission No. 12, above. In the alternative, any
         inventory retained and/or liquidated is collateral for amounts owed by PDTW, LLC to

1      Thomas Wylde, LLC.

2      **REQUEST FOR ADMISSION NO. 17:** Admit that Thomas Wylde, LLC has been using equipment belonging to PDTW, LLC since Thomas Wylde, LLC was formed.

3

4      *Objection:* The request is vague. Respondent has already given responses relating to computers, furniture, and artwork and knows of no other thing that could be in the category of "equipment" belonging to PDTW, LLC.

5

     Denied. *See* response to Request for Admission No. 12, above.

6

7      **REQUEST FOR ADMISSION NO. 18:** Admit that Thomas Wylde, LLC has not compensated PDTW, LLC for any of the tangible assets that Thomas Wylde, LLC has been using that belong to PDTW, LLC.

8

     Denied.

9

10      **REQUEST FOR ADMISSION NO. 19:** Admit that the lease for the space occupied by Thomas Wylde, LLC is in the name of PDTW, LLC.

11      Admitted as to the existence of a lease in the name of PDTW, LLC, for the indicated space.

12

13      **REQUEST FOR ADMISSION NO. 20:** Admit that Thomas Wylde, LLC has made all of the settlement payments to Michael Schiffman, M.D. to date.

14      Respondent admits only that it has made payments to Dr. Michael Schiffman as indicated in other responses, above, but denies any inferences to be drawn about their specific purpose.

15

16      **REQUEST FOR ADMISSION NO. 21:** Admit that Paula Thomas owns the domain names for the websites used by Thomas Wylde, LLC.

17

18      Denied. THOMAS and/or Perfect Privacy, LLC, holds such domain names in trust for the owner of the mark THOMAS WYLDE, which is Thomas Wylde, LLC. Thus, while Plaintiff THOMAS may hold apparent or legal title to domain names owned by Thomas Wylde, LLC, equitable and actual title resides in Thomas Wylde, LLC.

19

20      **REQUEST FOR ADMISSION NO. 22:** Admit that John Hanna and Jene Park did not contribute any funds to the initial capitalization of Thomas Wylde, LLC.

21

     Denied.

22

23      **REQUEST FOR ADMISSION NO. 23:** Admit that John Hanna and Jene Park did not pay any money in consideration for their membership units in Thomas Wylde, LLC.

24      Denied.

25      **REQUEST FOR ADMISSION NO. 24:** Admit that Paula Thomas did not resign from Thomas Wylde, LLC.

26

27

28      **REQUEST FOR ADMISSION NO. 25:** Admit that Paula Thomas did not abandon her job at Thomas Wylde, LLC.

1     Denied.

2   **REQUEST FOR ADMISSION NO. 26:** Admit that Paula Thomas' designs received positive
press, reviews, and/or feedback at the 2015 New York Fashion Show.

3

4     Denied. Respondent knows of no designs that can be described exclusively as "Paula
Thomas' designs." All designs presented at the 2015 New York Fashion Show were
created by a design team of which THOMAS was part and, as Creative Director, its
5     leader. And, the collection did not make it onto style.com/voguerunway.com. While the
designs may have received *some* positive feedback somewhere, they were largely ignored
6     by the most important sources of press, reviews and/or feedback. Thus it cannot be said
that the collection received positive feedback overall.

7

8   **REQUEST FOR ADMISSION NO. 27:** Admit that Thomas Wylde, LLC did not terminate
Paula Thomas for cause, as that term is defined in the employment agreement.

9     Denied.

10   **REQUEST FOR ADMISSION NO. 28:** Admit that Paula Thomas did not materially breach the
employment agreement.
11

12     Denied.

13   **REQUEST FOR ADMISSION NO. 29:** Admit that Paula Thomas did not commit
insubordination.

14     Denied.

15   **REQUEST FOR ADMISSION NO. 30:** Admit that Paula Thomas did not materially fail to
comply with any of Thomas Wylde, LLC's written rules, guidelines, policies or procedures.
16

17     Denied.

18   **REQUEST FOR ADMISSION NO. 31:** Admit that Paula Thomas' conduct during her
employment with Thomas Wylde, LLC did not cause any damage to Thomas Wylde, LLC, its
members, and/or management.
19

20     Denied.

21   **REQUEST FOR ADMISSION NO. 32:** Admit that Paula Thomas' conduct after her
employment with Thomas Wylde, LLC ended did not cause any damage to Thomas Wylde, LLC,
its members and/or management.
22

23     Denied.

24   **REQUEST FOR ADMISSION NO. 33:** Admit that Paula Thomas did not slander or defame
Thomas Wylde, LLC, its members and/or any of its management.

25     *Objection.* The request calls for a legal conclusion. Whether or not those comments
made by THOMAS to third parties in written or oral modes rose to the level of legal
26     defamation is a question of law. Nevertheless, those utterances, written and oral, made

28     Denied.

1  **REQUEST FOR ADMISSION NO. 34:** Admit that Paula Thomas did not breach her duty of
2  loyalty to Thomas Wylde, LLC.

