1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 West Sunset Blvd., Suite "9"
3  Pacific Palisades, California 90272
4  Telephone (310) 459-9870
   E-mail Address: biller_ldtconsulting@verizon.net
5
6  MARCIA DALEY (146,579)
7  DALEY & SACKS LAW RLLP
   1516 Westwood Boulevard, Suite 102
8  Los Angeles, California 90024
9  Telephone: (310) 985-2808
   E-mail: marcia@daleyandsackslaw.com
10
11 Attorneys for Creditor Paula Thomas

12

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT COURT OF CALIFORNIA

15

16

17

18  IN RE                          Case No.: 6-16-bk-15889-SY

19  PDTW, LLC,

20                                 INDEX TO EXHIBITS REFERRED
                                   TO IN THE DECLARATION OF
21             DEBTOR.             DIMITRIOS P. BILLER IN SUPPORT
                                   OF CREDITOR PAULA THOMAS'
22                                 BENCH BREIF ON THE EXCLUSION
                                   OF EVIDENCE, DENIAL OF ALL
23                                 CLAIMS FILED BY THOMAS
24                                 WYLDE, LLC, AND ORDER
                                   PROHIBITING NANCY ZAMORA
25

26
   INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
27 CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
   FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
28 THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                          1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FROM PARTICIPATING IN THE
AUGSUT 28 AND 29, 2017
EVIDENTARY HEARING.


**VOLUME NUMBER V, EXHIBITS
19 – 25**

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.

# INDEX OF EXHIBITS REFERRED TO IN THE DECL. OF BILLER

## VOLUME V

1.      **Exhibit "1"** Thomas Wylde's, LLC's Notice of Withdrawal of Claim No. 10.

2.      **Exhibit "2":** deposition transcript for Eniluz Gonzalez that was taken on July 31, 2017.

3.      **Exhibit "3":** Pleadings for Claim No. 10 that Richard Peddie apparently prepared and signed under penalty of perjury.

4.      **Exhibit "4":** e-mail Nancy Zamora sent to inform the parties that the Trustee will not call the accountant as a witness.

5.      **Exhibit "5":** Operating Agreement for Thomas Wylde, LLC signed on July 22, 2014.

6.      **Exhibit "6:** Transaction Accounts document that Stephen Choi claims to have received from Thomas Wylde, LLC.

7.      **Exhibit "7":** Agreement to Purchase Units of Membership in Thomas Wylde, LLC.

8.      **Exhibit "8":** Employment Agreement that Paula Thomas signed;

9.      **Exhibit "9"":** Amended Operating Agreement.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    3

10.  **Exhibit "10":** Amended Schedule B for Thomas Wylde, LLC

11.  **Exhibit "11":** is the salary chart showing Paula Thomas received her last pay check on April 15, 2015.

12.  **Exhibit "12":** Amendment to Schedule B of the Amended Operating Agreement

13.  **Exhibit "13":** income tax return for Thomas Wylde, LLC.

14.  **Exhibit "14":** Agreement to Purchase Membership Interest.

15.  **Exhibit "15":** e-mail Richard Peddie sent proving notice of the withdrawal of Claim No. 10.

16.  **Exhibit "16":** e-mail sent to Richard Peddie requesting more information regarding the reasons he withdrew the $2,000,000.00 claim.

17.  **Exhibit "17":** Motion for the Trustee seeking to buy the PDTW, LLC's.

18.  **Exhibit "18":** e-mail that apparently caused Mrs. Zamora to change her position to produce the expert witness, but then she withdrew him.

19.  **Exhibit "19":** e-mail Nancy Zamora send taking the position that the accountant is not an expert and he was only going to be called to "AUTHENICATE" business records of PDTW, LLC.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                              4

20.    **Exhibit "20":** e-mail from Mrs. Zamora changing her position.

21.    **Exhibit "21":** Second Amended Cross-Complaint TW filed against Paula Thomas.

22.    **Exhibit "22":** Paula Thomas' initial witness list.

23.    **Exhibit "23":** Paula Thomas' initial Exhibit List.

24.    **Exhibit "24":** e-mail received from Richard Peddie withdrawing the $2 million claim.

25.    **Exhibit "25":** "Explanatory Note – Basis for Claim attached to Claim No. 10.

26.    **Exhibit "26":** May 14, 2015 letter that Mr. Peddie wrote to create a false record that TW terminated Thomas one month earlier on April 15, 2015. responses to Form and Special Interrogatories to substantiate the position.

27.    **Exhibit "27"** Thomas Wylde, LLC's responses to form and special interrogatories referring to the letter.

28.    **Exhibit "28"** Demand for Production of Witnesses and served on Thomas Wylde, LLC.

1    Dated: August 7, 2017

2

3

4                                    Respectfully submitted,

5

6

7                                    By: /S/ Dimitrios P. Biller
                                     Counsel for Creditor Paula Thomas

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
      CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
      FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN

28    THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    6

**PROOF OF SERVICE**
**STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On **August 7, 2017**, I caused to be served, via e-mail, the following pleadings:

**INDEX OF EXHIBITS**

on the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 505 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants


> Nancy Hoffmeir Zamora
> Anthony N.R. Zamora
> Zamora & Hoffmeier
> U.S. Bank Tower
> 633 West 5th Street, Suite 2600
> Los Angeles, California 90071
> e-mail zamora3aol.com


**XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    7

1  Palisades, California. I am aware that on motion of the party served, service is
2  presumed invalid if postal cancellation date or postage meter date is more than one
   day after date of deposit for mailing in affidavit.
3

4     ____BY FEDERAL EXPRESS – I am familiar with the practice at my place of
   business for collection and processing of correspondence for overnight delivery
5  maintained by Federal Express. Such correspondence will be deposited with a
6  facility regularly maintained by Federal Express for receipt on the same day in the
   ordinary course of business. The envelope was sealed and placed for collection
7  and delivery by Federal Express with delivery fees paid or provided for in
8  accordance with ordinary business practices.
9     ____BY PERSONAL SERVICE – I caused such envelope to be delivered by hand
   to the offices of the addressee.
10

11  **XXX**: E-mail at the above e-mail addresses.

12  **XXX** (State) I declare **under penalty of perjury under the laws of the State of**
13  **California** that the foregoing is true and correct.

14
         Executed on **August 7, 2017**, at Pacific Palisades, California.
15

16

17  /S/ Dimitrios P. Biller
18  Dimitrios P. Biller

19

20

21

22

23

24

25

26  INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
27  CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
   FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
28  THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    8

# EXHIBIT "19"

**Dimitrios Biller**

| | |
|---|---|
| **From:** | zamora3@aol.com |
| **Sent:** | Friday, August 04, 2017 3:49 PM |
| **To:** | biller_ldtconsulting@verizon.net; lawstudios@comcast.net; marciad@daleyandsackslaw.com |
| **Cc:** | larry@lsimonslaw.com; MarciaD@daleyandsackslaw.com |
| **Subject:** | Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters |
| **Attachments:** | PDTW330.pdf |

Mr. Biller:

Please read the portion of the March 30, 2017 transcript of bankruptcy court hearing (see attached) that addresses preparation for the evidentiary hearings on August 28 and 29, 2017.

This is not a trial.

This is a hearing so that the Court can consider evidence supporting claim nos. 1, 3, 5 and 10 (if not withdrawn) and evidence supporting the objections to these respective claims.

The Court asked for a joint exhibit binder at the March 30, 2017 hearing.

Yesterday, August 3, 2017, we discussed at the hearing a joint witness list, a joint exhibit list, and a joint exhibit binder.

Previously, by email, we discussed exchanging this information to allow one of us to compile the information and present the joint list. The point is to make this as streamlined as possible for Judge Yun.

Consequently, one counsel can agree to compile and prepare the joint witness and exhibit lists and file them with the Court. If we can't reach agreement, then we all can file separate lists.

Regarding Paula Thomas' amended claim no. 1, what documents are you proposing as exhibits to support her claim. On your exhibit list of 109 items, the only entry I see is no. 105 "Paula Thomas' Claims and supporting documents." Please be more specific or confirm that the only exhibit you are offering to support amended claim no. 1 is the claim itself.

Mr. Fife will be called to authenticate reports generated from the quickbooks data of debtor PDTW, LLC and to authenticate financial records and tax returns, or portions thereof, of PDTW, LLC received by Trustee. There is no reason or basis to depose him as an expert witness.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

-----Original Message-----
From: Dimitrios Biller <biller_ldtconsulting@verizon.net>
To: zamora3 <zamora3@aol.com>; lawstudios <lawstudios@comcast.net>; marciad <marciad@daleyandsackslaw.com>
Cc: larry <larry@lsimonslaw.com>; 'Marcia Daley' <MarciaD@daleyandsackslaw.com>
Sent: Fri, Aug 4, 2017 3:06 pm
Subject: RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related
matters

When exchanging witness list and exhibit list it is always appropriate to identify the witnesses
and exhibits on separate documents, not in an e-mail. The attached lists include evidence and
witnesses that will provide testimony to support all objections to the meritless claims by
Thomas Wylde, LLC, undercut Thomas Wylde, LLC's objections to Paula Thomas' claims and
to undercut the Trustee's objections to Paula Thomas' claims.

I look forward to receiving copies of your exhibits on August 9, 2017.

I consider the Trustee's Estate Account is an expert witness who will seek to provide expert
witness testimony. Please provide me with dates in which I can take his deposition.

Dimitrios P. Biller

From: zamora3@aol.com [mailto:zamora3@aol.com]
Sent: Friday, August 04, 2017 2:20 PM
To: lawstudios@comcast.net; biller_ldtconsulting@verizon.net; marciad@daleyandsackslaw.com
Cc: larry@lsimonslaw.com
Subject: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related
matters

To all:

Below is Trustee's proposed witness and exhibit lists for the Evidentiary Hearing (8/28 and 8/29) on
objection to claim no. 1, as amended, filed by claimant Paula Thomas. All counsel agreed to
exchange this information today in an effort to compile a single joint witness list and a single joint
exhibit list. Trustee looks forward to receiving this information from other counsel today.

Trustee did not object to claim nos. 3, 5 and 10 that also are the subjects of the Evidentiary
Hearing. However, to the extent that the Court will reach a final determination on these claims at the
Evidentiary Hearing that will prevent Trustee from objecting to such claims in the future, Trustee
reserves his right to participate in examining or cross-examining witnesses who testify related to
these claims.

Finally, Trustee previously reviewed the objections to claim nos. 3, 5 and 10 and requested that
Thomas Wylde, LLC withdraw claim no. 10. Trustee renews this request. If Thomas Wylde, LLC will
comply, Trustee expects that the Evidentiary Hearing can be streamlined.

# EXHIBIT "20"

Dimitrios Biller

| | |
|---|---|
| **From:** | zamora3@aol.com |
| **Sent:** | Saturday, August 05, 2017 12:35 PM |
| **To:** | biller_ldtconsulting@verizon.net; marciad@daleyandsackslaw.com; lawstudios@comcast.net |
| **Cc:** | larry@lsimonslaw.com; dfife@hahnfife.com |
| **Subject:** | Evidentiary Hearing regarding claim no. 1 in Bankruptcy Case of PDTW, LLC and request to depose Trustee's Estate Accountant related thereto |

Mr. Biller/Ms. Daley:

Mr. Fife's qualifications and experience are contained in his resume, included in Trustee's application to employ accountant that was filed in the Bankruptcy Case. The employment application appears on the docket in the Bankruptcy Case.

The quickbooks data, tax returns, and all financial records of PDTW, LLC are property of the Bankruptcy Estate (see the U.S. Bankruptcy Code, the Bankruptcy Court's orders and transcripts of hearings previously provided to you). Trustee requested the quickbooks data, tax returns, and all financial records from Debtor at the 341(a) meetings at which Paula Thomas appeared and testified under oath. Debtor, through Debtor's bankruptcy counsel, provided some of this information and some of these documents. Debtor, by Paula Thomas' testimony as the representative of Debtor, and Debtor's bankruptcy counsel informed Trustee that Thomas Wylde, LLC had possession of the PDTW, LLC quickbooks data and some of the financial records of PDTW, LLC. Consequently, Trustee requested the quickbooks data and the financial records from Thomas Wylde, LLC and obtained them. This happened during the early months of the Bankruptcy Case. Indeed, Thomas Wylde, LLC also provided the quickbooks data to Debtor's bankruptcy counsel and to Thomas' counsel, Kring & Chung, LLP.

As Judge Yun emphasized during the hearing on August 3, 2017, Debtor's Bankruptcy Case has been pending for 13 months. Much happened prior to your substituting in as counsel for Paula Thomas, as an alleged creditor and equityholder, in the Bankruptcy Case.

I will inquire with Mr. Fife regarding his availability for a deposition related to the Trustee's objection to amended claim no. 1 filed by Paula Thomas. The deposition must be limited to the purpose of the evidentiary hearing, i.e., Trustee's objection to claim no. 1.

As of now, I am available to appear with Mr. Fife on August 16 (if the appointment on August 15 at Auctioneer's warehouse is completed in one day) or August 22. I may be available certain days during the week of August 7 through 11.

Trustee's proposed witness list already includes Jene Park and others who have personal information about the quickbooks data of PDTW, LLC.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

1

# EXHIBIT "21"

1  Richard Byron Peddie, SBN 193770
   lawstudios@comcast.net
2  Lawstudios | Richard Byron Peddie, P.C.
   5051 Euclid Avenue
3  Boulder, CO 80303-2831
   Tel.: 303.444.5447
4  Fax: 720.222.4766
   *Attorney for Defendants*

5

6

7

8                  **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
                          **COUNTY OF LOS ANGELES**
9                            **CENTRAL DISTRICT**

10  PAULA THOMAS, individually and in        No. BC 596 495
    the right of and for the benefit of      **SECOND AMENDED CROSS-COMPLAINT:**
11  THOMAS WYLDE, LLC, a California           **(1) BREACH OF CONTRACT;**
    limited liability company, and           **(2) BREACH OF THE DUTY OF GOOD**
12  PDTW, LLC, a California limited           **FAITH & FAIR DEALING;**
    liability company,                       **(3) BREACH OF FIDUCIARY DUTY;**
13                                            **(4) BREACH OF CONTRACT;**
         Plaintiffs,                          **(5) BREACH OF THE DUTY OF GOOD**
14                                            **FAITH & FAIR DEALING;**
    v.                                        **(6) OPEN BOOK ACCOUNT;**
15                                            **(7) ACCOUNT STATED;**
    THOMAS WYLDE, LLC, a California           **(8) MONEY HAD AND RECEIVED;**
16  limited liability company,                **(9) COMMON COUNT;**
    JOHN HANNA, an individual,               **(10) UNJUST ENRICHMENT;**
17  JENE PARK, an individual,                **(11) PROMISSORY ESTOPPEL;**
    SHOT IN THE ARMOIRE, LLC, a              **(12) COMMERCIAL**
18  Florida limited liability company, and   **DISPARAGEMENT/TRADE LIBEL;**
    H&H FASHION, LLC, a Florida limited      **(13) UNFAIR COMPETITION - BUS. &**
19  liability company, and                   **PROF CODE § 17200 *et seq.***
    DOES 1-50, inclusive.                    **(14) INDUCING BREACH OF CONTRACT;**
20                                            **(15) INTENTIONAL INTERFERENCE WITH**
         Defendants.                          **CONTRACTUAL RELATIONS;**
21                                            **(16) INTENTIONAL INTERFERENCE WITH**
                                              **PROSPECTIVE CONTRACTUAL**
22                                            **RELATIONS;**
                                              **(17) FORECLOSURE OF SECURITY**
23                                            **INTEREST; and**
                                              **(18) DECLARATORY RELIEF.**
24
                                              [By Fax]
25
                                              **DEMAND FOR JURY TRIAL**
26
                                              Judge: Hon. Michael Raphael
27                                            Dept: 51
                                              Action Filed: Oct. 1, 2015
28                                            Trial Date: April 11, 2017

                                        1

# SECOND AMENDED CROSS-COMPLAINT

COMES NOW DEFENDANT THOMAS WYLDE, LLC, a California limited liability company, with its Second Amended Cross-Complaint:

## Parties & Venue

1. Defendant/Cross-Claimant Thomas Wylde, LLC ("TW") is a California limited liability company with its principal place of business located in the County of Los Angeles, California.

2. Plaintiff/Crossclaim Defendant Paula Thomas ("THOMAS") is a natural person residing, upon information and believe, in Palm Springs, California, in the County of Riverside.

3. During certain times relevant to these proceedings, THOMAS held the job title of Creative Director of TW.

4. During certain times relevant to these proceedings, THOMAS was an officer of TW, holding the office and title of Chief Creative Officer.

5. Plaintiff/Cross-Claim Defendant PDTW, LLC ("PDTW") is a California limited liability company.

6. PDTW's principal place of business, upon information and belief, is now THOMAS' residence, located in the County of Riverside, California.

7. Defendant John Hanna ("HANNA") is a natural person working in Los Angeles, California. HANNA is a Florida resident. During certain times relevant to these proceedings, HANNA was the Chief Executive Officer and Managing Member of TW.

8. Defendant Jene Park ("PARK") is a natural person residing and working in Los Angeles, California.

9. Until some time after THOMAS' separation from TW, PARK was the Chief Operations Officer ("COO") of TW.

10. Once THOMAS stopped reporting to TW's offices in or around April 1, 2015, PARK undertook also the duties of acting Creative Director and, in or around June of 2015, was officially given that job title. In or around mid-2016, PARK also became acting CEO of TW upon HANNA's departure.

