1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 West Sunset Blvd., Suite "9"
3  Pacific Palisades, California 90272
4  Telephone (310) 459-9870
   E-mail Address: biller_ldtconsulting@verizon.net
5
6  MARCIA DALEY (146,579)
   DALEY & SACKS LAW RLLP
7  1516 Westwood Boulevard, Suite 102
8  Los Angeles, California 90024
9  Telephone: (310) 985-2808
   E-mail: marcia@daleyandsackslaw.com
10
11  Attorneys for Creditor Paula Thomas
12
13
14                  UNITED STATES DISTRICT COURT
15        FOR THE CENTRAL DISTRICT COURT OF CALIFORNIA
16
17
18  IN RE                          | Case No.: 6-16-bk-15889-SY
19  PDTW, LLC,
20                                 | INDEX TO EXHIBITS REFERRED
                                    TO IN THE DECLARATION OF
21              DEBTOR.             DIMITRIOS P. BILLER IN SUPPORT
                                    OF CREDITOR PAULA THOMAS'
22                                  BENCH BREIF ON THE EXCLUSION
                                    OF EVIDENCE, DENIAL OF ALL
23                                  CLAIMS FILED BY THOMAS
24                                  WYLDE, LLC, AND ORDER
                                    PROHIBITING NANCY ZAMORA
25
26
   INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
27  CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
   FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
28  THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                      1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FROM PARTICIPATING IN THE
AUGSUT 28 AND 29, 2017
EVIDENTARY HEARING.

**VOLUME NO. II, EXHIBITS 4 & 5**

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    2

## INDEX OF EXHIBITS REFERRED TO IN THE DECL. OF BILLER

## VOLUME II

1.      **Exhibit "1"** Thomas Wylde's, LLC's Notice of Withdrawal of Claim No. 10.

2.      **Exhibit "2":** deposition transcript for Eniluz Gonzalez that was taken on July 31, 2017.

3.      **Exhibit "3":** Pleadings for Claim No. 10 that Richard Peddie apparently prepared and signed under penalty of perjury.

4.      **Exhibit "4":** e-mail Nancy Zamora sent to inform the parties that the Trustee will not call the accountant as a witness.

5.      **Exhibit "5":** Operating Agreement for Thomas Wylde, LLC signed on July 22, 2014.

6.      **Exhibit "6:** Transaction Accounts document that Stephen Choi claims to have received from Thomas Wylde, LLC.

7.      **Exhibit "7":** Agreement to Purchase Units of Membership in Thomas Wylde, LLC.

8.      **Exhibit "8":** Employment Agreement that Paula Thomas signed;

9.      **Exhibit "9"":** Amended Operating Agreement.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    3

10.   **Exhibit "10":** Amended Schedule B for Thomas Wylde, LLC

11.   **Exhibit "11":** is the salary chart showing Paula Thomas received her last pay check on April 15, 2015.

12.   **Exhibit "12":** Amendment to Schedule B of the Amended Operating Agreement

13.   **Exhibit "13":** income tax return for Thomas Wylde, LLC.

14.   **Exhibit "14":** Agreement to Purchase Membership Interest.

15.   **Exhibit "15":** e-mail Richard Peddie sent proving notice of the withdrawal of Claim No. 10.

16.   **Exhibit "16":** e-mail sent to Richard Peddie requesting more information regarding the reasons he withdrew the $2,000,000.00 claim.

17.   **Exhibit "17":** Motion for the Trustee seeking to buy the PDTW, LLC's.

18.   **Exhibit "18":** e-mail that apparently caused Mrs. Zamora to change her position to produce the expert witness, but then she withdrew him.

19.   **Exhibit "19":** e-mail Nancy Zamora send taking the position that the accountant is not an expert and he was only going to be called to "AUTHENICATE" business records of PDTW, LLC.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                        4

20.  **Exhibit "20":** e-mail from Mrs. Zamora changing her position.

21.  **Exhibit "21":** Second Amended Cross-Complaint TW filed against Paula Thomas.

22.  **Exhibit "22":** Paula Thomas' initial witness list.

23.  **Exhibit "23":** Paula Thomas' initial Exhibit List.

24.  **Exhibit "24":** e-mail received from Richard Peddie withdrawing the $2 million claim.

25.  **Exhibit "25":** "Explanatory Note – Basis for Claim attached to Claim No. 10.

26.  **Exhibit "26":** May 14, 2015 letter that Mr. Peddie wrote to create a false record that TW terminated Thomas one month earlier on April 15, 2015. responses to Form and Special Interrogatories to substantiate the position.

27.  **Exhibit "27"** Thomas Wylde, LLC's responses to form and special interrogatories referring to the letter.

28.  **Exhibit "28"** Demand for Production of Witnesses and served on Thomas Wylde, LLC.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BRIEF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                                5

1    Dated: August 7, 2017

2

3

4                                    Respectfully submitted,

5

6

7                                    By: /S/ Dimitrios P. Biller
                                     Counsel for Creditor Paula Thomas

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
      CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
      FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN

28    THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    6

1

## PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

2

3

4    I declare under penalty of perjury that I live in the County of Los Angeles,
state of California, I am over the age of 18 years; my business is located at 15113
West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On **August 7, 2017**, I
caused to be served, via e-mail, the following pleadings:

5

6

7

## INDEX OF EXHIBITS

8

9    on the interested parties in this action by e-mail:

10

11          Richard Byron Peddie,
            lawstudios@comcast.net
            Lawstudios Richard Bryon Peddie
            505 Euclid Avenue
            Boulder, Co 80303-2811
            Counsel for ALL Defendants

12

13

14

15

16          Nancy Hoffmeir Zamora
            Anthony N.R. Zamora
            Zamora & Hoffmeier
            U.S. Bank Tower
            633 West 5th Street, Suite 2600
            Los Angeles, California 90071
            e-mail zamora3aol.com

17

18

19

20

21

22    **XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service
by the United States Postal service, with postage thereon fully prepaid. I am
"readily familiar" with the practice of collection and processing correspondence
for mailing. Under that practice, it would be deposited with the United States
Postal Service on that same day with postage thereon fully prepaid at Pacific

23

24

25

26

27    INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
CREDITOR PAULA THOMAS' BENCH BRIEF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                          7

28

1  Palisades, California. I am aware that on motion of the party served, service is

2  presumed invalid if postal cancellation date or postage meter date is more than one

day after date of deposit for mailing in affidavit.

