1  DIMITRIOS P. BILLER (142730)
2  LDT Consulting, Inc.
   15113 West Sunset Blvd., Suite "9"
3  Pacific Palisades, California 90272
4  Telephone (310) 459-9870
   E-mail Address: biller_ldtconsulting@verizon.net
5
6  MARCIA DALEY (146,579)
7  DALEY & SACKS LAW RLLP
   1516 Westwood Boulevard, Suite 102
8  Los Angeles, California 90024
9  Telephone: (310) 985-2808
   E-mail: marcia@daleyandsackslaw.com
10
11 Attorneys for Creditor Paula Thomas
12
13
14             UNITED STATES DISTRICT COURT
15       FOR THE CENTRAL DISTRICT COURT OF CALIFORNIA
16
17
18 IN RE                          │ Case No.: 6-16-bk-15889-SY
19 PDTW, LLC,                     │
20                                │ INDEX TO EXHIBITS REFERRED
                                  │ TO IN THE DECLARATION OF
21              DEBTOR.           │ DIMITRIOS P. BILLER IN SUPPORT
22                                │ OF CREDITOR PAULA THOMAS'
                                  │ BENCH BREIF ON THE EXCLUSION
23                                │ OF EVIDENCE, DENIAL OF ALL
24                                │ CLAIMS FILED BY THOMAS
                                  │ WYLDE, LLC, AND ORDER
25                                │ PROHIBITING NANCY ZAMORA
26
   INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
27 CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
   FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
28 THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                      1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FROM PARTICIPATING IN THE
AUGSUT 28 AND 29, 2017
EVIDENTARY HEARING.

**VOLUME I, EXHIBITS 1-3**

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                    2

# INDEX OF EXHIBITS REFERRED TO IN THE DECL. OF BILLER

## VOLUME 1

1.      **Exhibit "1"** Thomas Wylde's, LLC's Notice of Withdrawal of Claim No. 10.

2.      **Exhibit "2":** deposition transcript for Eniluz Gonzalez that was taken on July 31, 2017.

3.      **Exhibit "3":** Pleadings for Claim No. 10 that Richard Peddie apparently prepared and signed under penalty of perjury.

4.      **Exhibit "4":** e-mail Nancy Zamora sent to inform the parties that the Trustee will not call the accountant as a witness.

5.      **Exhibit "5":** Operating Agreement for Thomas Wylde, LLC signed on July 22, 2014.

6.      **Exhibit "6:** Transaction Accounts document that Stephen Choi claims to have received from Thomas Wylde, LLC.

7.      **Exhibit "7":** Agreement to Purchase Units of Membership in Thomas Wylde, LLC.

8.      **Exhibit "8":** Employment Agreement that Paula Thomas signed;

9.      **Exhibit "9"":** Amended Operating Agreement.

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    3

10.   **Exhibit "10":** Amended Schedule B for Thomas Wylde, LLC

11.   **Exhibit "11":** is the salary chart showing Paula Thomas received her last pay check on April 15, 2015.

12.   **Exhibit "12":** Amendment to Schedule B of the Amended Operating Agreement

13.   **Exhibit "13":** income tax return for Thomas Wylde, LLC.

14.   **Exhibit "14":** Agreement to Purchase Membership Interest.

15.   **Exhibit "15":** e-mail Richard Peddie sent proving notice of the withdrawal of Claim No. 10.

16.   **Exhibit "16":** e-mail sent to Richard Peddie requesting more information regarding the reasons he withdrew the $2,000,000.00 claim.

17.   **Exhibit "17":** Motion for the Trustee seeking to buy the PDTW, LLC's.

18.   **Exhibit "18":** e-mail that apparently caused Mrs. Zamora to change her position to produce the expert witness, but then she withdrew him.

19.   **Exhibit "19":** e-mail Nancy Zamora send taking the position that the accountant is not an expert and he was only going to be called to "AUTHENICATE" business records of PDTW, LLC.

20. **Exhibit "20":** e-mail from Mrs. Zamora changing her position.

21. **Exhibit "21":** Second Amended Cross-Complaint TW filed against Paula Thomas.

22. **Exhibit "22":** Paula Thomas' initial witness list.

23. **Exhibit "23":** Paula Thomas' initial Exhibit List.

24. **Exhibit "24":** e-mail received from Richard Peddie withdrawing the $2 million claim.

25. **Exhibit "25":** "Explanatory Note – Basis for Claim attached to Claim No. 10.

26. **Exhibit "26":** May 14, 2015 letter that Mr. Peddie wrote to create a false record that TW terminated Thomas one month earlier on April 15, 2015. responses to Form and Special Interrogatories to substantiate the position.

27. **Exhibit "27"** Thomas Wylde, LLC's responses to form and special interrogatories referring to the letter.

28. **Exhibit "28"** Demand for Production of Witnesses and served on Thomas Wylde, LLC.

Dated: August 7, 2017

Respectfully submitted,

By: /S/ Dimitrios P. Biller
Counsel for Creditor Paula Thomas

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    6

## PROOF OF SERVICE
## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I declare under penalty of perjury that I live in the County of Los Angeles, state of California, I am over the age of 18 years; my business is located at 15113 West Sunset Blvd., Suite "9", Pacific Palisades, CA 90272. On **August 7, 2017**, I caused to be served, via e-mail, the following pleadings:

### INDEX OF EXHIBITS

on the interested parties in this action by e-mail:

> Richard Byron Peddie,
> lawstudios@comcast.net
> Lawstudios Richard Bryon Peddie
> 505 Euclid Avenue
> Boulder, Co 80303-2811
> Counsel for ALL Defendants


> Nancy Hoffmeir Zamora
> Anthony N.R. Zamora
> Zamora & Hoffmeier
> U.S. Bank Tower
> 633 West 5th Street, Suite 2600
> Los Angeles, California 90071
> e-mail zamora3aol.com

**XXXX** BY MAIL – I placed such envelope for deposit in the U.S. Mail for service by the United States Postal service, with postage thereon fully prepaid. I am "readily familiar" with the practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at Pacific

INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    7

1  Palisades, California.  I am aware that on motion of the party served, service is
2  presumed invalid if postal cancellation date or postage meter date is more than one
   day after date of deposit for mailing in affidavit.
3

4  ____ BY FEDERAL EXPRESS – I am familiar with the practice at my place of
   business for collection and processing of correspondence for overnight delivery
5  maintained by Federal Express.  Such correspondence will be deposited with a
6  facility regularly maintained by Federal Express for receipt on the same day in the
7  ordinary course of business.  The envelope was sealed and placed for collection
   and delivery by Federal Express with delivery fees paid or provided for in
8  accordance with ordinary business practices.
9  ____ BY PERSONAL SERVICE – I caused such envelope to be delivered by hand
   to the offices of the addressee.
10

11  **XXX**: E-mail at the above e-mail addresses.

12  **XXX** (State) I declare **under penalty of perjury under the laws of the State of**
13  **California** that the foregoing is true and correct.

14
       Executed on **August 7, 2017**, at Pacific Palisades, California.
15

16

17  /S/ Dimitrios P. Biller
18  Dimitrios P. Biller

19

20

21

22

23

24

25

26

27  INDEX TO EXHIBITS REFERRED TO IN THE DECLARATION OF DIMITRIOS P. BILLER IN SUPPORT OF
    CREDITOR PAULA THOMAS' BENCH BREIF ON THE EXCLUSION OF EVIDENCE, DENIAL OF ALL CLAIMS
    FILED BY THOMAS WYLDE, LLC, AND ORDER PROHIBITING NANCY ZAMORA FROM PARTICIPATING IN
28  THE AUGSUT 28 AND 29, 2017 EVIDENTARY HEARING.                                    8

# EXHIBIT "1"

Richard Byron Peddie, SBN 193770
lawstudios@comcast.net
Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue
Boulder, CO 80303-2831
Tel.: 303.444.5447
Fax: 720.222.4766
*Attorney for Thomas Wylde, LLC*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>PDTW, LLC,<br><br>Debtor. | **Case No.: 6:16-bk-15889-SY**<br><br>**THOMAS WYLDE, LLC'S NOTICE OF WITHDRAWAL OF CLAIM NO. 10**<br><br>**Hon. Scott H. Yun**<br><br>**DATE: n/a**<br>**TIME: n/a**<br>**COURTROOM.: 302** |

### THOMAS WYLDE, LLC'S NOTICE OF WITHDRAWAL OF CLAIM NO. 10

Claimant Thomas Wylde, LLC, hereby WITHDRAWS its Claim Number 10 in these proceedings.

*Respectfully submitted, Aug. 7, 2017:*

Lawstudios | Richard Byron Peddie, P.C.

By:
Richard Byron Peddie
Lawstudios | Richard Byron Peddie, P.C.
5051 Euclid Avenue
Boulder, CO 80303-2831
Tel.: 303.444.5447
Fax: 720.635.9222
*Attorney for Thomas Wylde, LLC*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

5051 Euclid Avenue, Boulder, CO 80303-2831

A true and correct copy of the foregoing document entitled (specify):
**THOMAS WYLDE, LLC'S NOTICE OF WITHDRAWAL OF CLAIM NO. 10**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) 08/07/2017_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On (date) 08/08/2017_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
***Judge NOT served pursuant to Appendix F of Court Manual***

☑ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 08/07/2017 | Richard Byron Peddie | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

SERVICE LIST ATTACHMENT [In re PDTW 6:16-bk-15889-SY]

1. SERVED VIA CM-ECF.

*For Debtor:* Misty A Perry Isaacson    misty@ppilawyers.com, ecf@ppilawyers.com
*Trustee:* Larry D Simons (TR)   larry@lsimonslaw.com, c119@ecfcbis.com;
       nancy@lsimonslaw.com; cynthia@lsimonslaw.com
*United States Trustee:* United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov
*Trustee's Counsel:* Nancy H Zamora    zamora3@aol.com
*For Claimant Paula Thomas:* Dimitrios P Biller    biller_ldtconsulting@verizon.net

2. SERVED VIA UNITED STATES MAIL:

*Debtor:*
ATTN: Paula Thomas,
CEO/Creative Director
PDTW, LLC
2514 S. Toledo Avenue
Palm Springs, CA 92264

# EXHIBIT "2"

```
 1            CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2               COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3
 4    PAULA THOMAS, INDIVIDUALLY    )
      AND IN THE RIGHT OF AND FOR   )
 5    THE BENEFIT OF THOMAS WYLDE,  )
      LLC, A CALIFORNIA LIMITED     )
 6    LIABILITY COMPANY, AND PDTW   )
      [PAULA DOROTHY THOMAS WYLDE], )
 7    LLC, A CALIFORNIA LIMITED     )
      COMPANY,                      )
 8                                  )
                    Plaintiffs,     )
 9                                  )
              vs.                   ) Case No.:  BC596495
10                                  )
      THOMAS WYLDE, LLC, A          )
11    CALIFORNIA LIMITED LIABILITY  )
      COMPANY, JOHN HANNA, AN       )
12    INDIVIDUAL, JENE PARK, AN     )
      INDIVIDUAL, SHOT IN THE       )
13    ARMOIRE, LLC, A FLORIDA       )
      LIMITED LIABILITY COMPANY, AND)
14    H&H FASHION, LLC, A FLORIDA   )
      LIMITED LIABILITY COMPANY,    )
15    AND DOES 1 THROUGH 50,        )
                                    )
16                  Defendants.     )
                                    )
17
18            DEPOSITION OF ENILUZ GONZALEZ
19               Los Angeles, California
20               Monday, July 31, 2017
21
22
      Reported by:
23    Damon M. LeBlanc
      CSR No. 11958
24    Job No. 2661669
25    Pages 1 - 157
```

Page 1

1          CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             COUNTY OF LOS ANGELES, CENTRAL DISTRICT

3

4      PAULA THOMAS, INDIVIDUALLY  )

       AND IN THE RIGHT OF AND FOR )

5      THE BENEFIT OF THOMAS WYLDE, )

       LLC, A CALIFORNIA LIMITED   )

6      LIABILITY COMPANY, AND PDTW  )

       [PAULA DOROTHY THOMAS WYLDE], )

7      LLC, A CALIFORNIA LIMITED   )

       COMPANY,                  )

8                           )

                Plaintiffs,    )

9                           )

10           vs.           ) Case No.: BC596495

                           )

11     THOMAS WYLDE, LLC, A      )

       CALIFORNIA LIMITED LIABILITY )

12     COMPANY, JOHN HANNA, AN    )

       INDIVIDUAL, JENE PARK, AN   )

13     INDIVIDUAL, SHOT IN THE    )

       ARMOIRE, LLC, A FLORIDA    )

14     LIMITED LIABILITY COMPANY, AND)

       H&H FASHION, LLC, A FLORIDA  )

15     LIMITED LIABILITY COMPANY,   )

       AND DOES 1 THROUGH 50,     )

16                           )

                Defendants.    )

17     —————————————————————————)

18          Deposition of ENILUZ GONZALEZ, taken on behalf

19    of the Plaintiff, at 2049 Century Park East,

20    Suite 2400, Los Angeles, California, beginning at

21    9:12 a.m. and ending at 2:38 p.m., Monday,

22    July 31, 2017, before Damon M. LeBlanc, Certified

23    Shorthand Reporter, Number 11958.

24

25

Page 2

```
 1          APPEARANCES:
 2          For the Plaintiff:
 3                  LDT CONSULTING, INC.
                    By:  Dimitrios P. Biller, Esq.
 4                  15113 West Sunset Boulevard
                    Suite 9
 5                  Pacific Palisades, California 90272
                    Telephone:  310-459-9870
 6                  E-mail:  biller_ldtconsulting@verizon.net
 7                  DALEY & SACKS LAW, RLLP
                    By:  Marcia Daley, Esq.
 8                  269 South Beverly Drive
                    Suite 446
 9                  Beverly Hills, California 90212
                    Telephone:  310-985-2808
10                  E-mail:  marcia@daleyandsackslaw.com
11
12          For the Defendants:
                    LAW OFFICES OF JOHN D. WILSON
13                  By:  John D. Wilson, Esq.
                    1900 Avenue of the Stars
14                  Suite 960
                    Los Angeles, California 90067-4310
15                  Telephone:  310-277-2323
16                  E-mail:  johnw@jdwilsonlaw.net
17
18          Also Present:
                    Paula Thomas
19                  Veronica Ann Stocker
20                  Spanish-English Interpreter
21
22
23
24
25
```

Page 3

```
 1                        I N D E X
 2      THE WITNESS:                    EXAMINATION
 3      ENILUZ GONZALEZ
 4                                         Page
 5                  BY MR. BILLER:           7
 6
 7                     E X H I B I T S
```

|        |            |                            | Page       | Page   |
|--------|------------|----------------------------|------------|--------|
|  8     | Exhibit    | Description                | Introduced | Marked |
|  9     | Exhibit 20 | Notice of Service          | 68         | 7      |
| 10     | Exhibit 21 | Deposition Subpoena        | 36         | 7      |
| 11     | Exhibit 22 | Notice of Issuance of      | 23         | 23     |
|        |            | New Membership Interest    |            |        |
| 12     |            | and Agreement to Purchase  |            |        |
|        |            | Membership Interest        |            |        |
| 13     |            |                            |            |        |
|        | Exhibit 23 | Documents illustrating     | 67         | 67     |
| 14     |            | The Thomas Wylde brand     |            |        |
| 15     | Exhibit 24 | Valuation of the           | 71         | 71     |
|        |            | Intellectual Property      |            |        |
| 16     |            | Owned by Ms. Paula Thomas  |            |        |
|        |            | and Licensed to PDTW, LLC  |            |        |
| 17     |            | October 17, 2013           |            |        |
|        |            | Thomas Wylde               |            |        |
| 18     |            |                            |            |        |
|        | Exhibit 25 | Dato Capital               | 73         | 73     |
| 19     |            | Director Report            |            |        |
| 20     | Exhibit 26 | Document entitled,         | 79         | 79     |
|        |            | "REPUBLICA DE PANAMA       |            |        |
| 21     |            | PAPEL NOTARIAL             |            |        |
|        |            | NOTARIA QUINTA DEL         |            |        |
| 22     |            | CIRCUITO DE PANAMA:        |            |        |
| 23     |            |                            |            |        |
| 24     |            |                            |            |        |
| 25     |            | Continued...               |            |        |

Veritext Legal Solutions
866 299-5127

INDEX OF EXHIBITS (CONTINUED):

| Exhibit | Description | Page Introduced | Page Marked |
|---------|-------------|-----------------|-------------|
| Exhibit 27 | Thomas Wylde LLC Profit & Loss January through December 2014 | 121 | 121 |
| Exhibit 28 | Thomas Wylde LLC Profit & Loss January through December 2015 | 122 | 122 |
| Exhibit 29 | Complaint For Damages in the United States District Court Case | 124 | 124 |
| Exhibit 30 | Operating Agreement of Thomas Wylde, LLC | 126 | 126 |
| Exhibit 31 | Members and Capital Contributions April 15, 2015 | 128 | 128 |
| Exhibit 32 | Thomas Wylde LLC Transaction by Account | 130 | 130 |
| Exhibit 33 | Agreement to Purchase Membership Interest | 133 | 133 |
| Exhibit 34 | Thomas Employment Agreement | 137 | 137 |
| Exhibit 35 | Amendment To Secured Promissory Note | 138 | 138 |
| Exhibit 36 | Secured Promissory Note | 142 | 142 |
| Exhibit 37 | Amended and Restated Operating Agreement of Thomas Wylde, LLC | 149 | 149 |

Continued...

Veritext Legal Solutions
866 299-5127

```
 1                    Witness Instructed Not To Answer
 2                        Page                   Line
 3                         10                    2
                           16                    7
 4                         22                    16
                           26                    1
 5                         28                    2
                           32                    23
 6                         33                    6
                           35                    22
 7                         42                    1
                           44                    7,  24
 8                         52                    24
                           54                    19
 9                         58                    4,  11
                           64                    4,  15
10                         91                    16
                           94                    8,  19,  24
11                        104                    5
                          117                    21
12                        134                    9
                          144                    3
13
14                  MARKED PORTIONS OF TRANSCRIPT
15                        Page                   Lines
16                        125                    2 - 20
17
18
19
20
21
22
23
24
25
                                                      Page 6
```

```
 1              Los Angeles, California, Monday, July 31, 2017
 2                        9:12 a.m. - 2:38 p.m.
 3
 4                        (Exhibits 20 and 21 were
 5              previously marked for identification by
 6              the Certified Shorthand Reporter and are
 7              attached hereto.)
 8
 9                        VERONICA ANN STOCKER,
10         the Interpreter herein, was duly sworn to correctly
11         interpret the English language into Spanish and the
12         Spanish language into English, to the best of her
13         ability.
14              MR. BILLER:  On the record.  I'm going to
15         court, and you're going to pay for this deposition.
16
17                        ENILUZ GONZALEZ,
18         having been first duly sworn by the Certified Shorthand
19         Reporter, was examined and testified as follows:
20
21              THE INTERPRETER:  The Interpreter's name is
22         Veronica Stocker, Certification Number 301559.
23         ///
24         ///
25         ///
```

Page 7

```
 1                    (Whereupon, unless specified in a
 2           parenthetical "Through the Interpreter,"
 3           all the witness's answers were answered in
 4           English.)
 5                          EXAMINATION
 6       BY MR. BILLER:
 7               Q      Veronica, have you had your deposition
 8       taken before?
 9               THE REPORTER:  You said "Veronica," Counsel.
10               MR. BILLER:  I did.
11               MR. WILSON:  Do you want to rephrase?
12               MR. BILLER:  What is the witness's first name?
13               THE INTERPRETER:  Eniluz.
14       BY MR. BILLER:
15               Q      Ms. Gonzalez, have you ever had your
16       deposition taken before?
17               A      No.
18               Q      Have you ever testified in court?
19               A      No.
20               Q      I'm going to go over some of the ground
21       rules for taking of a deposition.  You have to speak
22       verbally.
23               A      Okay.
24               Q      All your answers have to be verbal
25       responses, not physical gestures, not huh-uh's, or
```

Page 8

1          uh-huh's.  Do you understand?

2                    A        Yes.

3                    Q        This will not be the last time you and I

4          will have this type of discussion.

5                    MR. WILSON:  That's not a question, Counsel.

6          You want to ask one?

7                    MR. BILLER:  I'm giving her an admonishment,

8          Counsel.  It's called due process.

9                    MR. WILSON:  Okay.

10         BY MR. BILLER:

11                   Q        I will be calling you as a witness at

12         trial in the federal bankruptcy court on August 28th.

13         Do you understand?

14                   A        Yes.

15                   Q        I will be calling you as a witness at

16         trial on October 10, and I will cross-examine you for

17         the third time.  Do you understand?

18                   A        Yes.

19                   Q        I will be calling you as a witness in

20         the federal RICO action case against you personally and

21         Hillshore Investments to examine you in that case.  Do

22         you understand?

23                   A        Yes.

24                   Q        Do you understand you're a defendant in

25         a federal RICO action?

                                                       Page 9

```
 1                  A.    Yes.

 2                  Q     Have you read the complaint?

 3            MR. WILSON:  Counsel, it's not relevant, not

 4      material --

 5            MR. BILLER:  Are you going to instruct her not

 6      to answer?

 7            MR. WILSON:  Yeah, when I get done.  Don't

 8      interrupt me again.  That's your last warning.

 9            MR. BILLER:  Oh, really?

10            MR. WILSON:  Yes.  So we're not here for

11      anything other than the state court case.  You want to

12      ask questions about some other case, you can do that.

13      But you're not going to do it today.

14            MR. BILLER:  I'm not going to ask any other

15      questions about any other case.

16            MR. WILSON:  Good.

17            MR. BILLER:  I'm putting her on notice that

18      this is not the only time I'm going to cross-examine

19      her.  I think the witness has a right -- and if I were

20      representing her, I would want to know if this was the

21      only time I cross-examine her.

22            MR. WILSON:  Right.  But I think you're doing

23      to intimidate her, so let's move on.

24            MR. BILLER:  No.

25       ///
```

Veritext Legal Solutions
866 299-5127

BY MR. PILLER:

2        Q     And the last time we will meet will be

3    in federal court in front of a federal jury in the RICO

4    action case.  Do you understand?

5        A     Yes.

6        Q     So it's very important that you tell the

7    truth today.  Do you understand?

8        A     Yes.

9        Q     It's very important.  Because if you

10   don't tell the truth today, you may be impeached in

11   front of a judge in later proceedings.  Do you

12   understand?

13       A     Yes.

14       Q     Do you know what the penalty of perjury

15   is?

16       A     No.

17       Q     Penalty of perjury is a state law under

18   Penal Code Section 118.  If you knowingly, willingly

19   make a false statement of material fact that you know

20   to be false in these proceedings, you could be held

21   liable or guilty or be charged with committing perjury.

22   Do you understand?

23       A     Yes.

24       Q     That carries a $10,000 fine and/or one

25   year in prison.  Do you understand?

Page 11

1          A     Yes

2          Q     Since you've taken an oath and since the

3   penalty of perjury applies, you're obligated to tell

4   the truth. Do you understand?

5          A     Yes.

6          Q     Only one person should speak at a time.

7   And I think you're doing a great job by listening to

8   the interpreter and responding to the questions

9   appropriately in a timely fashion. Do you understand?

10         A     Yes.

11         Q     If my questions are vague, ambiguous, or

12   unintelligible, let me know I'll be more than happy to

13   rephrase. Do you understand?

14         A     Yes.

15         Q     If you don't lodge an objection or you

16   don't tell me that you don't understand the question,

17   it will be assumed you did understand the question when

18   you provided an answer. Do you understand?

19         A     Yes.

20         Q     It's also important that you allow your

21   attorney time to give an objection, and I may respond

22   or not. I won't respond if it's just an objection.

23   And then you can answer the question, or you can follow

24   the instructions of your lawyer.

25         A     Yes.

Page 12

1    Q In two weeks a transcript will be sent

2 to your lawyer's office, and the transcript will

3 contain everything that is said here today in this

4 room -- your testimony, my questions, your counsel's

5 objections -- anything that is verbally said.

6   You'll be given an opportunity to review the

7 transcript and to make any changes to the transcript

8 that you deem to make your testimony more accurate.  Do

9 you understand?

10   A Yes.

11   Q I just want to warn you that if you make

12 any changes to your transcript that are material

13 changes -- in other words, important changes -- your

14 credibility as a witness may be attacked at the state

15 court, bankruptcy court, or federal court.  Do you

16 understand?

17   A Yes.

18   Q You will be given one week to review

19 that transcript and have your lawyer send it back to

20 me.

21   MR. WILSON:  No.  That's not enough time.

22   MR. BILLER:  I have trial on the 20th.

23   MR. WILSON:  She has two weeks.  Get an earlier

24 transcript.  That's the way it's going to work.

25   MR. BILLER:  You're something else, buddy.

Page 13

1             MR. WILSON:  Two weeks.

2             MR. BILLER:  I'm not stipulating two weeks.

3    We'll do it under the code.

4             MR. WILSON:  Okay.  That's longer.

5             MR. BILLER:  We'll do it under the code.

6    BY MR. BILLER:

7         Q     You will have to come here at the court

8    reporter's office and review the transcript.  Do you

9    understand?

10            MR. WILSON:  It's okay.

11            THE WITNESS:  Yes.

12   BY MR. BILLER:

13        Q     You are going to be in the United States

14   from today until November; correct?

15        A     Yes.

16        Q     Okay.  You have no travel plans, do you?

17        A     I don't know.

18        Q     You don't know if you have any travel

19   plans?

20        A     Yes.

21        Q     When?

22            MR. WILSON:  When what?

23   BY MR. BILLER:

24        Q     When do you have travel plans?

25            MR. WILSON:  You can answer.  Go ahead.

                                            Page 14

1              THE WITNESS:  I do have plans.

2    BY MR. BILLER:

3              Q       What plans do you have?

4              A       I'm traveling on Wednesday.

5              Q       And when are you coming back?

6              A       I don't know.

7              Q       When did you purchase your tickets?

8              MR. WILSON:  Counsel, enough.  Okay.  Just ask

9    questions.

10             MR. BILLER:  I have a right to know if the

11   witness is going to be in this country at the time

12   she's served.

13             MR. WILSON:  She said she will be, so your

14   question has been answered.

15             MR. BILLER:  She said she's going to leave next

16   Wednesday, but she didn't tell me when she's coming

17   back.  Is she going to be here?

18             MR. WILSON:  That's up to her.  I don't know.

19             MR. WILSON:  Let's move on.

20             MR. BILLER:  No.  I want an answer.

21   BY MR. BILLER:

22             Q       When are you going to be back?

23             A       In November.

24             Q       Oh, isn't that convenient.  You're going

25   to be gone from Wednesday to November.

