# EXHIBIT "1"

Page 80

1  Richard Byron Peddie, SBN 193770
   lawstudios@comcast.net
2  Lawstudios | Richard Byron Peddie, P.C.
   5051 Euclid Avenue
3  Boulder, CO 80303-2831
   Tel.: 303.444.5447
4  Fax: 720.222.4766
   *Attorney for Thomas Wylde, LLC*
5

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **RIVERSIDE DIVISION**

11  In re                          | Case No.: 6:16-bk-15889-SY

12  PDTW, LLC,                      | **SUPPLEMENTAL DECLARATION OF**
                                    | **DAVID SCHNIDER**
13       Debtor.
                                    | Hon. Scott H. Yun
14
                                    | DATE: Feb. 14, 2018
15                                  | TIME: 10:00 a.m.
                                    | COURTROOM.: 302
16

17         **SUPPLEMENTAL DECLARATION OF DAVID SCHNIDER**

   I, DAVID SCHNIDER declare, upon my oath and under penalty of perjury, that if called to
18
   testify, I could and would testify as follows:
19
   1.      My name is DAVID SCHNIDER.  I submit this declaration in connection with Thomas
20
           Wylde, LLC's Opposition to Paula Thomas' Objection to Proof of Claim [Claim No.
21
           9]("Opposition")..
22
   2.      I was PDTW, LLC's ("Debtor") general counsel and am now TW's general counsel. In
23
           that position, I was and am familiar with certain loans taken out by Debtor as well as
24
           Debtor's internal documents..
25
   3.      I have reviewed the exhibits prepared for the Opposition.
26
   4.      **Exhibit A** to the Opposition contains a true and correct copy of that Dec. 22, 2014
27
           Agreement to Purchase Membership Interest ("APMI"), as well as its associated Use of
28
           Proceeds Agreement, executed by Paula Thomas, on the one hand, and TW, on the other

                                    1

**OPPOSITION EXHIBITS 000058 DAVID SCHNIDER**

Exhibit   9
David
Schnider
Date: January 11, 2019

Page 82

5.    **Exhibit B** to the Opposition is a true and correct copy of Debtor's Dec. 22, 2014 minutes
in which it delegates certain debts to Paula Thomas.

6    As indicated on **Exhibit C**, TW paid off creditor CBC Partners I, LLC on Dec. 29-30,
2014, in two separate payments made on those days

7.    **Exhibit D** to the Opposition contains true and correct copies of excerpted pages from
certain debt instruments evidencing that Oct. 29, 2013 loan in the amount of $1.625M
borrowed by Debtor from lender CBC Partners I, LLC.

8.    **Exhibit E** to the Opposition is a true and correct copy of that March 17, 2015 letter of
guarantee TW issued, guaranteeing Debtor's payment of its debts to the law firm of
Murphy Rosen, LLP, under the conditions set forth therein.

9.    **Exhibit J** to the Opposition is a true and correct copy of an e-mail chain starting on July
9, 2014 and ending on July 10, 2014, in which I was copied. This e-mail chain contains
the initial proposal I was aware of from a potential investor concerning obtaining capital
and restructuring the THOMAS WYLDE fashion house. This was before TW was
formed. Paula Thomas was a participant in these communications. I am informed and
believe that at the time she had hired attorney Andrew Apfelberg to represent her interests
in the contemplated transaction. It is my understanding that Apfelberg represented
Thomas throughout the transaction. He worked with me on Thomas' Agreement to
Purchase Membership Interest and the related instruments.

10.    After Dec. 22, 2014, attorney Apfelberg remained involved inasmuch as he
communicated with me regarding TW's performance under the APMI and Use of
Proceeds Agreement to confirm that TW in fact made good on its covenant to pay off
certain debts affecting Thomas and Debtor.

11.    FURTHER DECLARANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Nov. 30, 2017:

DAVID SCHNIDER

2
SUPPLEMENTAL DECLARATION OF DAVID SCHNIDER

**OPPOSITION EXHIBITS 00058**

# EXHIBIT "2"

```
1                    UNITED STATES BANKRUPTCY COURT
2          CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION
3
4
    In Re                              )
5                                      )
    PDTW, LLC                          )
6                                      )
                         Debtor        )   No. 6:16-bk-15889 SY  .
7                                      )
    _____) Chapter 7
8                                      )
    LARRY SIMONS, Chapter 7 Trustee,   ) Adv. No. 6:17-ap-01200
9                                      ) SY
                     Plaintiff,        )
10                                     )
              vs.                      )
11                                     )
    PAULA THOMAS, an individual;       )
12  THOMAS WYLDE, LLC, a California    )
    Limited Liability Company; THOMAS  )
13  WYLDE HOLDINGS, LLC, a California  )
    Limited Liability; and DOES 1-10, )
14                                     )
                     Defendants.       )
15  _____)
16
17                DEPOSITION OF DAVID SCHNIDER
18                   Los Angeles, California
19                  Friday, January 11, 2019
20                          Volume I
21
22      Reported by:
        AMANDA J. KALLAS
23      CSR No. 13901
24      Job No. 3179103
25      PAGES 1 - 334
```

```
 1              UNITED STATES BANKRUPTCY COURT
 2         CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION
 3
 4
    In Re                           )
 5                                  )
    PDTW, LLC                       )
 6                                  )
                       Debtor       )   No. 6:16-bk-15889 SY
 7                                  )
    _____)   Chapter 7
 8                                  )
    LARRY SIMONS, Chapter 7 Trustee, )  Adv. No. 6:17-ap-01200
 9                                  )   SY
                  Plaintiff,
10
            vs.
11
    PAULA THOMAS, an individual;
12  THOMAS WYLDE, LLC, a California
    Limited Liability Company; THOMAS
13  WYLDE HOLDINGS, LLC, a California
    Limited Liability; and DOES 1-10,
14
                  Defendants.
15  _____
16
17       Deposition of DAVID SCHNIDER, Volume I, taken on behalf
18  of Defendant, at 2049 Century Park East, Suite 2400, Los
19  Angeles, California 90067, beginning at 8:54 A.M. and
20  ending at 5:02 P.M. on Friday, January 11, 2019, before
21  Amanda J. Kallas, Certified Shorthand Reporter No. 13901.
22
23
24
25
                                                        Page 2
```

```
 1        APPEARANCES:

 2

 3      For Witness:

 4         KAUFMAN DOLOWICH VOLUCK LLP

 5         BY:  ROBERT SILVER, ESQ.

 6         135 SOUTH LA SALLE STREET

 7         SUITE 2100

 8         CHICAGO, ILLINOIS 60603

 9         312-863-3692

10         RSILVER@KDVLAW.COM

11

12      For Defendant:

13         LDT CONSULTING, INC.

14         BY:  DIMITRIOS P. BILLER, ESQ.

15         15113 WEST SUNSET BOULEVARD

16         NUMBER 9

17         PACIFIC PALISADES, CALIFORNIA 90272

18         310-459-9870

19         BILLER_LTDCONSULTING@VERIZON.NET

20

21

22      Also Present:

23         PAULA THOMAS

24

25
```

Page 3

```
 1                              INDEX

 2    WITNESS                                 EXAMINATION

 3    DAVID SCHNIDER

 4                   (By Mr. Biller)               12

 5

 6

 7              QUESTIONS INSTRUCTED NOT TO ANSWER

 8                     Page      Line

 9                        NONE

10

11                 INFORMATION REQUESTED

12                     Page      Line

13                        NONE

14

15

16                 MARKED QUESTIONS

17                     Page      Line        .

18                        NONE

19

20

21

22

23

24

25

                                           Page  4
```

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | PLAINTIFF'S AMENDED NOTICE OF DEPOSITION OF DAVID SCHNIDER AND DEMAND FOR PRODUCTION OF DOCUMENTS CASE NO. BC596495 | 72 |
| Exhibit 2 | PLAINTIFF'S AMENDED NOTICE OF DEPOSITION OF THE PERSON MOST KNOWLEDGEABLE AT THOMAS WYLDE, LLC RELATED TO PARTICULAR TOPICS AND DEMAND FOR PRODUCTION OF DOCUMENTS CASE NO. BC596495 | 72 |
| Exhibit 3 | RULE 1.7 CONFLICT OF INTEREST | 83 |
| Exhibit 4 | BANK OF AMERICA ACCOUNTING DOCUMENTS BATES: 03649 - 03749 AND 03509 - 03750 | 93 |
| Exhibit 5 | DAVID A. SCHNIDER RESUME BATES: SCHNIDER_BK001531 - 001532 | 98 |

Page 5

```
 1                    EXHIBITS CONTINUED

 2       NUMBER                 DESCRIPTION              PAGE

 3     Exhibit 6      ARTICLES OF ORGANIZATION             111

 4                    BATES: SCHNIDER_BK001815 - 001952

 5

 6

 7                 ***EXHIBIT 7 NOT MARKED***

 8     Exhibit 8      MARCH 25, 2014 EMAIL WITH            131

 9                    ATTACHMENT RE: "REDLINE"

10                    BATES: SCHNIDER_BK005020 - 005072

11

12     Exhibit 9      SUPPLEMENTAL DECLARATION OF DAVID    141

13                    SCHNIDER

14                    BATES: TR000221 - 000223 AND

15                    TR000209 - 000207

16

17     Exhibit 10     DECLARATION OF DAVID SCHNIDER        150

18                    BATES: OPPMSJ00057 - 00060

19

20     Exhibit 11     DECLARATION OF DAVID SCHNIDER        154

21                    BATES: TR000206 - 000207

22

23     Exhibit 12     ACTION BY WRITTEN                    159

24                    BATES: SCHNIDER_BK002390 - 002391

25
```

                                              Page 6

```
1    way you catch people -- or criminals.  I'm going to ask
2    you to profile; okay?
3              MR. SILVER:  Are you asking if he seemed Middle
4    Eastern?
5              MR. BILLER:  Yeah.
6              MR. SILVER:  Is that the question?
7              MR. BILLER:  Yeah.
8              MR. SILVER:  Really?
9              THE WITNESS:  He did not, because he had a
10   British accent.
11   BY MR. BILLER:
12        Q    Okay.  Now, you sent this document, this
13   promissory note, that includes the IP as collateral;
14   right?
15        A    Yes.  Well, it includes Thomas Wylde's IP as
16   collateral.
17        Q    No, it -- Thomas Wylde doesn't own the IP at this
18   point.  That's owned by TW Holdings.
19             And what does it say about the collateral?  Read
20   it into the record.
21        A    It says, (reading):
22                         To secure its obligations under
23                    this note, maker hereby grants and
24                    pledges to lender a security interest in
25                    maker's right, title, and interest, in
```

Page 178

1              and to all intellectual property rights

2              and associated goodwill relating to the

3              Thomas Wylde brand and designs.

4              Including, without limitation, any

5              copyrights, trademarks, patents, trade

6              secrets, moral rights, or any other

7              rights therein.  Including, without

8              limitation, the trademark and copyright

9              registrations or applications set forth

10             on Exhibit A hereto.

11        Q    Who told you to put that language in there?

12        A    I can't answer that without revealing

13   attorney/client privileged information.

14        Q    It's been waived, buddy.

15             MR. SILVER:  Who waived it?

16             MR. BILLER:  Lee -- Doug Lee.

17             MR. SILVER:  That's -- I don't know if that's

18   true or not.

19             MR. BILLER:  I'm going to show him the documents.

20             MR. SILVER:  Okay.  But I can't -- I can't

21   operate on that.

22             MR. BILLER:  Okay.

23   BY MR. BILLER:

24        Q    So -- and this note's never been paid back, has

25   it?

                                        Page 179

1    A    Not to my knowledge.

2    Q    So they -- TW went in default; right?

3    A    To my knowledge, yes.

4    Q    So the IP goes to Eniluz Gonzalez, according to

5    this document; right?

6    A    Well, doesn't necessarily go to them, but Eniluz

7    and Khondker would have -- or Shoeb would have a claim to

8    it under this document.

9    Q    Okay.  And so they're not part of the bankruptcy

10    case, are they?

11    A    I don't know.

12    Q    Okay.  So let's -- what happened, between July

13    18, 2014 and December 8, 2014, to require that the IP

14    become the collateral for two -- $2 million loan?

15    A    I can't answer that without violating

16    attorney/client privilege.

17    Q    Okay.  Well, let's do this, let me put words in

18    your mouth; okay?

19    A    Well, not okay, but go ahead.

20    Q    You kind of messed up.  Because Stephan Choi was

21    pissed off at you or others for not having an operating

22    agreement; right?  He -- in early November 2014, he was

23    angry that an operating agreement was not in place, and he

24    owned nothing of one company and something of another

25    company that belonged to Paula; isn't that right?

Page 180

1          A    Not to my knowledge.

2          Q    Really?  Okay.  I'll show you the e-mail, we'll

3     get there.

4               MS. THOMAS:  Wow.

5     BY MR. BILLER:

6          Q    And as -- as a -- John Hanna kind of pissed his

7     pants, so to say, and ran around trying to figure out how

8     to appease him.

9               So he's the one who decided to make my client's

10    IP the collateral to a $2 million loan; right?

11         A    I can't answer that without revealing privileged

12    information.

13         Q    Okay.  But there's communication between you,

14    Hanna, and Choi -- and Choi's nothing, by the way, he's

15    not a client, he's nothing, he breaks the privilege -- in

16    which he accepts the IP being used as collateral; isn't

17    that right?

18         A    I don't recall.  There may be, but --

19         Q    Okay.

20         A    -- I don't recall.

21         Q    Now, to a member of a company, having the company

22    own the IP is substantially different than having the IP

23    being collateral that goes to another person who was not

24    an owner; isn't that true?

25         A    Well, again, you're conflating two different

                                              Page 181

1          A    It's more of a lecture.

2          Q    It's a leading question; okay?

3               MR. SILVER:  A leading question is fine.

4     BY MR. BILLER:

5          Q    You committed fraud on Paula Thomas so you could

6     get extra money from Stephan Choi; is that not right?

7          A    No.

8          Q    You, in fact, received $26,000, in a three-month

9     period, from Stephan Choi, didn't you?

10         A    No.

11         Q    Where did you get it from?

12         A    Well, one, I don't know if it's true, what I got.

13    So I'm assuming your represent -- representation is true,

14    that Thomas Wylde paid me $26,000 in a three-month period.

15    It was based on invoices for legal work performed, that

16    the company paid me that money.

17         Q    Which company?

18         A    Thomas Wylde.

19         Q    Thomas Wylde wasn't formed.  It only had an

20    operating agreement, and it didn't have an officer, it

21    didn't have anybody there.

