# EXHIBIT "15"

```
 1 |  CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2 |       COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3 |
 4 |  PAULA THOMAS, INDIVIDUALLY      )
    |  AND IN THE RIGHT OF AND FOR     )
 5 |  THE BENEFIT OF THOMAS WYLDE,    )
    |  LLC, A CALIFORNIA LIMITED       )
 6 |  LIABILITY COMPANY, AND PDTW     )
    |  [PAULA DOROTHY THOMAS WYLDE],   )
 7 |  LLC, A CALIFORNIA LIMITED        )
    |  COMPANY,                        )
 8 |                                   )
    |                Plaintiffs,       )
 9 |                                   )
    |            vs.                   )  Case No.:  BC596495
10 |                                   )
    |  THOMAS WYLDE, LLC, A            )
11 |  CALIFORNIA LIMITED LIABILITY     )
    |  COMPANY, JOHN HANNA, AN         )
12 |  INDIVIDUAL, JENE PARK, AN        )
    |  INDIVIDUAL, SHOT IN THE         )
13 |  ARMOIRE, LLC, A FLORIDA          )
    |  LIMITED LIABILITY COMPANY, AND)
14 |  H&H FASHION, LLC, A FLORIDA      )
    |  LIMITED LIABILITY COMPANY,      )
15 |  AND DOES 1 THROUGH 50,           )
    |                                   )
16 |                Defendants.        )
    |                                   )
17 |
18 |           DEPOSITION OF MELDY RAFOLS
19 |              Los Angeles, California
20 |              Friday, August 18, 2017
21 |
22 |  Reported by:
    |  Damon M. LeBlanc
23 |  CSR No. 11958
    |  Job No. 2679975
24 |
25 |
    |                                        Page 1
```

```
1       CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
2               COUNTY OF LOS ANGELES, CENTRAL DISTRICT
3
4     PAULA THOMAS, INDIVIDUALLY      )
      AND IN THE RIGHT OF AND FOR     )
5     THE BENEFIT OF THOMAS WYLDE,    )
      LLC, A CALIFORNIA LIMITED       )
6     LIABILITY COMPANY, AND PDTW     )
      [PAULA DOROTHY THOMAS WYLDE],   )
7     LLC, A CALIFORNIA LIMITED       )
      COMPANY,                        )
8                                     )
                      Plaintiffs,     )
9                                     )
                 vs.                  )  Case No.: BC596495
10                                    )
      THOMAS WYLDE, LLC, A            )
11    CALIFORNIA LIMITED LIABILITY    )
      COMPANY, JOHN HANNA, AN         )
12    INDIVIDUAL, JENE PARK, AN       )
      INDIVIDUAL, SHOT IN THE         )
13    ARMOIRE, LLC, A FLORIDA         )
      LIMITED LIABILITY COMPANY, AND)
14    H&H FASHION, LLC, A FLORIDA     )
      LIMITED LIABILITY COMPANY,      )
15    AND DOES 1 THROUGH 50,          )
                                      )
16                    Defendants.     )
                                      )
17
18          Deposition of MELDY RAFOLS, taken on behalf
19    of the Plaintiff, at 2049 Century Park East,
20    Suite 2400, Los Angeles, California, beginning at
21    8:43 a.m. and ending at 12:20 p.m., Friday,
22    August 18, 2017, before Damon M. LeBlanc, Certified
23    Shorthand Reporter, Number 11958.
24
25

                                                   Page 2
```

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3            DT CONSULTING, INC.
              By:  Dimitrios P. Biller, Esq.
 4            15113 West Sunset Boulevard
              Suite 9
 5            Pacific Palisades, California 90272
              Telephone:  310-459-9870
 6            E-mail:  biller_idtconsulting@verizon.net
 7   For the Defendants:
 8            LAW OFFICES OF RICHARD BYRON PEDDIE
              By:  Richard Byron Peddie, Esq.
 9            5051 Euclid Avenue
              Boulder, Colorado 80303
10            Telephone:  303-444-5447
11   Also Present:
12            Paula Thomas
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

**Doug Lee**

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Tuesday, November 18, 2014 3:53 AM |
| **To:** | John Hanna |
| **Cc:** | Doug Lee; Roger Kuo; Meldy Rafols |
| **Subject:** | Re: Loan $2M.. |

We will split this loan between Eni and Shoeb...

Thanks

On Monday, November 17, 2014, John Hanna <johnhanna@thomaswylde.com> wrote:
Stephen thank you
Whose name should I put on the agreement ? Regards John

Sent from my iPhone

On Nov 17, 2014, at 4:33 PM, "Stephen Choi" <stephen@choisite.com> wrote:

> yes I can send next week no problem
>
> On Mon, Nov 17, 2014 at 6:24 PM, John Hanna <johnhanna@thomaswylde.com> wrote:
> Stephen.Yes,I did get it.
>
> I wasn't sure of our next step .. We will update the loan agreement to include the IP and send it
> to you tomorrow ..
>
> Please let's know who's name should be on the loan document and also, please could you also
> let's know  if we can receive the funds by next week to pay off CBC as they a requesting a date
> of settlement...
>
>
> many thanks john
>
> Regards,
>
> John Hanna
> Chief Executive Officer

# THOMAS WYLDE

3231 S. La Cienega Blvd.
Los Angeles, CA  90016

| | |
|---|---|
| phone: | 310 559 5549 |
| mobile: | 310 770 3741 |

| | |
|---|---|
| email: | johnhanna@ThomasWylde.com |

1

LEE000071

```
1                    I N D E X
2   THE WITNESS:                    EXAMINATION
3   MELDY RAFOLS
4                                        Page
5            BY MR. BILLER:           6, 143
6            BY MR. PEDDIE:         139, 156
7
8              E X H I B I T S
                                  Page        Page
9   Exhibit      Description     Introduced  Marked
10  Exhibit 65   Thomas Wylde LLC      41        41
                 Transactions by
11               Account
12  Exhibit 66   Agreement to Purchase 53        53
                 Membership Interest
13
    Exhibit 67   Exhibit A to Agreement 54       54
14               to Purchase Membership
                 Interest
15
    Exhibit 68   Thomas Wylde documents 67       67
16               beginning with Notice
                 of Issuance of New
17               Membership Interest
18  Exhibit 69   E-mail from David      84       84
                 Schnider to Paula Thomas
19               Subject: Meeting today
20  Exhibit 70   E-mails between John   88       88
                 Hanna and Meldy Rafols
21               Subject: Executive Paycut
22  Exhibit 71   E-mails between Paula  91       92
                 Thomas and Meldy Rafols
23               Subject: Executive Paycut
24  Exhibit 72   Third Amended Exhibit B 95      95
25                      Continued...

                                        Page 4
```

1   INDEX OF EXHIBITS (CONTINUED):

2                                              Page      Page

    Exhibit        Description           Introduced   Marked

3

    Exhibit 73     November 9, 2016            98        98
4                  "CONFIDENTIAL"
                   Kyu Hong Kim, CPA
5                  letterhead and
                   attached tax returns

6

    Exhibit 74     Thomas Wylde 2014          117       117
7                  Tax Returns

8   Exhibit 75     Thomas Wylde LLC           128       128
                   QuickReport

9

10              Witness Instructed Not To Answer

11                      Page      Line

12                       25        24

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 5

```
 1        Los Angeles, California, Friday, August 18, 2017
 2                    8:43 a.m. - 12:20 p.m.
 3
 4                         MELDY RAFOLS,
 5    having been first duly sworn by the Certified Shorthand
 6    Reporter, was examined and testified as follows:
 7
 8                         EXAMINATION
 9    BY MR. BILLER:
10         Q    State your name for the record, please.
11         A    Meldy Rafols.
12         Q    Do you mind if I called you Meldy or
13    Ms. Rafols?
14         A    Meldy is okay.
15         MR. PEDDIE:  I'd like to enter an appearance.
16         MR. BILLER:  I'm sorry.
17         MR. PEDDIE:  Richard Peddie on behalf of
18    Thomas Wylde, LLC, and noting that it is 8:43 a.m.
19         MR. BILLER:  Dimitrios Biller on behalf of
20    Plaintiff.  Also, Paula Thomas is sitting in on the
21    deposition.
22    BY MR. BILLER:
23         Q    Meldy, have you had your deposition
24    taken before?
25         A    No.
```

Page 6

```
1          Q    Have you ever testified in court?
2          A    Once.
3          Q    When was that?
4          A    Long time ago.  I can't remember.
5    2006-7, maybe.
6          Q    Was that for a civil case or criminal
7    case?
8          A    It's bankruptcy.
9          Q    Was that your own case?
10         A    No, it's a company.
11         Q    What company?
12         A    The Fashion House.
13         Q    I'm sorry?
14         A    The Fashion House.
15         Q    Okay.  And when did that bankruptcy take
16   place?
17         A    I believe, 2007.
18         Q    Okay.  Were you working for the company
19   at the time?
20         A    Yeah.
21         Q    In what position?
22         A    Controller.
23         Q    Okay.  And what chapter was that
24   bankruptcy?
25         A    11.
```

Page 7

1              Q        What was the result of the bankruptcy

2    proceedings?

3              A        I have no idea.

4              Q        Okay. And why were you called as a

5    witness, do you know?

6              A        Just to verify some information.

7              Q        On authenticating documents, things of

8    that nature?

9              A        No, just questions.

10             Q        Well, let's go over some of the ground

11   rules that govern these proceedings. I don't think

12   we're going to have any problems because you seem to be

13   a person who listens very well and waits until

14   responses are appropriate.

15             Only one person should speak at a time because

16   the court reporter is taking down what is being said by

17   everybody. So when everybody talks at the same time,

18   he cannot possibly take down what is being said. Do

19   you understand?

20             A        Yes.

21             Q        Okay. Also, you can't say "uh-huh" or

22   "huh-uh," physical gestures. The reporter is not

23   entitled to interpret those physical gestures. You

24   always have to give a verbal response. Do you

25   understand?

                                                          Page 8

```
 1          A      Yes.

 2          Q      You understand that you took an oath to

 3    tell the truth?

 4          A      Yes.

 5          Q      You understand that you have to tell the

 6    truth even if the information or answers you give are

 7    damaging to yourself personally or to Thomas Wylde or

 8    anybody else.  Do you understand?

 9          A      Yes.

10          Q      It's very important because our whole

11    system of justice depends on honesty and truthfulness.

12    Do you understand?

13          A      Yes.

14          Q      If you make a dishonest statement that I

15    believe to be truthful, it may change the whole course

16    of this case that's on going to trial on October 10.

17          A      Yes.

18          Q      The penalty of perjury applies.  Do you

19    understand that?

20          A      Yes.

21          Q      Do you understand the penalty of

22    perjury?

23          A      Yes.

24          Q      If any question or statement that I make

25    is vague, ambiguous, unintelligible, please tell me.
```

Page 9

**2014 DEPRECIATION AND AMORTIZATION REPORT**

OTHER      1

| Asset No. | Description | Date Acquired | Method | Life | Line No. | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 | IPAD | 052511 | 200DB | 5.00 | 17 | 882. | | | 882. | 882. | | 0. |
| 46 | COMPUTER EQUIPMENT | 072811 | 200DB | 5.00 | 17 | 4,949. | | | 4,949. | 4,949. | | 0. |
| 47 | FURNITURE | 082311 | 200DB | 7.00 | 17 | 1,110. | | | 1,110. | 1,110. | | 0. |
| 48 | FURNITURE | 092011 | 200DB | 7.00 | 17 | 1,200. | | | 1,200. | 1,200. | | 0. |
| 49 | COMPUTER EQUIPMENT | 110311 | 200DB | 5.00 | 17 | 3,950. | | | 3,950. | 3,950. | | 0. |
| 50 | MAC COMPUTER | 082912 | 200DB | 5.00 | 17 | 2,164. | | | 2,164. | 1,645. | | 415. |
| 51 | OFFICE FURNITURE | 060512 | 200DB | 7.00 | 17 | 5,427. | | | 5,427. | 3,765. | | 949. |
| 52 | OFFICE FURNITURE | 021412 | 200DB | 7.00 | 17 | 392. | | | 392. | 272. | | 69. |
| 53 | OFFICE FURNITURE | 021512 | 200DB | 7.00 | 17 | 3,262. | | | 3,262. | 2,264. | | 571. |
| 54 | FURNITURE | 060413 | 200DB | 7.00 | 17 | 901. | | 901. | | | | 0. |
| 55 | FURNITURE | 111813 | 200DB | 7.00 | 17 | 2,770. | | 2,770. | | | | 0. |
| 56 | FURNITURE | 120413 | 200DB | 7.00 | 17 | 868. | | 868. | | | | 0. |
| 57 | LEASEHOLD IMPROVEMENTS | 121713 | SL | 15.00 | 16 | 20,241. | | | 20,241. | 20,241. | | 0. |
| 58 | OFFICE FURNITURE | 082814 | 200DB | 7.00 | 19C | 2,437. | | 1,219. | 1,218. | | | 1,393. |
| 59 | OFFICE FURNITURE | 090214 | 200DB | 7.00 | 19C | 1,740. | | 870. | 870. | | | 994. |
| 60 | OFFICE FURNITURE | 122014 | 200DB | 7.00 | 19C | 877. | | 439. | 438. | | | 502. |
| 61 | COMPUTER | 081414 | 200DB | 5.00 | 19B | 1,310. | | 655. | 655. | | | 786. |
| 62 | COMPUTER | 082614 | 200DB | 5.00 | 19B | 1,136. | | 568. | 568. | | | 682. |

428102
05-01-14

(D) - Asset disposed

* ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction

9.3

```
 1   answer the question.  Do you understand?

 2          A      Yes.

 3          Q      At the end of these proceedings, you'll

 4   receive a transcript.  The transcript will contain

 5   everything that was said here today by counsel, by me,

 6   by you, objections, statements -- things of that

 7   nature.  Do you understand?

 8          A      Yes.

 9          Q      Have you ever seen a transcript?

10          A      Discoverable accounts?

11          Q      No.  Let me explain.  A transcript is

12   going to be a -- it's going to be a booklet.  And it's

13   going to have all the statements made here, my

14   questions, your answers, objections -- things of that

15   nature.  Do you understand?

16          A      Yes.

17          Q      You'll be given an opportunity to change

18   any answer that you make here today when you receive

19   the transcript and review it.  Do you understand?

20          A      Yes.

21          Q      But it's very important that you

22   minimize any opportunity that you will have to make

23   changes after the deposition.  Do you understand?

24          A      Yes.

25          Q      It's very important that you provide
```

Page 11

```
 1    your most accurate testimony here today.  Do you
 2    understand?
 3              A     Yes.
 4              Q     Although you have the right and freedom
 5    to make changes before you sign the transcript under
 6    penalty of perjury, if you make changes, you're denying
 7    me the opportunity to question you about those changes.
 8    Do you understand?
 9              A     Yes.
10              Q     Because that's how this works.  I'll ask
11    you a question.  You'll make a response, and that
12    response may trigger another question I didn't think
13    about.
14              A     Okay.
15              Q     And I'll go off on a tangent.  I'll
16    develop that information until it's exhausted.  Do you
17    understand?
18              A     Yes.
19              Q     When you get the transcript after you
20    review and approve of it and after you make any changes
21    you deem necessary, you have to sign under penalty of
22    perjury.  Do you understand?
23              A     Yes.
24              Q     What you are saying when you do that is
25    every answer you gave at that time was truthful and
```

Page 12

Case 6:16-bk-15889-SY  Doc 394  Filed 10/28/19  Entered 10/28/19 12:23:13  Desc
Main Document    Page 15 of 204

```
 1   answer honest.  Do you understand?
 2           A      Yes.
 3           Q      If there is an answer that is not
 4   truthful and not honest, believe me I will
 5   cross-examine you hard on that.  Do you understand?
 6           A      Yes.
 7           Q      In front of the judge and jury, because
 8   you are going to be a trial witness; okay?
 9           A      Yes.
10           Q      At the end of the deposition, Counsel
11   and I will reach a stipulation in which we'll probably
12   agree -- we may not -- that you'll have two weeks to
13   review the transcript.  You'll send it to counsel.
14           MR. BILLER:  She doesn't have to send it to
15   you.  She can send it to me.  She's not an employee.
16   We'll deal with that later.
17           MR. PEDDIE:  It can be sent to her directly.
18   Keep it fast, I guess.
19           MR. BILLER:  Yeah.
20   BY MR. BILLER:
21           Q      You understand everything I just said?
22           A      Yes.
23           Q      Okay.  Have you done anything to prepare
24   for this depo?  Have you done anything to prepare for
25   the deposition?
```

Page 13

```
 1            A       Probably just tried to recollect what
 2   you might be asking me.
 3            Q       Do you know Richard Peddie?
 4            A       Yes.
 5            Q       When did you meet with him?
 6            MR. PEDDIE:  Meet with me?
 7   BY MR. BILLER:
 8            Q       Did you ever meet with Richard Peddie
 9   before the deposition?
10            A       No.
11            Q       How do you know Mr. Peddie?
12            A       From the -- there was a legal issue that
13   he handled in Thomas Wylde.
14            Q       Okay.  What legal issue was that?
15            A       I think that was a case that was filed
16   against Thomas Wylde?
17            Q       By Schiffman?  By Dr. Schiffman?
18            A       Schiffman is -- I'm not sure if he
19   handled Schiffman.  I think it was someone else.
20            Q       Can you identify the case?
21            A       It was a case filed by Paula.
22            Q       Okay.  All right.  Let's talk about you.
23   Why don't you give me some background information about
24   your personal life; like when and where were you born,
25   things of that nature?
```

Page 14

```
1              A     I was born in the Philippines.

2              Q     And when were you born?

3              A     1966.

4              MR. PEDDIE:  That's three of us.

5              THE WITNESS:  We have the same birthday.

6    BY MR. BILLER:

7              Q     So when did you move to the

8    United States?

9              A     2003.

10             Q     When you were 23.  So --

11             THE WITNESS:  2003.

12             MR. PEDDIE:  2003.

13   BY MR. BILLER:

14             Q     Oh, 2003.  So that would make you 40

15   years old?

16             A     50.

17             Q     You were born in 1963?

18             A     '66.

19             Q     And you moved to the United States in

20   2003?

21             A     Yes.

22             Q     Okay.  Before coming to the

23   United States, what did you do?

24             A     I'm an accountant.

25             Q     Tell me your educational background.
```

Page 15

PDTW, LLC                                                                    20-4937773

| SCHEDULE L | OTHER ASSETS | | STATEMENT 7 |
|---|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| ADVANCE-THOMAS WYLDE, LLC | 0. | 36,734. |
| ADVANCES TO OFFICERS | 265,532. | 211,901. |
| DEPOSITS | 83,217. | 83,217. |
| TOTAL TO SCHEDULE L, LINE 13 | 348,749. | 331,852. |

| SCHEDULE L | OTHER CURRENT LIABILITIES | | STATEMENT 8 |
|---|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| ACCRUED EXPENSES | 24,780. | 22,500. |
| ADVANCES FROM THOMAS WYLDE, LLC | 0. | 1,782,000. |
| CREDIT CARDS PAYABLE | 28,428. | 66,128. |
| CUSTOMER DEPOSITS | 208,933. | 157,697. |
| NOTE PAYABLE | 125,000. | 125,000. |
| PAYROLL TAX PAYABLE | 1,078. | 0. |
| TOTAL TO SCHEDULE L, LINE 17 | 388,219. | 2,153,325. |

| SCHEDULE L | OTHER LIABILITIES | | STATEMENT 9 |
|---|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| NOTE PAYABLE - LONG TERM | 0. | 270,000. |
| TOTAL TO SCHEDULE L | 0. | 270,000. |

| | | |
|---|---|---|
| 1 | A | No. Jut one accounting firm, and the |
| 2 | rest are private. | |
| 3 | Q | Okay. So identify the four companies |
| 4 | you worked for in the Philippines? | |
| 5 | A | One is a manufacturing company, one is a |
| 6 | fashion company, and then the last one is a -- it's | |
| 7 | involved with ships. | |
| 8 | Q | Is it a shipping company? |
| 9 | A | It's a shipping company. |
| 10 | Q | Own ships or -- |
| 11 | A | No. It's -- |
| 12 | Q | Export/import businesses? |
| 13 | A | Yes. |
| 14 | Q | In each of those companies, did you use |
| 15 | QuickBooks? | |
| 16 | A | No. |
| 17 | Q | What system did you use? |
| 18 | A | It was manual back then. |
| 19 | Q | It was all manual? |
| 20 | A | Yeah. |
| 21 | Q | Good old days. |
| 22 | A | I think QuickBooks was being introduced |
| 23 | when I was leaving. Not QuickBooks, Peachtree. | |
| 24 | Q | Are you married? |
| 25 | A | I was. |

Page 17

```
1              Q        Divorced I take it?

2              A        Yes.

3              Q        Children?

4              A        No.

5              Q        And you came to the United States in

6    2003 because?

7              A        I moved here, visit my sister, and came

8    for work.

9              Q        So you came to the United States to

10   visit your sister and to look for work?

11             A        Yes.

12             Q        And what type of work were you looking

13   for?

14             A        Accounting.

15             Q        And for any particular firm?

16             A        Private.

17             Q        Private business?

18             A        Yes.

19             Q        Give me your work experience from

20   2003 --

21             A        (Indicating.)

22             Q        Sure.  If you need to get a drink of

23   water, you need to go to the restroom, you want to take

24   a break, just let me know.

25             A        I will.
```

Page 18

```
 1          Q      I mean, you can do that.  So let's talk
 2    about the companies you worked for starting in 2003.
 3          A      I worked with the Fashion House.
 4          Q      Fashion House.  And what did you do?
 5          A      As an accountant.
 6          Q      And how long did you work for that
 7    company?
 8          A      About a little over five years.
 9          Q      So approximately 2008 you left that
10    company?
11          A      Early -- toward the end of 2008, early
12    2009.
13          Q      And that was the Fashion House?
14          A      Yes.
15          Q      Was that a fashion business?
16          A      Yeah.
17          Q      Okay.
18          A      It's footwear.
19          Q      Footwear, okay.  So then you started
20    with another company I take it in 2009?
21          A      I practice independently.
22          Q      Independently.
23          A      Consulting.
24          Q      And how long did you do that?
25          A      I am still doing that now on different
```

Page 19

1    clients.

2        Q       You work for Thomas Wylde at some point,

3    didn't you?

4        A       Yes.

5        Q       And you worked for PDTW?

6        A       No, not for PDTW.

7        Q       Who's John Hanna?

8        A       John Hanna is the CEO of Thomas Wylde.

9        Q       He was the CEO of Thomas Wylde?

10       A       He was the CEO.

11       Q       So what do you know about his departure

12   from Thomas Wylde?

13       A       I'm not sure, but I believe he -- I

14   believe he was let go.

15       Q       Okay.  Have you talked to him since he

16   worked at Thomas Wylde?

17       A       Yeah.

18       Q       When?

19       A       I've been working with him.

20       Q       So when did you talk to him last?

21       A       Yesterday.

22       Q       So did you talk about this case?

23       A       No.  I just told him I'm going to a

24   deposition but not particularly details.

25       Q       John Hanna did not tell you what to say

Veritext Legal Solutions
866 299-5127

1    or don't say?

2          A       No.

3          Q       John Hanna did not say anything about

4    the litigation?

5          A       He just said stay relaxed and be calm.

6          Q       Did he say anything else?

7          A       No.

8          Q       Okay.  So you were working independently

9    from 2009 until now?

10         A       Yes.

11         Q       When did you start working for

12   Thomas Wylde?

13         A       2014.

14         Q       2014.  What month?

15         A       July.

16         Q       Okay.  Were you working directly for

17   Thomas Wylde?

18         A       Yes.

19         Q       So you were receiving a paycheck from

20   Thomas Wylde?

21         A       Yes.

22         Q       Did you have other business on the side?

23         A       Yes.

24         Q       Did Thomas Wylde know that?

25         A       Yes.

Page 21

```
 1          Q      So who brought you into Thomas Wylde?
 2          A      John Hanna.
 3          Q      Do you remember the month you started?
 4          A      For Thomas Wylde?
 5          Q      Yes.
 6          A      July 2014.
 7          Q      Okay.  Interesting.  Do you remember the
 8  day you started?
 9          A      Not particularly.
10          Q      Okay.  Because --
11          A      I think it was middle.
12          Q      -- in -- before July 22nd, there was no
13  Thomas Wylde.  Do you understand that?
14          A      Okay.
15          Q      Thomas Wylde started to exist on
16  July 22, 2014.  Do you know that?
17          A      I don't remember.
18          Q      Okay.  So did you start to work for
19  John Hanna before the 26th of 2014?
20          A      I came on board in July.  And he came on
21  board, I think, a few weeks after me.  I interviewed
22  with Paula and Jene.
23          Q      And he's the one who told you you should
24  interview with him; right?
25          A      With whom?
```

Page 22

```
1          Q       Thomas Wylde -- or Paula and Jene.
2          A       Yes.
3          Q       And what did he tell you about why you
4   should do that?
5          A       Well, he wanted me on board because he
6   trust how I work.
7          Q       Okay.  And how many -- how much time did
8   you spend working with John Hanna over the years before
9   2014?
10         A       I've worked with him at the
11  Fashion House.
12         Q       Five years?
13         A       Yes.
14         Q       What was his title at Fashion House?
15         A       He was president and CEO.
16         Q       And that company went bankrupt?
17         A       Yes.
18         Q       And Thomas Wylde is in bad financial
19  position today, isn't it?
20         A       I believe so.
21         MR. PEDDIE:  Objection, calls for speculation.
22  BY MR. BILLER:
23         Q       Do you think it is close to filing for
24  bankruptcy?
25         MR. PEDDIE:  Objection, calls for speculation.

                                               Page 23
```

1    BY MR. BILLER:

2        Q        You can answer.

3        A        I believe that's their plan before.

4        Q        Okay.  And what do you know about that?

5        A        Not much.

6        Q        Okay.  When did you hear that they were

7    first going to file for bankruptcy?

8            MR. PEDDIE:  Objection, assumes facts; calls

9    for speculation.

10   BY MR. BILLER:

11       Q        You can answer.

12       A        I don't know if they are filing.

13       Q        Did John Hanna tell you that they might

14   file for bankruptcy?

15       A        No.

16       Q        How did you learn that Thomas Wylde may

17   file for bankruptcy?

18       A        It was just talk at that.  I think it

19   was a suggestion.

20       Q        When was the suggestion made?

21       A        I can't remember.

22       Q        Was it in 2014?

23       A        No.

24       Q        When did you leave Thomas Wylde?

25       A        Last year.

                                         Page 24

```
1          Q        2016?

2          A        Yes.

3          Q        What month?

4          A        I think in either early June or middle

5    of June.

6          Q        So you were there for two years

7    essentially?

8          A        Yes.

9          Q        Did you hear about bankruptcy discussion

10   closer to July 2014 or closer to June 2016?

11         A        It was not a discussion.

12         Q        Okay.

13         A        I think it was just a suggestion -- an

14   idea or suggestion, but it was not --

15         Q        Who came up with the idea or suggestion?

16         A        I'm not so sure.  I believe David might

17   have said it.

18         Q        David Schnider?

19         A        David Schnider.

20         Q        How about John Hanna, he's the CEO?

21         A        He's talking to David.  I was not

22   participating in their discussion.

23         Q        So you overheard this discussion between

24   Schnider and John Hanna; correct?

25              MR. PEDDIE:  Objection, solicits
```

Page 25

1    attorney-client privileged material.

2         MR. BILLER:  Okay.  Do you instruct her not to

3    answer?

4         MR. PEDDIE:  If she overheard something that

5    was between John and David as a private conversation.

6         MR. BILLER:  Well, they didn't take any

7    reasonable steps to make sure there was no disclosure

8    to a third party.

9         MR. PEDDIE:  I don't know whether they took

10   reasonable steps or not.

11        MR. BILLER:  So are you instructing her to

12   answer?  That's all I want to know.

13        MR. PEDDIE:  Yes, I do.  Would you like a

14   stipulation that the discussion of bankruptcy was

15   occurring at least as early as August of 2015?

16        MR. BILLER:  I don't know that to be true.

17        MR. PEDDIE:  Well, okay.  I thought that's what

18   you wanted to establish.

19        MR. BILLER:  If that's what you're saying and

20   that's the truth, then I can't stipulate it because I

21   don't know if it's the truth.  But if you are telling

22   me that's true, it's on the record and I think it's an

23   admission.

24        MR. PEDDIE:  You know that we had to go seek

25   additional capital and all that.  And if that hadn't

                                        Page 26

1    happened, we would have been belly up.

2         MR. BILLER:  And the additional capital was

3    from Choi?

4         MR. PEDDIE:  That's the only place we could

5    find it.

6    BY MR. BILLER:

7         Q    Okay.  Let's get moving on to more

8    interesting topics.  I would like to know, other than

9    being a CPA from 2003 to the present time and working

10   for Thomas Wylde, have you worked for any other company

11   beside Fashion Company?

12        A    Can I just stipulate that I'm not a CPA

13   here?

14        Q    That's fine.  You took the CPA license

15   in the Philippines; right?

16        A    Yes.

17        Q    Is there any reason why you didn't take

18   it here?

19        A    I don't want to practice as a CPA here.

20        Q    You want to do more work like an

21   accountant?

22        A    More managerial, more forecasting.

23        Q    That's great.  So I need to identify

24   your complete employment history between 2003 and the

25   present time.  I know between 2003 and 2009 you worked

Page 27

```
1    for this fashion company; correct?

2         A    Uh-huh.

3         Q    Is that a yes?

4         A    Yes.

5         Q    Then you went on your own; is that

6    correct?

7         A    Yes.

8         Q    And you started to work for Thomas Wylde

9    in July 2014; correct?

10        A    Yes.

11        Q    And you stopped working for Thomas Wylde

12   in June 2016; correct?

13        A    Yes.

14        Q    Did you work for any company between

15   2009 and 2014?

16        A    Yes.

17        Q    What company?

18        A    Interior design company.

19        Q    What's it called?

20        A    Crate Interiors, C-r-a-t-e.

21        Q    How long did you work for that company?

22        A    Until 2012.

23        Q    Okay.  So from 2009 to 2012?

24        A    Yes.

25        Q    What did you do between 2012 and 2014?
```

Page 28

1       A       I moved up north.

2       Q       Did you work for any company up there?

3       A       Yes.

4       Q       What company?

5       A       It's wholesale and retail and

6   manufacturing as well.

7       Q       Okay.  What's that company called?

8       A       It's called -- it's two companies.  One

9   is The Laughing Giraffe and Earthly Nutrition.

10      Q       Are those the only two companies you

11  worked for between -- that you worked for in that time

12  frame?

13      A       Yes.

14      Q       And in all of these jobs that you've

15  had, you've been -- you've not been performing the work

16  as a CPA but of an accountant?

17      A       Yeah, internal controller.

18      Q       What is an internal controller?

19      A       Basically an accounting manager handling

20  the books, financial statements, budgets, and

21  reporting.

22      Q       Okay.  So you had personal knowledge of

23  the financial state of Thomas Wylde as late as

24  June 2016?

25      A       Yes.

Page 29

1          Q       Now, identify all the positions you had

2     with Thomas Wylde?

3          A       Financial controller.

4          Q       Human resource?

5          A       Yes.

6          Q       So what did you do as human resource?

7          A       I just got documents and filed their HR

8     files, personnel files, and payroll.

9          Q       You got to walk me through this; okay?

10    Let's talk about the first one.  What documents did you

11    get?

12         A       From the employees?

13         Q       Yes.  Wherever you got them from.  I

14    don't know.

15         A       They're W4, I-9, and offer letter.

16         Q       Anything else?

17         A       And a copy of the ID.

18         Q       And did you get documents from any other

19    source?

20         A       I don't understand.  Like, what source?

21         Q       Whatever source.  It could be anybody.

22    Did you get any documents from any other source in your

23    position as human resource person?

24         A       That's about all I can remember.

25         Q       Were you the manager of human resource?

                                          Page 30

1    What was your title?

2          A      It was not part of that.  I was handling

3    part of HR in that aspect.

4          Q      Okay.  You were the only one handling

5    HR; right?

6          A      At that time, yes.

7          Q      Okay.  Tell me exactly what your duties

8    and responsibilities were specifically when you were

9    handling HR?

10         A      Just coordination with the time; time

11   sheet; payroll; and again, keeping those documents,

12   record keeping.

13         Q      What is included in record keeping?  Of

14   the document you received from employees?

15         A      Yes, those files, personnel files.

16         Q      Did you do anything else?

17         A      That's about it.

18         Q      Did you sit in any conversations with

19   Paula Thomas regarding complaints she had about

20   Jene Park and John Hanna?

21         A      Yes, I did.

22         Q      And how many times?

23         A      I can't really remember.  I would say

24   two or three times maybe.

25         Q      What year?

Page 31

1          A       Late -- probably late 2014.

2          Q       And what were the nature of the

3    discussions?

4          A       I think about function and --

5          Q       Production?

6          A       Function.

7          Q       But function meaning production?

8          A       Function in terms of decision making or

9    who's handling what.

10         Q       What did you hear Paula Thomas say

11   during those discussions?

12         A       Well, she just mentioned that -- I can't

13   remember if it's a function between Jene and her, who's

14   going to be handling what.

15         Q       Was it a discussion about design and who

16   is going to be the creative director?

17         A       No.

18         Q       What was it about, then?

19         A       It's a little bit more personal.  Like

20   she doesn't like Jene, to that effect.

21         Q       And what did you hear to make you

22   conclude that she didn't like Jene?

23         A       She said it herself.

24         Q       And did Jene like Paula?

25         A       I'm not so sure, but it seems to me.

                                      Page 32

1          Q       So there was a mutual dislike for each

2    other?

3          MR. PEDDIE:  Objection, mischaracterizes the

4    testimony.

5    BY MR. BILLER:

6          Q       You can answer the question.

7          A       I can only assume.

8          Q       But did you see anything or hear

9    anything to indicate to you that Jene Park liked

10   Paula Thomas?

11         A       They seemed to be civil with each other

12   when in the office.

13         Q       But you said Paula Thomas told you she

14   didn't like Jene Park; right?

15         A       She said that.

16         Q       Did Jene Park say anything similar to

17   that, what Paula said to you?

18         A       No.  Jene -- Jene loves everybody.

19   That's what she keeps saying.

20         Q       She loves everybody?

21         A       Yes.

22         Q       You have to worry about people like

23   that.

24         A       That's -- I do my own precaution.

25         Q       Okay.  Were you involved in creating the

                                        Page 33

1    employee handbook?

2        A    No.

3        Q    Who created that?

4        A    It was there already when I got in.  I

5    believe it was David Schnider who introduced that.

6        Q    And who actually drafted it?

7        A    I would I just assume it's David.  It

8    came from him.

9        Q    Okay.  And are you certain that was in

10   2014?

11       A    No.  I don't -- I'm not certain, but I

12   know it was in place at the time.  But I'm not sure if

13   it is 2014, if it was done in 2014.

14       Q    Were all the employees supposed to sign

15   off receipt of that booklet?

16       A    Yes.

17       Q    And did you maintain a record of that?

18       A    Yes.

19       Q    And where are those records maintained?

20       A    It should be in their folders as well.

21       Q    In their individual folders?

22       A    Yes.  Or in the handbook.

23       Q    So it would be in Paula's handbook or

24   her folder; right?

25       A    It should be, yes.

Page 34

PDTW, LLC                                                                    20-4937773

---

CA 568                    PENALTIES AND INTEREST                      STATEMENT   1

| FROM | TO | AMOUNT | PTRS/ MBRS | RATE | DAYS | MOS | INTEREST | PENALTIES |
|------|-----|--------|-----------|------|------|-----|----------|-----------|
| 06/15/14 | 12/09/14 | 11,790. | | .1000 | | | | 1,179. |
| | | | | | | | | 1,179. |
| TOTAL TO FORM 568, LINE 15 | | | | | | | | 1,179. |

---

CA 568            AMOUNT PAID WITH FORMS 3537, 3522, 3536             STATEMENT   2

| DESCRIPTION | AMOUNT |
|-------------|--------|
| AMOUNT PAID WITH FORM 3537 | 0. |
| AMOUNT PAID WITH FORM 3522 | 12,969. |
| AMOUNT PAID WITH FORM 3536 | 800. |
| TOTAL TO FORM 568, LINE 6 | 13,769. |

---

CA SCHEDULE A                COGS OTHER COSTS                         STATEMENT   3

| DESCRIPTION | AMOUNT |
|-------------|--------|
| FREIGHT COSTS | 63,693. |
| PACKAGING COSTS | 33,840. |
| TOTAL TO SCHEDULE A, LINE 5 | 97,533. |

---

CA                              OTHER INCOME                          STATEMENT   4

| DESCRIPTION | AMOUNT |
|-------------|--------|
| MISCELLANEOUS | 19,212. |
| TOTAL TO TRADE OR BUSINESS INCOME SCHEDULE, LINE 10 | 19,212. |

STATEMENT(S) 1, 2, 3, 4

PDTW, LLC                                                                20-4937773

| CA | DEPRECIATION AND AMORTIZATION | STATEMENT 5 |
|----|-------------------------------|-------------|

| DESCRIPTION | REPORTED ELSEWHERE | REPORTED ON PAGE 1 |
|-------------|--------------------|--------------------|
| DEPRECIATION - TRADE OR BUSINESS | | 17,299. |
| TOTAL TO LINES 17B AND 17C | | 17,299. |

| CA | OTHER DEDUCTIONS | STATEMENT 6 |
|----|------------------|-------------|

| DESCRIPTION | AMOUNT |
|-------------|--------|
| ADVERTISING | 91,523. |
| AUTO EXPENSE | 24,987. |
| BANK FEES | 32,442. |
| COMMISSIONS | 98,596. |
| COMPUTER AND INTERNET EXPENSE | 13,303. |
| DUES AND SUBSCRIPTIONS | 2,825. |
| EQUIPMENT RENTAL | 23,516. |
| INSURANCE | 10,439. |
| MEALS AND ENTERTAINMENT | 23,112. |
| OFFICE EXPENSE | 47,787. |
| OUTSIDE SERVICES | 81,092. |
| PAYROLL FEES | 476. |
| PHOTOSHOOT EXPENSE | 97,524. |
| PICK AND PACK EXPENSE | 153,690. |
| POSTAGE AND SHIPPING | 95,491. |
| PRINTING AND REPORDUCTION | 20,801. |
| PROFESSIONAL FEES | 398,607. |
| PUBLIC RELATIONS | 110,432. |
| REFERENCE | 57,707. |
| SHOWROOM EXPENSE | 98,416. |
| STORAGE | 78,535. |
| SUPPLIES | 46,773. |
| TELEPHONE | 33,384. |
| TRAVEL | 228,123. |
| UTILITIES | 13,269. |
| RENT | 403,172. |
| PAYROLL TAX EXPENSE | 73,806. |
| TAX AND LICENSE | 6,574. |
| CALIFORNIA TAXES - OTHER | 800. |
| REPAIRS | 15,379. |
| TOTAL TRADE OR BUSINESS OTHER DEDUCTIONS, LINE 21 | 2,382,581. |

```
 1              A       Yes.

 2              Q       So what are your duties and

 3     responsibilities as a financial controller for

 4     Thomas Wylde between July 2014 and June 2016?

 5              A       The function did you say?

 6              Q       What were your duties?

 7              A       Duties?  I handled the books.  I

 8     oversee the financials, the bank accounts, and

 9     reporting and coordination with management and the

10     budget as well.

11              Q       Okay.  You handled the books, oversee

12     the financials, did the banking, coordinated with

13     management, and budget.  Did I miss anything?  I think

14     I missed one.

15              A       Partial HR.

16              Q       Okay.  Well, if I missed one --

17              MR. BILLER:  Can you read her answer back,

18     please?

19                      (The record was read by the Certified

20              Shorthand Reporter.)

21              MR. BILLER:  Okay.  I got it all.

22     BY MR. BILLER:

23              Q       All right.  Let's talk about handling

24     the books.  What did you do in terms of the book, and

25     what books are you talking about?
```

Page 37

```
 1          A       QuickBooks.

 2          Q       QuickBooks?

 3          A       Yeah.

 4          Q       You handled QuickBooks?

 5          A       Yes.

 6          Q       Now, does that include simply taking

 7   information off of other sources regarding expenses and

 8   revenues and things of that nature and inputting that

 9   information into the QuickBooks software program?

10          A       Yes.

11          Q       So the QuickBooks data is actually the

12   third party to receive information.  The first is from

13   the vendor or the expenses, whatever, the second is

14   from you, and then you got QuickBooks; right?

15          A       When you say source --

16          Q       Well, you can't put data into QuickBooks

17   without receiving information from a third party.

18          A       Source documents.

19          Q       Right.  Source documents.  So QuickBooks

20   is only as accurate as the information going in.

21          A       Yes.

22          Q       Okay.  QuickBooks can be easily

23   manipulated to give false information reports; correct?

24          A       Yes, if you enter wrong data.

25          Q       So if you were given an invoice
```

Page 38

1    regarding $2 million and you believed it to be a true

2    document but it wasn't, that would affect all of the

3    data in QuickBooks; correct?

