[return - sent]

142:25 143:4,13
143:21 144:10
145:16,19 146:6
149:9 155:22
156:3
**returns** 5:5,7 78:2
102:3 106:3
119:12 121:22
135:16 145:5
152:23
**revenue** 132:24
135:6,7
**revenues** 38:8
**review** 11:19
12:20 13:13 83:19
109:11,13,15,17
**richard** 3:8,8 6:17
14:3,8 64:19
65:24
**right** 1:4 2:4 12:4
14:22 22:24 27:15
31:5 33:14 34:24
36:3 37:23 38:14
38:19 47:11,13
49:7 50:19 51:8
51:10,22 53:19,22
53:25 54:23 55:15
55:19 56:15 58:18
61:10,12 62:13,15
65:10,13 68:10
69:16 70:19 74:14
77:16 79:16,17,19
80:4 82:17 86:11
86:17 87:1 88:5
88:15 90:2,25
92:7,13 93:10
95:16 96:12,19
99:19,23 100:2,5
100:17,20 101:1
101:19 102:6
103:23 105:2,6,10

105:18,20 106:12
106:18 109:8,18
109:21 110:2
111:15,18 112:11
112:14 114:3,18
119:17,19,22
120:7 122:18
123:5,16 124:5,14
126:11,17,20
132:14 134:12,17
136:8,15,18 137:3
137:25 138:6
139:5,13 140:3
147:22 148:18
150:22 151:10,14
151:20 152:5,5,7,9
152:11,12 153:8
154:11,14,17,19
155:2,9,17,20,23
156:4 158:1
**roger** 67:7
**ruined** 156:8
**rules** 8:11 146:13
158:21

**s**

**s** 4:8
**salaries** 88:23 89:3
89:9
**salary** 90:2,16,20
91:2
**sale** 132:20,23
137:15
**sales** 94:20,22
133:1,3
**sample** 132:15,16
132:17 133:1
**samples** 132:8,14
132:21
**saw** 126:17 151:2
**saying** 12:24 26:19
33:19 48:24 57:23

59:8 67:12 73:20
74:11 78:1,6,7
103:13 120:2,3
139:2,3 144:11,20
149:11,15 150:13
153:2,17 154:22
**says** 10:25 35:25
42:8,12,23 43:7
53:2 55:8,10,22
57:17 73:24 81:14
92:22 93:4 95:14
95:24 101:17
118:16 127:22
140:8 145:15,16
147:10,16,24
148:13 157:1,2
**schedule** 41:19
46:6 55:3 56:18
57:19 73:19
101:18 103:18
111:20 118:11,12
119:8 120:25
121:10,23 122:3,4
122:20 123:2,5
128:16 142:4,8
148:15 154:20,22
154:24,25 155:1
155:12
**scheduled** 142:13
**schedules** 99:15
121:24
**schiffman** 14:17
14:17,18,19
**schnider** 4:18
25:18,19,24 34:5
69:3 72:3 86:4
95:1,19 133:19
**screaming** 108:14
147:1
**search** 138:24
139:4

**season** 137:8,12
**second** 36:11
38:13 101:22
102:4 143:2
144:13
**seconds** 45:1
**section** 119:6
147:8,10,24
**security** 76:19,25
77:15
**see** 33:8 40:17
42:14,25 43:8
48:5,6 53:14 54:9
55:1 58:15 60:17
60:21 61:14 68:8
92:25 95:10 99:19
100:15 101:7
102:15 104:2,5,8
108:21 120:18
121:13 125:22
126:15 129:12,13
129:23 133:4
141:8,10 142:5,5
142:13 159:20,21
159:22
**seeing** 36:4
**seek** 26:24
**seen** 11:9 77:1
**seldom** 40:7
**self** 159:4
**seller** 148:3,4,6
**selling** 132:14
**send** 13:13,14,15
86:25 159:1
**sense** 145:14
**sent** 13:17 68:6
78:8 84:15 85:13
85:14,16,18 86:10
92:12 93:9 98:23
99:6 157:15
158:23

## PROMISSORY NOTE

$2,000,000                                                    Los Angeles, California
                                            November 1, 2014 ("Effective Date")

For value received, Thomas Wylde, LLC ("Maker") promises to pay to the order of Steven Choi ("Holder") the sum of two million dollars ($2,000,000) (the "Principal"), due in full on or before the third anniversary of the Effective Date set forth above.

### 1.  PAYMENTS

1.1  **Payments.** Maker shall make monthly payments sixteen thousand six hundred and sixty six dollars and sixty-six cents ($16,666.66), payable by the last day of each month, commencing on the Effective Date to cover the monthly interest due. Maker shall pay the principal balance in full as a balloon payment on or before November 1, 2017. Maker may prepay all or any portion of this Note at any time prior to the Maturity Date without premium or penalty.

1.2  **Interest.** The Principal shall accrue interest at the rate of ten percent (10%) per annum. Notwithstanding the foregoing, it is intended that the rate of interest shall never exceed the maximum rate, if any, which may be legally charged, and if the interest provisions contained in this Note would result in a higher rate, then interest shall be limited to the legal limit and any amounts interest paid in excess shall be applied to the reduction of the Principal.

1.3  Upon payment of all Principal and interest required to be paid under this Note, Holder will return to Maker a copy of this note marked "CANCELLED/PAID IN FULL," and all of Maker's obligations under this Note will be terminated.

### 2.  DEFAULT

2.1  Maker will be in default if it: (i) fails to pay any installment of interest or Principal when due and does not cure such deficiency within thirty (30) days; or (ii) makes an assignment for the benefit of creditors; is subject to a petition in bankruptcy that is not removed within thirty (30) days; has a receiver, trustee, or similar officer appointed to take charge of all or part of its property and same is not removed within thirty (30) days; or is adjudicated bankrupt.

2.2  Whenever Maker is in default, the entire unpaid principal balance inclusive of unpaid interest added to principal and any accrued but unpaid interest shall immediately become due and payable at the option of Holder and without notice or demand of any kind.

2.3  If this Note is not paid when due, or in the event that proceedings at law are instituted in connection with this Note, Maker shall pay all costs of collection, and all expenses in connection with the protection or realization of this Note, which fees, costs and expenses are incurred by Holder on account of such collection, whether or not suit is filed, including without limitation, reasonable attorney's fees incurred by Holder on account of such collection.

2.4  During the existence of any default or delinquency under the terms of this Note, Holder is hereby expressly authorized to apply all payments made on this Note to the payment of such part of any delinquency as it may elect.

LEE000483

**3. Miscellaneous**

3.1    The headings in this instrument are inserted for convenience and shall not be considered a part of this instrument or used in its interpretation.

3.2    This Note, and the parties' rights and liabilities thereunder, shall be construed under the law of the state of California.

3.3    Except as specifically set forth in this Note, Maker waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this note.

3.4    The obligations of Maker under this Note shall not be subject to reduction, limitation, impairment, termination, set-off, or recoupment for any reason.

3.5    No delay or omission on the part of Holder in exercising any right hereunder shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right and/or remedy on any future occasion.

3.6    Any amendment or modification of the terms of this Note shall be in writing and signed by both parties.

3.7    Failure by Holder to exercise the option of determining this Note to be due and payable or any other option to call the indebtedness for a specific default shall not constitute nor be deemed to be a waiver of the right to exercise the same in the event of any subsequent default. The right to plead any statutes of limitation as a defense to any demand hereunder is hereby waived to the full extent permitted by law.

3.8    If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

3.9    Whenever possible, each provision of this Note will be interpreted in such manner as to be effective, valid and enforceable under applicable law. In case any provision of this Note is held to be prohibited by, invalid, or unenforceable under applicable law, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby.

Maker acknowledges that Maker has read, understands and agrees to the terms and conditions of this Note. IN WITNESS WHEREOF, Maker hereby executes this Promissory Note.

Thomas Wylde, LLC

_____

John Hanna, Manager

LEE000484

# EXHIBIT

# "24"

```
1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   RIVERSIDE DIVISION

4        _____

5    In Re                        ) No.

6    PDTW, LLC,                    ) 6:16-bk-15889-SY

7                Debtor.          )

8    _____)

9    LARRY SIMMONS, Chapter 7     ) Adv. No.

10   Trustee,                     ) 6:17-AP-01200-SY

11                Plaintiff,      )

12             vs.                )

13   PAULA THOMAS, an individual,)

14   et al.,                      )

15                Defendants.     )

16   _____)

17

18         VIDEOTAPED DEPOSITION OF DOUGLAS LEE

19              Los Angeles, California

20            Friday, November 2, 2018

21                   Volume I

22   Reported by:

23   JUDITH A. MANGO

24   CSR No. 5584

25   PAGES 1 - 274
```

Page 1

1    UNITED STATES BANKRUPTCY COURT
2    CENTRAL DISTRICT OF CALIFORNIA
3    RIVERSIDE DIVISION
4    _____
5   In Re          ) No.
6   PDTW, LLC,          ) 6:16-bk-15889-SY
7        Debtor.    )
8   _____)
9   LARRY SIMMONS, Chapter 7  ) Adv. No.
10  Trustee.         ) 6.17-AP-01200-SY
11       Plaintiff,  )
12       vs.        )
13  PAULA THOMAS, an individual,)
14  et al.,           )
15       Defendants.  )
16  _____)
17
18
19      Videotaped Deposition of DOUGLAS LEE,
20  Volume I, taken on behalf of Defendant Paula Thomas,
21  at 2049 Century Park East, Los Angeles, California,
22  beginning at 10:14 a.m. and ending at 4:32 p.m. on
23  Friday, November 2, 2018, before JUDITH A. MANGO,
24  Certified Shorthand Reporter No. 5584.
25

Page 2

1 APPEARANCES:
2
3 For Defendant Paula Thomas:
4       LDT CONSULTING, INC.
5       BY: DIMITRIOS P. BILLER
6       Attorney at Law
7       15113 West Sunset Boulevard, Suite 9
8       Pacific Palisades, California  90272
9       (310) 459-9870
10      biller_ltdconsulting@verizon.net
11
12 For the Witness:
13      THE BRAND LAW FIRM
14      BY: DON E. BRAND
15      Attorney at Law
16      2321 East 4th Street, Suite C-473
17      Santa Ana, California  92705
18      (714) 769-6485
19      don@brandlawfirm.net
20
21 Also Present:
22      PAULA THOMAS
23      STEVEN TOGAMI, VIDEOGRAPHER
24
25

Page 3

1               INDEX
2
3 WITNESS                    EXAMINATION
4 DOUGLAS LEE
5 VOLUME I
6
7        BY MR. BILLER  11, 166
8
9
10
11      INSTRUCTION NOT TO ANSWER
12      PAGE      LINE
13      21        6
14      26        15
15      28        8
16      32        19
17      69        15
18      167       8
19      172       3
20
21
22      EXHIBITS
23
24 NUMBER        DESCRIPTION        PAGE
25 Exhibit 1    Subpoena for Douglas Lee    19

Page 4

1       EXHIBITS (CONTINUED)
2
3 NUMBER        DESCRIPTION        PAGE
4 Exhibit 2    Subpoena for person most    19
5             knowledgeable at LaunchPad
6             Communications
7
8 Exhibit 3    Douglas Lee's responses and    36
9             objections to request for
10            production of documents
11            pursuant to subpoena
12
13 Exhibit 4    Privilege log         36
14
15 Exhibit 5    Pages from LaunchPad website    71
16
17 Exhibit 6    Document entitled "Valuation of    92
18            the Intellectual Property Owned
19            by Ms. Paula Thomas and Licensed
20            to PDTW, LLC, Date of Value
21            October 17, 2013
22
23 Exhibit 7    Document entitled "Thomas Wylde    101
24            Presentation to Management, January
25            8, 2016"

Page 5

2 (Pages 2 - 5)

1       EXHIBITS (CONTINUED)
2

3 NUMBER        DESCRIPTION        PAGE
4 Exhibit 8    Series of e-mails, first dated    104
5             December 10, 2015 from David
6             Schnider to Henry J. Kahrs
7
8 Exhibit 9    Series of e-mails, first dated    109
9             November 5, 2015 from Stephen
10            Choi to Doug Lee and Roger Kuo
11
12 Exhibit 10   Series of e-mails, first dated    116
13            March 3, 2015 from Stephen Choi
14            to Roger Kuo and Doug Lee
15
16 Exhibit 11   Document entitled "Binding Term    120
17            Sheet"
18
19 Exhibit 12   E-mail dated May 16, 2014 from    131
20            Doug Lee to John Hanna
21
22 Exhibit 13   E-mail dated July 9, 2014 from    144
23            Doug Lee to Paula Thomas
24
25
                                        Page 6

1       EXHIBITS (CONTINUED)
2

3 NUMBER        DESCRIPTION        PAGE
4 Exhibit 20   Document entitled "Clawback    213
5            Agreement"
6
7 Exhibit 21   Document entitled "Indemnity    213
8            Agreement"
9
10 Exhibit 22   Document entitled "Agreement To   213
11            Purchase Membership Interest"
12
13 Exhibit 23   Document entitled "Use of Proceeds 213
14            Agreement"
15
16 Exhibit 24   Document entitled "Amended and    213
17            Restated Operating Agreement of
18            Thomas Wylde, LLC"
19
20 Exhibit 25   Document entitled "Action by    217
21            Written Consent of the Members
22            of PDTW, LLC"
23
24 Exhibit 26   Document entitled "Thomas Wylde,   223
25            LLC Account QuickReport"
                                        Page 8

1       EXHIBITS (CONTINUED)
2

3 NUMBER        DESCRIPTION        PAGE
4 Exhibit 14   One-page document, Bates    148
5            PDTW_TW_GG000670
6
7 Exhibit 15   Series of e-mails, first dated    149
8            July 10, 2014 from Andrew
9            Apfelberg to Paula Thomas
10
11 Exhibit 16   Document entitled "Operating    153
12            Agreement of Thomas Wylde, LLC"
13
14 Exhibit 17   Document entitled "Secured    183
15            Promissory Note"
16
17 Exhibit 18   Letter dated November 9, 2016    192
18            from Kyu Hong Kim to Thomas Wylde,
19            LLC with attached amended 2015 tax
20            return
21
22 Exhibit 19   2013 Form 1065 tax return for    203
23            PDTW, LLC
24
25
                                        Page 7

1       EXHIBITS (CONTINUED)
2

3 NUMBER        DESCRIPTION        PAGE
4 Exhibit 27   E-mail dated December 24, 2014    230
5            from David Schnider to Andrew
6            Apfelberg
7
8 Exhibit 28   Official Form 410 Proof of    232
9            Claim with attachments
10
11 Exhibit 29   Document entitled "Thomas    256
12            Wylde," Bates 02218 and 02219
13
14 Exhibit 30   Document entitled "Action By    260
15            Written Consent of the Members
16            of Thomas Wylde, LLC"
17
18
19
20
21
22
23
24
25
                                        Page 9

3 (Pages 6 - 9)

| | |
|---|---|
| 1 Los Angeles, California, Friday, November 2, 2018 | 1 A Yes. |
| 2 10:14 a.m. | 2 Q Do you typically appear at meetings like |
| 3 | 3 you rolled out of bed, unshaven, with a -- a shirt |
| 4 THE VIDEOGRAPHER: Good morning. We are on | 4 that doesn't fit you and wrinkled, in a slouched |
| 5 the record at 10:14 A.M. on November 2nd, 2018. 10:14:21 | 5 position? Do you typically show up at business 10:17:10 |
| 6 Please note that the microphones are | 6 meetings like that? |
| 7 sensitive and may pick up whispers, private | 7 MR. BRAND: Objection; argumentative. |
| 8 conversations and cellular interference. Audio and | 8 BY MR. BILLER: |
| 9 video recording will continue to take place unless | 9 Q You can answer the question. |
| 10 all parties agree to go off the record. 10:14.42 | 10 A I disagree with what you're saying. 10:17:18 |
| 11 This is Media Unit No. 1 of the | 11 Q Okay. Can you answer my question now. |
| 12 video-recorded deposition of Douglas Lee taken by | 12 A No. |
| 13 counsel for the defendant in the matter of In Re: | 13 Q "No," you don't. So why did you take this |
| 14 PDTW, LLC, Case No. 6:16-bk-15889-SY, and Larry | 14 special occasion to dress as you are, unshaven, like |
| 15 Simmons, Chapter 7 Trustee, versus Paula Thomas, 10:15:13 | 15 you just woke up and rolled out of bed? Is that 10:17:31 |
| 16 et al., Case No. 6:17-ap-01200-SY, both filed in | 16 part of your shtick that this is not an important |
| 17 United States Bankruptcy Court for the Central | 17 case? |
| 18 District of California, Riverside Division. | 18 MR. BRAND: Objection; argumentative. I'd |
| 19 This deposition is being held at Veritext | 19 like you to continue to the next line of |
| 20 Legal Solutions, located at 2049 Century Park East, 10:15.47 | 20 questioning, or we're going to get out of here. 10:17:41 |
| 21 Los Angeles, California. 90067 | 21 MR. BILLER: Okay. |
| 22 My name is Steven Togami from the firm | 22 Q You can answer the question. |
| 23 Veritext Legal Solutions, and I am the videographer. | 23 A I dress like this all the time. That's |
| 24 The court reporter is Judith Mango, from the firm | 24 how -- |
| 25 Veritext Legal Solutions 10.16.08 | 25 Q Even in business meetings? 10:17:48 |
| Page 10 | Page 12 |

| | |
|---|---|
| 1 I am not related to any party in this | 1 A Yes. |
| 2 action, nor am I financially interested in the | 2 Q Okay. You just said "no." |
| 3 outcome. If there are any objections to proceeding, | 3 A No, this is how I dress at business |
| 4 please state them at the time of your appearance. | 4 meetings. Yes. |
| 5 At this time will counsel and all present 10:16:24 | 5 Q Okay. 10:17:54 |
| 6 please state their appearances and affiliations for | 6 A Yeah. |
| 7 the record. | 7 Q All right. The oath that you've taken is |
| 8 MR. BILLER: Dimitrios Biller, LTD | 8 an obligation to tell the truth. |
| 9 Consulting, Inc., representing Defendant Paula | 9 Do you understand that? |
| 10 Thomas in the adversary proceedings before the 10.16.36 | 10 A Yes. 10:17:57 |
| 11 United States District Court | 11 Q If you lie, you can be brought up on |
| 12 MR. BRAND: Don Brand on behalf of the | 12 charges or before a Court and be held in contempt. |
| 13 deponent, Douglas Lee. | 13 Do you understand that? |
| 14 THE WITNESS: Douglas Lee | 14 A Yes. |
| 15 THE VIDEOGRAPHER: Thank you. 10.16.50 | 15 Q And if you do lie, I will do that. 10:18:05 |
| 16 MR. BILLER: Can you swear in the witness, | 16 Do you understand that? |
| 17 please | 17 A Yes. |
| 18 | 18 Q You understand the penalty of perjury |
| 19 DOUGLAS LEE, | 19 applies? |
| 20 having been administered an oath, was examined and | 20 A Yes. 10:18:10 |
| 21 testified as follows | 21 Q You understand what that means? |
| 22 | 22 A Yes. |
| 23 EXAMINATION | 23 Q Do you understand the punishment for |
| 24 BY MR. BILLER | 24 penalty of perjury? |
| 25 Q Are you a businessman? 10.16 58 | 25 A Yes. 10:18:15 |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

| | |
|---|---|
| 1  Q  What is it? | 1  Q  It exists because the court reporter to |
| 2  A  I don't know. | 2  your right can only be -- take -- can only |
| 3  Q  So you just lied. | 3  transcribe what is being said by one person at a |
| 4  MR. BRAND:  Objection; argumentative. | 4  time. |
| 5  BY MR. BILLER:          10:18:22 | 5  Do you understand that?       10:19:32 |
| 6  Q  You just lied, sir. | 6  A  Yes. |
| 7  MR. BRAND:  Objection; argumentative. | 7  Q  So it's -- it's a courtesy also to the |
| 8  BY MR. BILLER: | 8  court reporter, okay? |
| 9  Q  I asked you what the penalty of perjury is, | 9  Do you understand? |
| 10  if you knew the penalty, and you said --    10:18:28 | 10  A  Yes.            10:19:40 |
| 11  (Simultaneous talking.) | 11  Q  All right. Now, you can give me estimates |
| 12  A  I do not -- | 12  all you want, but you can't speculate. |
| 13  Q  -- "yes." | 13  Do you understand the difference? |
| 14  A  I do not know what the penalty -- | 14  A  Explain. |
| 15  Q  Okay. Are you --       10:18:30 | 15  Q  Speculation is if I were to ask you the   10:19:52 |
| 16  A  -- of perjury is. | 16  size of my desk in my office and you were to give me |
| 17  Q  -- going to be truthful from here on and | 17  an answer, that would be speculation because you |
| 18  going forward? | 18  haven't seen my desk. You don't have personal |
| 19  A  Yes. | 19  knowledge of my desk. |
| 20  Q  Okay. Is that a lie?     10:18:32 | 20  Do you understand?       10:20:03 |
| 21  MR. BRAND:  Objection; argumentative. | 21  A  Yes. |
| 22  BY MR. BILLER: | 22  Q  Okay. But if I were to ask you the |
| 23  Q  Okay. Penalty of perjury is this: You can | 23  dimensions of the conference table in front of you, |
| 24  be in prison up to one year and/or pay $10,000 and a | 24  and you would look at it, maybe walk around it, |
| 25  fine.           10:18:43 | 25  maybe pace it a little bit and give me an answer,  10:20:12 |
| Page 14 | Page 16 |

| | |
|---|---|
| 1  Do you understand that? | 1  that would be an estimate. |
| 2  A  Yes. | 2  Do you understand? |
| 3  Q  Okay. If you do commit the penalty of | 3  A  Yes. |
| 4  perjury, you could be assured I will be filing a | 4  Q  An estimate is based on personal knowledge, |
| 5  motion to have you punished in some form or another. 10:18:50 | 5  okay?           10:20:21 |
| 6  Do you understand? | 6  Do you understand? |
| 7  MR. BRAND:  Objection; argumentative. | 7  A  Yes. |
| 8  MR. BILLER:  That's giving a witness due | 8  Q  If you don't understand my questions, if |
| 9  process notice, Counsel. | 9  they're vague, ambiguous, unintelligible, you've got |
| 10  Q  Do you understand?     10:19:00 | 10  to tell me, okay?       10:20:29 |
| 11  A  Yes. | 11  A  Yes. |
| 12  Q  Okay. Only one person can speak at a time, | 12  Q  If you don't tell me, it will be assumed |
| 13  not both of us. | 13  you understand, okay? |
| 14  Do you understand? | 14  A  Yes. |
| 15  A  Yes.         10:19:06 | 15  Q  This morning you've heard a couple   10:20:36 |
| 16  Q  I'm going to ask my questions. When I | 16  objections. Let your lawyer make his objections, |
| 17  finish my question, you give me an answer. | 17  and -- and then you can answer the question, or you |
| 18  Do you understand? | 18  can have the question rephrased, or you can have the |
| 19  A  Yes | 19  question read back; whatever you want. |
| 20  Q  I will work my best not to ask you another  10:19:14 | 20  Do you understand?       10:20:52 |
| 21  question till you finish your answer. | 21  A  Yes. |
| 22  Do you understand? | 22  Q  Okay. At the end of these proceedings you |
| 23  A  Yes. | 23  will be given -- you'll receive a transcript. |
| 24  Q  Do you know why that rule exists? | 24  Are you going to get it? |
| 25  A  No.        10:19:23 | 25  MR. BRAND. Yes.       10:21:02 |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

1   MR. BILLER: Okay. Is he going to -- is he
2   going to review it at your office?
3       MR. BRAND: Yeah.
4       MR. BILLER: And you'll send it back to me?
5       MR. BRAND: Yes.               10:21:10
6       MR. BILLER: Okay
7   Q   The transcript will be sent to your
8   counsel's office and your counsel will -- will then
9   make it available to have -- for you to review it,
10  to make any changes, if you deem necessary   10:21:18
11      Do you understand?
12  A   Yes.
13  Q   In other words, it's the transcript that
14  determines what your testimony is. However, if you
15  make a serious change or significant change or a   10:21:26
16  material change to your testimony, I will be able to
17  and I will comment on that material change and argue
18  to the jury that you shouldn't be believed.
19      Do you understand?
20  A   Yes.                       10:21:40
21  Q   And it's very important that you give your
22  most honest testimony here today because when you
23  don't give me honest testimony, I'm not going to be
24  able to ask the questions that I would have asked if
25  you gave honest testimony.       10:21:52
                                    Page 18

1       Do you understand?
2   A   Yes.
3   Q   Okay? So it's not only for the
4   credibili -- your own personal credibility in front
5   of the jury, it's also you're denying me the fact to  10:22:01
6   ask you questions about your most accurate
7   testimony.
8       Do you understand?
9   A   Yes.
10  Q   Okay. Exhibit 1 and Exhibit 2 have been   10:22:07
11  marked for identification.
12      (Exhibit 1 and Exhibit 2 were marked for
13      identification by the court reporter.)
14  BY MR. BILLER:
15  Q   Exhibit 1 is your deposition subpoena   10:22:16
16  with -- and Exhibit 2 is the deposits -- deposition
17  subpoena regarding LaunchPad Communications.
18      MR. BRAND: Objection; misstates the
19  exhibits. This is a subpoena to appear and testify
20  at a hearing or a trial, not a deposition subpoena.  10:22:33
21      MR. BILLER: Okay.
22  Q   Can you look through the -- can you look
23  through the list of documents in Exhibit No. 1,
24  please.
25      (Witness complies.)          10:22:59
                                    Page 19

1   BY MR. BILLER:
2   Q   Have you seen this document before?
3   A   Yes.
4   Q   Okay. Have you read it?
5   A   Yes.                       10:23:13
6   Q   After you read it, what did you do?
7   A   I started gathering the information.
8   Q   Okay. Let's -- let's back up for a second.
9       Who have you talked to, other than your
10  counsel, regarding this deposition before today?   10:23:29
11  A   My counsel, and I talked to Richard Peddie
12  as well
13  Q   Anybody else?
14  A   My wife.
15  Q   How about Stephen Choi?       10:23:44
16  A   No, I have not talked to Stephen Choi about
17  this.
18  Q   How about Roger Kuo?
19  A   I did talk to Roger Kuo that I got
20  subpoenaed.                    10:23:53
21  Q   Okay. And how about Jene Park?
22  A   No.
23  Q   How about David Schnider?
24  A   No.
25  Q   What was your conversation with Richard   10:23:59
                                    Page 20

1   Peddie?
2       MR. BRAND: Objection, attorney-client
3   privilege.
4       MR. BILLER: No, he's not a member. He's
5   not a member of TW. He's nothing of TW, okay?   10:24:07
6       MR. BRAND: Instruct the witness not to
7   answer
8       MR. BILLER: He's not a -- lay the
9   foundation, please. Lay the foundation that he is
10  connected with TW.             10:24:18
11      MR. BRAND: He was a member of TW
12      MR. BILLER: He was a member. He's not
13  anymore.
14      MR. BRAND: Okay. But at the time of the
15  communications --              10:24:25
16      MR. BILLER: I said before this deposition
17      MR. BRAND: It relates -- the conversation
18  relates back to an attorney-client relationship
19      MR. BILLER: Are you saying -- I just want
20  to hear your -- hear your position.   10:24:36
21      Are you invoking the attorney-client
22  privilege today because his current conversation
23  with Richard Peddie relates to a conversation he had
24  with Richard Peddie when he was a member of TW? Is
25  that your -- is that your argument?   10:24:48
                                    Page 21

6 (Pages 18 - 21)

**Page 22**

1    MR. BRAND: That is correct.

2    MR. BILLER: Okay. We'll bring that up.

3    Q    What conversation did you have with -- with

4    Roger Kuo?

5    A    Just I got subpoenaed.            10:25:00

6    Q    That's it?

7    A    Yeah.

8    Q    You didn't say anything else?

9    A    Oh, we talked about trying to find counsel.

10   Q    Anything else?       10:25:15

11   A    I guess talked about legal costs.

12   Q    Anything else?

13   A    Not that I can remember  That's all I can

14   recall.

15   Q    Okay  And when did this conversation take  10:25:42

16   place?

17   A    Probably -- again, I -- I don't remember

18   exactly, but probably somewhere between a day to two

19   days after  Around there.

20   Q    A day or two days after what?       10:25:57

21   A    I got the documents.

22   Q    And what did you guys talk about in terms

23   of legal costs?

24   A    Like what -- I mean, just talked about how

25   it's going to cost money  We didn't specify or --  10:26:15

**Page 23**

1    obviously I didn't know what the legal costs would

2    be at that time.

3    Q    Okay. Did you talk about sharing cou --

4    counsel?

5    A    No, not at that time.            10:26:26

6    Q    Are you sharing counsel?

7    A    No --

8    Q    Okay.

9    A    -- not right now.

10   Q    Do you know if he has counsel?       10:26:33

11   A    Well, in regards to what?  I guess --

12   Q    In regards to the federal lawsuit for RICO

13   violations in regard -- in -- in federal court.

14   A    Oh, okay.  Okay.  If that's your

15   question -- I thought this was related to the     10:26:44

16   bankruptcy proceeding, so...

17       No.  Our counsel is Richard Peddie.

18   Q    Richard Peddie is representing you in the

19   federal action?

20   A    I believe so.          10:26:53

21   Q    In what capacity?

22   A    As our attorney.

23       MR. BRAND: Objection; vague.

24   BY MR. BILLER:

25   Q    Okay. As your attorney in what capacity?  10:26:59

**Page 24**

1    As an individual?

2    A    I -- I don't understand your question.

3    Q    Okay.  Is Richard Peddie represent --

4    you've been named in the federal action, correct?

5    A    I believe so.          10:27:10

6    Q    Okay. Have you seen the federal complaint?

7    A    No, I have not.

8    Q    Okay.  Let me -- I sent your cli -- lawyer

9    a revised first amended federal complaint.  Have you

10   seen that?            10:27:20

11   A    I -- I don't think so.  I -- I haven't seen

12   it.

13   Q    Okay.  I'll get it out.  You've been named

14   the defendant in a federal U.S. RICO Act case as an

15   individual, not as TW.          10:27:39

16       Do you understand that?

17   A    Yes.

18   Q    So is Richard representing you as part of

19   TW, or as part of -- as an individual?

20   A    As -- again, I believe he's representing us  10:27:54

21   or we're in the process of deciding if he's

22   representing us as an individual.

23   Q    Okay.  As individuals?

24   A    Yes.

25   Q    So he hasn't -- he hasn't -- he hasn't      10:28:04

**Page 25**

1    taken any steps to represent you in a capacity for

2    TW?

3    A    I don't know.

4    Q    Okay.  All right

5       Other than legal costs, the subpoena, did   10:28:20

6    you guys talk about documents that were requested?

7       MR. BRAND: Objection; am -- ambiguous.

8    BY MR. BILLER:

9    Q    Did you talk about the documents that were

10   requested for production in the subpoena?       10:28:37

11      MR. BRAND: Ambiguous  Talked to whom?

12      MR. BILLER: I'm sorry.  Roger Kuo.  Good

13   objection.

14      THE WITNESS: No.

15   BY MR. BILLER:            10:28:46

16   Q    Do you remember any other conversation you

17   had with him?

18   A    No.

19   Q    So you talked to him only once, two or

20   three days after you received the subpoena, is that  10:28:57

21   right?

22   A    No.  I talked to him -- let me see.  I

23   mean, I talked to him other times but not about the

24   subpoena.  And then yesterday I talked to him for a

25   short period, just to -- just asking when the     10:29:14

1  subpoe -- when -- when the -- when I was going to
2  have the deposition. So I told him it'd be today.
3      Q   When did you and Roger talk about John --
4  Peddie -- Richard Peddie representing you and -- and
5  Roger?                          10:29:33
6          MR. BRAND: Objection; attorney-client
7  privilege, outside the -- the scope of relevant
8  testimony. It's not proportional. We're dealing
9  today with a bankruptcy case regarding PDTW and --
10         MR. BILLER: You're not supposed to make a  10:29:51
11 speaking objection, right?
12         MR. BRAND: Okay.
13         MR. BILLER: Are you instructing him not to
14 answer?
15         MR. BRAND: Then I instruct him not to   10:29:58
16 answer the question.
17         MR. BILLER: You're instructing him not to
18 answer the question what conversation he had with a
19 nonlawyer, Roger Kuo, regarding any representation
20 by Richard Peddie?               10:30:06
21         MR. BRAND: Objection. It was already
22 asked and answered.
23         MR. BILLER: No, it wasn't.
24     Q   Answer that question
25         MR BRAND  I'll allow you to answer that  10 30 13
Page 26

1  BY MR. BILLER:
2      Q   You can answer the question.
3      A   I don't understand your question.
4      Q   Okay. When Richard -- did Richard call you
5  and talk to you?                10 31 19
6          MR. BRAND: Objection, attorney-client
7  privilege. Instruct the witness not to answer
8  BY MR. BILLER:
9      Q   Did Richard actually talk to you? Did
10 Richard actually talk to you about representing you  10:31:33
11 in the federal action?
12     A   Yes.
13     Q   Okay. When was that conversation?
14     A   I don't recall. I think -- I'm guessing
15 sometime after the -- the -- the -- whenever the  10:31:47
16 action was filed.
17         He told -- he told us -- I mean, I guess he
18 didn't tell us. It was through an e-mail that this
19 action was filed. And so he was representing us in
20 defending or dealing with the -- the litigation.  10:32.08
21     Q   How did he become the -- the attorney for
22 TW?
23     A   I don't know.
24     Q   Well, did you vote to have him become the
25 attorney for TW?                10:32:20
Page 28

1  question. Go ahead.
2          THE WITNESS: So repeat the question again.
3          MR. BILLER: Read back the question,
4  please.
5          (The question was read as follows:   10:30:21
6          "Q   When did you and Roger talk
7          about Richard Peddie representing
8          you and Roger?")
9          THE WITNESS: I -- I did not specifically
10 talk to Roger about him representing us. It was   10:30:36
11 just kind of -- Richard was the one who was handling
12 the -- the -- the litigation, and he was the one who
13 was giving us information as to what was going on.
14 BY MR. BILLER:
15     Q   And why was he giving you information as to  10:30:54
16 what was going on?
17         MR. BRAND: Objection, calls for
18 speculation.
19         THE WITNESS  I said "why " Why, not what
20 Why                            10:31:04
21         MR BRAND  It still calls for speculation.
22 BY MR BILLER
23     Q   Did you have an interest in receiving that
24 information?
25         MR. BRAND  Objection, vague   10:31:10
Page 27

1      A   I'm not sure if it was a discussion that --
2  that there was counsel that was going to be involved
3  in representing TW. And, again, I think this is
4  related to the original action that happened with --
5  in the first lawsuit, I think.      10:32:45
6      Q   With Paula?
7      A   Yeah.
8      Q   Okay. I'm asking you --
9      A   Uh-hmm.
10     Q   -- to describe how Richard Peddie became   10:32:50
11 TW's attorney.
12         MR. BRAND: Objection. Asked and answered.
13 BY MR. BILLER:
14     Q   You can answer.
15     A   I -- I don't recall.       10:32:58
16     Q   Okay. Did you cast a vote?
17     A   There was, I believe, a meeting, and there
18 might have been a discussion, about Richard
19 representing us. And I think there was agreement
20 that he would represent us.        10:33:14
21     Q   Okay. When did that meeting take place?
22     A   I don't recall.
23     Q   Okay. Was there -- were there minutes
24 taken of that meeting?
25     A   I believe is something that -- that  10:33:23
Page 29

8 (Pages 26 - 29)

1 says that, but I don't remember.
2  Q  Okay. Did you produce it?
3  A  I believe there's a document that says
4 something about him being in that role.
5  Q  Okay. Did you see that document?      10:33:33
6  A  I do believe I saw a document --
7  Q  Okay.
8  A  -- that said that.
9  Q  So when I go through those documents that
10 you produced, which was one -- I guess one Bekins      10:33:41
11 size box, and that's about --
12      MR. BRAND: There's 400 -- 4,008 pages
13 produced.
14      MR. BILLER: Okay. All right.
15  Q  Who's been paying his legal fee; do you      10:33:52
16 know?
17  A  I have no idea.
18  Q  Okay. Who else is he representing?
19  A  I don't know.
20  Q  Do you know that TW's being sued separately 10:34:00
21 and apart from yourself in the federal action?
22  A  I don't know.
23  Q  Okay. Do you know what his relationship
24 with Jene Park is?
25  A  Whose relationship?      10 34 14

Page 30

1  Q  Richard Peddie's relationship with Jene
2 Park.
3      MR. BRAND: Objection; vague.
4      THE WITNESS: I don't know.
5 BY MR. BILLER:      10:34:22
6  Q  Do you know they've had a romantic
7 relationship?
8  A  I do not know.
9  Q  Do you know that they've had a business
10 relationship?      10:34:29
11  A  I do not know.
12  Q  Do you know that he actually represented
13 her in separate -- separate legal matters?
14  A  I do not know.
15  Q  Did anybody tell you any of that?      10:34:37
16  A  No.
17  Q  Okay. Do you know that she was -- she
18 actually had to disqualif -- Richard Peddie had to
19 disqualify himself in the U.S. Bankruptcy Court
20 because of the conflict of interest that he had      10:34:51
21 representing TW and her?
22      Did you know that?
23      MR. BRAND: Objection; calls for a legal
24 opinion.
25 BY MR. BILLER:      10:34:59

Page 31

1  Q  Did you know that?
2  A  I don't know.
3  Q  Okay. Does any of that matter to you?
4      MR. BRAND: Objection; vague. Objection;
5 argumentative.      10:35:08
6 BY MR. BILLER:
7  Q  Does it matter to you that the lawyer for
8 the company that you claim to have some type of
9 ownership interest through another dummy corporation
10 has had this long-standing personal and professional 10:35:16
11 relationship with the lawyer that's supposedly
12 representing TW and Jene Park and yourself?
13      Does that bother you?
14      MR. BRAND: Objection; vague. Objection;
15 argumentative.      10:35:32
16 BY MR. BILLER:
17  Q  You can answer the question.
18      MR. BRAND: Instruct the witness not to
19 answer.
20      MR. BILLER: You can't instruct the witness 10:35:37
21 not to answer on those objections. The only basis
22 upon which you can instruct the witness not to
23 answer is on privilege.
24      MR BRAND: And on invasion of privacy.
25      MR. BILLER. What privacy am I invading, 10 35 47

Page 32

1 Counsel?
2      MR. BRAND: You're invading his privacy
3 with regards to his former business relationships
4 that have nothing to do with the subject matter of
5 this case.      10:35:57
6      MR. BILLER: Of course, it does. It has to
7 do with whether Richard Peddie is legally able to
8 represent both Mr. Lee and TW.
9      My client still owns part -- actually, she
10 owns more than him. She owns more of TW than      10:36:09
11 Mr. Lee; okay?
12      MR BRAND: I would object that, you know,
13 there's --
14      MR. BILLER: Okay. Are you --
15      MR. BRAND: -- no question pending.      10:36:16
16      MR. BILLER -- instructing him not to --
17 are you instructing him not to answer the last
18 question?
19      MR. BRAND That's correct
20      MR. BILLER Okay      10 36 22
21      MR. BRAND: And I -- I'd like to move on to
22 questions having to do with PDTW and the bankruptcy
23 case.
24      MR. BILLER Counsel, don't tell me how to
25 take my examination.      10 36 29

Page 33

9 (Pages 30 - 33)

Page 34

1    MR. BRAND: Okay.
2    MR. BILLER: Don't try and control me.
3    MR. BRAND: I -- I -- I understand that.
4    MR. BILLER: Okay?
5    MR. BRAND: However --                10:36:31
6    MR. BILLER: I have a right -- I have every
7  right to take my examination the way I want, so
8  don't volun -- stop making silly objections that
9  don't hold water, and stop instructing the witness
10 not to answer the question, 'cause this is going up  10:36:43
11 on a motion. You and I are going to be sitting next
12 week down together preparing a joint stipulation --
13    MR. BRAND: That is correct.
14    MR. BILLER: -- and we're going to go up,
15 okay? So let's move on.              10:36:52
16    MR. BRAND: Okay.
17    MR. BILLER: Let's go through the documents
18 now.
19    MR. BRAND: Okay.
20 BY MR. BILLER:                    10:36:55
21    Q  Do you have the list of documents in front
22 of you?
23    A  Yes.
24    Q  Category 1. Did you produce any documents
25 in Category 1?                    10:37:01

Page 35

1    A  Yes.
2    Q  What kind of documents?
3    A  Documents that were related to people you
4  didn't list below --
5    Q  Okay.                    10:37:14
6    A  -- that were part of TW, so other people
7  who -- that I had. I guess, some form of
8  communication with that was not stated below that
9  were part of TW.
10   Q  Okay. Richard Peddie included?      10:37:24
11   A  No.
12   Q  You didn't produce any Richard Peddie
13 documents?
14   A  No.
15   Q  Do you have any Richard Peddie documents?  10:37:31
16   A  Some. A few. Not that many, but yes.
17   Q  Okay. Did you prepare a privilege log?
18    MR. BRAND: He did.
19    MR. BILLER: Is that one of the documents
20 you produced?                    10:37:47
21    MR. BRAND: Yeah.
22    MR. BILLER: Let's go ahead and mark as
23 Exhibit No. 3 for identification the belated
24 objections of Douglas Lee.
25    MR. BRAND: Objection; mischaracterizes the  10:38:08

Page 36

1  exhibit.
2    (Exhibit 3 was marked for identification
3    by the court reporter.)
4    MR. BILLER: And let's go ahead and prepare
5 (sic) as Exhibit No. 4 what is entitled "Privilege  10:38:25
6  Log." Exhibit No. 3 and Exhibit No. 4 were produced
7  this morning.
8    (Exhibit 4 was marked for identification
9    by the court reporter.)
10 BY MR. BILLER:                    10:38:42
11   Q  Did you prepare Exhibit No. 4?
12   A  No.
13   Q  Your counsel prepared it?
14   A  Yes.
15   Q  Okay. And you didn't prepare Exhibit    10:38:51
16 No. 3, obviously, right?
17   A  Yes --
18   Q  Okay.
19   A  -- I did not prepare it.
20   Q  So let's go to Category No. 2.        10:38:59
21      How many -- did you produce any documents
22 regarding Category No. 2?
23   A  Yes.
24   Q  Did you produce a retainer fee agreement of
25 Richard Peddie?                    10:39:13

Page 37

1    A  No.
2    Q  "No." Do you have that?
3    A  No.
4    Q  Let me ask you: Is it safe to say that you
5  either produced the documents identified in this    10:39:32
6  subpoena or, if they were called for and you didn't
7  produce them, they're on the log?
8      Is that a reasonable position to take?
9    MR. BRAND: Objection; ambiguous.
10    MR. BILLER: Okay. I'll go through each    10:39:48
11 one.
12   Q  Are any of the documents that you produced
13 in response to No. 2 in the exhibit log? I mean the
14 privilege log.
15   A  I don't know.                  10:39:57
16   Q  Okay. How about 3?
17   A  I don't believe I produced any documents
18 there.
19   Q  Why not?
20   A  I just -- I didn't -- I didn't have -- I    10:40:10
21 didn't have any of the information.
22   Q  Where was the information?
23   A  I mean, I just -- I -- I don't remember
24 what those costs and expenses were.
25   Q  Well, can you estimate?            10:40:23

Page 38

```
 1   A   Um, no, not really. I mean, there's travel
 2   costs. I just -- yeah. I don't know.
 3   Q   Well, did you pay for these costs on a
 4   credit card?
 5   A   I don't recall. I mean, some of it --     10:40:35
 6   Q   Is it more than a hundred, less than a
 7   hundred thousand?
 8   A   Oh, it's less than a hundred thousand.
 9   Q   Okay. More than 5,000?
10   A   I don't know.                             10:40:47
11   Q   Would these be reflected on your tax
12   returns?
13   A   No.
14   Q   So they were not business-related costs?
15   A   They were business related. I just didn't 10:40:54
16   track 'em.
17   Q   Do you use a travel agent?
18   A   No
19   Q   Okay. No. 4, did you produce all those
20   documents? Or did you produce documents responsive 10:41.08
21   to No. 4?
22   A   Yes.
23   Q   How about No. 5? Did you produce documents
24   responsive to No. 5?
25   A   Yes.                                      10:41.28
```

Page 39

```
 1   Q   What kind of documents?
 2   A   This would be documents regarding the
 3   operating agreement, like information regarding the
 4   operating agreement and how we -- how I have a
 5   membership interest in TW.                    10:41:46
 6   Q   Who prepared the operating agreement?
 7   A   I -- I'm not sure.
 8   Q   You're talking about the original operating
 9   agreement, the amended operating agreement, the
10   restated amended operating agreement? Which one are 10:42:01
11   you talking about?
12   A   I don't know that the -- so I'm not sure
13   what you're asking.
14   Q   Well, what -- do you have a copy of the --
15   did you produce a copy of the operating agreement? 10:42:09
16   A   I believe so, yes.
17   Q   Okay. How about No. 6? Did you produce
18   any documents responsive to No. 6?
19   A   Yes.
20   Q   Did you produce any doc -- did you fail to 10:42:19
21   produce any documents that would be responsive to
22   No. 6?
23       MR. BRAND: Objection; calls for a legal
24   opinion.
25       MR BILLER  Okay.                          10 42:36
```

Page 40

```
 1       THE WITNESS:  So repeat the question.
 2   BY MR. BILLER:
 3   Q   Yeah. Did you find any documents that
 4   would be responsive to No. 6 that you did not
 5   produce?                                      10:42:47
 6   A   No, I believe -- I don't believe so.
 7   Q   Okay. How about No. 7? Did you find any
 8   documents that were responsive to No. 7?
 9   A   Yes.
10   Q   And you produced some of those documents on 10:43:01
11   the log, correct?
12   A   I don't understand the question.
13   Q   Did you produce all the communications
14   between you and Stephen Choi?
15   A   Which question are we talking about?       10:43:19
16   Q   We're talking about No. 7.  Did you produce
17   all documents regarding any communications you had
18   with Stephen Choi?
19   A   That's not what the question says, the
20   document request says.                        10:43:34
21   Q   It says regarding any con -- I'm sorry.
22   Any compensation you received in connection with the
23   investment.
24   A   Yes.
25   Q   And that compensation was?                 10:43:43
```

Page 41

```
 1   A   I received interest in TW and a few months
 2   of consulting fees.
 3   Q   Didn't you get $50,000?
 4   A   Repeat the question.
 5   Q   Didn't you get $50,000 to find Stephen Choi 10:44:11
 6   as an investor?
 7   A   No.
 8   Q   You're not -- are you familiar with the
 9   binding term agreement?
10   A   Yes.                                       10:44:21
11   Q   Aren't you supposed to get some
12   compensation for that?
13   A   Yeah -- no.  We -- we received -- we had a
14   consulting agreement where we had monthly consulting
15   fees to provide services, and we received, I    10:44:33
16   believe. $18,000.
17   Q   When you say "we," who's we?
18   A   Oh, I mean I received $18,000.
19   Q   Was that part of a business that you had,
20   or was it just you personally?                 10:44.46
21   A   It was me personally and it was part of the
22   term -- the binding term agreement.
23   Q   Okay. Well, the next question asks for
24   documents regarding the binding term agreement  Did
25   you receive compensation pursuant to that agreement? 10:45:03
```

1  And the answer would be "yes"?
2  A  Yes, as I stated before.
3  Q  18,000?
4  A  Yes.
5  Q  Okay.  Do you have any documents?  Did you    10:45:11
6  produce the documents on that?
7  A  I produced a document showing that we
8  received those statements.  It has a list of the
9  days and when it was deposited.
10  Q  Okay.                         10:45:26
11  A  It's a -- it's in an e-mail.
12  Q  Do you have any -- did you produce any
13  documents related to communications with Paula
14  Thomas?
15  A  Yes.                          10:45:37
16  Q  Did you produce all those documents?
17  A  Yes, I believe so.
18  Q  So you didn't withhold any?
19  A  Are you asking if it was withheld under the
20  privilege log?                    10:45:51
21  Q  No, I'm just asking if it was withheld.  It
22  could be held with the privilege log or it could be
23  held without the privilege log  I don't care  Was
24  it withheld?  Then I'll ask -- then I'll ask you why
25  it was withheld.                   10:46:01

Page 42

1       Were there any communications between you
2  and Paul Thomas withheld?
3  A  No.
4  Q  So everything you had regarding that issue
5  was produced?                     10:46:12
6  A  Yes, I believe so.
7  Q  How about communication with Stephen Choi?
8  Did you produce all those documents?
9  A  As it relates to TW.
10  Q  That's not what it -- the request demanded. 10:46:29
11  The request demanded communication with Stephen
12  Choi.  You didn't produce all those documents, did
13  you?
14  A  I produced the documents related with
15  Stephen Choi related to communications with -- that 10:46:48
16  had to deal with Thomas Wylde --
17  Q  Okay.
18  A  -- and PDTW.
19  Q  I'll say it again.
20  A  Uh-hmm                        10:46:57
21  Q  And try and listen this time
22  A  Okay.
23       MR. BRAND  Objection, argumentative
24  BY MR. BILLER
25  Q  Did you produce all of the documents    10:47:03

Page 43

1  regarding communications between you and Stephen
2  Choi?
3       MR. BRAND:  Objection; asked and answered.
4       THE WITNESS:  No.
5  BY MR. BILLER:                    10:47:13
6  Q  What documents are you withholding?
7  A  Stuff that's -- that might be social,
8  documents that are -- may be related to other
9  business -- business that's unrelated to Thomas
10  Wylde.                         10:47:40
11  Q  Anything else?
12  A  I believe those are -- yeah, I believe
13  those are the documents.
14  Q  Okay.  Were any of those documents related
15  to Hillshore Investment?              10:47:55
16  A  I do not believe -- I believe -- I don't
17  believe they were related to Hillshore Investment.
18  Q  Hillshore is a dummy corporation, correct?
19       MR. BRAND:  Objection, vague.
20  BY MR. BILLER:                    10:48:08
21  Q  You can answer.
22  A  I do -- no, I do not believe it's a dummy
23  corporation.
24  Q  Well, what -- on what bel -- on what basis
25  do you believe it's not a dummy corporation?    10:48:16

Page 44

1       MR. BRAND:  Objection; vague.
2  BY MR. BILLER:
3  Q  Please explain.
4  A  I don't understand what -- the definition
5  of why you would think it's a dummy corporation.  10:48:25
6  Q  Then why did you ask the -- why did you
7  answer the question do you think it's a dummy --
8  it's not -- do you think it's a dummy corporation?
9  You said "no," you don't think it's a dummy
10  corporation.                     10:48:38
11       Did you understand the first question and
12  then just not understand the second question because
13  you didn't want to answer it?
14       MR. BRAND:  Objection; argumentative.
15  BY MR. BILLER:                    10:48:46
16  Q  Okay.  So, please, tell me, do you know
17  what a dummy corporation is, "yes" or "no"?
18  A  Well, I need you to explain what you --
19  Q  No, I don't.  It's common knowledge.
20       MR. BRAND:  Objection --         10:48:55
21  BY MR. BILLER:
22  Q  You have a tax --
23       MR. BRAND:  -- argumentative.
24  BY MR. BILLER:
25  Q  You have a tax -- international tax degree  10:48:59

Page 45

12 (Pages 42 - 45)

Page 46

1 from Dartmouth. You have a UCLA law degree. I
2 think you know what a dummy corporation is, sir.
3    MR. BRAND: Is there a question pending?
4 BY MR. BILLER:
5    Q  So do you know what a dummy corporation is? 10:49:07
6    MR. BRAND  Objection, asked and answered
7    THE WITNESS. I don't know what your
8 definition of --
9 BY MR. BILLER.
10   Q  Okay.                          10:49:12
11   A  -- how you're defining dummy corporation.
12   Q  What is your definition?
13   A  A corporation -- a corporation that doesn't
14 legally exist.
15   Q  Okay. Anything else? Any other       10:49:28
16 definition?
17   A  No. I would say that's -- that would be my
18 understanding of what a dummy corporation is
19   Q  Okay  And do you believe Hillshore
20 Investment legally exists?            10:49:41
21   A  Yes, I do
22   Q  On what basis?
23   A  Based on the information that was provided
24 in the documentation when the deal was structured.
25   Q  What information was provided in the    10:49:52

Page 47

1 documentation that was provided when the deal was
2 structured?
3    A  The name of the corporation, where it was
4 located.
5    Q  So that's it?                  10:50:00
6    A  Yes.
7    Q  You've never visited the offices of
8 Hillshore Insure -- Investment, correct?
9    A  Yes, I have not.
10   Q  Have you ever purchased any products from  10:50:10
11 that company?
12   A  No
13   Q  Have you ever pur -- made -- has that
14 company ever provided you with any services?
15   A  No                            10:50:18
16   Q  Do you know who the boards of the member --
17 members of the board are for that company?
18   A  No
19   Q  Do you know how many employees they have?
20   A  No.                           10:50:25
21   Q  Do you know if it pays taxes?
22   A  No.
23   Q  Do you know if it has any sources of
24 income?
25   A  I do not know.                  10:50:32

Page 48

1    Q  Do you know if it has any expenses?
2    A  I do not know.
3    Q  Do you know if it has distribution
4 contracts or other contracts with third parties?
5    A  I do not know               10:50:54
6    Q  Okay  Who owns Hillshore?
7    A  I'm -- I am not sure
8    Q  Okay  Who do you think owns Hillshore?
9    A  I -- Stephen Choi or -- and -- and -- or
10 Enluz.                          10:51:26
11   Q  Do you know why Stephen Choi would say at
12 his deposition he doesn't own Hillshore?
13   MR. BRAND: Objection; calls for
14 speculation.
15   THE WITNESS: I don't know.        10:51:34
16 BY MR. BILLER:
17   Q  You -- you would -- you would agree with me
18 that that testimony is inconsistent with what you
19 just said, correct?
20   A  Mine was speculation, so --      10:51:41
21   Q  Oh, thank you. Everything you've said
22 about Hillshore was speculation, right?
23   A  Yeah, I don't know
24   Q  No  You don't know if it was speculation?
25   MR. BRAND  Objection, mis -- misstates his 10:51:55

Page 49

1 testimony.
2 BY MR. BILLER.
3    Q  Do you know if everything you've said was
4 speculation about Hillshore?
5    MR. BRAND  Objection, argumentative.   10:52:04
6    THE WITNESS  Yes.
7 BY MR. BILLER.
8    Q  Okay. Is it speculative?
9    MR. BRAND: Objection --
10 BY MR. BILLER:                    10:52:09
11   Q  Was it --
12   MR. BRAND: -- asked and answered.
13 BY MR. BILLER:
14   Q  Was it speculative?
15   MR. BRAND: Objection; vague.       10:52:14
16   THE WITNESS  Yes
17 BY MR. BILLER.
18   Q  Okay  So merely because Hillshore's name
19 appears on a piece of paper doesn't mean it exists,
20 does it?                         10:52:23
21   A  Yes
22   Q  Okay. Did you sign an agreement to
23 purchase?
24   MR. BRAND  Objection, vague
25   THE WITNESS: I don't understand your   10:52:42

13 (Pages 46 - 49)

Page 50

```
 1   question.
 2   BY MR. BILLER:
 3      Q   Did you sign an agreement to purchase
 4   membership interest in TW?
 5      A   Yes.                           10:52:47
 6      Q   Where is it?
 7      A   It's in the operating agreement.
 8      Q   No, it's not. I'm asking for a separate
 9   document that's entitled "Agreement to Purchase
10   Membership Interest in TW." It's a separate   10:53:03
11   document.
12      A   If there's an exhibit which states what we
13   had to pay to have interest in TW.
14      Q   Okay. That's not a purchase agreement,
15   okay? We'll get to it.               10:53:18
16          Other than the operating agreement, you
17   never signed anything else, correct, regarding
18   purchase of membership interest? Is that right?
19      A   I don't know.
20      Q   Okay. So as you sit here today on November  10:53:30
21   2nd, 2018, you have no idea if you signed any other
22   document other than the operating agreement to
23   purchase any interest in TW, correct?
24      A   I -- I don't -- I don't recall.
25      Q   Okay. All right. Let's go over to the   10:53:47
```

Page 51

```
 1   next page.
 2          By the way, Counsel, on what basis are you
 3   withholding the Choi documents?
 4          MR. BRAND: Which? Which?
 5          MR. BILLER: No. 10.             10:53:59
 6          MR. BRAND: On the basis of privacy.
 7          MR. BILLER: Privacy. Okay. You know
 8   there is no privacy interest with regard to
 9   businesses. Do you realize that?
10          MR. BRAND: We're --            10:54:09
11          MR. BILLER: Okay.
12          MR. BRAND: -- not going to discuss the
13   legal issues right now.
14   BY MR. BILLER:
15      Q   No. 11. Can you read No. 11, the next   10:54:16
16   page, please. Are you there?
17      A   Yes.
18      Q   Okay. Did you produce all those documents?
19   Oh, did you produce the documents with -- reflected
20   in No. 11?                           10:54:25
21      A   I don't recall. I'm not sure if we had any
22   documents of potential business transactions.
23      Q   If you did have any such documents, would
24   you have produced them?
25      A   Yes.                          10:54:42
```

Page 52

```
 1      Q   How about No. 12?
 2      A   Yes.
 3      Q   Did you produce all those documents?
 4      A   As it relates to PDTW?
 5      Q   Yes.                          10:54:56
 6      A   So the --
 7      Q   No, no, no.
 8      A   Yeah, so --
 9      Q   As related to TW.
10      A   Okay. Documents relating to -- so I'm   10:55:06
11   confused with the request.
12      Q   Okay. Let me go through it, then.
13          And that's perfectly natural, by the way.
14          We're on No. 12, right? Do you see that?
15      A   Uh-hmm. Uh-hmm.               10:55:27
16      Q   "Documents regarding communications with
17   Jene Park at TW between the 14th and the present
18   time." Any communications.
19      A   So I did not produce all these documents.
20      Q   You did not produce them all. Why not?   10:55:44
21      A   One is time frame. I did not produce
22   documents after -- starting in 2016.
23      Q   Why in 2016?
24      A   Because there's a -- I guess there's a
25   Court Order saying -- limiting the scope of the   10:56:03
```

Page 53

```
 1   discovery.
 2      Q   Okay. So you're -- okay. Did you put
 3   those on the privilege log?
 4      A   I don't know.
 5      Q   There's also a Court Order that says that   10:56:13
 6   discovery should go up to June 2016. Why didn't you
 7   produce documents up to June 2016?
 8      A   I was not aware of that Court Order.
 9      Q   Were you -- were you -- are you willing to
10   produce -- it's part of the same order. It's part   10:56:27
11   of the same order.
12          Did you see the order?
13      A   I did not see the order. I was --
14      Q   Okay. That was counsel's decision.
15          Counsel, was that your decision, to limit   10:56:37
16   it?
17          MR. BRAND: I'm not going to discuss the
18   conversations --
19          MR. BILLER: Okay.
20          MR. BRAND: -- that I had with --   10:56:44
21          MR. BILLER: We'll -- I'll put that on the
22   list of things to talk about.
23          MR. BRAND: Sure.
24      Q   How about Meldy? Any conversations with
25   her, communications?               10:56:53
```

14 (Pages 50 - 53)

Page 54

1    A    Yes.
2    Q    Did you produce all of them?
3    A    Limited to the time frame.
4    Q    Okay. So there are documents you have not
5    produced, right?                          10:57:02
6    A    I believe so.
7    Q    Okay.
8    A    I don't know.
9    Q    Now, look, I just want to just briefly
10   describe something to you                 10:57:09
11        Did you know that all the computers at TW
12   have been destroyed?
13   A    I -- I -- I don't know.
14   Q    Okay. I'm telling you -- I'm telling you
15   right now that if you have any documents that relate  10:57:18
16   to this litigation or the federal litigation in any
17   way whatsoever, please preserve them. Can you do
18   that? Even if you find them objectionable, can you
19   do that?
20   A    Yes.                                  10:57:33
21   Q    Will you do that?
22   A    To the best of my ability.
23   Q    Okay. Well, are you a paperless operation,
24   or do you have paper?
25        MR. BRAND: Objection, vague.          10:57:43

Page 55

1    BY MR. BILLER:
2    Q    You can answer the question.
3    A    I don't understand the question.
4    Q    Do you maintain all of your documents in
5    electronic form?                          10:57:50
6        MR. BRAND: Objection; vague.
7        THE WITNESS: Some. I mean, I don't know.
8    BY MR. BILLER:
9    Q    You don't know if you maintain all your
10   papers in electronic form? Really? You don't know  10:58:04
11   that?
12        MR. BRAND: Objection; argumentative.
13   Objection, vague.
14        THE WITNESS: I don't understand your
15   question.                                 10:58:11
16   BY MR. BILLER:
17   Q    Okay. Do you have a computer?
18   A    Yes.
19   Q    Do you know how to use a computer?
20   A    Yes.                                  10:58:15
21   Q    Does that computer have a tower or some
22   form of hard drive inside to store electronic
23   information?
24   A    Yes.
25   Q    Do you know what ESI is?              10:58:23

Page 56

1    A    No.
2    Q    Electronically-stored information. Do you
3    know what it is now?
4        MR. BRAND: Objection, argumentative.
5    BY MR. BILLER:                            10:58:29
6    Q    Do you know what electronically-stored
7    information is?
8    A    No. I don't understand what you're saying.
9    Q    You're the most educated man I have met in
10   my life who doesn't know what electronically-stored  10:58:42
11   information aid -- information is in 2018. Let me
12   explain it to you, okay?
13        Let me -- if you type something into a
14   computer or you receive an e-mail or you receive a
15   DP -- DPF (sic) document or you receive an Excel   10:58:58
16   spreadsheet, that's stored automatically in your
17   computer and in the hard drive.
18        Do you understand that?
19        MR. BRAND: Objection, mischaracterizes
20   ESI.                                       10:59:11
21   BY MR. BILLER:
22   Q    Go ahead.
23   A    I -- I guess I understand what you're
24   saying.
25   Q    Okay. So do you have electronic folders   10:59:19

Page 57

1    for your businesses?
2    A    Yes.
3    Q    Or do you have paper folders?
4    A    I mean, we have probably both.
5    Q    When you say "we," who is "we"?        10:59:30
6    A    Me.
7    Q    Okay. And what's your business?
8        MR. BRAND: Objection; vague.
9    BY MR. BILLER:
10   Q    What -- do you work? Sir, do you work?  10:59:38
11   A    Yes.
12   Q    Okay. Where do you work?
13   A    I work -- I have a business, Ethona.
14   Q    I'm sorry?
15   A    Ethona.                              10:59:50
16   Q    Ethona?
17   A    Yeah.
18   Q    And is that business connected to any other
19   business?
20   A    I don't understand your question.      10:59:57
21   Q    Well, is it associated with LaunchPad?
22   A    No. It's a separate business.
23   Q    Okay. And what does that business do?
24   A    It sells activewear.
25   Q    What is activewear?                   11:00:06

1    A   It is workout sort of clothes, like yoga
2  clothes.
3    Q   And how long has that business been in
4  business?
5    A   I don't remember the exact starting point.   11:00:22
6  but a few years.
7    Q   Well, five years, less than five?
8    A   Probably less than five years.
9    Q   Okay. And you started radiation -- I'm
10  sorry, LaunchPad Communications in 1995, correct?   11:00:34
11    A   I believe so. I don't know. I mean, I
12  believe so.
13    Q   And you caused a website to be put up for
14  that business, didn't you?
15    A   I believe so.            11:00:53
16    Q   Okay. And that website contains
17  information regarding LaunchPad Communications,
18  doesn't it?
19    A   I believe so. I -- I mean, I haven't seen
20  that website for a super long time, so...      11:01:03
21    Q   Okay. So you were the CEO of that
22  business, weren't you?
23    A   I don't think technically I was the CEO.
24    Q   Well --
25    A   I was -- I was a member manager of the      11:01:16

Page 58

1  company.
2    Q   Okay. You were a founder of the business,
3  weren't you?
4    A   Yes.
5    Q   Okay. And how long did that business      11:01:26
6  exist?
7    A   We stopped -- we didn't take any new
8  clientele -- I don't remember the exact date, but
9  definitely a few years back, probably even maybe
10  several years back.            11:01:48
11    Q   How many years?
12    A   I don't -- three to five years ago I think
13  we stopped taking business.
14    Q   I saw the website had TW as its client.
15  Wasn't TW a client?            11:01:57
16    A   No.
17    Q   TW was never its client?
18    A   Of LaunchPad Communications?
19    A   Yeah.
20    A   No.              11:02:04
21    Q   Okay. Was LaunchPad Communications in
22  business when TW became operative?
23    A   Yes.
24    Q   Okay. So if -- what type of business was
25  LaunchPad Communications?            11:02:23

Page 59

1    A   LaunchPad Communications is a d/b/a for
2  Consumer Resource Network.
3    Q   Okay. So when I refer to LaunchPad
4  Communications --
5    A   Uh-hmm.              11:02:39
6    Q   -- you understand the business I'm
7  referring to, correct?
8    A   I'm assuming you're referring to Consumer
9  Resource Network, then.
10    Q   Okay.              11:02:49
11    A   Yes.
12    Q   Consumer Resource Network.
13    A   Uh-hmm.
14    Q   Okay. So what type of business was
15  Consumer Resource Network?          11:02:55
16    A   It was a marketing business that -- it was
17  a marketing business we had, yeah.
18    Q   I don't understand what marketing business
19  is.
20    A   We marketed products, real estate products   11:03:12
21  mostly.
22    Q   Did Consumer Research -- what is it,
23  Consumer Research --
24    A   Resource Network.
25    Q   -- Networks (sic)?            11:03:28

Page 60

1    A   Uh-hmm.
2    Q   Did that business provide TW with any
3  services?
4    A   At one point Consumer Resource Network
5  loaned TW money            11:03:38
6    Q   About what, a hundred thousand, 250,000?
7    A   It was 225,000.
8    Q   Was that paid back?
9    A   Yes.
10    Q   Do you have documentation regarding that   11:03:48
11  loan?
12    A   Yeah.
13    Q   Did you produce that?
14    A   Yes.
15    Q   Okay. When you say "marketing," explain   11:03:54
16  how the business went about marketing products or
17  services.
18    A   It would market through all different media
19  sources, so it would be radio, TV, print ads, so...
20    Q   That sounds like LaunchPad      11:04:16
21    MR. BRAND:  That's --
22    THE WITNESS:  I think there's -- there's a
23  confusion as to what -- I -- I don't -- I don't know
24  exactly what you saw on LaunchPad Communications.
25  BY MR. BILLER            11:04:27

Page 61

16 (Pages 58 - 61)

1   Q   I have it. I'll show you. We'll get to
2 it.
3   A   So I think there's a little bit of
4 confusion as to what LaunchPad Communications was.
5        MR. BILLER:  What time did we start?     11:04:41
6        THE VIDEOGRAPHER:  10:14 A.M.
7        MR. BILLER:  Okay.
8   Q   How about No. 14?  I take it you didn't
9 produce all those documents, did you?
10   A   I did not produce those documents.     11:04:57
11   Q   Are they on the privilege log?
12   A   I believe so.
13   Q   Okay. Are there any documents not on the
14 privilege log?
15   A   No.                11:05:09
16   Q   Do you have --
17   A   That I know of.
18   Q   -- any documents regarding David Schnider
19 that falls outside of the unilaterally imposed
20 January 1st, 2016 date that you didn't put on the     11:05:20
21 privilege log?
22        MR. BRAND:  Objection to the
23 characterization as unilaterally imposed.
24        THE WITNESS:  Can you repeat the question.
25        MR. BILLER:  Read the question back,     11:05:35

Page 62

1 please.
2        (The last question was read.)
3        THE WITNESS:  I don't understand the
4 question.  Could you repeat it in a -- I'm not
5 exactly --             11:05:55
6 BY MR. BILLER:
7   Q   Did you --
8   A   -- sure what you're asking.
9   Q   -- produce any documents related to David
10 Schnider, any communications related to David     11:06:01
11 Schnider that took place after January 1st, 2016?
12   A   Can you repeat the question again.
13        MR. BILLER:  Read back the question.
14        (The last question was read.)
15        MR. BRAND:  Did you mean '14 or '16?     11:06:33
16        MR. BILLER:  No, I meant '16.
17        MR. BRAND:  Okay.
18        THE WITNESS:  After 2016.  So can you
19 repeat the question.  Documents after 2016?
20 BY MR. BILLER:              11:06:42
21   Q   Lookit, let me do it this way.  You
22 produced documents up to a certain point in time,
23 correct?
24   A   Yes.
25   Q   And that point in time was December 31,     11:06:49

Page 63

1 2015?
2   A   Yes.
3   Q   Okay. So are there any documents that you
4 didn't produce after that regarding David -- David
5 Schnider?                11:07:02
6   A   I -- I believe so.
7   Q   Okay. Are they on the privilege log?
8   A   I don't know.
9   Q   Okay. Did you produce all the documents
10 you have regarding communications related to John     11:07:23
11 Hanna?
12   A   Again, based on time frame?
13   Q   No, just at all.
14   A   Did I pro -- did we produce -- can you
15 repeat the question.            11:07:42
16        (The prior question was read.)
17        THE WITNESS:  No.
18 BY MR. BILLER:
19   Q   And on what basis are you withholding
20 documents from -- regarding John Hanna?  On what     11:08:01
21 basis are you withholding communications with John
22 Hanna?
23        MR. BRAND:  Objection, calls for a legal
24 opinion.
25        MR. BILLER:  Is it this -- the date?     11:08:13

Page 64

1        MR. BRAND:  Yes, it's the date.
2        MR. BILLER:  Okay.
3        THE WITNESS:  Yes, the date.
4 BY MR. BILLER:
5   Q   So is it safe to say -- let's try and get     11:08:22
6 through all of this -- that you didn't produce any
7 documents related to Request 16 through 21 that fell
8 outside of December 31st, 2015?
9   A   Yes.
10   Q   Okay. Did you produce documents that     11:08:35
11 existed before that date regarding these requests?
12   A   Yes.
13   Q   Okay. You -- so you produced documents
14 regarding business dealings between yourself and
15 Roger Kuo, Gonzalez, Park, Hanna and Hillshore?     11:09:03
16        MR. BRAND:  Objection: compound.
17        MR. BILLER:  Okay.
18   Q   Did you produce any documents regarding any
19 business dealings you had with Hillshore?
20   A   Yes, if I had any.        11:09:20
21   Q   Okay. But you don't know if you had any?
22   A   I don't know. I -- I don't -- I don't
23 remember if there was anything there, but.
24   Q   Have you had any business dealings with
25 John Hanna?              11:09:31

Page 65

17 (Pages 62 - 65)

Page 66

1  A   I -- I don't believe so.
2  Q   Jene Park?
3  A   I don't believe so.
4  Q   Gonzalez?
5  A   I don't believe so.                11:09:37
6  Q   Kuo?
7  A   Have I had business dealings with --
8  Q   Yes.
9  A   -- Kuo?  Yes.
10  Q   Before two thou -- before December 31,   11:09:48
11 2015?
12  A   Yes.
13  Q   Did you produce those documents?
14  A   I -- I produced documents that were all
15 related to TW.                11:09:59
16  Q   But you didn't produce the other documents
17 related to other business dealings?
18  A   Yes.
19  Q   Same thing with Stephen Choi?
20  A   Yes.                11:10:09
21  Q   22.  Did you produce any documents related
22 to other companies that you have an ownership
23 interest in other than TW?
24  A   No.
25  Q   How many companies are there?        11:10:33

Page 67

1  A   I -- I don't know.
2  Q   More than one?
3  A   Yes.
4  Q   More than five?
5  A   Yes.                11:10:41
6  Q   More than 15?
7  A   I don't know.
8  Q   I have a website that shows that you have
9 13 dummy corporations.  Is it more or less than 13?
10       MR. BRAND   Objection; mischaracterizes the 11:10:50
11 website.
12 BY MR. BILLER
13  Q   Are you familiar with the website that has,
14 you know, your -- a -- a business that you own in
15 the middle, then branches out to 13 other     11:11:00
16 businesses?
17       Do you remember that?
18  A   I -- I -- I kind of remember.  I don't --
19 again, I'm not sure what you've seen, and I think
20 there's a -- yeah.                11:11:13
21       So I -- I don't -- I don't remember.  I can
22 vaguely remember something.  I just don't remember
23 what you're looking at.
24  Q   Did you produce any documents from those
25 other businesses?                11:11:24

Page 68

1  A   No.
2  Q   Okay.  Did you produce any documents
3 regarding the lawsuit against TW, involving TW?
4  A   No.  I -- I mean, I didn't -- I didn't
5 really understand that question of --        11:11:45
6  Q   Let me --
7  A   -- what I was supposed to provide you.
8  Q   Documents related to any lawsuit involving
9 TW.  I don't know how simple it can get  Documents
10 related to any lawsuit involving TW.        11:11:53
11       Did you provide any such documents?
12       MR. BRAND:  Objection; argumentative.
13       THE WITNESS:  So I -- I -- I don't have --
14 I mean, again, I'm not -- if you're talking about
15 the -- the litigation that I'm involved in, I think  11:12:10
16 I provided a complaint that -- I think there was a
17 complaint that Paul (sic) -- the Paula document.
18 But outside of that, I don't have any.
19       I don't think -- I believe I don't have any
20 documents related to any lawsuits involving TW.   11:12:30
21 BY MR. BILLER:
22  Q   Okay.  Have you had any con -- doc -- do
23 you have -- did you produce any documents regarding
24 financial losses or damages sustained?
25  A   I -- I don't believe I do  I don't believe 11:12:45

Page 69

1 I did, or I don't have anything.
2  Q   Did you ever recover your $16,000 from TW?
3       MR. BRAND:  Objection; mischaracterizes --
4 BY MR. BILLER:
5  Q   Did you ever re --            11:12:58
6       MR. BRAND:  -- prior testimony.
7 BY MR. BILLER:
8  Q   Did you ever recover any money that you
9 invested in TW?
10  A   No.                11:13:06
11  Q   Okay.  Did you declare any losses on your
12 personal tax returns for TW?
13       MR. BRAND:  Objection; privacy right.
14       You don't have to answer questions about
15 your tax returns.                11:13:18
16 BY MR. BILLER:
17  Q   Do you know who Alex Park is?
18  A   I -- I believe so.
19  Q   Okay.  Who is Alex Park?
20  A   I believe he is a -- one of the vendors for  11:13:31
21 Thomas Wylde.
22  Q   Did you have any communications between him
23 and you?
24  A   Direct communications between, no.
25  Q   How about indirect?            11:13:46

**Page 70**

1  A  Well, there's something after 2016.  He
2  sent an e-mail to a group of people I was cc'd on,
3  so...
4  Q  Did you produce that?
5  A  No, because it was after 2016.  11:14:02
6  Q  Do you have any business records of TW?
7  A  No.  Define "business records."
8  Q  Well, I'll tell you what Judge Yun said.
9  Accounting, finance, contracts, e-mails.
10  A  Oh, okay.  Is this -- is this Question  11:14:42
11  No 30 you're asking?
12  Q  Yeah.
13  A  Yeah.  So I have reports that Meldy had
14  sent out  I mean, random.  And I don't think I have
15  every single one.  So whatever she had sent out, I  11:14:58
16  have provided those
17  Q  Would you refer to those reports as
18  financial reports telling you the health of the
19  company?
20  A  Yeah.  Yes.  They would be financial  11:15:06
21  reports, yeah.
22  Q  Okay  Did they fall -- follow the same
23  format?
24  A  What do you mean by that question?  Can you
25  restate  11:15:17

**Page 71**

1  Q  Were -- were they identical in form other
2  than the specific numbers?
3  A  Yes and no.  I mean, sometimes they'd be —
4  I mean, I guess, kind of  I mean, I think overall.
5  I mean, I couldn't tell you exactly  And I don't  11:15:33
6  remember each document and exactly how it was set
7  up, but pretty similar
8  MR. BILLER:  Okay.  It's been one hour.  Do
9  you want to take a break?  It's been one hour.
10  MR. BRAND:  Yeah.  11:15:59
11  THE VIDEOGRAPHER:  This marks the end of
12  Media No. 1.  Going off the record at 11:16 A.M.
13  (Recess.)
14  THE VIDEOGRAPHER:  This marks the beginning
15  of Media No. 2.  Going back on the record at 11:27  11:27:36
16  A.M.
17  MR. BILLER.  Let's have the next document
18  in order marked as Exhibit 5, pages from a website
19  for LaunchPad.
20  (Exhibit 5 was marked for identification  11:28:01
21  by the court reporter )
22  (Witness reviews document.)
23  MR BRAND  Madam Court Reporter, if I may,
24  do we have an appearance from -- on the record from
25  the lady at the end of the table?  I don't think we  11:28:45

**Page 72**

1  ever –
2  MR. BILLER:  Oh.  Paula Thomas.
3  MR. BRAND:  Okay.  Thanks.  I forgot about
4  that.
5  BY MR. BILLER:  11:28:52
6  Q  Have you had a chance to look over Exhibit
7  No. 5?
8  A  Yes.
9  Q  Okay.  Is Exhibit No. 5 pages from the
10  Internet site maintained by LaunchPad?  11:29:35
11  A  Yes.
12  Q  And do you see in the left-hand corner
13  where it says 7/21/2018?
14  Do you see that?
15  A  Yes.  11:29:45
16  Q  And do you know what that date represents?
17  A  I don't know.
18  Q  Okay.  And this business started in 1995,
19  right?
20  A  Yes.  11:29:55
21  Q  And if we go to the back, it describes your
22  position, doesn't it?
23  A  Yes.
24  Q  So can you please read into the record what
25  your position is in the description.  11:30:17

**Page 73**

1  A  You mean where it says "Douglas Lee,
2  Founder and Managing Director"?
3  Q  Yeah.
4  A  Okay.
5  "Founder and Managing Director.
6  Doug is a Founder and Managing
7  Director of LaunchPad.  His primary
8  role is to set the vision and
9  direction of the company.  In
10  addition, he oversees the
11  Advertising, Human Resources --"
12  Q  Slow down.  Slow down.
13  A  Oh, I'm sorry.
14  ..."he oversees the Advertising,
15  Human Resources and Sales
16  Department, handles all legal and
17  regulatory matters and is involved
18  in new business development and
19  strategic alliances.  Doug has 14
20  years' experience in management and
21  business development.  Prior to
22  co-founding the company in 1995,
23  Doug was a Manager at Ernst & Young
24  LLP specializing in international
25  tax.  He was involved in planning

19 (Pages 70 - 73)

Page 74

```
 1     and implementing tax-advantage
 2     structures and transactions  Doug
 3     holds a B.A. in Government (cum
 4     laude) from Dartmouth College and a
 5     J.D. from UCLA School of Law.  Doug
 6     enjoys playing golf, swimming,
 7     working out and watching movies as
 8     well as spending time with his wife
 9     and two kids."
10  Q   So when you testified you didn't -- you    11:31:24
11  didn't know what a dummy corporation was when you
12  were a manager at Ernst & Young in international
13  tax, and you've got a degree in international tax --
14  you've heard of the phrase "dummy corporation"
15  before today, haven't you?    11:31:43
16     MR. BRAND:  Objection; misstates his prior
17  testimony.
18  BY MR. BILLER.
19  Q   Haven't you?
20  A   Yes and no.  I mean, I'm not -- I just    11:31:50
21  didn't understand the context of what you were
22  trying to say.
23  Q   My question is:  Before today you've heard
24  of the phrase "dummy corporation," correct?
25  A   I believe so.    11:32:00
```

Page 75

```
 1  Q   Okay.  And you knew a meaning of the
 2  word -- the phrase "dummy corporation," didn't you?
 3  A   I mean, again, I -- the context of what you
 4  were saying, I wasn't sure what you were getting to,
 5  but, yes.    11:32:13
 6  Q   It really doesn't matter what I'm getting
 7  to, sir.  What matters is the question and whether
 8  you can answer the question.
 9     So my question to you:  Before today you
10  had an understanding of the meaning of "dummy    11:32:23
11  corporation," correct?
12     MR BRAND  Objection, asked and answered
13     Objection, argumentative
14  BY MR BILLER
15  Q   You can answer.    11:32:31
16  A   I guess so
17  Q   Okay  Now, you -- this -- I was really
18  impressed with this website, you know.  I thought,
19  wow, they must do a lot to help a company.  And I --
20  I suppose you were -- this company was successful in    11:32:46
21  some respects with helping other companies market,
22  advertise, strategic planning and all that stuff?
23  A   Yes.
24  Q   Okay.  And -- but is the company still in
25  business?    11 33:00
```

Page 76

```
 1  A   No.
 2  Q   When did it go out of business?
 3  A   Like I said, several years back.
 4  Q   Okay.  Did you produce any documents on
 5  this business?    11.33.08
 6  A   No
 7  Q   Why not?
 8  A   I don't understand the question.
 9  Q   You don't understand the question why you
10  failed to produce documents regarding LaunchPad?    11 33:22
11  A   Oh, you mean under the -- the -- the
12  separate subpoena?
13  Q   The subpoena, yes
14  A   I -- I guess my question is, is are you
15  talking about the questions under LaunchPad that you  11.33 35
16  were asking in -- there's two subpoenas, so --
17  Q   Yes.
18  A   So, you know, yeah, we did provide
19  documents.
20  Q   Okay  It says.    11:33:43
21     "Documents related to any and all
22     products, website pages, images,
23     conduct, language, marketing
24     materials, photographs and
25     communications -- LaunchPad    11 33:49
```

Page 77

```
 1     Communi -- Communications provided
 2     to TW between 2014 and the present
 3     time."
 4     Did you produce any of that?
 5  A   LaunchPad didn't do anything for TW.    11:33:58
 6  Q   Okay.
 7  A   So there was nothing to produce.  We -- we
 8  had no -- outside of the -- the loan that was
 9  provided, there was no other interaction with P --
10  TW.  It was me as an individual.    11:34:12
11  Q   Why didn't you use your skills as a manager
12  in charge of advertising, in charge of marketing, in
13  charge of human resource, in charge of sales -- why
14  didn't you use those skills to help TW?
15  A   TW had all of those different components,    11:34:34
16  so our role was more as advisory role, and we tried
17  to -- I did try to assist in kind of the marketing
18  side of it, so we'd have discussions about the
19  marketing.  But, I mean, I wasn't there on a
20  day-to-day basis, so it wasn't --    11:34:56
21  Q   My question is.  Why didn't you have
22  LaunchPad provide those services?  'Cause that's
23  what the company did.
24  A   LaunchPad at this time was not in
25  existence.    11:35:06
```

20 (Pages 74 - 77)

**Page 78**

1  Q   Okay. But the -- how about the sub -- the
2  resource consumer network?
3  A   No. It was not in business at this time.
4  The business had already been -- so at this -- by
5  this time LaunchPad was not around. So I was not    11:35.18
6  doing anything as LaunchPad.
7  Q   Okay. What business was around -- what
8  business was around in 2014, 2015 that you were
9  engaged in?
10      MR. BRAND: Objection; vague. Objection --   11:35:30
11 BY MR. BILLER:
12  Q   You can answer.
13      MR. BRAND: -- right to privacy. Can you
14 rephrase the question?
15      MR. BILLER: Sure.    11:35:40
16  Q   Who did you work for in 2014?
17  A   I didn't -- I mean, I didn't technically
18 work for anyone. I had -- so LaunchPad and Consumer
19 Resource Network was no longer operational, so it
20 was not doing anything for anybody else. At that    11:35:53
21 point we were just maintaining business --
22 subscription businesses and different things like
23 that.
24      We had built a -- I guess at that point
25 Consumer Resource Network had some recurring    11:36:08

**Page 79**

1  revenue. We had information that was being
2  provided, so it was supporting that.
3      And then we had some other subscription
4  businesses, shopping clubs; different things like
5  that, so it supported that.    11:36:21
6      So at that time LaunchPad was not taking on
7  clients or doing anything like it says here. We
8  were already out of -- we weren't doing any of the
9  stuff.
10     Technically we were still in business    11:36:31
11 because revenue streams that were still coming in,
12 but we weren't operational or doing any of these
13 things. We didn't have a call center. We didn't
14 have these different aspects at that point.
15  Q   Did you have people responsible for or    11:36:41
16 talented in advertising?
17  A   No. We did not --
18  Q   How about marketing?
19  A   We had almost no -- by this time we didn't
20 have any employees.    11:36:51
21  Q   By what time?
22  A   By the time we had met with TW we had a
23 handful of employees, probably like --
24     (Cell phone interruption.)
25     THE WITNESS: This is probably two or three    11:37:01

**Page 80**

1  employees or something like that, just to maintain
2  our old businesses.
3  A   So we weren't doing any of these services
4  at the time that we -- when I met PD --
5  BY MR. BILLER.    11:37:14
6  Q   Did you lo --
7  A   -- TW.
8  Q   Did you lose all the knowledge you had
9  gained while working at LaunchPad?
10     MR. BRAND: Objection, argumentative    11:37:18
11     THE WITNESS: No.
12 BY MR. BILLER:
13  Q   You had that knowledge, correct?
14  A   Yes.
15  Q   Okay. So you had advertising knowledge,    11:37.23
16 correct?
17  A   Our advertising knowledge was not for
18 brand -- fashion brands.
19  Q   Okay. That's not my question. I'm asking
20 you if you had advertising knowledge.    11:37:35
21  A   Yes.
22  Q   Marketing? You still had that knowledge
23 that you gained over the years, right?
24  A   Yes.
25  Q   And sales as well, right?    11:37.45

**Page 81**

1  A   Yes, but very different sales, so...
2  Q   Okay. I want to know -- I still -- you
3  know, I still don't know what you do. I've been
4  with you for an hour and 15 minutes, and it seems
5  like every time I try to get an answer as to what    11:38:03
6  you do or what you did, I can't get a straight
7  answer.
8      Like the answer you just gave about
9  LaunchPad, that sounded great but meant nothing. So
10 I would like to know what job you had in 2014. What    11:38:13
11 was your job?
12     MR. BRAND: Objection; argumentative.
13 Objection, misstates prior testimony. Objection;
14 vague
15     THE WITNESS: In 2014, as I was trying to    11:38:28
16 explain to you, LaunchPad Communications was no
17 longer taking on business or being operational. We
18 had legacy business, we had customers that were --
19 where -- we provided real estate information for.
20 We had other businesses that provided various    11:38:49
21 services like auto care or shopping or different
22 things like that
23     So we were still maintaining that business.
24 We had customer service issues that would come up.
25 We would have to take care of accounting, you know,    11:39:04

**Page 82**

1  that we had merchant accounts. Different things
2  like that. So I was doing that.
3      So that was still our primary role of
4  maintaining or just managing that business. So that
5  was probably the main thing that I was doing at that  11:39:19
6  time
7  BY MR. BILLER
8      Q   How many businesses did LaunchPad control
9  or own at that time?
10     A   LaunchPad didn't -- I mean, I don't -- I do  11:39:27
11 not believe LaunchPad owned any companies underneath
12 it. I don't think there were any subsidiaries
13 underneath it, but I don't -- I don't remember
14 exactly
15     Q   How were you connected to Consumer Research  11:39:41
16 (sic) Network?
17     A   Like I said, Consumer Resource Network was
18 doing -- was d/b/a LaunchPad Communications. And so
19 I was owner or member of Consumer Resource Network.
20     Q   So -- and when did you stop working with  11:40:04
21 Consumer Network -- Consumer Resource Network or
22 LaunchPad Communications?
23     A   I -- we still technically have left over --
24 we still have that business
25     Q   So that's your main form of occupation?  11:40:17

**Page 83**

1      A   That, yes, and Ethona.
2      Q   And what?
3      A   And Ethona, the activewear company.
4      Q   Can you spell that.
5      A   E T H O N A.  11:40:27
6      Q   Who is -- who owns that business?
7      A   I'm one of the partners.
8      Q   Who's the other partner?
9      A   Roger is a partner. Roger Kuo's a partner.
10 Let's see. I'm trying to figure out -- Jason Webski  11:40:55
11 is a partner. And then I guess -- I think those are
12 the current partners.
13     Q   Okay.
14     A   Yeah.
15     Q   Now, you have other businesses that you  11:41:13
16 won't identify, correct?
17     A   I -- yes.
18     Q   Okay. How many other businesses do you
19 have?
20         MR. BRAND: Objection; asked and answered.  11:41:27
21         THE WITNESS. I don't -- I mean, I'm not
22 exactly sure  I have -- I have businesses that
23 related to LaunchPad that we still file tax returns
24 associated with
25         So -- again, I don't know how many  11:41:44

**Page 84**

1  companies are still under -- underneath that group
2  of companies. Probably, altogether -- like
3  entities, probably ten, maybe.
4  BY MR. BILLER.
5      Q   I just asked you a few moments ago if there  11:42:01
6  were any businesses under LaunchPad and you said
7  "no," there are no subsidiaries under LaunchPad.
8      A   Yeah, they're not subsidiaries.
9      Q   Now you just told me that there are
10 businesses under LaunchPad that you still prepare  11:42:13
11 tax returns on
12     A   Well, no, they're not under LaunchPad.
13 Launch -- Consumer Resource Network is here
14 (indicating) and there might be -- they're next
15 to -- they're brother/sister corporations, I would  11:42:23
16 say, or just separate entities.
17     Q   They're --
18     A   But they were kind of -- what I meant that
19 they were related was they're all part of a -- a
20 similar sort of business when we had start -- when  11:42:33
21 we had created it originally.
22     Q   Okay. What type of businesses are those?
23     A   So the other businesses are -- like I said,
24 they're subscription companies, so we have a third
25 party that we outsource it  They provide various  11:42:46

**Page 85**

1  services. So there might be a shopping club, there
2  might be a health discount program.
3      A lot of 'em are discount programs. There
4  might be an auto discount program. So those are the
5  entities that we have -- that we get -- we still get  11:42:59
6  subscription from. So we --
7      Q   Do you --
8      A   -- get monthly fees from some.
9      Q   Do you have a -- a chart that shows all
10 these companies?  11:43:08
11     A   I -- I don't. I mean, no, I don't have one
12 right now.
13     Q   So how do you keep -- how do you keep all
14 these companies organized so that you can easily
15 refer to them?  11:43:18
16     A   Well, I haven't had to, so -- and then we
17 have an accountant who takes care of just, you know,
18 filing and dealing with the taxes and --
19     Q   Who's --
20     A   -- the --  11:43:33
21     Q   -- your accountant?
22     A   -- P&L's.
23         It would be Alex Kim. He's actually a
24 partner in a company.
25     Q   What's the company?  11:43:45

22 (Pages 82 - 85)

1  A  He's one of the guys on this list, Alex
2 Kim. He's the chief financial officer. So he
3 still is the chief financial officer. He still
4 maintains it, so...
5  Q  Does he do the taxes at his company or  11:43:55
6 for -- at LaunchPad?
7  A  Oh, he's -- he does the taxes for --
8  Q  The company?
9  A  -- the company, yes.
10   (Simultaneous talking.)  11:44:03
11  Q  So he's like --
12  A  He's just --
13  Q  -- the CFO?
14  A  Yeah. Yeah. That's right.
15  Q  So he does -- he's -- he's the person that  11:44:06
16 prepares the tax returns?
17  A  Yeah.
18  Q  Okay. What's the current status of TW?
19   MR. BRAND: Objection; ambiguous.
20   THE WITNESS: I -- I don't -- I don't know.  11:44:26
21 BY MR. BILLER:
22  Q  Aren't you interested?
23   MR. BRAND: Objection; argumentative.
24   THE WITNESS: I mean, I -- I'm -- I know
25 that it's not doing well, so -- I mean, that's --  11:44:37

Page 86

1  Q  Do you know what --
2  A  I can't answer.
3  Q  -- T -- PDTW is?
4  A  I -- I know it's an entity that Paula owned
5 and that it owned at one point the IP. And then  11:45:38
6 when TW was created there was a transfer. But
7 outside of that I -- I don't really know --
8  Q  Okay.
9  A  -- PDTW that well.
10   (Simultaneous talking, unreportable.)  11:45:53
11  Q  Let me get --
12  A  I -- I don't know --
13  Q  Let me --
14  A  I don't know how the structure was.
15  Q  Let me get this right.  11:45:54
16  A  Okay.
17  Q  Okay? You were somebody who's supposed to
18 find an investment for PDTW, right? That was the
19 company you signed an agreement with, right?
20  A  I'm not sure which -- I didn't know which  11:46:08
21 company we signed the agreement with.
22  Q  You -- you can -- I'm sorry, I'm just in
23 shock. I'm just in shock.
24   You signed a binding term agreement to
25 collect a finder's fee to find investors willing to  11:46:20

Page 88

1 that's the extent of what I know. I --
2 BY MR. BILLER:
3  Q  Well, it hasn't been doing well for nearly
4 four years; isn't that right?
5  A  Yes.  11:44:48
6  Q  It never did well after Paula -- Paula
7 Thomas left; is that right?
8  A  It -- it didn't do well prior to Paula
9 Thomas leaving.
10  Q  She was there three months.  11:44:56
11  A  Even prior to that it wasn't doing well.
12  Q  Uh-huh.
13  A  So when we got involved it was doing very
14 poorly.
15  Q  Okay. Have you looked at its tax returns?  11:45:03
16  A  I have not.
17  Q  Have you ever looked at PDTW's tax returns?
18  A  PDTW?
19  Q  Yeah, the company that you put out of
20 business.  11:45:13
21   MR. BRAND: Objection; argumentative.
22   THE WITNESS: I don't -- I haven't seen --
23 I don't --
24   (Simultaneous talking.)
25 BY MR. BILLER:  11:45:18

Page 87

1 invest $5.5 million on behalf of PDTW, and you don't
2 remember PDTW? Really?
3   MR. BRAND: Objection; argumentative.
4   THE WITNESS: I'm saying I didn't -- I
5 didn't -- I don't remember which companies were  11:46:38
6 which when we had this arrangement. So I didn't
7 know that -- whether PDTW -- there was TW. I don't
8 know if there was other entities. I just didn't
9 know which entities that we were talking with.
10 BY MR. BILLER  11:46:52
11  Q  Well, don't you -- don't you do a certain
12 amount of investigation before you go and find an
13 investor who's going to invest $5.5 million in a
14 company?
15  A  Yes.  11:47:00
16  Q  What do you do?
17  A  We -- we spent time talking with the people
18 who were involved, and they kind of explained to us
19 what they do. We got financial information. And
20 then we went through the process of -- and so I  11:47:13
21 don't -- again, I don't remember the semantics of
22 each company that was involved and the exact
23 structure that was set up.
24  Q  Excuse me if I -- if I don't -- if I take
25 offense to your use of the word of "semantics."  11:47:26

Page 89

23 (Pages 86 - 89)

1   Okay?
2       Did you not know that PDTW was the -- the
3   entity that actually was responsible for designing
4   the clothes and manufacturing the clothes and
5   distributing the clothes and selling the clothes and  11:47:39
6   marketing the clothes and having shows regarding the
7   clothes? Do you not remember that?
8       MR. BRAND: Objection; argumentative.
9   Objection; compound.
10  BY MR. BILLER:                          11:47:55
11   Q   Do you or do you not remember that?
12   A   I think the confusion is more that I -- my
13  understanding was that there was a comp -- two
14  separate companies. There was a company that Paula
15  owned separately and a -- a company that was the  11:48:06
16  operational company. So I guess that's my
17  confusion.
18       I didn't know -- if there was two
19  companies, I didn't know what the companies' names
20  were.                                   11:48:18
21   Q   Well, you're still confused, 'cause Paula
22  owned both those companies.
23   A   Okay. Well, that's what -- when you say
24  "PDTW" --
25   Q   Okay  So --                        11 48 21

Page 90

1   A   -- I don't know which company that was.
2   Q   This investment scheme did not involve
3   PDTW, right?
4   A   I -- I -- I can't answer that question. I
5   don't know.                            11:48:32
6   Q   You were -- you -- you were involved in
7   negotiating the investment. You were the guy who
8   was responsible for negotiating the investment with
9   John Hanna, right? You acted on behalf of Stephen
10  Choi and negotiated the investment with John Hanna  11:48:46
11  for PDTW, correct?
12   A   I negotiated -- I didn't -- I mean, at the
13  end of the day, no, the negotiation -- the final
14  negotiation was Stephen decided on what -- what --
15  what -- what the terms were, but we were -- we  11:49:04
16  presented the idea to Stephen, yes, but --
17   Q   Oh --
18   A   -- we didn't -- we didn't negotiate the
19  final deal as to what this deal --
20   Q   All right.                         11:49:13
21   A   -- was for.
22   Q   You were just -- you were just a puppet for
23  Stephen?
24       MR. BRAND: Objection; argumentative and
25  ambiguous.                             11:49 19

Page 91

1   BY MR. BILLER:
2    Q   You just did what -- what Stephen Choi
3   told you to do, is that it?
4    A   Yeah, Stephen decided what the deal terms
5   were.                                  11:49:27
6    Q   Did he -- did he give you the terms of the
7   deal to communicate to the other side?
8    A   I believe so, yes.
9    Q   Okay.
10       Let me have the next document marked in  11:49:35
11  order, No. 6. I can't find the other copies. I'm
12  sorry, but...
13       MR. BRAND: Okay. I only seem to have
14  three copies of exhibits here, so I guess --
15       MR. BILLER: Well, you have one of the --  11:49:52
16       MR. BRAND: So this is 5.
17       MR. BILLER: Yeah, the next one will be 6.
18       MR. BRAND: I think this is 1 and 2. I'm
19  missing 3 and 4.
20       MR. BILLER: Okay. I'll give you 3 and 4.  11:50:00
21       (Exhibit 6 was marked for identification
22       by the court reporter.)
23  BY MR. BILLER:
24   Q   Have you seen Exhibit No 6 before?
25       MR. BRAND: Can you show him the exhibit?  11 50 24

Page 92

1        MR. BILLER: Yeah (handing).
2        MR. BRAND: Thank you.
3        THE WITNESS: Have I -- so what's the
4   question?
5   BY MR. BILLER:                          11:50:34
6    Q   Have you seen Exhibit No. 6 before?
7    A   I have -- I've seen it, yes.
8    Q   Did you read it?
9    A   I did not read this whole thing.
10   Q   Did you read anything in it?           11:50:42
11   A   I don't recall.
12   Q   Do you know what that is?
13   A   It's a valuation.
14   Q   Valuation report, right?
15   A   Yeah.                              11:50:52
16   Q   Do you know what that is?
17   A   Yes.
18   Q   What is a valuation report?
19   A   It's the valuation of the intellectual
20  property.                              11:50:59
21   Q   Do you know when that was prepared?
22   A   Well, it says here October 17th, 2013.
23   Q   Right. That was a little over a -- a
24  little over a year before TW was created, right? TW
25  was created on July 22, 2014.           11:51:16

Page 93

1    have it.

2            A       I'm sorry about that.

3            Q       What type of backup documents are you

4    referring to?

5            A       There would be deposit slip or bank

6    credits -- bank statements.

7            Q       So unless you have backup documents, you

8    can't rely on QuickBooks.  Is that what you're saying?

9            A       No.  The QuickBooks entries has backup

10   documents before you enter them.

11           Q       Just answer me a simple question.  There

12   is no entries for any money received by Thomas Wylde on

13   Exhibit 65 for 2015; correct?

14           A       Rephrase that.

15           MR. BILLER:  Read the question back.

16                   (The record was read by the Certified

17           Shorthand Reporter.)

18           THE WITNESS:  If it's recorded here, the money

19   was received.

20   BY MR. BILLER:

21           Q       Just answer the question, Exhibit 65,

22   are there any entries for 2015?

23           A       2015 for this?

24           Q       Just answer my question, please.  I know

25   you're trying to help John Hanna.  Please, you have to

Page 59

1    A    No, I did not.

2    Q    You just went straight to a CPA firm, one

3 of the biggest ones, correct?

4    A    Yes.

5    Q    But you weren't an accountant, right?    11:58:46

6    A    No.

7    Q    So what did you do in your position as a

8 manager for the international tax group?

9    A    We would work on -- well, clients had

10 international tax questions, and we would help    11:59:05

11 create -- solve or help them with their tax

12 structures.

13    Q    You also helped -- helped them put their

14 money in offshore accounts, right?

15    A    No.    11:59:15

16    Q    You never did that?

17    A    I was not involved or I did not do -- we

18 did corporate sort of structuring. I was not

19 involved in individuals moving --

20    Q    Well, you said Hillshore is a corporation.    11:59:26

21    A    Yeah. So, I mean -- we were doing

22 corporate structures for very large corporations and

23 setting up tax structures for them, for

24 corporations.

25    Q    Is it your testimony you don't know how to    11:59:38

Page 98

1 hide money in offshore accounts?

2    MR. BRAND:    Objection; misstates the

3 testimony and argumentative.

4    THE WITNESS:    Yes, I do not know how to

5 hide money in offshore accounts.    11:59:46

6 BY MR. BILLER:

7    Q    You don't know how to move money around the

8 country?

9    A    I do not know how to move money around the

10 country.    11:59:53

11    Q    What happened to the over $20 million that

12 was invested in TW?

13    MR. BRAND:    Objection; lack of foundation.

14 BY MR. BILLER:

15    Q    What happened to the nearly $20 million    12:00:04

16 that was invested in TW between August 13, 2014 and

17 November 2nd, 2016? What happened to that money?

18    MR. BRAND:    Objection; lacks foundation.

19 BY MR. BILLER:

20    Q    You can answer the question.    12:00:22

21    A    Well, obviously I'm not at the corporation,

22 but it was used for overhead, which there was quite

23 a bit. So it's used for payroll. It was used to

24 pay back quite a bit of debt that P dub -- PDTW had.

25 It was used to pay for inventory.    12:00:43

Page 99

1    Q    Okay. You're guessing right now.

2    A    Well, I don't understand --

3    Q    Okay.

4    A    -- how I'm supposed to --

5    Q    The question --    12:00:48

6    A    -- answer the question.

7    Q    The question is: How can a company that

8 operated on expenses at $3 million a year and

9 have revenues of $7 million a year -- how can a

10 company like that go to a company that is getting    12:01:0

11 $12 million a year, three in revenue and nine in

12 investment and loans, and making negative $6 million

13 a year? How does that happen?

14    MR. BRAND:    So objection; compound.

15 Object -- objection; argumentative. Objection;    12:01:17

16 ambiguous.

17 BY MR. BILLER:

18    Q    How does that happen?

19    MR. BRAND:    And calls for speculation.

20    THE WITNESS:    I -- I -- I'm not sure where    12:01:2

21 you're getting your numbers from. I can't base --

22 you're just saying these numbers.

23 BY MR. BILLER:

24    Q    Am I?

25    A    Yeah.    12:01:31

Page 100

1    Q    I'm going to show you the promissory notes

2 and tax returns, sir, and then I'll re-ask you the

3 question, okay?

4    But first I want to know why you wanted to

5 do a report on Jene Park and John Hanna.    12:01:41

6    A    I don't -- I don't remember. I don't

7 recall.

8    Q    You produced these.

9    A    Yeah. I don't remember.

10    Q    You produced these.    12:01:48

11    Let's have this marked as No. 7, please.

12    (Exhibit 7 was marked for identification

13    by the court reporter.)

14    MR. BILLER:    Did you get 4, Paula?

15    MS. THOMAS:    Yeah.    12:02:08

16    MR. BILLER:    Okay.

17    MS. THOMAS:    I was just pointing it out so

18 you know what it is.

19 BY MR. BILLER:

20    Q    What is Exhibit No. 7, sir?    12:02:20

21    A    It's a report, I would think, by Robert

22 Sniderman.

23    Q    Okay. And do you know why he prepared this

24 report?

25    A    I -- I don't recall.    12:02:34

Page 101

26 (Pages 98 - 101)

1    Q   Oh, you don't recall?
2    A   No, I don't recall.
3    Q   Okay.  Do -- do you know who he is?
4    A   No, I don't know who he is.
5    Q   Did you ever read this report?          12:02:39
6    A   I believe I did.
7    Q   Okay.  When did you read it?
8    A   Sometime after receiving it.
9    Q   Okay.  And so why is Jene Park still
10   employed at TW?                             12:02:53
11   A   I don't know.
12   Q   I mean, you have the power -- Stephen Choi
13   has the power to fire her, doesn't he?
14   A   I -- I don't know.
15   Q   You don't know if he has the power to fire  12:03:01
16   her?  Is that what you said?
17   A   I don't -- I don't know what the structure
18   was at that time.
19   Q   No.  I'm talking about in 2016 or 2017 or
20   2018.                                       12:03:11
21   A   Uh-hmm.
22   Q   Stephen Choi has the power to fire Jene
23   Park, correct?
24   A   I -- I believe so.
25   Q   Okay.  But you fired John Hanna, correct?  12:03:19
                                                  Page 102

1        MR. BRAND:  Objection; misstates prior
2    testimony, lack of foundation.
3    BY MR. BILLER
4    Q   John Hanna was terminated from T -- TW,
5    correct?                                    12 03 30
6    A   I believe so.
7    Q   Okay  For what reason?
8    A   I -- I don't know the exact details
9    Q   Well, isn't it true that you hired a -- you
10   were put on the litigation committee?       12:03:42
11   A   Yes, but that was not rel -- that was
12   related to the Paula -- Paula's lawsuit
13   Q   Am I going to have to stick a document in
14   your face to get a straight answer?
15       MR. BRAND:  Objection; argumentative.   12:03:58
16       MR. BILLER:  You know, I videotape very few
17   depositions, very few, but I'm glad I did on this
18   one
19       MR. BRAND.  Objection; argumentative
20       MR. BILLER:  I'm not talking to anybody but 12:04:26
21   myself.
22   Q   Do you remember being put on a litigation
23   committee?
24   A   Yes
25   Q   How long were you on it?                 12 04 55
                                                  Page 103

1    A   I don't know.  I don't --
2    Q   What did --
3    A   -- remember.
4    Q   -- you do on it?
5    A   The litigation committee was related to    12:05:07
6    Paula's -- I believe it was related to the lawsuit
7    that Paula had filed.
8    Q   Okay.  That's what you say.  Let's see what
9    you say now.
10       MR. BRAND:  Objection; argumentative.    12:05:19
11       MR. BILLER:  Let's have the next document
12   marked as Exhibit 8.
13       (Exhibit 8 was marked for identification
14       by the court reporter.)
15   BY MR. BILLER:                              12:05:45
16   Q   Turn to the third page, please.  This is an
17   e-mail from David Schnider to Hank, the accountant.
18   Read that to yourself, please.
19       (Witness complies.)
20       THE WITNESS:  Okay, yes.                12:06:06
21       MR. BRAND:  The last line is a little cut
22   off.  Do you have a --
23       MR. BILLER:  The last --
24       MR. BRAND:  -- cleaner --
25       MR. BILLER  You know what, I --         12 06 12
                                                  Page 104

1        MR. BRAND:  -- copy?
2        MR. BILLER:  -- don't.  Yeah.
3    Q   So let's -- you were the head -- you were
4    the contact person for the accountant, right?
5    A   Yes.                                    12:06:18
6    Q   And there was an audit did -- done by this
7    accountant related to the allegations Jene Park --
8    Jene Park and John Hanna were stealing money from
9    the company, right?
10   A   Based off of the complaint that you guys   12:06:30
11   presented.
12   Q   I didn't present it.
13   A   It was based -- it was based on Paula's
14   complaint.
15   Q   I know.  That's what it says.           12:06:38
16   A   Yeah.
17   Q   Did you do an audit?
18   A   Yes, there was an audit done based on that
19   complaint.
20   Q   And what -- what was -- what was the     12:06:44
21   results of the audit?
22   A   That they didn't see any wrongdoing.
23   Q   And did you produce that audit?
24   A   No.  I -- I don't have a copy of it.
25   Q   You don't have a copy of the audit?     12:06:53
                                                  Page 105

27 (Pages 102 - 105)

1    A    No, I don't have a copy.

2    Q    You were a member of the litigation

3 committee and you don't have a copy of the audit?

4       MR. BRAND.  Asked and answered.

5 BY MR. BILLER.                    12.07.01

6    Q    Is that right?

7    A    Yeah, I don't have a copy of it

8    Q    Do you have copies of anything regarding

9 the work done by the litigation committee?

10   A    I mean, I'm guessing we have e-mails.    12:07:11

11   Q    Okay.  Did you produce those e-mails?

12   A    I don't know  I think it was -- David was

13 part of it

14   Q    In 2016 -- or -- yeah, 2016 you were not

15 even a member of TW, were you?    12:07:33

16   A    Yes, I was a member

17   Q    You transferred your interest and owner --

18 units to your dummy corporation, DBSR (sic), didn't

19 you?

20       MR. BRAND: Objection; argumentative.    12:07:48

21 Objection; mischaracterizes the nature of the

22 business.

23       THE WITNESS: DSRB is not a dummy

24 corporation.  It's a family LLC.

25 BY MR. BILLER:                    12:07:59

                              Page 106

1    Q    Okay.

2    A    So I transferred --

3    Q    What does it do?

4    A    It owns -- it owns my interest in these

5 companies as well                    12:08:06

6    Q    So it doesn't do anything?  It doesn't

7 manufacture anything?

8    A    Yeah, yeah, it doesn't manufacture  It's a

9 holding company

10   Q    Oh, okay                    12:08:13

11   A    Yeah, so

12   Q    So --

13   A    I -- I don't know why you're calling it a

14 dummy corporation.  That's -- that's -- that -- it's

15 a holding company.  You constantly use that term.    12:08:22

16 That's why it's confusing.

17       MR. BILLER: Move to strike everything you

18 just said.

19       MR. BRAND  Can you be a little more

20 specific about what you're moving to strike?    12:08:36

21       MR. BILLER: Yeah, everything he said

22 after -- after my question.

23       MR. BRAND: Okay.

24 BY MR. BILLER:

25   Q    Do you remember seeing this Exhibit 8    12:08:44

                              Page 107

1 before?

2    A    Do I remember seeing this document?

3    Q    Yes, Exhibit 8.

4    A    I believe so.

5    Q    Okay.  Would this be -- this be one of the    12:09:06

6 documents that would -- that you received and that

7 you still have but have not produced?

8    A    Possibly, yes.

9    Q    So Exhibit No. 8 is an e-mail regarding the

10 retention of an accountant to do an audit.  And    12:09:27

11 Exhibit No. 7 is a report done on the performance

12 of -- for Jene Park and John Hanna; yet, you and

13 Choi and Kuo continued to allow them to work at TW.

14       Why is that?

15   A    I think there was two -- well, we needed    12:09:55

16 someone to run the company, and so -- I mean, again,

17 I don't -- I don't remember why this report was

18 created.  And we needed to have somebody run the

19 company.

20   Q    Don't you have any e-mails regarding this    12:10:14

21 report, Exhibit 7?

22   A    I do not know.

23   Q    Well, you produced the report.  Shouldn't

24 you have an e-mail or some type of letter regarding

25 the report?                    12:10:29

                              Page 108

1    A    I mean, possibly, yes.

2    Q    Okay.

3    A    I don't know.

4    Q    Will you produce that?

5       MR. BRAND  We can discuss what he will or    12:10:36

6 won't produce later

7       MR. BILLER  Okay

8    Q    Now -- now, that's in December and in

9 January, December 2015 and January 2016  You get an

10 e-mail from Stephen Choi.                    12:11:01

11       Let's mark this as Exhibit No. 9.

12       (Exhibit 9 was marked for identification

13       by the court reporter.)

14 BY MR. BILLER:

15   Q    I just -- we just marked -- oh, sorry.    12:11:33

16       We just marked for identification Exhibit

17 No. 9, which is an e-mail from Stephen Choi to Anna

18 Bennett (sic), cc'd to Doug Lee

19       Would you please read the substance of the

20 e-mail into the record.                    12:11:45

21       MR. BRAND  I -- I'm sorry, you said

22 to Anna --

23       MR. BILLER: Barnett -- Barrett.

24    B A R R -- am I looking -- I'm looking at one --

25 the wrong one.                    12:11:53

                              Page 109

28 (Pages 106 - 109)

**Page 110**

1  MR. BRAND: Yeah, I don't think we're
2  looking at the same one. This is what you provided
3  me (indicating).
4  MR. BILLER: Yeah. I'm sorry, you're
5  right. Stephen Choi to Doug Lee.          12.12.03
6  Q  Would you read the substance of that
7  e-mail, please
8  A  "John is coming over this
9  morning but I'm very worried
10  about the future of this company."      12:12:15
11  Q  And then you cause that -- you cause
12  Stephen to write that e-mail  What were you -- what
13  did you send him to cause him to be worried or very
14  worried about the future of this company?
15  MR. BRAND: Objection; lacks foundation.   12:12:26
16  mischaracterizes that exhibit. I'm not sure what
17  you mean by "you caused."
18  MR BILLER  Okay
19  Q  Did you talk to Stephen about this e-mail?
20  A  I -- I don't recall.             12:12:42
21  Q  Did you talk to him about the substance of
22  the e-mail at any time?
23  A  I think the -- the -- the e-mail was from
24  Meldy, telling Stephen here are the cash flow
25  projections, so on and so forth  And his response  12 12:57

**Page 111**

1  was that he was worried about it.
2  Q  And you never talked to him about that?
3  A  Did I -- did we talk about it? I don't
4  remember.
5  Q  Okay  So you have -- we now have an e-mail  12 13:09
6  from Stephen Choi on November 5 expressing his
7  concern that he's very worried about the future of
8  this company
9  Then there's an accountant retained to look
10  at the books because of allegations of stealing     12:13:27
11  money from TW in December 2015. And then we get a
12  report regarding two officers left in the company,
13  in January 2016, which reads like the worst
14  employees ever hired by any company.
15  So why did you not replace these people?     12:13:50
16  MR. BRAND: Objection as far as the
17  characterization of this document.
18  MR. BILLER: Read it
19  THE WITNESS: I -- I think the -- the --
20  repeat the question again. Is it why we were not --  12:14:04
21  BY MR. BILLER:
22  Q  You have three straight months of getting
23  bad information about TW, one, regarding
24  us -- the money; two, regarding potential thieves,
25  and, three, regarding your officers and directors   12 14:17

**Page 112**

1  performing horribly at -- at their jobs.
2  My question to you is: Why didn't you guys
3  fire them and hire new people?
4  A  So, first of all, I guess in regards to the
5  allegations, or whatever, of them stealing. So, you  12:14:34
6  know, we -- the reports show there was nothing about
7  that.
8  Second, in regards to the -- I guess I'm
9  not exactly sure of the characterization of this
10  e-mail, but this e-mail was more about the future   12:14:50
11  projections of the company and the financial --
12  (Simultaneous talking.)
13  Q  Where -- where does --
14  A  -- issues that --
15  Q  -- it say --                    12:14:55
16  A  -- they state.
17  Q  -- that? Where does it say that?
18  A  "Sending you updated cash flow projection
19  for your review and reference." That --
20  Q  What --                      12:15:02
21  A  That's what this e-mail -- that's what this
22  e-mail was about.
23  Q  And you say he's very concerned about the
24  future of the company.
25  A  Yeah. He's wor -- he's worried about the   12:15:09

**Page 113**

1  numbers. He was -- it's always about the numbers.
2  He worried about how much --
3  Q  Is it?
4  A  -- more -- yeah.
5  Q  I want you to remember that.         12:15:14
6  A  Yeah. He was worried about how much more
7  money he would have to put into the company. That's
8  what -- that's what he meant by "I was very worried
9  about the future of the company." He thought
10  that --                        12:15:24
11  MR. BILLER: Move to strike.
12  Q  You don't know what he thought.
13  So why was John Hanna fired?
14  A  It was -- I mean, obviously there was
15  discussion about his role. And I think at that      12:15:45
16  point -- I mean, Stephen had put in a tremendous
17  amount of money. He wasn't seeing what the changes
18  were going to be or he didn't see that the company
19  was improving.
20  And John wanted still more money from       12:16:01
21  Stephen, and as a result he felt uncomfortable
22  continuing with it.
23  Jene -- Jene was willing to take over and
24  help out and she was willing to kind of cut the
25  costs associated with it dramatically and try to   12:16:23

29 (Pages 110 - 113)

1 kind of maintain the company.

2     And so I think out of the two options he

3 thought that it'd be more prudent to take the more

4 conservative approach.

5     John was still trying to build it out. You 12:16:38

6 know, his expenses still were quite high, so I think

7 that -- I think that's kind of the process of the

8 determination.

9   Q  So he wanted to stop putting money into the

10 company?     12:16:48

11   A  Oh, yeah. I mean, he'd put a tremendous

12 amount of money in the company, yes.

13   Q  But did he want to stop when he fired John

14 Hanna and see what Jene Park can do with it?

15   A  He wanted -- Jene was willing to -- thought 12:16:58

16 she needed, like, substantially less money, a

17 lot, lot less money.

18   Q  Why did John -- why did Stephen Park give

19 her five million?

20   A  I don't believe Stephen gave her     12:17:07

21 $5 million.

22   Q  You don't believe that?

23   A  No. After she took over, no.

24   Q  You know, you're right. It was 5.6.

25 That's what he gave her. And we'll get to those.   12:17:18

Page 114

---

1     He gave her $5.6 million from June -- from

2 May 2016 to November 2016. Didn't you know that?

3     Did you know that, sir?

4   A  No, I did not know --

5   Q  How could you --     12:17:31

6   A  -- it was that much.

7   Q  -- not know that Stephen Choi invested

8 another $5.6 million into this company in that time

9 frame? How could you not know that?

10   A  Because I was not -- we were not involved 12:17:42

11 in the decision-making process of how Stephen was

12 going to put -- invest the money.

13   Q  Okay.

14   A  We had -- we had -- we -- we were not

15 involved in any of the -- the actual money     12:17:51

16 transactions that were involved. That was Stephen.

17 Stephen made those decisions.

18   Q  Okay. So where did that money go? Do you

19 know?

20   A  Again, try to -- inventory, build the   12:18:00

21 company.

22     MR. BILLER: Oh --

23     THE WITNESS: There was debt.

24     MR. BILLER: Move to strike.

25 Nonresponsive.     12:18:09

Page 115

---

1     MR. BRAND: How is that nonresponsive?

2     MR. BILLER: Because he doesn't have the

3 foundation to talk about that.

4     MR. BRAND: He was answering your question.

5     MR. BILLER: No, he wasn't answering my   12:18:16

6 question. He's giving a dishonest statement based

7 on what he thinks will make him look good and not

8 make him part of the money laundering scheme that

9 was going on.

10     MR. BRAND: I'll object to that on the   12:18:25

11 basis of misstating his testimony --

12     MR. BILLER: Okay.

13     MR. BRAND -- and lack of --

14 BY MR. BILLER:

15   Q  Were you --     12:18:32

16     MR. BRAND -- foundation

17 BY MR. BILLER:

18   Q  -- one of the drains on the company,

19 Mr. -- Mr. Lee?

20   A  No     12:18:36

21     MR. BILLER: We're on number -- No. 11

22 (sic), please

23     (Exhibit 10 was marked for identification

24     by the court reporter.)

25 BY MR. BILLER:     12:18:40

Page 116

---

1   Q  You weren't one of the drains on the

2 company?

3   A  No.

4   Q  Hmm.

5     MS. THOMAS: Hey, Di. Sorry, can we just 12:18:44

6 take a break for one second? I just need to talk

7 to --

8     MR. BILLER: Not right now, Paula.

9     MS. THOMAS: Sorry?

10     MR. BILLER: Not right now.   12:18:51

11     MS. THOMAS: Okay. Go ahead.

12     MR. BRAND: Will this be Exhibit 10?

13     MR. BILLER: Yeah, it's Exhibit 10.

14   Q  Why don't you read Exhibit 10 into the

15 record, from who -- from who -- from who is this   12:19:26

16 from, to -- to and the substance.

17     (Witness complies.)

18     THE WITNESS: Okay.

19 BY MR. BILLER:

20   Q  Read it.     12:19:35

21   A  "Why are you guys on TW payroll?"

22   Q  Why?

23   A  Those were those three payments that we

24 received, the consulting payments.

25   Q  Why were you on the payroll, though?   12:19:43

Page 117

30 (Pages 114 - 117)

1  A  Well, I mean, she -- she made a mistake and
2  she should have put it in consulting, so...
3  Q  No. You were paid -- you were supposed to
4  be paid by TT -- PDTW, not TW. Where's the mistake?
5  The mistake is yours.                    12:19:58
6  A  No, we were not supposed to be paid by
7  PDTW, because TW was the entity that was running the
8  company and we were helping -- TW was a new company
9  that was created, that was a operational company.
10      PDTW at that point was not operational.   12:20:10
11  Everything was moved to TW to be the operational
12  company.
13  Q  Sir, you signed -- you signed the binding
14  term agreement on May 27, 2014.
15      MR. BRAND: Objection; lack of foundation.   12:20:21
16  BY MR. BILLER:
17  Q  You -- I'll get there.
18      You cut the deal with Paula in July 2014,
19  so that money that you claim was consulting fees
20  should have been paid by PDTW, not by TW.   12:20:37
21      Do you understand?
22  A  No, but the -- the plan after that was that
23  a new entity was going to be created, and TW was
24  going to be created, TW was going to be funded, and
25  as a result of it that's the operational company   12:20:51

Page 118

1  Q  Where's the document that says your -- your
2  consulting fees are going to be paid by TW? Where
3  is it?
4      MR. BRAND: Objection; argumentative.
5  BY MR. BILLER:                          12:21:02
6  Q  Is there a document that says consulting
7  fees will be paid by TW?
8  A  There was -- no, there was no document that
9  stated --
10  Q  And it wasn't in the binding agreement, was   12:21:12
11  it? Binding term agreement, it wasn't in there, was
12  it?
13  A  It wasn't specified who was going to pay
14  for it.
15  Q  Okay. But you were contracting with PDTW,   12:21:20
16  right?
17  A  PDTW was not operational at that point.
18  Q  That's not true, sir. In May of 2014 it
19  was completely operational.
20      You cannot sit here and make stuff up, make   12:21:33
21  facts up and pretend that they're true --
22      MR. BRAND: Objection --
23  BY MR. BILLER:
24  Q  -- okay?
25      MR BRAND -- argumentative  Look at --   12:21:42

Page 119

1      THE WITNESS: PD --
2      MR. BRAND: -- that document.
3      THE WITNESS: P -- TW was created for the
4  purpose of the money that was going to come in and
5  then start this new -- start -- start the new   12:21:50
6  entity.
7  BY MR. BILLER:
8  Q  And when was that?
9  A  I believe it was sometime in -- well, I
10  don't know exactly when the money came in but it   12:21:56
11  started sometime in the fall.
12  Q  Fall of 2014?
13  A  Yeah.
14      MR. BILLER: Okay. Let's take a break,
15  two-minute break.                      12:22:11
16      THE VIDEOGRAPHER: Going off the record at
17  12:22 P.M.
18      (Recess.)
19      THE VIDEOGRAPHER: Going back on the record
20  at 12:25 P.M.                        12 25.33
21      MR. BILLER  Let's have the next document
22  marked as -- 12?
23      THE REPORTER  11
24      MR BILLER  11
25      (Exhibit 11 was marked for identification   12 26:05

Page 120

1      by the court reporter.)
2  BY MR. BILLER:
3  Q  Please read Exhibit No. 11. That's the
4  binding term sheet.
5      (Witness complies.)                 12:26:15
6      THE WITNESS: Okay.
7  BY MR. BILLER:
8  Q  Have you read Exhibit 11?
9  A  Yes.
10  Q  Who's the contract between?          12:27:01
11  A  PDTW and the consultants.
12  Q  Does this contract say anything about a
13  specific deal structure when PDTW was going to stop
14  doing business and TW will start doing business?
15  A  No, we couldn't -- we didn't -- we   12:27:22
16  couldn't, you know, think about that at that point.
17  We didn't know what the structure was going to be.
18  Q  Was this agreement signed on May 27th,
19  2014?
20  A  Yeah, I believe so.                12:27:33
21  Q  Okay. Both you and Roger signed, correct?
22  A  Yes.
23  Q  And do you recognize the chairman of PDTW?
24  A  Yes.
25  Q  So at this point in time what did you know   12:27:45

Page 121

31 (Pages 118 - 121)

1   BY MR. BILLER:

2        Q      Can the QuickBooks be verified without

3   checking all the backup data?

4        MR. PEDDIE:  Objection, calls for speculation

5   and hypothetical.

6        THE WITNESS:  You can generate report and

7   verify with backup data.

8   BY MR. BILLER:

9        Q      You need the backup documents to verify

10  what data is being spit out of QuickBooks; right?

11       A      Yes.

12       Q      Because when you input the information,

13  you have that backup data; right?

14       A      Source documents, yes.

15       Q      And you're the one who makes sure it's

16  accurate; correct?

17       A      Yes.

18       Q      And if a third party wanted to do an

19  audit, that third party couldn't do an audit without

20  the backup documents; correct?

21       A      Yes.

22       MR. PEDDIE:  You were asking about financial

23  statements.  They are generated by QuickBooks.

24       MR. BILLER:  You know what, Richard, don't

25  treat me like a fool.  Okay.  You know -- you tell it

Page 65

| | |
|---|---|
| 1    A    I believe it was Roger. | 1    want it like this" or whatever. |
| 2    Q    Okay. When did you talk to Stephen about | 2        And so -- yeah, so that's it. That -- |
| 3    investing in the new company? | 3    that's -- that's what I recall. |
| 4    A    I mean, sometime thereafter. I think it | 4    Q    How did you communicate with Stephen during |
| 5    was -- I think there was an e-mail that went out in  12:32:08 | 5    this time?                              12:33:55 |
| 6    regards to it and then at some point Stephen came | 6    A    Either through e-mail or, you know, |
| 7    out and met with the team. | 7    possibly a phone call, but -- |
| 8    Q    Okay. What team? | 8    Q    Did you produce those e-mails? |
| 9    A    The T dub -- TW. | 9    A    I believe so, yes. |
| 10    Q    Okay.                        12:32:16 | 10    Q    You believe you produced those e-mails in  12:34:12 |
| 11    A    So it would be the -- | 11    this time frame -- |
| 12    Q    When was that? | 12    A    Yes. |
| 13    A    I don't remember the exact date. | 13    Q    -- of 2014? |
| 14    Q    I don't want the exact date. I want an | 14    A    Yeah. |
| 15    estimate.                        12:32:24 | 15    Q    Regarding the deal structure?          12:34:20 |
| 16    A    Ah. I don't know. Sometime -- I don't | 16    A    Yeah. Yeah. |
| 17    know. | 17    Q    Now, how long did you think the -- what did |
| 18    Q    So you -- | 18    you think your compensation was going to be for this |
| 19    A    I'm guessing sometime -- yeah, I don't | 19    binding term agreement? |
| 20    remember.                        12:32:30 | 20    A    I mean, it states we would get -- we would  12:34:33 |
| 21    Q    You don't remember the date Stephen Choi | 21    get an equity piece into the company and then we |
| 22    came out to meet with the team at -- | 22    would have -- we would come aboard and, you know, |
| 23    A    No, I don't -- | 23    have a -- kind of a real role, advisory role in the |
| 24    Q    -- Paula Thomas? | 24    company to help the -- to help them. And I think it |
| 25    A    No, I don't remember.          12:32:36 | 25    was for a time frame.                  12:34:56 |
| Page 126 | Page 128 |

| | |
|---|---|
| 1    Q    Was it in the summer? | 1    Q    What time frame? |
| 2    A    I mean, I believe so, but I -- I couldn't | 2    A    It says here, I think, for two years. |
| 3    tell you the exact time frame. | 3    Q    And how much money were you supposed to |
| 4    Q    Was it before or after you made the -- the | 4    receive for these services? |
| 5    overtures to do an investment?        12:32:44 | 5    A    $6,000 a month.                      12:35:03 |
| 6    A    Repeat that question. I don't understand | 6    Q    For how many months? |
| 7    your question. | 7    A    For two years. |
| 8    Q    Did Steve -- Stephen Choi come out to meet | 8    Q    Two years |
| 9    the team before there was an acceptable agreement in | 9    A    Yeah. |
| 10    place, or after?                  12:32:59 | 10    Q    And how much money did you actually        12:35:08 |
| 11    A    I think Stephen Choi came out. We | 11    receive? |
| 12    explained -- we explained the deal, and then after | 12    A    We received $18,000. We received it for |
| 13    that he came out, but it wasn't -- so we explained | 13    three months. |
| 14    to him the deal, and then af -- sometime thereafter | 14    Q    Why did you only receive it for three |
| 15    he came out to see if this is something he wanted to  12:33:14 | 15    months and not two years?              12:35:17 |
| 16    do. | 16    A    Because it was very clear that there was |
| 17    Q    Okay. What did you explain to him the deal | 17    not -- the company's performance wasn't going to be |
| 18    was? | 18    able to afford our consulting fees. |
| 19    A    I mean, I don't -- I don't remember the | 19    Q    So you knew or it was known before April |
| 20    exact deal terms that was -- that was discussed. I  12:33:23 | 20    2014 that the company was not going to be able to  12:35:34 |
| 21    think John had said something about generally what | 21    afford you, right? |
| 22    the deal terms were going to be. | 22    A    No. |
| 23        I think we forwarded it off to Stephen and | 23    Q    When did you get paid? |
| 24    then, you know -- I don't remember if Stephen had | 24    A    We got paid in 2015. |
| 25    any comments or came back and said, "Oh, you know, I  12:33:43 | 25    Q    Okay, 2015. What did I say?          12:35:44 |
| Page 127 | Page 129 |

33 (Pages 126 - 129)

Page 130

1    A    You said in 2014 we knew this.
2    Q    Okay. I'm sorry.
3         You knew before April 2015 the company
4    wasn't going to be able to afford your services?
5    A    Yes. Yeah.                    12:35:56
6    Q    I'm going to hand you the next document.
7         Let's mark it as Exhibit No. 12, which is
8    an e-mail from Adam (sic) Apfelberg to John Hanna
9    forwarding an e-mail from you.
10        MR. BRAND: I'm sorry. It's from Hanna to   12:36:59
11   Apfelberg.
12        MR. BILLER: Yeah
13        MR. BRAND: Okay. I thought you had said
14   it reverse.
15        MR. BILLER: I'm dyslexic, so I may have    12:37:09
16   done that.
17        MR. BRAND: Okay.
18        THE WITNESS: Am I supposed to look at this
19   one, or look at the --
20        MR. BRAND: No.                   12:37:29
21        THE REPORTER: You have to give me a chance
22   to stop writing and get my hands off the keys --
23        THE WITNESS: Okay.
24        THE REPORTER: -- and mark the exhibit,
25   please.                      12:37:31

Page 131

1         (Exhibit 12 was marked for identification
2         by the court reporter.)
3         (Witness reviews document.)
4    BY MR. BILLER:
5    Q    Do you see that -- the date of this e-mail   12:37:59
6    that you sent -- that you originally sent,
7    actually --
8    A    Uh-hmm.
9    Q    -- was May 16 to John Hanna giving him an
10   offer?                      12:38:10
11        Do you see that?
12   A    Yes. 2014, yeah.
13   Q    Why would you make him an offer when you
14   don't have your term -- binding term sheet signed
15   and sealed? Why would you do that?         12:38:17
16   A    What -- what are you saying?
17   Q    You signed the binding term sheet on May
18   27th --
19   A    Yeah.
20   Q    -- 2014?                    12:38:30
21   A    Uh-hmm.
22   Q    You sent him an offer on May 16, 2014.
23   A    No. This was the offer that was the --
24   what became the basis of the binding term agreement.
25   Q    That's backwards, sir. You know it is.    12:38:44

Page 132

1    A    No, it's not. This is the e-mail
2    telling me --
3    Q    First you sign a binding term agreement,
4    then go find the investor, then make the offer,
5    okay. Then -- then you go ahead and sign.    12:38:53
6    A    No, no, no. You're --
7         (Simultaneous talking, unreportable.)
8         MR. BRAND: Objection --
9         THE WITNESS: -- you're totally
10   misstating --                   12:38:57
11        MR. BILLER: Okay.
12        MR. BRAND: -- argumentative --
13        MR. BILLER: Okay. All right.
14        MR. BRAND: Objection; misstates --
15        MR. BILLER: Whatever.            12:38:59
16        MR. BRAND: -- the evidence.
17        MR. BILLER: Okay.
18        THE WITNESS: This is the e-mail that
19   describes, hey, this is the structure that we want
20   to set up. This is our goal. Our goal is to find   12:39:03
21   you $5.5 million. We get a percentage and, you
22   know, whatever, the -- the consulting fee.
23        Do you want to go forward; do you not want
24   to go forward. And that was the structure.
25        If you read this, this is the basic -- the   12:39:19

Page 133

1    language of the binding term agreement. So this was
2    the basis of the binding term agreement.
3    BY MR. BILLER
4    Q    Sir, I'm --
5    A    And then that's when we signed the binding   12:39:25
6    term agreement --
7    Q    Sir, I'm --
8         (Simultaneous talking.)
9    A    -- and then --
10   Q    -- going to --                12:39:28
11   A    -- we went to go look --
12   Q    I'm going to --
13   A    -- for the money
14   Q    Then why does it say this is our -- "This
15   being said, this is our final offer"?        12:39:31
16   A    That's telling him that if he wants us to
17   move forward, this is the deal. If he doesn't want
18   to move forward --
19   Q    Where --
20   A    -- then it won't -- we won't --      12:39:38
21   Q    Where is --
22   A    -- do it.
23   Q    -- the binding term sheet agreement
24   mentioned in this e-mail?
25   A    Thi -- this was -- this is not -- this is   12:39:44

34 (Pages 130 - 133)

1 just -- we were telling him this is what we want out
2 of the deal. And then he -- he -- he accepted it
3 and that's why this document was created.
4      I don't unders -- what -- what are you
5 talking about?                    12:39:56
6   Q  Obviously you're upset because you're
7 lying.
8   A  No --
9      (Simultaneous talking, unreportable.)
10  Q  And you're --              12:40:01
11  A  -- I'm not lying. And you're --
12     MR. BRAND: Objection --
13 BY MR. BILLER:
14  Q  Okay.
15     MR. BRAND. -- misstates the evidence.    12:40:02
16 BY MR. BILLER:
17  Q  So just calm down.
18     MR. BRAND: Objection.
19     THE WITNESS: No, you should calm down.
20     (Simultaneous talking.)           12:40:03
21 BY MR. BILLER
22  Q  No, calm down. Okay?
23     MR. BRAND: Do we need a break?
24     THE WITNESS: No, it's fine.
25     MR. BRAND: Misstates the evidence.    12:40:09
                                          Page 134

1 Objection; argumentative.
2 BY MR. BILLER:
3   Q  Let's read this together so I can embarrass
4 you. Quote --
5     MR. BRAND: Objection; argumentative.    12:40:17
6 BY MR. BILLER:
7   Q  -- "Here are answers to TW's questions
8 and revised term sheet."
9     Where's the original?
10  A  It was still in e -- e-mail format.    12:40:25
11  Q  Where is it?
12  A  I don't know. I don't know.
13  Q  Do you have it?
14  A  I don't know.
15  Q  Okay.                         12:40:31
16     "1. Deal structure with investors.
17     In all deals we have -- we ask for
18     percentage of com -- of company
19     before we bring in investors."
20     Did I read that correctly?      12:40:46
21  A  Yeah.
22  Q  Okay.
23     "Goals. Our goal is to secure $5.5
24     million in capital for Thomas Wylde
25     in return for 35 percent of the    12:40:57
                                          Page 135

1     company."
2     Did that ever happen? Did you ever get 35
3 percent of the company, sir?
4   A  No. That's not for me.
5   Q  Of course not. That's for Choi.      12:41:07
6   A  Yeah
7   Q  Right.
8   A  So --
9   Q  So who is this e-mail referring to,
10 the -- the deal given to Choi or the deal given to    12:41:14
11 you?
12  A  That's for the investor who's going to come
13 in.
14  Q  Oh, okay  So this document -- in your mind
15 this document refers to the binding term sheet and    12:41:23
16 what the investor's willing to do, right?
17  A  Yeah, this is the goal --
18  Q  In your mind.
19  A  This a goal of what we're trying to get
20 for them and this is -- this is partly of what the    12:41:33
21 binding term agreement is about.
22  Q  Okay.
23     "Consulting fees. We have been
24     running businesses for over 20 years
25     and bring quite a bit of experience    12:41:57
                                          Page 136

1     and expertise and all facets to
2     running a business (strategy,
3     operations, legal, finance, digital
4     media, marketing)."
5     Who is that for?               12:42:09
6   A  That's for us.
7   Q  Did you -- did you provide those services?
8   A  Yeah, to a certain level we did in the very
9 beginning.
10  Q  What did you do for the $18,000?    12:42:18
11  A  Oh, we were involved in various -- like
12 multiple, multiple executive meetings.
13     We talked about whatever operational issues
14 there might be. We were involved in the digital
15 media website stuff when they were looking at    12:42:34
16 developing a new website. We were involved in
17 trying to help them with their marketing strategies.
18  Q  I suppose you have invoices for all this
19 work, don't you?
20  A  No, we -- we didn't -- we didn't have to    12:42:47
21 provide the invoices. We -- we were told that we
22 would come and we would come multiple times in -- in
23 the very beginning, and we were there quite a bit.
24 And we'd have executive meetings and we'd have
25 various discussions about these -- these -- these    12:43:00
                                          Page 137

35 (Pages 134 - 137)

1 issues.

2 Q Okay. So there's no --

3 A So we didn't -- we didn't -- we didn't

4 invoice them directly, no.

5 Q Yeah. There's no way to track -- track    12:43:06

6 whether that $18,000 was really spent for those

7 services, right? There's no way to connect the

8 $18,000 to the services you just outlaid other than

9 your testimony, right?

10 A No, I mean, there's e-mail about -- talking    12:43:20

11 about marketing strategy, talking about --

12 Q Where are those e-mails? Did you produce

13 'em?

14 A Yeah, I'd say I -- yeah, I produced them.

15 Q So everything -- all the e-mails you    12:43:29

16 produced is an accumulation of the work you did for

17 TW?

18 A No, it's just part of it.

19 Q No.

20 A We had conversations, too.    12:43:37

21 Q So there's no way to trace back all of the

22 work you did for TW, to the $18,000, other than your

23 testimony and the e-mails you produced, right?

24 MR. BRAND: Objection; misstates evidence.

25 BY MR. BILLER:    12:43:52

Page 138

1 Q Right?

2 A I -- I don't -- I don't -- I don't know how

3 to answer that question.

4 Q You really don't know how to answer the

5 question?    12:43:59

6 A No. I don't understand.

7 Q Somebody from Dartmouth and UCLA Law

8 School? Let's ask it again, okay?

9 MR. BRAND: Objection.

10 (Simultaneous talking.)    12:44:03

11 BY MR. BILLER:

12 Q You know how to trace funds --

13 MR. BRAND: Objection --

14 BY MR. BILLER:

15 Q You know how to --

16 MR. BRAND: -- argumentative.

17 BY MR. BILLER:

18 Q -- trace funds from -- in the bank account

19 to services provided? Do you know how to do that?

20 A I don't -- your question doesn't make any    12:44:10

21 sense.

22 Q No, you're saying it doesn't make any sense

23 'cause you don't want to answer it.

24 A No. The --

25 (Simultaneous talking.)    12:44:16

Page 139

1 MR. BRAND: Objection --

2 THE WITNESS -- question doesn't --

3 MR. BRAND: -- argumentative.

4 THE WITNESS -- make any sense.

5 BY MR. BILLER:    12:44:18

6 Q You know what, keep on saying that You

7 look great. Let me ask you --

8 MR. BRAND: Objection, argumentative.

9 BY MR. BILLER:

10 Q -- is there any way to trace the $18,000    12:44:24

11 that TW gave you to any services you performed for

12 TW?

13 MR. BRAND: Objection, asked and answered.

14 THE WITNESS: I mean, there's -- there's

15 website information that was provided, there was    12:44:36

16 marketing information that was provided. And then

17 our being there at the various meetings and

18 discussing these different things.

19 So if that's -- if -- if you don't think

20 that's enough, then no.    12:44:48

21 BY MR. BILLER:

22 Q And plus your testimony, right?

23 A Yes.

24 Q So somebody has to believe your testimony

25 to buy what you just said, right?    12:44:54

Page 140

1 MR. BRAND: Objection; argumentative.

2 BY MR. BILLER:

3 Q The jury will have to believe you as a

4 witness in order to buy what you just said, right?

5 A I believe that there's also e-mails and    12:45:06

6 different things that we were at the meetings that

7 would show that we were there and we were --

8 Q Okay.

9 A -- involved in this stuff

10 MR. BILLER: Move to -- move to strike.    12:45:15

11 Nonresponsive.

12 Q The jury -- the jury will have to believe

13 you as a witness to actually believe that you were

14 paid $18,000 for the services that you've testified.

15 Is that "yes," or is that "no"?    12:45:29

16 MR. BRAND: Objection, calls for a legal

17 opinion.

18 BY MR. BILLER:

19 Q You're a lawyer. Is that a "yes" or a

20 "no"?    12:45:36

21 A No.

22 Q "No"?

23 A It's not just my testimony, no

24 Q Oh, so you have 18 worth -- $18,000 worth

25 of material that can back you up?    12:45:44

Page 141

36 (Pages 138 - 141)

**Page 142**

1  A  I -- I mean, I don't know what you mean by
2  "material."
3  Q  Like invoices and backup work and receipts
4  and, you know --
5  A  Why would I have receipts?                12:45:57
6  Q  Because you're getting 18,000 -- did you
7  get a W-2 form?  Did you get a --
8     MR. BRAND: Objection. He's not answering
9  tax questions.
10    MR. BILLER: Okay.                          12:46:06
11  Q  How were you paid?  Were you paid by cash?
12  A  No.  We were -- we were paid by check
13  Q  And who was paid, LaunchPad or you?
14  A  DSRB
15  Q  Oh, DSRB was paid?                         12:46:14
16  A  Yeah, the -- the entity that we moved it
17  to.
18  Q  Okay.  So this is -- we're talking about,
19  you know, you were paid in the first three months of
20  December, you said.  I mean, 2015.            12:46:27
21     So DR -- DSRB became the owner sometime
22  between January and March, right?
23  A  I don't know.
24  Q  Okay.  Do you have -- does DRSB (sic) have
25  an accounting?                                12:46:46

**Page 143**

1  A  What do you mean, accounting.
2  Q  Well, it received money, so it has bank
3  accounts, right?
4  A  Yes.
5  Q  Okay.  So it issues bank statements, right? 12:46:53
6  A  Yes.
7  Q  And those bank statements are sent to your
8  home, your office via mail or via electronically or
9  both, right?
10  A  Yeah, I believe -- I believe -- yeah, I    12:47:06
11  believe so.  I don't know if it's by mail or
12  electronically.
13  Q  Okay.  And it shows the money that was
14  deposited in your account, right?
15  A  Yes.                                       12:47:15
16  Q  Was it by check or straight deposit that
17  you received the $18,000?
18  A  I believe it was -- two of 'em were checks
19  and one of 'em was deposited through some -- you
20  know, electronically.                         12:47:27
21  Q  How many executive meetings did you have?
22  A  I don't know.
23  Q  You can't tell us?
24  A  I just don't remember.
25  Q  No.  Give us an estimate.                  12:47:34

**Page 144**

1  A  During when?
2  Q  During the times you had the executive
3  meetings.
4  A  Like for how long?  For what time period?
5  Q  As long as you were being paid.            12:47:45
6  A  Oh, during the time we were being paid?
7  Probably five, six meetings, I think.
8  Q  Okay.
9  A  I don't know,
10  Q  How much did you charge an hour?           12:47:55
11  A  I'm not charging per hour.  I don't -- it
12  was -- it was a deal term that was set up.  There
13  was no hourly charges.
14     MR. BILLER: Let me show you the next
15  document in order, 13, I guess.               12:48:12
16     (Exhibit 13 was marked for identification
17     by the court reporter.)
18  BY MR. BILLER:
19  Q  Do you recognize Exhibit 13?
20     (Witness reviews document.)               12:49:02
21     THE WITNESS: Okay.
22  BY MR. BILLER:
23  Q  Okay.  Did you negotiate these terms
24  reflected in Exhibit 13 with John Hanna?
25  A  Did I negotiate these terms?              12:49:36

**Page 145**

1  Q  Yes
2  A  Um --
3  Q  After --
4  A  Prior -- prior to presenting it to Paula?
5  That's my question                            12:49:43
6  Q  Yes.
7  A  Possibly.
8  Q  Okay.  Did you and John Hanna ever reach an
9  oral agreement as to the terms of the deal?
10  A  No.  I mean -- no.  I think this had to be  12:50:03
11  presented to Paula as well.  So I think we had
12  general deal terms that were --
13  Q  Who --
14  A  -- presented.  And I think Stephen said,
15  "Hey, this is what I'm comfortable with."  And then  12:50:15
16  I think John was involved in understanding what
17  Stephen was, and then I think this was presented to
18  Paula after
19  Q  Who did you think John Hanna was?  At this
20  time who did you think he was?                12:50:31
21     MR. BRAND  Objection, vague
22  BY MR. BILLER
23  Q  Or who did he represent himself to be?
24  A  John was -- he was saying that he was
25  helping Paula and Jene find money and he was going  12:50:39

1 to be running the company. So the -- the new
2 company was going to be formed with the new team
3 with the -- with the money
4  Q  He --
5  A  So that's how he presented himself.     12:50:54
6  Q  Did he present himself as having binding
7 authority with Paula for this deal?
8  A  No, no. So at -- at the end of the day
9 this still needed to be approved by Paula.
10  Q  Paula's the one who would ultimately have  12:51:05
11 to approve it, right?
12  A  Yeah, yeah.
13  Q  Okay. So in this deal -- I mean, I don't
14 want to go through the particulars, but this deal is
15 pretty consistent with what we just discussed  12:51:23
16 earlier. But you talked to Stephen Choi about
17 these -- these issues before you sent this e-mail?
18  A  Oh, yeah. Yeah. This was, I think,
19 something that -- well, I mean, if I -- I don't
20 know. I mean, I -- to the best of my recollection,  12:51:43
21 I think that these were things that were discussed,
22 and so Stephen was okay with it. And so then that's
23 why it was presented, like, on behalf of Stephen.
24  Q  So who were you representing? Were you
25 representing Stephen Choi in this deal?       12:51:58

Page 146

1  A  I mean, I -- I was -- I was relaying the
2 message of what Stephen wanted. I wasn't
3 technically -- you know, I was just explaining what
4 the deal terms were going to be.
5  Q  Okay. My question to you is: Who were you  12:52:12
6 representing in the deal?
7  A  I mean, I wasn't representing anyone. I
8 was trying to -- you know, I -- I was explaining --
9 we -- we -- pro -- prov -- presented this deal to
10 Stephen and then -- and on his behalf we wrote this  12:52:24
11 e-mail for him.
12  Q  Okay And who were you under contract with
13 to make a deal like this?
14  A  We -- I mean, we -- we were -- we had an
15 agreement, I guess, with PDTW to go and find, you  12:52:39
16 know. this is the deal terms, we're going to go out
17 and try to find financing, and so that's -- that's
18 what happened.
19  Q  Okay  Were you protecting Paula Thomas or
20 were you looking after Paula Thomas' interest, or  12:52:54
21 were you just serving as a pigeon between Choi and
22 Paula Thomas?
23       MR. BRAND: Objection; argumentative.
24       THE WITNESS: Well, we were doing what we
25 said under the terms of the binding agreement. We  12:53:07

Page 147

1 were trying to find that money so that it could be
2 provided to -- to T -- T -- PDTW so this new entity
3 could be formed, so
4  BY MR BILLER
5  Q  Okay  So it's safe to assume that every  12:53:19
6 entry under entity -- I mean equity and debt that
7 Stephen Choi agreed with?
8  A  When -- when this -- when it was presented?
9  Q  Yes.
10  A  I believe so. Yeah, at this point, I  12:53:34
11 think, when we presented it to them, yeah.
12  Q  You presented this as Stephen Choi's terms
13 of an agreement, right?
14  A  Yeah  Yes
15  Q  Okay. I mean, you wouldn't present  12:53:44
16 something that was not truthful, that Stephen Choi
17 didn't want, would you?
18  A  I mean, yeah. To the best of our
19 knowledge, yeah, this is -- that's -- what we were
20 presenting was something Stephen wanted, yes.  12:53:55
21  Q  Okay
22       MR BILLER  Let's go ahead and mark the
23 next document in order as No  14
24       (Exhibit 14 was marked for identification
25       by the court reporter )       12:54:24

Page 148

1       MR. BILLER: Sorry.
2       MR. BRAND: Single page?
3       MR. BILLER: Yeah.
4  Q  I just wanted to ask if you've ever seen
5 this document before.                 12:54:30
6       (Witness reviews document.)
7       THE WITNESS: I don't -- I don't recall.
8  BY MR. BILLER:
9  Q  Yeah. Okay. I just need to confirm that.
10       You can hand that.       12:55:29
11       I'll mark the next document as No. 15.
12       (Exhibit 15 was marked for identification
13       by the court reporter.)
14       (Witness reviews document.)
15  BY MR. BILLER:              12:56:34
16  Q  You know, if we want to get through this
17 quicker, the first page is just communication
18 between Paula and her lawyer. The second page is
19 your communication on Jan -- July 9 to Paula.
20       And the questions I want to ask you  12:56:50
21 are -- dated July 18th, David Schnider to John Hanna
22 that's then forwarded to you.
23  A  Uh-hmm. Okay.
24       MR. BRAND: Where does -- where does it
25 show that it was forwarded to --       12:57:18

Page 149

38 (Pages 146 - 149)

Veritext Legal Solutions
866 299-5127

**Page 150**

1    MR. BILLER: I think it was forwarded,
2  3150.
3    MR. BRAND: I see a copy of the e-mail. I
4  don't see that it was forwarded.
5  BY MR. BILLER:                    12:57:31
6    Q   Okay. I want to focus on the last
7  paragraph or the -- yeah, the last two paragraphs of
8  that July 9th -- July 18th e-mail.
9       Do you see that on the last page?
10   A   Oh, the last two?              12:57:44
11   Q   Yeah, where it says.
12      "The above are the general points
13      for your approval  Once we get
14      this -- once we get receive" (sic)
15      "your approval we would get lawyers   12:57:49
16      to draft legal documents.  Funds
17      would be deployed once the documents
18      are executed.  We look forward to
19      working together to -- in building
20      TW into a highly valuable luxury   12:58:09
21      brand.  If you have any questions,
22      please do not hesitate to ask."
23      Do you see that?
24   A   Uh-hmm.
25   Q   Did you -- did I read that correctly?   12:58:16

**Page 151**

1    A   Yeah.  I think so, yeah.
2    Q   Okay.  What legal documents were you
3  referring to?
4       MR. BRAND:  Objection, lack of foundation
5  There's no evidence that he wrote this e-mail   12:58:29
6  BY MR. BILLER
7    Q   Okay  What legal documents did you believe
8  were necessary to start the deal?
9    A   Well, I'm assuming there would be some sort
10 of an operating agreement that would be created   12:58:44
11 So, you know, that would probably the -- be the
12 precursor.
13     All the other details of what the documents
14 were, you know, those were all going to be
15 determined by the attorneys that got involved.   12:58:54
16   Q   Okay.  So you were waiting for some form of
17 legal documents before you would re -- before Choi
18 would release funds, right?
19   A   Yeah, I mean, again, how Choi would release
20 funds was up to Choi, to Stephen.  I think this was   12:59:14
21 just a general framework.
22     If they're okay with it, then, you know,
23 we'll have legal documents drafted to, you know,
24 summarize what the deal terms would be.  And -- and
25 then I think the attorneys would work on, you know,   12:59:28

**Page 152**

1  kind of the structure of how it would be set up,
2    Q   Okay  Well, in my mind that's -- just take
3  all -- all up at the same time.  Really?  Isn't that
4  right?
5       MR. BRAND: Objection; vague.          12:59:41
6  BY MR. BILLER.
7    Q   Shouldn't all that take place near or at
8  the same time?
9    A   What -- what should all take place at the
10 same time?                            12:59:49
11   Q   All the documents, all the -- the legal
12 documents that are necessary to form the company
13 should take place -- should be, you know, drafted
14 and signed before, you know, millions and millions
15 and millions and millions and millions of dollars   12:59:58
16 are flooded into the company, right?
17      MR. BRAND: Objection; calls for a legal
18 conclusion.
19      THE WITNESS:  Well, I -- ideally the
20 documents would be created, but I do -- I do recall  13:00:09
21 that they were under a lot of financial stress at
22 that point.
23      So, I mean, again, that -- that -- that
24 wasn't -- that's a decision process that -- that
25 was, you know, not -- not my decision as to whether  13:00:22

**Page 153**

1  the money would come or not.
2  BY MR. BILLER.
3    Q   Whose decision was that?
4    A   That would be Stephen's decision
5    Q   Okay.  Now, there was an operating          13:00:31
6  agreement present -- prepared.
7       No. 16, please
8       (Exhibit 16 was marked for identification
9       by the court reporter.)
10      MR. BRAND  Can you confirm that it's 29   13:00:59
11 pages?
12      MR. BILLER  Yeah.
13      MR. BRAND  Okay
14 BY MR BILLER
15   Q   Now, this operating agreement has your   13:01:11
16 signature on it, correct, on Page 22?
17   A   Yes.
18   Q   Okay  And there are four signatures on
19 that -- that page in the entire agreement.
20   A   Yes.                              13:01:32
21   Q   Doug Lee, Roger, Jene and John, right?
22   A   Yes.
23   Q   Why wasn't Paula's name there?
24   A   I believe -- well, I mean, again, I --
25 I'm -- I don't -- I don't remember exactly, but I   13:01:42

39 (Pages 150 - 153)

1 think that's what's created first. And then I think
2 what happened was Paula then would -- would be the
3 next person, because then she would put in the IP
4 and stuff like that.
5    Q    Why?                               13:01:55
6    A    I -- I don't know. I mean, I -- I wasn't
7 involved in --
8    Q    Who came up with that scheme, I guess?
9    A    I -- I have no idea.
10    Q    You didn't come up with it, did you?    13:02:02
11    A    No. I was -- yeah, I didn't -- I wasn't
12 involved in the -- I was -- I was not directly
13 involved in the original drafting of the operating
14 agreement or --
15    Q    Well, you weren't --                13:02:10
16    A    -- the structure.
17    Q    -- involved in it -- the drafting of any of
18 them.
19    A    I mean, at some point we reviewed them
20 and --                                      13:02:16
21    Q    Right.
22    A    -- we had our comments, but, no, I was not
23 involved in drafting --
24    Q    Okay.
25    A    -- the original.                    13:02:20
                                                Page 154

1    Q    But you would agree with me that an
2 operating agreement is an essential part of getting
3 a company up and running, right?
4    A    Yes.
5    Q    Okay. And you would agree with me that the  13:02:29
6 first document that needs to be filed to get an LLC
7 up and running, since you've owned so many, is the
8 articles of organization, right?
9    A    Yes
10    Q    Okay. Those are two essential documents?  13:02:40
11    A    Yes, those are two essential documents.
12    Q    And the -- the owners of the company are
13 typically identified on the opting -- operating
14 agreement, right?
15    A    Yes.                                13:02:52
16    Q    Okay. Can you think of any reason why an
17 owner of a company would not be identified on the
18 operating agreement for --
19        MR. BRAND: Objection; calls for
20 speculation.                               13:03:05
21        MR. BILLER: Can I finish my question?
22        MR. BRAND: I'm sorry. I thought you did.
23        MR. BILLER: No.
24        MR. BRAND: Please.
25 BY MR. BILLER                             13:03:11
                                                Page 155

1    Q    Can you think of any reason why an owner of
2 a company would not be included on the operating
3 agreement when all other owners sign it?
4        MR. BRAND: Objection; calls for
5 speculation.                               13:03:18
6        THE WITNESS: I -- I -- I wasn't involved
7 in that -- in that process.
8 BY MR. BILLER:
9    Q    Did you ask the reason -- did you ask the
10 question "Why isn't Paula's name here?"    13:03:25
11    A    Well, I -- again, I didn't -- I didn't look
12 at -- or I didn't know what the -- the structure
13 was. They just sent me a signature page, so we just
14 signed off on it.
15    Q    Okay.                              13:03:34
16    A    I didn't even know the details of who was
17 involved or who wasn't involved at this point.
18    Q    Did you have a copy of the operating
19 agreement?
20    A    I -- I don't know.                  13:03:41
21    Q    Well --
22    A    I -- I've -- I know we saw operating
23 agreements. I do recall that there was a bunch of
24 other documents that when Paula came aboard, that
25 was part of it, so...                      13:03:54
                                                Page 156

1    Q    No, that was part of the fraud.
2        MR. BRAND: Objection.
3 BY MR. BILLER:
4    Q    That wasn't -- that wasn't part of the
5 purchase of the -- of the company.          13:04:00
6        MR. BRAND: Objection; misstates the
7 evidence  Objection --
8        MR. BILLER: How would --
9        MR. BRAND: -- argumentative.
10        MR. BILLER: -- you know? You've been in  13:04:06
11 this for one week  I've been in this for a year and
12 a half, living it every day of my life. How would
13 you possibly know that it misstates the evidence?
14    Q    Now, you would agree with me that the
15 agreement that was consummated between the July 9  13:04:26
16 and July 18 e-mails were the terms of the agreement
17 that were ultimately -- panned out?
18        MR. BRAND: Are you referring to a specific
19 exhibit?
20 BY MR. BILLER                             13:04:46
21    Q    Is there another document other than
22 Exhibit 15 -- is there another document that you
23 signed that lays out all of the terms and conditions
24 of the -- of the new company?
25    A    I -- I don't know. I --              13:04:58
                                                Page 157

40 (Pages 154 - 157)

Page 158

```
 1   Q   You don't know or you don't think -- you
 2   don't -- you don't know, or are you saying "no"?
 3   A   I don't know.
 4   Q   If there was, would you have produced it?
 5   A   If there was something, yeah, I would have,   13:05:07
 6   unless it was privileged in some way  But I -- I'm
 7   not sure.
 8   Q   But if it was privileged, it would be on
 9   the log, right?
10   A   Yeah                            13:05:16
11   Q   Okay.
12   A   I think so.  I mean, I don't know.
13   Q   Okay.  So this is the last document that
14   you were personally involved in, in exchange with
15   Paula -- Paula Thomas, regarding the terms of the   13:05:27
16   agreement, right?
17   A   Again, I don't know.
18   Q   Okay.  Sir, I'm asking you --
19   A   Uh-huh.
20   Q   -- do you know of any other document other   13:05:34
21   than Exhibit 15 that exists that sets forth terms of
22   the agreement creating the new company between you
23   as Stephen Choi's representative and Paula Thomas.
24       MR. BRAND:  Objection; asked and answered.
25   BY MR. BILLER                   13:05:53
```

Page 159

```
 1   Q   Do you know of any document?
 2       MR. BRAND:  Objection; asked and answered.
 3       THE WITNESS:  I mean, I don't know.  I --
 4   I'm not sure.
 5   BY MR. BILLER:                  13:05:58
 6   Q   Okay.  There's a problem with that answer.
 7   The problem with that answer is that you can come
 8   back here in three months and say "Oh, yeah, we have
 9   a document.  I forgot about this."
10       As you sit here today, here today, do you   13:06:11
11   know of any document that -- other than Exhibit
12   15 that sets forth the terms of conditions of the
13   deal that was made by Stephen Choi and Paula Thomas?
14       MR. BRAND:  Objection; asked and answered.
15       THE WITNESS:  I mean, I don't recall.   13:06:30
16   BY MR. BILLER:
17   Q   Okay.
18   A   I can't tell you.
19   Q   If you had such a document, would you have
20   produced it?                    13:06:36
21       MR. BRAND:  Objection; asked and answered.
22       THE WITNESS:  Yes.
23   BY MR. BILLER:
24   Q   Okay.  Did you sign a purchase agreement?
25   Well, let me -- see, you don't remember that.   13:06:44
```

Page 160

```
 1       Did you sign an agreement to purchase
 2   membership interest in TW?
 3   A   I -- I don't recall.
 4   Q   Would it be in the box of materials that
 5   you produced?                   13:06:58
 6   A   I don't know.
 7   Q   If you had it, would it be in there?
 8   A   I believe so, but, I mean, I -- I don't
 9   know.
10   Q   Is it customary for you to throw away   13:07:06
11   agreements of purchase interest in a company?
12       MR. BRAND:  Objection; argumentative.
13   BY MR. BILLER:
14   Q   Do you usually throw away agreements that
15   involve your interests in a company?   13:07:18
16   A   No, I wouldn't throw away, I'd just -- I'm
17   just telling you I -- I don't know if --
18   Q   How did you organize your files for TW?
19   A   They're mostly just through e-mails.
20   Q   Okay.  So do you have an e-mail folder   13:07:33
21   called --
22   A   No.
23   Q   -- Thomas Wylde?
24   A   No.
25   Q   You don't save any e-mails?   13:07:38
```

Page 161

```
 1       MR. BRAND:  Objection; misstates the
 2   evidence --
 3   BY MR. BILLER:
 4   Q   Do you save --
 5       MR. BRAND:  -- the testimony.   13:07:42
 6   BY MR. BILLER:
 7   Q   Do you have any e-mails?
 8   A   I mean, yeah, most of 'em, but sometimes
 9   obviously some of 'em are not saved as well.
10   Q   And how do you save them?   13:07:50
11   A   They just -- well, they're just in my
12   e-mails, so --
13   Q   Okay.
14   A   Do I separately save 'em?  No, I don't
15   separately save them.            13:07:56
16   Q   Do you have a Word folder for TW PDA -- pdf
17   documents?
18   A   No --
19   Q   Okay.
20   A   -- I do not.                  13:08:02
21   Q   Okay.  What computer do you use?
22   A   The computer at my work.
23   Q   Which one is that?
24   A   Just gen --
25   Q   Can you describe it?          13:08:09
```

41 (Pages 158 - 161)

**Page 162**

```
1    A   It's a general computer. It's on my desk.
2  It's a desktop.
3    Q   Okay. How long have you worked on that
4  computer?
5    A   Oh, I don't know. A few years.        13:08.17
6    Q   Since 2014?
7    A   I believe so.
8    Q   Okay. This is what I'm going to do. I'm
9  going to get a Court Order that's going to allow me
10 to get everything inside your computer and servers   13:08.34
11 regarding anything related to TW and the other
12 characters in this case.
13       So I'm asking you -- I'm telling you do not
14 allow anything to happen with that ESI, that
15 electronically-stored information.                    13:08.50
16       There's a rule in federal court -- I'm just
17 putting everybody on notice, because Peddie did this
18 and now he's going to get his case dismissed, okay?
19       MR. BRAND: I understand, but you and I can
20 talk --                                               13:09:03
21       MR. BILLER: No.
22       MR. BRAND: -- about that.
23       MR. BILLER: He needs to know
24       MR. BRAND: It's not a --
25       MR. BILLER: He needs to know               13:09:04
```

**Page 163**

```
1        MR. BRAND: Okay.
2        MR. BILLER: Because Peddie didn't tell
3  Park, and she destroyed everything. Now the case
4  is -- their case is gone.
5        MR. BRAND: Just send me an evidence    13:09:10
6  preservation letter --
7        MR. BILLER: Yeah.
8        MR. BRAND: -- and it will be handled.
9  BY MR. BILLER
10   Q   Sir, there's a rule. It's Rule 37(e) in   13:09:15
11 the Federal Rules of Civil Procedure. If you
12 destroy evidence that prejudice -- not -- it doesn't
13 have to prejudice my client.
14       If you intentionally destroy evidence to
15 deprive my client of any evidence, ESI, your case   13:09:28
16 can be dismissed or a default judgment can be
17 entered against you.
18       Do you understand?
19   A   Yes.
20   Q   Okay.                                    13:09:34
21       MR. BILLER: What time is it?
22       MR. BRAND: 1:09.
23       MR. BILLER: What?
24       MR. BRAND: 1:09?
25       MR. BILLER: No, it can't be 1:09         13:09:45
```

**Page 164**

```
1        THE VIDEOGRAPHER: It is.
2        MS. THOMAS: Oh, wow. Time went quick.
3        MR. BILLER: We've been going three
4  hours --
5        MR. BRAND: I don't --                    13:09:47
6        MR. BILLER: -- with one break?
7        MR. BRAND: Yeah.
8        MS. THOMAS: We had two breaks.
9        MR. BRAND: We had two short breaks.
10       MR. BILLER: I'm sorry. I didn't even    13:09:58
11 realize. Somebody should have told me.
12       Okay. Let's take the lunch break.
13       MR. BRAND: Sure.
14       MR. BILLER: Lunch break? I'm sorry. You
15 should have told me.                                13:10:10
16       THE VIDEOGRAPHER: This marks the end of
17 Media No. 2. Going off the record at 1:10 P.M.
18       (The luncheon recess was taken at
19       1:10 P.M.)
20
21
22
23
24
25
```

**Page 165**

```
1  APPEARANCES OF COUNSEL:
2     (P.M. SESSION)
3
4        DON EMIL BRAND, ESQ.
5
6        DIMITRIOS P. BILLER, ESQ.
7
8
9
10
11    ALSO PRESENT:
12
13    PAULA THOMAS
14    STEVEN TOGAMI, VIDEOGRAPHER
15
16
17
18
19    REPORTED BY:
20
21    JUDITH A. MANGO, CSR No. 5584
22
23
24
25
```

42 (Pages 162 - 165)

1     (The deposition of DOUGLAS LEE was
2     reconvened at 2:16 P.M.)
3
4         DOUGLAS LEE,
5 having been previously duly sworn, testified further
6 as follows:
7
8     THE VIDEOGRAPHER: This marks the beginning
9 of Media No. 3. Going back on the record at 2:16
10 P.M.                    14:15:57
11
12    EXAMINATION (CONTINUING)
13 BY MR. BILLER:
14    Q   How did you meet Stephen Choi?
15    A   Like I said, it was through my -- through    14:16:07
16 Roger Co.
17    Q   Okay. When did you meet Stephen Choi?
18    MR. BRAND: Objection; asked and answered.
19    THE WITNESS: I don't -- I don't know.
20 Five to ten years ago. I -- I -- I don't really    14:16:20
21 remember the date.
22 BY MR. BILLER:
23    Q   How many business dealings have you done
24 with Stephen Choi?
25    A   Probably, I don't know, five, four. I    14:16:32

Page 166

1 before Thomas Wylde
2    Q   Well, prior to Thomas Wylde, how many --
3 how many built dealings -- how many business
4 dealings did you have with Stephen Choi? Prior to
5 Thomas Wylde.                    14:17:34
6    A   I believe one, but I'm not a hundred
7 percent sure.
8    Q   Okay.
9    A   I can't remember.
10    Q   And Roger Kuo, how many business dealings    14:17:45
11 have you had with him?
12    A   Probably pretty similar. Whatever  You
13 know --
14    Q   And when --
15    A   -- six.                    14:18:00
16    Q   -- did you meet him?
17    A   He's my brother-in-law, so I've known him
18 since -- obviously since I got married, so. .
19    Q   When did you get married?
20    A   I think 2000. So somewhere around there,    14:18:12
21 or before that, and probably before
22    Q   When did you first meet him before 2000?
23    A   I don't know.
24    Q   Okay  And how many -- what businesses are
25 you involved with with Roger Kuo?            14:18:26

Page 168

1 mean, again, it's a range. Four to six or
2 something, I believe.
3    Q   Identify the business dealings by name that
4 you've done with Stephen Choi
5    MR. BRAND: Objection, invasion of privacy    14:16:45
6 BY MR. BILLER:
7    Q   You can answer
8    MR. BRAND: Instruct not to answer. We
9 already talked about this, and we were going to
10 discuss it --                    14:16:53
11    MR. BILLER  No.
12    MR. BRAND: -- later.
13    MR. BILLER: You can lay -- you can make
14 the objection. I can tell him to answer the
15 question. If he decides not to answer the    14:16:58
16 question --
17    MR. BRAND: Okay.
18    MR. BILLER: -- then I seek sanctions
19 against him and you.
20    MR. BRAND: Okay.            14:17:04
21    MR. BILLER: Okay?
22    Q   What years did you have business with
23 Stephen Choi?
24    A   What years did I have business with Stephen
25 Choi? I'm not exactly sure  Probably a little bit    14:17:19

Page 167

1    MR. BRAND: Are you asking for the names?
2    MR. BILLER: Roger Kuo.
3    Q   How many businesses?
4    A   How many? I -- I said around the same,
5 like --                    14:18:39
6    Q   Around the same?
7    A   I think like five to six, maybe.
8    Q   So you've identified -- and you have, you
9 said, 13 businesses yourself?
10    MR. BRAND: Objection                14:18:52
11    THE WITNESS: No, I think that includes the
12 other businesses.
13 BY MR. BILLER:
14    Q   What businesses?
15    A   That includes the five to six businesses    14:18:56
16 that we're talking about right now.
17    Q   Yeah, I know.
18    A   Yeah, so what --
19    Q   You said in total.
20    A   Yeah  So there's 13, and the five and    14:19:03
21 (sic) six are included in those 13, probably.
22    Q   Right
23    A   Around there, yeah.
24    Q   So you have been involved yourself in 13
25 businesses and five or six businesses with Roger Kuo    14:19:13

Page 169

43 (Pages 166 - 169)

1 and five or six businesses with Stephen Choi, right?
2    A    Uh-hmm.  About, yeah.
3    Q    It's about 23 to 25 businesses, right?
4    A    Well, no.  A lot of the businesses with
5 Stephen are similar -- are the same with Roger    14:19:27
6    Q    Okay  So that's at least 18 to 20
7 businesses
8    A    No, no  I'm saying the five to six are
9 prob -- are part of the 18
10    Q    Right.    14:19:41
11    A    The 15.
12    Q    You have 13
13    A    No.  My 13 --
14    Q    So every -- every -- you're involved in
15 every business involving Roger Kuo and Stephen Choi?  14:19:45
16    A    No.  What I'm saying --
17    (Simultaneous talking.)
18    MR. BRAND:  Objection --
19    THE WITNESS:  No, what I'm saying is --
20    MR BRAND:  -- misstates the testimony    14:19:52
21    THE REPORTER:  Whoa, whoa.  Gentlemen, one
22 at a time, please
23    THE WITNESS:  Okay
24    MR. BRAND:  Objection; misstates the
25 testimony.

Page 170

1 BY MR. BILLER:
2    Q    Okay.  Let's start over, okay?
3    How many businesses do you currently -- are
4 you currently involved in?
5    MR. BRAND:  Objection; asked and answered.  14:20:00
6    THE WITNESS:  I guess around 13, but I
7 don't know.  I mean, it's around there.
8 BY MR. BILLER:
9    Q    Okay.  How many -- do you know how many
10 businesses Roger Kuo has?    14:20:10
11    A    No, I don't know how many businesses he
12 has.
13    Q    You don't know how many businesses Stephen
14 Choi has?
15    A    No.  No, I don't know    14:20:17
16    Q    Okay  But you have businesses -- in the
17 13, you have businesses involving Stephen Choi and
18 Roger Kuo, right?
19    A    Out of the 13, some of those -- five to six
20 of 'em are -- have Roger and Stephen involved.  And  14:20:29
21 Stephen is involved in most of those -- Stephen and
22 Roger are both involved in those five to six.
23    Q    Okay.  How many of those businesses involve
24 apparel?
25    A    Probably two or three.  Two or three.    14:20:52

Page 171

1    Q    What are those businesses called?
2    MR. BRAND:  Objection; invasion of privacy.
3 Instruct the witness not to answer.
4    MR. BILLER:  You're kidding me, right?
5    MR. BRAND:  Um, no.    14:21:06
6    MR. BILLER:  Okay.  You know, we're going
7 to bring a motion on this.  I just hope you know.
8 And I'm going to ask for sanctions for wasting all
9 the time I'm going to be forced to waste in doing a
10 joint stipulation with you.    14:21:14
11    There is no right to privacy as to the name
12 of the businesses you own.  There is none, okay?
13 Can you cite me any authority for that?
14    MR. BRAND:  Not at this very moment
15 as I --    14:21:23
16    MR. BILLER:  No --
17    MR. BRAND:  -- sit here.
18    MR. BILLER:  -- you won't be able to
19 either.
20    Q    Do you have any experience in the sale of  14:21:28
21 high-end luxury garments?
22    A    No.
23    Q    Okay.  Are any of your businesses involved
24 in the international marketing of -- of high-end
25 garments?    14:21:44

Page 172

1    A    No.
2    Q    How about the international marketing of
3 any garments?
4    A    No.
5    Q    Have -- does your business -- any of your  14:21:49
6 business involved in the sale of high-end men's wear
7 and women's wear?
8    A    No.
9    Q    How about shoes and bags?
10    A    No.    14:22:02
11    Q    Okay.  So when you and your friends decided
12 to straight a -- create a new company called TW, you
13 have -- you had absolutely no experience whatsoever
14 as to what tho -- what that company would do,
15 correct?    14:22:19
16    MR. BRAND:  Objection; misstates the prior
17 testimony.
18    THE WITNESS:  No, we had -- well, we had
19 the discussions with John, Paula and Jene as to what
20 they think they could do with the company.    14:22:31
21 BY MR. BILLER:
22    Q    Okay.  But you didn't have any personal
23 experience to determine what their thoughts were,
24 good thoughts or bad thoughts?
25    A    No, I think we can kind of listen to them  14:22:39

Page 173

44 (Pages 170 - 173)

**Page 174**

1 and make an educated guess like, okay, that makes
2 sense.
3    Q   Okay. You fired Paula Thomas in -- I
4 believe it was April 1st, 2014, right?
5        MR. BRAND: Objection: misstates the    14:22:55
6 testimony.
7        THE WITNESS: No. I mean, I didn't fire
8 Paula Thomas.
9 BY MR. BILLER:
10    Q   Who fired her?    14:23:00
11    A   John Hanna.
12    Q   Okay. Aren't -- aren't you concerned why
13 she was fired?
14    A   Yeah.
15    Q   Did you find out?    14:23:05
16    A   Yeah, and -- yeah, in general terms,
17 the -- what -- the issues, yeah.
18    Q   What issues did you find out?
19    A   I think at that time there was, I guess, a
20 lot of infighting. I think Paula and Jene were not    14:23:18
21 getting along.
22        And we -- when we heard about it we
23 actually told John that we think that he should keep
24 'em both. You know, ideally work it out.
25        He thought that it would be really    14:23:39

**Page 175**

1 difficult because of all the issues that were
2 associated with it. We suggested then that to keep
3 Paula aboard as, like, the brand, being in charge of
4 the brand, like maybe not being the creative
5 director, per se, but being something involved in    14:23:53
6 the brand still.
7        And the decision -- the final decision as
8 to what was decided was done by John, because John
9 had operational control of the company.
10    Q   Okay.    14:24:06
11    A   Like he decided --
12    Q   Stephen -- Stephen Choi had all the money
13 to finance the company, right?
14    A   Yes.
15    Q   He ultimately controls what goes on in that    14:24:12
16 company. In fact, it's in the agreement that you
17 identified as a July 18th e-mail that he makes all
18 the decisions with regard to the financing of the
19 company, right?
20    A   Yeah, but that's different from the HR    14:24:25
21 decisions and the direction of the company.
22    Q   Stephen Choi couldn't make a decision
23 whether Paula stay and Jene go? Is that what you're
24 saying?
25    A   Stephen relied very heavily on what John    14:24:34

**Page 176**

1 said because he's not there.
2    Q   Okay.
3    A   He doesn't know. I mean all of --
4        (Simultaneous talking, unreportable.)
5    Q   That's not --    14:24:39
6    A   -- us did.
7    Q   -- the question.
8    A   All of us did.
9    Q   The question was: Are you telling me
10 Stephen Choi couldn't make the decision whether    14:24:44
11 Paula stay or Jene go? He did not have that power?
12        Is that what you're saying?
13    A   I mean, obviously he could say that that's
14 what he wanted to do. In terms of actual -- I think
15 the way the operating agreement was set up was he    14:25:01
16 had control over the day-to-day operations of the
17 company.
18    Q   You're saying that Stephen Choi couldn't
19 fire John Hanna?
20    A   No. Yeah    14:25:11
21        MR. BRAND: Objection, asked and answered.
22 BY MR. BILLER:
23    Q   He could -- he could fire anybody, right?
24    A   No, there's -- obviously there was a
25 separate thing about each of the -- in terms of    14:25:18

**Page 177**

1 officer roles and stuff like that. There was a
2 contract that was --
3    Q   Yeah.
4    A   -- put together.
5    Q   Believe me, we're going to get to that in a    14:25:26
6 second, okay? We're going to get to that in a
7 second.
8        Now, what experience does Jene Park have as
9 a chief creative design direct -- officer? What
10 experience?    14:25:41
11    A   I mean --
12        MR. BRAND: Objection; calls for
13 speculation.
14        THE WITNESS: Yeah.
15 BY MR. BILLER:    14:25:47
16    Q   Do you know?
17    A   I mean, she's obviously been in the
18 industry for --
19    Q   No.
20    A   -- many, many, years    14:25:51
21    Q   Do you know what experience she has was a
22 chief creative officer?
23        MR. BRAND: Objection, asked and answered.
24        MR. BILLER: Sir, an asked -- asked and
25 answered question is when I asked a question and    14:26:01

45 (Pages 174 - 177)

1 it's actually answered, and -- but an asked and
2 answered question is not when I ask a question and
3 he gives some stupid comment that's not responsive,
4 okay?
5       And you -- and your "asked and answered"      14:26:11
6 objections mean nothing, all right? So stop --
7       MR. BRAND: That's for Judge Yun to decide.
8       MR. BILLER: No.
9   Q   Okay. What experience does she have in
10 that capacity?                                      14:26:21
11  A   I don't know.
12  Q   None -- you have none, right?
13  A   No, I don't know.
14  Q   Okay.
15  A   I don't know -- I don't know her background  14:26:28
16 well enough, like what she did prior.
17  Q   Okay. So you don't know what experience
18 she had in that capacity, right?
19  A   I said, "I don't know."
20  Q   So say the words. I -- you had -- the        14:26:34
21 answer is "Yes, I don't know what experience she had
22 in that capacity."
23  A   No. I said, "I don't know."
24  Q   You don't know what?
25      (Simultaneous talking, unreportable.)        14:26:42

Page 178

1       MR. BRAND: Objection --
2 BY MR. BILLER:
3   Q   I don't know what you --
4       MR. BRAND: -- argumentative.
5 BY MR. BILLER:                                       14:26:44
6   Q   -- don't know what to. What are -- what
7 are you saying "I don't know" to?
8       (Simultaneous talking, unreportable.)
9       MR. BRAND: Objection, arg --
10 argumentative.                                      14:26:49
11      THE WITNESS: I don't know her --
12      MR. BRAND: Stop screaming.
13      THE WITNESS: -- background.
14 BY MR. BILLER:
15  Q   Okay.                                         14:26:51
16  A   So I don't know if she had creative
17 director experience.
18  Q   Okay. Thank you.
19  A   Okay.
20  Q   Now, Paul was fired and somebody who you     14:26:58
21 have no -- you don't know has any experience in --
22 as a creative officer becomes the creative officer
23 of the company, right? Who made that brilliant
24 decision?
25  A   John did                                      14:27:21

Page 179

1   Q   John Hanna?
2   A   Yeah.
3   Q   Okay. And then John Hanna was fired a year
4 later, right?
5   A   Yeah. I mean, I don't know the exact time   14:27:28
6 frame, but yes.
7   Q   Okay. And who convinced Choi to make that
8 decision?
9   A   It wasn't a convinced. Choi decided on --
10 on -- you know, at that time the decision -- there   14:27:39
11 was -- I think the decision-making process was does
12 he shut it down, does he continue with John, or Jene
13 said, "You know what, I can try to salvage this and,
14 you know, I need much less money. I'll cut all the
15 expenses and let's try to see if I can, you          14:28:00
16 know --"
17  Q   Oh, yeah.
18  A   -- "salvage it."
19  Q   This is where in the beginning you said
20 there's no way John -- Stephen Choi paid over        14:28:06
21 $5 million in loans.
22      Let's mark the next exhibit --
23      MR. BRAND: Objection: misstates --
24      MR. BILLER: -- as 15 -- 16 --
25      MR. BRAND: -- prior testimony.               14:28:10

Page 180

1       MR. BILLER: -- 17. Can you mark this as
2 Exhibit 17.
3       (Exhibit 17 was marked for identification
4       by the court reporter.)
5       MR. BILLER: Oh, I gave you one.              14:28:31
6       MR. BRAND: Is it -- is this 17 and 18, or
7 16 and 17? I have an operating agreement that's
8 marked Exhibit 16.
9       MR. BILLER: What are we at? 17 -- 16 and
10 17.                                                 14:28:44
11      MR. BRAND: Okay.
12 BY MR. BILLER:
13  Q   Do you know what those documents are?
14  A   No
15  Q   Okay. One's a line of credit agreement and  14:28:47
16 one's a promissory note. Do you see that?
17      (Witness reviews document.)
18      THE WITNESS: Oh, that's the second one.
19 BY MR. BILLER:
20  Q   Are you adding up the figures?               14:30:04
21  A   No. I -- I've not seen this stuff.
22      (Simultaneous talking.)
23  Q   There's about 2.4 million --
24  A   Okay.
25  Q   -- on the line of credit.                    14:30:10

Page 181

46 (Pages 178 - 181)

1    A    Okay.

2    Q    The line of credit's five -- five bil --

3    $5 million. Withdrawals were taken out in the

4    amount of approximately two four -- 2.4 million.

5    A    Okay.                                    14:30:21

6    Q    Okay? And they were -- they started in May

7    and they ended in November of 2016.

8    A    Okay.

9    Q    Do you want to confirm that, or do you want

10    to believe me?                                14:30:29

11    A    Okay. I mean, I'm not going to spend the

12    time adding it up.

13    Q    Okay. So we then have a promissory note,

14    which is Exhibit 17, for $2,686,000.

15        Do you see that?                          14:30:39

16    A    On -- I didn't get that. Where's that?

17        MR. BRAND: Here's the promissory note. I

18    don't think you have a copy of it.

19        THE WITNESS: Yeah, I don't have a copy of

20    it.                                           14:30:53

21        THE REPORTER: Then you marked the wrong

22    exhibit.

23        MR. BILLER: I gave you one of this. Do

24    you have it?

25        THE REPORTER: Can you give me that back

Page 182

---

1    and let me mark that. That's not 17.

2        (Exhibit 17 was re-marked for identification

3    by the court reporter.)

4        THE REPORTER: Thank you.

5    BY MR. BILLER:                                14:31:28

6    Q    Are you ready?

7    A    Yes. So which one's which?

8        MR. BRAND: That's 17.

9        THE WITNESS: This is 17, and this is

10    another one?                                  14:31:34

11        MR. BRAND: This is 16.

12        THE WITNESS: Okay. All right. Okay.

13    BY MR. BILLER:

14    Q    Did you know Stephen Choi was injecting

15    over -- approximately $5 million into TW during the   14:31:46

16    time frame John Hanna was fired?

17    A    No, I did not.

18    Q    Didn't you get monthly reports?

19    A    No.

20    Q    What -- as an investor wouldn't you want   14:31:57

21    monthly reports?

22    A    No. We didn't get monthly reports at that

23    point. We knew it was struggling and Jene had a lot

24    on her plate. So, no, I -- we didn't -- I didn't

25    get any monthly reports.                      14:32:09

Page 183

---

1    Q    Jene had a lot on her plate, so you made

2    her the CEO on top of everything else, right? She

3    was the COO, she was the CEO and she was the

4    creative director; is that right?

5    A    Yes. During that -- I mean, she -- like we   14:32:19

6    said, the idea was that she wanted to cut expenses,

7    make it as lean as possible and try to turn it

8    around. So that's why she took on all those roles.

9    Q    Okay. Do you think one person can

10    successfully take on all those roles in a business?   14:32:31

11    A    Well, it wasn't just her. She had

12    obviously other people that were helping her out,

13    but that was the -- that was the plan. I mean, at

14    the end --

15    Q    That's not -- that wasn't my question.     14:32:42

16    A    Uh-hmm.

17    Q    My question was: Do you think one person

18    can take on all those roles?

19    A    Well, Jene felt like she could --

20    Q    Okay.                                     14:32:50

21    A    -- so we -- we gave her -- we thought -- we

22    gave her the shot --

23    Q    Okay.

24    A    -- for it.

25    Q    Running that --                           14:32:54

Page 184

---

1    A    Stephen thought she -- gave her the shot.

2    Q    Running that business successfully was not

3    a primary concern, was it?

4    A    It was

5    Q    It was? What effort other than dumping a   14:33:01

6    bunch a money in there, just having it go fly out

7    the door -- what effort did you make or Choi make

8    other than firing people and letting -- letting Jene

9    run the show herself -- what management decisions

10    did you make to make that business successful?   14:33:15

11    A    Well, I didn't make any of the management

12    decisions.

13    Q    Of course you didn't, but you could have.

14    A    No, I could not.

15    Q    Okay. All right.                          14:33:24

16    A    I'm not -- yeah, I wasn't -- I -- I didn't

17    make any of these management decisions at this

18    point. It was Stephen's decisions

19    Q    It was all Stephen's job, huh?

20    A    Well, yeah.                               14:33:34

21    Q    Stephen's -- Stephen was 100 percent

22    responsible?

23    A    No, but at that -- at that point when they

24    were going through this process Stephen was deciding

25    if he was going to -- I mean, it came down to   14:33:41

Page 185

47 (Pages 182 - 185)

**Page 186**

1  whether he was going to fund the company or not
2  That's what it --
3  Q  Is the --
4  A  -- came down to
5  Q  Is the company still operating?          14:33:48
6  A  I don't know
7  Q  What do you mean, you don't know?  You're a
8  member  You don't know?
9  A  No, I don't know.
10 Q  Really?                    14:33:53
11 A  I don't know
12 Q  You're a member of the company and you
13 don't know if it's operating?
14 A  I don't bel -- I know that they have not
15 done any more -- they bought no more products.   14:33:58
16 Stephen has not funded the company anymore, so --
17 Q  When did Stephen stop funding the company?
18 A  I don't know
19 Q  Who would know that?  Stephen?
20 A  Stephen and I'm sure Jene would know, yeah  14:34:09
21 Q  It's on the books, right?
22 A  I guess  I don't know  I mean, I'm not --
23 Q  I mean, you have -- you have 13 businesses
24 Is that the way you run businesses, just throw in
25 $18 million over two years and fire everybody on   14:34:22

**Page 187**

1  the -- on management and expect it to run?  Is that
2  the way you operate a business?
3  A  Again, this is -- the decision-making
4  process was not mine.  You know, this is not my
5  decision as to how to do it          14:34:39
6     In the end it was Stephen's decision as to
7  whether he wanted to fund it to -- to try to salvage
8  it or not.  And, you know, that's what it came down
9  to, was -- and obviously he put in this money to try
10 to salvage it and it didn't work out.       14:34:51
11 Q  No, he put in money to salvage it in 2015,
12 right, because you said the company was going under
13 from -- before it became a company, right?  Right?
14 A  2014?
15 Q  2 – no  You said PDTW wasn't successful  14:35:06
16 in 2014 when TW was created, right?
17 A  It was struggling in 2014 when we got
18 involved, yes
19 Q  And that's why Stephen Choi decided to put
20 $5 million and loan $2 million to the new company,  14:35:25
21 right?
22 A  Yes.
23 Q  Okay  Then you testified you knew in April
24 '15 – in April 2015 the company just wasn't going
25 to succeed.              14:35:38

**Page 188**

1  Q  Do you remember that testimony?
2  A  No, I did not say it was not going to
3  succeed.  I said that we realized that it would be
4  very hard for us to continue to receive a consulting
5  fee because it was having challenges      14:35:49
6  Q  Okay  So Stephen Choi decided to put
7  another $4 million into the company, in November of
8  2015  That's -- so far that's $9 million that he
9  puts in, in a company that has no -- has shown no
10 signs of doing -- having success, right?       14:36:07
11 A  No, well, again, Stephen talk – John was
12 telling him "Hey, it's going to turn around.  Here
13 are the different things --
14 Q  Okay
15 A  -- I'm working on."              14:36:18
16    (Simultaneous talking.)
17 Q  He looks --
18 A  A lot of things he does --
19 Q  -- at numbers, doesn't he?
20 A  Yes, he does, but --          14:36:20
21 Q  Yeah.
22 A  – John -- John had been telling him "Hey,
23 I could do this.  I could do this."
24    He had different ideas and -- and, you
25 know, gave -- you know, "Hey, we could do this     14:36:26

**Page 189**

1  licensing deal.  We might have a Kohl's deal."
2     So he had these plans and he -- and he
3  presented it to him, and then at each point, you
4  know, Stephen had to make the decision as to whether
5  he wanted to move forward.           14:36:37
6  Q  Stephen must be pretty dumb, then, huh?  I
7  mean --
8     MR. BRAND:  Objection; argumentative.
9  BY MR. BILLER:
10 Q  I mean, it's pretty stupid, don't you    14:36:42
11 think, to invest $9 million in a company that's
12 going nowhere?
13    MR. BRAND:  It's argumentative.
14 BY MR. BILLER:
15 Q  Do you think he's a stupid man?       14:36:47
16 A  No.  I --
17    MR. BRAND:  Argumentative.
18    THE WITNESS:  I -- I don't think -- I think
19 it's a question of how much trust that he had in --
20 in John at that point to see if he could turn it   14:36:53
21 around.  And that's what it came down to.
22 BY MR. BILLER:
23 Q  Okay.  He had no --
24 A  Maybe -- maybe he was too trusting.
25 Q  Oh, he was too trusting.  Really?  Maybe –  14:37:01

48 (Pages 186 - 189)

**Page 190**

1  did he have a lot -- a lot of trust in John when he
2  fired him in 2016 as he's giving Jene $5 million?
3  A  No. I think at that --
4  Q  So at that point he trusted Jene more? Is
5  that what you're saying?                    14:37:14
6  MR. BRAND: Objection; calls for
7  speculation.
8  THE WITNESS: Well, in terms -- when that
9  hap -- by that time John had gone through quite a
10  bit of money and he had told them all these    14:37:22
11  different things and it didn't seem like he was
12  going to be able to deliver. So -- and on top of it
13  John wanted substantially even more money.
14  BY MR. BILLER:
15  Q  By the way, how do you know all this?    14:37:31
16  A  Because tho -- that was the general
17  discussions that happened at that point.
18  Q  With who?
19  A  With Steve -- you know, Stephen was, you
20  know, kind of thinking through what these different  14:37:43
21  options would be.
22  Q  So you had discussions with Stephen
23  throughout the years about what to do with the
24  company, right?
25  A  No. He would ask kind of our advice as to  14:37:50

**Page 191**

1  "Hey, this is -- this is the scenario," you know,
2  and say, "What -- what do you guys think? Is
3  this -- which -- which -- what's -- what's the
4  scenarios?" Or -- you know, so basically he would
5  give us -- or ask us for advice in certain    14:38:06
6  situations, but, I mean, obviously the decision was
7  his.
8  Q  Okay. But you gave him the advice to -- to
9  fire John? Did you give him that advice?
10  A  I mean, I -- no. What -- I think at that  14:38:15
11  point -- we were torn between what to do at that
12  point and it was more a question of him feeling more
13  comfortable with which direction it would go and
14  the -- the amount of money that he would probably
15  need to put in. So, I mean, yeah.    14:38:28
16  Q  Did the company ever show any signs at any
17  time of making a profit?
18  A  I think during -- there's -- I mean, each
19  time they would have new -- you know, new designs
20  come out and they thought that that would do it.  14:38:48
21  So, I mean, each -- each season you were
22  hoping that it would do better, but it is -- you
23  know, it is what it is. It was challenging.
24  MR. BILLER: Let's have the next document
25  marked as Exhibit 18.    14:39:01

**Page 192**

1  (Exhibit 18 was marked for identification
2  by the court reporter.)
3  BY MR. BILLER:
4  Q  So you've been given Exhibit 18, which is
5  the income tax return for year 2015. And you've  14:39:28
6  turned to Bates stamp No. 4162.
7  MR. BRAND: I don't see -- maybe I'm
8  missing something. I don't see Bates stamps on
9  here.
10  MR. BILLER: Oh, I'm sorry. You probably  14:39:43
11  got a copy that doesn't have Bates stamps, so --
12  MR. BRAND: This, the U.S. return of --
13  MR. BILLER: Yeah.
14  MR. BRAND: -- partnership income?
15  MR. BILLER: Yeah.    14:39:51
16  MR. BRAND: That's a couple more pages.
17  There you go. Yeah.
18  BY MR. BILLER:
19  Q  Do you know how to read a tax return?
20  A  Generally, yes.    14:40:01
21  Q  Okay. So why don't you tell me the
22  revenues for TW in 2015.
23  A  Three million -- 3.9 million.
24  Q  Okay. And why don't you tell me the
25  expenses that were incurred for that company for  14:40:13

**Page 193**

1  that year.
2  A  6.7 million.
3  Q  Okay. And what was the ordinary income?
4  A  Negative 4.6 million.
5  Q  Okay. I'm going to go through TW -- PDTW's  14:40:24
6  tax returns in a moment, and I'm going to show --
7  those tax returns will show that it was never in the
8  negative and that its expenses were never as high as
9  this.
10  Did anybody -- did you ever -- did you  14:40:42
11  receive this tax return? Have you seen it before?
12  A  I don't -- I don't recall.
13  Q  Do you think these are good numbers for
14  business?
15  A  No.    14:40:51
16  Q  Okay. Can you explain where all the money
17  went other than pointing to the document and
18  claiming it went somewhere?
19  A  Well --
20  Q  Like, example, the California statement  14:41:02
21  page, it shows $5 million. $5 million went for
22  expenses.
23  Did anybody check to see if that $5 million
24  was legitimate?
25  MR. BRAND: Hold on. I'm trying to find  14:41:21

49 (Pages 190 - 193)

Page 194

1  it.
2     MR. BILLER: It's the second-to-last -- no,
3  I'm sorry. Sorry (handing).
4     MR. BRAND: Okay. Do you see that?
5     THE WITNESS: Yeah.                    14:41:31
6     MR. BRAND: Okay, you've got it.
7     THE WITNESS: Uh-hmm.
8  BY MR. BILLER:
9     Q  Did anybody do an audit?
10    A  No. It was done -- I mean, obviously we   14:41:36
11 had the -- the secondary that -- person that came in
12 that did do the audit, but not --
13    Q  Who?
14    A  That guy David -- or whatever, Hank Kahrs.
15    Q  You said he didn't do an audit, he didn't   14:41:47
16 complete the audit.
17    A  No, he com --
18    Q  Oh, you completed the audit regarding the
19 theft?
20    A  Yeah, he went --                   14:41:53
21       (Simultaneous talking.)
22    Q  Regarding --
23    A  Well, he went through all the numbers to
24 determine if there was anything going wrong.
25    Q  Where is that audit report?          14:41:57

Page 195

1     A  I don't know.
2     Q  You don't have a copy of the audit report?
3     A  I don't have a copy of the audit report.
4     Q  Why wouldn't you have a copy of the audit
5  report?                                14:42:05
6     A  I -- I don't know. I wasn't given a copy
7  of the audit report.
8     Q  You're a member. Aren't you interested?
9     A  Yeah, but it -- I -- I don't have a copy of
10 it right now. I don't -- I don't -- I don't have   14:42:12
11 one.
12    Q  Oh, I find that peculiar. Aren't you
13 interested in the audit report?
14       MR. BRAND: Objection; asked and answered.
15 BY MR. BILLER:                          14:42:20
16    Q  Are you interested or not?
17    A  Yes.
18    Q  Okay. Why didn't you make an effort to get
19 it?
20    A  I -- we found the results associated with   14:42:26
21 it, so, I mean -- yeah.
22    Q  There's an entry --
23    A  Uh-hmm.
24    Q  -- here that shows advance to PW (sic) LLC
25 for $4 million. I'll share my copy (indicating).   14:43:05

Page 196

1     A  Advance to PDTW?
2     Q  PDTW.
3     A  Yeah.
4     Q  It's right there looking at you.
5     A  That's to PDTW?                    14:43:19
6     Q  Yeah. Do you see that?
7     A  Uh-huh.
8     Q  Do you know what the word "advance" means?
9     A  Yes.
10    Q  What does it mean?                 14:43:26
11    A  Was given in kind of like a loan.
12    Q  No, that's not what it means. You know
13 that's not what it means, because a loan is
14 something you give -- is money you give to somebody
15 that pays an interest on it.               14:43:35
16    A  Uh-hmm.
17    Q  An advance, you don't pay interest on it --
18    A  Okay.
19    Q  -- right? Isn't that right?
20    A  Yes.                            14:43:42
21    Q  Okay. An advance is when a company is owed
22 money or has access to certain money at a certain
23 point in time and payment is made --
24    A  Uh-hmm.
25    Q  -- in advance --                  14:43:52

Page 197

1     A  Uh-hmm.
2     Q  -- of the due date.
3     A  Uh-hmm.
4     Q  Is that --
5     A  Okay.                           14:43:55
6     Q  Is that your understanding?
7     A  Yes.
8     Q  Okay. So what document do you know that
9  exists that gave T -- PDTW an advance of $4 million?
10    A  I don't know.                    14:44:06
11    Q  Did -- did -- did TW give PDTW an advance
12 of $4 million?
13    A  I don't know.
14    Q  You would think it would say in here,
15 wouldn't you, in the tax returns?          14:44:19
16    A  Uh-hmm.
17    Q  Now, let's talk about the -- the gross
18 losses for TW. It made, let's say, $4 million in
19 profits, right?
20       Do you see that? About -- yeah. It's --  14:44:41
21 here (indicating).
22       MR. BRAND: Okay.
23 BY MR. BILLER:
24    Q  I'm just rounding up just for, you know,
25 the whole of that matter.                 14:44:52

50 (Pages 194 - 197)

1    Do you see it made approximately $4 million
2 for gross receipts?
3    A    Right.
4    Q    Do you see that?
5    A    Yes.    14:44:57
6    Q    Okay    And then it shows an ordinary
7 business income loss of 4,613,383 cents (sic)
8    Do you see that?
9    A    Yes.
10    Q    Okay.  -83 dollars.    14:45:09
11    So the actual -- the actual loss for the
12 company would be the difference between the
13 $4 million in gross receipts and the negative
14 4,600,000, right?
15    A    I don't understand what you're saying.    14:45:29
16    Q    Okay.  What math did you take in college?
17    MR. BRAND.  Objection, argumentative.
18 BY MR. BILLER:
19    Q    Or high school, for that matter.
20    MR. BRAND:  Objection, argumentative.    14:45:39
21    MR. BILLER:  I'm not arguing.  I'm asking
22 him --
23    (Simultaneous talking, unreportable )
24    MR. BRAND    Okay
25    MR. BILLER:  -- what math did you take    14 45 43

Page 198

1    MR. BRAND:  Clearly he can do --
2    MR. BILLER:  I want --
3    MR. BRAND:  -- the subtraction of --
4    MR. BILLER:  Well, he said he doesn't --
5 I'm saying -- I want to know if he has the basic    14:45:46
6 understanding of arithmetic
7    Q    Do you have the basic understanding of
8 arithmetic?
9    A    Yes.
10    Q    Okay.  So what is the difference between    14:45:54
11 four million -- approximately four million and
12 4,613,000 -- negative 4,613,000?
13    A    Ordinary business income loss  So it's
14 two, six -- so it's around eight, a little over
15 eight.    14:46:23
16    Q    Million?
17    A    Yeah.
18    Q    The company lost $8 million in one year,
19 right?
20    A    No, it did not lose $8 million.  It lost    14:46:28
21 four -- $4.6 million.
22    Q    No, the gross loss of $8 million.
23    A    No.  It had cost of goods sold of one
24 point -- or $2 million, and then you end up with
25 total income of $2 million --    14:46:41

Page 199

1    Q    That's built into the four.
2    A    Yeah, the -- no.  The four -- you subtract
3 out the two mil -- the $2 million.  You end up with
4 $2 million, and then you add an additional
5 $6 million of expenses.  So that's how you get to    14:46:53
6 negative 4.6.
7    Q    Right.  It's all built into the four.
8 That's why it says --
9    A    It's not -- what do you mean, built into
10 the four?    14:47:02
11    Q    It says "ordinary business income."
12    A    All right.
13    Q    That means every -- every expense and every
14 revenue that's taken into account comes to a
15 negative four, right?    14:47:12
16    A    Right.
17    Q    Okay.  And so it made 3.9 in profits, in
18 revenues.
19    A    It made four million in revenues, yes.
20    Q    Right.  So it's an eight -- it's an    14:47:20
21 eight-million-dollar loss.
22    A    That's what I said.
23    Q    Okay.  Did you get any type of document
24 that stated TW sustained an eight-million-dollar
25 loss in 2015?    14:47:37

Page 200

1    A    Again, it -- it wasn't an
2 eight-million-dollar loss, first of all.  And, I
3 mean, they were P&L statements.
4    Q    But the P&L statements are what they are.
5 They're just created from some accountant    14:47:50
6    Did anybody go in there and do an actual
7 determination to see where those losses came from?
8    A    I don't know.
9    Q    Did you ask for one?
10    A    No, I didn't ask for one.    14:48:01
11    Q    Did Stephen Choi ask for one?
12    A    I don't know.
13    Q    And you don't have a copy of the audit?
14    A    No.
15    MR. BRAND.  Asked and answered.    14:48:09
16    MR. BILLER:  I want that audit
17    MR. BRAND:  If he doesn't have a copy, he
18 doesn't have a copy.
19    MR. BILLER:  He has access to it.
20    MR. BRAND:  If he has access to it, fine.    14:48:17
21 Otherwise, it's probably better just to subpoena it
22 and get it.
23    MR. BILLER:  No, don't tell me how to
24 practice law.
25    MR. BRAND:  Okay.  Well, don't tell me to    14:48:2?

Page 201

51 (Pages 198 - 201)

Page 202:

```
 1   I get a document I can't get.
 2        MR. BILLER: He can get -- he has access to
 3   it. He doesn't have to have physical possession of
 4   a document to produce it. I asked --
 5        MR. BRAND: If -- if it's possible for us    14:48:32
 6   to get the audit, we will give you the audit. I
 7   don't have a problem with giving you the audit.
 8        MR. BILLER: Okay.
 9   Q    Now, let's look at a real company.
10        MR. BRAND: Argumentative.                    14:48:52
11        MR. BILLER: Can I have the next document
12   in order as 20, please.
13        THE REPORTER: 19.
14        MR. BILLER: 19. Sorry.
15        (Exhibit 19 was marked for identification   14:49:11
16        by the court reporter.)
17   BY MR. BILLER:
18   Q    And I would like you to --
19        THE REPORTER: One second, please.
20        MR. BILLER: Oh, sorry. Sorry about that.    14:49:27
21   Q    Have you seen Exhibit 19 before?
22   A    No, I have not.
23   Q    Do you agree that appears to be the 2013
24   tax return for PDTW?
25        MR. BRAND: Objection. It's a 2013 -- '14,   14:49:40
```

Page 204:

```
 1   2015 gross receipts?
 2   A    It's higher.
 3   Q    Substantially higher?
 4   A    Yeah.
 5   Q    Twice as high?                               14:51:19
 6   A    No.
 7   Q    Okay. Do you see where it talks about the
 8   total expenses?
 9   A    Yes.
10   Q    And what number do you have?                 14:51:34
11   A    3.8 million.
12   Q    3.8 million?
13   A    Uh-hmm.
14   Q    That is substantially lower than PDTW,
15   isn't it?                                         14:51:45
16   A    Yes.
17   Q    Okay. How much lower?
18   A    Two -- a little over two million less. Two
19   million. Yeah, two million.
20   Q    Let's go to the back sheet, expense sheet.   14:52:01
21   A    Uh-hmm.
22   Q    Do you see the expenses for the company?
23   A    Yes.
24   Q    Are the expense -- what are the expenses
25   for T -- PDTW?                                    14:52:19
```

Page 203:

```
 1   it looks like.
 2        MR. BILLER: No, '13. Did I give you '14?
 3        MR. BRAND: Yeah, I've got '14 here.
 4   BY MR. BILLER:
 5   Q    What do you have?                            14:49:53
 6   A    '14.
 7   Q    '14, too. Okay. I know this -- oh, here
 8   we go. Let's take the stamp off and switch 'em to
 9   '13, please.
10        (Exhibit 19 was re-marked for identification 14:50:26
11        by the court reporter.)
12        THE WITNESS: Okay.
13        MR. BILLER: Do you have '13?
14        MR. BRAND: This is '13.
15        MR. BILLER: Okay.                            14:50:53
16        MR. BRAND: You have '13 right there.
17        THE WITNESS: Uh-huh.
18   BY MR. BILLER:
19   Q    Does this appear to be the 2013 PDTW tax
20   return?                                           14:51:00
21   A    Yes.
22   Q    Okay. Can you read what the -- the gross
23   receipts were for that year?
24   A    Seven million.
25   Q    Okay. Is that higher or lower for TW's       14:51:09
```

Page 205:

```
 1   A    2.4 million.
 2   Q    Is it substantially lower than the expenses
 3   for TW in 2015?
 4   A    Yes, it's less.
 5   Q    How much less?                               14:52:31
 6   A    I don't know. I don't have it in front of
 7   me.
 8   Q    It's about half as much, isn't it?
 9   A    Where's the other one from before?
10        (Witness reviews document.)                  14:52:38
11        THE WITNESS: It's about two million less.
12   BY MR. BILLER:
13   Q    What is the number on the TW return for
14   2013 in terms of expenses?
15   A    4.5.                                         14:53:39
16   Q    Did you ever compare the numbers for TW and
17   PDTW --
18   A    No.
19   Q    -- to determine how well the company was
20   doing prior to TW's destruction?                  14:53:57
21   A    No.
22   Q    It's fair to say that TW never made up
23   those losses from its first year, correct?
24   A    Yeah, it did not.
25   Q    Okay. Instead, it continued to incur         14:54:10
```

1 losses from the first year?

2 A  Yes.

3 Q  Right?

4 A  Yes.

5 Q  Okay. Because we know after the first year 14:54:16

6 Stephen Choi invested at least another $9.5 million,

7 right?

8 A  I don't know.

9 Q  Okay. Do you have -- you know Stephen

10 Choi. You have 13 businesses that -- some of which 14:54:30

11 involve him.

12 You've -- you know, you're -- can you

13 explain why he would invest $9 million in a company

14 that was in -- in the -- showing so poorly from the

15 very beginning? 14:54:46

16 MR. BRAND: Objection; calls for

17 speculation.

18 THE WITNESS: I think Stephen's --

19 Stephen's a trusting guy.

20 BY MR. BILLER: 14:54:54

21 Q  He's a trusting guy. All right.

22 A  And also he is somebody who -- you know,

23 obviously he put in so much money, he doesn't want

24 to lose it, so he wanted to try to make it work.

25 And, like I said, John was good at telling 14:55:04

**Page 206**

1 him, "Hey, it's going to turn around." He did a

2 good job in saying he could turn it around, and

3 that's why -- that's why he kept on investing.

4 Q  Okay. Is -- is Stephen Choi such a

5 trustworthy guy he regularly commits perjury? 14:55:19

6 MR. BRAND: Objection.

7 BY MR. BILLER:

8 Q  Is that the type of man he is?

9 MR. BRAND: Objection; argumentative.

10 Objection; no foundation. 14:55:25

11 BY MR. BILLER:

12 Q  Do you know if he's told -- if he told the

13 truth when he testified?

14 A  I don't know.

15 Q  Do you? 14:55:31

16 A  I don't know.

17 Q  Did he ever tell you that he had a -- he

18 had to make -- make stuff up when he testified?

19 A  I don't know.

20 Q  But the following statement would be 14:55:40

21 untrue, would it not, "I had nothing to do with

22 Hillshore"? That's not a truthful statement, is it?

23 A  I don't know.

24 Q  You don't know? You just gave testimony

25 about Hillshore. You don't know if Choi's statement 14:55:54

**Page 207**

1 "I have nothing to do with Hillshore" is an honest

2 statement or not?

3 A  I -- I don't know the arrangement of

4 what -- what his arrangement with Hillshore is.

5 Q  But he has some arrangement? 14:56:07

6 A  I don't know. I don't know -- I don't know

7 who owns Hillshore.

8 Q  But Hillshore is a partner, a member of TW,

9 right?

10 A  I believe so. 14:56:15

11 Q  Yeah. Stephen Choi is not, right?

12 A  Yeah, he -- yeah  Hillshore is the --

13 Hill -- Hillshore is the partner, yes

14 Q  And the deal was between Stephen Choi and

15 Paula Thomas, right? 14:56:25

16 MS. THOMAS  Uh-hmm.

17 THE WITNESS  No.

18 BY MR. BILLER:

19 Q  You just testified that the deal was

20 between Stephen Choi and Paula Thomas in your 14:56:35

21 e-mail.

22 A  Yes. I mean, if you're saying who --

23 who -- the decision-making process of the deal term,

24 yes  I'm just saying I -- I mean, the entity

25 Hillshore, how it got involved. I don't know 14:56:51

**Page 208**

1 Q  Okay. So you would agree that the

2 agreement, though, was between Choi and Paula

3 Thomas?

4 A  Yes.

5 MR. BRAND: Is it -- 14:57:00

6 BY MR. BILLER:

7 Q  Okay. So it didn't involve Hillshore at

8 the time the agreement was made, right?

9 A  Yeah, I don't believe so.  Yes.

10 Q  Okay. 14:57:08

11 Okay. Why wasn't Stephen Choi put on the

12 original operating agreement?

13 A  Because we set up the company before, so

14 when the money was funded, I think there's tax --

15 tax reasons associated with it. 14:58:21

16 Q  That benefit Choi?

17 A  No. It benefitted all of us for -- if we

18 did it all at one time, then it would create basis.

19 Q  Okay. Explain that to me.

20 A  If you put -- if he puts in money and the 14:58:33

21 valuation is a certain amount and the rest of us

22 don't put in money, we either have to -- to -- to

23 own the company at the original valuation if --

24 unless we put -- if -- unless we put up the money,

25 we can't get the value -- we can't get the -- let's 14:58:51

**Page 209**

53 (Pages 206 - 209)

**Page 210**

1 say the company is valued at $9 million.
2     If he puts in the money and we all come in
3 at the same time, he has whatever basis, he owns
4 whatever percentage. If we ever sold the company at
5 a later point, my understanding is, is that the        14:59:05
6 first nine million we would get no percentage in.
7 And then after, then we would get it.
8     But by putting the structure the other way,
9 where you put the people first, they own the
10 company, and when Stephen comes in, then you -- you    14:59:18
11 can -- you -- when you sell it later you would still
12 have the zero basis so you'd be able to capture all
13 of the --
14    Q   Who told you that?
15    A   Just the tax people.                            14:59:29
16    Q   Tax -- who tax -- who tax people?
17    A   General tax people.
18    Q   No. General -- not --
19    A   I don't know. I don't remember, but --
20        (Simultaneous talking.)                         14:59:35
21    Q   Who told -- I want to know who told
22 you --
23    A   I don't --
24    Q   -- that was the scheme.
25    A   It wasn't a scheme. It --                       14:59:38

**Page 211**

1    Q   It is a scheme, because Paula put in
2 32,000 -- $3,200, so why would she have to wait?
3 She wasn't going to get a tax benefit out of it. It
4 was Choi, you, Hanna, Park
5    A   Well, we all put in money --                     14:59:53
6    Q   No --
7    A   -- based on a percentage
8    Q   How much did you put in, $700?
9    A   Yeah, because we got the 2.5 percent.
10   Q   So why wouldn't Paula have to put her money 15:00:00
11 to get benefit of that deal?
12   A   She did.
13   Q   She did in January.
14   A   Yeah, but she got the -- she got the same
15 exact thing.                                           15:00:06
16   Q   No, but she didn't -- she wasn't made part
17 of the operating agreement in July. Why wasn't
18 that -- why was she held out of the operating
19 agreement?
20   A   Because there was so many documents that 15:00:16
21 still needed to be created for Paula. She had a
22 clawback provision, she had a purchase agreement.
23 There was -- there was four or five more documents
24 that Paula had to --
25   Q   Why couldn't they create them by then?  15:00:26

**Page 212**

1    A   There was a lot of negotiation on those
2 documents.
3    Q   No. How do you know?
4    A   Because -- what do you mean, how do I know?
5 Because --                                             15:00:35
6    Q   How do you know?
7    A   Because we saw the documents
8    Q   Who gave you the documents?
9    A   We got the documents as part of the
10 process, because we -- when -- when Paula had to  15:00:39
11 come in we got to see -- we had to sign off on all
12 these documents.
13   Q   Okay. What -- what are you talking about,
14 sir?
15       MR. BRAND: Objection --                          15:00:47
16 BY MR. BILLER:
17   Q   Because --
18       MR. BRAND: -- argumentative.
19 BY MR. BILLER:
20   Q   Can you get the documents? Okay.               15:00:50
21   A   The clawback provision documents?
22   Q   Let's get the documents. I've got all
23 seven of 'em. Okay? Let's get 'em all out
24       You signed one document That's what you
25 signed, one That's it, buddy                          15:01:10

**Page 213**

1        MR. BRAND: Well, let's see. And
2 objection; argumentative.
3        MR BILLER  Let's go off the record for a
4 second.
5        THE VIDEOGRAPHER  Going off the record at 15:02:41
6 3:02 P.M.
7        (Discussion off the record.)
8        (Exhibit 20, Exhibit 21, Exhibit 22,
9        Exhibit 23 and Exhibit 24 were marked by
10       the court reporter.)                            15:04:53
11       THE VIDEOGRAPHER  Going back on the record
12 at 3:05 P.M.
13 BY MR. BILLER:
14   Q   Is the first document in front of you,
15 Exhibit 20, the clawback agreement?                   15:05:07
16   A   Yes.
17   Q   Does your name appear on that?
18   A   Yes.
19   Q   And you signed it, right?
20   A   Yes.                                            15:05:14
21   Q   And, generally speaking, the clawback --
22 clawback agreement allows Paula to collect a certain
23 amount of percentage of the ownership of the company
24 from you and the other members if the five bil --
25 $5 million is repaid in a certain amount of time, is 15:05:28

54 (Pages 210 - 213)

**Page 214**

1  that right?
2  A  Yes.
3  Q  You're giving back some of your interest to
4  Paula, right?
5  A  Yes.                15:05:37
6  Q  Okay.  Did -- you didn't sign -- did you
7  sign the indemnity agreement?
8  A  Yes, I did.
9  Q  Okay.  And this was the whole -- I'm sorry.
10     When I read this agreement I just laugh,    15:05:59
11  because it's supposed to indemnify Paula for any of
12  the debt that is paid off by TW on the existing --
13  some of the existing money from debtors.  Is that
14  right?
15  A  Yes.                15:06:12
16  Q  Okay.  Then we've got the agreement through
17  membership interest that you did not sign because
18  one wasn't prepared for you, right?
19  A  Yeah.  Yeah, I didn't -- I didn't sign off
20  on this.  John did.            15:06:31
21  Q  Right.  And this -- you didn't sign any
22  similar document, right?
23  A  I don't know.  I don't believe so.
24  Q  Okay.  You signed the operating agreement,
25  though?                15:06:40

**Page 216**

1  essentially says TW has received lots of money and
2  we're going to use it in this manner, right?
3  A  No.  TW was going to give this money to
4  P -- the money that's owed by PDTW.  So the CBC
5  loan, the Da Da Trading, the monies owed to Da Da   15:08:02
6  Trading, Finance One --
7  Q  It's going to pay off its debts?
8  A  Yeah.  PDTW's debts, yes.
9  Q  Okay.  And what did I say?
10  A  TW.                15:08:12
11  Q  Okay.  That document essentially is that TW
12  is going to pay off PDTW's debts, right?
13  A  It's going to give this money so that PDTW
14  could pay off the debts, yes.
15  Q  Okay.  Is it going to give that money    15:08:25
16  directly to PDTW?
17  A  I -- I don't know.
18  Q  You have no idea?
19  A  I'm not sure.
20  Q  Can you tell me why there was a notice of  15:08:31
21  action or something to that effect that put all that
22  debt on Paula Thomas?
23  A  I don't know.  I don't know what you're
24  talking about.
25  Q  You don't know?            15:08:45

**Page 215**

1  A  Yes.
2  Q  Okay.  Do you know when you signed that?
3  A  I don't know.  I don't remember.
4  Q  Now -- shoot.  The next document is the
5  amended and restated operating agreement, right?  15:07:04
6  A  No.
7  Q  What do you have?
8  A  Use of proceeds agreement.
9  Q  Use of proceeds agreement.  Okay.  Well,
10  did you sign that document?        15:07:13
11  A  Yes.
12     MR. BRAND:  I'd like to point out on this
13  document the very last page is a signature page for
14  the indemnity agreement.  This second page is a
15  signature page for the use of proceeds.    15:07:24
16     MR. BILLER:  Okay.
17     MR. BRAND:  So it looks like a signature
18  page got tacked on
19     MR. BILLER:  Okay, but he has a current
20  copy of the document.  That's part of the record.  15:07:34
21     MR. BRAND:  Okay.  That is -- I mean,
22  it's -- it's in there.  I just wanted you to be
23  aware of that.
24  BY MR. BILLER:
25  Q  So the use of proceeds agreement    15:07:38

**Page 217**

1  A  No.
2  Q  Okay.  I'll show you.
3     MR. BRAND:  I would just say objection;
4  misstates the evidence.  I mean, let's see the
5  document itself.            15:08:53
6     MR. BILLER:  I can ask questions, Counsel,
7  before I show him documents.  It's called laying the
8  foundation.
9     What number did we get up to?
10     THE REPORTER:  24.        15:09:32
11     MR. BILLER:  24?  Let's mark the next one
12  as Exhibit No 25
13     (Exhibit 25 was marked for identification
14     by the court reporter.)
15  BY MR. BILLER:            15:09:54
16  Q  Sir, do you have a copy of all the minutes
17  for the company?
18  A  All the minutes.  I'm not sure.
19  Q  Did you produce any?
20  A  If I had any minutes, yes.        15:10:05
21  Q  Okay.  I didn't see any, so that's why I'm
22  asking.  I didn't see any notices regarding action
23  taken by the members.  Did you throw those away?
24  A  No, I don't think so.
25     MR. BRAND:  I believe we did produce some  15:10:15

55 (Pages 214 - 217)

1 minutes. I'll take a look.
2    MR. BILLER: Okay.
3    Q    All right. Why don't you look at Exhibit
4 No 25.
5    (Witness reviews document.)        15:10:25
6 BY MR. BILLER:
7    Q    Have you read it?
8    (Witness reviews document.)
9 BY MR. BILLER:
10    Q    Why would --        15:11:00
11    A    Yes.
12    Q    Why would Paula Thomas allegedly --
13 allegedly -- we believe there is a forgery --
14 allegedly sign this action of written consent that
15 makes her responsible for the $2 million that TW was 15:11:09
16 supposed to pay for the debt for PDTW?
17    Why would she do that?
18    A    I don't know.
19    MR. BRAND: Calls for speculation.
20 BY MR. BILLER:        15:11:24
21    Q    You would agree this document is putting
22 debt on Paula's back, right?
23    A    I believe so
24    Q    Okay. Do you have any idea why that --
25 anybody would do that?        15:11:33

Page 218

1    MR. BRAND: The --
2 BY MR. BILLER:
3    Q    What -- what -- do -- do you -- do you know
4 of any document, as you sit here today, that shows
5 Exhibit 25 was made part of the deal to create TW?    15:12:25
6    MR. BRAND: Objection; asked and answered.
7 BY MR. BILLER:
8    Q    Do you know of any document that states
9 that?
10    MR. BRAND: Asked and answered.        15:12:35
11    THE WITNESS: I don't know. I mean --
12 BY MR. BILLER:
13    Q    You don't know? You don't know of a
14 document?
15    A    No. I --        15:12:40
16    Q    Is that saying "I don't know of a
17 document"?
18    A    Yes. I don't know of a document, but I
19 don't know what -- if this was part of the deal or
20 not        15:12:48
21    Q    Okay. Has anybody told you Exhibit 25 was
22 part of the deal?
23    A    I don't remember anyone saying it.
24    Q    All right. That's a lot of money.
25 $2 million, don't you think?        15:13:00

Page 220

1    MR. BRAND: Calls for speculation.
2    THE WITNESS: I -- I don't know.
3 BY MR. BILLER:
4    Q    Okay. You would agree that this was not
5 part of the deal? Exhibit 25 was not part of the    15:11:40
6 deal, right?
7    A    I -- I don't know. I -- I don't -- I don't
8 know -- I don't know who owned the original debt --
9    Q    Okay.
10    A    -- so I'm not sure.        15:11:55
11    Q    No. Sir, "I don't know" is not the right
12 answer.
13    A    Uh-hmm.
14    Q    I'm asking you if you do know. You could
15 say "yes" or "no."        15:12:02
16    A    Okay.
17    Q    But you can't say "I don't know," because
18 you could come back sometime -- later time and say
19 "Oh, now I remember."
20    Do you understand?        15:12:12
21    So do you or do you not know whether or not
22 this document, Exhibit 25, was part of the deal that
23 created TW?
24    A    I don't remember.
25    Q    No. Sir --        15:12:17

Page 219

1    A    Yes.
2    Q    Okay. So don't you think Paula Thomas
3 owing $2 million is a significant fact that you
4 would want recorded in the paperwork someplace?
5    A    So -- I mean, again, I -- I don't know        15:13:18
6 enough about this. I -- I didn't know if PDTW, she
7 owned this debt and then the money was going to be
8 given so that they could repay the debt.
9    I mean, again, I don't know what the --
10    Q    Okay.        15:13:33
11    A    -- what -- what the -- the logistics of how
12 this was going to be set up. That's all --
13    (Simultaneous talking, unreportable.)
14    Q    You -- you --
15    A    That's all I'm saying. I don't know --        15:13:37
16    Q    You do --
17    A    -- that.
18    Q    -- know. Sir, you do know.
19    A    No, I don't know.
20    Q    You just testified about it.        15:13:39
21    Well, this -- you're showing me this.
22    PDTW owed $2 million. The deal was Stephen
23 Choi will fund a two-million-dollar loan. That
24 money would then be used to pay off PDTW debt.
25 Isn't that your understanding?        15:13:55

Page 221

56 (Pages 218 - 221)

1    MR. BRAND: Objection; misstates the prior
2 testimony.
3 BY MR. BILLER:
4    Q    Is that -- is that your understanding?
5    A    My understanding is, is that there is this    15:14:02
6 debt out there and it would be repaid. How it would
7 repay, it doesn't clearly state.
8    Q    Well, you put on the e-mail that $2 million
9 would be lent to the company or loaned to the
10 company to pay the debt.    15:14:17
11    That's what the e-mail says, right?
12    A    Well, I don't remember this exact wording
13 of the e-mail. I know that at the end, yes, this
14 $2 million would be repaid.
15    Q    Okay. And that would come from money from    15:14:28
16 Stephen Choi?
17    A    From the -- the loan?
18    Q    Yes.
19    A    Yes.
20    Q    Okay. So you don't know anybody who told    15:14:35
21 you that $2 million would be put back on Paula
22 Thomas and you haven't -- you don't know of any
23 document that says that, right?
24    A    Yeah, I don't -- I don't know and -- I
25 mean, again, I -- I -- I don't know the details. My    15:14:48

Page 222

1 assumption was the $2 million was paid off.
2    Q    Okay. In 2014?
3    A    No, I don't know exactly when it was paid
4 off, but my understanding was it was paid off.
5    Q    Okay. By somebody other than Paula?    15:15:00
6    A    Yeah. I'm -- I'm -- yeah. Well, I -- I
7 thought what happened was that $2 million was
8 provided and then used to pay off -- pay off
9 these -- you know, the various debts that are
10 associated with it.    15:15:16
11    Q    And you have no explanation why the same
12 debts amounting to approximately $2 million would be
13 put back on Paula's shoulder, do you?
14    A    No, I don't know.
15    Q    Okay. Did you -- did -- you know, one of    15:15:25
16 the most interesting documents I find in this
17 case -- I don't mind telling you because it kills
18 you. It kills TW.
19    MR. BRAND: Objection; argumentative.
20    MR. BILLER: Next one in order, please, 26.    15:15:30
21    (Exhibit 26 was marked for identification
22    by the court reporter.)
23 BY MR. BILLER:
24    Q    Have you ever read a QuickBook (sic)
25 report, sir?    15:16:02

Page 223

1    A    Yeah. Yes.
2    Q    If you would turn to the third page. Does
3 it not show there that TW claims PDTW owes it
4 $4.4 million in expenses for 2014 and 2015?
5    MR. BRAND: Can you point that out on    15:16:28
6 the --
7    MR. BILLER: It's on the bottom. Do you
8 want to see my copy?
9    MR. BRAND: Sure.
10    (Document handed to counsel.)    15:16:35
11    MR. BRAND: Okay, I see it.
12    THE WITNESS: Where is it?
13    MR. BRAND: It's the total.
14    THE WITNESS: The total. Okay. So what's
15 the question?    15:16:45
16 BY MR. BILLER:
17    Q    That report, Exhibit No. 26 --
18    A    Uh-hmm.
19    Q    -- shows that TW is expecting to collect
20 $4.4 million for expenses that TW paid for PDTW.    15:16:55
21    A    So what is this category? I -- I'm not
22 quite --
23    Q    This is a report that says on the top
24 "Thomas Wylde LLC Account QuickBook" (sic) "All
25 Transactions."    15:17:32

Page 224

1    A    Okay.
2    Q    "Advanced by TW to PDTW."
3    A    Okay.
4    Q    Upper left-hand corner.
5    A    Okay.    15:17:40
6    Q    And we have the bank statement for these
7 entries, and it's a QuickBook (sic) 1, and it shows
8 4.4 (sic) allegedly was paid by TW for the benefit
9 of PDTW.
10    A    Okay.    15:17:57
11    Q    Do you see that?
12    A    Yes.
13    Q    Okay. Now, if you go on to -- I have
14 horrible eyes, so just wait one second.
15    Okay. If you go on to Page 2 -- I'm going    15:18:07
16 to show you --
17    Do you mind, Counsel? Because I have
18 horrible eyes. I can't --
19    MR. BRAND: Okay.
20    MR. BILLER: -- explain it. I just put a    15:18:20
21 check next to the amount.
22    MR. BRAND: Okay. So you're looking at an
23 entry of $1,639,015.63?
24    MR. BILLER: Yes.
25    Q    Do you know what that entry is for?    15:18:33

Page 225

57 (Pages 222 - 225)

1 A    Sounds like it was the payment that -- that
2 TW made on the CBC note.
3 Q    Right.
4 A    Yes.
5 Q    So TW was charging PDTW the 6.39 million    15:18:46
6 that it paid off, with your money, the CBC loan?
7      MR. BRAND  Objection, mischaracterizes the
8 evidence
9 BY MR. BILLER:
10 Q    Is that your understanding?    15:19:11
11 A    Can you repeat the question
12 Q    Sure.
13      This document indicates that TW was
14 claiming to pay expenses for T -- PDTW to pay off
15 the -- the CBC loan.    15:19:25
16 A    Okay.
17 Q    Is that right?
18 A    Yes
19 Q    Okay  But it was Stephen Choi who made the
20 loan that was used to pay off the CBC loan before    15:19:36
21 2015, correct?
22 A    Yes
23 Q    Okay.  That's consistent with the use of
24 proceeds agreement, right?
25 A    I believe so    15:19:50

Page 226

1 Q    Okay.  So do you have any -- do you know
2 why TW would want PDTW to pay $4.4 million in debt
3 including a loan that was already paid off?
4      MR. BRAND: Calls --
5 BY MR. BILLER.    15:20:08
6 Q    Do you --
7      MR. BRAND. -- for speculation
8 BY MR. BILLER
9 Q    -- know why?
10 A    Well, I'm not exactly sure what -- what the  15:20:11
11 entity structure was at that point.  I don't think
12 that TW -- I'm not sure if the TW was finalized in
13 terms of the funding associated with it, so I'm not
14 sure if this was created as a holder and then when
15 everything was going to be set up, when Stephen put  15:20:29
16 in the money, into TW --
17 Q    This was created in 2015  Expenses go in
18 to deep 2015
19      MR. BRAND: Is there any --
20      MR. BILLER: The dates.  Look at the dates, 15:20:42
21 guys.
22      MR. BRAND  So it looks like the last entry
23 was September 15th, 2015?
24      MR. BILLER  Yeah.
25      MR. BRAND  Okay    15:20:52

Page 227

1 BY MR. BILLER:
2 Q    Everything was closed by then, wasn't it?
3 A    I believe so.
4 Q    Now, this is where your company -- and I'm
5 going to hold every single one of you responsible    15:21:05
6 for committing fraud on the bankruptcy court.
7      Do you know TW filed for bankruptcy?
8 A    Do I what?
9 Q    Do you know TW filed for bankruptcy?
10 A    No, I do not.    15:21:19
11 Q    It didn't file for bankruptcy.  It made
12 claims in bankruptcy court.  Did you know that?
13 A    Claims in bankruptcy court?
14 Q    Yes.
15 A    I -- I don't know.    15:21:29
16 Q    You don't know anything from Richard Peddie
17 about the bankruptcy proceedings in this -- you're
18 being deposed in the bankruptcy proceedings.
19      Is that what you're saying?
20 A    I don't -- I don't know the details of    15:21:43
21 what's happening in the bankruptcy proceedings.
22 Q    Well, what did -- what did Richard Peddie
23 tell you about them?
24      MR. BRAND: Objection; attorney-client
25 privilege.    15:21:52

Page 228

1      MR. BILLER: When do you want to work this
2 out? Tomorrow?
3      MR. BRAND: Sure.
4      MR. BILLER: Here?  Your office?
5      MR. BRAND: We'll -- we'll -- we'll select  15:21:59
6 a place --
7      MR. BILLER: Okay.
8      MR. BRAND: -- later.
9      MR. BILLER: All right.
10 Q    TW made a -- a claim in bankruptcy court    15:22:04
11 against PDTW for $2.5 million.
12      Did you know that?
13 A    No, I did not know that.
14 Q    Do you know where that $2.5 million comes
15 from?    15:22:24
16 A    I do not know.
17 Q    That $2.5 million comes from Exhibit
18 No. 5 -- 20 -- the exhibit I just showed you, 20 --
19 26, minus the $2 million that Choi paid off.  That's
20 where it comes from.    15:22:42
21      So you were managing or you were involved
22 with TW.  How in the world did TW or PDTW incur two
23 million doll -- $2.4 million in debt when its debt
24 was paid off by Stephen Choi and it was not
25 functioning, essentially, in the latter part of    15:23:08

Page 229

58 (Pages 226 - 229)

1 2014?

2    How did -- how is that possible?

3    A    I don't know.

4    Q    Okay. Let me just find -- find that claim.

5    What time is it?    15:24:13

6    MR. BRAND: 3:23.

7    MR. BILLER: 3:23. So what does that mean?

8 How long have we been going now, an hour and 10

9 minutes?

10    MR. BRAND: Yeah, about.    15:24:25

11    MR. BILLER: Does everybody want to take a

12 break, then?

13    THE WITNESS: I'm fine to keep going.

14    MR. BILLER: How about the reporter?

15 That's what I'm --    15:24:33

16    THE WITNESS: Oh.

17    MR. BILLER: -- most concerned about.

18 She's the one that's working the hardest.

19    THE REPORTER: Whenever you can take a

20 break, I'll take a break.    15:24:41

21    MR. BILLER: Okay. This says that how

22 important to me -- well, never mind.

23    The next document, marked as 27, please.

24    (Exhibit 27 was marked for identification

25    by the court reporter.)    15:25:20

Page 230

1    A    He might have had outside counsel help.

2    Q    This e-mail states that there's no tax

3 consequence to Paula, correct?

4    A    It says,

5    "Based on advice from our outside    15:26:55

6    CPA, those assets and debts should

7    cancel out so that Paula has no tax

8    consequence."

9    Correct.

10    Q    Okay. Now, did you have to approve of the    15:27:02

11 employment agreement --

12    Let's take a break, actually.

13    MR. BRAND: Okay.

14    MR. BILLER: It's getting hot. Is anybody

15 else hot?    15:27:28

16    THE VIDEOGRAPHER: This marks the end of

17 Media No. 3. Going off the record at 3:27 P.M.

18    (Recess.)

19    THE VIDEOGRAPHER: This marks the beginning

20 of Media No. 4. Going back on the record at 3:33    15:33:40

21 P.M.

22 BY MR. BILLER:

23    Q    Sir -- I'm sorry. Sir, would you please

24 look at Exhibit No. 28.

25    (Exhibit 28 was marked for identification    15:34:18

Page 232

1    (Witness reviews document.)

2    THE WITNESS: Okay.

3 BY MR. BILLER:

4    Q    Do you know who David Schnider is?

5    A    Yes.    15:26:16

6    Q    Who is he?

7    A    Attorney.

8    Q    Attorney for who?

9    A    I believe he was the attorney for Thomas

10 Wylde.    15:26:23

11    Q    Was he an attorney for PDTW?

12    A    I don't know.

13    Q    When did he become the attorney for Thomas

14 Wylde?

15    A    I don't know.    15:26:29

16    Q    Well, it was certainly after it became a

17 business.

18    A    Yeah, so -- well, I mean, he was involved

19 from the very beginning.

20    Q    For Thomas -- to create Thomas Wylde?    15:26:38

21    A    Yes.

22    Q    And is it your understanding that he

23 created all the documents in this case?

24    A    I don't know.

25    Q    Okay.    15:26:46

Page 231

1    by the court reporter.)

2    (Witness reviews document.)

3 BY MR. BILLER:

4    Q    Did you see any entry for $1.639 million in

5 Exhibit No. 28?    15:35:18

6    MR. BRAND: Is it on the credit or the

7 debit?

8    MR. BILLER: Credit.

9    MR. BRAND: Okay.

10    THE WITNESS: No, I don't believe I see    15:36:26

11 anything.

12    MR. BILLER: Can you hand the witness the

13 amended and restated operating agreement.

14    MR. BRAND: Yes (handing).

15 BY MR. BILLER:    15:37:14

16    Q    Okay. Let's go through this.

17    On Page 2 --

18    MR. BRAND: Right here (indicating).

19 BY MR. BILLER:

20    Q    You iden --    15:37:37

21    MR. BRAND: I was going to put it here so

22 we can both look at it.

23    THE WITNESS: Oh.

24 BY MR. BILLER:

25    Q    You're identified as a member of Thomas    15:37:43

Page 233

59 (Pages 230 - 233)

```
 1  Wylde LLC, right?
 2  A   Yes.
 3  Q   Okay.  As a member -- well, the articles
 4  were -- articles of organization were formed on July
 5  22, 2014, right?  That's on Page 4.        15:38:00
 6  A   Yes.
 7  Q   And on Page 5, Section 2.9, it says John
 8  Hanna will be the manager and there will be only one
 9  manager for the company, right?
10  A   Yes.                               15:38:20
11  Q   And then Article V, Management and
12  Executive Committee.  5.1.
13      Now, you signed this document, right?
14  Yeah, you signed it.
15  A   Yes.                               15:38:47
16  Q   So did you read it before you signed it?
17  A   I mean, yeah.  I mean, I -- I don't know if
18  I read line for line, but, yeah, general overview.
19  Q   Okay.  Why don't you read the first two
20  sentences -- or first three sentences in Paragraph   15:39:03
21  5.1, "Managed By Manager."
22  A   "Subject to Sections 5.4 and 7.3,
23      the business of the company shall be
24      managed by one Manager, who may also
25      be a Member.  Except as otherwise       15:39:19
                                        Page 234
```

```
 1      set forth in this Agreement, all
 2      decisions concerning the management
 3      of the Company's business shall be
 4      made by the Manager.  The Manager
 5      shall also serve as Chief Executive    15:39:26
 6      Officer of the Company.  The Manager
 7      shall have general supervision of
 8      the business and affairs of the
 9      Company, shall preside at all
10      meetings of Members and the
11      Executive Committee, and shall have
12      any other powers and duties usually
13      vested in the CEO.  The Managers may
14      also provide for additional Officers
15      of the Company from time to time and
16      shall establish the powers, duties,
17      and compensation of all other
18      Company officers and employees."
19  Q   Basically this clause gives the manager
20  power to do whatever he wants within TW, right --  15:39:51
21  A   Uh.
22  Q   -- except for the two limitations?
23  A   Yes.
24  Q   Right?
25  A   Yes.                               15:39:58
                                        Page 235
```

```
 1  Q   And so if he wanted to fire Paula, he could
 2  fire Paula any time he wanted, right?
 3  A   Yes.
 4  Q   Did he ever complain to you about Paula?
 5  A   Who are you talking about?          15:40:13
 6  Q   Did John ever complain to you about Paula,
 7  John Hanna?
 8  A   I mean, yeah, a little.  Yeah, he -- he
 9  would say -- he would say that there was challenges
10  or had difficulties or -- you know, the usual sort   15:40:32
11  of stuff, I would say.
12  Q   Well, did he ever call her a bitch?
13  A   I -- I don't know.  I don't remember.
14  Q   Did he -- did he ever tell you that she
15  wanted to have her child's daughter (sic) by another  15:40:40
16  man?  Did she ever tell you -- tell you that?
17  A   I -- I don't -- can you repeat that
18  question.  I didn't --
19  Q   Sure.
20      Did she ever tell you that Paula wanted to  15:40:50
21  have a child with -- by her -- by her daughter (sic)
22  with another man?
23  A   The question doesn't make sense
24  Q   Okay  Did she ever -- did she -- did he
25  ever tell you that he was willing to kill Paula?   15:41:04
                                        Page 236
```

```
 1  A   No.
 2  Q   Did he ever -- did he ever use the word
 3  "fuck" in reference to Paula?
 4  A   I don't remember.  I don't recall.
 5  Q   Did he -- was he -- was he vulgar in     15:41:18
 6  reference to Paula?
 7  A   I don't recall.
 8      MR. BRAND:  Objection; vague, ambiguous.
 9  BY MR. BILLER:
10  Q   Did he use profanity?              15:41:29
11  A   Ever?
12  Q   With reference to Paula.
13  A   I don't remember.
14  Q   Okay.  He was a hot-headed guy, wasn't he?
15  A   Yes.  I mean, he could get hot, but usually  15:41:39
16  he was pretty calm.  But, yeah, sometimes he
17  could --
18  Q   And when --
19  A   -- get hot.
20  Q   -- he got hot, he got really hot, right?   15:41:46
21  A   I mean, I guess -- I don't know.  I know
22  what your -- I found him to be -- he could get hot
23  but no more than anyone else that I've seen.  I've
24  seen --
25  Q   Really?                             15:41:58
                                        Page 237
```

60 (Pages 234 - 237)

Page 238

```
 1   A   Yeah.  I think he's --
 2   Q   He wasn't a screamer?
 3   A   Not that I know.  Not -- not that I've
 4   experienced.
 5   Q   Okay.  All right.                    15:42:04
 6       When was the last time you talked to Jene
 7   Park?
 8   A   I -- we, I think, were on a phone call
 9   regarding litigation, and it must have been several
10   months ago.                             15:42:24
11   Q   Are you telling me you haven't talked to
12   Penny -- Jene Park in two months, over two months?
13   A   Yeah, more than two months.
14   Q   When did you talk to John Hanna last?
15   A   I haven't talked to John Hanna -- he wasn't  15:42:37
16   even at that -- when we had like a general
17   conference call he wasn't there.  So I have not
18   talked to him for years.  Yeah, for years.
19   Q   How about David Schnider?  When did you
20   talk to him last?                       15:42:54
21   A   Again, part of that -- just litigation
22   update, like, conference call.
23   Q   Who was on that -- without -- I don't want
24   to know the communication.  I just want to know who
25   was on it.                              15:43:06
```

Page 239

```
 1   A   I believe it was Richard, Stephen, Jene,
 2   David and then I think myself.  I don't believe
 3   John.  And I don't think Roger was on it either.
 4   Yeah, I don't think they -- they were able to make
 5   it.                                     15:43:34
 6   Q   Okay.  And how long did the conversation
 7   last?
 8   A   Not that long.  I would say 15, 20 minutes.
 9   Q   There's not a time I've been with Richard
10   Peddie that he's spoken for only 15 minutes.  15:43:47
11   A   It wasn't -- well, again, I don't remember
12   exactly.  It was not a -- a super-long call.
13   Q   Okay.  How many of those conversations have
14   you had?
15   A   I'm not -- I don't -- I don't know.  I     15:44:00
16   can't tell you for sure.  I think -- I think we
17   might have had one other.  I don't know.  I felt
18   like we set up appointments to do 'em but we never
19   did 'em, so that's why I just -- I can't remember.
20   Q   Do you --                           15:44:18
21   A   I might have had another one.
22   Q   Do you have any notes from the
23   conversations?
24   A   No.
25   Q   Okay.  All right.                    15:44:23
```

Page 240

```
 1       Now, Section 5.3 refers to the descriptions
 2   of what officers are in the -- are in the company,
 3   right?
 4   A   Yes.
 5   Q   Okay.  Why don't you read Section 5.31(a).  15:44:5?
 6   A   "The Chief Creative Officer and
 7       Creative Director shall be in charge
 8       of the Company's creative design
 9       process and product conception and
10       shall have sole discretion over the
11       creation and designs marketed by the
12       Company.  The CCOD shall also be the
13       Chairperson of the Executive
14       Committee.  For so long as she is
15       employed by the Company, the CCOD
16       for the Company shall be Paula."
17   Q   Okay.  So that makes her the sole
18   discretionary decision maker on the brand image and
19   the -- and the designs, right?  It says "sole."
20   A   Yes.                                15:45:39
21   Q   She's the decision maker, right?
22   A   Yes.
23   Q   So Jene Park had absolutely no right to
24   interfere with her decisions as to -- let's use the
25   right language -- "design processes and product  15:45:4?
```

Page 241

```
 1   conception" and crea -- "creation and designs
 2   marketed by the company," right?
 3       Jene had no power to do that.
 4   A   Yes.
 5   Q   So that was Paula's call, right?       15:46:01
 6   A   Yes.
 7   Q   Okay.  And then what -- read -- why don't
 8   you read below that, which is the COO position.
 9   A   "The Chief Operating Officer and
10       Chief Commercial Officer shall be in
11       charge of the Company's commercial
12       strategy, the development --
13       development of merchandise and
14       products, customer relations and
15       sales.  The COO and CCO for the
16       Company as of the effective date
17       shall be Jene Park."
18   Q   That's a different position, right?
19   A   Yes.
20   Q   Okay.  And then you have a position for  15:46:28
21   CEO, right?
22   A   Yes.
23   Q   And that has a different description,
24   right?
25   A   Yes.                                15:46:37
```

61 (Pages 238 - 241)

1    Q    Okay. I'll go through the various work
2    descriptions of the three positions just to
3    emphasize how different they are, okay?
4        In fact, why don't we go ahead and do that
5    now. I'm going to give you -- great.    15:46:50
6        Did you ever read the employment agreements
7    for Hanna, Park and Thomas?
8    A    I don't -- I don't believe so.
9    Q    Were you --
10    A    I -- I believe I read John's.    15:48:09
11    Q    Okay. Were you -- did you contribute to
12    those descriptions, work descriptions?
13    A    No.
14    Q    Well, you certainly have the background to
15    do that, don't you?    15:48:23
16    A    I don't know. I mean, this is -- it's for
17    the fashion world, so I -- I probably would defer to
18    somebody else's judgment.
19    Q    Okay Okay. Now, you would agree as a
20    member you have every right to look at the -- the    15:48:47
21    article -- the accounts and -- of rec -- and
22    records, books and records of the company, right?
23    A    Yes.
24    Q    Focusing on 6 point -- 6.1. And you would
25    agree?    15:49:06

Page 242

1    A    Yes.
2    Q    You could walk into Thomas Wylde any day,
3    any time, or wherever the books and records are
4    located, and look at 'em, right?
5    A    Yes.    15:49:16
6    Q    Okay. Would you tell Jene Park to allow
7    Paula to do that? Because she's still a member.
8    And for some reason your lawyer, Richard Peddie, and
9    Jene Park are concealing those records from my
10    client.    15:49:30
11        Now, can you --
12    MR. BRAND: Objection --
13    BY MR. BILLER:
14    Q    -- intervene?
15    MR. BRAND: -- lack of foundation.    15:49:32
16    Objection; lack of foundation.
17    BY MR. BILLER:
18    Q    I'm asking. Can you intervene?
19    A    I guess.
20    Q    Okay. So will you give Jene Park the    15:49:40
21    instruction to allow me and my client to look at
22    those records. Nothing more but those records.
23    A    Can I give you the instruct -- can I
24    give --
25    Q    Can you give Jene the instruction to allow    15:49:52

Page 243

1    us to look at those records.
2    A    Yeah, I guess so.
3    Q    Okay Did you tell you that she had
4    destroyed all the computers for the company?
5    A    No.    15:50:07
6    Q    Did she tell you that she had transferred
7    the electronically-stored information from the
8    computers to an Amazon cloud?
9    A    No.
10    Q    Did she tell you anything about the status    15:50:19
11    of the business records?
12    A    No.
13    Q    You would agree that a company's business
14    records are important to determine financial losses,
15    the reasons for the financial losses, whether    15:50:33
16    there's been embezzlement or other crimes? You
17    would agree with that?
18    A    Yes.
19    Q    Okay. In fact, it's not only the
20    electronic records that are important, you also need    15:50:45
21    the backup material, the paper documents, don't you?
22    A    I believe so.
23    Q    Because QuickBooks isn't good enough
24    QuickBooks is just as good as the information that's
25    going in there, right?    15:50:57

Page 244

1    A    I believe so.
2    Q    Okay. So if you don't have the paperwork
3    or the backup material, you have no way to
4    authenticate the QuickBooks, do you?
5    A    I don't -- I don't know. I'm sure -- I    15:51:07
6    don't know if there's other ways of doing it, but --
7    so I don't know if I can say definitively yes. But
8    there might be other ways to -- to substantiate it.
9    Q    Do you know of any?
10    A    I would think you could talk with the    15:51:21
11    vendors.
12    Q    Oh, so you need to go get the backup
13    material?
14    A    Yeah, you could ask for --
15    Q    Okay.    15:51:29
16    A    -- the backup material.
17    Q    Yeah, I understand that.
18    A    Okay.
19    Q    But I'm talking about without backup
20    material is there any way to authenticate the    15:51:36
21    information in QuickBooks.
22    A    Well, we have bank statements.
23    Q    Okay. That's backup material.
24        Without backup material -- we don't have
25    any backup material. All the paper's gone. And    15:51:44

Page 245

62 (Pages 242 - 245)

1 without going to the various vendors and banks and
2 financial institutions and all that, is there any --
3 is there any way to authenticate QuickBooks for
4 accuracy purposes?
5    A    I guess not. I don't know.        15:52:00
6    Q    What is it, "I guess not," or "I don't
7 know"?
8    A    I mean, I -- I haven't thought through all
9 the different ways. So right now, yeah, I guess
10 that's there's -- there's no other way.        15:52:10
11   Q    Okay.
12   A    I'm not --
13   Q    All right. But it's part of the operating
14 agreement, wouldn't you agree, to maintain the books
15 and records for the company for at least tax        15:52:18
16 purposes?
17   A    Yes.
18   Q    I mean, companies are supposed to maintain
19 records for tax purposes for at least seven years,
20 right?        15:52:30
21   A    I -- I don't know what the time frame is,
22 but, yes, you need to maintain tax records.
23   Q    Okay. Let's talk about financial
24 statements, Section 6.4.
25        Let me ask you something. When was the        15:52:45

Page 246

1 last time you visited TW's offices?
2    A    I mean, I don't know if it's -- it's more
3 than a year ago. I -- I -- I don't have the -- I
4 don't remember exactly.
5    Q    Was it sometime in 2017?        15:53:06
6    A    I don't know.
7    Q    Well, was it 2016?
8    A    I'm sure I visited in 2016 at some point.
9 I -- I just don't know when -- when the last time it
10 was. In -- yeah.        15:53:21
11   Q    Well, last time you visited it, where was
12 it located?
13   A    It was in downtown.
14   Q    Well, do you know -- do you recall the
15 street?        15:53:31
16   A    No, I don't recall the street.
17   Q    321 31st Street?
18   A    I don't know. It's not --
19   Q    Was it in a building -- was it in a -- an
20 office or -- or a space on the second floor or the        15:53:39
21 bottom floor?
22   A    The last time I went, it was on -- it was
23 in the bottom floor.
24   Q    Bottom floor.
25   A    Yeah.        15:53:49

Page 247

1    Q    And how many people were working there?
2    A    When I went there?
3    Q    Yes.
4    A    There -- there was still quite a few people
5 the last time I went. I think there were a lot of        15:54:01
6 interns, so, I mean, I couldn't tell you exactly.
7 There were probably more than ten people there, I
8 think, at that point. But I do know some of 'em
9 were interns.
10   Q    Okay. Did you go there for any particular        15:54:15
11 purpose?
12   A    I think the last time we went they were
13 doing a -- they were showing products, I think, so
14 they had actually had products that they had
15 created. So they were doing kind of a little        15:54:35
16 line -- I forget what it was called. Kind of a line
17 review.
18   Q    Okay. But they're not creating products
19 today, are they?
20   A    I don't believe so.        15:54:46
21   Q    And they didn't create products last year,
22 did they?
23   A    I -- yeah, I don't know when it ended, but
24 I don't -- I don't know, but --
25   Q    Okay. When did they stop selling product?        15:54:54

Page 248

1    A    Stopped selling new product, or just
2 stopped selling product?
3    Q    Just stopped selling product.
4    A    I don't know.
5    Q    Because on the website you can't buy any        15:55:05
6 product.
7    A    Okay.
8    Q    It doesn't allow you to.
9    A    Okay. So that --
10   Q    Did you know that?        15:55:13
11   A    I did not know.
12   Q    Okay. So what is it doing? It's not
13 selling product. It's not making product. What is
14 the company doing?
15   A    I mean, I'm not sure. I mean, it -- maybe        15:55:23
16 they have lef -- leftover inventory that they could
17 sell. So maybe that's what they're doing, but I --
18 I don't know.
19   Q    Okay.
20   A    I don't know what's going on exactly.        15:55:34
21   Q    Isn't Choi interested in what the company
22 is doing to make money?
23        MR. BRAND: Objection; speculation.
24 BY MR. BILLER:
25   Q    I mean, did you have any discussions with        15:55:44

Page 249

63 (Pages 246 - 249)

1  Stephen Choi about what the company is doing so he
2  could get some of his money back?
3      A   I -- I haven't talked to Stephen about
4  Thomas Wylde for -- for a while. Yeah.
5      Q   At the time you went to the office of    15:56:00
6  Thomas Wylde did you talk to Jene about the
7  litigation?
8      A   No.
9      Q   Okay. 6.4 talks about financial
10  statements.                    15:56:13
11         You said you -- you testified you received
12  some financial statements or reports, right?
13     A   Yes.
14     Q   Okay. Did you produce all of them?
15     A   I believe so.            15:56:21
16     Q   Okay. All that you have, I mean.
17     A   Yeah, I believe so.
18     Q   And did you -- you believe you got -- got
19  them frequently?
20     A   I mean, it was -- it was usually from    15:56:32
21  Meldy, so she would send it.
22         And so usually she would send it with an
23  attachment with financial statements, so -- I don't
24  know if it was every single month. I remember some
25  of 'em were quarterly and they had -- they would    15:56:49

Page 250

1  have cash flow projections as well sometimes, too.
2      Q   When you -- you received them from Meldy
3  via e-mail, right?
4      A   Yes.
5      Q   And you stored all those e-mails -- or you    15:57:01
6  didn't delete those e-mails? They're just in your
7  computer where you can find them?
8      A   Yes. And I provided all the -- the
9  documents here.
10     Q   Okay. So that's what I'm about to ask you.    15:57:13
11         Did you actually go through all the e-mails
12  and computers to find every single document that
13  related to the subpoena?
14     A   Yes, to the best of my ability.
15     Q   Or did you do a search?        15:57:24
16     A   I -- I did, you know, the best of my
17  ability to go through and -- and try to find all the
18  documents.
19     Q   Okay. Have you ever been involved in
20  litigation?                    15:57:39
21     A   Yes.
22     Q   On how many occasions? I don't want
23  detail. I just -- you know, I just want to know.
24     A   A few times. A few times. I would say
25  three. Three times, maybe.            15:57:54

Page 251

1      Q   As the defendant or plaintiff?
2      A   As a defendant, like mostly employment
3  stuff.
4      Q   Were those cases filed in Orange County in
5  state court or federal court?        15:58:07
6      A   I don't know where they were filed. I'm
7  not sure.
8      Q   Were you in federal court or state court?
9      A   I believe mostly -- I think state court.
10     Q   State court.                15:58:18
11     A   Yeah.
12     Q   Okay. And were you defended by the same
13  lawyer the whole time, on all three cases?
14     A   I don't believe so.
15     Q   What's your -- your thoughts about the cost  15:58:33
16  of litigation?
17     A   It's -- it's expensive.
18     Q   Okay. It -- it's -- many businesses find
19  themselves in litigation even when they don't do
20  anything wrong, right?            15:58:55
21     A   Yes.
22     Q   Okay. And so when you say litigation is
23  expensive, give me an idea of what you think is
24  expensive.
25     A   Tens to hundreds of thousands of dollars.    15.59.13

Page 252

1      Q   Okay. Has the litigation -- if you refer
2  to Page 12, I'll go through some of the entries
3  there.
4         Does the litigation with Paula Thomas make
5  it impossible to carry on ordinary business for    15.59.36
6  the company?
7      A   Has it made it --
8      Q   Impossible
9      A   I don't know.
10     Q   Okay. Would you consider legal expenses    15.59.44
11  debt not in the ordinary course of business?
12     A   Debt not in the ordinary course of
13  business. Say -- repeat that question
14     Q   Sure.
15         Would you consider debt, legal debt,    16.00.10
16  expenses, not in -- not in the ordinary course of
17  business?
18     A   Legal debt?
19     Q   Yeah. Like attorney fees.
20     A   Okay. So you mean legal expenses?    16.00.26
21     Q   Yeah, legal expenses.
22     A   Okay. So you're asking do I think legal
23  expenses are --
24     Q   Part of the ordinary course of business
25     A   I guess, yes, if it's -- I guess it depends  16.00.40

Page 253

Page 254

1 on how much it is. Obviously in a normal course of
2 business you expect that there would be some legal
3 expenses. Most -- most of it I would think is more
4 transactional.
5      Litigation, I don't know. I mean, I -- I  16:00:59
6 don't -- I don't know. Again, I don't know how
7 booking it would look like.
8      For me personally, if I looked at it in my
9 business, it's -- it's definitely not something you
10 plan for.                    16:01:10
11   Q   Okay. Now, do you know Thoma -- Paula
12 Thomas would have settled her case against TW four
13 years ago or almost four years ago for $200,000?
14   A   I don't -- I don't recall exactly, but when
15 I went through the documents I -- I did see that.  16:01:30
16   Q   Okay. And do you think that was a bad
17 decision or a good decision for the company, not to
18 settle?
19   A   You're asking my opinion?
20   Q   Yes, as a manager -- as a member of the  16:01:44
21 company.
22   A   I -- I -- well, I think -- yeah, I think
23 that we should have settled, although -- I mean, it
24 wasn't -- it wasn't our -- it wasn't our decision or
25 my decision.                    16:02:02

Page 255

1   Q   Whose decision was it?
2   A   I'm guessing it was Stephen and John and --
3 I'm guessing it was -- it was their decision.
4   Q   Okay. How often did you have meetings, the
5 members have meetings?            16:02:28
6   A   Vague. I mean, when do you mean?
7   Q   The operating agreement -- the operating
8 agreement requires that the members have meetings to
9 discuss the operation of the business. I'm asking
10 you: How often do you have those meetings, if at  16:02:42
11 all?
12   A   I guess the question -- you mean before,
13 when it was operational or --
14   Q   Yes.
15   A   Oh. I think it was -- they tried to do it  16:02:53
16 once a month. Sometimes they would try to do it
17 more than that.
18      It just -- you know, everyone was busy, so
19 there would be -- meeting requests would go out and
20 people would respond if they could meet or not. So  16:03:10
21 I think -- ideally I think they were trying to meet
22 once a month.
23   Q   Okay. Did you get any minutes from those
24 meetings?
25   A   Sometimes we did          16:03.18

Page 256

1   Q   Okay. Who prepared the minutes?
2   A   I believe Meldy would.
3   Q   Have -- did David Schnider ever prepare
4 minutes?
5   A   I don't believe so.          16:03:29
6   Q   Is TW contemplating bankruptcy?
7   A   I don't know.
8   Q   Has that come up?
9      MR. BRAND: Objection to the extent you
10 might be asking about any conversations he's had  16:03:53
11 with attorneys --
12      MR. BILLER: Yeah --
13      MR. BRAND: -- about that.
14      MR. BILLER: -- except that.
15      THE WITNESS: I think -- I -- I -- I mean,  16:04:02
16 I recall that there was a -- a discussion about it,
17 but I don't remember what the -- I don't remember
18 the details of the discussion.
19      MR. BILLER: Let's have the next document
20 marked, Exhibit 29. Thank you.          16:04:26
21      (Exhibit 29 was marked for identification
22      by the court reporter.)
23      MR. BILLER: David Schnider is such a
24 sneaky, tricky bastard. He never di -- he never
25 dates his documents            16 04 57

Page 257

1      MR. BRAND I do not --
2      MR. BILLER Very few documents --
3      MR. BRAND -- know about that.
4      MR. BILLER -- are dated.
5      MR. BRAND I will admit that this document  16:05:05
6 is not dated and deny everything else you said,
7 because I do not --
8      MR. BILLER: You haven't met him.
9      MR. BRAND: -- have firsthand knowledge.
10      MR. BILLER: Have you -- have you met him  16:05:12
11 yet?
12      MR. BRAND: I have not.
13      MR. BILLER: I'm going to take his
14 deposition for the fifth time next month.
15      (Witness reviews document.)        16:05:24
16      THE WITNESS: Okay. Yeah.
17 BY MR. BILLER:
18   Q   Did you sign this document, Exhibit No. 29?
19   A   Yes, I did.
20   Q   And for what purpose?          16:05:30
21   A   I think this was to do the transfer of
22 interest from the individual to, you know, people's
23 kind of pers -- family LLC's.
24   Q   Okay. So, in other words, you transferred
25 your ownership interest into TW from yourself to  16:05:49

65 (Pages 254 - 257)

**Page 258**

1 DSRB, right?
2 A  Yes.
3 Q  What does DSRB stand for?
4 A  Doug, Shirley, Rachel and Brendan.
5 Q  Doug, Shirley, Rachel and Brendan?    16:06:01
6 A  Yes.
7 Q  I guess Shirley's your wife?
8 A  Yes.
9 Q  Brendan and Rachel are your children?
10 A  Yes.    16:06:14
11 Q  When did you set up that business?
12 A  I don't know.  It's -- it's like just a
13 holding company.
14 Q  Okay.  Do you remember when you signed this
15 document?    16:06:24
16 A  I -- I don't know.
17 Q  Well, was it soon after you became a member
18 of the company?
19 A  It was -- it was -- I don't remember.  A
20 lot of these resolutions were done kind of all    16:06:44
21 together, so I -- I don't remember if it was after
22 Paula's documents got done, after Stephen -- I -- I
23 just can't remember exactly.
24 Q  Well, it was certainly after January 1st,
25 2015.    16:07:03

**Page 259**

1 A  I believe so.
2 Q  Okay.
3 A  But I -- yeah, I couldn't tell you the
4 exact date.
5 Q  Was it in 2015?    16:07:08
6 A  I don't know.  I don't know.
7 Q  Well, that presents a problem, sir.  Do you
8 have any information that can tell us when you
9 signed the document?  Because it's not dated.
10 A  Yeah, there might be other e-mails that    16:07:26
11 were in regards to it that would --
12 Q  Did you produce those e-mails?
13 A  I don't know if it was -- if -- if it was
14 through a -- David Schnider, so I'm not sure.  I
15 don't know.  I might --    16:07:39
16 Q  Did you produce any -- this would have been
17 from David Schnider.  Did you produce any e-mails
18 from David Schnider?
19 MR. BRAND:  No.
20 BY MR. BILLER:    16:07:48
21 Q  Okay.  But you do have 'em?
22 A  Yes.
23 Q  Okay.  How many e-mails from David Schnider
24 do you have?
25 A  I don't -- I don't know how many.  You --    16:07:54

**Page 260**

1 it should be in the log that you -- that you
2 received.
3 Q  Okay.  Let's go ahead and show you the next
4 one, Exhibit 30.
5 (Exhibit 30 was marked for identification    16:08:43
6 by the court reporter.)
7 BY MR. BILLER:
8 Q  Now --
9 MR. BRAND:  Do you have a copy for me?
10 MR. BILLER:  Oh, I'm sorry.    16:09:08
11 MR. BRAND:  It's okay.
12 MR. BILLER:  I should.
13 MR. BRAND:  That's fine.  I'll share.  I'll
14 share this one.  That's fine.
15 MR. BILLER:  Oh, I do.  I do.  I do.  I    16:09:23
16 didn't realize it was still attached.
17 (Document handed to counsel.)
18 MR. BRAND:  Thanks.
19 THE WITNESS:  Okay.
20 BY MR. BILLER:    16:09:32
21 Q  Does your signature appear on that
22 document?
23 A  Yes.
24 Q  Okay.  When is the document dated?  It's
25 not dated, but...    16:09:37

**Page 261**

1 A  I believe it's January 1st.
2 Q  January 1st
3 A  Yeah
4 Q  Right  Now, isn't it true Hillshore did
5 not sign the agreement to purchase membership    16:09:54
6 interest until March 27 -- approximately March 27,
7 2015?
8 A  I don't know.
9 Q  If it did not sign the agreement until that
10 date, then Paula Thomas would have been the majority    16:10:21
11 shareholder of units, right?
12 A  I believe so.
13 Q  Okay  So everything decided between
14 January 1st, 2015 and the time Hillshore signed a
15 purchase agreement should have been decided by Paula    16:10:42
16 Thomas if she knew she was the majority holder,
17 right?
18 MR. BRAND:  I just object on a legal
19 conclusion.
20 BY MR. BILLER:    16:10:58
21 Q  You can answer the question
22 A  I -- I guess, what decisions?
23 Q  Okay.  Any decision affecting the company.
24 A  Well, no.  The -- the -- the decisions of
25 running the company were signed off on the operating    16:11:11

66 (Pages 258 - 261)

**Page 262**

1　agreement that John had the right to do all those
2　different things.
3　　Q　Didn't you know, in fact, that Hillshore
4　didn't sign the operating agreement -- I mean, the
5　purchase agreement until March? In fact --　16:11:22
6　　A　I don't -- I don't know.
7　　Q　-- isn't there an e-mail from David
8　Schnider to you complaining about not having
9　somebody sign the agreement?
10　　MR. BRAND: Objection; attorney-client　16:11:35
11　privilege.
12　　You answered it. If you have the e-mail,
13　you have the e-mail.
14　　THE WITNESS: I mean --
15　　MR. BRAND: Well, you don't want to waive　16:11:45
16　any --
17　　MR. BILLER: There is no -- this is between
18　him and Steve -- Stephen Choi.
19　　MR. BRAND: Oh, you said David Schnider
20　　MR. BILLER: Okay. Let me rephrase the　16:11:55
21　question
22　　Q　Isn't it true that there's an e-mail
23　between you and Choi regarding the late signing of
24　the purchase agreement?
25　　A　I -- I don't know　16:12:06

**Page 263**

1　　Q　Did you produce all the Choi e-mails?
2　　A　Yes, as long as -- well, I mean, unless
3　David was somehow part of the conversation. So I --
4　I don't -- I don't know if David sent it directly
5　and cc'd me on it, so I'm not sure.　16:12:21
6　　Q　Okay. You didn't produce all the Stephen
7　Chi -- Stephen Choi e-mails that you have in your
8　computer, right? You didn't do that.
9　　A　I provided the stuff related to Thomas
10　Wylde.　16:12:36
11　　Q　Right.
12　　A　Yeah.
13　　Q　But there's other businesses for which you
14　didn't -- there are other e-mails related to other
15　businesses for which you did not produce, right?　16:12:42
16　　A　Yes.
17　　Q　Are those on the log?
18　　A　On the privilege log? No.
19　　Q　Why not?
20　　MR. BRAND: Objection, calls for a legal　16:12:52
21　conclusion
22　BY MR. BILLER:
23　　Q　Why wouldn't you produce those e-mails?
24　　MR. BRAND: I -- I can just skip it and say
25　nonresponsive to the document production request or,　16:13:01

**Page 264**

1　you know, not likely to lead to -- reasonably
2　calculated to lead to admissible evidence, or
3　proportional. It's the -- the objections are set
4　forth in the written responses and objections I gave
5　you.　16:13:23
6　　MR. BILLER: Do you have a copy of those
7　objections?
8　　MR. BRAND: I only had one copy, and I gave
9　it to you.
10　　MR. BILLER: And there's the problem.　16:13:47
11　　Did we mark this?
12　　(Reporter indicates document.)
13　BY MR. BILLER:
14　　Q　Would you take Exhibit No. 7, please. Why
15　was Robert Sniderman retained?　16:14:29
16　　A　I don't remember.
17　　Q　Who retained him?
18　　A　I don't know.
19　　Q　Is this the only document you received from
20　him, Exhibit 7?　16:14:40
21　　A　I believe so.
22　　Q　And how was the document used?
23　　A　I -- I don't -- I don't recall.
24　　Q　Okay. Do you usually re -- you retain
25　consultants for no purpose and use their work for no　16:14:55

**Page 265**

1　reason, don't use their work?
2　　MR. BRAND: Objection, argumentative
3　BY MR. BILLER:
4　　Q　I mean, this isn't a consultant, right?
5　　A　Again, I -- I wasn't -- we weren't involved　16:15:05
6　in -- or I was not involved in hiring him, so I
7　don't know what the background was as to why this --
8　this report was created
9　　Q　Okay.
10　　MR. BILLER: I think you told me. You guys　16:15:17
11　are producing the audit, right?
12　　MR. BRAND: I told you that to the extent
13　we can get it, that --
14　　MR. BILLER: Okay.
15　　MR. BRAND: -- we would produce it for you　16:15:24
16　　MR. BILLER: Okay
17　　Q　Well, have you read it? Have you read this
18　document?
19　　A　I believe when -- when it came I did read
20　it. Yeah, I did look it over. I mean, I don't　16:15:32
21　know. It's a long time ago.
22　　Q　Did you read it, what it said about Jene
23　Park?
24　　A　Yeah. I think I read stuff about -- yeah.
25　I remember they had stuff both about Jene and John　16:15:42

1    Q    And do you think that was complimentary
2 stuff?
3    A    No. I mean, I -- I assumed -- yeah, no.
4    Q    Did you agree with the comments?
5    A    Again. I -- I -- I don't have -- based on    16:15:55
6 my dealings with Jene, no, I -- I didn't see the
7 comments or the things that they had mentioned.  So
8 I wasn't there on a day-to-day level to see how
9 the -- how the interaction worked.
10    Q    So you really didn't have any basis to    16:16:16
11 formulate an opinion?
12    A    Exp -- that's ambiguous.
13    Q    Well --
14    A    I don't understand.
15    Q    How many -- how many hours have you spent    16:16:24
16 with Jene Park?
17    A    Well, I don't know.  I don't know.
18    Q    It can't be that many.
19    A    No, I mean, I've seen her multiple times.
20 And we were in New York for fashion shows and stuff,    16:16:42
21 so I've probably spent probably 20 to 30 hours,
22 maybe.  Maybe more.
23    Q    Okay.
24    A    I don't know.
25    Q    Of those hours, how many -- how much of    16:16:59

Page 266

1 BY MR. BILLER:
2    Q    No, I'm asking about these two, what you've
3 read in this report.
4    A    Okay.
5    Q    Take the matter for the truth.    16:18:34
6    If it's truthful, have you ever reviewed --
7 have you ever reviewed reports about other
8 executives that are worse?
9    A    Well, I've -- I've never heard -- read a
10 review of other executives, so I --    16:18:46
11    (Simultaneous talking.)
12    Q    Well, did you --
13    A    -- don't know the context.
14    Q    -- read employment -- an employment review?
15    A    Employment review of?    16:18:53
16    Q    Have you ever read an employment review of
17 an employee?  You had 300 employees in your
18 business.
19    A    Yes.  I have read employment reviews, yes.
20    Q    Okay.    16:19:06
21    A    So...
22    MR. BILLER:  I have -- let's go off the
23 record.
24    THE VIDEOGRAPHER:  Going off the record at
25 4:19 P.M.    16:19:32

Page 268

1 that time did you see her at TW working in her
2 capacity as CEO, CFO, COO, whatever?
3    A    Probably like -- I mean, probably like ten,
4 ten hours, maybe  I probably -- we'd go up there    16:17:18
5 and spend half a day up there a few times, so, yeah
6    Q    Do you know if Stefan Choi -- is it Stefan
7 or Stephen?
8    A    I believe it's Stephen.
9    Q    Okay.  Stephen Choi.  Do you know if he had
10 this document prepared?    16:17:42
11    A    I -- I -- I don't know
12    Q    I mean, you read this document and they're
13 the worst employees on the face of the earth.  Isn't
14 that the impression you get?
15    A    Well, it seems like both of 'em had the    16:17:56
16 various issues.
17    Q    That's to say it politely.
18    Wouldn't you agree that this document reads
19 as you're -- as if you're dealing with two of the
20 most incompetent executives that you've ever worked    16:18:08
21 with?
22    MR. BRAND:  Objection; asked and answered.
23    THE WITNESS:  I -- I'm -- I'm sure there's
24 been a lot of other executives that have been said
25 horrible things about, too, so...    16:18:26

Page 267

1    (Recess.)
2    THE VIDEOGRAPHER:  Going back on the record
3 at 4:29 P M
4    MR. BILLER:  Okay.  I propose the following
5 stipulation  My client has at least one hour and 20    16:29:09
6 minutes, one hour and a half, actually, of time
7 available to depose Mr. Lee in these bankruptcy
8 proceedings.
9    There are a number of disagreements and
10 disputes regarding the production of documents, and    16:29:30
11 approximately 4,400 pages of documents were produced
12 here today
13    I was sent a link for production of
14 documents sometime yesterday afternoon.  I wasn't
15 able to get into the link.  I sent an e-mail to    16:29:46
16 counsel.  I'm going to forward that e-mail to
17 counsel.
18    The bottom line is I need time to review
19 the documents, and I'm entitled to that.  So counsel
20 and I are going to meet next week at his office to    16:30:03
21 do a meet and cons -- confer in person to comply
22 with the -- the rules of federal procedure and see
23 if we can iron out a lot of these disagreements.
24    In the meantime, counsel has agreed to
25 produce an audit if his client can get ahold of it.    16:30:27

Page 269

68 (Pages 266 - 269)

1  And I don't see why he can't  And he's also agreed
2  to produce some other documents that are on the
3  record  And counsel may know what they are
4       But at some point we're going to re-adjourn
5  (sic) this deposition. It may be after the -- a      16:30:43
6  motion for -- a Motion to Compel, a motion for
7  sanctions is heard, but maybe before  Time will
8  tell
9       But for purposes of this deposition, it is
10  adjourned. A transcript will be prepared within two  16:30:58
11  weeks from today  The transcript will be sent to
12  Mr. Lee's attorney  Mr. Lee will have two weeks to
13  review the transcript and make the -- and sign the
14  transcript under penalty of perjury. And Mr. Lee's
15  attorney will then send the transcript back to me     16:31:13
16  shortly after it is signed, within days after it is
17  signed.
18       I will maintain custody and control of the
19  original. The certified copy may be used in lieu of
20  the original if the original is lost, destroyed,     16:31:28
21  misplaced or somehow unavailable. I will make the
22  original available for trial or for a hearing upon
23  reasonable notice.
24       MR. BRAND: Okay. Just a comment about
25  the -- about the link.          16:31:50
                                        Page 270

1  talking about? Do you have it?
2       THE VIDEOGRAPHER: We are off the record at
3  4 32 P.M , and this concludes today's testimony
4  given by Douglas Lee. The total number of media
5  used was four and will be retained by Veritext Legal  16:32:45
6  Solutions
7
8       (TIME NOTED: 4:32 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 272

1       Send me that e-mail that you said you sent
2  me, 'cause I did not receive it. To the extent that
3  we're able to get it, you know, and I'm not sure we
4  are, we will provide the audit.
5       You mentioned other documents on the     16:32:03
6  record
7       MR. BILLER: What I meant was the date when
8  you switched over from Mr. Lee being the owner or
9  the member to --
10       MR. BRAND: I see.          16:32:14
11       MR. BILLER: -- his company --
12       MR. BRAND: Okay.
13       MR. BILLER: -- being the member.
14       MR. BRAND: So when you say "other
15  documents," you're referring to the DSRB assignment  16:32:19
16  issue?
17       MR. BILLER: Right.
18       MR. BRAND: Okay. All right. And of
19  course any continued deposition is also subject to
20  any kind of Protective Order that we may file.      16:32:28
21       MR. BILLER  Yeah  Okay  That's -- that's
22  fine
23       So stipulated?
24       MR. BRAND  So stipulated
25       MR. BILLER  What Protective Order are you  16 32 33
                                        Page 271

1
2
3
4       I, DOUGLAS LEE, do hereby declare under
5  penalty of perjury that I have read the foregoing
6  transcript; that I have made any corrections as
7  appear noted, in ink, initialed by me, or attached
8  hereto; that my testimony as contained herein as
9  corrected is true and correct.
10       EXECUTED this _____ day of _____,
11  2018, at _____, _____.
12       (City)          (State)
13
14
15       _____
16       DOUGLAS LEE
17       VOLUME I
18
19
20
21
22
23
24
25
                                        Page 273

69 (Pages 270 - 273)

```
 1        I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4        That the foregoing proceedings were taken
 5   before me at the time and place therein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
 9   machine shorthand which was thereafter transcribed
10   under my direction; further, that the foregoing is a
11   true record of the testimony given.
12        Further, that if the foregoing pertains to
13   the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [ ] was not requested.
16        I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19        IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21   Dated: November 15, 2018
22
23
24
25        JUDITH A. MANGO, CSR No. 5584
```

Page 274

Veritext Legal Solutions
866 299-5127

**[& - 2015]**

| & | | | |
|---|---|---|---|
| **&**  73:23 74:12 | **120**  6:16 | **17**  5:21 7:14 181:1 | 233:17 |
| **0** | **12:22**  120:17 | 181:2,3,6,7,9,10 | **2,686,000**  182:14 |
| **01200**  1:10 2:10 | **12:25**  120:20 | 182:14 183:1,2,8,9 | **2.4**  181:23 182:4 |
| 10:16 | **13**  6:22 67:9,9,15 | **172**  4:19 | 205:1 229:23 |
| **02218**  9:12 | 99:16 144:15,16 | **17th**  93:22 | **2.5**  211:9 229:11 |
| **02219**  9:12 | 144:19,24 169:9 | **18**  7:17 141:24 | 229:14,17 |
| **1** | 169:20,21,24 | 157:16 170:6,9 | **2.9**  234:7 |
| **1**  1:25 4:25 10:11 | 170:12,13 171:6 | 181:6 186:25 | **20**  8:4 99:11,15 |
| 19:10,12,15,23 | 171:17,19 186:23 | 191:25 192:1,4 | 136:24 170:6 |
| 34:24,25 71:12 | 203:2,9,13,14,16 | **18,000**  41:16,18 | 202:12 213:8,15 |
| 92:18 135:16 | 206:10 | 42:3 129:12 | 229:18,18 239:8 |
| 225:7 | **131**  6:19 | 137:10 138:6,8,22 | 266:21 269:5 |
| **1,639,015.63** | **14**  7:4 62:8 63:15 | 140:10 141:14,24 | **200,000**  254:13 |
| 225:23 | 73:19 148:23,24 | 142:6 143:17 | **2000**  168:20,22 |
| **1.639**  233:4 | 202:25 203:2,3,6,7 | **183**  7:14 | **2013**  5:21 7:22 |
| **10**  6:5,12 7:8 51:5 | **144**  6:22 | **18th**  149:21 150:8 | 93:22 202:23,25 |
| 116:23 117:12,13 | **148**  7:4 | 175:17 | 203:19 205:14 |
| 117:14 230:8 | **149**  7:7 | **19**  4:16,25 5:4 | **2014**  6:19,22 7:8 |
| **10,000**  14:24 | **14th**  52:17 | 7:22 202:13,14,15 | 9:4 77:2 78:8,16 |
| **100**  185:21 | **15**  4:14,17 7:7 | 202:21 203:10 | 81:10,15 93:25 |
| **101**  5:23 | 67:6 81:4 149:11 | **192**  7:17 | 99:16 118:14,18 |
| **104**  6:4 | 149:12 157:22 | **1990**  97:18,20 | 119:18 120:12 |
| **1065**  7:22 | 158:21 159:12 | **1994**  97:21 | 121:19 124:10,12 |
| **109**  6:8 | 170:11 180:24 | **1995**  58:10 72:18 | 128:13 129:20 |
| **10:14**  2:22 10:2,5 | 187:24 239:8,10 | 73:22 | 130:1 131:12,20 |
| 62:6 | 274:21 | **1:09**  163:22,24,25 | 131:22 162:6 |
| **11**  4:7 6:16 51:15 | **15113**  3:7 | **1:10**  164:17,19 | 174:4 187:14,16 |
| 51:15,20 116:21 | **153**  7:11 | **1st**  62:20 63:11 | 187:17 223:2 |
| 120:23,24,25 | **154**  95:1 | 174:4 258:24 | 224:4 230:1 234:5 |
| 121:3,8 | **15889**  1:6 2:6 | 261:1,2,14 | **2015**  6:5,9,13 7:19 |
| **116**  6:12 | 10:14 | **2** | 64:1 65:8 66:11 |
| **11:16**  71:12 | **15th**  227:23 | **2**  1:20 2:23 5:4 | 78:8 109:9 111:11 |
| **11:27**  71:15 | **16**  6:19 7:11 63:15 | 10:1 19:10,12,16 | 129:24,25 130:3 |
| **11:53**  96:11 | 63:16 65:7 131:9 | 36:20,22 37:13 | 142:20 187:11,24 |
| **11:57**  96:14 | 131:22 153:7,8 | 71:15 92:18 142:7 | 188:8 192:5,22 |
| **12**  6:19 52:1,14 | 180:24 181:7,8,9 | 164:17 187:15,20 | 200:25 204:1 |
| 100:11 120:22 | 183:11 | 199:24,25 200:3,4 | 205:3 224:4 |
| 130:7 131:1 253:2 | **16,000**  69:2 | 218:15 220:25 | 226:21 227:17,18 |
| | **166**  4:7 | 221:3,22 222:8,14 | 227:23 258:25 |
| | **167**  4:18 | 222:21 223:1,7,12 | 259:5 261:7,14 |
| | | 225:15 229:19 | |

**[2016 – 700]**

**2016** 5:25 7:17
52:22,23 53:6,7
62:20 63:11,18,19
70:1,5 99:17
102:19 106:14,14
109:9 111:13
115:2,2 182:7
190:2 247:7,8
**2017** 102:19 247:5
**2018** 1:20 2:23
10:1,5 50:21
56:11 102:20
273:11 274:21
**2019** 95:1
**203** 7:22
**2049** 2:21 10:20
**21** 4:13 8:7 65:7
213:8
**213** 8:4,7,10,13,16
**217** 8:20
**22** 8:10 66:21
93:25 153:16
213:8 234:5
**223** 8:24
**225,000** 61:7
**23** 8:13 170:3
213:9
**230** 9:4
**232** 9:8
**2321** 3:16
**24** 8:16 9:4 213:9
217:10,11
**25** 8:20 170:3
217:12,13 218:4
219:5,22 220:5,21
**250,000** 61:6
**256** 9:11
**26** 4:14 8:24
223:20,21 224:17
229:19

**260** 9:14
**27** 9:4 118:14
230:23,24 261:6,6
**274** 1:25
**27th** 121:18
124:11,13 131:18
**28** 4:15 9:8 232:24
232:25 233:5
**29** 9:11 153:10
256:20,21 257:18
**2nd** 10:5 50:21
99:17

**3**

**3** 4:19 5:8 6:13
35:23 36:2,6,16
37:16 92:19,20
100:8 166:9
232:17
**3,200** 211:2
**3.8** 204:11,12
**3.9** 192:23 200:17
**30** 9:14 70:11
260:4,5 266:21
**300** 268:17
**31** 63:25 66:10
95:1
**31,154,000** 95:19
**310** 3:9
**3150** 150:2
**31st** 65:8 247:17
**32** 4:16
**32,000** 211:2
**321** 247:17
**35** 135:25 136:2
**36** 5:8,13
**37** 163:10
**3:02** 213:6
**3:05** 213:12
**3:23** 230:6,7
**3:27** 232:17

**3:33** 232:20

**4**

**4** 5:13 36:5,6,8,11
38:19,21 92:19,20
101:14 188:7
195:25 197:9,12
197:18 198:1,13
232:20 234:5
**4,008** 30:12
**4,400** 269:11
**4,600,000** 198:14
**4,613,000** 199:12
199:12
**4,613,383** 198:7
**4.4** 224:4,20 225:8
227:2
**4.5.** 205:15
**4.6** 193:4 199:21
**4.6.** 200:6
**400** 30:12
**410** 9:8
**4162** 192:6
**459-9870** 3:9
**473** 3:16
**4:19** 268:25
**4:29** 269:3
**4:32** 2:22 272:3,8
**4th** 3:16

**5**

**5** 5:15 6:9 38:23
38:24 71:18,20
72:7,9 92:16
111:6 114:21
180:21 182:3
183:15 187:20
190:2 193:21,21
193:23 213:25
229:18 234:7
**5,000** 38:9

**5.1** 234:21
**5.1.** 234:12
**5.3** 240:1
**5.31** 240:5
**5.4** 234:22
**5.5** 89:1,13 132:21
135:23
**5.6** 115:1,8
**5.6.** 114:24
**50,000** 41:3,5
**54** 95:1
**5584** 1:24 2:24
165:21 274:25
**5971** 274:24

**6**

**6** 4:13 5:17 39:17
39:18,22 40:4
92:11,17,21,24
93:6 100:12 200:5
242:24
**6,000** 129:5
**6.1.** 242:24
**6.39** 226:5
**6.4** 250:9
**6.4.** 246:24
**6.7** 193:2
**69** 4:17
**6:16** 1:6 2:6 10:14
**6:17** 1:10 2:10
10:16

**7**

**7** 1:9 2:9 5:23
10:15 40:7,8,16
100:9 101:11,12
101:20 108:11,21
264:14,20
**7.3** 234:22
**7/21/2018** 72:13
**700** 211:8

**[71 - ahead]**

**71** 5:15
**714** 3:18
**769-6485** 3:18

**8**

**8** 4:15,18 5:25 6:4
104:12,13 107:25
108:3,9 199:18,20
199:22
**83** 198:10

**9**

**9** 3:7 6:8,22 7:17
109:11,12,17
149:19 157:15
188:8 189:11
206:13 210:1
**9.5** 206:6
**90067** 10:21
**90272** 3:8
**92** 5:17
**92705** 3:17
**9th** 150:8

**a**

**a.m.** 2:22 10:2,5
62:6 71:12,16
96:11,14
**ability** 54:22
251:14,17
**able** 18:16,24 33:7
129:18,20 130:4
172:18 190:12
210:12 239:4
269:15 271:3
**aboard** 128:22
156:24 175:3
**absolutely** 173:13
240:23
**acceptable** 127:9
**accepted** 134:2
**access** 196:22
201:19,20 202:2

**account** 8:25
139:18 143:14
200:14 224:24
**accountant** 85:17
85:21 97:11 98:5
104:17 105:4,7
108:10 111:9
201:5
**accounting** 70:9
81:25 142:25
143:1
**accounts** 82:1
98:14 99:1,5
143:3 242:21
**accumulation**
138:16
**accuracy** 246:4
**accurate** 19:6
**act** 24:14
**acted** 91:9
**action** 8:20 9:14
11:2 23:19 24:4
28:11,16,19 29:4
30:21 216:21
217:22 218:14
274:17,18
**activewear** 57:24
57:25 83:3
**actual** 115:15
176:14 198:11,11
201:6
**adam** 130:8
**add** 200:4
**adding** 181:20
182:12
**addition** 73:10
**additional** 200:4
235:14
**adjourn** 270:4
**adjourned** 270:10

**administered**
11:20 274:7
**admissible** 264:2
**admit** 257:5
**ads** 61:19
**adv** 1:9 2:9
**advance** 195:24
196:1,8,17,21,25
197:9,11
**advanced** 225:2
**advantage** 74:1
**adversary** 11:10
**advertise** 75:22
**advertising** 73:11
73:14 77:12 79:16
80:15,17,20
**advice** 190:25
191:5,8,9 232:5
**advisory** 77:16
128:23
**af** 127:14
**affairs** 235:8
**affiliations** 11:6
**afford** 129:18,21
130:4
**afternoon** 269:14
**agent** 38:17
**ago** 59:12 84:5
166:20 238:10
247:3 254:13,13
265:21
**agree** 10:10 48:17
155:1,5 157:14
202:23 209:1
218:21 219:4
242:19,25 244:13
244:17 246:14
266:4 267:18
**agreed** 148:7
269:24 270:1

**agreement** 7:12
8:5,8,10,14,17
29:19 36:24 39:3
39:4,6,9,9,10,15
41:9,14,22,24,25
49:22 50:3,7,9,14
50:16,22 88:19,21
88:24 118:14
119:10,11 121:18
124:17 125:4
127:9 128:19
131:24 132:3
133:1,2,6,23
136:21 145:9
147:15,25 148:13
151:10 153:6,15
153:19 154:14
155:2,14,18 156:3
156:19 157:15,16
158:16,22 159:24
160:1 175:16
176:15 181:7,15
209:2,8,12 211:17
211:19,22 213:15
213:22 214:7,10
214:16,24 215:5,8
215:9,14,25
226:24 232:11
233:13 235:1
246:14 255:7,8
261:5,9,15 262:1,4
262:5,9,24
**agreements**
156:23 160:11,14
242:6
**ah** 126:16
**ahead** 27:1 35:22
36:4 56:22 117:11
132:5 148:22
242:4 260:3

Page 3

[ahold - assignment]

ahold 269:25
aid 56:11
al 1:14 2:14 10:16
alex 69:17,19
 85:23 86:1
allegations 105:7
 111:10 112:5
allegedly 218:12
 218:13,14 225:8
alliances 73:19
allow 26:25
 108:13 162:9,14
 243:6,21,25 249:8
allows 213:22
altogether 84:2
amazon 244:8
ambiguous 17:9
 25:7,11 37:9
 86:19 91:25
 100:16 237:8
 266:12
amended 7:19
 8:16 24:9 39:9,10
 215:5 233:13
amount 89:12
 113:17 114:12
 182:4 191:14
 209:21 213:23,25
 225:21
amounting 223:12
ana 3:17
andrew 7:8 9:5
angeles 1:19 2:21
 10:1,21
anna 109:17,22
answer 4:11 12:9
 12:11,22 15:17,21
 16:17,25 17:17
 21:7 26:14,16,18
 26:24,25 28:2,7
 29:14 32:17,19,21

32:23 33:17 34:10
42:1 44:21 45:7
45:13 55:2 69:14
75:8,15 78:12
81:5,7,8 88:2 91:4
99:20 100:6
103:14 123:12,14
139:3,4,23 159:6,7
167:7,8,14,15
172:3 178:21
219:12 261:21
answered 26:22
 29:12 44:3 46:6
 49:12 75:12 83:20
 106:4 140:13
 158:24 159:2,14
 159:21 166:18
 171:5 176:21
 177:23,25 178:1,2
 178:5 195:14
 201:15 220:6,10
 262:12 267:22
answering 116:4,5
 142:8
answers 135:7
anybody 20:13
 31:15 78:20
 103:20 176:23
 193:10,23 194:9
 201:6 218:25
 220:21 222:20
 232:14
anymore 21:13
 186:16
ap 1:10 2:10 10:16
apart 30:21
apfelberg 7:9 9:6
 130:8,11
apparel 171:24
appear 12:2 19:19
 203:19 213:17

260:21 273:7
appearance 11:4
 71:24
appearances 3:1
 11:6 165:1
appears 49:19
 202:23
applies 13:19
appointments
 239:18
approach 114:4
approval 150:13
 150:15
approve 146:11
 232:10
approved 146:9
approximately
 182:4 183:15
 198:1 199:11
 223:12 261:6
 269:11
april 129:19 130:3
 174:4 187:23,24
arg 179:9
argue 18:17
arguing 198:21
argument 21:25
argumentative
 12:7,18 14:4,7,21
 15:7 32:5,15
 43:23 45:14,23
 49:5 55:12 56:4
 68:12 75:13 80:10
 81:12 86:23 87:21
 89:3 90:8 91:24
 95:4,15,23 99:3
 100:15 103:15,19
 104:10 106:20
 119:4,25 132:12
 135:1,5 139:16
 140:3,8 141:1

147:23 157:9
160:12 179:4,10
189:8,13,17
198:17,20 202:10
207:9 212:18
213:2 223:19
265:2
arithmetic 199:6,8
arrangement 89:6
 208:3,4,5
article 234:11
 242:21
articles 155:8
 234:3,4
asked 14:9 18:24
 26:22 29:12 44:3
 46:6 49:12 75:12
 83:20 84:5 106:4
 140:13 158:24
 159:2,14,21
 166:18 171:5
 176:21 177:23,24
 177:24,25 178:1,5
 195:14 201:15
 202:4 220:6,10
 267:22
asking 25:25 29:8
 39:13 42:19,21
 50:8 63:8 70:11
 76:16 80:19 125:1
 158:18 162:13
 169:1 198:21
 217:22 219:14
 243:18 253:22
 254:19 255:9
 256:10 268:2
asks 41:23
aspects 79:14
assets 232:6
assignment 271:15

# THOMAS WYLDE

**ACTION BY WRITTEN CONSENT
OF THE SOLE ORGANIZER OF
THOMAS WYLDE, LLC**
a California Limited Liability Company
July 22, 2014

The undersigned, acting as sole organizer of Thomas Wylde, LLC, a California Limited Liability Company (the "Company"), hereby adopts the following resolutions by this written consent without a meeting, pursuant to the instructions of the Members of the Company, which shall be effective on the commencement of the Company's existence:

RESOLVED that John Hanna has been appointed as Chief Executive Officer of the Company until such time as the first meeting of the Members or until his successor is duly appointed by the Members. As Chief Executive Officer, Hanna is hereby empowered to manage the day to day operations of the Company, subject to review and direction by the Members.

RESOLVED FURTHER that John Hanna is hereby authorized and directed to establish, maintain, and close one or more bank accounts in the name of the Company for the funds of the Company with any federally insured bank or similar depository; to cause to be deposited from time to time to such accounts such funds of the Company as such officer deems necessary or advisable, and to designate, change, or revoke the designation, from time to time, of the officer or officers or agent or agents of the Corporation authorized to make such deposits or to countersign checks, drafts, or other orders for the payment of money issued in the name of the Company against any funds deposited in any such accounts; and to make such rules and regulations with respect to such accounts as such officer may deem necessary or advisable to complete, execute, and deliver any documents as such banks and similar financial institutions customarily require to establish any such account and to exercise the authority granted by this binding resolution including, but not limited to, customary signature card forms and form banking resolutions.

RESOLVED FURTHER that all form resolutions required by any such depository, if any, are adopted in such form used by such depository by the Members, and that the Secretary or other designated officer is authorized to certify such resolutions as having been adopted by the Members and to insert a copy of any such resolutions into the minute book of the Company.

RESOLVED FURTHER that any such depository to which a certified copy of such resolutions has been delivered by the CEO or Secretary of the Company is entitled to rely on such resolutions for all purposes until it shall have received written notice from the Members of the revocation or amendment of such resolutions.

SCHNIDER_BK 002390

[bennett - brand]

| | | | |
|---|---|---|---|
| **bennett** 109:18 | 89:10 90:10 92:1 | 164:3,6,10,14 | 259:20 260:7,10 |
| **best** 15:20 54:22 | 92:15,17,20,23 | 165:6 166:13,22 | 260:12,15,20 |
| 146:20 148:18 | 93:1,5 95:5,17 | 167:6,11,13,18,21 | 261:20 262:17,20 |
| 251:14,16 | 96:2,5,8,15 99:6 | 169:2,13 171:1,8 | 263:22 264:6,10 |
| **better** 191:22 | 99:14,19 100:17 | 172:4,6,16,18 | 264:13 265:3,10 |
| 201:21 | 100:23 101:14,16 | 173:21 174:9 | 265:14,16 268:1 |
| **biggest** 98:3 | 101:19 103:3,16 | 176:22 177:15,24 | 268:22 269:4 |
| **bil** 182:2 213:24 | 103:20 104:11,15 | 178:8 179:2,5,14 | 271:7,11,13,17,21 |
| **biller** 3:5,10 4:7 | 104:23,25 105:2 | 180:24 181:1,5,9 | 271:25 |
| 11:8,8,16,24 12:8 | 106:5,25 107:17 | 181:12,19 182:23 | **binding** 6:16 41:9 |
| 12:21 14:5,8,22 | 107:21,24 109:7 | 183:5,13 189:9,14 | 41:22,24 88:24 |
| 15:8 18:1,4,6 | 109:14,23 110:4 | 189:22 190:14 | 118:13 119:10,11 |
| 19:14,21 20:1 | 110:18 111:18,21 | 191:24 192:3,10 | 121:4 124:16,23 |
| 21:4,8,12,16,19 | 113:11 115:22,24 | 192:13,15,18 | 125:2 128:19 |
| 22:2 23:24 25:8 | 116:2,5,12,14,17 | 194:2,8 195:15 | 131:14,17,24 |
| 25:12,15 26:10,13 | 116:21,25 117:8 | 197:23 198:18,21 | 132:3 133:1,2,5,23 |
| 26:17,23 27:3,14 | 117:10,13,19 | 198:25 199:2,4 | 136:15,21 146:6 |
| 27:22 28:1,8 | 118:16 119:5,23 | 201:16,19,23 | 147:25 |
| 29:13 30:14 31:5 | 120:7,14,21,24 | 202:2,8,11,14,17 | **bit** 16:25 62:3 |
| 31:25 32:6,16,20 | 121:2,7 122:11,17 | 202:20 203:2,4,13 | 99:23,24 136:25 |
| 32:25 33:6,14,16 | 123:10,12,25 | 203:15,18 205:12 | 137:23 167:25 |
| 33:20,24 34:2,4,6 | 130:12,15 131:4 | 206:20 207:7,11 | 190:10 |
| 34:14,17,20 35:19 | 132:11,13,15,17 | 208:18 209:6 | **bitch** 236:12 |
| 35:22 36:4,10 | 133:3 134:13,16 | 212:16,19 213:3 | **bk** 1:6 2:6 10:14 |
| 37:10 39:25 40:2 | 134:21 135:2,6 | 213:13 215:16,19 | **board** 47:17 |
| 43:24 44:5,20 | 138:25 139:11,14 | 215:24 217:6,11 | **boards** 47:16 |
| 45:2,15,21,24 46:4 | 139:17 140:5,9,21 | 217:15 218:2,6,9 | **booking** 254:7 |
| 46:9 48:16 49:2,7 | 141:2,10,18 | 218:20 219:3 | **books** 111:10 |
| 49:10,13,17 50:2 | 142:10 144:14,18 | 220:2,7,12 222:3 | 186:21 242:22 |
| 51:5,7,11,14 53:19 | 144:22 145:22 | 223:20,23 224:7 | 243:3 246:14 |
| 53:21 55:1,8,16 | 148:4,22 149:1,3,8 | 224:16 225:20,24 | **bother** 32:13 |
| 56:5,21 57:9 | 149:15 150:1,5 | 226:9 227:5,8,20 | **bottom** 224:7 |
| 61:25 62:5,7,25 | 151:6 152:6 153:2 | 227:24 228:1 | 247:21,23,24 |
| 63:6,13,16,20 | 153:12,14 155:21 | 229:1,4,7,9 230:7 | 269:18 |
| 64:18,25 65:2,4,17 | 155:23,25 156:8 | 230:11,14,17,21 | **bought** 186:15 |
| 67:12 68:21 69:4 | 157:3,8,10,20 | 231:3 232:14,22 | **boulevard** 3:7 |
| 69:7,16 71:8,17 | 158:25 159:5,16 | 233:3,8,12,15,19 | **box** 30:11 160:4 |
| 72:2,5 74:18 | 159:23 160:13 | 233:24 237:9 | **branches** 67:15 |
| 75:14 78:11,15 | 161:3,6 162:21,23 | 243:13,17 249:24 | **brand** 3:13,14 |
| 80:5,12 82:7 84:4 | 162:25 163:2,7,9 | 256:12,14,19,23 | 11:12,12 12:7,18 |
| 86:21 87:2,25 | 163:21,23,25 | 257:2,4,8,10,13,17 | 14:4,7,21 15:7 |

[brand - businesses]

17:25 18:3,5
19:18 21:2,6,11,14
21:17 22:1 23:23
25:7,11 26:6,12,15
26:21,25 27:17,21
27:25 28:6 29:12
30:12 31:3,23
32:4,14,18,24 33:2
33:12,15,19,21
34:1,3,5,13,16,19
35:18,21,25 37:9
39:23 43:23 44:3
44:19 45:1,14,20
45:23 46:3,6
48:13,25 49:5,9,12
49:15,24 51:4,6,10
51:12 53:17,20,23
54:25 55:6,12
56:4,19 57:8
61:21 62:22 63:15
63:17 64:23 65:1
65:16 67:10 68:12
69:3,6,13 71:10,23
72:3 74:16 75:12
78:10,13 80:10,18
81:12 83:20 86:19
86:23 87:21 89:3
90:8 91:24 92:13
92:16,18,25 93:2
95:4,15,22 96:3,7
99:2,13,18 100:14
100:19 103:1,15
103:19 104:10,21
104:24 105:1
106:4,20 107:19
107:23 109:5,21
110:1,15 111:16
116:1,4,10,13,16
117:12 118:15
119:4,22,25 120:2
122:2,16 123:6,9

123:11 130:10,13
130:17,20 132:8
132:12,14,16
134:12,15,18,23
134:25 135:5
138:24 139:9,13
139:16 140:1,3,8
140:13 141:1,16
142:8 145:21
147:23 149:2,24
150:3,21 151:4
152:5,17 153:10
153:13 155:19,22
155:24 156:4
157:2,6,9,18
158:24 159:2,14
159:21 160:12
161:1,5 162:19,22
162:24 163:1,5,8
163:22,24 164:5,7
164:9,13 165:4
166:18 167:5,8,12
167:17,20 169:1
169:10 170:18,20
170:24 171:5
172:2,5,14,17
173:16 174:5
175:3,4,6 176:21
177:12,23 178:7
179:1,4,9,12
180:23,25 181:6
181:11 182:17
183:8,11 189:8,13
189:17 190:6
192:7,12,14,16
193:25 194:4,6
195:14 197:22
198:17,20,24
199:1,3 201:15,17
201:20,25 202:5
202:10,25 203:3

203:14,16 206:16
207:6,9 209:5
212:15,18 213:1
215:12,17,21
217:3,25 218:19
219:1 220:1,6,10
222:1 223:19
224:5,9,11,13
225:19,22 226:7
227:4,7,19,22,25
228:24 229:3,5,8
230:6,10 232:13
233:6,9,14,18,21
237:8 240:18
243:12,15 249:23
256:9,13 257:1,3,5
257:9,12 259:19
260:9,11,13,18
261:18 262:10,15
262:19 263:20,24
264:8 265:2,12,15
267:22 270:24
271:10,12,14,18
271:24
**brandlawfirm.net**
3:19
**brands** 80:18
**break** 71:9 96:5
117:6 120:14,15
134:23 164:6,12
164:14 230:12,20
230:20 232:12
**breaks** 164:8,9
**brendan** 258:4,5,9
**briefly** 54:9
**brilliant** 179:23
**bring** 22:2 135:19
136:25 172:7
**brother** 84:15
168:17

**brought** 13:11
**buddy** 212:25
**build** 114:5 115:20
**building** 150:19
247:19
**built** 78:24 168:3
200:1,7,9
**bunch** 156:23
185:6
**business** 12:5,25
13:3 31:9 33:3
38:14,15 41:19
44:9,9 51:22 57:7
57:13,18,19,22,23
58:3,4,14,22 59:2
59:5,13,22,24 60:6
60:14,16,17,18
61:2,16 65:14,19
65:24 66:7,17
67:14 70:6,7
72:18 73:18,21
75:25 76:2,5 78:3
78:4,7,8,21 79:10
81:17,18,23 82:4
82:24 83:6 84:20
87:20 106:22
121:14,14 137:2
166:23 167:3,22
167:24 168:3,10
170:15 173:5,6
184:10 185:2,10
187:2 193:14
198:7 199:13
200:11 231:17
234:23 235:3,8
244:11,13 253:5
253:11,13,17,24
254:2,9 255:9
258:11 268:18
**businesses** 51:9
57:1 67:16,25

[businesses - choi]

78:22 79:4 80:2
81:20 82:8 83:15
83:18,22 84:6,10
84:22,23 136:24
168:24 169:3,9,12
169:14,15,25,25
170:1,3,4,7 171:3
171:10,11,13,16
171:17,23 172:1
172:12,23 186:23
186:24 206:10
252:18 263:13,15
**businessman**
11:25
**busy** 255:18
**buy** 140:25 141:4
249:5

c

**c** 3:16
**calculated** 264:2
**california** 1:2,19
2:2,21 3:8,17 10:1
10:18,21 193:20
274:2
**call** 28:4 79:13
128:7 236:12
238:8,17,22
239:12 241:5
**called** 37:6 160:21
172:1 173:12
217:7 248:16
**calling** 107:13
**calls** 27:17,21
31:23 39:23 48:13
64:23 100:19
141:16 152:17
155:19 156:4
177:12 190:6
206:16 218:19
219:1 227:4
263:20

**calm** 134:17,19,22
237:16
**cancel** 232:7
**capacity** 23:21,25
25:1 178:10,18,22
267:2
**capital** 135:24
**capture** 210:12
**card** 38:4
**care** 42:23 81:21
81:25 85:17
**carry** 253:5
**case** 10:14,16
12:17 24:14 26:9
33:5,23 162:12,18
163:3,4,15 223:17
231:23 254:12
274:14
**cases** 252:4,13
**cash** 110:24
112:18 142:11
251:1
**cast** 29:16
**category** 34:24,25
36:20,22 224:21
**cause** 34:10 77:22
90:21 110:11,11
110:13 139:23
271:2
**caused** 58:13
110:17
**cbc** 216:4 226:2,6
226:15,20
**cc'd** 70:2 109:18
263:5
**cco** 241:15
**ccod** 240:12,15
**cell** 79:24
**cellular** 10:8
**center** 79:13

**central** 1:2 2:2
10:17
**cents** 198:7
**century** 2:21
10:20
**ceo** 58:21,23 122:7
122:12,22 123:2,4
123:20 184:2,3
235:13 241:21
267:2
**certain** 63:22
89:11 137:8 191:5
196:22,22 209:21
213:22,25
**certainly** 231:16
242:14 258:24
**certified** 2:24
270:19 274:1
**certify** 274:3,16
**cfo** 86:13 267:2
**chairman** 121:23
**chairperson**
240:13
**challenges** 188:5
236:9
**challenging**
191:23
**chance** 72:6
130:21
**change** 18:15,15
18:16,17
**changes** 18:10
113:17
**chapter** 1:9 2:9
10:15
**characterization**
62:23 111:17
112:9
**characters** 162:12
**charge** 77:12,12
77:13,13 144:10

175:3 240:7
241:11
**charges** 13:12
144:13
**charging** 144:11
226:5
**chart** 85:9
**check** 142:12
143:16 193:23
225:21
**checks** 143:18
**chi** 263:7
**chief** 86:2,3 177:9
177:22 235:5
240:6 241:9,10
**child** 236:21
**child's** 236:15
**children** 258:9
**choi** 6:10,13 20:15
20:16 40:14,18
41:5 43:7,12,15
44:2 48:9,11 51:3
66:19 91:10 92:2
102:12,22 108:13
109:10,17 110:5
111:6 115:7
124:16,20 125:10
125:15 126:21
127:8,11 136:5,10
146:16,25 147:21
148:7,16 151:17
151:19,20 159:13
166:14,17,24
167:4,23,25 168:4
170:1,15 171:14
171:17 175:12,22
176:10,18 180:7,9
180:20 183:14
185:7 187:19
188:6 201:11
206:6,10 207:4

[choi - compensation]

208:11,14,20
209:2,11,16 211:4
221:23 222:16
226:19 229:19,24
249:21 250:1
262:18,23 263:1,7
267:6,9
**choi's** 148:12
158:23 207:25
**cite** 172:13
**city** 273:12
**civil** 163:11
**claim** 9:9 32:8
118:19 229:10
230:4
**claiming** 193:18
226:14
**claims** 224:3
228:12,13
**clause** 235:19
**clawback** 8:4
211:22 212:21
213:15,22
**clawblack** 213:21
**cleaner** 104:24
**clear** 129:16
**clearly** 199:1
222:7
**cli** 24:8
**client** 21:2,18,21
26:6 28:6 33:9
59:14,15,17 95:25
163:13,15 228:24
243:10,21 262:10
269:5,25
**clientele** 59:8
**clients** 79:7 98:9
**closed** 228:2
**clothes** 58:1,2 90:4
90:4,5,5,6,7 95:12
95:12,13,13

**cloud** 244:8
**club** 85:1
**clubs** 79:4
**collect** 88:25
213:22 224:19
**college** 74:4 96:18
97:19,20 198:16
**com** 135:18
194:17
**come** 81:24 120:4
122:6 123:2,3,19
127:8 128:22
136:12 137:22,22
153:1 154:10
159:7 191:20
210:2 212:11
219:18 222:15
256:8
**comes** 200:14
210:10 229:14,17
229:20
**comfortable**
145:15 191:13
**coming** 79:11
110:8
**comment** 18:17
178:3 270:24
**comments** 127:25
154:22 266:4,7
**commercial**
241:10,11
**commit** 15:3
**commits** 207:5
**committee** 103:10
103:23 104:5
106:3,9 234:12
235:11 240:14
**committing** 228:6
**common** 45:19
**communi** 77:1

**communicate** 92:7
124:20 128:4
**communication**
35:8 43:7,11
149:17,19 238:24
**communications**
5:6 19:17 21:15
40:13,17 42:13
43:1,15 44:1
52:16,18 53:25
58:10,17 59:18,21
59:25 60:1,4
61:24 62:4 63:10
64:10,21 69:22,24
76:25 77:1 81:16
82:18,22
**comp** 90:13
**companies** 66:22
66:25 75:21 82:11
84:1,2,24 85:10,14
89:5 90:14,19,19
90:22 107:5
246:18
**company** 32:8
47:11,14,17 59:1
70:19 73:9,22
75:19,20,24 77:23
83:3 85:24,25
86:5,8,9 87:19
88:19,21 89:14,22
90:14,15,16 91:1
94:25,25 100:7,10
100:10 105:9
107:9,15 108:16
108:19 110:10,14
111:8,12,14
112:11,24 113:7,9
113:18 114:1,10
114:12 115:8,21
116:18 117:2
118:8,8,9,12,25

122:5,7,8,10,20
123:2,5,18,20,21
123:24 126:3
128:21,24 129:20
130:3 135:18
136:1,3 146:1,2
152:12,16 155:3
155:12,17 156:2
157:5,24 158:22
160:11,15 173:12
173:14,20 175:9
175:13,16,19,21
176:17 179:23
186:1,5,12,16,17
187:12,13,20,24
188:7,9 189:11
190:24 191:16
192:25 196:21
198:12 199:18
202:9 204:22
205:19 206:13
209:13,23 210:1,4
210:10 213:23
217:17 222:9,10
228:4 234:9,23
235:6,9,15,18
240:2,12,15,16
241:2,16 242:22
244:4 246:15
249:14,21 250:1
253:6 254:17,21
258:13,18 261:23
261:25 271:11
**company's** 129:17
235:3 240:8
241:11 244:13
**compare** 205:16
**compel** 270:6
**compensation**
40:22,25 41:12,25
128:18 235:17

**[complain - correct]**

complain 236:4,6
complaining 262:8
complaint 24:6,9
68:16,17 105:10
105:14,19
complete 194:16
completed 194:18
completely 119:19
completion 274:14
complies 19:25
104:19 117:17
121:5
complimentary
266:1
comply 269:21
components 77:15
compound 65:16
90:9 100:14
computer 55:17
55:19,21 56:14,17
161:21,22 162:1,4
162:10 251:7
263:8
computers 54:11
244:4,8 251:12
con 40:21 68:22
concealing 243:9
conception 240:9
241:1
concern 111:7
185:3
concerned 112:23
174:12 230:17
concerning 235:2
concluded 94:3,6
94:7
concludes 272:3
conclusion 152:18
261:19 263:21
conditions 157:23
159:12

conduct 76:23
confer 269:21
conference 16:23
238:17,22
confirm 149:9
153:10 182:9
conflict 31:20
confused 52:11
90:21
confusing 107:16
confusion 61:23
62:4 90:12,17
connect 138:7
connected 21:10
57:18 82:15
connection 40:22
cons 269:21
consent 8:21 9:15
218:14
consequence
232:3,8
conservative
114:4
consider 253:10
253:15
consistent 146:15
226:23
constantly 107:15
consultant 265:4
consultants
121:11 264:25
consulting 3:4
11:9 41:2,14,14
117:24 118:2,19
119:2,6 129:18
132:22 136:23
188:4
consumer 60:2,8
60:12,15,22,23
61:4 78:2,18,25
82:15,17,19,21,21

84:13
consummated
157:15
contact 105:4
contacted 125:21
125:22,23,25
contained 273:8
contains 58:16
contemplating
256:6
contempt 13:12
context 74:21 75:3
268:13
continue 10:9
12:19 180:12
188:4
continued 5:1 6:1
7:1 8:1 9:1 108:13
205:25 271:19
continuing 113:22
166:12
contract 121:10
121:12 147:12
177:2
contracting
119:15
contracts 48:4,4
70:9
contribute 242:11
control 34:2 82:8
175:9 176:16
270:18
controls 175:15
conversation
20:25 21:17,22,23
22:3,15 25:16
26:18 28:13 239:6
263:3
conversations
10:8 53:18,24
138:20 239:13,23

256:10
convinced 180:7,9
coo 184:3 241:8,15
267:2
copies 92:11,14
106:8
copy 39:14,15
94:10 105:1,24,25
106:1,3,7 150:3
156:18 182:18,19
192:11 195:2,3,4,6
195:9,25 201:13
201:17,18 215:20
217:16 224:8
260:9 264:6,8
270:19
corner 72:12
225:4
corporate 98:18
98:22
corporation 32:9
44:18,23,25 45:5,8
45:10,17 46:2,5,11
46:13,13,18 47:3
74:11,14,24 75:2
75:11 98:20 99:21
106:18,24 107:14
corporations 67:9
84:15 98:22,24
correct 22:1 24:4
33:19 34:13 40:11
44:18 47:8 48:19
50:17,23 58:10
60:7 63:23 74:24
75:11 80:13,16
83:16 91:11 98:3
102:23,25 103:5
121:21 153:16
173:15 205:23
226:21 232:3,9
273:9

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Hillshore Investments, a Panamanian corporation with its principal place of business located at Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá ("Purchaser"), effective January 1, 2015 (the "Effective Date").

### RECITALS

A.    Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, Doug Lee, and Paula Thomas (the "Members").

B.    Purchaser seeks to invest five million five hundred thousand US dollars ($5,500,000) into Seller in exchange for 90 membership Units in the Seller.

C.    Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.    Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Sale of the Interest</u>. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, 90 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.    <u>Instruments of Conveyance</u>. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.    <u>Consideration</u>. In consideration for the Membership Interest, Purchaser shall make a capital contribution to Seller in the amount of five million five hundred thousand US dollars

[deals - directors]

deals  135:17
debit  233:7
debt  99:24 115:23
  148:6 214:12
  216:22 218:16,22
  219:8 221:7,8,24
  222:6,10 227:2
  229:23,23 253:11
  253:12,15,15,18
debtor  1:7 2:7
debtors  214:13
debts  216:7,8,12
  216:14 223:9,12
  232:6
december  6:5 9:4
  63:25 65:8 66:10
  109:8,9 111:11
  142:20
decide  178:7
decided  91:14
  92:4 173:11 175:8
  175:11 180:9
  187:19 188:6
  261:13,15
decides  167:15
deciding  24:21
  185:24
decision  53:14,15
  115:11 152:24,25
  153:3,4 175:7,7,22
  176:10 179:24
  180:8,10,11 187:3
  187:5,6 189:4
  191:6 208:23
  240:18,21 254:17
  254:17,24,25
  255:1,3 261:23
decisions  115:17
  175:18,21 185:9
  185:12,17,18
  235:2 240:24

261:22,24
declare  69:11
  273:4
deem  18:10
deep  227:18
default  163:16
defendant  2:20
  3:3 10:13 11:9
  24:14 252:1,2
defendants  1:15
  2:15
defended  252:12
defending  28:20
defer  242:17
define  70:7
defining  46:11
definitely  59:9
  254:9
definition  45:4
  46:8,12,16
definitively  245:7
degree  45:25 46:1
  74:13 96:20
degrees  96:22
delete  251:6
deliver  190:12
demanded  43:10
  43:11
deny  257:6
denying  19:5
department  73:16
depends  253:25
deployed  150:17
deponent  11:13
depose  269:7
deposed  228:18
deposis  19:16
deposit  143:16
deposited  42:9
  143:14,19

deposition  1:18
  2:19 10:12,19
  19:15,16,20 20:10
  21:16 26:2 48:12
  166:1 257:14
  270:5,9 271:19
  274:13
depositions  103:17
deprive  163:15
describe  29:10
  54:10 161:25
describes  72:21
  132:19
description  4:24
  5:3 6:3 7:3 8:3 9:3
  72:25 241:23
descriptions  240:1
  242:2,12,12
design  177:9 240:8
  240:25
designed  95:11
designing  90:3
designs  191:19
  240:11,19 241:1
desk  16:16,18,19
  162:1
desktop  162:2
destroy  163:12,14
destroyed  54:12
  163:3 244:4
  270:20
destruction
  205:20
detail  251:23
details  103:8
  151:13 156:16
  222:25 228:20
  256:18
determination
  114:8 201:7

determine  173:23
  194:24 205:19
  244:14
determined
  151:15
determines  18:14
developing  137:16
development
  73:18,21 241:12
  241:13
di  117:5 256:24
difference  16:13
  198:12 199:10
different  61:18
  77:15 78:22 79:4
  79:14 81:1,21
  82:1 140:18 141:6
  175:20 188:13,24
  190:11,20 241:18
  241:23 242:3
  246:9 262:2
diffic  96:21
difficult  96:21
  175:1
difficulties  236:10
digital  137:3,14
dimensions  16:23
dimitrios  3:5 11:8
  95:22 165:6
direct  69:24 177:9
direction  73:9
  175:21 191:13
  274:10
directly  138:4
  154:12 216:16
  263:4
director  73:2,5,7
  175:5 179:17
  184:4 240:7
directors  111:25

[disagree - dummy]

| | | | |
|---|---|---|---|
| disagree  12:10 | 92:10 103:13 | 43:8,12,14,25 44:6 | 252:25 |
| disagreements | 104:11 108:2 | 44:8,13,14 51:3,18 | don  3:14,19 11:12 |
| 269:9,23 | 111:17 119:1,6,8 | 51:19,22,23 52:3 | 165:4 |
| discount  85:2,3,4 | 120:2,21 130:6 | 52:10,16,19,22 | door  185:7 |
| discovery  53:1,6 | 131:3 134:3 | 53:7 54:4,15 55:4 | doug  6:10,14,20 |
| discretion  240:10 | 136:14,15 144:15 | 62:9,10,13,18 63:9 | 6:23 73:6,19,23 |
| discretionary | 144:20 148:23 | 63:19,22 64:3,9,20 | 74:2,5 109:18 |
| 240:18 | 149:5,6,11,14 | 65:7,10,13,18 | 110:5 153:21 |
| discuss  51:12 | 155:6 157:21,22 | 66:13,14,16,21 | 258:4,5 |
| 53:17 109:5 | 158:13,20 159:1,9 | 67:24 68:2,8,9,11 | douglas  1:18 2:19 |
| 167:10 255:9 | 159:11,19 181:17 | 68:20,23 76:4,10 | 4:4,25 5:8 10:12 |
| discussed  127:20 | 191:24 193:17 | 76:19,21 108:6 | 11:13,14,19 35:24 |
| 146:15,21 | 197:8 200:23 | 150:16,17 151:2,7 | 73:1 166:1,4 |
| discussing  140:18 | 202:1,4,11 205:10 | 151:13,17,23 | 272:4 273:4,16 |
| discussion  29:1,18 | 212:24 213:14 | 152:11,12,20 | downtown  247:13 |
| 113:15 213:7 | 214:22 215:4,10 | 155:10,11 156:24 | dp  56:15 |
| 256:16,18 | 215:13,20 216:11 | 161:17 181:13 | dpf  56:15 |
| discussions  77:18 | 217:5 218:5,8,21 | 211:20,23 212:2,7 | dr  142:21 |
| 137:25 173:19 | 219:22 220:4,8,14 | 212:8,9,12,20,21 | draft  150:16 |
| 190:17,22 249:25 | 220:17,18 222:23 | 212:22 217:7 | drafted  151:23 |
| dishonest  116:6 | 224:10 226:13 | 223:16 231:23 | 152:13 |
| dismissed  162:18 | 230:23 231:1 | 244:21 251:9,18 | drafting  154:13,17 |
| 163:16 | 233:2 234:13 | 254:15 256:25 | 154:23 |
| disputes  269:10 | 251:12 256:19 | 257:2 258:22 | drains  116:18 |
| disqualif  31:18 | 257:5,15,18 | 269:10,11,14,19 | 117:1 |
| disqualify  31:19 | 258:15 259:9 | 270:2 271:5,15 | dramatically |
| distributed  95:13 | 260:17,22,24 | doing  78:6,20 79:7 | 113:25 |
| distributing  90:5 | 263:25 264:12,19 | 79:8,12 80:3 82:2 | dress  12:14,23 |
| distribution  48:3 | 264:22 265:18 | 82:5,18 86:25 | 13:3 |
| district  1:2 2:2 | 267:10,12,18 | 87:3,11,13 98:21 | drive  55:22 56:17 |
| 10:18 11:11 | documentation | 121:14,14 147:24 | drsb  142:24 |
| division  1:3 2:3 | 46:24 47:1 61:10 | 172:9 188:10 | dsrb  106:23 |
| 10:18 | documents  5:10 | 205:20 245:6 | 142:14,15,21 |
| doc  39:20 68:22 | 19:23 22:21 25:6 | 248:13,15 249:12 | 258:1,3 271:15 |
| document  5:17,23 | 25:9 30:9 34:17 | 249:14,17,22 | dub  99:24 126:9 |
| 6:16 7:4,11,14 8:4 | 34:21,24 35:2,3,13 | 250:1 | due  15:8 197:2 |
| 8:7,10,13,16,20,24 | 35:15,19 36:21 | doll  229:23 | duly  166:5 |
| 9:11,14 20:2 30:3 | 37:5,12,17 38:20 | dollar  200:21,24 | dumb  189:6 |
| 30:5,6 40:20 42:7 | 38:20,23 39:1,2,18 | 201:2 221:23 | dummy  32:9 |
| 50:9,11,22 56:15 | 39:21 40:3,8,10,17 | dollars  95:1,2 | 44:18,22,25 45:5,7 |
| 68:17 71:6,17,22 | 41:24 42:5,6,13,16 | 152:15 198:10 | 45:8,9,17 46:2,5 |

[dummy - executed]

46:11,18 67:9
74:11,14,24 75:2
75:10 106:18,23
107:14
**dumping** 185:5
**duties** 235:12,16
**dyslexic** 130:15

**e**

**e** 3:14 6:4,8,12,19
6:22 7:7 9:4 28:18
42:11 56:14 70:2
70:9 83:5 104:17
106:10,11 108:9
108:20,24 109:10
109:17,20 110:7
110:12,19,22,23
111:5 112:10,10
112:21,22 126:5
128:6,8,10 130:8,9
131:5 132:1,18
133:24 135:10,10
136:9 138:10,12
138:15,23 141:5
146:17 147:11
150:3,8 151:5
157:16 160:19,20
160:25 161:7,12
163:10 175:17
208:21 222:8,11
222:13 232:2
251:3,5,6,11
259:10,12,17,23
262:7,12,13,22
263:1,7,14,23
269:15,16 271:1
**earlier** 146:16
**earn** 95:1,19
**earth** 267:13
**easily** 85:14
**east** 2:21 3:16
10:20

**educated** 56:9
96:17 174:1
**effect** 216:21
**effective** 241:16
**effort** 185:5,7
195:18
**eight** 199:14,15
200:20,21,24
201:2
**either** 37:5 128:6
172:19 209:22
239:3
**electronic** 55:5,10
55:22 56:25
244:20
**electronically** 56:2
56:6,10 143:8,12
143:20 162:15
244:7
**else's** 242:18
**em** 38:16 85:3
138:13 143:18,19
161:8,9,14 171:20
174:24 203:8
212:23,23 239:18
239:19 243:4
248:8 250:25
259:21 267:15
**embarrass** 135:3
**embezzlement**
244:16
**emil** 165:4
**emphasize** 242:3
**employed** 102:10
240:15
**employee** 122:13
268:17 274:17
**employees** 47:19
79:20,23 80:1
111:14 235:18
267:13 268:17

**employment**
232:11 242:6
252:2 268:14,14
268:15,16,19
**ended** 182:7
248:23
**engaged** 78:9
**eniluz** 48:10
**enjoys** 74:6
**entered** 163:17
**entire** 153:19
**entities** 84:3,16
85:5 89:8,9
**entitled** 5:17,23
6:16 7:11,14 8:4,7
8:10,13,16,20,24
9:11,14 36:5 50:9
269:19
**entity** 88:4 90:3
118:7,23 120:6
122:22 142:16
148:2,6 208:24
227:11
**entries** 225:7
253:2
**entry** 148:6
195:22 225:23,25
227:22 233:4
**equity** 128:21
148:6
**ernst** 73:23 74:12
**esi** 55:25 56:20
162:14 163:15
**esq** 165:4,6
**essential** 155:2,10
155:11
**essentially** 216:1
216:11 229:25
**establish** 235:16
**estate** 60:20 81:19

**estimate** 17:1,4
37:25 126:15
143:25
**estimates** 16:11
**et** 1:14 2:14 10:16
**ethona** 57:13,15
57:16 83:1,3
**everybody** 162:17
186:25 230:11
**evidence** 95:23
122:16 132:16
134:15,25 138:24
151:5 157:7,13
161:2 163:5,12,14
163:15 217:4
226:8 264:2
**exact** 58:5 59:8
89:22 94:24 103:8
124:21 126:13,14
127:3,20 180:5
211:15 222:12
259:4
**exactly** 22:18
61:24 63:5 71:5,6
82:14 83:22 112:9
120:10 124:5,14
153:25 167:25
223:3 227:10
239:12 247:4
248:6 249:20
254:14 258:23
**examination** 4:3
11:23 33:25 34:7
166:12
**examined** 11:20
**example** 193:20
**excel** 56:15
**exchange** 158:14
**excuse** 89:24
**executed** 150:18
273:10

Page 14

[executive – find]

executive 137:12
137:24 143:21
144:2 234:12
235:5,11 240:13
executives 267:20
267:24 268:8,10
exhibit 4:25 5:4,8
5:13,15,17,23 6:4
6:8,12,16,19,22
7:4,7,11,14,17,22
8:4,7,10,13,16,20
8:24 9:4,8,11,14
19:10,10,12,12,15
19:16,23 35:23
36:1,2,5,6,6,8,11
36:15 37:13 50:12
71:18,20 72:6,9
92:21,24,25 93:6
101:12,20 104:12
104:13 107:25
108:3,9,11,21
109:11,12,16
110:16 116:23
117:12,13,14
120:25 121:3,8
130:7,24 131:1
144:16,19,24
148:24 149:12
153:8 157:19,22
158:21 159:11
180:22 181:2,3,8
182:14,22 183:2
191:25 192:1,4
202:15,21 203:10
213:8,8,8,9,9,15
217:12,13 218:3
219:5,22 220:5,21
223:21 224:17
229:17,18 230:24
232:24,25 233:5
256:20,21 257:18

260:4,5 264:14,20
exhibits 4:22 5:1
6:1 7:1 8:1 9:1
19:19 92:14
exist 46:14 59:6
123:4
existed 65:11
existence 77:25
existing 214:12,13
exists 15:24 16:1
46:20 49:19
158:21 197:9
exp 266:12
expect 187:1 254:2
expecting 224:19
expense 200:13
204:20,24
expenses 37:24
48:1 100:8 114:6
180:15 184:6
192:25 193:8,22
200:5 204:8,22,24
205:2,14 224:4,20
226:14 227:17
253:10,16,20,21
253:23 254:3
expensive 252:17
252:23,24
experience 73:20
136:25 172:20
173:13,23 177:8
177:10,21 178:9
178:17,21 179:17
179:21
experienced 238:4
expertise 137:1
explain 16:14 45:3
45:18 56:12 61:15
81:16 127:17
193:16 206:13
209:19 225:20

explained 89:18
122:21 127:12,12
127:13
explaining 147:3,8
explanation
223:11
expressing 111:6
extent 87:1 256:9
265:12 271:2
eyes 225:14,18

**f**

face 103:14 267:13
facets 137:1
fact 19:5 175:16
221:3 242:4
244:19 262:3,5
facts 119:21
fail 39:20
failed 76:10
fair 205:22
fall 70:22 120:11
120:12
falls 62:19
familiar 41:8
67:13
family 106:24
257:23
far 111:16 188:8
fashion 80:18
242:17 266:20
federal 23:12,13
23:19 24:4,6,9,14
28:11 30:21 54:16
162:16 163:11
252:5,8 269:22
274:13
fee 30:15 36:24
88:25 132:22
188:5
feeling 191:12

fees 41:2,15 85:8
118:19 119:2,7
129:18 136:23
253:19
feet 124:7
fell 65:7
felt 113:21 184:19
239:17
fifth 257:14
figure 83:10
figures 95:24 96:1
181:20
file 83:23 228:11
271:20
filed 10:16 28:16
28:19 104:7 155:6
228:7,9 252:4,6
files 160:18
filing 15:4 85:18
final 91:13,19
133:15 175:7
finalized 227:12
finance 70:9 137:3
175:13 216:6
financial 68:24
70:18,20 86:2,3
89:19 112:11
152:21 244:14,15
246:2,23 250:9,12
250:23
financially 11:2
274:16
financing 147:17
175:18
find 22:9 40:3,7
41:5 54:18 88:18
88:25 89:12 92:11
122:9 123:22
132:4,20 145:25
147:15,17 148:1
174:15,18 193:25

Form 1065 (2015)   THOMAS WYLDE LLC                              47-1444612                              Page 3

**Schedule B**   **Other Information (continued)**

| | Yes | No |
|---|---|---|
| **11** At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions | | X |
| **12a** Is the partnership making, or had it previously made (and not revoked), a section 754 election? See instructions for details regarding a section 754 election. | | X |
| **b** Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes" attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| **c** Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions | | X |
| **13** Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) ▶ ☐ | | |
| **14** At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property? | | X |
| **15** If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect To Foreign Disregarded Entities, enter the number of Forms 8858 attached. See instructions ▶ | | |
| **16** Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership. ▶ | | X |
| **17** Enter the number of Forms 8865, Return of U.S Persons With Respect to Certain Foreign Partnerships, attached to this return. ▶ | | |
| **18a** Did you make any payments in 2015 that would require you to file Form(s) 1099? See instructions | X | |
| **b** If "Yes," did you or will you file required Form(s) 1099? | X | |
| **19** Enter the number of Form(s) 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return. ▶            0 | | |
| **20** Enter the number of partners that are foreign governments under section 892 ▶            0 | | |

**Designation of Tax Matters Partner (see instructions)**

Enter below the general partner or member-manager designated as the tax matters partner (TMP) for the tax year of this return:

| Name of designated TMP ▶ | | Identifying number of TMP ▶ | |
|---|---|---|---|
| If the TMP is an entity, name of TMP representative ▶ | | Phone number of TMP ▶ | |
| Address of designated TMP ▶ | | | |

DAA

[give - head]

| | | | |
|---|---|---|---|
| 252:23 | 51:12 53:17 71:12 | **goods** 199:23 | **hand** 72:12 130:6 |
| **given** 17:23 | 71:15 89:13 95:19 | **government** 74:3 | 149:10 225:4 |
| 136:10,10 192:4 | 96:10,13 101:1 | 97:6,7 | 233:12 |
| 195:6 196:11 | 103:13 113:18 | **graduate** 97:17,19 | **handed** 224:10 |
| 221:8 272:4 | 115:12 116:9 | **graduated** 97:20 | 260:17 |
| 274:11 | 118:23,24,24 | 97:21 | **handful** 79:23 |
| **gives** 178:3 235:19 | 119:2,13 120:4,16 | **great** 81:9 140:7 | **handing** 93:1 |
| **giving** 15:8 27:13 | 120:19 121:13,17 | 242:5 | 194:3 233:14 |
| 27:15 116:6 131:9 | 122:6,25 123:19 | **gross** 197:17 198:2 | **handled** 163:8 |
| 190:2 202:7 214:3 | 127:22 128:18 | 198:13 199:22 | **handles** 73:16 |
| **glad** 103:17 | 129:17,20 130:4,6 | 203:22 204:1 | **handling** 27:11 |
| **go** 10:10 27:1 30:9 | 133:10,12 136:12 | **group** 70:2 84:1 | **hands** 130:22 |
| 34:14,17 35:22 | 145:25 146:2 | 98:8 122:22 | **hank** 104:17 |
| 36:4,20 37:10 | 147:4,16 151:14 | **guess** 22:11 23:11 | 194:14 |
| 50:25 52:12 53:6 | 162:8,9,9,18 164:3 | 28:17 30:10 35:7 | **hanna** 6:20 64:11 |
| 56:22 72:21 76:2 | 164:17 166:9 | 52:24 56:23 71:4 | 64:20,22 65:15,25 |
| 89:12 94:11 | 167:9 172:6,8,9 | 75:16 76:14 78:24 | 91:9,10 94:8,11 |
| 100:10 115:18 | 177:5,6 182:11 | 83:11 90:16 92:14 | 101:5 102:25 |
| 117:11 132:4,5,23 | 185:24,25 186:1 | 112:4,8 144:15 | 103:4 105:8 |
| 132:24 133:11 | 187:12,24 188:2 | 147:15 154:8 | 108:12 113:13 |
| 146:14 147:15,16 | 188:12 189:12 | 171:6 174:1,19 | 114:14 122:12 |
| 148:22 175:23 | 190:12 193:5,6 | 186:22 237:21 | 124:1,8 130:8,10 |
| 176:11 185:6 | 194:24 207:1 | 243:19 244:2 | 131:9 144:24 |
| 191:13 192:17 | 211:3 213:5,11 | 246:5,6,9 253:25 | 145:8,19 149:21 |
| 193:5 201:6 203:8 | 216:2,3,7,12,13,15 | 253:25 255:12 | 174:11 176:19 |
| 204:20 213:3 | 221:7,12 225:15 | 258:7 261:22 | 180:1,3 183:16 |
| 225:13,15 227:17 | 227:15 228:5 | **guessing** 28:14 | 211:4 234:8 236:7 |
| 233:16 242:1,4 | 230:8,13 232:17 | 100:1 106:10 | 238:14,15 242:7 |
| 245:12 248:10 | 232:20 233:21 | 126:19 255:2,3 | **hap** 190:9 |
| 251:11,17 253:2 | 242:5 244:25 | **guy** 91:7 194:14 | **happen** 100:13,18 |
| 255:19 260:3 | 246:1 249:20 | 206:19,21 207:5 | 136:2 162:14 |
| 267:4 268:22 | 257:13 268:24 | 237:14 | **happened** 29:4 |
| **goal** 132:20,20 | 269:2,16,20 270:4 | **guys** 22:22 25:6 | 99:11,15,17 125:9 |
| 135:23 136:17,19 | **golf** 74:6 | 86:1 95:6 105:10 | 147:18 154:2 |
| **goals** 135:23 | **gonzalez** 65:15 | 112:2 117:21 | 190:17 223:7 |
| **goes** 175:15 | 66:4 | 191:2 227:21 | **happening** 228:21 |
| **going** 12:20 14:17 | **good** 10:4 25:12 | 265:10 | **hard** 55:22 56:17 |
| 14:18 15:16 17:24 | 116:7 173:24 | | 188:4 |
| 18:1,2,23 22:25 | 193:13 206:25 | **h** | **hardest** 230:18 |
| 26:1 27:13,16 | 207:2 244:23,24 | **h** 83:5 | **head** 105:3 |
| 29:2 34:10,11,14 | 254:17 | **half** 157:12 205:8 | |
| | | 267:5 269:6 | |

**[headed – individual]**

headed  237:14
health  70:18 85:2
hear  21:20,20
heard  17:15 74:14
  74:23 174:22
  268:9 270:7
hearing  19:20
  270:22
heavily  175:25
held  10:19 13:12
  42:22,23 211:18
help  75:19 77:14
  98:10,11 113:24
  122:7 123:20
  128:24,24 137:17
  232:1
helped  98:13,13
helping  75:21
  118:8 145:25
  184:12
henry  6:6
hereto  273:8
hesitate  150:22
hey  117:5 125:7
  132:19 145:15
  188:12,22,25
  191:1 207:1
hide  99:1,5
high  114:6 172:21
  172:24 173:6
  193:8 198:19
  204:5
higher  203:25
  204:2,3
highly  150:20
hill  208:13
hillshore  44:15,17
  44:18 46:19 47:8
  48:6,8,12,22 49:4
  65:15,19 98:20
  207:22,25 208:1,4

208:7,8,12,13,25
209:7 261:4,14
  262:3
hillshore's  49:18
hire  112:3
hired  103:9
  111:14
hiring  265:6
hmm  29:9 43:20
  52:15,15 60:5,13
  61:1 102:21 117:4
  125:3,18 131:8,21
  149:23 150:24
  170:2 184:16
  194:7 195:23
  196:16,24 197:1,3
  197:16 204:13,21
  208:16 219:13
  224:18
hold  34:9 193:25
  228:5
holder  227:14
  261:16
holding  107:9,15
  258:13
holds  74:3
home  143:8
honest  18:22,23,25
  208:1
hong  7:18
hope  172:7
hoping  191:22
horrible  225:14,18
  267:25
horribly  112:1
hot  232:14,15
  237:14,15,19,20
  237:20,22
hour  71:8,9 81:4
  144:10,11 230:8
  269:5,6

hourly  144:13
hours  164:4
  266:15,21,25
  267:4
hr  175:20
huh  87:12 158:19
  185:19 189:6
  196:7 203:17
human  73:11,15
  77:13 96:21
hundred  38:6,7,8
  61:6 97:23 168:6
hundreds  252:25

**i**

idea  30:17 50:21
  91:16 154:9 184:6
  216:18 218:24
  252:23
ideally  152:19
  174:24 255:21
ideas  188:24
iden  233:20
identical  71:1
identification
  19:11,13 35:23
  36:2,8 71:20
  92:21 101:12
  104:13 109:12,16
  116:23 120:25
  131:1 144:16
  148:24 149:12
  153:8 181:3 183:2
  192:1 202:15
  203:10 217:13
  223:21 230:24
  232:25 256:21
  260:5
identified  37:5
  155:13,17 169:8
  175:17 233:25

identify  83:16
  167:3
image  240:18
images  76:22
implementing
  74:1
important  12:16
  18:21 230:22
  244:14,20
imposed  62:19,23
impossible  253:5,8
impressed  75:18
impression  267:14
improving  113:19
included  35:10
  156:2 169:21
includes  169:11,15
including  227:3
income  47:24
  192:5,14 193:3
  198:7 199:13,25
  200:11
incompetent
  267:20
inconsistent  48:18
incur  205:25
  229:22
incurred  192:25
indemnify  214:11
indemnity  8:7
  214:7 215:14
index  4:1
indicates  226:13
  264:12
indicating  84:14
  110:3 195:25
  197:21 233:18
indirect  69:25
individual  1:13
  2:13 24:1,15,19,22
  77:10 257:22

Veritext Legal Solutions
866 299-5127

[individuals - job]

individuals  24:23
   98:19
industry  177:18
infighting  174:20
information  20:7
   27:13,15,24 37:21
   37:22 39:3 46:23
   46:25 55:23 56:2
   56:7,11,11 58:17
   79:1 81:19 89:19
   111:23 140:15,16
   162:15 244:7,24
   245:21 259:8
initialed  273:7
injecting  183:14
ink  273:7
inside  55:22 94:20
   162:10
institutions  246:2
instruct  21:6
   26:15 28:7 32:18
   32:20,22 167:8
   172:3 243:23
instructing  26:13
   26:17 33:16,17
   34:9
instruction  4:11
   243:21,25
insure  47:8
intellectual  5:18
   93:19
intentionally
   163:14
interaction  77:9
   266:9
interest  8:11 27:23
   31:20 32:9 39:5
   41:1 50:4,10,13,18
   50:23 51:8 66:23
   106:17 107:4
   147:20 160:2,11

196:15,17 214:3
   214:17 257:22,25
   261:6
interested  11:2
   86:22 95:8,8
   125:8 195:8,13,16
   249:21 274:17
interesting  223:16
interests  160:15
interfere  240:24
interference  10:8
international
   45:25 73:24 74:12
   74:13 96:22,25
   97:2,9 98:8,10
   172:24 173:2
internet  72:10
interns  248:6,9
interruption  79:24
intervene  243:14
   243:18
introduced  124:2
   124:5,6
invading  32:25
   33:2
invasion  32:24
   167:5 172:2
inventory  99:25
   115:20 249:16
invest  89:1,13
   115:12 125:22
   189:11 206:13
invested  69:9
   99:12,16 115:7
   206:6
investigation
   89:12
investing  126:3
   207:3
investment  40:23
   44:15,17 46:20

47:8 88:18 91:2,7
   91:8,10 100:12
   125:7 127:5
investor  41:6
   89:13 124:16
   125:15,20,20
   132:4 136:12
   183:20
investor's  136:16
investors  88:25
   135:16,19
invoice  138:4
invoices  137:18,21
   142:3
invoking  21:21
involve  91:2
   160:15 171:23
   206:11 209:7
involved  29:2
   68:15 73:17,25
   87:13 89:18,22
   91:6 98:17,19
   115:10,15,16
   122:5 123:18
   137:11,14,16
   141:9 145:16
   151:15 154:7,12
   154:13,17,23
   156:6,17,17
   158:14 168:25
   169:24 170:14
   171:4,20,21,22
   172:23 173:6
   175:5 187:18
   208:25 229:21
   231:18 251:19
   265:5,6
involving  68:3,8
   68:10,20 170:15
   171:17

ip  88:5 154:3
iron  269:23
issue  43:4 271:16
issues  51:13 81:24
   112:14 137:13
   138:1 143:5
   146:17 174:17,18
   175:1 267:16
it'd  26:2 114:3
ivy  96:17

j

j  6:6
j.d.  74:5
jan  149:19
january  5:24
   62:20 63:11 109:9
   109:9 111:13
   142:22 211:13
   258:24 261:1,2,14
jason  83:10
jene  20:21 30:24
   31:1 32:12 52:17
   66:2 101:5 102:9
   102:22 105:7,8
   108:12 113:23,23
   114:14,15 122:4
   123:17 145:25
   153:21 173:19
   174:20 175:23
   176:11 177:8
   180:12 183:23
   184:1,19 185:8
   186:20 190:2,4
   238:6,12 239:1
   240:23 241:3,17
   243:6,9,20,25
   250:6 265:22,25
   266:6,16
job  81:10,11
   185:19 207:2

Page 19

[jobs - know]

| | | | |
|---|---|---|---|
| **jobs** 112:1 | **jury** 18:18 19:5 | 53:4 54:8,11,13 | 152:25 154:6 |
| **john** 6:20 26:3 | 141:3,12,12 | 55:7,9,10,19,25 | 156:12,16,20,22 |
| 64:10,20,21 65:25 | **k** | 56:3,6,10 58:11 | 157:10,13,25 |
| 91:9,10 94:8,11 | | 61:23 62:17 64:8 | 158:1,2,3,12,17,20 |
| 101:5 102:25 | **kahrs** 6:6 194:14 | 65:21,22 67:1,7,14 | 159:1,3,11 160:6,9 |
| 103:4 105:8 | **keep** 85:13,13 | 68:9 69:17 72:16 | 160:17 162:5,23 |
| 108:12 110:8 | 140:6 174:23 | 72:17 74:11 75:18 | 162:25 166:19,25 |
| 113:13,20 114:5 | 175:2 230:13 | 76:18 81:2,3,3,10 | 168:13,23 169:17 |
| 114:13,18 122:6 | **kept** 207:3 | 81:25 83:25 85:17 | 171:7,9,11,13,15 |
| 122:12 123:18 | **keys** 130:22 | 86:20,24 87:1 | 172:6,7 174:24 |
| 124:1,7,20 125:7 | **kidding** 172:4 | 88:1,4,7,12,14,20 | 176:3 177:16,21 |
| 127:21 130:8 | **kids** 74:9 | 89:7,8,9 90:2,18 | 178:11,13,15,15 |
| 131:9 144:24 | **kill** 236:25 | 90:19 91:1,5 | 178:17,19,21,23 |
| 145:8,16,19,24 | **kills** 223:17,18 | 93:12,16,21 94:2 | 178:24 179:3,6,7 |
| 149:21 153:21 | **kim** 7:18 85:23 | 95:10,11,14 98:25 | 179:11,16,21 |
| 173:19 174:11,23 | 86:2 | 99:4,7,9 101:4,18 | 180:5,10,13,14,16 |
| 175:8,8,25 176:19 | **kind** 27:11 35:2 | 101:23 102:3,4,11 | 181:13 183:14 |
| 179:25 180:1,3,12 | 39:1 67:18 71:4 | 102:14,15,17 | 186:6,7,8,9,11,13 |
| 180:20 183:16 | 77:17 84:18 89:18 | 103:8,16 104:1,25 | 186:14,18,19,20 |
| 188:11,22,22 | 113:24 114:1,7 | 105:15 106:12 | 186:22 187:4,8 |
| 189:20 190:1,9,13 | 128:23 152:1 | 107:13 108:22 | 188:25,25 189:4 |
| 191:9 206:25 | 173:25 190:20,25 | 109:3 112:6 | 190:15,19,20 |
| 214:20 234:7 | 196:11 248:15,16 | 113:12 114:6,24 | 191:1,4,19,23 |
| 236:6,7 238:14,15 | 257:23 258:20 | 115:2,3,4,7,9,19 | 192:19 195:1,6 |
| 239:3 255:2 262:1 | 271:20 | 120:10 121:16,17 | 196:8,12 197:8,10 |
| 265:25 | **knew** 14:10 75:1 | 121:25 122:3,8,12 | 197:13,24 199:5 |
| **john's** 242:10 | 122:4,19 123:16 | 122:13,18 123:15 | 201:8,12 203:7 |
| **joint** 34:12 172:10 | 129:19 130:1,3 | 123:21 124:3,4,6 | 205:6 206:5,8,9,12 |
| **judge** 70:8 178:7 | 183:23 187:23 | 124:14,21,21,25 | 206:22 207:12,14 |
| **judgment** 163:16 | 261:16 | 125:5 126:16,17 | 207:16,19,23,24 |
| 242:18 | **know** 14:2,14 | 127:24,25 128:6 | 207:25 208:3,6,6,6 |
| **judith** 1:23 2:23 | 15:24 23:1,10 | 128:22 131:25 | 208:25 210:19,21 |
| 10:24 165:21 | 25:3 28:23 30:16 | 132:22 135:12,12 | 212:3,4,6 214:23 |
| 274:25 | 30:19,20,22,23 | 135:14 139:2,4,12 | 215:2,3 216:17,23 |
| **july** 6:22 7:8 93:25 | 31:4,6,8,9,11,12 | 139:15,19 140:6 | 216:23,25 218:18 |
| 118:18 149:19,21 | 31:14,17,22 32:1,2 | 142:1,4,19,23 | 219:2,7,8,8,11,14 |
| 150:8,8 157:15,16 | 33:12 37:15 38:2 | 143:11,20,22 | 219:17,21 220:3,8 |
| 175:17 211:17 | 38:10 39:12 45:16 | 144:9 146:20 | 220:11,13,13,16 |
| 234:4 | 46:2,5,7 47:16,19 | 147:3,8,16 149:16 | 220:18,19 221:5,6 |
| **june** 53:6,7 115:1 | 47:21,23,25 48:1,2 | 151:11,14,22,23 | 221:9,15,18,18,19 |
| | 48:3,5,11,15,23,24 | 151:25 152:13,14 | 222:13,20,22,24 |
| | 49:3 50:19 51:7 | | |

**[know - little]**

222:25 223:3,9,14
223:15 225:25
227:1,9 228:7,9,12
228:15,16,20
229:12,13,14,16
230:3 231:4,12,15
231:24 234:17
236:10,13 237:21
237:21 238:3,24
238:24 239:15,17
242:16 245:5,6,7,9
246:5,7,21 247:2,6
247:9,14,18 248:8
248:23,24 249:4
249:10,11,18,20
250:24 251:16,23
251:23 252:6
253:9 254:5,6,6,11
255:18 256:7
257:3,22 258:12
258:16 259:6,6,13
259:15,25 261:8
262:3,6,25 263:4
264:1,18 265:7,21
266:17,17,24
267:6,9,11 268:13
270:3 271:3
**knowledge** 16:19
17:4 45:19 80:8
80:13,15,17,20,22
148:19 257:9
**knowledgeable**
5:5
**known** 129:19
168:17
**kohl's** 189:1
**kuo** 6:10,14 20:18
20:19 22:4 25:12
26:19 65:15 66:6
66:9 108:13
168:10,25 169:2

169:25 170:15
171:10,18
**kuo's** 83:9
**kyu** 7:18

**l**

**lack** 99:13 103:2
116:13 118:15
151:4 243:15,16
**lacks** 99:18 110:15
**lady** 71:25
**language** 76:23
133:1 240:25
**large** 98:22
**larry** 1:9 2:9 10:14
**late** 262:23
**laude** 74:4
**laugh** 214:10
**launch** 84:13
**launchpad** 5:5,15
19:17 57:21 58:10
58:17 59:18,21,25
60:1,3 61:20,24
62:4 71:19 72:10
73:7 76:10,15,25
77:5,22,24 78:5,6
78:18 79:6 80:9
81:9,16 82:8,10,11
82:18,22 83:23
84:6,7,10,12 86:6
142:13
**laundering** 95:7
116:8
**law** 3:6,13,15 46:1
74:5 97:15,21,24
139:7 168:17
201:24
**lawsuit** 23:12 29:5
68:3,8,10 103:12
104:6
**lawsuits** 68:20

**lawyer** 17:16 24:8
32:7,11 141:19
149:18 243:8
252:13
**lawyers** 150:15
**lay** 21:8,9 167:13
**laying** 217:7
**lays** 157:23
**ldt** 3:4
**lead** 264:1,2
**league** 96:18
**lean** 184:7
**leaving** 87:9
**led** 125:10
**lee** 1:18 2:19 4:4
4:25 6:10,14,20,23
10:12 11:13,14,19
33:8,11 35:24
73:1 96:17 109:18
110:5 116:19
153:21 166:1,4
269:7 270:12
271:8 272:4 273:4
273:16
**lee's** 5:8 270:12,14
**lef** 249:16
**left** 72:12 82:23
87:7 111:12 225:4
**leftover** 249:16
**legacy** 81:18
**legal** 10:20,23,25
22:11,23 23:1
25:5 30:15 31:13
31:23 39:23 51:13
64:23 73:16 137:3
141:16 150:16
151:2,7,17,23
152:11,17 253:10
253:15,18,20,21
253:22 254:2
261:18 263:20

272:5
**legally** 33:7 46:14
46:20
**legitimate** 193:24
**lent** 222:9
**letter** 7:17 108:24
163:6
**letting** 185:8,8
**level** 137:8 266:8
**licensed** 5:19
**licensing** 189:1
**lie** 13:11,15 14:20
**lied** 14:3,6
**lieu** 270:19
**life** 56:10 157:12
**limit** 53:15
**limitations** 235:22
**limited** 54:3
**limiting** 52:25
**line** 4:12 12:19
104:21 181:15,25
182:2 234:18,18
248:16,16 269:18
**link** 269:13,15
270:25
**list** 19:23 34:21
35:4 42:8 53:22
86:1
**listen** 43:21
173:25
**litigation** 27:12
28:20 54:16,16
68:15 103:10,22
104:5 106:2,9
238:9,21 250:7
251:20 252:16,19
252:22 253:1,4
254:5
**little** 16:25 62:3
93:23,24 104:21
107:19 167:25

Page 21

[little - manufactured]

199:14 204:18
236:8 248:15
**living** 157:12
**llc** 1:6 2:6 5:20
7:12,19,23 8:18,22
8:25 9:16 10:14
106:24 155:6
195:24 224:24
234:1
**llcs** 257:23
**llp** 73:24
**lo** 80:6
**loan** 61:11 77:8
187:20 196:11,13
216:5 221:23
222:17 226:6,15
226:20,20 227:3
**loaned** 61:5 222:9
**loans** 100:12
180:21
**located** 10:20 47:4
243:4 247:12
**log** 5:13 35:17
36:6 37:7,13,14
40:11 42:20,22,23
53:3 62:11,14,21
64:7 158:9 260:1
263:17,18
**logistics** 221:11
**long** 32:10 58:3,20
59:5 103:25
128:17 144:4,5
162:3 230:8 239:6
239:8,12 240:14
263:2 265:21
**longer** 78:19 81:17
**look** 16:24 19:22
19:22 54:9 72:6
95:25 96:6 111:9
116:7 119:25
130:18,19 133:11

140:7 150:18
156:11 202:9
218:1,3 227:20
232:24 233:22
242:20 243:4,21
244:1 254:7
265:20
**looked** 87:15,17
254:8
**looking** 67:23
109:24,24 110:2
137:15 147:20
196:4 225:22
**lookit** 63:21
**looks** 188:17 203:1
215:17 227:22
**los** 1:19 2:21 10:1
10:21
**lose** 80:8 199:20
206:24
**loss** 198:7,11
199:13,22 200:21
200:25 201:2
**losses** 68:24 69:11
197:18 201:7
205:23 206:1
244:14,15
**lost** 199:18,20
270:20
**lot** 75:19 85:3
114:17,17 152:21
170:4 174:20
183:23 184:1
188:18 190:1,1
212:1 220:24
248:5 258:20
267:24 269:23
**lots** 216:1
**lower** 203:25
204:14,17 205:2

**ltdconsulting** 3:10
**lunch** 164:12,14
**luncheon** 164:18
**luxury** 150:20
172:21
**lying** 134:7,11

**m**

**machine** 274:9
**madam** 71:23
**mail** 6:19,22 9:4
28:18 42:11 56:14
70:2 104:17 108:9
108:24 109:10,17
109:20 110:7,12
110:19,22,23
111:5 112:10,10
112:21,22 126:5
128:6 130:8,9
131:5 132:1,18
133:24 135:10
136:9 138:10
143:8,11 146:17
147:11 150:3,8
151:5 160:20
175:17 208:21
222:8,11,13 232:2
251:3 262:7,12,13
262:22 269:15,16
271:1
**mails** 6:4,8,12 7:7
70:9 106:10,11
108:20 128:8,10
138:12,15,23
141:5 157:16
160:19,25 161:7
161:12 251:5,6,11
259:10,12,17,23
263:1,7,14,23
**main** 82:5,25
**maintain** 55:4,9
80:1 114:1 246:14

246:18,22 270:18
**maintained** 72:10
**maintaining** 78:21
81:23 82:4
**maintains** 86:4
**major** 97:2
**majored** 97:7
**majority** 261:10
261:16
**maker** 240:18,21
**making** 34:8
100:12 115:11
180:11 187:3
191:17 208:23
249:13
**man** 56:9 96:17
189:15 207:8
236:16,22
**managed** 234:21
234:24
**management** 5:24
73:20 185:9,11,17
187:1 234:11
235:2
**manager** 58:25
73:23 74:12 77:11
98:8 234:8,9,21,24
235:4,4,6,19
254:20
**managers** 235:13
**managing** 73:2,5,6
82:4 229:21
**mango** 1:23 2:23
10:24 165:21
274:25
**manner** 216:2
**manufacture**
107:7,8
**manufactured**
95:12

[manufacturing - microphones]

manufacturing
90:4
march  6:13
142:22 261:6,6
262:5
mark  35:22
109:11 130:7,24
148:22 149:11
180:22 181:1
183:1 217:11
264:11
marked  19:11,12
36:2,8 71:18,20
92:10,21 101:11
101:12 104:12,13
109:12,15,16
116:23 120:22,25
131:1 144:16
148:24 149:12
153:8 181:3,8
182:21 183:2
191:25 192:1
202:15 203:10
213:9 217:13
223:21 230:23,24
232:25 256:20,21
260:5
market  61:18
75:21
marketed  60:20
240:11 241:2
marketing  60:16
60:17,18 61:15,16
76:23 77:12,17,19
79:18 80:22 90:6
137:4,17 138:11
140:16 172:24
173:2
marks  71:11,14
164:16 166:8
232:16,19

married  168:18,19
material  18:16,17
141:25 142:2
244:21 245:3,13
245:16,20,23,24
245:25
materials  76:24
160:4
math  198:16,25
matter  10:13 32:3
32:7 33:4 75:6
197:25 198:19
268:5
matters  31:13
73:17 75:7 96:25
mean  22:24 25:23
28:17 37:13,23
38:1,5 41:18
49:19 55:7 57:4
58:11,19 63:15
68:4,14 70:14,24
71:3,4,4,5 73:1
74:20 75:3 76:11
77:19 78:17 82:10
83:21 85:11 86:24
86:25 91:12 95:21
98:21 102:12
106:10 108:16
109:1 110:17
113:14,16 114:11
118:1 122:4,19
123:16 124:4,13
124:24 125:9,12
126:4 127:2,19
128:20 138:10
140:14 142:1,1,20
143:1 145:10
146:13,19,20
147:1,7,14 148:6
148:15,18 151:19
152:23 153:24

154:6,19 158:12
159:3,15 160:8
161:8 167:1 171:7
174:7 176:3,13
177:11,17 178:6
180:5 182:11
184:5,13 185:25
186:7,22,23 189:7
189:10 191:6,10
191:15,18,21
194:10 195:21
196:10 200:9
201:3 208:22,24
212:4 215:21
217:4 220:11
221:5,9 222:25
230:7 231:18
234:17,17 236:8
237:15,21 242:16
246:8,18 247:2
248:6 249:15,15
249:25 250:16,20
253:20 254:5,23
255:6,6,12 256:15
262:4,14 263:2
265:4,20 266:3,19
267:3,12
meaning  75:1,10
means  13:21 196:8
196:12,13 200:13
meant  63:16 81:9
84:18 113:8 271:7
media  10:11 61:18
71:12,15 137:4,15
164:17 166:9
232:17,20 272:4
meet  124:1,7
126:22 127:8
166:14,17 168:16
168:22 255:20,21
269:20,21

meeting  29:17,21
29:24 255:19
meetings  12:2,6,25
13:4 137:12,24
140:17 141:6
143:21 144:3,7
235:10 255:4,5,8
255:10,24
meldy  53:24 70:13
110:24 250:21
251:2 256:2
member  21:4,5,11
21:12,24 47:16
58:25 82:19 106:2
106:15,16 186:8
186:12 195:8
208:8 233:25
234:3,25 242:20
243:7 254:20
258:17 271:9,13
members  8:21
9:15 47:17 213:24
217:23 235:10
255:5,8
membership  8:11
39:5 50:4,10,18
160:2 214:17
261:5
men's  173:6
mentioned  133:24
266:7 271:5
merchandise
241:13
merchant  82:1
merely  49:18
message  147:2
met  56:9 79:22
80:4 126:7 257:8
257:10
microphones  10:6

```
 1          A     Yes.  Money coming into the bank
 2   supported by the notes payable, the promissory note.
 3          Q     Okay.  And so when a loan is to be
 4   converted in equity, that would have an impact on the
 5   tax return information; right?
 6          A     Yes.
 7          Q     You would have more equity than $700;
 8   correct?
 9          A     Yes.
10          MR. PEDDIE:  Objection, it's calling for an
11   expert opinion.
12   BY MR. BILLER:
13          Q     And 2014 tax return is prepared sometime
14   in 2015; right?
15          A     Yes.
16          Q     And when was this Exhibit 75 prepared?
17          A     75?
18          Q     No, 2014 tax return.
19          A     74.
20          Q     74, thank you.  When was it prepared?
21          A     I don't remember.  September 10, 2015.
22          Q     September 10, 2015.  So if any loans in
23   2014 were converted to equity in 2014, should it be
24   reflected as a loan or equity?
25          A     Say that again.
```

Page 124

```
1          Q      When conversion of a loan takes place in

2    2015 -- you know, before January 1, 2016, and when a

3    loan is converted to equity before 2015 in 2014, how

4    should it be described in the tax return; as a loan or

5    equity?

6          A      It would have been classified as an

7    equity.

8          Q      Thank you.  Who is identified as the

9    partner in that tax return for 2014?

10         A      There's Hillshore.

11         Q      And how much capital contribution did it

12   make?

13         A      I'm only showing the profit sharing in

14   his K-1.  I'm only showing the profit sharing and loss

15   sharing in K-1.

16         Q      You're only showing losses?

17         A      No.  The percentage of profit sharing

18   and loss sharing and the losses.  I can't seem to find

19   the investment in here.

20         Q      Why not?

21         A      I don't know where to look here.

22         Q      Can I see that real quick, Exhibit 74.

23   The reason you can't find it is because it's all blank.

24   This is highly unusual.  It states here under

25   Hillshore Investments profit sharing to be 45 percent;
```

Page 125

## [oh - operating]

262:19

**okay** 12:11,21
13:2,5 14:15,20,23
15:3,12 16:8,22
17:5,10,13,22 18:1
18:6 19:3,10,21
20:4,8,21 21:5,14
22:2,15 23:3,8,14
23:14,25 24:3,6,8
24:13,23 25:4
26:12 28:4,13
29:8,16,21,23 30:2
30:5,7,14,18,23
31:17 32:3 33:11
33:14,20 34:1,4,15
34:16,19 35:5,10
35:17 36:15,18
37:10,16 38:9,19
39:17,25 40:7
41:23 42:5,10
43:17,22 44:14
45:16 46:10,15,19
48:6,8 49:8,18,22
50:14,15,20,25
51:7,11,18 52:10
52:12 53:2,2,14,19
54:4,7,14,23 55:17
56:12,25 57:7,12
57:23 58:9,16,21
59:2,5,21,24 60:3
60:10,14 61:15
62:7,13 63:17
64:3,7,9 65:2,10
65:13,17,21 68:2
68:22 69:11,19
70:10,22 71:8
72:3,9,18 73:4
75:1,17,24 76:4,20
77:6 78:1,7 80:15
80:19 81:2 83:13
83:18 84:22 86:18

87:15 88:8,16,17
90:1,23,25 92:9,13
92:20 94:2,10,13
94:16,19 96:7,8
97:22 100:1,3
101:3,16,23 102:3
102:7,9,25 103:7
104:8,20 106:11
107:1,10,23 108:5
109:2,7 110:18
111:5 115:13,18
116:12 117:11,18
119:15,24 120:14
121:6,21 122:12
124:1,7 125:1,6,16
125:21 126:2,8,10
127:17 129:25
130:2,13,17,23
132:5,11,13,17
134:14,22 135:15
135:22 136:14,22
138:2 139:8 141:8
142:10,18,24
143:5,13 144:8,21
144:23 145:8
146:13,22 147:5
147:12,19 148:5
148:15,21 149:9
149:23 150:6
151:2,7,16,22
152:2 153:5,13,18
154:24 155:5,10
155:16 156:15
158:11,13,18
159:6,17,24
160:20 161:13,19
161:21 162:3,8,18
163:1,20 164:12
166:17 167:17,20
167:21 168:8,24
170:6,23 171:2,2,9

171:16,23 172:6
172:12,23 173:11
173:22 174:1,3,12
175:10 176:2
177:6 178:4,9,14
178:17 179:15,18
179:19 180:3,7
181:11,15,24
182:1,5,6,8,11,13
183:12,12 184:9
184:20,23 185:15
187:23 188:6,14
189:23 191:8
192:21,24 193:3,5
193:16 194:4,6
195:18 196:18,21
197:5,8,22 198:6
198:10,16,24
199:10 200:17,23
201:25 202:8
203:7,12,15,22,25
204:7,17 205:25
206:5,9 207:4
209:1,7,10,11,19
212:13,20,23
214:6,9,16,24
215:2,9,16,19,21
216:9,11,15 217:2
217:21 218:2,24
219:4,9,16 220:21
221:2,10 222:15
222:20 223:2,5,15
224:11,14 225:1,3
225:5,10,13,15,22
226:16,19,23
227:1,25 229:7
230:4,21 231:2,25
232:10,13 233:9
233:16 234:3,19
236:24 237:14
238:5 239:6,13,25

240:5,17 241:7,20
242:1,3,11,19,19
243:6,20 244:3,19
245:2,15,18,23
246:11,23 248:10
248:18,25 249:7,9
249:12,19 250:9
250:14,16 251:10
251:19 252:12,18
252:22 253:1,10
253:20,22 254:11
254:16 255:4,23
256:1 257:16,24
258:14 259:2,21
259:23 260:3,11
260:19,24 261:13
261:23 262:20
263:6 264:24
265:9,14,16
266:23 267:9
268:4,20 269:4
270:24 271:12,18
271:21

**old** 80:2
**once** 25:19 150:13
150:14,17 255:16
255:22
**one's** 181:15,16
183:7
**ones** 98:3
**operate** 187:2
**operated** 100:8
**operating** 7:11
8:17 39:3,4,6,8,9
39:10,15 50:7,16
50:22 151:10
153:5,15 154:13
155:2,13,18 156:2
156:18,22 176:15
181:7 186:5,13
209:12 211:17,18

[operating - party]

214:24 215:5
233:13 241:9
246:13 255:7,7
261:25 262:4
**operation** 54:23
255:9
**operational** 78:19
79:12 81:17 90:16
118:9,10,11,25
119:17,19 137:13
175:9 255:13
**operations** 137:3
176:16
**operative** 59:22
**opinion** 31:24
39:24 64:24
141:17 254:19
266:11
**opportunity** 125:8
125:24
**opting** 155:13
**options** 114:2
190:21
**oral** 145:9
**orange** 252:4
**order** 52:25 53:5,8
53:10,11,12,13
71:18 92:11 141:4
144:15 148:23
162:9 202:12
223:20 271:20,25
**ordinary** 193:3
198:6 199:13
200:11 253:5,11
253:12,16,24
**organization**
155:8 234:4
**organize** 160:18
**organized** 85:14
**original** 29:4 39:8
135:9 154:13,25

209:12,23 219:8
270:19,20,20,22
274:13
**originally** 84:21
131:6
**outcome** 11:3
**outlaid** 138:8
**outside** 26:7 62:19
65:8 68:18 77:8
88:7 232:1,5
**outsource** 84:25
**overall** 71:4
**overhead** 99:22
**oversees** 73:10,14
**overtures** 127:5
**overview** 234:18
**owed** 196:21 216:4
216:5 221:22
**owes** 224:3
**owing** 221:3
**owned** 5:18 82:11
88:4,5 90:15,22
155:7 219:8 221:7
**owner** 82:19
106:17 142:21
155:17 156:1
271:8
**owners** 155:12
156:3
**ownership** 32:9
66:22 213:23
257:25
**owns** 33:9,10,10
48:6,8 83:6 107:4
107:4 208:7 210:3

**p**

**p** 3:5 77:9 99:24
120:3 165:6 216:4
**p&l** 201:3,4
**p&l's** 85:22

**p.m.** 2:22 120:17
120:20 164:17,19
165:2 166:2,10
213:6,12 232:17
232:21 268:25
269:3 272:3,8
**pace** 16:25
**pacific** 3:8
**page** 4:12,24 5:3
6:3 7:3,4 8:3 9:3
51:1,16 104:16
149:2,17,18 150:9
153:16,19 156:13
193:21 215:13,13
215:14,15,18
224:2 225:15
233:17 234:5,7
253:2
**pages** 1:25 5:15
30:12 71:18 72:9
76:22 153:11
192:16 269:11
**paid** 61:8 118:3,4
118:6,20 119:2,7
129:23,24 141:14
142:11,11,12,13
142:15,19 144:5,6
180:20 214:12
223:1,3,4 224:20
225:8 226:6 227:3
229:19,24
**palisades** 3:8
**panned** 157:17
**paper** 49:19 54:24
57:3 244:21
**paper's** 245:25
**paperless** 54:23
**papers** 55:10
**paperwork** 221:4
245:2

**paragraph** 150:7
234:20
**paragraphs** 150:7
**park** 2:21 10:20
20:21 30:24 31:2
32:12 52:17 65:15
66:2 69:17,19
101:5 102:9,23
105:7,8 108:12
114:14,18 163:3
177:8 211:4 238:7
238:12 240:23
241:17 242:7
243:6,9,20 265:23
266:16
**part** 12:16 24:18
24:19 33:9 35:6,9
41:19,21 53:10,10
84:19 106:13
116:8 122:20
138:18 155:2
156:25 157:1,4
170:9 211:16
212:9 215:20
219:5,5,22 220:5
220:19,22 229:25
238:21 246:13
253:24 263:3
**particular** 248:10
**particulars** 146:14
**parties** 10:10 48:4
**partly** 136:20
**partner** 83:8,9,9
83:11 85:24 208:8
208:13
**partners** 83:7,12
**partnership**
192:14
**party** 11:1 84:25
274:18

[paul - please]

paul 43:2 68:17
179:20
paula 1:13 2:13,20
3:3,22 5:19 6:23
7:9 10:15 11:9
29:6 42:13 68:17
72:2 87:6,6,8 88:4
90:14,21 101:14
103:12 104:7
117:8 118:18
122:4 123:17
126:24 145:4,11
145:18,25 146:7,9
147:19,20,22
149:18,19 154:2
156:24 158:15,15
158:23 159:13
165:13 173:19
174:3,8,20 175:3
175:23 176:11
208:15,20 209:2
211:1,10,21,24
212:10 213:22
214:4,11 216:22
218:12 221:2
222:21 223:5
232:3,7 236:1,2,4
236:6,20,25 237:3
237:6,12 240:16
243:7 253:4
254:11 261:10,15
paula's 103:12
104:6 105:13
146:10 153:23
156:10 218:22
223:13 241:5
258:22
pay 14:24 38:3
50:13 99:24,25
119:13 196:17
216:7,12,14

218:16 221:24
222:10 223:8,8
226:14,14,20
227:2
paying 30:15
payment 196:23
226:1
payments 117:23
117:24
payroll 99:23
117:21,25
pays 47:21 196:15
pd 80:4 120:1
pda 161:16
pdf 161:16
pdt 123:3
pdtw 1:6 2:6 5:20
7:5,23 8:22 10:14
26:9 33:22 43:18
52:4 87:18 88:3,9
88:18 89:1,2,7
90:2,24 91:3,11
99:24 118:4,7,10
118:20 119:15,17
121:11,13,23
122:1,13 147:15
148:2 187:15
196:1,2,5 197:9,11
202:24 203:19
204:14,25 205:17
216:4,13,16
218:16 221:6,22
221:24 224:3,20
225:2,9 226:5,14
227:2 229:11,22
231:11
pdtw's 87:17
193:5 216:8,12
peculiar 195:12
peddie 20:11 21:1
21:23,24 23:17,18

24:3 26:4,4,20
27:7 29:10 31:18
33:7 35:10,12,15
36:25 162:17
163:2 228:16,22
239:10 243:8
peddie's 31:1
penalty 13:18,24
14:9,10,14,23 15:3
270:14 273:5
pending 33:15
46:3
penny 238:12
people 35:3,6 70:2
79:15 89:17
111:15 112:3
184:12 185:8
210:9,15,16,17
248:1,4,7 255:20
people's 257:22
percent 97:23
135:25 136:3
168:7 185:21
211:9
percentage 132:21
135:18 210:4,6
211:7 213:23
perfectly 52:13
performance
108:11 129:17
performed 140:11
performing 112:1
period 25:25
144:4
perjury 13:18,24
14:9,16,23 15:4
207:5 270:14
273:5
pers 257:23
person 5:4 15:12
16:3 86:15 105:4

125:25 154:3
184:9,17 194:11
269:21
personal 16:18
17:4 19:4 32:10
69:12 173:22
personally 41:20
41:21 158:14
254:8
pertains 274:12
phone 79:24 125:7
128:7 238:8
photographs
76:24
phrase 74:14,24
75:2
physical 202:3
pick 10:7 125:6
piece 49:19 128:21
pigeon 147:21
place 10:9 22:16
29:21 63:11
127:10 152:7,9,13
229:6 274:5
plaintiff 1:11 2:11
252:1
plan 118:22
122:21 184:13
254:10
planning 73:25
75:22
plans 189:2
plate 183:24 184:1
played 94:17
playing 74:6
please 10:6 11:4,6
11:17 19:24 21:9
27:4 45:3,16
51:16 54:17 63:1
72:24 101:11
104:16,18 109:19

[please - produce]

110:7 116:22
121:3 123:13
130:25 150:22
153:7 155:24
170:22 202:12,19
203:9 223:20
230:23 232:23
264:14
plus 140:22
point 58:5 61:4
63:22,25 78:21,24
79:14 88:5 113:16
118:10 119:17
121:16,25 122:20
125:23 126:6
148:10 152:22
154:19 156:17
183:23 185:18,23
189:3,20 190:4,17
191:11,12 196:23
199:24 210:5
215:12 224:5
227:11 242:24
247:8 248:8 270:4
pointing 101:17
193:17
points 150:12
politely 267:17
poorly 87:14
206:14
position 12:5
21:20 37:8 72:22
72:25 98:7 241:8
241:18,20
positions 242:2
possession 202:3
possible 124:15
184:7 202:5 230:2
possibly 108:8
109:1 125:22
128:7 145:7

157:13
potential 51:22
111:24
power 102:12,13
102:15,22 176:11
235:20 241:3
powers 235:12,16
practice 201:24
precursor 151:12
prejudice 163:12
163:13
prepare 35:17
36:4,11,15,19
84:10 256:3
prepared 36:13
39:6 93:21 101:23
153:6 214:18
256:1 267:10
270:10
prepares 86:16
preparing 34:12
present 3:21 11:5
52:17 77:2 105:12
146:6 148:15
153:6 165:11
presentation 5:24
presented 91:16
105:11 145:11,14
145:17 146:5,23
147:9 148:8,11,12
189:3
presenting 145:4
148:20
presents 259:7
preservation
163:6
preserve 54:17
preside 235:9
pretend 119:21
pretty 71:7 146:15
168:12 189:6,10

237:16
previous 123:12
previously 166:5
primary 73:7 82:3
185:3
print 61:19
prior 64:16 69:6
73:21 74:16 81:13
87:8,11 95:24
96:4 103:1 123:9
145:4,4 168:2,4
173:16 178:16
180:25 205:20
222:1 274:7
prison 14:24
privacy 32:24,25
33:2 51:6,7,8
69:13 78:13 167:5
172:2,11
private 10:7
privilege 5:13 21:3
21:22 26:7 28:7
32:23 35:17 36:5
37:14 42:20,22,23
53:3 62:11,14,21
64:7 228:25
262:11 263:18
privileged 158:6,8
pro 64:14 147:9
prob 170:9
probably 22:17,18
57:4 58:8 59:9
79:23,25 82:5
84:2,3 96:20
124:9 144:7
151:11 166:25
167:25 168:12,21
169:21 171:25
191:14 192:10
201:21 242:17
248:7 266:21,21

267:3,3,4
problem 159:6,7
202:7 259:7
264:10
procedure 163:11
269:22
proceeding 11:3
23:16
proceedings 11:10
17:22 228:17,18
228:21 269:8
274:4,6,8,14
proceeds 8:13
215:8,9,15,25
226:24
process 15:9 24:21
89:20 114:7
115:11 152:24
156:7 180:11
185:24 187:4
208:23 212:10
240:9
processes 240:25
produce 30:2
34:24 35:12 36:21
36:24 37:7 38:19
38:20,23 39:15,17
39:20,21 40:5,13
40:16 42:6,12,16
43:8,12,25 51:18
51:19 52:3,19,20
52:21 53:7,10
54:2 61:13 62:9
62:10 63:9 64:4,9
64:14 65:6,10,18
66:13,16,21 67:24
68:2,23 70:4 76:4
76:10 77:4,7
105:23 106:11
109:4,6 128:8
138:12 202:4

**[produce - radiation]**

217:19,25 250:14
259:12,16,17
263:1,6,15,23
265:15 269:25
270:2
**produced** 30:10
30:13 35:20 36:6
37:5,12,17 40:10
42:7 43:5,14
51:24 54:5 63:22
65:13 66:14 101:8
101:10 108:7,23
128:10 138:14,16
138:23 158:4
159:20 160:5
269:11
**producing** 265:11
**product** 95:9
240:9,25 248:25
249:1,2,3,6,13,13
**production** 5:10
25:10 263:25
269:10,13
**products** 47:10
60:20,20 61:16
76:22 186:15
241:14 248:13,14
248:18,21
**profanity** 237:10
**professional** 32:10
**profit** 191:17
**profits** 197:19
200:17
**program** 85:2,4
**programs** 85:3
**projection** 112:18
**projections** 110:25
112:11 251:1
**promissory** 7:15
101:1 181:16
182:13,17

**proof** 9:8
**property** 5:18
93:20
**proportional** 26:8
264:3
**propose** 269:4
**protecting** 147:19
**protective** 271:20
271:25
**prov** 147:9
**provide** 41:15
61:2 68:7,11
76:18 77:22 84:25
137:7,21 235:14
271:4
**provided** 46:23,25
47:1,14 68:16
70:16 77:1,9 79:2
81:19,20 110:2
139:19 140:15,16
148:2 223:8 251:8
263:9
**provision** 211:22
212:21
**prudent** 114:3
**punished** 15:5
**punishment** 13:23
**puppet** 91:22
**pur** 47:13
**purchase** 8:11
49:23 50:3,9,14,18
50:23 157:5
159:24 160:1,11
211:22 261:5,15
262:5,24
**purchased** 47:10
**purpose** 120:4
248:11 257:20
264:25
**purposes** 246:4,16
246:19 270:9

**pursuant** 5:11
41:25
**put** 53:2,21 58:13
62:20 87:19 98:13
103:10,22 113:7
113:16 114:11
115:12 118:2
154:3 177:4 187:9
187:11,19 188:6
191:15 206:23
209:11,20,22,24
209:24 210:9
211:1,5,8,10
216:21 222:8,21
223:13 225:20
227:15 233:21
**puts** 188:9 209:20
210:2
**putting** 114:9
162:17 210:8
218:21
**pw** 195:24

**q**

**quarterly** 250:25
**question** 12:9,11
12:22 15:17,21
17:17,18,19 23:15
24:2 26:16,18,24
27:1,2,3,5 28:2,3
32:17 33:15,18
34:10 40:1,12,15
40:19 41:4,23
45:7,11,12 46:3
50:1 55:2,3,15
57:20 62:24,25
63:2,4,12,13,14,19
64:15,16 68:5
70:10,24 74:23
75:7,8,9 76:8,9,14
77:21 78:14 80:19
91:4 93:4 99:20

100:5,6,7 101:3
107:22 111:20
112:2 116:4,6
123:13 124:18
125:13 127:6,7
139:3,5,20 140:2
145:5 147:5
155:21 156:10
167:15,16 176:7,9
177:25,25 178:2,2
184:15,17 189:19
191:12 224:15
226:11 236:18,23
253:13 255:12
261:21 262:21
**questioning** 12:20
**questions** 15:16
17:8 18:24 19:6
33:22 69:14 76:15
98:10 123:13
135:7 142:9
149:20 150:21
217:6
**quick** 164:2
**quickbook** 223:24
224:24 225:7
**quickbooks**
244:23,24 245:4
245:21 246:3
**quicker** 149:17
**quickreport** 8:25
**quite** 99:22,24
114:6 136:25
137:23 190:9
224:22 248:4
**quote** 135:4

**r**

**r** 109:24,24
**rachel** 258:4,5,9
**radiation** 58:9

5.3.1. **Executive Officers**.   Executive Officers shall have the duties, functions, and powers described herein.  Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members.  Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)     **Chief Creative Officer and Creative Director**.  The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company.  The CCOD shall also be the Chairperson of the Executive Committee.  For so long as she is employed by the Company, the CCOD for the Company shall be Paula.

(b)     **Chief Operating Officer and Chief Commercial Officer**.  The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.     **Manager's Powers and Limitations**.  The Manager of the Company shall have all powers and authority provided by this Agreement and the Act.   Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.     **Compensation**.   Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.     **Company Assets**.  The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.     **Company Funds**.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.     **Removal and Replacement of Manager**.  The Manager shall serve until the earlier of: (a) the Manager's resignation, retirement, death, or disability, (b) the Manager's removal by Vote of a Supermajority of Members or (c) the Manager ceasing to be a Member of the Company.  A new Manager shall be appointed by Vote of a Supermajority of Members.

### ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.     **Books of Account**.   Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any

8

[relative - reviews]

relative  274:17
relaying  147:1
release  151:18,19
relevant  26:7
relied  175:25
remember  22:13
  22:17 25:16 30:1
  37:23 58:5 59:8
  65:23 67:17,18,21
  67:22,22 71:6
  82:13 89:2,5,21
  90:7,11 94:14,24
  101:6,9 103:22
  104:3 107:25
  108:2,17 111:4
  113:5 124:9
  126:13,20,21,25
  127:19,24 143:24
  153:25 159:25
  166:21 168:9
  188:1 210:19
  215:3 219:19,24
  220:23 222:12
  236:13 237:4,13
  239:11,19 247:4
  250:24 256:17,17
  258:14,19,21,23
  264:16 265:25
repaid  213:25
  222:6,14
repay  221:8 222:7
repeat  27:2 40:1
  41:4 62:24 63:4
  63:12,19 64:15
  111:20 124:18
  127:6 226:11
  236:17 253:13
rephrase  78:14
  262:20
rephrased  17:18

replace  111:15
report  93:14,18
  94:2,5,7,8,14,21
  95:18 101:5,21,24
  102:5 108:11,17
  108:21,23,25
  111:12 194:25
  195:2,3,5,7,13
  223:25 224:17,23
  265:8 268:3
reported  1:22
  165:19
reporter  2:24
  10:24 16:1,8
  19:13 36:3,9
  71:21,23 92:22
  101:13 104:14
  109:13 116:24
  120:23 121:1
  130:21,24 131:2
  144:17 148:25
  149:13 153:9
  170:21 181:4
  182:21,25 183:3,4
  192:2 202:13,16
  202:19 203:11
  213:10 217:10,14
  223:22 230:14,19
  230:25 233:1
  256:22 260:6
  264:12 274:2
reports  70:13,17
  70:18,21 112:6
  183:18,21,22,25
  250:12 268:7
represent  24:3
  25:1 29:20 33:8
  145:23
representation
  26:19

representative
  158:23
represented  31:12
representing  11:9
  23:18 24:18,20,22
  26:4 27:7,10
  28:10,19 29:3,19
  30:18 31:21 32:12
  146:24,25 147:6,7
represents  72:16
request  5:9 40:20
  43:10,11 52:11
  65:7 263:25
requested  25:6,10
  274:15
requests  65:11
  255:19
requires  255:8
research  60:22,23
  82:15 125:10
resolutions  258:20
resource  60:2,9,12
  60:15,24 61:4
  77:13 78:2,19,25
  82:17,19,21 84:13
resources  73:11
  73:15
respects  75:21
respond  255:20
response  37:13
  110:25
responses  5:8
  264:4
responsible  79:15
  90:3 91:8 185:22
  218:15 228:5
responsive  38:20
  38:24 39:18,21
  40:4,8 178:3
rest  209:21

restate  70:25
  125:12
restated  8:17
  39:10 215:5
  233:13
result  113:21
  118:25
results  105:21
  195:20
retain  264:24
retained  111:9
  264:15,17 272:5
retainer  36:24
retention  108:10
return  7:20,22
  135:25 192:5,12
  192:19 193:11
  202:24 203:20
  205:13
returns  38:12
  69:12,15 83:23
  84:11 86:16 87:15
  87:17 95:6 101:2
  193:6,7 197:15
revenue  79:1,11
  100:11 200:14
revenues  100:9
  192:22 200:18,19
reverse  130:14
review  18:2,9
  112:19 248:17
  268:10,14,15,16
  269:18 270:13
  274:14
reviewed  154:19
  268:6,7
reviews  71:22
  131:3 144:20
  149:6,14 181:17
  205:10 218:5,8
  231:1 233:2

Page 32

[reviews - schnider]

257:15 268:19
**revised** 24:9 135:8
**richard** 20:11,25
21:23,24 23:17,18
24:3,18 26:4,20
27:7,11 28:4,4,9
28:10 29:10,18
31:1,18 33:7
35:10,12,15 36:25
228:16,22 239:1,9
243:8
**rico** 23:12 24:14
**right** 13:7 16:2,11
23:9 25:4,21
26:11 30:14 34:6
34:7 36:16 48:22
50:18,25 51:13
52:14 54:5,15
69:13 72:19 78:13
80:23,25 85:12
86:14 87:4,7
88:15,18,19 91:3,9
91:20 93:14,23,24
98:5,14 100:1
105:4,9 106:6
110:5 114:24
117:8,10 119:16
123:5 125:16,17
125:19,22 129:21
132:13 136:7,16
138:7,9,23 139:1
140:22,25 141:4
142:22 143:3,5,9
143:14 146:11
148:13 151:18
152:4,16 153:21
154:21 155:3,8,14
158:9,16 169:16
169:22 170:1,3,10
171:18 172:4,11
174:4 175:13,19

176:23 178:6,12
178:18 179:23
180:4 183:12
184:2,4 185:15
186:21 187:12,13
187:13,16,21
188:10 190:24
195:10 196:4,19
196:19 197:19
198:3,14 199:19
200:7,12,15,16,20
203:16 206:3,7,21
208:9,11,15 209:8
213:19 214:1,4,14
214:18,21,22
215:5 216:2,12
218:3,22 219:6,11
220:24 222:11,23
226:3,17,24 229:9
233:18 234:1,5,9
234:13 235:20,24
236:2 237:20
238:5 239:25
240:3,19,21,23,25
241:2,5,18,21,24
242:20,22 243:4
244:25 246:9,13
246:20 250:12
251:3 252:20
258:1 261:4,11,17
262:1 263:8,11,15
265:4,11 271:17
271:18
**riverside** 1:3 2:3
10:18
**robert** 101:21
264:15
**roger** 6:10,14
20:18,19 22:4
25:12 26:3,5,19
27:6,8,10 65:15

83:9,9 121:21
124:2 125:21
126:1 153:21
166:16 168:10,25
169:2,25 170:5,15
171:10,18,20,22
239:3
**role** 30:4 73:8
77:16,16 82:3
94:17 113:15
128:23,23
**roles** 177:1 184:8
184:10,18
**rolled** 12:3,15
**romantic** 31:6
**rounding** 197:24
**rule** 15:24 162:16
163:10,10
**rules** 163:11
269:22
**run** 108:16,18
122:7 123:20
185:9 186:24
187:1
**running** 118:7
136:24 137:2
146:1 155:3,7
184:25 185:2
261:25

| s |
| --- |

**safe** 37:4 65:5
148:5
**sale** 172:20 173:6
**sales** 73:15 77:13
80:25 81:1 241:15
**salvage** 180:13,18
187:7,10,11
**sanctions** 167:18
172:8 270:7
**santa** 3:17

**save** 160:25 161:4
161:10,14,15
**saved** 161:9
**saw** 30:6 59:14
61:24 156:22
212:7
**saying** 12:10 21:19
52:25 56:8,24
75:4 89:4 95:19
100:22 123:3
131:16 139:22
140:6 145:24
158:2 170:8,16,19
175:24 176:12,18
179:7 190:5
198:15 199:5
207:2 208:22,24
220:16,23 221:15
228:19
**says** 30:1,3 40:19
40:20,21 53:5
72:13 73:1 76:20
79:7 93:22 97:3
105:15 119:1,6
129:2 150:11
200:8,11 216:1
222:11,23 224:23
230:21 232:4
234:7 240:19
**scenario** 191:1
**scenarios** 191:4
**scheduled** 94:25
**scheme** 91:2 95:7
116:8 154:8
210:24,25 211:1
**schnider** 6:6 9:5
20:23 62:18 63:10
63:11 64:5 104:17
149:21 231:4
238:19 256:3,23
259:14,17,18,23

```
 1              A      Thomas Wylde data transferred to?

 2              Q      The PDTW QuickBooks data be transferred

 3    to Thomas Wylde QuickBooks data.

 4              A      No.  It's still a different company.

 5              Q      So the company started new?

 6              A      Yes.

 7              Q      Okay.  Started with a clean slate?

 8              A      Yes.

 9              Q      Didn't owe any money?

10              A      Yes.

11              Q      And all the losses were left with PDTW;

12    right?

13              A      Whatever the transaction is left in

14    there.

15              Q      So if PDTW owned, you know, loans and

16    those weren't transferred to Thomas Wylde, Thomas Wylde

17    had no obligation to pay them; right?

18              MR. PEDDIE:  Objection, calls for a

19    hypothetical.  Calls for a legal opinion.

20              THE WITNESS:  It's not Thomas Wylde loans, yes.

21    BY MR. BILLER:

22              Q      Do you know how the Great Depression was

23    caused?  Do you know how the Great depression was

24    caused?

25              A      No.

                                                     Page 134
```

[sic - start]

| | | | |
|---|---|---|---|
| 224:24 225:7,8 | **simple** 68:9 | **slouched** 12:4 | **space** 247:20 |
| 236:15,21 270:5 | **simultaneous** | **slow** 73:12,12 | **speak** 15:12 |
| **side** 77:18 92:7 | 14:11 86:10 87:24 | **smile** 95:2 | **speaking** 26:11 |
| **sign** 49:22 50:3 | 88:10 112:12 | **smirk** 95:3,21,21 | 213:21 |
| 132:3,5 156:3 | 123:7 132:7 133:8 | **sneaky** 256:24 | **special** 12:14 |
| 159:24 160:1 | 134:9,20 139:10 | **sniderman** 101:22 | **specializing** 73:24 |
| 212:11 214:6,7,17 | 139:25 170:17 | 264:15 | **specific** 71:2 |
| 214:19,21 215:10 | 176:4 178:25 | **social** 44:7 | 107:20 121:13 |
| 218:14 257:18 | 179:8 181:22 | **sold** 95:13 199:23 | 157:18 |
| 261:5,9 262:4,9 | 188:16 194:21 | 210:4 | **specifically** 27:9 |
| 270:13 | 198:23 210:20 | **sole** 240:10,17,19 | **specified** 119:13 |
| **signature** 153:16 | 221:13 268:11 | **solutions** 10:20,23 | **specify** 22:25 |
| 156:13 215:13,15 | **single** 70:15 149:2 | 10:25 272:6 | **speculate** 16:12 |
| 215:17 260:21 | 228:5 250:24 | **solve** 98:11 | **speculation** 16:15 |
| 274:24 | 251:12 | **somebody** 88:17 | 16:17 27:18,21 |
| **signatures** 153:18 | **sir** 14:6 46:2 57:10 | 108:18 139:7 | 48:14,20,22,24 |
| **signed** 50:17,21 | 75:7 95:3 101:2 | 140:24 164:11 | 49:4 100:19 |
| 88:19,21,24 | 101:20 115:3 | 179:20 196:14 | 155:20 156:5 |
| 118:13,13 121:18 | 118:13 119:18 | 206:22 223:5 | 177:13 190:7 |
| 121:21 124:17 | 131:25 133:4,7 | 242:18 262:9 | 206:17 218:19 |
| 125:4 131:14,17 | 136:3 158:18 | **someplace** 221:4 | 219:1 227:7 |
| 133:5 152:14 | 163:10 177:24 | **soon** 258:17 | 249:23 |
| 156:14 157:23 | 212:14 217:16 | **sorry** 25:12 40:21 | **speculative** 49:8 |
| 212:24,25 213:19 | 219:11,25 221:18 | 57:14 58:10 73:13 | 49:14 |
| 214:24 215:2 | 223:25 232:23,23 | 88:22 92:12 97:7 | **spell** 83:4 |
| 234:13,14,16 | 259:7 | 97:21 109:15,21 | **spend** 182:11 |
| 258:14 259:9 | **sister** 84:15 | 110:4 117:5,9 | 267:5 |
| 261:14,25 270:16 | **sit** 50:20 119:20 | 130:2,10 149:1 | **spending** 74:8 |
| 270:17 | 159:10 172:17 | 155:22 164:10,14 | **spent** 89:17 138:6 |
| **significant** 18:15 | 220:4 | 192:10 194:3,3 | 266:15,21 |
| 221:3 | **site** 72:10 | 202:14,20,20 | **spoken** 239:10 |
| **signing** 262:23 | **sitting** 34:11 | 214:9 232:23 | **spreadsheet** 56:16 |
| **signs** 188:10 | **situations** 191:6 | 260:10 | **stamp** 192:6 203:8 |
| 191:16 | **six** 144:7 167:1 | **sort** 58:1 84:20 | **stamps** 192:8,11 |
| **silly** 34:8 | 168:15 169:7,15 | 98:18 151:9 | **stand** 258:3 |
| **similar** 71:7 84:20 | 169:21,25 170:1,8 | 236:10 | **standing** 32:10 |
| 168:12 170:5 | 171:19,22 199:14 | **sounded** 81:9 | **start** 62:5 84:20 |
| 214:22 | **size** 16:16 30:11 | **sounds** 61:20 | 120:5,5,5 121:14 |
| **simmons** 1:9 2:9 | **skills** 77:11,14 | 226:1 | 124:15,19 151:8 |
| 10:15 | **skip** 263:24 | **sources** 47:23 | 171:2 |
| | | 61:19 | |

Veritext Legal Solutions
866 299-5127

[started - success]

**started** 20:7 58:9
72:18 120:11
124:24 182:6
**starting** 52:22
58:5
**state** 11:4,6 112:16
222:7 252:5,8,9,10
273:12 274:2
**stated** 35:8 42:2
94:21 119:9
200:24
**statement** 116:6
193:20 207:20,22
207:25 208:2
225:6
**statements** 42:8
143:5,7 201:3,4
245:22 246:24
250:10,12,23
**states** 1:1 2:1
10:17 11:11 50:12
128:20 220:8
232:2
**status** 86:18
244:10
**stay** 175:23 176:11
**stealing** 105:8
111:10 112:5
**stefan** 267:6,6
**stephen** 6:9,13
20:15,16 40:14,18
41:5 43:7,11,15
44:1 48:9,11
66:19 91:9,14,16
91:23 92:2,4
102:12,22 109:10
109:17 110:5,12
110:19,24 111:6
113:16,21 114:18
114:20 115:7,11
115:16,17 124:16

124:20 125:10,15
125:23 126:2,6,21
127:8,11,23,24
128:4 145:14,17
146:16,22,23,25
147:2,10 148:7,12
148:16,20 151:20
158:23 159:13
166:14,17,24
167:4,23,24 168:4
170:1,5,15 171:13
171:17,20,21,21
175:12,12,22,25
176:10,18 180:20
183:14 185:1,21
185:24 186:16,17
186:19,20 187:19
188:6,11 189:4,6
190:19,22 201:11
206:6,9 207:4
208:11,14,20
209:11 210:10
221:22 222:16
226:19 227:15
229:24 239:1
250:1,3 255:2
258:22 262:18
263:6,7 267:7,8,9
**stephen's** 153:4
185:18,19,21
187:6 206:18,19
**steps** 25:1
**steve** 127:8 190:19
262:18
**steven** 3:23 10:22
165:14
**stick** 103:13
**stipulated** 271:23
271:24
**stipulation** 34:12
172:10 269:5

**stop** 34:8,9 82:20
114:9,13 121:13
130:22 178:6
179:12 186:17
248:25
**stopped** 59:7,13
249:1,2,3
**store** 55:22
**stored** 56:2,6,10
56:16 162:15
244:7 251:5
**straight** 81:6 98:2
103:14 111:22
143:16 173:12
**strategic** 73:19
75:22
**strategies** 137:17
**strategy** 137:2
138:11 241:12
**streams** 79:11
**street** 3:16 247:15
247:16,17
**stress** 152:21
**strike** 107:17,20
113:11 115:24
141:10
**structure** 88:14
89:23 102:17
121:13,17 128:15
132:19,24 135:16
152:1 154:16
156:12 210:8
227:11
**structured** 46:24
47:2
**structures** 74:2
98:12,22,23
**structuring** 98:18
**struggling** 183:23
187:17

**stuff** 44:7 75:22
79:9 119:20
137:15 141:9
154:4 177:1
181:21 207:18
236:11 252:3
263:9 265:24,25
266:2,20
**stupid** 178:3
189:10,15
**sub** 78:1
**subject** 33:4 96:25
234:22 271:19
**subpoe** 26:1
**subpoena** 4:25 5:4
5:11 19:15,17,19
19:20 25:5,10,20
25:24 37:6 76:12
76:13 201:21
251:13
**subpoenaed** 20:20
22:5
**subpoenas** 76:16
**subscribed** 274:20
**subscription** 78:22
79:3 84:24 85:6
**subsidiaries** 82:12
84:7,8
**substance** 94:24
109:19 110:6,21
117:16
**substantially**
114:16 190:13
204:3,14 205:2
**substantiate** 245:8
**subtract** 200:2
**subtraction** 199:3
**succeed** 187:25
188:3
**success** 188:10

```
 1   BY MR. BILLER:
 2         Q     -- but it took the clothing and the name
 3   and the brand of the company and sold those; right?
 4         MR. PEDDIE:  Objection, calls for a legal
 5   opinion.
 6   BY MR. BILLER:
 7         Q     The clothes, it sold the clothes.
 8         A     There was a cut-off season.
 9         Q     But they still sold the clothes that
10   were --
11         A     After the -- when Thomas Wylde was
12   created, it started with its own season.
13         Q     But what did they do with the
14   clothes that Paula PDTW had already manufactured and
15   had on sale before July 22, 2014?  Did they throw it
16   away?
17         A     No.  It was invoiced under PDTW.  That's
18   why we have these advances.  So whatever collection is
19   in there it goes to this account, advances to advances
20   from.  And so when that happened, invoices pertaining
21   to PDTW stayed in PDTW books.
22         Q     So people works on the PDTW books?
23         A     Yes.
24         Q     And so those books should show what
25   property was sold; right?
```

Page 137

[ten - time]

**ten**  84:3 166:20
  248:7 267:3,4
**tens**  252:25
**term**  6:16 41:9,22
  41:22,24 88:24
  107:15 118:14
  119:11 121:4
  124:17 128:19
  131:14,14,17,24
  132:3 133:1,2,6,23
  135:8 136:15,21
  144:12 208:23
**terminated**  103:4
**terms**  22:22 91:15
  92:4,6 127:20,22
  144:23,25 145:9
  145:12 147:4,16
  147:25 148:12
  151:24 157:16,23
  158:15,21 159:12
  174:16 176:14,25
  190:8 205:14
  227:13
**testified**  11:21
  74:10 95:10
  141:14 166:5
  187:23 207:13,18
  208:19 221:20
  250:11
**testify**  19:19
**testifying**  274:7
**testimony**  18:14
  18:16,22,23,25
  19:7 26:8 48:18
  49:1 69:6 74:17
  81:13 95:24 96:4
  98:25 99:3 103:2
  116:11 123:11
  138:9,23 140:22
  140:24 141:23
  161:5 170:20,25

173:17 174:6
  180:25 188:1
  207:24 222:2
  272:3 273:8
  274:11
**thank**  11:15 48:21
  93:2 179:18 183:4
  256:20
**thanks**  72:3
  260:18
**theft**  194:19
**thi**  133:25
**thieves**  111:24
**thing**  66:19 82:5
  93:9 176:25
  211:15
**things**  53:22 78:22
  79:4,13 81:22
  82:1 140:18 141:6
  146:21 188:13,18
  190:11 262:2
  266:7 267:25
**think**  24:11 28:14
  29:3,5,19 45:5,7,8
  45:9 46:2 48:8
  58:23 59:12 61:22
  62:3 67:19 68:15
  68:16,19 70:14
  71:4,25 82:12
  83:11 90:12 92:18
  94:15 95:18,20
  97:21 101:21
  106:12 108:15
  110:1,23 111:19
  113:15 114:2,6,7
  121:16 124:2
  126:4,5 127:11,21
  127:23 128:17,18
  128:24 129:2
  140:19 144:7
  145:10,11,14,16

145:17,19,20
  146:18,21 148:11
  150:1 151:1,20,25
  154:1,1 155:16
  156:1 158:1,12
  168:20 169:7,11
  173:20,25 174:19
  174:20,23 176:14
  180:11 182:18
  184:9,17 189:11
  189:15,18,18
  190:3 191:2,10,18
  193:13 197:14
  206:18 209:14
  217:24 220:25
  221:2 227:11
  238:1,8 239:2,3,4
  239:16,16 245:10
  248:5,8,12,13
  252:9,23 253:22
  254:3,16,22,22
  255:15,21,21
  256:15 257:21
  265:10,24 266:1
**thinking**  190:20
**thinks**  116:7
**third**  48:4 84:24
  104:16 224:2
**tho**  173:14 190:16
**thoma**  254:11
**thomas**  1:13 2:13
  2:20 3:3,22 5:19
  5:23 6:23 7:9,12
  7:18 8:18,24 9:11
  9:16 10:15 11:10
  42:14 43:2,16
  44:9 69:21 72:2
  87:7,9 101:15,17
  117:5,9,11 126:24
  135:24 147:19,20
  147:22 158:15,23

159:13 160:23
  164:2,8 165:13
  168:1,2,5 174:3,8
  208:15,16,20
  209:3 216:22
  218:12 221:2
  222:22 224:24
  231:9,13,20,20
  233:25 242:7
  243:2 250:4,6
  253:4 254:12
  261:10,16 263:9
**thou**  66:10
**thought**  23:15
  75:18 113:9,12
  114:3,15 130:13
  155:22 174:25
  184:21 185:1
  191:20 223:7
  246:8
**thoughts**  173:23
  173:24,24 252:15
**thousand**  38:7,8
  61:6
**thousands**  252:25
**three**  25:20 59:12
  79:25 87:10 92:14
  100:11 111:22,25
  117:23 129:13,14
  142:19 159:8
  164:3 171:25,25
  192:23 234:20
  242:2 251:25,25
  252:13
**throw**  160:10,14
  160:16 186:24
  217:23
**till**  15:21
**time**  11:4,5 12:23
  15:12 16:4 21:14
  23:2,5 43:21

**[time – tw's]**

| | | | |
|---|---|---|---|
| 52:18,21 54:3 | told 26:2 28:17,17 | trial 19:20 270:22 | 29:3 31:21 32:12 |
| 58:20 62:5 63:22 | 84:9 92:3 125:24 | tricky 256:24 | 33:8,10 35:6,9 |
| 63:25 64:12 74:8 | 137:21 164:11,15 | tried 77:16 122:9 | 39:5 41:1 43:9 |
| 77:3,24 78:3,5 | 174:23 190:10 | 123:22 255:15 | 50:4,10,13,23 52:9 |
| 79:6,19,21,22 80:4 | 207:12,12 210:14 | true 103:9 119:18 | 52:17 54:11 59:14 |
| 81:5 82:6,9 89:17 | 210:21,21 220:21 | 119:21 261:4 | 59:15,17,22 61:2,5 |
| 102:18 110:22 | 222:20 265:10,12 | 262:22 273:9 | 66:15,23 68:3,3,9 |
| 115:8 121:25 | tomorrow 229:2 | 274:11 | 68:10,20 69:2,9,12 |
| 124:21 127:3 | top 184:2 190:12 | trust 189:19 190:1 | 70:6 77:2,5,10,14 |
| 128:5,11,25 129:1 | 224:23 | trusted 190:4 | 77:15 79:22 80:7 |
| 144:4,6 145:20 | torn 191:11 | trustee 1:10 2:10 | 86:18 88:6 89:7 |
| 152:3,8,10 163:21 | total 169:19 | 10:15 | 93:24,24 95:7,11 |
| 164:2 170:22 | 199:25 204:8 | trusting 189:24,25 | 99:12,16 102:10 |
| 172:9 174:19 | 224:13,14 272:4 | 206:19,21 | 103:4 106:15 |
| 180:5,10 182:12 | totally 132:9 | trustworthy 207:5 | 108:13 111:11,23 |
| 183:16 190:9 | tower 55:21 | truth 13:8 207:13 | 117:21 118:4,7,8 |
| 191:17,19 196:23 | trace 138:21 | 268:5 | 118:11,20,23,24 |
| 209:8,18 210:3 | 139:12,18 140:10 | truthful 14:17 | 119:2,7 120:3 |
| 213:25 219:18 | track 38:16 138:5 | 148:16 207:22 | 121:14 123:3 |
| 230:5 235:15,15 | 138:5 | 268:6 | 125:22 126:9 |
| 236:2 238:6 239:9 | trading 216:5,6 | try 34:2 43:21 | 138:17,22 140:11 |
| 243:3 246:21 | transactional | 65:5 77:17 81:5 | 140:12 150:20 |
| 247:1,9,11,22 | 254:4 | 113:25 115:20 | 160:2,18 161:16 |
| 248:5,12 250:5 | transactions 51:22 | 147:17 180:13,15 | 162:11 173:12 |
| 252:13 257:14 | 74:2 115:16 | 184:7 187:7,9 | 183:15 187:16 |
| 261:14 265:21 | 224:25 | 206:24 251:17 | 192:22 193:5 |
| 267:1 269:6,18 | transcribe 16:3 | 255:16 | 197:11,18 200:24 |
| 270:7 272:8 274:5 | transcribed 274:9 | trying 22:9 74:22 | 205:3,13,16,22 |
| times 25:23 | transcript 17:23 | 81:15 83:10 114:5 | 208:8 214:12 |
| 137:22 144:2 | 18:7,13 270:10,11 | 136:19 137:17 | 216:1,3,10,11 |
| 251:24,24,25 | 270:13,14,15 | 147:8 148:1 | 218:15 219:23 |
| 266:19 267:5 | 273:6 274:13,15 | 193:25 255:21 | 220:5 223:18 |
| today 18:22 20:10 | transfer 88:6 | tt 118:4 | 224:3,19,20 225:2 |
| 21:22 26:2,9 | 257:21 | turn 104:16 184:7 | 225:8 226:2,5,13 |
| 50:20 74:15,23 | transferred | 188:12 189:20 | 227:2,12,12,16 |
| 75:9 159:10,10 | 106:17 107:2 | 207:1,2 224:2 | 228:7,9 229:10,22 |
| 220:4 248:19 | 244:6 257:24 | turned 192:6 | 229:22 235:20 |
| 269:12 270:11 | travel 38:1,17 | tv 61:19 | 254:12 256:6 |
| today's 272:3 | tremendous | tw 7:5 21:5,5,10 | 257:25 267:1 |
| togami 3:23 10:22 | 113:16 114:11 | 21:11,24 24:15,19 | tw's 29:11 30:20 |
| 165:14 | | 25:2 28:22,25 | 135:7 203:25 |

Veritext Legal Solutions
866 299-5127

[tw's - volume]

205:20 247:1
twice 204:5
two 22:18,20
  25:19 66:10 74:9
  76:16 79:25 90:13
  90:18 108:15
  111:12,24 114:2
  120:15 123:13
  129:2,7,8,15
  143:18 150:7,10
  155:10,11 164:8,9
  171:25,25 182:4
  186:25 199:14
  200:3 204:18,18
  204:18,19 205:11
  221:23 229:22
  234:19 235:22
  238:12,12,13
  267:19 268:2
  270:10,12
type 32:8 56:13
  59:24 60:14 84:22
  108:24 200:23
  207:8
typically 12:2,5
  155:13

**u**

u.s. 24:14 31:19
  192:12
ucla 46:1 74:5
  139:7
uh 29:9 43:20
  52:15,15 60:5,13
  61:1 87:12 102:21
  125:3,18 131:8,21
  149:23 150:24
  158:19 170:2
  184:16 194:7
  195:23 196:7,16
  196:24 197:1,3,16
  203:17 204:13,21

208:16 219:13
  224:18 235:21
ultimately 146:10
  157:17 175:15
um 38:1 145:2
  172:5
unavailable
  270:21
uncomfortable
  113:21
underneath 82:11
  82:13 84:1
unders 134:4
undersigned 274:1
understand 13:9
  13:13,16,18,21,23
  15:1,6,10,14,18,22
  16:5,9,13,20 17:2
  17:6,8,13,20 18:11
  18:19 19:1,8 24:2
  24:16 28:3 34:3
  40:12 45:4,11,12
  49:25 55:3,14
  56:8,18,23 57:20
  60:6,18 63:3 68:5
  74:21 76:8,9
  100:2 118:21
  127:6 139:6
  162:19 163:18
  198:15 219:20
  245:17 266:14
understanding
  46:18 75:10 90:13
  145:16 197:6
  199:6,7 210:5
  221:25 222:4,5
  223:4 226:10
  231:22
understatement
  96:16

unilaterally 62:19
  62:23
unintelligible 17:9
unit 10:11
united 1:1 2:1
  10:17 11:11
units 106:18
  261:11
unrelated 44:9
unreportable
  88:10 132:7 134:9
  176:4 178:25
  179:8 198:23
  221:13
unshaven 12:3,14
untrue 207:21
update 238:22
updated 112:18
upper 225:4
upset 134:6
use 8:13 38:17
  55:19 77:11,14
  89:25 107:15
  161:21 215:8,9,15
  215:25 216:2
  226:23 237:2,10
  240:24 264:25
  265:1
usual 236:10
usually 160:14
  235:12 237:15
  250:20,22 264:24

**v**

v 234:11
vague 17:9 23:23
  27:25 31:3 32:4
  32:14 44:19 45:1
  49:15,24 54:25
  55:6,13 57:8
  78:10 81:14 122:2
  145:21 152:5

237:8 255:6
vaguely 67:22
valuable 150:20
valuation 5:17
  93:13,14,18,19
  209:21,23
value 5:20 209:25
valued 210:1
various 81:20
  84:25 137:11,25
  140:17 223:9
  242:1 246:1
  267:16
vendors 69:20
  245:11 246:1
verify 95:25
veritext 10:19,23
  10:25 272:5
verizon.net 3:10
versus 10:15
vested 235:13
video 10:9,12
videographer 3:23
  10:4,23 11:15
  62:6 71:11,14
  96:10,13 120:16
  120:19 164:1,16
  165:14 166:8
  213:5,11 232:16
  232:19 268:24
  269:2 272:2
videotape 103:16
videotaped 1:18
  2:19
violations 23:13
vision 73:8
visited 47:7 247:1
  247:8,11
volume 1:21 2:20
  4:5 273:17

1    contribution was?  Do you remember talking about this?

2            A        Yes.

3            Q        And what figure is shown on

4    Third Amended Exhibit B, which is Exhibit 72 to this

5    deposition?

6            A        He referred to the last line, which is

7    $9,000,013.

8            Q        Okay.  So on tax return, we see

9    $7,500,013.  We just went through that.  On Amended

10   Exhibit B we see $9,000,013.  And another source that

11   we looked at earlier, what was this transmittal form?

12           A        That's 68.

13           Q        I'm referring to what is shown as

14   Exhibit A to Exhibit 68 to this deposition.  Would you

15   please read the title of Exhibit A for us.

16           MR. BILLER:  I just want to interpose an

17   objection.  This is the same exact page of the document

18   I introduced that Counsel put in front of the witness

19   on my direct examination and pointed to to distract

20   her.  It's been tainted.

21           MR. PEDDIE:  And I'm trying to clear that up,

22   Mr. Biller.

23   BY MR. PEDDIE:

24           Q        Would you please read the first caption

25   to Exhibit 68 to this deposition?

                                                Page 141

[workout - zero]

| | | | z |
|---|---|---|---|
| **workout** 58:1 | 84:8 86:14,14,17 | 222:24 223:6,6 | **zero** 210:12 |
| **world** 229:22 | 87:19 92:4,17 | 224:1 227:24 | |
| 242:17 | 93:1,15 98:21 | 230:10 231:18 | |
| **worried** 110:9,13 | 100:25 101:9,15 | 234:14,17,18 | |
| 110:14 111:1,7 | 105:2,16 106:7,14 | 236:8,8 237:16 | |
| 112:25 113:2,6,8 | 107:8,8,11,21 | 238:1,13,18 239:4 | |
| **worse** 268:8 | 110:1,4 112:25 | 244:2 245:14,17 | |
| **worst** 111:13 | 113:4,6 114:11 | 246:9 247:10,25 | |
| 267:13 | 117:13 120:13 | 248:23 250:4,17 | |
| **worth** 141:24,24 | 121:20 122:19 | 252:11 253:19,21 | |
| **wow** 75:19 164:2 | 124:13 126:19 | 254:22 256:12 | |
| **wrinkled** 12:4 | 128:2,14,16,16 | 257:16 259:3,10 | |
| **write** 110:12 | 129:9 130:5,12 | 261:3 263:12 | |
| **writing** 130:22 | 131:12,19 135:21 | 265:20,24,24 | |
| **written** 8:21 9:15 | 136:6,17 137:8 | 266:3 267:5 | |
| 218:14 264:4 | 138:5,14,14 | 271:21 | |
| **wrong** 109:25 | 142:16 143:10,10 | **year** 14:24 93:24 | |
| 182:21 194:24 | 146:12,12,18,18 | 97:17,19 100:8,9 | |
| 252:20 | 148:10,11,14,18 | 100:11,13 157:11 | |
| **wrongdoing** | 148:19 149:3,9 | 180:3 192:5 193:1 | |
| 105:22 | 150:7,11 151:1,1 | 199:18 203:23 | |
| **wrote** 147:10 | 151:19 153:12 | 205:23 206:1,5 | |
| 151:5 | 154:11 158:5,10 | 247:3 248:21 | |
| **wylde** 5:23 7:12 | 159:8 161:8 163:7 | **years** 58:6,7,8 | |
| 7:18 8:18,24 9:12 | 164:7 169:17,18 | 59:9,10,11,12 | |
| 9:16 43:16 44:10 | 169:20,23 170:2 | 73:20 76:3 80:23 | |
| 69:21 135:24 | 174:14,16,16,17 | 87:4 129:2,7,8,15 | |
| 160:23 168:1,2,5 | 175:20 176:20 | 136:24 162:5 | |
| 224:24 231:10,14 | 177:3,14 180:2,5 | 166:20 167:22,24 | |
| 231:20 234:1 | 180:17 182:19 | 177:20 186:25 | |
| 243:2 250:4,6 | 185:16,20 186:20 | 190:23 238:18,18 | |
| 263:10 | 188:21 191:15 | 246:19 254:13,13 | |
| | 192:13,15,17 | **yesterday** 25:24 | |
| **y** | 194:5,20 195:9,21 | 269:14 | |
| **yeah** 13:6 18:3 | 196:3,6 197:20 | **yoga** 58:1 | |
| 22:7 29:7 35:21 | 199:17 200:2 | **york** 266:20 | |
| 38:2 40:3 41:13 | 203:3 204:4,19 | **young** 73:23 74:12 | |
| 44:12 48:23 52:8 | 205:24 208:11,12 | **yun** 70:8 178:7 | |
| 57:17 59:19 60:17 | 208:12 209:9 | | |
| 61:12 67:20 70:12 | 211:9,14 214:19 | | |
| 70:13,20,21 71:10 | 214:19 216:8 | | |
| 73:3 76:18 83:14 | | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT

# "25"

**Doug Lee**

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Tuesday, January 06, 2015 7:36 PM |
| **To:** | David Schnider |
| **Cc:** | John Hanna; Meldy Rafols; Doug Lee; Roger Kuo |
| **Subject:** | Re: Thomas Wylde agreement |

here is Hillshore address..

The legal address is:

Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá.

 I do not see anything else blank..do you have any specific questions? would it be better if I call you?

Thanks

On Tue, Jan 6, 2015 at 2:05 PM, David Schnider <david@thomaswylde.com> wrote:
Stephen:

I'm following up on the email below regarding the draft agreement for you to purchase your membership interest in Thomas Wylde, LLC. We need to fill in a few blanks and I need to know if there are any changes we need to discuss so we can get this finalized and formally transfer your membership interest. Please get back to me about it at your earliest convenience.

Thanks,
David


> On Dec 10, 2014, at 8:34 PM, David Schnider <david@thomaswylde.com> wrote:
>
> Stephen:
>
> Attached is a draft agreement for you to purchase your membership interest in Thomas Wylde, LLC. We have just submitted documents to Paula's counsel, so this agreement may be subject to revisions, but I wanted to get it to you for your review and input as soon as possible. Please have a look and let me know if there are any issues we need to discuss and what information we should use to fill in the highlighted portions.
>
> Thanks,
> David
>
>
> David Schnider
> General Counsel
> david@thomaswylde.com

1

LEE004476

**THOMAS WYLDE**
www.thomaswylde.com

&lt;Choi Membership Purchase Agreement.docx&gt;

LEE004477

## Doug Lee

| | |
|---|---|
| **From:** | Stephen Choi <stephen@choisite.com> |
| **Sent:** | Wednesday, January 07, 2015 5:07 PM |
| **To:** | David Schnider |
| **Cc:** | John Hanna; Meldy Rafols; Doug Lee; Roger Kuo |
| **Subject:** | Re: Thomas Wylde agreement |

Well heck lets put this in the name of Eniluz Gonzalez..not sure what title you need president? GM?..Anything works for me

thanks

On Tue, Jan 6, 2015 at 10:28 PM, David Schnider <david@thomaswylde.com> wrote:
Just need the name and title of the person who will sign for the company. I'll then send you a final version for signature.

Sent from my iPad

On Jan 6, 2015, at 7:36 PM, Stephen Choi <stephen@choisite.com> wrote:

here is Hillshore address..

The legal address is:

Calle 53 Este, Urbanización Marbella, Torre MMG, 2, Ciudad de Panamá, Panamá.

I do not see anything else blank..do you have any specific questions? would it be better if I call you?

Thanks

On Tue, Jan 6, 2015 at 2:05 PM, David Schnider <david@thomaswylde.com> wrote:
Stephen:

I'm following up on the email below regarding the draft agreement for you to purchase your membership interest in Thomas Wylde, LLC. We need to fill in a few blanks and I need to know if there are any changes we need to discuss so we can get this finalized and formally transfer your membership interest. Please get back to me about it at your earliest convenience.

Thanks,
David

On Dec 10, 2014, at 8:34 PM, David Schnider <david@thomaswylde.com> wrote:

Stephen:

1

LEE004478

Attached is a draft agreement for you to purchase your membership interest in Thomas Wylde, LLC. We have just submitted documents to Paula's counsel, so this agreement may be subject to revisions, but I wanted to get it to you for your review and input as soon as possible. Please have a look and let me know if there are any issues we need to discuss and what information we should use to fill in the highlighted portions.

Thanks,
David


David Schnider
General Counsel
david@thomaswylde.com

THOMAS WYLDE
www.thomaswylde.com


<Choi Membership Purchase Agreement.docx>

LEE004479