429422 12-04-14

**I** Analysis of member's capital account: Check the box  ● (1) [X] Tax Basis  (2) [ ] GAAP (3)  [ ] Section 704(b) Book  (4) [ ] Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7, Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year combine column (a) through column (d) |
|---|---|---|---|---|
| ● -1,258,633. ● | ● | ● | -447. ●( | 8,644.) ● | ● -1,267,724. ● |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law  Combine col (b) and col (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|
| | **Income (Loss)** | | | | |
| 1 | Ordinary income (loss) from trade or business activities | 37,987. | 23,285. | ● 61,272. | ▶ 61,272. |
| 2 | Net income (loss) from rental real estate activities | | | ● | ▶ |
| 3 | Net income (loss) from other rental activities | | | ◉ | ◉ |
| 4 | Guaranteed payments to members | | | ● | ▶ |
| 5 | Interest income | | | ● | ▶ |
| 6 | Dividends | | | ● | ▶ |
| 7 | Royalties | | | ● | ▶ |
| 8 | Net short-term capital gain (loss) | | | ● | ▶ |
| 9 | Net long-term capital gain (loss) | | | ● | ▶ |
| 10 a | Total gain under IRC Section 1231 (other than due to casualty or theft) | | | ● | ▶ |
| b | Total loss under IRC Section 1231 (other than due to casualty or theft) | | | ● | ▶ |
| 11 a | Other portfolio income (loss) Attach schedule | | | ● | ▶ |
| b | Total other income. | | | ● | ▶ |
| c | Total other loss. | | | ● | ▶ |
| | **Deductions** | | | | |
| 12 | Expense deduction for recovery prop. (IRC Section 179) | | | | |
| 13 a | Charitable contributions | | | | |
| b | Investment interest expense | | | | |
| c 1 | Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| 2 | Type of expenditures | | | | |
| d | Deductions related to portfolio income | | | | |
| e | Other deductions  **STMT** | 10,991. | | 10,991. | 10,991. |

# Paula Deal Docs

| | |
|---|---|
| **From:** | David Schnider <david@thomaswylde.com> |
| **To:** | "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com> |
| **Cc:** | John Hanna <johnhanna@thomaswylde.com>, Paula Thomas <paula@thomaswylde.com> |
| **Date:** | Tue, 09 Dec 2014 14:27:39 -0800 |
| **Attachments:** | Thomas Wylde Operating Agreement Final.pdf (347.13 kB); Thomas Clawback Agreement.docx (183.92 kB); Thomas Membership Purchase Agreement.docx (183.28 kB); Written Consent to Assignment of Liabilities.docx (112.81 kB); Written Consent - Dissolution.docx (223.13 kB) |

Andrew:

Attached for your review are the Operating Agreement for Thomas Wylde, LLC and the deal docs for Paula's investment in the company. It may be helpful to discuss further by phone, but so you understand I'll break down the basic structure. Paula is dissolving Thomas Wylde Holdings, LLC, the sole asset of which is the Thomas Wylde IP. Paula is assuming three specific liabilities from PDTW, LLC, consisting of the CBC loan and two loans to Steve Prestemon. Based on advice from our outside CPA, those assets and debts should cancel out so that Paula has no tax consequence. Paula will then assign the Thomas Wylde IP, the CBC loan, and the Prestemon loans to Thomas Wylde, LLC and will also provide $3200 cash for her 32% interest in the company. Thomas Wylde, LLC will then immediately pay off the CBC loan and Prestemon loans. In practice, that pay off may actually happen before we get the transfer documents all signed. Thomas Wylde, LLC anticipates that it will then issue a membership interest to Hillshore Investments in exchange for a $5.5M cash investment. If Hillshore earns out it's full investment in distributions within three years, then each of the four current LLC members will give a unit of their membership interest back to Paula, representing a 2% total stake in the company.

Let me know if you need anything further from me. Otherwise, please review the documents and provide me with your comments.

Regards,
David


David Schnider
General Counsel
david@thomaswylde.com

T H O M A S   W Y L D E
www.thomaswylde.com

P_THOMAS000112

## OPERATING AGREEMENT OF THOMAS WYLDE, LLC

This Operating Agreement (the "Agreement") of THOMAS WYLDE, LLC, a limited liability company formed under the California Revised Uniform Limited Liability Company Act (the "Company"), is entered into as of July 22, 2014 by John Hanna, Jene Park, Doug Lee, and Roger Kuo (each a "Member," and collectively the "Members").

The Articles of Organization of the Company were filed with the California Secretary of State on July 22, 2014 and have been adopted and approved by the Members.

The Members enter into this Agreement to memorialize the terms and conditions of governance of the Company, the conduct of its business, and their relative rights and obligations.

Now therefore, the parties agree as follows:

### ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article, Exhibit C, or elsewhere in this Agreement, and when not so defined shall have the meanings set forth in Corporations Code § 17701.02.

1.1.    "**Act**" means the California Revised Uniform Limited Liability Company Act (Corporations Code §§ 17701.01-17713.13), including amendments from time to time.

1.2.    "**Affiliate**" of a Member or Manager means (i) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or Manager or (ii) a family member of the Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.3.    "**Available Cash**" means all net revenues from the Company's operations, including net proceeds from all sales, re-financings, and other dispositions of Company property that the Members, by Vote of a Supermajority of Members, deem in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.4.    "**Capital Account**" shall mean the account maintained for a Member or Assignee pursuant to Section 2.1 of Exhibit C. Each Member's initial Capital Account balance as of the date of this Agreement is set forth in Exhibit A.

1.5.    "**Capital Contribution**" means a Member's capital contribution to the Company in exchange for Units.

P_THOMAS000113

1.6.    **"Cause"** shall mean, with respect to the Manager, any Officer of the Company, and any Executive Officer serving on the Company's Executive Committee, fraud, willful misconduct, gross negligence, breach of fiduciary duty or other gross misconduct with respect to a material matter relating to the affairs of the Company.

1.7.    **"Confidential Information"** means all trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, and other business information of or relating to the Company.

1.8.    **"Corporations Code"** means the California Corporations Code.

1.9.    **"Electronic transmission by the Company"** and "electronic transmission to the Company" have the meanings set forth in Corporations Code § 17701.02(i)(1)-(2).

1.10.    **"Encumber"** means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.    **"Encumbrance"** means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.    **"Executive Committee"** means the Company's Executive Committee, as described in Article V.

1.13.    **"Executive Officer"** means an Officer of the Company that serves on the Company's Executive Committee.

1.14.    **"Involuntary Transfer"** means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15.    **"IRC"** or **"Code"** means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.16    **"Member"** means any of the four initial Members listed herein - John Hanna, Jene Park, Doug Lee, and Roger Kuo - or a Person who subsequently acquires a Membership Interest in the Company, as permitted under this Agreement, and who has not ceased to be a Member under Article VIII or for any other reason.

1.17.    **"Membership Interest"** means a Member's entire interest and rights in the Company, collectively, including the Member's economic rights, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

2

P_THOMAS000114

1.18.  **"Net Profits"** and **"Net Loss"** shall have the meaning set forth in Section 1.7 of Exhibit C attached hereto.

1.19.  **"Notice"** means a notice in writing required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company; or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe shall promptly communicate the notice to the recipient.

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that the notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger, or overnight delivery service.

Any party may change its address, electronic mail address, or fax number by giving the Manager Notice of the change.

1.20.  **"Person"** means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.21.  **"Proxy"** means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.22.  **"Regulations," "Reg,"** or **"Treasury Reg"** means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the IRC, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.23.  **"Reserves"** means the aggregate of reserve accounts that the Members, by Vote of a Supermajority of Members, deem reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.24.  **"Successor in Interest"** means a Transferee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.25.  **"Supermajority of Members"** means a Member or Members whose aggregate Unit Percentage represents at least sixty-five percent (65%) of the Unit Percentages of all non-Defaulting Members.

P_THOMAS000115

1.26.   "**Transfer**" means any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.27.   "**Unit(s)**" means the unit(s) of Membership Interest in the Company.

1.28.   "**Unit Percentage**" means, with respect to a Member, the percentage obtained by dividing the total number of Units held by such Member by the total number of Units outstanding.

1.29.   "**Vote**" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.30.   "**Voting Interest**" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Unit Percentage.

1.31.   "**Writing**" includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" shall include electronic transmissions by and to the Company as defined in Corporations Code §17701.02(i).

1.32.   "**Written**" or "**in writing**" includes facsimile and other electronic communication authorized by the Corporations Code.

## ARTICLE II: ORGANIZATION

2.1.   **Articles of Organization**.   The Articles of Organization were filed with the California Secretary of State on July 22, 2014, File Number 201420310399.

2.2.   **Company Name**.   The name of the Company is Thomas Wylde, LLC.   The business of the Company may be conducted under that name, or, in compliance with applicable laws, under any other name that the Manager deems appropriate.

2.3.   **Company Offices**.   The principal executive office and mailing address of the Company shall be at 3231 S. La Cienega Blvd., Los Angeles, California 90016, or any other place or places determined by the Manager from time to time.

2.4.   **Company Agent**.   The initial agent for service of process on the Company shall be David Schnider, Esq. whose street address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.   The Manager may from time to time change the Company's agent for service of process. If the agent ceases to act as such for any reason, the Manager shall promptly designate a replacement agent and notify the Secretary of State of the change.

4

P_THOMAS000116

2.5.    **Business**.  The purpose of the Company is to (a) engage in any lawful act or activity for which limited liability companies may be organized under the Act and (b) do all things necessary, suitable or proper for the accomplishment of, or in the furtherance of the Company's participation in the luxury fashion industry.

2.6.    **Taxation**.  The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and state income tax purposes, to the maximum extent possible.

2.7.    **Term**.  The term of existence of the Company shall commence on the date that the Articles of Organization were filed with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

2.8.    **Members**.    The names and addresses (including fax numbers and email addresses) of the Members are as set forth in Exhibit B.

2.9.    **Managed by One Manager**.  The Company shall be managed by one Manager, who shall initially be John Hanna, whose address is 3231 S. La Cienega Blvd., Los Angeles, California 90016.

2.10.    **Consent of Spouse or Domestic Partner**.  Each and every Member who is a natural person, and who is married or has entered into a domestic partnership under the laws of any jurisdiction, shall cause his or her spouse or domestic partner to execute and deliver a copy of the Consent of Spouse or Domestic Partner attached hereto as Exhibit A.

### ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.    **Capital Contributions of the Members**.  The capital structure of the Company shall consist of Units all of the same class with equal rights, except as otherwise provided in this Agreement.  Units may only exist in positive, whole integer quantities and not in fractional amounts.

3.2    **Members' Initial Capital Contribution**.  On the Effective Date, each Member shall contribute capital to the Company for the Units as set forth in Exhibit B, attached hereto, which shall thereafter constitute the Capital Contribution for each Member.  The 46 Units issued to the Members constitute 100% of all Membership Interest in the Company.  Other than the initial Capital Contributions set forth in Exhibit B, no Member shall be required to make any additional Capital Contributions without such Member's approval.

3.3.    **Failure to Make Initial Capital Contributions**.  If a Member fails to make the required Capital Contribution set forth in in Exhibit B, then the Manager shall provide written notice that such Member is in default of this Agreement (a "Defaulting Member").  On the occurrence of, and for the duration of, a Defaulting Member's default, the Defaulting Member shall forfeit all right to Vote the Defaulting Member's Voting Interest or otherwise participate in the business and affairs of the Company, and any and all provisions of this Agreement relating to Voting or written consent of the Members shall be implemented without including the Voting

5

Interest of the Defaulting Member. A Defaulting Member's death, disability, or inability to make a required contribution does not relieve that Defaulting Member of its contribution obligations. On satisfaction of a Defaulting Member's obligations, that Member's Voting Interest shall be restored. In any event, any Defaulting Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to timely make a required Capital Contribution.

3.4.    **No Withdrawals**. A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5.    **No Interest On Capital**. No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.6.    **Members and Manager Not Liable**. The Members and the Manager shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement. The Manager and the Company shall not take any action that would cause a Member to be personally liable for the Company's obligations without such Member's express written consent, which may be withheld or conditioned in the Member's sole and absolute discretion.

3.7    **Right of Participation**. Each Member shall have a right of first refusal to purchase such Member's pro-rata share (based on that Member's Unit Percentage) of any new Membership Interest issued by the Company on the same terms as the other purchaser(s) of such newly-issued Membership Interest. For purposes of clarification, the foregoing participation right is intended to be an anti-dilution right that would enable each Member to maintain that Member's Unit Percentage.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1.    **Allocation**. After giving effect to the special allocation provisions of Exhibit C attached hereto, Net Profits and Net Losses for any fiscal year shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Unit Percentage.

4.2.    **Distributions**. Distributions of Available Cash to the Members shall be made on a *pro rata* basis to the Members in accordance with their respective Unit Percentages. By a Vote of Supermajority of Members, Members shall decide when Available Cash shall be distributed the Members. All distributions of Available Cash shall be subject to maintaining the Company in a sound financial and cash position.

4.3.    **Tax Distribution**. Notwithstanding Paragraph 4.2, and subject to any applicable law, the Manager shall distribute to each Member, within 75 days after the close of each fiscal year an amount equal to 50% of the Net Profits (and items of income and gain) for such fiscal year allocated to such Member, less the aggregate amount of prior Distributions by the Company

P_THOMAS000118

to such Member during such fiscal year; provided that the Members, by Vote of a Supermajority of Members, may change the amount of such tax distribution.

## ARTICLE V: MANAGEMENT AND EXECUTIVE COMMITTEE

5.1.    **Managed by Manager**. The business of the Company shall be managed by one Manager, who may also be a Member. Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager. The Manager shall also serve as the Chief Executive Officer ("CEO") of the Company. The Manager shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and the Executive Committee, and shall have any other powers and duties usually vested in a CEO. The Manager may also provide for additional Officers of the Company from time to time and shall establish the powers, duties, and compensation of all other Company officers and employees.

5.2.    **Officers**. Subject to Section 7.3, the Manager may, from time to time, but shall not be required to, designate or appoint one or more Officers of the Company, including without limitation, president, one or more vice presidents, a secretary, an assistant secretary, a treasurer and/or an assistant treasurer. Such Officers may, but need not, be employees of the Company or Members of the Company. Each appointed Officer shall hold such office until (a) his or her successor is appointed, (b) such Officer submits his or her resignation, or (c) such Officer is removed by the Manager (subject to Section 7.3). All Officers of the Company shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances.

5.3.    **Executive Committee**. The Manager shall be assisted and advised by an Executive Committee, consisting of Company Officers designated herein as Executive Officers of the Company. Executive Officers may, but need not be, employees of the Company or Members of the Company.

5.3.1.    **Executive Officers**. Executive Officers shall have the duties, functions, and powers described herein. Each Executive Officer shall serve until he or she (a) submits his or her resignation, or (b) is removed by Vote of a Supermajority of Members. Each Executive Officer named below shall perform his or her duties in good faith and with such degree of care, which an ordinarily prudent individual in a like position would use under similar circumstances, and shall owe fiduciary duties of loyalty and care to the Company and the other Members.

(a)    **Chief Creative Officer and Creative Director**. The Chief Creative Officer and Creative Director ("CCOD") shall be in charge of the Company's creative design processes and product conception and shall have sole discretion over the creation and designs marketed by the Company. The CCOD shall also be the Chairperson of the Executive Committee. The CCOD for the Company as of the Effective Date shall be Paula Thomas.

(b)    **Chief Operating Officer and Chief Commercial Officer**. The Chief Operating Officer ("COO") and Chief Commercial Officer ("CCO") shall be in charge of the Company's

7

P_THOMAS000119

commercial strategy; development of merchandise and products; customer relations; and sales. The COO and CCO for the Company as of the Effective Date shall be Jene Park.

5.4.  **Manager's Powers and Limitations**.  The Manager of the Company shall have all powers and authority provided by this Agreement and the Act.  Notwithstanding the foregoing, the Manager shall not take any of the actions described in Section 7.3 unless it has been approved by the Members by Vote of a Supermajority of Members.

5.5.  **Compensation**.  Subject to Section 7.3, the Manager shall be entitled to compensation for the Manager's services and reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.6.  **Company Assets**.  The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.7.  **Company Funds**.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by the Manager. Withdrawal from those accounts shall require only the signature of the Manager or any other person or persons as the Manager may designate.

5.8.  **Removal and Replacement of Manager**.  The Manager shall serve until the earlier of (a) the Manager's resignation, retirement, death, or disability, or (b) the Manager's removal for Cause by Vote of a Supermajority of Members.  A new Manager shall be appointed by Vote of a Supermajority of Members.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.  **Books of Account**.   Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at other locations that the Manager shall determine from time to time, and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of inspection and copying shall be borne by the Member seeking inspection.

6.2.  **Accounting Method**.  Financial books and records of the Company shall be kept based on the Manager's choice of accounting method.  The financial statements of the Company shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be determined by the Manager.

6.3.  **Content of Books**.   At all times during the term of existence of the Company, and beyond that term, if reasonably necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)   A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

8

P_THOMAS000120

1      Q      Should there be information regarding

2  these entries?

3      A      I believe it's here in -- sorry.

4      Q      There are no entries for 2015.  Look at

5  Exhibit 65.  There are no entries for 2015.

6      A      Not on this account.  There might be

7  other accounts.

8      Q      I'm not worried about other accounts.

9  This is the Hillshore account.

10      MR. PEDDIE:  Objection, assumes facts.

11  BY MR. BILLER:

12      Q      Do you doubt this is the Hillshore

13  account?  Do you have any question that this

14  Document 65 relates to the Hillshore account?

15      A      Unless I see the backup documents on

16  this.

17      Q      So you don't -- if you don't have the

18  backup documents, you don't know if the data is right;

19  correct?

20      A      I could verify that with the backup

21  documents.

22      Q      Okay.  Where are the backup documents?

23      A      I don't have it.  I don't know.  You

24  should have it.  The company should have it.

25      Q      The company should have it, but I don't

Page 58

(a)    Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC § 6231(a)(3)) at the Company level, as required under IRC § 6223(g) and the implementing Regulations;

(b)    Enter into settlement agreements under IRC § 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the Secretary) with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that the agreement shall bind the other Members, except that the settlement agreement shall not bind any Member who (within the time prescribed under the IRC and Regulations) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of that Member;

(c)    On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6226(a) and applicable Regulations;

(d)    File requests for administrative adjustment of Company items on Company tax returns under IRC § 6227(b) and applicable Regulations; and, to the extent those requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC § 6228(a); and

(e)    Take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Partner may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP AND UNITS

### 7.1    **Membership Interest and Units**

7.1.1    **Membership and Units**.  There shall be only one class of Membership Interest and one class of Units.  Members shall have the right and power to appoint, remove, and replace the Manager and Executive Officers of the Company as provided in this Agreement, and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits Member action.  Each Member shall vote in proportion to the Member's then-existing Voting Interest.

7.1.2.    **Units**.  The Company has issued 46 (Forty-Six) Units to the Members as set forth in Exhibit B.

7.2.    **Certificates**.  All issuances, reissuances, exchanges, and other transactions in Units involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.  The Company may, but is not required to, issue certificates evidencing

10

P_THOMAS000122

**19.    Governing Law And Venue.** This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California.

**20.    Waiver.** No consent or waiver, expressed or implied, by either party to or of any breach or default by the other in the performance by the other of its obligations hereunder shall be deemed or construed to be a consent or waiver of any other breach or default in the performance by such other party, or a consent or waiver to complain of any act or failure to act of any of the other party, or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver of such party of its rights hereunder.

**21.    Attorney Review.** Employee warrants and represents that Employee in executing his Agreement has had the opportunity to rely on legal advice from an attorney of Employee's choice, so that the terms of this Agreement and their consequences could have been fully read and explained to Employee by an attorney and that Employee fully understands the terms of this Agreement

**22.    Counterparts.** This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

**Thomas Wylde, LLC**

By: _____          December 2Ꝑ, 2014
     John Hanna, Manager

### EMPLOYEE'S ACKNOWLEDGMENT

I acknowledge that I have carefully read, understand and agree to the provisions of this Agreement.

_____          December 3L, 2014

Paula Thomas

(h)     The entering into, on behalf of the Company, of any transaction constituting (i) a "reorganization" within the meaning of Corporations Code §17711.01 or (ii) a sale, merger, or conversion of the Company;

(g)     The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than $500,000;

(h)     The issuance or redemption of any Membership Interest (including the terms thereof);

(i)     Making operating or liquidating distributions to Members;.

(j)     The Transfer of any Membership Interest (other than to a Permitted Transferee);

(k)     The admission of any new Member (other than a Permitted Transferee);

(l)     Instituting, settling, or compromising of any claim or litigation for more than $100,000;

(m)     Any transaction between the Company and an Affiliate of a Member or a Manager;

(n)     Approval of annual budget and deviation of more than 10% for any line item in any previously-approved budget; and

(o)     Paying any officer or employee more than $200,000 per year.

7.4.    **Record Date**. The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager, provided that the record date shall not be more than 60, or less than 10 calendar days before the date of the meeting and not more than 60 calendar days before any other action. In the absence of any action setting a record date, the record date shall be determined in accordance with Corporations Code § 17704.07(p).

7.5.    **Meetings**.

7.5.1.    **General**. Meetings of the Members may be called at any time by the Manager, Members representing more than 32% of the Unit Percentage, or any member of the Executive Committee, for the purpose of addressing any matters on which the Members may Vote. If a meeting of the Members is called by the Members or a member of the Executive Committee, Notice of the call shall be delivered to the Manager. Meetings may be held at the principal executive office of the Company or at any other location designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than 10, nor more than 60, calendar days before the meeting date to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting, the means of electronic transmission by and to the Company or electronic video communication, if any, and the general

12

Case 6:16-bk-15889-SY    Doc 434    Filed 11/21/19    Entered 11/21/19 19:20:29    Desc
Main Document    Page 15 of 158

nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of a Supermajority of Members, represented in person or by Proxy. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Unit Percentage as specified in this Agreement or the Act.

7.5.2. **Quorum**. A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.5.3. **Waiver of Notice**. The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the Persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.5.4. **Proxies**. At all meetings of Members, a Member may Vote in person or by Proxy.    Any Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or any other address given by the Manager to the Members for those purposes.

7.5.5. **Video Attendance**. A meeting of the Members may be conducted, in whole or in part, by electronic means (audio or video with audio) so long as the Company implements reasonable measures to provide participating Members a full opportunity to hear and be heard and otherwise concurrently participate in the meeting. The permanent record of any such meeting shall consist of the minutes of such meeting and/or the electronic recording of such meeting, if recorded..

7.5.6. **Written Consent**. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote were present and voted. Prompt Notice of any action taken in such manner shall be given to all Members who have not consented in writing.

P_THOMAS000125

7.5.7. **No Authority**. No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability, or damage arising from or out of any claim based on any action by the Member in contravention of this Section 7.6.

## ARTICLE VIII: TRANSFER OF UNITS

8.1.    **Dissociation**. A Member may not dissociate from the Company without the written consents of all of the Members. Dissociation shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of dissociation.

8.2.    **Transfers**. Except as expressly provided in this Agreement, a Member shall not Transfer any Units in the Company, whether now owned or later acquired, unless a Supermajority of Members approves in writing the transferee's admission to the Company as a Member. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Units unless the Encumbrance has been approved by the Members by Vote of a Supermajority of Members. Approval may be granted or withheld in the Members' sole discretion. Any Transfer or Encumbrance of a Membership Interest without the required approval shall be void. Notwithstanding the foregoing, (x) any Member may Transfer such Member's Membership Interest to (i) such Member's spouse (including domestic partner) or family member, (ii) a company wholly-owned by such Member and such Member's spouse and family member(s), and (iii) any revocable trust created for the benefit of the Member and/such Member's spouse and family member(s) (each such transferee, a "Permitted Transferee"), (y) the Company's and other Members' right of first refusal set forth in this Agreement shall not apply to any such Transfer to a Permitted Transferee, and (z) the Members shall approve a Permitted Transferee's admission as a substitute Member. A Permitted Transferee of a Member may transfer its Membership Interest to any Person that is a Permitted Transferee of the initial Member without triggering the Company's and other Members' right of first refusal.

8.3.    **No Release on Transfer**. A Member shall not be released from liabilities as a Member solely as a result of a Transfer of Units, both with respect to obligations to the Company and to third parties incurred before the Transfer.

8.4.    **Agreement Binds New Members**. Any new Person admitted to the Company as a Member shall hold one or more Units; if such Unit(s) were obtained by Transfer from a current or former Member, such Unit(s) shall remain subject to all the provisions of this Agreement that applied to the Member from whom such Unit(s) were obtained.