3      Denied.

4  **REQUEST FOR ADMISSION NO. 35:** Admit that Paula Thomas did not materially breach her
   obligations under a Confidentiality and Intellectual Property Agreement.

5      Denied.

6  **REQUEST FOR ADMISSION NO. 36:** Admit that Paula Thomas' physical or mental
7  disability was a substantial factor in your decision to terminate her employment.

       Denied.

8  **REQUEST FOR ADMISSION NO. 37:** Admit that Paula Thomas' taking a medical leave of
9  absence was a substantial factor in your decision to terminate her employment.

10      Denied.

11  **REQUEST FOR ADMISSION NO. 38:** Admit that Paula Thomas had a physical or mental
    health condition during her employment with Thomas Wylde, LLC which temporarily limited her
12  ability to work.

13      Denied. Respondent is now and has always been without sufficient information to enable
        it to form a belief as to whether or not THOMAS had any physical or mental health
14      condition whatsoever during her period of employment at Thomas Wylde, LLC. Lacking
        that information, Respondent cannot opine as to whether or not any such alleged
15      condition created a temporary or permanent limitation upon THOMAS' ability to work.

16                                    * * * * *

        *I declare under penalty of perjury under the laws of the State of California that the foregoing*
17  *answers are true and correct.*

18  Date: February 26, 2016

19                                          _____
                                            John Hanna

20

21      *As to objections:*

22  Date: February 26, 2016                 _____

                                            Richard Peddie
23

24

25

26

27

28

1    **REQUEST FOR ADMISSION NO. 34:** Admit that Paula Thomas did not breach her duty of
loyalty to Thomas Wylde, LLC..

2    Denied.

3    **REQUEST FOR ADMISSION NO. 35:** Admit that Paula Thomas did not materially breach her
4    obligations under a Confidentiality and Intellectual Property Agreement.

5    Denied.

6    **REQUEST FOR ADMISSION NO. 36:** Admit that Paula Thomas' physical or mental
disability was a substantial factor in your decision to terminate her employment.

7    Denied.

8    **REQUEST FOR ADMISSION NO. 37:** Admit that Paula Thomas' taking a medical leave of
9    absence was a substantial factor in your decision to terminate her employment.

10   Denied.

11   **REQUEST FOR ADMISSION NO. 38:** Admit that Paula Thomas had a physical or mental
health condition during her employment with Thomas Wylde, LLC which temporarily limited her
12   ability to work.

13   Denied. Respondent is now and has always been without sufficient information to enable
it to form a belief as to whether or not THOMAS had any physical or mental health
14   condition whatsoever during her period of employment at Thomas Wylde, LLC. Lacking
that information, Respondent cannot opine as to whether or not any such alleged
15   condition created a temporary or permanent limitation upon THOMAS' ability to work.

16                                      *   *   *   *   *

     *I declare under penalty of perjury under the laws of the State of California that the foregoing*
17   *answers are true and correct.*

18   Date: February 26, 2016

19                                                        Todd Hymel

20

21        *As to objections:*

22   Date: February 26, 2016
                                                         Richard Peddie
23

24

25

26

27

28

EXHIBIT "11"

## THOMAS EMPLOYMENT AGREEMENT

This _____ ____ of ____ between Thomas Wylde, LLC, a California limited liability company with its principal place of business located at 3231 S. La Cienega Blvd., Los Angeles, CA 90016 ("Company"), and Paula Thomas, an individual residing at 2514 S. Toledo Ave. Palm Springs, CA 92264 ("Employee"), effective January 1, 2015 ("Effective Date").

**1.    Employment.** Employee shall serve as the Company's Chief Creative Officer and Creative Director and shall be in charge of the Company's brand image, product and service design, function, look, feel, materials, marketing, advertising, promotion and all such other activities that could affect the goodwill of the Company and/or its products and services, as well as such other title or position as may be mutually agreed by the parties. In addition, Employee shall have the rights and responsibilities relative to her title set forth in the Company's Operating Agreement as in existence as of the date hereof. Employee shall devote all of her working time, attention, knowledge, and skills to Employer's business interests and shall do so in good faith, with best efforts, and to Employer's reasonable satisfaction. During the term of this Agreement, Employee agrees that she will not, without the knowledge and express written consent of the Company's Manager (not unreasonably to be withheld, delayed or conditioned): (i) engage in any form of activity that produces a "conflict of interest" with Employer; or (ii) have any interest in or engagement with any business directly competitive to Employer's. The Company acknowledges and agrees that Employee's activities set forth in Schedule 1 hereto, as it may be amended from time to time, is not a conflict of interest. Employee is expected to comply with Company's policies, procedures and work rules as they now exist or may be modified or adopted by the Company in the future as set forth in any written policy, handbook, or otherwise. These policies include but are not limited to policies against violence in the workplace, discrimination, harassment, and retaliation.