11. Cross-Claimaints are informed and believe and thereon allege that, during certain relevant periods, each Plaintiff/Cross-Claim Defendant was the agent of the other Plaintiff/Cross-Claim Defendant, and that otherwise, during such periods, each Plaintiff/Cross-Claim Defendant was the alter ego, joint venturer, successor in interest, parent or successor entity, or otherwise jointly and severally or otherwise responsible for the acts, omissions, and contractual liability of the other Plaintiff/Cross-Claim Defendant. In particular, THOMAS has caused PDTW to do the following, by way of illustration, and not limitation:

   a. Loan money to her, at times when no legal distributions could be made under California limited liability company law, and when PDTW was overdue in paying its existing lenders and trade creditors, for major purchases for herself. Examples include the purchase of her Palm Springs house, the purchase of a truck for her ex-boyfriend Johnny Alexander, and the purchase of a Porsche automobile;

   b. Pay for personal expenses of every sort and then, later, to reclassify these purchases as business expenses. Examples include, but are not limited to: Dog walkers, pet care expenses, veterinary services, pet food, cash withdrawals, paying her boyfriend's attorneys' fees, meals and entertainment unrelated to business, groceries, hairdressers, beauty supplies, travel and lodging, car insurance, medical expense, and otherwise myriad other things;

   c. Claim direct ownership of things belonging to PDTW, or to continuously confound what is PDTW's with what belongs to her;

   d. Restate at her whim, as it may seem advantageous to her at any moment, the ownership structure of PDTW, at times claiming 100% ownership, at times claiming that Joel Keyser is a 0.5% owner, at times claiming that instead her daughter, Harley Wolitzky, owns that same 0.5% interest, and at times stating that Defendant PARK is a 10% owner;

   e. Commingle PDTW's assets with her own, and to take them as her own, without payment;

3

f.    Falsely claim that PDTW is liable to her for withholding personal property from
her, or for undocumented loans made by her, or for undocumented services
rendered by her, all to avoid her true liabilities to PDTW, in essence once again to
manipulate PDTW for personal advantage and personal gain, or to eviscerate
PDTW of any value and transfer that value to herself; and

g.    Falsely deny that she owes PDTW money for loans made by PDTW to her.

In sum, THOMAS has so treated PDTW and so abused their separate existence that no
distinction should be made between the two and law and equity demand that any such
separateness be disregarded, that the veil of limited liability be pierced, and that the one
be treated as the *alter ego* of the other, and that each be held responsible for the acts and
debts and liabilities of the other, jointly and severally.

12.    Venue is proper in this court because venue under the complaint is proper. Venue would
otherwise be proper because: Plaintiffs/Cross-Claim Defendants either resided or
maintained their principal place of business in Los Angeles, California, during the acts
complained of herein; THOMAS was employed by TW at its Los Angeles office; and a
substantial portion of the acts and transactions alleged in this Second Amended Cross-
Complaint occurred in Los Angeles.

### General Allegations

### PDTW's History

13.    PDTW was organized as a California limited liability company on or about May 9, 2006.

14.    In its first few months of existence, PDTW needed working capital to fund its operations.
Because it had no cheaper source for such capital, PDTW borrowed $500,000.00 from
Dr. Michael Schiffman ("Schiffman") at an interest rate of 18% *per annum*.

15.    To memorialize this indebtedness, on September 25, 2006, PDTW executed a secured
promissory note in favor of Schiffman in the amount of $500,000.00 ("Schiffman Note").

16.    The Schiffman Note was secured under a security agreement, also executed by PDTW on
Sept. 25, 2006 ("Schiffman Security Agreement").

17.    Under the Schiffman Security Agreement, PDTW granted Schiffman a security interest

1      "in and to all of its right, title, and interests, whether now existing or hereafter acquired or

2      arising in, to and under all of its assets . . ."

3   18.    PDTW was unable to make even the first scheduled payment due to Schiffman.

4   19.    Nor was PDTW able to pay the Schiffman Note when it became due and payable.

5   20.    In fact, even by mid-2013 the indebtedness to Schiffman remained outstanding.

6   21.    On or about July 1, 2013, Schiffman sued PDTW in this Court in a case styled *Michael*

7          *Schiffman, M.D. v. PDTW, LLC, Thomas Wylde, and Paula Thomas*, which was assigned

8          Case No. BC 513 911.

9   22.    On Oct. 4, 2013, Schiffman filed a UCC-1 financing statement in order to perfect his

10         security interest in "[a]ll assets" of PDTW.

11  23.    Throughout most of its existence, and for similar reasons, PDTW likewise borrowed

12         additional money from other sources. Some of this money was borrowed from PARK

13         and/or her family members. And, because PDTW and THOMAS themselves lacked

14         adequate credit, PDTW also relied upon PARK's credit to receive certain loans, or to

15         obtain credit cards, often with PARK cosigning or otherwise remaining personally liable.

16  24.    For example, in 2007, PDTW began borrowing money from PARK and her family, such

17         that eventually the amount owed was $131,336.93. To evidence this debt, on Jan. 1, 2013,

18         PDTW signed a balloon promissory note in the amount of $131,337.00 in favor of

19         PARK's husband, Steven John Prestemon ("First Balloon Note").

20  25.    As yet another example, by 2011, PDTW had borrowed yet additional funds from PARK

21         and her family. The additional amount owed was $228,00.00. To evidence this debt, on

22         March 27, 2011, PDTW signed a balloon promissory note in the amount of $228,000.00

23         ("Second Balloon Note").[1]

24

25         [1] Given the proximity of this loan, time-wise, to PDTW's loan to THOMAS to purchase
26   her house -- all at a time when PDTW was too insolvent to legally make distributions to her, and
     all at a time when certain loans were long overdue -- one could argue that the need for the March
27   27, 2011 loan was indeed necessitated by the constant use, by THOMAS, of PDTW, essentially
28   as her personal checkbook. This is just one vignette that illustrates the justness of imposing *alter
     ego* liability. *See* paragraph 11, *supra*.

1    26.    As yet another example, on June 22, 2012, PARK lent another $100,000.00 to PDTW.

2    27.    As yet another example, on July 2, 2012 PARK lent another $50,000.00 for the benefit of

3          PDTW. To evidence this debt, on April 23, 2013, PDTW signed a promissory note in the

4          amount of $50,000.00.

5    28.    As yet another example, in or around October of 2013, PARK, as an accommodation to

6          PDTW, guaranteed a loan from CBC Partners I, LLC, in the amount of $1,625,000.00,

7          pledging, as collateral, her home.

8    29.    As yet another example, as early as December, 2006, PARK, as an accommodation to

9          PDTW and THOMAS, guaranteed personally amounts advanced by PDTW's factor,[2]

10          Finance One, pledging, as collateral, her home.

11    30.    Thus, whatever success the brand THOMAS WYLDE has had, and whatever promise it

12          may yet have, PDTW has never enjoyed financial success sufficient to clear it of debts

13          incurred even during its first year of existence, or even debts to employees; nor has it

14          been able to operate under its own credit, or the credit of THOMAS, but has instead

15          relied upon the credit of one of its employees, PARK, who, out of loyalty, friendship, and

16          out of a believe in THOMAS, and to keep the business afloat, not only guaranteed certain

17          debts, but even pledged her home to do so, all the while herself also lending substantial

18          sums to the enterprise.

19                              **PDTW in Distress**

20    31.    By late 2014, PDTW's position had become untenable: The company was about to post

21          losses for 2014. At the same time, it was unable to service its debt load, was being sued

22          by Schiffman, and its principal, THOMAS, was herself, together with PARK, liable as a

23          guarantor for the $1.6M debt to CBC Partners I, LLC.

24    32.    Thus, contrary to what Plaintiffs say in their First Amended Complaint ("FAC") – *see* ¶

25          21 – THOMAS did not "decide[] to bring on a CEO to handle the financial aspect of the

26          business so that [she] could focus on the creative design side of the business."

27    _____

28          [2] A "factor" in the garment industry is a lender that supplies short- to mid-term financing
for production and operations that is secured largely by the debtor's receivables.

6

33. Instead, THOMAS began talks with HANNA in mid-2013 because the business was even
then about to collapse. At first THOMAS hoped that HANNA would be able to locate
bridge financing for PDTW. Once PDTW's true financial picture came into focus and
was discussed, however, these talks led to proposals by THOMAS that HANNA take on
management of the brand, fix problems with it, and also locate and bring in that capital
necessary to save it, and otherwise come up with a plan of reorganization for the brand
("Plan of Reorganization") that would rescue it financially and thereafter enhance its
chances for survival and success.

34. Also contrary to what Plaintiffs say in their FAC – *see again* ¶ 21 – THOMAS did not
"form[] a new company, Defendant TW, and ... hire[] defendant HANNA as the CEO of
TW."

35. While THOMAS had made HANNA CEO of PDTW, TW's genesis and HANNA's
appointment as managing member and CEO did not occur in the manner Plaintiffs claim.
Instead, Thomas Wylde, LLC, was organized on July 22, 2014, by attorney David
Schnider, acting as organizer, and at the behest not only of THOMAS, but also of those
other persons who had come forward to invest money in TW and participate in the Plan
of Reorganization to rescue the brand. Those investors, located by HANNA, insisted that
HANNA be the managing member and CEO of TW.

36. Indeed, THOMAS was not even one of the first tier of four initial members of Thomas
Wylde, LLC, but instead, all by design under the Plan of Reorganization, which she
helped create, joined slightly later.

**The Plan of Reorganization**

37. In sum, the creation of Thomas Wylde, LLC, was part of a carefully planned initiative
designed to save the brand from almost certain failure.

38. As part of the Plan of Reorganization, TW initially took in $5,505,500.00 in investor
money.

39. Of this amount, $5.5M was from a single outside investor.

40. As part of the Plan of Reorganization, TW was to take an assignment of all of the

7

1    goodwill, intellectual property, and other rights associated with the brand THOMAS
2    WYLDE, including all rights in and to the associated designs. TW did so.

3    41.    As part of the Plan of Reorganization, PDTW was to hand over, and TW was to gradually
4    take over, the operations of FDTW. Over time, the two companies each did so.

5    42.    As part of the Plan of Reorganization, and while TW was gradually taking over the
6    operations of PDTW, PDTW was to continue operating, as it gradually handed over its
7    operations to TW, starting on July 22, 2014. PDTW did so.

8    43.    As part of the Plan of Reorganization, the two companies were to operate in tandem, out
9    of the same space, and with the same employees, as TW gradually took over more and
10    more of PDTW's operations. The two companies did so.

11    44.    As part of the Plan of Reorganization, most transactions would still be in PDTW's name,
12    and between PDTW and its customers or vendors through Dec. 31, 2014, even though the
13    activities behind these transactions were, by Dec. 31, 2014, essentially performed by TW.
14    This is substantially what occurred.

15    45.    As part of the Plan of Reorganization, most transactions would formally and officially
16    shift to TW effective Jan. 1, 2015, and thereafter be in TW's name, even though certain
17    activities behind these transactions were, by necessity, still performed by PDTW and still
18    nominally in PDTW's name. This is substantially what occurred.

19    46.    In sum, while the Plan of Reorganization involved a target date of Jan. 1, 2015, for
20    handing over all operations to TW, in reality TW began taking on PDTW's
21    responsibilities as early as July 22, 2014, and PDTW necessarily still fulfilled certain
22    responsibilities even after Dec. 31, 2014.

23    47.    The above-described portions of the Plan of Reorganization and associated efforts to hand
24    operations over gradually to TW were, by design, to protect the brand THOMAS
25    WYLDE by, as far as possible, providing a nearly seamless transition that would not
26    affect the perception of the brand held by consumers, or even by PDTW's customers,
27    vendors, or other trading partners or third parties, or otherwise the fashion industry at
28    large.

48.   As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant, TW occupied the space leased and formerly used by PDTW, and paid the rent for that space. PDTW, for its part, delivered and surrendered possession of the leased space to TW and permitted TW to pay the rent. THOMAS, for her part, demanded and received indemnification from TW for any obligations related to the lease for that space.

49.   As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant, PDTW's employees gradually performed more and more services that were really for TW and, for a time, PDTW employees were essentially working for both companies, although still formally working for PDTW.

50.   As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant, even once PDTW's former employees had been formally hired and transferred to TW, they still performed certain services that were really for PDTW, and, for a time, TW employees were essentially working for both companies, although now formally employed by TW.

51.   As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant, TW otherwise made use of, and has taken for itself, things formerly belonging to PDTW and reasonably necessary for the continued operations of the brand THOMAS WYLDE, and otherwise to preserve its history and its legacy. For its part, PDTW and THOMAS have given and surrendered possession of such things to TW, all as part of the Plan of Reorganization, and all as part of their obligations under that plan.

52.   As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant, formal title to many assets or things formerly belonging to PDTW has not, however, been transferred to TW. As part of the Plan of Reorganization, and with THOMAS' knowledge and consent, this is because there were certain secured creditors and PDTW was being sued by one of them — Dr. Michael Schiffman. These assets or things could not be transferred until the claims of such creditors were satisfied without running the risk that such transfers would be deemed fraudulent. Nonetheless, as part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a participant,

1    all such things are to transfer to TW once that risk is eliminated or minimized.

2    53.    As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a

3    participant, TW has lent money to PDTW to pay down or off certain trade or other debts.

4    54.    As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a

5    participant, TW has directly paid down or off certain of PDTW's trade or other debts.

6    55.    As part of the Plan of Reorganization, and with THOMAS' knowledge and consent as a

7    participant, TW has not only made PDTW's lease payments, but also stored all property

8    formerly belonging to PDTW and now belonging to TW, and stored much property still

9    nominally held by PDTW until such time as that property can safely be transferred to

10    TW, and stored all other property which serves as collateral for those debts incurred by

11    PDTW to TW, and otherwise paid not only for the costs of storage, but all other carrying

12    costs as well.

13    56.    PDTW eventually settled the lawsuit with Schiffman. Since the initial filing of this suit,

14    TW purchased the Schiffman debt and all rights under that settlement.

15    **Plan of Reorganization: What Did THOMAS Give/Receive?**

16    57.    As part of the Plan of Reorganization, THOMAS was to serve as the Chief Creative

17    Officer of TW and to hold that office within the company.

18    58.    As part of the Plan of Reorganization, THOMAS was to be employed as TW's Creative

19    Director.

20    59.    Thus, THOMAS was offered employment under that contract of employment titled

21    "Thomas Employment Agreement" and annexed as Exhibit B to the FAC.

22    60.    As part of the Plan of Reorganization, THOMAS was to become one of the owners of

23    Thomas Wylde, LLC, with membership units evidencing her ownership, all for that

24    consideration described in an Agreement to Purchase Membership Interest signed by

25    THOMAS on Dec. 22, 2014.

26    61.    Under the Agreement to Purchase Membership Interest, THOMAS was to receive 64

27    Membership Units in TW. THOMAS has received these Membership Units and, as

28    indicated in the FAC, is a member of TW.

62. Under the Agreement to Purchase Membership Interest, THOMAS was required to furnish $5,200.00 in the form of money as part of her capital contribution for the Membership Units. THOMAS did so.

63. Under the Agreement to Purchase Membership Interest, THOMAS was to assign to TW:

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, or any other rights therein but specifically excluding Paula Thomas' name, image, likeness, biography and moral rights ("IP").

Agreement to Purchase Membership Interest. *See* **Exhibit A**, annexed and incorporated (Agreement to Purchase Membership Interest -- omitting its internal exhibits aft of exhibit A-2) at Bates 00001 (consideration) & 00005 (quoted portion). THOMAS did so.

64. Notwithstanding the foregoing, THOMAS now repudiates her obligation to transfer the rights in this brand's "designs" and repudiates her act in doing so: She has, after all, both directly and through Plaintiff PDTW, laid claim to the archive pieces which constitute the "designs" and are therefore the embodiment of them.

65. Under the Agreement to Purchase Membership Interest, THOMAS was to transfer certain liabilities to TW. These included $1.6M in liability under the note held by CBC Partners I, LLC ("CBC") as well as liabilities to Steven John Prestemon ("Prestemon") under two different notes in the amounts of $228,000.00 and $131,337.00, respectively ("IP Transaction Debts").

66. The IP Transaction Debts were accepted by TW, and TW paid them off, cleansing THOMAS, as guarantor, of those liabilities, and conferring a sizeable benefit to her, all to its detriment, and all in reliance upon THOMAS fulfilling her covenants and obligations to TW.

67. In actuality, the IP Transaction Debts transferred by THOMAS to TW and accepted by TW -- and soon thereafter fully paid by TW -- were originally PDTW liabilities. As part of tax-motivated delegations of debt occurring back-to-back on Dec. 22, 2014, PDTW first delegated the IP Transaction Debts to THOMAS, and THOMAS immediately delegated them to TW. Thus, in paying off the IP Transaction Debts, TW also cleansed

1    PDTW of those liabilities, also conferring a sizeable benefit upon PDTW, all to TW's

2    detriment, and all in reliance upon THOMAS and PDTW fulfilling all covenants and

3    obligations to TW.