3

4  ____BY FEDERAL EXPRESS – I am familiar with the practice at my place of

5  business for collection and processing of correspondence for overnight delivery

maintained by Federal Express. Such correspondence will be deposited with a

6  facility regularly maintained by Federal Express for receipt on the same day in the

7  ordinary course of business. The envelope was sealed and placed for collection

and delivery by Federal Express with delivery fees paid or provided for in

8  accordance with ordinary business practices.

9  ____BY PERSONAL SERVICE – I caused such envelope to be delivered by hand

to the offices of the addressee.

10

11  **XXX**: E-mail at the above e-mail addresses.

12  **XXX** (State) I declare **under penalty of perjury under the laws of the State of**

13  **California** that the foregoing is true and correct.

14

Executed on **August 7, 2017**, at Pacific Palisades, California.

15

16

17  /S/ Dimitrios P. Biller

18  Dimitrios P. Biller

19

20

21

22

23

24

25

26

27  INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN

28  THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                8

# EXHIBIT "4"

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Saturday, August 05, 2017 8:21 AM |
| **To:** | 'zamora3@aol.com'; 'lawstudios@comcast.net'; 'marciad@daleyandsackslaw.com' |
| **Cc:** | 'larry@lsimonslaw.com'; 'MarciaD@daleyandsackslaw.com' |
| **Subject:** | RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters |

Good morning. Thank you for your response. I respectfully disagree. An accountant has skills, training, education and experience that allow him to conduct "forensic accountant" expert work. Only an accountant is allowed to give opinions as an expert. He is not a percipient witness. Everything he relies on, reviews, and analyzes are the product of hearsay. He is not allowed to state what QuickBooks shows. Call Jene Park for a percipient and allow her to authenticate QuickBooks to make an effort to get the data in evidence. If you do not give me a date to take Mr. Fife's deposition under *Rule 26 of the Federal Rules of Civil Procedure* that also applies to bankruptcy matters, then I will move to exclude his testimony. You cannot sandbag Creditor Thomas.

Also, how did he get the QuickBooks data? There is only one way to get that data: from Thomas Wylde, LLC because you did not demand production of that data in formal discovery procedures. This is just another example of you working hand in glove with Thomas Wylde, LLC and Richard Peddie. You are an attorney for the Trustee, so you are his agent and all of your conduct is imputed to the Trustee. Therefore, I will move to exclude all data from QuickBooks.

Dimitrios P. Biller

**From:** zamora3@aol.com [mailto:zamora3@aol.com]
**Sent:** Friday, August 04, 2017 3:49 PM
**To:** biller_ldtconsulting@verizon.net; lawstudios@comcast.net; marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com; MarciaD@daleyandsackslaw.com
**Subject:** Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

Mr. Biller:

Please read the portion of the March 30, 2017 transcript of bankruptcy court hearing (see attached) that addresses preparation for the evidentiary hearings on August 28 and 29, 2017.

This is not a trial.

This is a hearing so that the Court can consider evidence supporting claim nos. 1, 3, 5 and 16 (if not withdrawn) and evidence supporting the objections to these respective claims.

The Court asked for a joint exhibit binder at the March 30, 2017 hearing.

Yesterday, August 3, 2017, we discussed at the hearing a joint witness list, a joint exhibit list, and a joint exhibit binder.

Previously, by email, we discussed exchanging this information to allow one of us to compile the information and present the joint list. The point is to make this as streamlined as possible for Judge Yun.

Consequently, one counsel can agree to compile and prepare the joint witness and exhibit lists and file them with the Court. If we can't reach agreement, then we all can file separate lists.

Regarding Paula Thomas' amended claim no. 1, what documents are you proposing as exhibits to support her claim. On your exhibit list of 109 items, the only entry I see is no. 105 "Paula Thomas' Claims and supporting documents." Please be more specific or confirm that the only exhibit you are offering to support amended claim no. 1 is the claim itself.

Mr. Fife will be called to authenticate reports generated from the quickbooks data of debtor PDTW, LLC and to authenticate financial records and tax returns, or portions thereof, of PDTW, LLC received by Trustee. There is no reason or basis to depose him as an expert witness.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

-----Original Message-----
From: Dimitrios Biller <biller_ldtconsulting@verizon.net>
To: zamora3 <zamora3@aol.com>; lawstudios <lawstudios@comcast.net>; marciad <marciad@daleyandsackslaw.com>
Cc: larry <larry@lsimonslaw.com>; 'Marcia Daley' <MarciaD@daleyandsackslaw.com>
Sent: Fri, Aug 4, 2017 3:06 pm
Subject: RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

When exchanging witness list and exhibit list it is always appropriate to identify the witnesses and exhibits on separate documents, not in an e-mail. The attached lists include evidence and witnesses that will provide testimony to support all objections to the meritless claims by Thomas Wylde, LLC, undercut Thomas Wylde, LLC's objections to Paula Thomas' claims and to undercut the Trustee's objections to Paula Thomas' claims.

I look forward to receiving copies of your exhibits on August 9, 2017.

I consider the Trustee's Estate Account is an expert witness who will seek to provide expert witness testimony. Please provide me with dates in which I can take his deposition.

Dimitrios P. Biller


**From:** zamora3@aol.com [mailto:zamora3@aol.com]
**Sent:** Friday, August 04, 2017 2:20 PM
**To:** lawstudios@comcast.net; biller_idtconsulting@verizon.net; marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com
**Subject:** Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

To all:

Below is Trustee's proposed witness and exhibit lists for the Evidentiary Hearing (8/28 and 8/29) on objection to claim no. 1, as amended, filed by claimant Paula Thomas. All counsel agreed to exchange this information today in an effort to compile a single joint witness list and a single joint exhibit list. Trustee looks forward to receiving this information from other counsel today.