Page 15

1          MR. BILLER: And she's smiling.

2          MR. WILSON: Counsel, you're going to have this

3   deposition end soon if you don't treat the witness with

4   respect.

5          MR. BILLER: You're --

6   BY MR. BILLER:

7          Q    Where are you going?

8          MR. WILSON: It's none of your business,

9   Counsel. I instruct her not to answer.

10         MR. BILLER: You're going to instruct her not

11  to answer?

12         MR. WILSON: Yeah.

13         MR. BILLER:  Okay.

14         MR. WILSON: Counsel, here's what I suggest.

15  You send the transcript to me, and I will get it signed

16  for you by her. If you do that, you should solve any

17  problem. So if you wish to proceed in that way, have

18  it sent to me, I will get it her, and she will have two

19  weeks to sign it; okay?

20         MR. BILLER: That won't solve the problems,

21  because I won't be able to cross-examine her at trial

22  in 28 days.

23         MR. WILSON: Well --

24         MR. BILLER: And I'm going to get an order from

25  the bankruptcy judge to hold her in this country

Page 16

1          because she's evading the service process, I believe.

2                    MR. WILSON:  You do what you want.  If that's

3          not satisfactory -- I've given you an opportunity to

4          have a situation where the transcript will be

5          presented.  If you don't want to take me up on that --

6                    MR. BILLER:  Sir, how does that help me?  When

7          I get the transcript to her on August 14, she takes two

8          weeks to review it and sign it and the trial starts on

9          August 28, how does that help me?

10                    MR. WILSON:  Your trial starts in October.

11                    MR. BILLER:  No, it doesn't.  The bankruptcy

12          trial starts on October 28.

13                    MR. WILSON:  She's not a part of the

14          bankruptcy.

15                    MR. BILLER:  It doesn't matter.  She's a

16          witness.

17                    MR. WILSON:  If you're telling me -- the trial

18          in the bankruptcy is what date?

19                    MR. BILLER:  August 28.

20                    MR. WILSON:  Then why don't you get an

21          expedited transcript so that we can -- just give her

22          enough time.  As I said, her better language is

23          Spanish.  So she's going to need someone to help her

24          with the transcript, so we would like a little time.

25          Why don't you get it to me in a week, and we'll get it

Page 17

1       back to you by the 21st?

2                MR. BILLER:  First of all, I don't appreciate

3       you telling me that her better language is Spanish,

4       because that's not the standard.  That's not the

5       standard.  My position is going to be you've

6       intentionally attempted to obstruct these processes by

7       forcing me to bring an interpreter when, in fact, it's

8       not needed.

9                MR. WILSON:  Well, it is needed.  And you

10      wouldn't know that --

11               MR. BILLER:  Yes, I would.

12               MR. WILSON:  -- because you don't know this

13      proceeding.

14               MR. BILLER:  Believe me, I know it.

15               MR. WILSON:  All right.  Can we just ask

16      questions now and proceed with the deposition instead

17      of all the preliminary nonsense?

18               MR. BILLER:  I'm giving her my admonishings.

19      BY MR. BILLER:

20          Q       What did you do to prepare for the

21      deposition today?

22          A       I'm sorry, can you repeat?

23          Q       What did you do to prepare for the

24      deposition today?

25               MR. WILSON:  Objection, assumes facts not in

                                                    Page 18

| 1 | | evidence. But you can answer. |
|---|---|---|
| 2 | | THE WITNESS:  Nothing. |
| 3 | | BY MR. BILLER: |
| 4 | Q | Did you receive the subpoena? |
| 5 | A | The subpoena? |
| 6 | Q | Yes.  Did you receive a subpoena? |
| 7 | A | Yes. |
| 8 | Q | Okay.  And when you received it, what |
| 9 | | did you do? |
| 10 | A | I read it. |
| 11 | Q | It was in English; correct? |
| 12 | A | Yes. |
| 13 | Q | And you were able to read it; correct? |
| 14 | A | Yes. |
| 15 | Q | And the subpoena required you to produce |
| 16 | | specific documents at your deposition; correct? |
| 17 | A | Yes. |
| 18 | Q | But you didn't, did you? |
| 19 | A | No. |
| 20 | Q | Why didn't you produce any documents at |
| 21 | | your deposition? |
| 22 | A | Say that again. |
| 23 | Q | Why did you not produce any documents at |
| 24 | | your deposition? |
| 25 | A | I don't know. |

Page 19

```
 1               Q       Do you know that the subpoena is a court
 2     order for you to appear at a deposition to produce
 3     documents?
 4               MR. WILSON:  Counsel, she has no documents.
 5               MR. BILLER:  You want to take the oath,
 6     Counsel?
 7               MR. WILSON:  No.  I'm telling you --
 8               MR. BILLER:  That's not an objection.  That's a
 9     speaking objection.  That's a comment.
10               MR. WILSON:  Why don't you ask her if she has
11     any --
12               MR. BILLER:  Don't tell me how to cross-examine
13     a witness.
14               MR. WILSON:  You need to ask whether she has
15     any documents.
16               MR. WILSON:  You're assuming --
17               MR. BILLER:  Read the question back, please.
18               MR. WILSON:  You're assuming --
19               MR. BILLER:  Stop it, please.  You're making
20     speaking objections, and you're trying to influence
21     this witness's testimony.  Please, stop it.  Don't tell
22     me how to ask questions.  I've been doing this for
23     nearly 30 years.  I know how to ask questions.
24               MR. WILSON:  Actually, no, you don't.
25               MR. BILLER:  Great.  Great.
```

Page 20

1          MR. WILSON:  So here's the deal ...

2          MR. BILLER:  No.

3          MR. WILSON:  This is the deal.  You're assuming

4     she didn't bring any documents with her, but you

5     haven't ask her the preliminary question of whether she

6     has any documents.

7          MR. BILLER:  It doesn't matter.

8          MR. WILSON:  It does matter.

9          MR. BILLER:  Can we please stop talking, so I

10    can cross-examine the witness?

11         MR. WILSON:  No.  If you're not going to

12    conduct this deposition properly, I'm going to go get a

13    court order myself.

14         MR. BILLER:  Ask the question.

15              (The record was read by the Certified

16         Shorthand Reporter as follows:

17              "Q    Why did you not produce any

18              documents at your deposition?

19              "A    I don't know.

20              "Q    Do you know that the subpoena

21              is a court order for you to appear at a

22              deposition to produce documents.")

23    BY MR. WILSON:

24         Q    What are you talking about?

25         MR. WILSON:  I'm talking about the fact that

                                        Page 21

1        you didn't ask a preliminary question.

2                MR. BILLER:  It doesn't matter.  I'm asking her

3        a question about the subpoena.

4                MR. WILSON:  No.  But you missed the boat.  You

5        have to see if she has any documents first.

6                MR. BILLER:  No.

7                MR. WILSON:  If she has documents and didn't

8        produce them, then you can ask the question.

9                MR. BILLER:  Are you going to instruct her not

10       to answer?

11               MR. WILSON:  No.

12       BY MR. BILLER:

13               Q       Then answer the question.  Answer the

14       question.

15               A       I don't have any documents.

16               Q       Oh.  Did you get that testimony from

17       your lawyer?

18               MR. WILSON:  All right.  Counsel, next

19       question.  Instruct her not to answer.

20       BY MR. BILLER:

21               Q       You're the president of

22       Hillshore Investments; correct?

23               A       Yes.

24               Q       And Hillshore Investments has invested

25       nearly $10 million in Thomas Wylde LLC; correct?

Page 22

1              A      I don't know

2              Q      Do you know how much money Hillshore

3    invested into Thomas Wylde?

4              A      I don't know.

5              Q      Okay.  What are your duties and

6    responsibilities as the president for Hillshore?

7              MR. WILSON:  You can answer.  If you have

8    duties, you can tell him what they are.

9              THE WITNESS:  No.

10   BY MR. BILLER:

11             Q      You don't have any duties as the

12   president of Hillshore?

13             A      No.

14             Q      You recently signed, I believe, a

15   document indicating that Hillshore will receive 3,300

16   additional units for the investment it has made in the

17   amount of $9.1 million; correct?

18             A      I don't know.

19             MR. BILLER:  Well, let's have marked as

20   Exhibit 22 the document that is referred to as

21   "AGREEMENT TO PURCHASE MEMBERSHIP INTEREST."

22                    (Exhibit 22 was marked for

23                    identification by the Certified Shorthand

24                    Reporter and is attached hereto.)

25   ///

                                        Page 23

1       BY MR. BILLER:

2              Q      Can you look at Exhibit Number 22,

3       please?

4              A      (Witness complies.)

5              Q      Can you read Exhibit Number 22, please?

6              MR. WILSON:  You want her to read every page of

7       Exhibit 22, Counsel?

8              MR. BILLER:  Yes, I do.

9       BY MR. BILLER:

10             Q      Are you familiar with Exhibit Number 22?

11      Why don't you turn -- did you say no, you're not

12      familiar with Exhibit Number 22?

13             A      No.

14             Q      I'm sorry, we have a double negative.

15      That's my fault.  Are you familiar with Exhibit

16      Number 22?

17             A      No.

18             Q      Turn to page 4, please.

19             A      (Witness complies.)

20             Q      Do you see your name at the bottom?

21      Page 4?

22             A      Yes.

23             Q      It states there you're the general

24      manager of Hillshore Investment; is that true?

25             A      Yes.

                                        Page 24

1          Q       So you hold two positions, the president

2     and the general manager; right?

3          A       Yes.

4          Q       Can you tell me why you didn't tell me

5     before that you were also the general manager?

6          A       I forgot.

7          Q       What are your duties and

8     responsibilities as the general manager?

9          A       Nothing.

10         Q       Do you hold any other positions with

11    Hillshore?

12         A       I don't know.

13         Q       You don't know if you have any other job

14    positions with Hillshore?

15         A       No.

16         Q       Now, your signature appears on page 4;

17    correct?

18         A       Yes.

19         Q       Do you remember signing this document?

20         A       I don't remember.

21         Q       But that's your signature; correct?

22         A       Yes.

23         Q       Okay.   And before signing this document,

24    did you read it?

25         A       No.

Page 25

1           Q      Who asked you to sign it?

2           MR. WILSON:   I'm going to object to the extent

3    that it calls for an attorney-client privilege; or if

4    you ask "by your husband," I'm going to object based on

5    the spousal privilege.

6           And I'm going to instruct you not to answer.

7    BY MR. BILLER:

8           Q      Do you know why you were asked to sign

9    this document?

10          A      No.

11          Q      Do you have a copy of this document?

12          A      No.

13          Q      Does Hillshore Investments have a copy

14   of this document?

15          A      I don't know.

16          Q      Does Hillshore Investments have an

17   office?

18          A      I don't know.

19          Q      You're the president and general manager

20   of Hillshore, and you don't know if it has an office?

21          A      I don't know.

22          Q      Okay.   How long have you been the

23   president of Hillshore?

24          A      I don't remember.

25          Q      How long have you been the president of

Page 26

1   general -- how long have you been the general manager

2   for Hillshore?

3         A      I don't remember.

4         Q      Have you ever walked into an office for

5   Hillshore Investments?

6         A      No.

7         Q      Do you have a laptop computer at home?

8         A      Yes.

9         Q      Do you have any information or

10   electronically stored information on a computer

11   regarding Hillshore Investments?

12         A      No.

13         Q      Do you have any documents at home

14   whatsoever regarding Hillshore Investments?

15         A      No.

16         Q      Who is the owner of

17   Hillshore Investments?

18         MR. WILSON:   Objection, vague and ambiguous as

19   phrased.   Hillshore --

20         MR. BILLER:   Don't make any comments, Counsel.

21   I'll rephrase.

22         MR. WILSON:   Thank you.

23   BY MR. BILLER:

24         Q      Who owns the shares for

25   Hillshore Investments?

Page 27

1          A      Me

2          Q      How many shares do you own?

3          MR. WILSON:   Objection, invades right of

4    privacy.   Instruct her not to answer.

5    BY MR. BILLER:

6          Q      Are you going to follow your counsel's

7    advice?

8          A      Yes.

9          Q      When did you buy those shares?

10         A      I don't remember.

11         Q      Okay.   Do you have a certificate of

12   shares?

13         A      No.

14         Q      Okay.   Do you have any document that

15   indicates that you are the shareholder of all the

16   shares for Hillshore Investments?

17         A      No.

18         Q      What's the telephone number for

19   Hillshore Investments?

20         A      I don't know.

21         Q      Is there any physical location where

22   Hillshore Investments is located?

23         A      I don't know.

24         Q      Do you operate Hillshore Investments out

25   of your house?

                                        Page 28

```
 1                 A       Yes.

 2                 Q       Okay.  So what do you do out of your

 3      house to operate Hillshore Investments?

 4                 A       Could you repeat the question?

 5                 Q       Sure.  What do you do out of your house

 6      to operate Hillshore Investments?

 7                 A       What do I do outside my house?

 8                 Q       Inside.

 9                 A       Nothing.

10                 Q       So I'm confused.  You say

11      Hillshore -- you operate Hillshore from your home;

12      correct?

13                 A       Yes.

14                 Q       Okay.  What do you do to operate

15      Hillshore Investment?

16                 MR. WILSON:  Objection, asked and answered.

17      BY MR. BILLER:

18                 Q       You can answer.

19                 A       Nothing.

20                 Q       So Hillshore Investments doesn't have

21      any business operations; correct?

22                 A       I don't know.

23                 Q       Do you have any personal knowledge of

24      any business operations for Hillshore?

25                 MR. WILSON:  Objection, vague and ambiguous as
```

Page 29

1          phrased.  But you can answer.

2                    THE WITNESS:  One more time, the question.

3                         (The record was read by the Certified

4               Shorthand Reporter.)

5                MR. WILSON:  Same objections.

6          BY MR. BILLER:

7                Q      You can answer.

8                A      Thomas Wylde.

9                Q      So Hillshore operates Thomas Wylde out

10         of your home?

11                    MR. WILSON:  Objection, mischaracterizes the

12              witness's testimony.

13              Do you understand the question?

14              THE WITNESS:  No, not really.

15              MR. BILLER:  Read back the question.

16                       (The record was read by the Certified

17              Shorthand Reporter.)

18              MR. WILSON:  If you don't understand the

19         question, let the lawyer know.

20              THE WITNESS:  I don't understand.

21         BY MR. BILLER:

22              Q      You testified that Hillshore operates

23         Thomas Wylde; correct?

24              MR. WILSON:  That's not what she said.

25         Mischaracterizes her testimony.

                                                Page 30

1          BY MR. BILLER:

2                  Q      You can answer the question.

3                  MR. WILSON:   Do you understand his question?

4                  MR. BILLER:   Read back the question.

5                          (The record was read by the Certified

6                  Shorthand Reporter as follows:

7                          "Q    You testified that Hillshore

8                  operates Thomas Wylde; correct?")

9                  MR. BILLER:   I'll rephrase it.

10         BY MR. BILLER:

11                 Q      What does Hillshore Investments do?

12                 A      I don't really know.

13                 Q      Okay.  So do you know if Hillshore has

14         any business operations with Thomas Wylde?

15                 A      No.

16                 Q      Why did Hillshore Investments invest

17         $9 million in Thomas Wylde?

18                 A      I don't know.

19                 Q      Was it your decision to invest

20         $9 million in Thomas Wylde?

21                 A      No.

22                 Q      Who's decision was that?

23                 A      I don't know.

24                 Q      Was it your husband's decision,

25         Stephen Choi?

                                                    Page 31

```
 1                    THE INTERPRETER:   Interpreter would like a
 2      repeat of the name.
 3                    MR. BILLER:  Stephen Choi.
 4                    MR. WILSON:  I'm going to object to the extent
 5      that it calls for a violation of marital privilege and
 6      spousal privilege.
 7                    You can answer.
 8                    THE WITNESS:  Yes.
 9      BY MR. BILLER:
10           Q     Did you have any discussions with your
11      husband about the decision to invest $9 million in
12      Hillshore?
13                    MR. WILSON:  Objection.
14                    MR. BILLER:  I'm asking if.
15                    MR. WILSON:  I was going to tell her she can
16      answer.
17                    You may answer yes or no; that is, yes if you
18      had discussions or no if you didn't have discussions
19      but nothing else.
20                    THE WITNESS:  No.
21                    MR. BILLER:  Okay.
22      BY MR. BILLER:
23           Q     Did Hillshore Investments have
24      $9 million to invest between August 2014 and
25      April 2016?
```

Page 32

1           MR. WILSON: I'm going to object. Invades the

2      right of privacy. It's not relevant nor material to

3      this case that we're here on.

4           And I'll instruct you not to answer.

5      BY MR. BILLER:

6           Q      How does Hillshore Investments generate

7      revenues?

8           MR. WILSON: Objection, invades right of

9      privacy. Not relevant nor material to this case.

10          Instruct you not to answer.

11          MR. BILLER: Do you know Hillshore signed a

12     document or is part of numerous documents in this case

13     that are being challenged, Counsel? Do you know that?

14          MR. WILSON: I don't know what you mean by

15     "being challenged."

16          MR. BILLER: Breaches of contract. Do you know

17     that?

18          MR. WILSON: What breach of contract?

19          MR. BILLER: Purchase agreement. That

20     agreement is subject to a breach of contract claim.

21     The employment agreement, that's the subject of the

22     breach of contract. If you don't know anything about

23     the case, you're not in a position to say something is

24     relevant or not.

25          MR. WILSON: Counsel, I know about the case. I

                                                    Page 33

1    have seen the complaint.  It's a complaint for wrongful

2    termination.

3              MR. BILLER:  And breach of contract, breach of

4    fiduciary duty --

5              MR. WILSON:  Counsel, don't interrupt me again

6    or we're done.

7              MR. BILLER:  Can we finish?  I just want to get

8    out of here.  Have you made your objection?

9              MR. WILSON:  Hold on.  No, I haven't.  The

10   complaint is for wrongful termination, for breach of

11   employment agreement, for conversion of intellectual

12   property rights, that's what this case is about.

13             MR. BILLER:  No, it's not.

14             MR. WILSON:  Well, okay.

15             MR. BILLER:  There's an answer to the cross

16   complaint that pleads 18 causes of action for business

17   claims.  The answer -- one of the answers is fraud.

18   Another answer is promissory estoppel.  My client is

19   pursuing those answers against the defendants in this

20   case.

21             MR. WILSON:  Answers?

22             MR. BILLER:  Yes.  Answers like a defense, the

23   defense in an answer.

24             MR. WILSON:  Go ahead and ask your next

25   question.

Page 34

1           MR. BILLER:  Are you instructing her not to

2      answer?

3           MR. WILSON.  The last question, yeah.

4      BY MR. BILLER:

5           Q      How many employees does

6      Hillshore Investments have?

7           MR. WILSON:  Currently are you talking about?

8           MR. BILLER:  Yes.

9           THE WITNESS:  I don't know.

10     BY MR. BILLER:

11          Q      What was the maximum number of employees

12     Hillshore Investments had during its existence?

13          A      I don't know.

14          Q      Okay.  Do you have any documents to

15     prove that Hillshore Investments actually employed

16     people?

17          A      No.

18          MR. BILLER:  I think I asked this question.

19     I'm not trying to be abusive, but I want make sure I

20     get it on the record.  I think you objected to it.

21     BY MR. BILLER:

22          Q      How does Hillshore Investments generate

23     revenues?

24          MR. WILSON:  Objection, not relevant or

25     material to this case.  Also invades right of privacy.

                                              Page 35

1           I'll instruct her not to answer.

2      BY MR. BILLER:

3           Q     Do you have Exhibit 21 in front of you?

4           MR. WILSON:  You started with 22.

5           MR. BILLER:  No.  I started with 20.  20; 21;

6      22.

7           MR. WILSON:  I don't have 20 or 21.  You didn't

8      distribute them.  And you haven't identified them, as

9      far as I know.

10          THE REPORTER:  Before we went on the record, he

11     had me mark them 20 and 21.

12          MR. WILSON:  Oh.

13     BY MR. BILLER:

14          Q     So let me hand you Exhibit Number 21.

15          MR. WILSON:  Okay.

16     BY MR. BILLER:

17          Q     Exhibit Number 21 is a subpoena, a

18     subpoena showing the documents that you were obligated

19     to produce.  Can you look at those documents, the list

20     of those documents?

21          MR. WILSON:  Counsel, she doesn't have any

22     documents.

23          MR. BILLER:  I don't care.  I'm entitled to get

24     on the record what was asked for and if she has them.

25          MR. WILSON:  Right.  She said she doesn't have

Page 36

1    any documents.  What more can she tell you?

2    BY MR. BILLER:

3        Q    Will you please read the list in front

4    of you?

5        MR. WILSON:  Start there (indicating).

6        THE WITNESS:  (Witness complies.)

7    BY MR. BILLER:

8        Q    Did you read the list of documents?

9        A    Yes.

10        Q    And how many documents -- how many

11    category of documents were requested?

12        MR. WILSON:  The document speaks for itself,

13    Counsel.

14        MR. BILLER:  You're going to instruct her not

15    to answer?

16        MR. WILSON:  No.  I'm making an objection.

17    BY MR. BILLER:

18        Q    How many categories of documents are on

19    the subpoena?

20        A    22.

21        Q    Okay.  You don't have any communications

22    between Hillshore and T.W., Thomas Wylde?

23        MR. WILSON:  You mean you don't have any

24    documents regarding communication?

25        MR. BILLER:  Documents is defined as including

Page 37

1       verbal, texts, electronics -- it's not paper.

2              MR. WILSON:  If you want your question to make

3       sense, I suggest you rephrase it.  You want to leave it

4       the way it is, then do so.

5       BY MR. BILLER:

6              Q       You can answer the question.

7              A       No.

8              Q       Do you understand the word "document" or

9       "documents" include handwriting, typewriting, printing,

10      photostating, photographing, transmitting by electronic

11      mail or facsimile and any other means of recording upon

12      any tangible thing, any form of communication or

13      presentation, including letters, words, pictures, sound

14      or symbols or combination thereof and any record there

15      created regardless of the manner in which the record

16      was stored?

17             A       Yes.

18             Q       Do you also understand that document or

19      documents includes writings, letters, correspondence,

20      electronically stored ESI, metadata, e-mails,

21      attachments to e-mails, including PF copies,

22      spreadsheets, word documents, reports, records,

23      statements, materials --

24             THE INTERPRETER:  Counsel, the Interpreter

25      would request that you slow down a little.

Page 38

1          MR. BILLER:  Sorry.  Sure.  Where did I leave?

2          THE INTERPRETER:  Spreadsheets.

3                    (The record was read by the certified

4          Shorthand Reporter as follows:

5                         "Q    Do you also understand that

6                    document or documents includes writings,

7                    letters, correspondence, electronically

8                    stored ESI, metadata, e-mails,

9                    attachments to e-mails, including PF

10                   copies, spreadsheets, word documents,

11                   reports, records, statements,

12                   materials -- ")

13         BY MR. BILLER:

14         Q    Materials containing any writing and

15    written data, forms, policies, any tangible items

16    containing any form of images, communications, voice

17    mail recordings, tape recordings, photographs,

18    videotapes, digital images, declarations, signed

19    statements, and correspondence.

20         As I just read, the definition for word

21    "document" and "documents," as defined in the subpoena,

22    is it your testimony you don't have any documents

23    regarding communications between Hillshore and

24    Thomas Wylde?

25         A    No.


                                             Page 39

1          Q     Do you have any documents related to any

2     loans Hillshore provided to Thomas Wylde?

3          A     No.

4          Q     Do you have any documents related to

5     investments by Hillshore Investments S.A. and

6     Thomas Wylde?

7          A     No.

8          Q     Do you have any documents related to any

9     returns on any investment Hillshore S.A. received from

10    Thomas Wylde or any person associated with

11    Thomas Wylde?

12         A     No.

13         Q     Do you have any documents related to the

14    transfer of money from any bank accounts in the name of

15    Hillshore Investments and Thomas Wylde?

16         A     No.

17         Q     Do you have any documents related to

18    units of membership in Thomas Wylde by Hillshore?

19         A     No.

20         Q     Do you have any documents related to any

21    and all ownership interest in Thomas Wylde?

22         A     No.

23         Q     Do you have any documents related to any

24    bylaws of Hillshore Investments?

25         A     No.

Page 40

1         Q     Do you have any document related to

2   articles of incorporation for Hillshore Investments?

3         A     No.

4         Q     Do you have any documents related to any

5   and all minutes of board of directors from 2014 to the

6   present?

7         A     No.

8         Q     Do you have any documents regarding the

9   purchase agreement regarding Hillshore Investments and

10  Thomas Wylde?

11        A     No.

12        Q     Do you have any documents regarding the

13  purchase agreement between Thomas Wylde and

14  Paula Thomas?

15        A     No.

16        Q     Do you have any documents related to the

17  employment agreement between Thomas Wylde and

18  Paula Thomas?

19        A     No.

20        Q     Do you have any document related to the

21  physical location of Hillshore Investments?

22        A     No.

23        Q     Do you have any documents related to the

24  business purchase of Hillshore Investments?

25        A     No.

Page 41

1          Q    Do you have any documents related to any

2     and all advertising Hillshore Investments authorizes

3     for business purposes?

4          MR. WILSON:  We're objecting to that category

5     of documents as being an invasion of the right of

6     privacy as well as not material nor relevant and will

7     instruct her not to answer.

8          MR. BILLER:  On those grounds you're

9     instructing her not to answer?

10         MR. WILSON:  Yes.

11    BY MR. BILLER:

12         Q    Do you have any documents related to

13    organizational charts for Hillshore Investments used

14    between 2014 and the present time?

15         MR. WILSON:  Same objection, but you can answer

16    if you know.

17         THE WITNESS:  No.

18    BY MR. BILLER:

19         Q    Any documents related to bank statements

20    reflecting any transfer of money between any accounts

21    in the name of Hillshore and bank accounts in the name

22    of Thomas Wylde?

23         A    No.

24         Q    Do you have any documents regarding the

25    names, addresses, e-mail addresses, and telephone

Page 42

1       numbers of any agents, employees, directors and

2       officers for Hillshore Investments?

3               A       No.

4               Q       Do you have any documents relating to

5       the number of shares issued to Hillshore Investments?

6               MR. WILSON:   Issued to Hillshore Investments,

7       is that what you meant to say?

8               MR. BILLER:   Yes.

9               MR. WILSON:   In what?   Issued by?

10              MR. BILLER:   "Produce any and all documents

11      related to the number of shares issued to

12      Hillshore Investments."

13              MR. WILSON:   By whom?

14              MR. BILLER:   It doesn't matter.

15              MR. WILSON:   No.   It does matter because the

16      question doesn't make sense.

17              MR. BILLER:   Thomas Wylde.

18              MR. WILSON:   You can answer the question if you

19      know.