22         A    What period are you talking about?

23         Q    August, September, and October.

24         A    Of 20...

25         Q    '14.

                                              Page 286

```
 1        A    Then that would have been PDTW.
 2        Q    Okay.  So you were working for TW, and getting
 3   paid by PDTW right; right?
 4        A    Yeah, that's possible.
 5        Q    It's not possible, sir.  That's exactly what
 6   happened.
 7             You were getting paid by my client's company
 8   while you were working for another company, stealing her
 9   IP; isn't that right?
10        A    No, that is not right.
11        Q    Okay.  You were getting paid by PDTW while you
12   were doing legal work for TW; correct?
13        A    That's possible.
14        Q    Okay.  So where's the privilege?  Where's the
15   privilege?
16        A    Where's what privilege?
17        Q    My client is paying you, so what privilege do you
18   have between anybody at TW -- PDTW and PDTW?  What --
19   where's the privilege?  My client's paying you.
20        A    Your client didn't pay me; the company did.
21        Q    She owns the company.
22        A    There's still -- we've done this 20 times.
23        Q    No, it doesn't matter.  She's the manager, she is
24   the CEO -- did you give her a disclosure agreement, that
25   you're going to work for TW and get paid by PDTW?  Did you
```

Page 287

1    give her that?

2        A    No.

3        Q    Did you call her a conflict waiver on that?

4        A    No.

5        Q    That's a violation of the rules of professional

6    conduct, isn't it?

7            MR. SILVER:  Calls for a legal conclusion.

8            THE WITNESS:  I think in the context, it probably

9    wasn't.

10    BY MR. BILLER:

11        Q    I'm sorry?

12        A    I think it probably wasn't.

13        Q    Was not?

14        A    Was not.

15        Q    Why not?

16            MR. SILVER:  Hey, man.  Go get an expert, and

17    then you'll find out.

18            MR. BILLER:  No, he's a lawyer.  He's a

19    specialist in 13 areas.

20            MR. SILVER:  He's not a specialist in this.

21            It calls for a legal conclusion.

22            The whole thing is just argumentative.

23            MR. BILLER:  Okay.

24            MR. SILVER:  You know, it's amazing that I'm just

25    sitting here listening to this.

Page 288

```
1                    UNITED STATES BANKRUPTCY COURT
2         CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION
3
4
     In Re                            )
5                                     )
     PDTW, LLC                        )
6                                     )
                          Debtor      )   No. 6:16-bk-15889 SY
7                                     )
     _____ )   Chapter 7
8                                     )
     LARRY SIMONS, Chapter 7 Trustee, )   Adv. No. 6:17-ap-01200
9                                     )   SY
                     Plaintiff,       )
10                                    )
               vs.                    )
11                                    )
     PAULA THOMAS, an individual;     )
12   THOMAS WYLDE, LLC, a California   )
     Limited Liability Company; THOMAS )
13   WYLDE HOLDINGS, LLC, a California )
     Limited Liability; and DOES 1-10, )
14                                    )
                     Defendants.      )
15   _____ )
16
17              DEPOSITION OF DAVID SCHNIDER
18                  Los Angeles, California
19                 Friday, January 11, 2019
20                       Volume I
21
22    Reported by:
      AMANDA J. KALLAS
23    CSR No. 13901
24    Job No. 3179103
25    PAGES 1 - 334
```

1              UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

3

4

     In Re                        )
5                                 )
     PDTW, LLC                     )
6                                 )
                      Debtor       )   No. 6:16-bk-15889 SY
7                                 )
     _____ )   Chapter 7
8                                 )
     LARRY SIMONS, Chapter 7 Trustee, ) Adv. No. 6:17-ap-01200
9                                 )   SY
               Plaintiff,
10
          vs.
11
     PAULA THOMAS, an individual;
12   THOMAS WYLDE, LLC, a California
     Limited Liability Company; THOMAS
13   WYLDE HOLDINGS, LLC, a California
     Limited Liability; and DOES 1-10,
14
               Defendants.
15   _____

16

17      Deposition of DAVID SCHNIDER, Volume I, taken on behalf

18   of Defendant, at 2049 Century Park East, Suite 2400, Los

19   Angeles, California 90067, beginning at 8:54 A.M. and

20   ending at 5:02 P.M. on Friday, January 11, 2019, before

21   Amanda J. Kallas, Certified Shorthand Reporter No. 13901.

22

23

24

25

                                                      Page 2

```
 1      APPEARANCES:

 2

 3      For Witness:

 4          KAUFMAN DOLOWICH VOLUCK LLP

 5          BY:   ROBERT SILVER, ESQ.

 6          135 SOUTH LA SALLE STREET

 7          SUITE 2100

 8          CHICAGO, ILLINOIS 60603

 9          312-863-3692

10          RSILVER@KDVLAW.COM

11

12      For Defendant:

13          LDT CONSULTING, INC.

14          BY:   DIMITRIOS P. BILLER, ESQ.

15          15113 WEST SUNSET BOULEVARD

16          NUMBER 9

17          PACIFIC PALISADES, CALIFORNIA 90272

18          310-459-9870

19          BILLER_LTDCONSULTING@VERIZON.NET

20

21

22      Also Present:

23          PAULA THOMAS

24

25
```

                                          Page 3

```
 1                          INDEX
 2    WITNESS                           EXAMINATION
 3    DAVID SCHNIDER
 4              (By Mr. Biller)              12
 5
 6
 7          QUESTIONS INSTRUCTED NOT TO ANSWER
 8                   Page     Line
 9                      NONE
10
11          INFORMATION REQUESTED
12                   Page     Line
13                      NONE
14
15
16          MARKED QUESTIONS
17                   Page     Line
18                      NONE
19
20
21
22
23
24
25
                                          Page  4
```

```
 1                          EXHIBITS
 2       NUMBER                DESCRIPTION              PAGE
 3     Exhibit 1      PLAINTIFF'S AMENDED NOTICE OF       72
 4                    DEPOSITION OF DAVID SCHNIDER AND
 5                    DEMAND FOR PRODUCTION OF DOCUMENTS
 6                    CASE NO. BC596495
 7
 8     Exhibit 2      PLAINTIFF'S AMENDED NOTICE OF       72
 9                    DEPOSITION OF THE PERSON MOST
10                    KNOWLEDGEABLE AT THOMAS WYLDE, LLC
11                    RELATED TO PARTICULAR TOPICS AND
12                    DEMAND FOR PRODUCTION OF DOCUMENTS
13                    CASE NO. BC596495
14
15     Exhibit 3      RULE 1.7 CONFLICT OF INTEREST       83
16
17     Exhibit 4      BANK OF AMERICA ACCOUNTING          93
18                    DOCUMENTS
19                    BATES: 03649 - 03749
20                    AND 03509 - 03750
21
22     Exhibit 5      DAVID A. SCHNIDER RESUME           98
23                    BATES: SCHNIDER_BK001531 - 001532
24
25
                                                    Page 5
```

EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 6 | ARTICLES OF ORGANIZATION | 111 |
| | BATES: SCHNIDER_BK001815 - 001952 | |
| | | |
| | | |
| | ***EXHIBIT 7 NOT MARKED*** | |
| Exhibit 8 | MARCH 25, 2014 EMAIL WITH | 131 |
| | ATTACHMENT RE: "REDLINE" | |
| | BATES: SCHNIDER_BK005020 - 005072 | |
| | | |
| Exhibit 9 | SUPPLEMENTAL DECLARATION OF DAVID | 141 |
| | SCHNIDER | |
| | BATES: TR000221 - 000223 AND | |
| | TR000209 - 000207 | |
| | | |
| Exhibit 10 | DECLARATION OF DAVID SCHNIDER | 150 |
| | BATES: OPPMSJ00057 - 00060 | |
| | | |
| Exhibit 11 | DECLARATION OF DAVID SCHNIDER | 154 |
| | BATES: TR000206 - 000207 | |
| | | |
| Exhibit 12 | ACTION BY WRITTEN | 159 |
| | BATES: SCHNIDER_BK002390 - 002391 | |

Page 6

EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | EMAIL CHAIN RE: "TW OPERATION AGREEMENT" BATES: SCHNIDER_BK004776 - 004836 | 165 |
| Exhibit 14 | DECEMBER 11, 2014 EMAIL WITH ATTACHMENT RE: "DOCS" BATES: SCHNIDER_BK005163 - 005209 | 172 |
| Exhibit 15 | DECEMBER 8, 2014 EMAIL WITH ATTACHMENT RE: "CHOI NOTE" BATES: SCHNIDER_BK003992 - 003997 | 174 |
| Exhibit 16 | NOVEMBER 25, 2014 EMAIL WITH ATTACHMENT RE: "PROMISSORY NOTE" BATES: SCHNIDER_BK001548 - 001553 | 184 |
| Exhibit 17 | RESOLUTION RE TRANSFER OF MEMBERSHIP INTERESTS BATES: 02217 - 02240 | 190 |
| Exhibit 18 | EMAIL CHAIN RE: "EXERCISE OF OPTION" BATES: LEE004485 - 004487 | 193 |

Page 7

```
1                         EXHIBITS CONTINUED

2       NUMBER                  DESCRIPTION                    PAGE

3    Exhibit 19     EMAIL CHAIN RE: "HANNA EMPLOYMENT          207

4                   AGREEMENT"

5                   BATES: LEE004725 - 004741

6

7    Exhibit 20     EMAIL CHAIN RE: "HANNA EMPLOYMENT          207

8                   AGREEMENT"

9                   BATES: LEE004725 - 004738

10

11

12                  ***EXHIBIT 21 NOT MARKED***

13   Exhibit 22     MARCH 31, 2016 EMAIL                       225

14                  RE: "LITIGATION HOLD"

15                  BATES: SCHNIDER_BK001588

16

17   Exhibit 23     EMAIL CHAIN RE: "LOAN"                     227

18                  BATES: LEE002020 - 002038

19

20   Exhibit 24     EMAIL CHAIN RE: "NOTICE OF                 233

21                  CONSENT-IMPORTANT"

22                  BATES: LEE004786 - 004788

23

24

25

                                                         Page 8
```

1       BY MR. BILLER:

2            Q    So that's not true, huh?

3                 Who gave you the authority to be the general

4       counsel?  You said John Hanna did?

5            A    John Hanna did.

6            Q    And you say he was the CEO of -- of TW?

7            A    Yes.

8            Q    Where is that written?

9                 MR. SILVER:  That he's the CEO of TW?

10                MR. BILLER:  Yeah.

11                THE WITNESS:  That he's the -- well, he was the

12      manager as well.

13      BY MR. BILLER:

14           Q    Where is that written?

15           A    Both of those are in the operating agreement.

16           Q    That were signed and finally produced in December

17      of 2015 -- '14.

18                So who -- where is it written in any document,

19      between July 22nd and 2014 and December 1, 2014, that he

20      had the authority as the CEO or a manager?  Where is that?

21           A    I believe there was a document signed by me,

22      under the authority of Stephan Choi, that said he could

23      open bank accounts.

24           Q    Who was Stephan Choi?

25           A    Stephan Choi was the investor.

                                          Page 156

```
1        Q    Right.

2             He's not an owner?

3        A    He was not an owner at the time.

4        Q    No.  He's nothing, actually.  He's just a man who

5    launders money, through TW, in the form of $25 million, in

6    three years.  And -- and he says in January, that he's

7    made his investment back.  That's what he says in January

8    of 2015.  He had no authority to do that.

9             So who had authority, and what instrument was

10   used, to authorize John Hanna to be a CEO or a manager?

11       A    The only instrument I'm aware of is the articles

12   of incorporation and the letter that was sent to the bank.

13       Q    What does the articles of incorporation say?

14       A    It just says that the company is formed.

15       Q    That's it?

16       A    I don't think it identifies -- at some point, we

17   filed the statement of information, I don't know the date

18   on it.

19       Q    No, but it doesn't give anybody authority.

20            I'm asking you, give me a document that gave John

21   Hanna authority, power, permission, the ability to act on

22   behalf of TW as a CEO or manager.

23       A    And I've listed all the documents that I know.

24       Q    Articles of incorporation?

25       A    Articles of incorporation.
```

Page 157

1          Q     But his name's not on it.

2          A     The bank letter, the statement of information

3    might, I don't recall what's listed on there, I think the

4    managers are.   And the operating agreement.

5          Q     Operating agreement wasn't signed until December;

6    right?

7          A     I --

8          Q     Please don't say "no."

9          A     I just don't recall what date the --

10         Q     Well --

11         A     -- original member signed --

12               MR. SILVER:  Well, the document says whatever it

13   is.

14   BY MR. BILLER:

15         Q     No, he didn't produce what the document is.  He

16   produced -- I got e-mails from Lee, I got e-mails from Lee

17   saying that it wasn't ready by November 25.

18               MR. SILVER:  Do you have a copy of the document?

19               MR. BILLER:  I do.  I do.  Of the --

20               MR. SILVER:  Operating agreement.

21               MR. BILLER:  -- e-mail?

22               Yeah.  I have a copy of an operating agreement,

23   yeah.

24               MR. SILVER:  Well, whatever date that is.

25               MR. BILLER:  There's no date on it.  He never

                                            Page 158

1    dates his documents.

2            MR. SILVER:  Okay.

3            MR. BILLER:  Let's mark the next document in

4    order, please.

5                    (Exhibit 12 was

6                    marked for identification.)

7            MR. BILLER:  This will be No. 12.

8    BY MR. BILLER:

9        Q    Please identify Exhibit No. 12.

10       A    This is an action by written consent of the sole

11   organizer of Thomas Wylde, LLC, dated July 22nd, 2014.

12       Q    That's not the real date, though, is it?

13       A    That's the -- the effective date.

14       Q    The real date is July 29th; right?

15       A    Well, I don't know what you mean by the real

16   date.  That's the effective date, and I -- looks like,

17   from the signature line, the date it was signed is July

18   29th.

19       Q    Where does it say Stephan Choi gave you authority

20   for this document?

21       A    I don't think it says that.

22       Q    No, it does not say that.  You just created it.

23   You had no authority whatsoever from anyone with authority

24   to create this document; correct?

25       A    No.

                                        Page 159

1        Q    Who had the authority to allow you to create this

2    document?

3        A    John Hanna.

4        Q    Who had the authority -- John Hanna doesn't have

5    any authority to do anything.  We just established, John

6    Hanna did not have the authority to be a CEO or a manager.

7    And you're saying he's the one who had authority to make

8    you sign this document?