4            A       I verify the documents.

5            Q       How do you verify the documents?

6            A       I would go to the person, the bank, to

7    what that is about.  And I would ask what the nature of

8    the transaction and input in the QuickBooks.

9            Q       So if you got a bill from the telephone

10   company, you would call up telephone company and say,

11   "I just got a bill from the telephone company for

12   $9,000.  Can you verify this"?

13           A       Not --

14           Q       For every source document you verified?

15           A       Yes.

16           Q       Every single one?

17           A       As much as I can, yes.

18           Q       So there might be times where you didn't

19   verify documents?

20           A       No.  Because before you enter it, you

21   need to verify the accuracy of the information you

22   input in QuickBooks to make sure that the transaction

23   is valid and legit.

24           Q       How did you verify the investments by

25   Hillshore?

                                              Page 39

1         A       Getting the information from the bank

2    and their -- what the nature of that transaction is.

3         Q       Who did you talk to from Hillshore?

4         A       Stephen Choi.

5         Q       How many times did you talk to

6    Stephen Choi?

7         A       Very seldom.

8         Q       How much did he invest in Thomas Wylde

9    while you were there?

10        A       I don't remember.  I believe it's up to

11   about 9 million.

12        Q       9.1?

13        A       Maybe 9.1.  9.5 maybe.

14        Q       And all of that was investment?

15        A       Some of it, I think, are loans.

16        Q       Like what?

17        A       I can't remember if I don't see the

18   documents.

19        Q       How much was the loan?

20        A       I don't remember the amount.

21        Q       Okay.  What loan documents did you

22   receive to confirm it was a loan as opposed to

23   investment?

24        A       There should be a promissory note that

25   was executed.

                                           Page 40

1          Q        Is that it?

2          A        Yes.

3          Q        Really?  Okay.  Since we're on this

4    topic -- where were we at?

5          THE REPORTER:  I have no idea.  Didn't you have

6    other depositions?

7    BY MR. BILLER:

8          Q        I'm going make the representation to you

9    that Stephen Choi, he testified in this case.  Came by

10   TW to pick up a document showing what his investments

11   were, and I'm about to show you that document.

12         MR. BILLER:  Let's have this marked as

13   Exhibit 65.

14                  (Exhibit 65 was marked for

15         identification by the Certified Shorthand

16         Reporter and is attached hereto.)

17   BY MR. BILLER:

18         Q        Are you familiar with that document?

19         A        Yeah.  This schedule is from QuickBooks.

20         Q        Did you hand -- did you generate this

21   document and give it to Mr. Choi?

22         MR. PEDDIE:  Objection to form.

23         THE WITNESS:  I don't remember giving it to

24   him.

25   ///

                                          Page 41

1    BY MR. BILLER:

2        Q      Are you the one who made the entries?

3        A      Yes.

4        Q      So on August 8 -- August 26, 2014, you

5    made the entry, "Incoming Domestic Wire in 1/Hillshore

6    600,000."  You made that entry?

7        A      Yes.

8        Q      Okay.  The next one says, "Incoming

9    Domestic Wire in Hillshore 350,000," dated

10   September 18, 2014.  Did you make that entry?

11       A      Yes.

12       Q      Next one says [as read] "Fund transfer

13   from Hillshore investment on October 14, 2014 for

14   $350,000."  Do you see that?

15       A      Yes.

16       Q      Did you make that entry?

17       A      Yes.

18       Q      The next one is 500,000 loan to

19   Thomas Wylde to be converted to equity L.A. in the

20   amount of $500,000, dated November 13, 2014.  Did you

21   make that entry?

22       A      Yes.

23       Q      Okay.  The next one says

24   [as read], "December 12, 2014, December Funding 2014

25   $500,000."  Do you see that?

Page 42

1        A        Which one?

2        Q        The one dated --

3        A        Oh, yeah.

4        Q        You made that entry?

5        A        Yes.

6        Q        And the one dated December 31, 2014, it

7    says, "To reclass Hillshore loan to Equity $2.3

8    million."  Do you see that?

9        A        Yes.

10       Q        Did you make that entry?

11       A        Yes.

12       Q        When did that reclassification take

13   place?

14       A        Year end of 2014.

15       Q        So by December 31, 2014?  Is that a yes?

16       A        Yes.

17       Q        And how do you know that?

18       A        There should be some documents to

19   support that.  I don't remember what those were.

20       Q        There should be, shouldn't there?

21       A        Yeah.

22       MR. BILLER:  Are you going to produce those?

23       MR. PEDDIE:  You have hem.

24       MR. BILLER:  No, I don't.

25       MR. PEDDIE:  You have the unit --

Page 43

1          MR. BILLER:  You know what --

2          MR. PEDDIE:  -- issuance from September 2015

3     where Hillshore committed -- this is 2014.  Hillshore

4     committed $5.5 million of investments.

5          MR. BILLER:  That has nothing to do with

6     $2.3 million loaned to equity conversion.

7          MR. PEDDIE:  It has everything in do with it.

8          MR. BILLER:  There's no document.

9          MR. PEDDIE:  You have the document.

10         MR. BILLER:  No, I don't.

11         MR. PEDDIE:  You have the document.  It's the

12    Hillshore --

13         MR. BILLER:  That document does not state

14    anything about conversion.  Nothing.

15         MR. PEDDIE:  If you owe me a hundred

16    dollars --

17         MR. BILLER:  I don't want to argue.

18         MR. PEDDIE:  That's it, Dimitrios.  By the way,

19    I'm objecting to this exhibit only as much as it's a

20    report generated in February 2017.  And obviously the

21    entries go beyond her knowledge --

22         MR. BILLER:  Obviously that's because --

23         MR. PEDDIE:  -- because she no longer worked

24    there after the entries.

25         MR. BILLER:  Fine.

                                      Page 44

1          MR. PEDDIE:  Can you give me 20 seconds?

2          MR. BILLER:  Why?

3          MR. PEDDIE:  I need to grab some documents from

4     her.

5          MR. BILLER:  Yeah.

6          MR. PEDDIE:  Actually go ahead.

7     BY MR. BILLER:

8          Q     Do you have any reason to believe that

9     somebody changed the information depicted in this

10    Exhibit 65?

11         A     Repeat that again.

12         Q     Do you have any reason to believe that,

13    after you made these entries, somebody else went into

14    QuickBooks and changed the entries?

15         A     I wouldn't know that.

16         Q     Okay.  Now, when you have a loan to

17    conversion -- loan conversion to equity, identify the

18    types of documents that should go with that

19    transaction?

20         A     I believe there -- the legal document

21    that might have been executed --

22         MR. PEDDIE:  Objection, calls for an expert

23    opinion.

24    BY MR. BILLER:

25         Q     You can answer the question.  Go ahead,

                                        Page 45

1   answer.

2        A       A distribution.  I can't remember what

3   the document is called.  But there is a list of

4   distribution, what the capitalization is.

5        Q       Okay.  And are you talking about the

6   Schedule B on the operating agreement?

7        A       I don't remember that one.

8        Q       Okay.  Do you understand what a loan to

9   equity conversion is?

10       A       I would believe so.

11       Q       Why don't you explain that to me.

12       A       Well, it was a loan -- well, basically

13   converted to equity because the company owned more

14   shares for -- the distribution has been -- it was

15   distributed to the owners.

16       Q       So when Hillshore made these, quote,

17   loans and they were to be converted to equity, that

18   would be known at the time the money received?

19       A       Say that again.

20       Q       Okay.  You have these various entries of

21   monies, and you have these entries that say loan

22   converted to equity.  Did you input those entries when

23   you received the money?

24       A       No.  When the document was executed.

25       Q       On December 31?

1    A  It could be other date, but it's the

2 year end when you reclass that.

3    Q  So you went back in the system, and you

4 made these entries?

5    A  Not --

6    Q  I want to know when these entries were

7 made.  We have these deposits dated August, September,

8 October to November, December and December.

9 $2.3 million.  And they were allegedly loans converted

10 to equity.  The words establishing that fact are

11 printed on this Document 65; right?

12    A  Yes.

13    Q  And you inputted those words; right?

14    A  Yes.

15    Q  So when did you input the words?

16    A  I don't remember when I put the entry.

17    Q  Okay.  What was your normal custom and

18 practice?  You were an accountant for, I don't know, 20

19 or 30 years.  It can't be the first time that you made

20 an entry loan to conversion equity, did you?

21    A  Not very often.

22    Q  So what was your custom and practice?

23    A  Well, you input the transaction when the

24 transaction happened.

25    Q  How about the entries?

Page 47

1          A       Well, the entry indicates here the date.

2   But that's not mean I inputted on 12/31/14.

3          Q       But it can mean that, could it?

4          A       It could be.  But when you go to

5   QuickBooks, you can see there is an audit trail in

6   there.  You can see the date when it was inputted.

7          Q       When the memo was inputted?

8          A       Yes.  I could do an entry for 12/31, but

9   it could be January 1st.

10         Q       So is it your testimony, then, money

11  would be received on one day, and then you would go

12  back and write a memo regarding that money and not

13  identify the date the memo was written?

14         A       When you say "go back," what do you

15  mean?

16         MR. PEDDIE:  Objection, compound.

17  BY MR. BILLER:

18         Q       I want to understand when these

19  memos were inputted into QuickBooks.

20         A       I don't remember the date.  It would say

21  the date here.  But as to when the actual journal entry

22  is made, it's probably not this date.

23         Q       How do you know that?

24         A       That's what I'm saying.  I don't.

25         Q       Don't say anything you don't know.

Page 48

1          A       Okay.

2          Q       So you made the entry, but you don't

3     remember what dates?

4          A       Yes.

5          Q       But you're telling me, in QuickBooks,

6     there is a journal that states the dates this

7     information was made; right?

8          A       There's audit trail, yes.

9          Q       There's an audit trail.  And what is

10    that called?

11         A       It's audit trail.

12         Q       How do you get to it?

13         A       You go to reports.

14         Q       And how do you do that?

15         A       You enter into QuickBooks as an

16    admin.  You go to reports.  I can't remember the

17    module, but there should be an audit trail there.

18         Q       Okay.  And if there's not?

19         A       There is.  QuickBooks --

20         Q       If there's not an audit trail regarding

21    these entries, what does that mean?

22         A       QuickBooks wouldn't be able to -- there

23    is an audit trail in QuickBooks.

24         Q       For everything that goes in?

25         A       Yes.

                                             Page 49

```
1          Q     So the audit trail my indicate that the
2    first entry was made August 26, 2014?
3          A     It could say that.
4          Q     Or it could say it was made on
5    December 31, 2014?
6          A     It could say that.  The audit trail
7    would indicate all the dates there was an edit to a
8    transaction.
9          Q     Is there any system in QuickBooks that
10   prevents somebody from going into the audit trail and
11   changing dates or information?
12         A     I don't believe so.  An admin could go
13   to the QuickBooks.  All the edits in there in the
14   transaction would show all the edits on one particular
15   transaction.
16         Q     But we know -- based on this document,
17   we know for a fact that $2.3 million was either
18   invested or loaned to Thomas Wylde as of
19   December 31, 2014; right?
20         A     Uh-huh.
21         Q     Is that yes?
22         A     Yes.
23         Q     And we also know that that amount was
24   accumulated over the course of four or five months
25   between August and December; correct?
```

Page 50

1        A        Yes.

2        Q        Okay.  So this shows that Thomas Wylde

3    actually received that money between August and

4    December of 2014; correct?

5        A        Yes.

6        Q        Now, do you think that's a lot of money?

7        A        It depends on --

8        Q        Perspective; right?

9        A        Yes, it's relative.

10       Q        Right.  But do you think it was a lot of

11   money for Thomas Wylde considering its financial

12   condition at the time?

13       A        At that time I wouldn't think so.

14       Q        Do you think it's important for

15   Thomas -- Paula Thomas to know that $2.3 million is

16   being injected over that period of time?

17       A        Yes, it is important.

18       Q        It's a material fact, isn't it?

19       A        Yes, I believe so.

20       Q        It's a material fact for an officer or

21   somebody in Paula Thomas's position to know that;

22   right?

23       A        Yes.

24       MR. PEDDIE:  Objection, calls for a legal

25   conclusion.

Page 51

```
1    BY MR. BILLER:

2          Q      Can you tell me why Thomas Wylde did not

3    inform --

4          MR. PEDDIE:  Objection, calls for speculation.

5          MR. BILLER:  Let me finish the question.

6    BY MR. BILLER:

7          Q      Inform Paula Thomas that, from August

8    2014 to December 2014, Hillshore invested or loaned

9    $2.3 million?  Do you know any reason?

10         MR. PEDDIE:  Objection, calls for speculation.

11         THE WITNESS:  I believe she was informed.

12   BY MR. BILLER:

13         Q      How do you know that?

14         A      I don't know, but I believe she was.

15         Q      I'm asking if you know that how do you

16   know?

17         A      I know they are having a meeting.  They

18   discussed these matters.

19         Q      How Doe know that?  How do you know that

20   $2.3 million was discussed?

21         A      I think that was in the agreement that

22   they have.

23         Q      Oh, so it's the agreement?

24         A      It's --

25         Q      The purchase agreement?
```

Page 52

1          A       It could be.

2          Q       The purchase agreement says $2 million,

3     not 2.3.

4          A       I'm not so sure about that.

5          Q       Okay.  I wasn't going to bring this

6     document, but I'm glad I did.

7              MR. BILLER:  Let's have the next document

8     marked as 66.

9                  (Exhibit 66 was marked for

10              identification by the Certified Shorthand

11              Reporter and is attached hereto.)

12    BY MR. BILLER:

13         Q       Can you look to page 2236, paragraph 3,

14    "Consideration."  Do you see that?

15         A       Yes.

16         Q       Do you want to read it yourself?

17         A       (Witness complies.)

18         Q       Now, that paragraph talks about

19    $3.5 million; right?

20         A       Yes.

21         Q       Two installments, 1.5 and 2 million;

22    right?

23         A       Yes.

24         Q       And there's Exhibit B that refers to the

25    dates of investment; right?

Page 53

```
 1              A       Exhibit B or Exhibit A?

 2              Q       I have it separately.

 3              MR. BILLER:  Let's go ahead and mark the next

 4     document as Exhibit Number 67.

 5                       (Exhibit 67 was marked for

 6              identification by the Certified Shorthand

 7              Reporter and is attached hereto.)

 8     BY MR. BILLER:

 9              Q       Do you see that, Exhibit 67?

10              A       Yes.

11              Q       Did you create that document?

12              A       No.

13              Q       Okay.  That's Exhibit A to the purchase

14     agreement; correct?

15              A       Yes.

16              Q       And that shows investments of 500,000 on

17     November 15; 500,000 on January 16; 250,000 on February

18     2016; 2,500 on March 2016 --

19              MR. PEDDIE:  You said "2,500" before.

20              MR. BILLER:  Yeah, March 1.

21              MR. PEDDIE:  2,500?

22              MR. BILLER:  No.  250,000

23              MR. PEDDIE:  Right.

24     BY MR. BILLER:

25              Q       And then 500,000 on April 1, 2016, for a
```

Page 54

1    total of $2 million.  Do you see that?

2            A      Yes.

3            Q      Do you believe this schedule of payments

4    corresponds to the 2,000,013 stated in Clause 4 of

5    Exhibit 66?

6            A      This information, I think, is beyond the

7    date that this one.  This is 2016.

8            Q      It says [as read] "Exhibit 'A' to

9    Purchase Agreement Membership Interest."  That's what

10   it says.  Exhibit A.

11           MR. PEDDIE:  Objection, calls for

12   interpretation of the document.

13   BY MR. BILLER:

14           Q      And Exhibit A is referred to in

15   paragraph -- Clause 3 of the purchase agreement; right?

16           MR. PEDDIE:  Objection, calls for a legal

17   conclusion.

18   BY MR. BILLER:

19           Q      Right?

20           MR. PEDDIE:  Calls for speculation.

21   BY MR. BILLER:

22           Q      You can answer the question.  It says,

23   does it not, "Exhibit 'A'" -- pursuant to Exhibit A

24   $2,000,013 would be invested?

25           A      Yes.

                                                Page 55

1          Q       Okay.   Exhibit 67 and Exhibit 65 are

2     totally inconsistent, aren't they?

3          MR. PEDDIE:   Objection, calls for a legal

4     opinion.   Calls for speculation.

5          THE WITNESS:   Yes.   What was the last question?

6     BY MR. BILLER:

7          Q       Are the data on Exhibit 67 and the data

8     on 65 -- Exhibit 65 are inconsistent; correct?

9          MR. PEDDIE:   Objection, foundation; calls for a

10    legal opinion; calls for speculation.

11    BY MR. BILLER:

12         Q       You're an accountant.   You're a CPA also

13    in the Philippines.   Just look at the numbers.

14    Exhibit 65 states that in November there was a $500,000

15    loan; right?

16         A       Yes.

17         Q       That's consistent with the payment

18    schedule of Exhibit A, correct?

19         MR. PEDDIE:   Objection, assuming facts.

20         THE WITNESS:   You're referring to the total?

21         MR. BILLER:   Yes.

22    BY MR. BILLER:

23         Q       No.   I'm referring to the amount of

24    money -- this is not difficult.   Really it's not.   I

25    know you want to help your client and your friend,

Page 56

1   John Hanna.  But you're supposed to be honest.  This is
2   not this difficult that we have to spend this amount of
3   time answering this simple question.
4        Isn't the data noted in Exhibit 65 and
5   Exhibit 67 regarding the amount of money Thomas Wylde
6   was to receive consistent?
7        A     You're referring to the 2,300
8   and -- sorry, 2,000,300 and the 2,000,000?
9        Q     No.  I'm referring to the November 15,
10  500,000 and the November 13, 500,000?
11       A     November 13 of --
12       Q     2014.
13       A     -- 2014, and this is 2015.  This is a
14  balance to be paid the year after.
15       Q     Where is that indicated in the purchase
16  agreement?
17       A     Well, it says [as read], "Purchaser will
18  pay the remaining balance of 2,000,013 U.S. dollars
19  pursuant to the payment schedule attached hereto as
20  Exhibit A."  This is 2015 up to 2016.  This
21  reclassification is 2014 pertaining to the previous
22  transactions.
23       Q     So are you saying that should there
24  should be information regarding these entries?
25       A     I'm sorry?

Page 57

1          Q          Should there be information regarding
2    these entries?
3          A          I believe it's here in -- sorry.
4          Q          There are no entries for 2015.  Look at
5    Exhibit 65.  There are no entries for 2015.
6          A          Not on this account.  There might be
7    other accounts.
8          Q          I'm not worried about other accounts.
9    This is the Hillshore account.
10         MR. PEDDIE:  Objection, assumes facts.
11   BY MR. BILLER:
12         Q          Do you doubt this is the Hillshore
13   account?  Do you have any question that this
14   Document 65 relates to the Hillshore account?
15         A          Unless I see the backup documents on
16   this.
17         Q          So you don't -- if you don't have the
18   backup documents, you don't know if the data is right;
19   correct?
20         A          I could verify that with the backup
21   documents.
22         Q          Okay.  Where are the backup documents?
23         A          I don't have it.  I don't know.  You
24   should have it.  The company should have it.
25         Q          The company should have it, but I don't

Page 58

1    have it.

2          A        I'm sorry about that.

3          Q        What type of backup documents are you

4    referring to?

5          A        There would be deposit slip or bank

6    credits -- bank statements.

7          Q        So unless you have backup documents, you

8    can't rely on QuickBooks.  Is that what you're saying?

9          A        No.  The QuickBooks entries has backup

10   documents before you enter them.

11         Q        Just answer me a simple question.  There

12   is no entries for any money received by Thomas Wylde on

13   Exhibit 65 for 2015; correct?

14         A        Rephrase that.

15         MR. BILLER:  Read the question back.

16              (The record was read by the Certified

17         Shorthand Reporter.)

18         THE WITNESS:  If it's recorded here, the money

19   was received.

20   BY MR. BILLER:

21         Q        Just answer the question, Exhibit 65,

22   are there any entries for 2015?

23         A        2015 for this?

24         Q        Just answer my question, please.  I know

25   you're trying to help John Hanna.  Please, you have to

Page 59

1    be honest --

2         MR. PEDDIE:  Objection, argumentative.

3    BY MR. BILLER:

4         Q       -- you have to be straight forward, and

5    you have to be honest.  It's a simple question.  Are

6    there any entries on Exhibit 65 for 2015?

7         A       There's not.

8         Q       Thank you.  Was that hard?  That took 15

9    minutes to answer.

10        MR. PEDDIE:  Counsel, she told you there may be

11   other accounts --

12        MR. BILLER:  I asked on the exhibit.

13        MR. PEDDIE:  Before you were asking questions

14   suggesting this was the only account.

15   BY MR. BILLER:

16        Q       Now, let's turn to 67.  There is an

17   entry for November 15, 2015.  Do you see that?

18        A       Yes.

19        Q       For $500,000?

20        A       Yes.

21        Q       Do you see that?

22        A       Yes.

23        Q       Why isn't that on Exhibit Number 65?

24        A       I don't know.  It might be recorded to

25   another account.

                                        Page 60

1          Q       So why would it be recorded to another

2     account?

3          A       It might be recorded as an equity

4     directly.

5          Q       Is there an account for equity?

6          A       Yes, there is.  It's in QuickBooks.

7          Q       And it states the date of the entries?

8          A       Yes, it should.

9          Q       And it states -- it should have some

10    type of memo; right?

11         A       Yes.

12         Q       All right.  So we got 2016, 2016, 2016,

13    2016, and $1.5 million reflected on Exhibit 67.  Do you

14    see that?

15         A       Yes.

16         Q       That is not reflected on Exhibit 65;

17    correct?

18         A       Yes.

19         Q       Okay.  Isn't it true once entries are

20    made -- I don't know if it's true, frankly.  Once

21    entries are made in QuickBooks, can anybody go back and

22    change the data?

23         A       If they have access to it, yes.

24         Q       If they have access to QuickBooks?

25         A       Yes.

Page 61

1        Q     Stephen Choi produced Exhibit 65 at his

2  deposition and swore it was a record he obtained from

3  Thomas Wylde.  Do you understand?

4        A     Yes.

5        Q     I believe he obtained it on -- well,

6  there's a date here of February 27, 2017 at 11:41 a.m.

7  That would reflect the date that this was printed out;

8  correct?

9        A     Yes.

10       Q     Is that true?

11       A     Yes.  It would be the date it was

12  generated.

13       Q     Right.  His deposition was March 2017.

14  So that's consistent with generating this report in

15  February; right?

16       A     Yes.

17       Q     So can you think of any reason, any

18  reason why Stephen Choi would make changes in

19  QuickBooks regarding the data on Exhibit 65?

20       MR. PEDDIE:  Objection, assumes facts.

21       THE WITNESS:  No, I can't.

22       MR. BILLER:  Okay.

23  BY MR. BILLER:

24       Q     If he did make any changes, wouldn't

25  that affect the rest of the QuickBooks data?

Page 62

1    A    Yes.

2    Q    Impact everything?

3    A    Yes.

4    Q    Correct?

5    A    Yes.

6    Q    So if he went in and deleted the

7    infusion of $3.5 million in 2015 and 2016, what would

8    the consequences be for the QuickBooks' data?

9    MR. PEDDIE:  Objection, calls for a

10   hypothetical.

11   THE WITNESS:  Any changes in QuickBooks would

12   change the financial statements.

13   BY MR. BILLER:

14   Q    What are the financial statements?

15   A    The profit and loss, balance sheet, and

16   statement of cash flow.

17   Q    And all those are one document or

18   separate documents?

19   A    Separate documents.

20   MR. BILLER:  Counsel, do you want to explain

21   why I don't have that?

22   MR. PEDDIE:  You do.

23   MR. BILLER:  I just looked.

24   MR. PEDDIE:  You have the entire QuickBooks

25   file.

Page 63

1         MR. BILLER:  I don't want the entire QuickBooks

2    file.  I want the documents.

3         MR. PEDDIE:  This is how they are kept.

4         MR. BILLER:  The QuickBooks file --

5         MR. PEDDIE:  Mr. Biller, this is how they are

6    kept.

7         MR. BILLER:  The QuickBooks file can be

8    manipulated.

9         MR. PEDDIE:  This is how they are kept.  These

10   documents exist within QuickBooks.  You generate them,

11   and you print them.

12        MR. BILLER:  No.  The data in QuickBooks,

13   unless I have the backup file, backup data cannot be

14   checked.

15        MR. PEDDIE:  The backup data does not consist

16   of a profit and loss statement, balance sheet, and

17   statement of cash flows.  Those are generated in

18   QuickBooks and printers.

19        MR. BILLER:  You know what, Richard, I swear to

20   God, I'm going to -- this is recorded.  If these are

21   the type of tricks that you can play with other

22   lawyers --

23        MR. PEDDIE:  This is not a trick.

24        MR. BILLER:  The QuickBooks cannot be verified.

25    ///

                                              Page 64

1    BY MR. BILLER:

2         Q       Can the QuickBooks be verified without

3    checking all the backup data?

4         MR. PEDDIE:  Objection, calls for speculation

5    and hypothetical.

6         THE WITNESS:  You can generate report and

7    verify with backup data.

8    BY MR. BILLER:

9         Q       You need the backup documents to verify

10   what data is being spit out of QuickBooks; right?

11        A       Yes.

12        Q       Because when you input the information,

13   you have that backup data; right?

14        A       Source documents, yes.

15        Q       And you're the one who makes sure it's

16   accurate; correct?

17        A       Yes.

18        Q       And if a third party wanted to do an

19   audit, that third party couldn't do an audit without

20   the backup documents; correct?

21        A       Yes.

22        MR. PEDDIE:  You were asking about financial

23   statements.  They are generated by QuickBooks.

24        MR. BILLER:  You know what, Richard, don't

25   treat me like a fool.  Okay.  You know -- you tell it

Page 65

1 to the judge.

2    MR. PEDDIE:  You were asking her --

3    MR. BILLER:  Hey, let me speak.

4    MR. PEDDIE:  Why don't you let me speak for

5 once.

6    MR. BILLER:  You've already said it.  My

7 specific request for production of documents asks for

8 all documents related to financial --

9    MR. PEDDIE:  You said to me a moment ago,

10 "Counsel, why don't I have the balance sheet, profit

11 and loss statement, and the statement of cash flows?"

12    MR. BILLER:  I don't.

13    MR. PEDDIE:  You do.  They are generated by

14 QuickBooks, which you have.

15    MR. BILLER:  No, I don't.  Tell it to the

16 judge.

17    MR. PEDDIE:  It's not a separate document.

18    MR. BILLER:  Tell it to the judge.

19    MR. PEDDIE:  She does not take the balance

20 sheet, the profit and loss statement --

21    MR. BILLER:  Tell it to the judge.

22    MR. PEDDIE:  -- and input that into the

23 QuickBooks --

24    MR. BILLER:  Tell it to the judge.

25    MT. PEDDIE:  QuickBooks makes those documents.

Page 66

1          MR. BILLER:  You're wasting my time now.

2          MR. PEDDIE:  You're wasting your time because

3    you don't understand financial matters.

4          MR. BILLER:  You represent crooks, thieves,

5    mafia personnel from South Korea.  That's who you

6    represent.

7          MR. PEDDIE:  No.  Your theory that Roger Kuo

8    and Doug Lee and Stephen Choi are all from Korea and

9    all speak Korean to each other and are part of a mafia

10   is absolutely outlandish.  It comes out of a crack

11   pipe, I'm telling you.

12         MR. BILLER:  Are you saying --

13         MR. PEDDIE:  I'm being emphatic to tell you

14   that I don't think those guys speak Korean.  In fact,

15   some of them are not even Korean.

16         MR. BILLER:  Let's mark the next document as

17   68.

18              (Exhibit 68 was marked for

19         identification by the Certified Shorthand

20         Reporter and is attached hereto.)

21         MR. BILLER:  Sorry.

22         MR. PEDDIE:  Please be careful.  I don't like

23   being hit in the head with documents.

24         MR. BILLER:  It hit you in the chest.

25         MR. PEDDIE:  It hit me in the forehead,

                                        Page 67

```
 1    Dimitrios.

 2    BY MR. BILLER:

 3         Q      Do you know what this is?

 4         A      Yes.

 5         Q      What is it?

 6         A      It's a transmittal form sent to

 7    Paula about the notice of issuance of new membership.

 8         Q      Do you see your name at the bottom?

 9         A      Yes.

10         Q      And you signed it; right?

11         A      Yes.

12         Q      You signed your name in the regular

13    course of business?

14         A      Yes.

15         Q      Did you produce this exhibit in the

16    regular course of your business?

17         A      Say that again.

18         Q      Did you create this exhibit in the

19    ordinary course of your business?

20         A      "Exhibit" meaning this document?

21         Q      Yes.

22         A      Yes.

23         Q      You assembled all the documents referred

24    to in Exhibit 68; correct?

25         A      Yes, it was given to me.
```

Page 68

1    Q      Who gave it to you?

2    A      I believe it's David.

3    Q      David Schnider?

4    A      Yes.

5    Q      Okay.  Why did he give you these
6  documents?

7    A      He's the lawyer of the company, and he
8  prepares these documents.

9    Q      He prepared all of them?

10    A      Yes, I believe so.

11    Q      Okay.  Did you have any involvement in
12  preparing these documents?

13    A      No.

14    Q      Now, remember we had a bit of a
15  discussion about whether Exhibit A that is marked as
16  Exhibit number -- they're right next to you.

17    A      Yes.

18    Q      The page attached to Exhibit 68 that
19  you're looking at is the same as the previous exhibit
20  that was titled, "Exhibit 'A' to Purchase Agreement."

21    A      Yes.

22    Q      Same document?

23    A      Yes.

24    Q      And why was this document distributed?

25    A      I believe it's for information.

Page 69

1           MR. PEDDIE:  Objection, calls for speculation.

2    BY MR. BILLER:

3           Q     You're the financial controller.  You

4    signed the facsimile form; correct?

5           A     Yes.

6           Q     And who did you fax it to

7           MR. PEDDIE:  Objection, assumes facts.

8           THE WITNESS:  It is by mail in Korea.

9    BY MR. BILLER:

10          Q     And you mailed it to Paula Thomas?

11          A     Paula Thomas and the legal counsel that

12    she has at that time.

13          Q     And why did you do that?

14          A     I was advised that she needs to be

15    advised.

16          Q     Because she's a member?

17          A     Yes.

18          Q     She should be advised of the finances of

19    the company; right?

20          A     Yes.

21          Q     As a member of the company, she still

22    has a say regarding anything that affects the finances

23    of the company; correct?

24          A     Yes, I believe so.

25          MR. PEDDIE:  Objection, calls for legal

                                              Page 70

```
 1     conclusion.
 2     BY MR. BILLER:
 3          Q      That includes making decisions regarding
 4     loans and equity; correct?
 5          A      Yes.
 6          MR. PEDDIE:  Can we just keep this further?  It
 7     doesn't look like it's mine.
 8          MR. BILLER:  I didn't think it was yours.
 9     BY MR. BILLER:
10          Q      Now, who is Ms. Gonzalez on page 4?
11          A      Stephen Choi's wife.
12          Q      Have you ever met her?
13          A      Yes.
14          Q      How many times?
15          A      A few times.
16          Q      What were the purposes of the meeting?
17          A      She came over to shop.
18          Q      Just to shop?
19          A      Yes.
20          Q      She didn't come over for business
21     purposes?
22          A      Not that I know of.
23          Q      And who calculated the total of
24     $9,005,013?
25          A      Which one is that?
```

Page 71

1    Q    It's the bottom entry, last page.   It's

2    actually $9,000,013.  Who inputted that total?

3    A    I believe it was David Schnider who

4    computed the shares.

5    Q    But who computed the capital account

6    balance?

7    A    I don't know.

8    Q    Okay.  Did you ever -- do you remember

9    ever inputting into QuickBooks $9 million in

10   investments by Hillshore?

11   A    I don't remember.

12   Q    Okay.  Does that sound accurate to you?

13   A    I don't know.

14   Q    Because you were still at Thomas Wylde

15   obviously when this document was created?

16   A    Yes.

17   Q    So who would have access to the amount

18   of money that was invested into the company?

19   A    That would be me.

20   Q    Okay.  And how would you find out

21   $9,000,013 was invested, if it was?

22   A    I would assume it's collected from all

23   of these contribution.

24   Q    You assume that?

25   A    Yes.

Page 72

1          Q        Where would you go to find out if that
2     was accurate?
3          A        In QuickBooks it would say all of this
4     cash that came in, it's a matter of reclassification.
5     It would be in the equity account in QuickBooks.
6          Q        Would the reclassification take place on
7     the same day the money was received?
8          A        The money would be recorded at the time
9     it was received.  But the reclassification of this,
10    based on the documents, may come later.
11         Q        So suppose the 9 million -- assume for
12    purposes of my question that the 9 million came into
13    Thomas Wylde as equity investment.  When would that be
14    noted in the equity account?
15         A        Upon execution of these documents, when
16    it's converted to equity.
17         Q        Okay.  So the money could come in in any
18    fashion, but you have to have the execution of the
19    Schedule B for that to be converted into equity; is
20    that what you're saying?
21         MR. PEDDIE:  Objection, calls for a legal
22    conclusion.
23         THE WITNESS:  Unless there is a document prior
24    that says it's an equity, then it would be in the
25    equity.  This money could be in there already.  This is

Page 73

```
 1   just the distribution of how much each member has.
 2   BY MR. BILLER:
 3         Q     If the money is in there already, where
 4   would it be in QuickBooks?
 5         A     It would be in equity.
 6         Q     Anyplace else?  Loans?
 7         A     It could be in loans if it's not sure
 8   with the documents.  But once we have the documents to
 9   verify the nature of the transaction, it would have
10   been recorded as an equity.
11         Q     I hear you saying repeatedly, which I
12   think is completely accurate, that you need to verify
13   QuickBooks with the actual documents that contain the
14   information that goes in QuickBooks; right?
15         A     Yes.
16         Q     So relying on QuickBooks, unless you
17   verify it, that's not a reasonable thing to do; is it?
18         A     It's the normal practice to do.
19         Q     It's a normal practice, but it's not the
20   normal practice when there is a legal dispute as to
21   whether the QuickBooks data is accurate or not.
22         MR. PEDDIE:  Objection, calls for a legal
23   opinion.
24         THE WITNESS:  As long as you have the backup,
25   you can verify the nature of the transaction.
```

Page 74

```
 1   BY MR. BILLER:
 2          Q    Where did you store all the backup?
 3          A    There would be files.  There would be
 4   folders.
 5          Q    Describe the folders.  Paper folders?
 6          A    Paper folders.
 7          Q    Where would those paper folders be?
 8          A    It should be in Thomas Wylde's
 9   possession.
10          Q    It shouldn't be destroyed, should they?
11          A    No.
12          Q    That's important data, isn't it?
13          A    Yes.  And IRS requires for data to be --
14          Q    Seven years?
15          A    Yes.
16          Q    So if Thomas Wylde doesn't produce
17   backup documents that you're describing, that would be
18   in violation of IRS regulations; correct?
19          MR. PEDDIE:  Objection, calls for a legal
20   opinion.
21          THE WITNESS:  Well, there could be other
22   documents, or there could be other means for them to
23   verify.
24   BY MR. BILLER:
25          Q    Put that side -- move to strike.  Non
```

Page 75

```
1   responsive.
2           If Thomas Wylde does not have the backup
3   documents for the last seven years regarding the data
4   going into QuickBooks, that would be a violation of IRS
5   regulations; correct?
6           MR. PEDDIE:  Objection, calls for legal
7   conclusion.
8           THE WITNESS:  I believe so.
9           MR. BILLER:  Thank you.
10          What time do you have?
11          THE REPORTER:  10:03.
12          MR. BILLER:  It's been an hour.  Let's take a
13  break.
14          MR. PEDDIE:  Before we go off, Dimitrios, I'm
15  going to hand you 2014 income tax return.  I think you
16  have a copy already.  I'm going to hand you 2015 income
17  tax return marked "Confidential."  I ask that you just
18  verify -- I have tried to do this -- that Social
19  Security numbers of everyone from Paula Thomas to
20  John Hanna have been redacted.
21          MR. BILLER:  If you say they have been
22  redacted, that's fine.
23          MR. PEDDIE:  Well, they're --
24          MR. BILLER:  I've never accused you of using or
25  allowing Paula's Social Security number to be left in
```

Page 76

```
 1   the open and seen by everybody.
 2           MR. PEDDIE:  I understand.
 3           MR. BILLER:  I never did that.  What I've
 4   accused you of and is clear to me today in this one
 5   hour is that you withheld, you've concealed, and you
 6   may have destroyed material documents regarding
 7   QuickBooks.
 8           MR. PEDDIE:  Well, I can assure you I have not.
 9           MR. BILLER:  You probably haven't.
10           MR. PEDDIE:  My point is I'm handing you these
11   documents because I know you would like them.  I think
12   you already have them.
13           MR. BILLER:  I don't have 14.  I have 15.
14           MR. PEDDIE:  But before you use them in court,
15   just have a double check on the Social Security
16   numbers; all right?
17           MR. BILLER:  And why didn't you produce them
18   earlier?
19           MR. PEDDIE:  We did.
20           MR. BILLER:  When?
21           MR. PEDDIE:  During the whole Kring and Chung
22   phase.
23           MR. BILLER:  I looked at all 175 documents in
24   your index, and I looked at all the documents I have
25   from Kring and Chung.  And it's just not true.  Stop
```

Page 77

1    saying that.

2          MR. PEDDIE:  You say there are no tax returns

3    in there?

4          MR. BILLER:  I didn't say that.  I did not say

5    that.  I said your index does not match the documents

6    for Kring and Chung.  That's what I'm saying.  So stop

7    saying it.

8          MR. PEDDIE:  I sent you all 24 batches Bates

9    numbered.  And if there are error, let me know.

10         THE REPORTER:  Are we going off?

11         MR. PEDDIE:  Yes, that's fine.

12              (Break taken:  10:04 a.m. - 10:26 a.m.)

13   BY MR. BILLER:

14         Q     Let's talk about now -- you say oversee

15   financials.  What does that mean?