8.5    **Voluntary Lifetime Transfers**. No Member may make a Voluntary Lifetime Transfer (as defined below) except pursuant to this Section. Any Member who wishes to make a Voluntary Lifetime Transfer must promptly send a notice ("Member Notice") to the Company and each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Membership Interest is to be Transferred, the name, address (both

14

P_THOMAS000126

home and office), and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer. The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest to be transferred to the Company and the other Members as described in Section 8.7. A "Voluntary Lifetime Transfer" means any Transfer made during a Member's lifetime, which is not an Involuntary Lifetime Transfer (as defined in Section 8.6).

8.6 **Involuntary Lifetime Transfer**. Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable, including bankruptcy, legal action, etc. must promptly send a Member Notice to the Company and each other Member. Such notice shall include a description of the expected Transfer, the name, address (both home and office), and business or occupation of the expected transferee, and any other facts that are, or would reasonably be deemed to be, material to the involuntary Transfer. The Member who may be making an Involuntary Lifetime Transfer shall be deemed to have offered to sell his or her Membership Interest otherwise to be transferred to the Company and the other Members as described in Section 8.7. An "Involuntary Lifetime transfer" means any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any bankruptcy, divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law.

8.7 **Right of First Refusal of the Company and Non-Transferring Members.**

8.7.1 **General**. Each Member shall be deemed to have offered to sell his or her Membership Interest proposed or forced to be Transferred in a Voluntary Lifetime Transfer or an Involuntary Lifetime Transfer ("Offered Membership Interest") to the Company and the other Members (i) at the price and payment terms offered by a proposed transferee set forth in the Member Notice or (ii) if there is no price or payment terms offered by a proposed transferee (e.g., in the case of an Involuntary Lifetime Transfer), at the Agreement Price (as defined below) and Agreement Terms (as defined below).

8.7.2. **Company's Right**. Within the later of (i) thirty (30) days following receipt of a Member Notice or (ii) ten (10) days following the determination of the Agreement Price, the Company shall send a written notice ("Company Notice") to the Members stating the portion of the Offered Membership Interest the Company wishes to purchase.

8.7.3. **Members' Right**. Unless the Company Notice specifies all of the Offered Membership Interest, within thirty (30) days after mailing of the Company Notice, each Member who desires to purchase a portion of the Offered Membership Interest shall give a written notice to the Company specifying the maximum portion of the Offered Membership Interest that the Member wishes to purchase. If the aggregate Offered Membership Interest to be purchased by the Members exceeds the total amount of the Offered Membership Interest, the Offered Membership Interest shall be allocated to the exercising Members based on their respective Unit Percentages.

8.7.4 **Remaining Offered Membership Interest**. If the Company and the other Members do not agree to buy all of the Offered Membership Interest, any remaining

15

P_THOMAS000127

1
2
3
4
5
6
7
8
UNITED STATES BANKRUPTCY COURT FOR THE
9
DISTRICT OF CALIFORNIA (RIVERSIDE DIVISION)
10
11
12  IN RE                                    **Case No: 6:16-bk-15889-SY**
13          PDTW, LLC
                                             **Chapter 7**
14
15  LARRY SIMONS, CHAPTER 7                  **[PROPOSED] ORDER**
16  TRUSTEE
17
18  VS.
19
20
21  PAULA THOMAS, AN INDIVIDUAL;
22  THOMAS WYLDE, LLC, A
    CALIFORNIA LIMITED LIABILITY
23  COMPANY; THOMAS WYLDE
    HOLDINGS, LLC, A CALIFORNIA
24  LIMITED LIABILTY COMPANY, AND
25  DOES 1-10
26
27                                           1
28  **[PROPOSED] ORDER**

        (c)      The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

      8.10   **Transfers at Death**. Upon the death of any Member, the surviving spouse or any family member of the deceased Member may receive such deceased Member's Membership Interest (without triggering the Company's and Members' right of first refusal with respect to such Transferred Membership Interest). If a deceased Member's proposed transferee is not a Permitted Transferee, such proposed Transfer shall be subject to the Company's and Members' right of first refusal described in section 8.7.

## ARTICLE IX: DISSOLUTION AND WINDING UP

      9.1.   **Dissolution**. The Company shall be dissolved on the first to occur of the following events:

        (a)      The Vote of a Supermajority of Members to dissolve the Company;

        (b)      The sale or other disposition of substantially all of the Company's assets; or

        (c)      Entry of a decree of judicial dissolution under Corporations Code § 17707.03.

      9.2.   **Winding Up**. On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Manager shall wind up the affairs of the Company, and shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

        (a)      To pay the expenses of liquidation;

        (b)      To the establishment of reasonable reserves for contingent liabilities or obligations of the Company. On the determination that reserves are no longer necessary, they shall be distributed as provided in this Section 9.2;

        (c)      To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member shall be repaid in the ratio that the Member's loan, together with accrued and unpaid interest, bears to the total of all loans from Members, including all accrued and unpaid interest. Repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest; and

        (d)      To the Members in accordance with their respective positive Capital Account balances.

17

*26 U.S.C §7201.*

PDTW also asserts that Respondents have engaged in a systematic filing of documents, pleadings and declarations that contain knowingly false information for the purpose of dragging out the bankruptcy proceedings and attempting to take what does not belong to TW: $2.4 million and ownership of the IP.  In doing so, PDTW argues that Respondents have committed perjury in violation of *18 U.S.C. §1621(2)* and *Penal Code §118*, and subrogation of perjury in violation of *Penal Code §127.*

## I.    BACKGROUND

PDTW filed for Chapter 7 bankruptcy relief on July 29, 2016.  Larry Simons was assigned as Trustee.  At the time, PDTW was engaged in litigation in the Superior Court for the Court of Los Angeles against TW in a wrongful discharge case involving Thomas/PDTW against TW.  The State Court action commenced on October 1, 2015, and TW filed a Crossclaim for numerous business torts in February 2016.  TW claimed that Thomas violated the Agreement to Purchase Membership Interests in TW, thereby granting TW sole ownership of the intellectual property Thomas created and registered in her own name and then in the name of Thomas Wylde Holdings, LLC (TWH).  TW also alleged that PDTW owed $2.5 million for expenses that TW paid on behalf PDTW.

3

[PROPOSED] ORDER

legal proceeding shall be paid by the Company in advance of the final disposition of that proceeding, on receipt of an undertaking by that Person to repay that amount unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company.

11.3.    **Arbitration**.  **Any action to enforce or interpret this Agreement, or to resolve disputes relating in any way to (or arising out of) this Agreement or the Company among or between any of the Company, a current or former Member, or the current or a former Manager shall be settled by binding arbitration before a single arbitrator in accordance with the then-applicable Commercial Arbitration Rules of the American Arbitration Association.  The place of arbitration shall be Los Angeles, California.  The award of the arbitrator shall be final, binding, and conclusive on all parties.  Judgment may be entered on any such award in any court of competent jurisdiction.**

## ARTICLE XII: GENERAL PROVISIONS

12.1.    **Integration**.  This Agreement constitutes the whole and entire agreement of the parties with respect to its subject matter, and it shall not be modified or amended in any respect except by a written instrument as described herein.  No party is relying on any representations or warranties not expressly contained in this Agreement.  This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Manager or any of them.

12.2.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Executed counterparts of this Agreement may be delivered by facsimile transmission or in portable document format (PDF) by e-mail.  The signatures in a facsimile or PDF data file shall have the same force and effect as an original.

12.3.    **Choice of Law**.  This Agreement shall be construed and enforced under the laws of the State of California, without regard to the conflicts of law provisions thereof.

12.4.    **Severability**.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal, or unenforceable, that provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

12.5    **Binding Effect**.  This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.6.    **Representation**.  Each party to this Agreement warrants and represents that it has had sufficient time to adequately consult with its own independent counsel prior to execution.

12.7.    **Additional Instruments**.  The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

P_THOMAS000131

1          MR. BILLER:  You're wasting my time now.

2          MR. PEDDIE:  You're wasting your time because

3    you don't understand financial matters.

4          MR. BILLER:  You represent crooks, thieves,

5    mafia personnel from South Korea.  That's who you

6    represent.

7          MR. PEDDIE:  No.  Your theory that Roger Kuo

8    and Doug Lee and Stephen Choi are all from Korea and

9    all speak Korean to each other and are part of a mafia

10   is absolutely outlandish.  It comes out of a crack

11   pipe, I'm telling you.

12         MR. BILLER:  Are you saying --

13         MR. PEDDIE:  I'm being emphatic to tell you

14   that I don't think those guys speak Korean.  In fact,

15   some of them are not even Korean.

16         MR. BILLER:  Let's mark the next document as

17   68.

18              (Exhibit 68 was marked for

19              identification by the Certified Shorthand

20              Reporter and is attached hereto.)

21         MR. BILLER:  Sorry.

22         MR. PEDDIE:  Please be careful.  I don't like

23   being hit in the head with documents.

24         MR. BILLER:  It hit you in the chest.

25         MR. PEDDIE:  It hit me in the forehead,

                                           Page 67

## SECURITIES LAW REPRESENTATIONS

EACH MEMBER OR OTHER PERSON, BY EXECUTING THIS AGREEMENT, AND EVERY OTHER PERSON WHO EXECUTES THIS AGREEMENT OR OTHERWISE THEREAFTER BECOMES A MEMBER, HEREBY REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT HE, SHE, OR IT: (A) IS AWARE THAT THE ACQUISITION OF ITS UNITS IN THE COMPANY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE, (B) IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (C) UNDERSTANDS THAT THE SALE, PLEDGE, ASSIGNMENT OR OTHER TRANSFER OF ITS UNITS IN THE COMPANY IS LIMITED BY THIS AGREEMENT AND IN ANY EVENT MAY NOT BE EFFECTED UNLESS (I) THE TRANSFER IS REGISTERED AND QUALIFIED UNDER APPLICABLE SECURITIES LAWS, OR IS EFFECTED AS A NON-PUBLIC OFFERING THAT IS EXEMPT FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF APPLICABLE SECURITIES LAWS, AND (II) THE PERSON ACQUIRING SUCH UNITS REPRESENTS AND WARRANTS TO THE COMPANY AND TO THE OTHER MEMBERS THAT SUCH PERSON IS ACQUIRING ITS UNITS IN THE COMPANY SOLELY FOR ITS OWN ACCOUNT AND NOT FOR THE ACCOUNT OF ANY OTHER PERSON, FOR INVESTMENT ONLY, AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH ANY DISTRIBUTION OF SUCH UNITS, (D) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF ACQUIRING ITS UNITS IN THE COMPANY, (E) ACKNOWLEDGES THAT THERE IS NO GUARANTEE THAT THE COMPANY WILL BE A FINANCIAL SUCCESS, AND IS ABLE TO BEAR THE ECONOMIC RISK OF THE LOSS OF ITS UNITS IN THE COMPANY, (F) CONFIRMS THAT THE COMPANY HAS NOT SOLICITED OR ADVERTISED THE UNITS IN ANY WAY, AND (G) ACKNOWLEDGES THAT THE COMPANY AND THE OTHER MEMBERS ARE RELYING ON THE FOREGOING REPRESENTATIONS.

P_THOMAS000133

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first written above.

_____
JOHN HANNA, Manager, Member, and Chief Executive Officer

_____
JENE PARK, Member, Chief Operations Officer and Chief Commercial Officer

_____
DOUG LEE, Member

_____
ROGER KUO, Member

22

P_THOMAS000134

## EXHIBIT A

### CONSENT OF SPOUSE OR DOMESTIC PARTNER

The undersigned is the spouse or registered domestic partner of _____ ("Member"), and acknowledges that he or she has read the foregoing Operating Agreement of Thomas Wylde, LLC (the "Agreement") and understands its provisions.  The undersigned is aware that, by the provisions of the Agreement, Member and the undersigned have consented to sell or transfer all Units in the Company, including any community property interest or quasi-community property interest therein, only in accordance with the terms and provisions of the Agreement.  The undersigned expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Units and the restrictions on them.  If the undersigned predeceases Member while Member owns any Units therein, the undersigned agrees not to devise or bequeath any community property interest or quasi-community property interest in such Units in contravention of the Agreement.

Date: _____

_____
Signature

_____
Name

23

P_THOMAS000135

# EXHIBIT B

## MEMBERS AND CAPITAL CONTRIBUTIONS

| Name | Contact Information | Capital Contributions and Due Dates | No. Units | Initial Capital Account Balance |
|---|---|---|---|---|
| John Hanna | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: john@thomaswylde.com | $700<br><br>December 15, 2014 | 14 | $700 |
| Jene Park | 3231 S. La Cienega Blvd., Los Angeles, CA 90016 Fax: 310-559-5765 Email: jene@thomaswylde.com | $900<br><br>December 15, 2014 | 18 | $900 |
| Roger Kuo | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: roger@zther.com | $350<br><br>December 15, 2014 | 7 | $350 |
| Doug Lee | 18141 Irvine Blvd. Tustin, CA 92780 Fax: 714-237-9991 Email: dlee@lpdirect.com | $350<br><br>December 15 2014 | 7 | $350 |

P_THOMAS000136

## EXHIBIT C
## TAX PROVISIONS

### ARTICLE I: DEFINITIONS

1.1    "**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

    1.1.1    Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

    1.1.2    Credit to such Capital Account the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Unit Percentage) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

    1.1.3    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.2    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.3    "**Company Minimum Gain**" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

1.4    "**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.5    "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.6    "**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

25

P_THOMAS000137

1.7    "**Net Profits**" and "**Net Losses**" means, for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.7.1    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

1.7.2    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

1.7.3    In the event the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

1.7.4    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

1.7.5    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such fiscal year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

1.7.6    Notwithstanding any other provision of this Section 1.7, any items that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C shall be determined by applying rules analogous to those set forth in Sections 1.7.1 through 1.7.5 above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

1.8    "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1).

26

P_THOMAS000138

1.9    "**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

## ARTICLE II: CAPITAL ACCOUNT

2.1    **Capital Accounts**.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

2.1.1    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

2.1.2    To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 3.2 and 3.3 of this Exhibit C, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

2.1.3    In the event all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

2.1.4    In determining the amount of any liability for purposes of Sections 2.1.1 and 2.1.2 of this Exhibit C, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Members, by Vote of a Supermajority of Members, determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the Members, by Vote of a Supermajority of Members, may make such modification.

## ARTICLE III: SPECIAL ALLOCATIONS

3.1    **Adjusted Capital Account Deficit**.  An allocation of Net Losses under Section 4.1 of the Agreement shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any fiscal year.  Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Member or Members in proportion to such Member's or Members' respective Unit Percentages; provided, however, that to the extent such allocation would create or increase an Adjusted

27

P_THOMAS000139

Capital Account Deficit for another Member or Members at the end of any fiscal year, such allocation shall be made to the remaining Member or Members in proportion to the respective Unit Percentages of such Member or Members.

3.2    **Special Allocations**.

3.2.1    **Member Nonrecourse Deductions**.  Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

3.2.2    **Nonrecourse Deductions Referable to Liabilities Owed to Non-Members**.  Any Nonrecourse Deductions for any fiscal year and any other deductions or losses for any fiscal year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Unit Percentages.

3.2.3    **Member Minimum Gain Chargeback**.  Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 3.2.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

3.2.4    **Minimum Gain Chargeback**.  Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 3.2.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

28

P_THOMAS000140

3.2.5  **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.2.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 3.2.5 were not in the Agreement.

3.3  **Curative Allocations**.  The allocations set forth in Sections 3.1 and 3.2 of this Exhibit C (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 3.3.  Therefore, notwithstanding any other provision of the Agreement (other than the Regulatory Allocations), the Members, by Vote of a Supermajority of Members, shall  make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.1 of the Agreement.  In exercising their discretion under this Section 3.3, the Members, by Vote of a Supermajority of Members, shall take into account any future Regulatory Allocations under Sections 3.2.3 and 3.2.4 of this Exhibit C that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.2.1 and 3.2.2 of this Exhibit C.

3.4  **Code Section 704(c) Allocations**.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Agreement: (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).

3.5  **Allocations in Respect of a Transferred Membership Interest**.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year shall be allocated among the Members, as determined by the Members, by Vote of a Supermajority of Members, in accordance with any method permitted by Code Section 706(d) and the Regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such fiscal year.

P_THOMAS000141

## CLAWBACK AGREEMENT

This Clawback Agreement (the "Agreement") is entered into by and between John Hanna, Jene Park, Roger Kuo, and Doug Lee ("Grantors"), on the one hand, and Paula Thomas ("Grantee"), on the other hand, effective November [DATE], 2014 (the "Effective Date").

## RECITALS

A.      Grantors and Grantee are Members of Thomas Wylde, LLC, a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State (the "Company"). The Company operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement").

B.      On or about December [DATE], 2014, Grantors and Grantee executed a written resolution authorizing the Company to issue 90 Units of Membership Interest in the Company to [Stephen Choi], thereby diluting the existing Membership Interest (the "Resolution").

C.      As a material inducement to Grantee to enter into the Resolution, Grantors agreed to give Grantee a right to "claw back" one Unit of Membership Interest from each of them upon the performance of certain conditions.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Clawback. If on or before December 31, 2017, the Company has distributed assets to Hillshore Investments in an amount equal to or exceeding $5,500,000, then each Grantor agrees that at such time one Unit of each of their Membership Interest shall be re-allocated to Thomas, representing a 2% membership interest in the Company.

2.      Instruments of Conveyance. The Manager shall be responsible to track all distributions to Hillshore Investments. Upon satisfying the distribution requirement set forth in paragraph 1, the Manager shall notify Grantors and Grantee within thirty (30) days and shall simultaneously record in the Company's minute book the transfer of one (1) Unit of Membership Interest from each Grantor to Grantee and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests. Such recordation shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Grantee all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Grantee to all Transferable Interests as well as any Voting Interest provided by the Operating Agreement in the Units transferred. If the Company has issued a certificate or certificates representing the Units to Grantors, then Grantors must return that certificate or those certificates to the extent necessary to reflect the change in Membership Interest.

3.      Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

4.      Necessary Actions. Each party shall execute and deliver any documents or instruments and take any action reasonably required to effectuate the transaction contemplated by this Agreement.

P_THOMAS000142

5. <u>Waiver and Amendment</u>. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

6. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

7. <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8. <u>Governing Law And Venue</u>. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9. <u>Drafting</u>.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

10. <u>Counterparts</u>. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.


_____    _____
John Hanna                 Paula Thomas


_____    _____
Jene Park                  Doug Lee


_____
Roger Kuo


Clawback Agreement                                    Page 2

P_THOMAS000143

## AGREEMENT TO PURCHASE MEMBERSHIP INTEREST

This Agreement to Purchase Membership Interest (the "Agreement") is entered into by and between Thomas Wylde, LLC, a California limited liability company ("Seller"), and Paula Thomas, an individual ("Purchaser"), effective November 18, 2014 (the "Effective Date").

### RECITALS

A.    Seller is a California limited liability company, formed on July 22, 2014, pursuant to Articles of Organization of a Limited Liability Company filed with the California Secretary of State. Seller operates pursuant to an Operating Agreement entered into on or about July 22, 2014 (the "Operating Agreement"). All Units Membership Interest in Seller are owned by John Hanna, Jene Park, Roger Kuo, and Doug Lee (the "Members").

B.    Purchaser seeks to invest $3,200 and certain assets and liabilities into Seller in exchange for 64 membership Units in the Seller.

C.    Seller and its Members desire to accept Purchaser's investment in the company and to issue new membership Units in exchange.

D.    Seller's Manager and Members have unanimously approved the sale of such new membership Units to Purchaser.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Sale of the Interest</u>. Upon the execution of this Agreement, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties, and agreements herein, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, a 64 Units of Membership Interest in the Seller. All undefined capitalized terms herein shall have the meaning ascribed by the Operating Agreement.

2.    <u>Instruments of Conveyance</u>. Upon execution hereof, this Agreement shall evidence conveyance and transfer of the Membership Interest, which shall be effective to immediately vest in Purchaser all right, title, and interest in and to all of the securities underlying the Membership Interest pursuant to this Agreement, free and clear of all liens, claims, encumbrances, and adverse interests. Such conveyance shall entitle Purchaser to all the rights of a Member under the Operating Agreement, including, without limitation, all Transferable Interests as well as any Voting Interest provided by the Operating Agreement. Seller may, at its discretion, deliver a certificate or certificates representing the Units to Purchaser, in form and substance customary in the industry. Within five (5) business days of the Effective Date, Seller shall record this Agreement in the Seller's minute book and shall amend Exhibit A to the Operating Agreement and any company membership listing to reflect the change in ownership interests.

3.    <u>Consideration</u>. In consideration for the Membership Interest, Purchaser shall make a

Membership Purchase Agreement                                                      Page 1

P_THOMAS000144

capital contribution to Seller in the amount of Three Thousand Two Dollars ($3,200) and shall transfer to Seller those assets and liabilities set forth on Exhibit "A" hereto.

4.    <u>Purchaser Representations and Warranties</u>. Purchaser represents and warrants to Seller as follows:

a.    This Agreement and any other document, instrument, or agreement to be executed and delivered by Purchaser in connection herewith has been duly executed and delivered by the Purchaser and constitutes the legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

b.    Purchaser is acquiring the Membership Interest for her own account, for investment purposes, and not with a view to the distribution thereof.

c.    Purchaser has firsthand knowledge of the business and affairs of Seller, has reviewed the Operating Agreement, and agrees to be bound by all of the terms and conditions of the Operating Agreement.

5.    <u>Seller Representations and Warranties</u>. Purchaser represents and warrants to Seller as follows:

a.    Seller has not taken any action, or entered into any agreements, in any way affecting or binding Seller, its Manager, or Members and has full right, power, and authority to sell, transfer, and deliver the Membership Interest pursuant to this Agreement.

b.    Seller shall transfer title in and to the Membership Interest to the Purchaser free and clear of all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever.

c.    Seller has received fair equivalent value under the terms of this Agreement.

d.    Seller has the legal capacity to execute and deliver this Agreement and to effect the sale with respect to the Membership Interest.

e.    The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of Seller's obligations hereunder will not conflict with or result in any violation of or default under any provision of any agreement or instrument by which the Seller is bound.

f.    Except for any consent or approval that has been obtained and remains in full force and effect as of the date hereof, no consent, approval or authorization of, or declaration, notice, filing or registration with, any governmental or regulatory authority, or any other person, is required to be made or obtained by the Seller on or prior to the date hereof in connection with the execution, delivery, and performance of this Agreement or the consummation of the transactions contemplated hereby.

6.    <u>Benefit</u>. This Agreement shall be binding upon and inure to the benefit of the parties

P_THOMAS000145

and their respective successors and assigns.

7.   <u>Necessary Actions</u>.  Each party agrees to execute and deliver all such other documents or instruments and to take any action as may be reasonably required in order to effectuate the transaction contemplated by this Agreement.

8.   <u>Waiver And Amendment</u>.  No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision. This Agreement may only be amended by a written agreement signed by both Parties.

9.   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, written or oral, between the parties relating to the subject matter hereof.

10.   <u>Severability</u>. If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

11.   <u>Governing Law And Venue</u>. The laws of the State of California shall govern this Agreement. Venue for any legal action arising from or relating to this Agreement shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

12.   <u>Drafting</u>.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

13.   <u>Counterparts</u>. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.


Thomas Wylde, LLC


_____  ____        _____  _____  _

John Hanna, Manager                              Paula Thomas


Membership Purchase Agreement                                              Page 3

P_THOMAS000146

# Exhibit "A" to Agreement to Purchase Membership Interest

List of Asset Being Transferred from Paula Thomas to Thomas Wylde, LLC

All intellectual property rights and associated goodwill relating to the Thomas Wylde brand and designs, including, without limitation, any copyrights, trademarks, patents, trade secrets, moral rights, or any other rights therein ("IP"). The IP includes, without limitation, the following:

TRADEMARKS

| **Mark** | **Serial No. / Reg. No.** | **Status** |
|---|---|---|
| Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |

Membership Purchase Agreement                                              Page 4

P_THOMAS000147

COPYRIGHTS

| Title | Registration Number | Registration Date |
|---|---|---|
| Acid Flower | VA 1-344-484 | 04/14/2006 |
| Henna Skull | VA 1-813-811 | 03/30/2011 |
| Skull Flower | VAu 691-713 | 04/14/2006 |
| Skull Pattern | VA 1-344-483 | 04/14/2006 |
| Money Print | VA 1-853-563 | 10/24/2012 |
| Hidden Death Print | VA 1-853-575 | 10/24/2012 |
| Ballet Bowie Print | VA 1-853-570 | 10/24/2012 |
| Carpe Diem Print | VA 1-853-579 | 10/24/2012 |
| Goth Moth | VA 1-853-573 | 10/24/2012 |
| Madame Butterfly | VA 1-853-576 | 10/24/2012 |
| Samona Print | VA 1-853-569 | 10/24/2012 |
| Cyclops | VA 1-907-692 | 9/11/2013 |
| Louis Skull | VA 1-889-372 | 11/5/2013 |
| Spinal Tap | VA 1-907-688 | 9/11/13 |

P_THOMAS000148

<u>List of Liabilities Being Transferred from Paula Thomas to Thomas Wylde, LLC</u>

Secured Promissory Note executed by PDTW, LLC in favor of CBC Partners I, LLC, dated October 15, 2013 in the amount of $1,600,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

P_THOMAS000149

## ACTION BY WRITTEN CONSENT
## OF THE MEMBERS OF PDTW, LLC

The undersigned, Paula Thomas (the "Sole Member"), the sole member of PDTW, LLC, a California limited liability company (the "**Company**"), in accordance with the California Revised Uniform Limited Liability Company Act and the Operating Agreement of the Company does hereby take the following actions and adopts the following resolutions without a meeting with the intention that such actions will have the same force and effect as if a meeting was duly called and held:

WHEREAS, the Sole Member has agreed to accept an assignment of certain of the company's liabilities.