**2.    Term of Employment.** This Agreement shall be binding upon full execution and shall be effective as of the Effective Date and shall continue until the earlier of (i) three years from the Effective Date or (ii) termination of the Agreement in accordance with Section 9, below. Unless the Agreement is terminated pursuant to Section 9, below, at the end of the first three-year term, Employee's employment with the Company shall continue on the terms and conditions set forth herein on an "at-will" basis, meaning that either the Company or the employee may terminate the employment relationship at any time, with or without cause, and with or without notice.

**3.    Compensation.** For the services to be rendered by Employee during the term of employment, the Company shall pay the Employee a base salary in the amount of $300,000 per year. Employee's wages shall be paid in accordance with the Company's normal payroll practices. All compensation payable to the Employee pursuant hereto shall be subject to the customary income tax withholding and such other Employee deductions as are required by law with respect to compensation paid by a company to an employee. Employee's compensation and employee benefits are subject to increase in accordance with the Company's policies and procedures, as determined from time to time in the reasonable discretion of the Company, upon written notice to Employee. Employee shall contemporaneously receive increases in her base salary in the same amounts as the largest increase to the base salary of any other member of the Company's senior management team,

4.      **Bonuses.** In addition to the compensation set forth in Section 3 above, the Company may, in its sole and exclusive discretion, pay Employee bonuses from time to time. Bonus amounts may be fixed, discretionary, performance-related, or based on a target amount. Performance bonuses may be based on the individual performance or the Company performance, or both. Except as set forth in Section 9, Employee must be employed at the time of payment to receive any such bonuses. Notwithstanding anything contained herein, Employee shall receive a bonus that is not less than 10% less than the largest bonus or aggregate bonuses paid to any member of the Company's senior management team, excluding any sales commissions or similar sales based incentives. Such mandatory bonus shall be paid in amounts and type of consideration equivalent to such largest bonus.

5.      **Vacation and Holidays.** Employee is entitled to four weeks of vacation in accordance with the Company's standard policies, provided that such vacation shall be taken in commercially reasonable increments and is subject to the notification and approval of the CEO, which approval shall not be unreasonably withheld.

6.      **Other Benefits.** Employee shall be eligible for all other benefits generally provided by Company for exempt employees; provided, that, the Company shall provide Employee with all health, dental and vision insurance equivalent to which she had as a PDTW LLC employee. In the event that Company obtains key person insurance on any of the lives of Company's senior management, it shall do so on Employee's life in at least the same amounts.

7.      **Expense Reimbursement.** Employee shall be entitled to reimbursement of any or all expenses authorized and reasonably incurred in the performance of the functions and duties under this Agreement. In order to receive reimbursement, Employee must timely provide Employer with an itemized account of all expenditures, along with suitable receipts therefore in accordance with the Company's standard policies. Any expenditure over the dollar amount of $2,000 requires prior written authorization of the Company's Manager

8.      **Exempt Status.** Employee is employed as a salaried/exempt employee and, is not entitled to overtime wages. Employee shall not receive overtime compensation for the services performed under this Agreement.

9.      **Termination.** The Company shall have the right to terminate Employee's employment under this Agreement at any time for Cause, which termination shall be effective immediately. Termination for "Cause" shall mean the commission of the following acts by Employee that are not reasonably cured within thirty days of Employee's receipt of written notice from Company detailing in specifics the alleged acts or omissions of Employee that Company believes fit the definition of Cause:

(i)     material breach of this Agreement;

(ii)    intentional nonperformance or mis-performance of her duties, or refusal to abide by or comply with the reasonable directives of her superior officers, or the Corporation's policies and procedures;

(iii)    willful dishonesty, fraud, or misconduct with respect to the business or affairs of the Company, that in the reasonable judgment of the Manager or a Supermajority of the Membership Interest or, unfairly and adversely affects the Company;

(iv)    conviction of, or a plea of nolo contendere to, a felony or other crime involving moral turpitude; or

(v)    the commission of any act that is a conflict of interest (as defined above).

Employee shall have the right to terminate her employment under this Agreement by giving the Company at least thirty (30) days written notice. In the event that Employer terminates this Agreement without Cause or Employee terminates this Agreement for Good Reason, the Company shall pay her severance in the amount of her base salary, bonus and reimbursement of COBRA expenses until the later of: (a) December 31, 2017 or (b) one year after her last day of employment. For purposes hereof, "Good Reason" shall mean (1) material diminishment or reduction of Employee's compensation, benefits, expense reimbursement, authority, responsibilities, title or to whom she reports, (2) the hiring or engagement of any person to perform substantially the same services as Employee without Employee's prior written consent (which may be withheld in her sole discretion), (3) the appointment of any officer that is superior in rank to her other than the CEO, (4) relocation of Employee's principal place of providing services by more than twenty miles, or (5) material breach by Company or its members of this Agreement or any other agreement between Company or one or more of its members on the one hand and Employee on the other hand.