4    68.    In sum, the Plan of Reorganization transported THOMAS from a situation in which she

5    and everything associated with THOMAS WYLDE were on the brink of failure to one in

6    which she was suddenly freed of crushing personal liabilities and, in accordance with her

7    stated desires, in a new position in which she could indeed focus on the creative side of

8    this business, all in a new company, freshly capitalized, and with a salary twice as high as

9    any she had ever received before. THOMAS had been rescued and given a fresh start.[3]

10    All she had to do was hold up her end of the bargain.

11    **THOMAS' Performance Under the Employment Agreement**

12    69.    Because THOMAS was on vacation, she did not actually report to TW's offices for work

13    until on or about January 10, 2015.

14    70.    The last date that THOMAS came to TW's offices was on or about April 8, 2015, and

15    even that was just to deliver a doctor's note and then leave. Her actual last day reporting

16    to TW's offices for any purpose related to work -- or even just for the purpose of

17    resolving her work situation -- was in or around the last week of March.

18    71.    Thus, THOMAS' entire work history under the Thomas Employment Agreement consists

19    of under three months.

20    72.    Problems with THOMAS' performance surfaced almost immediately after she first

21    _____

22    [3] To put this in perspective, out of the approx. $5.5M obtained as part of TW's initial
capitalization, over $4.5M went to paying off old PDTW liabilities, leaving less than $1M of the

23    initial capitalization for the new company to operate. Even those liabilities characterized as
THOMAS' liabilities and comprising the $2M portion were actually PDTW liabilities that were

24    at all times guaranteed by THOMAS but formally delegated to THOMAS and then
instantaneously re-delegated to TW, apparently for tax-motivated reasons, as part of the IP

25    acquisition. *See* paragraph 67, *supra*. Thus, approximately 82% of TW's initial capitalization was
used, not for launching itself, and not for forward-looking purposes and operations, but for

26    cleansing PDTW and THOMAS of crushing liabilities that came from before TW's very
existence and to give THOMAS and the brand this fresh start. True, TW obtained the trademark

27    and IP in the process, but one must never lose sight of the tremendous benefits conferred upon

28    plaintiffs during the Plan of Reorganization.

12

1    reported to work just after her return on January 10, 2015.

2    73.    For example, when she left for her vacation on or about Dec. 19, 2014, TW was already

3    late in preparing its Pre-Spring 2016 line. THOMAS knew this, yet still opted to go on

4    vacation.

5    74.    THOMAS understood that, if she did leave for a three week vacation at that time, TW

6    would necessarily be forced to appoint someone to lead the design team in her stead so

7    that the Pre-Spring 2016 collection could be ready by the time THOMAS returned.

8    75.    TW did so, hiring Giselle Limtao for that purpose. TW, with Limtao's assistance, in fact

9    prepared a Pre-Spring 2016 line, preparing also a presentation of this line for THOMAS

10    to review upon her return. To do so essentially required that Limtao and the design team

11    work almost non-stop through the holiday period at no small degree of personal sacrifice

12    for all involved.

13    76.    Upon THOMAS' return to the office, Giselle Limtao, together with the TW design team,

14    gave this presentation to THOMAS.

15    77.    THOMAS flatly rejected the work of the design team.

16    78.    Even so, THOMAS herself failed to complete the Pre-Spring 2016 collection by the time

17    she ceased reporting to the office in late March, 2015. Instead, even after an estimated

18    seven iterations of the Pre-Spring 2016 line under THOMAS' direction, THOMAS never

19    in fact finished that collection before leaving TW.

20    79.    Thus, THOMAS failed, during that short period, to perform the core function of her job:

21    She failed to complete the design process for even a single collection under her

22    employment agreement.

23    80.    Otherwise, during that same period, THOMAS' conduct fell short of the mark – whether

24    THOMAS is held to the standards erected under her employment contract, or the

25    standards applicable to her as a company officer, or any reasonableness or good faith or

26    fair dealing standard.

27    81.    For example, THOMAS was informed that the Japanese market in particular and, to a

28    lesser extent, the Russian market, required certain design modifications involving the

1    inclusion or exclusion of certain materials for certain seasonal collections. THOMAS

2    flatly refused to accommodate these important markets, leading to the complete loss of

3    the Japanese market.

4    82.    For example, THOMAS, apparently now unhappy in her new role in which she was no

5    longer CEO, but instead under one, and therefore accountable for her actions, became

6    unhappy, insubordinate and disruptive.

7    83.    For example, on various occasions she sought to undermine PARK to HANNA, but also

8    HANNA to PARK, disparaging each to the other, and otherwise seeking to sow dissent,

9    or even to have PARK fired or HANNA removed: In private she would meet with PARK

10    to attempt to enlist PARK's aid in getting rid of HANNA, while at the same time meeting

11    privately with HANNA to discuss how they might do the same to PARK. These childish

12    antics had a deleterious effect not only upon the working relationships between company

13    officers, but also upon employee morale as the growing dissension became more and

14    more obvious to everyone at the company.

15    84.    Not content to confine the back-biting to the company, THOMAS also disparaged TW

16    and its management to outsiders.

17    85.    For example, on Feb. 17, 2015 – just over five weeks after THOMAS started under her

18    new employment agreement – HANNA met Vanessa Von Bismarck, President of BPCM,

19    for breakfast. Both were in New York City at that time for Fashion Week.

20    86.    At that breakfast, Von Bismarck informed HANNA that THOMAS was actively

21    disparaging company management, had openly called HANNA a "moron," and had stated

22    that HANNA was "running the company into the ground."

23    87.    In addition, THOMAS continued simply making decisions for the brand that were no

24    longer hers to make. This problem persisted despite at least two warnings that THOMAS

25    not make decisions on behalf of TW and instead confine her activities to their proper

26    sphere as Creative Director.

27    88.    For example within a single day after one such warning, TW was approached by

28    representatives for the performing artist Sia with an opportunity to dress Sia in THOMAS

14

1     WYLDE clothing. THOMAS, consulting no one, declined this opportunity on behalf of

2     the company.

3  89.   Indeed, after only about one-and-a-half months of at least some appearance of at least

4     superficial performance under her employment contract, things had deteriorated so badly

5     that THOMAS herself hired counsel.

6  90.   Representatives of the company therefore met with THOMAS and her counsel, Olivia

7     Goodkin, on Feb. 26, 2015, to try to work out problems and differences. Management

8     emerged from that meeting hopeful that, moving forward, THOMAS would be happy,

9     would refrain from undermining management, would collaborate with her fellow

10    company officers, and would successfully lead the design team, because all such things

11    were aired at that meeting. Yet THOMAS' behavior did not change.

12  91.   Instead THOMAS simply continued with attempts to undermine management and refused

13    to collaborate or cooperate or effectively lead the design team.

14  92.   THOMAS' overall intentions became clear through yet other actions as well. In late

15    February of 2015, she began removing her personal effects from TW's offices. Then, on

16    March 31, 2015, THOMAS had others remove almost all of whatever remained from

17    TW's offices.

18  93.   Apparently as part of this planned yet secretive exodus from TW, and for no reasons

19    relating to legitimate company business, on or about March 3, 2015, THOMAS instructed

20    the company's IT specialist, Ed Smith, to furnish passwords to the company's servers to

21    Tony Jay and Joshua Sophrin. Doing so constituted a blatant violation of the

22    Confidentiality and Intellectual Property Agreement THOMAS agreed to as part of her

23    employment agreement.

24  94.   Ed Smith in fact furnished the passwords to the company's servers to Tony Jay and/or

25    Joshua Sophrin. Thereafter, at THOMAS' request, the company's confidential

26    information was in fact accessed, downloaded, copied, and used by Tony Jay and Joshua

27    Sophrin and THOMAS for THOMAS' personal benefit. For example, to-date THOMAS

28    continues to use TW's proprietary information and images on her own personal website

1       found at www.paulathomas.world. What other use Jay and Sophrin may otherwise have

2       made of these TW company materials is as yet unknown.

3     95.    In addition, on March 26, 2015, Olivia Goodkin, speaking for THOMAS, conveyed to

4       TW's in-house counsel, David Schnider, that TW should hire a new Creative Director to

5       design the spring and summer 2016 collections, indicating that THOMAS would not

6       continue to lead the design team.

7     96.    What Goodkin stated verbally was essentially repeated in writing in an e-mail from her

8       dated April 5, 2015. In that e-mail Goodkin, on behalf of THOMAS, indicated that

9       THOMAS "will not design Spring/Summer 2016 . . .".

10    97.    Thus, THOMAS, in communicating that TW should hire a new Creative Director and that

11       she would not design future collections, resigned from her position as Creative Director.

12    98.    In the alternative, THOMAS abandoned her post by communicating that TW should hire

13       a new Creative Director and that she would not design future collections.

14    99.    In sum, during her short tenure at TW, THOMAS demonstrated that she could not or

15       would not do what was necessary to be employed at TW. Instead, THOMAS

16       demonstrated that she had absolutely no regard for the fact that TW's existence, and,

17       indeed, the continued existence of the brand, now depended wholly upon tremendous

18       sums of newly-invested money coming from third parties to whom the company was now

19       accountable and who had placed their faith and trust in TW. THOMAS further

20       demonstrated precisely zero cognizance of the fact that her new status as someone who

21       had been wrested from colossal personal debt and the brink of failure was all due to the

22       faith and trust of those new investors. Finally, THOMAS in fact demonstrated, by

23       resigning or abandoning her post, that she did not even want to be there.

24                       **THOMAS' Conduct Post-Separation**

25   100.    After separating from TW, THOMAS continued her attempts to undermine TW, its

26       management, and the brand.

27   101.    For example, THOMAS attempted to solicit or recruit TW sales agents away from TW.

28   102.    As another example, in late April of 2015, Siim Kohv, TW's global PR representative,

1    indicated that THOMAS had called him and had told him that HANNA and PARK are

2    "not good people" and are "untrustworthy". In that same call, Kohv indicated that

3    THOMAS had admitted to having made similar comments to Yann Weber at *Antidote*

4    magazine.

5  103.  As another example, THOMAS contacted existing customers and caused them to

6    discontinue their relationship with the brand, not to order from TW as they had in the

7    past, and/or to terminate or reject orders already placed.

8  104.  In one instance, customer Just One Eye simply returned, without explanation, its order,

9    never communicating any basis for rejection.

10  105.  In another instance, the Russian department store TSUM simply cut off communications

11    with TW.

12  106.  Upon information and belief, both instances occurred because THOMAS intervened,

13    actively to sabotage the brand, making untrue statements about TW, violating her

14    fiduciary duties to TW. TW expects to find yet other examples of such conduct.

15  107.  As yet another example, on July 25, 2015, Emma Murmuridis, a long-time supporter of

16    the brand, sent PARK an e-mail facially protesting the fact that PARK had "unfriended"

17    Murmuridis on Facebook and had removed Murmuridis from PARK's Instagram list.

18  108.  The Murmuridis e-mail contained, at its end, a post-script, reading as follows:

19          BTW I'm Bcc all my friends and everyone I know . . . Friends: I have been told,
20          Paula Thomas (the founder and creative director since the line began) is no longer
             with the company; let's wait and see what the next line looks like before making
21          decisions whether to continue to support Thomas Wylde!

22  109.  Through calls from trading partners, management learned that the Murmuridis e-mail was

23    in fact, as threatened, blind-copied to an unknown number of people.

24  110.  The Murmuridis e-mail is essentially a call to boycott the brand.

25  111.  The Murmuridis e-mail was sent to company vendors, trading partners, and customers.

26  112.  Some of the names and e-mail addresses of the recipients of the Murmuridis e-mail could

27    only have been obtained from THOMAS making use of TW confidential company

28    information and passing it along to Murmuridis.

113.  Thus, upon information and belief, THOMAS was instrumental not only in composing the Mournaridis e-mail and its call for a boycott, but also in making sure that it reached the widest possible audience.

114.  As yet another example, on Aug. 5, 2015, and due in part to company promotional and public relations initiatives, the *LA Times* published an article and was considering publishing yet another article about TW.

115.  THOMAS contacted the *LA Times*, demanding that it retract the article and making false statements about her continued involvement with the company, all in an attempt to derail the company's promotional initiatives. This led to a wasteful diversion of company energies, attention, money and other resources in correcting the record and putting this public relations initiative back on track.

116.  As yet another example, on various occasions THOMAS has taken images belonging to the company and published them on her personal Instagram or elsewhere in social media, either laying false claims to having created the things shown, or otherwise essentially implying, to a vast number of people, that TW now has no design capacity without her.

117.  As yet another example of how this conduct continues *even after* the filing of the First Amended Cross-Complaint, THOMAS took a certain copyrighted image used by TW in its advertising campaigns, copied it, modified it -- creating a derivative work from it -- by superimposing, in large, red letters, the word "NOT" over the image, and then broadcast this derivative work through social media. Beneath the image, THOMAS then published the following caption:

> I would like to announce for the record - THIS IS NOT MY WORK - for all of my industry associates *I am no longer Thomas Wylde*.

*See* **Exhibit B**, annexed and incorporated (the announcement) at **Bates 00008 - 00009** (emphasis supplied). The purpose of this exercise was to harm TW and to damage the value of that trademark -- THOMAS WYLDE -- purchased by TW from THOMAS and to suggest to the world that the trademark itself is essentially valueless without THOMAS, or that otherwise TW is without any design capacity, or that goods sold by

18

1  TW bearing the THOMAS WYLDE mark are not genuine or are somehow inferior.

2  118.  In addition, THOMAS has, through this lawsuit, and by bringing a host of claims that can

3  only be described as frivolous, vexatious, and groundless, sought to damage the company,

4  its reputation, and the reputation of its managers and officers, and to divert the company's

5  energies, attention, and funds to defending against such a suit, all in an effort to destroy

6  the brand, or at least force it to purchase anew that which she has already sold once – in

7  short, to extort it.

## FIRST CROSSCLAIM

## BREACH OF CONTRACT

## (TW v. THOMAS)

11  119.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-118

12  above, as if fully set forth herein.

13  120.  On or about Dec. 31, 2014 TW entered into a written contract with THOMAS for her

14  services.

15  121.  A true and correct copy of that agreement is attached to Plaintiffs' FAC as Exhibit B.

16  122.  THOMAS breached the agreement by failing to design saleable products as promised and

17  by failing to complete even a single season for TW.

18  123.  THOMAS breached the agreement by failing to dedicate adequate time and effort to

19  fulfilling her duties under the agreement.

20  124.  THOMAS breached the agreement by breaching its confidentiality provisions.

21  125.  THOMAS breached the agreement by breaching her duty of loyalty and fiduciary duties

22  when sharing TW's confidential, proprietary information with outside third parties.

23  126.  THOMAS breached the agreement by denigrating TW and its other officers to members

24  of the press and public.

25  127.  THOMAS breached the agreement by breaching her duty of loyalty and other fiduciary

26  duties when denigrating TW and its other officers to third parties.

27  128  THOMAS breached her agreement by failing to follow the direct orders of her superior

28  129.  THOMAS breached the agreement by resigning or abandoning her post when she stated

1    that she would no longer design garments and articles for TW.

2  130.   THOMAS breached the agreement by failing to display leadership and failing in fact to

3    lead the design team and by instead sowing dissension within the design team and within

4    the company in general.

5  131.   THOMAS breached the agreement by failing to be present enough to supervise the

6    activities of those working under her.

7  132.   THOMAS breached the agreement by, post-separation, soliciting or recruiting members

8    of TW's sales team or other employees.

9  133.   TW fulfilled all of its obligations to THOMAS and satisfied all conditions precedent,

10    save only those it was prevented from performing or satisfying, or was otherwise excused

11    from performing or satisfying, by THOMAS.

12  134.   TW suffered damages legally or proximately caused by THOMAS' breaches in amounts

13    to be demonstrated according to proof at trial.

14  135.   TW suffered special or consequential damages when it had to hire others to fulfill

15    THOMAS' duties or was required to divert others from their existing duties to fulfill her

16    duties. THOMAS knew or should have known that this was the case and is liable for

17    these damages as well.

18  136.   TW is entitled to all such general and special or consequential damages.

19  137.   The breach being material, TW is entitled to disgorgement and restitution of all salary and

20    all things of value paid or tendered to THOMAS.

21  138.   TW is entitled to its reasonable attorneys' fees in pursuing this claim in accordance with

22    the agreement.

23  139.   Plaintiff is entitled to its reasonable costs in pursuing this claim.

24  WHEREFORE, TW prays for judgment in an amount to be proven at trial, restitution in the

25  amount of the value of all amounts paid to THOMAS, plus prejudgment interest, plus reasonable

26  costs and, if allowed, reasonable attorneys' fees, plus any and all other relief that this Court may

27  deem just.

28

**SECOND CROSSCLAIM**

**BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING**

**(TW v. THOMAS)**

140. Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-139 above, as if fully set forth herein.

141. There is implied in every contract a covenant of good faith and fair dealing that neither party will do anything deliberately to deprive the other of the benefits of the contract.

142. TW performed all of its obligations under the Employment Agreement, save only where its performance was excused.

143. All conditions precedent to THOMAS' duty to perform under the Employment Agreement were satisfied.

144. THOMAS breached the covenant of good faith and fair dealing implied in the Employment Agreement by, among other things: not accepting her new role as Chief Creative Officer and Creative Director or performing the duties of that position; not accepting or respecting the chain of command; not following the directives of her superiors; undertaking a campaign to disparage management to outside, third parties; by undertaking a campaign to divide management against itself; sowing dissension and strife within the company; generating an atmosphere of such negativity that production was adversely affected; causing the company's energies and attention and funds – all desperately needed for the survival of the company – to be diverted to sorting out a constant stream of unnecessary and often childish problems created by THOMAS; and by failing to complete even a single season for TW.