Trustee did not object to claim nos. 3, 5 and 10 that also are the subjects of the Evidentiary Hearing. However, to the extent that the Court will reach a final determination on these claims at the Evidentiary Hearing that will prevent Trustee from objecting to such claims in the future, Trustee reserves his right to participate in examining or cross-examining witnesses who testify related to these claims.

Finally, Trustee previously reviewed the objections to claim nos. 3, 5 and 10 and requested that Thomas Wylde, LLC withdraw claim no. 10. Trustee renews this request. If Thomas Wylde, LLC will comply, Trustee expects that the Evidentiary Hearing can be streamlined.


**Trustee's Proposed Witness List:**

Don Fife, Trustee's Estate Accountant in the Case

Paula Thomas, Claimant

Any and all prior employees or consultants of PDTW, LLC who have personal knowledge regarding and of the following:

   the preparation and maintenance of payroll, expense, tax, and other financial records of PDTW, LLC;

   PDTW, LLC's quickbooks data;

   compensation and other amounts paid to Ms. Thomas whether as salary, expense reimbursement, expense advance, member
   distribution, and/or other advances;

including, but not limited to:

Jene Park
Yoonsung Bae
Joel Keyser
Meldy Rafols

**Trustee's Proposed Exhibit List:**

Debtor's schedules and statement of financial affairs

Debtor's amended schedules

Claim No. 1

Amended Claim No. 1

Tax Returns of PDTW, LLC including, without limitation, for 2010, 2011, 2012, 2013, 2014 and 2015 (if prepared).

Financial reports generated from PDTW, LLC's quickbooks data.


Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

Dimitrios Biller

| | |
|---|---|
| **From:** | zamora3@aol.com |
| **Sent:** | Saturday, August 05, 2017 12:35 PM |
| **To:** | biller_ldtconsulting@verizon.net; marciad@daleyandsackslaw.com; lawstudios@comcast.net |
| **Cc:** | larry@lsimonslaw.com; dfife@hahnfife.com |
| **Subject:** | Evidentiary Hearing regarding claim no. 1 in Bankruptcy Case of PDTW, LLC and request to depose Trustee's Estate Accountant related thereto |

Mr. Biller/Ms. Daley:

Mr. Fife's qualifications and experience are contained in his resume, included in Trustee's application to employ accountant that was filed in the Bankruptcy Case. The employment application appears on the docket in the Bankruptcy Case.

The quickbooks data, tax returns, and all financial records of PDTW, LLC are property of the Bankruptcy Estate (see the U.S. Bankruptcy Code, the Bankruptcy Court's orders and transcripts of hearings previously provided to you). Trustee requested the quickbooks data, tax returns, and all financial records from Debtor at the 341(a) meetings at which Paula Thomas appeared and testified under oath. Debtor, through Debtor's bankruptcy counsel, provided some of this information and some of these documents. Debtor, by Paula Thomas' testimony as the representative of Debtor, and Debtor's bankruptcy counsel informed Trustee that Thomas Wylde, LLC had possession of the PDTW, LLC quickbooks data and some of the financial records of PDTW, LLC. Consequently, Trustee requested the quickbooks data and the financial records from Thomas Wylde, LLC and obtained them. This happened during the early months of the Bankruptcy Case. Indeed, Thomas Wylde, LLC also provided the quickbooks data to Debtor's bankruptcy counsel and to Thomas' counsel, Kring & Chung, LLP.

As Judge Yun emphasized during the hearing on August 3, 2017, Debtor's Bankruptcy Case has been pending for 13 months. Much happened prior to your substituting in as counsel for Paula Thomas, as an alleged creditor and equityholder, in the Bankruptcy Case.

I will inquire with Mr. Fife regarding his availability for a deposition related to the Trustee's objection to amended claim no. 1 filed by Paula Thomas. The deposition must be limited to the purpose of the evidentiary hearing, i.e., Trustee's objection to claim no. 1.

As of now, I am available to appear with Mr. Fife on August 16 (if the appointment on August 15 at Auctioneer's warehouse is completed in one day) or August 22. I may be available certain days during the week of August 7 through 11.

Trustee's proposed witness list already includes Jene Park and others who have personal information about the quickbooks data of PDTW, LLC.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Saturday, August 05, 2017 1:28 PM |
| **To:** | 'zamora3@aol.com'; 'marciad@daleyandsackslaw.com'; 'lawstudios@comcast.net' |
| **Cc:** | 'larry@lsimonslaw.com'; 'dfife@hahnfife.com' |
| **Subject:** | RE: Evidentiary Hearing regarding claim no. 1 in Bankruptcy Case of PDTW, LLC and request to depose Trustee's Estate Accountant related thereto |

Dear Ms. Zamora

I always have to laugh when an attorney attempts to limit the scope of the deposition before any testimony is taken. I will not agree to limit my cross-examination to any issues. I will prepare a Notice for Taking Deposition on August 16, 2017 and I expect your expert/you to comply with Rule 26. That means bring everything he have reviewed, created, approved of in this case. I expect you may or may not object to my examination, but you are not entitled to make any speaking objections that fully expect you to make. I'm noting this for the record because I will move to exclude your witness if you or Peddie attempt to coach him in any way.

Since Park is identified I just you want Fife's testimony to be expert witness testimony. Why do you fight so much?

Dimitrios

**From:** zamora3@aol.com [mailto:zamora3@aol.com]
**Sent:** Saturday, August 05, 2017 12:35 PM
**To:** biller_ldtconsulting@verizon.net; marciad@daleyandsackslaw.com; lawstudios@comcast.net
**Cc:** larry@lsimonslaw.com; dfife@hahnfife.com
**Subject:** Evidentiary Hearing regarding claim no. 1 in Bankruptcy Case of PDTW, LLC and request to depose Trustee's Estate Accountant related thereto

Mr. Biller/Ms. Daley:

Mr. Fife's qualifications and experience are contained in his resume, included in Trustee's application to employ accountant that was filed in the Bankruptcy Case. The employment application appears on the docket in the Bankruptcy Case.