20              THE WITNESS:   No.

21      BY MR. BILLER:

22              Q       Do you have any documents regarding the

23      name, addresses, e-mails -- e-mail addresses and

24      telephone numbers of any shareholders?

25              A       No.

1          Q      Well, that's not true, is it?  You're a

2    shareholder you claim.

3          A      Yes.

4          Q      You're a 100 percent shareholder;

5    correct?

6          A      Yes.

7          Q      So do you have -- is your

8    317 17th Street Manhattan Beach home the only home you

9    have in the United States?

10         MR. WILSON:  I'm going to object.  It invades

11   her right of privacy.  I'll instruct her not to answer.

12   BY MR. BILLER:

13         Q      Are you going to follow your counsel's

14   instruction?

15         A      Yes.

16         Q      Other than yourself, do you know if

17   shares have been issued to any other person in

18   Hillshore Investments?

19         A      Could you repeat the question?

20         Q      Other than yourself, do you know any

21   person who has received shares issued by

22   Hillshore Investments?

23         A      I don't know.

24         Q      Okay.  Do you have any documents

25   regarding the value of shares for

                                        Page 44

1          Willshore Investments?

2                    MR. WILSON:  Objection, invades her right of

3          privacy; not relevant nor material.   Instruct not to

4          answer.

5          BY MR. BILLER:

6                    Q     Are you going to follow your counsel's

7          instruction?

8                    A     Yes.

9                    Q     Okay.  Are you married to Stephen Choi?

10                   A     Yes.

11                   Q     When were you married?

12                   A     15 years ago.

13                   Q     Do you speak Korean?

14                   A     No.

15                   Q     Does your husband speak Spanish?

16                   A     Yes.

17                   Q     How well does he speak Spanish?

18                   A     Not good.

19                   Q     I take it you use English as the

20         language to speak to your husband?

21                   A     Yes.

22                   Q     And he uses English to speak to you;

23         correct?

24                   A     Yes.

25                   Q     Do you know Richard Peddie?

                                              Page 45

1        A       No.

2        Q       Okay.  Have you ever met Paula Thomas?

3        A       Yes.

4        Q       How many times did you meet her?

5        A       Like, four.

6        Q       Okay.  Do you recognize her?

7        A       Yes.

8        Q       Is she in this room?

9        A       I think so.

10        Q       Do you remember any of your

11   conversations with Paula Thomas?

12        A       About clothes.

13        Q       What about clothes?

14        A       Dresses.

15        Q       What was discussed about dresses?

16        A       I don't remember.

17        Q       What was your impression of the role

18   Paula Thomas played in Thomas Wylde?

19        MR. WILSON:   Objection, no foundation; assumes

20   facts not in evidence.

21        You can answer.

22        THE WITNESS:   I'm sorry, could you --

23   BY MR. BILLER:

24        Q       Do you have any understanding as to

25   Paula Thomas's role while with Thomas Wylde?

Page 46

```
 1                    MR. WILSON:  If you can answer that question

 2      without revealing any conversations you had with your

 3      attorney, then you can answer.

 4                    MR. BILLER:  I'll rephrase it.

 5                    MR. WILSON:  That's fine.

 6      BY MR. BILLER:

 7           Q       From your discussions -- the four times

 8      you talked to Paula Thomas, did you learn what her

 9      position was at Thomas Wylde?

10           A       No.

11           Q       Did you have an understanding of what

12      she did for Thomas Wylde?

13                    MR. WILSON:  You're saying based on those four

14      conversations?

15                    THE WITNESS:  No.

16                    MR. BILLER:  Okay.

17      BY MR. BILLER:

18           Q       So it's your testimony that you,

19      Hillshore Investments, invested $9 million into

20      Thomas Wylde and you had four conversations with

21      Paula Thomas; and you never learned that she was the

22      creative director and designer for Thomas Wylde?

23           A       I don't know.

24           Q       You don't know what?

25                    MR. WILSON:  Objection --
```

Page 47

1        BY MR. BILLER:

2                Q       What don't you know?

3                MR. WILSON:  Counsel, ask another question.

4        That's just not a well-phrased question.

5        BY MR. BILLER:

6                Q       You can answer.

7                A       I don't remember what was her role

8        there.

9                Q       When did you first meet her?

10               A       I don't remember.

11               Q       Well, Hillshore Investments started

12       investing money in Thomas Wylde in August 2014.  Did

13       you meet her before August 2014 or after 2014?

14               A       I don't remember.

15               Q       Did you do any research to determine

16       what Thomas Wylde was all about?

17               A       No.

18               Q       Did your husband, to your knowledge, do

19       any research regarding Thomas Wylde?

20               A       I don't know.

21               Q       Do you think it's wise -- as a

22       sophisticated person investing money, do you think it's

23       wise to do some type of investment in the company

24       you're going to invest $9 million?

25               MR. WILSON:  I'm going to object to the extent

                                                    Page 48

1    it's supposed to be a hypothetical.  It's woefully

2    incomplete.  It otherwise has no relevance.  It's not

3    calculated to lead to the discovery of admissible

4    evidence.

5    BY MR. BILLER:

6        Q    You can answer.

7        MR. WILSON:  But you may answer.

8        THE WITNESS:  Okay.  Can you repeat?

9        MR. BILLER:  Can you read back the question,

10    please?

11            (The record was read by the Certified

12        Shorthand Reporter as follows:

13            "Q   Do you think it's wise -- as a

14            sophisticated person investing money,

15            do you think it's wise to do some type

16            of investment in the company you're

17            going to invest $9 million?")

18        MR. BILLER:  Let me clear it up.

19        MR. WILSON:  Great.

20    BY MR. BILLER:

21        Q    As a president and general manager of

22    Hillshore Investments which invested $9 million into

23    Thomas Wylde, do you think it's prudent to invest that

24    amount of money into a company without doing any

25    investigation into the company?

Page 49

1                    MR. WILSON:  Same objections.  You may answer.

2                    THE WITNESS:  Yes.

3          BY MR. BILLER:

4                    Q       Do you know anybody within your family

5          who did any investigation of Thomas Wylde?

6                    A       No.

7                    Q       Okay.  Are you familiar with the

8          Internet?

9                    A       Yes.

10                   Q       Have you ever used the Internet to do

11         searches?

12                   A       Yes.

13                   Q       Did you ever use the Internet before the

14         investment in August 2014 into Thomas Wylde to

15         determine what type of business it was?

16                   A       No.

17                   Q       Okay.  That would be easy to do,

18         wouldn't it?

19                   A       Yes.

20                   Q       So let's finish up with Hillshore and

21         then take a break.  I think we've been going an hour.

22                   MR. WILSON:  Yeah.

23         BY MR. BILLER:

24                   Q       Let's finish up with Hillshore.  To your

25         knowledge, Hillshore doesn't have any employees,

Page 50

1      directors, officers, location where it operates its

2      business.  You claim it operates its business out of

3      your home to operate Thomas Wylde.  Isn't that true?

4              MR. WILSON:  Objection, mischaracterizes the

5      witness's testimony on at least two occasions in that

6      statement.

7      BY MR. BILLER:

8              Q      Is that true?

9              MR. WILSON:  Objection, mischaracterizes the

10     statements made on at least two occasions.

11     BY MR. BILLER:

12             Q      Please answer the question.

13             A      Can you repeat the question?

14             MR. BILLER:  Read back the question, please.

15                   (The record was read by the Certified

16             Shorthand Reporter as follows:

17                       "Q   To your knowledge, Hillshore

18                   doesn't have any employees, directors,

19                   officers location where it operates its

20                   business.  You claim it operates its

21                   business out of your home to operate

22                   Thomas Wylde.  Isn't that true?")

23             MR. WILSON:  Let me add to that that it's a

24     multiple, compound question, which also makes it

25     objectionable as phrased.  She said she was an officer.

                                                    Page 51

```
 1              MR. BILLER:  You objected.  She said she was

 2      the president and general manager.

 3              MR. WILSON:  President is an officer.

 4              MR. BILLER:  Okay.  That's fine.  Okay.

 5              MR. WILSON:  So you intentionally asked her a

 6      question you know is false?

 7              MR. BILLER:  No.  I don't believe -- I don't

 8      believe a president is an officer.  It's on the record.

 9      BY MR. BILLER:

10          Q      Go ahead and answer the question.

11              MR. WILSON:  If you understand it.

12              THE WITNESS:  No, I don't understand it.

13      BY MR. BILLER:

14          Q      Okay.  Let's do it this way.

15      Do you know what a shell corporation is?

16          A      No.

17          Q      Does Hillshore Investments have any bank

18      accounts?

19          A      I don't know.

20              MR. WILSON:  Excuse me.

21      BY MR. BILLER:

22          Q      Does Hillshore Investments -- strike

23      that.

24          Is Thomas Wylde the only company

25      Hillshore Investments has invested its money in?
```

Page 52

1            MR. WILSON:  Objection, invades right of

2     privacy; not relevant nor material to this case.

3     Instruct not to answer.

4            MR. BILLER:  You're going to instruct a witness

5     not to answer on relevancy.  Is that your position?

6            MR. WILSON:  No, on invasion of privacy.

7            MR. BILLER:  Whose privacy?  The question is --

8            MR. WILSON:  Her privacy.

9            MR. BILLER:  The question is if Hillshore has

10    any other investments in any other company besides --

11           MR. WILSON:  In California an LLC and a small

12    corporation has privacy rights.

13           MR. BILLER:  Okay.  You know what, I'm not

14    asking about Thomas Wylde.

15           MR. WILSON:  No, you're asking about Hillshore.

16           MR. BILLER:  Hillshore is an international

17    corporation out of Panama.

18           MR. WILSON:  So what.

19           MR. BILLER:  California does not govern its

20    rights.

21           MR. WILSON:  I made my objection, Counsel.

22    BY MR. BILLER:

23           Q       Answer the question.

24           MR. WILSON:  No.  I instructed her not to

25    answer.

                                        Page 53

 1                  MR. BILLER:  Let me just put it on the record.

 2      All the instructions not to answer questions based on

 3      relevancy or privacy -- not necessarily spousal and

 4      marital privilege -- I'm going to bring a motion as

 5      soon as I get the transcript, and I'm going to seek

 6      sanctions against you and the witness for

 7      obstructing --

 8                  MR. WILSON:  That's your prerogative.

 9                  MR. BILLER:  -- for obstructing this

10      deposition.

11      BY MR. BILLER:

12          Q      Isn't it true that Hillshore Investments

13      is a shell corporation?

14                  MR. WILSON:  Objection, the witness has said

15      she doesn't know what a shell corporation is, one.

16      Secondly, it's improperly phrased.  You want to try

17      another question, Counsel?

18      BY MR. BILLER:

19          Q      Assume a shell corporation is a company

20      that doesn't have any employees, doesn't have any

21      agents, doesn't have a place of business where it

22      conducts its business out of, doesn't have -- doesn't

23      pay taxes.  Isn't it true that Hillshore Investments is

24      that company?

25                  MR. WILSON:  Objection, invades right of

                                                      Page 54

1   privacy. It also is an improper hypothetical as

2   phrased. No foundation that this witness knows that

3   information. I'll instruct her not to answer.

4   BY MR. BILLER:

5            Q     Does Hillshore Investment pay taxes?

6            MR. WILSON: Objection, invades right of

7   privacy. Not material to this action whatsoever.

8   Instruct not to answer.

9   BY MR. BILLER:

10           Q     Does Hillshore pay any employee

11   benefits, like medical insurance; dental insurance?

12           MR. WILSON: Same objection, but you can answer

13   that question.

14           THE WITNESS: I don't know.

15           MR. BILLER: Okay. We'll take our break.

16                (Break taken: 10:16 a.m. - 10:29 a.m.)

17   BY MR. BILLER:

18           Q     When you testified before the break you

19   don't know if Hillshore Investments had specific

20   documents, is that because you didn't look for those

21   documents or because you know Hillshore doesn't have

22   them?

23           A     I'm sorry. Can you --

24           Q     I forgot to tell you one thing. I know

25   we just took a break. But if you ever want a break

Page 55

1          during the examination process, just ask and we'll take

2          another break; okay?

3                    A     I don't have any documents.

4                          (The record was read by the Certified

5                    Shorthand Reporter as follows:

6                          "Q    When you testified before the

7                    break you don't know if Hillshore

8                    Investments had specific documents, is

9                    that because you didn't look for those

10                   documents or because you know Hillshore

11                   doesn't have them?")

12                   THE WITNESS:   I don't have any documents.

13         BY MR. BILLER:

14                   Q     Are any of those documents in the house

15         located at 317 Street, Manhattan Beach?

16                   A     I don't know.

17                   Q     But did you look in the house for those

18         documents?

19                   A     No.

20                   Q     Did you not look because you knew they

21         weren't there?

22                   A     I'm sorry, say it again.

23                   MR. BILLER:   Read back the question.

24                         (The record was read by the Certified

25                   Shorthand Reporter.)

                                              Page 56

```
 1                    THE WITNESS:  I didn't look for anything.

 2       BY MR. BILLER:

 3            Q     And I'm asking you why?

 4            A     I don't know any documents.

 5            Q     Okay.  All right.  Where were you born?

 6            A     Venezuela.

 7            Q     Did you go to school in Venezuela?

 8            A     No.

 9            Q     Where did you go to school?

10            A     I only graduate from high school.

11            Q     In Venezuela?

12            A     Yes.

13            Q     Did you learn how to speak any foreign

14       languages?

15            A     No.

16            Q     Are the only languages you know how to

17       speak English and Spanish?

18            A     Yes.

19            Q     On a scale of one to ten, how would you

20       categorize your ability to speak English?

21            MR. WILSON:  Objection, vague and ambiguous as

22       phrased.

23            You can answer.

24            THE WITNESS:  Seven.

25       ///
```

Page 57

```
 1          BY MR. BILLER:

 2                    Q      Do you have a passport?

 3                    A      Yes.

 4                    Q      How many?

 5                    A      One.

 6                    MR. WILSON:  I'm going to object.  Not relevant

 7          nor calculated to lead to the discovery of admissible

 8          evidence.

 9                    Instruct you not to answer.

10          BY MR. BILLER:

11                    Q      Do you and your husband own the house in

12          Manhattan Beach, or does Hillshore Investment own it?

13                    MR. WILSON:  Objection, instruct the witness

14          not to answer based on invasion of right of privacy.

15          Also not material to this litigation.

16          BY MR. BILLER:

17                    Q      When were you born?

18                    A      June 18, '74.

19                    THE INTERPRETER:  Interpreter would like a

20          repeat.

21                    THE WITNESS:  June 18, 1974.

22          BY MR. BILLER:

23                    Q      So that makes 50 years old?  No, 53.

24                    A      No.

25                    Q      43?
```

Page 58

1              A.      43.

2              Q      Okay.  43.  So in your 43 years, upon

3       graduation from high school, what did you do for a

4       living?

5              A      I had different jobs.

6              Q      Let's go through them.  Let's start with

7       the first job you had.

8              A      I work in the bank.

9              Q      How long did you work in the bank?

10             A      Just one year.

11             Q      What was your position?

12             A      I went to a school for -- can I speak to

13      you in Spanish?

14             Q      Yes.

15             A      (Through the Interpreter) I took a

16      course in government school.

17             THE INTERPRETER:  The interpreter would like to

18      clarify.

19             THE WITNESS:  (Through the Interpreter) And you

20      had to complete one year in order to graduate from that

21      course.

22      BY MR. BILLER:

23             Q      Okay.  What was that course?

24             A      (Through the Interpreter) For banking.

25             Q      And did you graduate?

                                                   Page 59

```
1                    A       (Through the Interpreter) Yes.

2            Q      Did you take a job with a bank?

3                    A       (Through the Interpreter) No.  I only

4    worked for the year that I was taking the course.

5            Q      Did you get a certificate of completion

6    or anything like that?

7            A      Yes.

8            Q      Okay.  So you had that job in

9    1992-1993?

10           A      Yes, I don't remember.  A year.

11           Q      Okay.  What's the next job you had?

12           A      I worked in a telephone store -- in a

13   telephone store.

14           Q      Selling telephones?

15           A      Yes.

16           Q      Were you a salesperson?

17           A      I was a salesperson.

18           Q      And what was your position?

19           A      Just selling -- selling telephones.

20           Q      And how long did you work there?

21           A      About one year.

22           Q      Do you know who created

23   Hillshore Investments?

24           MR. WILSON:  Objection, vague and ambiguous as

25   phrased.
```

Page 60

1      BY MR. BILLER:

2              Q      You can answer.

3              A      Yes.

4              Q      Who was that?

5              A      My husband.

6              Q      When did he create it?

7              MR. WILSON:   Objection, vague and ambiguous as

8      phrased.

9      BY MR. BILLER:

10             Q      You can answer.

11             A      I don't know.

12             Q      Do you know how he created it?

13             A      No.

14             Q      Is that a company registered in Panama?

15             A      I don't know.

16             Q      Do you have any explanation why he put

17     you down on the corporate documents?

18             A      I don't know.

19             Q      Okay.  So let's go back -- how long did

20     you have the job with selling telephones?

21             A      One year.

22             Q      What job did you get next?

23             A      I work on my own.

24             Q      What did you do?

25             A      I was selling bathing suits.

                                                    Page 61

1          Q      Were you manufacturing the suits?

2          A      No.  I buy them.  No.  I buy them and

3     then sell them.

4          Q      Do you have your own business?

5          A      Yes.

6          Q      Where was that business located?

7          A      I didn't have a business.

8          Q      You worked out of the home?

9          A      No.  I was moving around, friends.

10          Q      Did you design any bathing suits?

11          A      No.

12          Q      Did you manufacture any bathing suits?

13          A      No.

14          Q      And how long did you have that job?

15          A      I don't remember.

16          Q      When is the next job you had?

17          A      I worked as a waitress.

18          Q      Okay.  Do you know what year that was?

19          A      1997.

20          Q      Okay.  Did you say 1990 to 1997, or did

21     you say 1997?

22          A      Actually, yeah, 1997.

23          Q      Okay.  I take it as a waitress your

24     responsibility included taking orders and serving food?

25          A      Yes.

Page 62

```
 1              Q      Okay.  Anything else?

 2              A      Nope.

 3              Q      What did you do after that?

 4              A      I worked in that until 2000.

 5              Q      And what was your next position?

 6              A      I had my son.  I got pregnant, and I had

 7      my son.

 8              Q      So then you started to work real hard?

 9              A      Yes.

10              Q      So your son was born in 2000?

11              A      2001.

12              Q      So was your son -- was your son born

13      before you got married?

14              A      Yes.

15              Q      And where were you living at the time?

16              A      I was living -- I was living in

17      Costa Rica.

18              Q      When did you come to the United States?

19              A      Two years ago.

20              Q      Where did you meet your husband?

21              A      I met him in Venezuela.

22              Q      When did you meet him?

23              A      1999.

24              Q      And when were you married?

25              A      2002.
```

Page 63

```
 1                   Q      When you married him, did you know what

 2        he did for a living?

 3                   A      Yes.

 4                   Q      What did he do?

 5                   MR. WILSON:   Objection.  It invades her right

 6        of privacy.  Not relevant.  Not material to this case.

 7                   Instruct you not to answer.

 8        BY MR. BILLER:

 9                   Q      Is it true that you moved from Venezuela

10        to Costa Rica?

11                   A      Well, I moved from Venezuela to

12        Gibraltar and then Costa Rica.

13                   Q      Okay.  What did you do in Costa Rica?

14                   A      Me?  At home with my son.

15                   Q      Did you buy the home yourself, or did

16        your husband buy it?

17                   MR. WILSON:   Objection, invades right of

18        privacy.  Instruct you not to answer.  Also not

19        material or relevant to this case.

20        BY MR. BILLER:

21                   Q      From 2000 until the present time, is it

22        true that the only job you had was as a stay-at-home

23        mother?

24                   A      Yes.

25                   Q      So you haven't worked outside the house?
```

Page 64

| 1 | | A | No. |
| 2 | | MR. WILSON: | Objection, vague and ambiguous as |
| 3 | | phrased. | |
| 4 | BY MR. BILLER: | | |
| 5 | | Q | You have not worked for any business |
| 6 | inside the house? | | |
| 7 | | A | No. |
| 8 | | Q | Okay.  And when was your second son |
| 9 | born? | | |
| 10 | | A | My daughter. |
| 11 | | Q | I'm sorry. |
| 12 | | A | 2005. |
| 13 | | Q | Do you have any other children? |
| 14 | | A | No. |
| 15 | | Q | So you don't have any training, |
| 16 | education, background, knowledge to work as a president | | |
| 17 | for an investment company like Hillshore Investments; | | |
| 18 | correct? | | |
| 19 | | A | No. |
| 20 | | MR. BILLER: | Do we have a double negative? |
| 21 | | (The record was read by the Certified | |
| 22 | Shorthand Reporter.) | | |
| 23 | | THE WITNESS: | I mean yes. |
| 24 | | MR. BILLER: | Let me clean it up. |
| 25 | /// | | |

Page 65

1          BY MR. BILLER:

2                    Q       It's correct --

3                    A       It's correct.

4                    Q       It's correct that you don't have

5          education, background, training, work experience to be

6          the president of an investment company like

7          Hillshore Investments?

8                    A       Correct.

9                    Q       And you certainly don't have any

10         background, education, knowledge, experience to work as

11         a general manager for an investment company like

12         Hillshore Investments; correct?

13                   A       Correct.

14                   Q       Did you ever learn from whatever

15         sources, other than your husband, that you were named

16         as a president for Hillshore Investments, Inc., or

17         S.A.?

18                   A       Sorry, could you repeat the question?

19                   Q       Sure.  Other than from your husband, did

20         you ever learn from any source that you were identified

21         as the president of Hillshore, Inc. -- I mean

22         Hillshore Investments?

23                   A       No.  I don't understand the question.

24                   Q       Okay.  Did anybody inform you that you

25         were the president of Hillshore Investments other than

                                                        Page 66

1       your husband?

2               A       Okay.  Sorry, could you ask please?

3               Q       I'll say it again.  Except from your

4       husband, did you ever learn from anybody that you were

5       the president of Hillshore Investments S.A.?

6               A       No.

7               Q       Have you ever seen any documents that

8       stated you were the president?

9               A       Yes.

10              Q       What document?

11              A       I don't remember.

12              Q       When did you last see the document?

13              A       I don't remember.

14              Q       Okay.  I only have one of these

15      documents.  I'm going to hand you this document,

16      Exhibit 23.

17                      (Exhibit 23 was marked for

18                      identification by the Certified Shorthand

19                      Reporter and is attached hereto.)

20              MR. WILSON:  So Exhibit 21 you identified that

21      previously?

22              MR. BILLER:  I'll go through them.

23              MR. WILSON:  I don't really care.  I just want

24      to know whether you're going to make them part of the

25      deposition.

Page 67

1           MR. BILLER:  Yes.  We're going to make them

2     part of the record.  Exhibit 20 is the proof of service

3     that the witness was served by the sheriffs.

4     Exhibit Number 21 is the subpoena and attachment.

5     Exhibit Number 22 is the Notice of Issuance of New

6     Membership Interest.

7           MR. WILSON:  Okay.

8           MR. BILLER:  And Exhibit Number 23 is a

9     document.

10    BY MR. BILLER:

11          Q     Please look at Exhibit Number 23.

12          MR. WILSON:  Exhibit 23 is rather large.  Do

13    you want her to go through each page?

14          MR. BILLER:  Just flip through it.  It's a

15    magazine.

16          MR. WILSON:  Okay.

17          MR. BILLER:  I don't want her to read anything.

18          MR. WILSON:  I just want to clarify.  That's

19    all.  You're saying this is a magazine?

20          MR. BILLER:  A book magazine.

21          MR. WILSON:  Ask your client.  She'll know.

22          MR. BILLER:  She's not under examination

23          MR. WILSON:  You could get a hint.

24    BY MR. BILLER:

25          Q     Have you seen enough of Exhibit 23 to

                                              Page 68

1      discuss it, or do you want to go to the end?

2              A      I've seen enough.

3              Q      Prior to today, did you ever see

4      Exhibit Number 23?

5              A      I see books, but --

6              Q      Books of Thomas Wylde?

7              A      One.

8              Q      And is Exhibit Number 23 that book?

9              A      Sorry, I don't understand.

10             Q      Is Exhibit Number 23 the book that you

11     previously seen?

12             A      I don't know if it's the same.

13             Q      Is it similar?

14             A      Similar.

15             Q      And you understand that the models in

16     this book of wearing clothes Paula Thomas designed?

17             MR. WILSON:  Objection, if you know the answer

18     to that question, if you know that they are designs by

19     Paula Thomas, please go ahead and state that.  The

20     question kind of assumes it.

21             MR. BILLER:  I said "if."

22             THE WITNESS:  I don't know.

23     BY MR. BILLER:

24             Q      Weren't you interested -- well, the book

25     that you saw, was it about Thomas Wylde?

                                                Page 69

1          A     I think so.

2          Q     And when did you see that book?  Was it
3     before 2014 or after?

4          A     I don't remember.

5          Q     Did you ever think to yourself, "Wow,
6     these are beautiful clothes.  Who designed them"?  Or
7     similar thoughts?

8          A     Maybe.

9          Q     Did you try to find out who the designer
10    was?

11         A     No.

12         Q     Who did you think designed the clothes
13    for Thomas Wylde?

14         MR. WILSON:  As of what date, Counsel?

15         MR. BILLER:  Any date.

16         MR. WILSON:  Well, it could be different for
17    different people.

18         MR. BILLER:  Then she can tell me different
19    people.

20         MR. WILSON:  Okay.

21         THE WITNESS:  Actually, I didn't know who was
22    the one who is the designer.

23    BY MR. BILLER:

24         Q     So Hillshore invested $9 million in a
25    clothing company without knowing who the designer of

Page 70

1    the clothes were; correct?

2              MR. WILSON:  Objection, misstates the

3    evidence.

4              THE WITNESS:  What was the question?

5              MR. BILLER:  Read the question back.

6                   (The record was read by the Certified

7              Shorthand Reporter as follows:

8                        "Q    So Hillshore invested

9                   $9 million in a clothing company

10                  without knowing who the designer of

11                  the clothes were; correct?")

12             MR. WILSON:  Objection, misstates the

13   witness's testimony.

14             But you can answer the question.

15             THE WITNESS:  I don't know.

16             MR. BILLER:  Okay.  Can you mark the next

17   document in order, please.

18                  (Exhibit 24 was marked for

19             identification by the Certified Shorthand

20             Reporter and is attached hereto.)

21   BY MR. BILLER:

22        Q    Why don't you look at Exhibit Number 24.

23             MR. WILSON:  This is a lot of different

24   documents, Counsel.  Do you want her to look through

25   everything?

                                            Page 71

1              MR. BILLER:  That's one document.  It's one

2       document.  I think I know what my exhibits are.  I just

3       want her to flip through it to become familiar with it.