9        A    I -- I don't agree with you.

10       Q    Okay.  Why does John Hanna have the authority to

11   make you sign Exhibit No. --

12            MR. SILVER:  Isn't the --

13   BY MR. BILLER:

14       Q    -- 12?

15            MR. SILVER:  -- testimony -- you've asked this.

16   You -- David said --

17            MR. BILLER:  Please -- please, Robert.

18            MR. SILVER:  I know, but it's asked and answered.

19            MR. BILLER:  No, it's not.  It's not.  It relates

20   to the document itself.

21            MR. SILVER:  The authority of John Hanna, you've

22   covered.  I know you don't agree with it, but his answer

23   hasn't changed.

24            MR. BILLER:  He's fabricating it, and I need to

25   tie it down.

Page 160

1          MR. SILVER:  Go ahead.

2     BY MR. BILLER:

3          Q    When did he tell you to create this document?

4          A    I don't recall.

5          Q    Okay.  What were the circumstances of him asking

6     you to create this document?

7          A    I don't know if I can answer that without

8     invading the attorney/client privilege.

9          MR. SILVER:  Yeah, how can you tell -- how can

10    you answer?  Unless someone else was present who broke the

11    privilege.

12         MR. BILLER:  What are you talking about?

13         MS. THOMAS:  Yeah.

14         MR. BILLER:  Robert, please don't feed

15    questions -- or answers.

16         MR. SILVER:  This is me advising my client.

17         MR. BILLER:  This -- no, it's you making a

18    speaking objection.

19         MR. SILVER:  I'm the quietist guy you've ever

20    seen in one of these -- in this chair.

21         MR. BILLER:  All right.

22    BY MR. BILLER:

23         Q    You have no -- your only authority, you say, to

24    draft this document was from John Hanna; right?

25         A    No.  Actually, I think I got authority as well

                                              Page 161

1    from Stephan Choi.

2         Q    How?  E-mail?

3         A    I don't --

4         Q    Or did he call you from Costa Rica?  Huh?  What

5    is it?  Because I don't see an e-mail.

6         A    I don't recall if it was an e-mail or a telephone

7    call.

8         Q    Yeah.

9         A    Given Stephan, it likely would have been a

10   telephone call.

11        Q    Give --

12        A    It -- if there was no e-mail --

13        Q    Do you --

14             THE REPORTER:  Excuse me, one at a time.

15             I need your full answer.

16             THE WITNESS:  If there was no e-mail, then it was

17   probably a telephone call, but I don't recall.

18   BY MR. BILLER:

19        Q    So you don't have any memory; right?

20        A    I -- I have a memory of the process, and I have a

21   memory that I had to talk to the members.

22        Q    He's not a member, dude.

23        A    That's true.

24        Q    Nobody's a member, dude, until December.

25             Do you understand that concept?

Page 162

1      A    That's not true.

2      Q    Who was a member?

3      A    The original members of the company were John,

4   Jene, Doug, and Roger.

5      Q    When did they sign an operating agreement?

6      A    I don't recall.

7      Q    Oh, really?  You don't recall?

8      A    (No audible response.)

9      Q    On November 21, 2014, you sent Norman Ko a draft

10  of the operating agreement, asking him for his help;

11  right?

12     A    I don't recall.

13     Q    You don't recall having any communications with

14  Norman Ko?

15     A    That's not what I said.

16     Q    Was it true that you asked him to look at the

17  document for you and give him insight?

18     A    I don't recall.

19     Q    Have you ever communicated with Richard Kim?

20     A    I don't recall.

21     Q    Okay.

22          MR. BILLER:  I'm going to hand you a document,

23  I'm going to mark it number --

24              (Off-the-record discussion.)

25          THE WITNESS:  Oh, hang on.  You handed me two

                                        Page 163

1    documents.  Do you want one back?

2              MS. THOMAS:  I don't see another copy of that.

3              MR. BILLER:  Okay.  That's fine.

4              I'm going to hand you a document, an e-mail you

5    wrote to Richard Kim, CC'd to John Hanna, BCC'd to Jene

6    Park, CC to Doug Lee, but not CC to Paula Thomas.

7    BY MR. BILLER:

8         Q    Why is that?

9         A    I don't know what e-mail you're talking about.

10        Q    Okay.  All of your e-mails, you never CC'd Paula

11   Thomas.

12             Why is that?

13        A    All of them?

14        Q    Yeah.

15        A    That's not true.

16        Q    On 90 percent of your e-mails that are CC'd to

17   Jene Park, John Hanna, Doug Lee, and Roger Kuo, they're

18   not CC'd to Paula.

19             Why?

20        A    I would have to go one-by-one to answer that.

21        Q    Oh, really?  You don't have a general idea why

22   you would do that?  Generally, you don't have a general

23   approach, strategic approach, why you would keep Paula out

24   of the loop; is this what you're saying?

25        A    I have a general idea why I might not send -- or

                                              Page 164

```
 1        letter that Paula signed?
 2            A    I don't know.
 3            Q    When -- when were both those engagement letters
 4        signed?
 5            A    I don't know.
 6            Q    Okay.  So how can you possibly tell me that she
 7        got Andrew Apfelberg to represent her during the
 8        investment phase of that deal?
 9            A    Because I told her to do it, she went and did it.
10        And then I negotiated with him on her behalf because she
11        told me he was representing her.
12            Q    You negotiated on behalf of Paula Thomas?
13            A    No.  I negotiated on behalf of the company, with
14        Andrew, because he was representing her.
15            Q    You're talking about November/December 2014?
16            A    Correct.  I think that's when she hired Andrew.
17            Q    No.
18            A    Before November; right?
19            Q    You were just caught because you told her to hire
20        Andrew, you said earlier during the investment period, not
21        the investment document period.
22            A    You're confusing two different things.
23            Q    No, I'm not confusing anything.  I think I've
24        displayed more knowledge about these facts than you could
25        ever display.  You're only interested in trying to confuse
```

Page 125

```
 1      the issues, and protect your butt, and protect Andrew
 2      Apfelberg's butt.
 3               So let me get this right:
 4               Did you ever tell Paula Thomas to get her own
 5      counsel between January 2014 and July 2014?
 6          A    I just need to check dates.  So I did tell her to
 7      get her own counsel, I don't know the dates.  I have to
 8      look at some documents to see if I can remember what the
 9      timing was.
10          Q    So you don't remember?
11          A    I remember talking to her.
12          Q    But you don't remember?
13          A    I remember talking to her, you were asking is
14      about a specific date, date range.
15               And I don't know if I'm going to be able to
16      figure it out from the documents in front of me.
17          Q    Okay.  I'm going to give you a fact, maybe this
18      will figure it out for you.
19               Andrew Apfelberg gave her a retainer agreement to
20      sign on November 24th, 2014.
21          A    Gave Paula Thomas?
22          Q    Yes.
23          A    Okay.  Then I don't think so.
24          Q    She was not represented?
25          A    Between January and July of 2014?
```

Page 126

1        Q    Yes.

2        A    Separately, I don't think so.

3        Q    Okay.  And PDTW had two lawyers, had you and

4    Andrew; right?

5        A    It had me.  It -- and it had Andrew in early

6    2014.

7        Q    Okay.  Andrew signed -- PDTW and Holdings signed

8    the engagement letter of -- February 5 --

9        A    That sounds right.

10       Q    -- right?

11       A    2014.

12       Q    The company was formed on July 22; right?

13       A    Yes.

14       Q    Okay.

15       A    Yes.

16       Q    In that entire seven-month period -- six-month,

17   however, Paula Thomas was unrepresented; right?

18       A    So far as I know, yes.

19       Q    Okay.  But you and Andrew were both representing

20   PDTW; right?

21       A    During that period, yes.

22       Q    Okay.  So PDTW had two lawyers, my client had

23   zero; right?

24       A    So far as I'm aware, yes.

25       Q    Okay.  Didn't you think it was prudent for you to

                                            Page 127

1    tell my client, in that seven-month period, "get your own

2    lawyer"?  Didn't you think that was prudent -- would --

3    for you to do?

4         A    I did not think, in that period, that she needed

5    her own lawyer.

6         Q    I got to get that made into a poster board, and

7    put that in front of the jury.  "I did not think at that

8    time she needed her -- her own lawyer."

9              Her company was going to be taken over, her IP

10   was going to be put on the blocks to serve as some type of

11   investment deal to be sold to a crook out of Costa Rica

12   and his buddy on Costa Rica, and you didn't think she

13   needed the lawyer.  Really?

14        A    Well, maybe I'm getting the timing wrong --

15        Q    No, you're not.

16        A    -- but you're talking about things that happened

17   after.

18        Q    No.  I'm talking about the same deal.  There's

19   not two deals, there's one deal.  There's the investment

20   part and there's the documentation part, because you

21   screwed it up.

22        A    I'm talking about two different things.

23        Q    No.  What am I talking about?

24        A    So I'm talking about, when we initially hired

25   Andrew, I believe that's when John was coming in.  There

                                        Page 128

1          Q    Okay.  You sent an e-mail on 9:34 a.m.; okay?
2     You said, "If she can sign the e-mails today, that --
3     that'd be great."
4          A    Okay.
5          Q    Okay.  And you said something about Hanna putting
6     pressure on you or some stupid thing like that.
7               Do you remember that?
8          A    Vaguely, yeah.
9          Q    Okay.  Why was -- why was there such a hurry to
10    have Paula Thomas go through six, seven, eight legal
11    documents -- that were incomplete, by the way -- and sign
12    them while she was in Uruguay, before the end of the year?
13         A    So the only information I have on that is based
14    on communications with John Hanna, so I can't answer
15    because of privilege.
16         Q    Of course, you can't.  You know why?  I'll tell
17    you why, because you were stealing her IP.  Troy would not
18    give the money or pay the rest of the money unless she
19    gave over the IP, that's exactly why it happened.  I'm
20    going to prove how dishonest you are right now by using
21    some document -- some declarations that you filed with the
22    United States Bankruptcy Court, that Peddie prepared for
23    you.
24                         (Exhibit 9 was
25                    marked for identification.)

                                             Page 141

1          MR. BILLER:   No. 9 is the supplemental

2    declaration of David Schnider, signed on March 29, 2017.

3    I've highlighted the two portions of the declaration that

4    I'm interested in.

5          Did I say that was 9?

6          MR. SILVER:   Yeah, you said it was 9.   I don't

7    know if that's right or not, Dimitrios.

8          MR. BILLER:   Yeah, I -- I missed one.

9          MR. SILVER:   Do you think this is 10?

10         MR. BILLER:   No, this is 9.

11         MR. SILVER:   Okay.   So this is -- all right.

12         THE WITNESS:   Okay.

13   BY MR. BILLER:

14      Q   Okay.   What does the word "restructured" mean

15   under the internal revenue codes?

16      A   I don't know.

17      Q   You don't know?   Then why would you use that word

18   in a document that you don't know what the meaning is for?

19      A   I didn't say I don't know what the meaning is,

20   I --

21      Q   What is the meaning of restructured then?

22      A   I said I don't know what the meaning is.   I don't

23   know what the IRS codes are.

24      Q   Okay.   What is the meaning, according to you?

25      A   So in my opinion, restructuring a company can

                                        Page 142

1    mean different things, but typically, it is...

2          Q    Be careful.

3          A    You done?

4          Q    No.

5          A    Typically, restructuring a company means either

6    forming new entities and moving assets into those, or

7    finding a way to deal with existing debts, in my opinion.

8          Q    Yeah, in your opinion?  That doesn't exist in any

9    book of law, does it?

10         A    I have no idea, I've never looked.

11         Q    That's something -- you just made it up; right?

12         A    Yes, I came up with that definition as we sit

13    here today.

14         Q    Okay.  So you never used it before?  You never

15    used the -- the word before?

16         A    Of course, I've used it before.

17         Q    And you used it with the same meaning?

18         A    I mean, same or similar.

19         Q    Okay.  And you think the creation of TW was a

20    restructuring?

21         A    The whole process was, yes.

22         Q    T --

23             MS. THOMAS:  What?

24    BY MR. BILLER:

25         Q    TW was a new company.  Isn't that true?

                                        Page 143

```
 1            A    Yes.

 2            Q    Okay.  And PDTW went out of operations; right?

 3            A    I mean, it still exists, as I understand it.

 4            Q    It went out of operations, is not generating

 5      money, it's not paying taxes, it doesn't have any

 6      employees, it's in bankruptcy; isn't that true?

 7            A    That is true.

 8            Q    Okay.  So PDTW wasn't restructured, was it?

 9            A    Yes, it was.

10            Q    No, it was restructured from an operating company

11      into a bankrupt company; is that what you're saying?

12            A    No.  It's -- I mean, the whole process was one of

13      moving the intellectual property into a new company

14      financing.

15            Q    That's part of the whole scheme.  The whole

16      scheme that you came up with, through this concept of

17      leveraging IP, was to create a new company, and to then

18      put the new -- put the IP assets into the new company, and

19      put the debt on PDTW.

20                 That was your idea, wasn't it?

21            A    You stated that incorrectly.

22            Q    Okay.  We'll see what the jury says.

23                 Okay.  Page 2, on this document.  Read

24      Paragraph 9.

25            A    I read it when you handed it to me, because it
```

Page 144

1   was highlighted.

2        Q    Read it into the record.

3        A    (Reading):

4                      Exhibit J, to the opposition,

5               is a true and correct copy of an e-mail

6               chain, starting on July 9th, 2014 and

7               ending on July 10th, 2014, in which I

8               was copied.  This e-mail chain contains

9               the initial proposal I was aware of from

10              a potential investor concerning

11              obtaining capital and restructuring the

12              Thomas Wylde fashion house.

13       Q    Let me stop you there.

14       A    Okay.

15       Q    Identify one publication that refers to PDTW as

16  the Thomas Wylde fashion house.  One publication.

17       A    I can't possibly.

18       Q    Yeah.  Because it didn't -- it was never referred

19  as the Thomas Wylde fashion house, wasn't it?

20       A    I have no idea.

21       Q    Okay.  So you just put those words in to make it

22  appear that PDTW, the Thomas Wylde fashion house, was

23  restructured into Thomas Wylde; isn't that right?

24       A    That is what happened.

25       Q    No, that's not what happened.  There's no such

                                        Page 145

1    thing as Thomas Wylde fashion house.  It doesn't exist.

2    It's only in your mind.  Where does it exist?  Give me one

3    piece of paper that states Thomas Wylde fashion house.

4           Is it on the letterhead?

5    A    No.

6    Q    No.

7           Is it in any marketing materials?  No.

8    A    I don't know.

9    Q    No.

10          Is it on any -- is it on the website?

11   A    I don't know.

12   Q    No.  It's not.

13          Is it on any pleadings or any publications of any

14   nature?