16         A     The record keeping, analysis of the

17   accounts, and generating the financial statements.

18         Q     Record keeping meaning the backup

19   material received for the information put into the

20   QuickBooks?

21         A     Yes.

22         Q     Explain to me where that material is

23   located at Thomas Wylde?

24         A     It used to be in my drawer.  I don't

25   know now.

                                              Page 78

```
 1          Q      Your drawer meaning your office?
 2          A      My office at the time and table.
 3          Q      Was there a filing cabinet?
 4          A      There's a drawer on the table, and there
 5    is a separate filing cabinet in the back.
 6          Q      And how many cabinets does the filing
 7    cabinet have?
 8          A      There are several in the back.
 9          Q      Okay.  And how far back do those
10    documents go?  Seven years?
11          A      Not in my tenure, so I have the current
12    records that I have.
13          Q      So I want to know where all the
14    documents -- the backup documents are located so
15    Mr. Peddie can go get them for me?
16          A      I don't know where they are right now.
17          Q      But they were in your office; right?
18          A      The current ones were in my office.
19          Q      Right.
20          A      I believe they moved.
21          Q      You think they moved?  Where did they
22    go?
23          A      They moved office.
24          MR. PEDDIE:  We moved.
25          THE WITNESS:  They moved office, so I don't
```

Page 79

1   know where it is now.

2   BY MR. BILLER:

3         Q     When you left in June of 2016, those

4   documents were in your office; right?

5         A     Yes.

6         Q     Okay.

7         MR. PEDDIE: All of them?

8         THE WITNESS: The ones that I have.

9         MR. PEDDIE: Every last invoice?

10         MR. BILLER: This is not your chance to cross.

11         MR. PEDDIE: I just want you to get a clear

12   answer.

13         MR. BILLER: I got an idea, believe me.

14         MR. PEDDIE: Just don't think everything is in

15   a single drawer.

16         MR. BILLER: No. Because it's been destroyed.

17         MR. PEDDIE: No, nothing has been destroyed.

18   BY MR. BILLER:

19         Q     Let's talk about your duties with regard

20   to bank accounts.

21         A     Say that again.

22         Q     With regard to bank accounts, you said

23   you had some duties and responsibilities regarding bank

24   accounts. What were they?

25         A     Viewing the bank statements, generating

Page 80

1    the bank statements, and getting information online.

2         Q       Okay.  That's what I wanted to ask you.

3    You didn't maintain bank statements in the old fashion

4    way where you put a paper in the filing cabinet;

5    correct?

6         A       I would generate it sometimes.

7         Q       Okay.  How would you receive the bank

8    statements?

9         A       Downloading it from online.

10        Q       So let's talk about your computer.  What

11   folders did you have in your computer that related to

12   Thomas Wylde?

13        A       There should be a TW folder in my

14   computer.  It says, "TW LLC."  I don't remember all the

15   folders.  I keep specific folders for some information

16   in there, but I don't remember them all.

17        Q       Just tell me what you remember.

18        A       There should be bank; there should be

19   financials; AP, accounts payable; accounts receivables.

20        Q       And let's go over those folders.  What

21   type of documents would you electronically store in

22   each those folders?

23        A       Would be bank statements.  AP will be

24   some invoices received online.  If it's physical, it is

25   filed in the file cabinet.  And AR would be list of

                                        Page 81

```
 1   customers' invoices as to follow up.

 2          Q      Payments?

 3          A      Will be in AP if there is any.

 4          Q      Okay.  And did your electronic folder

 5   still exist when you left in June of 2016?

 6          A      Yes.

 7          Q      And how many documents do you think were

 8   stored in that folder?

 9          A      I don't remember.

10          Q      Now, you can easily transfer all of

11   those documents by putting a flash drive in the

12   computer and transferring the TW folder; correct?

13          A      Yes, that could be done.

14          Q      That will result in not only the folders

15   in TW folder be transferred but that would result in

16   all the documents within each folder to be transferred;

17   right?

18          A      That could be.

19          Q      And you could do that with a flash or a

20   hard drive?

21          A      Yes.

22          Q      It could take anywhere from a couple

23   hours to six hours.

24          A      Yes.  If they know the password of the

25   PC.
```

Page 82

1          Q      So that's not a burden to you, is it?

2          A      What do you mean "burden"?

3          Q      To press a button and transfer the

4     document, do you think that's burdensome?

5          A      It shouldn't be.

6          Q      Do you think it's annoying to have to

7     do?

8          A      I don't believe so.

9          Q      Do you think it's harassing to ask that

10    be done so Paula can have the records?

11         MR. PEDDIE:  Objection, assumes facts.

12         THE WITNESS:  That can be anyone's opinion.

13    BY MR. BILLER:

14         Q      But is it yours?

15         A      It depends on the nature of the file.

16    It depends on -- well, I would say it depends on the

17    mood of the person, also.

18         Q      But as a member, as a member of the

19    company, a holder of units, she's entitled to review

20    those documents; isn't she?

21         MR. PEDDIE:  Objection, calls for legal

22    opinion.

23         THE WITNESS:  Yes.

24    BY MR. BILLER:

25         Q      Let me hand you the next document.

Page 83

1                 (Exhibit 69 was marked for

2           identification by the Certified Shorthand

3           Reporter and is attached hereto.)

4    BY MR. BILLER:

5           Q       Do you know what 69 is?

6           A       Pardon?

7           Q       Exhibit 69, you can read it.

8           A       Yes.

9           Q       Did you read it?

10          A       Not yet.

11          Q       Go ahead and read it to yourself.

12          A       (Witness complies.)

13          Q       Have you read Exhibit 69?

14          A       Yes.

15          Q       Do you know why you were sent this

16   e-mail?

17          A       As a copy for reference information and

18   maybe file.

19          Q       What file?

20          A       It could be an HR file.

21          Q       Okay.  Was there an HR file on

22   Paula Thomas?

23          A       You mean a folder?

24          Q       A folder.

25          A       Yes.

                                        Page 84

1          Q      What was in that folder?

2          A      Her agreement, her -- I believe there's

3    W-2 in there.

4          Q      Did she have a separate file other than

5    the file you're trying to describe?

6          A      Not that I know of.

7          Q      Was there a disciplinary file, for

8    example?

9          A      No, not that I know of.

10          Q      Did you have an electronic folder in

11    your opinion computer regarding Paula Thomas?

12          A      I believe only the transmittal form or

13    whatever I might have sent her in this context.

14          Q      Okay.  So whatever you would have sent

15    her would be in a electronic Paula Thomas folder?

16          A      Whatever I sent her?

17          Q      You just said in the electronic folder

18    you have anything you would have sent her.

19          A      Like this (indicating).  Others might be

20    e-mailed.

21          Q      I just want to know if you had a

22    separate electronic folder that contained documents and

23    information on Paula Thomas?

24          A      There is only few documents in there,

25    and they're in a separate folder.

                                              Page 85

```
1          Q       Did you have that for every employee?

2          A       For?

3          Q       Do you have it for Jene Park,

4   John Hanna, David Schnider, other designers, or did you

5   just have a folder for Paula Thomas?

6          A       There is a folder -- in the e-mail there

7   is a folder for them.  There are some, not all

8   employees.

9          Q       So you have separate folder regarding

10  e-mails that you sent and received regarding

11  Paula Thomas; right?

12         A       The e-mail context.  Some people that I

13  have separate folders, too.

14         Q       Okay.  So it sounds like -- and correct

15  me if I'm wrong -- you have a separate electronic

16  folder for Paula Thomas regarding Word or PDF

17  documents; right?

18         A       What do you mean "Word" and "PDF"?

19         Q       Documents that you would store in an

20  electronic folder; correct?

21         A       Yeah.

22         Q       And then you have a separate folder for

23  e-mails --

24         A       Yes.

25         Q       -- that you would send and receive for
```

Page 86

```
 1   Paula Thomas; right?
 2           A      For different people, yes.
 3           Q      Including Paula Thomas?
 4           A      Yes.
 5           Q      And when you left in June of 2016, was
 6   the e-mail folder and the electronic folder in
 7   existence?
 8           A      Yes, I believe so.
 9           Q      Did you produce it as well?
10           MR. PEDDIE:   The Meldy Rafols' e-mail folder?
11           MR. BILLER:   Yeah.
12           MR. PEDDIE:   I don't think so.
13           MR. BILLER:   I didn't think so.  They relate to
14   Paula Thomas.  That's the subject of the request.  You
15   want to produce those, or do I have to go
16   file -- whatever?
17           MR. PEDDIE:   We can discuss specific requests
18   for actual things like that.
19           MR. BILLER:   I want everything that she
20   discussed in this deposition.  It's that simple.
21           MR. PEDDIE:   Well, We can make a list later and
22   discuss it.
23   BY MR. BILLER:
24           Q      Now, when you received this Exhibit 69,
25   what did you think?
```

Page 87

```
 1              MR. PEDDIE:  Objection, relevance.
 2              THE WITNESS:  I just thought that it was an
 3    instruction.
 4    BY MR. BILLER:
 5         Q      And that's it; right?
 6         A      Yes.
 7         Q      Did you think it was a termination
 8    letter?
 9         A      No.
10         Q      Did you think Paula Thomas was being
11    threatened she was going to be terminated if her
12    behavior did not change?
13         A      Not that I believe so.  It's an
14    instruction about function.
15         Q      Right.  Thank you.  Now at some
16    point -- let me show you another e-mail.
17                (Exhibit 70 was marked for
18          identification by the Certified Shorthand
19          Reporter and is attached hereto.)
20    BY MR. BILLER:
21         Q      Please read Exhibit 70.
22         A      (Witness complies.)
23         Q      Why was the salaries cut by a third as
24    indicated in Exhibit 70?
25         A      I believe it's because of the financial
```

Page 88

```
 1    condition.
 2          Q     Okay.   Who made the decision to cut the
 3    salaries?
 4          A     I believe they all talk about it and
 5    agreed to it.
 6          Q     Including Paula Thomas?
 7          A     Yes, that's why I confirmed.
 8          Q     Okay.   And then you prepared a chart of
 9    what the salaries were and how they would be impacted
10    with the one third reduction; correct?
11          A     I believe so.
12          Q     Yeah.   And what was the payment cycle
13    for Paula Thomas?
14          A     I can't remember.   I think once a month.
15          Q     Once a month.   At the end of the month
16    or the beginning of the month?
17          A     The beginning of the month.
18          Q     So if the chart showed that Paula Thomas
19    received $16,000 -- approximately $16,000 in April of
20    2015 and nothing in May 2015, what would that tell you
21    about her employment status?
22          MR. PEDDIE:   Objection, vague.   It calls for
23    speculation.
24    BY MR. BILLER:
25          Q     She didn't work for free, did she?
```

Page 89

```
 1            A        No, I don't believe so.
 2            Q        Everybody worked for a salary; right?
 3            A        Yes.
 4            Q        So if she didn't get paid in May of
 5   2015, don't you think that would indicate that she was
 6   no longer employed with the company?
 7            MR. PEDDIE:  Objection, calls for speculation.
 8            THE WITNESS:  I can't remember if she got paid
 9   in May or not.
10   BY MR. BILLER:
11            Q        She did not.  I can't believe I didn't
12   bring the chart, which I'm sorry.  But I have it
13   completely memorized, and I'll be wrong if I ask you a
14   question that misrepresents the chart.  But the chart
15   shows she was not paid in May of 2015.  And she was
16   paid 16,000 out of a $25,000 salary in April of 2015.
17            When would she have received the approximately
18   $16,000 in April 2015?
19            A        That would have been on the 1st.
20            Q        And the first salary was $25,000.  What
21   would one third of that be?
22            MR. PEDDIE:  Objection, calls for math.
23            THE WITNESS:  One third would be about --
24   BY MR. BILLER:
25            Q        Two-thirds would be about 16; right?
```

Page 90

1           A       About 16, yes.

2           Q       So that would represent her salary with

3    the one -- the 33 deduction; correct?

4           A       Yes.

5           Q       So if she was still employed with

6    Thomas Wylde in May of 2015, she would have received a

7    paycheck for approximately 16,000 on May 1, 2015;

8    correct?

9           MR. PEDDIE:  Objection, assumes facts.

10          THE WITNESS:  Yes, if she's employed at the

11   time.

12          MR. BILLER:  Okay.  Thank you.

13   BY MR. BILLER:

14          Q       Now, all these documents signed by

15   John Hanna, notice approval of action, notice of

16   issuance of new membership, action by written

17   consent -- did you have any involvement in deciding

18   those issues?

19          A       No.

20          Q       Did you have any involvement in

21   preparing those documents?

22          A       No.  These documents, no.

23          Q       Let me go ahead and hand you another

24   document as 71.

25   ///

Page 91

```
1                          (Exhibit 71 was marked for
2                 identification by the Certified Shorthand
3                 Reporter and is attached hereto.)
4     BY MR. BILLER:
5              Q     Did you prepare Exhibit 71?
6              A     Yes.
7              Q     Okay.  You wrote this document; right?
8              A     Yes.
9              Q     And you wrote it in the ordinary course
10    of your business; correct?
11             A     Yes.
12             Q     And you sent it to Paula Thomas and cc'd
13    it to John Hanna; right?
14             A     Yes.
15             Q     And for what purpose did you write this
16    e-mail?
17             A     This is for backup.
18             Q     Backup?
19             A     And information.
20             Q     Okay.  And this relates to Paula Thomas?
21             A     Yes.
22             Q     And so it says here, "With the paycut
23    and the membership contribution deduction, your net pay
24    will be $8,247.95 for the month April and May."  Do you
25    see that?
```

Page 92

```
1              A       Yes.
2              Q       Did I read that correctly?
3              A       Yes.
4              Q       And then it says, "After the
5    membership deduction, your monthly net pay will be
6    $9,847.95 starting in June 1, 2015."  Did I read that
7    correctly?
8              A       Yes.
9              Q       Okay.  And this was sent on
10   March 30, 2015; right?
11             A       Yes.
12             Q       So as of the date of this e-mail,
13   Paula Thomas was employed with Thomas Wylde; correct?
14             A       Yes.
15             Q       Now, if my memory of the charts are
16   correct and Paula Thomas did not receive any money in
17   May, June, and July 2015 and never again, what does it
18   indicate to you?
19             MR. PEDDIE:  Objection, calls for speculation.
20   It calls for a legal opinion.
21   BY MR. BILLER:
22             Q       You can answer.
23             A       I don't remember, but I -- at that time
24   I believe it was on hold.  I was waiting for an advice.
25             Q       Did you ever get advice?

                                              Page 93
```

```
1          A    After -- I can't remember the time, but
2    after a while I was advised that she's no longer with
3    the company.
4          Q    And how long did it take them to inform
5    you of that fact?
6          A    I can't remember.
7          Q    Did they tell you when she was no longer
8    employed?
9          A    I believe there's a document for that.
10   I don't remember.
11         Q    No.  I'm asking for your personal
12   knowledge.
13         A    I don't remember.
14         Q    Okay.  Who is Natalie?
15         A    Natalie?
16         Q    Do you know a woman named Natalie?
17         A    There are two Natalies.
18         Q    Which one do you know?
19         A    There's Natalie in production and then a
20   Natalie in sales.
21         Q    How long did Natalie work -- Natalie in
22   sales, how long did she work at TW?
23         A    I don't remember.  I'm not sure
24   if -- probably less than a year.
25         Q    Okay.  And did Jene Park or John Hanna
```

Page 94

```
 1    or David Schnider tell you not to let Natalie know that
 2    Paula Thomas is no longer working there?
 3         A    No.
 4         MR. BILLER:  Let's go ahead and mark the next
 5    document in order Exhibit 72.
 6              (Exhibit 72 was marked for
 7         identification by the Certified Shorthand
 8         Reporter and is attached hereto.)
 9    BY MR. BILLER:
10         Q    You see Exhibit Number 72?
11         A    Yes.
12         Q    That's a "THIRD AMENDED EXHIBIT B";
13    correct?
14         A    Yes, it says here.
15         Q    And it states, "MEMBERS AND CAPITAL
16    CONTRIBUTIONS November 15, 2015."  Right?
17         A    Yes.
18         Q    Who created this document??
19         A    David Schnider, I believe.
20         Q    Okay.  Where did he get the number
21    "9,000,013" at the bottom for "Hillshore Investments"?
22         MR. PEDDIE:  9,513,000?
23         MR. BILLER:  9,000,013.
24         MR. PEDDIE:  It says 9,005,513.
25         MR. BILLER:  No, it doesn't.
```

Page 95

```
1              THE WITNESS:  This one (indicating).
2              MR. PEDDIE:  Oh, I'm sorry.  I apologize.
3    BY MR. BILLER:
4         Q       Do you know where he got that number,
5    where that number came from?
6         A       I can't remember.  I can't remember.
7         Q       Do you remember Hillshore investing
8    $9,000,013 as of November 15, 2015?
9         A       I don't remember.
10        Q       Okay.
11        A       It looks like a total of these two.
12        Q       And it shows 3200 units; right?
13        A       33 here.
14        MR. PEDDIE:  3390
15        MR. BILLER:  I'm sorry, 3390.  Sorry, that was
16   my mistake.
17   BY MR. BILLER:
18        Q       And that was his ownership interest in
19   the company; right?
20        A       Yes.
21        Q       In 2015?
22        A       Yes.
23        Q       Okay.  Can you determine what the
24   percentage of the company he owned at that time?
25        A       I think approximately over 90.
```

Page 96

1           Q       Over 90.   Now, I'm going back to

2    Exhibit 65 and ask you whether Exhibit 65, without any

3    entries in 2015, is consistent with 72 where there is a

4    capital account balance of $9,000,013 for Hillshore.

5    Are those two documents consistent?

6           MR. PEDDIE:   Objection, lacks foundation;

7    assumes facts.

8           THE WITNESS:   In numbers.   But again, there

9    could be other account that supports this.

10   BY MR. BILLER:

11          Q       I understand.   But in purely numbers,

12   are they consistent?

13          A       Again, not in numbers.

14          Q       So can you explain the inconsistencies?

15          A       It could be on another account.

16          Q       I want to know if you have personal

17   knowledge of any facts that explain the

18   inconsistencies?

19          A       It could be in QuickBooks.   I don't

20   remember, but if it's in QuickBooks it would generate

21   the account.

22          Q       Okay.   I don't want you to think where

23   the inconsistency can be found.   I want to know if you

24   have any personal knowledge of any facts that you know

25   about that can explain the inconsistency?

Page 97

1    the issues, and protect your butt, and protect Andrew

2    Apfelberg's butt.

3          So let me get this right:

4          Did you ever tell Paula Thomas to get her own

5    counsel between January 2014 and July 2014?

6      A   I just need to check dates.  So I did tell her to

7    get her own counsel, I don't know the dates.  I have to

8    look at some documents to see if I can remember what the

9    timing was.

10     Q   So you don't remember?

11     A   I remember talking to her.

12     Q   But you don't remember?

13     A   I remember talking to her, you were asking is

14   about a specific date, date range.

15          And I don't know if I'm going to be able to

16   figure it out from the documents in front of me.

17     Q   Okay.  I'm going to give you a fact, maybe this

18   will figure it out for you.

19          Andrew Apfelberg gave her a retainer agreement to

20   sign on November 24th, 2014.

21     A   Gave Paula Thomas?

22     Q   Yes.

23     A   Okay.  Then I don't think so.

24     Q   She was not represented?

25     A   Between January and July of 2014?

Page 126

1    an extension, I'm not there anymore.

2          Q       Have you participated in that process

3    before at Thomas Wylde?

4          A       2015, yes.

5          Q       Tell me what you did.

6          A       Sent her the financial statements for

7    tax return, the CPA.  And she prepared the --

8          Q       When you say financial statements, what

9    is included in that?

10         A       Profit and loss; balance sheet.

11         Q       Okay.  Can you explain why the financial

12   statements profit and loss and balance sheet are not

13   attached to this tax return?

14         A       I can't, but profit and loss is

15   indicated in this the schedules here in the balance

16   sheet as well.

17         Q       Okay.  Now Exhibit 73, that relates

18   to -- that relates to the tax year ending on 12/2015;

19   right?  Do you see that?

20         A       Yes.

21         Q       Now, Exhibit 72 indicates there was an

22   investment by Hillshore of $9 million by

23   November 15, 2015; right?

24         A       Yes.

25         Q       Okay.  And the ordinary business income

Page 99

1    loss for Thomas Wylde that year 2015 was $4.6 million;

2    right?

3            A       Yes.   That's what it states here.

4            Q       The difference between $4.6 million and

5    $9 million is approximately 4.4 million; right?

6            MR. PEDDIE:   Objection, calls for speculation

7    and calls for a legal opinion.

8            THE WITNESS:   Mathematically, yes.   But it is

9    not the result of this versus minus this (indicating).

10   BY MR. BILLER:

11           Q       We're going through it.   We'll get

12   there.   We'll get there.   Ordinary business income on

13   line 22 on the 1065 form.

14           A       Line 22?

15           Q       Do you see that?

16           A       Yes.

17           Q       Okay.   It's 4,613,388.83; right?

18           A       Yes.

19           Q       It was operating at a loss that year

20   2015; right?

21           A       Yes.

22           Q       Please find for me in this document

23   where it states that Hillshore made an investment.

24           The document doesn't show

25   Hillshore Investments made any investment in

                                              Page 100

1    Thomas Wylde for 2015; right?

2           MR. PEDDIE:  Objection, misstates the

3    truth -- the facts.

4    BY MR. BILLER:

5           Q     Does the document show that?

6           A     It's not on the balance sheet.  But if

7    you see analysis of partners capital accounts, there's

8    capital cash of 7 million 500 in there.  There should

9    be a breakdown of that.

10          Q     But that doesn't indicate it was made in

11   2015, does it?

12          A     Sorry?

13          Q     That doesn't indicate it was made in

14   2015.

15          A     No.  It's a carry over.  A balance

16   sheet account is cumulative.

17          Q     Okay.  So we're talking about -- it says

18   on Schedule B-1 Hillshore owns 100 percent of

19   Thomas Wylde; right?

20          A     Which page?

21          Q     B-1.

22          A     Okay.  Give me one second.

23          Q     Okay.  Did you find it?

24          A     Not yet.

25          Q     "Information on Partners Owning 50% or

                                            Page 101

```
 1    More of the Partnership."

 2            MR. PEDDIE:  It may be 20 pages in, or 15.

 3            MR. BILLER:  I hate tax returns.

 4            THE WITNESS:  Give me one second.  I'm actually

 5    on the K already.

 6            MR. PEDDIE:  It's before that.  It's right

 7    after 1125-A.

 8            MR. BILLER:  This is where I got the number of

 9    160,000 for legal fees.  It's on the tax return.

10            MR. PEDDIE:  I would love that if that were

11    true.

12    BY MR. BILLER:

13            Q       You want to just look at mine?

14            A       Yes, please.

15            Q       You see it shows hundred percent

16    ownership by Hillshore Investments?

17            A       Yes.

18            Q       Okay.  What does that mean to you?

19            MR. PEDDIE:  Objection, calls for speculation.

20            THE WITNESS:  That it's a hundred percent

21    owned.

22            MR. BILLER:  Okay.

23    BY MR. BILLER:

24            Q       And on the next three or four pages, it

25    identifies others who have an ownership interest in the
```

Page 102

1    company and it identifies a percentage of ownership.

2    So if that were the case, how it could it be a hundred

3    percent?

4          A      I don't know.

5          Q      Isn't that inconsistent?

6          A      I could probably ask the CPA how it's

7    presented.

8          Q      I'm going to.

9          A      I don't know.

10         Q      Now, where do you say Hillshore's -- the

11   amount of money Hillshore invested in TW is indicated

12   on that Exhibit 73?

13         A      As I was saying, it's probably here in

14   the Analysis of Partners' Capital Accounts.

15         Q      What page?

16         A      Page 5 of this.

17         Q      Okay.  That's good.  What line number?

18         A      Line Number 2 on Schedule M-2.

19         Q      Line Number 2 Attach Form 1125-A, is

20   that what you're looking at?

21         A      No.  I'm looking at this one

22   (indicating).

23         Q      I'm not on the right page.  "Analysis of

24   Partners' Capital Accounts."  Okay.

25         A      Yes.

Page 103

1          Q       Balance at the beginning of the year

2    "-181,359."  Do you see that?

3          A       Yes.

4          Q       Capital contribution cash "7,504,813."

5    Do you see that?

6          A       Yes.

7          Q       Net income per books, "-4,651,971."  Do

8    you see that?

9          A       Yes.

10         Q       It doesn't indicate here whether the

11   $7,504,813 is only the capital contribution of

12   Hillshore Inc., does it?

13         A       No.

14         Q       This is a capital contribution of

15   everybody?

16         A       Yes.

17         Q       And this is a capital contribution from

18   2014 and 2015 or just 2015?

19         A       It's accumulated over the years.

20         Q       So as of December 31, 2015, there was

21   only $7,504,813 identified as capital contribution for

22   Thomas Wylde?

23         A       Yes.

24         Q       That figure is inconsistent with

25   Exhibit 72 wherein it states Hillshore Investments made

Page 104

```
 1    a $9,000,013 capital contribution for 3390 units;
 2    right?
 3           MR. PEDDIE:  Objection, calls for a legal
 4    conclusion.
 5    BY MR. BILLER:
 6           Q      Right?
 7           A      Yes.
 8           Q      Okay.  Both those documents -- both
 9    those documents are inconsistent with the information
10    on Exhibit 65; right?
11           MR. PEDDIE:  Objection, calls for a legal
12    conclusion; assumes facts.
13           THE WITNESS:  The numbers, yes.
14    BY MR. BILLER:
15           Q      The numbers are inconsistent on all
16    three documents; correct?
17           A      They don't tie up.
18           Q      They don't tie up; right?
19           A      (Inaudible response.)
20           Q      Is that right?
21           A      Yes.
22           Q      Can you explain why you have three
23    different numbers for capital contributions by
24    Hillshore Investments in 2015; zero, short of 9
25    million, and 9 million?
```

Page 105

1          A        I can't.

2          Q        If you want to determine why you have

3    three inconsistent numbers coming from tax returns,

4    members and capital contributions Third Amended

5    Exhibit B and the QuickBooks analysis or QuickBooks

6    data on Exhibit Number 65, how would you do that?

7          A        You have to look at the other accounts

8    in balance sheet.  It could be in other account, and

9    then you have to ask the tax CPA how she classified

10   those accounts in presenting the tax return.  I'm not a

11   tax person.

12         Q        You have to have all the backup; right?

13         MR. BILLER:  What are you pointing the witness

14   at?

15         MR. PEDDIE:  I'm just showing her your exhibit.

16         MR. BILLER:  No.  You pointed to a page on my

17   exhibit.

18         MR. PEDDIE:  On your exhibit, that's right.

19         MR. BILLER:  And you looked at her, and you

20   wanted her to read it.

21         MR. PEDDIE:  Yes.

22         MR. BILLER:  That's not proper, Counsel.

23         MR. PEDDIE:  Why not?

24         MR. BILLER:  Because that's interfering with my

25   examination, and you're trying to coach the witness.

                                        Page 106

1        MR. PEDDIE:  Will I have a chance to ask some

2   questions.

3        MR. BILLER:  Of course you will.  So why don't

4   you stop interfering with my --

5        MR. PEDDIE:  I'm not interfering with anything.

6        MR. BILLER:  Of course you are.

7        MR. PEDDIE:  This is your exhibit.

8        MR. BILLER:  It doesn't matter if it's my

9   exhibit.

10        MR. PEDDIE:  You're asking her about

11   documents and --

12        MR. BILLER:  You're interfering with my depo.

13   Do you got it?

14        MR. PEDDIE:  I'm just showing her the

15   document.

16        MR. BILLER:  You're not showing -- you're

17   showing her a page within the document.

18        MR. PEDDIE:  Dimitrios --

19        MR. BILLER:  Don't do it again.

20        MR. PEDDIE:  Dimitrios, you have the

21   commitment --

22        MR. BILLER:  Don't do it again.

23        MR. PEDDIE:  You have a commitment to

24   contribute $1.5 million in 2016.

25        MR. BILLER:  So what.  Are you testifying now?

Page 107

Also enclosed is any material you furnished for use in preparing the returns. If the returns are examined, requests may be made for supporting documentation. Therefore, we recommend that you retain all pertinent records for at least seven years.

In order that we may properly advise you of tax considerations, please keep us informed of any significant changes in your financial affairs or of any correspondence received from taxing authorities.

If you have any questions, or if we can be of assistance in any way, please call.

Sincerely,

Kyu Hong Kim, CPA, Inc.

1          MR. BILLER:  You signed those under penalty of

2    perjury and that you had personal knowledge.

3          MR. PEDDIE:  Calm down, Mr. Biller.  You need

4    to read your own documents.

5          MR. BILLER:  Excuse me.

6    BY MR. BILLER:

7          Q     In order to figure all this out, you

8    have to do an audit; right?

9          MR. PEDDIE:  Objection, calls for a legal

10   opinion.

11         THE WITNESS:  A review or an audit.

12   BY MR. BILLER:

13         Q     What is the difference between a review

14   and an audit?

15         A     Well, a review is not as thorough as an

16   audit.

17         Q     Of course not.  A review doesn't look at

18   the backup material; right?

19         A     They do sometimes.

20         Q     They don't most of the time; correct?

21   They just look at the QuickBooks; right?

22         A     They ask for backup.

23         Q     Do they look for all the backup?

24         A     Not all of it.

25         Q     But an audit looks at all the backup

Page 109

1   material to make sure that the data going into

2   QuickBooks is consistent with the backup; right?

3          MR. PEDDIE:  Objection, assumes facts; calls

4   for a legal opinion.

5          THE WITNESS:  Yes.  Whatever they want

6   to --

7          MR. PEDDIE:  Calls for an expert opinion.

8   BY MR. BILLER:

9          Q       And then once you check if the data in

10  QuickBooks is proper and accurate, then you can do an

11  analysis of QuickBooks to try and find why there was an

12  inconsistency; correct?

13         MR. PEDDIE:  Objection, calls for a legal

14  opinion; calls for an expert opinion; calls for

15  speculation.

16         THE WITNESS:  Yes.

17  BY MR. BILLER:

18         Q       Okay.  Why do you think Counsel was

19  showing you a particular page?

20         MR. PEDDIE:  Will you allow her to look at the

21  page?

22  BY MR. BILLER:

23         Q       Why do you think Counsel -- when he

24  showed you a page from one of my exhibits, what did you

25  think at that moment?

Page 110

```
 1              A       He's just pointing out the number, the
 2    amount.
 3              Q       What did you think?
 4              A       Just pointing out the number.
 5              Q       And what did you -- do you know why he
 6    was pointing out the number?
 7              A       Probably to strike a recollection.
 8              Q       So he's trying to force you to recall
 9    some information?
10              MR. PEDDIE:  Objection, mischaracterizes what
11    she's --
12              THE WITNESS:  I wouldn't say force.
13    BY MR. BILLER:
14              Q       He was asking you to recall some
15    information; right?
16              A       Just pointing out a number in there.
17              Q       And that was to recall information;
18    right?  Do you know what information he was trying to
19    get you to recall?
20              A       It's the same schedule that you have
21    given.  It's the same number that I have.
22              Q       What do you mean it's the same number?
23              A       It's on the document that we both have.
24              Q       What is?
25              A       The amount.
```

Page 111

Form 1065X (1-2012)     THOMAS WYLDE LLC                                    47-1444612                           Page **4**

**Part III**    Explanation of Changes to Items in Part I and Part II. Enter the line number from Part I or Part II for the items you are changing, and give the reason for each change. For partnerships, show the box number and code used to report the item on Schedule K-1. Show any computation in detail. Also, see What To Attach in the instructions.

If this amended return or AAR is reporting any change in the allocation of the partnership's or REMIC's income, gain, loss, deduction, or credit among its partners or residual interest holders, see Changes in Allocation in the instructions, and check here ........................................................................................................................................................... ▶ ☐

This amended return is to correct only partners' share of profit and
capital. Partners' share of loss is same as original return.
Since the taxpayer made loss in current year, change in partners' share of
profit and capital will not affect partner's share of current year income,
deductions, credits, and other items in Part III of Schedule K-1.

DAA

1          Q      So he was -- he distracted you when I

2   gave -- when I was in the middle of formulating and

3   asking you questions; correct?

4          A      I wouldn't really say distracted.  I

5   just glanced --

6          Q      You just said he was.

7          A      I was glancing through it.

8          Q      Which is it, you weren't distracted or

9   you were distracted; because you gave two different

10  answers?

11         A      I said I wasn't really distracted.

12         Q      That's now a third, actually.  A third

13  answer.

14         MR. PEDDIE:  Objection, argumentative.

15  BY MR. BILLER:

16         Q      Let's start all over.  When opposing

17  counsel inappropriately showed you

18         MR. PEDDIE:  Objection --

19  BY MR. BILLER:

20         Q      -- a document before to try to refresh

21  your recollection, were you distracted?

22         MR. PEDDIE:  Objection, argumentative;

23  mischaracterizes.

24         THE WITNESS:  A bit, yes.

25         MR. BILLER:  Thank you.

Page 113

```
 1    BY MR. BILLER:

 2         Q      Let's talk about John Hanna.  You've

 3    known him for five years; right?

 4         A      No, longer.

 5         Q      How long have you known him?

 6         A      About 13 years?

 7         Q      13 years?

 8         A      2003.

 9         Q      Yeah.  How did you meet him?

10         A      He hired me.

11         Q      And did you have a personal

12    relationship?

13         A      No.

14         Q      Did you ever have dinner with him

15    outside of work?

16         A      No.  With -- only on meetings.  Not

17    dinner, a meeting.

18         Q      All right.  And were you always

19    financial controller?

20         A      Sorry?

21         Q      Were you always a financial controller

22    with him?

23         A      Yes.

24         Q      And he was your supervisor?

25         A      He's my boss, yes, CEO.
```

Page 114

| | | |
|---|---|---|
| 1 | Q | And where does he work now? |
| 2 | A | Thale Blanc. |
| 3 | Q | I'm sorry? |
| 4 | A | Thale, T-h-a-l-e, one word. |
| 5 | Q | Where? |
| 6 | A | In Melrose Place. |
| 7 | Q | Melrose Place.  Okay.  And what is his |
| 8 | position? | |
| 9 | A | CEO. |
| 10 | Q | And how long has he been working there? |
| 11 | A | Just recently. |
| 12 | Q | When did he start, do you know? |
| 13 | A | I don't -- I believe maybe late July. |
| 14 | Q | Okay.  And what's his position? |
| 15 | A | CEO. |
| 16 | Q | And what kind of business is that? |
| 17 | A | It's a fashion company as well. |
| 18 | Wholesale and retail purses. | |
| 19 | Q | How many people work for that company? |
| 20 | A | Three or four at the time that he |
| 21 | joined. | |
| 22 | Q | Okay.  Where is that company located? |
| 23 | A | Melrose Place. |
| 24 | Q | Address? |
| 25 | A | 8481. |

Page 115

```
1           Q       8481?

2           A       8481 Melrose Place, L.A., California

3    90069.

4           Q       Do you have his telephone number?

5           A       His cell phone, yes.

6           Q       Can you give it to us, please?

7           THE WITNESS:  Am I allowed to do that?

8           MR. BILLER:  Yes.

9           MR. PEDDIE:  Did the other one not work?  You

10   have it?

11          THE WITNESS:  Yes.  310-770-3741.

12          MR. BILLER:  Okay.

13   BY MR. BILLER:

14          Q       And you're working with him currently?

15          A       Yes.

16          Q       I thought you were working at a trucking

17   company.  No?

18          A       No.  Where did you get that?

19          MR. PEDDIE:  Same place he gets everything

20   else.

21          MR. BILLER:  My assistant told me that.

22          THE WITNESS:  I have another client that I'm

23   working with.  It's an apparel company.

24          MR. BILLER:  Okay.

25   ///
```

                                    Page 116

```
 1    BY MR. BILLER:
 2         Q     So how many days a week do you work with
 3    John Hanna?
 4         A     How many?
 5         Q     Days do you work with John Hanna per
 6    week?
 7         A     Two to three days.
 8         Q     Okay.  I only have one copy of this
 9    document, unfortunately.  I'll give it to you because I
10    think it's more important for you to have it because
11    I'll be asking you about it.  I'll be asking you
12    questions; okay?
13         A     Okay.
14         MR. BILLER:  Let's have the next document
15    marked.
16              (Exhibit 74 was marked for
17         identification by the Certified Shorthand
18         Reporter and is attached hereto.)
19    BY MR. BILLER:
20         Q     I want you to flip through 74 and let me
21    know when you become familiar with it.
22         MR. BILLER:  Let's go off the record.
23              (Break taken:  11:14 a.m. - 11:19 a.m.)
24    BY MR. BILLER:
25         Q     Are you ready?
```

Page 117

```
 1            A      Yes.

 2            Q      Can you please show me where in

 3    Exhibit Number 74 it indicates the investments

 4    Thomas Wylde received in 2014?

 5            MR. PEDDIE:  I'm going to object to this entire

 6    line of questioning in that it asks this witness to be

 7    an expert on finding things in a U.S. tax return and

 8    also on relevance.

 9    BY MR. BILLER:

10            Q      Did you find something?

11            A      Well, I would go against this schedule,

12    Schedule M-2?

13            Q      And what does it state?

14            A      Capital contributed 700.

15            Q      700?  Is that $700 or $7 million?

16            A      It says $700 here.

17            Q      $700.  So the 2014 tax return for

18    Thomas Wylde indicates that there was a capital

19    contribution of $700 in total; correct?

20            A      Yes.

21            Q      Okay.  It doesn't show 2.3 million?

22            A      It could be in the other liabilities

23    here.

24            Q      I'm not asking where it could be.  I'm

25    asking where it should be.  Is it in the partners
```

Page 118

```
 1   analysis contribution portion of the tax return?
 2           MR. PEDDIE:  Objection, calls for an expert
 3   opinion.  It's a continuation of the quiz.  This
 4   witness is not an expert on U.S. tax return.
 5   BY MR. BILLER:
 6           Q    Does it show in that section you're
 7   looking at any contribution larger than $700?
 8           A    It does not on this schedule.
 9           Q    Do you do your own taxes?
10           A    I do.
11           Q    So you're familiar with filling out tax
12   returns in the State of California and for the federal
13   government?
14           A    Individual yes, not corporate.
15           Q    This is not a corporation, is it?
16           A    This is an LLC.
17           Q    It's not a corporation, though; right?
18   There's a difference between a corporation and an LLC;
19   right?
20           A    Yes.
21           Q    An LLC is not as complicated as a
22   corporation; right?
23           MR. PEDDIE:  Objection, calls for --
24           THE WITNESS:  But it's extensive.
25   ///
```

Page 119

```
 1   BY MR. BILLER:
 2          Q     Are you saying you can't read a tax
 3   return?  Is that what you're saying?
 4          A     I could but this is -- as I said, it's a
 5   tax return for an entity.
 6          Q     I understand.  But you can read it;
 7   right?
 8          A     Yes.
 9          Q     Okay.  So can you explain why there are
10   no -- there's only $700 in capital contribution into
11   Thomas Wylde for 2014?
12          MR. PEDDIE:  Objection, calls for an expert
13   opinion.
14          THE WITNESS:  I can't.  As I said, it could be
15   in the liabilities and not reclassed yet.
16          MR. BILLER:  Okay.
17   BY MR. BILLER:
18          Q     Do you see any amount in liabilities for
19   3.2 million?
20          A     Not that exact figure.
21          Q     That adds up to that figure?
22          A     More than that.  It's 4.3 here.
23          Q     In liabilities?
24          A     In other liabilities, and there is a
25   statement that pertains to that schedule.
```

Page 120

1          Q      And what's that statement?

2          A      Statement 7.

3          Q      Can I look behind you?

4          MR. PEDDIE:  Yeah, come on over.  I think you

5    may have flown past the statements.  What's this here?