WHEREAS, the Sole Member has determined it to be in the best interest of the Company to transfer those liabilities to the Sole Member.

NOW, THEREFORE, IT IS RESOLVED that the following liabilities held by the Company are hereby transferred and assigned to Paula Thomas individually:

Secured Promissory Note executed by PDTW, LLC in favor of CBC Partners I, LLC, dated October 15, 2013 in the amount of $1,625,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated March 27, 2011 in the amount of $228,000

Balloon Payment Promissory note executed by PDTW, LLC in favor of Steven John Prestemon, dated January 1, 2013 in the amount of $131,337

RESOLVED, FURTHER, that the Company be and it hereby is authorized, empowered, and directed to take such further action as it deems necessary to effectuate the foregoing resolutions.

RESOLVED, FURTHER, that the Company shall obtain any consents, from the Note holders or otherwise, to authorize the transfer of the foregoing liabilities to Paula Thomas.

This Consent shall be effective for all purposes on December ___, 2014.

### SOLE MEMBER:

_____
Paula Thomas

# EXHIBIT "22"

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                COUNTY OF LOS ANGELES, CENTRAL DISTRICT
 3     ------------------------------------
                                           )
 4     PAULA THOMAS, INDIVIDUALLY AND IN   )
       THE RIGHT OF AND FOR THE BENEFIT    )
 5     OF THOMAS WYLDE, LLC, A CALIFORNIA  )
       LIMITED LIABILITY COMPANY, AND      )
 6     PDTW [PAULA DOROTHY THOMAS WYLDE],  )
       LLC, A CALIFORNIA LIMITED COMPANY,  )
 7                                         )
                    Plaintiffs,            )   No. BC596495
 8                                         )
 9            vs.                          )
                                           )
10     THOMAS WYLDE, LLC, A CALIFORNIA     )
       LIMITED LIABILITY COMPANY; JOHN     )
11     HANNA, AN INDIVIDUAL, JENE PARK,    )
       AN INDIVIDUAL, SHOT IN THE          )
12     ARMOIRE, LLC, A FLORIDA LIMITED     )
       LIABILITY COMPANY, AND H&H          )
13     FASHION, LLC, A FLORIDA LIMITED     )
       LIABILITY COMPANY, AND DOES 1       )
       THROUGH 50,                         )
14                                         )
                    Defendants.            )
15     ------------------------------------)
16
17                DEPOSITION OF DAVID SCHNIDER
18                   Los Angeles, California
19                  Wednesday, April 4, 2018
20
21
22     Reported by:
       KATHLEEN E. BARNEY
23     CSR No. 5698
24     Job No. 2863757
25     PAGES 1 - 201
```

Page 1

```
 1                    (Exhibit 69 was marked for

 2          identification by the Certified Shorthand

 3          Reporter and is attached hereto.)

 4   BY MR. BILLER:

 5          Q     Do you know what 69 is?

 6          A     Pardon?

 7          Q     Exhibit 69, you can read it.

 8          A     Yes.

 9          Q     Did you read it?

10          A     Not yet.

11          Q     Go ahead and read it to yourself.

12          A     (Witness complies.)

13          Q     Have you read Exhibit 69?

14          A     Yes.

15          Q     Do you know why you were sent this

16   e-mail?

17          A     As a copy for reference information and

18   maybe file.

19          Q     What file?

20          A     It could be an HR file.

21          Q     Okay.  Was there an HR file on

22   Paula Thomas?

23          A     You mean a folder?

24          Q     A folder.

25          A     Yes.
```

Page 84

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4

 5         LDT CONSULTING, INC.

 6         BY:  DIMITRIOUS P. BILLER

 7         Attorney at Law

 8         15113 West Sunset Boulevard

 9         Pacific Palisades, California 90272

10         (310) 459-9870

11         ldtconsulting@verizon.net

12

13    For Defendants:

14

15         KAUFMAN DOLOWICH & VOLUCK, LLP

16         BY:  ROBERT SILVER

17         Attorney at Law

18         11755 Wilshire Boulevard

19         Los Angeles, California 90025

20         (424) 901-7978

21         rsilver@kdvlaw.com

22

23    Also Present:

24

25         PAULA THOMAS
```

Page 3

```
1                          INDEX

2     WITNESS                          EXAMINATION

3     DAVID SCHNIDER

4

5

6              BY MR. BILLER:                    8

7

8

9                         EXHIBITS

10    NUMBER            DESCRIPTION           PAGE

11    Exhibits 120 Guaranty, Promissory notes and    32

12    through 129  Line of Credit

13

14    Exhibit 130  Binding Term Sheet          40

15

16    Exhibit 131  E-mails                     45

17

18    Exhibit 132  Articles of Organization    56

19

20    Exhibit 133  Quickbooks transaction report***   84

21

22    Exhibit 134  Document***                 84

23

24    Exhibit 135  Action by Written Consent of the   95

25                 Members
```

Page 4

1

2    Exhibit 136   Notice of Proposed Action by          98

3                  Written Consent

4

5    Exhibit 137   E-mails                               101

6

7    Exhibit 138   Handwritten list                      109

8

9    Exhibit 139   Action by Written Consent of the      109

10                 Members of PDTW, LLC

11

12   Exhibit 140   Amended Exhibit B, Members and        114

13                 Capital Contributions

14

15   Exhibit 141   E-mails                               116

16

17   Exhibit 142   Document titled "Thomas Wylde"        123

18

19   Exhibit 143   E-mail                                126

20

21   Exhibit 144   E-mails                               127

22

23   Exhibit 145   2013 tax return                       131

24

25   Exhibit 146   2015 tax return                       133

Page 5

1

2    Exhibit 147    2015 tax return                           143

3

4    Exhibit 148    E-mails                                   145

5

6    Exhibit 149    E-mails                                   146

7

8    Exhibit 150    E-mails                                   149

9

10   Exhibit 151    E-mails                                   150

11

12   Exhibit 152    E-mails                                   152

13

14   Exhibit 153    E-mails                                   153

15

16   Exhibit 154    E-mails                                   158

17

18   Exhibit 155    Operating Agreement of Thomas             162

19                  Wylde, llc

20

21   Exhibit 156    Amended and Restated Operating            164

22                  Agreement of Thomas Wylde, LLC

23

24   Exhibit 157    E-mails                                   167

25

Page 6

```
 1     Exhibit 158  E-mails                              167

 2

 3     Exhibit 159  Amended Notice of Deposition         172

 4

 5     Exhibit 160  Invoice                              181

 6

 7     Exhibit 161  Invoice                              182

 8

 9     Exhibit 162  E-mails                              184

10

11     Exhibit 163  E-mail                               188

12

13     Exhibit 164  E-mails                              190

14

15

16     ***Exhibits 133 and 134 were retained

17

18

19

20

21

22

23

24

25

                                              Page  7
```

1          Los Angeles, California, Wednesday, April 4, 2018

2                          12:49 p.m.

3

4                      DAVID SCHNIDER,

5    having been administered an oath, was examined and

6    testified as follows:

7

8                          EXAMINATION

9    BY MR. BILLER:

10       Q    Good morning, David.   It's Dimitrios Biller.

11   Obviously we've met before in three other

12   depositions.   This is the fourth session of your

13   notice of taking deposition and subpoena starting on

14   August 10th.

15       Is that consistent with your memory?

16       A    I don't remember the date, but the rest is.

17       Q    Okay.   And we're taking this particular

18   deposition because on September 28th you produced

19   for the first time a manila folder -- not a manila

20   folder, a Redweld -- I think it's about three inches

21   tall -- of e-mails and text messages and documents;

22   is that right?

23       A    I believe so.

24       Q    And it's actually four inches tall.   I'm

25   holding a measuring stick to it.   Do you see that?

Page 8

1          MR. SILVER:   A ruler?

2    BY MR. BILLER:

3      Q    A ruler.   I'm sorry.

4          Do you see that?   It's four inches tall?

5      A    I can't see the number, but I see -- I don't

6    know if those are the documents.   I presume they

7    are.   But I see that you're holding a ruler and it

8    looks like about three, three and a half inches of

9    documents that you're measuring.

10     Q    Okay.   This deposition is primarily focused

11   on the documents that you produced, but the

12   documents you produced relate to the documents and

13   testimony you previously gave.

14         Do you understand?

15     A    I understand what you're saying.

16     Q    Okay.  So do you want me to go through the

17   admonishments that I've gone over three times?

18     A    I don't think that's necessary.

19         MR. SILVER:   Not necessary.

20         MR. BILLER:   Pardon?

21         MR. SILVER:   I'm adding not necessary.

22   BY MR. BILLER:

23     Q    Frankly, your e-mails caused more problems in

24   my mind than it solved, so I need to ask you some

25   foundational questions.

Page 9

1  condition.

2      Q      Okay.  Who made the decision to cut the

3  salaries?

4      A      I believe they all talk about it and

5  agreed to it.

6      Q      Including Paula Thomas?

7      A      Yes, that's why I confirmed.

8      Q      Okay.  And then you prepared a chart of

9  what the salaries were and how they would be impacted

10  with the one third reduction; correct?

11     A      I believe so.

12     Q      Yeah.  And what was the payment cycle

13  for Paula Thomas?

14     A      I can't remember.  I think once a month.

15     Q      Once a month.  At the end of the month

16  or the beginning of the month?

17     A      The beginning of the month.

18     Q      So if the chart showed that Paula Thomas

19  received $16,000 -- approximately $16,000 in April of

20  2015 and nothing in May 2015, what would that tell you

21  about her employment status?

22     MR. PEDDIE:  Objection, vague.  It calls for

23  speculation.

24  BY MR. BILLER:

25     Q      She didn't work for free, did she?

Page 89

1     Q    You remember before -- two weeks prior to
2  that date, correct?
3     A    Probably earlier than that.
4     Q    So what is the date?  What is the date
5  specifically that you -- was it July 1?
6     A    I don't know.
7     Q    Was it before or after July 4th holiday?
8     A    I don't know.
9     Q    But it was before -- 14 days before July 22,
10  correct?
11     A    I can't tell you specifically.  It was
12  definitely before July 22.  I suspect it was even
13  before that.
14     Q    You say it takes two weeks to get a stamp.
15  That's 14 days, okay.
16     A    So I said -- first I said it takes on average
17  in my experience now two weeks.  I don't know if we
18  did this rush or not, but I would --
19     Q    You're all over the place.
20     MR. SILVER:  No, he's not.
21  BY MR. BILLER:
22     Q    Yes, you are.  Answer my question.
23     MR. SILVER:  Come on.
24  BY MR. BILLER:
25     Q    Did you know that a new company was going to

Page 75

1    be formed before July 8th, 2014?   Yes or no?

2        A    Probably.

3        Q    How soon before July 8 did you know that

4    company was going to be formed?

5        A    I don't recall.

6        Q    So the earliest time that you can remember

7    that the company was going to be formed was

8    July 8, 2014, right?

9        A    The earliest?   No, it could have been before

10   then.

11       Q    Okay.   But you don't remember.

12       A    I don't.

13       Q    We don't live on could have, would have,

14   should haves.   We live on memory, we live on facts,

15   okay?   So if you remember, give me the first date

16   you think you would have remembered.

17       A    I don't remember.   I told you that.

18       Q    Okay.   Give me a general date before you

19   think you first remembered -- first learned about

20   it.

21       A    It would have been in mid-2014 sometime,

22   before we filed the articles.

23       Q    And the article was filed 14 days, according

24   to your own testimony, fourteen days --

25            MR. SILVER:   That's not what he said.   Will

Page 76

1    you stop?  You can say whatever you want, but I'm

2    objecting, it misstates his testimony.

3         Go ahead.

4    BY MR. BILLER:

5         Q    Okay.  You would have known about it at least

6    by July 9th, wouldn't you, when the first offer came

7    in, right?

8         A    Yes.

9         Q    You knew it by then, right?

10        A    I think I knew it before then, but yes, at

11   least by then.

12        Q    So you knew before then.

13             When did you talk to Paula Thomas about this

14   new company?

15        A    I don't recall.

16        Q    Did you talk to her before or after this

17   date, July 22?

18        A    Probably before.  I don't recall if my

19   conversations were with her or Andrew Apfelberg.

20        Q    You don't know what Andrew Apfelberg told

21   her, do you?

22        A    I don't.

23        Q    He could be a shitty lawyer and didn't tell

24   her anything, right?

25        A    Well, that's not my experience, but I suppose

                                            Page 77

```
 1    it's possible.
 2        Q    So you have absolutely no personal knowledge
 3    as to what Apfelberg told her, right?
 4        A    Correct.
 5        Q    So let's forget about him.  Let's talk about
 6    you.
 7        A    Okay.
 8        Q    Okay?  When was the first date that you
 9    remember telling Paula Thomas about a new company?
10        A    I don't recall.
11        Q    Let's talk about this oral agreement.  Who
12    did you learn that from?
13        A    I don't know what you're referring to.
14        Q    Oral agreement to form a new company.
15            MR. SILVER:  I think that was your term.  I
16    think he said that he acted at John Hanna's
17    direction.
18    BY MR. BILLER:
19        Q    Okay.  When did John Hanna ask you to do
20    that?
21        A    I don't recall.
22        Q    Was it -- it was certainly before July 8th,
23    correct?
24        A    Not certainly.  It was certainly before
25    July 22nd.
```

Page 78

1    Q    Well, it was prior to the time you filed the
2    articles of organization, correct?

3    A    Correct.

4    Q    And if it takes 14 -- let's assume it takes
5    14 days.

6    A    If we did it on normal speed, not rush, and
7    if it did at this time take 14 days, then at least
8    14 days before the 22nd I would have had the
9    instruction to file it.

10    Q    Okay.  And then you created the operating
11    agreement, right?

12    A    No.

13    Q    That was created by Jenkins.  I understand
14    that.

15    A    Yes.

16    Q    But you finished it?

17    A    Yes.

18    Q    You're the one who put the final product
19    together, right?

20    A    Yes.

21    Q    And you're telling me between the time that
22    you filed the Articles of Incorporation and the time
23    of the operating agreement, you didn't have any
24    discussions whatsoever what should be contained in
25    that operating agreement?

Page 79

1      A   I'm sure we did.

2      Q   With who?

3      A   All right.   Well, there were discussions with

4  John Hanna.   I'm pretty sure I had discussions with

5  Jene Park.   I think that I had some discussions with

6  Paula Thomas.

7      Q   You think, but you don't know?

8      A   I'm pretty sure I did.

9      Q   Well, she's here.   And I'm going to say you

10  didn't.   And if I'm wrong, she'll correct me.

11          You didn't have any discussions with Paula

12  Thomas about the original operating agreement.   In

13  fact, you didn't show it to her.   Isn't that right?

14      A   I think I probably did have conversations

15  with her about it.   I would have shown it to her

16  lawyer.   I'm not sure that I ever would have given

17  it directly to her.

18      Q   Why not?

19      A   Because she was represented by counsel.

20      Q   Oh.   So you felt you can represent her at the

21  same time as PDTW and Paula Thomas, but you couldn't

22  tell her about the new operating agreement because

23  she was represented by counsel?   Really?

24      A   I don't understand your question.   Do you

25  want to rephrase that?

Page 80

1    Q    Yeah, I'll rephrase the question.

2         It appears to me you pick and choose when you

3    can help Paula Thomas or talk to Paula Thomas.

4    Sometimes you can because you're acting as her

5    lawyer, you're acting as a friend, you're acting as

6    the -- as PDTW, correct?

7    A    I think in general I could talk to Paula

8    Thomas.  We were working together.  I could have

9    told her about these things.  I generally went

10   through her lawyer.

11   Q    The operating agreement essentially set up a

12   new corporation, correct?

13   A    No.  The corporation was set up by the

14   articles.  But the operating agreement governs how

15   it's run.

16   Q    Okay.

17   A    You don't need an operating agreement to have

18   a company.

19   Q    But you created one?

20   A    Yes.

21   Q    And Paula Thomas wasn't an owner, not a named

22   owner?

23   A    In the original operating agreement, no.

24   Q    No.  And she wasn't given specifically any

25   duties whatsoever in the original operating

Page 81

# EXHIBIT "23"

1        CALIFORNIA SUPERIOR COURT OF THE STATE OF CALIFORNIA
              COUNTY OF LOS ANGELES, CENTRAL DISTRICT

2    PAULA THOMAS, INDIVIDUALLY,        )
                                        )
3                   PLAINTIFF,          )
                                        )
4       VS.                             ) CASE NO. 18STCV05667
                                        )
5    1)KRING & CHUNG, LLC; (2) KENNETH ) VOLUME I
     W. CHUNG, AN INDIVIDUAL; (3)       ) (PAGES 1-346)
6    LAURA C. HESS, AN INDIVIDUAL; (4) )
     ALLYSON K. THOMPSON, AN            )
7    INDIVIDUAL, (5) LAURA BOOTH, AN    )
8    INDIVIDUAL, (6) ANDREW APFELBERG, )
9    AN INDIVIDUAL; (7) OLIVIA GOODKIN,)
     AN INDIVIDUAL; (8) LEE DRESIE, AN )
10   INDIVIDUAL; (9) GREENBERG GLUSKER,)
     A LLP; (10) JENE PARK, AN          )
11   INDIVIDUAL; (11) JOHN HANNA, AN    )
12   INDIVIDUAL; (12) KF PROFESSIONAL, )
     A CALIFORNIA CORPORATION; (13)     )
13   NORMAN KO, AN INDIVIDUAL; (14)     )
14   JOSEPH FOSTER; AN INDIVIDUAL, (15))
15   MELODY RAFOLS, AN INDIVIDUAL;(16) )
     YOONSUNG BAE, AN INDIVIDUAL, (17) )
16   KYU HONG KIM, CPA, INC. AN         )
17   INDIVIDUAL; KYU HONG KIM, AN       )
     INDIVIDUAL; ALICE KIM, AN          )
18   INDIVIDUAL, AND DOES 1 THROUGH 50,)
19                                      )
                    DEFENDANTS.         )
20   _____ )

21       VIDEOTAPED DEPOSITION OF ANDREW APFELBERG, ESQ.
22                 FRIDAY, APRIL 26, 2019
23   JOB NO. 3268172
24   REPORTED BY:  IVY REID, CSR NO. 13897
25   Pages 1- 345

                                              Page 1

1              VIDEOTAPED DEPOSITION OF ANDREW APFELBERG,

2    ESQ., TAKEN ON BEHALF OF THE PLAINTIFF, AT 9:05 A.M.,

3    FRIDAY, APRIL 26, 2019, AT 2049 CENTURY PARK EAST, SUITE

4    2450, LOS ANGELES, CALIFORNIA 90067, BEFORE IVY REID, CSR

5    NO. 13897.

6

7    APPEARANCES OF COUNSEL:

8    FOR THE PLAINTIFF:

9            LDT CONSULTING, INC.

             BY:  DIMITRIOS P. BILLER, ESQ.

10           15113 WEST SUNSET BOULEVARD

             SUITE 9

11           PACIFIC PALISADES, CALIFORNIA 90272

             310.459.9870

12           BILLER_LDTCONSULTING@VERIZON.NET

13

14   FOR THE DEFENDANTS:

15           HILL FARRER

             BY:  KEVIN H. BROGAN, ESQ.

16           300 SOUTH GRAND AVENUE

             37TH FLOOR

17           LOS ANGELES, CALIFORNIA 90071

             213.620.0460

18           KBROGAN@HILLFARRER.COM

19

20   ALSO PRESENT:

21           LEE A. DRESIE, ESQ.

22           JULIO LUEVANO, VIDEOGRAPHER

23           PAULA THOMPSON

24

25

                                              Page 2

```
1                              INDEX
2
3    DEPONENT               EXAMINATION             PAGE
4    ANDREW APFELBERG, ESQ.
5
                      BY MR. BILLER               6
6
7
                      E X H I B I T S
8
     EXHIBIT                                      PAGE
9
     EXHIBIT 1    COMPLAINT                        15
10
     EXHIBIT 2    DECLARATION                      47
11
     EXHIBIT 3    E-MAIL, SCHNIDER_BK 001162       68
12
     EXHIBIT 4    E-MAIL, SCHNIDER_BK 001233 TO 1234    69
13
     EXHIBIT 5    GREENBERG GLUSKER INVOICES,      135
14                P THOMAS000045 TO 48
15   EXHIBIT 6    E-MAIL CHAIN, SCHNIDER_BK 001310 TO 1315    79
16   EXHIBIT 7    LETTER, PDTW_TW_GG000771 TO 777    87
17   EXHIBIT 8    INDEPENDENT CONTRACTOR AGREEMENT,    114
                  SCHNIDER_BK 005021 TO 5073
18
     EXHIBIT 9    LETTER, SCHNIDER_BK 003920       123
19
     EXHIBIT 10   E-MAIL, SCHNIDER_BK 001530 TO 1532    129
20
     EXHIBIT 11   E-MAIL, PDTW_TW_GG000049 TO 50    131
21
     EXHIBIT 12   INVOICES, P THOMAS000049 TO 78    145
22
     EXHIBIT 13   BINDING TERM AGREEMENT, PDTW_TW_GG000661    175
23
     EXHIBIT 14   E-MAIL, PDTW_TW_GG000659 TO 660    184
24
     EXHIBIT 15   E-MAIL, PDTW_TW_GG000667 TO 668    186
25
                                            Page 3
```

```
 1    INDEX (CONTINUED):

 2

 3                    E X H I B I T S

 4    EXHIBIT                                              PAGE

 5    EXHIBIT 16   E-MAIL, PDTW_TW_GG000669                 187

 6    EXHIBIT 17   NOTES, P DTW_TW_G G000670                188

 7    EXHIBIT 18   NOTES, PDTW_TW_GG000671 TO 672           189

 8    EXHIBIT 19   E-MAIL, 03112 TO 3116                    191

 9    EXHIBIT 20   E-MAIL, PDTW_TW_GG000667 TO 672          197

10    EXHIBIT 21   INVOICES, PDTW_TW_00000836 TO 838        199

11    EXHIBIT 22   LETTER, P_THOMAS000105 TO 109            220

12    EXHIBIT 23   LETTER FROM ANDREW APFELBERG TO PAULA    248
                   THOMAS DATED 11/24/14

13

      EXHIBIT 24   E-MAIL, P_THOMAS000152 TO 153            253
14

      EXHIBIT 25   E-MAIL, P_THOMAS000112 TO 151            257
15

      EXHIBIT 26   E-MAIL, SCHNIDER_BK 001548 TO 1553       276
16

      EXHIBIT 27   E-MAIL, SCHNIDER BK 003992 TO 3397       281
17

      EXHIBIT 28   E-MAIL, SCHNIDER_BK 005163 TO 5209       281
18

      EXHIBIT 29   AMENDED AND RESTATED OPERATING AGREEMENT, 291
19                 SCHNIDER_BK 003604, 30 PAGES

20    EXHIBIT 38   E-MAIL, SCHNIDER_BK 000563 TO 623        321

21                    INSTRUCTED NOT TO ANSWER

22                           (NONE)

23

24                    INFORMATION REQUESTED

25                           (NONE)


                                              Page 4
```

```
1                    LOS ANGELES, CALIFORNIA

2              FRIDAY, APRIL 26, 2019, 9:05 A.M.

3

4           THE VIDEOGRAPHER:  Good morning.  We're on      09:05:47

5    the record.  The time is 9:05 a.m.  Today's date is    09:05:49

6    April 26, 2019.  My name is Julio Luevano, Junior.     09:05:54

7    I'm the notary video technician with Veritext Legal    09:06:00

8    Solutions, located in Los Angeles, California.         09:06:05

9           We're recording these proceedings at 2049       09:06:07

10   Century Park East, Los Angeles, California.  This is   09:06:09

11   media one for the video deposition of Andrew           09:06:13

12   Apfelberg in the action entitled Paula Thomas versus   09:06:17

13   Kring & Chung, LLC.                                    09:06:22

14           This deposition is being taken on behalf of    09:06:24

15   the plaintiff.  The case number is 18STCV05667.  Now   09:06:26

16   may I please have an introduction for the record       09:06:33

17   beginning with counsel.                                09:06:36

18           MR. BILLER:  Dimitrios Biller on behalf of     09:06:37

19   plaintiff and Paula Thomas and plaintiff TW            09:06:39

20   Holdings, Inc.                                         09:06:45

21           MR. BROGAN:  Gavin Brogan on behalf of the     09:06:47

22   Greenberg Glusker defendants.                          09:06:47

23           MR. DRESIE:  Lee Dresie of Greenberg           09:06:50

24   Glusker.                                               09:06:50

25           THE VIDEOGRAPHER:  Thank you.                  09:06:53
```