The Agreement shall terminate automatically upon Employee's death. Upon termination due to death, Company shall pay to Employee's beneficiaries or estate, as appropriate and upon any proper showing or order required by law, any compensation then due and owing including without limitation a pro-rata portion of any bonuses that may accrue for such fiscal year. Thereafter, all obligations of the Company under this Agreement (including but not limited to salary and any other benefits) shall cease. Nothing in this Section shall affect any entitlement of Employee's heirs to the benefits of any life insurance plan or other applicable benefits.

Employee acknowledges and agrees that her obligations under the Confidentiality and Intellectual Property Agreement set forth in Addendum A survive termination of this Agreement so long as the mandatory bonus set forth in Section 4 and the severance set forth above (as applicable) is actually paid.

10.    **Non-Solicitation Covenant.** Employee agrees that for a period of one year following termination of employment, for any reason whatsoever, Employee will not solicit customers or clients of Employer. By agreeing to this covenant, Employee acknowledges that her contributions to Employer are unique to Employer's success and that she has significant access to Employer's trade secrets and other confidential or proprietary information regarding Employer's customers or clients. A general advertisement, marketing efforts or attendance at trade shows and other industry events that is not targeted to Company's customers or clients shall not be deemed to be solicitation.

11. **Non-Recruit Covenant.** Employee agrees not to recruit any of Employer's employees for the purpose of any outside business either during the term of, or for a period of one year following termination of employment. Employee agrees that such effort at recruitment also constitutes a violation of the non-solicitation covenant set forth above. A general advertisement or job posting not specifically directed to Company's employees shall not be deemed to be recruitment.

12. **"Key Man" Life Insurance.** Employee acknowledges that Company may purchase, own and maintain, at Company's expense, a "key man" life insurance policy on Employee. Employee agrees, as long as this Agreement is in effect, to cooperate with any other requirements (such as physicals or execution of documents) for maintaining any such insurance policy. If Company elects to terminate such policy, to the extent legally possible it will permit Paula to assume all rights and obligations under the policy instead.

13. **Intellectual Property and Confidentiality.** By signing below, you agree and acknowledge that your execution of the Intellectual Property and Confidentiality Agreement attached hereto as Addendum A is a material condition of this Agreement.

14. **Audit Rights.** During the term of this Agreement and for a period of three years thereafter, Employee shall have unfettered access to the books and records of the Company and any successor and assign solely to confirm the Company's compliance with the terms of this Agreement. Such audit shall be at Employee's sole expense except to the extent that the audit report shows an underpayment of Employee of more than five percent (5%) of the applicable component of her consideration (in which instance Company shall be solely responsible for all expenses related to such audit).

15. **Integration Clause.** This Agreement supersedes and replaces any and all conflicting representations, agreements, understandings, or policies (whether oral or written) between Company and Employee that were in effect prior to the Effective Date of this Agreement. Employee acknowledges and agrees that no representations or promises have been made to her regarding her employment with the Company other than as stated in this Agreement.

16. **Assignment.** This Agreement is personal in nature and Employee may not assign it without the Company's written consent and any attempt to do so is void. Company may not assign, transfer or delegate this Agreement without Employee's prior written consent which shall not unreasonably be withheld, delayed or conditioned. Any such assignment, transfer or delegation shall not relieve Company of its obligations hereunder and is conditioned upon the assignee agreeing in writing to be bound by all of the terms and conditions hereof.

17. **Modification.** Except as otherwise set forth herein, the terms of this Agreement may only be amended or modified in a written agreement signed by both parties.

18. **Severability.** This Agreement is severable. If any part of this Agreement is found invalid or unenforceable in any jurisdiction, that provision as to that jurisdiction, will not render invalid or unenforceable the other remaining provisions of this Agreement.

19.   **Governing Law And Venue.** This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California.

20.   **Waiver.** No consent or waiver, expressed or implied, by either party to or of any breach or default by the other in the performance by the other of its obligations hereunder shall be deemed or construed to be a consent or waiver of any other breach or default in the performance by such other party, or a consent or waiver to complain of any act or failure to act of any of the other party, or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver of such party of its rights hereunder.

21.   **Attorney Review.** Employee warrants and represents that Employee in executing his Agreement has had the opportunity to rely on legal advice from an attorney of Employee's choice, so that the terms of this Agreement and their consequences could have been fully read and explained to Employee by an attorney and that Employee fully understands the terms of this Agreement.

22.   **Counterparts.** This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

**Thomas Wylde, LLC**

By: _____          December 2⅞, 2014
John Hanna, Manager

**EMPLOYEE'S ACKNOWLEDGMENT**

I acknowledge that I have carefully read, understand and agree to the provisions of this Agreement.