145. TW has been deprived of the benefits of the Employment Agreement and materially damaged by these and other breaches of the implied covenant as set forth above, all in an amount according to proof at trial, plus prejudgment interest.

WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other relief that this Court may deem just.

## THIRD CROSSCLAIM

### BREACH OF FIDUCIARY DUTY

### (TW v. THOMAS)

146. Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-145 above, as if fully set forth herein.

147. THOMAS was an officer of TW with the title of Chief Creative Officer during all relevant time periods, acting on TW's behalf as such until her separation.

148. A company officer owes fiduciary duties to the company.

149. This fiduciary duty imposes on the officer a duty to act with the utmost good faith in the best interests of the company.

150. This fiduciary duty imposes on the officer a duty of the utmost loyalty to the company.

151. This fiduciary duty imposes upon the officer a duty to use reasonable care in the discharge of the duties of her office.

152. This fiduciary duty imposes upon the officer a duty to maintain the confidentiality of the company's confidential information.

153. By doing the things above-described, TW was harmed by THOMAS' failure to act with the utmost good faith.

154. By doing the things above-described, TW was harmed by THOMAS' failure to act with the utmost loyalty.

155. By doing the things above-described, TW was harmed by THOMAS' failure to use reasonable care.

156. By doing the things above-described, TW was harmed by THOMAS' failure to maintain the confidentiality of its confidential information.

157. In addition, TW's company operating agreement contains a provision requiring that a supermajority of members approve any salary above $200,000.00.

158. Specifically, TW's operating agreement states that--

> [A]ll of the following acts shall require the consent by Vote of a Supermajority of Members: . . . (o) Paying any Officer or Employee more than $200,000.00 per year; . . ."

1    AMENDED AND RESTATED OPERATING AGREEMENT OF THOMAS WYLDE,

2    LLC § 7.5 (Dec. 22, 2014) ("Operating Agreement").

3    159.    THOMAS, as the second largest member of TW, and as an officer, had a duty to uphold

4            and abide by the Operating Agreement.

5    160.    No supermajority ever approved that portion of her salary in excess of $200,000.00 per

6            year.

7    161.    Nevertheless, THOMAS accepted, during her tenure at TW, salary payments under a

8            contract purporting to pay over $200,000.00 per year and now sues for damages asserting

9            the right to over $200,000.00 per year.

10   162.    The excess amounts accepted and now sued for are *ultra vires* and in violation of the TW

11           operating agreement. The claims are therefore in violation of THOMAS' fiduciary duties

12           to the company and its other members, in violation of her duty of loyalty, her duty of care,

13           and her duty to act in good faith in TW's best interests.

14   163.    By accepting excess amounts and suing over them and by attempting to force TW to do

15           that which is *ultra vires* and that which it may not do under the operating agreement,

16           THOMAS has harmed TW.

17   164.    In each instance in which THOMAS has harmed TW, as described above, THOMAS'

18           conduct was a substantial factor in causing TW's harm.

19   165.    These harms have caused TW to suffer damages.

20   166.    THOMAS' actions as alleged herein were committed with malice, oppression, or fraud,

21           entitling TW to recover punitive damages.

22   WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

23   interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

24   relief that this Court may deem just.

25                                **FOURTH CROSSCLAIM**

26                                **BREACH OF CONTRACT**

27                                **(TW v. THOMAS & PDTW)**

28   167.    Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-166

                                              23

1        above, as if fully set forth herein.

168.    As part of the Plan of Reorganization, PDTW agreed to transfer certain assets, and did
        transfer certain assets, to TW.

169.    As part of the Plan of Reorganization, and as part of its agreement to transfer certain
        assets to TW, and as part of transferring those assets to TW, PDTW in fact delivered
        possession of these assets to TW.

170.    As part of the Plan of Reorganization, PDTW agreed to continue to hold title to certain
        assets in trust for TW, and to transfer them to TW once they no longer served as collateral
        under certain secured debts owed by PDTW.

171.    As part of the Plan of Reorganization, PDTW agreed that TW would pay down or even
        pay off certain of its debts, and that PDTW would owe TW a corresponding debt for all
        monies spent in paying down or off its debts.

172.    As part of the Plan of Reorganization, THOMAS agreed to the Agreement to Purchase
        Membership Interest, under which she bound herself to transfer all intellectual property,
        including all designs and all related rights, to TW.

173.    TW has in fact paid down or even paid off certain debts owed by PDTW.

174.    TW has also, in every other way, fulfilled its obligations to PDTW, and satisfied every
        condition precedent to PDTW's duty to perform its obligations to TW.

175.    Nevertheless, PDTW has breached its obligations to TW.

176.    PDTW has breached its obligations to TW by denying that TW has the right to possess its
        inventory and to sell that inventory and apply the proceeds to satisfy PDTW's debts,
        whether to TW or to third parties.

177.    PDTW has breached its obligations to TW by denying that TW now owns all archive
        pieces and samples, and by seeking to disrupt TW's enjoyment of that personalty.

178.    PDTW has breached its obligations to TW by failing to reimburse it for monies expended
        for it.

179.    PDTW has breached its obligations to TW by failing to pay or even acknowledge its
        debts to TW.

180. TW has in fact fulfilled its obligations to THOMAS under the Agreement to Purchase Membership Interest, and satisfied every condition precedent to THOMAS' duty to perform her obligations under that agreement.

181. Nevertheless, THOMAS has breached her obligations under that agreement.

182. THOMAS has breached her obligations under that agreement by pretending that archive pieces did not pass to TW and by attempting, directly, and through manipulation of PDTW, indirectly, to exercise ownership over those archive pieces.

183. THOMAS has breached her obligations under that agreement by pretending that all rights of whatever sort related to designs or otherwise related to intellectual property, including the embodiment of that intellectual property, did not pass to TW.

184. THOMAS has otherwise breached her obligations under the Plan of Reorganization by manipulating PDTW in such a way as to cause it to breach its obligations to TW.

185. TW has either performed all of its obligations under all agreements with PDTW and THOMAS, or its performance was excused.

186. As a direct result of PDTW's breach of contract, TW has suffered damages in an amount to be proven at trial, plus prejudgment interest.

187. As a direct result of THOMAS' breaches of contract, TW has suffered damages in an amount to be proven at trial, plus prejudgment interest.

188. Some of those things that THOMAS and/or PDTW were bound to transfer are unique and their loss cannot be adequately addressed with money damages. TW is therefore entitled to specific performance ordering the transfer of all such things to it, and otherwise to injunctive relief preventing the disposal of any such items.

WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other relief that this Court may deem just. which relief can, and should, include an order commanding Plaintiffs to transfer certain items to TW and/or enjoining them from disposing of the same.

## FIFTH CROSSCLAIM

## BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING

### (TW v. PDTW & THOMAS)

189.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1- 188 above, as if fully set forth herein.

190.  There is implied in every contract a covenant of good faith and fair dealing that neither party will do anything deliberately to deprive the other of the benefits of the contract.

191.  TW performed all of its obligations under its agreements with PDTW and THOMAS, save only where its performance was excused.

192.  All conditions precedent to PDTW's and THOMAS' duty to perform under its agreements with TW were satisfied.

193.  PDTW and THOMAS breached the covenant of good faith and fair dealing implied in its agreements with TW by, among other things: seeking to obstruct TW's liquidation of inventory; seeking to interfere with, and indeed denying, TW's rights in and to THOMAS WYLDE archive pieces; seeking to eviscerate the value of the IP obtained by TW under the Agreement to Purchase Membership Interest; disavowing debts incurred by PDTW to TW; seeking to recharacterize monies spent with PDTW's consent and on its behalf and for its benefit as things instead done for the benefit of others; attempting to reclaim things they had already sold or that they know they must transfer to TW once certain PDTW secured debts are paid off, or otherwise things that they know are collateral for debts incurred to TW; and by disavowing those other things they bound themselves to do under that Plan of Reorganization described above, including that part of the Plan of Reorganization which is the Agreement to Purchase Membership Interest..

194.  TW has been deprived of the benefits of its agreements with PDTW and THOMAS and materially damaged by these and other breaches of the implied covenant as set forth above, in an amount according to proof at trial, plus prejudgment interest.

WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

1   relief that this Court may deem just.

2                              **SIXTH CROSSCLAIM**

3                             **OPEN BOOK ACCOUNT**

4                                 **(TW v. PDTW)**

5   195.   Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-194

6          above, as if fully set forth herein.

7   196.   TW and PDTW entered into certain financial transactions.

8   197.   TW kept an account of the debits and credits involved in these transactions.

9   198.   PDTW owes TW money on this account.

10  199.   The amount of money that PDTW owes TW as of the date of this First Amended Cross-

11         Complaint is $2,597,303.92 which amount is due and unpaid despite demand or despite

12         PDTW's repudiation of this debt, plus prejudgment interest according to proof.

13  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

14  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

15  relief that this Court may deem just.

16                            **SEVENTH CROSSCLAIM**

17                             **ACCOUNT STATED**

18                                **(TW v. PDTW)**

19  200.   Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-199

20         above, as if fully set forth herein.

21  201.   PDTW owes TW money because of those financial transactions between them.

22  202.   The amount owed was stated in writing.

23  203.   TW and PDTW, by words or conduct, agreed that the amount stated in the account was

24         the correct amount owed by PDTW to TW.

25  204.   $2,597,303.92 which is the current amount of this debt, is due and unpaid despite demand

26         or despite PDTW's repudiation of this debt, plus prejudgment interest according to proof.

27  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

28  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

1  relief that this Court may deem just.

2  ## EIGHTH CROSSCLAIM

3  ## MONEY HAD & RECEIVED

4  ### (TW v. PDTW)

5  205.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-204

6  above, as if fully set forth herein.

7  206.  PDTW became indebted to TW for money had and received by PDTW.

8  207.  The money had and received by PDTW was for the use and benefit of TW.

9  208.  $2,597,303.92, which is the amount of this debt, is due and unpaid despite demand or

10  despite PDTW's repudiation of this debt, plus prejudgment interest according to proof.

11  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

12  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

13  relief that this Court may deem just.

14  ## NINTH CROSSCLAIM

15  ## COMMON COUNT

16  ### (TW v. PDTW)

17  209.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-208

18  above, as if fully set forth herein.

19  210.  PDTW became indebted to TW within the last two years for money lent by TW to PDTW

20  at PDTW's request.

21  211.  PDTW became indebted to TW within the last two years for money paid, laid out, and

22  expended to or for PDTW at PDTW's special instance and request.

23  212.  $2,597,303.92, which is the amount of this debt, is due and unpaid despite demand or

24  despite PDTW's repudiation of this debt, plus prejudgment interest according to proof.

25  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

26  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

27  relief that this Court may deem just.

28

28

# TENTH CROSSCLAIM

## RESTITUTION/UNJUST ENRICHMENT

### (TW v. THOMAS & PDTW)

213. Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-212 above, as if fully set forth herein.

214. As part of the Plan of Reorganization, TW furnished a benefit to PDTW in the form of paying off at least $2,597,303.92 in debt on which PDTW was directly liable, including, by way of example, and not limitation, the settlement payments to Schiffman.

215. This benefit furnished by TW to PDTW is separate and distinct from that consideration paid by TW on THOMAS' behalf for the IP, as set forth above, paragraphs 57 - 68 – *and see*, in particular, paragraphs 65 - 67 (TW bound to pay off, for *THOMAS' benefit*, nearly $2M in specific, named liabilities and TW in fact paid these, respectively).

216. This benefit furnished by TW to PDTW is above and beyond that consideration paid by TW on THOMAS' behalf as set forth above, paragraphs 57 - 68 – *and see*, in particular, paragraphs 65 - 67 (TW bound to pay off, for *THOMAS' benefit*, nearly $2M in specific, named liabilities and TW in fact paid these, respectively).

217. PDTW knew that TW was furnishing this benefit.

218. PDTW accepted this benefit.

219. It would be inequitable for PDTW to retain the benefit of these payments without having to pay their fair value.

220. In addition, as part of the Plan of Reorganization, TW furnished a benefit to THOMAS in the form of paying off at least $2M in debt on which THOMAS was initially personally liable as a guarantor and later assumed liability. *See* paragraphs 65-67, *supra*.

221. THOMAS knew that TW was furnishing this benefit.

222. THOMAS accepted this benefit.

223. It would be inequitable for THOMAS to retain this benefit without having to pay for it.

224. Yet, by denying that TW has received all rights to the THOMAS WYLDE designs, by denigrating the brand, by insinuating publicly that the brand is inseparable from her and

1    cannot continue without her, and otherwise by committing the acts complained of

2    elsewhere herein, THOMAS has not paid for this benefit, but instead has eviscerated

3    TW's acquisition of the THOMAS WYLDE intellectual property of much of its value.

4  225.  Thus, PDTW and THOMAS, and each of them, have been unjustly enriched and should

5    be held liable to TW in an amount to be proven at trial, plus prejudgment interest.

6  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

7  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

8  relief that this Court may deem just.

9

**ELEVENTH CROSSCLAIM**

**PROMISSORY ESTOPPEL**

**(TW v. THOMAS & PDTW)**

10

11

12  226.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-225

13    above, as if fully set forth herein.

14  227.  As part of the Plan of Reorganization, THOMAS clearly promised to do all things

15    necessary to allow TW to take over operations under the THOMAS WYLDE brand and

16    continue as the fashion house under that brand name.

17  228.  As part of the Plan of Reorganization, PDTW clearly promised to do all things necessary

18    to allow TW to take over operations under the THOMAS WYLDE brand and continue as

19    the fashion house under that brand name.

20  229.  As part of the Plan of Reorganization, THOMAS clearly promised to convey all things

21    necessary to allow TW to take over operations under the THOMAS WYLDE brand and

22    continue as the fashion house under that brand name. The things to be conveyed included

23    all things having to do with the brand, its history, its legacy, and otherwise, its goodwill.

24  230.  As part of the Plan of Reorganization, PDTW clearly promised to convey all things

25    necessary to allow TW to take over operations under the THOMAS WYLDE brand and

26    continue as the fashion house under that brand name. The things to be conveyed included

27    all things having to do with the brand, its history, its legacy, and otherwise, its goodwill.

28  231.  As part of the Plan of Reorganization, PDTW clearly promised to retain legal title to

1    certain things, but only as an accommodation to TW, and only for so long as certain
2    secured debts remained outstanding.

3  232.  As part of the Plan of Reorganization, PDTW clearly promised to permit TW to take
4    possession of its assets, and to deal with them, and to sell off its inventory, and to apply
5    the proceeds from all such sales to PDTW's debts, whether to TW or to third parties.

6  233.  As part of the Plan of Reorganization, PDTW clearly promised that any monies expended
7    by TW to pay for its debts would become debts owed by PDTW to TW.

8  234.  As part of the Plan of Reorganization, PDTW clearly promised that all other things
9    owned by it, and all other assets not necessary to allow TW to take over operations under
10    the THOMAS WYLDE brand and continue as the fashion house under that brand name,
11    would nonetheless serve as collateral for PDTW's debts to TW.

12  235.  These promises made by THOMAS and PDTW were separate and distinct from those
13    made as part of the Agreement to Purchase Membership Interest or the Thomas
14    Employment Agreement or otherwise those promises explicitly made as part of
15    THOMAS' acquisition of her membership interest in TW, on the one hand, and TW's
16    acquisition of the IP and cash, set forth above, paragraphs 57 - 68.

17  236.  These promises made by THOMAS and PDTW were above and beyond those made as
18    part of the Agreement to Purchase Membership Interest or the Thomas Employment
19    Agreement or otherwise those promises explicitly made as part of THOMAS' acquisition
20    of her membership interest in TW, on the one hand, and TW's acquisition of the IP and
21    cash, set forth above, paragraphs 57 - 68.

22  237.  TW relied upon these promises in paying down or paying off PDTW's other -- i.e., those
23    debts other than the IP Transaction Debts - and otherwise in furnishing money to PDTW
24    or on its behalf, and in hiring THOMAS and paying her, and in extinguishing specified
25    liabilities of THOMAS. Given PDTW's and THOMAS' promises, this reliance was
26    justified.

27  238.  The detriment suffered by TW in relying upon these promises and receiving little or
28    nothing in return is substantial: It has paid out over $2.5M of funds to Plaintiffs or on

1      their behalves, almost all of which was obtained from outside investors who expect

2      something in return.

3  239.  Because of its reliance upon these promises, TW has suffered damages in an amount to be

4      proven at trial, plus prejudgment interest.

5  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

6  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

7  relief that this Court may deem just.

8  **TWELFTH CROSSCLAIM**

9  **COMMERCIAL DISPARAGEMENT/TRADE LIBEL**

10  **(TW v. THOMAS)**

11  240.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-239

12      above, as if fully set forth herein.

13  241.  By making those statements and taking those actions described above, THOMAS made

14      statements or committed acts that would clearly or necessarily be understood to have

15      disparaged the quality of TW's products and services.

16  242.  Specifically, as described elsewhere herein, THOMAS communicated or at least

17      insinuated to key players within the fashion industry and members of the consuming

18      public: That she was no longer with the brand and therefore the brand could not function

19      without her; that she was inseparable from the trademark THOMAS WYLDE and

20      indistinguishable from it -- *i.e.* that "[she is] no longer Thomas Wylde" and that that

21      should be considered by anyone purchasing TW products, whether trade customers or

22      even the consuming public; that the brand without her was without value and without

23      design capability; and that articles issuing under the mark without her involvement were

24      not genuine articles or at least of lower quality. She did all of this after selling the

25      trademark THOMAS WYLDE, voluntarily alienating it, and *personal* benefits of

26      approximately $2M for it, and inherently conceding and representing that the mark in fact

27      had an existence separate from her own and value apart from her.