The quickbooks data, tax returns, and all financial records of PDTW, LLC are property of the Bankruptcy Estate (see the U.S. Bankruptcy Code, the Bankruptcy Court's orders and transcripts of hearings previously provided to you). Trustee requested the quickbooks data, tax returns, and all financial records from Debtor at the 341(a) meetings at which Paula Thomas appeared and testified under oath. Debtor, through Debtor's bankruptcy counsel, provided some of this information and some of these documents. Debtor, by Paula Thomas' testimony as the representative of Debtor, and Debtor's bankruptcy counsel informed Trustee that Thomas Wylde, LLC had possession of the PDTW, LLC quickbooks data and some of the financial records of PDTW, LLC. Consequently, Trustee requested the quickbooks data and the financial records from Thomas Wylde, LLC and obtained them. This happened during the early months of the Bankruptcy Case. Indeed, Thomas Wylde, LLC also provided the quickbooks data to Debtor's bankruptcy counsel and to Thomas' counsel, Kring & Chung, LLP.

As Judge Yun emphasized during the hearing on August 1, 2017, Debtor's Bankruptcy Case has been pending for 13 months. Much happened prior to your substituting in as counsel for Paula Thomas, as an alleged creditor and equityholder, in the Bankruptcy Case.

I will inquire with Mr. Fife regarding his availability for a deposition related to the Trustee's objection to amended claim no. 1 filed by Paula Thomas. The deposition must be limited to the purpose of the evidentiary hearing, i.e., Trustee's objection to claim no. 1.

As of now, I am available to appear with Mr. Fife on August 16 (if the appointment on August 15 at Auctioneer's warehouse is completed in one day) or August 22. I may be available certain days during the week of August 7 through 11.

Trustee's proposed witness list already includes Jene Park and others who have personal information about the quickbooks data of PDTW, LLC.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

Dimitrios Biller

| | |
|---|---|
| **From:** | Dimitrios Biller <biller_ldtconsulting@verizon.net> |
| **Sent:** | Sunday, August 06, 2017 7:10 AM |
| **To:** | 'Richard' |
| **Cc:** | 'Zamora, Nancy'; 'marciad@daleyandsackslaw.com'; 'Simons, Larry' |
| **Subject:** | RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters |

Richard

Good morning. You seem to miss the point. By giving the QuickBooks to the Trustee informally is evidence of more collusion; you have identified the same account, more evidence of collusion.

Dimitrios

**From:** Richard [mailto:lawstudios@comcast.net]
**Sent:** Saturday, August 05, 2017 1:50 PM
**To:** Dimitrios Biller <biller_ldtconsulting@verizon.net>
**Cc:** Zamora, Nancy <zamora3@aol.com>; marciad@daleyandsackslaw.com; Simons, Larry <larry@lsimonslaw.com>
**Subject:** Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

Everyone:

The PDTW QuickBooks file was given to Kring & Chung in September of 2015, before any lawsuit was filed. Plaintiff's counsel have the signed receipt/transmittal sheet.

That we then supplied it again upon request by both PDTW's counsel and the Trustee is neither here nor there.

RBP

---

**From:** "Dimitrios Biller" <biller_ldtconsulting@verizon.net>
**To:** zamora3@aol.com, "lawstudios" <lawstudios@comcast.net>, marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com, MarciaD@daleyandsackslaw.com
**Sent:** Saturday, August 5, 2017 9:20:43 AM
**Subject:** RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

Good morning. Thank you for your response. I respectfully disagree. An accountant has skills, training, education and experience that allow him to conduct "forensic accountant" expert work. Only an accountant is allowed to give opinions as an expert. He is not a percipient witness. Everything he relies on, reviews, and analyzes are the product of hearsay. He is not allowed to state what QuickBooks shows. Call Jene Park for a percipient and allow her to authenticate QuickBooks to

make an effort to get the data in evidence. If you do not give me a date to take Mr. Fife's deposition under *Rule 26 of the Federal Rules of Civil Procedure* that also applies to bankruptcy matters, then I will move to exclude his testimony. You cannot sandbag Creditor Thomas.

Also, how did he get the QuickBooks data? There is only one way to get that data: from Thomas Wylde, LLC because you did not demand production of that data in formal discovery procedures. This is just another example of you working hand in glove with Thomas Wylde, LLC and Richard Peddie. You are an attorney for the Trustee, so you are his agent and all of your conduct is imputed to the Trustee. Therefore, I will move to exclude all data from QuickBooks.

Dimitrios P. Biller

**From:** zamora3@aol.com [mailto:zamora3@aol.com]
**Sent:** Friday, August 04, 2017 3:49 PM
**To:** biller_ldtconsulting@verizon.net; lawstudios@comcast.net; marciad@daleyandsackslaw.com
**Cc:** larry@lsimonslaw.com; MarciaD@daleyandsackslaw.com
**Subject:** Re: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

Mr. Biller:

Please read the portion of the March 30, 2017 transcript of bankruptcy court hearing (see attached) that addresses preparation for the evidentiary hearings on August 28 and 29, 2017.

This is not a trial.

This is a hearing so that the Court can consider evidence supporting claim nos. 1, 3, 5 and 10 (if not withdrawn) and evidence supporting the objections to these respective claims.

The Court asked for a joint exhibit binder at the March 30, 2017 hearing.

Yesterday, August 3, 2017, we discussed at the hearing a joint witness list, a joint exhibit list, and a joint exhibit binder.

Previously, by email, we discussed exchanging this information to allow one of us to compile the information and present the joint list. The point is to make this as streamlined as possible for Judge Yun.

Consequently, one counsel can agree to compile and prepare the joint witness and exhibit lists and file them with the Court. If we can't reach agreement, then we all can file separate lists.

Regarding Paula Thomas' amended claim no. 1, what documents are you proposing as exhibits to support her claim. On your exhibit list of 109 items, the only entry I see is no. 105 "Paula Thomas'

Claims and supporting documents."  Please be more specific or confirm that the only exhibit you are offering to support amended claim no. 1 is the claim itself.