4              THE WITNESS:  I don't know what it is.

5       BY MR. BILLER:

6              Q       Have you ever seen this document before?

7              A       No.

8              Q       Okay.  Do you know what type of document

9       that is?

10             A       No.

11             MR. BILLER:  Can I have the interpreter read

12      the front page of the document?

13                    (Whereupon, the Interpreter translates

14             the front page of the document to the

15             witness.)

16      BY MR. BILLER:

17             Q       Have you ever seen a document like that?

18             A       No.

19             Q       You've never seen a valuation report

20      regarding your company?

21             A       No.

22             Q       Do you see the skull below

23      "THOMAS WYLDE"?

24             A       Yes.

25             Q       What is that?

Page 72

1          A      This a skull.

2          Q      Do you know what it symbolizes?

3          A      About Thomas Wylde.

4          Q      Okay.  So by looking at that skull, it

5     connected in your brain Thomas Wylde?

6          A      No.

7          Q      No?  Okay.  Hand that back.

8          A      (Witness complies.)

9          Q      Did you ever look on the Internet or in

10    bookstores for any documents like Exhibit Number 23 and

11    Exhibit Number 24?

12         A      Can you repeat the question?

13         Q      Sure.  The last two exhibits, Number 23

14    and Number 24, did you ever search the Internet for

15    similar materials?

16         A      No.

17              MR. BILLER:  Can we have the next one in order.

18                   (Exhibit 25 was marked for

19              identification by the Certified Shorthand

20              Reporter and is attached hereto.)

21    BY MR. BILLER:

22         Q      Now, you testified earlier that you

23    were, to your knowledge, the only company that you were

24    the president of was Hillshore Investments; correct?

25         A      Say that again.

Page 73

1          Q      Is it true that the only company in

2     which you served as president was

3     Hillshore Investment S.A.?

4          A      Yes.

5          Q      Okay.   I've handed in front of you a

6     document that's available to the public, and I want to

7     focus your attention on page 2.  Do you see any -- do

8     you see any information on that page that relates to

9     you?

10         A      Yes.

11         Q      In the entry that says "Name," the name

12    identifies you; correct?

13         A      Correct.

14         Q      "Other company names" includes you;

15    correct?

16         MR. WILSON:   I didn't understand.

17    BY MR. BILLER:

18         Q      Look at the second entry.   "Other

19    company names" identifies you as other companies?

20         A      I don't -- can you repeat the question?

21         MR. BILLER:   Restate the question.

22              (The record was read by the Certified

23              Shorthand Reporter.)

24         MR. WILSON:   Objection, misstates the document.

25    But you can answer if you know what he's talking about.

Page 74

1            MR. BILLER:   How does it misstate the document?

2            THE WITNESS:   I don't know.

3     BY MR. BILLER:

4            Q     You were first appointed, it says here,

5     to a company that's identified on the third page in

6     August 10, 2004.  Do you see that, the name of that

7     company?  Or two companies actually?

8            A     I can see it.

9            Q     Are you the president of that company?

10           A     I don't know.

11           Q     Okay.  So can you describe the company

12    name or say the company?  Read it.

13           A     "BUCANOS ENTERPRISES."

14           Q     Before today, have you ever uttered

15    those words?

16           A     No.

17           Q     Okay.  Did you see another company

18    below?

19           A     Yes.

20           Q     And for the company you just identified,

21    it says here you were the president and director.  Do

22    you see that?

23           A     Okay.  Yes, I see it.

24           Q     Were you the president and director of

25    that company?

Page 75

1           A      I don't know.

2           Q      In the second company, what is that

3    company name?

4           A      "MAGNETIC BLUE INVESTMENT FOUNDATION."

5           Q      Have you ever uttered those words before

6    today?

7           A      No.

8           Q      And it has you as the president and

9    member foundation for that company.  Do you see that?

10          A      I can see it, yes.

11          Q      Did you ever know that you were the

12   president of these companies?

13          MR. WILSON:  Objection, assumes facts not in

14   evidence.

15   BY MR. BILLER:

16          Q      Did you ever -- you can answer the

17   question.

18          A      I don't know.

19          Q      You don't know if you were ever the

20   president of these companies?

21          MR. WILSON:  That's what she said, Counsel.

22   BY MR. BILLER:

23          Q      You can answer the question.

24          A      I don't know.

25          Q      Did you ever know that you were the

Page 76

1          director and member of foundation for these companies?

2                    A     I don't know.

3                    Q     Now, let's go to page 6.  Do you see

4          page 6 lists companies?  Do you see that on the left

5          column?

6                    A     Okay.

7                    MR. WILSON:  What are you saying, Counsel?

8          BY MR. BILLER:

9                    Q     The left column lists the names of

10         companies; correct?

11                   MR. WILSON:  I don't think so.

12                   MR. BILLER:  Lists the names.

13                   THE WITNESS:  There's names.

14         BY MR. BILLER:

15                   Q     And your name has "President" and

16         "Director"; right?

17                   A     Yes.

18                   Q     And above that it says

19         "responsibilities" of you; correct?

20                   MR. WILSON:  It says "responsibilities."

21                   MR. BILLER:  Of the witness.

22                   MR. WILSON:  Okay.  Fine.

23         BY MR. BILLER:

24                   Q     Correct?

25                   A     Yes, I can see.

                                                        Page 77

1        Q      Who are the people in the left-hand

2    corner?  Do you know them?

3            MR. WILSON:  I'm going to object.  It's not

4    relevant nor calculated to lead to the discovery of

5    admissible evidence.

6            But you can answer that question.

7            THE WITNESS:  I don't know.

8    BY MR. BILLER:

9        Q      You don't know any of these people?

10           MR. WILSON:  Same objection.  Same instruction.

11   BY MR. BILLER:

12       Q      Is that correct?

13       A      I don't know.

14       Q      Okay. Please turn to page 10.

15       A      (Witness complies.)

16       Q      Do you see any names on page 10 that you

17   know?

18       A      Can I go -- I don't feel good.

19           MR. WILSON:  Do you want to take a break?

20           THE WITNESS:  Yes.

21           MR. WILSON:  Let's take a break.

22               (Break taken:  11:04 a. - 11:18 a.m.)

23   BY MR. BILLER:

24       Q      The subpoena is going to require you to

25   produce the same documents that you did not produce

Page 78

1   here today. And I'm going to ask counsel to provide me

2   with documents proving that you're leaving the country

3   next Wednesday and that you're not going to be back

4   until after November or at November. Do you have such

5   documents?

6          A     I don't know.

7          MR. WILSON: We'll find out for you, Counsel,

8   what they have.

9          MR. BILLER: I need to know because I have to

10  get an order for her to be here. So when can you find

11  out?

12         MR. WILSON: I don't know. After the

13  deposition. I'll talk to Mr. Choi, and we'll go from

14  there.

15         THE INTERPRETER: Counsel, Interpreter would

16  like to make one correction on the record.

17         The training that the witness received was

18  internship. It was not a school but an internship that

19  she had done.

20         MR. BILLER: Okay.

21         All right. Let's go ahead and

22  mark for identification the next document.

23              (Exhibit 26 was marked for

24              identification by the Certified Shorthand

25              Reporter and is attached hereto.)

Page 79

BY MR. BILLER:

1

2          Q        Have you seen -- have you ever seen a

3     document like this before, Exhibit Number 26?

4          A        No.

5          Q        Would you please turn to page 6?

6          A        This one?

7          Q        It should say "Certificate of

8     Incorporation Hillshore Investment."  I'll find it for

9     you.

10         Counsel, can I get a stipulation that

11    Exhibit 26 will be remarked for another document?

12         MR. WILSON:   You want to withdraw 26.

13         MR. BILLER:   I withdraw the 26 that was

14    marked and put this document which looks just look like

15    it as 26.

16                  (Exhibit 26 was re-marked for

17                  identification by the Certified Shorthand

18                  Reporter and is attached hereto.)

19         MR. BILLER:   I have a Spanish version and an

20    English version.   Yeah.

21    BY MR. BILLER:

22         Q        You want to start on this page.

23    The pages are not numbered on Exhibit Number 26.  So I

24    flipped over six pages to get the first page I want to

25    talk to you about.  So when I want to talk about the

Veritext Legal Solutions
866 299-5127

1       next page. I'm just going to say flip the page.

2              A      Okay.

3              Q      Do you understand?

4              A      Yes.

5              Q      Put 26 aside for a second.

6              MR. WILSON:  This doesn't look to be a complete

7       document.

8              MR. BILLER:  It's not.  The pages are 500

9       pages.  It's that big.

10      BY MR. BILLER:

11             Q      Let's go back to that document where we

12      left off.  And I was asking you when you started to

13      feel uncomfortable if you recognized any of the names

14      on page 8.

15             A      Page 7.

16             Q      Page 6, I'm sorry.  Page 6.

17             MR. WILSON:  Hold on.  Let me just get my

18      objection.  Objection, not relevant or calculated to

19      lead to the discovery of admissible evidence.

20             But you can answer.

21             THE WITNESS:  I think I know him (indicating),

22      but I don't know if it's the same person.

23      BY MR. BILLER:

24             Q      Who is the "him"?

25             MR. WILSON:  Objection, not relevant nor

                                        Page 81

```
 1          calculated to lead to the discovery of admissible
 2          evidence.  Counsel, you want to give me some offer of
 3          proof why this company, if it is a company, has
 4          anything to do with this state court litigation?
 5                    MR. BILLER:  It does because it's another
 6          shell, and our theory of the case is that it's a
 7          conspiracy between your clients and the Thomas Wylde
 8          people who conspired to kick my client out of her own
 9          business by injecting nine to ten million dollars and
10          clean that money and send it back to South Korea.  And
11          there are various corporations that are involved in
12          this.
13                    MR. WILSON:  That is not at all any part of
14          your pleading.
15                    MR. BILLER:  It's part of fraud.
16                    MR. WILSON:  I'll give you -- no.  I'll give
17          you a little bit of leeway.  Not much, though.
18                    MR. BILLER:  You can object and instruct the
19          witness.  I'm taking a motion anyway.  So bring it on.
20          I'll just bring up other grounds.  You cannot instruct
21          the witness to not answer a case on irrelevancy.  The
22          only reason you can instruct the witness not to answer
23          a question is privilege, and I've let you go with the
24          privilege objection.  But all the other objections you
25          made are wrong.
```

Page 82

1    MR. WILSON: No. They've been coupled with

2    privilege objections. None of them have been wrong. I

3    have not instructed not to answer based on relevancy

4    alone.

5         MR. BILLER: That's not true.

6         MR. WILSON: Well, the record will speak for

7    itself. We'll meet and confer on that.

8    BY MR. BILLER:

9         Q    Who is that person?

10        MR. WILSON: Again, same objections. But I'll

11   let you -- I'll allow you to answer.

12   BY MR. BILLER:

13        Q    You can answer the question.

14        A    "German."

15        Q    "German." The "G" is pronounced like

16   "H." And how do you know him?

17        MR. WILSON: Same objection, but you can

18   answer. I'll allow another question.

19        THE WITNESS: I don't really know him much.

20   BY MR. BILLER:

21        Q    Have you met him in person?

22        A    Yes.

23        Q    Did you meet him part of

24   Hillshore Investment?

25        A    I don't know.

Page 83

1          Q      When did you meet him?

2          A      I don't remember when.

3          Q      Was he working for the company that is

4     listed above.

5          MR. WILSON:  Objection, not relevant nor

6     calculated to lead to the discovery of admissible

7     evidence.

8          You can answer.

9          THE WITNESS:  I'm sorry, what was the question?

10         (The record was read by the Certified

11     Shorthand Reporter.)

12         THE WITNESS:  I don't know.

13    BY MR. BILLER:

14         Q      Do you know anything about him?

15         MR. WILSON:  Same objection.  Same instruction.

16         THE WITNESS:  I don't know.

17    BY MR. BILLER:

18         Q      You don't know anything about him?

19         A      No.

20         Q      Okay.  Let's go to page 10.  Are you

21    familiar with any of those the people on page 10?

22         A      Yes.

23         Q      Who?

24         A      My husband.

25         Q      Anybody else?

Page 84

1        A        And my brother.

2        Q        Who is your brother?

3        A        "Luis."

4        Q        And where does he live?

5        A        He lives in Costa Rica.

6        Q        How old is he?

7        A        43.

8        Q        Are you twins?

9        A        No.  He's 44.  I'm sorry.

10       Q        All right.  So you, your husband, and

11   your brother are identified on this page.  You as the

12   president, your husband as the treasurer, and your

13   brother as the secretary.  All three of you are also

14   identified as "MEMBER OF FOUNDATION."  Is that correct?

15           MR. WILSON:  Objection, the document says what

16   it says, Counsel.

17   BY MR. BILLER:

18       Q        You can answer the question.

19       A        I mean, I don't know.

20       Q        Well, have you ever -- did you and your

21   brother ever talk about this company, "MAGNETIC BLUE

22   INVESTMENT FOUNDATION"?

23           MR. WILSON:  I'm going to object.  Not relevant

24   or calculated to lead to the discovery of admissible

25   evidence.

Page 85

1            You can answer this question.

2            THE WITNESS:  No.

3    BY MR. DILLER:

4            Q      When is the last time you talked to your

5    brother?

6            A      Two days ago.

7            Q      Do you talk often?

8            A      Yes.

9            Q      Are you close?

10           A      Yes.

11           Q      Do you ever get together personally over

12   the year?

13           A      Yes.

14           Q      How often do you see him a year?

15           A      Maybe three times a year.

16           Q      Do you go to Costa Rica, or does he come

17   up here?

18           A      He comes or I go.

19           Q      Okay.  Although, he is the secretary and

20   member of foundation for the same company that you're

21   identified to be the president and member of

22   foundation, you've never had any conversations with

23   your brother regarding this company?

24           MR. WILSON:  Objection, not relevant nor

25   calculated to lead to the discovery of admissible

                                                    Page 86

1    evidence.

2    BY MR. BILLER:

3        Q    You can answer.

4        A    No.

5        Q    Okay.  Do you know how you are

6    identified as the president for this company?

7        A    Say that again.

8        Q    Do you know how you were identified as a

9    president for this company?

10        A    I don't know.

11        Q    Do you think your husband did it?

12        MR. WILSON:  Objection, calls for speculation.

13    You can answer.

14        THE WITNESS:  What was the question?

15    BY MR. BILLER:

16        Q    Do you think your husband caused you to

17    be identified as the president of this company?

18        A    I don't understand the question.

19        Q    Let me break it down.  On page 10 of

20    Exhibit 25 it identifies you as the president of this

21    company; correct?

22        A    Correct.

23        Q    Did you do anything to put you down as

24    the president of the company?

25        MR. WILSON:  Objection, vague and ambiguous.

Page 87

1   Incomprehensible as phrased.

2        THE WITNESS:  I didn't understand the question.

3   Is it?

4   BY MR. BILLER:

5        Q    Did you write anything or tell anybody

6   that you're going to be the president of the company?

7        MR. WILSON:  Objection, compound as phrased.

8        THE WITNESS:  No.

9        MR. BILLER:  Okay.

10   BY MR. BILLER:

11        Q    Did your husband do anything, to your

12   knowledge -- not communications with you.  Did your

13   husband do anything, to your knowledge, to put you down

14   as the president and member of foundation for the

15   company?

16        A    I don't understand the question.

17        Q    What don't you understand about the

18   question?

19        A    I don't know.  I'm tired.  I don't feel

20   good.

21        Q    Okay.  Do you want to come back

22   August 7th?

23        A    No.  Can you repeat the question,

24   please?

25        Q    I've stated the question three or four

Page 88

1     times now

2             MR. BILLER:  Read the question back.

3                     (The record was read by the Certified

4             Shorthand Reporter as follows:

5                     "Q   Did your husband do

6                     anything, to your knowledge -- not

7                     communications with you.  Did your

8                     husband do anything, to your knowledge,

9                     to put you down as the president and

10                    member of foundation for the

11                    company?")

12            MR. WILSON:  Same objection, but you can

13    answer.

14            THE WITNESS:  If he did something?  No.

15    BY MR. BILLER:

16            Q     So if your husband did something, you

17    wouldn't know about it?

18            MR. WILSON:  Objection, calls for speculation.

19            THE WITNESS:  I just don't understand the

20    question.  Something like what?  I don't understand the

21    question.

22            MR. WILSON:  That's fine.

23    BY MR. BILLER:

24            Q     I'll try it again.  Assume for purposes

25    of my question that your husband, Stephen Choi, took

                                                    Page 89

1           some action to cause your name to be identified as the

2           president and member of foundation for this company.

3           That's an assumption.

4                A    I don't know.

5                Q    I haven't finished the question.   I

6           haven't finished the question.

7                MR. BILLER:  Read the assumption back.

8                      (The record was read by the Certified

9                Shorthand Reporter as follows:

10                      "Q   Assume for purposes of my

11                    question that your husband,

12                    Stephen Choi, took some action to

13                    cause your name to be identified as the

14                    president and member of foundation for

15                    this company.  That's an assumption.")

16        BY MR. BILLER:

17                Q    Do you know of any action that

18           Stephen Choi, your husband, took to make that happen?

19                MR. WILSON:  Objection, not relevant or

20           calculated to lead to the discovery of admissible

21           evidence.

22                But if you know the answer, you can tell him.

23                THE WITNESS:  I don't know.  I don't have an

24           answer.

25                MR. WILSON:  Next question.

Veritext Legal Solutions
866 299-5127

| 1 | MR. BILLER: No. I'm not finished with this |
| 2 | issue. |
| 3 | MR. WILSON: Well, you still have to ask a |
| 4 | question. |
| 5 | MR. BILLER: I know. But you just said ask |
| 6 | another question. |
| 7 | MR. WILSON: Yeah. She's already said she |
| 8 | doesn't know. |
| 9 | MR. BILLER: No. She's being evasive. |
| 10 | MR. WILSON: No, I don't think so. |
| 11 | MR. BILLER: She's being evasive to protect her |
| 12 | husband. Let's call a spade a spade. |
| 13 | MR. WILSON: You're out in left field, Counsel. |
| 14 | MR. BILLER: Sure. |
| 15 | BY MR. BILLER: |
| 16 | Q    Let's do it this way. What does your |
| 17 | husband do for a living? |
| 18 | MR. WILSON: Object, not relevant nor |
| 19 | calculated to lead to the discovery of admissible |
| 20 | evidence. Invades right of privacy. |
| 21 | Instruct you not to answer. |
| 22 | BY MR. BILLER: |
| 23 | Q    Do you know what your husband does? |
| 24 | MR. WILSON: Same objection, same instruction. |
| 25 | Also, it would violate the marital privilege. |

Page 91

1          MR. BILLER:  I said "know."

2          MR. WILSON:  The way your question as

3     phrased --

4          MR. BILLER:  No.

5          MR. WILSON:  -- subject to those objections.

6          MR. BILLER:  What is the communication between

7     husband and wife?

8          MR. WILSON:  How does she know if not through

9     him.

10          MR. BILLER:  She can drop him off at work.  She

11     can take him or pick him up from work.

12          MR. WILSON:  What does this have to do with

13     this case?  Nothing.

14          MR. BILLER:  I told you what the case is all

15     about.  You just don't like it because your client is

16     going to be dragged into and has been in the federal

17     action.

18          MR. WILSON:  Again, you're barking up the wrong

19     tree.  He's just the moron who gave money --

20          MR. BILLER:  Yeah.  He's a real moron.  He's

21     worth $400 million by engaging in illegal gambling.

22     He's a real moron.  And he launders money through the

23     United States to Korea.

24          MR. WILSON:  And you, of course, know all of

25     this?

                                                    Page 92

1           MR. BILLER:  Yes, I do.

2           MR. WILSON:  All right.  Ask your next

3    question.  We're going to walk out soon.

4           MR. BILLER:   Walk out?  Fine.  You walk out,

5    and I'll have a motion filed by the end of the week.

6    You cannot end a deposition on relevancy.

7           MR. WILSON:  Okay.  Let's ask a question.

8    BY MR. BILLER:

9           Q      Have you ever seen your husband go to

10   work?

11          MR. WILSON:  Objection, not relevant nor

12   calculated to lead to the discovery of admissible

13   evidence.  Invades the right of privacy.

14          You can answer this one question.  It's also

15   vague and ambiguous, as phrased.

16          THE WITNESS:  Yes.

17   BY MR. BILLER:

18          Q      And when you saw him go to work, where

19   did he go?

20          MR. WILSON:  Objection, invades right of

21   privacy.  Instruct not to answer.

22   BY MR. BILLER:

23          Q      Are you going to follow your counsel's

24   instruction?

25          A      Yes.

                                            Page 93

1        Q        Did you ever see your husband work out

2    of 317 17th Street in Manhattan Beach, your home?

3            MR. WILSON:   Did she see him doing work there?

4    Is that what you're asking?

5    BY MR. BILLER:

6        Q        You can answer.

7        A        Yes.

8        Q        What did you see him do?

9            MR. WILSON:   Objection, invades right of

10   privacy.  Instruct not to answer.

11   BY MR. BILLER:

12       Q        You can answer the question.

13           MR. WILSON:   No.   I instructed her not to

14   answer.

15   BY MR. BILLER:

16       Q        Are you going to follow your counsel's

17   instruction?

18       A        Yes.

19       Q        Do you have a joint banking account with

20   your husband?

21           MR. WILSON:   Objection, invades right of

22   privacy.  Instruct not to answer.

23   BY MR. BILLER:

24       Q        Do you know how much money your husband

25   earns a year?

Page 94

1          MR. WILSON: Objection, invades right of

2    privacy. Instruct not to answer.

3    BY MR. BILLER:

4          Q      Are you going to follow your counsel's

5    instruction?

6          A      Yes.

7          MR. WILSON: Let's stipulate, Counsel, when I

8    instruct her not to answer, she's going to follow my

9    instructions.

10         MR. BILLER: No.

11         MR. WILSON: Okay. Fine.

12   BY MR. BILLER:

13         Q      Did you ever cause any money to be

14   transferred from a bank account in the name of

15   Hillshore Investments S.A. to another bank in another

16   bank account in the name of Thomas Wylde?

17         A      I don't know.

18         Q      You don't know if you caused millions of

19   dollars to be transferred? Is that your answer?

20         MR. WILSON: Counsel, that is what she just

21   said. She's answered the question, Counsel.

22   BY MR. BILLER:

23         Q      Have you ever in your lifetime wire

24   transferred any money from Hillshore Investments S.A.

25   to the United States for the bank account belonging to

Page 95

1    Thomas Wylde LLC?

2              A    I don't know.

3              MR. BILLER.   I have to bring this transcript to

4    the judge.

5    BY MR. BILLER:

6              Q    As the president of

7    Hillshore Investments S.A., have you ever instructed

8    anybody to wire transfer any money from a bank account

9    in the name of Hillshore Investments to a bank account

10   in the United States for Thomas Wylde?

11             MR. WILSON:   You can answer.

12             THE WITNESS:   No.

13   BY MR. BILLER:

14             Q    And you didn't do that because there's

15   no employees?

16             MR. WILSON:   Objection, argumentative.   Ask

17   your next question.

18             MR. BILLER:   No.   Are you instructing her not

19   to answer?

20             MR. WILSON:   No.   It's just a silly question.

21   You know who caused the wire transfers.

22             MR. BILLER:   Who, Counsel?   Do you want to

23   stipulate?   Do you want to stipulate?

24             MR. WILSON:   Who do you think it was?

25             MR. BILLER:   Let's stipulate, and I can move

                                                  Page 96

1        on.  But if this witness is going to continue to be

2        dishonest and hide for her husband, I have to ask these

3        questions.

4                MR. WILSON:  She's not being dishonest.  Are

5        you doubting the money was transferred?

6                MR. BILLER:  Yeah.  The money was transferred,

7        but it wasn't transferred from Hillshore.

8                MR. WILSON:  Okay.

9        BY MR. BILLER:

10               Q        As the general manager of

11       Hillshore Inc., have you ever caused money to be

12       transferred from a bank account in the name of

13       Hillshore Investments to a bank account in the

14       United States in the name of Thomas Wylde?

15               A        I'm sorry, can you repeat the question?

16               MR. BILLER:  Read it back.

17                        (The record was read by the Certified

18               Shorthand Reporter as follows:

19                        "Q   As the general manager of

20                        Hillshore Inc., have you ever caused

21                        money to be transferred from a bank

22                        account in the name of Hillshore

23                        Investments to a bank account in the

24                        United States in the name of

25                        Thomas Wylde?")

Page 97

1              THE WITNESS:   No.

2      BY MR. BILLER:

3              Q      Your husband's identified as the

4      treasurer --

5              Do you have an understanding that money can be

6      transferred from a personal computer by gaining access

7      to bank accounts?

8              MR. WILSON:   Objection, ambiguous as phrased.

9      You can answer, if you know.

10             THE WITNESS:   Yes.

11             MR. BILLER:   Okay.

12     BY MR. BILLER:

13             Q      Do you know if your husband ever

14     transferred money from Hillshore Investment to

15     Thomas Wylde?

16             A      I don't know.

17             Q      Now let's turn to 26.

18             A      (Witness complies.)

19             Q      Turn to the page where it says

20     Certificate of Incorporation Hillshore Investment.

21     It's right -- it's right here.   It's right here.

22             So just flip through the next five pages.   Have

23     you ever seen these five pages before?

24             A      No.

25             Q      So as the president and general manager

                                              Page 98

```
 1          of Hillshore Investments, you've never seen the
 2     Certificate of Incorporation for Hillshore Investment?
 3              A     NO.
 4              Q     Do you know what a Certificate of
 5     Incorporation is?
 6              A     Not really.
 7              Q     Could you please read --
 8              MR. BILLER:  Or I'm asking the interpreter to
 9     read to the witness Clause 2, "The purpose."
10     BY MR. BILLER:
11              Q     And I'm going to ask you a question
12     about that, so listen very carefully.
13              THE INTERPRETER:  Counsel, what page are we on?
14              MR. BILLER:  It's not very clear because
15     there's not any page numbers.
16              THE INTERPRETER:  "The purposes"?
17              MR. WILSON:  Yes.  The entire paragraph.
18              THE INTERPRETER:  The Interpreter would like a
19     moment to please read.
20              MR. BILLER:  Absolutely.
21                   (Whereupon, Mr. Biller and Mr. Wilson
22              step out of the conference room for a brief
23              discussion.)
24              MR. BILLER:  Did you finish?
25              THE INTERPRETER:  Yes.
```

Page 99

1  BY MR. BILLER:

2          Q       The interpreter kindly read to you

3  paragraph 2, the purpose of Hillshore Investments;

4  correct?

5          A       Correct.

6          Q       Were you involved in any activities or

7  conversations or cause anybody to get involved in any

8  of the business purposes identified on Exhibit 26?