15   A    I don't know.

16   Q    Okay.  So you just came up with the phrase

17   "Thomas Wylde fashion house," because you never saw that

18   phrase ever; correct?

19   A    I don't recall.

20   Q    Okay.  You came up with that phrase, though,

21   didn't you?

22   A    I -- I don't recall.

23   Q    You don't recall.

24          You don't remember coming up with a phrase on the

25   declaration that was signed?

Page 146

1      A    Well, I'm saying I don't know if I came up with

2    it or had heard it before.

3      Q    Oh, you don't -- okay.  So where would you have

4    heard it from?

5      A    From --

6      Q    Did Jene -- Jene Park use it?

7      A    I don't know, she might have.

8      Q    John Hanna?

9      A    I don't know, he might have.

10     Q    Oh, everybody might have, but do you remember?

11     A    No.  I just told you that.

12     Q    Okay.  So we can't -- you can't find any

13   documents, you can't find any publications, you can't find

14   any social media, like Instagram or anything else, you

15   can't identify any people.  This was a figment of your

16   imagination, wasn't it?

17     A    Again, I don't know if I came up with this phrase

18   or I'd heard it before, and I've never searched for

19   documents to see if they used it.

20     Q    Okay.  So the Thomas Wylde fashion house does not

21   exist.  Go on, finish your sentence.

22     A    I was done.  Oh, reading.  (Reading):

23                    This was before TW was formed.

24               Paula Thomas was a participant in these

25               communications.  I am informed and

                                        Page 147

1        believe that at the time, she has hired

2        attorney Andrew Apfelberg to represent

3        her interests in the completed

4        transaction.

5    Q    Okay.   That's another false statement, isn't it?

6        MR. SILVER:   Contemplated.

7    BY MR. BILLER:

8    Q    (Reading):

9              I am informed and believe that

10       at that time, she had --

11       She.   She.   (Reading continued):

12              -- had hired Andrew Apfelberg

13       to represent her interests in the

14       contemplated transaction.

15       That's not true, is it?

16   A    Well, based on what you've told me today, no.

17   Q    Yeah.

18       So -- but -- so when you signed this, did

19   somebody give you false information?

20   A    I -- if what you're telling me is true, then I

21   was misinformed.

22   Q    By who?

23   A    I don't recall where I got that.

24   Q    Peddie?  Didn't you write this declaration for

25   Peddie?

                                            Page 148

1      A    Yeah.   He was the company counsel.

2      Q    Okay.   Did -- when he -- when you received this

3   document, did -- was it finished?   Or did you write it?

4      A    I don't think I wrote it; I think he drafted it.

5      Q    Did you add the words "fashion house"?

6      A    I don't recall who put that in.   If I did it or

7   if I accepted it.

8      Q    Okay.   So either you committed perjury or Richard

9   Peddie subrogated perjury, one of the two?

10     A    No, I disagree with that.

11     Q    All right.   Then we can all disagree.   It all

12   doesn't matter till November.

13          MR. SILVER:   November?

14          MR. BILLER:   I've asked for a November trial

15   date.

16          MR. SILVER:   I'm going to be a on a river cruise,

17   man.   I don't know about you, but I'm seeing the Rhine, so

18   you have a great time in trial.

19          MS. THOMAS:   We will.

20          MR. BILLER:   You kill me, man.

21          MR. SILVER:   I'm kidding.

22          MS. THOMAS:   You want me to be there?   I will.

23   Honestly.

24          MR. SILVER:   Just send me highlights.   You know,

25   David -- you know, take a break, step out in the hall,

                                        Page 149

# EXHIBIT "3"

# BINDING TERM SHEET

This binding term sheet is entered into effective as of May 27, 2014 by and between (i) PDTW, LLC, a California Limited Liability Company (the "Company") and (ii) Roger Kuo and Douglas Lee (collectively the "Consultants"). This agreement describes the terms pursuant to which Consultant will assist Company in obtaining financing and provide ongoing consulting services to Company. To the extent necessary, the parties will work diligently and in good faith to prepare and enter into definitive agreements reflecting the provisions of this term sheet.

1.      Consultants agree to work diligently to find prospective equity investors willing to invest $5,500,000.00 ("Five Million Five Hundred Thousand Dollars") as capital and $2,000,000.00 ("Two Million Dollars") as debt into the Company (the "Investment"). Company will have the sole right and power to negotiate and approve or reject the terms of any Investment. If the company completes a deal with an investor or investors directly as a result of Consultants' efforts, then upon receipt of funding, Company shall pay the Consultants a finder's fee consisting of a 5% ("Five Percent") equity interest in Company (on a fully-diluted basis after the Closing) as long as investor(s) invests $5,500,000.00 ("Five Million Five Hundred Thousand Dollars") as capital. If Company receives less than $5,500,000.00 ("Five Million Five Hundred Thousand Dollars") as capital, then Consultants will receive a prorated equity amount.

2.      If the Company completes a deal with an investor or investors directly as a result of Consultants' efforts, then upon receipt of funding, Consultants will each be paid $6,000 ("Six Thousand Dollars") per month to provide consulting services to the Company for two years. The parties agree to negotiate formal consulting agreements at that time, pursuant to which Consultants will advise Company in strategy, planning, digital media and legal/financial issues for at least a day a week. If Consultants do not provide consulting services, Consultants will each still be paid $3,000 ("Three Thousand Dollars") per month for two years. If Company receives less than $5,500,000.00 ("Five Million Five Hundred Thousand Dollars") as capital, then Consultants will receive a prorated consulting fee.

3.      If the Company does not complete a deal with an investor or investors directly as a result of Consultants' efforts, then Consultants shall receive no compensation of any kind from the Company.

4.      The term of this Agreement is six months and it will expire on November 13, 2014 if the Company has not received an Investment by that date. If the Company has commenced negotiations with any investors directly as a result of Consultants' efforts prior to termination, then Consultants shall still receive the compensation set forth in this agreement if such Investment is completed and received by the Company within three (3) months of the date this Agreement terminates.

5.      This Agreement shall be deemed confidential pursuant to the terms of the non-disclosure agreement executed by consultants and shall not be disclosed to third parties other than any investors or any agents or consultants retained by either party for purposes of the Investment.


PDTW, LLC

By: _____
Name: PAULA THOMAS
Title:
    CHAIRMAN

Consultants

By: _____
Name: Douglas Lee

By: _____
Name: Roger Kuo

03117

# EXHIBIT "4"

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Hillshore Investments, a Panamanian corporation with its principal place of business located at Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá ("Purchaser"), effective January 1, 2015 (the "Effective Date").

### RECITALS

A.      Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, Doug Lee, and Paula Thomas (the "Members").

B.      Purchaser seeks to invest five million five hundred thousand US dollars ($5,500,000) into Seller in exchange for 90 membership Units in the Seller.

C.      Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.      Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Sale of the Interest</u>. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, 90 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.      <u>Instruments of Conveyance</u>. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.      <u>Consideration</u>. In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of five million five hundred thousand US dollars

($5,500,000). Seller acknowledges that prior to the Effective Date, Purchaser advanced Seller two million three hundred thousand US dollars ($2,300,000), which advance shall be applied as consideration under this Agreement. Purchaser shall pay the remaining balance of three million two hundred thousand US dollars ($3,200,000) pursuant to the payment schedule attached hereto as Exhibit "A."

4.      Default. If Purchaser fails to make any payment set forth on Exhibit "A" within thirty (30) days of the date on which it is due, it shall be deemed a "Defaulting Member" pursuant to section 3.3 of the Operating Agreement and shall be subject to the provisions of that section relating to Defaulting Members. If Purchaser fails to cure the default within another thirty (30) days thereafter, a pro rata share of its Membership Interest, equal to the percentage of the balance of the consideration remaining due divided by the total consideration set forth in section 3, above, shall automatically revert back to the Company. Furthermore, the Company and its Members shall then have the right to repurchase the balance of Purchaser's Membership Interest subject to the provisions of Section 8 of the Operating Agreement relating to Involuntary Lifetime Transfers.

5.      Purchaser Representations and Warranties. Purchaser represents and warrants to Seller as follows:

a.      This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

b.      Purchaser is aware that the acquisition of its Units in the company has not been registered under the securities act of 1933, as amended, or qualified under the securities laws of any state.

c.      Purchaser is acquiring the Membership Interest for its own account, for investment purposes, and not with a view to the distribution thereof.

d.      Purchaser understands that the sale, pledge, assignment or other transfer of its units in the company is limited by this agreement and in any event may not be effected unless (i) the transfer is registered and qualified under applicable securities laws, or is effected as a non-public offering that is exempt from the registration and qualification requirements of applicable securities laws and (ii) the person acquiring such units represents and warrants to the company and to the other members that such person is acquiring its units in the company solely for its own account and not for the account of any other person, for investment only, and not with a view to or for sale in connection with any distribution of such units.

e.      Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring its Units in the Company.

f.      Purchaser acknowledges that there is no guarantee that the Company will be a financial success and is able to bear the economic risk of the loss of its Units in the Company.

g.      The Company has not solicited or advertised the Units in any way.

Agreement to Purchase Membership Interest

Page 2

h.        Purchaser has firsthand knowledge of the business and affairs of Company, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

i.        Purchaser acknowledges that the Company and the Members are relying on the foregoing representations.

6.    <u>Seller Representations and Warranties</u>. Seller represents and warrants to Purchaser as follows:

a.        Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

b.        Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

c.        Seller has received fair equivalent value under the terms of this Agreement.

d.        Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

e.        The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

f.        Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

7.    <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8.    <u>Necessary Actions</u>. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.    <u>Waiver And Amendment</u>. ☐ No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

Agreement to Purchase Membership Interest

Page 3

11.    <u>Severability.</u> If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12.    <u>Governing Law And Venue.</u> The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The parties agree that they are subject to the personal jurisdiction of such courts and waive any objection to such jurisdiction and venue, including any claim that it is an inconvenient forum. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

13.    <u>Drafting.</u>  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

14.    <u>Counterparts.</u> This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC                                    Hillshore Investments


_____        _____
John Hanna, Manager                                  Eniluz Gonzalez, General Manager

## Exhibit "A" to Agreement to Purchase Membership Interest

### Payment Schedule

| Date | Amount |
|------|--------|
| 12/1/14 | $2,300,000 |
| 1/1/15 | $900,000 |
| 2/1/15 | $450,000 |
| 3/1/15 | $350,000 |
| 4/1/15 | $400,000 |
| 5/1/15 | $300,000 |
| 6/1/15 | $600,000 |
| 9/1/15 | $200,000 |
| Total | $5,500,000 |

Agreement to Purchase Membership Interest



Page 5

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Paula Thomas, an individual ("Purchaser"), effective December 22, 2014 (the "Effective Date").

### RECITALS

A.      Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). Other than as set forth herein, all Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, and Doug Lee (the "Members").

B.      Purchaser seeks to invest $3,200 and certain assets and liabilities into Seller in exchange for 64 membership Units in the Seller.

C.      Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.      Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Sale of the Interest</u>. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, a 64 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2. <u>Instruments of Conveyance</u>. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3. <u>Consideration</u>. In consideration for the Membership Interest, Purchaser shall make a capital

Membership Purchase Agreement                                                      Page 1

contribution to Seller in the amount of Three Thousand Two Dollars ($3,200) and shall transfer to Seller those assets and liabilities set forth on Exhibit "A" hereto.

4.  Purchaser Representations and Warranties. Purchaser represents and warrants to Seller as follows:

      a.    This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

      b.    Purchaser is acquiring the Membership Interest for her own account, for investment purposes, and not with a view to the distribution thereof.

      c.    Purchaser has firsthand knowledge of the business and affairs of Seller, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

5.  Seller Representations and Warranties. Seller represents and warrants to Purchaser as follows:

      a.    Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

      b.    Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

      c.    Seller has received fair equivalent value under the terms of this Agreement.

      d.    Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

      e.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

      f.    Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

      g.    Subsequent to the purchase contemplated hereby, the fully diluted capitalization of Company is as set forth in Exhibit "B" to the Amended Agreement (defined below).

6. <u>Conditions Precedent</u>. Purchaser's obligations hereunder are conditioned upon:

a.    The Company and the Members' execution and delivery of that certain Amended and Restated Operating Agreement of Company in the form attached as Exhibit "B" hereto ("Amended Agreement");

b.    The Members' execution and delivery of that certain Clawback Agreement in the form attached as Exhibit "C" hereto;

c.    Hillshore Investments funding of a Two Million Dollar ($2,000,000) loan to the Company;

d.    The Company's use of the proceeds of such loan in the manner set forth in that certain Use Of Proceeds Agreement in the form attached as Exhibit "D" hereto (a fully executed copy of which must be delivered to Purchaser);

e.    The Company and the Members' execution and delivery of that certain Indemnity Agreement in the form attached as Exhibit "E"; and

f.    The Company's execution and delivery of an employment agreement for Paula in a form mutually agreed to by the parties.

7. <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

8. <u>Necessary Actions</u>. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9. <u>Waiver And Amendment</u>. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10. <u>Entire Agreement</u>. This Agreement and the exhibits hereto constitute the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11. <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12. <u>Governing Law And Venue</u>. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's

84016-00001/2311643.2

fees.

13. <u>Drafting</u>.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

14. <u>Counterparts</u>. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.


Thomas Wylde, LLC


_____     _____
John Hanna, Manager          Paula Thomas

## Exhibit "A" to Agreement to Purchase Membership Interest

List of Asset Being Transferred from Paula Thomas to Thomas Wylde, LLC

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, or any other rights therein but specifically excluding Paula Thomas' name, image, likeness, biography and moral rights ("IP"). The IP includes the following:

### TRADEMARKS

| Mark | Serial No. / Reg. No. | Status |
|------|----------------------|--------|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |

COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

List of Liabilities Being Transferred from Paula Thomas to Thomas Wylde, LLC

Secured Promissory Note executed by PDTW, LLC in favor of CBC Partners I, LLC, dated October 15, 2013 in the amount of $1,600,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

# Exhibit "B"

# Amended And Restated Operating Agreement

# Exhibit "C"

# Clawback Agreement

# Exhibit "D"

## Use Of Proceeds Agreement

# Exhibit "E"

## Indemnity Agreement

# EXHIBIT "5"

# AMENDED AND RESTATED OPERATING AGREEMENT
# OF THOMAS WYLDE, LLC

This Amended and Restated Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company formed under the California Revised Uniform Limited Liability Company Act (the "Company"), is entered into as of December 22, 2014 by John Hanna, Jene Park, Doug Lee, Roger Kuo and Paula Thomas (each a "Member," and collectively the "Members").