6          THE WITNESS:  It's Form 1065.

7          MR. PEDDIE:  These are California statements?

8          THE WITNESS:  Yeah.

9          MR. PEDDIE:  Well, go back in May.

10         THE WITNESS:  Schedule L, notes payable

11   long-term.

12   BY MR. BILLER:

13         Q      What do you see?

14         A      Notes payable long-term.

15         Q      What does that mean?

16         A      It's in the notes payable, the

17   4,000,300.

18         Q      What does that indicate to you?

19         A      It's in the liability account.  It's

20   not -- it's not in the capital account.

21         Q      If there were any loans made to the

22   company, would that be included in the tax returns?

23         A      On the schedule.

24         Q      On the schedules?

25         A      Yes.

                                          Page 121

```
 1            Q     Can you please find if any loans were
 2   made to the company?
 3            A     On the schedule here, not necessarily
 4   the schedule itself.
 5            Q     So is there any information in the U.S.
 6   tax return that will indicate that
 7   Hillshore Investments received a loan in 2014?
 8            A     I don't believe so.
 9            MR. PEDDIE:  Objection, it's calling for her to
10   go through an entire tax return that she did not
11   prepare.
12            MR. BILLER:  That's not an objection.  That's a
13   speaking statement.
14            MR. PEDDIE:  Can you give her time to go
15   through it, then?
16            MR. BILLER:  Of course I can.  I'll give her
17   all the time she needs.
18            MR. PEDDIE:  All right.
19            THE WITNESS:  I don't believe it's here.  It's
20   a schedule that's given to the tax CPA to classify that
21   as such.
22            MR. BILLER:  Okay.
23   BY MR. BILLER:
24            Q     But wouldn't it be noted in the tax
25   return?
```

Page 122

1          A       It's here.  It's on the statement 7 and

2     schedule but not the actual detail, if you're asking

3     for that.

4          Q       There's $4 million looking on the

5     schedule and the other page; right?

6          A       Yes.

7          Q       You don't know if that's loans, do you?

8          A       It's classified as notes payable.

9          Q       Is that a loan?

10         A       Yes.  A notes payable is a loan.

11         Q       Okay.  So when did -- how many loans did

12    Hillshore -- Thomas Wylde have?

13         A       I don't remember.

14         Q       Okay.  Now, to determine the loans for

15    that document, you would have to go back to QuickBooks

16    and the backup; right?

17         A       Yes.

18         Q       So what type of backup would you need to

19    look at or find to confirm there were loans in that

20    amount?

21         A       Promissory note.

22         Q       That's it?

23         A       Yes.

24         Q       How about money coming in representing

25    the loan?

                                        Page 123

```
1            A      Yes.   Money coming into the bank

2    supported by the notes payable, the promissory note.

3            Q      Okay.  And so when a loan is to be

4    converted in equity, that would have an impact on the

5    tax return information; right?

6            A      Yes.

7            Q      You would have more equity than $700;

8    correct?

9            A      Yes.

10           MR. PEDDIE:  Objection, it's calling for an

11   expert opinion.

12   BY MR. BILLER:

13           Q      And 2014 tax return is prepared sometime

14   in 2015; right?

15           A      Yes.

16           Q      And when was this Exhibit 75 prepared?

17           A      75?

18           Q      No, 2014 tax return.

19           A      74.

20           Q      74, thank you.  When was it prepared?

21           A      I don't remember.  September 10, 2015.

22           Q      September 10, 2015.  So if any loans in

23   2014 were converted to equity in 2014, should it be

24   reflected as a loan or equity?

25           A      Say that again.
```

Page 124

```
 1          Q     When conversion of a loan takes place in
 2   2015 -- you know, before January 1, 2016, and when a
 3   loan is converted to equity before 2015 in 2014, how
 4   should it be described in the tax return; as a loan or
 5   equity?
 6          A     It would have been classified as an
 7   equity.
 8          Q     Thank you.  Who is identified as the
 9   partner in that tax return for 2014?
10          A     There's Hillshore.
11          Q     And how much capital contribution did it
12   make?
13          A     I'm only showing the profit sharing in
14   his K-1.  I'm only showing the profit sharing and loss
15   sharing in K-1.
16          Q     You're only showing losses?
17          A     No.  The percentage of profit sharing
18   and loss sharing and the losses.  I can't seem to find
19   the investment in here.
20          Q     Why not?
21          A     I don't know where to look here.
22          Q     Can I see that real quick, Exhibit 74.
23   The reason you can't find it is because it's all blank.
24   This is highly unusual.  It states here under
25   Hillshore Investments profit sharing to be 45 percent;
```

Page 125

```
 1    correct?

 2           A     Yes.

 3           Q     Okay.  So that means Hillshore has 45

 4    percent interest in Thomas Wylde; correct?

 5           A     The profit sharing.

 6           Q     Profit sharing?

 7           A     Yes.

 8           Q     But isn't profit sharing equal to its

 9    investment interest?

10           A     I can't tell from that.

11           Q     Okay.  All right.

12           A     I think you have to ask the tax CPA how

13    they determined that.

14           Q     And this loss sharing 100 percent, do

15    you see that?

16           A     Yes.

17           Q     You saw that; right?

18           A     Yes.

19           Q     And then there is ownership of capital

20    45 percent; right?

21           A     Yes.

22           Q     Okay.  And ownership of capital, that is

23    a percentage of equity owned; correct?

24           A     I believe so.

25           MR. PEDDIE:  Objection, calls for --
```

Page 126

```
 1    BY MR. BILLER:
 2          Q     Say that again.
 3          A     I believe so.
 4          Q     This Exhibit 74 is a tax return for
 5    Thomas Wylde for 2014, and it shows that in 2014 it had
 6    a 45 percent equity -- ownership of capital of 45
 7    percent; correct?
 8          A     Yes.
 9          Q     Okay.  That information is completely
10    inconsistent with Exhibit 65 that shows $2.3 million
11    loan conversion to equity into Thomas Wylde; correct?
12          MR. PEDDIE:  Objection, calls for a legal
13    opinion and an expert opinion.
14          THE WITNESS:  In numbers, yes.
15          MR. BILLER:  Thank you.  Let's take a break.
16                (Break taken:  11:32 a.m. - 11:37 a.m.)
17    BY MR. BILLER:
18          Q     Would you please find, if there is any,
19    information in Exhibit 74 that relates to loans made to
20    Thomas Wylde in 2014?
21          A     The line that I showed you earlier, the
22    one that says "Notes Payable" on it.
23          Q     Does it indicate how much?
24          A     4,300,000.
25          Q     4,300,000?
```

Page 127

```
1              A      Yes.

2              Q      But it doesn't indicate where that money

3     came from?

4              A      Not specifically.

5              Q      Would the QuickBooks note that?

6              A      Yes.

7              MR. BILLER:  Okay.  Let's go ahead and mark the

8     next document in order.

9                     (Exhibit 75 was marked for

10                    identification by the Certified Shorthand

11                    Reporter and is attached hereto.)

12    BY MR. BILLER:

13             Q      Do you know what Exhibit 75 is?

14             A      Yes.

15             Q      What is it?

16             A      It's an account schedule for advance to

17    PDTW LLC.

18             Q      And is this an indication of monies

19    going to PDTW?

20             A      Not necessarily.  It looks like it's

21    payments on behalf.  Payments made by Thomas Wylde on

22    behalf of PDTW.

23             Q      Now, is there a calculation at the

24    bottom at the end of September 2015?

25             MR. PEDDIE:  Dimitrios, I'm going to object on
```

Page 128

```
 1   the grounds of relevance, this entire line of
 2   questioning.  It seems to be more about the bankruptcy
 3   proceedings.
 4          MR. BILLER:  Please.
 5          MR. PEDDIE:  Just give me a standing objection,
 6   and we'll be done with it.
 7          MR. BILLER:  Yeah.
 8          MR. PEDDIE:  Do you give me that?  Do you?
 9          MR. BILLER:  Yes.  State your objection.
10   That's fine.
11   BY MR. BILLER:
12          Q     Do you see that bottom line entry
13   4,425,996.71?  Do you see that?
14          A     Yes.
15          Q     That's dated September 15, 2015.  And
16   this document starts on September 2, 2015 -- no,
17   September 2, 2014, I'm sorry.
18          A     Yes.
19          Q     So what is all the information dated
20   from September 2, 2014, to December 15, 2015, indicate
21   to you?
22          A     These, I believe, are liabilities.
23          Q     Where did you see the negative?
24          A     It doesn't say negative in it.
25          Q     But you believe this is liabilities.
```

                                                  Page 129

```
 1            A       These are payments to this these
 2    vendors.
 3            Q       Okay.  So this document indicates that
 4    $4,425,996.71 was paid to vendors?
 5            A       Yes, I believe so.
 6            Q       And the bottom beneath that it shows
 7    advance from PDTW for a total amount of 88,300?
 8            A       Yes.
 9            Q       What does the advance mean?  Is that
10    money PDTW was paying out?
11            A       Some transaction looks like a fund
12    transfer from PDTW account to TW, and some looks like a
13    collection from customers for invoices -- customers'
14    invoices related to PDTW.
15            Q       I want you to compare the number
16    4,425,996.71 to the information on the 2014 tax return,
17    which is Exhibit 74.  You have it in front of you.
18            A       How do you want me to compare?
19            Q       I'll tell you.  Did Thomas while operate
20    on a fiscal year or calendar year?
21            A       Calendar year.
22            Q       Actually, it's this one.  It's 73.  I
23    want you to look at.  If Exhibit 75 indicates a loss
24    for Thomas Wylde in 2015, a magnitude of 4,425,000,
25    shouldn't that be reflected in the tax return?
```

Page 130

5.3.1. **Executive Officers**. Executive Officers shall have the duties, functions, and powers described herein. Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members. Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a) **Chief Creative Officer and Creative Director**. The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company. The CCOD shall also be the Chairperson of the Executive Committee. For so long as she is employed by the Company, the CCOD for the Company shall be Paula.

(b) **Chief Operating Officer and Chief Commercial Officer**. The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4. **Manager's Powers and Limitations**. The Manager of the Company shall have all powers and authority provided by this Agreement and the Act. Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5. **Compensation**. Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6. **Company Assets**. The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7. **Company Funds**. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8. **Removal and Replacement of Manager**. The Manager shall serve until the earlier of: (a) the Manager's resignation, retirement, death, or disability, (b) the Manager's removal by Vote of a Supermajority of Members or (c) the Manager ceasing to be a Member of the Company. A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1. **Books of Account**. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any

8

```
 1           Q       So that's what 75 reflects?
 2           A       Yes.
 3           MR. PEDDIE:  I'm okay with this exhibit being
 4      used.  But obviously she can't authenticate it, so I
 5      object to it.
 6      BY MR. BILLER:
 7           Q       Are you familiar with any QuickBooks
 8      accounts for samples?
 9           A       Yes.
10           Q       What is that?
11           A       It's an expense account.
12           Q       And it's an expense account recognizing
13      the amount of money generated by Thomas Wylde or PDTW
14      selling samples; right?
15           A       No.  It's a sample cost, producing the
16      sample.
17           Q       Oh, producing the sample?
18           A       Yes.
19           Q       Is there anything in QuickBooks that
20      recognizes the money generated from the sale of
21      samples?
22           A       It should be on the -- it should be on
23      the income account.  It could be a sale account in
24      there on a revenue side.
25           Q       So it could be an entry that talks about
```

Page 132

```
 1    sample sales?
 2         A       Not -- maybe not specific.  Probably a
 3    generic account like sales.
 4         Q       Did you ever see QuickBooks accounts for
 5    PDTW?
 6         A       Briefly.
 7         Q       Now, this has always bothered me about
 8    this case.  Well, a lot of things have bothered me
 9    about it.  Here you have a business, PDTW, that shuts
10    down essentially.  It stops business operations in
11    2015, July 2015.  And a new company is formed in July
12    2015 called Thomas Wylde.
13         A       2014.
14         Q       2014 called Thomas Wylde.
15         A       And the reason that company is created
16    is to shield or protect the members and the owners from
17    any debt that is owed by PDTW.
18              MR. PEDDIE:  Objection, assumes facts.
19              MR. BILLER:  That's what Schnider testified to.
20    BY MR. BILLER:
21         Q       And it was essentially a new company to
22    protect itself from paying any of its creditors the
23    money it owed.  So shouldn't -- in normal
24    circumstances, shouldn't the QuickBooks data be
25    transferred to the Thomas Wylde data, QuickBooks?
```

Page 133

```
 1          A       Thomas Wylde data transferred to?
 2          Q       The PDTW QuickBooks data be transferred
 3    to Thomas Wylde QuickBooks data.
 4          A       No.  It's still a different company.
 5          Q       So the company started new?
 6          A       Yes.
 7          Q       Okay.  Started with a clean slate?
 8          A       Yes.
 9          Q       Didn't owe any money?
10          A       Yes.
11          Q       And all the losses were left with PDTW;
12    right?
13          A       Whatever the transaction is left in
14    there.
15          Q       So if PDTW owned, you know, loans and
16    those weren't transferred to Thomas Wylde, Thomas Wylde
17    had no obligation to pay them; right?
18          MR. PEDDIE:  Objection, calls for a
19    hypothetical.  Calls for a legal opinion.
20          THE WITNESS:  It's not Thomas Wylde loans, yes.
21    BY MR. BILLER:
22          Q       Do you know how the Great Depression was
23    caused?  Do you know how the Great depression was
24    caused?
25          A       No.
```

Page 134

1          Q          Companies and corporations would set up

2     sister corporations and then put all the debt into

3     these sister corporations?

4          A          Okay.

5          Q          And the mother corporation only had the

6     revenue.  So all these companies -- mother companies

7     showed great profits and lots of revenue until one

8     company was discovered to have all the debt of a sister

9     company.  And that's what caused the Great Depression.

10    Did you know that?

11         A          No.

12         Q          You know there are laws against that now

13    to prevent that from happening?  Do you know that?

14         A          I'm not aware of it.

15         Q          Have you ever worked with the accounting

16    firm that prepared the tax returns?

17         A          Worked with?  Coordinate you mean?

18         Q          Yes.

19         A          Yes.

20         Q          Does the person who prepares the tax

21    return, does that person speak English?

22         A          Who are you talking about?

23         Q          Well, this letter is signed by

24    Hong Kim -- Kyu Hong Kim, do you know that entity?

25         A          No.  I know Alison, but I don't know

Page 135

1    what -- it might be a Korean name.

2         Q      Is that the person you dealt with?

3         A      Yes.

4         Q      And what is her last name?

5         A      I can't remember.  Alison -- I believe

6    she's on this.  It could be Kim.  I'm not sure.  I

7    don't remember.

8         Q      Okay.  All right.  Let me just have a

9    one-minute break.

10              (Break taken:  11:50 a.m. - 11:54 a.m.)

11   BY MR. BILLER:

12        Q      Now, we just finished talking about the

13   money or the debt that would not have been necessarily

14   transferred over but the clothes were.  Isn't that

15   right?

16        A      Excuse me?  Say that --

17        Q      Thomas Wylde simply took the assets of

18   PDTW and sold the clothes; right?

19        A      I believe that was the intention at that

20   time?

21        Q      So it left all the debt with PDTW, but

22   it --

23        MR. PEDDIE:  Objection, calls for legal

24   opinion.

25   ///

                                        Page 136

```
 1   BY MR. BILLER:
 2        Q     -- but it took the clothing and the name
 3   and the brand of the company and sold those; right?
 4        MR. PEDDIE:  Objection, calls for a legal
 5   opinion.
 6   BY MR. BILLER:
 7        Q     The clothes, it sold the clothes.
 8        A     There was a cut-off season.
 9        Q     But they still sold the clothes that
10   were --
11        A     After the -- when Thomas Wylde was
12   created, it started with its own season.
13        Q     But what did they do with the
14   clothes that Paula PDTW had already manufactured and
15   had on sale before July 22, 2014?  Did they throw it
16   away?
17        A     No.  It was invoiced under PDTW.  That's
18   why we have these advances.  So whatever collection is
19   in there it goes to this account, advances to advances
20   from.  And so when that happened, invoices pertaining
21   to PDTW stayed in PDTW books.
22        Q     So people works on the PDTW books?
23        A     Yes.
24        Q     And so those books should show what
25   property was sold; right?
```

Page 137

```
1            A      Yeah, it should.
2            Q      Okay.  Are you sure that the property
3    that was sold belonging to PDTW wasn't put on the books
4    for Thomas Wylde?
5            A      I'm not sure.  I can't remember.
6            Q      All right.  Now, were you in the meeting
7    where Jene Park and John Hanna were trying to find a
8    description for Paula Thomas's job?
9            MR. PEDDIE:  Objection, assumes facts.
10   BY MR. BILLER:
11           Q      Go ahead.  Answer.
12           A      Say that again.
13                  (The record was read by the Certified
14           Shorthand Reporter.)
15           THE WITNESS:  I don't remember what particular
16   meeting, but there were meetings discussing certain
17   things.  Not the details, though.
18   BY MR. BILLER:
19           Q      Let's talk about the meetings that you
20   attended in which Paula Thomas was discussed.  How many
21   of those meetings did you have?
22           A      A few times, maybe two or three.
23           Q      And isn't it true that they did a Google
24   search for a creative director while Paula Thomas was
25   there?
```

Page 138

8.9    **Agreement Terms**.

8.9.1    **Installment Note**.  If there are no payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), unless the parties agree otherwise, twenty percent (20%) of the purchase price shall be paid within 30 days of the closing for the sale of the Offered Membership Interest and the balance of the purchase price will be paid pursuant to a promissory note equally amortized over four years, principal and interest payable in monthly installments, with interest at the prime rate quoted by the Company's main bank in effect on the date of the closing.

8.9.2    **Closing**. The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a purchaser becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree.  At the closing, the purchaser or purchasers will pay for the Offered Membership Interest in cash, by wire transfer or certified cashier's check, and/or promissory note, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred.  If the seller does not appear at the closing, then:

(a)    The purchaser or purchasers shall deposit the purchase price in full, or the first payment of same, by check (or other verifiable means) with an escrow agent;

(b)    The escrow agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company for administrative costs; and

(c)    The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

8.10    **Transfers at Death**.  Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest).  If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

### ARTICLE IX: DISSOLUTION AND WINDING UP

9.1.    **Dissolution**.  The Company shall be dissolved on the first to occur of the following events:

(a)    The Vote of a Supermajority of Members to dissolve the Company;

(b)    The sale or other disposition of substantially all of the Company's assets;

or

17

```
 1              THE WITNESS:  Yeah, I think it's 2015.
 2    BY MR. PEDDIE:
 3         Q    All right.  We do have several copies of
 4    the 2015 return.  I refer you to the K1 of the 2015
 5    return.  Can you find on that page of the return where
 6    it lists Hillshore's capital contributions for that
 7    year?
 8         A    Yes.  It says capital contributed during
 9    the year.
10         Q    And what is the figure given?
11         A    $7,500,013.
12         Q    And do you recall earlier when
13    Mr. Biller was trying to sort out with you how that
14    number ever became $9,000,013?
15         A    Yes.
16              MR. BILLER:  Misstates and mischaracterizes the
17    question and response.
18    BY MR. PEDDIE:
19         Q    Do you remember when Mr. Biller was
20    referring you to the Third Amended Exhibit B and
21    talking about Hillshore Investments capital account
22    balance?
23         A    Yes.
24         Q    And do you remember when he asked you
25    what the amount of the Hillshore Investment capital
```

Page 140

1    contribution was?  Do you remember talking about this?

2           A      Yes.

3           Q      And what figure is shown on

4    Third Amended Exhibit B, which is Exhibit 72 to this

5    deposition?

6           A      He referred to the last line, which is

7    $9,000,013.

8           Q      Okay.  So on tax return, we see

9    $7,500,013.  We just went through that.  On Amended

10   Exhibit B we see $9,000,013.  And another source that

11   we looked at earlier, what was this transmittal form?

12          A      That's 68.

13          Q      I'm referring to what is shown as

14   Exhibit A to Exhibit 68 to this deposition.  Would you

15   please read the title of Exhibit A for us.

16          MR. BILLER:  I just want to interpose an

17   objection.  This is the same exact page of the document

18   I introduced that Counsel put in front of the witness

19   on my direct examination and pointed to to distract

20   her.  It's been tainted.

21          MR. PEDDIE:  And I'm trying to clear that up,

22   Mr. Biller.

23   BY MR. PEDDIE:

24          Q      Would you please read the first caption

25   to Exhibit 68 to this deposition?

Page 141

PARTNER# 3

| TAXABLE YEAR 2015 | Member's Share of Income, Deductions, Credits, etc. | | CALIFORNIA SCHEDULE K-1 (568) |

```
TYB  01-01-2015  TYE  12-31-2015
47-1710832

DSRB, LLC

18141 IRVINE BLVD
TUSTIN              CA  92780


47-1444612        201420310399
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES        CA  90007
```

A  What type of entity is this member? ●

(1) ☐ Individual    (4) ☐ C Corporation    (7) ☐ LLP    (10) ☐ Exempt Organization

(2) ☐ S Corporation    (5) ☒ General Partnership    (8) ☐ LLC    (11) ☐ Disregarded Entity

(3) ☐ Estate/Trust    (6) ☐ Limited Partnership    (9) ☐ IRA/Keogh/SEP

B  Is this member a foreign member? ............................................................... ● ☐ Yes  ☒ No

C  Enter member's percentage (without regard to special allocations) of:

| | (i) Before decrease or termination | (ii) End of year |
|---|---|---|
| Profit sharing | 3.500000 % ● | 0.200000 % |
| Loss sharing | 0.000000 % ● | 0.000000 % |
| Ownership of capital | 3.500000 % ● | 0.200000 % |

D  Member's share of liabilities:

Nonrecourse ................................................................... ● $ [              ].00

Qualified nonrecourse financing .................................... ● $ [              ].00

Other ............................................................................ ● $ [              ].00

E  Reportable transaction or tax shelter registration number(s) .....

F  (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) ............................................ ◉ ☐

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ............................................ ◉ ☐

G  Check here if this is: ● (1) ☐ A final Schedule K-1 (568)    (2) ☒ An amended Schedule K-1 (568)

H  Is this member a resident of California? ................................................................... ● ☒ Yes  ► ☐ No

1    get?

2        MR. BILLER:  One second.  Clearly irrelevant,

3    immaterial, intentionally misleading the witness by

4    comparing payments in 2016 with a tax return in 2015

5    and misleading.

6    BY MR. PEDDIE:

7        Q  What figure -- you may answer.  What

8    figure do you get when you add the payments that

9    Hillshore committed to pay in 2016 which is how much

10   again?

11        A  1,500,000.

12        Q  To the capital contributed during the

13   year according to the 2015 tax return?

14        A  $9,000,013.

15        MR. PEDDIE:  Thank you.  No more questions.

16        MR. BILLER:  Now I'll clear this up to show how

17   misleading and dishonest that was.

18

19            FURTHER EXAMINATION

20   BY MR. BILLER:

21        Q  On the 2015 tax return, whatever

22   happens in 2016 is immaterial; correct?

23        MR. PEDDIE:  Objection, mischaracterizes the

24   law.  It calls for a legal opinion.

25   ///

                           Page 143

```
 1   BY MR. BILLER:
 2        Q      You can answer the question.
 3        A      No, not really.
 4        Q      So you can you can take capital
 5   contributions that were supposed to be paid in
 6   2016 --
 7        MR. PEDDIE:  Mr. Biller, can you sit down?
 8   BY MR. BILLER:
 9        Q      -- and add them to the capital
10   contribution for 2015 tax return.  Is that what you're
11   saying?
12        MR. PEDDIE:  Mr. Biller, please sit down.  Can
13   we go off the record for just one second?
14        MR. BILLER:  No, we can't.
15   BY MR. BILLER:
16        Q      You can answer the question.
17        MR. PEDDIE:  Calls for a legal opinion,
18   objection.
19   BY MR. BILLER:
20        Q      Is that what you're saying?
21        MR. PEDDIE:  Objection, calls for a legal
22   opinion.
23        THE WITNESS:  I was going to say there is some
24   subsequent events in the accounting that may affect the
25   previous year.
```

                                        Page 144

1   BY MR. BILLER:

2        Q       That may affect?

3        A       Yes.

4        Q       What sequence of events occurred that

5   affected this case tax returns for 2015 and capital

6   contributions in 2016?  What sequence of events?

7        MR. PEDDIE:  Objection, relevance.  Objection,

8   calls for legal opinion.

9        THE WITNESS:  This is November 15, related to

10  November 15 transaction.  Although the payment might

11  have been made in 2016, this is a transaction that

12  transpired in 2015.

13  BY MR. BILLER:

14       Q       That doesn't make any sense either;

15  because that says $9,000,013, and the previous document

16  on the tax return says 7 million.  I'm asking you what

17  facts affected -- what sequence of facts affected this

18  irrational thought that monies contributed to

19  Thomas Wylde in 2016 can be added to a 2015 tax return?

20       MR. PEDDIE:  Objection, calls for a legal

21  opinion.

22       THE WITNESS:  I just need to go back through

23  this.

24       MR. BILLER:  You need to go back to explain

25  this one.  You really need to go back.

Page 145

1          You just jeopardized the integrity of the
2    witness, buddy.
3          MR. PEDDIE:  No, I didn't.  Mr. Biller, in
4    California a commitment to contribute money in the
5    future is a proper capital contribution by law.
6          MR. BILLER:  It's not on a tax return.
7          MR. PEDDIE:  You ought to know this.  It's a
8    legal matter.
9          MR. BILLER:  Make it to the jury.  Just make it
10   to the jury.
11         MR. PEDDIE:  You need to show some knowledge --
12         MR. BILLER:  I don't want to hear it --
13         MR. PEDDIE:  -- partnership taxation rules.
14         MR. BILLER:  The witness is here.  Stop
15   speaking.  The witness is here.
16         MR. PEDDIE:  These are not part of her
17   providence.
18         MR. BILLER:  Would you please stop speaking in
19   front of the witness.  Can you do that?  You already
20   showed your propensity to shove documents in her
21   face --
22         MR. PEDDIE:  I showed her one number.
23         MR. BILLER:  Stop speaking in front of the
24   witness.
25         MR. PEDDIE:  I showed her one number.  Let the

                                          Page 146

1    record reflect Mr. Biller is screaming at me.

2          MR. BILLER:  Let the record reflect the

3    attorney across from me has tainted this witness.

4          MR. PEDDIE:  I showed her a number --

5          MR. BILLER:  Stop -- stop talking.  Stop

6    talking.

7          THE WITNESS:  Can I just point out this

8    Section C?

9          MR. BILLER:  Sure.

10          THE WITNESS:  Section C says [as read],

11    "Pursuant to its knowledge of intent to exercise its

12    opinion, purchaser hereby agrees to purchase all

13    3,300 units at the price of $1,060.61 per unit for a

14    total exercise price of $3,500,013 payable on the terms

15    set forth herein."  And that's the 3,500,013 here, and

16    it says --

17    BY MR. BILLER:

18          Q       And you're pointing to the

19    Third Amended Exhibit B?

20          A       Yes, 6872.  Exhibit 72.

21          Q       That's the document that shows $9

22    million contribution; right?

23          A       Yes.  And I read on Exhibit 66,

24    Section C.  And it also says on Exhibit 66, Item

25    Number 3, which you asked me to read earlier:

                                        Page 147

```
 1              [As read] "Consideration.  In consideration for
 2    the Membership Interest, Purchaser shall make a capital
 3    contribution to Seller in the amount of Three Million
 4    Five Hundred Thousand and Thirteen US dollars.  Seller
 5    acknowledges that prior to the Effective Date,
 6    Purchaser advance Seller One Million Five Hundred
 7    Thousand US dollars, which advance shall be applied as
 8    consideration under this Agreement.  Purchaser shall
 9    pay the remaining balance of Two Million and
10    Thirteen" --
11         Q    You're reading the document.  Can you
12    get to your point, please?
13         A    Well, it says, "pay the remaining
14    balance of Two Million and Thirteen US dollars pursuant
15    to the payment schedule attached hereto as
16    Exhibit 'A.'"
17         Q    Okay.  So you read from a document
18    signed in 2014; right?  2014?
19         MR. PEDDIE:  I don't think so.  I think that's
20    mischaracterizing the document.
21         MR. BILLER:  This is a purchase agreement.
22         MR. PEDDIE:  There were two transactions.
23         THE WITNESS:  It's 2015 here.
24    BY MR. BILLER:
25         Q    So what is --
```

Page 148

```
 1          A       I --

 2          Q       This is an amendment to the purchase

 3    agreement?

 4          A       Yeah.

 5          Q       So did Counsel meet with you and talk

 6    about this document?

 7          A       No.

 8          Q       So why -- so you have the thought that

 9    the tax return showing $7.5 million in capital

10    contribution for 2015 should have been $9 million.  Is

11    that what you're saying?

12          MR. PEDDIE:  Objection, mischaracterizing the

13    testimony of the witness.

14    BY MR. BILLER:

15          Q       Are you saying that it should have been

16    $9 million?

17          A       No.  I was just tying up the number

18    9 million.

19          Q       But I'm asking you -- you're tying it

20    up.  You're coming up with some theory that you didn't

21    have on your own; correct?

22          A       No.  I just realized now the total.

23          Q       You just realized this minute; correct?

24          A       Yes.

25          Q       This minute, 12 afternoon after three
```

Page 149

1    hours of cross-examination, you just realized that this

2    theory existed.  Is that what you're telling me?

3          A      I'm objecting to the relevance of all

4    this, and I'm objecting to the ongoing quiz of this

5    witness of lengthy documents that she did not prepare

6    and not sign.

7    BY MR. BILLER:

8          Q      You can answer my question.

9          MR. BILLER:  Those are not objections.

10         MR. PEDDIE:  I'm allowing some questions, but I

11   want to register that objection.

12   BY MR. BILLER:

13         Q      That what you're saying?

14         A      Say that again.

15         Q      After three hours of cross-examination

16   over these documents, you spent five minutes with

17   opposing counsel --

18         MR. PEDDIE:  When are these five minutes?

19   Objection.

20         MR. BILLER:  In cross-examination.  Jesus.

21   BY MR. BILLER:

22         Q      And you came up with this theory; right?

23   You just realized it?

24         A      I'm tying up the numbers.

25         Q      I'm asking you when did you realize to

1   tie up the numbers?

2       A    When I saw the total here and tying it

3   up with the 9 million.

4       Q    The same exhibits that I showed you?

5       A    Yes.

6       Q    The same exhibits that I said to you

7   these are inconsistent numbers, and you said yes?

8       A    Yes.

9       Q    The same exhibits that I said numerous

10  times these documents show inconsistent numbers; right?

11      A    Yes.

12      Q    And you never said, no, they're not

13  inconsistent because of these reasons.  You never said

14  that; right?

15      A    No, I did not.

16      Q    So you came up with the first time after

17  we've had numerous breaks and you've had numerous

18  opportunities -- whether it happened or not, I don't

19  know -- you had numerous opportunities to talk with

20  Defense counsel; right?

21      MR. PEDDIE:  I object.

22      THE WITNESS:  I did not talk to him.

23  BY MR. BILLER:

24      Q    This is the same document that is shoved

25  in your face -- he put in your face --

Page 151

```
 1              MR. PEDDIE:  Objection, mischaracterizes --
 2    BY MR. BILLER:
 3         Q      Put in your face this chart and he
 4    wanted you to talk about these figures on this chart;
 5    right?  That happened at this deposition; right?
 6         A      He showed me the number, yes.
 7         Q      While I was cross-examining you; right?
 8         A      He pointed it out, yes.
 9         Q      When I was cross-examining you; right?
10         A      Yes.
11         Q      And he distracted you; right?  That's
12    what you testified to, he distracted you; right?
13         A      Yes.
14         Q      So now why didn't you say at that time,
15    at that time when he shoved this document in your face
16    and I was asking you why are these numbers not
17    consistent, why didn't you come up with a theory just
18    tying up the numbers?  Why not?
19         A      It didn't occur to me at that time.
20         Q      It didn't occur to you at the time when
21    I've been cross-examining up for three hours over
22    approximately 15 exhibits having all these
23    numbers -- 2014, 2015 tax returns, the check register,
24    the account transaction by QuickBooks showing a $2.3
25    million transaction with Hillshore in 2014, and all the
```

                                                Page 152

1    other documents we discussed, you didn't think of it;

2    is that what you're saying?

3         A        The total.

4         Q        You didn't think about it?

5         A        It didn't occur to me to tie up the

6    total with this --

7         Q        But we talked about the $9 million;

8    right?

9         A        Yes, we did.

10        Q        And Counsel shoved this paper with a

11   chart showing $1.5 million while I was cross examining

12   you --

13        MR. PEDDIE:  Objection, mischaracterizes --

14   BY MR. BILLER:

15        Q        -- and you didn't think about it to

16   point it out at that time that they really were

17   consistent.  Is that what you're saying?

18        A        No.  It's the date after that.

19        Q        But he shoved the document in front of

20   you.  He told -- he was essentially telling you look at

21   this document.  That didn't trigger anything in your

22   mind that, Oh, maybe these numbers tie up?

23        A        At that time, no.

24        Q        No.  Amazing.  Then I finish my

25   cross-examination, and then he comes up and questions

                                        Page 153

1    you.  And you all of a sudden say these numbers tie up.

2    Is that what happened?

3         A       I suddenly remembered it.

4         Q       After three hours you suddenly remember

5    it.  Is that what happened?

6         A       I remember reading this.

7         MR. PEDDIE:  Objection, argumentative.

8    BY MR. BILLER:

9         Q       Is that what happened, that you came up

10   with that theory when counsel for the defendants was

11   asking you questions; right?

12        A       Yes.

13        Q       Now, how do you know your theory is

14   right?

15        A       I don't.

16        Q       It's just a theory that you came up

17   with; right?

18        A       No.  It's --

19        Q       How do you know your theory is right?

20        A       Because you have the schedule here.

21        Q       You just said you don't know, and now

22   you're saying because you have the schedule here.

23   Which is the truth, that you don't know or that you

24   have the schedule here?  I want to know the truth.

25        A       You have the schedule here.

                                        Page 154

```
 1           Q       So you now say you have the schedule.
 2    So how do you know your theory is right?  How do you
 3    know the numbers should add up?  How do you know?
 4           A       The balance of 1.5 is stated here
 5    (indicating).  The 7.5 is recorded here (indicating).
 6    If you add it up, it totals up to this (indicating).
 7    And this 3 million --
 8           Q       But you said -- you said that there was
 9    $9 million contributed as of November 15; right?  2015,
10    that's what you said?
11           A       Yes, with the intention to payment
12    schedule.
13           Q       No.  You never said that.  I want to go
14    over your testimony now.  You said in your testimony
15    according to -- there should have been $9 million
16    contributed by November 15, 2015 because that's the
17    only time this document would have been created; right?
18           A       Yes.
19           Q       So this document is created
20    November 15, 2015; right?
21           A       Yes.
22           Q       But the tax return for 2015 shows
23    7.7 million; right?
24           A       Yes.
25           MR. PEDDIE:  Objection --
```

Page 155

1   BY MR. BILLER:

2          Q     In 2015 there is supposed to be

3   $9 million.  The tax return only shows $7 million;

4   right?

5          A     Yes.

6          MR. BILLER:  Thank you.  No further questions.

7   BY MR. BILLER:

8          Q     You've just ruined your credibility,

9   ma'am.  At the time of trial, I'm going to really show

10  the jury that you are in the pocket of Choi and

11  Plaintiff's counsel.  He coached you.  He made you

12  change your testimony.

13         MR. PEDDIE:  I have some additional questions.

14

15                  FURTHER EXAMINATION

16  BY MR. PEDDIE:

17         Q     Ms. Rafols, we've had various breaks

18  today.

19         A     Yes.

20         Q     During these breaks, did we discuss

21  anything having to do with the case at any point in

22  time?

23         A     No.  You went out, and I just stayed and

24  got water.

25         MR. BILLER:  Okay.  Do you know there is a jury

                                        Page 156

September 14, 2015


Pdtw, LLC
3231 S. LA Cienega Blvd. Ste A
Los Angeles, CA  90016


Pdtw, LLC:

We have prepared and enclosed your 2014 Limited Liability
Company returns for the year ended December 31, 2014.

This return has been prepared for electronic filing.  If you
wish to have it transmitted electronically to the IRS, please
sign, date, and return Form 8879-PE to our office.  We will
then submit your electronic return to the IRS.  Do not mail
the paper copy of the return to the IRS.  Return federal Form
8879-PE to us by September 15, 2015.

No payment is required with this return when filed.

The California Form 568 return has been prepared for
electronic filing.  If you wish to have it transmitted
electronically to the FTB, please sign, date and return Form
8453-LLC to our office.  We will then submit the electronic
return to the FTB.  Do not mail a paper copy of the return to
the FTB.  Return Form 8453-LLC to us by October 15, 2015.

No payment is required with this return when filed.

This return includes a penalty for underpayment of estimated
tax of $1,179.00.

The California Form 3536 (LLC) Estimate should be mailed as
soon as possible with a check payable to Franchise Tax Board
to:

            Franchise Tax Board
            PO Box 942857
            Sacramento, CA 94257-0531


An amount of $11,790 is due.

1   day.  One week?  All right.

2          MR. BILLER:  Let me start over.  Why do you

3   think you can always out trick me?

4          MR. PEDDIE:  I don't.

5          MR. BILLER:  I don't.  It's only the part about

6   me beating you every time in the courtroom.  That might

7   have something to do with it.

8          MR. BILLER:  You know --

9          MR. PEDDIE:  Let the record reflect I have

10  Mr. Biller standing in front of me in my fact --

11         MR. BILLER:  No, leaning forward.  Winning a

12  motion, Counsel --

13         MR. PEDDIE:  How about six or eight.

14         MR. BILLER:  Winning 20 motions, Counsel,

15  doesn't mean you win a trial.

16         MR. PEDDIE:  I retract the comment.  I feel bad

17  about it.  It was a stupid comment to make.

18         MR. BILLER:  I propose the following

19  stipulation:  The court reporter be relieved of his

20  duties under the California Code of Civil Procedure and

21  Federal Rules of Civil Procedure.

22         The transcript will be prepared within two

23  weeks and sent to the witness. The witness will have

24  one week to read the transcript, make any changes she

25  wants to the transcript, sign the transcript under

Page 158

1    penalty of perjury, and send me the original

2    transcript.

3            Can you provide the witness with a

4    self-addressed stamped envelope so that she can easily

5    put the transcript in the envelope and drop it in the

6    mail?

7            THE REPORTER:  Yes.

8            MR. BILLER:  So if the original is lost,

9    destroyed, misplaced or damaged in any way, a certified

10   copy may be used in lieu of the original.  I will keep

11   custody and control of the original.  I will make the

12   original available upon reasonable notice for any

13   hearing and for trial.

14           MR. PEDDIE:  For any hearing or for trial?

15           MR. BILLER:  Yeah.

16           MR. PEDDIE:  Or just in general if I request it

17   may I please have access to it?

18           MR. BILLER:  The original?  Aren't you getting

19   a certified copy?

20           MR. PEDDIE:  If I need to see it.

21           MR. BILLER:  If you need to see the original?

22   Why would you need to see the original?

23           MR. PEDDIE:  If I do.

24           MR. BILLER:  No.  That's not part of the

25   stipulation.  We'll go by code.