Page 5

| | | |
|---|---|---|
| 1 | Ms. Reporter, please administer the oath. | 09:07:01 |
| 2 | THE WITNESS:  I do. | 09:07:02 |
| 3 | ANDREW APFELBERG, ESQ., | 09:07:03 |
| 4 | called as a witness on behalf of the Plaintiffs, | 09:07:03 |
| 5 | having been first duly sworn, was examined and | 09:07:03 |
| 6 | testified as follows: | 09:07:03 |
| 7 | ---oOo--- | 09:07:03 |
| 8 | EXAMINATION | 09:07:03 |
| 9 | ---oOo--- | 09:07:03 |
| 10 | BY MR. BILLER: | 09:07:03 |
| 11 | Q.   Have you had your deposition taken | 09:07:03 |
| 12 | before? | 09:07:05 |
| 13 | A.   No. | 09:07:05 |
| 14 | Q.   What's your name? | 09:07:06 |
| 15 | A.   Andrew Apfelberg. | 09:07:07 |
| 16 | Q.   Do you understand what you just did when | 09:07:09 |
| 17 | you raised your right hand? | 09:07:10 |
| 18 | A.   I do. | 09:07:11 |
| 19 | Q.   What did you do? | 09:07:12 |
| 20 | A.   Took an oath. | 09:07:13 |
| 21 | Q.   Took the oath to tell the truth and nothing | 09:07:15 |
| 22 | but the truth; right? | 09:07:17 |
| 23 | A.   Correct. | 09:07:18 |
| 24 | Q.   You know the penalty of perjury applies; | 09:07:19 |
| 25 | right? | 09:07:21 |

Page 6

```
1        A.    Correct.                              09:07:21

2        Q.    In other words, if you make an intentional    09:07:21

3   misstatement of a material fact, you may be and can    09:07:23

4   be reported to law enforcement agencies for    09:07:28

5   prosecution.                                    09:07:33

6        Do you understand that?                     09:07:34

7        A.    I do.                                  09:07:35

8        Q.    Okay.  Do you know what the penalty is for    09:07:35

9   perjury?                                        09:07:38

10       A.    I don't.                              09:07:38

11       Q.    It's one year or $10,000.             09:07:39

12       Do you understand?                          09:07:41

13       A.    I do.                                  09:07:41

14       Q.    Okay.  I'm going to be asking you questions    09:07:42

15  and I'm going to be showing you lots of documents.    09:07:46

16  When I ask you a question, whether it's with a    09:07:50

17  document or not, if you don't understand my    09:07:52

18  question, you got to let me know.               09:07:55

19       Do you understand?                          09:07:57

20       A.    I do.                                  09:07:59

21       Q.    Okay.  If it's vague, ambiguous,       09:08:00

22  unintelligible, you have to let me know because I    09:08:03

23  need to know if you don't understand the question    09:08:06

24  and ask you a better question.                  09:08:08

25       Do you understand?                          09:08:10
```

Page 7

| | | |
|---|---|---|
| 1 | A.   Okay. | 09:08:11 |
| 2 | Q.   One person can speak at a time, the person | 09:08:13 |
| 3 | asking the question and the person answering the | 09:08:17 |
| 4 | question.  Counsel may raise objections.  If he does | 09:08:19 |
| 5 | raise objections, please let him finish his | 09:08:23 |
| 6 | objection.  The objection in most circumstances will | 09:08:27 |
| 7 | be to preserve the objection for a judge and make a | 09:08:29 |
| 8 | ruling upon that at a later date. | 09:08:32 |
| 9 | Do you understand? | 09:08:35 |
| 10 | A.   Okay. | 09:08:35 |
| 11 | Q.   If you want the question read back to you | 09:08:35 |
| 12 | because you don't remember it as a result of the | 09:08:37 |
| 13 | objection, we'll read that question back.  If you | 09:08:37 |
| 14 | want me to restate the question, I'll be more than | 09:08:41 |
| 15 | happy to restate it. | 09:08:44 |
| 16 | Do you understand? | 09:08:45 |
| 17 | A.   Yes. | 09:08:45 |
| 18 | Q.   Okay.  You're not entitled to speculate. | 09:08:46 |
| 19 | You are entitled to provide estimates -- | 09:08:49 |
| 20 | estimations. | 09:08:52 |
| 21 | Do you know the difference? | 09:08:53 |
| 22 | A.   No. | 09:08:54 |
| 23 | Q.   Okay.  In front of you there's a conference | 09:08:54 |
| 24 | table; right? | 09:08:57 |
| 25 | A.   Yes. | 09:08:58 |

Page 8

| | | |
|---|---|---|
| 1 | Q.    So if you were to look at the conference | 09:08:58 |
| 2 | room, stand up, walk it, do measurement by your eye, | 09:08:59 |
| 3 | if I were to ask you what's the dimensions of the | 09:09:04 |
| 4 | conference table, you can actually ask -- tell me | 09:09:06 |
| 5 | the answer to that question because you actually saw | 09:09:10 |
| 6 | it. | 09:09:12 |
| 7 | Do you understand? | 09:09:13 |
| 8 | A.    Yes. | 09:09:13 |
| 9 | Q.    But you didn't measure it.  You saw it and | 09:09:14 |
| 10 | provided me an estimate. | 09:09:16 |
| 11 | Do you understand? | 09:09:17 |
| 12 | A.    Okay. | 09:09:18 |
| 13 | Q.    If I were to ask you what's the size of my | 09:09:18 |
| 14 | desk in my office -- I don't think you've been in my | 09:09:20 |
| 15 | office -- and you give an answer, that would be | 09:09:23 |
| 16 | speculation. | 09:09:25 |
| 17 | A.    Got it. | 09:09:27 |
| 18 | Q.    Do you understand? | 09:09:27 |
| 19 | A.    Yes. | 09:09:28 |
| 20 | Q.    Okay. | 09:09:29 |
| 21 | A.    Thank you. | 09:09:29 |
| 22 | Q.    At the end of these proceedings -- at the | 09:09:35 |
| 23 | end of these proceedings there's going to be a | 09:09:40 |
| 24 | transcript.  It's going to be a voluminous | 09:09:42 |
| 25 | transcript.  It's going to be about 400 pages, and | 09:09:43 |

Page 9

| | | |
|---|---|---|
| 1 | you're going to be asked to read the transcript, and | 09:09:47 |
| 2 | if you find it necessary to make changes to your | 09:09:50 |
| 3 | testimony -- you may find a need to make changes, | 09:09:52 |
| 4 | you may not, I don't know. | 09:09:57 |
| 5 | But if you do make a change to a material | 09:10:00 |
| 6 | answer in the transcript, I will have the right to | 09:10:02 |
| 7 | comment upon that change at the time of trial and | 09:10:08 |
| 8 | attack your credibility for making a material change | 09:10:12 |
| 9 | to the transcript. | 09:10:15 |
| 10 | Do you understand? | 09:10:16 |
| 11 | A.   Okay. | 09:10:16 |
| 12 | Q.   So I welcome you and I encourage you to | 09:10:17 |
| 13 | provide the best testimony here today because I want | 09:10:20 |
| 14 | to avoid that situation.  It's embarrassing to you, | 09:10:23 |
| 15 | embarrassing to your client, and it denies me the | 09:10:26 |
| 16 | opportunity to ask you a question about the real | 09:10:30 |
| 17 | answer because once you leave the deposition room, I | 09:10:32 |
| 18 | can't ask you any more questions. | 09:10:37 |
| 19 | Do you understand? | 09:10:39 |
| 20 | A.   Okay. | 09:10:40 |
| 21 | Q.   In other words, if you change an answer | 09:10:40 |
| 22 | after the deposition is over, then I can't ask you a | 09:10:45 |
| 23 | question about that changed answer. | 09:10:52 |
| 24 | Do you understand? | 09:10:53 |
| 25 | A.   Okay. | 09:10:53 |

Page 10

| | | |
|---|---|---|
| 1 | she would remain on as an employee. | 10:59:20 |
| 2 | In July 2014, I was advised that the | 10:59:23 |
| 3 | companies did not want Greenberg Glusker to continue | 10:59:27 |
| 4 | to represent the companies in any capacity, expect | 10:59:30 |
| 5 | for one brief phone call in October 2014.  Neither | 10:59:33 |
| 6 | Greenberg Glusker nor I subsequently provided | 10:59:37 |
| 7 | services to the companies." | 10:59:40 |
| 8 | Q.   Okay.  Why was Greenberg discharged or | 10:59:42 |
| 9 | asked not to work on the case anymore? | 10:59:48 |
| 10 | MR. BROGAN:  Lack of foundation.  You can | 10:59:55 |
| 11 | answer if you know. | 10:59:56 |
| 12 | THE WITNESS:  Based on my belief and | 11:00:01 |
| 13 | understanding, Mr. Hanna did not like the fact that | 11:00:05 |
| 14 | I was very critical of him and his investment group | 11:00:14 |
| 15 | and did want me or my firm around. | 11:00:19 |
| 16 | BY MR. BILLER: | 11:00:22 |
| 17 | Q.   And when did that conversation take place? | 11:00:22 |
| 18 | A.   Which conversation? | 11:00:26 |
| 19 | Q.   The conversation that you just conveyed. | 11:00:27 |
| 20 | MR. BROGAN:  That's incomplete.  It's vague | 11:00:31 |
| 21 | as to time, but you can -- | 11:00:33 |
| 22 | THE WITNESS:  The conversation about us no | 11:00:36 |
| 23 | longer providing services? | 11:00:37 |
| 24 | BY MR. BILLER: | 11:00:38 |
| 25 | Q.   Yeah. | 11:00:38 |

Page 99

| | | |
|---|---|---|
| 1 | A. What's your question about that | 11:00:40 |
| 2 | conversation? | 11:00:42 |
| 3 | Q. When did you learn that you were being | 11:00:44 |
| 4 | terminated and your firm was being terminated for | 11:00:52 |
| 5 | the reasons you explained? | 11:00:54 |
| 6 | A. I would assume on the last day that we | 11:00:56 |
| 7 | billed to the file because if we're terminated we | 11:01:01 |
| 8 | wouldn't, you know, probably stop working then. | 11:01:03 |
| 9 | Q. That would be July 10? | 11:01:06 |
| 10 | A. I don't recall the exact date, but I think | 11:01:09 |
| 11 | it's probably around there. | 11:01:11 |
| 12 | Q. Yeah. That's the date as reflected in your | 11:01:12 |
| 13 | time sheets. | 11:01:15 |
| 14 | Did you ever convey this information to | 11:01:18 |
| 15 | Paula? | 11:01:21 |
| 16 | MR. BROGAN: Objection. | 11:01:22 |
| 17 | BY MR. BILLER: | 11:01:23 |
| 18 | Q. Did you ever convey information that you | 11:01:23 |
| 19 | were being -- I don't want to say discharge, because | 11:01:27 |
| 20 | that implies something, you know -- that your firm | 11:01:31 |
| 21 | was not going to be representing the companies any | 11:01:35 |
| 22 | longer because you were critical of Hanna? | 11:01:38 |
| 23 | A. I don't know if I relayed all that | 11:01:42 |
| 24 | information to her. No, I don't recall one way or | 11:01:45 |
| 25 | another. | 11:01:48 |

Page 100

```
1        Q.   Don't you think that is important for the      11:01:49

2   owner of those companies to understand?                  11:01:52

3        MR. BROGAN:   The reason he was terminated?          11:01:56

4   Objection.   Vague.                                       11:01:58

5   BY MR. BILLER:                                            11:01:59

6        Q.   You can answer.                                 11:01:59

7        THE WITNESS:   Ma'am, can you please read me         11:02:03

8   the question?                                             11:02:09

9        (The record was read by the court reporter           11:01:49

10       as follows:                                          11:01:49

11       "Don't you think that is important               11:01:49

12       for the owner of those companies to               11:01:51

13       understand?")                                    11:01:53

14       THE WITNESS:   No.                                   11:02:10

15   BY MR. BILLER:                                           11:02:11

16       Q.   You don't.   Why not?                           11:02:11

17       A.   The owner is not my client.   The company is    11:02:14

18   my client.                                               11:02:17

19       Q.   And who is the representative of the            11:02:18

20   client?   You think the client is just some type of     11:02:20

21   box that doesn't -- that's it?   You can't talk to it    11:02:24

22   or have any communication with it?   Is that your       11:02:28

23   idea of the -- of PDTW or TW Holdings?                   11:02:30

24       MR. BROGAN:   Objection.   Argumentative.            11:02:35

25   ///                                                      11:02:36
```

Page 101

| | | |
|---|---|---|
| 1 | BY MR. BILLER: | 11:02:36 |
| 2 | Q.    Is that your idea of a client in this | 11:02:36 |
| 3 | situation? | 11:02:39 |
| 4 | MR. BROGAN:  Objection.  Argumentative. | 11:02:40 |
| 5 | THE WITNESS:  I really don't understand | 11:02:40 |
| 6 | what you're asking. | 11:02:41 |
| 7 | BY MR. BILLER: | 11:02:42 |
| 8 | Q.    You really don't?  Okay.  I'm sorry.  Let | 11:02:42 |
| 9 | me try it again, okay? | 11:02:44 |
| 10 | A corporation or company is separate and | 11:02:47 |
| 11 | independent from the owners; correct? | 11:02:49 |
| 12 | A.    Correct. | 11:02:51 |
| 13 | Q.    A company cannot communicate on its own | 11:02:52 |
| 14 | without people in power to do it for it; correct? | 11:02:57 |
| 15 | A.    Correct. | 11:03:02 |
| 16 | Q.    Okay.  Like Thomas -- Paula Thomas signed | 11:03:02 |
| 17 | the retainer fee agreement on February 5, 2014; is | 11:03:07 |
| 18 | that right? | 11:03:16 |
| 19 | A.    I would have to check the date, but yes, | 11:03:16 |
| 20 | she signed my engagement agreement with my firm. | 11:03:19 |
| 21 | Q.    Okay.  PDTW didn't, did it? | 11:03:23 |
| 22 | MR. BROGAN:  Objection. | 11:03:26 |
| 23 | BY MR. BILLER: | 11:03:27 |
| 24 | Q.    Did PDTW, the company, not Paula Thomas, | 11:03:27 |
| 25 | the company, did it sign the engagement letter? | 11:03:32 |

Page 102

| | | |
|---|---|---|
| 1 | MR. BROGAN:  Objection.  Argumentative. | 11:03:36 |
| 2 | THE WITNESS:  Yes. | 11:03:37 |
| 3 | MR. BROGAN:  Exhibit 7 speaks for itself. | 11:03:38 |
| 4 | BY MR. BILLER: | 11:03:39 |
| 5 | Q.    So now you're saying PDTW was operated and | 11:03:39 |
| 6 | had the ability to sign the retainer fee agreement; | 11:03:43 |
| 7 | right? | 11:03:48 |
| 8 | MR. BROGAN:  Objection.  Argumentative. | 11:03:48 |
| 9 | THE WITNESS:  An officer of the company is | 11:03:50 |
| 10 | empowered to bind it to contracts by signing them. | 11:03:53 |
| 11 | BY MR. BILLER: | 11:03:56 |
| 12 | Q.    Okay.  And you were assigned by -- to | 11:03:56 |
| 13 | represent PDTW and TW Holding -- and you do not | 11:03:59 |
| 14 | believe it's important to inform TW Holding and | 11:04:02 |
| 15 | Thomas Wylde Holdings about your criticisms of John | 11:04:08 |
| 16 | Hanna; is that right? | 11:04:12 |
| 17 | MR. BROGAN:  Objection.  Okay.  Wait. | 11:04:13 |
| 18 | Objection.  Assumes facts not in evidence.  There's | 11:04:15 |
| 19 | a reference to TW Holdings.  The client was Thomas | 11:04:19 |
| 20 | Wylde holdings -- | 11:04:22 |
| 21 | MR. BILLER:  No, it wasn't. | 11:04:23 |
| 22 | MR. BROGAN:  Says right here. | 11:04:24 |
| 23 | MR. BILLER:  No, it's TW Holdings.  It goes | 11:04:25 |
| 24 | by both names, sir.  I'm not going to have this | 11:04:27 |
| 25 | argument with you, okay.  Everybody in the world -- | 11:04:30 |

Page 103

| | | |
|---|---|---|
| 1 | every court in the world knows TW -- Thomas Wylde | 11:04:32 |
| 2 | Holdings is TW Holdings. So you want to pull that | 11:04:36 |
| 3 | one out of your hat? Fine. I'll move on. | 11:04:41 |
| 4 | Read the question back. | 11:04:43 |
| 5 | (The record was read by the court reporter | 11:03:56 |
| 6 | as follows: | 11:03:56 |
| 7 | "And you were assigned by -- to | 11:03:56 |
| 8 | represent PDTW and TW Holding -- and you do | 11:03:59 |
| 9 | not believe it's important to inform TW | 11:04:02 |
| 10 | Holding and Thomas Wylde Holdings about | 11:04:07 |
| 11 | your criticisms of John Hanna; is that | 11:04:09 |
| 12 | right?") | 11:04:12 |
| 13 | MR. BROGAN: Objection. Argumentative. | 11:05:08 |
| 14 | Assumes facts not in evidence. Compound. | 11:05:10 |
| 15 | THE WITNESS: I -- I'm sorry. I don't | 11:05:13 |
| 16 | think it's important -- there's a double negative in | 11:05:14 |
| 17 | there, I think. I don't think it's important to | 11:05:17 |
| 18 | notify the companies of my concerns about John | 11:05:19 |
| 19 | Hanna? | 11:05:23 |
| 20 | BY MR. BILLER: | 11:05:23 |
| 21 | Q. I know you don't want to answer the | 11:05:23 |
| 22 | question because it makes you look incompetent, but | 11:05:25 |
| 23 | let's try it again. | 11:05:26 |
| 24 | MR. BILLER: Read the question back. | 11:05:27 |
| 25 | MR. BROGAN: Objection. Argumentative. | 11:05:29 |

Page 104

| | | |
|---|---|---|
| 1 | (The record was read by the court reporter | 11:03:56 |
| 2 | as follows: | 11:03:56 |
| 3 | "And you were assigned by -- to | 11:03:56 |
| 4 | represent PDTW and TW Holding -- and you | 11:03:59 |
| 5 | do not believe it's important to inform TW | 11:04:02 |
| 6 | Holding and Thomas Wylde Holdings about | 11:04:07 |
| 7 | your criticisms of John Hanna; is that | 11:04:09 |
| 8 | right?") | 11:04:12 |
| 9 | MR. BROGAN:  Same objections. | 11:05:46 |
| 10 | THE WITNESS:  I do think it's important to | 11:05:48 |
| 11 | notify the companies. | 11:05:55 |
| 12 | BY MR. BILLER: | 11:05:58 |
| 13 | Q.   Why didn't you? | 11:05:58 |
| 14 | MR. BROGAN:  Objection.  Argumentative. | 11:06:00 |
| 15 | THE WITNESS:  I did notify the companies -- | 11:06:02 |
| 16 | BY MR. BILLER: | 11:06:04 |
| 17 | Q.   How? | 11:06:04 |
| 18 | A.   -- on many occasions. | 11:06:04 |
| 19 | Q.   How? | 11:06:06 |
| 20 | A.   Orally. | 11:06:06 |
| 21 | Q.   Not in e-mail? | 11:06:08 |
| 22 | A.   No, probably not. | 11:06:09 |
| 23 | Q.   Why not? | 11:06:11 |
| 24 | A.   When -- I didn't feel it was necessary. | 11:06:14 |
| 25 | Q.   Oh, you didn't feel it was necessary to say | 11:06:17 |

Page 105

| | | |
|---|---|---|
| 1 | to Paula Thomas that you don't think Hanna is acting | 11:06:20 |
| 2 | properly.  And you think you can just go -- oh, by | 11:06:25 |
| 3 | phone call, hey, these are my beliefs.  Don't you | 11:06:28 |
| 4 | think that type of issue rises to the level of a | 11:06:33 |
| 5 | memo to document to the file or an e-mail to | 11:06:35 |
| 6 | document to the file as to what's going on as | 11:06:39 |
| 7 | opposed to an alleged phone call? | 11:06:42 |
| 8 | MR. BROGAN:  Objection.  Argumentative. | 11:06:46 |
| 9 | Calls for a conclusion.  Assumes fact not in | 11:06:47 |
| 10 | evidence.  It's vague. | 11:06:51 |
| 11 | THE WITNESS:  Under these specific | 11:06:53 |
| 12 | circumstances, I didn't think it was required. | 11:06:55 |
| 13 | BY MR. BILLER: | 11:06:58 |
| 14 | Q.  Oh, so what in your mind makes it -- makes | 11:06:58 |
| 15 | it required?  I mean, what level of conduct has to | 11:07:02 |
| 16 | occur before you think I better convey this message | 11:07:08 |
| 17 | to the client in writing? | 11:07:12 |
| 18 | MR. BROGAN:  Objection.  Argumentative. | 11:07:17 |
| 19 | THE WITNESS:  It's -- it's not as much the | 11:07:22 |
| 20 | conduct that informed my decision as much as the | 11:07:26 |
| 21 | frequency of having raised these issues orally to | 11:07:33 |
| 22 | the entire senior management team and getting in | 11:07:37 |
| 23 | loud arguments with Mr. Hanna in front of the | 11:07:43 |
| 24 | management team. | 11:07:47 |
| 25 | /// | 11:07:48 |

Page 106

```
1    BY MR. BILLER:                                    11:07:48

2        Q.   So you didn't think it was important     11:07:48

3    because you got in large arguments with Hanna to put  11:07:50

4    it in writing what you felt and why he was in    11:07:54

5    error -- you didn't think that was important; is  11:07:58

6    that right?                                        11:08:00

7            MR. BROGAN:  Objection.  Argumentative.   11:08:00

8    Calls for a conclusion.  Assumes facts not in     11:08:02

9    evidence.                                          11:08:07

10           THE WITNESS:  I didn't think it was        11:08:07

11   important to put in writing the same thing that I  11:08:09

12   had said orally numerous times.                    11:08:13

13   BY MR. BILLER:                                    11:08:16

14       Q.   Why wouldn't you put in writing something  11:08:16

15   about your beliefs, maybe not quote what you said  11:08:18

16   orally -- allegedly said orally, but put something  11:08:22

17   in writing?                                        11:08:25

18           Why didn't you find a need to do that?    11:08:27

19           MR. BROGAN:  Objection.  Argumentative.   11:08:30

20   Two questions.  Vague.                             11:08:31

21           THE WITNESS:  Which question are you       11:08:33

22   asking?                                            11:08:35

23   BY MR. BILLER:                                    11:08:36

24       Q.   Answer the question, both, if there are  11:08:36

25   two.                                              11:08:38
```

Page 107

| | | |
|---|---|---|
| 1 | MR. BROGAN:  There are two.  He can only | 11:08:39 |
| 2 | answer one at a time. | 11:08:40 |
| 3 | BY MR. BILLER: | 11:08:42 |
| 4 | Q.    What -- why didn't you put it in writing | 11:08:42 |
| 5 | your concerns about Hanna -- and forget about what | 11:08:47 |
| 6 | he was yelling and screaming about or arguing about | 11:08:52 |
| 7 | with everybody -- or they were arguing about you -- | 11:08:54 |
| 8 | why wouldn't you just simply write an e-mail, Paula, | 11:08:57 |
| 9 | memo to file, John Hanna is doing this, that, and | 11:09:00 |
| 10 | the other, I recommend that he not be part of the | 11:09:03 |
| 11 | mission -- part of the program -- or whatever. | 11:09:05 |
| 12 | Why couldn't you write that?  How long | 11:09:07 |
| 13 | would that take? | 11:09:09 |
| 14 | MR. BROGAN:  Objection.  Argumentative. | 11:09:10 |
| 15 | Compound.  Two questions. | 11:09:13 |
| 16 | BY MR. BILLER: | 11:09:17 |
| 17 | Q.    Forget the second question of how long it | 11:09:17 |
| 18 | would take. | 11:09:19 |
| 19 | Why didn't you do it? | 11:09:20 |
| 20 | A.    Again, given the frequency with which I had | 11:09:23 |
| 21 | had oral communications with the entire management | 11:09:28 |
| 22 | team and Mr. Hanna in front of him including | 11:09:32 |
| 23 | numerous times about my concerns about his ability | 11:09:35 |
| 24 | to perform, I didn't feel it was necessary to send | 11:09:37 |
| 25 | an additional communication to say the same thing. | 11:09:45 |

Page 108

| | | |
|---|---|---|
| 1 | Q. How long would have that taken you, to | 11:09:52 |
| 2 | draft an e-mail about your thoughts of Hanna? | 11:09:55 |
| 3 | How long would that have taken you? | 11:09:57 |
| 4 | MR. BROGAN: Objection. Argumentative. | 11:10:00 |
| 5 | Incomplete hypothetical. Vague. | 11:10:01 |
| 6 | THE WITNESS: Not very long. | 11:10:02 |
| 7 | BY MR. BILLER: | 11:10:03 |
| 8 | Q. Okay. And you bill the time that you work | 11:10:03 |
| 9 | on a case; right? | 11:10:07 |
| 10 | A. Yes. | 11:10:09 |
| 11 | Q. So when you took the time -- if you would | 11:10:09 |
| 12 | have taken the time to write the memo -- it could | 11:10:12 |
| 13 | have been a one-page memo, it could have been a | 11:10:15 |
| 14 | ten-page memo -- you would have billed that work to | 11:10:20 |
| 15 | the companies; right? | 11:10:23 |
| 16 | A. I may have. | 11:10:23 |
| 17 | Q. You would have, wouldn't you -- don't your | 11:10:24 |
| 18 | partnership agreements require you to bill all the | 11:10:27 |
| 19 | time you spend on the work for clients? | 11:10:30 |
| 20 | MR. BROGAN: Lack of foundation. | 11:10:35 |
| 21 | THE WITNESS: I don't think that topic is | 11:10:36 |
| 22 | covered in our partnership agreement. | 11:10:38 |
| 23 | BY MR. BILLER: | 11:10:40 |
| 24 | Q. I want to ask you, why did you give | 11:10:40 |
| 25 | inconsistent testimony on this issue? | 11:10:42 |

Page 109

| | | |
|---|---|---|
| 1 | MR. BROGAN:  Objection.  Vague. | 11:10:45 |
| 2 | Argumentative. | 11:10:47 |
| 3 | THE WITNESS:  You testified you didn't | 11:10:49 |
| 4 | inform Paula because you represented the companies. | 11:10:51 |
| 5 | That's what you testified to now. | 11:10:55 |
| 6 | MR. BROGAN:  That mischaracterizes his | 11:10:58 |
| 7 | testimony -- | 11:10:58 |
| 8 | MR. BILLER:  Let me finish my statement. | 11:10:59 |
| 9 | MR. BROGAN:  That mischaracterizes his | 11:11:00 |
| 10 | testimony. | 11:11:01 |
| 11 | MR. BILLER:  Listen -- let me finish my | 11:11:02 |
| 12 | question. | 11:11:03 |
| 13 | BY MR. BILLER: | 11:11:04 |
| 14 | Q.   Now you're saying that you didn't convey | 11:11:04 |
| 15 | this to Paula because you were conveying it to the | 11:11:06 |
| 16 | management team at TW Hold- -- which is the truth? | 11:11:10 |
| 17 | MR. BROGAN:  That mischaracterizes his | 11:11:14 |
| 18 | testimony. | 11:11:14 |
| 19 | BY MR. BILLER: | 11:11:16 |
| 20 | Q.   Which is the truth? | 11:11:16 |
| 21 | MR. BROGAN:  Mischaracterizes his | 11:11:16 |
| 22 | testimony.  It's argumentative. | 11:11:17 |
| 23 | MR. BILLER:  Okay. | 11:11:19 |
| 24 | Let's go back to my question before I | 11:11:21 |
| 25 | started talking about the boxes. | 11:11:24 |

Page 110

1      Q      So he was -- he distracted you when I

2   gave -- when I was in the middle of formulating and

3   asking you questions; correct?