_____          December 31, 2014
Paula Thomas

## Addendum A— Confidentiality and Intellectual Property Agreement

You shall at all times observe, respect and comply with the policy and procedures of Company then existing (whether oral or written) and, including those pertaining to the performance of your duties, your duty of loyalty to Company, and dealing with confidential information of Company and its clients.

In the course of your work for the Company, you have gained access and will gain access to certain information of a confidential, proprietary or trade secret nature relating to the business of the Company and/or its clients, all of which information is collectively referred to in this Agreement as "Confidential Information." The Confidential Information includes any valuable, competitively sensitive data and information related to the Company's business (and/or that of its clients) that are not generally known or readily available to the Company's competitors, including without limitation: customer information such as pricing, names and addresses, preferences, habits and methods of contacting, servicing, and methods of soliciting customers, customer lists, business plans, methods of operation and financial information not generally known to the public, personnel files, computer codes and access information, service techniques, advertising and promotional ideas and strategy, unpublished designs, manufacturing techniques, sales forecasting and planning procedures, warehouse organization and technology, packaging procedures, importing and shipping techniques, and strategic or marketing information or plans, and other trade secrets, inventions, or pending patents. Information and documents constitute Confidential Information whether or not marked as "confidential" or "proprietary," and whether or not in electronic or documentary form, and whether or not the information or documents were created or obtained by you while performing services for the Company. Confidential Information shall not include items generally available to the public, those disclosed to the public by Company, general industry knowledge, expertise and contacts and those items independently developed by Employee without reference to Company's Confidential Information.

You covenant that in the future you will keep, strictly confidential all of the Confidential Information. You agree that you will not, directly or indirectly, use or disclose to any third party any of the Confidential Information, either during your employment or at any time thereafter, except as required in the course of performing services for the Company or with the express written consent of the Managing Member of the Company, or as otherwise required by law.

You further agree to return to the Company immediately upon resignation or termination of your employment all Confidential Information and any other property or documents belonging to the Company in your possession, custody or control, whether in hard copy or electronic form and together with all copies. You will not at any time, during or after your employment, directly or indirectly use the Confidential Information for your benefit or the benefit of any other person or entity other than the Company, nor will you publish or allow to be published or disclosed any Confidential Information to any person who is not an employee of the Company.

The non-disclosure obligations set forth in this Paragraph shall not be applicable to any information which: (i) the Company has authorized you in writing to publicly disclose, copy or use, to the extent of such authorization; (ii) is generally known or becomes part of the public domain through no fault of your own; (iii) is disclosed to the Company by third parties without restrictions

or disclosure; or (iv) is required to be disclosed in the context of any administrative or judicial proceedings; provided that, if you are requested or legally compelled to disclose any Confidential Information, you shall provide the Company with prompt written notice thereof.

You further acknowledge and agree that a breach of the provisions of this Agreement relating to Confidential Information would cause the Company to suffer irreparable damage that could not be adequately remedied by an action at law. Accordingly, you agree that the Company or its Affiliates shall be entitled to injunctive relief to enforce these provisions in an action filed in any court of competent jurisdiction, in addition to recovery of its reasonable attorneys' fees and costs and any other remedies provided by law.

Except with respect to "moral rights," in consideration for the compensation and benefits set forth in this Agreement you hereby irrevocably and unconditionally assign and agree to assign in the future to the Company all rights, title and interest in any intellectual property (trademarks, copyrights, patents), discoveries, inventions, works of authorship, improvements and innovations, and other information/data that relates to any of the Company's business operations, products or services (including all electronic data, other data, and records pertaining thereto), whether or not patentable, trademarkable and/or copyrightable material and whether or not reduced to writing, developed in whole or in part by you in the course of your employment with the Company, even if developed prior to the date of this Agreement (collectively, the "Work Product"). All Work Product shall be deemed to be and shall remain "a work made for hire" under the United States Copyright Act and the sole and exclusive property of the Company. To the extent that any such Work Product is ever determined not to fall within the scope of "works made for hire" or otherwise not to belong to the Company, you hereby irrevocably, absolutely and perpetually assign and agree to assign, transfer and convey to Company all of your right, title and interest worldwide in and to the Work Product.

If you have any rights in Work Product (other than "moral rights"), that cannot be assigned, you agree to unconditionally and irrevocably waive enforcement worldwide of such rights against Company and all claims and causes of action of any kind against Company with respect to such rights, and agree, at Company's sole expense and request, to consent to an join in any action to enforce such rights. If such rights are not waivable, you hereby grant to Company a sole, exclusive, royalty-free, irrevocable, perpetual, transferable, assignable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to such non-waivable rights so that Company may fully exploit those retained rights in such Work Product, including to make, have made, import, modify, use, copy, perform, display, sell and otherwise distribute such rights in connection with its current and future business, in any medium or format, whether now know or later developed.

You agree to keep, maintain and make available to Company adequate and current records (in the form of notes, sketches, reports, correspondence, lists, specifications, or other information), in any form that may be required by Company, of all Confidential Information developed by you and all "works made for hire" and "Work Product" made by you during your employment by the Company, whether before or after you executed this Agreement. You must return to the Company upon resignation or termination of employment all Confidential Information and other property of the Company, whether in document or electronic form, together with all copies.