28  243.  As just one example, as described elsewhere herein, THOMAS took copyrighted TW

32

advertising, modified it by superimposing, in large, red letters, the word "NOT", and then rebroadcast the modified image to important members of the fashion industry and consumer base. She accompanied this with a statement that "[she is] no longer Thomas Wylde." *See* paragraph 117, *supra*, *see* Exhibit B at Bates 00008 - 00009.

244.   These statements were made to third-party persons and/or entities other than TW.

245.   These statements were untrue. In the alternative, they were intentionally misleading or intentionally infused with false and misleading innuendo and implied meaning.

246.   THOMAS either knew that the statements were untrue or acted with reckless disregard of the truth or falsity of the statements.

247.   THOMAS knew or should have known that someone else might act in reliance on the statement, causing TW financial loss.

248.   TW suffered direct financial harm because others in fact acted in reliance on the statements.

249.   TW's conduct was a substantial factor in causing TW's harm.

WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other relief that this Court may deem just.

## THIRTEENTH CROSSCLAIM

## UNFAIR COMPETITION – BUS. & PROF. CODE § 17200 *et seq.*

### (TW v. THOMAS)

250.   Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-249 above, as if fully set forth herein.

251.   THOMAS has sold the trademark THOMAS WYLDE with the rest of the IP to TW.

252.   By suggesting or insinuating that she is indispensable to the trademark THOMAS WYLDE that she sold and parted with, she has damaged the value of the trademark and the IP.

253.   For example, by broadcasting through social media a copy of copyright-protected images from TW's advertising campaigns, but first superimposing over such images, in large, red

1     lettering, the word "NOT", THOMAS suggested and insinuated to the public, or an

2     important segment of it, or to the fashion industry, or an important segment of it, that

3     whatever is now being produced under the trademark THOMAS WYLDE is somehow

4     deficient or false or defective, or that it lacks genuineness or authenticity, or that TW

5     otherwise now lacks any capacity to design garments and continue operations under the

6     mark THOMAS WYLDE. *See* **Exhibit B**, annexed and incorporated (Bates 00008 -

7     00009)(TW advertising materials taken by THOMAS and modified to superimpose, in

8     large, red letters, the word "NOT" and then published by THOMAS in social media, with

9     accompanying caption wherein THOMAS states that "[she is] no longer THOMAS

10     WYLDE"); *see also* paragraph 117, *supra*.

11 254.   For example, by giving to Emma Murmuridis TW's contact list, and by causing

12     Murmuridis to broadcast that message as described above (*see* paragraphs 107-113,

13     above), THOMAS suggested and insinuated to the public, or an important segment of it,

14     or to the fashion industry, or an important segment of it, that whatever is now being

15     produced under the trademark THOMAS WYLDE is somehow deficient or false or

16     defective, or that it lacks genuineness or authenticity, or that TW is somehow without

17     design capability.

18 255.   For example, by continuing to incorporate into her personal website

19     www.paulathomas.world images belonging to TW and showing products and designs

20     belonging to TW and/or created by TW, THOMAS not only violates copyright, but also

21     suggests that she is the source or origin of those things shown, in violation of state and

22     federal unfair competition laws.

23 256.   These practices deployed by THOMAS are unlawful, unfair, and/or fraudulent. They also

24     constitute unfair, deceptive, untrue and/or misleading advertising, or otherwise violate

25     BUS. & PROF. CODE § 17500 *et seq.* and, in turn BUS. & PROF. CODE § 17200 *et seq.*

26 WHEREFORE, TW prays for this Court's injunction preventing THOMAS from continuing the

27 above-described practices and ordering restitution of all things of value gained by her thereby.

28

## FOURTEENTH CROSSCLAIM

### INDUCING BREACH OF CONTRACT

#### (TW v. THOMAS)

257. Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-256 above, as if fully set forth herein.

258. There was a contract between TW and Just One Eye for the purchase of goods.

259. Likewise, there were yet other contracts between TW and yet other customers, vendors, and service providers, to be identified in discovery.

260. THOMAS knew of these contracts.

261. As described above in ¶¶ 100-116 and elsewhere herein, THOMAS embarked upon a campaign to malign TW and its management intended to cause Just One Eye and TW's other contractual partners to breach these contracts.

262. THOMAS' conduct caused Just One Eye to breach its contract with TW. Specifically, THOMAS' conduct caused Just One Eye to breach its duty not to reject conforming goods and its duty to pay for goods received, and otherwise its good faith and fair dealing duty not to reject arbitrarily conforming goods.

263. THOMAS' conduct caused those other customers, vendors, and service providers, to breach their contracts with TW, all similarly in breach of their contracts.

264. Specifically, as described elsewhere herein, THOMAS communicated or at least insinuated to key players within the fashion industry and members of the consuming public -- including TW's contractual partners -- that she was no longer with the brand and that the brand could not function with out her, that she was inseparable from the trademark THOMAS WYLDE and indistinguishable from it, that the brand without her was without value and without design capability, and that articles issuing under the mark without her involvement were not genuine articles.

265. As just one example, as described elsewhere herein, THOMAS took TW advertising, modified it by superimposing, in large, red letters, the word "NOT", and then rebroadcast the modified image to important members of the fashion industry and consumer base, all

1   with a caption in which she declares that "[she is] no longer Thomas Wylde". *See*

2   paragraph 117, *supra*.

3   266.   As described above in TW's commercial disparagement/trade libel and unfair

4   competition claims, THOMAS' conduct was independently wrongful, violating

5   constitutional, statutory, regulatory, common law, or other determinable legal standards.

6   267.   As a member of TW, THOMAS' conduct was independently wrongful, violating

7   THOMAS' fiduciary duties to TW and its members.

8   268.   In each instance, TW was harmed, suffering damages.

9   269.   THOMAS' conduct was a substantial factor in causing TW's harm and resultant

10   damages.

11   WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

12   interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

13   relief that this Court may deem just.

14   FIFTEENTH CROSSCLAIM

15   INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

16   (TW v. THOMAS)

17   270.   Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-269

18   above, as if fully set forth herein.

19   271.   There were contracts between TW and certain of its customers, and also certain of its

20   vendors or service providers, including, without limitation, Just One Eye, in Los Angeles,

21   and TSUM, in Russia, and others yet to be discovered.

22   272.   THOMAS knew of these contracts.

23   273.   As described above in ¶¶ 100-116 and elsewhere herein, THOMAS embarked upon a

24   campaign to malign TW and its management intended to cause Just One Eye and TSUM

25   and TW's other contractual partners to breach these contracts or to prevent their

26   performance or to make performance more expensive or difficult.

27   274.   Specifically, as described elsewhere herein, THOMAS communicated or at least

28   insinuated to key players within the fashion industry -- including TW's contractual

50

1  partners -- and members of the consuming public that she was no longer with the brand

2  and that the brand could not function without her, that she was inseparable from the

3  trademark THOMAS WYLDE and indistinguishable from it, that the brand without her

4  was without value and without design capability, and that articles issuing under the mark

5  without her involvement were not genuine articles.

6  275.  As just one example, as described elsewhere herein, THOMAS took TW advertising,

7  modified it by superimposing, in large, red letters, the word "NOT", and then rebroadcast

8  the modified image to important members of the fashion industry and consumer base.

9  This announcement was accompanied, as described, with THOMAS' declaration that

10  "[she is] no longer Thomas Wylde". *See* paragraph 117, *supra*.

11  276.  THOMAS intended to disrupt the performance of these contracts or knew that disruption

12  of performance was certain or substantially certain to occur.

13  277.  As described above in TW's commercial disparagement/trade libel and unfair

14  competition claims, THOMAS' conduct was independently wrongful, violating

15  constitutional, statutory, regulatory, common law, or other determinable legal standards.

16  278.  As a member of TW, THOMAS' conduct was independently wrongful, violating

17  THOMAS' fiduciary duties to TW and its members.

18  279.  TW was harmed, suffering damages.

19  280.  THOMAS' conduct was a substantial factor in causing TW's harm and damages.

20  WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment

21  interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other

22  relief that this Court may deem just.

23  ### SIXTEENTH CROSSCLAIM

24  ### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

25  ### (TW v. THOMAS)

26  281.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-280

27  above, as if fully set forth herein.

28  282.  TW and Just One Eye were in an economic relationship that probably would have

1    resulted in an economic benefit to TW.

2    283.    TW and TSUM were in an economic relationship that probably would have resulted in an
3    economic benefit to TW.

4    284.    TW and other customers, vendors, and service providers were in economic relationships
5    that probably would have resulted in economic benefits to TW.

6    285.    THOMAS knew of these relationships.

7    286.    As described above in ¶¶ 100-116 and elsewhere herein, THOMAS engaged in a
8    campaign designed to denigrate TW and its management, to cause others to think that,
9    after her departure, TW was without any capacity to continue, and otherwise to cause
10    TW's customers, vendors, and service providers, including, by way of example, and not
11    limitation, Just One Eye and TSUM, to sever business relations with TW.

12    287.    Specifically, as described elsewhere herein, THOMAS communicated or at least
13    insinuated to key players within the fashion industry and members of the consuming
14    public that she was no longer with the brand and that the brand could not function with
15    out her, that she was inseparable from the trademark THOMAS WYLDE and
16    indistinguishable from it, that the brand without her was without value and without
17    design capability, and that articles issuing under the mark without her involvement were
18    not genuine articles.

19    288.    As just one example, as described elsewhere herein, THOMAS took TW advertising,
20    modified it by superimposing, in large, red letters, the word "NOT", and then rebroadcast
21    the modified image to important members of the fashion industry and consumer base, at
22    the same time declaring that "[she is] no longer Thomas Wylde". *See* paragraph 117,
23    *supra*.

24    289.    By engaging in this conduct, THOMAS intended to disrupt these relationships and/or
25    knew that disruption of these relationships was certain or substantially certain to occur.

26    290.    Certain of these relationships were in fact disrupted.

27    291.    As described above in TW's commercial disparagement/trade libel and unfair
28    competition claims, THOMAS' conduct was independently wrongful, violating

constitutional, statutory, regulatory, common law, or other determinable legal standards.

292.  As a member of TW, THOMAS' conduct was independently wrongful, violating THOMAS' fiduciary duties to TW and its members.

293.  TW was harmed, suffering damages.

294.  THOMAS' conduct was a substantial factor in causing TW's harm and damages.

WHEREFORE, TW prays for judgment in an amount to be proven at trial, plus prejudgment interest, plus reasonable costs and, if allowed, reasonable attorneys' fees, plus any and all other relief that this Court may deem just.

## SEVENTEENTH CROSSCLAIM

## UCC FORECLOSURE OF SECURITY INTEREST

## (TW v. PDTW)

295.  Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-294 above, as if fully set forth herein.

296.  On March 15, 2016, TW obtained an assignment of the Schiffman Note and the Schiffman Security Agreement, together with any and all other debts or obligations of PDTW to Michael Schiffman, M.D., of whatever nature, including, without limitation, all such obligations set forth under that Mutual Release and Settlement Agreement ("Settlement") entered into between Schiffman and PDTW on or about April 29, 2015 and relating to *Michael Schiffman, M.D. v. PDTW, LLC, Thomas Wylde, and Paula Thomas,* Los Angeles Superior Court Case No. BC 513 911.

297.  Under the Settlement, PDTW was required to make a $12,000.00 payment on March 15, 2016.

298.  PDTW did not make its March 15, 2016 payment.

299.  On March 17, 2016, TW served PDTW with a notice of default and demand for payment.

300.  PDTW failed to cure the default and has now also failed to make that $12,000.00 payment due on April 15, 2016.

301.  PDTW is currently in default under the Settlement.

302.  TW is therefore entitled to exercise those rights assigned to it, whether under the Mutual

1     Settlement and Release or Schiffman Security Agreement or otherwise as a secured

2     creditor under the Uniform Commercial Code.

3  303.   Under COMMERCIAL CODE § 9601(a)(1), TW is entitled to elect, at its option, to foreclose

4     its security interest through judicial procedure.

5  304.   Under COMMERCIAL CODE § 9609(c), TW is entitled to compel PDTW to assemble all

6     collateral and to make it available to TW at a reasonably convenient place.

7  305.   Under COMMERCIAL CODE § 9615(a)(1) and the Schiffman Security Agreement, TW is

8     entitled to its reasonable costs and attorneys' fees in retaking and holding and preparing

9     for disposition and otherwise processing and disposing of the collateral.

10  306.   Under COMMERCIAL CODE § 9627(c)(1), TW is entitled to the protections of this Court's

11     determination that its disposition of all collateral is commercially reasonable.

12  307.   TW is otherwise entitled to foreclose its security interest and sell the collateral invoking

13     those protections and rights it has under the Schiffman Security Agreement and Uniform

14     Commercial Code and seeking, where necessary or desirable, such orders from this Court

15     as will result in an orderly and commercially reasonable disposition of all collateral.

16  WHEREFORE, TW prays for such orders as may, from time to time be necessary or desirable to

17  protect its security interest, to compel PDTW and THOMAS to assemble and deliver all

18  collateral not already in TW's hands, and to permit the orderly liquidation of all collateral

19  securing PDTW's debts to it plus, as provided by agreement and statute, all reasonable costs and

20  attorneys' fees.

21               **EIGHTEENTH CROSSCLAIM**

22                 **DECLARATORY RELIEF**

23               **(TW v. THOMAS & PDTW)**

24  308.   Cross-Claimant TW restates and realleges all allegations set forth in paragraphs 1-307

25     above, as if fully set forth herein.

26  309.   Actual controversies have arisen and now exist between TW and THOMAS with respect

27     to the Employment Agreement.

28  310.   Specifically, a controversy has arisen and now exists as to whether or not THOMAS

1    resigned or abandoned her position.

2    311.    Specifically, a controversy has arisen and now exists as to whether or not THOMAS, if
3    she did not resign or abandon her position, was fired for cause.

4    312.    Actual controversies have arisen and now exist between TW, on the one hand, and
5    THOMAS and PDTW, on the other, with respect to those agreements that formed part of
6    the Plan of Reorganization described above.

7    313.    Specifically, a controversy has arisen and now exists as to whether or not whatever TW
8    received under those agreements is limited solely to those things set forth as THOMAS'
9    consideration paid for her membership interest in TW.

10    314.    Specifically, a controversy has arisen and now exists as to whether or not whatever
11    PDTW in fact transferred and delivered and surrendered to TW in apparent performance
12    of its contractual obligations can now be claimed as PDTW property, subject to return.

13    315.    Actual controversies have arisen and now exist between TW, on the one hand, and
14    THOMAS and PDTW, on the other, with respect to those rights obtained by TW from
15    Schiffman and any resultant obligations now flowing from PDTW to TW, and the extent
16    to which they are secured by the Schiffman Security Agreement, or the extent to which
17    TW has a valid security interest which may be foreclosed.

18    316.    TW requests a judicial determination of its rights under the Employment Agreement and
19    Operating Agreement.

20    317.    Specifically, TW requests a declaration that THOMAS resigned from TW.

21    318.    Specifically, TW requests a declaration that, in the alternative, THOMAS breached the
22    Employment Agreement and Operating Agreement by engaging in the actions alleged
23    above. TW therefore requests, in the alternative, a declaration that THOMAS was
24    terminated for cause.

25    319.    TW requests a judicial determination of its rights under those agreements with PDTW
26    under which it has, to-date, lent approximately $2,597,303.92 to PDTW, paying down or
27    off its debts, and fending off litigation against it

28    320.    TW requests a judicial determination that those assets reasonably related to or necessary

41

1   for the continued operation of the THOMAS WYLDE brand passed to TW under the Plan

2   of Reorganization by agreement and by virtue of those benefits conferred upon PDTW,

3   and in partial payment of those debts owed by PDTW to TW.

4   321.   TW requests a judicial determination that any and all other assets are fairly held as

5   collateral for these debts owed by PDTW to TW for amounts lent.

6   322.   TW requests a judicial determination that, with respect to inventory, its sale of PDTW

7   inventory is lawful, and that its application of the proceeds from the sale of inventory

8   towards PDTW's debts is likewise lawful.

9   323.   TW requests a judicial determination that it possesses a valid security interest in all assets

10  of PDTW which it may foreclose in accordance with the Security Agreement and

11  Uniform Commercial Code, and that this security interest extends to all debts for all

12  monies lent by TW to PDTW.

13  324.   A judicial declaration is necessary at this time under these circumstances so that TW may

14  assert its rights and remedies.

15  WHEREFORE, TW prays for this Court's declaration that, under the agreements pertaining to

16  this case, THOMAS resigned from or abandoned her position at TW. In the alternative, TW

17  prays for this Court's declaration that THOMAS was terminated for cause. TW further prays for

18  this Court's declaration that TW has lent, and PDTW has borrowed, all funds expended on

19  PDTW's behalf for trade debts or to pay off Schiffman or otherwise for PDTW's liabilities. TW

20  further prays for this Court's declaration that it owns all archive pieces and holds all other

21  property, including inventory, as collateral for PDTW's debts to TW, and that TW's liquidation

22  of inventory and application of the proceeds to pay down PDTW's is lawful and just, and that it

23  has a valid and enforceable security interest which it may foreclose by selling all collateral held

24  by it under the Security Agreement.