Mr. Fife will be called to authenticate reports generated from the quickbooks data of debtor PDTW, LLC and to authenticate financial records and tax returns, or portions thereof, of PDTW, LLC received by Trustee.  There is no reason or basis to depose him as an expert witness.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

-----Original Message-----
From: Dimitrios Biller <biller_ldtconsulting@verizon.net>
To: zamora3 <zamora3@aol.com>; lawstudios <lawstudios@comcast.net>; marciad <marciad@daleyandsackslaw.com>
Cc: larry <larry@lsimonslaw.com>; 'Marcia Daley' <MarciaD@daleyandsackslaw.com>
Sent: Fri, Aug 4, 2017 3:06 pm
Subject: RE: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

When exchanging witness list and exhibit list it is always appropriate to identify the witnesses and exhibits on separate documents, not in an e-mail.  The attached lists include evidence and witnesses that will provide testimony to support all objections to the meritless claims by Thomas Wylde, LLC, undercut Thomas Wylde, LLC's objections to Paula Thomas' claims and to undercut the Trustee's objections to Paula Thomas' claims.

I look forward to receiving copies of your exhibits on August 9, 2017.

I consider the Trustee's Estate Account is an expert witness who will seek to provide expert witness testimony.  Please provide me with dates in which I can take his deposition.

Dimitrios P. Biller

From: zamora3@aol.com [mailto:zamora3@aol.com]
Sent: Friday, August 04, 2017 2:20 PM
To: lawstudios@comcast.net; biller_ldtconsulting@verizon.net; marciad@daleyandsackslaw.com
Cc: larry@lsimonslaw.com
Subject: Trustee's proposed witness and exhibit lists for Evidentiary Hearing on Objection to Claim No. 1 and related matters

To all:

Below is Trustee's proposed witness and exhibit lists for the Evidentiary Hearing (8/28 and 8/29) on objection to claim no. 1, as amended, filed by claimant Paula Thomas. All counsel agreed to exchange this information today in an effort to compile a single joint witness list and a single joint exhibit list. Trustee looks forward to receiving this information from other counsel today.

Trustee did not object to claim nos. 3, 5 and 10 that also are the subjects of the Evidentiary Hearing. However, to the extent that the Court will reach a final determination on these claims at the Evidentiary Hearing that will prevent Trustee from objecting to such claims in the future, Trustee reserves his right to participate in examining or cross-examining witnesses who testify related to these claims.

Finally, Trustee previously reviewed the objections to claim nos. 3, 5 and 10 and requested that Thomas Wylde, LLC withdraw claim no. 10. Trustee renews this request. If Thomas Wylde, LLC will comply, Trustee expects that the Evidentiary Hearing can be streamlined.

**Trustee's Proposed Witness List:**

Don Fife, Trustee's Estate Accountant in the Case

Paula Thomas, Claimant

Any and all prior employees or consultants of PDTW, LLC who have personal knowledge regarding and of the following:

the preparation and maintenance of payroll, expense, tax, and other financial records of PDTW, LLC;

PDTW, LLC's quickbooks data;

compensation and other amounts paid to Ms. Thomas whether as salary, expense reimbursement, expense advance, member
distribution, and/or other advances;

including, but not limited to:

Jene Park
Yoonsung Bae
Joel Keyser
Meldy Rafols

**Trustee's Proposed Exhibit List:**

Debtor's schedules and statement of financial affairs

Debtor's amended schedules

Claim No. 1

Amended Claim No. 1

Tax Returns of PDTW, LLC including, without limitation, for 2010, 2011, 2012, 2013, 2014 and 2015 (if prepared).

Financial reports generated from PDTW, LLC's quickbooks data.

Nancy Zamora, Esq.
Zamora & Hoffmeier, APC
Counsel for Chapter 7 Trustee Larry D. Simons

# EXHIBIT "5"

## OPERATING AGREEMENT OF THOMAS WYLDE, LLC

This Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company formed under the California Revised Uniform Limited Liability Company Act (the "Company"), is entered into as of July 22, 2014 by John Hanna, Jene Park, Doug Lee, and Roger Kuo (each a "Member," and collectively the "Members").

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

## ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "**Act**" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "**Affiliate**" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "**Available Cash**" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    "**Capital Account**" shall mean the account maintained for a Member or Assignee pursuant to Section 2.1 of Exhibit C. Each Member's initial Capital Account balance as of the date of this Agreement is set forth in Exhibit A.

1.5.    "**Capital Contribution**" means a Member's capital contribution to the Company in exchange for Units.

1.6.   **"Cause"** shall mean, with respect to the Manager, any Officer of the Company, and any Executive Officer serving on the Company's Executive Committee, fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct with respect to a material matter relating to the affairs of the Company.

1.7.   **"Confidential Information"** means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of or relating to the Company.

1.8.   **"Corporations Code"** means the California Corporations Code.

1.9.   **"Electronic transmission by the Company"** and "electronic transmission to the Company" have the meanings set forth in Corporations Code § 17701.02(i)(1)-(2).

1.10.   **"Encumber"** means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.   **"Encumbrance"** means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.   **"Executive Committee"** means the Company's Executive Committee, as described in Article V.

1.13.   **"Executive Officer"** means an Officer of the Company that serves on the Company's Executive Committee.

1.14.   **"Involuntary Transfer"** means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15.   **"IRC"** or **"Code"** means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.16   **"Member"** means any of the four initial Members listed herein – John Hanna, Jene Park, Doug Lee, and Roger Kuo – or a Person who subsequently acquires a Membership Interest in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.17.   **"Membership Interest"** means a Member's entire interest and rights in the Company, collectively, including the Member's economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.18. **"Net Profits"** and **"Net Loss"** shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

1.19. **"Notice"** means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.20. **"Person"** means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.21. **"Proxy"** means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.22. **"Regulations," "Reg,"** or **"Treasury Reg"** means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.23. **"Reserves"** means the aggregate of reserve accounts that the Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.24. **"Successor in Interest"** means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.25. **"Supermajority of Members"** means a Member or Members whose aggregate Unit Percentage represents at least sixty-five percent (65%) of the Unit Percentages of all non-Defaulting Members.

1.26.    "**Transfer**" means any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.27.    "**Unit(s)**" means the unit(s) of Membership Interest in the Company.