9          MR. WILSON:  Are you limiting this as to

10  Thomas Wylde?  Because any other business purposes I'm

11  not going to allow her to answer.  If you want to limit

12  it to Thomas Wylde, it's a fair question.

13          MR. BILLER:  By limiting it to Thomas Wylde,

14  you understand that I believe I'm entitled to

15  everything and I'll just take it up with the judge.

16  Otherwise, are you going to instruct her not to answer?

17          MR. WILSON:  Well, what I'm saying is why don't

18  you ask the question with respect to Thomas Wylde

19  because that's what your case is about.  It's

20  not -- this case is not about something other than.

21          MR. BILLER:  Counsel, you've got to listen to

22  me.  I have my case.  Okay.  I know what the evidence

23  is in my case.  My case goes beyond

24  Hillshore Investments.  It goes way beyond

25  Hillshore Investments.  This is much bigger, much

Page 100

1      bigger than what you think it is.  That's why the

2      federal complaint has identified seven predicate

3      federal RICO statutes that were violated.

4              MR. WILSON:  Do you mean the one that has been

5      staid?

6              MR. BILLER:  Including --

7              MR. WILSON:  You mean the one that has been

8      staid?

9              MR. BILLER:  Yeah.

10             MR. WILSON:  And --

11             MR. BILLER:  I'm not finished.  Can I make a

12     record?  Can I make a record?

13             MR. WILSON:  No.

14             MR. BILLER:  In this case, we have an

15     affirmative defense -- number of affirmative offenses

16     that go to fraud and how deep that fraud went, and I'm

17     entitled to prove that.

18             MR. WILSON:  Well, one, Hillshore Investments

19     is not a defendant in this state court case.

20             MR. BILLER:  No, they're a coconspirator.

21             MR. WILSON:  Excuse me.  No.  They're not named

22     as anything.

23             MR. BILLER:  It doesn't matter.  You don't have

24     to be named as a coconspirator.

25             MR. WILSON:  They're not a party to this

                                                    Page 101

1        lawsuit.

2                MR. BILLER:  It doesn't matter.

3                MR. WILSON:  Are they, Counsel?  Answer for the

4        record.  Are they a party?

5                MR. BILLER:  I'm not going to answer.

6                MR. WILSON:  Are they a party, Counsel?

7                MR. BILLER:  Stop talking to me.  You're

8        wasting my time, and that's what you want to do.

9                MR. WILSON:  No.

10               MR. BILLER:  You have an objection.  Instruct

11       her not to answer.  I'll move on.

12               MR. WILSON:  I asked you if you want to limit

13       it --

14               MR. BILLER:  No, I don't.

15               MR. WILSON:  Okay.  Then I would instruct her

16       not to answer.  I gave you the opportunity to do

17       something right, but you chose not to.

18               MR. BILLER:  Counsel, you don't understand I

19       asked any company.  That includes Thomas Wylde.

20               MR. WILSON:  I know what it includes.

21               MR. BILLER:  So you're instructing her not to

22       answer a question that includes Thomas Wylde?

23               MR. WILSON:  Because it involves --

24               MR. BILLER:  Brain child.

25               MR. WILSON:  -- other companies and other

                                                Page 102

1    actions that you don't have any entitlement to find out

2    about.

3                MR. BILLER:  And you don't represent those

4    companies at this deposition, and you don't have any

5    saying in what rights those companies have.  Are you

6    representing the other fraudulent companies besides

7    Hillshore Investment?

8                MR. WILSON:  Ask your next question, Counsel.

9                MR. BILLER:  What was the last question and

10   answer?

11                    (The record was read by the Certified

12               Shorthand Reporter as follows:

13                    "Q   Were you involved in any

14               activities or conversations or cause

15               anybody to get involved in any of the

16               business purposes identified on

17               Exhibit 26?")

18   BY MR. BILLER:

19               Q   Answer the question, please.

20               A   I'm sorry, can you repeat it again?

21                    (The record was read by the Certified

22               Shorthand Reporter.)

23               THE WITNESS:  No.

24               MR. BILLER:  You want to take a lunch break

25   now?

                                              Page 103

```
 1              MR. WILSON:  We can.  Sure.

 2                   (Lunch recess taken:  11:56 a.m. to

 3              1:03 p.m.)

 4         BY MR. BILLER:

 5              Q       Focusing on Exhibit 26, were you

 6         involved in any way with contributing $10,000 in legal

 7         currency within the United States of America as capital

 8         for Hillshore Investments?

 9              MR. WILSON:  Objection, invades right of

10         privacy.  Instruct not to answer.

11         BY MR. BILLER:

12              Q       Are you going to follow your counsel's

13         instruction?

14              A       Yes.

15              MR. BILLER:  Can you, Madam Interpreter, please

16         read part of paragraph 4 under "The Stock Register"

17         where my thumb is to the witness, as highlighted.

18                   (Whereupon, the Interpreter translates

19              the portion specified to the witness.)

20              MR. WILSON:  Hold on one second.  I'm trying to

21         look for Exhibit 26.  Which one is 26, Counsel?

22              MS. DALEY:  The corporate documents.

23              MR. WILSON:  What page are you at?

24              MR. BILLER:  They don't have page numbers.

25         It's the next -- flip it from page 6.
```

                                        Page 104

1    BY MR. BILLER:

2        Q    Did you understand what was just read to

3    you?

4        A    Can I look it up?

5        Q    Do you want to read it yourself?

6        A    Yes.

7        Q    Let the record reflect that the witness

8    is reading part of the paragraph under the stock

9    registration.

10        A    Can you read it to me again, please?

11            (Whereupon, the Interpreter translates

12        the portion specified to the witness.)

13        THE WITNESS:  I don't really understand it.

14    BY MR. BILLER:

15        Q    So you have no knowledge whatsoever

16    about any stock for Hillshore Investments being

17    registered?

18        A    No.

19        Q    Okay.  But you are the 100 percent

20    shareholder?

21        A    Yes.

22        Q    Can you please explain the

23    inconsistencies between being the 100 percent

24    shareholder and not knowing how shares are registered?

25        MR. WILSON:  Objection, argumentative.  There

Page 105

1        is no inconsistencies

2               You can answer the question.  Go ahead.  If you

3        don't know how to answer it, then don't.

4        BY MR. BILLER:

5               Q       In paragraph 5 it says that

6        [as read] Hillshore Investments has its domicile in the

7        City of Panama, Republic of Panama, with its board of

8        directors determine, engage in business and established

9        branches anywhere in the world, and keeps its records

10       and assets anywhere in the world."

11              MR. WILSON:  What's wrong with that?

12       BY MR. BILLER:

13              Q       Is that your understanding?

14              MR. WILSON:  Is what her understanding?  That

15       was a compound sentence you read.

16       BY MR. BILLER:

17              Q       Is it your understanding,

18       Hillshore Investments has its domicile in the City of

19       Panama, the Republic of Panama?

20              MR. WILSON:  Objection, no foundation this

21       witness understands what a domicile is.

22              MR. BILLER:  Do you want to stipulate, Counsel,

23       that this witness doesn't have any knowledge whatsoever

24       of Hillshore Investments and that her name appears on

25       corporate documents as a fraud for shell corporations?

Page 106

1    Do you want to stipulate to that? Because if you

2    stipulate to that, I'll stop.

3            MR. WILSON:  And if you stop asking moronic

4    questions --

5            MR. BILLER:  They're moronic to you only

6    because you're representing a criminal.

7            MR. WILSON:  Oh, please.  Stop it, Counsel.

8    I'm just going to have to report you to the State Bar.

9    I'm very close to it.

10           MR. BILLER:  For what?

11           MR. WILSON:  For saying what you just did.  You

12   don't say that --

13           MR. BILLER:  You get reported to the State Bar

14   if you threaten to a report a crime or a violation of

15   rules of professional conduct to another lawyer or

16   witness.  Okay.  Not what I just said.

17           MR. WILSON:  You have your own opinion.  All

18   I'm telling you is you're crossing the line, and stop

19   it.  Ask your questions.  Do what a lawyer is supposed

20   to you.

21           MR. BILLER:  If you stop flapping your mouth I

22   would.

23           MR. WILSON:  If you ask decent questions -- of

24   course that's impossible.  So ask your next question.

25   ///

                                              Page 107

1          MR. BILLER:   Please restate my question.

2                    (The record was read by the Certified

3          Shorthand Reporter as follows:

4                         "Q    Is it your understanding

5                    Hillshore Investments has its domicile

6                    in the City of Panama, the Republic of

7                    Panama?")

8          MR. WILSON:   The same objections as before.   No

9     foundation.   Calls for speculation.

10    BY MR. BILLER:

11         Q     You can answer.

12         MR. WILSON:   If you know.   If you don't, tell

13    him you don't know.

14         THE WITNESS:   I don't know.

15         MR. BILLER:   Move to strike that answer.   And

16    I'm bringing a motion to compel.   You cannot tell the

17    witness what to say.   You can make objections.   That's

18    it.   No speaking objections.   You can't coach the

19    witness, and you can't tell the witness what to say.

20         MR. WILSON:   She doesn't know, Counsel.

21         MR. BILLER:   Do you want to take the oath?   I

22    just offered you a stipulation.   You want to sign the

23    stipulation?

24         MR. WILSON:   Stop pointing your finger or we're

25    done.   I'm not going to take crap from you.

                                              Page 108

1           MR. BILLER:  I'm going to bring a motion on

2    that issue as well.

3           MR. WILSON.  You do that.

4    BY MR. BILLER:

5           Q      Is it your understanding that the board

6    of directors shall engage in business and branches

7    anywhere in the world that have their assets and

8    records anywhere in the world?

9           MR. WILSON:  Objection, compound.

10          THE WITNESS:  I'm sorry?

11                  (The record was read by the Certified

12          Shorthand Reporter.)

13          THE WITNESS:  I don't know.

14          MR. BILLER:  Okay.

15   BY MR. BILLER:

16          Q      As the 100 percent shareholder, did you

17   have any meetings as required by this corporate

18   document in Panama City?

19          MR. WILSON:  Objection, misstates the document;

20   calls for a legal conclusion as phrased.

21          You can answer it.

22          THE WITNESS:  No.

23   BY MR. BILLER:

24          Q      So it's true that there has never been a

25   shareholder meeting for Hillshore Investment; correct?

Page 109

1          MR. WILSON:  You mean has she ever met with

2    herself?  Objection, the question is unintelligible as

3    phrased since there is only one shareholder.

4          MR. BILLER:  Yeah.  Does it mean she has a

5    meeting with herself every day when she's with herself?

6    Moron.

7          MR. WILSON:  Yes, you are.  A giant one.

8    BY MR. BILLER:

9          Q     Have you ever had any such meetings?

10         A     No.

11         Q     How many directors are on the board of

12   directors for Hillshore Investments?

13         A     I don't know.

14         Q     Do you have an understanding there has

15   to be at least three and no more than seven?

16         A     I don't know.

17         MR. BILLER:  I'm going to give the document

18   back to the translator so she can read most of the

19   paragraph under "The powers."  And it's all

20   highlighted.  So if you want to put the paper

21   down -- exhibit down so you can see it and read it

22   together.

23         MR. WILSON:  Counsel, this isn't a complete

24   document; is it?

25         MR. BILLER:  I'm not here to testify, sir.

                                              Page 110

1          MR. WILSON:  Well, hold on a second.  If this

2     isn't a complete document, then we need to know that

3     because then it's an improper exhibit.

4          MR. BILLER:  No.  It's not an improper exhibit.

5     You haven't seen --

6          MR. WILSON:  Is it a complete document?

7          MR. BILLER:  -- the document.  Believe me, it's

8     not an improper exhibit.

9          MR. WILSON:  Is this a complete document?

10          MR. BILLER:  I'm not going to answer any

11     questions.

12          MR. WILSON:  Then she's not going to answer any

13     questions until you do.  You're asking her about a

14     document that may not even be complete.  It may not

15     even be readable.

16          MR. BILLER:  Then you know what, it's your

17     burden to show that.  I don't have the burden to show a

18     document is complete.

19          MR. WILSON:  I think you do.

20          MR. BILLER:  No, I don't.  That's your burden.

21          MR. WILSON:  You presented it as a complete

22     document.

23          MR. BILLER:  She couldn't even authenticate the

24     document.  It's a document that is publicly available

25     on the Internet.

Page 111

1           MR. WILSON:  So you don't know whether it's a

2    complete document.  Is what you're saying?

3           MR. BILLER:  Don't put words in my mouth.

4    That's not what I'm saying.

5           Is that it?

6           THE INTERPRETER:  Yes.

7    BY MR. BILLER:

8           Q      Did you understand what the interpreter

9    said?

10          A      No.

11          Q      Let me do it this way, then.  Do you

12   understand what the powers of the corporation known as

13   Hillshore Investments S.A. are?

14          A      No.

15          Q      Do you know who the officers are at

16   Hillshore Investments, Inc.?

17          A      No.

18          Q      Can you turn to the next page, please.

19   Turn to the next page.

20          A      (Witness complies.)

21          Q      Do you see at the bottom where it says

22   "First Directors"?

23          MR. WILSON:  Once again, proves this is not a

24   complete document.

25          MR. BILLER:  Counsel, if I wanted to go outside

                                                  Page 112

1   and tear a page out of the dictionary and come into

2   this room and ask her a question about a definition of

3   a word and I submit that as an exhibit, that is

4   perfectly proper. I can formulate any question I want

5   from any document I want.

6          MR. WILSON: That's false.

7          MR. BILLER: It's a courtesy to identify it as

8   an exhibit as it becomes part of the record. I'm not

9   introducing the document in evidence. It can't be

10  through this witness, so stop interrupting.

11         MR. WILSON: That's false. I just want to

12  prove what I said before. It's not a complete

13  document, and I think that is done intentionally.

14  BY MR. BILLER:

15        Q   Do you see the name "DIAZ" at the

16  bottom?

17        A   No.

18        Q   Do you see that name (indicating)? Who

19  is it?

20        A   I don't know him.

21        Q   Do you know that he is the president,

22  officer and/or director of 38,000 corporations?

23        A   I don't know.

24        Q   Do you see the name below him?

25        A   I see it.

Page 113

1          Q      Do you know him?

2          A      No.

3          Q      Turn the page, please.  Do you see

4    paragraph 8, the "Treasurer"?

5          MR. WILSON:  Wait.  Hold on a second.  Did you

6    say turn the page from where it says "TRANSITORY

7    PROVISIONS"?

8          MR. BILLER:  Yes.

9          MR. WILSON:  I don't have a next page.

10         MR. BILLER:  Well, she does.

11         MR. WILSON:  Well, I don't.

12         THE WITNESS:  Yes.

13         MR. BILLER:  Well, she does.  Use her copy.

14         MR. WILSON:  Do you have a complete exhibit,

15   Counsel?

16         MR. BILLER:  I do.

17         MR. WILSON:  This is what I was saying to you.

18         MR. BILLER:  She's holding the completed

19   exhibit.

20         MR. WILSON:  For my records I want a complete

21   copy.

22         MR. BILLER:  Take that one.

23         MR. WILSON:  Thank you.

24         MR. BILLER:  By the way, Counsel, I'm not

25   obligated to provide you with anything.  It's a

Page 114

1   courtesy.

2          MR. WILSON:  All right.  Let's go.

3   BY MR. BILLER.

4          Q      Do you know Fernando Gil?

5          A      No.

6          Q      Did you ever -- as the 100 percent

7   shareholder for Hillshore Investments, did you ever

8   vote for any officers or directors?

9          A      No.

10         Q      It says here Mr. Diaz, the man who is a

11  president, officer, and director of 38,000 companies

12  around the world, he's the president.  So who is the

13  president?  Are you the president, or is he the

14  president?

15         A      I don't know.

16         MR. WILSON:  Let me give this incomplete one

17  back to you.

18         MR. BILLER:  You do that.

19         Let's take a break.

20               (Brief respite in proceedings.)

21  BY MR. BILLER:

22         Q      What is a loan?

23         A      A loan from the bank?

24         Q      From anybody who lends money, what is a

25  loan to your understanding?

Page 115

1           A       I know what it is.

2           Q       Please explain what you believe it is?

3           A       When the bank give you money for an

4   investment or buy a house or whatever.

5           Q       And you have to pay that money back over

6   time; correct?

7           A       Correct.

8           Q       And you have to -- you don't have to but

9   typically banks and other financial institutions that

10  lend out money want an interest rate on top of the

11  money they lend out; correct?

12          MR. WILSON:  Objection, the witness is not here

13  as an expert, Counsel.  You can ask percipient

14  questions.  That's not a percipient question.

15          MR. BILLER:  Of course it is.

16  BY MR. BILLER:

17          Q       You can answer the question.

18          MR. WILSON:  She can answer this last question,

19  and that will be it.

20  BY MR. BILLER:

21          Q       Can you answer the question?

22          A       Correct.

23          Q       Okay.  Do you have an understanding what

24  the word "invest" means?

25          A       Yes.

Page 116

1          Q      What does that mean?

2          A      When you put money in a company for

3    investors.

4          Q      Is it -- is the following consistent

5    with what you think the word "invest" means:  People or

6    company put money into another company to help that

7    company grow in return for an increase in the value of

8    the company receiving the investment?

9          MR. WILSON:  Objection, incomplete

10   hypothetical; seeking expert opinion of a lay witness.

11   BY MR. BILLER:

12         Q      You can answer the question.

13         A      I don't know.

14         Q      The question I just asked you, was that

15   inconsistent with your knowledge of investment?

16         MR. WILSON:  Objection to the form of the

17   question.

18         THE WITNESS:  I don't know.

19   BY MR. BILLER:

20         Q      I don't want any particulars.  I'm just

21   laying the foundation.  You as a person have taken out

22   a loan; correct?

23         MR. WILSON:  Objection, invades right of

24   privacy.  Instruct not to answer.

25   ///

                                             Page 117

1    BY MR. BILLER:

2            Q        Are you familiar with the type of papers

3    that are involved in taking a loan?

4            MR. WILSON:  Objection, incomplete

5    hypothetical; asking for expert opinion.

6            If you're able to answer his question, you can.

7            THE WITNESS:  I don't know.

8    BY MR. BILLER:

9            Q        Does Hillshore Investments S.A. have any

10   type of loan documents that discuss any loans by

11   Hillshore Investments S.A. to Thomas Wylde LLC?

12           A        I don't know.

13           Q        Do you believe there is a difference

14   between a loan and an investment?

15           MR. WILSON:  Objection, incomplete hypothetical

16   as phrased; calls for expert opinion of a lay witness.

17           You can answer.

18           THE WITNESS:  I don't know.

19           MR. BILLER:  Okay.

20   BY MR. BILLER:

21           Q        Do you have any understanding what the

22   relationship is between Hillshore Investments and

23   Thomas Wylde?

24           MR. WILSON:  Objection, calls for a legal

25   conclusion.

                                                        Page 118

1          You can answer, except if your understanding

2     came from your husband or it came from an attorney.

3          MR. BILLER:  Okay.  That is improper because

4     the question didn't call for spousal communication or

5     communications between her and her attorney.  What

6     you've done is you've just interfered with the

7     question.

8          MR. WILSON:  No.

9          MR. BILLER:  Yes, you have.  You interfered

10    with the question because the question didn't ask for

11    any of that information.  That's a no no.

12         MR. WILSON:  No.  Actually that's the proper

13    way to conduct the deposition so you protect your

14    client.

15         MR. BILLER:  Oh, yeah.  That's the improper way

16    so you coach your client.

17         MR. WILSON:  No.

18         MR. BILLER:  Can you read the question back?

19              (The record was read by the Certified

20         Shorthand Reporter.)

21         MR. BILLER:  Same objection.  Plus it calls for

22    a legal conclusion as phrased.

23         Did you understand --

24         MR. BILLER:  No, no, no, no, Don't do that.

25    Don't do that.

Page 119

1          MR. WILSON:  Oh, yeah, I'm going to.

2          MR. BILLER:  You have no right to ask the

3     witness --

4          MR. WILSON:  Do you want to terminate the

5     deposition?

6          MR. BILLER:  -- ask the witness -- I'm having

7     too much fun.  You have no right to ask the witness a

8     question when a question is being asked.

9          MR. WILSON:  I absolutely do.

10          MR. BILLER:  No, you don't, moron.

11          MR. WILSON:  Did you understand that I'm

12     instructing you, if you got this information from an

13     attorney or from your husband, you're not to answer it?

14     If you got it from any other source, you can answer it.

15     Do you get that?

16          THE WITNESS:  I don't understand it.

17     BY MR. BILLER:

18          Q     Have you ever seen any documents

19     involving Hillshore?

20          A     I don't know.

21          Q     Okay.  Let me show -- do you know what a

22     profit and loss statement is?

23          A     Yes.

24          Q     What is a profit and loss statement?

25          MR. WILSON:  Objection, calls for a legal

                                        Page 120

1     conclusion as phrased.

2          MR. BILLER:  She is the president of

3     Hillshore Investments.

4          MR. WILSON:  So what.

5          MR. BILLER:  It's not a legal conclusion.

6     She's the president of that company.

7          MR. WILSON:  The way you asked is a legal

8     conclusion.

9          MR. BILLER:  No.  I asked it properly.

10    BY MR. BILLER:

11         Q     Do you know what a profit and loss

12    statement is?

13         MR. WILSON:  Same objections.

14    BY MR. BILLER:

15         Q     You can answer the question.

16         A     (Through the Interpreter) I know about

17    profits and losses.

18         MR. BILLER:  Let's have the next document

19    marked.

20            (Exhibit 27 was marked for

21           identification by the Certified Shorthand

22           Reporter and is attached hereto.)

23    BY MR. BILLER:

24         Q     Could you please look at

25    Exhibit Number 27.

Page 121

1        MR. WILSON:  Is there a question pending?

2        MR. BILLER:  Is she finished.

3        THE WITNESS.  Yes.

4        MR. BILLER:  Okay.

5    BY MR. BILLER:

6        Q      Let me hand you Exhibit Number 28.

7               (Exhibit 28 was marked for

8        identification by the Certified Shorthand

9        Reporter and is attached hereto.)

10   BY MR. BILLER:

11       Q      Please look at Exhibit 28, and turn to

12   the last page.  And do you see on the last page net

13   income total is negative 2,358,812?  Do you see that?

14       MR. WILSON:  I'm sorry, Counsel, where are you

15   looking?

16       MR. BILLER:  On the last line, last page.

17       MR. WILSON:  You said turn the page.

18       MR. BILLER:  I said page 3.

19   BY MR. BILLER:

20       Q      Do you see that?

21       A      Yeah, I see it.

22       Q      Okay.  And this is -- do you see that

23   this is the profit and loss statement for Thomas Wylde

24   between January and June 2015?  Do you see that?

25       MR. WILSON:  Are you making a representation

Page 122

1    that that's what this is, Counsel?

2          MR. BILLER:   That's what the document says.

3          MR. WILSON:   Well, I don't care what it says.

4    BY MR. BILLER:

5          Q     Do you see that?

6          A     I see it.

7          Q     Okay.   As a sophisticated president of

8    an investment company who happens to be the general

9    manager of the investment company, can you please

10   explain why your company, Hillshore Investments LLC,

11   would invest an additional $8 million in 2016 when this

12   company was losing 2.3 million?

13         A     I don't know.

14         Q     Do you think that's a wise investment?

15   Ma'am, you can answer the question.

16         A     No.

17         Q     What is a loan to equity conversion?

18         MR. WILSON:   Objection, calls for a legal

19   conclusion and expert opinion.

20         MR. BILLER:   She's president of a major

21   investment company.

22         MR. WILSON:   Counsel, just ask good questions.

23   Try it.   It's not a bad thing.

24         MR. BILLER:   You know what, you don't like the

25   questions because it's showing that your clients are

                                        Page 123

1      thieves.

2                 MR. WILSON:  They're the ones that made the

3      investment, big brains.

4                 MR. BILLER:  The money is being laundered

5      through the company.  Do you understand that?

6                 MR. WILSON:  I understand you're in Dreamsville

7      is where you are.

8                 MR. BILLER:  We'll see.  We'll see when you're

9      standing in front of a federal jury.

10                MR. WILSON:  I'm happy to.

11     BY MR. BILLER:

12          Q     Do you know what a conversion from loan

13     to equity is?

14          A     No.

15          Q     I'm going hand you Exhibit Number 29.

16                (Exhibit 29 was marked for

17                identification by the Certified Shorthand

18                Reporter and is attached hereto.)

19     BY MR. BILLER:

20          Q     Do you see Exhibit Number 29?

21                MR. WILSON:  Hold on.  Don't answer any

22     questions.  Do you have a copy for me, Counsel?

23                MR. BILLER:  I have my copy if you want it.

24                MR. WILSON:  I don't care whose copy it is.

25     Counsel, we're not answering any questions about this.

                                              Page 124

1   BY MR. BILLER:

2           Q       Can you please look at Exhibit 29?

3           MR. WILSON:  No.  I'm telling her she's not to

4   answer any questions about this.

5   BY MR. BILLER:

6           Q       Please look at Exhibit Number 29.

7           MR. WILSON:  We're not answering any questions.

8   BY MR. BILLER:

9           Q       You're a named defendant in that

10  complaint; correct?

11          MR. WILSON:  Counsel, we're not answering any

12  questions.  This case has been staid.  You have no

13  right to ask any questions, and in doing so you're in

14  contempt.

15          MR. BILLER:  What order prevents me from asking

16  questions at a deposition?

17          MR. WILSON:  I'll find out from the district

18  court judge.

19          I want this portion of the transcript marked

20  because I'm bringing it up before the magistrate.

21  BY MR. BILLER:

22          Q       Are you going to follow your counsel's

23  instruction?

24          A       Yes.

25          Q       Okay.  Let me show Exhibit Number 30.

Page 125

```
 1                    (Exhibit 30 was marked for

 2               identification by the Certified Shorthand

 3               Reporter and is attached hereto.)

 4          MR. BILLER:  I'll make the representation on

 5    the record Exhibit 30 is the "OPERATING AGREEMENT OF

 6    THOMAS WYLDE, LLC," as entitled on the top of the first

 7    page.

 8    BY MR. BILLER:

 9          Q     Have you ever seen this document before?

10          A     No.

11          Q     Did you ask to ever see the operating

12    agreement for Thomas Wylde?

13          A     No.

14          Q     As the president and general manager of

15    an investment company, don't you think it's important

16    to read the operating agreement of the company you're

17    investing in?

18          A     Yes.

19          Q     Okay.  But you never saw Exhibit 30?

20          A     No.

21          Q     Let me show you another document.

22          I just want to note for the record that this

23    document, Operating Agreement, took effect on

24    July 22, 2014.  And it doesn't identify Paula Thomas as

25    a member of that company.  Do you see that?
```

Page 126

1              MR. WILSON:  You're asking her about the

2    document she's never seen before?