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members. The Operating Agreement of Thomas Wylde ("July Agreement") was entered into concurrently therewith.

Contemporaneous herewith, Paula Thomas ("Paula") is making a capital contribution and being admitted as a Member. In connection therewith, the Company and Members desire to amend and restate the July Agreement which shall be replaced and superseded in its entirety by this Agreement.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

## ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "**Act**" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "**Affiliate**" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "**Available Cash**" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    **"Capital Account"** shall mean the account maintained for a Member or Assignee pursuant to Section 2.1 of Exhibit C. Each Member's initial Capital Account balance as of the date of this Agreement is set forth in Exhibit A.

1.5.    **"Capital Contribution"** means a Member's capital contribution to the Company in exchange for Units.

1.6.    **"Cause"** shall mean, with respect to the Manager, any Officer of the Company, and any Executive Officer serving on the Company's Executive Committee, fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct with respect to a material matter relating to the affairs of the Company.

1.7.    **"Confidential Information"** means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of or relating to the Company.

1.8.    **"Corporations Code"** means the California Corporations Code.

1.9.    **"Electronic transmission by the Company"** and "electronic transmission to the Company" have the meanings set forth in Corporations Code § 17701.02(i)(1)-(2).

1.10.    **"Encumber"** means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.    **"Encumbrance"** means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.    **"Executive Committee"** means the Company's Executive Committee, as described in Article V.

1.13.    **"Executive Officer"** means an Officer of the Company that serves on the Company's Executive Committee.

1.14.    **"Involuntary Transfer"** means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15.    **"IRC"** or **"Code"** means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.16    **"Member"** means any of the five Members listed herein - John Hanna, Jene Park, Doug Lee, Roger Kuo and Paula - or a Person who subsequently acquires a Membership Interest

2

in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.17. **"Membership Interest"** means a Member's entire interest and rights in the Company, collectively, including the Member's economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.18. **"Net Profits"** and **"Net Loss"** shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

1.19. **"Notice"** means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.20. **"Person"** means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.21. **"Proxy"** means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.22. **"Regulations,"** **"Reg,"** or **"Treasury Reg"** means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.23. **"Reserves"** means the aggregate of reserve accounts that the Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

3

1.24.    **"Successor in Interest"** means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.25.    **"Supermajority of Members"** means a Member or Members whose aggregate Unit Percentage represents at least sixty-five percent (65%) of the Unit Percentages of all non-Defaulting Members.

1.26.    **"Transfer"** means any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.27.    **"Unit(s)"** means the unit(s) of Membership Interest in the Company.

1.28.    **"Unit Percentage"** means, with respect to a Member, the percentage obtained by dividing the total number of Units held by such Member by the total number of Units outstanding.

1.29.    **"Vote"** means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.30.    **"Voting Interest"** means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Unit Percentage.

1.31.    **"Writing"** includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code §17701.02(i).

1.32.    **"Written"** or **"in writing"** includes facsimile and other electronic communication authorized by the Corporations Code.

## ARTICLE II: ORGANIZATION

2.1.    **Articles of Organization**.   The Articles of Organization were filed with the California Secretary of State on July 22, 2014, File Number 201420310399.

2.2.    **Company Name**.   The name of the Company is Thomas Wylde, LLC.   The business of the Company may be conducted under that name, or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

4

2.3.    **Company Offices**.  The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.    **Company Agent**.  The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.  The Manager may from time to time change the Company's agent for service of process.  If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

2.5.    **Business**.  The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may he organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the luxury fashion industry.

2.6.    **Taxation**.  The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.    **Term**.  The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.    **Members**.  The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.    **Managed by One Manager**.  The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016, all as more particularly set forth in Section 5.1.

2.10.    **Consent of Spouse or Domestic Partner**.  Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.    **Capital Contributions of the Members**.  The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement.  Units may only exist in positive, whole integer quantities and not in fractional amounts.

3.2    **Members' Initial Capital Contribution**.  On or before the Effective Date, each Member has or shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto, which shall thereafter constitute the Capital Contribution for each Member.  The 110 Units issued to the Members constitute 100% of all Membership Interest in the Company.

5

Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

     3.3.   **Failure to Make Initial Capital Contributions**.  If a Member fails to make the required Capital Contribution set forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting Interest of the Defaulting Member.  A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's Voting Interest shall be restored.  In any event, any Defaulting Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

     3.4.   **No Withdrawals**.  A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

     3.5.   **No Interest On Capital**.  No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

     3.6.   **Members and Manager Not Liable**.  The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.  The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

     3.7   **Right of Participation**.  Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such newly-issued Membership Interest. Within fifteen (15) days of receiving notice such new Membership Interest, Paula (and/or her designee) shall have the first opportunity to purchase some or all of any new Membership Interest issuance. Thereafter, within fifteen (15) days, the other Members shall have the second opportunity to purchase any remaining new Membership Interests.  For purposes of clarification, the foregoing participation right is intended to give Paula (and/or her designee) the opportunity to increase her Member's Unit Percentage and, to the extent she does not desire to do so, then to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

### ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

6

4.1.    **Allocation**. After giving effect to the special allocation provisions of Exhibit C attached hereto, Net Profits and Net Losses for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

4.2.    **Distributions**. Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members in accordance with their respective Unit Percentages. By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members. All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3.    **Tax Distribution**. Notwithstanding Paragraph 4.2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year an amount equal to 50% of the Net Profits (and items of income and gain) for such fiscal year allocated to such Member, less the aggregate amount of prior Distributions by the Company to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

## ARTICLE V: MANAGEMENT AND EXECUTIVE COMMITTEE

5.1.    **Managed by Manager**. Subject to Sections 5.4 and 7.3, the business of the Company shall be managed by one Manager, who may also be a Member. Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager. The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company. The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO. The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.    **Officers**. Subject to Section 7.3 and 5.3(a), the Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer. Such Officers may, but need not, be employees of the Company or Members of the Company. Each appointed Officer shall hold such office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager (subject to Section 7.3). All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.    **Executive Committee**. The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company. Executive Officers may, but need not be, employees of the Company or Members of the Company.

7

5.3.1. **Executive Officers**.    Executive Officers shall have the duties, functions, and powers described herein. Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members. Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)    **Chief Creative Officer and Creative Director**. The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company. The CCOD shall also be the Chairperson of the Executive Committee. For so long as she is employed by the Company, the CCOD for the Company shall be Paula.

(b)    **Chief Operating Officer and Chief Commercial Officer**. The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.    **Manager's Powers and Limitations**. The Manager of the Company shall have all powers and authority provided by this Agreement and the Act.    Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.    **Compensation**.    Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.    **Company Assets**. The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.    **Company Funds**. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.    **Removal and Replacement of Manager**. The Manager shall serve until the earlier of: (a) the Manager's resignation, retirement, death, or disability, (b) the Manager's removal by Vote of a Supermajority of Members or (c) the Manager ceasing to be a Member of the Company. A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.    **Books of Account**.    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any

8

Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.    **Accounting Method**. Financial books and records of the Company shall be kept based on the Manager's choice of accounting method. The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.    **Content of Books**.    At all times during the term of existence of the Company, and beyond that term, if reasonably necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A copy of the Articles of Organization, as amended;

(c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)    An original executed copy or counterparts of this Agreement, as amended;

(e)    Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(f)    Financial statements of the Company for the six most recent fiscal years; and

(g)    The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(h)    If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of those items shall be as designated by the Manager.

6.4.    **Financial Statements**. From time to time as determined by the Manager and at the end of each fiscal year, the books of the Company shall be closed and examined, statements reflecting the financial condition of the Company and its profits or losses shall be prepared, and a report about those matters shall be issued by the Company's accountants. Copies of the financial statements shall be given to all Members. In addition, all Members shall receive, not less frequently than at the end of each month, copies of such financial statements regarding the previous calendar month as may be prepared in the ordinary course of business by the Manager or accountants selected by the Manager. The Manager shall cause an annual report to be sent to each Member within 120 days after the end of the fiscal year of the Company. The annual report may be sent by electronic transmission by the Company and shall include:

Case 6:16-bk-15889-SY   Doc 392   Filed 10/28/19   Entered 10/28/19 12:15:14   Desc
Main Document    Page 77 of 139

(a)    A balance sheet, income statement, and a statement of cash flows of the Company for and as of the close of the fiscal year; and

(b)    A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year.

6.5.    **Tax Information**.  Within 90 days after the end of each taxable year of the Company, the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for that year.

6.6.    **Tax Matters Partner**.  The Manager shall act as Tax Matters Partner of the Company under IRC § 6231(a)(7).  The Tax Matters Partner is authorized to do the following:

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223(g) and the implementing Regulations;

(b)    Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

(c)    On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)    File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)    Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

10

## ARTICLE VII: MEMBERSHIP AND UNITS

7.1    **Membership Interest and Units**

      7.1.1    **Membership and Units**.  There shall be only one class of Membership Interest and one class of Units.  Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action.  Each Member shall vote in proportion to the Member's then-existing Voting Interest.

      7.1.2.    **Units**.  The Company has issued 110 (One Hundred Ten) Units to the Members as set forth in Exhibit B.

      7.2.    **Certificates**.  All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.  The Company may, but is not required to, issue certificates evidencing Units ("Unit Certificates") to Members of the Company.  Once Unit Certificates have been issued, they shall continue to be issued as necessary to reflect current Units held by Members.  Unit Certificates shall be in a form approved by the Manager, shall be manually signed by the Manager, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Units and Members set forth in this Agreement, including the following:

> *THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT OF THE COMPANY, AS AMENDED FROM TIME TO TIME. THE UNITS MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH SUCH OPERATING AGREEMENT.*

> *THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION THEREFROM AND THE COMPANY RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS LEGAL COUNSEL THAT SUCH SALE, PLEDGE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.*

      7.3.    **Acts Requiring Member Vote**.  Except as otherwise provided in this Agreement or by the Act, all of the following acts shall require the consent by Vote of a Supermajority of Members:

11

(a)    Any act that would make it impossible to carry on the ordinary business of the Company;

(b)    Any confession of a judgment against the Company;

(c)    The dissolution of the Company;

(d)    The disposition, sale, transfer, assignment or license of all or a substantial part of the Company's assets not in the ordinary course of business;

(e)    The incurring of any debt not in the ordinary course of business;

(f)    A change in the nature of the principal business of the Company or establishment of new or diffusion product lines;

(g)    The filing of a petition in bankruptcy or entering into an assignment for the benefit of the Company's creditors;

(h)    The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company;

(g)    The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(h)    The issuance or redemption of any Membership Interest (including the terms thereof);

(i)    Making operating or liquidating distributions to Members;.

(j)    The Transfer of any Membership Interest (other than to a Permitted Transferee);

(k)    The admission of any new Member (other than a Permitted Transferee);

(l)    Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)    Any transaction between the Company and a Member or an Affiliate of a Member or between the Company and a Manager or an Affiliate of a Manager;

(n)    Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget;

(o)    Paying any officer or employee more than $200,000 per year; and

12

(p)    incurring any debt secured by the assets of the Company and all amendments and modifications thereto.

7.4.    **Record Date**.  The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action.  In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.    **Meetings**.

7.5.1.    **General**.  Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote.  If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager.  Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a Supermajority of Members, represented in person or by Proxy.  The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2.    **Quorum**.  A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3.    **Waiver of Notice**.  The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of

13

matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4. **Proxies**. At all meetings of Members, a Member may Vote in person or by Proxy. Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5. **Video Attendance**. A meeting of the Members may be conducted, in whole or in part, by electronic means (audio or video with audio) so long as the Company implements reasonable measures to provide participating Members a full opportunity to hear and be heard and otherwise concurrently participate in the meeting. The permanent record of any such meeting shall consist of the minutes of such meeting and/or the electronic recording of such meeting, if recorded..

7.5.6. **Written Consent**. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted. Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

7.5.7. **No Authority**. No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1. **Dissociation**. A Member may not dissociate from the Company without the written consents of all of the Members. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.

8.2. **Transfers**. Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved by the Members by Vote of a Supermajority of Members. Approval may he granted or withheld in the Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void. Notwithstanding the foregoing, (x) any Member may Transfer such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and

14

family member(s), (iii) any revocable trust created for the benefit of the Member and/such Member's spouse and family member(s), (iv) another Member of the Company and (v) pursuant to Section 8.11 (each, a "Permitted Transfer"), (y) the Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Permitted Transfer, and (z) the Members shall approve a person's admission as a substitute Member so long as such person obtained Units pursuant to a Permitted Transfer. Any Person that obtained Units pursuant to a Permitted Transfer may, in turn, transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the Company's and other Members' right of first refusal.

8.3.   **No Release on Transfer**.  A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

8.4.   **Agreement Binds New Members**.  Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5   **Voluntary Lifetime Transfers**.  No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section.  Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member.  Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both home and office), and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer.  The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest to be transferred to the Company and the other Members as described in Section 8.7.  A "Voluntary Lifetime Transfer" means any Transfer made during a Member's lifetime, which is not a Permitted Transfer or an Involuntary Lifetime Transfer (as defined in Section 8.6).

8.6   **Involuntary Lifetime Transfer**.  Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable, including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company and each other Member.  Such notice shall include a description of the expected Transfer, the name, address (both home and office), and business or occupation of the expected transferee, and any other facts that are, or would reasonably be deemed to be, material to the involuntary Transfer.  The Member who may be making an Involuntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest otherwise to be transferred to the Company and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law.

15

8.7    **Right of First Refusal of the Company and Non-Transferring Members.**

    8.7.1    **General.**  Each Member shall be deemed to have offered to sell his or her Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other Members (i) at the price and payment terms offered by a proposed transferee set forth in the Member Notice or (ii) if there is no price or payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), at the Agreement Price (as defined below) and Agreement Terms (as defined below).

    8.7.2.    **Company's Right.**  Within the later of (i) thirty (30) days following receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement Price, the Company shall send a written notice ("Company Notice") to the Members stating the portion of the Offered Membership Interest the Company wishes to purchase.

    8.7.3.    **Members' Right.**  Unless the Company Notice specifies all of the Offered Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member who desires to purchase a portion of the Offered Membership Interest shall give a written notice to the Company specifying the maximum portion of the Offered Membership Interest that the Member wishes to purchase. If the aggregate Offered Membership Interest to be purchased by the Members exceeds the total amount of the Offered Membership Interest, the Offered Membership Interest shall be allocated to the exercising Members based on their respective Unit Percentages.