                                          Page 159

1            MR. PEDDIE:  Carry on.

2            MR. BILLER:  So stipulated.

3            MR. PEDDIE:  So stipulated.

4            THE REPORTER:  Counsel, would you like to order

5       a copy of the transcript?

6            MR. PEDDIE:  Not at this time.

7

8                 (Deposition concluded at 12:20 p.m.

9            Declaration under penalty of perjury on the

10           following page hereof.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 160

1                              * *

2

3

4

5

6              I DO SOLEMNLY DECLARE UNDER PENALTY OF

7    PERJURY THAT THE FOLLOWING IS MY DEPOSITION UNDER OATH;

8    THAT THESE ARE THE QUESTIONS ASKED OF ME AND MY ANSWERS

9    THERETO; THAT I HAVE READ SAME AND HAVE MADE THE

10   NECESSARY CORRECTIONS, ADDITIONS, OR CHANGES TO MY

11   ANSWERS THAT I DEEM NECESSARY.

12              IN WITNESS WHEREOF, I HEREBY SUBSCRIBE

13   MY NAME THIS_____DAY OF_____, 20_____.

14

15                              _____

16                              WITNESS SIGNATURE

17

18

19

20

21

22

23

24

25

                                             Page 161

1

CERTIFICATION

2

OF

3

CERTIFIED SHORTHAND REPORTER

4

5              I, the undersigned, a Certified

6   Shorthand Reporter of the State of California do hereby

7   certify:

8              That the foregoing proceedings were

9   taken before me at the time and place herein set forth;

10  that any witnesses in the foregoing proceedings, prior

11  to testifying, were placed under oath; that a verbatim

12  record of the proceedings was made by me using machine

13  shorthand which was thereafter transcribed under my

14  direction; further, that the foregoing is an accurate

15  transcription thereof.

16             I further certify that I am neither

17  financially interested in the action nor a relative or

18  employee of any attorney of any of the parties.

19             IN WITNESS WHEREOF, I have this date

20  subscribed my name

21

22

23             Damon M. LeBlanc, CSR No. 11958

24  Dated:   September 1, 2017

25

Page 162

**[1 - 250,000]**

| 1 |
|---|

**1** 1:15 2:15 42:5
54:20,25 91:7
93:6 101:18,21
125:2,14,15
162:24
**1,060.61** 147:13
**1,500,000** 143:11
**1.5** 53:21 61:13
107:24 142:23,24
153:11 155:4
**1/1/16** 112:4
**10** 9:16 124:21,22
**100** 101:18 126:14
**1065** 100:13 121:6
131:14
**10:03** 76:11
**10:04** 78:12
**10:26** 78:12
**11** 7:25
**11/15/2015** 142:10
**1125** 102:7 103:19
**117** 5:6,6
**11958** 1:23 2:23
162:23
**11:14** 117:23
**11:19** 117:23
**11:32** 127:16
**11:37** 127:16
**11:41** 62:6
**11:50** 136:10
**11:54** 136:10
**12** 42:24 149:25
**12/2015** 99:18
**12/31** 48:8
**12/31/14** 48:2
**128** 5:8,8
**12:20** 2:21 6:2
160:8
**13** 42:20 57:10,11
114:6,7

**139** 4:6
**14** 42:13 77:13
**143** 4:5
**15** 54:17 57:9 60:8
60:17 77:13 95:16
96:8 99:23 102:2
129:15,20 145:9
145:10 152:22
155:9,16,20
**15113** 3:4
**156** 4:6
**16** 54:17 90:25
91:1 112:2
**16,000** 89:19,19
90:16,18 91:7
**160,000** 102:9
**175** 77:23
**18** 1:20 2:22 6:1
42:10
**181,359** 104:2
**19** 131:14,17
**1963** 15:17
**1966** 15:3
**1st** 48:9 90:19

| 2 |
|---|

**2** 39:1 53:2,21
55:1 85:3 103:18
103:18,19 118:12
129:16,17,20
**2,000,000** 57:8
**2,000,013** 55:4,24
57:18
**2,000,300** 57:8
**2,300** 57:7
**2,500** 54:18,19,21
**2.3** 43:7 44:6 47:9
50:17 51:15 52:9
52:20 118:21
127:10 152:24
**2.3.** 53:3

**20** 45:1 47:18
102:2 131:20
158:14 161:13
**2003** 15:9,11,12,14
15:20 18:6,20
19:2 27:9,24,25
114:8
**2006-7** 7:5
**2007** 7:17
**2008** 19:9,11
**2009** 19:12,20 21:9
27:25 28:15,23
**2012** 28:22,23,25
**2014** 5:6 21:13,14
22:6,16,19 23:9
24:22 25:10 28:9
28:15,25 32:1
34:10,13,13 37:4
42:4,10,13,20,24
42:24 43:6,14,15
44:3 50:2,5,19
51:4 52:8,8 57:12
57:13,21 76:15
104:18 118:4,17
120:11 122:7
124:13,18,23,23
125:3,9 127:5,5,20
129:17,20 130:16
133:13,14 137:15
148:18,18 152:23
152:25
**2015** 26:15 35:16
36:1 44:2 57:13
57:20 58:4,5
59:13,22,23 60:6
60:17 63:7 76:16
89:20,20 90:5,15
90:16,18 91:6,7
93:6,10,17 95:16
96:8,21 97:3
98:24 99:4,23

**100:**1,20 **101:**1,11
101:14 104:18,18
104:20 105:24
112:5,6,11 124:14
124:21,22 125:2,3
128:24 129:15,16
129:20 130:24
131:12 133:11,11
133:12 139:12,18
140:1,4,4 142:25
143:4,13,21
144:10 145:5,12
145:19 148:23
149:10 152:23
155:9,16,20,22
156:2
**2016** 5:3 25:1,10
28:12 29:24 37:4
54:18,18,25 55:7
57:20 61:12,12,12
61:13 63:7 80:3
82:5 87:5 107:24
112:4,11 125:2
142:19,22 143:4,9
143:22 144:6
145:6,11,19
**2017** 1:20 2:22 6:1
44:20 62:6,13
162:24
**2049** 2:19
**22** 22:16 100:13,14
137:15
**2236** 53:13
**22nd** 22:12
**23** 15:10
**24** 5:12 78:8
**2400** 2:20
**25** 5:12
**25,000** 90:16,20
**250,000** 54:17,22

**[26 - a.m.]**

| | | | |
|---|---|---|---|
| **26** 42:4 50:2 | **4.4** 100:5 | **6872** 147:20 | **80303** 3:9 |
| **2679975** 1:23 | **4.6** 100:1,4 | **69** 4:18 84:1,5,7,13 | **84** 4:18,18 |
| **26th** 22:19 | **40** 15:14 | 87:24 | **8481** 115:25 116:1 |
| **27** 62:6 | **41** 4:10,10 | **7** | 116:2 |
| **3** | **45** 125:25 126:3,20 | | **88** 4:20,20 |
| | 127:6,6 | **7** 101:8 118:15 | **88,300** 130:7 |
| **3** 53:13 55:15 | **5** | 121:2 123:1 | **8:43** 2:21 6:2,18 |
| 147:25 155:7 | | 145:16 156:3 | **9** |
| **3,300** 147:13 | **5** 103:16 | **7,500,013** 140:11 | |
| **3,500,013** 147:14 | **5.5** 44:4 | 141:9 142:25 | **9** 3:4 5:3 30:15 |
| 147:15 | **50** 1:15 2:15 15:16 | **7,504,813** 104:4,11 | 40:11 72:9 73:11 |
| **3.2** 120:19 | 101:25 | 104:21 | 73:12 99:22 100:5 |
| **3.5** 53:19 63:7 | **500** 101:8 | **7.5** 139:16,23 | 105:24,25 147:21 |
| **30** 47:19 93:10 | **500,000** 42:18,20 | 149:9 155:5 | 149:10,16,18 |
| **303-444-5447** 3:10 | 42:25 54:16,17,25 | **7.7** 155:23 | 151:3 153:7 155:9 |
| **31** 43:6,15 46:25 | 56:14 57:10,10 | **70** 4:20 88:17,21 | 155:15 156:3 |
| 50:5,19 104:20 | 60:19 142:12 | 88:24 | **9,000** 39:12 |
| **310-459-9870** 3:5 | **5051** 3:9 | **700** 118:14,15,15 | **9,000,013** 72:2,21 |
| **310-770-3741** | **53** 4:12,12 | 118:16,17,19 | 95:21,23 96:8 |
| 116:11 | **54** 4:13,13 | 119:7 120:10 | 97:4 98:4 105:1 |
| **3200** 96:12 | **6** | 124:7 | 140:14 141:7,10 |
| **33** 91:3 96:13 | | **71** 4:22 91:24 92:1 | 143:14 145:15 |
| **3390** 96:14,15 | **6** 4:5 | 92:5 | **9,005,013** 71:24 |
| 105:1 | **600,000** 42:6 | **72** 4:24 95:5,6,10 | **9,005,513** 95:24 |
| **350,000** 42:9,14 | **65** 4:10 41:13,14 | 97:3 98:2 99:21 | **9,513,000** 95:22 |
| **4** | 45:10 47:11 56:1 | 104:25 141:4 | **9,847.95** 93:6 |
| | 56:8,8,14 57:4 | 147:20 | **9.1** 40:12 |
| **4** 55:4 71:10 123:4 | 58:5,14 59:13,21 | **73** 5:3 98:14,18 | **9.1.** 40:13 |
| 131:12 | 60:6,23 61:16 | 99:17 103:12 | **9.5** 40:13 |
| **4,000,300** 121:17 | 62:1,19 97:2,2 | 130:22 | **90** 96:25 97:1 |
| **4,300,000** 127:24 | 105:10 106:6 | **74** 5:6 117:16,20 | **90069** 116:3 |
| 127:25 | 127:10 | 118:3 124:19,20 | **90272** 3:5 |
| **4,425,000** 130:24 | **66** 4:12 15:18 53:8 | 125:22 127:4,19 | **91** 4:22 |
| 131:3 | 53:9 55:5 147:23 | 130:17 | **92** 4:22 |
| **4,425,996.71** | 147:24 | **75** 5:8 124:16,17 | **95** 4:24,24 |
| 129:13 130:4,16 | **67** 4:13,15,15 54:4 | 128:9,13 130:23 | **98** 5:3,3 |
| **4,538,000** 131:13 | 54:5,9 56:1,7 57:5 | 131:2,11,21 132:1 | **9:12** 36:16 |
| **4,613,388.83** | 60:16 61:13 | **8** | **9:16** 36:16 |
| 100:17 | **68** 4:15 67:17,18 | | **a** |
| **4,651,971** 104:7 | 68:24 69:18 | **8** 42:4 | **a.m.** 2:21 6:2,18 |
| **4.3** 120:22 | 141:12,14,25 | **8,247.95** 92:24 | 36:16,16 62:6 |

[a.m. - asked]

| | | | |
|---|---|---|---|
| 78:12,12 117:23 | accused 76:24 | agrees 147:12 | 143:7 144:2,16 |
| 117:23 127:16,16 | 77:4 | ahead 45:6,25 | 150:8 |
| 136:10,10 | acknowledges | 54:3 84:11 91:23 | answering 57:3 |
| able 49:22 | 148:5 | 95:4 128:7 138:11 | answers 9:6 10:12 |
| absolutely 67:10 | action 91:15,16 | alison 135:25 | 11:14 113:10 |
| access 61:23,24 | 162:17 | 136:5 | 161:8,11 |
| 72:17 159:17 | actual 48:21 74:13 | allegedly 47:9 | anybody 9:8 30:21 |
| account 4:11 58:6 | 87:18 123:2 | allow 110:20 | 61:21 |
| 58:9,13,14 60:14 | add 142:24 143:8 | allowed 116:7 | anymore 99:1 |
| 60:25 61:2,5 72:5 | 144:9 155:3,6 | allowing 76:25 | anyone's 83:12 |
| 73:5,14 97:4,9,15 | added 145:19 | 150:10 | anyplace 74:6 |
| 97:21 101:16 | adding 142:21 | amazing 153:24 | ap 81:19,23 82:3 |
| 106:8 121:19,20 | additional 26:25 | ambiguous 9:25 | apologize 96:2 |
| 128:16 130:12 | 27:2 156:13 | amended 4:24 | apparel 116:23 |
| 131:22,22,23,24 | additions 161:10 | 95:12 106:4 | appearance 6:15 |
| 132:11,12,23,23 | address 115:24 | 140:20 141:4,9 | appearances 3:1 |
| 133:3 137:19 | addressed 159:4 | 147:19 | applied 148:7 |
| 140:21 152:24 | adds 120:21 | amendment 149:2 | applies 9:18 |
| accountancy 16:1 | admin 49:16 50:12 | amount 40:20 | appropriate 8:14 |
| accountant 15:24 | admission 26:23 | 42:20 50:23 56:23 | approval 91:15 |
| 19:5 27:21 29:16 | advance 128:16 | 57:2,5 72:17 | approve 12:20 |
| 47:18 56:12 98:23 | 130:7,9 131:23,24 | 103:11 111:2,25 | approximately |
| accounting 16:4 | 148:6,7 | 120:18 123:20 | 19:9 89:19 90:17 |
| 16:14,23,25 17:1 | advances 137:18 | 130:7 132:13 | 91:7 96:25 100:5 |
| 18:14 29:19 | 137:19,19 | 140:25 148:3 | 152:22 |
| 135:15 144:24 | advice 93:24,25 | analysis 78:16 | approximations |
| accounts 11:10 | advised 70:14,15 | 101:7 103:14,23 | 10:13 |
| 37:8 58:7,8 60:11 | 70:18 94:2 | 106:5 110:11 | april 35:16 36:1 |
| 78:17 80:20,22,24 | affect 39:2 62:25 | 119:1 | 54:25 89:19 90:16 |
| 81:19,19 101:7 | 144:24 145:2 | angeles 1:2,19 2:2 | 90:18 92:24 |
| 103:14,24 106:7 | afternoon 149:25 | 2:20 6:1 | ar 81:25 |
| 106:10 132:8 | ago 7:4 66:9 | annoying 83:6 | area 157:2 |
| 133:4 | agree 13:12 | answer 5:10 10:22 | argue 44:17 |
| accumulated | agreed 89:5 | 10:24 11:1,18 | argumentative |
| 50:24 104:19 | agreement 4:12,13 | 12:25 13:1,3 24:2 | 60:2 113:14,22 |
| accuracy 39:21 | 46:6 52:21,23,25 | 24:11 26:3,12 | 154:7 |
| accurate 12:1 | 53:2 54:14 55:9 | 33:6 35:17 37:17 | armoire 1:13 2:13 |
| 38:20 65:16 72:12 | 55:15 57:16 69:20 | 45:25 46:1 55:22 | asked 60:12 |
| 73:2 74:12,21 | 85:2 142:1 148:8 | 59:11,21,24 60:9 | 140:24 142:11 |
| 110:10 162:14 | 148:21 149:3 | 80:12 93:22 | 147:25 161:8 |
| | | 113:13 138:11 | |

**[asking - biller]**

**asking** 14:2 35:19
35:21 52:15 60:13
65:22 66:2 94:11
107:10 111:14
113:3 117:11,11
118:24,25 123:2
145:16 149:19
150:25 152:16
154:11
**asks** 66:7 118:6
**aspect** 31:3
**assembled** 68:23
**assets** 136:17
**assistant** 116:21
**assume** 10:8,8,9
33:7 34:7 72:22
72:24 73:11
**assumes** 24:8
58:10 62:20 70:7
83:11 91:9 97:7
105:12 110:3
133:18 138:9
**assuming** 56:19
**assure** 77:8
**attach** 103:19
**attached** 5:5 41:16
53:11 54:7 57:19
67:20 69:18 84:3
88:19 92:3 95:8
98:16 99:13
117:18 128:11
148:15
**attended** 138:20
**attorney** 10:21,24
26:1 147:3 162:18
**audit** 48:5 49:8,9
49:11,17,20,23
50:1,6,10 65:19,19
109:8,11,14,16,25
**august** 1:20 2:22
6:1 26:15 42:4,4

47:7 50:2,25 51:3
52:7
**authenticate** 132:4
**authenticating** 8:7
**available** 159:12
**avenue** 3:9
**aware** 135:14

**b**

**b** 4:8,24 46:6
53:24 54:1 73:19
95:12 101:18,21
106:5 140:20
141:4,10 147:19
**bachelor** 16:1
**back** 10:4,23
17:18 37:17 47:3
48:12,14 59:15
61:21 79:5,8,9
97:1 121:9 123:15
145:22,24,25
157:21
**background** 14:23
15:25
**backup** 58:15,18
58:20,22 59:3,7,9
64:13,13,15 65:3,7
65:9,13,20 74:24
75:2,17 76:2
78:18 79:14 92:17
92:18 106:12
109:18,22,23,25
110:2 123:16,18
**bad** 23:18 158:16
**balance** 57:14,18
63:15 64:16 66:10
66:19 72:6 97:4
99:10,12,15 101:6
101:15 104:1
106:8 131:21
140:22 148:9,14
155:4

**bank** 37:8 39:6
40:1 59:5,6 80:20
80:22,23,25 81:1,3
81:7,18,23 124:1
**banking** 37:12
**bankrupt** 23:16
**bankruptcy** 7:8,15
7:24 8:1 23:24
24:7,14,17 25:9
26:14 108:22
129:2
**based** 50:16 73:10
**basically** 29:19
46:12
**batches** 78:8
**bates** 78:8
**bc596495** 1:9 2:9
**beating** 158:6
**beginning** 2:20
4:16 89:16,17
104:1
**behalf** 2:18 6:17
6:19 128:21,22
**behavior** 88:12
**believe** 7:17 9:15
13:4 20:13,14
23:20 24:3 25:16
34:5 35:13 40:10
45:8,12,20 46:10
50:12 51:19 52:11
52:14 55:3 58:3
62:5 69:2,10,25
70:24 72:3 76:8
79:20 80:13 83:8
85:2,12 87:8
88:13,25 89:4,11
90:1,11 93:24
94:9 95:19 98:25
115:13 122:8,19
126:24 127:3
129:22,25 130:5

136:5,19 157:2
**believed** 39:1
157:1
**belly** 27:1
**belonging** 138:3
**beneath** 130:6
**benefit** 1:5 2:5
**benefits** 131:17
**beyond** 44:21 55:6
**bill** 39:9,11
**biller** 3:3,6 4:5 6:9
6:16,19,19,22
13:14,19,20 14:7
15:6,13 23:22
24:1,10 26:2,6,11
26:16,19 27:2,6
33:5 35:4,6,8,12
35:19,24 36:2,4,8
36:14,17 37:17,21
37:22 41:7,12,17
42:1 43:22,24
44:1,5,8,10,13,17
44:22,25 45:2,5,7
45:24 48:17 52:1
52:5,6,12 53:7,12
54:3,8,20,22,24
55:13,18,21 56:6
56:11,21,22 58:11
59:15,20 60:3,12
60:15 62:22,23
63:13,20,23 64:1,4
64:5,7,12,19,24
65:1,8,24 66:3,6
66:12,15,18,21,24
67:1,4,12,16,21,24
68:2 70:2,9 71:2,8
71:9 74:2 75:1,24
76:9,12,21,24 77:3
77:9,13,17,20,23
78:4,13 80:2,10,13
80:16,18 83:13,24

Page 4

[biller - case]

84:4 87:11,13,19
87:23 88:4,20
89:24 90:10,24
91:12,13 92:4
93:21 95:4,9,23,25
96:3,15,17 97:10
98:11,17 100:10
101:4 102:3,8,12
102:22,23 105:5
105:14 106:13,16
106:19,22,24
107:3,6,8,12,16,19
107:22,25 108:2,5
108:10,15 109:1,3
109:5,6,12 110:8
110:17,22 111:13
113:15,19,25
114:1 116:8,12,13
116:21,24 117:1
117:14,19,22,24
118:9 119:5 120:1
120:16,17 121:12
122:12,16,22,23
124:12 127:1,15
127:17 128:7,12
129:4,7,9,11 131:6
131:9,10,19 132:6
133:19,20 134:21
136:11 137:1,6
138:10,18 139:10
139:13,25 140:13
140:16,19 141:16
141:22 143:2,16
143:20 144:1,7,8
144:12,14,15,19
145:1,13,24 146:3
146:6,9,12,14,18
146:23 147:1,2,5,9
147:17 148:21,24
149:14 150:7,9,12
150:20,21 151:23

152:2 153:14
154:8 156:1,6,7,25
157:5,8,10,18,20
157:23 158:2,5,8
158:10,11,14,18
159:8,15,18,21,24
160:2
**birthday**   15:5
**bit**   32:19 69:14
108:13 112:25
113:24
**blanc**   115:2
**blank**   125:23
**board**   16:2 22:20
22:21 23:5
**book**   35:24,25
37:24
**booklet**   11:12
34:15
**books**   29:20 37:7
37:11,24,25 104:7
137:21,22,24
138:3
**born**   14:24 15:1,2
15:17
**boss**   114:25
**bothered**   133:7,8
**bottom**   68:8 72:1
95:21 128:24
129:12 130:6
**boulder**   3:9
**boulevard**   3:4
**brand**   137:3
**break**   18:24 36:12
36:16 76:13 78:12
117:23 127:15,16
136:9,10
**breakdown**   101:9
**breaks**   151:17
156:17,20

**brief**   16:22
**briefly**   133:6
**bring**   53:5 90:12
**brought**   22:1
**buddy**   108:6 146:2
**budget**   37:10,13
**budgets**   29:20
**burden**   83:1,2
**burdensome**   83:4
**business**   18:17
19:15 21:22 68:13
68:16,19 71:20
92:10 99:25
100:12 115:16
133:9,10
**businesses**   16:16
17:12
**button**   83:3
**byron**   3:8,8

**c**

**c**   28:20 147:8,10
147:24
**cabinet**   79:3,5,7
81:4,25
**cabinets**   79:6
**calculated**   71:23
**calculation**   128:23
**calendar**   130:20
130:21
**california**   1:1,1,5
1:7,11,19 2:1,1,5,7
2:11,20 3:5 6:1
116:2 119:12
121:7 146:4 157:6
157:11 158:20
162:6
**call**   39:10
**called**   6:12 8:4
28:19 29:7,8 46:3
49:10 108:23
133:12,14 139:15

**calling**   122:9
124:10
**calls**   23:21,25 24:8
45:22 51:24 52:4
52:10 55:11,16,20
56:3,4,9,10 63:9
65:4 70:1,25
73:21 74:22 75:19
76:6 83:21 89:22
90:7,22 93:19,20
100:6,7 102:19
105:3,11 109:9
110:3,7,13,14,14
119:2,23 120:12
126:25 127:12
131:16 134:18,19
136:23 137:4
143:24 144:17,21
145:8,20
**calm**   21:5 109:3
**capital**   26:25 27:2
72:5 95:15 97:4
98:4 101:7,8
103:14,24 104:4
104:11,14,17,21
105:1,23 106:4
118:14,18 120:10
121:20 125:11
126:19,22 127:6
139:11 140:6,8,21
140:25 143:12
144:4,9 145:5
146:5 148:2 149:9
**capitalization**   46:4
**caption**   141:24
142:3
**careful**   67:22
**carry**   101:15
160:1
**case**   1:9 2:9 7:6,7
7:9 9:16 14:15,20

Veritext Legal Solutions
866 299-5127

[case - consist]

14:21 20:22 35:21
41:9 103:2 133:8
145:5 156:21
157:11
**cash** 63:16 64:17
66:11 73:4 101:8
104:4
**caused** 134:23,24
135:9
**cc'd** 92:12
**cell** 116:5
**central** 1:2 2:2
**century** 2:19
**ceo** 20:8,9,10
23:15 25:20
114:25 115:9,15
**certain** 34:9,11
138:16
**certification** 162:1
**certified** 2:22 6:5
37:19 41:15 53:10
54:6 59:16 67:19
84:2 88:18 92:2
95:7 98:15 117:17
128:10 138:13
159:9,19 162:3,5
**certify** 162:7,16
**chance** 80:10
107:1
**change** 9:15 11:17
61:22 63:12 88:12
156:12
**changed** 45:9,14
**changes** 11:23
12:5,6,7,20 62:18
62:24 63:11
158:24 161:10
**changing** 50:11
**chapter** 7:23
**chart** 89:8,18
90:12,14,14 152:3

152:4 153:11
**charts** 93:15
**chases** 157:5
**cheater** 108:16
**check** 77:15 110:9
152:23
**checked** 64:14
**checking** 65:3
**chest** 67:24
**children** 18:3
**choi** 27:3 40:4,6
41:9,21 62:1,18
67:8 156:10
**choi's** 71:11
**chronological**
16:17,19
**chung** 77:21,25
78:6
**circumstances**
133:24
**civil** 7:6 33:11
158:20,21
**claimants** 108:23
**claims** 108:23
**classified** 106:9
123:8 125:6
**classify** 122:20
**clause** 55:4,15
**clean** 134:7
**clear** 35:17 77:4
80:11 141:21
143:16
**clearly** 143:2
**client** 26:1 56:25
116:22
**clients** 20:1
**close** 23:23
**closer** 25:10,10
**clothes** 136:14,18
137:7,7,9,14

**clothing** 137:2
**coach** 106:25
**coached** 156:11
**code** 157:20,21,22
158:20 159:25
**collected** 72:22
**collection** 130:13
137:18
**colorado** 3:9
**come** 71:20 73:10
73:17 121:4
152:17 157:20
**comes** 67:10
153:25
**coming** 15:22
106:3 123:24
124:1 149:20
**comment** 158:16
158:17
**commitment**
107:21,23 146:4
**committed** 44:3,4
143:9
**companies** 16:7,10
16:13,17 17:3,14
19:2 29:8,10
135:1,6,6
**company** 1:6,7,11
1:13,14 2:6,7,11
2:13,14 7:10,11,18
16:20,21,24 17:5,6
17:8,9 19:7,10,20
23:16 27:10,11
28:1,14,17,18,21
29:2,4,7 39:10,10
39:11 46:13 58:24
58:25 69:7 70:19
70:21,23 72:18
83:19 90:6 94:3
96:19,24 103:1
115:17,19,22

116:17,23 121:22
122:2 133:11,15
133:21 134:4,5
135:8,9 137:3
**compare** 130:15
130:18
**comparing** 143:4
**complaints** 31:19
**complete** 27:24
**completely** 74:12
90:13 127:9
**complicated**
119:21
**complies** 53:17
84:12 88:22
**compound** 48:16
**computed** 72:4,5
**computer** 81:10
81:11,14 82:12
85:11
**concealed** 77:5
**conceals** 108:17
**conclude** 32:22
**concluded** 160:8
**conclusion** 51:25
55:17 71:1 73:22
76:7 105:4,12
**condition** 51:12
89:1
**confidential** 5:4
76:17
**confirm** 40:22
123:19
**confirmed** 89:7
**consent** 91:17
**consequences** 63:8
**consideration**
53:14 148:1,1,8
**considering** 51:11
**consist** 64:15

[consistent - date]

| | | | |
|---|---|---|---|
| consistent 56:17 | conversations | 127:11 143:22 | credibility 156:8 |
| 57:6 62:14 97:3,5 | 31:18 | 149:21,23 | creditors 133:22 |
| 97:12 110:2 | conversion 44:6 | corrections 161:10 | credits 59:6 |
| 131:13 152:17 | 44:14 45:17,17 | correctly 93:2,7 | criminal 7:6 |
| 153:17 | 46:9 47:20 125:1 | corresponds 55:4 | crooks 67:4 |
| consulting 3:3 | 127:11 | cost 132:15 | cross 13:5 80:10 |
| 19:23 | converted 42:19 | counsel 11:5 13:10 | 150:1,15,20 152:7 |
| contain 11:4 74:13 | 46:13,17,22 47:9 | 13:13 60:10 63:20 | 152:9,21 153:11 |
| contained 85:22 | 73:16,19 124:4,23 | 66:10 70:11 | 153:25 |
| context 85:13 | 125:3 | 106:22 108:14,16 | csr 1:23 162:23 |
| 86:12 | coordinate 135:17 | 108:19 110:18,23 | cumulative 101:16 |
| continuation | coordinated 37:12 | 113:17 141:18 | current 79:11,18 |
| 119:3 | coordination | 149:5 150:17 | currently 116:14 |
| continued 4:25 5:1 | 31:10 37:9 | 151:20 153:10 | custody 157:24 |
| contribute 107:24 | copies 140:3 | 154:10 156:11 | 159:11 |
| 146:4 | copy 30:17 76:16 | 158:12,14 160:4 | custom 47:17,22 |
| contributed | 84:17 117:8 | county 1:2 2:2 | customers 82:1 |
| 118:14 140:8 | 159:10,19 160:5 | couple 82:22 | 130:13,13 |
| 143:12 145:18 | corporate 119:14 | course 9:15 10:19 | cut 88:23 89:2 |
| 155:9,16 | corporation | 50:24 68:13,16,19 | 137:8 |
| contribution | 119:15,17,18,22 | 92:9 107:3,6 | cycle 89:12 |
| 72:23 92:23 98:4 | 135:5 | 109:17 122:16 | d |
| 104:4,11,14,17,21 | corporations | court 1:1 2:1 7:1 | d 4:1 |
| 105:1 118:19 | 135:1,2,3 | 8:16 10:3,8 77:14 | damaged 159:9 |
| 119:1,7 120:10 | correct 25:24 28:1 | 108:20 157:23 | damaging 9:7 |
| 125:11 141:1 | 28:6,9,12 36:22,25 | 158:19 | damon 1:22 2:22 |
| 144:10 146:5 | 38:23 39:3 50:25 | courtroom 158:6 | 162:23 |
| 147:22 148:3 | 51:4 54:14 56:8 | cpa 5:4 16:3,3,5,11 | data 38:11,16,24 |
| 149:10 | 56:18 58:19 59:13 | 27:9,12,14,19 | 39:3 56:7,7 57:4 |
| contributions | 61:17 62:8 63:4 | 29:16 56:12 99:7 | 58:18 61:22 62:19 |
| 95:16 105:23 | 65:16,20 68:24 | 103:6 106:9 | 62:25 63:8 64:12 |
| 106:4 139:12,22 | 70:4,23 71:4 | 122:20 126:12 | 64:13,15 65:3,7,10 |
| 140:6 144:5 145:6 | 75:18 76:5 81:5 | crack 67:10 | 65:13 74:21 75:12 |
| control 157:24 | 82:12 86:14,20 | crate 28:20 | 75:13 76:3 106:6 |
| 159:11 | 89:10 91:3,8 | create 54:11 68:18 | 110:1,9 133:24,25 |
| controller 7:22 | 92:10 93:13,16 | created 34:3 72:15 | 134:1,2,3 |
| 29:17,18 30:3 | 95:13 98:5,8 | 95:18 133:15 | date 35:20 47:1 |
| 36:19 37:3 70:3 | 105:16 109:20 | 137:12 155:17,19 | 48:1,6,13,20,21,22 |
| 114:19,21 | 110:12 113:3 | creating 33:25 | 55:7 61:7 62:6,7 |
| conversation 26:5 | 118:19 124:8 | creative 32:16 | 62:11 93:12 98:3 |
| | 126:1,4,23 127:7 | 138:24 | 112:1 142:11 |

[date - documents]

148:5 153:18
162:19
dated  42:9,20 43:2
43:6 47:7 129:15
129:19 142:10
162:24
dates  49:3,6 50:7
50:11 53:25
david  4:18 25:16
25:18,19,21 26:5
34:5,7 69:2,3 72:3
86:4 95:1,19
day  22:8 48:11
73:7 158:1 161:13
days  17:21 117:2,5
117:7
deal  13:16
dealt  136:2
debt  133:17 135:2
135:8 136:13,21
december  42:24
42:24 43:6,15
46:25 47:8,8 50:5
50:19,25 51:4
52:8 104:20
129:20
deciding  91:17
decision  32:8 89:2
decisions  71:3
declaration  160:9
declare  161:6
deduction  91:3
92:23 93:5
deem  12:21
161:11
defendants  1:16
2:16 3:7 154:10
defense  151:20
deleted  63:6
demonstrate
108:12

denying  12:6
departure  20:11
depends  9:11 51:7
83:15,16,16
depicted  45:9
depo  13:24 107:12
deposit  59:5
deposition  1:18
2:18 6:21,23
11:23 13:10,25
14:9 20:24 62:2
62:13 87:20 108:5
108:8 141:5,14,25
152:5 160:8 161:7
depositions  41:6
deposits  47:7
depression  134:22
134:23 135:9
describe  75:5 85:5
described  125:4
describing  75:17
description  4:9
5:2 138:8
design  28:18 32:15
designers  86:4
destroyed  75:10
77:6 80:16,17
108:17 159:9
detail  123:2
details  20:24
138:17
determine  96:23
106:2 123:14
determined
126:13
develop  12:16
difference  10:16
100:4 109:13
119:18
different  19:25
87:2 105:23 113:9

134:4
difficult  56:24
57:2
dimitrios  3:3 6:19
44:18 68:1 76:14
107:18,20 128:25
139:15
dinner  114:14,17
direct  141:19
direction  162:14
directly  13:17
21:16 61:4 157:15
director  32:16
138:24
disciplinary  85:7
disclosure  26:7
discoverable
11:10
discovered  135:8
discuss  87:17,22
98:12 156:20
discussed  52:18,20
87:20 138:20
153:1
discussing  138:16
discussion  25:9,11
25:22,23 26:14
32:15 69:15
discussions  32:3
32:11
dishonest  9:14
143:17
dislike  33:1
dispute  74:20
disregard  10:25
distract  141:19
distracted  112:23
113:1,4,8,9,11,21
152:11,12
distributed  35:2
46:15 69:24

distribution  35:20
46:2,4,14 74:1
district  1:2 2:2
divorced  18:1
document  31:14
35:4,20 39:2,14
41:10,11,18,21
44:8,9,11,13 45:20
46:3,24 47:11
50:16 53:6,7 54:4
54:11 55:12 58:14
63:17 66:17 67:16
68:20 69:22,24
72:15 73:23 83:4
83:25 91:24 92:7
94:9 95:5,18 98:2
98:3,12 100:22,24
101:5 107:15,17
111:23 112:1
113:20 117:9,14
123:15 128:8
129:16 130:3
141:17 145:15
147:21 148:11,17
148:20 149:6
151:24 152:15
153:19,21 155:17
155:19
documents  4:15
8:7 30:7,10,18,22
31:11 35:9 38:18
38:19 39:4,5,19
40:18,21 43:18
45:3,18 58:15,18
58:21,22 59:3,7,10
63:18,19 64:2,10
65:9,14,20 66:7,8
66:25 67:23 68:23
69:6,8,12 73:10,15
74:8,8,13 75:17,22
76:3 77:6,11,23,24

[documents - exhibit]

78:5 79:10,14,14
80:4 81:21 82:7
82:11,16 83:20
85:22,24 86:17,19
91:14,21,22 97:5
105:8,9,16 107:11
108:19 109:4
112:22 146:20
150:5,16 151:10
153:1
**doe** 52:19
**doing** 19:25
108:10
**dollars** 44:16
57:18 148:4,7,14
**domestic** 42:5,9
**dorothy** 1:6 2:6
**double** 77:15
**doubt** 58:12
**doug** 67:8
**downloading** 81:9
**dr** 14:17
**draft** 35:16,25
**drafted** 34:6
**drawer** 78:24 79:1
79:4 80:15
**drink** 18:22
**drive** 82:11,20
**drop** 159:5
**dt** 3:3
**due** 142:9
**duly** 6:5
**duties** 31:7 37:2,6
37:7 80:19,23
158:20

**e**

**e** 3:6 4:1,8,18,20
4:22 28:20 84:16
85:20 86:6,10,12
86:23 87:6,10
88:16 92:16 93:12

115:4
**earlier** 77:18
127:21 139:10,19
140:12 141:11
147:25
**early** 19:11,11
25:4 26:15
**earthly** 29:9
**easily** 38:22 82:10
159:4
**east** 2:19
**edit** 50:7
**edits** 50:13,14
**educational** 15:25
**effect** 32:20
**effective** 148:5
**eight** 158:13
**either** 10:22,25
25:4 50:17 145:14
**electronic** 82:4
85:10,15,17,22
86:15,20 87:6
**electronically**
81:21
**emphatic** 67:13
**employed** 90:6
91:5,10 93:13
94:8
**employee** 13:15
34:1 35:7 86:1
131:17 162:18
**employees** 30:12
31:14 34:14 86:8
**employment** 27:24
89:21
**english** 135:21
**enter** 6:15 38:24
39:20 49:15 59:10
**entire** 63:24 64:1
118:5 122:10
129:1

**entitled** 8:23 10:11
83:19
**entity** 120:5
135:24
**entries** 42:2 44:21
44:24 45:13,14
46:20,21,22 47:4,6
47:25 49:21 57:24
58:2,4,5 59:9,12
59:22 60:6 61:7
61:19,21 97:3
**entry** 42:5,6,10,16
42:21 43:4,10
47:16,20 48:1,8,21
49:2 50:2 60:17
72:1 129:12
131:13 132:25
**envelope** 159:4,5
**equal** 126:8
**equity** 42:19 43:7
44:6 45:17 46:9
46:13,17,22 47:10
47:20 61:3,5 71:4
73:5,13,14,16,19
73:24,25 74:5,10
124:4,7,23,24
125:3,5,7 126:23
127:6,11
**error** 78:9
**esq** 3:3,8
**essentially** 25:7
133:10,21 153:20
**establish** 26:18
**establishing** 47:10
**estimate** 10:17
**estimates** 10:13
**euclid** 3:9
**events** 144:24
145:4,6
**everybody** 8:17,17
33:18,20 77:1

90:2 104:15
**evidence** 108:17
108:18 139:25
**exact** 120:20
141:17
**exactly** 31:7
**examination** 4:2
6:8 106:25 108:11
139:8 141:19
143:19 150:1,15
150:20 153:25
156:15
**examine** 13:5
**examined** 6:6
**examining** 152:7,9
152:21 153:11
**example** 85:8
**excuse** 109:5
136:16
**executed** 40:25
45:21 46:24
**execution** 73:15
73:18
**executive** 4:21,23
**exercise** 147:11,14
**exhausted** 12:16
**exhibit** 4:9,10,12
4:13,13,15,18,20
4:22,24,24 5:2,3,6
5:8 41:13,14
44:19 45:10 53:9
53:24 54:1,1,4,5,9
54:13 55:5,8,10,14
55:23,23 56:1,1,7
56:8,14,18 57:4,5
57:20 58:5 59:13
59:21 60:6,12,23
61:13,16 62:1,19
67:18 68:15,18,20
68:24 69:15,16,18
69:19,20 84:1,7,13

**[exhibit - form]**

87:24 88:17,21,24
92:1,5 95:5,6,10
95:12 97:2,2
98:14,18 99:17,21
103:12 104:25
105:10 106:5,6,15
106:17,18 107:7,9
117:16 118:3
124:16 125:22
127:4,10,19 128:9
128:13 130:17,23
131:2,5,11,16,21
132:3 140:20
141:4,4,10,14,14
141:15,25 142:1
147:19,20,23,24
148:16
**exhibits** 5:1
110:24 151:4,6,9
152:22
**exist** 22:15 64:10
82:5
**existed** 150:2
**existence** 87:7
**exists** 36:9
**expense** 132:11,12
**expenses** 38:7,13
**experience** 18:19
**expert** 45:22 110:7
110:14 118:7
119:2,4 120:12
124:11 127:13
131:16
**explain** 11:11
46:11 63:20 78:22
97:14,17,25 99:11
105:22 120:9
145:24
**export** 17:12
**extension** 99:1