4      A      I wouldn't really say distracted.  I

5   just glanced --

6      Q      You just said he was.

7      A      I was glancing through it.

8      Q      Which is it, you weren't distracted or

9   you were distracted; because you gave two different

10  answers?

11     A      I said I wasn't really distracted.

12     Q      That's now a third, actually.  A third

13  answer.

14          MR. PEDDIE:  Objection, argumentative.

15  BY MR. BILLER:

16     Q      Let's start all over.  When opposing

17  counsel inappropriately showed you

18          MR. PEDDIE:  Objection --

19  BY MR. BILLER:

20     Q      -- a document before to try to refresh

21  your recollection, were you distracted?

22          MR. PEDDIE:  Objection, argumentative;

23  mischaracterizes.

24          THE WITNESS:  A bit, yes.

25          MR. BILLER:  Thank you.

                                    Page 113

| | | |
|---|---|---|
| 1 | have the original document. | 11:59:45 |
| 2 | Q.   That would be Park? | 11:59:46 |
| 3 | A.   In this instance Ms. Park would be the | 11:59:48 |
| 4 | holder of the warrant. | 11:59:50 |
| 5 | Q.   And wouldn't the company have one? | 11:59:52 |
| 6 | A.   Oftentimes, the company will have a copy of | 11:59:56 |
| 7 | the warrant. | 11:59:59 |
| 8 | Q.   Okay. | 12:00:00 |
| 9 | MR. BILLER:  Let me go ahead and show you | 12:00:09 |
| 10 | what's been marked as Exhibit 12 -- no, number 5. | 12:00:13 |
| 11 | We need Number 5, don't we.  Number 5. | 12:00:17 |
| 12 | (Whereupon Exhibit 5 was marked by the | 12:00:19 |
| 13 | court reporter and attached hereto.) | 12:00:19 |
| 14 | MR. DRESIE:  This is the first 5 we've got? | 12:00:19 |
| 15 | MR. BILLER:  Yeah. | 12:00:22 |
| 16 | THE WITNESS:  Do you want me to read it? | 12:00:33 |
| 17 | BY MR. BILLER: | 12:00:34 |
| 18 | Q.   I want you to look at it.  If you need to | 12:00:34 |
| 19 | read it, read it.  I'm not going to ask you a lot of | 12:00:37 |
| 20 | questions about it. | 12:00:40 |
| 21 | You read this before your deposition, | 12:01:21 |
| 22 | didn't you? | 12:01:23 |
| 23 | A.   Yes.  But I don't know what it is you're to | 12:01:24 |
| 24 | going ask me, so I wanted to read it again. | 12:01:29 |
| 25 | Q.   Well, I'm just going to focus on -- I want | 12:01:32 |

Page 135

```
1    you to authenticate it.                               12:01:35
2              What is Exhibit Number 5?                   12:01:37
3         A.   Exhibit 5 appears to be an invoice dated    12:01:41
4    1/21/15, number 565012.                               12:01:44
5         Q.   And is this the complete invoice regarding  12:01:49
6    the time that you worked on Paula Thomas's case       12:01:51
7    between November 24 and December 24?                  12:01:59
8         A.   The first entry is 11/24/14 and the last    12:02:15
9    entry is 12/24/14.                                    12:02:18
10        Q.   So this document contains all of the work   12:02:21
11   or reflects all of the work that you did for          12:02:24
12   Ms. Thomas between November 24 and December 24;       12:02:27
13   correct?                                              12:02:38
14        A.   It reflects all the work that we billed her 12:02:38
15   for.                                                  12:02:40
16        Q.   Are you saying that's work that you did for 12:02:41
17   her that's not reflected in this billing sheet?       12:02:43
18        A.   I'm not saying that.                        12:02:46
19        Q.   Okay.  Well, Exhibit 5 is a time -- is a    12:02:48
20   billing document; right?                              12:02:51
21        A.   It's an invoice.                            12:02:53
22        Q.   Okay.  It's an invoice.  It's sent out to   12:02:54
23   the clients; right?                                   12:02:59
24        A.   I believe so.                               12:02:59
25        Q.   Okay.  And you have to prepare summaries of 12:03:00
```

Page 136

```
 1    the time you work on a given case and how much time    12:03:02

 2    you worked on that given case in order to bill the     12:03:07

 3    client a certain amount; right?                        12:03:11

 4         A.   Correct.                                     12:03:13

 5         Q.   Okay.  And it's customary in the legal       12:03:13

 6    practice, some do it better than others, to write      12:03:17

 7    descriptive details about the work done; right?        12:03:21

 8         A.   I think every attorney has their own style,  12:03:24

 9    but -- how detailed they get in their time             12:03:28

10    entries.                                               12:03:31

11         Q.   But you would agree some attorneys are very  12:03:31

12    detailed and others are not so detailed?               12:03:35

13         A.   Yes, I would agree with that.                12:03:39

14         Q.   Okay.  So are you saying that prior to       12:03:42

15    January 31, 2014 you did work for Paula Thomas         12:03:45

16    that's not reflected on Exhibit 5?                     12:03:53

17         MR. BROGAN:  Mr. Biller, check the date of        12:04:02

18    your question.  I just want to make sure --            12:04:04

19         MR. BILLER:  Okay.  Can you read it back,         12:04:06

20    please.                                                12:04:19

21         (The record was read by the court reporter        12:03:42

22         as follows:                                       12:03:42

23            "So are you saying that prior to               12:03:42

24         January 31, 2014 you did work for Paula           12:03:45

25         Thomas that's not reflected on Exhibit            12:03:52
```

Page 137

November 2014.  PDTW was not supposed to have any debt as of December 31,

2014, and I never agreed verbally or in writing that that PDTW would pay for the

expenses TW incurred in 2014 and 2015.

> **Thus, from mid-2014 or so onwards, and as Debtor and TW**
>
> **studied how best to hand off Debtor's business to TW, TW started**
>
> **lending money to Debtor either directly or through paying its**
>
> **creditors and vendors**. This was also so that Debtor could pay things
>
> like rent and payroll and otherwise continue operations at a time when
>
> it was insolvent and once again on the verge of collapsing. (pg. 2, lns.
>
> 14-18)

19.    Nobody talked to me about how to best hand off PDTW's business to

TW.  I own 99.5% of PDTW.  I never signed any promissory notes, loan

agreement, or contract allowing TW to "lend" money to PDTW or pay its

creditors.  I never signed any documents for loans from TW and I did not authorize

TW to pay Debtor's expenses.  Again, I was the CEO, President, Chief Creative

Designer for PDTW.  John Hanna was an independent contractor with no authority

to bind PDTW to anything.  I had to approve of all transactions involving PDTW.

16

**DECLARATON OF PAULA THOMAS IN SUPPORT OF PDTW, LLC AND PAULA THOMA'S MOTION FOR AN
ORDER TO SHOW CAUSE WHY THOMAS WYLDE, LLC, RICHARD PEDDIE, DAVID SCHNIDER AND JENE
PARK SHOULD NOT BE HELD IN CONTEMPT**

```
1              MR. BROGAN:  Okay.  Because your question    12:05:30
2    was different than that.                              12:05:31
3              MR. DRESIE:  It's during the 30-day         12:05:32
4    period.                                               12:05:34
5              MR. BROGAN:  Right.                          12:05:34
6              THE WITNESS:  I think this invoice          12:05:35
7    generally reflects the work that I did.               12:05:37
8    BY MR. BILLER:                                         12:05:39
9       Q.    Okay.  In this time period?                  12:05:39
10      A.    In this particular time period shown on      12:05:41
11   this invoice.                                          12:05:43
12      Q.    Okay.  Let's go to your declaration.  Go to  12:05:44
13   paragraph 16, please.                                  12:06:14
14      A.    Yep.                                          12:06:19
15      Q.    Okay.  Read 16 into the record, please.      12:06:20
16      A.    "Following Ms. Thomas's signing of the       12:06:25
17   Thomas engagement agreement, Greenberg Glusker        12:06:27
18   performed work under the terms of that agreement      12:06:30
19   which took several months.  In that time we           12:06:33
20   represented Ms. Thomas in the completion of a         12:06:35
21   transaction between the companies and an investment   12:06:37
22   group sourced by Mr. Hanna.  Thereafter, we did not   12:06:40
23   hear from or do any work for Ms. Thomas for several   12:06:44
24   months."                                              12:06:45
25      Q.    That's not true, is it?                      12:06:46
```

                                                    Page 139

| | | |
|---|---|---|
| 1 | A.   I disagree with your statement. | 12:06:49 |
| 2 | Q.   Well, the only work you did for Ms. Thomas | 12:06:51 |
| 3 | related to this transaction was the work you did in | 12:06:53 |
| 4 | that 30-day period; right? | 12:06:57 |
| 5 | A.   How are you defining "this transaction"? | 12:06:59 |
| 6 | Q.   The transactions as described in the | 12:07:03 |
| 7 | retainer agreement, employment and investment | 12:07:06 |
| 8 | documents. | 12:07:08 |
| 9 | A.   There were -- the transaction with the | 12:07:13 |
| 10 | Hillshore group closed around the end of December. | 12:07:20 |
| 11 | Shortly thereafter, Ms. Thomas considered launching | 12:07:26 |
| 12 | a bid to buy it back. | 12:07:29 |
| 13 | Q.   Who told you that? | 12:07:34 |
| 14 | A.   Ms. Thomas. | 12:07:37 |
| 15 | Q.   Do you have it in e-mail? | 12:07:38 |
| 16 | A.   I would have to review my e-mails to make | 12:07:41 |
| 17 | sure. | 12:07:44 |
| 18 | Q.   Well, I have all the e-mails -- well, let | 12:07:44 |
| 19 | me walk that back.  I have all the e-mails that your | 12:07:47 |
| 20 | firm has produced to me claiming them to be all your | 12:07:51 |
| 21 | e-mails. | 12:07:54 |
| 22 | I have not reviewed a single e-mail that | 12:07:55 |
| 23 | Ms. Thomas wanted to buy the corporation back or the | 12:07:58 |
| 24 | company back.  Not a single e-mail.  So did that -- | 12:08:02 |
| 25 | tell me exactly what -- what that work involved. | 12:08:07 |

Page 140

| | | |
|---|---|---|
| 1 | A.    Again, I'm going from memory, but basically | 12:08:13 |
| 2 | she was considering, you know, seeing if there would | 12:08:17 |
| 3 | be an investment group that would back her to buy | 12:08:19 |
| 4 | the company back. | 12:08:22 |
| 5 | Q.    And what did you do in that respect? | 12:08:23 |
| 6 | A.    I don't recall exactly but probably chatted | 12:08:29 |
| 7 | with her about what would be required to do that. | 12:08:32 |
| 8 | Q.    And that took several months? | 12:08:35 |
| 9 | A.    Again, I would have to look at the time | 12:08:39 |
| 10 | sheets for those several months to let you know. | 12:08:40 |
| 11 | Q.    So you would agree, if there was any work | 12:08:54 |
| 12 | regarding the lines that you just identified, it | 12:08:58 |
| 13 | would be in time sheets; right? | 12:09:00 |
| 14 | MR. BROGAN:    Objection.    Incomplete | 12:09:03 |
| 15 | hypothetical.    Vague. | 12:09:05 |
| 16 | THE WITNESS:    I don't agree with your | 12:09:10 |
| 17 | statement that I lied, nor do I agree with your | 12:09:12 |
| 18 | statement that things would necessarily be in the | 12:09:14 |
| 19 | time sheets.    I may not have billed her for, you | 12:09:16 |
| 20 | know, sitting and meeting with her about what it | 12:09:21 |
| 21 | would take to potentially buy back the company. | 12:09:23 |
| 22 | BY MR. BILLER: | 12:09:26 |
| 23 | Q.    Sir, you wrote this in your declaration. | 12:09:26 |
| 24 | Okay.    You wrote the words, "Following Ms. Thomas's | 12:09:29 |
| 25 | signing of the Thomas engagement letter, Greenberg | 12:09:45 |

Page 141

# EXHIBIT "1"

| | | |
|---|---|---|
| 1 | agreement, what work was being done under your | 12:10:48 |
| 2 | retainer fee agreement for Paula Thomas after | 12:10:49 |
| 3 | December 31, 2014. | 12:10:53 |
| 4 | What is that work? | 12:10:55 |
| 5 | MR. BROGAN:  Objection.  Vague as | 12:10:56 |
| 6 | phrased. | 12:10:58 |
| 7 | MR. DRESIE:  Asked and answered. | 12:10:59 |
| 8 | THE WITNESS:  All of our work would be | 12:10:59 |
| 9 | covered by the engagement letter. | 12:11:01 |
| 10 | BY MR. BILLER: | 12:11:03 |
| 11 | Q.  That's not true.  But anyways, I want to | 12:11:03 |
| 12 | know what work you're talking about. | 12:11:05 |
| 13 | A.  Can you clarify your question? | 12:11:09 |
| 14 | Q.  No, I can't.  I want to know what type of | 12:11:11 |
| 15 | work you're talking about that took months.  It's in | 12:11:13 |
| 16 | your declaration. | 12:11:16 |
| 17 | Please describe the work that you did for | 12:11:17 |
| 18 | months after.  What are you talking about? | 12:11:21 |
| 19 | A.  I believe the firm's invoices and time | 12:11:24 |
| 20 | statements would speak for themselves. | 12:11:27 |
| 21 | Q.  So you're not going to answer the question? | 12:11:30 |
| 22 | Really?  You're not going to answer the question? | 12:11:36 |
| 23 | A.  I believe I did. | 12:11:39 |
| 24 | Q.  No, you didn't.  What work did you do for | 12:11:40 |
| 25 | Thomas Wylde in January 2015? | 12:11:44 |

Page 143

```
 1              MR. BROGAN:  Objection.  Vague.              12:11:48
 2              THE WITNESS:  I don't remember what work I   12:11:51
 3   did or didn't do in January of '15.  I would need to   12:11:52
 4   see my time sheets --                                  12:11:55
 5   BY MR. BILLER:                                          12:11:56
 6      Q.   Well, you said you reviewed your time          12:11:56
 7   sheets before the depo, didn't you?                    12:11:58
 8      A.   I did.                                          12:11:59
 9      Q.   Okay.  Are you telling me you forgot the       12:12:00
10   information that you reviewed from the time you        12:12:03
11   reviewed until your deposition?                        12:12:06
12           Is that what you're saying?                    12:12:09
13              MR. BROGAN:  Objection.  Argumentative.     12:12:10
14              THE WITNESS:  I'm saying I don't remember   12:12:11
15   each time entry -- each word of each time entry over   12:12:13
16   that period.                                           12:12:17
17   BY MR. BILLER:                                          12:12:19
18      Q.   I'm not asking you for each time entry.        12:12:19
19   I'm asking you for generally speaking.  You say in     12:12:20
20   your declaration you did work for her for months.      12:12:23
21           Well, we know your December time sheet         12:12:26
22   shows you did work in December and November.  What     12:12:31
23   did you do in January, if anything?                    12:12:34
24      A.   Again, I don't recall the specifics.  I        12:12:38
25   believe I've already told you the general nature of    12:12:41
```

                                                    Page 144

| | | |
|---|---|---|
| 1 | it.  And other lawyers at the firm may have assisted | 12:12:43 |
| 2 | her with other items during that time period. | 12:12:48 |
| 3 | Q.    So you're talking about work that other | 12:12:50 |
| 4 | lawyers did; right? | 12:12:52 |
| 5 | A.    I deliberately used the word "Greenberg | 12:12:53 |
| 6 | Glusker" and not "I." | 12:12:57 |
| 7 | Q.    Okay. | 12:13:00 |
| 8 | MR. BILLER:  Let's go ahead and mark as | 12:13:01 |
| 9 | identification all the time sheets for client number | 12:13:03 |
| 10 | 84016.  84016.  We'll mark this Exhibit 12. | 12:13:09 |
| 11 | (Whereupon Exhibit 12 was marked by the | 12:13:30 |
| 12 | court reporter and attached hereto.) | 12:13:30 |
| 13 | MR. BILLER:  How do you guys want to | 12:13:30 |
| 14 | receive it?  I can put it together as one | 12:13:32 |
| 15 | document. | 12:13:35 |
| 16 | MR. BROGAN:  That's fine.  We'll get a copy | 12:13:36 |
| 17 | from the court reporter when we get the copy of the | 12:13:38 |
| 18 | deposition transcript. | 12:13:40 |
| 19 | MR. BILLER:  Okay.  So I just want -- | 12:13:40 |
| 20 | what's going to be easier for you?  Because I | 12:13:41 |
| 21 | unfortunately made it copies per month.  And I just | 12:13:44 |
| 22 | think that's going to be awkward. | 12:13:47 |
| 23 | MR. BROGAN:  If you want to combine them | 12:13:49 |
| 24 | all into one -- | 12:13:50 |
| 25 | MR. BILLER:  Yeah, that's what I would like | 12:13:52 |

Page 145

| | | |
|---|---|---|
| 1 | Q. Okay. Did you know anything about that? | 04:03:21 |
| 2 | A. About which? | 04:03:23 |
| 3 | Q. John Hanna signing a promissory note | 04:03:25 |
| 4 | naming -- giving the IP as collateral to Stephen | 04:03:27 |
| 5 | Choi's wife? | 04:03:31 |
| 6 | Did you know that? | 04:03:34 |
| 7 | A. That doesn't sound familiar, no. | 04:03:37 |
| 8 | Q. I didn't think you would know that. But | 04:03:38 |
| 9 | that happened between November -- I mean August 2014 | 04:03:41 |
| 10 | and December 2014. | 04:03:48 |
| 11 | Do you know why it happened? | 04:03:50 |
| 12 | A. No, sir. | 04:03:52 |
| 13 | Q. You guys interested in knowing what | 04:03:53 |
| 14 | happened? | 04:03:55 |
| 15 | A. Yes. | 04:03:56 |
| 16 | Q. It's funny story -- not funny, it's sad, | 04:03:56 |
| 17 | it's pathetic, these type of people you were dealing | 04:04:00 |
| 18 | with. | 04:04:02 |
| 19 | John Hanna didn't prepare the operating | 04:04:03 |
| 20 | agreement before November 11. Stephen Choi got | 04:04:05 |
| 21 | pissed off and told John Hanna, "What are you going | 04:04:11 |
| 22 | to do about this? I own a hundred percent of a | 04:04:14 |
| 23 | company that doesn't have anything and nothing of a | 04:04:16 |
| 24 | company that has everything." | 04:04:17 |
| 25 | John Hanna said, "We'll give you the | 04:04:19 |

Page 285

| | | |
|---|---|---|
| 1 | collateral. We'll use the IP as collateral for the | 04:04:21 |
| 2 | $2 million loan." | 04:04:24 |
| 3 | John Hanna went to David Schnider, drew up | 04:04:26 |
| 4 | the $2 million promissory note. Didn't talk to | 04:04:31 |
| 5 | Paula. Didn't get authority from Paula. Didn't get | 04:04:35 |
| 6 | permission from Paula. Then he signed it. They | 04:04:39 |
| 7 | defaulted within a month. | 04:04:46 |
| 8 | So actually, if a fraud wasn't committed on | 04:04:49 |
| 9 | multiple levels, and Eniluz Gonzales can claim she | 04:04:53 |
| 10 | owns the IP. | 04:04:57 |
| 11 | Now, what did you do to prevent that from | 04:04:59 |
| 12 | happening? | 04:05:02 |
| 13 | A.    To prevent which from happening -- | 04:05:04 |
| 14 | Q.    From Eniluz Gonzales getting put on -- | 04:05:07 |
| 15 | getting her name put on a promissory note that made | 04:05:11 |
| 16 | her the collector of the IP if the $2 million went | 04:05:13 |
| 17 | into default. | 04:05:19 |
| 18 | A.    I wasn't aware of that promissory note's | 04:05:23 |
| 19 | existence. | 04:05:27 |
| 20 | Q.    Do you know why you weren't aware? | 04:05:28 |
| 21 | A.    No, I don't know why. | 04:05:30 |
| 22 | Q.    You want to know why? Because you didn't | 04:05:32 |
| 23 | attach it to the purchase agreement. You attached | 04:05:33 |
| 24 | every other conceivable document to the purchase | 04:05:36 |
| 25 | agreement. You attached the employment agreement, | 04:05:39 |

Page 286

| | | |
|---|---|---|
| 1 | you attached the use of proceeds agreement, you | 04:05:41 |
| 2 | attached -- | 04:05:46 |
| 3 | MS. THOMAS:  Indemnity. | 04:05:48 |
| 4 | BY MR. BILLER: | 04:05:49 |
| 5 | Q.    -- indemnity agreement, you attached the | 04:05:49 |
| 6 | amended operating agreement, you attached a | 04:05:52 |
| 7 | dissolution agreement, you attached the assignments, | 04:05:56 |
| 8 | but you didn't, you didn't attach the promissory | 04:05:58 |
| 9 | note that gave Eniluz Gonzales authority to take | 04:06:02 |
| 10 | that IP, when the agreement for purchase said | 04:06:07 |
| 11 | Hillshore was obligated to fund a $2 million loan; | 04:06:10 |
| 12 | isn't that right? | 04:06:16 |
| 13 | MR. BROGAN:  Objection.  Argumentative. | 04:06:18 |
| 14 | Assumes facts not in evidence. | 04:06:19 |
| 15 | MR. BILLER:  Oh, they're all in evidence, | 04:06:20 |
| 16 | buddy, in spades. | 04:06:22 |
| 17 | THE WITNESS:  Sir, I ask you again to | 04:06:22 |
| 18 | please not raise your voice at me. | 04:06:23 |
| 19 | BY MR. BILLER: | 04:06:23 |
| 20 | Q.   I can't.  You know, I'm Greek.  Kind of get | 04:06:23 |
| 21 | passionate, you know? | 04:06:27 |
| 22 | A.   In any event, I prefer you not raise your | 04:06:31 |
| 23 | voice at me. | 04:06:33 |
| 24 | Q.   That wasn't at you.  That was at Eniluz | 04:06:34 |
| 25 | Gonzales and David Schnider.  You didn't -- did you | 04:06:36 |

Page 287

```
 1    do anything to stop that from happening?                04:06:39

 2             MR. BROGAN:  Objection.  Argumentative.        04:06:43

 3    Assumes facts not in evidence.  Calls for              04:06:44

 4    conclusion.                                             04:06:47

 5             THE WITNESS:  I'm not sure what question       04:06:49

 6    I'm being asked.  First, I was asked that --           04:06:49

 7    BY MR. BILLER:                                          04:06:49

 8        Q.   Did you --                                     04:06:49

 9        A.   Sir, let me finish.                            04:06:50

10        Q.   Okay.                                          04:06:51

11        A.   First, you were asking me --                   04:06:51

12        Q.   No, I'm withdrawing it.  I'm withdrawing       04:06:55

13    the question.  You don't understand, I don't want      04:06:55

14    you to talk.                                            04:06:55

15             Why didn't you put the promissory note with   04:06:58

16    the other documents as part of the purchase            04:07:01

17    agreement?  Why didn't you do that?                     04:07:04

18             MR. BROGAN:  Objection.  Argumentative.        04:07:07

19    Assumes facts not in evidence.                         04:07:10

20             THE WITNESS:  I don't recall exactly why I    04:07:11

21    did or did not attach it.  I can only assume it's      04:07:14

22    because it was a document that had already been        04:07:19

23    entered into previously, and so when I was attaching   04:07:23

24    the documents, I was attaching the ones that were to   04:07:26

25    be entered into contemporaneous with the closing of   04:07:30
```

Page 288

# GREENBERG GLUSKER

1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

General billing questions: (310) 785-6842
(310) 785-6831
(310) 785-6863

Summary of attached invoices for Client # 84016

Fax: (310) 553-7018

**Paula Thomas**

Due Date: February 11, 2015

Invoice date: 01/21/15
Invoice # 565012

Charges through: 12/31/14

| Matter Number | Name | Previous Balance | Current Charges | Payments and Retainers To 01/21/15 | Adjustments To 01/21/15 | Retainer Replenish-ment | Amount Due |
|---|---|---|---|---|---|---|---|
| 00001 | General | $ 0.00 | $ 12,736.00 | $ -5,000.00 | $ 0.00 | $ 5,000.00 | $ 12,736.00 |
| | **Bill Total** | **$ 0.00** | **$ 12,736.00** | **$ -5,000.00** | **$ 0.00** | **$ 5,000.00** | **$ 12,736.00** |

Paula Thomas
2514 South Toledo Avenue
Palm Springs, CA 92264

In order to ensure proper credit, please be sure your check reflects the client name or number shown above and the matters being paid, and return the remittance copies attached. Payments received will apply first to accrued interest and then to costs and fees. Please make checks payable to Greenberg Glusker Fields Claman & Machtinger LLP.