You further agree to execute and have notarized any additional documents reasonably requested by Company to effect or evidence the assignment described above and those documents reasonably requested by Company in order to apply for and obtain, in Company's name and for its benefit, copyrights, trademarks, and all other intellectual property rights throughout the world related to any of the Work Product and to transfer, effect, confirm, perfect, record, preserve, protect and enforce all right, title and interest transferred hereunder (collectively, "Supporting Documents"). If you fail or refuse to execute any Supporting Documents within thirty business days after receipt of written request, you hereby agree, for yourself and your successors and assigns, to the fullest extent permitted by law, that the Company is hereby irrevocably appointed as your attorney-in-fact with full authority to execute, verify and file any Supporting Documents requested by Company, and to perform all other acts necessary to effect, perfect or evidence the assignments set forth above. You hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which you now or may hereafter have for infringement of any proprietary rights in Work Product assigned hereunder to Company.

You acknowledge and agree that your obligations under this Addendum survive termination of this Agreement and/or your termination of employment with the Company for any reason.

I acknowledge that I have carefully read, understand and agree to the provisions of this Agreement.

_____
Paula Thomas

Date: __12·31·2014·__

## SCHEDULE 1

Activities That Do Not Constitute A Conflict Of Interest

Personal Stylist

Designer/stylist for hospitality, transportation, film, TV and music

# EXHIBIT "12"

# THOMAS WYLDE

## Transmittal Form

# EXHIBIT "13"

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_idtconsulting@verizon.net> |
| **Sent:** | Friday, July 28, 2017 1:34 PM |
| **To:** | 'zamora3@aol.com' |
| **Cc:** | 'Marcia Daley' |
| **Subject:** | RE: In re PDTW, LLC; scheduling appointment regarding alleged archives per court order entered July 27, 2017 |

We will not deny the subpoena and will being a motion to compel if he does not should up. This deposition in no way interferes with the Estate or Trustee's interests. The Judge did not say I could not issue an subpoena or have the garments inspected in connection with my state case, and I brought this issue up. Please read the transcript. You do not have control over Mr. Spears. He is an independent witness with valuable information for the state Court trial. If you are taking the position that Mr. Spears is property of the Estate, good luck.

If you interfere with my deposition and inspection, then I will seek sanctions against you and your firm. I will seek a Contempt Citation against Mr. Spears for failing to show up. Stop colluding with Richard Peddie and Thomas Wylde, LLC.

From: zamora3@aol.com [mailto:zamora3@aol.com]
Sent: Friday, July 28, 2017 1:15 PM
To: biller_idtconsulting@verizon.net; MarciaD@daleyandsackslaw.com; larry@lsimonslaw.com
Subject: In re PDTW, LLC; scheduling appointment regarding alleged archives per court order entered July 27, 2017

Mr. Biller/Ms. Daley:

As stated in the court order entered July 27, 2017 [docket no. 137], "Thomas may inspect the Property for the sole purpose of segregating those garments she contends are archival pieces. By applicable law, only the Bankruptcy Court has jurisdiction and authority to determine what constitutes property of the estate."

Consequently, we request that you immediately withdraw (1) the subpoena you served on Mr. David Spear, Trustee's agent, for deposition and production on August 4, 2017 and (2) the notice of inspection for August 24-28, 2017.

We propose any one of the following dates for the meeting at the warehouse of R.L. Spear & Co., Inc.located at 1837 Flower Street, Glendale, California. The business hours are 8:30 a.m. to 4:00 p.m. Mondays through Fridays. The inspection "for the sole purpose of segregating those garments

Thomas' contends are archival pieces" should be able to occur within the 7.5 hour period that the
facility is open on one of the following dates.

Tuesday August 1

Wednesday August 9

Thursday August 10

Tuesday August 15

Please respond by close of business today as to which one of these dates will work for Ms. Thomas.

Ms. Daley's comments regarding boxes and packaging are made without any knowledge about how
the alleged archives were stored. If Ms. Thomas wants to provide certain types of boxes or other
packaging for the alleged archival pieces, she may bring them to the appointment. Otherwise,
Trustee and his auctioneer, as Trustee's agent, will protect and store the identified items in a prudent
manner.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

-----Original Message-----
From: Dimitrios Biller <biller_ldtconsulting@verizon.net>
To: 'Marcia Daley' <MarciaD@daleyandsackslaw.com>; dlee <dlee@lpdirect.com>; larry <larry@lsimonslaw.com>;
zamora3 <zamora3@aol.com>
Sent: Fri, Jul 28, 2017 9:20 am
Subject: RE: Court Order

I'll be waiting for a responses today. By the way, the Order issued proves you are dishonest
and there is collusion. Wait until August 28/29!