25                          *   *   *   *   *

26  WHEREFORE, TW prays for:

27

28      A. Judgment in an amount to be proven at trial, joint and several under those theories

1  asserted herein;

2  B. Prejudgment interest;

3  C. Reasonable costs;

4  D. If and to the extent allowed, reasonable attorneys' fees;

5  E. This Court's declaration that:

6    (1) THOMAS resigned from TW (or, in the alternative that she was justly

7    terminated);

8    (2) PDTW has borrowed all funds expended by TW on its behalf, whether to pay

9    Schiffman or otherwise;

10   (3) TW owns all archive pieces and lawfully possesses and lawfully may sell any

11   and all inventory and apply the proceeds to PDTW's debts;

12   (4) TW holds all other things of value in its possession and owned by PDTW as

13   collateral for those debts owed by PDTW to TW; and

14   (5) TW holds a valid security interest which it may foreclose in all assets of

15   PDTW, which security interest extends to all debts owed by PDTW to it.

16  F. Any and all such other relief that this Court may deem just, including, without

17  limitation, those orders TW may request from time-to-time in seeking to foreclose its

18  security interest and dispose of all collateral held by it in an orderly fashion under the

19  Uniform Commercial Code, including, without limitation, orders compelling Plaintiffs to

20  assemble all collateral and make it available to TW for disposition, and including,

21  without limitation, such injunctive and equitable relief as may be available under BUS. 7

22  PROF. CODE § 17200 *et seq.*.

23                          *    *    *    *    *

24

25                          **DEMAND FOR JURY TRIAL**

Defendants exercise their right to demand trial by jury of all issues for which such right

26  exists.

27

28                          *    *    *    *    *

1

\* \* \* \* \*

2

*Respectfully submitted, January 10, 2017:*

3

Lawstudios | Richard Byron Peddie, P.C.

4

By:
Richard Byron Peddie

5

Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue

6

Boulder, CO 80303-2831
Tel.: 303.444.5447

7

Fax: 720.635.9222
*Attorney for Defendant Blue Source Group*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2    STATE OF COLORADO, COUNTY OF BOULDER

3        I, the undersigned, am employed in the County of Boulder, State of Colorado. I am over
the age of eighteen (18) years and not a party to the within action. My business address is: 5051
4    Euclid Avenue, Boulder, Colorado 80303-2831.

5        On January 10, 2017, I served true copies of the foregoing document(s) described as:
SECOND AMENDED CROSS-COMPLAINT on all interested parties in this action, addressed
6    as follows:

7        Kenneth W. Chung
Laura Booth
8        Allyson K. Thompson
KRING & CHUNG, LLP
9        38 Corporate Park
Irvine, CA 92606-5105
10       Tel.: 949.261.7700
Facsimile: 949.261.8800
11

12    ___    BY U.S. MAIL: The documents were placed in sealed, addressed envelopes on the above
date and placed for collection and mailing at my place of business. I am "readily familiar"
13    with the firm's practice of collecting and processing correspondence for mailing. Under
that practice, it would be deposited with the U.S. Postal Service on that same day with
14    postage thereon fully prepaid at Boulder, Colorado, in the ordinary course of business. I
am aware that on motion of the party served, service is presumed invalid if postal
15    cancellation date or postage meter date is more than one day after date of deposit for
mailing in affidavit.

16    _X_    BY ELECTRONIC SERVICE: Based on a court order or an agreement of the parties to
accept electronic service, I caused the documents to be sent to the persons at the
17    electronic service addresses: lbooth@kringandchung.com.
athompson@kringandchung.com and mbennett@kringandchung.com
18

19        I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

20        Executed on January 10, 2017, at Boulder, Colorado.

21

22

23                                                        Richard Byron Peddie

24

25

26

27

28

45

# EXHIBIT "22"

1   DIMITRIOS P. BILLER (142730)
2   LDT Consulting, Inc.
    15113 West Sunset Blvd., Suite "9"
3   Pacific Palisades, California 90272
4   Telephone (310) 459-9870
    E-mail Address: biller_ldtconsulting@verizon.net
5
6   MARCIA DALEY (146579)
    DALEY & SACKS LAW RLLP
7   1516 Westwood Boulevard, Suite 102
8   Los Angeles, California 90024
    Telephone: (310) 985-2808
9   E-mail: marciad@daleyandsackslaw.com
10
11  Attorneys for Creditor Paula Thomas
12
13
                   UNITED STATES DISTRICT COURT
14
15       FOR THE CENTRAL DISTRICT COURT OF CALIFORNIA
16
17
18  IN RE                          Case No.: 6:16-bk-15889 SY

19  PDTW, LLC,

20                                 CREDITOR PAULA THOMAS'
                                   EXHIBIT LIST FOR AUGUST 28-29,
21              DEBTOR.            2017 HEARING
22
23
24
25
26
27
28
    EXHIBIT LIST                        1

Creditor Paula Thomas hereby serves her Exhibit List identifying the

documents and evidence that may be used at the August 28 – 29, 2017 Evidentiary

Hearing. Furthermore, Creditor Paula Thomas reserves the right to supplement and

add to this Exhibit List based additional documents that are produced in August

2017.

| EXHIBIT NO. | EXHIBIT DESCRIPTION | DATE EXHIBIT IDENTIFIED | DATE EXHIBIT ADMITTED |
|---|---|---|---|
| | 1. Articles of Organization for Thomas Wylde, LLC dated July 22, 2014 | | |
| | 2. Professional Biography of Paula Thomas | | |
| | 3. Thomas Wylde Distribution Memorandum | | |
| | 4. Valuation Report by Santi, Pastore & Hill of | | |

EXHIBIT LIST

2

| | | | |
|---|---|---|---|
| | PDTW, LLC dated September __, 2013 | | |
| | 5. PDTW, LLC Articles of Organization | | |
| | 6. Articles of Organization dated July 22, 2014 for Thomas Wylde, LLC. | | |
| | 7. Amended Articles of Organization dated December 22, 2014 for Thomas Wylde, LLC | | |
| | 8. UCC Financing Statement | | |
| | 9. Written Consent Agreement waiving conflict of interests between Thomas Wylde Holdings, LLC, | | |

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | PDTW, LLC, and Paula Thomas | | |
| | 10.Draft Secured Promissory Note for $2,000,000.00 to be signed by Eniluz Gonzalez and Khondker Shoeb Ahmed dated December 1, 2014 | | |
| | 11. Draft Consulting Agreement between PDTW, LLC and John Hanna | | |
| | 12. Text Exchange between John Hanna, Jene Park, Elna Alexis Dressline about Ramona Agruma | | |

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 13. Documents Showing Investments into Thomas Wylde, LLC by Eniluz Gonzalez, Hillshore Investment, Inc. | | |
| | 14. Transaction by Account for Thomas Wylde | | |
| | 15. Amended Exhibit "B"/Members & Capital Contributions dated April 15, 2014 | | |
| | 16. E-mails between Andrew Apfelberg and David Schnider Regarding Drafting of (1) Agreement for Purchase of | | |

5

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Membership Interest and (2) Thomas Employment Agreement | | |
| | 17. Thomas Employment Agreement dated December 22, 2014 | | |
| | 18. Claw back Agreement dated December 22, 2014 | | |
| | 19. Reduction in Salary Chart | | |
| | 20. Unsigned Revocation and Termination of Guaranty Agreement | | |
| | 21. December 19, 2014 e-mail from David Schnider to Andrew Apfelberg regarding | | |

6

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Stephen Choi not having faith in Paula Thomas | | |
| | 22. December 22, 2014 e-mail from David Schnider to Andrew Apfelberg regarding documents Paula Thomas has to sign before end of year 2014 | | |
| | 23. December 24, 2014 e-mail from Andrew Apfelberg to David Schnider and Paula Thomas asking if she received documents to review and sign | | |
| | 24. Use of Proceeds | | |

7

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Agreement dated December 22, 2014 | | |
| | 25. Indemnity Agreement dated December 22, 2014 | | |
| | 26. Loan and Security Agreement dated October 30, 2013 between PDTW, LLC and Da Da Trading Co. LTD (Alex Park) | | |
| | 27. Action by Written Consent of the Members of PDTW, LLC dated December 22, 2014 | | |
| | 28. Guaranty from Thomas Wylde Holdings, LLC dated | | |

8

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | October 29, 2013 | | |
| | 29. Guaranty from Paula Thomas dated October 29, 2013 | | |
| | 30. Articles of Dissolution of Thomas Wylde Holdings, LLC dated December 22, 2014 | | |
| | 31. $270,000.00 Promissory Note | | |
| | 32. Dato Capital Report on Hillshore Investment, Inc. | | |
| | 33. February 2, 2016 Notice of Issuance of New Membership Interest | | |
| | 34. Exhibit "A" to Agreement to Purchase | | |

9

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Membership Agreement | | |
| | 35. Third Amended Exhibit "B" dated April 15, 2015 | | |
| | 36. February 26, 2015 Agenda for meeting between John Hanna, Jene Park, David Schnider, Meldi Rafols and Paula Thomas | | |
| | 37. February 27, 2015 e-mail from Olivia Goodkin to David Schnider regarding summarizing highlights of February 26, 2015 meeting | | |
| | 38. March 3, 2015 e-mail | | |

EXHIBIT LIST

10

| | | | |
|---|---|---|---|
| | from David Schnider to Olivia Goodkin regarding items he believes were discussed at the meeting | | |
| | 39. John Hanna's Congratulatory E-mail to Paula Thomas about NY Fashion Show | | |
| | 40. Text Message from Jene Park to Ramona Agruma, Elna Margret Zu Bentheim (aka Elna Alexis Dressline), and Diane Pistalu inviting them to a dinner at Ceconni's Italian Restaurant | | |

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 41. Photographs of February 23, 2015 Dinner at Ceconni's Italian Restaurant, attendants being Jene Park, Alex Park, John Hanna, Ramona Agruma, Elna Margret Zu Bentheim (aka Elna Alexis Dressline), and Diane Pistalu | | |
| | 42. March 27, 2015 e-mail from David Schnider to Olivia Goodkin about changing Paula Thomas' role at Thomas Wylde, LLC and reducing her salary | | |
| | 43. April 8, 2015 unsigned | | |

EXHIBIT LIST

12

| | | | |
|---|---|---|---|
| | Memorandum of Understanding | | |
| | 44. April 9, 2015 e-mail from David Schnider to Olivia Goodkin regarding a new role at Thomas Wylde, LLC for Paula Thomas | | |
| | 45. April 13, 2015 e-mail exchange between David Schnider and Olivia Goodkin regarding an offer to buy out Paula Thomas employment contract | | |
| | 46. April 20, 2015 e-mail from David Schnider to Olivia Goodkin constructively | | |

13

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | "Terminating" Paula Thomas' employment | | |
| | 47. April 21, 2015 e-mail response from Olivia Goodkin to David Schnider's April 20, 2015 e-mail | | |
| | 48. Unsigned Settlement Agreement between Thomas Wylde, LLC and Paula Thomas | | |
| | 49. May 14, 2015 letter from Thomas Wylde, LLC outside counsel, Richard Peddie, to Olivia Goodkin effectively terminating Paula Thomas' employment | | |

14

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 50. May 19, 2015 letter from Olivia Gookin to Richard Peddie | | |
| | 51. May 19, 2015 e-mail from Olivia Goodkin to Richard Peddie requesting the return of the personal belongings of Paula Thomas | | |
| | 52. June 1, 2015 letter from Richard Peddie to | | |
| | 53. Thomas Wylde, LLC Profit and Loss Statements for 2014 and 2015 | | |
| | 54. John Hanna text messages to Jene Park and Elna Margret Zu Bentheim (aka Elna | | |

EXHIBIT LIST

15

| | | | |
|---|---|---|---|
| | Alexis Dressline) regarding Ramona Agruma | | |
| | 55. AW Market Report for Thomas Wylde, LLC for Sales AW14 vs AW15 prepared by Jene Park | | |
| | 56. Notice of Issuance of New Membership Interests to the Members of Thomas Wylde, LLC, dated January 26, 2016 | | |
| | 57. Notice of Issuance of New Membership Interest, January 26, 2016 | | |
| | 58. Thomas Wylde, LLC | | |

16

EXHIBIT LIST

| | product catalog/book | | |
|---|---|---|---|
| | 59. Sales Review Sheet | | |
| | 60. Cancelled Styles Sheet | | |
| | 61. Finance One, Inc. Acknowledgment | | |
| | 62. Continuing Guarantee | | |
| | 63. Collecting Date Factoring Agreement | | |
| | 64. Supplement to Collection Date Factoring Agreement | | |
| | 65. Indemnity for Acceptance of Facsimile & Electronic Mail Documents | | |
| | 66. Client On-Line Access Agreement | | |
| | 67. Certify Resolution and Finance and Factoring | | |

17

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Agreement | | |
| | 68. LLC Agreement | | |
| | 69. Notice of Assignment of Invoices to Finance One, Inc. | | |
| | 70. December 16, 2013 Acknowledgement of Signatures | | |
| | 71. Guarantee of $1,625,000.00 loan | | |
| | 72. Loan and Security Agreement (Da Da Trading Company, Inc.) | | |
| | 73. Confidentiality, Non-Solicitation Agreement | | |
| | 74. Kring & Chung September 1, 2015 letter to John Hanna | | |

18

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 75. Sam Vaziri Vance, Inc. Complaint against Thomas Wylde, LLC | | |
| | 76. AP Aging Summary | | |
| | 77. 2015 Tax Return for Thomas Wylde, LLC | | |
| | 78. January through December 2016 Profit & Loss Statement | | |
| | 79. January 2017 Profit & Loss Statement | | |
| | 80. Thomas Wylde, LLC Balance Sheet as of January 31, 2017 | | |
| | 81. Profit & Loss Statement January 2017 | | |
| | 82. Deposition Transcript of Stephen Choi | | |

19

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 83. Deposition Transcript of Jene Park | | |
| | 84. Deposition Transcript of John Hanna | | |
| | 85. Deposition Transcript of David Schnider | | |
| | 86. Deposition Transcript of Eniluz Gonzalez | | |
| | 87. Deposition Transcript of the PMK at Thomas Wylde, LLC | | |
| | 88. Deposition Transcript of David Spear | | |
| | 89. Plaintiff's 1st Set of Special Interrogatories served on Thomas Wylde, LLC. | | |
| | 90. Thomas Wylde, LLC's | | |

20

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | Responses to Plaintiff's 1st Set of Special Interrogatories | | |
| | 91. Plaintiff's 2st Set of Special Interrogatories served on Thomas Wylde, LLC | | |
| | 92. Thomas Wylde, LLC's Responses to Plaintiff's 2nd Set of Interrogatories | | |
| | 93. Plaintiff's 1st Set of Requests for Production served on Thomas Wylde, LLC. | | |
| | 94. Thomas Wylde, LLC's Responses to Plaintiff's 1st Set of Requests for Production | | |

21

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 95. Plaintiff's 2nd Set of Requests for Production served on Thomas Wylde, LLC | | |
| | 96. Thomas Wylde, LLC's Responses to Plaintiff's 2nd Set of Requests for Production | | |
| | 97. Plaintiff's 3rd Set of Requests for Production served on Thomas Wylde, LLC | | |
| | 98. Thomas Wylde, LLC's Responses to Plaintiff's 3rd Set of Requests for Production | | |
| | 99. Subpoena Duces Tecum served on Kyu Hong Kim | | |

22

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 100. Subpoena Duces Tecum/Demand to Appear for Trial and Demand for Production of Documents for John Hanna | | |
| | 101. Subpoena Duces Tecum/Demand to Appear for Trial and Demand for Production of Documents for Jene Park | | |
| | 102. Subpoena Duces Tecum/Demand to Appear for Trial and Demand for Production of Documents for Stephen Choi | | |

23

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | 103.  Subpoena Duces Tecum/Demand to Appear for Trial and Demand for Production of Documents for Eniluz Gonzalez | | |
| | 104.  Paula Thomas' Demand served Thomas Wylde, LLC to Produce Witnesses and Documents on August 28, 2017 in lieu of Subpoena | | |
| | 105.  Paula Thomas' Claims and supporting documents | | |
| | 106.  Thomas Wylde, LLC's Claims and alleged supporting | | |

24

EXHIBIT LIST

| | | | |
|---|---|---|---|
| | documents | | |
| | 107. Any and all documents Thomas Wylde, LLC produces in response to Paula Thomas' Demand to Produce Witnesses and Documents Served via e-mail on August 4, 2017 | | |
| | 108. Impeachment documents | | |
| | 109. Rebuttal Documents | | |

Dated: August 4, 2017

Respectfully submitted,

By: /S/ Dimitrios P. Biller
Attorney for Creditor Paula

25

EXHIBIT LIST

Thomas

**PROOF OF SERVICE**
**STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On August 4, 2017, I caused to be served, via e-mail, the following pleadings:

**PAULA THOMAS' EXHIBIT LIST**

on the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 505 Euclid Avenue
> Boulder, Co 80303-2811
> e-mail: lawstudios@comcast.net
> Counsel for ALL Defendants

26

EXHIBIT LIST

1

2

Nancy Hoffmeir Zamora
3

Anthony N.R. Zamora
4

Zamora & Hoffmeier
U.S. Bank Tower
5

633 West 5th Street, Suite 2600
6

Los Angeles, California 90071
e-mail zamora3aol.com
7

8   **XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service

9   by the United States Postal service, with postage thereon fully prepaid. I am
"readily familiar" with the practice of collection and processing correspondence
10
for mailing. Under that practice, it would be deposited with the United States
11   Postal Service on that same day with postage thereon fully prepaid at Pacific
Palisades, California. I am aware that on motion of the party served, service is
12
presumed invalid if postal cancellation date or postage meter date is more than one
13   day after date of deposit for mailing in affidavit.