1.28.    "**Unit Percentage**" means, with respect to a Member, the percentage obtained by dividing the total number of Units held by such Member by the total number of Units outstanding.

1.29.    "**Vote**" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.30.    "**Voting Interest**" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Unit Percentage.

1.31.    "**Writing**" includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code §17701.02(i).

1.32.    "**Written**" or "**in writing**" includes facsimile and other electronic communication authorized by the Corporations Code.

## ARTICLE II: ORGANIZATION

2.1.    **Articles of Organization**.    The Articles of Organization were filed with the California Secretary of State on July 22, 2014, File Number 201420310399.

2.2.    **Company Name**.    The name of the Company is Thomas Wylde, LLC.    The business of the Company may be conducted under that name, or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

2.3.    **Company Offices**.    The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.    **Company Agent**.    The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.    The Manager may from time to time change the Company's agent for service of process.  If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

2.5.    **Business**.  The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may be organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the luxury fashion industry.

2.6.    **Taxation**.  The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.    **Term**.  The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.    **Members**.    The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.    **Managed by One Manager**.  The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.

2.10.    **Consent of Spouse or Domestic Partner**.  Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.    **Capital Contributions of the Members**.  The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement.  Units may only exist in positive, whole integer quantities and not in fractional amounts.

3.2    **Members' Initial Capital Contribution**.  On the Effective Date, each Member shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto, which shall thereafter constitute the Capital Contribution for each Member.  The 46 Units issued to the Members constitute 100% of all Membership Interest in the Company.  Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

3.3.    **Failure to Make Initial Capital Contributions**.  If a Member fails to make the required Capital Contribution set forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting

Interest of the Defaulting Member. A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's Voting Interest shall be restored. In any event, any Defaulting Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

3.4.    **No Withdrawals.** A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5.    **No Interest On Capital.** No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.6.    **Members and Manager Not Liable.** The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement. The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

3.7    **Right of Participation.** Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such newly-issued Membership Interest. For purposes of clarification, the foregoing participation right is intended to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1.    **Allocation.** After giving effect to the special allocation provisions of Exhibit C attached hereto, Net Profits and Net Losses for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

4.2.    **Distributions.** Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members in accordance with their respective Unit Percentages. By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members. All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3.    **Tax Distribution.** Notwithstanding Paragraph 4.2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year an amount equal to 50% of the Net Profits (and items of income and gain) for such fiscal year allocated to such Member, less the aggregate amount of prior Distributions by the Company

to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

## ARTICLE V. MANAGEMENT AND EXECUTIVE COMMITTEE

5.1.    **Managed by Manager**.  The business of the Company shall be managed by one Manager, who may also be a Member.  Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager. The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company.  The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO.  The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.    **Officers**.  Subject to Section 7.3, the Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer.  Such Officers may, but need not, be employees of the Company or Members of the Company.  Each appointed Officer shall hold such office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager (subject to Section 7.3).  All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.    **Executive Committee**.  The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company.    Executive Officers may, but need not be, employees of the Company or Members of the Company.

5.3.1.    **Executive Officers**.  Executive Officers shall have the duties, functions, and powers described herein.  Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members.  Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)    **Chief Creative Officer and Creative Director**.  The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company.  The CCOD shall also be the Chairperson of the Executive Committee.  The CCOD for the Company as of the Effective Date shall be Paula Thomas.

(b)    **Chief Operating Officer and Chief Commercial Officer**.  The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's

commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.    **Manager's Powers and Limitations.**    The Manager of the Company shall have all powers and authority provided by this Agreement and the Act. Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.    **Compensation.**    Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.    **Company Assets.**    The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.    **Company Funds.**    All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.    **Removal and Replacement of Manager.**    The Manager shall serve until the earlier of (a) the Manager's resignation, retirement, death, or disability, or (b) the Manager's removal for Cause by Vote of a Supermajority of Members. A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.    **Books of Account.**    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.    **Accounting Method.**    Financial books and records of the Company shall be kept based on the Manager's choice of accounting method. The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.    **Content of Books.**    At all times during the term of existence of the Company, and beyond that term, if reasonably necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A copy of the Articles of Organization, as amended;

(c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)    An original executed copy or counterparts of this Agreement, as amended;

(e)    Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(f)    Financial statements of the Company for the six most recent fiscal years; and

(g)    The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(h)    If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Manager.

6.4.    **Financial Statements.**  From time to time as determined by the Manager and at the end of each fiscal year, the books of the Company shall be closed and examined, statements reflecting the financial condition of the Company and its profits or losses shall be prepared, and a report about those matters shall be issued by the Company's accountants. Copies of the financial statements shall be given to all Members.  In addition, all Members shall receive, not less frequently than at the end of each month, copies of such financial statements regarding the previous calendar month as may be prepared in the ordinary course of business by the Manager or accountants selected by the Manager. The Manager shall cause an annual report to be sent to each Member within 120 days after the end of the fiscal year of the Company. The annual report may be sent by electronic transmission by the Company and shall include:

(a)    A balance sheet, income statement, and a statement of cash flows of the Company for and as of the close of the fiscal year; and

(b)    A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year.

6.5.    **Tax Information.**  Within 90 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for that year.

6.6.    **Tax Matters Partner.**  The Manager shall act as Tax Matters Partner of the Company under IRC § 6231(a)(7). The Tax Matters Partner is authorized to do the following:

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223(g) and the implementing Regulations;

(b)    Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

(c)    On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)    File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)    Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP AND UNITS

### 7.1    Membership Interest and Units

7.1.1    **Membership and Units.**    There shall be only one class of Membership Interest and one class of Units. Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action. Each Member shall vote in proportion to the Member's then-existing Voting Interest.

7.1.2.    **Units.**    The Company has issued 46 (Forty-Six) Units to the Members as set forth in Exhibit B.