3              MR. BILLER.  Yes.

4              THE WITNESS:  I don't know.  I never seen it.

5    BY MR. BILLER:

6         Q    That's what it states?

7              MR. WILSON:  The document speaks for itself.

8    You don't need to ask her that.

9              MR. BILLER:  Are you instructing her not to

10   answer?

11             MR. WILSON:  No.

12             MR. BILLER:  She can answer the question.

13             MR. WILSON:  It's just objectionable.  She

14   would have to go through page by page.

15             MR. BILLER:  I said on the first page.

16             MR. WILSON:  Only?

17             MR. BILLER:  Yes.

18             MR. WILSON:  So he wants you to tell him

19   whether Paula's name on the first page.

20             MR. BILLER:  Counsel, that is the last time

21   you're going to do that, you're going to interrupt my

22   question with a question.

23             MR. WILSON:  I was helping you.

24             MR. BILLER:  You weren't helping me.  Don't

25   help me.  I don't need any help.

                                        Page 127

1              MR. WILSON:  Actually, you need a lot of help.

2    BY MR. BILLER:

3         Q    Paula Thomas's name doesn't appear on

4    the top paragraph; correct?

5              MR. WILSON:  Objection, the document speaks for

6    itself.

7              You can answer.

8              THE WITNESS:  I don't see it.

9    BY MR. BILLER:

10        Q    Let me show the next document,

11   Number 31.

12              (Exhibit 31 was marked for

13              identification by the Certified Shorthand

14              Reporter and is attached hereto.)

15   BY MR. BILLER:

16        Q    Have you seen Exhibit 31 before?

17        A    No.

18        Q    Okay.  Let's go to the bottom of the

19   page where it says "Hillshore Investments."  Do you see

20   that?

21        A    Yes.

22        Q    Do you see an address there, "Contact

23   Information" column?  Do you see that?

24        A    I see it.

25        Q    You said that Hillshore Investments

                                        Page 128

```
 1    didn't have an office; is that right?

 2              A       Yes.

 3              Q       Okay.   Do you know what that address is?

 4              A       I don't know.

 5              Q       You see your name there [as read]

 6    "Attention General Manager"?

 7              A       Yes, I see it.

 8              Q       And do you see the column that says

 9    "Capital Contribution and Due Dates"?   It's the third

10    column over.

11              A       Where does it say?

12              Q       Third column from the left.

13              A       Oh, okay.

14              Q       Do you see it says 5.5 million,

15    January 1, 2015?

16              A       Yes.

17              Q       Is it your understanding that as of

18    January 1, 2015, Hillshore invested $5.5 million in

19    Thomas Wylde?

20              A       I see it, but I don't know.

21              Q       You have no personal knowledge of that

22    money being invested; correct?

23              A       Yes.   I don't know.

24              Q       Would your husband have personal

25    knowledge of that investment?
```

Page 129

| | |
|---|---|
| 1 | A    Say that again. |
| 2 | Q    Would your husband have personal |
| 3 | knowledge of $5.5 million being invested in |
| 4 | Thomas Wylde as of January 1, 2015? |
| 5 | A    I don't know. |
| 6 | Q    I'm going to show you a document that |
| 7 | your husband produced at his deposition. |
| 8 | (Exhibit 32 was marked for |
| 9 | identification by the Certified Shorthand |
| 10 | Reporter and is attached hereto.) |
| 11 | BY MR. BILLER: |
| 12 | Q    I'm going to make the representation to |
| 13 | you that your husband produced Exhibit 32 to represent |
| 14 | investments Hillshore Investments made to Thomas Wylde. |
| 15 | Do you understand that? |
| 16 | A    Say that again. |
| 17 | MR. BILLER:  Read it back, please. |
| 18 | (The record was read by the Certified |
| 19 | Shorthand Reporter.) |
| 20 | THE WITNESS:  Yes, I understand. |
| 21 | BY MR. BILLER: |
| 22 | Q    Now, just look at the document and |
| 23 | correct me if I'm wrong.  But there are three years |
| 24 | that are identified on this document: 2014, 2016, and |
| 25 | 2017; correct? |

Page 130

1          A      Yes.

2          Q      Okay.  And you would agree that, as of

3     December 31, 2014, it was -- Hillshore invested

4     $2.3 million?

5          MR. WILSON:  Are you asking her if that's what

6     the document says or that's what her understanding is?

7          MR. BILLER:  Her understanding.

8          MR. WILSON:  Okay.

9          THE WITNESS:  Yes, I understand.  But the

10    question is, Do I understand?

11         MR. BILLER:  Yes.

12         THE WITNESS:  Yes.

13    BY MR. BILLER:

14         Q      The document actually says to reclass

15    Hillshore loan to equity.  Do you see that?

16         A      Yes, I see it.

17         Q      And that is $2.3 million as of

18    December 31, 2014; right?

19         A      Yes.

20         Q      Okay.  There's not any entries for 2015;

21    correct?

22         MR. WILSON:  Objection, the document speaks for

23    itself.

24         You can answer.

25         THE WITNESS:  Yeah, I can see it.

Page 131

BY MR. BILLER:

Q        You cannot see it?

A        I mean, I can see there was no --

Q        Let me ask a better question.  It's
correct to say there's no entry for 2015 on
Exhibit Number 32; right?

A        It's correct.

Q        Can you please explain to me how in
Exhibit 31 -- strike that.

Look at Exhibit Number 31 and Number 32 side by
side.  Please explain why, as of the end of 2015,
Hillshore invested only $2.3 million as reflected on
Exhibit 31 -- 32, but it shows on Exhibit 31 that
Hillshore invested $5.5 million as of April 15, 2015?
Can you explain how that happened?

A        I have no idea.  I don't know.

Q        So as the president and general manager
of Hillshore Investments, you don't know how it came
about $2.3 million being acknowledged in Exhibit 32 but
$5.5 million being identified in Exhibit 31?

A        I don't know.

Q        Okay.  And you would agree that there is
no information on either of those exhibits showing a
transfer of 3.2 million from Hillshore to T.W.,
Thomas Wylde?

Page 132

1          A          I don't know.

2          Q          You don't know if that's true by looking

3     at the document?

4          MR. WILSON:  She doesn't know if it's true.

5     BY MR. BILLER:

6          Q          Looking at the documents --

7          A          I just don't understand.  I don't know.

8          Q          What don't you understand?  How does the

9     president of a company lose $2.3 million -- or

10    $3.2 million?

11         MR. WILSON:  Objection to the form of the

12    question.

13    BY MR. BILLER:

14         Q          Can you explain?

15         A          No.

16         Q          All right.  Let's go to the next

17    document.

18                    (Exhibit 33 was marked for

19                identification by the Certified Shorthand

20                Reporter and is attached hereto.)

21    BY MR. BILLER:

22         Q          Have you seen Exhibit 33 before?

23         A          No.

24         Q          Please turn the page 3.  Under

25    Paragraph 6.c. it states [as read] "Hillshore

                                                      Page 133

```
 1        Investments funding of $2,000,000." Did I read that
 2   correctly?
 3             A    Yes.
 4             Q    What was the interest rate for that
 5   loan?
 6             A    What?
 7             Q    The interest rate?
 8             A    I don't know.
 9             Q    Where did that $2 million come from?
10   What bank?
11             MR. WILSON:  Objection, invades right of
12   privacy.  Instruct not to answer.
13   BY MR. BILLER:
14             Q    Did you cause $2 million to be funded to
15   Thomas Wylde?
16             A    I don't know.
17             Q    Do you know of any documents that you
18   have at your home 317 17th Street, Manhattan Beach,
19   that can account for or discuss the $2 million that was
20   loaned to Thomas Wylde?
21             A    I don't know.
22             Q    Is this the first time that you've
23   learned that Hillshore Investments has loaned
24   Thomas Wylde $2 million?
25             A    I didn't know.
```

                                              Page 134

1      Q      So this is the first time you've learned

2  of that?

3      A      Yes.

4      Q      Did you authorize the transfer of

5  $2 million from Hillshore Investments to Thomas Wylde?

6      A      No.

7      Q      As the president of a company, do you

8  think it would be important for the president to know

9  if $2 million is being invested in another company?

10     MR. WILSON:  Objection, incomplete hypothetical

11  as phrased.

12         You can answer.

13         THE WITNESS:  I'm sorry, what was the question?

14             (The record was read by the Certified

15         Shorthand Reporter.)

16         MR. WILSON:  Same objections.

17         THE WITNESS:  I don't know.

18  BY MR. BILLER:

19     Q      Do you know who was involved or gave

20  authorization to Thomas Wylde to make the

21  representation that it would invest a loan of

22  $2 million to Hillshore?  Let me rephrase the question.

23         Do you know who would authorize the

24  representation to be placed on Exhibit 32 stating

25  Hillshore Investments funding of a $2 million loan to

Page 135

```
 1          the company?
 2                  A       I'm sorry, who?
 3                  MR. BILLER:  Read the question back.
 4                          (The record was read by the Certified
 5          Shorthand Reporter as follows:
 6                          "Q   Do you know who would
 7                          authorize the representation to be
 8                          placed on Exhibit 32 stating
 9                          Hillshore Investments funding of a
10                          $2 million loan to the company?")
11                  THE WITNESS:  I don't know.
12                  MR. BILLER:  Okay.
13          BY MR. BILLER:
14                  Q       Does Hillshore Investments have an
15          attorney?
16                  A       I don't know.
17                  Q       Do you and your husband have an attorney
18          other than the attorney at this deposition?
19                  MR. WILSON:  For what purpose, Counsel?
20                  MR. BILLER:  Who negotiated this?
21                  MR. WILSON:  What's that?
22                  MR. BILLER:  Who negotiated this?
23          BY MR. BILLER:
24                  Q       You can answer.
25                  A       Yes, we do.  But --
```

Page 136

1        Q       What type of lawyer are they?  Real

2     estate?

3                MR. WILSON:  Again, we need to constrict it

4     to -- your questions are general.

5                THE WITNESS:  I don't know that.

6     BY MR. BILLER:

7                Q       Do you know of a lawyer that you and

8     your husband have retained to negotiate a $2 million

9     loan from Hillshore Investments to Thomas Wylde?

10               A       I don't know.

11               Q       Okay.  Let me hand you an Employment

12    Agreement.

13                       (Exhibit 34 was marked for

14                       identification by the Certified Shorthand

15                       Reporter and is attached hereto.)

16    BY MR. BILLER:

17               Q       Can you please look at -- before you go

18    to 34, I want you to focus on 33.  33 states in clause

19    6.f. "The Company's execution and delivery of an

20    employment agreement to Paula in a form mutually agreed

21    to the parties."  Do you see that?

22               THE INTERPRETER:  Interpreter would like a

23    repeat.  Counsel, which one is it?

24               MR. BILLER:  6.f.

25               THE WITNESS:  Yes, I can see that.

                                              Page 137

1   BY MR. BILLER:

2         Q      Exhibit 34 is an Employment Agreement.

3   Do you see that?

4         A      Yes.

5         Q      Do you know if Exhibit 33, the Purchase

6   Agreement, was referring to Exhibit 34, the Employment

7   Agreement?

8         MR. WILSON:   Objection, calls for speculation;

9   no foundation.

10        THE WITNESS:   I don't know.   What was the

11  question?

12              (The record was read by the Certified

13              Shorthand Reporter.)

14  BY MR. BILLER:

15        Q      Have you ever seen Exhibit 34 before?

16        A      No.

17        Q      Let me show you Exhibit 35 that was

18  marked as Exhibit 3 at your husband's deposition.

19              (Exhibit 35 was marked for

20              identification by the Certified Shorthand

21              Reporter and is attached hereto.)

22  BY MR. BILLER:

23        Q      Had you ever seen that document before?

24        A      No.

25        Q      Do you know what that document relates

Page 138

1    to?

2         A    No.

3         Q    Okay.  Can you please read the first

4    paragraph?

5              MR. WILSON:  You want her to read it to

6    herself?

7              MR. BILLER:  If she can.  But if she needs the

8    interpreter --

9              MR. WILSON:  Do you want it interpreted?

10             THE WITNESS:  Let me read it.  And if I

11   don't...

12   BY MR. BILLER:

13        Q    Did you read it -- could you read it?

14        A    I read it.

15        Q    I just want to ask you one question.

16             THE WITNESS:  Can you translate to me?

17             (Whereupon, the Interpreter translates

18             the portion of the document to the witness.)

19   BY MR. BILLER:

20        Q    Isn't it true that the sentence in that

21   paragraph that was just read to you in Spanish and that

22   you read in English falsely states

23   Hillshore Investments is located in Panama City,

24   Panama, at the address stated?

25             A    What was the question?

Page 139

1                        (The record was read by the

2              Certified Shorthand Reporter as follows:

3                        "Q    Isn't it true that the

4                   sentence in that paragraph that was

5                   just read to you in Spanish and that

6                   you read in English falsely states

7                   Hillshore Investments is located in

8                   Panama City, Panama?")

9              THE WITNESS:  States falsely?

10             MR. BILLER:  Yes.

11             THE WITNESS:  I don't understand.

12       BY MR. BILLER:

13             Q     You're the president of

14       Hillshore; right?

15             A     Yes.

16             Q     Have you ever visited the location that

17       has the address identified in paragraph 1 of

18       Exhibit 35?

19             A     No.

20             Q     You've never been to Panama?

21             A     Yeah.  I've been to Panama.

22             Q     How many times?

23             A     Three times.

24             Q     For business or pleasure?

25             A     Pleasure.

                                        Page 140

1          Q      Pleasure.  Okay.  So you stated earlier

2     that Hillshore Investments operates out of your home.

3     So my question to you is:  Do you know why anybody

4     would put on this document that Hillshore Investments

5     is a Panamanian company with its principal place of

6     business in Panama City, Panama?

7          MR. WILSON:  Objection, calls for speculation

8     on the part of this witness.

9          THE WITNESS:  I don't know.

10         MR. BILLER:  Okay.

11    BY MR. BILLER:

12         Q      If you were doing business with somebody

13    or another company, would you like to know where that

14    business is located?

15         MR. WILSON:  Objection, calls for speculation.

16    It's and incomplete hypothetical as phrased.

17         You can answer.

18         THE WITNESS:  Yeah, I guess.  I don't know.

19    BY MR. BILLER:

20         Q      Well, don't you think that is an

21    important piece of information to know so you can

22    identify who you're going to do business with?

23         MR. WILSON:  Same objections.

24    BY MR. BILLER:

25         Q      You can answer the question.

Page 141

1            A      I already did; right?

2            MR. BILLER:   Read the question back.

3                   (The record was read by the Certified

4       Shorthand Reporter as follows:

5                      "Q    Well, don't you think that is

6                   an important piece of information to

7                   know so you can identify who you're

8                   going to do business with?")

9            MR. WILSON:   Same objections.

10           THE WITNESS:   Yes, I guess.

11           MR. BILLER:   Can I have this marked?

12                  (Exhibit 36 was marked for

13      identification by the Certified Shorthand

14      Reporter and is attached hereto.)

15      BY MR. BILLER:

16           Q      I just want to focus on the first

17      paragraph.

18           MR. WILSON:   Do you have a copy for me?

19           MR. BILLER:   I don't.   I have this one.

20           MR. WILSON:   I'll share, but I want a copy

21      before I leave.

22           MR. BILLER:   Here.   Just stick around and tell

23      me what you don't have.

24      BY MR. BILLER:

25           Q      Can you read paragraph 1, the first

                                             Page 142

1    paragraph?

2           A       (Witness complies.)

3           Q       Have you read it?

4           A       Yes.

5           Q       Who is Ms. Ahmed?

6           A       I don't know.

7           Q       This person is represented as living at

8    Puerto Rico -- not Puerto Rico, I'm sorry.   Costa Rica.

9    Do you see that?

10          A       I'm sorry.  Can you say one more time in

11   English?

12          Q       It's in the third sentence.

13          A       This?

14          Q       Yes.

15          A       Shoeb?

16          Q       Yes.

17          A       I know him.

18          Q       Who is he?

19          A       He's a friend of ours.

20          Q       Who is that, you and your husband?

21          A       Yes.

22          Q       Is he a business person?

23          A       Yes.

24          Q       Does he do business with your husband?

25          A       Yes.

                                              Page 143

1  Q  What kind of business does he do?

2  A  Real estate.

3  Q  Is he an investor?

4  MR. WILSON:  Hold on.  Objection, invades right

5 of privacy.  Instruct you not to answer.

6  MR. BILLER:  Whose privacy?  His?

7  MR. WILSON:  Mr. Choi's.

8  MR. BILLER:  I'm not asking about Mr. Choi.

9  MR. WILSON:  Yeah, you are.

10  MR. BILLER:  No, I'm not.

11  MR. WILSON:  Yes.  You're asking if they do

12 business with one another.

13  MR. BILLER:  What was the question, please?

14    (The record was read by the Certified

15  Shorthand Reporter as follows:

16    "Q What kind of business does

17  he do?

18    "A Real estate.

19    "Q Is he an investor?)

20  MR. WILSON:  "Investor" are you saying in

21 anything or --

22  MR. BILLER:  I'm trying to know what he does in

23 real estate.

24  MR. WILSON:  Well, as long as it doesn't

25 involve anything with Mr. Choi.

Page 144

1          MR. BILLER:  I'm getting his deposition in a

2    few weeks.  Don't worry about it.  And if you want,

3    I'll serve a new state court action on you next week

4    to bring him into this case; if that's what you want.

5          MR. WILSON:  Whatever you're going to do you're

6    going to do.

7    BY MR. BILLER:

8          Q    Do you know what type of investment this

9    man does?

10         A    Yes.

11         Q    What kind?

12         A    Real estate.

13         Q    If this document shows that you and he

14   live at the same address -- well, not the same.  Close

15   to each other.

16         MR. WILSON:  That's false.

17         MR. BILLER:  Close to each other.

18         MR. WILSON:  You want to rephrase the question?

19         MR. BILLER:  I'll rephrase it.

20   BY MR. BILLER:

21         Q    Have you ever lived in Costa Rica?

22         A    Yes.

23         Q    And did you know this man while you

24   lived in Costa Rica?

25         A    Yes.

                                        Page 145

1         Q        Does the address that appears on this

2    document that you reside at accurate and correct?

3         A        I'm sorry, say that again.

4         Q        Paragraph 1 identifies you; correct?

5         A        Yes.

6         Q        And it shows an address where you lived

7    at in Costa Rica; correct?

8         A        Yes.

9         Q        Is that an accurate description of the

10   address you lived at in Costa Rica?

11        A        Yes.

12        Q        How far did you live from the person,

13   the man identified in paragraph 1?

14        A        It's a neighborhood.

15        Q        So you lived in the same neighborhood?

16        A        Yes.

17        Q        Did you ever know that your name was

18   placed on the Secured Promissory Note for

19   $2 million?

20        A        No.

21        Q        Do you know who would have put your name

22   there on this document, Exhibit 36?

23        A        The question if I know?

24        Q        Yes.

25        A        I don't know.

Page 146

1              Q       Paragraph 1.1 essentially states that

2      Hillshore -- Thomas Wylde has to pay Hillshore

3      16,666.66 a month.

4              MR. WILSON:  I'm sorry, may I inquire here?

5              MR. BILLER:  Sure.

6              MR. WILSON:  This looks like it's a combination

7      of two different documents, and also --

8              MR. BILLER:  Why do you say?

9              MR. WILSON:  -- it isn't signed by anyone.

10             MR. BILLER:  It's a draft.  Do you know why

11     it's a draft?  Do you know why I don't have the

12     original?  Because your client would not produce it

13     because Thomas Wylde won't produce it.

14             MR. WILSON:  Maybe there is no signed original.

15             MR. BILLER:  Okay.

16             MR. WILSON:  Have you ever thought of that?

17             MR. BILLER:  You know what, that would be

18     great.  Would you just tell me so I know.

19             MR. WILSON:  I have no idea.

20             MR. BILLER:  Will your client know?  He would

21     know.  Somebody at Hillshore must know.

22             MR. WILSON:  But the record should reflect that

23     we're talking about an unsigned document.

24             MR. BILLER:  Let's make it more -- make it more

25     complete.  We're talking about a document -- a draft

                                                    Page 147

1    document that appears to be a $2 million Secured

2    Promissory Note.  And the final version, if one exists

3    -- if a final version that was signed exists is in the

4    custody and control of Hillshore Investments and it was

5    requested and not produced today -- it was requested

6    when Mr. Choi was deposed, and it was not produced.

7    And Hillshore has not produced it.  That's the record.

8          MR. WILSON:  No.  I'm looking at the document,

9    and it refers for instance to -- the last page, page 4,

10   refers to an "Exhibit 'A' to Agreement to Purchase

11   Membership Interest."

12         MR. BILLER:  Yeah.

13         MR. WILSON:  I don't see any Exhibit A.

14         MR. BILLER:  This is Exhibit A to the

15   Purchase Agreement.

16   BY MR. BILLER:

17         Q     Do you know if Hillshore Investments

18   received any money from Thomas Wylde at any time to pay

19   down a loan?

20         A     I don't know.

21         MR. BILLER:  Talk to your client, Counsel, and

22   produce it.  You've got it.

23         MR. WILSON:  Why would you say that?  What

24   makes you think that?

25         MR. BILLER:  Because it's a Secured Promissory

Page 148

1   Note with your witness's name on it.

2          MR. WILSON:  That doesn't mean it's been

3   executed.

4          MR. BILLER:  Just tell me if it was or wasn't,

5   because I'll get it from Choi.  If he doesn't know,

6   we'll have to assume it was.

7          MR. WILSON:  This Exhibit A that you're

8   referring to, this is an Exhibit A to different

9   document.  Not to this document.  So what I'm telling

10  you is you put together documents that don't go with

11  each other.

12         MR. BILLER:  Whatever you say.

13         MR. WILSON:  At least admit the facts.

14             (Exhibit 37 was marked for

15             identification by the Certified Shorthand

16             Reporter and is attached hereto.)

17         MR. WILSON:  This is the new one, 37.

18  BY MR. BILLER:

19         Q     I'm going to show you two documents.

20  You have Exhibit 31.

21         THE REPORTER:  You want me to give her 31?

22         MR. BILLER:  Yes.

23         THE REPORTER:  Okay.

24  BY MR. BILLER:

25         Q     And I've just presented you with

                                        Page 149

1       Exhibit 37.  Do you have those exhibits in front of

2       you?

3                   A.      Yes.

4                   Q       Okay.  Can you please turn to page 24 of

5       Exhibit 37?

6                   A       (Witness complies.)

7                   MR. WILSON:  Do you say "24"?

8                   MR. BILLER:  Yes.

9       BY MR. BILLER:

10                  Q       On Exhibit 37, Hillshore Investments is

11      not identified; correct?

12                  A       Correct.

13                  MR. WILSON:  Objection, the document speaks for

14      itself.

15      BY MR. BILLER:

16                  Q       Do you see that?

17                  A       Correct.

18                  Q       And then Exhibit 31 is

19      "AMENDED EXHIBIT B, MEMBERS AND CAPITAL CONTRIBUTIONS

20      April 15, 2015."  Do you see that?

21                  A       I'm sorry, what -- the members?

22                  Q       Exhibit 31, "AMENDED EXHIBIT B, MEMBERS

23      AND CAPITAL CONTRIBUTIONS."

24                  A       Yes.

25                  Q       Do you see that?

                                                    Page 150

1        A       Yes, I see that.

2        Q       And as we previously discussed, as of

3    that date it shows Hillshore Investments with 90 units

4    of membership and a 5.5 contribution; correct?

5        A       Correct.

6        Q       Now, can you please explain how

7    Hillshore Investments was not recognized on the Amended

8    Operating Agreement when it's identified in the Amended

9    Exhibit B, Exhibit 31, making a 5.5 contribution when

10   the transaction by account exhibit that we talked about

11   clearly shows there were no investments from

12   December 31, 2014 to 2016?

13       A       I don't know.

14       BY MR. BILLER:  Okay.  Let me talk to my client

15   and my colleague first.

16              (Brief respite in proceedings.)

17       MR. BILLER:  Since I'm getting you an expedited

18   transcript, you said you will get it to me signed and

19   delivered by August 21.

20       MR. WILSON:  When will my office have it?

21       THE REPORTER:  Today is Monday.  Next Monday.

22   Is that what you want for the expedite, or do you want

23   it sooner?

24       MR. WILSON:  If you get it next Monday --

25       THE REPORTER:  That will be a one-week

                                            Page 151

1   expedite  for next Monday.

2          MR. WILSON:  Today is what, the 31st?

3          MR. BILLER:  The 31st.  That would be the 7th.

4   You get it to me August 31st.

5          MR. WILSON:  That's fine.

6          MR. BILLER:  Can you overnight it?

7          MR. WILSON:  Yes.

8          MR. BILLER:  I'm going to expedite it.  I

9   should ask you to pay some of that.

10         MR. WILSON:  You can ask but I won't.

11         MR. BILLER:  So I'll just propose the normal

12  stipulation, and you need to let me know soon if she's

13  going to be here on the 28th; because if she's not, I'm

14  going to get a court to prevent her from leaving.  And

15  if she is, then I need to know -- I need to have

16  documentation -- if she's not going to be here I need

17  documentation showing where she's going, where she's

18  staying, how long she's staying, when the ticket were

19  purchased -- all that stuff that any witness would have

20  to submit to a court to produce to get out of a trial.

21         MR. WILSON:  Right.  I assume that -- I'll talk

22  with her.  But I'll assume if that's what's happening,

23  I'm going to go in for a motion for protective order if

24  she's not going to be in the country.

25         MR. BILLER:  She's definitely not going to be

Page 152

1     in the country?

2          MR. WILSON:  I said if she isn't going to be in

3     the country.

4          MR. BILLER:  Listen, if you show me

5     documentation that proves everything I want proof, I'm

6     not going to make you go for protective order.  I just

7     need to be satisfied she's not running out of here out

8     of the country some day from today until the 28th.

9          MR. WILSON:  My understanding is -- and I have

10    to confirm this -- that I believe they're leaving

11    within the next few days for -- I can't remember the

12    name of the place.  But, yes.  And she won't be back

13    for quite a while.

14         MR. BILLER:  That's not -- you can bring your

15    protective order.

16         MR. WILSON:  What's that?

17         MR. BILLER:  You bring your protective order

18    and you prove it to the judge.  She's served.  She

19    can't go.  She has to appear.

20         MR. WILSON:  I thought you just said if I

21    showed you the documentation.

22         MR. BILLER:  But you just told me for the first

23    time she's leaving in a couple of days for a long time.

24         MR. WILSON:  If I find out -- I've got to go

25    have some phone calls to make sure of this.  I haven't

                                             Page 153

1    been able to do that.