    8.7.4    **Remaining Offered Membership Interest.**  If the Company and the other Members do not agree to buy all of the Offered Membership Interest, any remaining Offered Membership Interest may be sold to a non-Member within thirty (30) days after the expiration of the Company's and Members' option period. If such Transfer does not occur within thirty (30) days, the provisions of this Agreement will continue to apply to such Offered Membership Interest as if no such Transfer had been contemplated and no notice had been given. A Transfer is consummated when the Company has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

8.8    **Agreement Price.**  The Agreement Price will be the fair market value of the Membership Interest being Transferred and shall initially be determined in good faith by the Company. If any Member objects to the Company's determination of the fair market value, the Company and the objecting Member shall attempt to jointly appoint a qualified appraiser. If the parties cannot agree on a single appraiser, they shall each appoint one appraiser and the two appraisers appointed by the parties shall choose a third appraiser. In the event that three appraisers are used, the Agreement Price shall be the average of the two closest fair market values proposed by the three appraisers. The cost of appraisal shall be borne and paid by the objecting Member, unless the Company's proposed fair market value is at least twenty percent (20%) less than the Agreement Price determined by appraisal. The determination of the appraiser(s) shall be final and binding.

8.9     **Agreement Terms**.

8.9.1     **Installment Note**.  If there are no payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

8.9.2     **Closing**.  The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree.  At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred.  If the seller does not appear at the closing, then:

(a)     The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

(b)     The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

(c)     The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

8.10     **Transfers at Death**.  Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest).  If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1.     **Dissolution**.  The Company shall be dissolved on the first to occur of the following events:

(a)     The Vote of a Supermajority of Members to dissolve the Company;

(b)     The sale or other disposition of substantially all of the Company's assets; or

17

        (c)     Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

9.2.   **Winding Up**.  On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

        (a)     To pay the expenses of liquidation;

        (b)     To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

        (c)     To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

        (d)     To the Members in accordance with their respective positive Capital Account balances.

9.3.   **No Recourse**.  Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if Company property remaining after the payment or discharge of the Company's debts and liabilities is insufficient to return the investment of each Member, the Member shall have no recourse against any other Member or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X: CONFIDENTIALITY

10.1.   **Confidentiality**.  Each Member covenants with the Company and each other Member that for so long as a Member holds any Units in the Company, and for a two-year period following the Transfer of a Member's Units, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, a Member shall not, directly or indirectly, through an Affiliate or otherwise use or disclose in any manner any Confidential Information.

10.2.   **Money Damages Inadequate**.  Each Member agrees that a breach of Section 10.1 shall result in irreparable damage and injury to the Company that no money damages could adequately compensate. If the Member breaches Section 10.1, in addition to all other remedies to which the Company may be entitled to, and notwithstanding the arbitration provisions of

Article XI, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction. Each Member expressly waives any claim or defense that an adequate remedy at law exists for any such breach.

10.3.   **Reformation**.  If any provision of Section 10.1 is deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, that provision shall be deemed reformed in that jurisdiction to the extent necessary to permit enforcement.

## ARTICLE XI: INDEMNIFICATION AND ARBITRATION

11.1.   **Indemnification.**   The Company shall indemnify any Person who was or is a party, or who is threatened to be made a party, to any legal proceeding by reason of the fact that the Person was or is a Member, Manager, Officer, Executive Officer, employee, or other agent of the Company against expenses including reasonable attorneys' fees, judgments, fines, settlements, and other amounts actually and reasonably incurred by that Person in connection with the proceeding, if (a) that Person acted in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, and (b) in the case of a criminal proceeding, the Person had no reasonable cause to believe that the Person's conduct was unlawful.  The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

11.2.   **Advancement of Expenses**.   Expenses of each Person indemnified under this Agreement actually and reasonably incurred in connection with the defense or settlement of a legal proceeding shall be paid by the Company in advance of the final disposition of that proceeding, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.3.   **Arbitration**.   **Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to (or arising out of) this Agreement or the Company among or between any of the Company, a current or former Member, or the current or a former Manager shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association.  The place of arbitration shall be Los Angeles, California.  The award of the arbitrator shall be final, binding, and conclusive on all parties.  Judgment may be entered on any such award in any court of competent jurisdiction.**

## ARTICLE XII: GENERAL PROVISIONS

12.1.   **Integration**.  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein.  No party is relying on any representations or

19

warranties not expressly contained in this Agreement. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

12.2.   **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail. The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

12.3.   **Choice of Law**. This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

12.4.   **Severability**. If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

12.5    **Binding Effect**. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.6.   **Representation**. Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

12.7.   **Additional Instruments**. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.8.   **Independent Activities**. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members or the Manager in the carrying on of their own respective businesses or activities.

12.9.   **Capacity and Authority**. Each Member represents and warrants to the other Members that he, she, or it has the capacity and authority to enter into this Agreement.

12.10.  **Interpretation**. The article, section, and subsection titles and headings in this Agreement are inserted as matters of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

12.11.  **Time of the Essence**. Time is of the essence for every provision of this Agreement that specifies a time for performance.

20

12.12. **Exhibits**.  The exhibits referenced herein are expressly incorporated into and made part of this Agreement.

12.13. **No Third Party Beneficiaries**.  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and there are no intended third-party beneficiaries.

12.14. **Amendment**.  This Agreement may be amended only by the written approval of all of the Members.

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EVERY OTHER PERSON WHO EXECUTES THIS AGREEMENT OR OTHERWISE THEREAFTER BECOMES A MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

21

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first written above.

_____
JOHN HANNA, Manager, Member, and Chief Executive Officer


_____
JENE PARK, Member, Chief Operations Officer and Chief Commercial Officer


_____
DOUG LEE, Member


_____
ROGER KUO, Member


_____
PAULA THOMAS, Member, Chief Creative Officer and Creative Director

22

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first written above.

_____

JOHN HANNA, Manager, Member, and Chief Executive Officer

_____

JENE PARK, Member, Chief Operations Officer and Chief Commercial Officer

_____

DOUG LEE, Member

_____

ROGER KUO, Member

_____

PAULA THOMAS, Member, Chief Creative Officer and Creative Director

22

## EXHIBIT A

## CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____ ("Member"), and acknowledges that he or she has read the foregoing Amended and Restated Operating Agreement of Thomas Wylde, LLC (the "Agreement") and understands its provisions. The undersigned is aware that, by the provisions of the Agreement, Member and the undersigned have consented to sell or transfer all Units in the Company, including any community property interest or quasi-community property interest therein, only in accordance with the terms and provisions of the Agreement. The undersigned expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Units and the restrictions on them. If the undersigned predeceases Member while Member owns any Units therein, the undersigned agrees not to devise or bequeath any community property interest or quasi-community property interest in such Units in contravention of the Agreement.

Date: _____

_____
Signature

_____
Name

23

## EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700<br><br>December 15, 2014 | 14 | $700 |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900<br><br>December 15, 2014 | 18 | $900 |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350<br><br>December 15, 2014 | 7 | $350 |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350<br><br>December 15 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Spring, CA 92264 Email: paulathomas@me.com<br><br>*With a copy to:*<br>*Andrew Apfelberg*<br>*Greenberg Glusker*<br>*1900 Avenue of the Stars*<br>*21st Floor*<br>*Los Angeles, CA 90067*<br>*Email: aapfelberg@ggfirm.com* | $3,200 + intellectual property and certain liabilities<br><br>December __, 2014 | 64 | $3,200 |

24

**EXHIBIT C**
**TAX PROVISIONS**

**ARTICLE I: DEFINITIONS**

1.1    **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

1.1.1    Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

1.1.2    Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

1.1.3    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2    **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3    **"Company Minimum Gain"** has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4    **"Member Nonrecourse Debt"** has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5    **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6    **"Member Nonrecourse Deductions"** means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

25

1.7    **"Net Profits"** and **"Net Losses"** means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.7.1    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3    In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6    Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8    **"Nonrecourse Deductions"** has the meaning set forth in Regulations Section 1.704-2(b)(1).

26

1.9     **"Nonrecourse Liability"** has the meaning set forth in Regulations Section 1.704-2(b)(3).

## ARTICLE II: CAPITAL ACCOUNT

2.1     **Capital Accounts**.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2    To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3    In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4    In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

## ARTICLE III: SPECIAL ALLOCATIONS

3.1     **Adjusted Capital Account Deficit**.  An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year.  Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

27

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

3.2    **Special Allocations**.

3.2.1    **Member Nonrecourse Deductions**.  Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

3.2.2    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members**.  Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

3.2.3    **Member Minimum Gain Chargeback**.  Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.2.4    **Minimum Gain Chargeback**.  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

28

3.2.5  **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.2.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 3.2.5 were not in the Agreement.

3.3  **Curative Allocations**.  The allocations set forth in Sections 3.1 and 3.2 of this Exhibit C (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.3.  Therefore, notwithstanding any other provision of the Agreement (other than the Regulatory Allocations), the Members, by Vote of a Supermajority of Members, shall  make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.1 of the Agreement.  In exercising their discretion under this Section 3.3, the Members, by Vote of a Supermajority of Members, shall take into account any future Regulatory Allocations under Sections 3.2.3 and 3.2.4 of this Exhibit C that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.2.1 and 3.2.2 of this Exhibit C.

3.4  **Code Section 704(c) Allocations**.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Agreement: (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).

3.5  **Allocations in Respect of a Transferred Membership Interest**.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year shall be allocated among the Members, as determined by the Members, by Vote of a Supermajority of Members, in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such fiscal year.

29

# EXHIBIT "6"

**AMENDED EXHIBIT B**

**MEMBERS AND CAPITAL CONTRIBUTIONS**
April 15, 2015

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|------|--------------------|-----------------------------------|-----------|----------------------------------|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700<br><br>December 15, 2014 | 14 | $700 |
| The Palliative, LLC | 12114 Dewey St., Los Angeles, CA 90066 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900<br><br>December 15, 2014 | 18 | $900 |
| Stanley Ducks, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350<br><br>December 15, 2014 | 7 | $350 |
| DSRB Group, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350<br><br>December 15, 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Spring, CA 92264 Email: paulathomas@me.com<br><br>*With a copy to:*<br>*Andrew Apfelberg*<br>*Greenberg Glusker*<br>*1900 Avenue of the Stars*<br>*21st Floor*<br>*Los Angeles, CA 90067*<br>*Email: aapfelberg@ggfirm.com* | $3,200 + intellectual property and certain liabilities<br><br>December 22, 2014 | 64 | $3,200 |
| Hillshore Investments | Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá Attn: Eniluz Gonzalez, General Manager | $5,500,000<br><br>January 1, 2015 | 90 | $5,500,000 |

# EXHIBIT "7"

## PROMISSORY NOTE

$2,000,000                                                          Los Angeles, California
                                                    November 1, 2014 ("Effective Date")

For value received, Thomas Wylde, LLC ("Maker") promises to pay to the order of Steven Choi ("Holder") the sum of two million dollars ($2,000,000) (the "Principal"), due in full on or before the third anniversary of the Effective Date set forth above.

### 1.     PAYMENTS

1.1     **Payments.** Maker shall make monthly payments sixteen thousand six hundred and sixty six dollars and sixty-six cents ($16,666.66), payable by the last day of each month, commencing on the Effective Date to cover the monthly interest due. Maker shall pay the principal balance in full as a balloon payment on or before November 1, 2017. Maker may prepay all or any portion of this Note at any time prior to the Maturity Date without premium or penalty.

1.2     **Interest.** The Principal shall accrue interest at the rate of ten percent (10%) per annum. Notwithstanding the foregoing, it is intended that the rate of interest shall never exceed the maximum rate, if any, which may be legally charged, and if the interest provisions contained in this Note would result in a higher rate, then interest shall be limited to the legal limit and any amounts interest paid in excess shall be applied to the reduction of the Principal.

1.3     Upon payment of all Principal and interest required to be paid under this Note, Holder will return to Maker a copy of this note marked "CANCELLED/PAID IN FULL," and all of Maker's obligations under this Note will be terminated.

### 2.     DEFAULT

2.1     Maker will be in default if it: (i) fails to pay any installment of interest or Principal when due and does not cure such deficiency within thirty (30) days; or (ii) makes an assignment for the benefit of creditors; is subject to a petition in bankruptcy that is not removed within thirty (30) days; has a receiver, trustee, or similar officer appointed to take charge of all or part of its property and same is not removed within thirty (30) days; or is adjudicated bankrupt.

2.2     Whenever Maker is in default, the entire unpaid principal balance inclusive of unpaid interest added to principal and any accrued but unpaid interest shall immediately become due and payable at the option of Holder and without notice or demand of any kind.

2.3     If this Note is not paid when due, or in the event that proceedings at law are instituted in connection with this Note, Maker shall pay all costs of collection, and all expenses in connection with the protection or realization of this Note, which fees, costs and expenses are incurred by Holder on account of such collection, whether or not suit is filed, including without limitation, reasonable attorney's fees incurred by Holder on account of such collection.

2.4     During the existence of any default or delinquency under the terms of this Note, Holder is hereby expressly authorized to apply all payments made on this Note to the payment of such part of any delinquency as it may elect.

LEE000483

**3.    Miscellaneous**

3.1    The headings in this instrument are inserted for convenience and shall not be considered a part of this instrument or used in its interpretation.

3.2    This Note, and the parties' rights and liabilities thereunder, shall be construed under the law of the state of California.

3.3    Except as specifically set forth in this Note, Maker waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this note.

3.4    The obligations of Maker under this Note shall not be subject to reduction, limitation, impairment, termination, set-off, or recoupment for any reason.

3.5    No delay or omission on the part of Holder in exercising any right hereunder shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

3.6    Any amendment or modification of the terms of this Note shall be in writing and signed by both parties.

3.7    Failure by Holder to exercise the option of determining this Note to be due and payable or any other option to call the indebtedness for a specific default shall not constitute nor be deemed to be a waiver of the right to exercise the same in the event of any subsequent default. The right to plead any statutes of limitation as a defense to any demand hereunder is hereby waived to the full extent permitted by law.

3.8    If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

3.9    Whenever possible, each provision of this Note will be interpreted in such manner as to be effective, valid and enforceable under applicable law. In case any provision of this Note is held to be prohibited by, invalid, or unenforceable under applicable law, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby.

Maker acknowledges that Maker has read, understands and agrees to the terms and conditions of this Note. IN WITNESS WHEREOF, Maker hereby executes this Promissory Note.