**extensive** 119:24

**f**

**face** 146:21 151:25
151:25 152:3,15
**facsimile** 70:4
**fact** 47:10 50:17
51:18,20 67:14
94:5 157:11
158:10
**facts** 24:8 56:19
58:10 62:20 70:7
83:11 91:9 97:7
97:17,24 101:3
105:12 110:3
133:18 138:9
139:25 145:17,17
**false** 38:23
**familiar** 41:18
98:18 117:21
119:11 132:7
**far** 79:9
**fashion** 1:14 2:14
7:12,14 17:6 19:3
19:4,13,15 23:11
23:14 27:11 28:1
73:18 81:3 115:17
**fast** 13:18
**fax** 70:6
**february** 44:20
54:17 62:6,15
**federal** 119:12
158:21
**feel** 158:16
**fees** 102:9
**figure** 104:24
109:7 120:20,21
139:11 140:10
141:3 142:25
143:7,8
**figures** 152:4

**file** 24:7,14,17
63:25 64:2,4,7,13
81:25 83:15 84:18
84:19,20,21 85:4,5
85:7 87:16
**filed** 14:15,21 30:7
81:25 98:25
**files** 30:8,8 31:15
31:15 75:3
**filing** 23:23 24:12
79:3,5,6 81:4
**filling** 119:11
**finances** 70:18,22
**financial** 23:18
29:20,23 30:3
36:19 37:3 51:11
63:12,14 65:22
66:8 67:3 70:3
78:17 88:25 99:6
99:8,11 114:19,21
**financially** 162:17
**financials** 37:8,12
78:15 81:19
**find** 27:5 36:9
72:20 73:1 100:22
101:23 110:11
118:10 122:1
123:19 125:18,23
127:18 138:7
140:5
**finding** 118:7
**fine** 27:14 44:25
76:22 78:11
129:10
**finish** 52:5 131:6,7
131:8 153:24
**finished** 136:12
**firm** 16:4,23 17:1
18:15 135:16
**firms** 16:14,25

**first** 6:5 16:5,19
16:24 24:7 30:10
38:12 47:19 50:2
90:20 141:24
142:9 151:16
**fiscal** 130:20
**five** 19:8 23:12
50:24 114:3 148:4
148:6 150:16,18
**flash** 82:11,19
**flip** 117:20
**florida** 1:13,14
2:13,14
**flow** 63:16
**flown** 121:5
**flows** 64:17 66:11
**folder** 34:24 81:13
82:4,8,12,15,16
84:23,24 85:1,10
85:15,17,22,25
86:5,6,7,9,16,20
86:22 87:6,6,10
**folders** 34:20,21
75:4,5,5,6,7 81:11
81:15,15,20,22
82:14 86:13
**follow** 82:1
**following** 157:13
158:18 160:10
161:7
**follows** 6:6
**fool** 65:25
**footwear** 19:18,19
**force** 111:8,12
**forecasting** 27:22
**foregoing** 162:8
162:10,14
**forehead** 67:25
**form** 41:22 68:6
70:4 85:12 100:13
103:19 121:6

[form - hillshore]

131:14 141:11
formed 133:11
formulating 113:2
forth 142:6 147:15
162:9
forward 60:4
158:11
found 97:23
foundation 56:9
97:6
four 16:9,17 17:3
50:24 102:24
115:20 142:17,20
frame 29:12
frankly 61:20
free 89:25
freedom 12:4
friday 1:20 2:21
6:1
friend 56:25
front 13:7 130:17
141:18 146:19,23
153:19 158:10
function 32:4,6,7
32:8,13 37:5
88:14
fund 42:12 130:11
funding 42:24
further 71:6
143:19 156:6,15
162:14,16
future 146:5

g

general 159:16
generate 41:20
64:10 65:6 81:6
97:20
generated 44:20
62:12 64:17 65:23
66:13 98:3 132:13
132:20

generating 62:14
78:17 80:25
generic 133:3
gestures 8:22,23
getting 40:1 81:1
108:8 159:18
giraffe 29:9
give 8:24 9:6 10:12
10:12,20 14:23
16:17 18:19 38:23
41:21 45:1 69:5
101:22 102:4
116:6 117:9
122:14,16 129:5,8
given 11:17 35:13
38:25 68:25
111:21 122:20
140:10
giving 41:23
112:23
glad 53:6
glanced 113:5
glancing 113:7
go 8:10 12:15 16:5
18:23 20:14 26:24
39:6 44:21 45:6
45:18,25 48:4,11
48:14 49:13,16
50:12 54:3 61:21
73:1 76:14 79:10
79:15,22 81:20
84:11 87:15 91:23
95:4 117:22
118:11 121:9
122:10,14 123:15
128:7 138:11
144:13 145:22,24
145:25 155:13
159:25
god 64:20

goes 49:24 74:14
137:19
going 8:12 9:16
11:12,12,13 13:8
20:23 24:7 32:14
32:16 35:22 36:21
36:24 38:20 41:8
43:22 50:10 53:5
64:20 76:4,15,16
78:10 88:11 97:1
100:11 103:8
108:5,21,23 110:1
118:5 128:19,25
144:23 156:9
gonzalez 71:10
good 17:21 103:17
google 138:23
gotten 35:17
govern 8:11
government
119:13
grab 45:3
graduated 16:1
great 27:23 134:22
134:23 135:7,9
ground 8:10
grounds 129:1
guess 13:18
guys 67:14

h

h 4:8 115:4
h&h 1:14 2:14
half 157:25
hand 41:20 76:15
76:16 83:25 91:23
handbook 34:1,22
34:23 35:7
handing 77:10
handled 14:13,19
37:7,11 38:4

handling 29:19
31:2,4,9 32:9,14
37:23
hanna 1:11 2:11
4:20 20:7,8,25
21:3 22:2,19 23:8
24:13 25:20,24
31:20 57:1 59:25
76:20 86:4 91:15
92:13 94:25 114:2
117:3,5 138:7
happened 27:1
47:24 137:20
151:18 152:5
154:2,5,9
happening 135:13
happens 143:22
harassing 83:9
hard 13:5 60:8
82:20
hate 102:3
head 67:23
hear 24:6 25:9
32:10,21 33:8
74:11 146:12
hearing 159:13,14
help 56:25 59:25
hem 43:23
hereof 160:10
hereto 41:16 53:11
54:7 57:19 67:20
84:3 88:19 92:3
95:8 98:16 117:18
128:11 148:15
hey 66:3
highly 125:24
hillshore 39:25
40:3 42:5,9,13
43:7 44:3,3,12
46:16 52:8 58:9
58:12,14 72:10

**[hillshore - interior]**

95:21 96:7 97:4
98:4 99:22 100:23
100:25 101:18
102:16 103:11
104:12,25 105:24
122:7 123:12
125:10,25 126:3
139:23 140:21,25
143:9 152:25
**hillshore's** 103:10
140:6
**hired** 114:10
**history** 27:24
**hit** 67:23,24,25
**hold** 93:24
**holder** 83:19
**honest** 13:1,4 57:1
60:1,5
**honesty** 9:11
**hong** 5:4 135:24
135:24
**hour** 76:12 77:5
**hours** 82:23,23
150:1,15 152:21
154:24
**house** 7:12,14 19:3
19:4,13 23:11,14
**hr** 30:7 31:3,5,9
37:15 84:20,21
**huh** 8:21,22 28:2
50:20
**human** 30:4,6,23
30:25
**hundred** 44:15
102:15,20 103:2
148:4,6
**hypothetical**
63:10 65:5 134:19

**i**

**idea** 8:3 25:14,15
36:2 41:5 80:13
**identification**
41:15 53:10 54:6
67:19 84:2 88:18
92:2 95:7 98:15
117:17 128:10
**identified** 104:21
125:8
**identifies** 102:25
103:1
**identify** 14:20
17:3 27:23 30:1
45:17 48:13
**idtconsulting** 3:6
**immaterial** 143:3
143:22
**impact** 63:2 124:4
**impacted** 89:9
**import** 17:12
**important** 9:10
11:21,25 35:21
51:14,17 75:12
117:10
**inappropriately**
113:17
**inaudible** 105:19
**include** 38:6
**included** 31:13
99:9 121:22
**includes** 71:3
**including** 87:3
89:6
**income** 76:15,16
99:25 100:12
104:7 132:23
**incoming** 42:5,8
**inconsistencies**
97:14,18

**inconsistency**
97:23,25 110:12
**inconsistent** 56:2
56:8 103:5 104:24
105:9,15 106:3
127:10 151:7,10
151:13
**independently**
19:21,22 21:8
**index** 5:1 77:24
78:5
**indicate** 33:9 50:1
50:7 90:5 93:18
101:10,13 104:10
121:18 122:6
127:23 128:2
129:20
**indicated** 57:15
88:24 99:15
103:11
**indicates** 48:1
99:21 118:3,18
130:3,23 131:11
**indicating** 18:21
85:19 96:1 100:9
103:22 155:5,5,6
**indication** 128:18
**individual** 1:12,12
2:12,12 34:21
119:14
**individually** 1:4
2:4
**inform** 52:3,7 94:4
**information** 8:6
9:6 12:16 14:23
38:7,9,12,17,20,23
39:21 40:1 45:9
49:7 50:11 55:6
57:24 58:1 65:12
69:25 74:14 78:19
81:1,15 84:17

85:23 92:19
101:25 105:9
111:9,15,17,18
112:10 122:5
124:5 127:9,19
129:19 130:16
**informed** 52:11
**infusion** 63:7
**injected** 51:16
**input** 39:8,22
46:22 47:15,23
65:12 66:22
**inputted** 47:13
48:2,6,7,19 72:2
**inputting** 38:8
72:9
**installments** 53:21
**instruct** 26:2
**instructed** 5:10
**instructing** 26:11
**instruction** 88:3
88:14 157:1,4
**instructs** 10:24
**integrity** 146:1
**intent** 147:11
**intention** 112:18
136:19 155:11
**intentionally**
108:19 143:3
**interest** 4:12,14,17
55:9 96:18 102:25
126:4,9 142:2
148:2
**interested** 162:17
**interesting** 22:7
27:8
**interfere** 112:19
**interfering** 106:24
107:4,5,12 112:16
**interior** 28:18

[interiors - leblanc]

interiors  28:20
interject  36:11
internal  29:17,18
interpose  141:16
interpret  8:23
interpretation
   55:12
interview  22:24
interviewed  22:21
introduced  4:9 5:2
   17:22 34:5 141:18
invest  40:8
invested  50:18
   52:8 55:24 72:18
   72:21 103:11
investing  96:7
investment  40:14
   40:23 42:13 53:25
   73:13 99:22
   100:23,25 125:19
   126:9 140:25
investments  39:24
   41:10 44:4 54:16
   72:10 95:21
   100:25 102:16
   104:25 105:24
   118:3 122:7
   125:25 140:21
invoice  38:25 80:9
invoiced  137:17
invoices  81:24
   82:1 130:13,14
   137:20
involved  17:7
   33:25 98:22
involvement  69:11
   91:17,20
irrational  145:18
irrelevant  143:2
irs  75:13,18 76:4

issuance  4:16 44:2
   68:7 91:16
issue  14:12,14
issues  91:18
item  147:24

                 j

january  48:9
   54:17 125:2
jene  1:12 2:12
   22:22 23:1 31:20
   32:13,20,22,24
   33:9,14,16,18,18
   86:3 94:25 138:7
jeopardized  146:1
jesus  150:20
job  1:23 138:8
jobs  29:14
john  1:11 2:11
   4:20 20:7,8,25
   21:3 22:2,19 23:8
   24:13 25:20,24
   26:5 31:20 57:1
   59:25 76:20 86:4
   91:15 92:13 94:25
   114:2 117:3,5
   138:7
joined  115:21
journal  48:21 49:6
judge  13:7 66:1,16
   66:18,21,24
july  21:15 22:6,12
   22:16,20 25:10
   28:9 37:4 93:17
   115:13 133:11,11
   137:15
june  25:4,5,10
   28:12 29:24 37:4
   80:3 82:5 87:5
   93:6,17
jury  10:8 13:7
   146:9,10 156:10

156:25 157:4
justice  9:11
jut  17:1

                 k

k  102:5 125:14,15
k1  140:4
keep  13:18 71:6
   81:15 159:10
keeping  31:11,12
   31:13 78:16,18
keeps  33:19
kept  64:3,6,9
kim  5:4 135:24,24
   136:6
kind  115:16
know  8:5 14:3,11
   18:24 20:11 21:24
   22:16 24:4,12
   26:9,12,16,21,24
   27:8,25 30:14
   34:12 43:17 44:1
   45:15 47:6,18
   48:23,25 50:16,17
   50:23 51:15,21
   52:9,13,14,15,16
   52:17,19,19 56:25
   58:18,23 59:24
   60:24 61:20 64:19
   65:24,25 68:3
   71:22 72:7,13
   77:11 78:9,25
   79:13,16 80:1
   82:24 84:5,15
   85:6,9,21 94:16,18
   95:1 96:4 97:16
   97:23,24 98:1
   103:4,9 111:5,18
   112:7,9,12,13,13
   112:18 115:12
   117:21 123:7
   125:2,21 128:13

134:15,22,23
135:10,12,13,24
135:25,25 139:1,4
146:7 151:19
154:13,19,21,23
154:24 155:2,3,3
156:25 157:11
158:8
knowledge  29:22
   44:21 94:12 97:17
   97:24 109:2
   146:11 147:11
known  46:18
   114:3,5
korea  67:5,8 70:8
korean  67:9,14,15
   136:1
kring  77:21,25
   78:6
kuo  67:7
kyu  5:4 135:24

                 l

l  115:4 121:10
l.a.  42:19 116:2
lacks  97:6
larger  119:7
late  29:23 32:1,1
   115:13
laughing  29:9
law  3:8 143:24
   146:5
laws  135:12
lawyer  69:7
   157:12
lawyers  64:22
leaning  158:11
learn  24:16
leave  24:24
leaving  17:23
leblanc  1:22 2:22
   162:23

Veritext Legal Solutions
866 299-5127

**[led - math]**

led  35:12
lee  67:8
left  19:9 35:13
  76:25 80:3 82:5
  87:5 134:11,13
  136:21
legal  14:12,14
  45:20 51:24 55:16
  56:3,10 70:11,25
  73:21 74:20,22
  75:19 76:6 83:21
  93:20 100:7 102:9
  105:3,11 108:18
  109:9 110:4,13
  127:12 134:19
  136:23 137:4
  143:24 144:17,21
  145:8,20 146:8
legit  39:23
lengthy  150:5
letter  30:15 88:8
  135:23
letterhead  5:5
liabilities  118:22
  120:15,18,23,24
  129:22,25
liability  1:6,11,13
  1:14 2:6,11,13,14
  121:19 131:22
liar  108:16
license  16:5 27:14
lieu  159:10
life  14:24
liked  33:9
limited  1:5,7,11,13
  1:14 2:5,7,11,13
  2:14
line  5:11 100:13
  100:14 103:17,18
  103:19 118:6
  127:21 129:1,12

131:14,17,20
141:6
list  46:3 81:25
  87:21
listen  108:9
listens  8:13
lists  140:6
litigation  21:4
litigator  157:12
little  19:8 32:19
  108:12 112:25
llc  1:5,7,10,13,14
  2:5,7,10,13,14
  4:10 5:8 6:18
  81:14 119:16,18
  119:21 128:17
loan  40:19,21,22
  42:18 43:7 45:16
  45:17 46:8,12,21
  47:20 56:15 122:7
  123:9,10,25 124:3
  124:24 125:1,3,4
  127:11
loaned  44:6 50:18
  52:8
loans  40:15 46:17
  47:9 71:4 74:6,7
  121:21 122:1
  123:7,11,14,19
  124:22 127:19
  134:15,20
located  78:23
  79:14 115:22
long  7:4 19:6,24
  28:21 74:24 94:4
  94:21,22 114:5
  115:10 121:11,14
longer  44:23 90:6
  94:2,7 95:2 114:4
look  18:10 35:16
  53:13 56:13 58:4

71:7 102:13 106:7
109:17,21,23
110:20 121:3
123:19 125:21
130:23 153:20
looked  63:23
  77:23,24 106:19
  141:11
looking  18:12 36:5
  36:6 69:19 103:20
  103:21 112:21
  119:7 123:4
  139:18
looks  96:11 109:25
  128:20 130:11,12
los  1:2,19 2:2,20
  6:1
loss  63:15 64:16
  66:11,20 99:10,12
  99:14 100:1,19
  125:14,18 126:14
  130:23 131:2,12
  131:23
losses  125:16,18
  134:11
lost  159:8
lot  51:6,10 133:8
lots  135:7
love  102:10
loves  33:18,20
lying  108:19

**m**

m  1:22 2:22
  103:18 118:12
  162:23
ma'am  156:9
machine  162:12
mafia  67:5,9
magnitude  130:24
mail  3:6 4:18 70:8
  84:16 86:6,12

87:6,10 88:16
92:16 93:12 159:6
mailed  70:10
  85:20
mails  4:20,22
  86:10,23
maintain  34:17
  81:3 157:23
maintained  34:19
making  32:8 71:3
management  37:9
  37:13
manager  29:19
  30:25
managerial  27:22
manipulated
  38:23 64:8
manual  17:18,19
manufactured
  137:14
manufacturing
  17:5 29:6
march  54:18,20
  62:13 93:10
mark  54:3 67:16
  95:4 128:7
marked  4:9 5:2
  41:12,14 53:8,9
  54:5 67:18 69:15
  76:17 84:1 88:17
  92:1 95:6 98:14
  117:15,16 128:9
married  17:24
match  78:5
material  26:1
  51:18,20 77:6
  78:19,22 109:18
  110:1
materials  98:23
math  90:22

**[mathematically - never]**

mathematically
100:8
matter    73:4 107:8
146:8
matters    52:18
67:3
mean    19:1 48:2,3
48:15 49:21 78:15
83:2 84:23 86:18
102:18 111:22
121:15 130:9
135:17 157:22
158:15
meaning    32:7
68:20 78:18 79:1
means    75:22 126:3
meet    14:5,6,8
114:9 149:5
meeting    4:19
52:17 71:16
114:17 138:6,16
139:2
meetings    114:16
138:16,19,21
meldy    1:18 2:18
4:3,20,22 6:4,11
6:12,14,23 87:10
melrose    115:6,7
115:23 116:2
member    70:16,21
74:1 83:18,18
members    95:15
106:4 133:16
membership    4:12
4:14,17 55:9 68:7
91:16 92:23 93:5
142:2 148:2
memo    48:7,12,13
61:10
memorized    90:13

memory    93:15
memos    48:19
mentioned    32:12
met    71:12
middle    22:11 25:4
113:2
million    39:1 40:11
43:8 44:4,6 47:9
50:17 51:15 52:9
52:20 53:2,19,21
55:1 61:13 63:7
72:9 73:11,12
99:22 100:1,4,5,5
101:8 105:25,25
107:24 118:15,21
120:19 123:4
127:10 131:12
139:16,23 142:23
142:24 145:16
147:22 148:3,6,9
148:14 149:9,10
149:16,18 151:3
152:25 153:7,11
155:7,9,15,23
156:3,3
mind    6:12 36:14
142:21 153:22
mine    71:7 102:13
minimize    11:22
minus    100:9
minute    36:12
136:9 149:23,25
minutes    60:9
150:16,18
mischaracterizes
33:3 111:10
113:23 131:4,15
140:16 143:23
152:1 153:13
157:3

mischaracterizing
139:21 148:20
149:12
misleading    143:3
143:5,17
misplaced    159:9
misrepresents
90:14
missed    37:14,16
misstates    101:2
139:25 140:16
mistake    96:16
module    49:17
moment    66:9
110:25
money    46:18,23
48:10,12 51:3,6,11
56:24 57:5 59:12
59:18 72:18 73:7
73:8,17,25 74:3
93:16 98:7 103:11
123:24 124:1
128:2 130:10
132:13,20 133:23
134:9 136:13
146:4
monies    46:21
128:18 145:18
month    21:14 22:3
25:3 89:14,15,15
89:16,17 92:24
monthly    93:5
months    50:24
mood    83:17
mother    135:5,6
motion    158:12
motions    158:14
move    15:7 75:25
moved    15:19 18:7
29:1 79:20,21,23
79:24,25

moving    27:7
mt    66:25
mutual    33:1

**n**

n    4:1
name    6:10 68:8,12
108:18,22 136:1,4
137:2 161:13
162:20
named    94:16
natalie    94:14,15
94:16,19,20,21,21
95:1
natalies    94:17
nature    8:8 10:7
11:7,15 14:25
32:2 38:8 39:7
40:2 74:9,25
83:15
necessarily    122:3
128:20 136:13
necessary    12:21
161:10,11
need    18:22,23
27:23 39:21 45:3
65:9 74:12 108:12
109:3 123:18
145:22,24,25
146:11 157:25
159:20,21,22
needs    70:14
122:17
negative    129:23
129:24
neither    162:16
net    92:23 93:5
104:7
never    35:17 76:24
77:3 93:17 151:12
151:13 155:13
157:10

[new - opinion]

| | | | |
|---|---|---|---|
| **new** 4:16 68:7 | 151:1,7,10 152:16 | 153:13 154:7 | 61:19 62:22 65:25 |
| 91:16 133:11,21 | 152:18,23 153:22 | 155:25 157:3 | 69:5,11 72:8,12,20 |
| 134:5 | 154:1 155:3 | **objections** 10:20 | 73:17 79:9 80:6 |
| **non** 75:25 | **numerous** 151:9 | 11:6,14 150:9 | 81:2,7 82:4 84:21 |
| **normal** 47:17 | 151:17,17,19 | **obligation** 134:17 | 85:14 86:14 89:2 |
| 74:18,19,20 | **nutrition** 29:9 | **obtained** 62:2,5 | 89:8 91:12 92:7 |
| 133:23 | **o** | **obviously** 44:20 | 92:20 93:9 94:14 |
| **north** 29:1 | | 44:22 72:15 132:4 | 94:25 95:20 96:10 |
| **note** 40:24 123:21 | **oath** 9:2 108:2,3,7 | **occur** 152:19,20 | 96:23 97:22 98:2 |
| 124:2 128:5 | 161:7 162:11 | 153:5 | 99:11,17,25 |
| **noted** 57:4 73:14 | **object** 118:5 | **occurred** 145:4 | 100:17 101:17,22 |
| 122:24 | 128:25 132:5 | **occurring** 26:15 | 101:23 102:18,22 |
| **notes** 121:10,14,16 | 151:21 | **october** 9:16 42:13 | 103:17,24 105:8 |
| 123:8,10 124:2 | **objecting** 44:19 | 47:8 | 110:18 115:7,14 |
| 127:22 | 150:3,4 | **offer** 30:15 | 115:22 116:12,24 |
| **notice** 4:16 68:7 | **objection** 10:21 | **office** 33:12 79:1,2 | 117:8,12,13 |
| 91:15,15 159:12 | 23:21,25 24:8 | 79:17,18,23,25 | 118:21 120:9,16 |
| **noting** 6:18 | 25:25 33:3 41:22 | 80:4 | 122:22 123:11,14 |
| **november** 5:3 | 45:22 48:16 51:24 | **officer** 51:20 | 124:3 126:3,11,22 |
| 42:20 47:8 54:17 | 52:4,10 55:11,16 | **offices** 3:8 | 127:9 128:7 130:3 |
| 56:14 57:9,10,11 | 56:3,9,19 58:10 | **oh** 15:14 43:3 | 132:3 134:7 135:4 |
| 60:17 95:16 96:8 | 60:2 62:20 63:9 | 52:23 96:2 132:17 | 136:8 138:2 139:6 |
| 99:23 145:9,10 | 65:4 70:1,7,25 | 153:22 | 141:8 142:24 |
| 155:9,16,20 | 73:21 74:22 75:19 | **okay** 6:14 7:15,18 | 148:17 156:25 |
| **number** 2:23 54:4 | 76:6 83:11,21 | 7:23 8:4,21 10:1,2 | **old** 15:15 17:21 |
| 60:23 69:16 76:25 | 88:1 89:22 90:7 | 10:5,19 12:14 | 81:3 |
| 95:10,20 96:4,5 | 90:22 91:9 93:19 | 13:8,23 14:14,22 | **once** 7:2 61:19,20 |
| 102:8 103:17,18 | 97:6 98:10 100:6 | 15:22 16:10,24 | 66:5 74:8 89:14 |
| 103:19 106:6 | 101:2 102:19 | 17:3 19:17,19 | 89:15 110:9 |
| 111:1,4,6,16,21,22 | 105:3,11 109:9 | 20:15 21:8,16 | **ones** 79:18 80:8 |
| 116:4 118:3 | 110:3,13 111:10 | 22:7,10,14,18 23:7 | **ongoing** 150:4 |
| 130:15 131:2,11 | 113:14,18,22 | 24:4,6 25:12 26:2 | **online** 81:1,9,24 |
| 140:14 146:22,25 | 119:2,23 120:12 | 26:17 27:7 28:23 | **open** 77:1 |
| 147:4,25 149:17 | 122:9,12 124:10 | 29:7,22 30:9 31:4 | **operate** 130:19 |
| 152:6 | 126:25 127:12 | 31:7 33:25 34:9 | **operating** 46:6 |
| **numbered** 78:9 | 129:5,9 131:4,15 | 37:11,16,21 38:22 | 100:19 131:23 |
| **numbers** 56:13 | 133:18 134:18 | 40:21 41:3 42:8 | **operations** 133:10 |
| 76:19 77:16 97:8 | 136:23 137:4 | 42:23 45:16 46:5 | **opinion** 45:23 56:4 |
| 97:11,13 105:13 | 138:9 141:17 | 46:8,20 47:17 | 56:10 74:23 75:20 |
| 105:15,23 106:3 | 143:23 144:18,21 | 49:1,18 51:2 53:5 | 83:12,22 85:11 |
| 127:14 150:24 | 145:7,7,20 149:12 | 54:13 56:1 58:22 | 93:20 100:7 |
| | 150:11,19 152:1 | | |

[opinion - peddie]

109:10 110:4,7,14
110:14 119:3
120:13 124:11
127:13,13 131:16
134:19 136:24
137:5 143:24
144:17,22 145:8
145:21 147:12
**opportunities**
151:18,19
**opportunity** 10:21
11:17,22 12:7
**opposed** 40:22
**opposing** 108:19
113:16 150:17
**order** 16:17,19
95:5 98:13 109:7
128:8 160:4
**ordinary** 68:19
92:9 99:25 100:12
**original** 159:1,8
159:10,11,12,18
159:21,22
**ought** 146:7
**outlandish** 67:10
**outside** 114:15
**overheard** 25:23
26:4
**oversee** 37:8,11
78:14
**owe** 44:15 134:9
**owed** 133:17,23
**owing** 131:24
**owned** 46:13
96:24 102:21
126:23 134:15
**owners** 46:15
133:16
**ownership** 96:18
102:16,25 103:1
126:19,22 127:6

**owning** 101:25
**owns** 101:18

**p**

**p** 3:3
**p.m.** 2:21 6:2
160:8
**pacific** 3:5
**page** 4:4,8,8 5:2,2
5:11 53:13 69:18
71:10 72:1 101:20
103:15,16,23
106:16 107:17
110:19,21,24
123:5 140:5
141:17 142:6
160:10
**pages** 102:2,24
**paid** 57:14 90:4,8
90:15,16 130:4
142:18,21 144:5
**palisades** 3:5
**paper** 75:5,6,7
81:4 153:10
**paragraph** 53:13
53:18 55:15
**pardon** 84:6
**park** 1:12 2:12,19
31:20 33:9,14,16
86:3 94:25 138:7
**part** 31:2,3 67:9
146:16 158:5
159:24
**partial** 37:15
**participated** 99:2
**participating**
25:22
**particular** 18:15
50:14 110:19
138:15
**particularly** 20:24
22:9

**parties** 162:18
**partner** 125:9
**partners** 101:7,25
103:14,24 118:25
**partnership** 102:1
146:13
**party** 26:8 38:12
38:17 65:18,19
**pass** 139:5
**password** 82:24
**paula** 1:4,6 2:4,6
3:12 4:18,22 6:20
14:21 22:22 23:1
31:19 32:10,24
33:10,13,17 35:13
36:7 51:15,21
52:7 68:7 70:10
70:11 76:19 83:10
84:22 85:11,15,23
86:5,11,16 87:1,3
87:14 88:10 89:6
89:13,18 92:12,20
93:13,16 95:2
137:14 138:8,20
138:24
**paula's** 34:23
76:25
**pay** 57:18 92:23
93:5 134:17 143:9
148:9,13
**payable** 81:19
121:10,14,16
123:8,10 124:2
127:22 147:14
**paycheck** 21:19
91:7
**paycut** 4:21,23
92:22
**paying** 130:10
133:22

**payment** 56:17
57:19 89:12 142:4
142:8,9 145:10
148:15 155:11
**payments** 55:3
82:2 128:21,21
130:1 142:13,20
143:4,8
**payroll** 30:8 31:11
**pc** 82:25
**pdf** 86:16,18
**pdtw** 1:6 2:6 20:5
20:6 128:17,19,22
130:7,10,12,14
131:24 132:13
133:5,9,17 134:2
134:11,15 136:18
136:21 137:14,17
137:21,21,22
138:3
**peachtree** 17:23
**peddie** 3:8,8 4:6
6:15,17,17 13:17
14:3,6,8,11 15:4
15:12 23:21,25
24:8 25:25 26:4,9
26:13,17,24 27:4
33:3 35:5,7,10,15
35:23,25 36:3,6,9
36:15 41:22 43:23
43:25 44:2,7,9,11
44:15,18,23 45:1,3
45:6,22 48:16
51:24 52:4,10
54:19,21,23 55:11
55:16,20 56:3,9,19
58:10 60:2,10,13
62:20 63:9,22,24
64:3,5,9,15,23
65:4,22 66:2,4,9
66:13,17,19,22,25

| | | | |
|---|---|---|---|
| 67:2,7,13,22,25 | 153:13 154:7 | **phase** 77:22 | **portion** 119:1 |
| 70:1,7,25 71:6 | 155:25 156:13,16 | **philippines** 15:1 | **position** 7:21 |
| 73:21 74:22 75:19 | 157:3,7,9,17,19,22 | 16:2,2,3,6,8 17:4 | 23:19 30:23 36:18 |
| 76:6,14,23 77:2,8 | 157:25 158:4,9,13 | 27:15 56:13 | 36:21,24 51:21 |
| 77:10,14,19,21 | 158:16 159:14,16 | **phone** 116:5 | 115:8,14 |
| 78:2,8,11 79:15,24 | 159:20,23 160:1,3 | **physical** 8:22,23 | **positions** 30:1 |
| 80:7,9,11,14,17 | 160:6 | 81:24 | **possession** 75:9 |
| 83:11,21 87:10,12 | **penalty** 9:18,21 | **pick** 41:10 | **possibly** 8:18 |
| 87:17,21 88:1 | 12:6,21 109:1 | **pipe** 67:11 | **practice** 19:21 |
| 89:22 90:7,22 | 159:1 160:9 161:6 | **place** 7:16 27:4 | 27:19 47:18,22 |
| 91:9 93:19 95:22 | **people** 33:22 | 34:12 43:13 73:6 | 74:18,19,20 |
| 95:24 96:2,14 | 86:12 87:2 115:19 | 115:6,7,23 116:2 | **practicing** 16:3 |
| 97:6 98:10 100:6 | 137:22 | 116:19 125:1 | **precaution** 33:24 |
| 101:2 102:2,6,10 | **percent** 101:18 | 162:9 | **prepare** 13:23,24 |
| 102:19 105:3,11 | 102:15,20 103:3 | **placed** 162:11 | 92:5 122:11 150:5 |
| 106:15,18,21,23 | 125:25 126:4,14 | **plaintiff** 2:19 6:20 | **prepared** 69:9 |
| 107:1,5,7,10,14,18 | 126:20 127:6,7 | **plaintiff's** 156:11 | 89:8 98:24 99:7 |
| 107:20,23 108:1,4 | **percentage** 96:24 | **plaintiffs** 1:8 2:8 | 124:13,16,20 |
| 108:8,12,25 109:3 | 103:1 125:17 | 3:2 | 135:16 157:14 |
| 109:9 110:3,7,13 | 126:23 | **plan** 24:3 | 158:22 |
| 110:20 111:10 | **performing** 29:15 | **play** 64:21 | **prepares** 69:8 |
| 113:14,18,22 | **period** 51:16 | **please** 6:10 9:25 | 135:20 |
| 116:9,19 118:5 | **perjury** 9:18,22 | 37:18 59:24,25 | **preparing** 69:12 |
| 119:2,23 120:12 | 12:6,22 109:2 | 67:22 88:21 | 91:21 98:22 |
| 121:4,7,9 122:9,14 | 159:1 160:9 161:7 | 100:22 102:14 | **present** 3:11 27:9 |
| 122:18 124:10 | **person** 8:13,15 | 116:6 118:2 122:1 | 27:25 |
| 126:25 127:12 | 30:23 39:6 83:17 | 127:18 129:4 | **presented** 103:7 |
| 128:25 129:5,8 | 106:11 135:20,21 | 141:15,24 144:12 | **presenting** 106:10 |
| 131:4,8,15 132:3 | 136:2 | 146:18 148:12 | **president** 23:15 |
| 133:18 134:18 | **personal** 14:24 | 159:17 | **press** 83:3 |
| 136:23 137:4 | 29:22 32:19 94:11 | **pocket** 156:10 | **prevent** 135:13 |
| 138:9 139:6,9 | 97:16,24 109:2 | **point** 20:2 36:5 | **prevents** 50:10 |
| 140:2,18 141:21 | 114:11 | 77:10 88:16 147:7 | **previous** 57:21 |
| 141:23 143:6,15 | **personally** 9:7 | 148:12 153:16 | 69:19 144:25 |
| 143:23 144:7,12 | **personnel** 30:8 | 156:21 | 145:15 |
| 144:17,21 145:7 | 31:15 67:5 | **pointed** 106:16 | **price** 147:13,14 |
| 145:20 146:3,7,11 | **perspective** 51:8 | 141:19 152:8 | **print** 64:11 |
| 146:13,16,22,25 | **pertaining** 57:21 | **pointing** 106:13 | **printed** 47:11 62:7 |
| 147:4 148:19,22 | 137:20 | 111:1,4,6,16 | **printers** 64:18 |
| 149:12 150:10,18 | **pertains** 120:25 | 147:18 | **prior** 73:23 148:5 |
| 151:21 152:1 | | | 162:10 |

[private - receive]

private  17:2 18:16
  18:17 26:5
privileged  26:1
probably  13:11
  14:1 32:1 48:22
  77:9 94:24 103:6
  103:13 111:7
  133:2
problem  10:7
problems  8:12
procedure  158:20
  158:21
proceedings  8:2
  8:11 10:20 11:3
  129:3 162:8,10,12
process  99:2
produce  35:22,22
  43:22 68:15 75:16
  77:17 87:9,15
produced  35:4,5
  62:1
producing  132:15
  132:17
production  32:5,7
  66:7 94:19
profit  63:15 64:16
  66:10,20 99:10,12
  99:14 125:13,14
  125:17,25 126:5,6
  126:8
profits  135:7
program  38:9
programs  131:18
promissory  40:24
  123:21 124:2
propensity  146:20
proper  106:22
  110:10 146:5
property  137:25
  138:2

propose  157:13
  158:18
protect  133:16,22
provide  11:25
  159:3
providence  146:17
purchase  4:12,14
  52:25 53:2 54:13
  55:9,15 57:15
  69:20 142:2
  147:12 148:21
  149:2
purchaser  57:17
  147:12 148:2,6,8
purely  97:11
purpose  92:15
purposes  71:16,21
  73:12
purses  115:18
pursuant  55:23
  57:19 147:11
  148:14
put  38:16 47:16
  75:25 78:19 81:4
  108:18 135:2
  138:3 141:18
  151:25 152:3
  159:5
putting  82:11

q

quarter  16:18
question  9:24 10:4
  10:7,9,23,23,24
  11:1 12:7,11,12
  33:6 45:25 52:5
  55:22 56:5 57:3
  58:13 59:11,15,21
  59:24 60:5 73:12
  90:14 131:6,7,8
  140:17 144:2,16
  150:8

questioning  118:6
  129:2
questions  8:9
  11:14 60:13 107:2
  112:24 113:3
  117:12 143:15
  150:10 153:25
  154:11 156:6,13
  161:8
quick  125:22
quickbooks  17:15
  17:22,23 38:1,2,4
  38:9,11,14,16,19
  38:22 39:3,8,22
  41:19 45:14 48:5
  48:19 49:5,15,19
  49:22,23 50:9,13
  59:8,9 61:6,21,24
  62:19,25 63:8,11
  63:24 64:1,4,7,10
  64:12,18,24 65:2
  65:10,23 66:14,23
  66:25 72:9 73:3,5
  74:4,13,14,16,21
  76:4 77:7 78:20
  97:19,20 106:5,5
  109:21 110:2,10
  110:11 123:15
  128:5 132:7,19
  133:4,24,25 134:2
  134:3 152:24
quickreport  5:8
quiz  119:3 150:4
quote  46:16

r

r  28:20
rafols  1:18 2:18
  4:3,20,22 6:4,11
  6:13 87:10 156:17
reach  13:11

read  10:3,23 37:17
  37:19 42:12,24
  53:16 55:8 57:17
  59:15,16 84:7,9,11
  84:13 88:21 93:2
  93:6 106:20 109:4
  120:2,6 138:13
  141:15,24 142:1
  147:10,23,25
  148:1,17 158:24
  161:9
reading  148:11
  154:6
ready  117:25
real  125:22
realize  150:25
realized  149:22,23
  150:1,23
really  31:23 41:3
  56:24 112:21
  113:4,11 144:3
  145:25 153:16
  156:9
reason  27:17 45:8
  45:12 52:9 62:17
  62:18 125:23
  133:15
reasonable  26:7
  26:10 74:17
  159:12
reasons  151:13
recall  111:8,14,17
  111:19 139:10,24
  140:12
receipt  34:15 35:8
  35:20 36:5
receivables  81:19
receive  11:4,18
  38:12 40:22 57:6
  81:7 86:25 93:16