Atty : AMA, #500  P822154

Page 1

Tax ID # 95-2161045

P_THOMAS000045

# GREENBERG GLUSKER

1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

General billing questions: (310) 785-6842
(310) 785-6831
(310) 201-7443

Fax: (310) 553-7018

Client # 84016,    **Paula Thomas**
Matter # 00001,    General

**Due Date: February 11, 2015**

Invoice date: 01/21/15
Invoice # 565012

Charges through: 12/31/14

## FEES

| Date | Timekeeper | Description of Services | Hours | Amount |
|---|---|---|---|---|
| 11/24/14 | AM Apfelberg | Meeting with Paula Thomas and telephone conference(s) David S re employment and investment documents. | 1.10 | $ 577.50 |
| 11/25/14 | AM Apfelberg | Prepare call option language; email same to counsel for the company; email to counsel for company re repurchase on termination of employment issues | 1.10 | $ 577.50 |
| 12/10/14 | AM Apfelberg | Telephone conference(s) client re issues and strategy re negotiation. | 1.40 | $ 210.00 |
| 12/11/14 | AM Apfelberg | Conference with David re structure and issues; review and comment on drafts of documents | 1.20 | $ 630.00 |
| 12/11/14 | KA Spillers | Thomas Wylde call | 0.50 | $ 212.50 |
| 12/12/14 | AM Apfelberg | Preliminary review of Operating Agreement, Subscription Agreement and ancillary documents; review of diligence materials re personal guarantees, other employment and investment agreements, etc. | 0.30 | $ 157.50 |
| 12/13/14 | AM Apfelberg | Review and comment on entire package of transaction documents. | 1.90 | $ 997.50 |
| 12/15/14 | AM Apfelberg | Prepare amendment to Operating Agreement and Use of Proceeds Agreement;. | 6.40 | $ 3,360.00 |
| 12/15/14 | LA Cicconi | Discuss possible tax issue with clawback agreement with A. Apfelberg. | 0.20 | $ 81.00 |
| 12/16/14 | AM Apfelberg | Telephone conference(s) client re comments on transaction documents; revise documents; emails to/from David thereon and re issues relative to guarantees. | 0.70 | $ 367.50 |
| 12/17/14 | AM Apfelberg | Prepare guaranty revocations; telephone conference(s) Paula thereon and re independent contractor v employee issue; email to TW re withdrawal of Paula's financials from loan application to Finance 1; revise revocation of guaranty per Jeff Krieger comments; email same to client and David S. | 1.00 | $ 525.00 |
| 12/17/14 | JA Krieger | Review email regarding guaranty; review guaranty issues; preparation of response to A. Apfelberg. | 0.70 | $ 367.50 |
| 12/18/14 | AM Apfelberg | Conference call with client and accountants re employee v independent contractor issue; telephone conference(s) David thereon; detailed email to Paula re the issues | 1.60 | $ 840.00 |
| 12/19/14 | AM Apfelberg | Multiple emails and telephone conference(s) David re negotiation of call option; numerous emails to/from and telephone conference(s) Paula thereon; numerous emails and calls with David re PDTW liabilities issues | 2.30 | $ 1,207.50 |
| 12/20/14 | AM Apfelberg | Telephone conference(s) David re negotiation of transaction documents; review and comment on further revised documents; emails and telephone conference(s) Paula thereon; review and comment on revised forms of documents from David; revise same and email them to parties. | 2.10 | $ 1,102.50 |
| 12/21/14 | AM Apfelberg | Emails from/with David, review and comment on further revised documents | 0.80 | $ 420.00 |

Atty. AMA, #500    P822154                         Page 2                         Tax ID # 95-2161045

P_THOMAS000046

# GREENBERG GLUSKER

| | |
|---|---|
| **1900 Avenue of the Stars**<br>**Suite 2100**<br>**Los Angeles, CA 90067-4590** | General billing questions: (310) 785-6842<br>(310) 785-6831<br>(310) 201-7443 |

Fax: (310) 553-7018

Client # 84016,   **Paula Thomas**
Matter # 00001,   General

**Due Date: February 11, 2015**

Invoice date: 01/21/15                                             Charges through: 12/31/14
Invoice # 565012

### FEES

| Date | Timekeeper | Description of Services | Hours | Amount |
|------|-----------|------------------------|-------|--------|
| 12/22/14 | AM Apfelberg | Review of further revised suite of transaction documents, emails to/from client re execution authority. | 1.00 | $ 525.00 |
| 12/23/14 | AM Apfelberg | Telephone conference(s) David and emails with client re execution of documents. | 0.30 | $ 157.50 |
| 12/24/14 | AM Apfelberg | Review of guaranty documents; prepare revocations re CBC (for Paula and TW) and for Finance 1; email to client thereon | 0.80 | $ 420.00 |

Total fees for this matter:                                                                            $ 12,736.00

| RECAP OF AMOUNTS DUE | |
|---|---|
| Total Previous Balance | $ 0.00 |
| | |
| Balance Forward | $ 0.00 |
| Current Month Fees | $ 12,736.00 |
| Current Month Costs | $ 0.00 |
| | |
| Total Current Charges | $ 12,736.00 |
| Retainer Applied | -5,000.00 |
| | |
| Total Due from Current Charges | $ 7,736.00 |
| | |
| Amount Due to Replenish Retainer | $5,000.00 |
| | |
| **AMOUNT DUE** | **$ 12,736.00** |

Retainer balance:                                                                                       $ 0.00
Required Retainer Balance (for information only)                                          $ 5,000.00

Summary Of Attorney Time

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| A Apfelberg | 23.00 | 525 00 | $ 12,075.00 |
| J Krieger | 0 70 | 525.00 | $ 367 50 |
| K Spillers | 0.50 | 425 00 | $ 212 50 |
| L Ciccom | 0.20 | 405.00 | $ 81.00 |
| Total | 24.40 | | $ 12,736.00 |

P_THOMAS000047

# GREENBERG GLUSKER

1900 Avenue of the Stars
Suite 2100
Los Angeles, CA 90067-4590

General billing questions: (310) 785-6842
(310) 785-6831
(310) 785-6863

Summary of attached invoices for Client # 84016

Fax: (310) 553-7018

## Paula Thomas

### Due Date: February 11, 2015

Invoice date: 01/21/15
Invoice # 565012

Charges through: 12/31/14

| Matter Number | Name | Previous Balance | Current Charges | Payments and Retainers To 01/21/15 | Adjustments To 01/21/15 | Retainer Replenishment | Amount Due |
|---|---|---|---|---|---|---|---|
| 00001 | General | $ 0.00 | $ 12,736.00 | $ -5,000.00 | $ 0.00 | $ 5,000.00 | $ 12,736.00 |
| | **Bill Total** | **$ 0.00** | **$ 12,736.00** | **$ -5,000.00** | **$ 0.00** | **$ 5,000.00** | **$ 12,736.00** |

### PLEASE ENCLOSE THIS PAGE WITH YOUR REMITTANCE

In order to ensure proper credit, please be sure your check reflects the client name or number shown above and the matters being paid, and return the remittance copies attached. Payments received will apply first to accrued interest and then to costs and fees. Please make checks payable to Greenberg Glusker Fields Claman & Machtinger LLP.

Atty. AMA, #500    P822154                    Page 4                    Tax ID # 95-2161045

P_THOMAS000048

# EXHIBIT "24"

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| In Re: | ) Case No. 6:16-bk-15889-SY |
| | ) |
| PDTW, LLC, | ) Chapter 7 |
| | ) |
|      Debtor. | ) Riverside, California |
| | ) Tuesday, May 29, 2018 |
| | ) 10:00 a.m. |
| SIMONS (TR), | ) |
| | ) Adv. No. 6:17-ap-01200-SY |
|      Plaintiff, | ) |
| | ) |
|    vs. | ) |
| | ) |
| THOMAS, AN INDIVIDUAL, ET AL, | ) |
| | ) |
|      Defendants. | ) |

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SCOTT YUN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:         DAVID SEROR, ESQ.
Brutzkus, Gubner, Rozansky,
   Seror & We, LLP
21650 Oxnard Street
Suite 500
Woodland Hills, California
   91367
(818) 827-9000