Dimitrios

From: Marcia Daley [mailto:MarciaD@daleyandsackslaw.com]
Sent: Friday, July 28, 2017 7:53 AM
To: Dimitrios Biller <biller_ldtconsulting@verizon.net>; dlee@lpdirect.com; larry@lsimonslaw.com; zamora3@aol.com
Subject: Re: Court Order

Mr. Simons,
So there is no confusion, the archival pieces should be boxed, so all boxed
garments should be left as is, i.e., not removed from their
marked boxes. There are some archival pieces that may have been removed from
their boxes by Thomas Wylde LLC or Jene Park, so
please advise Mr. Biller as to when it would be convenient for Ms. Thomas to
conduct the court-ordered inspection to ensure all

2

archival pieces, especially those that have been removed from their
packaging, are properly segregated and protected.

Thank you,


Marcia L. Daley

DALEY & SACKS LAW PLLP · 1516 Westwood Boulevard, Suite 102 · Los Angeles, California 90024 · 310) 985-
2808 · tel · 'marciad@daleyandsackslaw.com'


THE CONTENTS OF THIS E-MAIL MESSAGE, INCLUDING ANY ATTACHMENTS, ARE INTENDED SOLELY FOR THE USE OF
THE DESIGNATED RECIPIENT AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND PROTECTED FROM
DISCLOSURE BY APPLICABLE LAW. IF YOU ARE NOT THE DESIGNATED RECIPIENT (OR AN EMPLOYEE OR AGENT RESPONSIBLE FOR
DELIVERING THIS MESSAGE TO THE DESIGNATED RECIPIENT), DISSEMINATION, DISTRIBUTION, COPYING OR USE OF THE
CONTENTS OF THIS MESSAGE AND/OR ITS ATTACHMENTS IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS E-MAIL IN ERROR,
PLEASE IMMEDIATELY NOTIFY THE SENDER BY REPLY E-MAIL, AND PERMANENTLY DELETE ALL COPIES OF THE ORIGINAL E-MAIL
AND ANY ATTACHMENTS.


From: Dimitrios Biller <biller_ldtconsulting@verizon.net>
Date: Friday, July 28, 2017 at 7:22 AM
To: Doug Lee <dlee@lodirect.com>, "larry@lsimonslaw.com" <larry@lsimonslaw.com>, "zamora3@aol.com"
<zamora3@aol.com>
Cc: Marcia Daley <MarciaD@daleyandsackslaw.com>
Subject: Court Order


Attached is the Court Order regarding legal documents in your
possession, and other issues. Please do not release any documents
(paper or electronic) related to your firm's representation of Paula
Thomas, and Paula Thomas Holding, Inc.

Larry, please let me know when the garments will be ready for
inspection/segration to identify the archieves.

Lastly, I hope you (Larry and Zomara) that the collusion issue is
up and evidence will be presented on August 28/29; Paula
Thomas' claims are real, but there is plenty of fraud between
Thoams Wylde, LLC, Richard Peddie, and the Trustee/Zomara.

As the Creditor for Thoams Wylde, LLC, I demand that you produce Jene Park, John Hanna and David Schider for examination. I will provide you with a formal demand of witnesses and documents.

Dimitrios P. Biller
LDT Consulting, Inc.
15113 West Sunset Blvd., Suite 9
Pacific Palisades, California 90272
(310) 459-9870
biller_ldtconsulting@verizon.net

This e-mail and/or attachments may contain confidential information protected by the Attorney-Client Privilege, Attorney Work-Product Privilege and/or the concept of "Confidentiality" as defined by the *California Rules of Professional Conduct*. If you have mistakenly received this e-mail please immediately delete it and confirm you have deleted it from your systems.

4

# EXHIBIT "14"

**Subject:** RE: Meet and Confer Correspondence related to In re PDTW, LLC. Chapter 7 Bankruptcy Case No. 1:16-bk-15889-SY and the State Court Action

**Date:** Tuesday, August 1, 2017 at 2:52:03 PM Pacific Daylight Time

**From:** Dimitrios Biller

**To:** zamora3@aol.com, Marcia Daley, larry@lsimonslaw.com, rlspear1@yahoo.com, lawstudios@comcast.net

You are wrong on so many levels. First, you have not joined the action in the State Court to act on behalf of PDTW, LLC. Second, you have not associated in as counsel of record for PDTW, LLC. Third, the Notice was served on behalf of Thomas Wylde, LLC, not PDTW, LLC. Fourth, you never gave noticed that you should be on any proof of service, and this case has been active for two years and you never wanted to get involved. Fifth, Larry Simons knew at the hearing for the Application to Appoint Auctioneer that we were representing PDTW, LLC in the state action; Larry Simons stated on the record that the Trustee was not getting involved in the state action. Read the Transcript. The deposition and inspections will go forward. If David Spears fails to appear, then I will bring a motion for contempt and request that you and David Spears be held in contempt, pay the Superior Court $1,000.00 as a fine and other appropriate penalties – five days in jail.