14
        BY FEDERAL EXPRESS – I am familiar with the practice at my place of
15   business for collection and processing of correspondence for overnight delivery

16   maintained by Federal Express. Such correspondence will be deposited with a
facility regularly maintained by Federal Express for receipt on the same day in the
17   ordinary course of business. The envelope was sealed and placed for collection

18   and delivery by Federal Express with delivery fees paid or provided for in
accordance with ordinary business practices.
19
        BY PERSONAL SERVICE – I caused such envelope to be delivered by hand
20   to the offices of the addressee.

21
**XXX**: E-mail at the above e-mail addresses.
22

23   **XXX** (State) I declare **under penalty of perjury under the laws of the State of**
**California** that the foregoing is true and correct.
24

25        Executed on **August 4, 2017**, at Pacific Palisades, California.

26

27

28
EXHIBIT LIST

27

1   /S/ Dimitrios P. Biller
2   Dimitrios P. Biller

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

EXHIBIT LIST

# EXHIBIT "23"

1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 West Sunset Blvd., Suite "9"
3  Pacific Palisades, California 90272
4  Telephone (310) 459-9870
   E-mail Address: biller_ldtconsulting@verizon.net
5
6  MARCIA DALEY (146,579)
7  DALEY & SACKS LAW RLLP
   1516 Westwood Boulevard, Suite 102
8  Los Angeles, California 90024
9  Telephone: (310) 985-2808
   E-mail: marcia@daleyandsackslaw.com
10
11
12                UNITED STATES DISTRICT COURT
13
14           FOR THE CENTRAL DISTRICT OF CALIFORNIA
15
16  In re PDTW,                          Case No.: 6:16-bk-15889
17                Debtor.
18
                                         PLAINTIFF, PAULA THOMAS'
19                                       WITNESS LIST
20
21
22
23      Creditor Paula Thomas hereby serves her Witness List for the August 218-
24
25  29, 2017 Evidentiary Hearing.  Creditor Paula Thomas reserves the right to
26  supplement her Witness List.
27
28
   WITNESS LIST                          1

# WITNESS LIST

1. John Hanna;

2. Jene Park;

3. David Schnider;

4. Stephen Choi;

5. Doug Lee;

6. Roger Kuo;

7. Eniluz Gonzalez;

8. Kyu Hong Kim;

9. Stanley Ducks;

10. Marilyn Heston;

11. PMK regarding Hillshore Investment, S.A;

12. Meldy Rafols;

13. Olivia Goodkin;

14. Andrew Apfelberg;

15. Tony Jay;

16. Luis Barajas;

17. Richard Peddie;

18. PMK of Specific Topics for Thomas Wylde, LLC;

2

WITNESS LIST

19. PMK from Sanli, Pastore & Hill;

20. Paul Murphy;

21. Michael Schifman;

22. Thomas Fore;

23. Michael Crain;

24. Harry Nadjarian;

25. Haley Barnes;

26. Amanda Grandinetti;

27. Jules Daly;

28. Jonathan Gale;

29. Harley Wolitzky;

30. Ramona Agruma;

31. Emma Murmuritis;

32. Diana Pistalu;

33. Elna Margret Zu Bentheim;

34. Amy Lu;

35. David Bang;

36. Chrisso Collins;

37. Natalie Lewin;

3

WITNESS LIST

38. Leslie Gregory;

39. Amanda Gregory;

40. Plaintiff Paula Thomas;

41. Rebuttal Witnesses;

42. Impeachment Witnesses.;

Dated: August 4, 2017

Respectfully submitted,

By: /S/ Dimitrios P. Biller
Dimitrios P. Biller, Counsel for
Creditor Paula Thomas

WITNESS LIST

4

# PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On **August 4, 2017**, I caused to be served, via e-mail, the following pleadings:

### PLAINTIFF PAULA THOMAS' WITNESS LIST

on the interested parties in this action by e-mail:

>           Richard Byron Peddie,
>           lawstudios@comcast.net
>           Lawstudios Richard Bryon Peddie
>           505 Euclid Avenue
>           Boulder, Co 80303-2811
>           Counsel for ALL Defendants
>
>           Nancy Hoffmeir Zamora
>           Anthony N.R. Zamora
>           Zamora & Hoffmeier
>           U.S. Bank Tower
>           633 West 5th Street, Suite 2600
>           Los Angeles, California 90071
>           e-mail zamora3aol.com

**XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific Palisades, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

WITNESS LIST

1    ____BY FEDERAL EXPRESS – I am familiar with the practice at my place of
2    business for collection and processing of correspondence for overnight delivery
     maintained by Federal Express.  Such correspondence will be deposited with a
3    facility regularly maintained by Federal Express for receipt on the same day in the
4    ordinary course of business.  The envelope was sealed and placed for collection
     and delivery by Federal Express with delivery fees paid or provided for in
5    accordance with ordinary business practices.
6    ____BY PERSONAL SERVICE – I caused such envelope to be delivered by hand
7    to the offices of the addressee.

8    **XXX**: E-mail at the above e-mail addresses.

9
     **XXX** (State) I declare **under penalty of perjury under the laws of the State of**
10   **California** that the foregoing is true and correct.

11
12       Executed on **August 4, 2017**, at Pacific Palisades, California.

13

14
     /S/ Dimitrios P. Biller
15   Dimitrios P. Biller

16

17

18

19

20

21

22

23

24

25

26

27

28
                                         6
     WITNESS LIST

# EXHIBIT "24"

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Saturday, August 05, 2017 8:31 AM |
| **To:** | 'Richard'; 'Zamora, Nancy' |
| **Cc:** | 'marciad@daleyandsackslaw.com'; 'Simons, Larry' |
| **Subject:** | RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters |

Good morning, Richard. You do not have a right to split your claims between the bankruptcy court and superior court. You have withdrawn your claims, so those claims are gone. There is no time to amend the Cross-Complaint in Superior Court because that will defeat the ends of justice. *CCP Section 473* prohibits this maneuver. There is not a $2,000,000.00 claim in bankruptcy court or in Superior Court. You have withdrawn the claim.

Furthermore, please send me a copy of any *"reasoning"* by Ms. Zamora that you relied upon to reach this "decision." Frankly, you reached this "decision" to avoid the evidence on the August 28/29, 2017 hearing. All the exhibits and witnesses Paula Thomas identified goes to the credibility and believability of all witness providing testimony to undercut Paula Thomas' claim and her objections to TW's claims. Please do not suggest how I am going to present my evidence. The more Jene Park testifies the more impeachment evidence will be introduced. You may want to withdraw all of TW's claims to streamline the hearing.

Dimitrios P. Biller

From: Richard [mailto:lawstudios@comcast.net]
Sent: Friday, August 04, 2017 3:40 PM
To: Zamora, Nancy <zamora3@aol.com>
Cc: biller ldtconsulting <biller_ldtconsulting@verizon.net>; marciad@daleyandsackslaw.com; Simons, Larry <larry@lsimonslaw.com>
Subject: Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

Nancy,

I have considered your reasoning and agree to withdraw TW's Claim No. 10.

1

Thus, all participants may limit their preparations to their defense of, or opposition to (as the case may be) Claims Nos. 1, 3 and 5.

Understand: This withdrawal is for the purposes of the bankruptcy proceedings only, and without prejudice to TW's right to assert the same or a substantially similar claim in any other forum against Paula Thomas or even against Debtor (or its assignee or the estate's assignee) as a setoff or in recoupment or as a cross- or counter-claim, or even as a direct claim, should circumstances permit the same and should it be lawful to do so. TW withdraws this claim because you have convinced me that any advantages to be obtained are wholly outweighed by the complexity of the claim and need to streamline things at this juncture. Moreover, you rightly point out that prevailing on this claim will likely do little for TW in practical terms, given the numbers involved and what we expect to occur during estate liquidation.

I have not yet decided whether I will file something or simply withdraw this claim verbally at the next hearing. Still, all parties may rely upon this withdrawal from this point forwards.

Best Regards,


Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.

This e-mail, including any included attachments or links (collectively "Communication") is subject to the Electronics Communications Privacy Act, 18 U.S.C. 2510-2521, and may be protected under other laws as well. The Communication may be protected as an attorney-client communication and/or attorney work product.
    In any event, the Communication is CONFIDENTIAL and PROPRIETARY, intended only for the designated recipient. If you are not the designated recipient, you are notified that any review, dissemination, distribution, or copying of the Communication is strictly prohibited.
    If you have received this transmission in error, please notify us immediately by return e-mail, or by telephone (303.444.5447), and delete the Communication, together with any attachments, from your system.

---

**From:** zamora3@aol.com
**To:** "lawstudios" <lawstudios@comcast.net>, "biller ldtconsulting" <biller_ldtconsulting@verizon.net>, marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com
**Sent:** Friday, August 4, 2017 3:19:56 PM
**Subject:** Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

To all:

Below is Trustee's proposed witness and exhibit lists for the Evidentiary Hearing (8/28 and 8/29) on objection to claim no. 1, as amended, filed by claimant Paula Thomas. All

counsel agreed to exchange this information today in an effort to compile a single joint witness list and a single joint exhibit list. Trustee looks forward to receiving this information from other counsel today.

Trustee did not object to claim nos. 3, 5 and 10 that also are the subjects of the Evidentiary Hearing. However, to the extent that the Court will reach a final determination on these claims at the Evidentiary Hearing that will prevent Trustee from objecting to such claims in the future, Trustee reserves his right to participate in examining or cross-examining witnesses who testify related to these claims.

Finally, Trustee previously reviewed the objections to claim nos. 3, 5 and 10 and requested that Thomas Wylde, LLC withdraw claim no. 10. Trustee renews this request. If Thomas Wylde, LLC will comply, Trustee expects that the Evidentiary Hearing can be streamlined.

**Trustee's Proposed Witness List:**

Don Fife, Trustee's Estate Accountant in the Case

Paula Thomas, Claimant

Any and all prior employees or consultants of PDTW, LLC who have personal knowledge regarding and of the following:

   the preparation and maintenance of payroll, expense, tax, and other financial records of PDTW, LLC;

   PDTW, LLC's quickbooks data;

   compensation and other amounts paid to Ms. Thomas whether as salary, expense reimbursement, expense advance, member
   distribution, and/or other advances;

including, but not limited to:

Jene Park
Yoonsung Bae
Joel Keyser
Meldy Rafols

**Trustee's Proposed Exhibit List:**

Debtor's schedules and statement of financial affairs

Debtor's amended schedules

Claim No. 1

Amended Claim No. 1

Tax Returns of PDTW, LLC including, without limitation, for 2010, 2011, 2012, 2013, 2014 and 2015 (if prepared).

Financial reports generated from PDTW, LLC's quickbooks data.


Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

4

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Saturday, August 05, 2017 2:11 PM |
| **To:** | 'Richard' |
| **Cc:** | 'Zamora, Nancy'; 'marciad@daleyandsackslaw.com'; 'Simons, Larry' |
| **Subject:** | RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters |

Dear Mr. Peddie, Mr. Simmons and Mrs. Zamora

Please forward to me immediately the "reasoning" of Nancy Zamora that convinced you to drop the $2 million claim. I make the requests once again to Mr. Zamora. If you do not provide me with evidence of that "reasoning" I will move to (1) exclude all evidence you want to introduce for the remaining claims and (2) prevent Nancy Zamora to introduce any evidence to defeat Paula Thomas' claim. **Nancy Zamora has a fiduciary duty to all claimants, not just TW**. I always knew there was collusion, and now you have provided me with the evidence. You continued failure to provide me with this evidence will be used to exclude all evidence on multiple grounds.

You cannot simply drop a $2 million claim on the reasoning of the attorney for the Trustee 13 months into the bankruptcy and weeks before the evidentiary hearing. Your withdraw of the claim is permanent and you will not be about to resurrect that claim in Superior Court with or without Nancy Zamora. The "reasoning" is important. I will amend my witness list to name Nancy Zamora and Larry Simons as witnesses based on this new information.

Do you

**From:** Richard [mailto:lawstudios@comcast.net]
**Sent:** Saturday, August 05, 2017 1:54 PM
**To:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Subject:** Fwd: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

1

Mr. Biller:

This was sent yesterday evening.

rbp

---

**From:** "Richard" <lawstudios@comcast.net>
**To:** "Nancy Zamora" <zamora3@aol.com>
**Cc:** "biller ldtconsulting" <biller_ldtconsulting@verizon.net>, marciad@daleyandsackslaw.com, "Larry
Simons" <larry@lsimonslaw.com>
**Sent:** Friday, August 4, 2017 7:40:16 PM
**Subject:** Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to
Claim No. 1 and related matters

All,

I have taken what Nancy did and added to it. See attached. I have included WordPerfect versions as
well but anyone using Word can no doubt open those too.

I have not added anything from Paula Thomas' lists because I am hoping her counsel will revise that
list given TW's withdrawal of Claim No. 10.

In any event, I too must reserve the right to make additions and deletions.

Also, we need to talk about whether or not Michael Schiffman really needs to be called and, if so,
why/what for.

No party has ever raised him as being germane to anything. Judge Yun seems to have become
curious about Schiffman for some reason, thinking he might have been a concealed equity owner of
PDTW who, at the last minute, decided it was really debt. But that was never raised as a defense in
the Schiffman litigation, would be blocked now as a defense (if it ever had any merit) by the
settlement, etc., would require acknowledging his equity position in PDTW if argued . . . *So, does
anyone really need to call him and, if so, why?* Or can we just all agree to tell Judge Yun that
Schiffman just doesn't figure into any of this?

In any event, whoever needs him needs to be ready to subpoena him.

Thanks all,

RBP

---

**From:** zamora3@aol.com
**To:** "lawstudios" <lawstudios@comcast.net>, "biller ldtconsulting" <biller_ldtconsulting@verizon.net>,
marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com
**Sent:** Friday, August 4, 2017 3:19:56 PM
**Subject:** Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim
No. 1 and related matters

To all.

Below is Trustee's proposed witness and exhibit lists for the Evidentiary Hearing (8/28 and 8/29) on objection to claim no. 1, as amended, filed by claimant Paula Thomas. All counsel agreed to exchange this information today in an effort to compile a single joint witness list and a single joint exhibit list. Trustee looks forward to receiving this information from other counsel today.

Trustee did not object to claim nos. 3, 5 and 10 that also are the subjects of the Evidentiary Hearing. However, to the extent that the Court will reach a final determination on these claims at the Evidentiary Hearing that will prevent Trustee from objecting to such claims in the future, Trustee reserves his right to participate in examining or cross-examining witnesses who testify related to these claims.

Finally, Trustee previously reviewed the objections to claim nos. 3, 5 and 10 and requested that Thomas Wylde, LLC withdraw claim no. 10. Trustee renews this request. If Thomas Wylde, LLC will comply, Trustee expects that the Evidentiary Hearing can be streamlined.

**Trustee's Proposed Witness List:**

Don Fife, Trustee's Estate Accountant in the Case

Paula Thomas, Claimant

Any and all prior employees or consultants of PDTW, LLC who have personal knowledge regarding and of the following:

the preparation and maintenance of payroll, expense, tax, and other financial records of PDTW, LLC;

PDTW, LLC's quickbooks data;

compensation and other amounts paid to Ms. Thomas whether as salary, expense reimbursement, expense advance, member
distribution, and/or other advances;

including, but not limited to:

Jene Park
Yoonsung Bae
Joel Keyser
Meldy Rafols

**Trustee's Proposed Exhibit List:**

Debtor's schedules and statement of financial affairs

Debtor's amended schedules

Claim No. 1

Amended Claim No. 1

Tax Returns of PDTW, LLC including, without limitation, for 2010, 2011, 2012, 2013, 2014 and 2015 (if prepared).

Financial reports generated from PDTW, LLC's quickbooks data.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

# EXHIBIT "25"

**DEBTOR: PDTW, LLC**                    **CLAIMANT: THOMAS WYLDE, LLC**

***Claimant reserves the right to amend and supplement this Proof of Claim and its attachments and supporting materials. Claimant also reserves the right to setoff, in case Debtor later asserts any claim against Claimant***

**Explanatory Note -- Basis for Claim**

## I.    Introduction -- Basis of Claim

Claimant's present claim is based upon breach of contract, breach of the duty of good faith and fair dealing, and equitable theories, including unjust enrichment and similar theories under which the recipient of a financial benefit may not retain that benefit where it is inequitable to do so, even in the absence of contract. In paying Debtor's debts listed in this claim, Claimant conferred a benefit upon Debtor, which Debtor accepted. It would be inequitable to allow Debtor to keep that benefit without paying for it.