7.2.    **Certificates.**    All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company. The Company may, but is not required to, issue certificates evidencing

Units ("Unit Certificates") to Members of the Company. Once Unit Certificates have been issued, they shall continue to be issued as necessary to reflect current Units held by Members. Unit Certificates shall be in a form approved by the Manager, shall be manually signed by the Manager, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Units and Members set forth in this Agreement, including the following:

> *THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF THE COMPANY, AS AMENDED FROM TIME TO TIME. THE UNITS MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH SUCH OPERATING AGREEMENT.*

> *THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION THEREFROM AND THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS LEGAL COUNSEL THAT SUCH SALE, PLEDGE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.*

7.3.    **Acts Requiring Member Vote.** Except as otherwise provided in this Agreement or by the Act, all of the following acts shall require the consent by Vote of a Supermajority of Members:

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company;

(g)    The filing of a petition in bankruptcy or entering into an assignment for the benefit of the Company's creditors;

(h)  The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company;

(g)  The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(h)  The issuance or redemption of any Membership Interest (including the terms thereof);

(i)  Making operating or liquidating distributions to Members;.

(j)  The Transfer of any Membership Interest (other than to a Permitted Transferee);

(k)  The admission of any new Member (other than a Permitted Transferee);

(l)  Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)  Any transaction between the Company and an Affiliate of a Member or a Manager;

(n)  Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget; and

(o)  Paying any officer or employee more than $200,000 per year.

7.4.  **Record Date.**  The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action. In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.  **Meetings.**

7.5.1.  **General.**  Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote. If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager. Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general

nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a Supermajority of Members, represented in person or by Proxy. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2. **Quorum**. A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3. **Waiver of Notice**. The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4. **Proxies**. At all meetings of Members, a Member may Vote in person or by Proxy. Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5. **Video Attendance**. A meeting of the Members may be conducted, in whole or in part, by electronic means (audio or video with audio) so long as the Company implements reasonable measures to provide participating Members a full opportunity to hear and be heard and otherwise concurrently participate in the meeting. The permanent record of any such meeting shall consist of the minutes of such meeting and/or the electronic recording of such meeting, if recorded..

7.5.6. **Written Consent**. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted. Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

7.5.7. **No Authority.** No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1. **Dissociation.** A Member may not dissociate from the Company without the written consents of all of the Members. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.

8.2. **Transfers.** Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved by the Members by Vote of a Supermajority of Members. Approval may be granted or withheld in the Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void. Notwithstanding the foregoing, (x) any Member may Transfer such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and family member(s), and (iii) any revocable trust created for the benefit of the Member and/such Member's spouse and family member(s) (each such transferee, a "Permitted Transferee"), (y) the Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Transfer to a Permitted Transferee, and (z) the Members shall approve a Permitted Transferee's admission as a substitute Member. A Permitted Transferee of a Member may transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the Company's and other Members' right of first refusal.

8.3. **No Release on Transfer.** A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

8.4. **Agreement Binds New Members.** Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5 **Voluntary Lifetime Transfers.** No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section. Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both

home and office), and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer. The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest to be transferred to the Company and the other Members as described in Section 8.7. A "Voluntary Lifetime Transfer" means any Transfer made during a Member's lifetime, which is not an Involuntary Lifetime Transfer (as defined in Section 8.6).

8.6   **Involuntary Lifetime Transfer.**   Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable, including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company and each other Member. Such notice shall include a description of the expected Transfer, the name, address (both home and office), and business or occupation of the expected transferee, and any other facts that are, or would reasonably be deemed to be, material to the involuntary Transfer. The Member who may be making an Involuntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest otherwise to be transferred to the Company and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law.

8.7   **Right of First Refusal of the Company and Non-Transferring Members.**

8.7.1   **General.**   Each Member shall be deemed to have offered to sell his or her Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other Members (i) at the price and payment terms offered by a proposed transferee set forth in the Member Notice or (ii) if there is no price or payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), at the Agreement Price (as defined below) and Agreement Terms (as defined below).

8.7.2.   **Company's Right.**   Within the later of (i) thirty (30) days following receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement Price, the Company shall send a written notice ("Company Notice") to the Members stating the portion of the Offered Membership Interest the Company wishes to purchase.

8.7.3.   **Members' Right.**   Unless the Company Notice specifies all of the Offered Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member who desires to purchase a portion of the Offered Membership Interest shall give a written notice to the Company specifying the maximum portion of the Offered Membership Interest that the Member wishes to purchase. If the aggregate Offered Membership Interest to be purchased by the Members exceeds the total amount of the Offered Membership Interest, the Offered Membership Interest shall be allocated to the exercising Members based on their respective Unit Percentages.

8.7.4   **Remaining Offered Membership Interest.**   If the Company and the other Members do not agree to buy all of the Offered Membership Interest, any remaining

Offered Membership Interest may be sold to a non-Member within thirty (30) days after the expiration of the Company's and Members' option period. If such Transfer does not occur within thirty (30) days, the provisions of this Agreement will continue to apply to such Offered Membership Interest as if no such Transfer had been contemplated and no notice had been given. A Transfer is consummated when the Company has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

8.8     **Agreement Price.**  The Agreement Price will be the fair market value of the Membership Interest being Transferred and shall initially be determined in good faith by the Company. If any Member objects to the Company's determination of the fair market value, the Company and the objecting Member shall attempt to jointly appoint a qualified appraiser. If the parties cannot agree on a single appraiser, they shall each appoint one appraiser and the two appraisers appointed by the parties shall choose a third appraiser. In the event that three appraisers are used, the Agreement Price shall be the average of the two closest fair market values proposed by the three appraisers. The cost of appraisal shall be borne and paid by the objecting Member, unless the Company's proposed fair market value is at least twenty percent (20%) less than the Agreement Price determined by appraisal.

8.9     **Agreement Terms**.

8.9.1    **Installment Note.**  If there are no payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

8.9.2    **Closing.**  The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree. At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred. If the seller does not appear at the closing, then:

(a)     The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

(b)     The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

       (c)    The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

8.?.?    **Transfers at Death.** Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest). If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1.    **Dissolution.** The Company shall be dissolved on the first to occur of the following events:

       (a)    The Vote of a Supermajority of Members to dissolve the Company;

       (b)    The sale or other disposition of substantially all of the Company's assets; or

       (c)    Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

9.2.    **Winding Up.** On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

    (a)    To pay the expenses of liquidation;

    (b)    To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

    (c)    To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

    (d)    To the Members in accordance with their respective positive Capital Account balances.