2         MR. BILLER:  All I know is she testified she

3    wasn't going to be around from August to November, and

4    then she changed her answer she was leaving on the 7th

5    and won't be back until November after I told her she

6    was going to be called to trial and be deposed on

7    subsequent case.  That's all I know.  That's the state

8    of the record.  She's running away from a subpoena.

9         MR. WILSON:  I don't think so.  I'll get you

10   the information, and then you can make your own

11   decision.

12        MR. BILLER:  Off the record.

13             (Discussion held off the record.

14        MR. BILLER:  I propose the following

15   stipulation under the laws of the State of California:

16        That the court reporter and the interpreter

17   shall be relieved of their duties under the California

18   Code of Civil Procedure; that an expedited transcript

19   shall be prepared and delivered to the witness's

20   lawyer, John Wilson.  I always I want to call you

21   "Wylde."

22        MR. WILSON:  She's Wylde.

23        MR. BILLER:  No.  She's Thomas.

24        And I'll ask that the court reporter

25   to send the transcript overnight delivery so

Page 154

1    counsel can receive it as soon as possible.  The

2    witness will have two weeks to review, approve, or make

3    any changes she deems necessary and sign the transcript

4    under penalty of perjury.

5              Mr. Wilson will then ensure that the

6    transcript -- the original transcript is returned to my

7    office via overnight mail.  If the original is lost,

8    destroyed, misplaced or damaged in any way --

9              MR. WILSON:  Or unsigned.

10             MR. BILLER:  -- or unsigned, a certified copy

11   may be used in lieu of the original.

12             MR. WILSON:  So stipulated.

13

14             (Deposition concluded at 2:38 p.m.

15             Declaration under penalty of perjury on the

16             following page hereof.)

17

18

19

20

21

22

23

24

25

Page 155

**\*\***

1

        I DO SOLEMNLY DECLARE UNDER PENALTY OF

2

PERJURY THAT THE FOLLOWING IS MY DEPOSITION UNDER OATH;

3

THAT THESE ARE THE QUESTIONS ASKED OF ME AND MY ANSWERS

4

THERETO; THAT I HAVE READ SAME AND HAVE MADE THE

5

NECESSARY CORRECTIONS, ADDITIONS, OR CHANGES TO MY

6

ANSWERS THAT I DEEM NECESSARY.

7

        IN WITNESS WHEREOF, I HEREBY SUBSCRIBE

8

MY NAME THIS_____DAY OF_____, 20\_\_\_\_\_.

9

10

                  _____

11

                  WITNESS SIGNATURE

12

13

        CERTIFICATE OF READER-INTERPRETER

14

    I, _____,

15

did translate the foregoing deposition from the

16

English language into the _____ language, reading

17

same to the deponent in his/her native tongue,

18

to the best of my ability;

19

    That all corrections and changes requested by

20

the deponent were made and initialed by the deponent;

21

    That upon completion of said reading, the

22

deponent did confirm to me that he/she had understood

23

the reading.

24

    _____

25

    READER-INTERPRETER

Page 156

## CERTIFICATION

## OF

## CERTIFIED SHORTHAND REPORTER

1

2

3

4          I, the undersigned, a Certified

5   Shorthand Reporter of the State of California do hereby

6   certify:

7          That the foregoing proceedings were

8   taken before me at the time and place herein set forth;

9   that any witnesses in the foregoing proceedings, prior

10  to testifying, were placed under oath; that a verbatim

11  record of the proceedings was made by me using machine

12  shorthand which was thereafter transcribed under my

13  direction; further, that the foregoing is an accurate

14  transcription thereof.

15          I further certify that I am neither

16  financially interested in the action nor a relative or

17  employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19  subscribed my name

20  Dated: 8/4/2017

21

22

23

24

25

Damon M. LeBlanc, CSR No. 11958

Page 157

# EXHIBIT "3"

Case 6:16-bk-15889-SY   Claim 10   Filed 01/02/17   Desc Main Document   Page 1 of

**Fill in this information to identify the case:**

Debtor 1     PDTW, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California

Case number   6:16-bk-15889-SY

## Official Form 410

# Proof of Claim
4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | Thomas Wylde, LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>c/o LAWstudios | Richard Byron Peddie, PC<br>Name<br>5051 Euclid Avenue<br>Number      Street<br>Boulder              CO        80303<br>City              State         ZIP Code<br><br>Contact phone 303.444.5447<br>Contact email  lawstudios@comcast.net | **Where should payments to the creditor be sent? (if different)**<br><br>Name _____<br>Number      Street<br>City              State         ZIP Code<br><br>Contact phone _____<br>Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _ | |
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____ / ___ / _____<br>                                                                                          MM  / DD  / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. How much is the claim? ***SEE ATTACHMENTS*** | $_____2,000,000.00____ Does this amount include interest or other charges? ☑ No ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. Contract/equity; tort claims. ***SEE ATTACHMENTS*** |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No ☐ Yes. The claim is secured by a lien on property. Nature of property: ☐ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim. ☐ Motor vehicle ☐ Other. Describe: _____ Basis for perfection: _____ Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) Value of property:                  $_____ Amount of the claim that is secured:    $_____ Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.) Amount necessary to cure any default as of the date of the petition:  $_____ Annual Interest Rate (when case was filed) _____% ☐ Fixed ☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No ☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No ☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. Check all that apply: | Amount entitled to priority |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/2/2017
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Richard Byron Peddie |
| | First name          Middle name          Last name |
| Title | President |
| Company | Lawstudios / Richard Byron Peddie, PC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 5051 Euclid Avenue |
| | Number          Street |
| | Boulder                              CO          80303 |
| | City                                 State       ZIP Code |
| Contact phone | 303.444.5447 | Email  lawstudios@comcast.net |

Case 6:16-bk-15889-SY    Claim 10    Filed 01/12/17    Desc Main Document    Page 4 of

11

**DEBTOR: PDTW, LLC**                    **CLAIMANT: THOMAS WYLDE, LLC**

***Claimant reserves the right to amend and supplement this Proof of Claim and its attachments and supporting materials. Claimant also reserves the right to setoff, in case Debtor later asserts any claim against Claimant.***

### Explanatory Note -- Basis for Claim

## I.    Introduction -- Basis of Claim

Claimant's present claim is based upon breach of contract, breach of the duty of good faith and fair dealing, and equitable theories, including unjust enrichment and similar theories under which the recipient of a financial benefit may not retain that benefit where it is inequitable to do so, even in the absence of contract. In paying Debtor's debts listed in this claim, Claimant conferred a benefit upon Debtor, which Debtor accepted. It would be inequitable to allow Debtor to keep that benefit without paying for it.

Claimant's claim is also based upon tortious conduct in which Debtor was either the tortfeasor, was the *alter ego* of the tortfeasor, or otherwise aided and abetted, was an accessory to, colluded in the commission of, or conspired to commit, actionable torts which have damaged Claimant by depriving it of the indicated sums of money, by causing it to suffer damages, or otherwise by eviscerating the value of Claimant's intellectual property, and principally its trademark -- THOMAS WYLDE.[1]

The debts listed in this claim ("Claim Debts") were, like the subject of Claimant's other claims, Debtor's debts. The Claim Debts, however, consist not of debts to suppliers or vendors, like those debts listed in the ninth Proof of Claim in this matter. *See* CLAIMS REGISTER ("CLAIMS REG.") No. 9 (Claimant's claims related to paying off Debtor's trade creditors). Nor are the Claim Debts related to debts purchased from third-parties arising after Claimant was forced to make good on a guarantee of Debtor's debts, as in Claimant's other claims. *See* CLAIMS REG. Nos. 3, 4 & 6 (Claimant's claims for acquired debts or for paying off debts under a guarantee).[2]

The Claim Debts have certain distinguishing features which will explain why they have been set apart for separate treatment. The Claim Debts were loans made by third-party lenders to Debtor that later played a role in that transaction in which Debtor's principal, Paula Thomas ("THOMAS") acquired her interest in Claimant. They were also debts that were purportedly delegated by Debtor to THOMAS and then, in a second, back-to-back, tax-motivated delegation,

---

[1] Collectively, the intellectual property will be referred to herein as the "IP"; the trademark THOMAS WYLDE, will be referred to as the "Trademark". The IP includes the Trademark.

[2] Claimant has also filed the eighth Proof of Claim in this matter, but that is an administrative claim. *See* CLAIMS REG. NO. 8 (Claimant's provisional administrative claim for paying ongoing storage costs).

Case 6:16-bk-15889-SY    Claim 10    Filed 01/03/17    Desc Main Document    Page 5 of

11

transferred to Claimant.

This last point is important for several reasons: First, the Claim Debts were indeed Debtor debts, transferred only momentarily to THOMAS for wholly artificial reasons and then immediately retransferred to Claimant. Secondly, the transaction is yet another example of conduct demonstrating that there really never was sufficient distinction between the person of THOMAS and Debtor, supporting all theories presented for imposing joint-and-several liability in this instance. Finally, the transaction itself offers a starting point for assessing the damages claimed.

## II.    The History

### A.    Claimant's Acquisition of the IP from Paula Thomas through Assumption of Certain of Debtor's Debts First Delegated to Paula Thomas and Immediately Delegated to Claimant

#### 1.    Preface: The Road to Insolvency

Debtor's approximately 10 year history of operations is complex. Debtor was never free of debt and often beleaguered with litigation. For present purposes, the facts may, however, be distilled somewhat:

By December of 2014, Debtor was inundated with debt, much of it guaranteed personally by Debtor's majority member, Paula Thomas ("THOMAS").

THOMAS variously claims to hold 100% of the equity of Debtor, or 99.5%, or 89.5%, as it may seem good to her. *See* DOCKET ("DKT.") No. 13 at p. 3 of 30 (Debtor's minutes signed by THOMAS claiming to be "sole member" of Debtor LLC); *compare with id.* at p. 25 of 30 (Debtor's Statement of Financial Affairs Item 28, indicating that Harley T. Wolitzky owns 0.5% of Debtor); *and compare with* CLAIMS REGISTER ("CLAIMS REG.") No. 5 (Jene Park ("PARK") Proof of Interest attaching THOMAS' responses to requests for admissions in state court litigation indicating that PARK is a 10% owner of Debtor).[3] *See also* Exhibit E, annexed and incorporated (excerpts from Debtor's 2013, 169 page, hard-bound confidential information memorandum) at Bates 00032 – 00037 generally, and at 00037 (p. 128; PARK listed as 10% owner).[4]

THOMAS has also filed her own personal Proof of Claim in this matter. *See* CLAIMS REG. No. 1 (THOMAS' Nov. 17, 2016 proof of claim at p. 2 — THOMAS makes a claim in an amount "[t]o be determined" and for "[m]oney loaned, [s]ervices performed, and personal

---

[3] PARK had served as Debtor's Chief Operations Officer for many years. For yet another instance in which THOMAS claims to own 100% of Debtor, *see* n. 8, *infra*, and referent text.

[4] THOMAS' cavalier treatment of the ownership structure of Debtor is just one indicator that the *alter ego* or veil-piercer remedy is available.

Case 6:16-bk-15889-SY    Claim 10    Filed 01/02/17    Desc Main Document    Page 6 of

11

property being held"). She does this notwithstanding the fact that she signed, under oath, the petition in this bankruptcy, the original schedules, and the amended schedules -- none of which lists any claim by THOMAS.[5]

In any event, by December of 2014 Debtor owed over $2M simply in loans, with other liabilities apparently of at least as much. And, at least two of these loans -- loans of over $1.6M owed to CBC Partners I, LLC, and hundreds of thousands owed to Debtor's factor, Finance One, Inc. -- were guaranteed personally by THOMAS and PARK, who had even pledged their residences as collateral these debts.

These loans were either already due or soon would be. Business was in decline, as it had been for years.[6] And, one lender was already suing over a long overdue note first issued in 2006. *See Schiffman v. PDTW et al.*, Los Angeles Superior Court No. BC513911 (Central Dist.), complaint (7/1/13) & amended complaint (3/21/2014).

The situation was untenable: Debtor and THOMAS were on the brink of losing everything. In sum, Debtor was already insolvent by that time, and its bankruptcy would have long since occurred, but for the appearance of Claimant.

### 2.    Reorganization: The Genesis of Claimant

In order to rid herself of personal liabilities, save her home, her career, and even the THOMAS WYLDE brand from certain annihilation, THOMAS agreed to a reorganization of the business ("Reorganization"). The Reorganization involved the creation of a new entity -- Claimant -- and its capitalization. The concept for the Reorganization had been under discussion for many months. Claimant had in fact been organized in mid-2014, and even started lending money to Debtor whether directly or otherwise by paying some of its debts to sustain Debtor as the Reorganization took shape. These loans benefitted Debtor and THOMAS alike. Nothing was signed, however, until Dec. 22, 2014. This will, however, explain why many of the payments one sees in the ninth Proof of Claim in this matter are from the second half of 2014.

During initial capitalization, Claimant's initial members each paid $100 per percentage point for equity ownership in Claimant. THOMAS was no different: She also paid $100 per percentage point -- thus paying in a total of $3,200.00 for a 32% stake in Claimant. But THOMAS' arrangement was unique: As part of THOMAS' deal, she was also required to assign the IP, held by her personally, to Claimant; Claimant was, in return, required to pay off certain

---

[5]  Upon information and belief, *on top of* those debts which THOMAS personally owes Debtor and which are consistently listed on Debtor's tax returns since 2010, there are *also* numerous instances in which THOMAS has caused Debtor to reclassify personal expenses as Debtor company business expense. Upon information and belief, the as-yet undiscovered amounts approach or even exceed $100K. This is yet another factor which will support *alter ego* or veil-piercer type remedies.

[6]  Upon information and belief, Debtor posted losses for 2014 of approximately $2.2M.

specified debts from amongst Debtor's debts -- the Claim Debts. *See* **Exhibit A**, annexed and incorporated -- Agreement to Purchase Membership Interest ("Agreement") at 1 ("Recital A"),(Bates 00002), at 1-2 (§ 3),(Bates 00002 - 00003),(consideration described) & at Exhibit A-3 (Claim Debts listed as: (a) an Oct. 15, 2013 balloon promissory note in favor of CBC Partners I, LLC, in the amount of $1.6M; and (b) two separate promissory notes in favor of Steven John Prestemon totaling $359,337.00 (**Bates 00008**)).[7]

### 3.   The Parties Perform the Agreement

#### a.   THOMAS Delegates the Claim Debts

Nobody disputes that THOMAS paid her $3,200.00 capital contribution; nor has anyone claimed at any time that THOMAS failed to transfer the IP to Claimant.

The means and steps by which the Claim Debts were transferred to Claimant from Debtor, however, must be understood for present purposes:

*Step One:* On Dec. 22, 2014, *Debtor* purported to delegate, and THOMAS purported to assume, liability for these debts. *See* Exhibit B at Bates 00020 (Action by Written Consent of the Members of PDTW, LLC assigning Claim Debts from Debtor to THOMAS).[8]

*Step Two:* Next, also on Dec. 22, 2014, THOMAS in turn purported to delegate, and Claimant assumed, liability from THOMAS for these debts. *See* Exhibit A at Bates 00002-00003 & 00008 (Exhibit A-3 to Agreement to Purchase Membership Interest setting forth these debts as being transferred from *THOMAS* to Claimant).

Again, since THOMAS was expected to pay $3,200.00 for her 32% membership interest in Claimant at the very same time that all other initial members were also paying $100.00 per percentage point of membership interest in Claimant, it follows that the contribution of the

---

[7] The Agreement purports to delegate the Claim Debts from *THOMAS* to Claimant. But, these were actually Debtor's debts. The back-to-back assumption and then delegation of these debts can only have been tax-motivated. For present purposes it is important to keep in mind three things:

First, neither creditor for the Claim Debts released Debtor of liability. These creditors remained free to disregard any purported delegations of the obligation to pay, and the Claim Debts remained fully enforceable against Debtor. Thus, to the outside world, the delegation was a nullity. Second, the "transfer" of liability from Debtor to THOMAS was in many ways of little significance anyway: THOMAS had already guaranteed most or all of the Claim Debts. Thus, she accepted little or no additional actual liability. And finally, obviously, Claimant's interest was in purchasing the IP: It did not care to whom it paid the indicated sum so long as it received the IP.

[8] True to form, here too THOMAS claims 100% of the ownership of Debtor by signing as "SOLE MEMBER".

intellectual property was to be offset by the debts delegated by THOMAS and assumed by Claimant in the transaction – the Claim Debts. That portion of the transaction was, as they say, "a wash" in terms of value for value, but gives us some indication of what value both THOMAS and Claimant placed upon the IP at that time. The amount paid to pay off the Claim Debts could therefore serve as one measure of the value of the IP as at Dec. 22, 2014 and so is used herein as one possible measure of damages.

### b. Claimant Pays the Claim Debts

As promised, Claimant paid the Claim Debts. *See* Exhibit B, annexed and incorporated – Bank of Manhattan bank statement for the month of December, 2014, indicating the following payments made by Claimant:

| Payee | Date | Amount | BATES-Obligation | BATES-PMT |
|---|---|---|---|---|
| Palliative/Prestemon | 12/24/14 | $8,333.33 | 000002-000003; 000008 | 000025 |
| CBC Partners I, LLC | 12/29/14 | $1,639,015.63 | 000002-000003; 000008 | 000026 |
| CBC Partners I, LLC | 12/30/14 | $3,656.25 | 000002-000003; 000008 | 000026 |
| Palliative/Prestemon | 12/31/14 | $359,336.93 | 000002-000003; 000008 | 000026 |

**TOTAL:**                              **$2,010,342.14**

## III.   The Claims

To understand Claimant's claims, one need only start from the proposition that Claimant was never in the business of giving away money, whether for Debtor's or THOMAS' benefit. From this it follows that Claimant expected something in return. As described above, Debtor and THOMAS configured this transaction in such a way as to cause the Claim Debts to travel from Debtor to THOMAS, and then, immediately thereafter, to travel from THOMAS to Claimant while she simultaneously handed Claimant the IP. In sum, it is clear that what Claimant expected was the IP if it was to pay off the Claim Debts.

In a nutshell, these claims are based upon Claimant's assertion that it did not receive what it reasonably expected and should have received, that it was deprived of the benefit of the bargain, and that Debtor is either directly liable or may be held liable under theories supporting the joint-and-several liability of Debtor and THOMAS together. Such theories include, but are not limited to, *alter ego*/veil-piercer, reverse veil-piercer, civil conspiracy, collusion, aiding and abetting, and accessory liability.

### A.   Contract/Quasi-Contract & Equitable Theories

Claimants contract and contract-related claims are not difficult to understand. Under a straight duty of good faith and fair dealing-type analysis, it is implicit in every contract that a party to a contract may not do something to deprive the other party of the benefit of the contract. *Ladd v. Warner Bros. Entm't., Inc.*, 184 Cal.App.4th 1298, 1306, 110 Cal.Rptr.3d 74, 81 (Cal.

App. 2010). THOMAS and Debtor have so conducted themselves as to deprive Claimant of the value, or much of the value, of the IP. While they have collaborated to transfer, in name at least, the IP to Claimant, they have thereafter done everything possible to undermine the value of that IP.

Apart from bringing utterly meritless litigation against Claimant and its principals in the Los Angeles Superior Court in an attempt to hamstring Claimant with a nuisance suit, Debtor and Claimant have set about to eviscerate the IP — and principally the Trademark — of its value.

Here is one way in which Debtor and THOMAS have done this: Perversely, after selling the IP and the Trademark to Claimant, Debtor and THOMAS have undertaken a campaign to tell the world that there is and can be no THOMAS WYLDE without THOMAS. While THOMAS will be heard to argue that she has merely told her friends and associates that she is no longer affiliated with Claimant — essentially claiming truth as a defense — this is far, far from an accurate description of her conduct: THOMAS has turned herself into a megaphone of sorts, broadcasting her dissociation from Claimant in the most graphic ways possible, at all times implying that Claimant, having the Trademark, really has *nothing* because THOMAS is not there. *See* Exhibit D, annexed and incorporated (THOMAS' social media broadcast of copyrighted images belonging to Claimant and forming part of its advertising campaign but with, superimposed in gigantic, red lettering, the word "NOT" over the image, accompanied with THOMAS' message to "all [her] industry associates [that she is] no longer Thomas Wylde")(Bates 00029 - 00031).

The reader will forgive this author if he states something fairly obvious: Anyone who claims that the value behind a trademark is inseparable from the person making the claim necessarily admits that she has nothing to sell: It is either fraudulent to make such a claim, or, if the claim is true, fraudulent to sell the mark.

In other respects there is every indication that Debtor, colluding and conspiring with THOMAS, and as her *alter ego*, has acted to harm Claimant and to deprive it of the value of the Trademark. Longtime customers have suddenly and mysteriously severed relationships; one even returned an order of goods without explanation; Claimant has even lost one of its largest markets — the entire country of Russia — apparently because of what Debtor and THOMAS have done in suggesting that there can be no THOMAS WYLDE without THOMAS. In sum, Debtor and THOMAS have undertaken a campaign to harm Claimant by depriving it of the benefit of that which it purchased.

One could also examine this under third-party beneficiary law. Assuming, *arguendo*, that Debtor is a third-party beneficiary of the Agreement,[9] with Claimant as promisor and THOMAS

---

[9] It is worth noting that no part of the Agreement explicitly makes Debtor -- or any of Debtor's creditors -- a third party beneficiary. Even those portions of the Agreement which may be considered as standalone agreements -- whether to deploy funds in specified ways, or to indemnify THOMAS -- are devoid of any third-party beneficiary language and contain rights solely for THOMAS' benefit. *See* Bates 00011 - 00014 & 00015 - 00018 ("Use of Proceeds

11

as promisee, Debtor is still liable to Claimant to return some or all of the benefit of what it received, if THOMAS, as promisee, has breached the contract.[10] The same holds true under an unjust enrichment analysis.[11]

### B.    Tort Theories

Under the same facts, any number of tort theories support this claim: including breach of contract; intentional interference with contractual relations; intentional interference with prospective contractual relations; federal and state unfair competition (Lanham Act; BUS. & PROF. CODE § 17200 et seq.; etc.); commercial disparagement; etc. Imposition of joint-and-several liability here too will be appropriate and for the same reasons.

### IV.    Amount of Claim

Claimant has inserted the amount of $2M for this claim. This is an estimate.

Under the contract theories, one measure of damages would be the difference between what Claimant bargained for and what it received. Or, to put it differently, Debtor would theoretically be able to retain the value of what THOMAS actually conveyed after consideration of breaches committed by her and/or Debtor, but required to disgorge the rest. An informal estimate places the current value of the mark at no more than $500K. If the mark was worth $2,010,342.14 as at December 22, 2014 — as indicated by the amount paid for it on that date — damages under this theory would be approximately $1.5M.

---

Agreement" and Indemnity Agreement", respectively). But if Debtor is not a third-party beneficiary, the analysis still holds: The only difference is that if debtor is *not* a third-party beneficiary it had absolutely no rights under the Agreement.

[10]    See, e.g., CORBIN ON CONTRACTS § 818 ("The claim of a beneficiary is dependent upon the validity of the contract that creates it. If that contract is void, voidable, or unenforceable, his claim is likewise affected. . . ."); see also RESTATEMENT 2D - CONTRACTS § 309 (". . . (2) If a contract ceases to be binding in whole or in part because of . . . non-occurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified. . . . (4) A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement.").

[11]    See, e.g., Hartford Cas. Ins. Co. v. J.R. Mktg., LLC, 61 Cal.4th 988, 998, 353 P.3d 319, 326, 190 Cal.Rptr.3d 599, 607 (2015)("An individual who has been unjustly enriched at the expense of another may be required to make restitution. (See Ghirardo v. Antonioli (1996) 14 Cal.4th 39, 51; see REST.3D RESTITUTION AND UNJUST ENRICHMENT, § 1; 1 WITKIN, SUMMARY OF CAL. LAW (10th ed. 2005) CONTRACTS, § 1013, p. 1102.) Where the doctrine applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty. . . . Though this restitutionary obligation is often described as quasi-contractual, a privity of relationship between the parties is not necessarily required. . . . ")(some cites omitted).

11

Under tort theories, Claimant will be entitled not only to the amount by which Debtor and THOMAS have damaged the Trademark and its associated goodwill; it will also be entitled to other forms of damages, including lost profits. A conservative estimate of such damages at this point in time supports the indicated amount of $2M.

# Exhibit A

POC00001

# AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Paula Thomas, an Individual ("Purchaser"), effective December 22, 2014 (the "Effective Date").

## RECITALS

A.      Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). Other than as set forth herein, all Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, and Doug Lee (the "Members").

B.      Purchaser seeks to invest $3,200 and certain assets and liabilities into Seller in exchange for 64 membership Units in the Seller.

C.      Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.      Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, a 64 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.  Instruments of Conveyance. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.  Consideration. In consideration for the Membership Interest, Purchaser shall make a capital

Membership Purchase Agreement                                                       Page 1

POC00002

Case 6:16-bk-15889-SY    Claim 10 Part 2    Filed 01/02/17    Desc Exhibit A-D    Page
3 of 31

contribution to Seller in the amount of Three Thousand Two Dollars ($3,200) and shall transfer to Seller those assets and liabilities set forth on Exhibit "A" hereto.

4.  <u>Purchaser Representations and Warranties</u>. Purchaser represents and warrants to Seller as follows:

  a.      This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

  b.      Purchaser is acquiring the Membership Interest for her own account, for investment purposes, and not with a view to the distribution thereof.

  c.      Purchaser has firsthand knowledge of the business and affairs of Seller, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

5.  <u>Seller Representations and Warranties</u>. Seller represents and warrants to Purchaser as follows:

  a.      Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

  b.      Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

  c.      Seller has received fair equivalent value under the terms of this Agreement.

  d.      Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

  e.      The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

  f.      Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

  g.      Subsequent to the purchase contemplated hereby, the fully diluted capitalization of Company is as set forth in Exhibit "B" to the Amended Agreement (defined below).

Membership Purchase Agreement                                                          Page 2

POC00003

6. <u>Conditions Precedent</u>. Purchaser's obligations hereunder are conditioned upon:

    a.    The Company and the Members' execution and delivery of that certain Amended and Restated Operating Agreement of Company in the form attached as Exhibit "B" hereto ("Amended Agreement");

    b.    The Members' execution and delivery of that certain Clawback Agreement in the form attached as Exhibit "C" hereto;

    c.    Hillshore Investments funding of a Two Million Dollar ($2,000,000) loan to the Company;

    d.    The Company's use of the proceeds of such loan in the manner set forth in that certain Use Of Proceeds Agreement in the form attached as Exhibit "D" hereto (a fully executed copy of which must be delivered to Purchaser);

    e.    The Company and the Members' execution and delivery of that certain Indemnity Agreement in the form attached as Exhibit "E"; and

    f.    The Company's execution and delivery of an employment agreement for Paula in a form mutually agreed to by the parties.