Thomas Wylde, LLC



_____

John Hanna, Manager

LEE000484

# EXHIBIT 8"

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Thursday, November 06, 2014 4:30 PM |
| **To:** | Omly2hanna |
| **Cc:** | Roger Kuo; Doug Lee; John Hanna |
| **Subject:** | Re: loan |

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

ok so lets talk on this loan..

what is collateral on this loan?.. I suggest we but the IP up as collateral ..

what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

length of time on this loan? 36 months tenor

can we make part or all of this loan into a convertible note? difficult since it would change the cap table .. It is best that we pay it off ..

lets start here..if terms are agreeable we can close on this next week

1

LEE000053

## Doug Lee

**From:**       Stephen Choi <stephen@choisite.com>
**Sent:**       Thursday, November 06, 2014 4:00 PM
**To:**         John Hanna; Roger Kuo; Doug Lee
**Subject:**    loan

ok so lets talk on this loan..

what is collateral on this loan?..

what rate are we willing to pay on this loan?

length of time on this loan?

can we make part or all of this loan into a convertible note?

lets start here..if terms are agreeable we can close on this next week

1

LEE000054

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Sunday, November 09, 2014 10:33 AM |
| **To:** | John Hanna |
| **Cc:** | Roger Kuo; Doug Lee; John Hanna |
| **Subject:** | Re: loan |

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*

On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

ok so lets talk on this loan..

what is collateral on this loan?.. I suggest we but the IP up as collateral ..

what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. interest would be paid monthly ..

1

LEE000055

length of time on this loan? 36 months tenor

can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..

lets start here..if terms are agreeable we can close on this next week

2

LEE000056

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Monday, November 10, 2014 5:47 PM |
| **To:** | John Hanna |
| **Cc:** | Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

hmm ok so eta on getting this IP transferred from a company that I own 0% to a company that I own a piece of?

On Mon, Nov 10, 2014 at 7:44 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Stephen .. you were made aware from the beginning of the structure of the IP ( TW. Holdings LLC ) and the operation  PDTW.LLC ..

You approved that we should start a new LLC and move the assets to it hence, (TW. LLC) .. As per first email on the investemt commitment it clearly states that you are investing in the IP as well as operating company ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310_559_5549 |
| mobile: | 310_770_3741 |
| email: | johnhanna@ThomasWylde.com |

On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:

1

LEE000057

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be
putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you …

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together,  we are moving
the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the
term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S La Cienega Blvd.
Los Angeles, CA 90016

phone:          310 559 5549
mobile:         310 770 3741

email:          johnhanna@ThomasWylde.com

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do
2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

2

LEE000058

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards


*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:


how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

    ok so lets talk on this loan..

    what is collateral on this loan?.. I suggest we but the IP up as collateral ..

    what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

    length of time on this loan? 36 months tenor

    can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. It is best that we pay it off ..

    lets start here..if terms are agreeable we can close on this next week

3

LEE000059

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Monday, November 10, 2014 5:25 PM |
| **To:** | John Hanna |
| **Cc:** | Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you ...

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together,  we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310_559_5549 |
| mobile: | 310_770_3741 |
| email: | johnhanna@ThomasWylde.com |

1

LEE000060

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM.with $4.5 M value at stress sale that, is how the CBC loan is based on . ..

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*


On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?


On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna <only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com> wrote:

    ok so lets talk on this loan..

    what is collateral on this loan?.. I suggest we but the IP up as collateral ..

    what rate are we willing to pay on this loan? As per loan documents sent to you last weak rate is 10% if we can get 8% it Would better for cash flow .. Interest would be paid monthly ..

    length of time on this loan? 36 months tenor

    can we make part or all of this loan into a convertible note?  difficult since it would change the cap table .. it is best that we pay it off ..

2

LEE000061

lets start here..if terms are agreeable we can close on this next week

3

LEE000062

**Doug Lee**

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Tuesday, November 11, 2014 4:59 AM |
| **To:** | John Hanna |
| **Cc:** | Roger Kuo; Doug Lee; Meldy Rafols |
| **Subject:** | Re: loan |

Look it is not that big of an issue but lets get it fixed.

thanks

On Tue, Nov 11, 2014 at 6:03 AM, John Hanna <johnhanna@thomaswylde.com> wrote:

Sent from my iPhone

> Stephen you are an investor in the IP according to all the documents you have on hand ..
> The lawyers are working on the operating agreements we should have the drafts soon
> Regards john
>
> Sent from my iPhone
>
> On Nov 10, 2014, at 8:47 PM, "Stephen Choi" <stephen@choisite.com> wrote:
>
>> hmm ok so eta on getting this IP transferred from a company that I own 0% to a
>> company that I own a piece of?
>>
>> On Mon, Nov 10, 2014 at 7:44 PM, John Hanna
>> <johnhanna@thomaswylde.com> wrote:
>> Stephen ..  you were made aware from the beginning of the structure of the IP (
>> TW. Holdings LLC ) and the operation  PDTW.LLC ..
>>
>> You approved that we should start a new LLC and move the assets to it hence,
>> (TW. LLC) .. As per first email on the investemt commitment it clearly states that
>> you are investing in the IP as well as operating company ..
>>
>> Regards,
>>
>> John Hanna
>> Chief Executive Officer
>>
>> # THOMAS WYLDE
>>
>> 3231 S. La Cienega Blvd.
>> Los Angeles, CA  90016

1

LEE000063

| | |
|---|---|
| phone: | 310 559 5549 |
| mobile | 310 770 3741 |

email:     johnhanna@ThomasWylde.com

On Nov 10, 2014, at 5:25 PM, Stephen Choi <stephen@choisite.com> wrote:

whats eta on getting this IP moved..I really wish you guys told me this BEFORE i invested..why would I be putting 5M in a company that does not even own the IP..let me know asap please

On Mon, Nov 10, 2014 at 7:15 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Hi Stephen .. I apologize for delay in getting back to you ...

The IP is sitting in a separate LLC, Thomas Wylde Holdings LLC., Paula owns 100% ..

With the new company structure and based on the Operating agreement we are putting together, we are moving the IP to Thomas Wylde LLC..

Based on the terms you suggested Thomas Holdings LLC would sign the IP to you against the $2M during the term of the loan ..

Please let me have your thoughts on the matter ..

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

2

LEE000064

| | |
|---|---|
| phone: | 310 559 5549 |
| mobile: | 310 770 3741 |

email:       johnhanna@ThomasWylde.com

On Nov 9, 2014, at 10:33 AM, Stephen Choi <stephen@choisite.com> wrote:

Ok I need to understand how the IP is held as collateral but assume I am comfortable with the setup I will do 2m at 10% for 12 month terms renewable..interest payments quarterly..let me know..

Thanks

On Thursday, November 6, 2014, John Hanna <only2hanna@yahoo.com> wrote:
Stephen,  Last valuation made in 2013 on the IP was $18.5MM,with $4.5 M value at stress sale that, is how the CBC loan is based on .  ..

Loan late is 13.5% ...

Regards

*John hanna*
*CEO., Private Collection and Co..LLC*
*Cell 310-770-3741*
*18001 Collins Avenue*
*Sunny Isles Beach, Florida 33160 USA*
*www.privatecollectionandco.com*

On Friday, November 7, 2014 9:30 AM, Stephen Choi <stephen@choisite.com> wrote:

how much is the IP really worth approximately? i mean if we cannot pay the loan then is the IP worth 2M?

i thought the terms of the current loan were higher like 13-14%?

3

LEE000065

On Thu, Nov 6, 2014 at 6:23 PM, Omly2hanna
<only2hanna@yahoo.com> wrote:
Stephen .. Please see answers on the questions below .. Thank you john

Sent from my iPhone

On Nov 7, 2014, at 8:59 AM, Stephen Choi <stephen@choisite.com>
wrote:

> ok so lets talk on this loan..

> what is collateral on this loan?.. I suggest we but the IP up as collateral ..

> what rate are we willing to pay on this loan? As per loan documents sent to
> you last weak rate is 10% if we can get 8% it Would better for cash flow ..
> Interest would be paid monthly ..

> length of time on this loan? 36 months tenor

> can we make part or all of this loan into a convertible note?  difficult since it
> would change the cap table .. It is best that we pay it off ..

> lets start here..if terms are agreeable we can close on this next week

4

LEE000066

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Monday, November 17, 2014 4:34 PM |
| **To:** | John Hanna |
| **Cc:** | Doug Lee; Roger Kuo; Meldy Rafols |
| **Subject:** | Re. Loan $2M.. |

yes I can send next week no problem

On Mon, Nov 17, 2014 at 6:24 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
Stephen. Yes, I did get it.

I wasn't sure of our next step .. We will update the loan agreement to include the IP and send it to you tomorrow ..

Please let's know who's name should be on the loan document and also, please could you also let's know if we can receive the funds by next week to pay off CBC as they a requesting a date of settlement…

many thanks john

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

| | |
|---|---|
| phone: | 310_559_5549 |
| mobile: | 310_770_3741 |
| email: | johnhanna@ThomasWylde.com |

1

LEE000067

On Nov 17, 2014, at 4:12 PM, Stephen Choi <stephen@choisite.com> wrote:

I thought I sent this to you..

will give 2M at 10% annually..obviously we need to make sure about the collateral as we discussed before..

thanks

On Mon, Nov 17, 2014 at 5:59 PM, John Hanna <johnhanna@thomaswylde.com> wrote:

Hi Stephen, please let me know of your plans with reference to the loan.. The lender putting pressure for a decision

thank you


Regards.

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S La Cienega Blvd
Los Angeles, CA 90016

phone:          310 559 5549
mobile:         310 770 3741


email:          johnhanna@ThomasWylde.com

2

LEE000068

## Doug Lee

**From:** Stephen Choi <stephen@choisite.com>
**Sent:** Monday, November 17, 2014 4:13 PM
**To:** John Hanna
**Cc:** Doug Lee; Roger Kuo; Meldy Rafols
**Subject:** Re: Loan $2M..

I thought I sent this to you..

will give 2M at 10% annually..obviously we need to make sure about the collateral as we discussed before..

thanks

On Mon, Nov 17, 2014 at 5:59 PM, John Hanna <johnhanna@thomaswylde.com> wrote:

Hi Stephen, please let me know of your plans with reference to the loan.. The lender putting pressure for a decision

thank you

Regards,

John Hanna
Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

phone:     310 559 5549
mobile:    310 770 3741

email:     johnhanna@ThomasWylde.com

1

LEE000069

2

LEE000070

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Tuesday, November 18, 2014 3:53 AM |
| **To:** | John Hanna |
| **Cc:** | Doug Lee; Roger Kuo; Meldy Rafols |
| **Subject:** | Re: Loan $2M.. |

We will split this loan between Eni and Shoeb...

Thanks

On Monday, November 17, 2014, John Hanna <johnhanna@thomaswylde.com> wrote:
Stephen thank you
Whose name should I put on the agreement ? Regards John

Sent from my iPhone

On Nov 17, 2014, at 4:33 PM, "Stephen Choi" <stephen@choisite.com> wrote:

> yes I can send next week no problem
>
> On Mon, Nov 17, 2014 at 6:24 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
> Stephen.Yes,I did get it.
>
> I wasn't sure of our next step .. We will update the loan agreement to include the IP and send it to you tomorrow ..
>
> Please let's know who's name should be on the loan document and also, please could you also let's know if we can receive the funds by next week to pay off CBC as they a requesting a date of settlement…
>
>
> many thanks john
>
> Regards,
>
> John Hanna
> Chief Executive Officer
>
> # THOMAS WYLDE
>
> 3231 S. La Cienega Blvd.
> Los Angeles, CA 90016
>
> phone:    310 559 5549
> mobile:   310 770 3741
>
> email:    johnhanna@ThomasWylde.com

1

LEE000071

On Nov 17, 2014, at 4:12 PM, Stephen Choi <stephen@choisite.com> wrote:

I thought I sent this to you..

will give 2M at 10% annually..obviously we need to make sure about the collateral as we discussed before..

thanks

On Mon, Nov 17, 2014 at 5:59 PM, John Hanna <johnhanna@thomaswylde.com> wrote:

Hi Stephen, please let me know of your plans with reference to the loan.. The lender putting pressure for a decision

thank you

Regards,

John Hanna
Chief Executive Officer

# **THOMAS WYLDE**

3231 S. La Cienega Blvd.
Los Angeles, CA 90016

phone'            310 559 5549
mob le'           310 770 3741

email             johnhanna@ThomasWylde.com

2

LEE000072

# EXHIBIT 9"

## SECURED PROMISSORY NOTE

$2,000,000

Los Angeles, California
December 1, 2014 ("Effective Date")

For value received, Thomas Wylde, LLC, a California limited liability company with its principal place of business located at 3231 S. La Cienega Blvd., Unit A, Los Angeles, CA 90013, USA ("Maker") promises to pay, jointly, to the order of Khondker Shoeb Ahmed, an individual residing at Puerto de Hierro #93, Santa Ana, San Jose, Costa Rica and Eniluz Gonzalez, an individual residing at Puerto de Hierro #5, Santa Ana, San Jose, Costa Rica (jointly "Holder") the sum of two million dollars ($2,000,000) (the "Principal"), due in full on or before the first anniversary of the Effective Date set forth above, unless extended as set forth herein.

**1.    PAYMENTS**

1.1    Maker shall make monthly payments sixteen thousand six hundred and sixty six dollars and sixty-six cents ($16,666.66), payable by the last day of each month, commencing on the Effective Date to cover the monthly interest due. Maker shall pay the principal balance in full as a balloon payment on or before December 1, 2015, unless it exercises its option to renew as set forth in section 2.1, below. Maker may prepay all or any portion of this Note at any time prior to the Maturity Date without premium or penalty.

1.2    Maker shall transmit payments under this Note by check made payable to [INSERT PAYEE] and delivered to [INSERT ADDRESS TO SEND CHECKS]. Payment shall be deemed made on the date Maker places the check for delivery. All payments shall be made in US dollars.

1.3    The Principal shall accrue interest at the rate of ten percent (10%) per annum. Notwithstanding the foregoing, it is intended that the rate of interest shall never exceed the maximum rate, if any, which may be legally charged, and if the interest provisions contained in this Note would result in a higher rate, then interest shall be limited to the legal limit and any amounts interest paid in excess shall be applied to the reduction of the Principal.

1.4    Upon payment of all Principal and interest required to be paid under this Note, Holder will return to Maker a copy of this note marked "CANCELLED/PAID IN FULL," and all of Maker's obligations under this Note will be terminated.