[received - return]

| | | | |
|---|---|---|---|
| **received** 31:14 46:18,23 48:11 51:3 59:12,19 73:7,9 78:19 81:24 86:10 87:24 89:19 90:17 91:6 118:4 122:7 | **referring** 56:20,23 57:7,9 59:4 140:20 141:13 | **relevant** 112:6,8 | 162:6 |
| **receiving** 21:19 38:17 | **refers** 53:24 | **relieved** 158:19 | **reporting** 29:21 37:9 |
| | **reflect** 62:7 98:3 108:13,15 147:1,2 158:9 | **rely** 59:8 | **reports** 38:23 49:13,16 |
| | | **relying** 74:16 | |
| | | **remaining** 57:18 148:9,13 | **represent** 67:4,6 91:2 |
| | **reflected** 61:13,16 124:24 130:25 | **remember** 7:4 22:3,7,17 24:21 30:24 31:23 32:13 36:4 40:10,17,20 41:23 43:19 46:2 46:7 47:16 48:20 49:3,16 69:14 72:8,11 81:14,16 81:17 82:9 89:14 90:8 93:23 94:1,6 94:10,13,23 96:6,6 96:7,9 97:20 123:13 124:21 136:5,7 138:5,15 140:19,24 141:1 154:4,6 | **representation** 41:8 |
| **reclass** 43:7 47:2 | **reflects** 132:1 | | **representing** 123:24 |
| **reclassed** 120:15 | **refresh** 113:20 | | |
| **reclassification** 43:12 57:21 73:4 73:6,9 | **regard** 80:19,22 | | **request** 66:7 87:14 159:16 |
| | **regarding** 31:19 38:7 39:1 48:12 49:20 57:5,24 58:1 62:19 70:22 71:3 76:3 77:6 80:23 85:11 86:9 86:10,16 | | **requests** 87:17 |
| **recognizes** 132:20 | | | **requires** 75:13 |
| **recognizing** 132:12 | | | **resource** 30:4,6,23 30:25 |
| **recollect** 14:1 | | | **response** 8:24 12:11,12 105:19 140:17 |
| **recollection** 111:7 113:21 | **register** 150:11 152:23 | | |
| **record** 6:10 10:22 26:22 31:12,13 34:17 37:19 59:16 62:2 78:16,18 108:13,15 117:22 138:13 144:13 147:1,2 158:9 162:12 | **regular** 68:12,16 | **remembered** 154:3 | **responses** 8:14 |
| | **regulations** 75:18 76:5 | **repeat** 45:11 | **responsibilities** 31:8 37:3 80:23 |
| | **relate** 87:13 | **repeatedly** 74:11 | **responsive** 76:1 |
| | **related** 35:9 66:8 81:11 112:11 130:14 131:12 145:9 | **rephrase** 10:1 59:14 | **rest** 17:2 35:18 62:25 |
| | | **report** 44:20 62:14 65:6 | **restroom** 18:23 |
| **recorded** 59:18 60:24 61:1,3 64:20 73:8 74:10 155:5 | | | **result** 8:1 82:14,15 100:9 |
| | **relates** 58:14 92:20 99:17,18 127:19 | **reported** 1:22 | **retail** 29:5 115:18 |
| | | **reporter** 2:23 6:6 8:16,22 10:3 37:20 41:5,16 53:11 54:7 59:17 67:20 76:11 78:10 84:3 88:19 92:3 95:8 98:16 117:18 128:11 138:14 157:23 158:19 159:7 160:4 162:3 | **retract** 158:16 |
| **records** 34:19 79:12 83:10 | **relationship** 114:12 | | **return** 76:15,17 98:24 99:7,13 102:9 106:10 118:7,17 119:1,4 120:3,5 122:6,10 122:25 124:5,13 124:18 125:4,9 127:4 130:16,25 135:21 139:19,23 140:4,5,5 141:8 |
| **redacted** 76:20,22 | **relative** 51:9 162:17 | | |
| **reduction** 89:10 | **relaxed** 21:5 | | |
| **refer** 140:4 | **relevance** 88:1 | | |
| **reference** 84:17 | | | |
| **referred** 55:14 68:23 141:6 | **relevant** 88:1 112:10 118:8 129:1 145:7 150:3 | | |

**[return - sent]**

142:25 143:4,13
143:21 144:10
145:16,19 146:6
149:9 155:22
156:3
**returns** 5:5,7 78:2
102:3 106:3
119:12 121:22
135:16 145:5
152:23
**revenue** 132:24
135:6,7
**revenues** 38:8
**review** 11:19
12:20 13:13 83:19
109:11,13,15,17
**richard** 3:8,8 6:17
14:3,8 64:19
65:24
**right** 1:4 2:4 12:4
14:22 22:24 27:15
31:5 33:14 34:24
36:3 37:23 38:14
38:19 47:11,13
49:7 50:19 51:8
51:10,22 53:19,22
53:25 54:23 55:15
55:19 56:15 58:18
61:10,12 62:13,15
65:10,13 68:10
69:16 70:19 74:14
77:16 79:16,17,19
80:4 82:17 86:11
86:17 87:1 88:5
88:15 90:2,25
92:7,13 93:10
95:16 96:12,19
99:19,23 100:2,5
100:17,20 101:1
101:19 102:6
103:23 105:2,6,10

105:18,20 106:12
106:18 109:8,18
109:21 110:2
111:15,18 112:11
112:14 114:3,18
119:17,19,22
120:7 122:18
123:5,16 124:5,14
126:11,17,20
132:14 134:12,17
136:8,15,18 137:3
137:25 138:6
139:5,13 140:3
147:22 148:18
150:22 151:10,14
151:20 152:5,5,7,9
152:11,12 153:8
154:11,14,17,19
155:2,9,17,20,23
156:4 158:1
**roger** 67:7
**ruined** 156:8
**rules** 8:11 146:13
158:21

**s**

**s** 4:8
**salaries** 88:23 89:3
89:9
**salary** 90:2,16,20
91:2
**sale** 132:20,23
137:15
**sales** 94:20,22
133:1,3
**sample** 132:15,16
132:17 133:1
**samples** 132:8,14
132:21
**saw** 126:17 151:2
**saying** 12:24 26:19
33:19 48:24 57:23

59:8 67:12 73:20
74:11 78:1,6,7
103:13 120:2,3
139:2,3 144:11,20
149:11,15 150:13
153:2,17 154:22
**says** 10:25 35:25
42:8,12,23 43:7
53:2 55:8,10,22
57:17 73:24 81:14
92:22 93:4 95:14
95:24 101:17
118:16 127:22
140:8 145:15,16
147:10,16,24
148:13 157:1,2
**schedule** 41:19
46:6 55:3 56:18
57:19 73:19
101:18 103:18
111:20 118:11,12
119:8 120:25
121:10,23 122:3,4
122:20 123:2,5
128:16 142:4,8
148:15 154:20,22
154:24,25 155:1
155:12
**scheduled** 142:13
**schedules** 99:15
121:24
**schiffman** 14:17
14:17,18,19
**schnider** 4:18
25:18,19,24 34:5
69:3 72:3 86:4
95:1,19 133:19
**screaming** 108:14
147:1
**search** 138:24
139:4

**season** 137:8,12
**second** 36:11
38:13 101:22
102:4 143:2
144:13
**seconds** 45:1
**section** 119:6
147:8,10,24
**security** 76:19,25
77:15
**see** 33:8 40:17
42:14,25 43:8
48:5,6 53:14 54:9
55:1 58:15 60:17
60:21 61:14 68:8
92:25 95:10 99:19
100:15 101:7
102:15 104:2,5,8
108:21 120:18
121:13 125:22
126:15 129:12,13
129:23 133:4
141:8,10 142:5,5
142:13 159:20,21
159:22
**seeing** 36:4
**seek** 26:24
**seen** 11:9 77:1
**seldom** 40:7
**self** 159:4
**seller** 148:3,4,6
**selling** 132:14
**send** 13:13,14,15
86:25 159:1
**sense** 145:14
**sent** 13:17 68:6
78:8 84:15 85:13
85:14,16,18 86:10
92:12 93:9 98:23
99:6 157:15
158:23

[separate - statement]

| | | | |
|---|---|---|---|
| separate 63:18,19 | show 41:11 50:14 | simply 38:6 | speaking 122:13 |
| 66:17 79:5 85:4 | 88:16 100:24 | 136:17 | 146:15,18,23 |
| 85:22,25 86:9,13 | 101:5 118:2,21 | single 39:16 80:15 | specific 66:7 81:15 |
| 86:15,22 | 119:6 137:24 | sister 18:7,10 | 87:17 133:2 |
| separately 54:2 | 143:16 146:11 | 135:2,3,8 | specifically 31:8 |
| september 42:10 | 151:10 156:9 | sit 31:18 144:7,12 | 128:4 |
| 44:2 47:7 124:21 | showed 89:18 | sitting 6:20 | speculate 10:11 |
| 124:22 128:24 | 110:24 113:17 | six 82:23 158:13 | speculation 10:13 |
| 129:15,16,17,20 | 127:21 135:7 | slate 134:7 | 10:17 23:21,25 |
| 162:24 | 146:20,22,25 | slip 59:5 | 24:9 52:4,10 |
| sequence 145:4,6 | 147:4 151:4 152:6 | social 76:18,25 | 55:20 56:4,10 |
| 145:17 | showing 41:10 | 77:15 | 65:4 70:1 89:23 |
| set 135:1 142:6 | 106:15 107:14,16 | software 38:9 | 90:7 93:19 100:6 |
| 147:15 162:9 | 107:17 110:19 | sold 136:18 137:3 | 102:19 110:15 |
| seven 75:14 76:3 | 125:13,14,16 | 137:7,9,25 138:3 | speculative 10:12 |
| 79:10 | 149:9 152:24 | solemnly 161:6 | spend 23:8 57:2 |
| shares 46:14 72:4 | 153:11 | solicits 25:25 | spent 150:16 |
| sharing 125:13,14 | shown 141:3,13 | somebody 45:9,13 | spit 65:10 |
| 125:15,17,18,25 | 142:25 | 50:10 51:21 | stamped 159:4 |
| 126:5,6,8,14 | shows 51:2 54:16 | 108:16,17,18 | stand 108:24 |
| sheet 31:11 63:15 | 90:15 96:12 | sophistication | 157:9 |
| 64:16 66:10,20 | 102:15 127:5,10 | 108:13 | standing 129:5 |
| 99:10,12,16 101:6 | 130:6 131:2 | sorry 6:16 7:13 | 158:10 |
| 101:16 106:8 | 147:21 155:22 | 57:8,25 58:3 59:2 | start 21:11 22:18 |
| 131:21 | 156:3 | 67:21 90:12 96:2 | 113:16 115:12 |
| shield 133:16 | shuts 133:9 | 96:15,15 98:20 | 158:2 |
| shipping 17:8,9 | side 21:22 75:25 | 101:12 112:3 | started 19:19 22:3 |
| ships 17:7,10 | 132:24 | 114:20 115:3 | 22:8,15 28:8 |
| shop 71:17,18 | sign 12:5,21 34:14 | 129:17 131:20 | 134:5,7 137:12 |
| short 105:24 | 150:6 158:25 | sort 140:13 142:3 | starting 19:2 93:6 |
| shorthand 2:23 | signature 161:16 | sound 72:12 | starts 129:16 |
| 6:5 37:20 41:15 | 162:22 | sounds 86:14 | state 1:1 2:1 6:10 |
| 53:10 54:6 59:17 | signed 35:17 36:7 | source 30:19,20,21 | 29:23 44:13 |
| 67:19 84:2 88:18 | 68:10,12 70:4 | 30:22 38:15,18,19 | 118:13 119:12 |
| 92:2 95:7 98:15 | 91:14 108:22 | 39:14 65:14 | 129:9 162:6 |
| 117:17 128:10 | 109:1 135:23 | 141:10 | stated 55:4 155:4 |
| 138:14 162:3,6,13 | 148:18 | sources 38:7 | statement 9:14,24 |
| shot 1:12 2:12 | similar 33:16 | south 67:5 | 63:16 64:16,17 |
| shove 146:20 | simple 57:3 59:11 | speak 8:15 66:3,4 | 66:11,11,20 |
| shoved 151:24 | 60:5 87:20 | 67:9,14 135:21 | 120:25 121:1,2 |
| 152:15 153:10,19 | | | 122:13 123:1 |

Veritext Legal Solutions
866 299-5127

[statements - thank]

statements 11:6
11:13 29:20 59:6
63:12,14 65:23
78:17 80:25 81:1
81:3,8,23 99:6,8
99:12 121:5,7
states 15:8,19,23
18:5,9 49:6 56:14
61:7,9 95:15
100:3,23 104:25
125:24
status 89:21
stay 21:5
stayed 137:21
156:23
stephen 40:4,6
41:9 62:1,18 67:8
71:11
steps 26:7,10
stipulate 26:20
27:12
stipulated 160:2,3
stipulation 13:11
26:14 157:13
158:19 159:25
stop 77:25 78:6
107:4 146:14,18
146:23 147:5,5,5
stopped 28:11
stops 133:10
store 75:2 81:21
86:19
stored 82:8
straight 60:4
strike 75:25 111:7
stupid 158:17
sub 142:3
subject 4:19,21,23
87:14
subscribe 161:12

subscribed 162:20
subsequent 144:24
sudden 154:1
suddenly 154:3,4
suggesting 60:14
suggestion 24:19
24:20 25:13,14,15
suite 2:20 3:4
sunset 3:4
superior 1:1 2:1
supervisor 114:24
support 43:19
supported 124:2
supports 97:9
suppose 73:11
supposed 34:14
57:1 98:2 144:5
156:2
sure 14:18 18:22
20:13 25:16 26:7
32:25 34:12 35:10
39:22 53:4 65:15
74:7 94:23 110:1
136:6 138:2,5
147:9
swear 64:19
swore 62:2
sworn 6:5
system 9:11 17:17
47:3 50:9

**t**

t 4:8 28:20 115:4
table 79:2,4 142:6
142:14
tainted 141:20
147:3
take 7:15 8:18
18:1,23 19:20
26:6 27:17 36:12
43:12 66:19 73:6
76:12 82:22 94:4

108:2,3,7 127:15
144:4
taken 2:18 6:24
36:16 78:12
117:23 127:16
136:10 162:9
takes 125:1
talk 14:22 19:1
20:20,22 24:18
30:10 36:13,18
37:23 40:3,5
78:14 80:19 81:10
89:4 108:10 114:2
138:19 149:5
151:19,22 152:4
talked 20:15 153:7
talking 25:21
37:25 46:5 101:17
112:5 135:22
136:12 139:11
140:21 141:1
147:5,6
talks 8:17 53:18
132:25
tangent 12:15
tax 5:5,7 76:15,17
78:2 98:24 99:7
99:13,18 102:3,9
106:3,9,10,11
118:7,17 119:1,4
119:11 120:2,5
121:22 122:6,10
122:20,24 124:5
124:13,18 125:4,9
126:12 127:4
130:16,25 135:16
135:20 139:19
141:8 142:25
143:4,13,21
144:10 145:5,16
145:19 146:6

149:9 152:23
155:22 156:3
taxation 146:13
taxes 119:9
telecommunicati...
16:21
telephone 3:5,10
39:9,10,11 116:4
tell 9:3,5,25 10:6
15:25 20:25 23:3
24:13 31:7 35:1
52:2 65:25 66:15
66:18,21,24 67:13
81:17 89:20 94:7
95:1 99:5 112:14
126:10 130:19
139:21
telling 26:21 49:5
67:11 150:2
153:20
tenure 79:11
term 121:11,14
terminated 88:11
termination 88:7
terms 32:8 37:24
142:8 147:14
testified 6:6 7:1
41:9 133:19
152:12
testifying 107:25
162:11
testimony 12:1
33:4 48:10 112:16
112:20 149:13
155:14,14 156:12
thale 115:2,4
thank 60:8 76:9
88:15 91:12
113:25 124:20
125:8 127:15
131:9 143:15

**[thank - transfer]**

| | | | |
|---|---|---|---|
| 156:6 | **thirds** 90:25 | **thomas's** 36:7 | **titled** 69:20 |
| **theory** 67:7 | **thirteen** 148:4,10 | 51:21 138:8 | **today** 4:19 11:5,18 |
| 149:20 150:2,22 | 148:14 | **thorough** 109:15 | 12:1 23:19 77:4 |
| 152:17 154:10,13 | **thomas** 1:4,5,6,10 | **thought** 26:17 | 156:18 |
| 154:16,19 155:2 | 2:4,5,6,10 3:12 | 88:2 116:16 | **told** 20:23 22:23 |
| **thereof** 162:15 | 4:10,15,18,22 5:6 | 145:18 149:8 | 33:13 60:10 |
| **thereto** 161:9 | 5:8 6:18,20 9:7 | **thousand** 148:4,7 | 116:21 153:20 |
| **thief** 108:16 | 14:13,16 20:2,8,9 | **threatened** 88:11 | **topic** 41:4 |
| **thieves** 67:4 | 20:12,16 21:12,17 | **three** 15:4 16:25 | **topics** 27:8 |
| **thing** 74:17 | 21:20,24 22:1,4,13 | 31:24 102:24 | **total** 55:1 56:20 |
| **things** 8:7 11:6,14 | 22:15 23:1,18 | 105:16,22 106:3 | 71:23 72:2 96:11 |
| 14:25 38:8 87:18 | 24:16,24 27:10 | 115:20 117:7 | 118:19 130:7 |
| 118:7 133:8 | 28:8,11 29:23 | 138:22 148:3 | 139:22 142:21 |
| 138:17 | 30:2 31:19 32:10 | 149:25 150:15 | 147:14 149:22 |
| **think** 8:11 12:12 | 33:10,13 36:11,22 | 152:21 154:4 | 151:2 153:3,6 |
| 14:15,19 16:9 | 36:25 37:4 40:8 | **throw** 137:15 | **totally** 56:2 |
| 17:22 22:11,21 | 42:19 50:18 51:2 | **tie** 105:17,18 | **totals** 155:6 |
| 23:23 24:18 25:4 | 51:11,15,15 52:2,7 | 151:1 153:5,22 | **trail** 48:5 49:8,9 |
| 25:13 26:22 32:4 | 57:5 59:12 62:3 | 154:1 | 49:11,17,20,23 |
| 37:13 40:15 51:6 | 70:10,11 72:14 | **time** 7:4,19 8:15 | 50:1,6,10 |
| 51:10,13,14 52:21 | 73:13 75:8,16 | 8:17 12:25 23:7 | **transaction** 39:8 |
| 55:6 62:17 67:14 | 76:2,19 78:23 | 27:9,25 29:11 | 39:22 40:2 45:19 |
| 71:8 74:12 76:15 | 81:12 84:22 85:11 | 31:6,10,10 34:12 | 47:23,24 50:8,14 |
| 77:11 79:21 80:14 | 85:15,23 86:5,11 | 46:18 47:19 51:12 | 50:15 74:9,25 |
| 82:7 83:4,6,9 | 86:16 87:1,3,14 | 51:13,16 57:3 | 130:11 134:13 |
| 87:12,13,25 88:7 | 88:10 89:6,13,18 | 67:1,2 70:12 73:8 | 145:10,11 152:24 |
| 88:10 89:14 90:5 | 91:6 92:12,20 | 76:10 79:2 91:11 | 152:25 |
| 96:25 97:22 | 93:13,13,16 95:2 | 93:23 94:1 96:24 | **transactions** 4:10 |
| 108:25 110:18,23 | 98:7 99:3 100:1 | 109:20 115:20 | 57:22 148:22 |
| 110:25 111:3 | 101:1,19 104:22 | 122:14,17 136:20 | **transcribed** |
| 117:10 121:4 | 118:4,18 120:11 | 151:16 152:14,15 | 162:13 |
| 126:12 140:1 | 123:12 126:4 | 152:19,20 153:16 | **transcript** 11:4,4,9 |
| 148:19,19 153:1,4 | 127:5,11,20 | 153:23 155:17 | 11:11,19 12:5,19 |
| 153:15 158:3 | 128:21 130:19,24 | 156:9,22 158:6 | 13:13 157:14,15 |
| **third** 4:24 26:8 | 131:12 132:13 | 160:6 162:9 | 157:24 158:22,24 |
| 38:12,17 65:18,19 | 133:12,14,25 | **times** 31:22,24 | 158:25,25 159:2,5 |
| 88:23 89:10 90:21 | 134:1,3,16,16,20 | 39:18 40:5 71:14 | 160:5 |
| 90:23 95:12 106:4 | 136:17 137:11 | 71:15 138:22 | **transcription** |
| 113:12,12 140:20 | 138:4,20,24 | 151:10 | 162:15 |
| 141:4 147:19 | 139:18 145:19 | **title** 23:14 31:1 | **transfer** 42:12 |
| | | 141:15 | 82:10 83:3 130:12 |

[transferred - witness]

| | | | |
|---|---|---|---|
| transferred  82:15 82:16 133:25 134:1,2,16 136:14 | two  13:12 25:6 29:8,10 31:24 36:12 53:21 90:25 94:17 96:11 97:5 113:9 117:7 138:22 148:9,14 148:22 157:14,17 157:19 158:22 | units  83:19 96:12 105:1 147:13 | 85:21 87:15,19 97:16,22,23 102:13 106:2 110:5 117:20 130:15,18,23 141:16 146:12 150:11 154:24 155:13 |
| transferring  82:12 | | unusual  125:24 | |
| transmittal  68:6 85:12 141:11 | | use  17:14,17 35:9 77:14 | |
| transpired  145:12 | | **v** | |
| treat  65:25 | | vague  9:25 89:22 98:10 | wanted  23:5 26:18 65:18 81:2 106:20 152:4 |
| trial  9:16 13:8 156:9 157:12 158:15 159:13,14 | | valid  39:23 | wants  158:25 |
| | | various  46:20 156:17 | wasting  67:1,2 |
| trick  64:23 158:3 | | vendor  38:13 | water  18:23 156:24 |
| tricks  64:21 | tying  149:17,19 150:24 151:2 152:18 | vendors  130:2,4 | |
| tried  14:1 76:18 157:5,10 | | verbal  8:24 | way  44:18 81:4 98:22 159:9 |
| | type  16:16 18:12 59:3 61:10 64:21 81:21 123:18 | verbatim  162:11 | |
| trigger  12:12 153:21 | | verified  39:14 64:24 65:2 | we've  151:17 156:17 |
| trucking  116:16 | types  45:18 | verify  8:6 39:4,5 39:12,19,21,24 58:20 65:7,9 74:9 74:12,17,25 75:23 76:18 | week  117:2,6 157:16,18 158:1 158:24 |
| true  26:16,22 39:1 61:19,20 62:10 77:25 102:11 138:23 | **u** | | |
| | u.s.  57:18 118:7 119:4 122:5 | | |
| | uh  8:21,22 28:2 50:20 | | weeks  13:12 22:21 157:14,17,19 158:23 |
| trust  23:6 | undersigned  162:5 | verizon.net  3:6 | |
| truth  9:3,6 26:20 26:21 101:3 154:23,24 | understand  8:19 8:25 9:2,5,8,12,19 9:21 10:9,14,16 11:1,7,15,19,23 12:2,8,17,22 13:1 13:5,21 22:13 30:20 46:8 48:18 62:3 67:3 77:2 97:11 108:24 120:6 | versus  100:9 | went  23:16 28:5 45:13 47:3 63:6 141:9 156:23 |
| | | viewing  80:25 | |
| | | violation  75:18 76:4 | |
| truthful  9:15 12:25 13:4 | | visit  18:7,10 | west  3:4 |
| | | vs  1:9 2:9 | whereof  161:12 162:19 |
| truthfulness  9:11 | | **w** | |
| try  36:9 110:11 113:20 | | w  85:3 | wholesale  29:5 115:18 |
| trying  59:25 85:5 106:25 111:8,18 112:14 138:7 140:13 141:21 | understanding  35:15 | w4  30:15 | |
| | understood  10:9 | waiting  93:24 | wife  71:11 |
| | unfortunately  117:9 | waits  8:13 | win  158:15 |
| | | walk  30:9 | winning  158:11,14 |
| turn  60:16 | unintelligible  9:25 | want  18:23 26:12 27:19,20 44:17 47:6 48:18 53:16 56:25 63:20 64:1 64:2 79:13 80:11 | wire  42:5,9 |
| tw  41:10 81:13,14 82:12,15 94:22 103:11 130:12 131:24 | unit  43:25 147:13 | | withheld  77:5 |
| | united  15:8,19,23 18:5,9 | | witness  4:2 5:10 8:5 13:8 15:5,11 41:23 52:11 53:17 |

[witness - zero]

56:5,20 59:18
62:21 63:11 65:6
70:8 73:23 74:24
75:21 76:8 79:25
80:8 83:12,23
84:12 88:2,22
90:8,23 91:10
96:1 97:8 100:8
102:4,20 105:13
106:13,25 109:11
110:5,16 111:12
113:24 116:7,11
116:22 118:6
119:4,24 120:14
121:6,8,10 122:19
127:14 131:17
134:20 138:15
140:1 141:18
143:3 144:23
145:9,22 146:2,14
146:15,19,24
147:3,7,10 148:23
149:13 150:5
151:22 157:1,2,15
158:23,23 159:3
161:12,16 162:19
**witnesses** 162:10
**woman** 94:16
**word** 35:9 86:16
86:18 115:4
**words** 47:10,13,15
**work** 16:4,7 18:8
18:10,12,19 19:6
20:2 22:18 23:6
27:20 28:8,14,21
29:2,15 89:25
94:21,22 114:15
115:1,19 116:9
117:2,5
**worked** 16:20,22
16:25,25 17:4

19:2,3 20:5,16
23:10 27:10,25
29:11,11 44:23
90:2 135:15,17
**working** 7:18
20:19 21:8,11,16
23:8 27:9 28:11
95:2 115:10
116:14,16,23
**works** 12:10
137:22
**worried** 58:8
**worry** 33:22
**write** 48:12 92:15
**written** 48:13
91:16
**wrong** 38:24 86:15
90:13
**wrote** 92:7,9
**wylde** 1:5,6,10 2:5
2:6,10 4:10,15 5:6
5:8 6:18 9:7 14:13
14:16 20:2,8,9,12
20:16 21:12,17,20
21:24 22:1,4,13,15
23:1,18 24:16,24
27:10 28:8,11
29:23 30:2 36:22
36:25 37:4 40:8
42:19 50:18 51:2
51:11 52:2 57:5
59:12 62:3 72:14
73:13 75:16 76:2
78:23 81:12 91:6
93:13 98:7 99:3
100:1 101:1,19
104:22 118:4,18
120:11 123:12
126:4 127:5,11,20
128:21 130:24
131:12 132:13

133:12,14,25
134:1,3,16,16,20
136:17 137:11
138:4 145:19
**wylde's** 75:8
139:18

**x**

**x** 4:1,8

**y**

**yeah** 7:20 13:19
17:20 19:16 20:17
29:17 38:3 41:19
43:3,21 45:5
54:20 86:21 87:11
89:12 114:9 121:4
121:8 129:7 138:1
140:1 149:4
159:15
**year** 24:25 31:25
43:14 47:2 57:14
94:24 99:18 100:1
100:19 104:1
130:20,20,21
139:11,12 140:7,9
142:18 143:13
144:25
**years** 15:15 19:8
23:8,12 25:6
47:19 75:14 76:3
79:10 104:19
114:3,6,7
**yesterday** 20:21

**z**

**zero** 105:24
157:10,11

Veritext Legal Solutions
866 299-5127

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

11 41 AM
02 27/17
Accrual Basis

# THOMAS WYLDE LLC
## Transactions by Account
### All Transactions

| Type | Date | Memo | | Debit | Credit | Balance |
|------|------|------|---|-------|--------|---------|
| **Notes Payable - Long Term** | | | | | | |
| **Notes Payable - Hillshore Contr** | | | | | | |
| Deposit | 08/28/2014 | INCOMING DOMESTIC WIRE WIRE IN | 1/HILLSHORE | | 600,000.00 | 600,000.00 |
| Deposit | 09/18/2014 | INCOMING DOMESTIC WIRE WIRE IN | HILLSHORE | | 350,000.00 | 950,000.00 |
| Deposit | 10/14/2014 | Fund transfer from Hillshore, Inv. | | | 350,000.00 | 1,300,000.00 |
| Deposit | 11/13/2014 | 5500K loan to Thomas Wylde LLC, to be converted to Equity ta | | | 500,000.00 | 1,800,000.00 |
| Deposit | 12/12/2014 | December Funding 2014 | | | 500,000.00 | 2,300,000.00 |
| General | 12/31/2014 | To reclass Hillshore loan to Equity | | 2,300,000.00 | | 0.00 |
| ransfer | 02/26/2016 | Funds Transfer | | | 249,975.00 | 249,975.00 |
| General | 02/26/2016 | bank fee | | | 25.00 | 250,000.00 |
| Deposit | 03/29/2016 | Deposit | | | 250,000.00 | 500,000.00 |
| Deposit | 04/15/2010 | Deposit | | | 200,000.00 | 700,000.00 |
| Deposit | 04/25/2016 | Deposit | | | 200,000.00 | 900,000.00 |
| Deposit | 05/10/2016 | Deposit | | | 674,000.00 | 1,574,000.00 |
| Deposit | 05/26/2016 | Deposit | | | 277,000.00 | 1,851,000.00 |
| Deposit | 06/15/2016 | Deposit | | | 80,000.00 | 1,931,000.00 |
| Deposit | 05/27/2016 | Deposit | | | 100,000.00 | 2,031,000.00 |
| Deposit | 06/30/2016 | Deposit | | | 280,000.00 | 2,311,000.00 |
| Deposit | 07/13/2016 | 375K | | | 375,000.00 | 2,688,000.00 |
| Deposit | 08/16/2016 | Deposit | | | 250,000.00 | 2,938,000.00 |
| Deposit | 09/02/2016 | Deposit | | | 200,000.00 | 3,138,000.00 |
| Deposit | 10/31/2016 | 99,891.12 | | | 100,000.00 | 3,238,000.00 |
| Deposit | 11/03/2016 | Deposit | | | 25,000.00 | 3,263,000.00 |
| General | 11/04/2016 | pay off -MURPHY ROSEN/Friday, November 4, 2016 3 52 55 | | | 35,000.00 | 3,298,000.00 |
| Deposit | 12/01/2016 | Deposit | | | 70,000.00 | 3,368,000.00 |
| Deposit | 12/09/2016 | Deposit | | | 55,000.00 | 3,421,000.00 |
| Deposit | 01/04/2017 | Deposit | | | 65,000.00 | 3,486,000.00 |
| Deposit | 01/17/2017 | Deposit | | | 60,000.00 | 3,546,000.00 |
| Deposit | 02/07/2017 | Deposit | | | 65,000.00 | 3,611,000.00 |
| Deposit | 02/13/2017 | Deposit | | | 60,000.00 | 3,671,000.00 |
| **Total Notes Payable - Hillshore Contr** | | | | 2,300,000.00 | 5,971,000.00 | 3,671,000.00 |
| **Total Notes Payable - Long Term** | | | | 2,300,000.00 | 5,971,000.00 | 3,671,000.00 |
| **TOTAL** | | | | 2,300,000.00 | 5,971,000.00 | 3,671,000.00 |

PLAINTIFF EXHIBIT
For Identification
Witness: MELODY BAFCLS
Date: 8-18-2019
Damon M. LeBlanc, CSR No. 11958

EXHIBIT NO. 32
For Identification
Witness: EMILY & GONZALEZ
Date: 7-31-2017
Damon M. LeBlanc, CSR No. 11958

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Hillshore Investments, a Panamanian corporation with its principal place of business located at Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá ("Purchaser"), effective November 5, 2015 (the "Effective Date").

### RECITALS

A.      Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, The Palliative, LLC, Stanley Ducks, LLC, DSRB Group, LLC, Paula Thomas, and Purchaser (the "Members").

B.      On August 25, 2015, John Hanna, as Manager and CEO of Seller (the "Manager") issued a Notice of Proposed Action by Written Consent and Request for Consent to the issuance of 3,300 Membership Interest Units ("Units") at a price of $1,060.61 per Unit. On August 27, 2015, the Manager issued a Notice of Approval of Action informing the Members that a Supermajority of Members had authorized the action. Pursuant to the Operating Agreement, Member Paula Thomas had until September 11, 2015 to exercise her exclusive right to purchase some or all of the Units at the indicated price. On September 14, 2015, the Manager issued a Notice of Non-Exercise informing the Members that Paula Thomas had not exercised her option and giving notice that, pursuant to the Operating Agreement, the remaining Members had until September 28, 2015 to exercise their exclusive right to purchase some or all of the Units at the indicated price. On September 28, 2015, Purchaser exercised its option to purchase all of the Units. No other Member exercised their option. On October 13, 2015, the Manager gave notice to all Members that Purchaser had exercised the option to buy all of the Units.

C.      Pursuant to its notice of intent to exercise its option, Purchasers hereby agrees to purchase all 3,300 Units at a price of $1,060.61 per Unit, for a total exercise price of Three Million Five Hundred Thousand and Thirteen Dollars ($3,500,013), payable on the terms set forth herein.

D.      Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

E.      Seller's Members have approved the sale of such new membership Units to Purchaser by Supermajority, as set forth above.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Sale of the Interest. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, 3,300 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

Agreement to Purchase Membership Interest

PLAINTIFF EXHIBIT  66
For Identification
Witness: MELDY RAFOLS
Date: 8-18-2017
Damon M. LeBlanc, CSR No. 11958

02235

2.      Instruments of Conveyance. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.      Consideration. In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of Three Million Five Hundred Thousand and Thirteen US dollars ($3,500,013). Seller acknowledges that prior to the Effective Date, Purchaser advanced Seller One Million Five Hundred Thousand US dollars ($1,500,000), which advance shall be applied as consideration under this Agreement. Purchaser shall pay the remaining balance of Two Million and Thirteen US dollars ($2,000,013) pursuant to the payment schedule attached hereto as Exhibit "A."

4.      Default. If Purchaser fails to make any payment set forth on Exhibit "A" within thirty (30) days of the date on which it is due, it shall be deemed a "Defaulting Member" pursuant to section 3.3 of the Operating Agreement and shall be subject to the provisions of that section relating to Defaulting Members. If Purchaser fails to cure the default within another thirty (30) days thereafter, a pro rata share of its Membership Interest, equal to the percentage of the balance of the consideration remaining due divided by the total consideration set forth in section 3, above, shall automatically revert back to the Company. Furthermore, the Company and its Members shall then have the right to repurchase the balance of Purchaser's Membership Interest subject to the provisions of Section 8 of the Operating Agreement relating to Involuntary Lifetime Transfers.

5.      Purchaser Representations and Warranties. Purchaser represents and warrants to Seller as follows:

a.      This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

b.      Purchaser is aware that the acquisition of its Units in the company has not been registered under the securities act of 1933, as amended, or qualified under the securities laws of any state.

c.      Purchaser is acquiring the Membership Interest for its own account, for investment purposes, and not with a view to the distribution thereof.

d.      Purchaser understands that the sale, pledge, assignment or other transfer of its units in the company is limited by this agreement and in any event may not be effected unless (i) the transfer is registered and qualified under applicable securities laws, or is effected as a non-public offering that is exempt from the registration and qualification requirements of applicable securities laws and (ii) the person acquiring such units represents and warrants to the company and to the other

Agreement to Purchase Membership Interest

02236

```
 1            A      Yes.

 2            Q      So what are your duties and

 3   responsibilities as a financial controller for

 4   Thomas Wylde between July 2014 and June 2016?

 5            A      The function did you say?

 6            Q      What were your duties?

 7            A      Duties?  I handled the books.  I

 8   oversee the financials, the bank accounts, and

 9   reporting and coordination with management and the

10   budget as well.

11            Q      Okay.  You handled the books, oversee

12   the financials, did the banking, coordinated with

13   management, and budget.  Did I miss anything?  I think

14   I missed one.

15            A      Partial HR.

16            Q      Okay.  Well, if I missed one --

17            MR. BILLER:  Can you read her answer back,

18   please?

19                  (The record was read by the Certified

20            Shorthand Reporter.)

21            MR. BILLER:  Okay.  I got it all.

22   BY MR. BILLER:

23            Q      All right.  Let's talk about handling

24   the books.  What did you do in terms of the book, and

25   what books are you talking about?
```

Page 37

8.    Necessary Actions. Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

9.    Waiver and Amendment.    No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

10.    Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

11.    Severability. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

12.    Governing Law And Venue. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The parties agree that they are subject to the personal jurisdiction of such courts and waive any objection to such jurisdiction and venue, including any claim that it is an inconvenient forum. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

13.    Drafting.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

14.    Counterparts. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

Thomas Wylde, LLC                           Hillshore Investments

_____                     _____
John Hanna, Manager                         Eniluz Gonzalez, General Manager

# THIRD AMENDED EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS
November 15, 2015

| Name | Contact Information | Capital Contributions and Effective Dates | No. Units | Capital Account Balance |
|------|---------------------|-------------------------------------------|-----------|-------------------------|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswvlde.com | $700<br><br>December 15, 2014 | 14 | $700 |
| The Palliative, LLC | 12114 Dewey St., Los Angeles, CA 90066 Fax: 310-559-5765 Email: jene@thomaswvlde.com | $900<br><br>December 15, 2014 | 18 | $900 |
| Stanley Ducks, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350<br><br>December 15, 2014 | 7 | $350 |
| DSRB Group, LLC | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350<br><br>December 15, 2014 | 7 | $350 |
| Paula Thomas | 2514 S. Toledo Ave. Palm Spring, CA 92264 Email: paulathomas@me.com<br><br>*With a copy to:*<br>*Laura Hess*<br>*Kring & Chung*<br>*38 Corporate Park*<br>*Irvine, CA 92606*<br>*Email: lhess@kringandchung.com* | $3,200 + intellectual property and certain liabilities<br><br>December 22, 2014 | 64 | $3,200 |
| Hillshore Investments | Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá Attn: Eniluz Gonzalez, General Manager | $5,500,000 January 1, 2015<br><br>$3,500,013 November 15, 2015 | 3390 | $9,000,013 |
| Totals | | | 3500 | $9,005,513 |

PLAINTIFF EXHIBIT   72
For Identification
Witness: MELDY DAFOLS
Date:   8—18—2017
Damon M. LeBlanc, CSR No. 11958