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

ii

```
 1  APPEARANCES:  (cont'd.)

 2  For the Defendant:              DIMITRIOS P. BILLER, ESQ.
                                    LDT Consulting, Inc.
 3                                  15113 West Sunset Boulevard
                                    Suite 9
 4                                  Pacific Palisades, California
                                       90272
 5                                  (310) 459-9870

 6  Court Recorder:                 Cynthia P. Jeanmarie
                                    United States Bankruptcy Court
 7                                  3420 Twelfth Street
                                    Riverside, California 92501
 8
    Transcriber:                    Jeane Hoehner
 9                                  Echo Reporting, Inc.
                                    4455 Morena Boulevard
10                                  Suite 104
                                    San Diego, California 92117
11                                  (858) 453-7590

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Echo Reporting, Inc.*

1

1    <u>RIVERSIDE, CALIFORNIA  TUESDAY, MAY 29, 2018 10:00 A.M.</u>

2                              --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Under, they're both in the case of

5    PDTW, they're both in the adversary proceeding, Chapter 7

6    Trustee versus Thomas et al.

7            Number one is Defendant, Paula Thomas.  It says

8    motion for a partial summary adjudication or partial summary

9    judgment.

10            Number two is Plaintiff, the Chapter 7 Trustee's

11    motion for partial summary judgment.

12            May I have appearances on both matters.

13            MR. BILLER:  Good morning, your Honor.  Dimitrios

14    Biller on behalf of Paula Thomas.

15            THE COURT:  Good morning.

16            MR. SEROR:  Good morning, your Honor.  David

17    Seror, Brutzkus Gubner, appearing on behalf of Plaintiff,

18    Larry Simons, in both matters.

19            THE COURT:  Good morning.

20            And do I have any appearances on the phone?  I

21    don't know if Mr. Peddie's (phonetic) going to be on the

22    phone or not.  He might be, but in any event, I think he

23    only filed a pleading in one of the matters, not both.

24            Let's see.  We'll turn to number one first.  Mr.

25    Seror, in connection with Defendant's motion for summary

2

1 judgment, there are four copyrights that the Plaintiff
2 acknowledges sort of predated the formation of the Debtor
3 PDTW.  How would your client like to resolve that matter?
4 By allowing the motion to be granted with respect to those
5 four copyrights, or by filing an abandonment?

6        MR. SEROR:  I think we would prefer to file the
7 abandonment, your Honor.

8        THE COURT:  All right.  All right.

9        So, Mr. Biller, no matter what happens, you have
10 partial victory with respect to those four copyrights that
11 clearly predate the formation of PDTW.

12        Before I hear from both parties, I want to give
13 you sort of my view on this matter, to guide both parties.
14 So let's deal with number one first.  Number one, after I
15 reviewed the motion, the oppositions, the reply, these are
16 the areas that I'm still concerned about.  One is brought up
17 by the Plaintiff, Trustee's opposition.

18        The law treats copyright and trademarks
19 differently.  And with respect to trademark, it's almost
20 immaterial who was the first to register or whether or not
21 you have a registration.  It seems to be the law is, who
22 went to use it commercially first.  And even though we have
23 thousands of pages of evidence, I haven't really seen
24 anything that shows Ms. Thomas individually, and not on
25 behalf of PDTW, used the trademarks commercially first

*Echo Reporting, Inc.*

3

1 before PDTW or TW or anybody else.

2       So, there seems to be a distinction in the law

3 between copyright and trademark, and I wasn't quite sure

4 where in the evidence I should look to where Ms. Paula

5 Thomas individually as herself, and not on behalf of anyone

6 else, started using those trademarks first commercially.  So

7 that's one issue.

8       The second issue is the same issue I had in

9 connection with the 12(b)(6) motion.  I don't think there's

10 a dispute Ms. Thomas was an artist, is an artist.  She may

11 have created all of the copyrights -- well, although there

12 is a factual dispute about that as well.  In fact, Ms.

13 Thomas in her own declaration acknowledges there was a

14 design team.

15       Now, if you believe Ms. Part's (phonetic)

16 declaration, the design team had little more to do with

17 creation of some of the designs.  Ms. Thomas's own

18 declaration acknowledging that she worked with the design

19 team doesn't really say about how -- whether all of the

20 designs belong to her or whether some of it belonged to the

21 design team.  But that's another side issue.

22       But I'm still having trouble.  She's an artist.

23 She created it, but there is this work-for-hire doctrine.  I

24 -- and in connection with the 12(b)(6) motion and the

25 supplemental brief, I asked for any case law authority that

4

1  someone, (indiscernible) or an artist, cannot by definition

2  also be an employee, and I haven't seen that in connection

3  with the 12(b)(6) motion.  I still don't see it in

4  connection with the motion for summary judgment.   If

5  anything, the law seems to be contrary to it.

6          In fact, if you live in California and you're in

7  the Ninth Circuit -- maybe like in the Fourth Circuit or the

8  Fifth Circuit or 11th Circuit, more conservative circuits,

9  the law might be different, but in California everyone's an

10  employee.

11          If you look at all those gig economy cases, Uber,

12  Lyft, GrubHub, even if you sign an agreement saying, I'm an

13  independent contractor, and that contract contains a

14  provision, I will never assert that I'm employee.

15  California courts and the Ninth Circuit have consistently

16  said over and over and over again, you're an employee.

17          And here, I think we have sufficient factual

18  dispute regarding Ms. Thomas's status.  She filled a W-4

19  form.  She got paid as a W-2 wage holder.  She submitted

20  employee reimbursement requests as an employee.

21          So, I'm not saying conclusively she was an

22  employee, but in -- based on the standard of the motion for

23  summary judgment, there's clearly a factual dispute whether

24  or not she was an employee, then, which then leads to the

25  work-for-hire doctrine.  And I remember reading this case,

# THOMAS WYLDE

applicable law.  If any information that the Company deems to be a Trade Secret is found by a court of competent jurisdiction not to be a Trade Secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement.

You agree that you will keep strictly confidential all of the Confidential Information and Trade Secrets and that you will not, directly or indirectly, use or disclose to any third party any of the Confidential Information or Trade Secrets, either during your consulting arrangement or at any time after it, except as required in the course of employment with the Company or with the express written consent of Paula Thomas, or as otherwise required by law.  You must return to the Company upon resignation or termination of your engagement all Confidential Information, Trade Secrets and other property of the Company, whether in document or electronic form, together with all copies which are in your possession, custody or control.  You will not at any time during or after your contract use the Company's Trade Secrets or Confidential Information for your benefit or the benefit of any other person or entity or to allow any third party to directly compete with Company, nor will you publish or allow to be published or disclosed any Trade Secrets or Confidential Information to any person who is not an employee of Company.  Furthermore, you will not use any client/customer Trade Secret, intellectual property or Confidential Information on behalf of any party other than the client/customer to whom it belongs.

In consideration for this offer, you also agree that during the term of your engagement and for two years thereafter you will not use the Company's Confidential Information or Trade Secrets to, directly or indirectly solicit: (a) any of the Company's customers, prospective customers, suppliers, vendors, distributors or strategic partners to do business with any other entity or person other than the Company; and (b) any of the Company's employees or independent contractors to work for another person or entity.

You shall not, directly or indirectly, at any time during or after the term of this Agreement, disparage the Company or any of its owners, employees, or agents. Except as otherwise required by law, neither party to this Agreement shall make or cause to be made any public announcement or press release with respect to the existence or terms of this Agreement or the transactions contemplated hereby without the prior written approval of the other party hereto.

If any covenant in this Section is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against you.

## Termination of Agreement

This Agreement will commence on the date set forth above. Either party may terminate this Agreement at any time by providing the other with written notice.  Upon termination of this Agreement for any reason, Contractor shall act in good faith to transfer to Company all of his knowledge of the Project in a reasonably timely manner, including but not limited to transferring to Paula Thomas all documents and data (both electronic and hard copies, including but not limited to notes, correspondence, e-mails, contracts, reports, research, etc.) in his possession regarding the work he has performed for Company.

## Amendments and Disputes/Governing Law and Venue

This Agreement constitutes the entire agreement of the parties and supersedes all prior written or oral and all contemporaneous oral agreements, understandings, and negotiations between the parties with respect to the subject matter hereof.  This Agreement is intended by the parties as the final expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or

3231 S LA CIENEGA BLVD LOS ANGELES CA 90016 310 559 5549

SCHNIDER_BK 005030

6

1  work predated maybe even PDTW, but there's a factual

2  dispute.  I can't tell for sure just reading that

3  declaration whether it's true or not.

4          And which then comes to me, I think, the last

5  issue I have is, in some ways, you know, Ms. Thomas's

6  strongest argument, but even that there is a factual

7  dispute, the copyright and trademark agreements.  Which

8  seems to very clearly, if you just look at the four corners

9  of the document, indicate all of those rights belong to her,

10 and not to PDTW, and it was transferred to TW as part of

11 this transaction that everyone's been fighting over.  But

12 even that, there is a factual dispute.

13         Ms. Park (phonetic) and others have now said, you

14 should disregard those documents because they were prepared

15 in duress.  And, once again, that's a factual dispute.  The

16 only way for me to determine whether or not one person's

17 telling the truth and one person is lying, is by having both

18 Ms. Park and Ms. Thomas go on the witness stand, so that I

19 can observe for myself as they testify their body language,

20 their behavior, their tone of voice.

21         It's really hard for me as a Judge to make rulings

22 like that on paper, people's testimony on declaration,

23 because there is no emotion to it.  There's -- I can't tell

24 whether someone is lying or telling the truth.  That is a

25 difficulty of motions for summary judgment for the Court.

3

LEE000145

8

1  just what -- is there admissible evidence that creates a

2  genuine issue of material fact?  It has to be admissible

3  evidence that creates a genuine issue of fact, so though no

4  reasonable trier of fact can find for the non-moving party.

5          And I submit to you, your Honor, what you have in

6  this case is there is no genuine issue of material fact

7  substantiated by any admissible evidence that can save their

8  case.  And let's not focus on this employee issue.  That's

9  irrelevant actually.  That's why my motion really didn't go

10 into it.

11         What is relevant is who owned the intellectual

12 property at the time Paula Thomas transferred it to Thomas

13 Wylde Holding.  They say PDTW did.  That was in October

14 2013.  That's what they say.  And they say PDTW owned it

15 because Paula Thomas was an employee.  And she created the

16 IP as an employee within the scope of her employment, or she

17 was a worker for hire.

18         But what they don't want to submit or they don't

19 want to argue, and they hid it from the Court, they hid it

20 from my client, they hid it from me for a year, are the

21 copyright agreements and the trade right agreement.

22         They concealed that evidence, your Honor.  They

23 concealed that evidence and they plain -- they stated in

24 their complaint that my client wasn't the owner of the IP,

25 when those agreements clearly state she's the owner.  They

9

1  concealed it in drafting the complaint, they concealed it in

2  making their arguments in motion to dismiss, 12(b)(6)

3  motion.  They concealed it in making their arguments for

4  sanctions.  They concealed it opposition to my motion for

5  summary judgment.  And they're still flying that flag that

6  she was an employee under scope of duty.

7          If -- why didn't they produce those documents

8  voluntarily?  Why did I have to get those documents from a

9  third source?  Because they're damming.  End of story.  End

10 of case.  Okay.

11         Now you bring up the issue of duress.  Park didn't

12 say she was under duress.  All Park says, she said, she

13 didn't think the agreements were fair.  I'm the one who

14 brought up in my opposition that that statement does not

15 rise to the level of duress, contract of adhesion,

16 unconsionability.  I'm the one who said that declaration is

17 irrelevant and inadmissible to defeat the contracts.

18         Park, all Park says, I didn't think it was fair.

19 Really?  I think every party in a contract who doesn't get

20 the benefit of the bargain thinks it's not fair.

21         On that basis alone, and based on what you said,

22 your Honor, we shall prevail on the motion for summary

23 judgment.  You acknowledge that duress was the only issue

24 that required you to evaluate the witnesses.  There is no

25 claim of duress.  There no claim of duress in the

10

1  counterclaim that we brought against PDTW for breach of
2  contract and other issues. They didn't make any defense of
3  duress, your Honor. They don't have a defense of duress.
4  It's nowhere in the pleadings. I wrote it in my opposition.
5          Once again, they're making stuff up. They making
6  stuff up because they're hoping the Court's not going to
7  read the voluminous material that has to be generated in
8  this type of case. They concealed evidence in the copyright
9  agreement and the trademark agreement. Now they use Park,
10 who's a criminal by the way, they use Park's declaration to
11 create this illusion of duress because she says it wasn't
12 fair.

13         The point of the copyright and trademark
14 agreement, your Honor, is, it destroys the notion that the
15 transfer of interest from Paula Thomas to Thomas Wylde
16 Holding was not valid because she didn't own the interest.

17         The copyrights clearly show she owned the
18 interest, so the transfer from Paula Thomas to Thomas Wylde
19 Holding is valid, it's legal, it's binding, and that's why
20 they lose. Because in each of their 18 claims they make
21 those allegations, or something close to those allegations.
22 That's why they concealed the contracts. That's why.

23         This is a fraud on the Court and it's a fraud on
24 my client. It's a fraud on the bankruptcy courts. It's a
25 fraud on the Bar. And that's why I've asked this Court to

*Echo Reporting, Inc.*

11

1  report these not even lawyers to the Bar.  Because they

2  violated rule 55 -- Rule 5200 by making misrepresentations

3  to the Court.

4          Now let's go to the first issue that you had --

5          THE COURT:  Uh-huh.

6          MR. BILLER:  -- an issue with.  There was one case

7  that was cited by both parties for use in commerce, use in

8  commerce.  First of all, that's not part of the complaint.

9  That's a legal theory that they did not plead.  They didn't

10 plead it in the answer, they didn't plead it in their

11 defense.  They came up with it for the first time in

12 opposition for the summary judgment.

13         There is one case that was cited by both parties.

14 The case holds unless there's a written agreement, use of

15 commerce decides ownership.  Unless there's a written

16 agreement, use of commerce, use of commerce will decide the

17 issue.

18         First of all, they didn't plead it, as I said.

19 Second, we've got two agreements.  We have a trademark

20 agreement, so use of commerce doesn't even apply.

21         Let's talk about the next issue.  Was she an

22 employee?  All their pleadings say is, Paula Thomas was a

23 CEO, the president and the creative director when employed

24 with PDTW.  They never say what her position was as an

25 employee.  They never say what her responsibilities were an

12

1 employee. They never identify the -- whether she was a --
2 or that she had a supervisor or not as an employee. In
3 fact, Park admits that she was the supervisor of the design
4 team. Park admits that. They never identify what her
5 salary was as an employee. They never identify how was her
6 payment, wages split up between being the president, the
7 CEO, the creative director and this, you know, unknown
8 employee.

9       They don't give her a position. They use her
10 other positions to create this illusion that she's an
11 employee. Park did not call her an employee. Park said she
12 did not review her as she reviewed the other employees. Now
13 why would Park, the COO, not review my client if she was an
14 employee?

15       THE COURT: So you don't think the CEO could ever
16 be an employee? Nobody reviews a CEO.

17       MR. BILLER: Not -- only with a board of director.
18 If you have a board of director and you have a contract, a
19 CEO can be an employee in dual capacity. We don't have a
20 board. We don't have a contract.

21       Your Honor, she was the founder of this company.
22 She was -- the operating agreement says she is in control of
23 everything. The management chart shows that she's at the
24 top and the designer is at the bottom.

25       The confidentiality agreement, she never signed

13

1 one because she's not an employee.  And Park says all the

2 employees have to sign a confidentiality agreement.

3          THE COURT:  Mr. Biller, even you have to agree

4 with me, in California and Ninth Circuit, basically

5 everyone's an employee.  Independent -- Uber, Lyft, GrubHub,

6 case after case after case --

7          MR. BILLER:  The law in California is -- and I

8 researched this, your Honor, because you asked.  The law in

9 California is, a CEO can be an employee if there's a

10 contract or board of directors.  She was -- neither of those

11 issues existed.

12          How about the job descriptions?  There's no job

13 description for Paula Thomas.  There's job descriptions for

14 all of the other assistant designers, but not for Paula

15 Thomas.  It's a false allegation.  It's not supported by

16 evidence, and it's -- the evidence that they're relying on,

17 that she got a salary, I get a salary.  We all get salaries.

18 Okay.  A CEO can get a salary.

19          THE COURT:  The difference is, if she was really

20 the person in control, the person who had the requisite

21 control to make this very clear that she was not an employee

22 was Ms. Thomas, and she didn't do that.

23          MR. BILLER:  She didn't have to.

24          THE COURT:  I can't ignore a W-2 --

25          MR. BILLER:  She didn't fill those out, your

14

1   Honor.

2              THE COURT:  I can't ignore a W-4.

3              MR. BILLER:  She didn't fill those out.

4              THE COURT:  She signed a W-4 form.  Her

5   signature's on it.

6              MR. BILLER:  Yeah, but Jules -- Jule Kaiser

7   (phonetic) is the one who prepared those, and we'll never be

8   able to call him to trial --

9              THE COURT:  Well, why did she sign it?

10             MR. BILLER:  -- because he's in jail.

11             THE COURT:  Why did she sign a W-4 form?

12             MR. BILLER:  I have no idea, your Honor.  When I

13  sign one --

14             THE COURT:  I don't know either.  You and I agree.

15             MR. BILLER:  -- when I sign one -- are you saying

16  a W-2 form, on one side of the scale, only a W-2 form

17  outweighs all the other evidence?

18             THE COURT:  All I'm saying is --

19             MR. BILLER:  Is that what you're saying, Judge?

20             THE COURT:  -- in the context of a motion for

21  summary judgment, that creates a factual dispute, a genuine

22  dispute --

23             MR. BILLER:  We are not in --

24             THE COURT:  -- of a fact.

25             MR. BILLER:  -- we are not in state court.  The

15

1 state court rule is, can a reasonable trier of fact rule

2 that a W-2 form is sufficient to find her an employee?  Is

3 that what you're saying, Judge?  Because if that's what

4 you're saying, just tell me.

5      THE COURT:  The Ninth Circuit case law has said

6 over and over again, even an independent contractor who

7 signs an agreement on its face saying, I'm an independent

8 contractor, I'm not an employee, who gets a 1099 and not a

9 W-2, can be deemed an employee.  So, I'm following Ninth

10 Circuit case law.

11      MR. BILLER:  But those cases do not involve all

12 the other facts, all the other facts that she's the owner.

13 She's the owner.

14      THE COURT:  Mr. Biller, in connection with the

15 trial you might ultimately prevail on this issue, but we're

16 here on a motion summary judgment.  I have documentary

17 evidence that seems to indicate for certain purposes, for

18 tax purposes, she went along with -- maybe it wasn't her

19 choice, she went along with, I'm an employee, treat me like

20 an employee.

21      MR. BILLER:  Well, let me try it this way, your

22 Honor.

23      THE COURT:  Uh-huh.

24      MR. BILLER:  If we went to trial and the only

25 evidence they had was a W-2 form, and we had all the other

16

1  evidence that she was the manager of the company, CEO, she

2  was the president, she was creative director.  She didn't

3  sign the confidentiality agreement.  She didn't have a job

4  description.  She was on the chart for the management at the

5  very top and nobody was beyond her.  Are you telling me

6  then, a reasonable trier of fact can find she was not -- she

7  was an employee under those facts?

8           THE COURT:  Potentially, because, once again,

9  another fact --

10          MR. BILLER:  Your Honor --

11          THE COURT:  -- that's been going on in this case

12 for the last 18 months is how -- Ms. Thomas has said this.

13 She started losing control of her company because she got

14 ill, and she wasn't there.  So --

15          MR. BILLER:  That was TW.

16          THE COURT:  No, no.

17          MR. BILLER:  That was TW.  It was TW, your Honor.

18 She was not ill with PDTW.  She got ill with TW.  That's

19 when she got ill.  That's when she -- I have doctor reports

20 and --

21          THE COURT:  But once again, in connection with

22 this bankruptcy case, she, on behalf of PDTW, signed all of

23 these documents, which is, you know, motion number two here,

24 and she's trying to disclaim her responsibility for signing

25 the bankruptcy schedules, saying archives and everything

17

1  belonged to PDTW, because she's saying, well, even though

2  I'm in control of PDTW, I'm filing the bankruptcy.  Don't

3  trust me because I was -- the lawyers told me to do this and

4  that.  Kring and Chung told me something bad, and I wasn't

5  really in the right state of mind.  That doesn't seem like

6  control to me.

7          MR. BILLER:  That is in 2016, your Honor.  We're

8  talking about facts that occurred in 2013.  And if you're

9  going to tell me --

10         THE COURT:  But this is why we need a trial.

11         MR. BILLER:  No, we don't.

12         THE COURT:  I need to know at what point Ms.

13 Thomas felt like she wasn't -- things were getting out of

14 control.  And she was listening to advice from lawyers that

15 she says now they did her wrong --

16         MR. BILLER:  Okay.  Your Honor, let --

17         THE COURT:  -- and made bad choices.

18         MR. BILLER:  -- let me give you the time line,

19 okay?  This is going to be the time line, okay.

20         THE COURT:  Uh-huh.

21         MR. BILLER:  She starts the company on May 6,

22 2006.

23         THE COURT:  I don't need this time line --

24         MR. BILLER:  Okay.

25         THE COURT:  -- because this a summary judgment

18

1  motion.  You want me to get into that time line.  We're

2  going to do it.  With everyone going on the witness stand,

3  you're going to give me that time line.

4      Right now, in a motion for summary judgment, the

5  other side has produced enough documentary evidence to call

6  into question whether she was an employee or not.  They're

7  entitled to go to trial on this issue.

8      MR. BILLER:  No, they're not.  They're not, Judge.

9      THE COURT:  Well --

10     MR. BILLER:  And I disagree, because all their

11 evidence, all their evidence cannot overcome the fact she is

12 the owner of the IP through the two licensing agreements,

13 and there's no evidence of duress.  There is no evidence of

14 duress.  None.  And even you acknowledge, if there's no

15 evidence of duress she prevails.  She prevails.

16     And I would like to focus on one fact, because I

17 think the Court can consider the conduct of a client in

18 concealing evidence.  There are jury instructions on this,

19 your Honor.  There are jury instructions on if a litigant

20 conceals evidence, the trier of fact has a right to view the

21 evidence that was presented for its less value.

22     How could anybody stand back for a year and not

23 produce this evidence of the copyright agreements and the

24 trademark agreements, when even you say that's the strongest

25 argument?  That's the strongest argument.  Forget about all

19

1  the other arguments.  That's the argument they can't win on.

2          They didn't plead duress in their answer.  They

3  didn't set forth any facts substantiating duress in the

4  Park, in the Park declaration.  None whatsoever.  Park

5  doesn't say she's an employee.  Park never gives her a

6  review.  All Park says, that she supervises the design team.

7          THE COURT:  Nobody reviews me either.  There is

8  literally no one --

9          MR. BILLER:  Well, because you're a judge, your

10  Honor.

11         THE COURT:  -- who reviews me, but I assure you, I

12  am an employee of the Federal Judiciary.  So, the --

13         MR. BILLER:  Okay.

14         THE COURT:  You're right.  That's one of the

15  factors we look into in determining in a very multi-factor

16  test to determine whether someone's an employee or not.

17         I acknowledge some of those factors favor your

18  client.  I do.  I think a lot of those factors favor your

19  client.  But I can't make that determination --

20         MR. BILLER:  Okay.

21         THE COURT:  -- in a summary judgment motion.

22         MR. BILLER:  I'd like to make a record, your

23  Honor.

24         THE COURT:  Okay.

25         MR. BILLER:  I'd like to make a record.  These

20

1  proceedings in this courtroom are extraordinary

2  circumstances.  Because what the Defendant -- or the

3  Plaintiff has done is allowed you to usurp, usurp the power

4  of the superior court.  I'm --

5          THE COURT:  Well --

6          MR. BILLER:  One second.  I have right to make a

7  record, your Honor.

8          THE COURT:  Go ahead.

9          MR. BILLER:  I have a right to make a record.

10 Simon testifies he was retained -- Seror was retained in

11 August of 2017.  I get the purchase agreement for the first

12 time in September '15.

13          They filed their complaint on September 19th,

14 having the trademark agreements, having the copyright

15 agreement.  They had them.  They didn't attach them to the

16 complaint.  Instead, they attached seven worthless,

17 worthless agreement to fabricate, to fabricate a story that

18 they knew from day one was false.

19          We bring a motion.  The motion's denied.  They

20 still argue the same facts in their complaint, that she's an

21 employee.  Okay.  We bring a motion for sanctions, and it

22 was on that date I told you, we found the documents that

23 will prove she's not an employee.  They argued she was an

24 employee.  They make these repeated arguments to this Court,

25 so that she will -- they can prevent my client from

21

1  adjudicating her rights in the superior court and in the

2  federal court.  Because they've raised this IP issue in a

3  complaint that was filed 15 months after the petition, when

4  they had their documents the whole time.  Fifteen months

5  after the petition.  They had the documents the whole time.

6  The goal -- what is happening, and they're using this Court

7  to deny my client to exercise her rights in other courts.

8  That's what they're doing.

9           THE COURT:  I agree with you, that's the end

10  result.  But nobody, definitely not me, nobody ordered the

11  superior court judge to stop.  Nobody ordered -- there is no

12  way I could order a district court judge --

13           MR. BILLER:  But you didn't let me --

14           THE COURT:  -- to stop.

15           MR. BILLER:  -- argue that day.  You did not let

16  me argue that day because I was 10 minutes late.  I was 10

17  minutes late, and you couldn't wait for me to present

18  argument.  Instead you had a transactional order.

19           THE COURT:  What does that have anything to do

20  with the superior court judge deciding he didn't want to

21  proceed?  And I think, ultimately, that lawsuit was

22  dismissed by Ms. Thomas, right?

23           MR. BILLER:  No, it's not.  It's still existing.

24  It's their counterclaim.  IP.

25           THE COURT:  You -- we have done nothing.  I have

22

1  done nothing to tell either the superior court or the

2  district court to stop.  They decided to stop on their own,

3  and there is nothing I can do about it.

4         Mr. Biller, if you don't want to litigate this

5  here, you can file a motion to withdraw the reference of

6  these adversary proceedings, to ask Judge Kronstadt to take

7  these adversary proceedings from me, and he can take it, and

8  he can try, try it with the district court action.

9         But you don't file that motion with the bankruptcy

10  court, you file that motion with the district court.  And

11  only the district court judge can decide whether or not he

12  wants to grant the motion to withdraw the reference.  That

13  is a right any party to the litigation have.  You can do it.

14  I can't force you.  You don't file it with me.  I have

15  nothing to do with it.

16         So, if you don't want to litigate here, you can

17  file a motion to withdraw the reference of the adversary

18  proceeding.  You have that right.  But it's up to Judge

19  Kronstadt.  Once again, I have nothing to do with it.  I

20  cannot order a district court judge to do something or don't

21  do something.  But don't you -- you can't complain about the

22  fact that you're here, because I did nothing --

23         MR. BILLER:  Your Honor --

24         THE COURT:  -- to the tell the superior court

25  judge and the district court judge.

23

1          MR. BILLER:  -- every judge, every judge, whether

2     they're a superior court judge or federal court judge, when

3     there's issues in bankruptcy, will naturally withhold from

4     adjudicating that issue because they don't want to have

5     multiple judgments.

6          THE COURT:  But --

7          MR. BILLER:  Inconsistent judgments.

8          THE COURT:  -- remember, bankruptcy court is

9     merely a unit of the district court.  I derive all of my

10    jurisdiction from the United States District Court.  That is

11    why the motion to withdraw the reference exists.  If you

12    think Judge Kronstadt, who has his own lawsuit pending, is

13    the right judge to also decide all of this, there is a

14    remedy.  You file that motion.

15         MR. BILLER:  That case isn't even open, your

16    Honor.  I can't even file anything in that case.  That's

17    what they've done.  That's what this whole -- it's a

18    kangaroo court almost, your Honor, because they fabricated

19    this whole lawsuit to -- and they're in collusion with TW.

20    Guess who's paying them, Steven Choi (phonetic).  Steven

21    Choi's paying Richard Peddie and trickling down to them.

22         THE COURT:  I'm sure that's not the case.

23         MR. BILLER:  I'm positive that's the case.

24         THE COURT:  Only -- Trustee and Trustee's counsel

25    could only get paid from fee orders that I approve.  I have

24

1  approved no such fee orders.

2          MR. BILLER:  Well, your Honor, you have a lot more

3  faith in lawyers than I do.

4          THE COURT:  I have to.  Or if not, I can't do my

5  job, since I have to look at lawyers all day and listen to

6  their arguments.  If I have no faith in lawyers, then I have

7  no faith in the courts.

8          So, I want to wrap up your argument so I can hear

9  from Mr. Seror, so we can get to number two.

10          MR. BILLER:  Okay.  I just want to make one

11  argument --

12          THE COURT:  Sure.

13          MR. BILLER:  -- for the record that's very

14  important.  There are no material facts, none, that were

15  submitted by the Defendant to raise a genuine issue of

16  material fact.  What they did was, they're coming up with

17  canned, boilerplate answers they could distribute to the

18  various material facts.  Use of commerce doesn't apply.  We

19  have a contract, and they didn't plead it.

20          Collaboratively design the clothes.  Not in the

21  contract, not in the complaint.  In fact, they say that my

22  client's the only one who did it.  They're saying, they're

23  presenting evidence from Park that contradicts their own

24  allegations.  You can't do it.  Can't be blamed for an

25  executive's mistake.  What is that?  That's argument.

25

1  That's not a material fact, that's argument.

2          Trustee -- here's a good one.  Trustee submits

3  evidence, generally disputes that these agreements are

4  unenforceable.  Trustee submits evidence that the agreements

5  are unenforceable.  Really?  That's not a fact, that's an

6  argument.  And when you go the Trustee's declaration, he

7  refers back to Park's declaration.  We go to Park's

8  declaration, she talks about the agreements not being fair.

9          Confidentiality agreements.  My client didn't sign

10 a confidentiality agreement.  It proves that she's not an

11 employee, because Park testifies all employees had to sign

12 the confidentiality agreement, all employees.

13         Your Honor, 18 issues have been submitted for this

14 Court's adjudication.  Those six -- they're not even facts.

15 I don't want to call them statements of argument and things

16 outside the pleadings cannot be possibly raise a genuine

17 issue of material fact.  It goes against Supreme Court law,

18 it goes against Ninth Circuit law.  That's why I am so

19 adamant that this case be thrown out.

20         THE COURT:  Thank you.

21         Mr. Seror.

22         MR. SEROR:  Thank you, your Honor.

23         THE COURT:  And if you can, as part of your

24 argument, focus on -- I think I called them the copyright

25 trademark agreement, but they are the license agreements.

26

1          MR. SEROR:  Your Honor --

2          THE COURT:  The facts related to that and Ms.

3   Park's declaration.

4          MR. SEROR:  Well, your Honor, Ms. Park described

5   the circumstances under which those documents were signed.

6   The documents themselves are worded to say that it is