I will provide the Superior Court judge with evidence of the collusion between you and Peddie to justify the jail time. Your e-mail below is yet another fraudulent communication. If I were you and Peddie I would not be worry about properly notice deposition, but start look to for evidence to prove no collisions. You and Peddie obviously collude to prevent the deposition.

Dimitrios P. Biller

**From:** zamora3@aol.com [mailto:zamora3@aol.com]
**Sent:** Tuesday, August 01, 2017 2:13 PM
**To:** marciad@daleyandsackslaw.com; biller_ldtconsulting@verizon.net; larry@lsimonslaw.com; rlspear1@yahoo.com; lawstudios@comcast.net
**Subject:** Meet and Confer Correspondence related to In re PDTW, LLC, Chapter 7 Bankruptcy Case No. 1:16-bk-15889-SY and the State Court Action

Ms. Daley/Mr. Biller:

Consider this a "meet and confer" communication pursuant to those discovery demands you, as counsel for plaintiff Paula Thomas, failed to serve on co-plaintiff Chapter 7 Trustee Larry D. Simons of the Bankruptcy Estate of PDTW, LLC, as real party in interest for PDTW, LLC, in that certain state court action captioned *Paula Thomas, et al. v. Thomas Wylde, LLC, et al.,* and assigned case no. BC596495 in the Los Angeles County Superior Court (the "State Court Action").

Of particular concern are the deposition subpoena for August 4, 2017 (the "Deposition

Subpoena") you served on the agent for service of process of R.L. Spear Co., Inc.
("Auctioneer") and the notice of inspection for August 24 – 28, 2017 (the "Notice of
Inspection") you served on Auctioneer.

You did not serve copies of the Deposition Subpoena and the Notice of Inspection on Trustee
and/or Trustee's counsel even though Trustee is a real party in interest in the State Court
Action and California Code of Civil Procedure ("CCP") Section 2025.240(a) requires that:
"The party who prepares a notice of deposition shall give the notice to every other party who
has appeared in the action. The deposition notice, or the accompanying proof of service, shall
list all parties or attorneys for parties on whom it is served."

Auctioneer provided to Trustee copies of the Deposition Subpoena and the Notice of
Inspection.

Trustee objects to the Deposition Subpoena and the Notice of Inspection on several grounds,
including, but not limited to:

1. Trustee's counsel has a scheduling conflict for August 4, 2017;

2. The dates in the Notice of Inspection include August 24, 2017, the hearing date
for Trustee's motion to sell intangibles (the "Sale Motion") [docket no. 139 in the Bankruptcy
Case]; August 26, 2017, a Saturday; August 27, 2017, a Sunday; and August 28, 2017, the
first of a two-day evidentiary hearing on claim objections in the Bankruptcy Case and,
consequently, the dates are in conflict with the Bankruptcy Case and Auctioneer's normal
business hours that do not include Saturday and Sunday;

3. Trustee and Trustee's counsel were not served with copies of the Deposition Subpoena and
the Notice of Inspection;

4. Auctioneer is an agent of Trustee;

5. Communications by and among Auctioneer, Trustee, and Trustee's counsel are protected
by the attorney-client privilege;

6. The objects that are the subject of the Notice of Inspection are property of the Estate and
only the U.S. Bankruptcy Court has jurisdiction and authority to determine what constitutes
property of the Estate (see the Bankruptcy Court's order entered July 27, 2017 as docket no.
137 in the Bankruptcy Case of Debtor PDTW, LLC (the "Auction Order"));

7. The Auction Order provides that "Auctioneer is immediately authorized to sell the Property
[defined in the Auction Order] except for those garments to be determined to be archives, and
such archival garments shall be the subject of further proceedings before the Bankruptcy
Court to determine the Estate's ownership of such archival garments;" and

8. The deposition of Auctioneer and the inspection described in the Notice of Inspection do
not concern matters admissible in evidence or reasonably calculated to lead to the discovery
of admissible evidence in the State Court Action as the Bankruptcy Court has sole jurisdiction
over any dispute between Thomas and Trustee related to property of the bankruptcy estate
(the "Estate").

Further, the Estate's interest in the State Court Action is among the intangibles that are the

subject of the Sale Motion filed with the U.S. Bankruptcy Court on July 31, 2017 and noticed for hearing on August 24, 2017. It is unreasonable, premature, and unnecessary to involve Trustee and Auctioneer in any discovery in the State Court Action until after the Bankruptcy Court rules on the Sale Motion. After Trustee sells the Intangibles, subject to overbid and approval of the Bankruptcy Court, the Estate will have no interest in the State Court Action. Any and all matters involving Trustee and the Estate must be determined by the Bankruptcy Court.

Confirm that you will withdraw the Deposition Subpoena for August 4, 2017 and the Notice of Inspection for August 24-28, 2017.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons
© 2017 AOL Inc. All Rights Reserved
Loading message... Undo ?