Claimant's claim is also based upon tortious conduct in which Debtor was either the tortfeasor, was the *alter ego* of the tortfeasor, or otherwise aided and abetted, was an accessory to, colluded in the commission of, or conspired to commit, actionable torts which have damaged Claimant by depriving it of the indicated sums of money, by causing it to suffer damages, or otherwise by eviscerating the value of Claimant's intellectual property, and principally its trademark -- THOMAS WYLDE.[1]

The debts listed in this claim ("Claim Debts") were, like the subject of Claimant's other claims, Debtor's debts. The Claim Debts, however, consist not of debts to suppliers or vendors, like those debts listed in the ninth Proof of Claim in this matter. *See* CLAIMS REGISTER ("CLAIMS REG.") No. 9 (Claimant's claims related to paying off Debtor's trade creditors). Nor are the Claim Debts related to debts purchased from third-parties arising after Claimant was forced to make good on a guarantee of Debtor's debts, as in Claimant's other claims. *See* CLAIMS REG. Nos. 3, 4 & 6 (Claimant's claims for acquired debts or for paying off debts under a guarantee).[2]

The Claim Debts have certain distinguishing features which will explain why they have been set apart for separate treatment. The Claim Debts were loans made by third-party lenders to Debtor that later played a role in that transaction in which Debtor's principal, Paula Thomas ("THOMAS") acquired her interest in Claimant. They were also debts that were purportedly delegated by Debtor to THOMAS and then, in a second, back-to-back, tax-motivated delegation,

---

[1] Collectively, the intellectual property will be referred to herein as the "IP"; the trademark THOMAS WYLDE, will be referred to as the "Trademark". The IP includes the Trademark.

[2] Claimant has also filed the eighth Proof of Claim in this matter, but that is an administrative claim. *See* CLAIMS REG. NO. 8 (Claimant's provisional administrative claim for paying ongoing storage costs).

11

transferred to Claimant.

This last point is important for several reasons. First, the Claim Debts were indeed Debtor debts, transferred only momentarily to THOMAS for wholly artificial reasons and then immediately retransferred to Claimant. Secondly, the transaction is yet another example of conduct demonstrating that there really never was sufficient distinction between the person of THOMAS and Debtor, supporting all theories presented for imposing joint-and-several liability in this instance. Finally, the transaction itself offers a starting point for assessing the damages claimed.

## II.    The History

### A.    Claimant's Acquisition of the IP from Paula Thomas through Assumption of Certain of Debtor's Debts First Delegated to Paula Thomas and Immediately Delegated to Claimant

#### 1.    Preface: The Road to Insolvency

Debtor's approximately 10 year history of operations is complex. Debtor was never free of debt and often beleaguered with litigation. For present purposes, the facts may, however, be distilled somewhat:

By December of 2014, Debtor was inundated with debt, much of it guaranteed personally by Debtor's majority member, Paula Thomas ("THOMAS").

THOMAS variously claims to hold 100% of the equity of Debtor, or 99.5%, or 89.5%, as it may seem good to her. See DOCKET ("DKT.") No. 13 at p. 3 of 30 (Debtor's minutes signed by THOMAS claiming to be "sole member" of Debtor LLC); compare with id. at p. 25 of 30 (Debtor's Statement of Financial Affairs Item 28, indicating that Harley T. Wolitzky owns 0.5% of Debtor); and compare with CLAIMS REGISTER ("CLAIMS REG.") NO.5 (Jene Park ("PARK") Proof of Interest attaching THOMAS' responses to requests for admissions in state court litigation indicating that PARK is a 10% owner of Debtor). See also Exhibit E, annexed and incorporated (excerpts from Debtor's 2013, 169 page, hard-bound confidential information memorandum) at Bates 00032 - 00037 generally, and at 00037 (p. 128: PARK listed as 10% owner).[4]

THOMAS has also filed her own personal Proof of Claim in this matter. See CLAIMS REG. NO. 1 (THOMAS' Nov. 17, 2016 proof of claim at p. 2 -- THOMAS makes a claim in an amount "[t]o be determined" and for "[m]oney loaned, [s]ervices performed, and personal

---

[3] PARK had served as Debtor's Chief Operations Officer for many years. For yet another instance in which THOMAS claims to own 100% of Debtor, see n. 8, infra, and referent text.

[4] THOMAS' cavalier treatment of the ownership structure of Debtor is just one indicator that the alter ego or veil-piercer remedy is available.

11

property being held"). She does this notwithstanding the fact that she signed, under oath, the petition in this bankruptcy, the original schedules, and the amended schedules -- none of which lists any claim by THOMAS.[5]

In any event, by December of 2014 Debtor owed over $2M simply in loans, with other liabilities apparently of at least as much. And, at least two of these loans — loans of over $1.6M owed to CBC Partners I, LLC, and hundreds of thousands owed to Debtor's factor, Finance One, Inc. — were guaranteed personally by THOMAS and PARK, who had even pledged their residences as collateral these debts.

These loans were either already due or soon would be. Business was in decline, as it had been for years.[6] And, one lender was already suing over a long overdue note first issued in 2006. *See Schiffman v. PDTW et al.*, Los Angeles Superior Court No. BC513911 (Central Dist.), complaint (7/1/13) & amended complaint (3/21/2014).

The situation was untenable. Debtor and THOMAS were on the brink of losing everything. In sum, Debtor was already insolvent by that time, and its bankruptcy would have long since occurred, but for the appearance of Claimant.

### 2.    Reorganization: The Genesis of Claimant

In order to rid herself of personal liabilities, save her home, her career, and even the THOMAS WYLDE brand from certain annihilation, THOMAS agreed to a reorganization of the business ("Reorganization"). The Reorganization involved the creation of a new entity — Claimant — and its capitalization. The concept for the Reorganization had been under discussion for many months. Claimant had in fact been organized in mid-2014, and even started lending money to Debtor whether directly or otherwise by paying some of its debts to sustain Debtor as the Reorganization took shape. These loans benefitted Debtor and THOMAS alike. Nothing was signed, however, until Dec. 22, 2014. This will, however, explain why many of the payments one sees in the ninth Proof of Claim in this matter are from the second half of 2014.

During initial capitalization, Claimant's initial members each paid $100 per percentage point for equity ownership in Claimant. THOMAS was no different: She also paid $100 per percentage point — thus paying in a total of $3,200.00 for a 32% stake in Claimant. But THOMAS' arrangement was unique: As part of THOMAS' deal, she was also required to assign the IP, held by her personally, to Claimant; Claimant was, in return, required to pay off certain

---

[5] Upon information and belief, *on top of* those debts which THOMAS personally owes Debtor and which are consistently listed on Debtor's tax returns since 2010, there are *also* numerous instances in which THOMAS has caused Debtor to reclassify personal expenses as Debtor company business expense. Upon information and belief, the as-yet undiscovered amounts approach or even exceed $100K. This is yet another factor which will support *alter ego* or veil-piercer type remedies.

[6] Upon information and belief, Debtor posted losses for 2014 of approximately $2.2M.

specified debts from amongst Debtor's debts — the Claim Debts. *See* Exhibit A, annexed and incorporated —Agreement to Purchase Membership Interest ("Agreement") at 1 ("Recital A") (Bates 00002), at 1-2 (§ 3) (Bates 00002 - 00003) (consideration described) & at Exhibit A-3 (Claim Debts listed per (a) an Oct. 15, 2013 balloon promissory note in favor of CBC Partners I, LLC, in the amount of $1.6M; and (b) two separate promissory notes in favor of Steven John Prestamon totaling $359,337.00 ( Bates 00008)).[7]

### 3.    The Parties Perform the Agreement

#### a.    THOMAS Delegates the Claim Debts

Nobody disputes that THOMAS paid her $3,200.00 capital contribution; nor has anyone claimed at any time that THOMAS failed to transfer the IP to Claimant.

The means and steps by which the Claim Debts were transferred to Claimant from Debtor, however, must be understood for present purposes:

*Step One:* On Dec. 22, 2014, *Debtor* purported to delegate, and THOMAS purported to assume, liability for these debts. *See* **Exhibit B** at Bates 00020 (Action by Written Consent of the Members of PDTW, LLC assigning Claim Debts from Debtor to THOMAS).[8]

*Step Two:* Next, also on Dec. 22, 2014, THOMAS in turn purported to delegate, and Claimant assumed, liability from THOMAS for these debts. *See* **Exhibit A** at Bates 00002-00003 & 00008 (Exhibit A-3 to Agreement to Purchase Membership Interest setting forth these debts as being transferred from *THOMAS* to Claimant).

Again, since THOMAS was expected to pay $3,200.00 for her 32% membership interest in Claimant at the very same time that all other initial members were also paying $100.00 per percentage point of membership interest in Claimant, it follows that the contribution of the

---

[7] The Agreement purports to delegate the Claim Debts from *THOMAS* to Claimant. But, these were actually Debtor's debts. The back-to-back assumption and then delegation of these debts can only have been tax-motivated. For present purposes it is important to keep in mind three things:

First, neither creditor for the Claim Debts released Debtor of liability. These creditors remained free to disregard any purported delegations of the obligation to pay, and the Claim Debts remained fully enforceable against Debtor. Thus, to the outside world, the delegation was a nullity. Second, the "transfer" of liability from Debtor to THOMAS was in many ways of little significance anyway: THOMAS had already guaranteed most or all of the Claim Debts. Thus, she accepted little or no additional actual liability. And finally, obviously, Claimant's interest was in purchasing the IP: It did not care to whom it paid the indicated sum so long as it received the IP.

[8] True to form, here too THOMAS claims 100% of the ownership of Debtor by signing as "SOLE MEMBER".

11

intellectual property was to be offset by the debts delegated by THOMAS and assumed by Claimant in the transaction -- the Claim Debts. That portion of the transaction was, as they say, "a wash" in terms of value-for-value, but gives us some indication of what value both THOMAS and Claimant placed upon the IP at that time. The amount paid to pay off the Claim Debts could therefore serve as one measure of the value of the IP as at Dec. 22, 2014 and so is used herein as one possible measure of damages.

### b.    Claimant Pays the Claim Debts

As promised, Claimant paid the Claim Debts. *See* Exhibit B, annexed and incorporated -- Bank of Manhattan bank statement for the month of December, 2014, indicating the following payments made by Claimant:

| Payee | Date | Amount | BATES Obligation | BATES PMT |
|---|---|---|---|---|
| Palliative/Prestemon | 12/24/14 | $8,333.33 | 000002-000003; 000008 | 000025 |
| CBC Partners I, LLC | 12/29/14 | $1,639,015.63 | 000002-000003; 000008 | 000026 |
| CBC Partners I, LLC | 12/30/14 | $3,656.25 | 000002-000003; 000008 | 000026 |
| Palliative/Prestemon | 12/31/14 | $359,336.93 | 000002-000003; 000008 | 000026 |

**TOTAL:**                    **$2,010,842.14**

## III.    The Claims

To understand Claimant's claims, one need only start from the proposition that Claimant was never in the business of giving away money, whether for Debtor's or THOMAS' benefit. From this it follows that Claimant expected something in return. As described above, Debtor and THOMAS configured this transaction in such a way as to cause the Claim Debts to travel from Debtor to THOMAS, and then, immediately thereafter, to travel from THOMAS to Claimant while she simultaneously handed Claimant the IP. In sum, it is clear that what Claimant expected was the IP if it was to pay off the Claim Debts.

In a nutshell, these claims are based upon Claimant's assertion that it did not receive what it reasonably expected and should have received, that it was deprived of the benefit of the bargain, and that Debtor is either directly liable or may be held liable under theories supporting the joint-and-several liability of Debtor and THOMAS together. Such theories include, but are not limited to, *alter ego*/veil-piercer, reverse veil-piercer, civil conspiracy, collusion, aiding and abetting, and accessory liability.

### A.    Contract/Quasi-Contract & Equitable Theories

Claimant's contract and contract-related claims are not difficult to understand. Under a straight duty of good faith and fair dealing-time analysis, it is implicit in every contract that a party to a contract may not do something to deprive the other party of the benefit of the contract. *Ladd v. Warner Bros. Entm't., Inc.*, 184 Cal.App.4th 1298, 1306, 110 Cal.Rptr.3d 74, 81 (Cal.

Case 6:16-bk-15889-SY    Claim 20-1    Filed 02/08/17    Desc Main Document    Page 5 of
11

App. 2010). THOMAS and Debtor have so conducted themselves as to deprive Claimant of the value, or much of the value, of the IP. While they have collaborated to transfer, in name at least, the IP to Claimant, they have thereafter done everything possible to undermine the value of that IP.

Apart from bringing utterly meritless litigation against Claimant and its principals in the Los Angeles Superior Court in an attempt to hamstring Claimant with a nuisance suit, Debtor and Claimants have set about to eviscerate the IP -- and principally the Trademark -- of its value.

Here is one way in which Debtor and THOMAS have done this: Perversely, after selling the IP and the Trademark to Claimant, Debtor and THOMAS have undertaken a campaign to tell the world that there is and can be no THOMAS WYLDE without THOMAS. While THOMAS will be heard to argue that she has merely told her friends and associates that she is no longer affiliated with Claimant -- essentially claiming truth as a defense -- this is far, far from an accurate description of her conduct: THOMAS has turned herself into a megaphone of sorts, broadcasting her dissociation from Claimant in the most graphic ways possible, at all times implying that Claimant, having the Trademark, really has *nothing* because THOMAS is not there. *See* Exhibit D, annexed and incorporated (THOMAS' social media broadcast of copyrighted images belonging to Claimant and forming part of its advertising campaign but with, superimposed in gigantic, red lettering, the word "NOT" over the image, accompanied with THOMAS' message to "all [her] industry associates [that she is] no longer Thomas Wylde")(Bates 00029 - 00031).

The reader will forgive this author if he states something fairly obvious: Anyone who claims that the value behind a trademark is inseparable from the person making the claim necessarily admits that she has nothing to sell. It is either fraudulent to make such a claim, or, if the claim is true, fraudulent to sell the mark.

In other respects there is every indication that Debtor, colluding and conspiring with THOMAS, and as her *alter ego*, has acted to harm Claimant and to deprive it of the value of the Trademark. Longtime customers have suddenly and mysteriously severed relationships; one even returned an order of goods without explanation; Claimant has even lost one of its largest markets -- the entire country of Russia -- apparently because of what Debtor and THOMAS have done in suggesting that there can be no THOMAS WYLDE without THOMAS. In sum, Debtor and THOMAS have undertaken a campaign to harm Claimant by depriving it of the benefit of that which it purchased.

One could also examine this under third-party beneficiary law. Assuming, *arguendo*, that Debtor is a third-party beneficiary of the Agreement,[9] with Claimant as promisor and THOMAS

---

[9] It is worth noting that no part of the Agreement explicitly makes Debtor — or any of Debtor's creditors -- a third party beneficiary. Even those portions of the Agreement which may be considered as standalone agreements -- whether to deploy funds in specified ways, or to indemnify THOMAS -- are devoid of any third-party beneficiary language and contain rights solely for THOMAS' benefit. *See* Bates 00011 - 00014 & 00015 - 00018 ("Use of Proceeds

Case 6:16-bk-15889-SY    Claim 1-1    Filed 05/02/17    Desc Main Document    Page 10 of
11

as promisee, Debtor is still liable to Claimant to return some or all of the benefit of what it received, if THOMAS, as promisee, has breached the contract.[10] The same holds true under an unjust enrichment analysis.

### B.    Tort Theories

Under the same facts, any number of tort theories support this claim: inducing breach of contract; intentional interference with contractual relations; intentional interference with prospective contractual relations; federal and state unfair competition (Lanham Act; Bus. & Prof. Code § 17200 *et seq.*; etc.); commercial disparagement; etc. Imposition of joint-and-several liability here too will be appropriate and for the same reasons.

## IV.    Amount of Claim

Claimant has inserted the amount of $2M for this claim. This is an estimate.

Under the contract theories, one measure of damages would be the difference between what Claimant bargained for and what it received. Or, to put it differently, Debtor would theoretically be able to retain the value of what THOMAS actually conveyed after consideration of breaches committed by her and/or Debtor, but required to disgorge the rest. An informal estimate places the current value of the mark at no more than $500K. If the mark was worth $2,010,342.14 as at December 22, 2014 — as indicated by the amount paid for it on that date — damages under this theory would be approximately $1.5M.

---

Agreement' and Indemnity Agreement'', respectively). But if Debtor is not a third-party beneficiary, the analysis still holds: The only difference is that if debtor is *not* a third-party beneficiary it had absolutely no rights under the Agreement.

[10]  *See, e.g.,* CORBIN ON CONTRACTS § 818 ("The claim of a beneficiary is dependent upon the validity of the contract that creates it. If that contract is void, voidable, or unenforceable, his claim is likewise affected . . ."); *see also* RESTATEMENT 2D - CONTRACTS § 309 (". . . (2) If a contract ceases to be binding in whole or in part because of . . . non-occurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified. . . . (4) A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement.").

[11]  *See, e.g., Hartford Cas. Ins. Co. v. J.R. Mktg., LLC,* 61 Cal.4th 988, 998, 353 P.3d 319, 326, 190 Cal.Rptr.3d 599, 607 (2015)("An individual who has been unjustly enriched at the expense of another may be required to make restitution. (*See Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51; *see* REST.3D RESTITUTION AND UNJUST ENRICHMENT, § 1; 1 WITKIN, SUMMARY OF CAL. LAW (10th ed. 2005) CONTRACTS, § 1013, p. 1102.) Where the doctrine applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty . . . Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required. . . . ")(some cites omitted).

11

Under tort theories, Claimant will be entitled not only to the amount by which Debtor and THOMAS have damaged the Trademark and its associated goodwill; it will also be entitled to other forms of damages, including lost profits. A conservative estimate of such damages at this point in time supports the indicated amount of $2M.