9.3.   **No Recourse**  Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, the Member shall have no recourse against any other Member or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X: CONFIDENTIALITY

10.1.   **Confidentiality.**  Each Member covenants with the Company and each other Member that for so long as a Member holds any Units in the Company, and for a two-year period following the Transfer of a Member's Units, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, a Member shall not, directly or indirectly, through an Affiliate or otherwise use or disclose in any manner any Confidential Information.

10.2.   **Money Damages Inadequate.**  Each Member agrees that a breach of Section 10.1 shall result in irreparable damage and injury to the Company that no money damages could adequately compensate. If the Member breaches Section 10.1, in addition to all other remedies to which the Company may be entitled to, and notwithstanding the arbitration provisions of Article XI, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction. Each Member expressly waives any claim or defense that an adequate remedy at law exists for any such breach.

10.3.   **Reformation.**  If any provision of Section 10.1 is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that provision shall be deemed reformed in that jurisdiction to the extent necessary to permit enforcement.

## ARTICLE XI: INDEMNIFICATION AND ARBITRATION

11.1.   **Indemnification.**  The Company shall indemnify any Person who was or is a party, or who is threatened to be made a party, to any legal proceeding by reason of the fact that the Person was or is a Member, Manager, Officer, Executive Officer, employee, or other agent of the Company against expenses including reasonable attorneys' fees, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if (a) that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and (b) in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

11.2.   **Advancement of Expenses.**  Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a

legal proceeding shall be paid by the Company in advance of the final disposition of that proceeding, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.3.    Arbitration.  Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to (or arising out of) this Agreement or the Company among or between any of the Company, a current or former Member, or the current or a former Manager shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association. The place of arbitration shall be Los Angeles, California. The award of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered on any such award in any court of competent jurisdiction.

## ARTICLE XII: GENERAL PROVISIONS

12.1.    Integration.  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein. No party is relying on any representations or warranties not expressly contained in this Agreement. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

12.2.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail. The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

12.3.    Choice of Law.  This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

12.4.    Severability.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

12.5    Binding Effect.  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.6.    Representation.  Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

12.7.    Additional Instruments.  The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.8.   **Independent Activities**.  Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members or the Manager in the carrying on of their own respective businesses or activities.

12.9.   **Capacity and Authority**.  Each Member represents and warrants to the other Members that he, she, or it has the capacity and authority to enter into this Agreement.

12.10.  **Interpretation**.  The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

12.11.  **Time of the Essence**.  Time is of the essence for every provision of this Agreement that specifies a time for performance.

12.12.  **Exhibits**.  The exhibits referenced herein are expressly incorporated into and made part of this Agreement.

12.13.  **No Third Party Beneficiaries**.  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and there are no intended third-party beneficiaries.

12.14.  **Amendment**.  This Agreement may be amended only by the written approval of all of the Members.

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EVERY OTHER PERSON WHO EXECUTES THIS AGREEMENT OR OTHERWISE THEREAFTER BECOMES A MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this instrument on the day and year first written above.

JOHN HANNA, Manager, Member, and Chief
Executive Officer

JENE PARK, Member, Chief Operations Officer
and Chief Commercial Officer

DOUG LEE, Member

ROGER KUO, Member

22

## EXHIBIT A

## CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____ ("Member"), and acknowledges that he or she has read the foregoing Operating Agreement of Thomas Wylde, LLC (the "Agreement") and understands its provisions. The undersigned is aware that, by the provisions of the Agreement, Member and the undersigned have consented to sell or transfer all Units in the Company, including any community property interest or quasi-community property interest therein, only in accordance with the terms and provisions of the Agreement. The undersigned expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Units and the restrictions on them. If the undersigned predeceases Member while Member owns any Units therein, the undersigned agrees not to devise or bequeath any community property interest or quasi-community property interest in such Units in contravention of the Agreement.

Date: _____          _____

                                        Signature

                                        _____

                                        Name

## EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700 December 15, 2014 | 14 | $700 |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900 December 15, 2014 | 18 | $900 |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350 December 15, 2014 | 7 | $350 |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350 December 15 2014 | 7 | $350 |

**EXHIBIT C**
**TAX PROVISIONS**

ARTICLE I. DEFINITIONS

1.1     "**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

    1.1.1     Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

    1.1.2     Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

    1.1.3     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2     "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3     "**Company Minimum Gain**" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4     "**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5     "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6     "**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

1.7    "Net Profits" and "Net Losses" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.7.1    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3    In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6    Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8    "Nonrecourse Deductions" has the meaning set forth in Regulations Section 1.704-2(b)(1).

1.9     "Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

ARTICLE II. CAPITAL ACCOUNT

2.1     **Capital Accounts.** The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1   To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2   To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3   In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4   In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

## ARTICLE III. SPECIAL ALLOCATIONS

3.1     **Adjusted Capital Account Deficit.** An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

3.2    **Special Allocations**.

3.2.1    **Member Nonrecourse Deductions**. Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

3.2.2    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members**. Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

3.2.3    **Member Minimum Gain Chargeback**. Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.2.4    **Minimum Gain Chargeback**. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

28

3.2.5    **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.2.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 3.2.5 were not in the Agreement.

3.3    **Curative Allocations**.  The allocations set forth in Sections 3.1 and 3.2 of this Exhibit C (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.3.  Therefore, notwithstanding any other provision of the Agreement (other than the Regulatory Allocations), the Members, by Vote of a Supermajority of Members, shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.1 of the Agreement.  In exercising their discretion under this Section 3.3, the Members, by Vote of a Supermajority of Members, shall take into account any future Regulatory Allocations under Sections 3.2.3 and 3.2.4 of this Exhibit C that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.2.1 and 3.2.2 of this Exhibit C.

3.4    **Code Section 704(c) Allocations**.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Agreement: (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).

3.5    **Allocations in Respect of a Transferred Membership Interest**.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year shall be allocated among the Members, as determined by the Members, by Vote of a Supermajority of Members, in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such fiscal year.