7. <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8. <u>Necessary Actions</u>. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9. <u>Waiver And Amendment</u>. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10. <u>Entire Agreement</u>. This Agreement and the exhibits hereto constitute the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11. <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12. <u>Governing Law And Venue</u>. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's

Membership Purchase Agreement                                                     Page 3

fees

13. <u>Drafting</u>.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

14. <u>Counterparts</u>.  This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC

_____
John Hanna, Manager

_____
Paula Thomas

82016-00001 (2315543 2

POC000005

## Exhibit "A" to Agreement to Purchase Membership Interest

### List of Asset Being Transferred from Paula Thomas to Thomas Wylde, LLC

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, or any other rights therein but specifically excluding Paula Thomas' name, image, likeness, biography and moral rights ("IP"). The IP includes the following:

### TRADEMARKS

| Mark | Serial No./ Reg. No. | Status |
|------|----------------------|--------|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |

POC00006

## COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

Agreement to Purchase Membership Interest

Exhibit A-2

64016.00001/2311643.2

POC00007

## List of Liabilities Being Transferred from Paula Thomas to Thomas Wylde, LLC

Secured Promissory Note executed by PDTW, LLC in favor of CBC Partners I, LLC, dated October 15, 2013 in the amount of $1,600,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

POC00008

## Exhibit "B"

## Amended And Restated Operating Agreement

POC00008

Case 6:16-bk-15889-SY    Claim 11 Part 2    Filed 01/02/17    Desc Exhibit A-D    P.
10 of 31

## Exhibit "C"

### Clawback Agreement

# Exhibit "D"

## Use Of Proceeds Agreement

Case 6:16-bk-15889-SY   Claim 10 Part 2   Filed 01/02/17   Desc Exhibits A-D   Page
12 of 31

## USE OF PROCEEDS AGREEMENT

This Use of Proceeds Agreement (the "Agreement") is entered into by and between Thomas Wylde, LLC ("Company"), the undersigned members of the Company ("Members") and Paula Thomas ("Paula"), effective December 22, 2014 (the "Effective Date").

### RECITALS

A.     Prior to or contemporaneous with this Agreement, has received a loan to the Company from Hillshore Investments in the amount of two million dollars ($2,000,000).

B.     Prior to or contemporaneous with this Agreement, Paula has made a capital contribution to Company of cash and intellectual property.

C.     As a material inducement to Paula to make such capital contribution, the Company and Members agree to use the proceeds of the loan referenced in Recital A ("Loan") as set forth herein.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Use of Proceeds. On or before December 31, 2014, the proceeds of the Loan shall be used to repay in full all amounts owing or potentially to become owing by PDTW LLC to: (a) CBC Partners I, LLC and/or its affiliates, (b) Da Da Trading Co., Ltd and/or its affiliates, (c) Finance 1 and/or its affiliates, (d) and Steven John Prestemon and/or his affiliates. Until all such obligations are paid in full and terminated or amended such that Paula shall have no personal guaranty or liability thereunder, the proceeds of the Loan or other monies provided to or invested in the Company by Investor shall not be used for any other purpose than items (a) through (e) above.

2.     Consent and Authorization. The parties hereby consent to and authorize the Company and direct the Manager to use the proceeds of the Loan solely as set forth in Section 1 above. The parties acknowledge and consent to Paula's termination and withdrawal of all personal guarantees given by her to the parties references in Section 1 above.

3.     Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

4.     Necessary Actions. Each party shall execute and deliver any documents or instruments and take any action reasonably required to effectuate the transaction contemplated by this Agreement.

5.     Waiver and Amendment. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

6.     Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

7.     Severability. If any provision of this Agreement is held to be illegal or invalid by a court of

POC00012

Case 6:16-bk-15889-SY   Claim 10 Part 2   Filed 01/02/17   Desc Exhibits A-D   Page
13 of 31

competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8.      Governing Law And Venue. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.      Drafting. All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

10.     Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

_____          THOMAS WYLDE, LLC

_____          _____
John Hanna                                John Hanna, Manager

_____          _____
Jene Park                                 Doug Lee

_____          _____
Roger Kuo                                 Paula Thomas

nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8.    Governing Law And Venue. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.    Drafting. All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

10.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

THOMAS WYLDE, LLC

_____    _____
John Hanna    John Hanna, Manager

_____    _____
Jene Park    Doug Lee

_____    _____
Roger Kuo    Paula Thomas

POC00014

# Exhibit "E"

## Indemnity Agreement

POC00015

Case 6:16-bk-15889-SY    Claim 10 Part 2    Filed 01/09/17    Desc Exhibits A-D    Page
16 of 31

# INDEMNITY AGREEMENT

This Indemnity Agreement (the "Agreement") is entered into by and between Thomas Wylde, LLC ("Company"), the undersigned members of the Company ("Members") and Paula Thomas ("Paula"), effective December 22, 2014 (the "Effective Date").

## RECITALS

A.      Prior to or contemporaneous with this Agreement, Paula has made a capital contribution to Company of cash and intellectual property.

B.      As a material inducement to Paula to make such capital contribution, the Company agrees indemnify Paula and hold her harmless from any personal liability for certain obligations of PDTW, LLC.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Indemnity. Company agrees to indemnify, defend, and hold Paula harmless from and against any personal liability arising from or related to: (a) any loans from CBC Partners I, LLC and/or its affiliates to PDTW, (b) any advances or terms provided to PDTW by Da Da Trading Co., Ltd and/or its affiliates, (c) any advances by Finance 1 and/or its affiliates to PDTW, (d) any loans to PDTW from Steven John Prestemon and/or his affiliates, (e) any obligations under the lease agreement between LCCP Blackwelder Fee Owner LLC, as amended, for the space commonly known as 3237 La Cienega Blvd. and 3233 La Cienega Blvd. (the "Lease") and those arising out of or related thereto, and (f) any obligations of PDTW LLC to its employees and trade vendors incurred as of the date of this Agreement.

2.      Lease Assignment. It is the intention of the parties to attempt to negotiate an assignment of the Lease from PDTW to the Company. Company agrees to make reasonable and good faith efforts to obtain such as assignment. If such assignment is not possible due to the landlord's actions, then Company shall attempt to sublease the premises from PDTW for the sum of all payments that PDTW is required to make under the Lease.

3.      Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

4.      Necessary Actions. Each party shall execute and deliver any documents or instruments and take any action reasonably required to effectuate the transaction contemplated by this Agreement.

5.      Waiver and Amendment. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

6.      Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

7.      Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision,

POC00016

nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8.    Governing Law And Venue. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.    Drafting. All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement.

10.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

_____          THOMAS WYLDE, LLC

_____          _____
John Hanna                                John Hanna, Manager

_____          _____
Jene Park                                 Doug Lee

_____          _____
Roger Kuo                                 Paula Thomas

POC00017

competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8.    **Governing Law And Venue.** This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.    **Drafting.** All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

10.    **Counterparts.** This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

THOMAS WYLDE, LLC

| John Hanna | John Hanna, Manager |
| --- | --- |
| Jene Park | Doug Lee |
| Roger Kuo | Paula Thomas |

POC00018

# Exhibit B

POC00019

## ACTION BY WRITTEN CONSENT
## OF THE MEMBERS OF PDTW, LLC

The undersigned, Paula Thomas (the "Sole Member"), the sole member of PDTW, LLC, a California limited liability company (the "Company"), in accordance with the California Revised Uniform Limited Liability Company Act and the Operating Agreement of the Company does hereby take the following actions and adopts the following resolutions without a meeting with the intention that such actions will have the same force and effect as if a meeting was duly called and held:

WHEREAS, the Sole Member has agreed to accept an assignment of certain of the company's liabilities.

WHEREAS, the Sole Member has determined it to be in the best interest of the Company to transfer those liabilities to the Sole Member.

NOW, THEREFORE, IT IS RESOLVED that the following liabilities held by the Company are hereby transferred and assigned to Paula Thomas individually:

Secured Promissory Note executed by PDTW, LLC in favor of GBC Partners I, LLC, dated October 15, 2013 in the amount of $1,625,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,387

RESOLVED, FURTHER, that the Company be and it hereby is authorized, empowered, and directed to take such further action as it deems necessary to effectuate the foregoing resolutions.

RESOLVED, FURTHER, that the Company shall obtain any consents, from the Note holders or otherwise, to authorize the transfer of the foregoing liabilities to Paula Thomas.

This Consent shall be effective for all purposes on December 22, 2014.

SOLE MEMBER:

_____
Paula Thomas

# Exhibit C



POC00021



**BANK** *of* **MANHATTAN**

Last statement: November 30, 2014
This statement: December 31, 2014
Total days in statement period: 31

Page 1 of 7

(27)

Direct inquiries to:
310 606-8020

THOMAS WYLDE, LLC
3231 S LA CIENEGA BLVD
LOS ANGELES CA 90016-3112

Bank Of Manhattan
2141 Rosecrans Ave, Suite 1100
El Segundo, CA 90245

## Simple Business Checking

| | | | |
|---|---|---|---|
| Account number | | Beginning balance | $141,058.01 |
| Enclosures | 27 | Total additions | 2,591,283.00 |
| Low balance | $12,394.58 | Total subtractions | 2,477,748.22 |
| Average balance | $1,047,092.70 | Ending balance | $254,592.79 |
| Avg collected balance | $1,047,092 | | |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 162 | 12-03 | 2,500.00 | 201 * | 12-31 | 250.00 |
| 163 | 12-17 | 18,500.00 | 207 * | 12-29 | 500.00 |
| 177 * | 12-16 | 21,500.00 | 208 | 12-30 | 6,000.00 |
| 179 * | 12-02 | 540.00 | 209 | 12-30 | 6,000.00 |
| 180 | 12-09 | 8,000.00 | 210 | 12-26 | 408.44 |
| 181 | 12-08 | 1,067.84 | 211 | 12-29 | 395.42 |
| 183 * | 12-09 | 6,628.47 | 212 | 12-26 | 80.00 |
| 184 | 12-02 | 1,200.00 | 213 | 12-26 | 168.00 |
| 185 | 12-12 | 30,000.00 | 218 * | 12-26 | 98.00 |
| 189 * | 12-31 | 2,000.00 | 219 | 12-26 | 98.00 |
| 190 | 12-30 | 900.00 | 220 | 12-24 | 98.00 |
| 191 | 12-29 | 5,000.00 | 221 | 12-24 | 98.00 |
| 193 * | 12-23 | 250.00 | 223 * | 12-26 | 98.00 |
| 198 * | 12-31 | 250.00 | * Skip in check sequence | | |

### DEBITS

| Date | Description | | Subtractions |
|---|---|---|---|
| 12-02 | Preauthorized Wd | | 578.54 |
| | ALLEN DELTA | 141202 | |
| 12-03 | Wire-Out Internatl | | 2,520.55 |
| | OUTGOING WIRE TO EVERNEX | | |
| 12-03 | Service Charge | | 40.00 |
| | WIRE-OUT INTERNATL | | |

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION

**THOMAS WYLDE, LLC**
December 31, 2014

Page 2 of 7

| Date | Description | Subtractions |
|------|-------------|-------------:|
| 12-03 | Wire-Out Internatl | 5,000.00 |
| | OUTGOING WIRE TO MK ACCESSORY | |
| 12-03 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-03 | Wire-Out Internatl | 6,067.16 |
| | OUTGOING WIRE TO SUN MOON TEXTILES CO | |
| 12-03 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-03 | Wire-Out Internatl | 12,994.29 |
| | OUTGOING WIRE TO 20000LIEUX | |
| 12-03 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-03 | Wire-Out Internatl | 35,000.00 |
| | OUTGOING WIRE TO CHIFENG SHENGLUN CASHMERE PRODUCTS | |
| 12-03 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-03 | Preauthorized Wd | 6,907.55 |
| | WELLPOINT INC CORP PYMN 141202 | |
| 12-04 | POS Purchase | 131.18 |
| | MERCHANT PURCHASE TERMINAL 469216 MAKOTO | |
| | BAL RANBO FL XXXXXXXXXXXXX8107 | |
| 12-04 | Preauthorized Wd | 0.65 |
| | Payroll PAYROLL 141204 | |
| 12-05 | POS Purchase | 20.00 |
| | MERCHANT PURCHASE TERMINAL 470790 MANGO S TROPICAL G | |
| | AFE IM MIAMI BEA FL XXXXXXXXXXXXX8107 | |
| 12-05 | POS Purchase | 78.54 |
| | MERCHANT PURCHASE TERMINAL 470790 MANGO S TROPICAL G | |
| | AFE IM MIAMI BEA FL XXXXXXXXXXXXX8107 | |
| 12-08 | POS Purchase | 10.87 |
| | MERCHANT PURCHASE TERMINAL 444600 NORDSTROM 0774 | |
| | AVENTURA FL XXXXXXXXXXXXX8107 | |
| 12-08 | POS Purchase | 63.13 |
| | MERCHANT PURCHASE TERMINAL 442733 NAVARRO DISCOUNT P | |
| | HARM SUNNY ISL FL XXXXXXXXXXXXX8107 | |
| 12-08 | Preauthorized Wd | 43.75 |
| | TSYS EBES SEP 141208 | |
| 12-09 | Service Charge | 10.00 |
| | WIRE-IN DOMESTIC | |
| 12-09 | POS Purchase | 3.50 |
| | MERCHANT PURCHASE TERMINAL 471705 VIRGIN AMERICA | |
| | BURLINGAM CA XXXXXXXXXXXXX8107 | |
| 12-09 | POS Purchase | 6.00 |
| | MERCHANT PURCHASE TERMINAL 471705 VIRGIN AMERICA | |
| | BURLINGAM CA XXXXXXXXXXXXX8107 | |

POC00028

**THOMAS WYLDE, LLC**
December 81, 2014

| Date | Description | Subtractions |
|------|-------------|--------------|
| 12-09 | Preauthorized Wd | 67,969.35 |
| | AMEX EPayment ACH PMT 141209 | |
| 12-10 | POS Purchase | 17,80 |
| | MERCHANT PURCHASE TERMINAL 469216 STARBUCKS 14412 L | |
| | OS ANGLos Angel CAXXXXXXXXXXXXX5107 | |
| 12-10 | POS Purchase | 25.81 |
| | MERCHANT PURCHASE TERMINAL 407106 GABYS PHD | |
| | CULVER CI CAXXXXXXXXXXXXX5107 | |
| 12-10 | POS Purchase | 64.02 |
| | MERCHANT PURCHASE TERMINAL 469948 INDEPENDENT TAXI L | |
| | A LOS ANGEL CAXXXXXXXXXXXXX5107 | |
| 12-11 | Service Charge | 10.00 |
| | WIRE-IN DOMESTIC | |
| 12-12 | Service Charge | 10.00 |
| | WIRE-IN DOMESTIC | |
| 12-12 | Wire-Out Business | 5,000.00 |
| | OUTGOING WIRE TO EZEQUEL A JAY | |
| 12-12 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-15 | Wire-Out Business | 100,000.00 |
| | OUTGOING WIRE TO PDTW LLC | |
| 12-15 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-15 | POS Purchase | 20.95 |
| | MERCHANT PURCHASE TERMINAL 469216 GOGOAIR.COM | |
| | 877 350 0 IL XXXXXXXXXXXXX5107 | |
| 12-16 | Wire-Out Business | 5,000.00 |
| | OUTGOING WIRE TO EZEQUEL A JAY | |
| 12-16 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-16 | Wire-Out Internatl | 13,328.53 |
| | OUTGOING WIRE TO MARIO BELLUCCI | |
| 12-16 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-16 | Wire-Out Internatl | 17,284.00 |
| | OUTGOING WIRE TO SUN MOON TEXTILES CO | |
| 12-16 | Service Charge | 40.00 |
| | WIRE-OUT INTERNATL | |
| 12-16 | POS Purchase | 55.10 |
| | MERCHANT PURCHASE TERMINAL 469216 STARBUCKS 14412 L | |
| | OS ANGLos Angel CAXXXXXXXXXXXXX5107 | |
| 12-17 | Service Charge | 10.00 |
| | WIRE-IN DOMESTIC | |
| 12-17 | POS Purchase | 27.78 |
| | MERCHANT PURCHASE TERMINAL 407106 GABYS PHD | |
| | CULVER CI CA XXXXXXXXXXXXX5107 | |

POC00024

**THOMAS WYLDE, LLC**
December 31, 2014                                    Page 4 of 7

| Date | Description | Subtractions |
|------|-------------|-------------|
| 12-17 | Preauthorized Wd<br>TSYS FEES SEP 141217 | 184.49 |
| 12-18 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 469216 STARBUCKS 14419 L<br>OS ANGLes Angel CA XXXXXXXXXXXX8107 | 14.00 |
| 12-19 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 478542 CITY OF B H PARKIN<br>G METEBEVERLY H CA XXXXXXXXXXXX8107 | 5.00 |
| 12-19 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 423186 TASCHEN<br>BEVERLY H CA XXXXXXXXXXXX8107 | 66.89 |
| 12-19 | Preauthorized Wd<br>TSYS FEES SEP 141219 | 259.71 |
| 12-22 | Wire-Out Internatl<br>OUTGOING WIRE TO JJ AND COLLECTION | 954.35 |
| 12-22 | Service Charge<br>WIRE OUT INTERNATL | 40.00 |
| 12-22 | Wire-Out Internatl<br>OUTGOING WIRE TO MASTER AIR | 3,266.43 |
| 12-22 | Service Charge<br>WIRE-OUT INTERNATL | 40.00 |
| 12-22 | Wire-Out Internatl<br>OUTGOING WIRE TO MK ACCESSORY | 10,846.00 |
| 12-22 | Service Charge<br>WIRE-OUT INTERNATL | 40.00 |
| 12-22 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 469216 STARBUCKS 00871 B<br>EVERLYBeverly H CA XXXXXXXXXXXX8107 | 10.95 |
| 12-22 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 478801 CRAIG S<br>WEST HOLL CA XXXXXXXXXXXX8107 | 34.34 |
| 12-22 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 424760 CECCONIS<br>WEST HOLL CA XXXXXXXXXXXX8107 | 230.75 |
| 12-22 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 469216 NESPRESSO USA INO<br>BEVERLY H CA XXXXXXXXXXXX8107 | 386.41 |
| 12-23 | Wire-Out Internatl<br>OUTGOING WIRE TO SUN MOON TEXTILE CO. | 22,748.61 |
| 12-23 | Service Charge<br>WIRE-OUT INTERNATL | 40.00 |
| 12-23 | POS Purchase<br>MERCHANT PURCHASE TERMINAL 423443 HOTEL BEL AIR FOOD<br>LOS ANGEL CA XXXXXXXXXXXX8107 | 1,376.11 |
| 12-24 | Wire-Out Business<br>OUTGOING WIRE TO PALLIATIVE LLC | 8,388.33 |

POC00025

**THOMAS WYLDE, LLC**
December 31, 2014

Page 5 of 7

| Date | Description | Subtractions |
|------|-------------|--------------|
| 12-24 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-24 | Wire-Out Business | 25,877.68 |
| | OUTGOING WIRE TO HI FASHION LLC | |
| 12-24 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-24 | POS Purchase | 75.00 |
| | MERCHANT PURCHASE TERMINAL 471706 VIRGIN AMER #04260 | |
| | 875538LOS ANGEL CAXXXXXXXXXXXXXS107 | |
| 12-24 | Preauthorized Wd | 579.64 |
| | ALLIED DELTA 141224 | |
| 12-24 | Preauthorized Wd | 4,120.17 |
| | ANTHEM BLUE 1010 CORP PYMT 141224 | |
| 12-26 | POS Purchase | 4.00 |
| | MERCHANT PURCHASE TERMINAL 489216 SMARTE CARTE | |
| | ST PAUL MN XXXXXXXXXXXXXS107 | |
| 12-29 | Wire-Out Business | 1,639,015.63 |
| | OUTGOING WIRE TO CBC PARTNERS I LLC | |
| 12-29 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-29 | POS Purchase | 636.43 |
| | MERCHANT PURCHASE TERMINAL 489216 VZWRLSS IVR VW | |
| | 800 922 0 NJ XXXXXXXXXXXXS107 | |
| 12-30 | Wire-Out Business | 3,656.25 |
| | OUTGOING WIRE TO CBC PARTNERS I LLC | |
| 12-30 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-30 | Preauthorized Wd | 0.07 |
| | INTUIT PAYROLL S QUICKBOOKS 141230 | |
| 12-30 | Preauthorized Wd | 0.65 |
| | INTUIT PAYROLL S QUICKBOOKS 141230 | |
| 12-31 | Wire-Out Business | 2,017.08 |
| | OUTGOING WIRE TO ANNA ZUYEVA | |
| 12-31 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-31 | Wire-Out Business | 359,335.93 |
| | OUTGOING WIRE TO STEVE PRESTEMON | |
| 12-31 | Service Charge | 25.00 |
| | WIRE-OUT BUSINESS | |
| 12-31 | Preauthorized Wd | 4.84 |
| | JSYS FEES SEP 141231 | |

POQ00026

**THOMAS WYLDE, LLC**
**December 31, 2014**

Page 6 of 7

| Date | Description | Subtractions |
|---|---|---|
| 12-31 | Preauthorized Wd | 7.95 |
| | AMERICAN EXPRESS COLLECTION 141231 | |
| 12-31 | Preauthorized Wd | 53.41 |
| | Intuit Payroll 141231 | |

**CREDITS**

| Date | Description | Additions |
|---|---|---|
| 12-03 | Preauthorized Credit | 0.01 |
| | TSYS PYMT PROC 141203 | |
| 12-05 | Preauthorized Credit | 0.65 |
| | Payout Credit 141205 | |
| 12-06 | Preauthorized Credit | 1,488.50 |
| | AMERICAN EXPRESS SETTLEMENT 141208 | |
| 12-08 | Preauthorized Credit | 1,499.99 |
| | TSYS PYMT PROC 141208 | |
| 12-09 | Wire-IN Domestic | 22,038.00 |
| | WIRE IN PDTW LLC | |
| 12-11 | Wire-IN Domestic | 44,595.87 |
| | WIRE IN PDTW LLC | |
| 12-12 | Wire-IN Domestic | 500,000.00 |
| | WIRE IN HILLSHORE INVESTMENTS SA | |
| 12-17 | Wire-IN Domestic | 2,000,000.00 |
| | WIRE IN HILLSHORE INVESTMENTS SA | |
| 12-17 | Preauthorized Credit | 6,117.00 |
| | TSYS PYMT PROC 141217 | |
| 12-18 | Preauthorized Credit | 3,460.00 |
| | AMERICAN EXPRESS SETTLEMENT 141218 | |
| 12-19 | Preauthorized Credit | 11,401.50 |
| | TSYS PYMT PROC 141219 | |
| 12-31 | Preauthorized Credit | 700.00 |
| | TSYS PYMT PROC 141231 | |

**DAILY BALANCES**

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11-30 | 141,058.01 | 12-03 | 89,960.99 | 12-05 | 89,731.17 |
| 12-02 | 138,738.47 | 12-04 | 89,826.18 | 12-08 | 70,082.41 |

POC00027

**THOMAS WYLDE, LLC**
December 31, 2014

Page 7 of 7

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 12-09 | 12,502.06 | 12-17 | 2,344,012.28 | 12-26 | 2,280,016.69 |
| 12-10 | 12,394.56 | 12-18 | 2,347,458.23 | 12-29 | 634,446.21 |
| 12-11 | 58,991.03 | 12-19 | 2,358,621.63 | 12-30 | 617,863.00 |
| 12-12 | 521,946.03 | 12-22 | 2,342,670.42 | 12-31 | 254,592.79 |
| 12-15 | 421,900.08 | 12-23 | 2,315,258.70 | | |
| 12-16 | 354,617.48 | 12-24 | 2,280,931.13 | | |

**OVERDRAFT/RETURN ITEM FEES**

| | Total for this period | Total year-to-date |
|------|------|------|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

*Thank you for banking with Bank Of Manhattan*

POG00028

# Exhibit D

POC00029

Case 6:16-bk-15889-SY   Claim 11 Part 2   Filed 07/10/17   Desc Exhibits A-D   Page
30 of 31

●●●●○ DIGICEL F  3G    21:31        ☀ ⊕ 89 % ▮▮▮ ▯



**stephaniepeers**
Fiskebäckil ›

gharri 🌹

IL Y A 4 HEURES · AFFICHER LA TRADUCTION



**misspaulathomas**           ...





POC00030

●●●●○ DIGICEL F  3G    21:32         ⊘ 88 %▭

 **misspaulathomas**                    •••





♡ ○ ⤳

♥ **26 J'aime**

**misspaulathomas** I would like to announce
for the record – THIS IS NOT MY WORK – for
all of my industry associates I am no longer
Thomas Wylde

**katemcgurgancameron** I saw that !!!!

**mattrprt** There is NO Thomas wylde without
you. Fuck this imposter shit.

IL Y A 4 HEURES · AFFICHER LA TRADUCTION

        

POC00031

# Exhibit E

POC00032



THOMAS WYLDE

Scanned by CamScanner



Scanned by CamScanner

POC00034



Scanned by CamScanner

Scanned by CamScanner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

1                          **PROOF OF SERVICE OF DOCUMENT**

2   I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

3   A true and correct copy of the foregoing document entitled (specify): **OBJECTION TO PROOF OF CLAIM 10; DECLARATIONS OF PAULA THOMAS AND IN SUPPORT THEREOF** will be served or was served **(a)** on the

4   judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

5   **1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the

6   document. On *(date)* _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email

7   addresses stated below:

8

9                            ☐   Service information continued on attached page

  **2. SERVED BY UNITED STATES MAIL:**

10   On *(date)* **12/29/2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first

11   class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

12

| Chapter 7 Trustee | Attorney for Chapter 7 Trustee | U.S. Trustee (RS) |
|---|---|---|
| Larry D. Simons | Nancy H Zamora | United States Trustee |
| 7121 Magnolia Avenue | Zamora & Hoffmeier | 3801 University Avenue, |
| Riverside, CA 92504 | 633 W 5th St, Ste 2600 | Suite 720 |
| | Los Angeles, CA 90071 | Riverside, CA 92501-3200 |

15

16                           ☒   Service information continued on attached page

  **3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

17   (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)* _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for

18   those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later

19   than 24 hours after the document is filed.

20

21                           ☐   Service information continued on attached page

  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

22

23

24   **03/13/2017**       **Imelda Bynog**
  *Date*              *Printed Name*                    *Signature*

25

26

27

28

F:\WP51\OA\SES\PDTW\Objection TW Proof of Claim.docx

1

## SERVICE LIST (CONTINUED)

2   Richard Byron Peddie, Esq.
    Richard Byron Peddie, P.C.
3   5051 Euclid Avenue
    Boulder, CO  80303-2831

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION TO PROOF OF CLAIM OF