**2.    TERM**

2.1    This Note shall commence on the Effective Date and continue for a period of 12 months, with the balance due on or before December 1, 2015 (the "Term"). Maker shall have a unilateral option to extend the Term for up to two additional twelve-month periods by giving Holder notice of its intent to do so on or before the final day of the Term. If Maker exercises this option, the remaining provisions of this Note shall remain in full force and effect, it shall continue to make the interest payments set forth in section 1.1, above, but the due date for the balloon payment of the Principal shall be extended to the end of the option period.

Secured Promissory Note

Page 1

**00815**

**3.    DEFAULT**

3.1    Maker will be in default if it: (i) fails to pay any installment of interest or Principal when due and does not cure such deficiency within thirty (30) days; or (ii) makes an assignment for the benefit of creditors; is subject to a petition in bankruptcy that is not removed within thirty (30) days; has a receiver, trustee, or similar officer appointed to take charge of all or part of its property and same is not removed within thirty (30) days; or is adjudicated bankrupt.

3.2    Whenever Maker is in default, the entire unpaid principal balance inclusive of unpaid interest added to principal and any accrued but unpaid interest shall immediately become due and payable at the option of Holder and without notice or demand of any kind.

3.3    If this Note is not paid when due, or in the event that proceedings at law are instituted in connection with this Note, Maker shall pay all costs of collection, and all expenses in connection with the protection or realization of this Note, which fees, costs and expenses are incurred by Holder on account of such collection, whether or not suit is filed, including without limitation, reasonable attorney's fees incurred by Holder on account of such collection.

3.4    During the existence of any default or delinquency under the terms of this Note, Holder is hereby expressly authorized to apply all payments made on this Note to the payment of such part of any delinquency as it may elect.

**4.    SECURITY INTEREST**

4.1    To secure its obligations under this Note, Maker hereby grants and pledges to Lender a security interest in Maker's right, title and interest in and to all intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, moral rights, or any other rights therein including, without limitation, the trademark and copyright registrations or applications set forth on Exhibit A hereto.

**5.    MISCELLANEOUS**

5.1    The headings in this instrument are inserted for convenience and shall not be considered a part of this instrument or used in its interpretation.

5.2    This Note, and the parties' rights and liabilities thereunder, shall be construed under the law of the state of California. Any dispute arising from or relating to this Note shall be solely and exclusively venued in the state or federal courts located in the County of Los Angeles State of California.

5.3    Except as specifically set forth in this Note, Maker waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this note.

5.4    The obligations of Maker under this Note shall not be subject to reduction, limitation, impairment, termination, set-off, or recoupment for any reason.

Secured Promissory Note

Page 2

00816

5.5     No delay or omission on the part of Holder in exercising any right hereunder shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

5.6     Any amendment or modification of the terms of this Note shall be in writing and signed by both parties.

5.7     Failure by Holder to exercise the option of determining this Note to be due and payable or any other option to call the indebtedness for a specific default shall not constitute nor be deemed to be a waiver of the right to exercise the same in the event of any subsequent default. The right to plead any statutes of limitation as a defense to any demand hereunder is hereby waived to the full extent permitted by law.

5.8     If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

5.9     Whenever possible, each provision of this Note will be interpreted in such manner as to be effective, valid and enforceable under applicable law. In case any provision of this Note is held to be prohibited by, invalid, or unenforceable under applicable law, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby.

Maker acknowledges that Maker has read, understands and agrees to the terms and conditions of this Note. IN WITNESS WHEREOF, Maker hereby executes this Promissory Note.

Thomas Wylde, LLC

John Hanna, Manager

## Exhibit "A" to Agreement to Purchase Membership Interest

### TRADEMARKS

| Mark | Serial No. / Reg. No. | Status |
|------|------------------------|--------|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |



Secured Promissory Note

## COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

# PROMISSORY NOTE

$100,000

Los Angeles, California
November 11, 2015 ("Effective Date")

For value received, Thomas Wylde, LLC ("Maker") promises to pay to the order of The Palliative, LLC ("Holder") the sum of One Hundred Thousand Dollars ($100,000) (the "Principal"), due in full on or before December 4, 2015.

## 1.    PAYMENTS

1.1    **Payments.** Maker shall pay the principal balance in full, plus any accrued interest, on or before December 4, 2015. Maker may prepay all or any portion of this Note at any time prior to the Maturity Date without premium or penalty.

1.2    **Interest.** The Principal shall accrue interest at the rate of six percent (6%) per annum. Notwithstanding the foregoing, it is intended that the rate of interest shall never exceed the maximum rate, if any, which may be legally charged, and if the interest provisions contained in this Note would result in a higher rate, then interest shall be limited to the legal limit and any amounts interest paid in excess shall be applied to the reduction of the Principal.

## 2.    DEFAULT

2.1    Maker will be in default if it: (i) fails to pay this Note when due and does not cure such deficiency within five (5) days; or (ii) makes an assignment for the benefit of creditors; is subject to a petition in bankruptcy that is not removed within thirty (30) days; has a receiver, trustee, or similar officer appointed to take charge of all or part of its property and same is not removed within thirty (30) days; or is adjudicated bankrupt.

2.2    Whenever Maker is in default, the entire unpaid principal balance inclusive of unpaid interest added to principal and any accrued but unpaid interest shall immediately become due and payable at the option of Holder and without notice or demand of any kind.

2.3    If this Note is not paid when due, or in the event that proceedings at law are instituted in connection with this Note, Maker shall pay all costs of collection, and all expenses in connection with the protection or realization of this Note, which fees, costs and expenses are incurred by Holder on account of such collection, whether or not suit is filed, including without limitation, reasonable attorney's fees incurred by Holder on account of such collection.

2.4    During the existence of any default or delinquency under the terms of this Note, Holder is hereby expressly authorized to apply all payments made on this Note to the payment of such part of any delinquency as it may elect.

## 3.    Miscellaneous

3.1    The headings in this instrument are inserted for convenience and shall not be considered a part of this instrument or used in its interpretation.

00820

# EXHIBIT 10”

From: "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com>
Subject: RE: Thomas Wylde Equity Investment USD $5.5M and Debt Instrument
USD $2.0M
Date: July 10, 2014 at 2:56:27 PM PDT
To: Paula Thomas <paula@thomaswylde.com>
Cc: "David Schnider (david@thomaswylde.com)" <david@thomaswylde.com>

No worries – see you then.

**From:** Paula Thomas [mailto:paula@thomaswylde.com]
**Sent:** Thursday, July 10, 2014 2:36 PM
**To:** Apfelberg, Andrew M.
**Cc:** Paula Thomas
**Subject:** Re: Thomas Wylde Equity Investment USD $5.5M and Debt
Instrument USD $2.0M

I am running 15 late
Sorry

Sent from my iPhone

On Jul 9, 2014, at 9:54 PM, "Apfelberg, Andrew M."
<aapfelberg@greenbergglusker.com> wrote:

Will review and be ready to discuss when we are together.

**Andrew M. Apfelberg | Attorney at Law | Biography**
D: 310.201.7408 | F: 310.201.2310 | AApfelberg@greenbergglusker.com
**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that
any U.S. tax advice contained in this communication (including any attachments)
is not intended or written to be used, and cannot be used, for the purpose of (i)
avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting,
marketing or recommending to another party any tax-related matters addressed
herein.

This message is intended solely for the use of the addressee(s) and is intended

to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

**From:** Paula Thomas [mailto:paula@thomaswylde.com]
**Sent:** Wednesday, July 09, 2014 5:57 PM
**To:** Apfelberg, Andrew M.
**Subject:** Fwd: Thomas Wylde Equity Investment USD $5.5M and Debt Instrument USD $2.0M

FYI

Sent from my iPhone

Begin forwarded message:

**From:** Doug Lee <dlee@lpdirect.com>
**Date:** July 9, 2014 at 5:54:30 PM PDT
**To:** "Paula Thomas (paula@thomaswylde.com)" <paula@thomaswylde.com>
**Cc:** John Hanna <only2hanna@yahoo.com>, "Roger Kuo (roger@zther.com)" <roger@zther.com>
**Subject: Thomas Wylde Equity Investment USD $5.5M and Debt Instrument USD $2.0M**

Hi Paula,

In reference to the above subject and on behalf of Stephen Choi, hereunder are the highlights and, the parameter of the investment:

***Equity:***
• $5.5 Million equity investment for all assets of Thomas Wylde Holdings LLC and PDTW LLC that would include Thomas Wylde intellectual property, accounts receivables, all logos and imagery, customers files, designs, library and client list.
• New LLC would be created to include all the above assets. The IP, on the other hand, would remain under the Thomas Wylde Holdings LLC.
• Both NewCo and Thomas Wylde Holdings LLC stock would be

**03113**

divided as follows: Stephen Choi 55%, Paula Thomas 30%, Jene Park 10%, Doug Lee, 2.5, Roger Kuo 2.5%.

- All executives must commit for five years and sign management contracts accordingly.
- Paula Thomas would have control over the creative aspects of the design elements and direction of the product and imagery of the brand.
- Financial and operations matters would be under the direction of management team designated by Stephen Choi.
- Funds would be deployed as per a schedule to be prepared and submitted by TW CEO.

**Debt:**
- $2.0 Million in loans would be made available to replace outstanding liabilities of the PDTW, LLC which include liabilities to CBC partners LLC, Jene Park and suppliers.
- Payment made quarterly by the NewCo to Stephen Choi.
- Interest rate, length of term and collateral will be determined in the coming weeks.

The above are the general points for your approval. Once, we get receive your approval we would get lawyers to draft legal documents. Funds would be deployed once the documents are executed.

We look forward to working together in building TW into a highly valuable luxury brand. If you have any questions, please do not hesitate to ask.

**LaunchPad Communications**
*"To Foster Entrepreneurial Spirit and Develop World Class Enterprises"*
**Douglas Lee | Managing Director | dlee@lpdirect.com | phone: 714.463.4677 | fax: 714.463.4678**

From: David Schnider <david@thomaswylde.com>
Subject: Response to Doug
Date: July 18, 2014 at 5:57:23 PM PDT
To: John Hanna <only2hanna@yahoo.com>
Cc: Paula Thomas <paula@thomaswylde.com>

John, further to our discussion this morning, below is a proposed response to
Doug, accepting the terms of the proposal with adjustments only to the
membership interests. Given that I was not on the original email, the response
should probably come from you or Paula.

One question, is the loan amount remaining at $2M? Jene mentioned to me that
it might be higher, like $2.5M. I put in a line for changing that, but we can adjust if
that is not the case.


Dear Doug:

Thank you for conveying the proposal from Stephen Choi. We agree to the basic
terms with four minor adjustments, as reflected below.

First, we have adjusted the ownership percentages to 45% for Steve, 32% for
Paula, 9% for John, 9% for Jene, and 2.5 percent each for you and Roger.

Second, we added in a provision that once Stephen recoups his equity, Paula
may "claw-back" 2% of his interest.

Third, we adjusted the amount of the loan to [????].

Fourth, we added in a provision that there will be no pre-payment penalty on the
loan.

We understand that the details will be ironed out in the legal documents to be
drawn up shortly. Please get those to us at your earliest convenience so we can
begin discussing the contractual provisions and ironing out the final points.


## *Equity:*

  ·    $5.5 Million equity investment for all assets of Thomas Wylde
Holdings LLC and PDTW LLC that would include Thomas Wylde
intellectual property, accounts receivables, all logos and imagery,
customers files, designs, library and client list.
  ·    New LLC would be created to include all the above assets. The IP,

on the other hand, would remain under the Thomas Wylde Holdings LLC.

• Both NewCo and Thomas Wylde Holdings LLC membership interest would be divided as follows: Stephen Choi 45%, Paula Thomas 32%, Jene Park 9%, John Hanna 9%, Doug Lee, 2.5, Roger Kuo 2.5%.

• Upon Stephen Choi's recoupment from profit sharing of his initial $5.5 Million equity investment, he shall transfer back 2% of his interest to Paula Thomas, reducing his membership interest to 43% and increasing hers to 34%

• All executives must commit for five years and sign management contracts accordingly.

• Paula Thomas would have control over the creative aspects of the design elements and direction of the product and imagery of the brand.

• Financial and operations matters would be under the direction of management team designated by Stephen Choi.

• Funds would be deployed as per a schedule to be prepared and submitted by TW CEO.

### Debt:

• $2.0 Million in loans would be made available to replace outstanding liabilities of the PDTW, LLC which include liabilities to CBC partners LLC, Jene Park and suppliers.

• Payment made quarterly by the NewCo to Stephen Choi.

• Interest rate, length of term and collateral will be determined in the coming weeks. There will be no pre-payment penalty.

The above are the general points for your approval. Once, we get receive your approval we would get lawyers to draft legal documents. Funds would be deployed once the documents are executed.

We look forward to working together in building TW into a highly valuable luxury brand. If you have any questions, please do not hesitate to ask.

03116

# EXHIBIT

# "11"

**201420310399**

| **LLC-1** | **Articles of Organization of a Limited Liability Company (LLC)** |
|---|---|

To form a limited liability company in California, you can fill out this form, and submit for filing along with:

– A $70 filing fee.

– A separate, non-refundable $15 service fee also must be included, if you **drop off** the completed form.

**Important!** LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

Note: *Before submitting the completed form*, you should consult with a private attorney for advice about your specific business needs.

**FILED**
Secretary of State
State of California

**JUL 2 2 2014**

ICC

This Space For Office Use Only

**For questions about this form, go to** *www.sos.ca.gov/business/be/filing-tips.htm.*

**LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

① Thomas Wylde, LLC

*Proposed LLC Name* — The name must include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and may not include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company.   For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**LLC Addresses**

③ a. 3231 S. La Cienega Blvd., Unit A        Los Angeles        CA  90016

*Initial Street Address of Designated Office in CA - Do not list a P.O. Box        City (no abbreviations)        State    Zip*

b. _____

*Initial Mailing Address of LLC, if different from 3a        City (no abbreviations)        State    Zip*

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. **Do not** list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

④ a. David Schnider

*Agent's Name*

b. 15165 Ventura Blvd., Ste. 245        Sherman Oaks        CA  91403

*Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box        City (no abbreviations)        State    Zip*

**Management** (Check only one.)

⑤ The LLC will be managed by:

○ One Manager      ● More Than One Manager      ○ All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

▶ _____        David Schnider

*Organizer - Sign here*        *Print your name here*

| Make check/money order payable to: **Secretary of State** Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | ***By Mail*** Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | ***Drop-Off*** Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |
|---|---|---|



I hereby certify that the foregoing
transcript of_____/_____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office

JUL 2 2 2014

Date:_____ _fJW

*Debra Bowen*

DEBRA BOWEN, Secretary of State

**00002**