02240

## THOMAS WYLDE LLC Account QuickReport *All Transactions*

Net Amount advanced by TW LLC to PDTW LLC                                                                                                                                          4,337,696.03

| Date | Num | Name | Memo | Split | Amount | Balance |
|------|-----|------|------|-------|--------|---------|
| | | | | | | |
| 08/02/2014 | | PDTW LLC | OUTGOING WIRE TO CONSUMER RESOURCE - sommore to pay for David profit invoices | Bank of Manhattan 5534 | 227,250.00 | 404 000 00 |
| 08/05/2014 1 b | UNDA | | | | | |
| 09/02/2014 110 | GREATAMERICA LEASING CORP | COPER LEASE PAYMENT | | Bank of Manhattan 5534 | 1,710 88 | 407 726 21 |
| 09/05/2014 113 | DIRTY INC | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 350.00 | 497,256.21 |
| | | | | Bank of Manhattan 5534 | 8 438 90 | 408 075 01 |
| 09/05/2014 120 | DAVID BANG | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 150.77 | 496,324.78 |
| 09/05/2014 115 | ANA JOVEL | OFFICE CLEANING 09/05/14 | | Bank of Manhattan 5534 | 250.00 | 496,684.78 |
| 09/05/2014 114 | BARDOMIANO ROJAS | LABOR 09/05/14 | | Bank of Manhattan 5534 | 120.00 | 496,604.78 |
| 08/05/2014 117 | NETCENTRA | COMPUTER SUPPLIES & SERVICE | | Bank of Manhattan 5534 | 802.02 | 497,506.80 |
| 09/09/2014 121 | UNITED LEATHER | INV# 87600 | | Bank of Manhattan 5534 | 10,000.00 | 507,506.80 |
| 09/08/2014 121 | UNITED LEATHER | INV# 87600 | | Bank of Manhattan 5534 | 0.00 | 507,506.80 |
| 09/09/2014 122 | ROBYN MORGAN | OUTSIDE SERVICE 09/09/14 | | Bank of Manhattan 5534 | 80.00 | 507,586.80 |
| 09/09/2014 123 | BARDOMIANO ROJAS | LABOR = OFFICE 9.9.89 | | Bank of Manhattan 5534 | 225.84 | 507,812.64 |
| 09/12/2014 130 | WORLD ASIA LOGISTIC | INV# 980123-01 | | Bank of Manhattan 5534 | 1,234.41 | 509,106.05 |
| 09/12/2014 131 | UNITED LEATHER | INV# 87600 - 10K PAID ON 09/09/14 FROM CK# 121 | | Bank of Manhattan 5534 | 1,700.00 | 510,806.05 |
| 09/12/2014 131 | UNITED LEATHER | INV# 88272 | | Bank of Manhattan 5534 | 3,300.00 | 514,106.05 |
| 09/12/2014 132 | BERKSHIRE HATHAWAY HOMESTATE CONT | BINDER# 303078 POLICY# 2200036411-141 | | Bank of Manhattan 5534 | 774.00 | 514,840.30 |
| 09/12/2014 132 | ANA JOVEL | OFFICE CLEANING 09/13/14 | | Bank of Manhattan 5534 | 250.00 | 515,190.30 |
| 09/12/2014 134 | RAYMOND J PAYGE | P.S STORAGE RENT - SEPT | | Bank of Manhattan 5534 | 1,388.00 | 514,576.85 |
| 09/12/2014 135 | DAVID BANG | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 122.08 | 516,701.93 |
| 09/15/2014 136 | ELBA CHAVEZ | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 80.00 | 516,781.08 |
| 09/13/2014 137 | JEAN JOHNSTON | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 57.82 | 516,819.73 |
| 09/12/2014 138 | SUMAN JO | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 75.70 | 516,895.54 |
| 09/12/2014 139 | SYLVIA CHOO | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 14.41 | 516,908.95 |
| 08/17/2014 140 | DEBORAH PAYNE, | EMPLOYEE REIMBURSE | | Bank of Manhattan 5534 | 49.72 | 516,950.92 |
| 09/13/2014 141 | INDUSTRIAL COLOR | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 797.80 | 517,747.67 |
| 09/12/2014 142 | M COREY WHITTED | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 330.00 | 518,087.67 |
| 09/12/2014 143 | PRUDENTIAL INC | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 000.00 | 518,882.67 |
| 09/13/2014 144 | CLIXOTE STUDIOS, LLC | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 304.00 | 518,301.67 |
| 09/12/2014 145 | URBAN PLATE LLC | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 1,080.00 | 518,051.67 |
| 09/12/2014 146 | VICTOR BALDANA | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 350.00 | 520,301.67 |
| 09/12/2014 147 | CAITLIN MYERS | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 350.00 | 520,651.67 |
| 09/12/2014 148 | MAGNET LA | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 000.00 | 521,551.67 |
| 09/12/2014 149 | YIOTIS PANAYKOTOLU | THOMAS WYLDE PHOTOSHOOT AW14 | | Bank of Manhattan 5534 | 750.00 | 522,301.67 |
| 09/12/2014 150 | ROSEMARY CUSTOM KITCHEN DESIGN | REPAIR - FITTING ROOM SLIDING DOOR | | Bank of Manhattan 5534 | 80.00 | 522,381.67 |
| 09/17/2014 WIRE | SUN MOON | SMDTW14-4232 | | Bank of Manhattan 5534 | 50,523.30 | 573,904.97 |
| 09/22/2014 151 | BLACKWELDER FEE OWNER LLC | RENT - AUGUST 14 | | Bank of Manhattan 5534 | 33,186.07 | 606,073.04 |
| 09/22/2014 152 | BLACKWELDER FEE OWNER LLC | RENT- SEPT 14 | | Bank of Manhattan 5534 | 36,000.00 | 636,073.04 |
| 09/25/2014 WIRE | PDTW, LLC | Memo:MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO PDTW LLC | | Bank of Manhattan 5534 | 218,000.00 | 846,073.04 |
| 10/01/2014 WIRE | VENDOME GLOBAL PARTNERS LLC | ADVANCE TO PDTW LLC | | Bank of Manhattan 5534 | 62,000.00 | 908,073.04 |
| 10/07/2014 156 | Louis Page Oversure | 10/06-07/14 | | Bank of Manhattan 5534 | 481.53 | 908,504.57 |
| 10/10/2014 157 | DADA | SEPTEMBER SAMPLE FEE | | Bank of Manhattan 5534 | 18,018.83 | 878,451.42 |
| 10/15/2014 158 | UNITED LEATHER | Memo:CHECK PAID | | Bank of Manhattan 5534 | 5,000.00 | 533,451.42 |
| 10/15/2014 ADH | | AMEX PAYMENT - PARTIAL FOR PDTW | | Bank of Manhattan 5534 | 32,405.11 | 966,056.53 |
| 10/15/2014 WIRE | | MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO PDTW, LLC | | Bank of Manhattan 5534 | 155,000.00 | 1,131,056.53 |
| 10/28/2014 154 | DADA | INVOICE # MC-15-1408 PPS10 BULK FABRIC TO LMU | | Bank of Manhattan 5534 | 8,208.83 | 1,137,115.09 |
| 10/29/2014 154 | DADA | INVOICE # MC-13-1408 PPS15 BULK FABRIC TO LMU | | Bank of Manhattan 5534 | 6,269.76 | 1,143,409.86 |
| 10/28/2014 154 | DADA | INVOICE # MC-13-1408 PPS15 BULK FABRIC TO LMU | | Bank of Manhattan 5534 | 9,328.84 | 1,151,728.47 |
| 11/07/2014 160 | DAVID SCHNADER | 0013-H&M FASHION, LLC - JM LLC FORMATION | | Bank of Manhattan 5534 | 1,311.88 | 1,153,841.07 |
| 11/09/2014 155 | DADA | INVOICE # MC-3-5429 PPS11 BULK FABRIC TO LMU | | Bank of Manhattan 5534 | 6,444.80 | 1,150,380.57 |
| 11/09/2014 159 | DADA | INVOICE # MC-75-1408 PPS15 BULK FABRIC TO LMU | | Bank of Manhattan 5534 | 374.85 | 1,159,760.02 |
| 11/14/2014 165 | NETCENTRA | INVOICE 34715 | | Bank of Manhattan 5534 | 2,348.75 | 1,162,156.57 |
| 11/14/2014 166 | GREATAMERICA LEASING CORP | Memo:CHECK PAID | | Bank of Manhattan 5534 | 1,679.83 | 1,163,828.30 |
| 11/14/2014 167 | BERKSHIRE HATHAWAY HOMESTATE CONT | Memo:CHECK PAID | | Bank of Manhattan 5534 | 776.00 | 1,164,611.30 |
| 11/14/2014 168 | MURPHY ROSEM | 08/00/13 | | Bank of Manhattan 5534 | 2,766.01 | 1,167,377.40 |
| 11/14/2014 169 | BLACKWELDER FEE OWNER LLC | NOV.14 | | Bank of Manhattan 5534 | 30,000.00 | 1,197,377.40 |
| 11/14/2014 171 | WORLD ASIA LOGISTIC | INV 20-45-00098-01-02 | | Bank of Manhattan 5534 | 980.80 | 1,198,358.00 |
| 11/14/2014 171 | WORLD ASIA LOGISTIC | INV 20-95-00098-01-03 | | Bank of Manhattan 5534 | 75.00 | 1,198,433.00 |
| 11/14/2014 168 | MURPHY ROSEM | 10/31/13 | | Bank of Manhattan 5534 | 2,223.80 | 1,200,656.80 |
| 11/14/2014 172 | RAYMOND J PAIGE | NOV 2014 | | Bank of Manhattan 5534 | 1,388.00 | 1,202,055.00 |
| 11/14/2014 173 | UNITED LEATHER | INV I 00589 | | Bank of Manhattan 5534 | 3,348.14 | 1,205,401.13 |
| 11/14/2014 173 | UNITED LEATHER | INV 100689 | | Bank of Manhattan 5534 | 1,804.88 | 1,207,205.99 |
| 11/14/2014 174 | MINA CHO BEAD WORK | 705812 | | Bank of Manhattan 5534 | 800.00 | 1,207,605.99 |
| 11/14/2014 WIRE | VENDOME GLOBAL PARTNERS LLC | Memo:MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO VENDOME GLOBAL PARTNERS | | Bank of Manhattan 5534 | 840.00 | 1,207,600.99 |
| 11/14/2014 WIRE | JJ & CO | Memo:IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO JJ AND COLLECTION | | Bank of Manhattan 5534 | 43,532.71 | 1,262,943.30 |
| 11/14/2014 WIRE | LMU | Memo:IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO MAX YOUNG WYO | | Bank of Manhattan 5534 | 11,380.00 | 1,264,238.50 |
| 11/14/2014 WIRE | WORLD ASIA LIE | Memo:IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO WORLDWIDE ASIA LOGISTICS LTD | | Bank of Manhattan 5534 | 2,058.52 | 1,208,375.80 |
| 12/03/2014 170 | ANA JOVEL | CLEANING 11/29/2014 | | Bank of Manhattan 5534 | 250.00 | 1,286,625.03 |
| 10/21/2014 579 | MINA CHO BEAD WORK | INV# 705816 | | Bank of Manhattan 5534 | 540.00 | 1,247,165.02 |
| 10/21/2014 180 | UNITED LEATHER | INV# 101926 | | Bank of Manhattan 5534 | 5,200.00 | 1,302,165.02 |
| 11/26/2014 | MK ACCESSORY | IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO MK ACCESSORY | | Bank of Manhattan 5534 | 29,143.00 | 1,328,308.02 |
| 11/26/2014 | SUN MOON | IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO SUN MOON TEXTILE | | Bank of Manhattan 5534 | 206,856.99 | 1,534,205.01 |
| 11/26/2014 981 | NETCENTRA | INV# 34176 | | Bank of Manhattan 5534 | 132.90 | 1,534,587.91 |
| 11/26/2014 981 | NETCENTRA | INV# 34200 | | Bank of Manhattan 5534 | 735.34 | 1,537,533.05 |

PLAINTIFF EXHIBIT 75
For Identification
Witness: MELDY RAFOLS
Date: 8-18-2017
Damon M. LeBlanc, CSR No. 11958

# THOMAS WYLDE LLC Account QuickReport All Transactions

| Date | Name | Memo | Account | Amount | Balance |
|------|------|------|---------|--------|---------|
| 11/20/2014 183 | UNITED LEATHER | INV 103620 | Bank of Manhattan 5534 | 6,176.47 | 1,942,511.32 |
| 11/20/2014 183 | UNITED LEATHER | INV 405262 | Bank of Manhattan 5534 | 630.00 | 1,942,081.32 |
| 11/26/2014 184 | MINA CHO BEAD WORK | Memo:CHECK PAID | Bank of Manhattan 5534 | 1,200.00 | 1,940,181.32 |
| 11/26/2014 | UNLI | IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO MIN YOUNG MYO (UNLI TRADING) | Bank of Manhattan 5534 | 85,796.30 | 1,830,085.02 |
| 12/01/2014 ACH | Arthurs Blue Cross | DED MEDICAL | Bank of Manhattan 5534 | 8,207.95 | 1,838,887.17 |
| | A...IL DELTA | DED DENTAL | Bank of Manhattan 5534 | | |
| 12/03/2014 182 | Mattrix Communications | INVOICE 517 FOR TWY | Bank of Manhattan 5534 | 2,500.00 | 1,838,948.71 |
| | L... | C... | | | |
| 12/05/2014 WIRE | SUN MOON | SMOTW14-37 | Bank of Manhattan 5534 | 3,337.95 | 1,845,909.01 |
| 12/05/2014 WIRE | SUN MOON | SMOTW14-39 | Bank of Manhattan 5534 | 2,868.50 | 1,846,472.51 |
| 12/05/2014 WIRE | SUN MOON | SMOTW14-40 | Bank of Manhattan 5534 | 205.00 | 1,846,678.91 |
| 12/05/2014 WIRE | SUN MOON | DUP CREDIT | Bank of Manhattan 5534 | (123.00) | 1,845,854.62 |
| 12/05/2014 WIRE | MK ACCESSORY | Memo:IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO MK ACCESSORY | Bank of Manhattan 5534 | 5,000.00 | 1,851,954.52 |
| 12/04/2014 182 | 1 MODEL MANAGEMENT LLC | INV 2029160 | Bank of Manhattan 5534 | 12,000.00 | 1,868,554.52 |
| 12/04/2014 182 | 1 MODEL MANAGEMENT LLC | 20% AGENCY FEE | Bank of Manhattan 5534 | 2,400.00 | 1,867,654.52 |
| 12/04/2014 182 | 1 MODEL MANAGEMENT LLC | AIRFARE | Bank of Manhattan 5534 | 720.00 | 1,868,344.52 |
| 12/04/2014 | POTW, LLC | MIA VIP SALE CARD BATCH | Bank of Manhattan 5534 | (1,459.89) | 1,867,244.63 |
| 12/08/2014 | POTW, LLC | MIA VIP SALE CARD BATCH | Bank of Manhattan 5534 | (7,466.50) | 1,905,778.23 |
| 12/08/2014 ACH | AMERICAN EXPRESS 0-22935 | Memo:PREAUTHORIZED ACH DEBIT AMEX EPayment ACH PMT 14136 | Bank of Manhattan 5534 | 87,809.34 | 1,723,740.30 |
| 12/09/2014 185 | BLACKHOLDER FEE OWNER LLC | December 14, Rent | Bank of Manhattan 5534 | 30,000.00 | 1,793,745.30 |
| 12/19/2014 177 | VENDORS GLOBAL PARTNERS LLC | Memo:CHECK PAID | Bank of Manhattan 5534 | 21,800.00 | 1,593,245.30 |
| 12/19/2014 Wire | POTW, LLC | Memo:MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO POTW LLC | Bank of Manhattan 5534 | 100,000.00 | 1,959,245.30 |
| 12/19/2014 WIRE | SUN MOON | SMOTW14-42C3 | Bank of Manhattan 5534 | 3,000.00 | 1,958,945.36 |
| 12/19/2014 WIRE | SUN MOON | SMOTW14-42B1 | Bank of Manhattan 5534 | 14,175.00 | 1,812,420.36 |
| 12/19/2014 WIRE | SUN MOON | SMOTW14-42K3 | Bank of Manhattan 5534 | 119.00 | 1,812,536.39 |
| 12/19/2014 | MARIO BELLUCCI | IND INTERNATNL MONEY TRANS DB OUTGOING WIRE TO MARIO BELLUCCI | Bank of Manhattan 5534 | 13,328.63 | 1,823,857.01 |
| 12/17/2014 207 | MADISON DIXON | VIP EVENT SALES 12 17 14 | Bank of Manhattan 5534 | 600.00 | 1,926,387.01 |
| 12/19/2014 210 | JAMES HONG | INTERN 12/16-12/17/14 | Bank of Manhattan 5534 | 0.00 | 1,923,907.01 |
| 12/19/2014 | POTW, LLC | NY VIP 12/13/14 | Bank of Manhattan 5534 | (5,460.40) | 1,922,907.01 |
| 12/19/2014 210 | POTW, LLC | NY VIP 12/16/14 | Bank of Manhattan 5534 | (8,117.00) | 1,919,790.01 |
| 12/19/2014 210 | JAMES HONG | Intern 12/16-17/14 | Bank of Manhattan 5534 | 408.44 | 1,917,197.36 |
| 12/19/2014 187 | UNITED LEATHER | INVOICE 108175 | Bank of Manhattan 5534 | 8,980.60 | 1,922,777.36 |
| 12/19/2014 187 | UNITED LEATHER | INVOICE 108176 | Bank of Manhattan 5534 | 9,210.39 | 1,922,888.73 |
| 12/19/2014 188 | 1 MODEL MANAGEMENT LLC | FEE INV# 2045003 | Bank of Manhattan 5534 | 25,000.00 | 1,880,888.73 |
| 12/19/2014 188 | 1 MODEL MANAGEMENT LLC | 20% AGENCY FEE | Bank of Manhattan 5534 | 6,000.00 | 1,893,308.73 |
| 12/19/2014 188 | 1 MODEL MANAGEMENT LLC | EXPENSE - TRANSPORTATION | Bank of Manhattan 5534 | 341.00 | 1,892,527.73 |
| 12/19/2014 188 | PHOTOGENICS | INVOICE 2757 | Bank of Manhattan 5534 | 5,000.00 | 1,888,527.73 |
| 12/19/2014 190 | REX, INC | INVOICE-ESI12641 | Bank of Manhattan 5534 | 900.00 | 1,888,727.73 |
| 12/19/2014 191 | MURPHY ROSEN | Memo:CHECK PAID | Bank of Manhattan 5534 | 5,000.00 | 1,874,737.73 |
| 12/19/2014 192 | PEAK MODELS & TALENT | INVOICE 84964 | Bank of Manhattan 5534 | 225.00 | 1,874,082.73 |
| 12/19/2014 192 | PEAK MODELS & TALENT | INVOICE 84758 | Bank of Manhattan 5534 | 225.00 | 1,876,187.73 |
| 12/19/2014 193 | ANA JOVEL | OFFICE CLEANING 12/20/14 | Bank of Manhattan 5534 | 250.00 | 1,876,437.73 |
| 12/19/2014 | POTW, LLC | OFFICE SALE 12/17/14 | Bank of Manhattan 5534 | (11,401.50) | 1,864,036.23 |
| 12/22/2014 WIRE | MK ACCESSORY | MK236 | Bank of Manhattan 5534 | 10,860.00 | 1,874,633.23 |
| 12/22/2014 WIRE | MK ACCESSORY | MK227 | Bank of Manhattan 5534 | 332.00 | 1,874,884.23 |
| 12/22/2014 WIRE | JJ & CO. | POTW Vendor payment | Bank of Manhattan 5534 | 984.20 | 1,875,839.56 |
| 12/22/2014 WIRE | MASTER INTL AIR | POTW Vendor payment | Bank of Manhattan 5534 | 3,388.42 | 1,872,194.80 |
| 12/22/2014 233 | JAMES HONG | HELP-YEAR-END INVENTORY COUNT 12/13/14 | Bank of Manhattan 5534 | 66.00 | 1,879,200.80 |
| 12/23/2014 WIRE | SUN MOON | SMOTW14-42K4 | Bank of Manhattan 5534 | 1,000.00 | 1,880,700.80 |
| 12/23/2014 WIRE | SUN MOON | SMOTW14-42X5 | Bank of Manhattan 5534 | 3,000.00 | 1,883,500.80 |
| 12/23/2014 WIRE | SUN MOON | SMOTW14-42K7 | Bank of Manhattan 5534 | 13,408.00 | 2,001,908.80 |
| 12/23/2014 WIRE | SUN MOON | SMOTW14-42K8 | Bank of Manhattan 5534 | 37.81 | 2,001,946.80 |
| 12/23/2014 211 | DUWA LAI | INTERN 12/18-12/23/14 32 HRS @ 12 = GAS MILEAGE | Bank of Manhattan 5534 | 385.42 | 2,002,942.92 |
| 12/23/2014 213 | JOANNE LEE | INTERN 12/23-12/14 10HRS@ 12 | Bank of Manhattan 5534 | 159.00 | 2,002,486.02 |
| 12/24/2014 WIRE | H&H FASHION LLC | Memo:MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO H&H FASHION LLC | Bank of Manhattan 5534 | 23,877.53 | 2,029,476.55 |
| 12/24/2014 WIRE | PALLIATIVE, LLC | Memo:MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO PALLIATIVE LLC | Bank of Manhattan 5534 | 8,223.33 | 2,034,606.86 |
| 12/28/2014 184 | UNITED LEATHER | INVOICE 108173 | Bank of Manhattan 5534 | 6,908.28 | 2,040,814.13 |
| 12/28/2014 184 | UNITED LEATHER | INVOICE 108178 | Bank of Manhattan 5534 | 430.00 | 2,041,244.13 |
| 12/28/2014 185 | TELEPACIFIC COMMUNICATION | POTW Vendor payment | Bank of Manhattan 5534 | 800.53 | 2,042,044.66 |
| 12/28/2014 190 | PREMIUM ASSIGNMENT CORP. | Insurance | Bank of Manhattan 5534 | 538.71 | 2,042,384.37 |
| 12/28/2014 187 | METCENTRA | INVOICE 30245 | Bank of Manhattan 5534 | 285.00 | 2,042,869.37 |
| 12/29/2014 188 | ANA JOVEL | OFFICE CLEANING 12/27/14 | Bank of Manhattan 5534 | 250.00 | 2,043,119.37 |
| 12/29/2014 189 | WORLDNET INTL. | INVOICE 10001187 | Bank of Manhattan 5534 | 4,868.48 | 2,047,778.62 |
| 12/29/2014 WIRE | CBC PARTNERS I, LLC | CBC note payment on behalf of POTW LLC | Bank of Manhattan 5534 | 1,230,015.93 | 3,059,791.46 |
| 12/30/2014 WIRE | CBC PARTNERS I, LLC | Additional interest for 12/26-29/14 paid on behalf of POTW | Bank of Manhattan 5534 | 3,658.29 | 3,086,447.70 |
| 12/31/2014 201 | ANA JOVEL | OFFICE CLEANING 01/03/05 | Bank of Manhattan 5534 | 250.00 | 3,069,697.70 |
| 12/31/2014 | ANNA ZUYEVA | MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO ANNA ZUYEVA | Bank of Manhattan 5534 | 2,017.06 | 3,082,714.70 |
| 12/31/2014 | Steve PRIESTEMON | MONEY TRANSFER ADJUSTMENT OUTGOING WIRE TO STEVE PRIESTEMON | Bank of Manhattan 5534 | 350,336.62 | 4,082,051.71 |
| 01/20/2015 83 | MARIO BELLUCCI | DP816-18 FEDEX 772850694300 | Accounts Payable | 0.00 | 4,052,051.71 |
| 02/03/2015 | | Awards Goods Private Sale from P918 inventory - paid to bank | Bank of Manhattan 5534 | (2,193.00) | 4,049,858.71 |
| 02/03/2015 CO#101 0521 | AMERICAN EXPRESS 0-22935 | american express payment | Bank of Manhattan 5534 | 47,010.74 | 4,096,897.48 |
| 02/04/2015 209 | MURPHY ROSEN | Self-Bess legal fees - partial payment | Bank of Manhattan 5534 | 5,000.00 | 4,101,867.45 |
| 02/06/2015 270 | AMERICAN TANNING & LEATHER LLC | INVOICE 33317 | Bank of Manhattan 5534 | 77.67 | 4,101,945.32 |
| 02/06/2015 270 | AMERICAN TANNING & LEATHER LLC | INVOICE 33282 | Bank of Manhattan 5534 | 1,590.14 | 4,103,535.46 |
| 02/06/2015 271 | UNITED LEATHER | INV 108853 | Bank of Manhattan 5534 | 1,828.67 | 4,105,464.33 |
| 02/06/2015 271 | UNITED LEATHER | INV 108857 | Bank of Manhattan 5534 | 6,000.00 | 4,111,464.33 |
| 02/06/2015 271 | UNITED LEATHER | INV 110055 | Bank of Manhattan 5534 | 8,500.00 | 4,119,044.33 |
| 02/06/2015 271 | UNITED LEATHER | INV 108716 | Bank of Manhattan 5534 | 3,250.00 | 4,123,394.33 |
| 02/06/2015 272 | DADA | MC-19-1411 | Bank of Manhattan 5534 | 8,913.18 | 4,129,207.49 |
| 02/06/2015 272 | DADA | MC-21-1411 | Bank of Manhattan 5534 | 3,713.10 | 4,132,920.80 |

THOMAS WYLDE LLC Account QuickReport All Transactions

| Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|
| 02/06/2015 | 272 | DADA | MC-29-1411 | Bank of Manhattan 5534 | 4,45... | 4,16...34... |
| 02/06/2015 | 272 | DADA | MC-33-1411 | Bank of Manhattan 5534 | 17,468.60 | 4,185,011.46 |
| 02/06/2015 | 272 | DADA | MC-63-1411 | Bank of Manhattan 5534 | 12,023.50 | 4,167,636.34 |
| 02/06/2015 | 272 | DADA | MC-66-1411 | Bank of Manhattan 5534 | 21,756.49 | 4,198,760.72 |
| 02/06/2015 | 272 | DADA | MC-82-1411 | Bank of Manhattan 5534 | 79.05 | 4,198,888.77 |
| 02/06/2015 | ... | DADA | MC-... | Bank of Manhattan 5534 | ... | ... |
| 02/06/2015 | 272 | DADA | MC-10-1412 | Bank of Manhattan 5534 | 22,273.48 | 4,223,695.53 |
| ... | ... | DADA | ... | Bank of Manhattan 5534 | ... | ... |
| 02/06/2015 | 272 | DADA | MC-12-1412 | Bank of Manhattan 5534 | 291.72 | 4,224,118.33 |
| 02/06/2015 | 272 | DADA | MC-6-1412 | Bank of Manhattan 5534 | 1,980.86 | 4,226,103.31 |
| 02/06/2015 | 272 | DADA | MC-13-1412 | Bank of Manhattan 5534 | 1,318.46 | 4,227,421.77 |
| 02/06/2015 | 8515 | ADI CO.,LTD | S315 Customer deposit for TW LLC order - deposited in PDTW account | Customer Deposit | 157,356.75 | 4,384,778.52 |
| 02/13/2015 | 288 | UNITED LEATHER | INVOICE 109854 | Bank of Manhattan 5534 | 17,772.75 | 4,402,651.27 |
| 02/13/2015 | 288 | UNITED LEATHER | INVOICE 109854 | Bank of Manhattan MD4 | 1,013.91 | 4,403,565.38 |
| 02/13/2015 | 288 | UNITED LEATHER | INVOICE 109853 | Bank of Manhattan MD4 | 81.80 | 4,403,646.99 |
| 02/17/2015 | | CHASE | PDTW Credit Card settlement | Bank of Manhattan 5534 | 29,409.88 | 4,433,056.87 |
| 02/20/2015 | | ADI CO.,LTD | PF16 GARMET ( BILLED TO PDTW) | Bank of America 0527 | (3,672.00) | 4,429,384.87 |
| 03/06/2015 | 307 | DADA | MC-29-1412 | Bank of Manhattan 5534 | 2,913.35 | 4,432,297.02 |
| 03/06/2015 | 307 | DADA | MC-37-1412 | Bank of Manhattan 5534 | 484.98 | 4,432,783.00 |
| 03/06/2015 | 307 | DADA | MC-20-1412 | Bank of Manhattan 5534 | 3,494.12 | 4,436,268.10 |
| 03/06/2015 | 307 | DADA | MC-57-1412 | Bank of Manhattan 5534 | 2,839.01 | 4,439,087.11 |
| 03/06/2015 | 307 | DADA | MC-50-1412 | Bank of Manhattan 5534 | 488.85 | 4,439,576.00 |
| 03/06/2015 | 307 | DADA | MC-90-1412 | Bank of Manhattan 5534 | 103.30 | 4,438,680.19 |
| 03/06/2015 | 307 | DADA | MC-43-1412 | Bank of Manhattan 5534 | 22,688.00 | 4,462,368.19 |
| 03/06/2015 | 307 | DADA | MC-60-1412 | Bank of Manhattan 5534 | 3,254.80 | 4,465,621.06 |
| 03/06/2015 | 307 | DADA | MC-74-1412 | Bank of Manhattan 5534 | 3,392.55 | 4,469,013.01 |
| 03/06/2015 | 307 | DADA | MC-79-1412 | Bank of Manhattan 5534 | 5,320.20 | 4,474,333.81 |
| 03/06/2015 | 307 | DADA | MC-91-1412 | Bank of Manhattan 5534 | 8,928.80 | 4,484,262.51 |
| 03/06/2015 | 307 | DADA | MC-80-1412 | Bank of Manhattan 5534 | 4,457.73 | 4,488,720.04 |
| 03/06/2015 | 307 | DADA | MC-79-1412 | Bank of Manhattan 5534 | 6,138.20 | 4,492,868.24 |
| 03/06/2015 | 307 | DADA | DD1215-PF15 DUP | Bank of Manhattan 5534 | 43,809.64 | 4,537,674.98 |
| 03/06/2015 | 307 | DADA | DD1219-2-PF16 SSUN | Bank of Manhattan 5534 | 9,243.04 | 4,546,917.92 |
| 03/06/2015 | 307 | DADA | SY-7-1411 | Bank of Manhattan 5534 | 600.00 | 4,547,517.92 |
| 03/09/2015 | ACH | AMERICAN EXPRESS 0-22000 | PDTW Amex card settlement | Bank of Manhattan 5534 | 34,769.76 | 4,582,287.69 |
| 03/17/2015 | JJ150317-1000 | JJ & CO. | DP518-25 TWM DEV LEA- FAUX CROCO | Accounts Payable | 0.00 | 4,582,287.69 |
| 03/18/2015 | 0140041 | MARIO BELLUCCI | DPS16.35 TWM DUPS & PROD | Accounts Payable | 0.00 | 4,582,287.69 |
| 03/18/2015 | 0140052 | MARIO BELLUCCI | DP83-R-83 TWM DUP3 & PROD | Accounts Payable | 0.00 | 4,582,287.69 |
| 03/24/2015 | JJ50327-1G | JJ & CO. | DP816-28 TWM | Accounts Payable | 0.00 | 4,582,287.69 |
| 03/27/2015 | JJ150327-2KI | JJ & CO. | DP816-26 TWM | Accounts Payable | 0.00 | 4,582,287.69 |
| 03/27/2015 | JJ150327-1000 | JJ & CO. | DP816-46 TWLA TO MK | Accounts Payable | 0.00 | 4,582,287.69 |
| 04/16/2015 | 329 | DADA | DD0113-AW15MSUN | Bank of Manhattan 5534 | 23,272.92 | 4,606,560.59 |
| 04/15/2015 | 329 | DADA | DD0113-AW15RDUP | Bank of Manhattan 5534 | 37,462.60 | 4,630,023.40 |
| 04/15/2015 | 329 | DADA | DD0121-DD15JS | Bank of Manhattan 5534 | 12,790.00 | 4,640,763.40 |
| 04/15/2015 | 329 | DADA | MC-58-1901 | Bank of Manhattan 5534 | 70.00 | 4,648,823.40 |
| 04/15/2015 | 329 | DADA | DD0130-TW I AW15 OU | Bank of Manhattan 5534 | 84,240.98 | 4,706,263.80 |
| 04/15/2015 | 329 | DADA | DD0136-TWMAW15 | Bank of Manhattan 5534 | 1,737.60 | 4,701,801.40 |
| 04/22/2015 | SALE | | UMB BANKING PYMT PROC 150421 8601001 8002003 | Bank of Manhattan 5534 | (70,444.73) | 4,631,366.71 |
| 04/22/2015 | SALE | | AMERICAN EXPRESS SETTLEMENT 150422 304457908 | Bank of Manhattan 5534 | (58,808.20) | 4,568,368.71 |
| 04/22/2015 | SALE | | UMB BANKING PYMT PROC 180422 8601001 8002003 | Bank of Manhattan 5534 | (2,000.00) | 4,560,308.71 |
| 04/22/2015 | | | AMERICAN EXPRESS SETTLEMENT 150423 304457908 | Bank of Manhattan 5534 | (2,000.00) | 4,531,388.71 |
| 04/27/2015 | 372 | Michael Shiffman | Michael Schiffman settlement - initial payment | Bank of Manhattan 5534 | 30,000.00 | 4,521,388.71 |
| 05/04/2015 | | | fund transfer | Bank of Manhattan 5534 | (20,000.00) | 4,501,388.71 |
| 05/06/2015 | JJ150506-100K | JJ & CO. | DP818-29 TWLA DEV, IVY LEA | Accounts Payable | 0.00 | 4,501,388.71 |
| 05/11/2015 | CHI08 | CHI08 STORE SARL | Consignment PS15 | Bank of America 0527 | (450.00) | 4,500,946.71 |
| 05/19/2015 | | | Funds Transfer | Bank of Manhattan 5534 | (10,000.00) | 4,590,946.71 |
| 06/26/2015 | | Four Star Trim | Four Star Trim - Design supplies | Accounts Payable | (952.00) | 4,589,906.71 |
| 07/06/2015 | JJ150706-12PI | JJ & CO. | DE218-23 TWLA BAG LEATHER | Accounts Payable | 0.00 | 4,590,008.71 |
| 08/12/2015 | | | Deposit - Add settlement | Bank of Manhattan 5534 | 1,000.00 | 4,414,905.71 |
| 08/27/2015 | | | Funds Transfer | Bank of Manhattan 5534 | (1,000.00) | 4,413,906.71 |
| 08/18/2015 | | | Deposit | Bank of Manhattan 5534 | 12,000.00 | 4,425,906.71 |
| 08/19/2015 | Wire | Michael Shiffman | Michael L Schiffman Trust | Bank of Manhattan 5534 | 12,000.00 | 4,425,906.71 |
| | | | | | 4,425,906.71 | 4,425,906.71 |
| | | | | | 4,425,906.71 | 4,425,906.71 |

| Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|
| Deposit from POTW LLC | | | | | | |
| 08/29/2014 | | | Funds Transfer | Bank of America | 10,000.00 | 10,000.00 |
| 08/29/2014 | | | Funds Transfer | Bank of America | 6,000.00 | 15,000.00 |
| 09/17/2014 | | POTW, LLC | From PDTW Clearer Account | Bank of Manhattan 5534 | 10,000.00 | 25,000.00 |
| 09/24/2014 | 1 | POTW, LLC | VOID | Bank of America | 0.00 | 25,000.00 |
| 12/19/2014 | | | office chairs from HOUZZ INC | Furniture and Fixtures | 1,336.80 | 23,335.40 |
| 12/26/2014 | Wire | POTW | Transfer to BOA from Chase | Bank of America | 10,000.00 | 36,335.40 |
| 12/26/2014 | | | office chair from HOUZZ INC | Furniture and Fixtures | 398.00 | 36,733.40 |
| 01/03/2015 | | ANA JOVEL | | 6300 Repairs and Master | 253.00 | 36,980.80 |
| 01/07/2015 | | | Office Furniture- 2 outdoor table & 8 chairs FROM CLASSIC TILE & MOSAIC | Furniture and Fixtures | 1,658.83 | 38,043.42 |
| 01/09/2015 | 2 | ANA JOVEL | OFFICE CLEANING 1/18/15 | 6300-01 Cleaning Expense | 250.00 | 38,193.42 |
| 01/03/2015 | | | Office Chair from HOUZZ INC for Jose | Furniture and Fixtures | 329.00 | 38,422.42 |
| 01/08/2015 | | | OFFICE FURNITURE - TWA LC - patio chair from PLUMBERS | 6300 Management Fee | 1,858.73 | 41,281.15 |
| 01/18/2015 | | MILDY RAPOLS | | 6300 Management Fee | 3,750.00 | 45,131.15 |
| 01/15/2015 | QU 011516 | LEXUS FINANCIAL SERVICES | Lexus - car lease payment for Jose paid by PDTW | Employee Advances | 890.97 | 46,021.12 |

## THOMAS WYLDE LLC Account QuickReport All Transactions

| | | | | | |
|---|---|---|---|---|---|
| 01/16/2015 | | Office Furniture- Conv. from from PARTNERS | Furniture and Fixtures | [illegible] | [illegible] |
| 01/16/2015 | VSP | Fab Value paid by Chase POTW | Prepaid Expenses | 111.00 | 48,434.87 |
| 01/23/2015 Wire | POTW, LLC | Fund transfer from POTW LLC to TW LLC | Bank of Manhattan 8534 | 25,000.00 | 73,434.87 |
| 01/28/2015 | R.A. RIVELA CONSTRUCTION CO | paid by chase check | Accounts Payable | 1,653.00 | 75,087.87 |
| 02/17/2015 | LEXUS FINANCIAL SERVICES | Jason's car lease - deduction from Emp salary | Employee Advances | 689.97 | 75,777.84 |
| [illegible] | [illegible] | [illegible] | Accounts Receivable | [illegible] | [illegible] |
| 02/17/2015 S815 | CLUB DESIGNER | S815 | Accounts Receivable | (11,185.00) | [illegible] |
| [illegible] | [illegible] | [illegible] | Customer Deposit | [illegible] | [illegible] |
| 02/24/2015 S815 | MADAME DE POMPADOUR | S815 | Accounts Receivable | (8,452.00) | 37,686.34 |
| 02/28/2015 | | S815 PAYMENT RCVD TO POTW | Bank of Manhattan 8534 | 38,321.50 | 76,007.84 |
| [illegible] S815 | JUST ONE EYE | S815 RECEIVED TO POTW LLC | Accounts Receivable | (7,480.00) | 68,527.84 |
| 03/02/2015 | POTW, LLC | S815 RECEIVED TO POTW LLC | Bank of Manhattan 8534 | 7,000.00 | 75,027.84 |
| 03/06/2015 | | [illegible] S815 payment [illegible] by [illegible] | Cash In [illegible] | 6,918.50 | 81,[illegible].34 |
| 03/16/2015 S815 | LANE CRAWFORD HK | S815 | Accounts Receivable | (4,032.00) | 77,[illegible].34 |
| 03/25/2015 S815 | LT APPAREL LIMITED | S815 | Accounts Receivable | (24,856.00) | 53,[illegible].34 |
| 03/26/2015 S815 | LANE CRAWFORD BEIJING | S815 | Accounts Receivable | (5,576.00) | 47,463.34 |
| 03/30/2015 | | S815 PYMT RCVD TO POTW CHASE | Bank of Manhattan 8534 | 34,353.00 | 81,[illegible].34 |
| 04/16/2015 | | Funds Transfer | Bank of Manhattan 8534 | 14,820.00 | 96,[illegible].34 |
| 04/16/2015 S815 | OXYGENE | S815 | Accounts Receivable | (14,820.00) | 81,[illegible].34 |
| 04/21/2015 PF15 DPS | YUAN YUAN | PF15 | Customer Deposit | (10,220.00) | 71,[illegible].34 |
| 04/22/2015 | | Funds Transfer | Bank of Manhattan 8534 | 10,220.00 | 81,[illegible].34 |
| 05/14/2015 S815 | QUARTIER 206 | S815 | Accounts Receivable | (1,265.00) | 80,[illegible].34 |
| 05/26/2015 | | Funds Transfer | Bank of Manhattan 8534 | 11,487.50 | 92,[illegible].84 |
| 05/29/2015 S815 | CULT | S815 | Accounts Receivable | (11,487.50) | 80,[illegible].34 |
| 05/29/2015 | | VAT REFUND FROM PARIS TRIP | Bank of Manhattan 8534 | 7,[illegible] | [illegible] |
| 06/18/2015 | HARVEY NICHOLS-ISTANBUL | S815 | Accounts Receivable | (7,510.00) | 80,[illegible] |
| 06/18/2015 | | Deposit | Bank of Manhattan 8534 | 7,510.00 | 88,200.[illegible] |
| 07/06/2015 | | PF15-16 | Bank of Manhattan 8534 | 20,[illegible] | 108,[illegible] |
| 07/09/2015 PF15 | HARVEY NICHOLS-HK | PF15 | Accounts Receivable | (20,[illegible]) | [illegible] |
| 08/04/2015 | | Deposit | Bank of Manhattan 8534 | 3,000.00 | 91,[illegible] |
| 08/04/2015 | | Deposit | Bank of Manhattan 8534 | 13,[illegible].00 | 104,[illegible] |
| 08/04/2015 PF15 | OXYGENE | PF15 | Accounts Receivable | (13,300.00) | 91,[illegible] |
| 08/04/2015 PF15 | JOAN SHEPP | PF15 | Accounts Receivable | (3,000.00) | [illegible] |
| 08/06/2015 | | Deposit | Bank of Manhattan 8534 | [illegible] | [illegible] |
| 08/06/2015 AW15 | DISTRACTIONS | AW15 | Accounts Receivable | ([illegible]) | [illegible] |
| 08/13/2015 | | Deposit | Bank of Manhattan 8534 | 14,575.00 | 102,[illegible] |
| 08/13/2015 AW15 | HARVEY NICHOLS-ISTANBUL | AW15 | Accounts Receivable | (14,575.00) | 88,[illegible] |
| 08/20/2015 | | PF15 PYMT RCVD TO CHASE | Bank of Manhattan 8534 | 3,[illegible] | 91,[illegible] |
| 08/20/2015 PF15 | JOAN SHEPP | PF15 | Accounts Receivable | ([illegible]) | 88,[illegible] |
| | | | | [illegible] | [illegible] |
| | | | | [illegible] | [illegible] |