7   acknowledged that Ms. Thomas is the owner.  It doesn't say

8   that she is the owner.  It doesn't say that these documents

9   transfer something to her.  It's an acknowledgment.

10         And, your Honor, if under the work for hire and

11  the non-use of the items in commerce, then -- and she wasn't

12  the owner because of those issues, the licensing agreements

13  really add nothing to it because of the way that it's

14  phrased.  That is an acknowledgment.

15         So, your Honor, so based on the language of the

16  document and Ms. Park's declaration describing the

17  circumstances under which they were signed, I think there is

18  a sufficient issue of fact to deny the motion for summary

19  judgment on those grounds.

20         With regard to the work for hire, your Honor, we

21  have a lot more than the W-4 -- or the W-2 statements.  We

22  have the W-4 statement that Ms. Thomas signed early on

23  saying that she is an employee.  She's filed the employee --

24  she's requested reimbursement as an employee, so she treated

25  herself as an employee, your Honor.  And I think that she

# DECLARATION OF DIMITRIOS P. BILLER

1.    I am the attorney for PDTW, LLC and Paula Thomas.  All the facts, events, circumstances, situations, statements and documents I describe in this Declaration are based on my personal knowledge.  I called to testify I would and could provide competent testimony based on my personal knowledge.  This Declaration is provided in Support of the Motion for an Order to Show Cause Why Thomas Wylde, LLC, Richard Peddie, David Schnider and Jene Park should not be held in contempt of Court for violating criminal statutes that interfere with the fair administration of justice and the processes/procedure set for in the United States Bankruptcy Code, United States Criminal Code and California Penal Codes.

| EXHBIT NUMBERS | DESCRIPTION OF EXHIBIT |
| --- | --- |
| Exhibit No. "1" | September 2015 e-mails exchanged between Choi and Schnider regarding Choi's illegal purchase of 3,300 units |

3

DECLARATON OF DIMITRIOS P. BILLER IN SUPPORT OF PDTW, LLC AND PAULA THOMA'S MOTION FOR
AN ORDER TO SHOW CAUSE WHY THOMAS WYLDE, LLC, RICHARD PEDDIE, DAVID SCHNIDER AND JENE
PARK SHOULD NOT BE HELD IN CONTEMPT

| Exhibit No. "2" | May 27, 2017 e-mail between Choi and Peddie |
| Exhibit No. "3" | E-mail from Peddie confirming he represents everyone |
| Exhibit No. 4" | Use of Proceeds Agreement, |
| Exhibit No. "5" | Rafols's Deposition testimony |
| Exhibit No. "6" | $4.4 Transaction Report |
| Exhibit No. "7" | Deposition of Lee |
| Exhibit No. "8" | January 11, 2019 Deposition Testimony Transcript of Schnider |
| | |

4

**DECLARATON OF DIMITRIOS P. BILLER IN SUPPORT OF PDTW, LLC AND PAULA THOMA'S MOTION FOR AN ORDER TO SHOW CAUSE WHY THOMAS WYLDE, LLC, RICHARD PEDDIE, DAVID SCHNIDER AND JENE PARK SHOULD NOT BE HELD IN CONTEMPT**

29

1  because they didn't want us to go trial in superior court.

2  We had a trial date for October 10.  They robbed her of her

3  trial.  That's what is usurping the power of another court,

4  when you rob a lady of her trial that she'd been waiting to

5  go to for over two years.  That's why -- you know, your

6  Honor, it's so funny.

7        THE COURT:  We talked about this a lot, and I

8  think I've said this at multiple hearings, including earlier

9  today.  I hear you.  That happened, but nobody ordered a

10  superior court judge to stop.

11        MR. BILLER:  He did.  He was there.  He wasn't

12  even in the case.  He made his appearance.  David Seror made

13  his appearance and told the superior court to stay the

14  action.

15        THE COURT:  And if Mr. Seror can order judges to

16  do his bidding, then he's a far greater lawyer than I think

17  I -- than Ernest Darryl (phonetic) or anybody else.

18        MR. BILLER:  Your Honor, I've got to tell you

19  something.  I've been doing this a long time.  And a judge

20  said to me last week, after having to continue a trial for

21  another six months, after my adversaries had concealed

22  evidence -- I guess that's a new thing in law, is lawyers

23  just to conceal evidence.  He said, Mr. Billing, to have to

24  bring a motion for sanctions.  I can't help you.  The

25  system's broken.  The system's not broken.  Our system of

30

1  justice is not broken.  It's people like these lawyers

2  practicing within the system that makes it almost impossible

3  to litigate within the system.

4       THE COURT:  All right.  So, on matter number one,

5  the motion for summary judgment is denied.  A genuine issue

6  of material facts exist as to whether or not Ms. Thomas was

7  ever an employee.  And whether or not, if she was an

8  employee or an independent contractor as well, if you look

9  at the Marvel Comics versus Kirby cases, even an independent

10  contractor can be covered under the work-for-hire doctrine.

11       So, thus, a freelance writer, a freelance designer

12  of the work, if the work was created for hire is covered

13  under the work-for-hire doctrine.  So there's a genuine

14  issue of material fact as to whether she was an employee,

15  and when she created, came up with these designs, what her

16  role was.

17       And I looked to declaration both provided by Ms.

18  Thomas and Ms. Park regarding who actually came up with the

19  design.  There is apparently a design team.  There were a

20  lot of people in it.

21       And I can't tell just looking at the declarations

22  whether Ms. Thomas was solely responsible for all the

23  designs, or whether she was partially responsible, or maybe

24  with respect to some designs it was some else on the design

25  team.

31

1          With respect to the trademark, Mr. Biller, you're

2    right.  I don't really have evidence from either party about

3    who first used these trademarks in commerce, whether it was

4    PDTW or Ms. Thomas.  So that I need a trial to determine,

5    since I don't really have any evidence who was first.

6          I do know PDTW at a certain point started using

7    those trademarks, but Ms. Thomas may have very well been

8    first.  I don't have any evidence of that in connection with

9    the motion for summary judgment.

10          With respect to the license agreement, Mr. Biller,

11   you're once again right.  Ms. Park doesn't specifically say

12   she signed these documents under duress.  But as Ms. Park

13   specifically acknowledges in paragraph 13, she's not an

14   attorney.

15          In fact, I would actually feel less, give less

16   weight to a declaration of a non-attorney who uses those

17   words like duress, because those are lawyer words.  Regular

18   human beings don't use words like that.

19          Rather than use legal terms like duress, Ms.

20   Park's declaration in paragraph 12 and 13 describes like a

21   regular human being why she as the CEO signed that document,

22   which could potentially be duress.  She doesn't use the

23   word, but I actually find declarations where non-lawyers use

24   legal terms less credible than a declaration --

25          MR. BILLER:  There's no defense of duress.

32

1  There's no defense of duress in this case.

2          THE COURT:  We are not even at pretrial.  A lot of

3  things could happen.  We go to trial based on a joint

4  pretrial stipulation, which supercedes and amends all

5  complaints, counterclaims and answers.  A lot of things can

6  happen between now and pretrial about what the operative

7  claims and counterclaims and defenses are.

8          So, if we -- this summary judgment motion was set

9  for hearing post-pretrial, I think you would have a very

10 good argument, but we are, unfortunately, still in a very

11 early stage of this litigation where a lot of things can

12 happen.

13         So, for all of those reasons, the motion is

14 obviously denied.  Once again, we're in early stage of the

15 case, it's denied without prejudice.

16         Mr. Seror, your client is now here.  Mr. Simons,

17 the Chapter 7 Trustee, is here.  Early on we had a brief

18 discussion about how to dispose of the four copyrights that

19 the Trustee acknowledges in the opposition predates PDTW,

20 and Mr. Seror indicated abandonment would be -- might be the

21 best way to go.

22         MR. SEROR:  Your Honor, obviously I haven't had a

23 chance to discuss it --

24         THE COURT:  Right.

25         MR. SEROR:  -- with Mr. Simons but I certainly

33

1  will.

2         THE COURT:  Right.

3         MR. BILLER:  Your Honor, can we just wait.  Let

4  them go talk about it.  It's a small issue.

5         THE COURT:  Uh-huh.

6         MR. BILLER:  I would like to resolve this now in

7  front of you, so we have a record.  Because, frankly, I

8  don't trust these guys.

9         THE COURT:  That's fine.

10        Mr. Seror, if you want to take a minute to talk to

11 Mr. Simons.

12        MR. SEROR:  Well, your Honor, I'd like the

13 opportunity to discuss today's ruling, the comments the

14 Court made about the items preformation.  I don't see a

15 burning rush to do it today.

16        MR. BILLER:  Because you're not an honest man.

17 That's why.

18        MR. SEROR:  Your Honor --

19        MR. BILLER:  I want you --

20        MR. SEROR:  -- I am sick and tired --

21        THE COURT:  All right.  Let's --

22        MR. BILLER:  -- I want --

23        THE COURT:  Okay.

24        MR. SEROR:  -- I am sick and tired of him.

25        THE COURT:  Yeah.

*Echo Reporting, Inc.*

competent jurisdiction such provision shall be considered severed and deleted. Neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions of this Agreement.

8.    <u>Governing Law And Venue</u>. This Agreement shall be governed by California law and venue for any legal action arising from or relating to it shall be solely in the state or federal courts located in the County of Los Angeles in the State of California. The prevailing party in any such action shall be entitled to recover its reasonable costs, including attorney's fees.

9.    <u>Drafting</u>.  All parties have been represented by independent counsel in this transaction and have participated in the negotiation and preparation of this Agreement, and this Agreement shall not be construed or interpreted against the interests of any party hereto based on that party's preparation of this Agreement

10.    <u>Counterparts</u>. This Agreement may be executed in counterparts, and a signed copy shall have the full force and effect of a signature on any original. A copy, PDF, or facsimile copy of the fully executed Agreement shall have the full force and effect of the original executed Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by a duly authorized representative.

_____
John Hanna

THOMAS WYLDE, LLC

_____
John Hanna, Manager

_____
Jene Park

_____
Doug Lee

_____
Roger Kuo

_____
Paula Thomas

35

1  file an abandonment of those four.

2          MR. SIMONS:  I will --

3          MR. SEROR:  We will take care of that, your Honor.

4          THE COURT:  Great.  Thank you.

5          MR. SIMONS:  Is the Court instructing me to

6  prepare the order?

7          THE COURT:  Yes.

8          MR. SIMONS:  Okay.

9          THE COURT:  As the prevailing party.

10         So now let's get to -- hold on here.  Let me

11  shuffle some paperwork around.  Number two, this is now the

12  Plaintiff's motion for summary judgment.  Before I hear

13  arguments from both counsel, there are two issues, one

14  legal, one factual, that I'm having issues with in

15  connection with this motion for the most part.

16         There is a little part of this motion that I think

17  I'm prepared to grant.  That's the little, tiny portion for

18  $4,901.69, that I don't think the opposition really provided

19  any facts to dispute.

20         With respect to the two big parts of it, these are

21  the issues.  One, on the concept of judicial admission, I'm

22  having a little bit of a problem of applying testimony Ms.

23  Thomas gave, and also the declaration she filed in

24  connection with the state court action, and applying it

25  here.

36

Because these definitely -- with respect to the 341(a) meeting of creditors, she was speaking as a CEO, representative of the Debtor. She did not have the benefit of having her own attorney. Ms. Perry-Isaacson only represented the entity, the Debtor.

And same thing with the declaration filed by Kring and Chung in the state court action for the TRO, I guess Kring and Chung represented both PDTW and Ms. Thomas.

This would be much cleaner if the person making the statements that I'm supposed to rely on for judicial admission wore the same hat. She is now here today solely in her individual capacity as Ms. Thomas. Statements she made before, she made basically as CEO or as a representative of the corporate entity, without the benefit of her own independent counsel.

And I looked at every single case cited by the Trustee in the moving papers under judicial admission, and I didn't find any one particular case that fit this fact pattern.

And in some ways this might sound like sophistry, this might sound like trying to count how many angels can dance on a pinhead. Can you apply judicial admission of a person who spoke as a CEO of a company in a separate litigation where she's now just herself, and not a representative of PDTW? I just don't know.

37

1           And the cases that have been cited, based on my

2   review, doesn't answer it.   And at a very minimum, I'm

3   inclined to ask for additional briefing on that issue,

4   because I'm just not sure whether judicial admission could

5   be used that way.

6           And I'm really focusing on the fact that Ms.

7   Thomas, when she made those statements, really did not have

8   her own counsel who was looking out for her just -- her and

9   her interest alone.   I mean, clearly, Misty Perry-Isaacson

10  only looked out for the interests of PDTW, and Kring and

11  Chung, they probably had divided loyalties to the

12  corporation and to the individual.   So, that's the legal

13  issue.   I'm just not sure.

14          Now the factual issue as well, I mean, I'm just

15  looking at just the excerpts cited by the Trustee, those

16  make a very compelling argument for judicial admission.   But

17  once I started looking at the entirety of the 341(a) meeting

18  of creditors' testimony, and also the balance of the

19  declaration Ms. Thomas provided, it's not at all clear that

20  it's so one-sided.

21          On the one hand, Ms. Thomas does indicate at the

22  341(a) that PD, I guess the Debtor, owned all the inventory

23  and the archives.   But the rest of the testimony she goes on

24  at length, both here and in the TRO declaration, where she

25  calls archives mine, personal to me.

38

1   And the impression I get is, it's, with respect to

2 the archives, these are not just -- yes, she does say it

3 belongs to PDTW, but the balance of the declaration and the

4 341(a) testimony, she uses the phrase, "me, mine, personal"

5 over and over again as she describes the archives, and she

6 also -- there is a -- I'm having a hard time just flipping

7 around looking for this now.

8   There is a place, I believe, in connection with

9 the declaration she filed in connection with the TRO motion

10 in state court, where she says, I'm using the archives now

11 because I -- as the creative director of TW, which seems to

12 indicate the archives belong to her, not to PDTW.  Because

13 that's personal to her, and she can use it for PDTW or TW or

14 wherever she works, because it is something that belongs to

15 her personally.

16   So, there's a, sort of a conflict in 341(a)

17 testimony and her declarations in the state court case about

18 exactly her relationship with the archives.  Which is, this

19 is sort of related to my first point about trying to apply

20 judicial admission of what she said wearing the role of the

21 hat of the CEO of the Debtor in this context.  Because,

22 perhaps, the testimony is garbled in the prior case because

23 she was only represented by lawyers who had the interest of

24 the Debtor at heart and not her interests at heart.  So,

25 that's the factual and concern.

39

1    And same thing with respect to the big chunk of
2  money as well, the 100,000 or so, for her house.  She does
3  at one place say at the 341(a) meeting of creditors that was
4  a loan.  But then the very next page she goes on at length
5  to talk about, well, it was a gift.  I just came back from
6  cancer.  I was ill.  And it was supposed to be gift, but the
7  CFO marked it down as a loan, but it was supposed to be a
8  gift.
9    So, even that testimony is, if you look at the
10  balance of the 341(a), that's a factual dispute whether it
11  was a loan or a gift.  So, we have these two issues here.
12    But, Mr. Seror --
13    MR. SEROR:  Well, your Honor, I --
14    THE COURT:  -- it's your motion.
15    MR. SEROR:  -- I understand and appreciate the
16  Court's concerns.  I would like the opportunity to brief the
17  issue on the judicial admissions --
18    THE COURT:  Right.
19    MR. SEROR:  -- and whether it matters what hat the
20  witness who was testifying is wearing at the time.  If I
21  could have a reasonable opportunity --
22    THE COURT:  Sure.
23    MR. SEROR:  -- I'd be glad to do that.
24    Your Honor, with regard to the archives -- excuse
25  me.  With regard to the archives, we also have the Debtor's

40

1 schedules signed by Ms. Thomas, which says they are property

2 of the estate.   And so, we have more than judicial

3 admissions in the sense of testimony.   We have judicial

4 admissions in the preparation of the schedules as to who the

5 rightful owner of the archives are.

6         And the same thing with the loan, your Honor.   It

7 may -- she may have liked it to be a loan, but the truth of

8 the matter is, she acknowledged that it's -- I'm sorry.   She

9 may have liked I to be a gift, but the truth of the matter

10 is that she acknowledged that it was loan.   She said it two

11 or three different times that it's a loan.   It was treated

12 on the books and records as a loan.

13         So, I think, your Honor, the Trustee is entitled

14 to take Ms. Thomas at her word, both that the archives are

15 property of the estate, and that the money was in fact a

16 loan and not a gift, but I will brief that issue.

17         THE COURT:   All right.   Thank you.

18         Mr. Biller.

19         MR. BILLER:   Thank you, your Honor.   I'd request

20 that the Court not -- I would request that the Court deny

21 the motion in its entirety.   In its entirety.

22         I had outstanding discovery served in March.   Then

23 they messed around with me as they always do, and I still

24 don't have it.   I asked for an opportunity to do a search on

25 their computers.   They denied me that opportunity.   I asked

41

1  them to produce documents.  They denied me the opportunity.

2  I've asked TW to produce witnesses.  They denied me that

3  opportunity.  I've asked TW to produce documents.  They

4  denied me the opportunity.

5        What does it take for a litigant to get evidence?

6  What does it take?  He should not be allowed -- do you know

7  when he filed his motion for summary judgment?  On April

8  16th.  You know what happened on April the 16th, Peddie

9  filed a motion for protective order prematurely.  I was

10 denied access to witnesses.  I was denied access to

11 documents.

12       Then we had the whole, you know, fiasco about the

13 distribution of 20 -- $10,250 that was going to -- they

14 imaged their computer.  I don't even know what happened to

15 that.  All of these accounting issues are based on the

16 declaration of if.  His opinions are based on the QuickBooks

17 that Peddie gave to Kring and Chung, that I was not able to

18 access through two different sources.

19       That Peddie then gave to I think Simons, then

20 Simons gave to Fitt (phonetic).  Where's the chain of

21 custody, your Honor?  At any point of those times you have

22 to show nothing has changed.  QuickBooks are horrible pieces

23 of evidence.  And I submitted 89, 89 statements of material

24 fact, 89 they didn't respond to on the issue of computers.

25 Eighty-nine, from the financial controller of TW, the person

42

1 who admits QuickBooks can be easily manipulated.

2        I also submitted evidence that TW dumped $4.4

3 million into PD for supposed PD expenses.  That's not PD

4 expenses.  And that $4.4 million never shows up in TW's tax

5 returns, it only shows up in TW's tax returns (sic) as an

6 advance to TW -- I mean, PDTW.

7        We cannot have a ruling on any accounting, your

8 Honor, any accounting, until we find out where are the 33

9 computers that nobody seems to know except Jennie Park

10 (phonetic), and she won't testify.  Two subpoenas, your

11 Honor, two subpoenas.  She refused to attend two

12 depositions.  We got five computers.  Who knows what they

13 did with them and who knows what's in there.

14        Then we have QuickBooks where Marsha Daily

15 (phonetic) and a CPA could not open them, because we didn't

16 have the right access information.  But according to their

17 expert he was able to open them, no problem.

18        Judge, there's due process.  Everybody's entitled

19 to the same relevant information.  They're playing games

20 over here with evidence.  They're denying the evidence.

21 It's not like I'm not serving them with evidence -- I mean,

22 discovery.  They're denying everything, your Honor,

23 everything.

24        You know they have initial disclosures, they

25 refuse to produce them because he says all the documents are

43

1 confidential.  All the documents in the initial disclosure

2 are confidential, so I can't see them.

3           THE COURT:  All right.  So, let me walk you back a

4 little bit on just this little, tiny issue of $4,901.  And

5 because I'm going to continue this mostly like to get

6 additional briefing on the legal issue, which will then in

7 some ways alleviate by continuing it, that hopefully more

8 discovery happen.  We'll put that aside whether it happens

9 or not.

10          But just looking at $4,901, all of that

11 information came from the Debtor's statement of financial

12 affairs that Ms. Thomas signed under penalty of perjury.  If

13 she thinks that's wrong, she has to in a declaration tell me

14 why she is involved, just like how Ms. Park wrote a

15 declaration saying, I signed the license agreements, but I

16 felt forced to do so.

17          I -- all of that information, $4,901, it didn't

18 come from QuickBooks, it didn't come from anywhere else, it

19 came from the statement of financial affairs in the Debtor's

20 case that Ms. Thomas signed under penalty of perjury.

21          So, that's it.  That's the evidence that I'm

22 looking at.

23          MR. BILLER:  I was only focusing on the other.

24          THE COURT:  Uh-huh.  I know, but the others, one,

25 I'm not ruling today.

44

1              MR. BILLER:  Yeah.

2              THE COURT:  And I'm going to continue, and

3    hopefully more discovery happens.  If not, then we'll get

4    into the discovery disputes in the proper way.  Just the

5    only thing that was even inclined to grant in connection

6    with this motion is just that, $4,901, and all of that

7    evidence came from the statement of financial affairs.

8              MR. BILLER:  Yeah.  Can I have one moment?

9              THE COURT:  Sure.

10        (Pause.)

11             MR. BILLER:  Your Honor, you may know that my

12   client's destitute?

13             THE COURT:  Uh-huh.

14             MR. BILLER:  She doesn't have money to pay this.

15   Can you give her six months to pay it?

16             THE COURT:  Well, if I -- one, I'm not granting

17   anything today --

18             MR. BILLER:  Okay.

19             THE COURT:  -- since I'm continuing this motion

20   for additional briefing.  Nothing will happen today.

21             And, two, you know, I don't enter partial

22   judgments.  Ultimately --

23             MR. BILLER:  Okay.

24             THE COURT:  -- an ultimate day, if there is a

25   trial, the parties don't settle, we're going to have a

45

1    trial, and there's going to be one judgment entered.  And

2    since we have counterclaims as well, it might be a judgment

3    that sort of might even set off against each other if

4    multiple parties prevail on their claims and counterclaims.

5              So, even if I grant this, it will just be an order

6    partially granting the motion that's going to be sitting

7    around until we have a trial and one judgment gets entered

8    one day.

9              MR. BILLER:  Okay.  Okay.  And the only other

10   issue, your Honor, I just think it's, I think the Federal

11   Rules of Civil Procedure are very clear, Rule 56(f), you

12   can't bring a motion for summary judgment when somebody

13   needs to do discovery.  It's very specific.

14             And I would also just add that not only are the

15   archives personal, they contain her IP.  You can't separate

16   the two.  And if they try to sell it, they're going to be

17   breaking the contracts.

18             THE COURT:  Thank you.

19             Mr. Seror, how long do you need to file that?

20             MR. SEROR:  Thirty days, your Honor.

21             MR. BILLER:  Do I have an opportunity to respond,

22   your Honor?

23             THE COURT:  Yes, you do.

24             So, June 28th, does that work for you, Mr. Seror?

25             MR. SEROR:  Yes, that's fine, your Honor.  Thank

46

1  you.

2          THE COURT:  June 28th, 2018.

3          MR. SEROR:  And that's not a hearing, that's just

4  a deadline date --

5          THE COURT:  Yes.

6          MR. SEROR:  -- for a supplemental brief?

7          THE COURT:  Yes.  And then I really can't have a

8  hearing in July.  My July is a complete mess this year.

9          So, Mr. Biller, I will give you until July 26 --

10 no -- yeah, I'll give you a month.  July 26, 2018 for the

11 Defendant's --

12          MR. BILLER:  I'll probably get it in before that,

13 your Honor.

14          THE COURT:  I appreciate it.  I'm just putting

15 things out, further out, just because I'm going to be gone

16 most of July.  I have consecrating orders, so I am actually

17 going to take a long vacation this year.

18          MR. BILLER:  Good for you.

19          THE COURT:  Thank you.  So, let's look at August

20 for possible hearing dates.

21          MR. SEROR:  Your Honor, I have the same problem

22 that you have in July.  I have it in August.

23          THE COURT:  Okay.

24          MR. SEROR:  Can we go on to September?

25          THE COURT:  We can.

47

1          MR. BILLER:  I seem to be the only one who doesn't

2    get vacation.

3          THE COURT:  Well, unless you wanted to take

4    September, we can go to October, too.

5          MR. BILLER:  No.

6          THE COURT:  Well, the first week of September is a

7    trial week.  I do have two trials set, but I have September

8    5th or 4th available, but we don't have to do it --

9          MR. SEROR:  Either one of those dates is fine with

10   me, your Honor.

11          THE COURT:  Okay.  Mr. Biller, September 4th or

12   5th?

13          MR. BILLER:  Your Honor, that's fine.

14          THE COURT:  All right.  Let's do September 5th.

15   September 5th, 2018 at 10:00 a.m.  And the supplemental

16   brief, if we can just limit it to the legal issue.  No new

17   evidence, just the legal issue of whether or not judicial

18   admission could be applied in the way we're take -- a

19   statement or a declaration or testimony of an individual

20   given as a representative of a corporate entity could be

21   used against -- in a separate lawsuit, in a separate

22   litigation against the individual as an individual.

23          MR. BILLER:  Okay, your Honor.

24          THE COURT:  All right.

25          MR. BILLER:  I'll just assume all the other

48

1  matters that were filed, objection to evidence, objection to

2  judicial notice --

3          THE COURT:  Right.  I looked at the evidentiary

4  objections.  I am -- in connection with the motion for

5  summary judgment, I am denying all of the evidentiary

6  objections, not because they weren't good or meritless,

7  because they were immaterial to the outcome of my decision

8  on the motions for summary judgment.  Even if I granted all

9  of them, I would have reached the same result, so.

10          MR. BILLER:  Okay, your Honor.  Thank you very

11  much.

12          THE COURT:  All right.  Thank you.

13          MR. BILLER:  I appreciate your attention.

14          MR. SEROR:  Thank you, your Honor.

15          THE COURT:  Thank you.

16          MR. BILLER:  Thank you, guys.

17          THE COURT:  And that concludes the Court's 10:00

18  a.m. calendar.

19      (Proceeding concluded.)

20

21

22

23

24

25

49

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4    /s/ Jeane Hoehner              6-12-18
     Transcriber                    Date

5

     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

6

     /s/ L.L. Francisco
7    L. L. Francisco, President
     Echo Reporting, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "25"

## DECLARATION OF JENE PARK

I, Jene Park, declare:

1.    I am over the age of eighteen years and currently serve as the acting Manager and acting Chief Executive Officer ("CEO") for Defendant Thomas Wylde, LLC ("TW"). I have personal knowledge of the facts contained in this declaration, and if called as witness, I would and could competently testify thereto under oath.

2.    In 2006, I joined PDTW, LLC ("Debtor") as its Chief Operating Officer ("COO"). I remained the Debtor's COO until operations ceased during the transition of the Debtor's business operations to TW during the last months of 2014 and early 2015.

3.    On December 14, 2016, I caused to be filed a Proof of Interest with the Court in connection with the Debtors' bankruptcy case, claiming a 10% equity ownership interest in the Debtor, which Proof of Interest is the subject of separate litigation with Thomas.

4.    Prepetition, the Debtor was in the business of designing, manufacturing, and selling luxury women's wear, including garments, handbags, shoes, and accessories. The brand name used for marketing of the merchandise was "Thomas Wylde." Defendant TW now controls that brand, claiming ownership to it in these proceedings.

5.    In my capacity as COO of the Debtor, my duties were varied, and included oversight of the Debtor's finances as well all employees, including the employees in the Debtor's design department, among other things. I regularly conducted and participated in employee reviews, including employees in the design department at all levels. The Debtor was a relatively small operation. While Paula Thomas had the most direct supervisory role for the design department, I also actively and necessarily supervised the Debtor's design team for matters falling within my areas of responsibility the entire time I worked for the Debtor. Thus, I interacted with the Debtor's designers on a daily basis. As such, I am familiar with the work done by specific former employees of the Debtor, and am familiar with the Debtor's designs used in its business.

6.    The Debtor employed a number of successful designers who drew and created designs that ultimately turned into protected works that the Debtor used in its business operations.

27

1943598

Some of the more successful designers on the Debtor's team included Alex Stone, Amelia Parks, Misako Akabori, Giselle Limtao, and Barbara Araujo.

7.    All employees of the Debtor were required to sign confidentiality agreements that contained, among other things, provisions that any drawings or designs created in connection with employment were property of the Debtor.  The sample Confidentiality Agreements attached as **Exhibits J through N** are the Confidentiality Agreements of former employees in the Debtor's design department, including: Alex Stone, Amelia Parks, Misako Akabori, Giselle Limtao, and Barbara Araujo.

8.    During my time as COO of the Debtor, Thomas acted as Chief Executive Officer and Creative Director.  From 2006 to approximately December 2014, Thomas and I worked closely together to run the Debtor's business and communicated on a daily basis.  Because of our regular communication, I am familiar with and regularly observed the work she did for the Debtor.  While Thomas, as Creative Director, worked closely with the Debtor's design department, Thomas did not personally put pen to paper to draw designs that turned into copyrighted material.  Instead, Thomas worked alongside the design department in a supervisory role, providing comments and feedback on proposed designs created by the designers.  Thomas actively participated in the design process, imparting the overall style or look and feel of product lines, but the creation of various designs was ultimately a collaborative effort of the design team, which team included Thomas and a number of other designers.  The design department's efforts resulted in numerous copyrights that the Debtor used in commerce in connection with its business operations.

9.    I am very familiar with the drawings and designs that obtained copyright protection during 2006 through 2014, including the Copyrights at issue in Thomas' Motion for Partial Summary Judgment.  As noted above, these copyrighted designs were the result of a collaborative effort of the Debtor's design team.  For example, during the time that Misako Akabori was employed as one of the Debtor's designers, the design department created the following designs that obtained copyright protection:  Hidden Death, Ballet Bowie, Carpe Diem, Goth Moth, Madame Butterfly, Samona Print, Cyclops, and Spinal Tap.

10.    Additionally, I was told by Paula Thomas and Samson Shafran that Mr. Shafran personally created all graphics and prints for the first few collections, as well as certain materials predating PDTW's formation. I believe Mr. Shafran's work included the following: Acid Flower. Henna Skull, Skull Flower, Skull Pattern, and Louis Skull.

11.    With regard to the Trademarks at issue in this litigation, I am not aware that Thomas ever personally used any of the Trademarks in commerce. Instead, the Debtor used those Trademarks on a regular basis in its business operations.

12.    Additionally, and with respect to Thomas' statements that she orally licensed "her" Copyrights and Trademarks to the Debtor between 2006 and 2013, if an oral license were to have occurred with the Debtor as licensee, it would have been a conversation with me in my capacity as COO of the Debtor. However, I never had any discussion with Thomas regarding her orally licensing the Copyrights and Trademarks to the Debtor. As noted above, the Debtor regularly used the Copyrights and Trademarks in its business operations, and the Debtor's design department actually designed the copyrighted material. Thomas did not do so on her own.

13.    With regard to the "License Agreements" attached as Exhibits 5 and 6 to Thomas' Declaration, I signed those documents in my capacity as COO of the Debtor, however the circumstances under which I signed them need to be explained. Throughout 2013, Thomas and I searched for potential investors to fund initiatives to revitalize and essentially save the Debtor's declining business. In connection with this effort, Thomas represented to me that the Debtor was more likely to be able to raise the funds it needed if the Copyrights and Trademarks were in her name personally as opposed to in the Debtor's name. Specifically, she told me that these documents were necessary for a loan the Debtor was trying to obtain from CBC Partners I, LLC. For this reason, I signed the license agreements. I am not an attorney. At the time, while I did not think that the License Agreements reflected what was fair to the Debtor with respect to an alleged "oral"

///
///
///

1943598

1  license to the Debtor, I was told these documents were necessary and thus signed them.

2  For these same reasons, and because of our friendship as well, I also guaranteed the

    CBC Partners I, LLC loan in the amount of approximately $1.625M, pledging my house

3  as collateral. I was given to believe that all of these measures were necessary to save

4  Debtor from bankruptcy in late 2013.

5       I declare under penalty of perjury under the laws of the United States of America

6  that the foregoing is true and correct.

7       Executed this 4 day of May, 2018

Jene Park

30

1943598