# EXHIBIT
# "22"

1     UNITED STATES BANKRUPTCY COURT

2    CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

3    ─────────────────────────

4    In Re                        )
                                  )
5    PDTW, LLC,                   )
                                  )   No. 6:16-bk-15889 SY
6          Debtor.               )
                                  )   Chapter 7
     ─────────────────────────── )
7    LARRY SIMONS, Chapter 7      )
     Trustee,                     )   Adv. No. 6:17-ap-01200 SY
8                                 )
                                  )
          Plaintiff,              )
9                                 )
                                  )
10        vs.                     )
                                  )
     PAULA THOMAS, an individual; )
11   THOMAS WYLDE, LLC, a         )
     California Limited Liability )
12   Company; THOMAS WYLDE        )
     HOLDINGS, LLC, a California  )
13   Limited Liability; and DOES  )
     1-10, inclusive.             )
14                                )
          Defendants.             )
15   ─────────────────────────── )

16

17        VIDEOTAPED DEPOSITION OF JENE PARK

18              Los Angeles, California

19              Monday, April 29, 2019

20                   Volume I

21

22

23   Reported by:
     KATHLEEN E. BARNEY
24   CSR No. 5698
     Job No. 3270342
25   PAGES 1 - 240

Page 1

1          UNITED STATES BANKRUPTCY COURT

2    CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

3

4    _____

5    In Re                          )
                                    )
6    PDTW, LLC,                     )
                                    )
7                                   )   No. 6:16-bk-15889 SY
               Debtor.             )
8    _____)   Chapter 7

9    LARRY SIMONS, Chapter 7        )
     Trustee                       )   Adv. No. 6:17-ap-01200
10                                  )

11             Plaintiff            )
                                    )
12        vs.                       )
                                    )
                                    )
13   PAULA THOMAS, an individual;  )
     THOMAS WYLDE, LLC, a          )
     California Limited Liability  )
14   Company; THOMAS WYLDE         )
     HOLDINGS, LLC, a California   )
15   Limited Liability; and DOES   )
     1-10, inclusive.,             )
16                                  )
               Defendants.          )
17   _____)

18

19        Videotaped deposition of JENE PARK, Volume I,

20   taken on behalf of Paula Thomas and TW Holdings, at

21   2049 Century Park East, Los Angeles, California,

22   beginning at 9:10 a.m. and ending at 3:00 p.m. on

23   Monday, April 29, 2019, before KATHLEEN E. BARNEY,

24   Certified Shorthand Reporter No. 5698.

25

                                            Page 2

```
 1    APPEARANCES:

 2

 3    For Paula Thomas and TW Holdings:

 4

 5         LDT CONSULTING, INC.

 6         BY:  DIMITRIOS P. BILLER

 7         Attorney at Law

 8         15113 West Sunset Boulevard

 9         Pacific Palisades, California 90272

10         (310) 459-9870

11         biller_ldtconsulting@verizon.net

12

13    For the Trustee Larry Simons:

14

15         BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP

16         BY:  JESSICA BAGDANOV (Telephonically)

17         Attorney at Law

18         21650 West Oxnard Street

19         Woodland Hills, California 91367

20         (818) 827-9212

21         jbagdanov@bg.law

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1    APPEARANCES (continued):

 2

 3    For Thomas Wylde LLC and the Deponent:

 4

 5          LAWSTUDIOS - RICHARD BYRON PEDDIE, P.C.

 6          BY:  RICHARD BYRON PEDDIE

 7          Attorney at Law

 8          5051 Euclid Avenue

 9          Boulder, Colorado 80303-2831

10          (303) 444-5447

11

12

13    Videographer:

14

15          GRANT CIHLAR

16

17    Also Present:

18

19          PAULA THOMAS

20

21

22

23

24

25

                                      Page 4
```

```
 1                          INDEX

 2    WITNESS                            EXAMINATION

 3    JENE PARK

 4    Volume I

 5

 6                  BY MR. BILLER              11

 7                  BY MS. BAGDANOV            203

 8                  BY MR. PEDDIE              210

 9                  BY MR. BILLER             211

10

11

12                      EXHIBITS

13    NUMBER              DESCRIPTION          PAGE

14    Exhibit 1    4/26/19 e-mail with attachment    16

15

16    Exhibit 2    L.A. Times article          43

17

18    Exhibit 3    September 11, 2013 letter    48

19

20    Exhibit 4    Copyright License Agreement    51

21

22    Exhibit 5    Declaration of Jene Park      55

23

24    Exhibit 6    Presentation to Management    76

25
```

Page 5

```
 1                              EXHIBITS
 2      NUMBER            DESCRIPTION                 PAGE
 3      Exhibit 7    Management organizational chart    91
 4                   with Growth Strategies and
 5                   Opportunities
 6
 7      Exhibit 8    Table of Organization              91
 8
        Exhibit 9    Tax documents from Kyu Hong Kim,  107
 9                   CPA
10
11      Exhibit 10   August 10, 2017, deposition       114
12                   transcript
13
14      Exhibit 11   1/22/16 e-mail                    119
15      Exhibit 12   Articles of Organization          128
16
17      Exhibit 13   Dun & Bradstreet report           129
18
19      Exhibit 14   June 7, 2016 e-mail               138
20
21      Exhibit 15   Notice of Proposed Action by      140
22                   Written Consent and Request for
23                   Consent
24
25      Exhibit 16   Secured Promissory Note           143
```

Page 6

```
1                              EXHIBITS

     NUMBER                  DESCRIPTION                    PAGE

2    Exhibit 17  Line of Credit Agreement                  144

3

4    Exhibit 18  Line of Credit Agreement                  144

5

6    Exhibit 19  June 20, 2016 e-mail                      153

7

8    Exhibit 20  October 29, 2014 e-mail with              169

9                attached cash flow projections

10

11   Exhibit 21  September 10, 2007 letter                 190

12

13   Exhibit 22  June 26, 2007 e-mail                      191

14

15   Exhibit 23  PDTW Depreciation Schedule                195

16

17   Exhibit 24  QuickBooks report                         200

18

19

20                  INSTRUCTION NOT TO ANSWER

21                      Page      Line

22                       25        10

23                       35        12

24                      168        14

25

                                                       Page 7
```

1          Los Angeles, California, Monday, April 29, 2019

2                         9:10 a.m.

3

4          THE VIDEOGRAPHER:  Good morning.  We're going

5    on the record.  The time is 9:10 a.m. on April 29,        09:10:35

6    2019.

7          Please note that the microphones are

8    sensitive and may pick up whispering, private

9    conversations, and cellular interference.  Please

10   turn off all cell phones or place them away from the      09:10:50

11   microphones, as they can interfere with the

12   deposition audio.  Audio and video recording will

13   continue to take place unless all parties agree to

14   go off the record.

15         This is Media Unit 1 of the video-recorded          09:11:04

16   deposition of Jene Park taken by counsel for

17   plaintiff in the matter of Larry Simons versus Paula

18   Thomas, et al., filed in U.S. Bankruptcy Court,

19   Central District of California, Riverside division.

20   The case number is 6:16-BK-15889SY.                       09:11:24

21         This deposition is being held at the Veritext

22   offices located at 2049 Century Park East, Suite

23   2450, in Los Angeles, California.

24         My name is Grant Cihlar from the firm

25   Veritext and I'm the videographer.  The court            09:11:48

                                                              Page 8

1    reporter is Kathy Barney from the firm Veritext.    I

2    am a notary public.    I'm not related to any party in

3    this action, nor am I financially interested in the

4    outcome.

5          Counsel and all present in the room and            09:12:04

6    everyone attending remotely will now state their

7    appearances and affiliations for the record.    If

8    there are any objections to proceeding, please state

9    them at the time of your appearance, beginning with

10    the noticing attorney.                                    09:12:17

11          MR. BILLER:  My name is Dimitrios Biller.    I

12    represent the defendant in the adversary proceeding,

13    Paula Thomas and TW Holdings.

14          MR. PEDDIE:  Richard Byron Peddie.    I

15    represent Thomas Wylde, LLC, and the deponent today,    09:12:33

16    Jene Park.

17          One notation is I believe this deposition is

18    being taken under the adversary proceeding

19    17-AP-01200-SY.

20          MR. BILLER:  Counsel is not representing Jene    09:12:52

21    Park.  He withdrew from her representation.    There

22    is a conflict of interest.  He cannot represent TW

23    and the deponent at the same time because there is a

24    direct conflict of interest.

25          He signed a substitution of attorney out        09:13:18

Page 9

1    representing Jene Park and a motion for a

2    disqualification on -- I believe it was November 9,

3    2017.  So I object to him appearing on behalf of and

4    defending this deponent here today.  I make an

5    objection.  He's going to do whatever he wants to

6    do, but I'll bring motion for sanctions if he

7    participates in the deposition because it will only

8    be prolonged.

9         Also attending with me is my client, Paula

10   Thomas.                                    09:13:44

11        THE VIDEOGRAPHER:  Thank you.  And those

12   appearing over the telephone?

13        MS. BAGDANOV:  Thank you.  My name is Jessica

14   Bagdanov.  I represent Larry Simons, the Chapter 7

15   trustee for the bankruptcy estate of PTDW, LLC.  And   09:13:58

16   he is the plaintiff in this adversary proceeding.

17        THE VIDEOGRAPHER:  Thank you.

18        Will the court reporter please swear in the

19   witness.

20

21             JENE PARK,

22   having been administered an oath, was examined and

23   testified as follows:

24

25   ////

Page 10

```
 1                        EXAMINATION

 2    BY MR. BILLER:

 3        Q    I took your deposition one other time,

 4    correct?

 5        A    Are you asking me?                    09:14:20

 6        Q    Yes.  Every question I ask is directed

 7    towards you.

 8        A    Okay.

 9        Q    So I took your deposition one other time,

10    correct?

11        A    Yes.

12        Q    Okay.  Do you want me to go over the

13    admonishments that I gave you at that time regarding

14    the deposition process?

15        A    Sure.                                 09:14:36

16        Q    Okay.  The oath you've taken obligates you to

17    tell the truth.

18             Can you tell the truth?

19        A    Yes.

20        Q    Will you tell the truth?             09:14:42

21        A    Yes.

22        Q    The penalty of perjury applies in this case.

23    And in this case regarding you, if in fact it is

24    determined that you have committed perjury in this

25    case, then there will be steps taken under Penal    09:15:01
```

Page 11

1   Code Section 118 because I believe you have been

2   dishonest in your previous deposition and I don't

3   want to waste any more of my money deposing you

4   again.

5       Do you understand that?                          09:15:18

6   A   I've never been dishonest in my deposition.

7   And I understand you clearly.

8   Q   Okay.  Well, you're just dishonest again.

9   A   I did not.

10  Q   At the end of this deposition you'll receive    09:15:30

11  a booklet.  It's called a transcript.  You'll have

12  to read it, make any changes you deem necessary, and

13  then sign it under penalty of perjury.

14      Do you understand that?

15  A   Yes, I do.                                        09:15:41

16  Q   Why didn't you do that last time?

17  A   What last time?

18  Q   Last time we deposed you, you received a

19  transcript, you didn't sign it under penalty of

20  perjury, and your lawyer didn't return it.  Why not?  09:15:50

21  A   I don't understand what you're referring to.

22  Q   I'm referring to the last time you were

23  deposed.

24  A   Last time what deposed?

25  Q   You -- were you deposed -- did you submit to     09:15:59

Page 12

1   a deposition in August of 2017?

2       A   I don't remember exact time, but I don't

3   recall anything that I did not sign.

4       Q   Okay.  Did you sign a transcript as a result

5   of that deposition?                                     09:16:13

6       A   Which one?

7       Q   The one that relates to your testimony.

8       A   The last one that I had with you?

9       Q   Yes.

10      A   I don't remember.  I believe I --            09:16:22

11      Q   You believe what?

12      A   I believe I did.  I don't remember.

13      Q   Okay.  So which is it?  You don't remember or

14  you believe you did?

15      A   I don't remember which one I signed.  But I    09:16:31

16  usually sign everything that is given to me.

17      Q   I don't have a signed transcript by you.  Did

18  you or did you not sign it?

19      A   I do not remember.  So we go back and take a

20  look at it.                                           09:16:49

21      Q   Okay.  Sign it, would you please?

22      A   Of course.

23          MR. PEDDIE:  That's --

24          MR. BILLER:  No.  You're not --

25          MR. PEDDIE:  Don't agree to anything.          09:16:56

Page 13

1        THE WITNESS:  I don't know -- I don't know

2    which one you're talking about.

3        MR. PEDDIE:  We'll revisit this and --

4        MR. BILLER:  You are not to speak.

5        MR. PEDDIE:  I'm speaking and I'm saying that    09:17:04

6    we're objecting to requests like this or homework

7    assignments, and it's just not going to happen

8    today.

9        MR. BILLER:  That's not objecting.  That's

10   talking.                                             09:17:14

11       MR. PEDDIE:  I'm -- I'm objection to you

12   asking her to do anything at all right now.

13       MR. BILLER:  Okay.  That's not an objection.

14   An objection is like hearsay, irrelevant.

15       MR. PEDDIE:  Would you like to ask some         09:17:20

16   questions?

17       MR. BILLER:  Yes, I would.  So don't

18   interrupt.  Because I'm telling you --

19       MR. PEDDIE:  If I have an objection, I'm

20   going to interrupt.                                  09:17:25

21       MR. BILLER:  No, you're not objecting.

22   You're talking.  That's what you're doing.

23       MR. PEDDIE:  Would you like to ask some

24   questions?

25   ////

                                                   Page 14

```
1     BY MR. BILLER:

2       Q   So when you get the transcript this time of

3     today's deposition, will you read it and sign it?

4       A   Yes.

5           MR. PEDDIE:  Objection.                    09:17:39

6           MR. BILLER:  She is supposed to read it and

7     sign it, Richard.  Are you really going --

8           MR. PEDDIE:  If she doesn't sign, she accepts

9     it.  You know how it works.

10          MR. BILLER:  Richard, for every word you      09:17:52

11    talk, because you're not supposed to be here, I'm

12    going to seek $1,000.

13          MR. PEDDIE:  I am supposed to be here.

14          MR. BILLER:  No, you're not.

15          MR. PEDDIE:  Do whatever you want to.         09:17:55

16    BY MR. BILLER:

17      Q   If my question is vague and ambiguous, let me

18    know.

19      A   Sure.

20      Q   Only one person is supposed to speak at a     09:18:04

21    time.  Okay?

22      A   I understand.

23      Q   I received a letter or an e-mail from your

24    ex-husband that you wrote to him claiming you were

25    fired from a job you had for 12 years.  Let's mark  09:18:13
```

Page 15

1    that as Exhibit 1.

2          (Exhibit 1 was marked for identification by

3       the court reporter and is attached hereto.)

4    BY MR. BILLER:

5       Q    Please read Exhibit 1.                     09:18:31

6             MR. PEDDIE:  Do you have a copy for me?

7             THE WITNESS:  I said I lost my job.  I don't

8    see the word "fired" here.  Do you see?

9    BY MR. BILLER:

10      Q    What job did you lose?                      09:19:17

11      A    I lost my job as a full-time paid CEO.

12      Q    So you lost your job as full-time paid CEO at

13   TW?

14      A    Which TW?  Thomas Wylde, LLC, you're

15   referring to?                                       09:19:36

16      Q    Yes.

17      A    As full-time paid.

18      Q    Let's be clear.

19      A    Sure.

20      Q    Did you lose a job recently?               09:19:46

21      A    I -- not recently.

22      Q    Did you lose a job within the last month?

23      A    As paid full-time employee.

24      Q    Is that a yes to my question?

25      A    Well, it's partially.                       09:20:07

Page 16

```
1      Q   The question is quite simple.  Did you lose a

2   job from your employment at Thomas Wylde, LLC?

3      A   As full-time employee.  Because it's

4   misleading, because I still have a job.

5      Q   What job do you have there now?              09:20:27

6      A   My job as part-time CEO.

7      Q   So you're still working at Thomas Wylde?

8      A   Oh, yes.  Nonpaid.

9      Q   Nonpaid?

10     A   One dollar per month.                        09:20:39

11     Q   And who is paying you?

12     A   Nobody.  Company.

13     Q   Okay.  Who owns the company?

14     A   Company.

15     Q   Who is the owner of the company?            09:20:53

16     A   Thomas Wylde, LLC.

17     Q   Thomas Wylde, LLC, is the owner of Thomas

18   Wylde, LLC?

19     A   Yes.

20     Q   Okay.  And who are the members of the        09:21:02

21   company?

22     A   You mean -- you mean the people who own the

23   shares?

24     Q   The people that own the units of interest,

25   yes.                                               09:21:17
```

Page 17

1    A   Okay.  It is Stephen Choi.  Doug.  I don't

2  remember his last name.

3    Q   Doug Lee?

4    A   Yes.  And Roger.  I don't remember his last

5  name either.                            09:21:37

6    Q   Roger Kuo?

7    A   Is last name Kuo?  I don't remember the last

8  name.  Roger, Paula, myself, John Hanna.  I believe

9  they are the owners, shareholders.

10    Q   Isn't it true that Stephen Choi is not an    09:21:59

11  owner or member?  Isn't that true?

12    A   I don't know.

13    Q   Hillshore Investment, a dummy corporation,

14  claims to be the owner and member of Thomas Wylde,

15  correct?                                09:22:13

16       MR. PEDDIE:  Objection.  Calls for a legal

17  conclusion.

18       THE WITNESS:  I don't understand.  I cannot

19  answer your question because your questions is -- I

20  don't understand.  What is dummy corporation?    09:22:22

21  BY MR. BILLER:

22    Q   A corporation that doesn't really exist.

23    A   I don't know anything about that.  I work

24  for --

25    Q   Have you ever heard of Hillshore Investment?   09:22:29

1    A    Yes, sure.

2    Q    Okay.  Now, isn't that company the owner or

3    member of Thomas Wylde, LLC?

4    A    Yes.

5    Q    So Stephen Choi is not the member?                09:22:39

6    A    You asked me the -- who is the -- who is the

7    shareholders.  Who are the shareholders --

8    Q    Is --

9    A    -- of Thomas Wylde, LLC.

10    Q    And that would be Hillshore Investment, not      09:22:52

11    Stephen Choi, right?

12    A    I don't know exactly legally who -- I don't

13    want to make a mistake.  I don't want to legally --

14    legal situation of who really own and this and that.

15         I know Hillshore Investment is own company       09:23:10

16    and you asked me the shareholders, so I gave

17    you the -- all the people that I know of as

18    shareholders.

19    Q    So you don't know if you're accurate, do you?

20    Because you don't know if Hillshore is an actual      09:23:24

21    owner instead of Stephen Choi, right?

22    A    I don't know I'm accurate.  I'm giving you

23    the answer that I know of.  So I don't know what you

24    mean accurate or not accurate.

25    Q    Why didn't you write in your e-mail reflected     09:23:38

                                                    Page 19

1    in Exhibit 1 that you lost your full-time job as CEO

2    at Thomas Wylde, LLC, as opposed to losing your --

3    as opposed to still having a part-time position as

4    CEO at Thomas Wylde, LLC?

5        A   Can you repeat the question?                09:24:01

6        Q   Why didn't you let the -- Nancy know that you

7    were still a part-time CEO at Thomas Wylde, LLC?

8        A   Why are you talk -- I don't understand your

9    question.

10       Q   I'm referring to the e-mail.                09:24:14

11       A   Okay.  So --

12       Q   I'm referring to the e-mail in front of you.

13       A   This person -- this person, I let her know --

14   I never met Nancy.  I let her know that I have a

15   financial problem because I have not get paid from    09:24:27

16   the company that I worked for.

17       Q   Okay.  So you're now -- you claim to be now

18   working for Thomas Wylde, LLC, for one dollar as the

19   part-time CEO, right?

20       A   Yes.                                         09:24:43

21       Q   Okay.  Do you have any other positions at

22   Thomas Wylde?

23       A   What do you mean?  That's what I just said.

24       Q   Do you hold any other positions?  Are you the

25   COO?                                                 09:24:55

Page 20

```
 1      A    I'm the only one person working for the
 2   company, so I guess I'm CEO, creative director,
 3   designer, salesperson, cleaning lady, whatever.   I'm
 4   the only one person working for the company.
 5      Q    I'm handing you as the part-time CEO of TW    09:25:10
 6   three subpoenas.  You've been served.  They're for
 7   the bank records at TW, Thomas Wylde, LLC.
 8           MR. PEDDIE:   We have the right to object to
 9   the mode of service.
10           THE WITNESS:   I don't see a signature here.   09:25:56
11   BY MR. BILLER:
12      Q    Okay.  I'll sign it right now.  Here you go.
13   There.  There you go.
14           Okay.  Back to the deposition now.
15      A    Yeah, I don't know what it is, so can I look   09:26:10
16   at this?
17      Q    You can't look at it at the time of the
18   deposition.  You can look after the deposition.
19      A    Oh, okay.
20      Q    Just putting you on notice.
21      A    Okay.  Then give it to me later.
22      Q    No.  Take these now.
23      A    Okay.  Then I'm going to look at it, right?
24   If you give me certain things, it's my right to look
25   at it.  Otherwise, give me later.  Can I look at it?   09:26:27
```

Page 21

1      Q    Yes, go ahead.

2      A    Can I take my time and look at it now?  Thank

3    you.

4      Q    Leave the camera on to see how much time the

5    witness is wasting.                                    09:26:38

6      A    Sure.

7           MR. PEDDIE:  Let me see what these are.

8           THE WITNESS:  What is COR?  What is COR?

9           MR. BILLER:  Don't talk to me.  Talk to your

10   lawyer.                                                09:26:53

11          THE WITNESS:  I don't know -- I don't

12   understand -- you give me something I don't

13   understand.  It's supposed to be me, but I don't

14   know the meaning of COR.

15          MR. BILLER:  First of all, it's not on you.    09:27:02

16   It's on the -- regarding records for Thomas Wylde,

17   LLC.

18          THE WITNESS:  I'm sorry, I'm not a lawyer, so

19   I have a question.  I'm just asking one simple

20   question because it's relating me.                     09:27:12

21   BY MR. BILLER:

22     Q    It's not relating to you.  You're not Thomas

23   Wylde, LLC.

24          MR. PEDDIE:  May I have these?

25          THE WITNESS:  What is a COR?                    09:27:18

                                                       Page 22

1           MR. PEDDIE:  May I have these?

2           THE WITNESS:  Sure.

3           MR. PEDDIE:  Listen, we'll talk about this

4    later.  This has to do with the state court lawsuit.

5    Let's just have you continue with the questions and          09:27:27

6    we'll talk about this at the break.

7    BY MR. BILLER:

8       Q    Okay.  So how much money did Thomas Wylde

9    make last year?

10      A    What year?                                            09:27:38

11      Q    2018.

12      A    I haven't returned the tax return yet.

13      Q    And who is doing your tax returns?

14      A    I haven't found a CPA yet.

15      Q    What happened to Allison Kim?                         09:27:57

16      A    They refused to be CPA.

17      Q    How come?

18      A    Because they don't want to get involved.  I

19   don't know.  You can ask her.

20      Q    Did she tell you why she refused to be your          09:28:07

21   CPA?

22      A    No.  They don't want to be working for Thomas

23   Wylde anymore.

24      Q    Who told you that?

25      A    The company.                                         09:28:15

                                                    Page 23

```
 1     Q    What -- who in the company?

 2     A    My last CPA company.

 3     Q    Yeah, but who told you that?  Because a

 4   company doesn't speak.  A person for the company

 5   speaks, though.  So who told you that?              09:28:23

 6     A    Allison.

 7     Q    Allison told you?

 8     A    Yes.

 9     Q    When did she tell you that?

10     A    I don't remember.                            09:28:27

11     Q    Okay.

12     A    But recently, because I had to file the tax

13   returns before the due.

14     Q    Okay.  You know they've been sued, correct?

15     A    Yes, I know.                                 09:28:41

16     Q    Okay.  They've been sued because -- do you

17   understand why they've been sued?

18     A    No, I don't.  And do I need to understand?

19     Q    I don't know.  Do you want to understand?

20   I'll tell you if you want.                          09:28:54

21     A    I don't know a lot of legal things, so --

22     Q    Okay.  Why haven't you allowed my client,

23   Paula Thomas, to look at the books and records at

24   Thomas Wylde, LLC?

25          MR. PEDDIE:  Objection.  Calls for           09:29:15
```

Page 24

1    attorney-client privileged information.

2         THE WITNESS:  I don't know what you're

3    talking about.

4    BY MR. BILLER:

5         Q    Why haven't you allowed my client to look at          09:29:20

6    the books and records at Thomas Wylde, LLC?

7         A    She never asked me.

8         Q    Well, I've asked your lawyer.  I've asked

9    your lawyer many times.

10        As a member -- she is a member, you are a          09:29:34

11   member.  As a member, will you allow her to look at

12   the books and records of Thomas Wylde, LLC?

13        MR. PEDDIE:  Objection.  I instruct you not

14   to answer.

15        MR. BILLER:  No, you can't -- go ahead.

16        MR. PEDDIE:  It's not a question.  You're

17   asking her to do a homework assignment.

18        MR. BILLER:  No.

19        MR. PEDDIE:  Whenever he asks you to do

20   something in the future, just say no.          09:29:50

21        MR. BILLER:  Okay.  You're coaching the

22   witness now.  Really?

23        MR. PEDDIE:  You're not asking factual --

24        MR. BILLER:  Really?

25        MR. PEDDIE:  -- questions about the past.          09:29:56

Page 25

1    You're asking homework assignments.

2         MR. BILLER:  Don't speak to me.  Make an

3    objection.  Don't speak to me.

4         MR. PEDDIE:  I'm objecting --

5    BY MR. BILLER:                                    09:30:02

6    Q    Where are the books and records for Thomas

7    Wylde, LLC?

8    A    It's in the storage.

9    Q    What storage?

10   A    It's in the storage in La Brea.          09:30:07

11   Q    In La Brea?

12   A    Uh-huh.

13   Q    What location?

14   A    I don't remember the address.  I can go give

15   you.                                             09:30:18

16   Q    Okay.  That will be fine.

17   A    You know, my daughter just called.  Do you

18   mind if I called her?

19   Q    No, you cannot call her.  We're in the middle

20   of a deposition.                                 09:30:41

21   A    Well, I just want to make sure that she is

22   okay.

23   Q    No.  Your daughter is fine.

24   A    How do you know?

25   Q    Would you please give me the address --     09:30:48

                                                      Page 26

1    you're texting your daughter.  You're not getting me

2    the address.  Would you please --

3        A    I'm not texting my daughter.

4        Q    -- please give me the address.

5        A    I'm typing Thomas Wylde so I get the address.    09:31:18

6    Would you like to see?  Why would you say things

7    that you don't know?  I don't understand.  I'm sorry

8    I'm not typing as fast as you are.

9            It's a self storage.  Sorry, it's just not --

10   okay.  3430 South La Brea.  That's Avenue.  And that    09:32:30

11   storage called Price Self Storage.

12       Q    Price Self Storage?

13       A    Price Self Storage.

14       Q    What is the telephone number?

15       A    I don't have the telephone number there.  You    09:32:48

16   can Google it.

17       Q    Okay.  And how big is the storage facility

18   that you rented to store the books and records for

19   Thomas Wylde?

20       A    I don't know exact size.                        09:32:58

21       Q    Bigger than a bathroom?  Smaller than a

22   bathroom?

23       A    Bigger than bathroom.

24       Q    Bigger than a master bedroom?  Smaller than a

25   master bedroom?                                          09:33:12

Page 27

| | | |
|---|---|---|
| 1 | A    Depend on master bedroom.  I don't know how | |
| 2 | America go by it.  I can't -- smaller than this | |
| 3 | room, I think. | |
| 4 | Q    Okay.  So this room is about, what, 25 feet | |
| 5 | by 12 feet; is that right? | 09:33:23 |
| 6 | A    I don't know.  I already said I don't know | |
| 7 | the exact size, but it is smaller than this room. | |
| 8 | Q    Okay.  And how -- how are the records stored? | |
| 9 | A    It's on the cabinet.  It's on the boxes. | |
| 10 | Q    It's on the what? | 09:33:44 |
| 11 | A    Inside the cabinet. | |
| 12 | Q    Cabinet? | |
| 13 | A    Yeah. | |
| 14 | Q    So it's all paper? | |
| 15 | A    All boxes. | 09:33:50 |
| 16 | Q    All boxes? | |
| 17 | A    Or clear plastic box. | |
| 18 | Q    Okay.  And what type of records do you | |
| 19 | maintain in that storage room? | |
| 20 | A    All records. | 09:34:01 |
| 21 | Q    Tax returns? | |
| 22 | A    Tax returns, I'm not sure, but I think the | |
| 23 | tax returns in the computer, all in the computer. | |
| 24 | Q    What computer? | |
| 25 | A    Computer. | 09:34:14 |

Page 28

```
1      Q    What computer?

2      A    I don't -- I don't understand your question.

3      Q    Do you have a computer for Thomas Wylde?

4      A    If I do personally?  It's in the storage.

5      Q    Does Thomas Wylde have any computers anymore?   09:34:26

6      A    Of course.  We have all the computers.

7      Q    How many computers?

8      A    I don't remember exactly how many.

9      Q    Well, in 2017 or 2016 there were 69

10    computers.  Do you have 69 computers?              09:34:42

11     A    We never had --

12          MR. PEDDIE:  Objection.

13          THE WITNESS:  We never had 69 computers.

14    BY MR. BILLER:

15     Q    I'll show you proof of that in a minute.       09:34:48

16     A    Okay.

17     Q    How many computers does Thomas Wylde

18    currently have?

19     A    I don't remember.

20     Q    One?                                           09:34:58

21     A    More than one.

22     Q    More than five?

23     A    More than five.

24     Q    More than ten?

25     A    I don't remember.  Could be more than ten.     09:35:07
```

Page 29

```
 1      Q    More than 15?

 2      A    I don't remember more than 15.  I don't want

 3   to give you a wrong answer.

 4      Q    I want you to give me an estimate.

 5      A    10 to 20.                                    09:35:33

 6      Q    And where are these 10 to 20 computers

 7   stored?

 8      A    Storage.

 9      Q    In the same storage room you just identified?

10      A    Yes.                                         09:35:40

11      Q    Okay.  When were they last used?

12      A    And the one -- no, two is in my office.

13      Q    What office?

14      A    The office that I'm working at right now.

15      Q    What is the address?                         09:35:59

16      A    229 West 31st Street, 2nd Floor, Los Angeles,

17   California 90007.

18      Q    Those two computers in that office that you

19   claim to exist, what are they used for?

20      A    One is for accounting and one is for          09:36:15

21   shipping.

22      Q    Okay.  And both those computers are used for

23   business purposes for Thomas Wylde?

24      A    Yes.

25      Q    Any other company?                           09:36:27
```

Page 30

1      A    No.

2      Q    Odd People?

3      A    No.

4      Q    B2?

5      A    No.                                              09:36:33

6      Q    Haute Tee?

7      A    No.

8      Q    Dada Tech?

9      A    No.

10     Q    You've owned a lot of companies, haven't you,    09:36:44

11   over the years?

12     A    Say that again.

13     Q    You've owned a lot of companies over the

14   years?

15     A    Yes.                                             09:36:52

16     Q    Why don't you identify all the companies you

17   own -- you have owned.

18     A    Okay.  I owned Jene Jen.  I -- then Jene Jen.

19   And then I had after Jene Jen, then I had Red Crow.

20   Then recently JSPP, LLC.                               09:37:30

21     Q    Is that it?

22     A    That's the corporations.  I had other -- I

23   had a brand name, but those are the LLC

24   corporations.

25     Q    What are the brand name LLCs?                    09:37:46

                                                    Page 31

1      A    I don't understand brand name LLC.  I had a

2    brand name long time ago.  Haute Tee.  It's

3    pronounced "Haute," because it's French.  But it's

4    spelled H-A-U-T-E.  It's -- people say, "Haute Tee,"

5    but it's French word, haute, H-A-U-T-E.                    09:38:13

6      Q    What other LLCs have you owned?

7      A    Haute Tee was the brand.  And then I had a

8    brand called One Gray Day.  And I had a brand called

9    Haute Tee.  And then I had a brand called HauteAche.

10   It's not a brand, actually.  It's same spelling,          09:38:48

11   haute, H-A-U-T-E, and ache, A-C-H-E.  HauteAche.

12   That's the brand.

13        Then I have a brand called Odd People, O-D-D,

14   P-E-O-P-L-E.  With Odd People, actually, I also a

15   part member of LLC called GPSLA, LLC.                     09:39:23

16        So I gave you Jene Jen, Red Crow --

17     Q    So what --

18     A    I'm trying to --

19     Q    One second.  You said these are brands.  I

20   want to know what companies owned the brands.             09:39:43

21     A    Okay.  So Jene Jen, I don't remember owned

22   the brand.  Haute Tee, or Haute Tee had owned LLC --

23   I don't remember.  It was a long time ago.  It was

24   more than ten years ago.

25     Q    Is that the company that you started with         09:40:03

Page 32

1   your ex-husband, David Fuchs?

2      A    Yes.

3      Q    Yes.  And then you got $50,000 from some man

4   as an investor and you never gave it to -- never

5   gave your husband any of that money?                    09:40:21

6      A    I don't remember that -- I had a lot of loss.

7      Q    Okay.  But you got $50,000 to be bought out;

8   is that right?

9      A    I don't remember.  Long time.  But I returned

10   those $50,000 back to the same investor because he     09:40:37

11   was going to buy the company and with expectation of

12   me doing a lot of sales.  But it turns out that

13   we're going through a divorce and everything, so

14   we -- the deal didn't go through.  All the money is

15   paid back.                                             09:41:02

16      Q    Your husband owned that company with you,

17   correct?

18      A    Which husband?

19      Q    David Fuchs, Dr. David Fuchs.  He owned that

20   company with you, right?                               09:41:10

21      A    Long time ago.

22      Q    Right.  And you didn't give him any part of

23   that investment?

24      A    I forgive him his debt.  The company has lots

25   of debt.                                               09:41:22

Page 33

1      Q    Okay.  You didn't give him any part of the

2    $50,000 investment, did you?

3      A    What 50,000?  He didn't invest anything.

4      Q    You didn't declare the $50,000 investment on

5    your family law financial statements, did you?          09:41:36

6      A    Came from the same investor, which I returned

7    back.

8      Q    Do you have any documents to prove that?

9      A    I do have documents and -- somewhere.

10   Probably my ex-husband have it.                          09:41:56

11     Q    Oh.  Your ex-husband who didn't collect any

12   part of his investment?

13         MR. PEDDIE:  Argumentative.

14         THE WITNESS:  What was that?

15         MR. PEDDIE:  Objection.  Argumentative.           09:42:09

16         THE WITNESS:  Say that again.  I'm sorry.

17   BY MR. BILLER:

18     Q    I'll just move on.

19     A    No, no.  Say that again.

20     Q    No, I'll move on.  I'm not going to get a        09:42:16

21   straight answer on this.

22     A    What --

23     Q    When was the last time you talked to Stephen

24   Choi?

25     A    Long time ago.  More than -- long time ago.      09:42:24

                                                    Page 34

1    Q   When did you last talk to Stephen Choi?  Give

2    me an estimate.

3    A   Last year.

4    Q   When last year?

5    A   I don't remember.                              09:42:34

6    Q   Did you talk to him in person?

7    A   Over the phone.

8    Q   And how long did the conversation last?

9    A   I would say less than five minutes.

10   Q   And what was the conversation about?          09:42:49

11   A   It was conversation about the lawsuits.

12   Q   And what did you tell him?

13   A   I don't know if that was the privilege,

14   because the lawyer is on the line, and I don't know

15   if --                                              09:43:15

16       MR. PEDDIE:  Are you talking about a

17   conversation --

18       THE WITNESS:  Yes.

19       MR. PEDDIE:  -- in which defendants in the

20   federal suit were participating or Stephen Choi was   09:43:23

21   participating?

22       THE WITNESS:  I remember there was you on the

23   line.

24       MR. PEDDIE:  All right.  Instruct you not to

25   answer for that particular call.  You can ask about   09:43:30

Page 35

1    other calls.

2    BY MR. BILLER:

3        Q    Do you remember any of the phone calls with

4    Stephen Choi?

5        A    Not without lawyers.                          09:43:37

6        Q    So every call you had with Stephen Choi was

7    in the presence of lawyers?

8        A    Yes.  Not every call, but you say the last

9    call -- I haven't talked to him for a long time.  So

10   the phone calls I was on with him was with lawyers   09:43:52

11   on.

12       Q    When was the last time he invested any money

13   into Thomas Wylde, LLC?

14       A    Who?

15       Q    Stephen Choi.                                 09:44:04

16       A    I don't remember.

17       Q    Okay.

18       A    Probably I would say 2017.  I would say.  I

19   don't -- I don't want to -- again, I don't want to

20   give you wrong answer.                                09:44:22

21       Q    I think that's right, actually.

22       A    So I just -- and I don't -- when I said I

23   don't remember, it means I don't exactly remember.

24       Q    How did -- how did Thomas Wylde manage to

25   spend nearly $20 million from Stephen Choi in 2015,  09:44:34

                                                          Page 36

```
 1    '16, and '17?  How did that happen?

 2      A   You ask that question to John Hanna and Paula

 3    Thomas.  Don't ask me.

 4      Q   Paula Thomas was not working at Thomas Wylde,

 5    LLC, in -- for nine months in 2015, 2016, or 2017.      09:44:55

 6    Okay?  You were the COO, weren't you?

 7      A   I had CEO overruling COO.  I was creative

 8    director as well.

 9      Q   Please don't even come close to saying that.

10      A   Why not?                                         09:45:16

11          MR. PEDDIE:  Objection.  Argumentative.

12    Don't --

13          THE WITNESS:  Why not?

14    BY MR. BILLER:

15      Q   Because you don't have a creative bone in        09:45:20

16    your body, that's why.

17      A   What is --

18          MR. PEDDIE:  Objection.  Don't be insulting,

19    Mr. Biller.

20          MR. BILLER:  She asked me why not.  I

21    answered the question.

22    BY MR. BILLER:

23      Q   Now, in --

24          THE WITNESS:  Can I ask you why I don't have

25    a creative bone?  Do I need to have a special         09:45:35
```

                                                    Page 37

1    creative bone to be a creative director for any

2    company?  Currently I'm creative director for two

3    different companies.

4         MR. BILLER:  That means nothing.  Move to

5    strike.                                          09:45:45

6    BY MR. BILLER:

7    Q    So you became CEO in 2016, correct?

8    A    I was -- when?  Say that again.

9    Q    2016.

10   A    I think 2016, yes.                          09:45:55

11   Q    How did you manage to lose $6 million in 2016

12   and 2017 for Thomas Wylde?  How did you do that?

13   A    Okay.  So when I took over that position, the

14   company was in debt, 2 million debt.  So I

15   actually -- until the debt was paid off, I actually  09:46:19

16   gave myself one dollar salary and paid working my

17   little butt  - behind off and paid off all the debt.

18   When I inherit the company, it was $2 million debt.

19   So --

20   Q    You're the one who had meetings with John      09:46:41

21   Hanna and David Schneider to encourage David

22   Schneider to fire Paula Thomas so you can become

23   the, quote, creative -- chief creative director;

24   isn't that right?

25   A    Not true.                                    09:46:56

                                              Page 38

```
1              A     Which one?

2              Q     The one dated --

3              A     Oh, yeah.

4              Q     You made that entry?

5              A     Yes.

6              Q     And the one dated December 31, 2014, it

7      says, "To reclass Hillshore loan to Equity $2.3

8      million."  Do you see that?

9              A     Yes.

10             Q     Did you make that entry?

11             A     Yes.

12             Q     When did that reclassification take

13     place?

14             A     Year end of 2014.

15             Q     So by December 31, 2014?  Is that a yes?

16             A     Yes.

17             Q     And how do you know that?

18             A     There should be some documents to

19     support that.  I don't remember what those were.

20             Q     There should be, shouldn't there?

21             A     Yeah.

22             MR. BILLER:  Are you going to produce those?

23             MR. PEDDIE:  You have hem.

24             MR. BILLER:  No, I don't.

25             MR. PEDDIE:  You have the unit --
```

Page 43

1      A    Yes.

2      Q    And when she first started, you knew her

3  brand name was Thomas Wylde, correct?

4      A    Before I met Paula?  Before I met Paula, I

5  don't know about the brand.  After I met Paula, yes.    09:48:19

6      Q    Answer my questions.

7      A    I'm trying -- I'm trying to give you the

8  correct answers.

9      Q    You -- you were selling fabric to Paula

10  Thomas before PDTW was created, right?                  09:48:31

11      A    The company PDTW or the brand Thomas Wylde?

12      Q    I'll say it again.

13      A    Yes.

14      Q    You knew Paula Thomas before she started the

15  company PDTW, correct?                                  09:48:54

16      A    Yes.

17      Q    Okay.  And when you knew her before the

18  company PDTW was started, she was marketing clothes

19  at that time, correct?

20      A    She was selling the clothes, yes.            09:49:11

21      Q    And she was selling clothes from fabrics that

22  Jene Jen sold her, right?

23      A    Yes.  We developed it for her, yes.

24      Q    Yes.  So you knew Paula Thomas was using her

25  brand name on the fabrics that you sold her before      09:49:29

Page 40

```
 1    PDTW was ever established, correct?

 2    A    I made that fabric for her.

 3    Q    I understand.

 4    A    Yes.

 5    Q    I'm -- I'm focusing on the trademark.          09:49:38

 6    A    Okay.

 7    Q    Okay?  You sold --

 8    A    Yes.

 9    Q    -- Paula Thomas fabric --

10    A    Yes.                                           09:49:48

11    Q    -- that she then made into garments with

12    Thomas Wylde on it, correct?

13    A    Yes.

14    Q    And you knew her in that situation before

15    PDTW was created?                                   09:49:59

16    A    I don't know exactly when PDTW was --

17    Q    May 6, 2010.

18    A    Oh, yeah.

19    Q    I'm sorry.  May 10, 2006.

20    A    I don't know exact year.  All I can tell you   09:50:16

21    is the first fabric was she made with me.

22    Q    Okay.

23    A    So I don't know what year.  I don't know what

24    year is PDTW, what year is Thomas Wylde, what --

25    Q    Forget the year.                               09:50:32

                                                          Page 41
```

1       A    But that's the question.

2       Q    No, that's not.  I'm asking you, PDTW was

3    established as a business, correct?  At some point

4    in time, correct?

5       A    Uh-huh.                                    09:50:42

6       Q    Is that a yes?

7       A    Yes.

8       Q    Before it was established as a business,

9    Paula Thomas was selling clothes with your fabrics,

10   right?                                            09:50:51

11      A    Yes.

12      Q    And on those clothes her brand name, Thomas

13   Wylde, was on those clothes, right?

14      A    She had two different brand names, Thomas

15   Wylde and Paula Thomas for TW.  And I made both of   09:51:04

16   those fabrics for her.

17      Q    I'm focusing on Thomas Wylde, the brand name

18   Thomas Wylde.  You sold her fabric to make clothes

19   that she put the brand name Thomas Wylde on before

20   PDTW was created; isn't that right?                09:51:25

21      A    I don't know the before or after.  I'm just

22   giving you -- I'm just answering you I made the

23   fabric for her from day one.

24      Q    Day one meaning when she started designing

25   clothes?                                          09:51:42

Page 42

```
1    answer.
2            A      A distribution.  I can't remember what
3    the document is called.  But there is a list of
4    distribution, what the capitalization is.
5            Q      Okay.  And are you talking about the
6    Schedule B on the operating agreement?
7            A      I don't remember that one.
8            Q      Okay.  Do you understand what a loan to
9    equity conversion is?
10           A      I would believe so.
11           Q      Why don't you explain that to me.
12           A      Well, it was a loan -- well, basically
13   converted to equity because the company owned more
14   shares for -- the distribution has been -- it was
15   distributed to the owners.
16           Q      So when Hillshore made these, quote,
17   loans and they were to be converted to equity, that
18   would be known at the time the money received?
19           A      Say that again.
20           Q      Okay.  You have these various entries of
21   monies, and you have these entries that say loan
22   converted to equity.  Did you input those entries when
23   you received the money?
24           A      No.  When the document was executed.
25           Q      On December 31?

                                              Page 46
```

```
1      A    I don't -- so I don't exactly know when.

2      Q    I'm not asking --

3      A    That's 12 years ago.  So if you're going hold

4  me up to exact date, I'm sorry, I won't be able

5  to --                                              09:57:10

6      Q    I'm not asking for the exact date.  I'm

7  asking for an estimate, a year, a month.

8           I just gave you an article that was published

9  January 25, 2006, that's talking about her garments.

10 Did you sell garments to Paula Thomas before        09:57:22

11 January 25th, 2006?

12          MR. PEDDIE:  Fabric or garments?

13 BY MR. BILLER:

14     Q    Fabrics.

15     A    I think so.                                 09:57:33

16     Q    Okay.

17     A    I think so.  I mean -- do you remember what

18 you did in 2005, 2006?  Again, I don't want to give

19 you wrong answer.  I'm really doing my best to try

20 to answer your question --                          09:57:47

21     Q    All I'm asking --

22     A    -- but I don't really -- you're asking

23 questions something happened 12 years ago, and I

24 don't -- I'm sorry, I'm 56 years old.  I don't

25 remember a lot of things that happened last month.  09:57:59
```

Page 44

```
 1    So I'm doing my best --

 2        Q    Okay.  Stop.  Stop.

 3        A    -- trying to --

 4        Q    Stop, please.

 5        A    -- give you --

 6        Q    You're wasting the -- I'm paying for this.

 7    Okay?  You're wasting time.

 8        A    I'm trying to answer your questions.

 9        Q    The answer is --

10        A    So I'm sorry if my answer isn't exactly what    09:58:13

11    you want to hear.  I want to give truthful, most

12    accurate answer.  So if you are going to ask me

13    certain dates and months and year and numbers, I

14    don't want to make a mistake.

15        Q    When did Jene Jen start?                         09:58:29

16        A    I don't remember.  Probably 2005.

17        Q    Okay.

18        A    2005, 2004, I don't remember.

19        Q    Okay.  But Jene Jen started selling fabric to

20    Paula Thomas, correct?                                    09:58:42

21        A    Yes.

22        Q    Okay.  And --

23        A    Are you saying Jene Jen started a company to

24    selling fabric to her?

25        Q    No, I did not say that.  I said when Jene Jen    09:58:56
```

Page 45

1    started, it started to sell fabric to Paula Thomas?

2       A   It started to sell?  No.  My company existed

3    before I met her.

4       Q   Okay.  So when did Jene Jen start selling

5    clothes to Paula Thomas?                              09:59:13

6       A   I don't remember exact date.  Probably

7    somewhere 2005, 2006.

8       Q   Okay.  All right.

9           MR. BILLER:  What time is it?

10          MS. THOMAS:  10:00.                             09:59:33

11          MR. BILLER:  Okay.  We've been going an hour.

12   BY MR. BILLER:

13      Q   You -- you met David Schnider before Paula

14   Thomas, right?

15      A   No.                                             09:59:46

16      Q   You introduced David Schnider to Paula

17   Thomas?

18      A   I -- I don't think so.

19      Q   David Schnider has testified that you

20   introduced him to Paula Thomas.                       10:00:01

21      A   I don't -- I don't remember.  I don't know

22   how I meet him.  I thought I meet him through Paula.

23      Q   You introduced Paula Thomas to John Hanna,

24   right?

25      A   I introduced John Hanna to Paula.              10:00:22

Page 46

1    Q    So you met John Hanna and introduced her to

2    Paula, right?

3    A    Say that again?

4    Q    You met John Hanna in Paris and introduced

5    him to Paula Thomas, correct?                          10:00:36

6    A    I met John Hanna long time ago.  I know him

7    for long time.

8    Q    Move to strike.  Nonresponsive.

9    A    What --

10    Q    Did you introduce John Hanna to Paula Thomas?    10:00:47

11    A    Yes.

12    Q    Okay.  When you met David Schnider, you knew

13    he was managing the intellectual property,

14    copyright, trademark, that Paula Thomas owned,

15    correct?

16    A    I -- I have no idea.  I don't remember how I

17    met him and I don't remember what we were doing,

18    what he was doing.

19    Q    Let me hand you a document that you signed in

20    September 16, 2013, written by David Schnider, the    10:01:25

21    lawyer for PDTW, informing you that there's a

22    conflict of interest between Paula Thomas and PDTW,

23    and was asking you to waive those conflicts of

24    interest.

25        Let's have this document marked as Exhibit 3.    10:01:52

                                                        Page 47

```
1              (Exhibit 3 was marked for identification by

2        the court reporter and is attached hereto.)

3    BY MR. BILLER:

4    Q    Would you turn to the second page.

5    A    I'm sorry?                                    10:02:13

6    Q    Turn to the second page.  I want to make

7    sure -- please turn to the second page.

8         Is that your signature?

9    A    Yes.

10   Q    On the second page?                           10:02:20

11   A    Yes.

12   Q    Is that your handwriting where you dated it?

13   A    Yes.

14   Q    What date is it?

15   A    It's September -- September 16, 2013.        10:02:27

16   Q    Okay.  Do you want to read the document and

17   become familiar with it?

18        Finished?

19   A    Yes.

20   Q    Okay.  Do you recognize David Schnider's    10:05:59

21   signature on page 2?

22   A    I never pay attention to his signature, but I

23   guess that is his signature.

24   Q    Okay.  Have you paid attention to Paula

25   Thomas's signature?                                10:06:14
```

Page 48

```
 1      A    Yes.

 2      Q    Is that her signature?

 3      A    Yes.

 4      Q    Did anybody force you to sign this document?

 5      A    What was that?                              10:06:20

 6      Q    Did anybody force you to sign this document?

 7      A    No.

 8      Q    Okay.  Did you believe that this document was

 9   a fair document for you to sign?

10      A    90 percent of it I don't understand what this   10:06:34

11   is.  I'm not -- I don't -- a lot of legal documents,

12   I -- it's really -- I'm not from this country, so --

13      Q    Yeah, but you're the CEO of an

14   international --

15      A    Sure.  Fashion company.  I can be CEO and COO   10:06:50

16   of a fashion company.  It does not mean that I do

17   understand every legal things.  I'm just answering

18   your question.

19      Q    No, you're not, actually.  But let me just

20   move on.                                            10:07:02

21          At the time you read it, did you have an

22   opportunity to talk to David Schnider about anything

23   that you didn't understand?

24      A    I don't even remember the time that I read

25   it.  I usually sign whatever Paula asked me to sign.   10:07:16
```

Page 49

1      Q    Well, Paula is not asking you to sign this

2   document, Exhibit 3.  David Schnider is.

3      A    Well, I don't know.  She sign, so I sign.

4      Q    So you'll sign whatever she signs?

5      A    No.  But a lot of things that it relating to    10:07:30

6   the company, if things that she is -- if she is good

7   with it, I signed, I agreed with her.  I go sign

8   with her.

9      Q    Do you believe that this document, exhibit --

10  Exhibit 3, do you think Exhibit 3 was forced upon      10:07:47

11  you to sign?

12     A    I actually don't know what it is.  I'm sorry.

13  But I don't know what this document is.  I don't

14  know what this means.

15     Q    This document is a conflict waiver.  David      10:08:00

16  Schnider was representing PDTW and Paula Thomas --

17     A    Uh-huh.

18     Q    -- simultaneously --

19     A    Uh-huh.

20     Q    -- to sign -- to execute some licensing        10:08:09

21  agreements.

22     A    Uh-huh.

23     Q    And so there was a potential conflict between

24  PDTW and Paula Thomas when he represented both.  And

25  he needed both the company and Paula Thomas to waive   10:08:20

Page 50

1   any conflicts of interest.

2        Do you understand?

3    A   So who is waiving conflict of interest?

4    Q   You and Paula.  Or PDTW and Paula.

5    A   Waiving conflict of interest for David        10:08:35

6   Schnider?

7    Q   Yes.

8    A   Because he would work for PDTW and Paula

9   separately?

10   Q   Yes.                                            10:08:47

11   A   Okay.  So I still don't understand.

12   Q   Okay.  Do you understand -- do you remember

13   anything about signing this document?

14   A   I don't remember particularly signing this

15   document.                                           10:08:57

16   Q   But your signature appears on it?

17   A   Yes, absolutely.

18   Q   Okay.  All right.  Let's have the next

19   document in order marked as Exhibit 4.

20   A   I remember this document.

21        (Exhibit 4 was marked for identification by

22    the court reporter and is attached hereto.)

23  BY MR. BILLER:

24   Q   What is in front of you -- if I'm wrong, just

25   let me know --                                      10:09:51

Page 51

1      A    Sure.

2      Q    -- but Exhibit 4 includes the copyright

3   license agreement and -- with your signature, I

4   believe, and the trademark license agreement; is

5   that correct?

6      A    Yes.

7      Q    Okay.  And you remember signing these

8   documents, right?

9      A    Yes.

10     Q    And who prepared these documents, if you          10:10:06

11   know?

12     A    I don't know who prepared it.

13     Q    Is your signature on both the trademark

14   license agreement and the copyright license

15   agreement?                                                10:10:28

16     A    Page 2?  Yes.  Whatever page this is, yes.

17     Q    Do you see at the bottom there's a number,

18   Bates stamp number right here (indicating)?

19     A    This one (indicating)?

20     Q    Yeah, that one.  So why don't you refer to        10:10:53

21   the Bates stamp number to identify your signatures

22   on this exhibit.

23     A    Oh, 001920?

24     Q    Yeah.

25     A    Okay.  Yes.                                        10:11:02

Page 52

1    Q    Okay.  And did you date those documents?

2    A    Yes.

3    Q    Did you sign these documents freely?

4    A    Yes.

5    Q    When you signed these documents, were you          10:11:08

6    upset about the language in the documents?

7    A    Yes.

8    Q    You were upset?

9    A    I don't -- I didn't think it was truthful and

10   fair.                                                    10:11:21

11   Q    And then why did you sign them?

12   A    Because Paula asked me to sign it.

13   Q    Paula asked you or David Schnider asked you

14   to sign it?

15   A    Paula asked me to sign.                             10:11:29

16   Q    Okay.  So what was so -- what was so

17   untruthful about the documents?

18   A    Because I thought the -- all the print and

19   everything created for the company stay in the

20   company, not for Paula personally.  Because all the      10:11:45

21   designers worked for the company and all the designs

22   created by the employees, it actually belongs to the

23   company, PDTW, not Paula personally.  So I thought

24   that was -- this was untruthful.  I was not happy

25   with it.                                                 10:12:10

Page 53

1     Q    Okay.  And that's regarding the copyright

2  licensing agreement, right?

3     A    Copyright?

4     Q    Yes.  Because those are the prints?

5     A    Oh, yes.                                     10:12:21

6     Q    Okay.  You didn't have any problems with the

7  trademark licensing agreement, did you?

8     A    You mean the name Thomas Wylde?

9     Q    Yes.

10    A    No.                                          10:12:31

11    Q    Okay.  So you didn't think that agreement was

12  unfair?

13    A    Name Thomas Wylde, I thought it was unfair,

14  but I knew about it.  It was actually Thomas Wylde

15  was because Paula told me that when she had lawsuit    10:12:46

16  previously that she told me that she put her name

17  under her name.  And that was one thing that I

18  wasn't aware when I joined the company.  I thought

19  it was unfair because it should have been -- belongs

20  to the company.  But I knew about it, that the name    10:13:10

21  was -- belongs to her.

22    Q    So it's interesting that you use the word

23  "unfair," because you didn't use that in your

24  declaration.  You -- I mean, untruthful, you didn't

25  use the word, "untruthful."  You used the word        10:13:29

Page 54

1    "unfair."  So who prepared the declaration that you

2    signed that I'm going to mark as Exhibit 5?  Who

3    prepared it?

4         I'm asking you who typed the document.

5    A    I don't remember who typed it.                10:14:18

6         (Exhibit 5 was marked for identification by

7    the court reporter and is attached hereto.)

8    BY MR. BILLER:

9    Q    Who did you speak to to give the information

10   contained in the document to create the document?   10:14:34

11   A    I don't remember.

12   Q    You don't remember?  Really?

13   A    Uh-huh.

14   Q    Was it your lawyer?  Was it the lawyer,

15   Richard Peddie?  Was it the lawyer for the other    10:14:44

16   firm representing PDTW?

17   A    I don't remember.

18   Q    Okay.  So how did you first come about

19   receiving this document?

20   A    Receiving what document?                       10:14:55

21   Q    The document in front of you, Exhibit 5.

22   A    Yes.

23   Q    How did you receive it?

24   A    You just gave it to me.

25   Q    Okay.  Look at the last page.                  10:15:06

Page 55

1    A    Yes.

2    Q    Is that your signature?

3    A    Uh-huh.

4    Q    Is that a yes?

5    A    Yes.                                    10:15:21

6    Q    Okay.   And is it dated May 4, 2018?

7    A    Yes.

8    Q    Do you remember signing this document?

9    A    Yes, I signed it.   It's my signature.

10   Q    So who gave it to you?                  10:15:41

11   A    What do you mean who gave it to me?   I signed

12   the document.

13   Q    But who gave you the document to sign?

14   A    I made the document.   I don't understand.

15   Q    Did you write this document?   Is that what   10:15:56

16   you're saying?

17   A    I didn't really write.   I mean, I -- my

18   English is not that great.   But it was my content.

19   Not --

20   Q    Okay.   But did you write the document,     10:16:09

21   Exhibit 5?

22   A    I don't remember.   It's my signature.   It's

23   what I said.

24   Q    Your signature is on Exhibit 3 and Exhibit 4.

25   Did you write those documents?                10:16:24

Page 56

```
1      A    Which documents?

2      Q    The licensing agreements and the conflict

3  waiver.

4      A    I didn't write that document.

5      Q    Okay.  Did you write Exhibit 5?              10:16:31

6      A    I mean, it's my statement.

7      Q    Did you write it?  Did you type it?

8      A    I don't remember.  I don't -- I -- I don't

9  remember.

10     Q    Okay.  So you're saying every word in         10:16:46

11  Exhibit 5 is your own word?

12     A    Yes.

13     Q    Every single word?

14     A    Well, let me read it.

15          Okay.                                         10:21:21

16     Q    Have you read Exhibit 5?

17     A    Yes.

18     Q    Okay.  I'm not going to -- I don't want to

19  ask you questions that might make your feel bad or

20  embarrass you.  I really just would like to avoid     10:21:30

21  that.  So I'm going to ask you one simple question.

22  Did you write this document, Exhibit 5?

23     A    A lot of the time writing English is

24  difficult for me, so whenever I write certain things

25  that grammar-wise, grammatically, I always ask my     10:21:51
```

Page 57

```
 1    husband to rewrite or -- not like rewrite.  Correct
 2    it, correct my grammar.  So it's -- I can't write
 3    this kind.  So probably my husband corrected it.  He
 4    corrects a lot of my papers.
 5        Q    Really?                              10:22:17
 6        A    Yes, he does.
 7        Q    Then tell me what the words "trademark in
 8    "commerce" mean.
 9        A    What --
10        Q    What does that mean?                 10:22:25
11        A    Trademark is trademark.
12        Q    No.  What does "trademarks in commerce" mean?
13    That's a legal term of art, so I'd like to know what
14    you think it means.
15        A    Where is that?                       10:22:35
16        Q    Page 29, paragraph 11, line 6.
17        A    When you use trademark in doing business.
18        Q    This is your writing.  These are your words,
19    you're telling me.  What does "trademark in
20    commerce" mean?                               10:23:12
21        A    I explain to you.  A lot of my writing is
22    perfected by either my husband or either lawyers
23    or --
24        Q    Okay.  You didn't say anything about lawyers.
25    You said your husband.  Now are you saying that    10:23:23
```

Page 58

1    lawyers helped you write this document?

2       A    I don't remember particular documents.

3       Q    Okay.   Are you saying -- who wrote the

4    document, then?   Did you write it or did a lawyer

5    write it or did your husband write it?                    10:23:36

6       A    It's my -- it's my story.   It's the way that

7    I say, it's the way that I give about my story, and

8    it's re-writed.

9       Q    Who wrote the words "trademarks in commerce"?

10   Who wrote those words?                                    10:23:52

11      A    I don't remember.

12      Q    Okay.   What does it mean?   What do the words

13   mean?

14      A    Trademark in commerce?

15      Q    Yes.                                              10:24:00

16      A    Trademark in business.

17      Q    What does trademark in business mean?

18      A    Trademark you usually use in business.

19      Q    You're using -- but what is the significance

20   of the word, of the phrase?                               10:24:10

21      A    What do you mean?   I don't understand.

22      Q    Well, you -- I'll tell you right now,

23   trademark in commerce in this case is the number one

24   issue.   So when you wrote "trademark in commerce,"

25   what did you mean?                                        10:24:26

Page 59

1      A    You use trademark in business.

2      Q    Okay.  And so what you're saying here is, "I

3    am not aware that Thomas ever personally used any

4    trademarks in business."  Is that what you're

5    saying?                                           10:24:43

6      A    I don't understand your question.

7      Q    Well, you just said trademark in commerce

8    means --

9      A    Right.

10     Q    -- trademark in business.                   10:24:50

11     A    Yes.

12     Q    So the sentence we just substitute the words

13   "trademark in commerce" -- "trademark in commerce"

14   out and you said trademark in business.  The

15   sentence reads, line 5:                            10:25:02

16           "With regard to trademarks at

17           issue in this litigation, I am not

18           aware that Thomas ever personally used

19           any of the trademarks in commerce."

20           Did I read that right?                     10:25:19

21     A    Yes.

22     Q    Okay.  Now, just insert the words "trademark

23   in business."

24     A    Yes.

25     Q    So are you saying you -- you did not have any   10:25:24

Page 60

1    personal knowledge that Paula Thomas used her brand

2    name in business? Is that what you're saying?

3        A    Personally, no. The company. In conjunction

4    with the company.

5        Q    What company?                                    10:25:43

6        A    Thomas Wylde.

7        Q    Okay. So before Thomas Wylde, you would

8    agree that she used the trademark in commerce?

9        A    Before PDTW?

10       Q    Yes.                                              10:26:00

11       A    Before PDTW if she used Thomas Wylde?

12       Q    Yes.

13       A    Yes.

14       Q    Okay. All right.

15            MR. PEDDIE: Objection. It's calling for a        10:26:07

16    legal conclusion.

17            MR. BILLER: She put it in her declaration.

18            MR. PEDDIE: And what she said in her

19    declaration I think is correct. That's right.

20    You're changing it. She had a company before PDTW.      10:26:16

21            MR. BILLER: Oh, God, please. Give it up,

22    Richard. You know, you would have more credibility

23    as a person if you would just not fight every issue

24    that you lose.

25            MR. PEDDIE: Dimitrios, you're conflating         10:26:27

                                                              Page 61

```
1    companies with entities --
2         MR. BILLER:  Okay.  I'm moving on.  Yeah.
3    Okay.  Right.
4         MR. PEDDIE:  -- that she had before PDTW.
5         MR. BILLER:  The whole issue in the case is
6    did Paula insert the trademark in commerce for use
7    first.  The answer is yes.  This is a bogus,
8    malicious adversary proceeding complaint.
9    BY MR. BILLER:
10        Q    Okay.  You didn't say you thought that was        10:26:51
11   unfair, did you, in your declaration?
12        A    Which -- which declaration?
13        Q    This declaration, Exhibit 5.  You did not
14   write in your declaration that -- anywhere in
15   paragraph 11 that that arrangement was unfair,        10:27:05
16   right?
17        A    This particular --
18        Q    No, I'm not -- I'm talking about your
19   declaration.  Declaration.
20        A    So in declaration that what is unfair?        10:27:16
21        Q    The trademark --
22        A    Yes.
23        Q    -- being in commerce by Paula Thomas, do you
24   think that was unfair?
25        A    The trademarks she used?        10:27:30
```

Page 62

```
 1      Q   Yeah.

 2      A   Was it unfair?

 3      Q   Yes.

 4      A   It was not unfair.

 5      Q   Okay.  Thank you.                          10:27:38

 6          MR. BILLER:  Can we take a break.

 7          MS. THOMAS:  Yeah.  I want to talk to you a

 8   little bit.

 9          THE VIDEOGRAPHER:  We are off the record.

10   The time is 10:27 a.m.                            10:27:47

11      (Recess.)

12          THE VIDEOGRAPHER:  We're back on the record.

13   The time is 10:37 a.m.  Please continue.

14   BY MR. BILLER:

15      Q   Okay.  Let's -- I want you to read -- well,  10:37:19

16   do you want me to read it or do you want to read it?

17   Do you want me to read it into the record?

18      A   I'd like to read it.

19      Q   Okay.  Why don't you read out loud page 29,

20   line 21, starting with "Specifically".             10:37:43

21      A   You mean Exhibit 5?

22      Q   Yes.  Page 29?

23      A   Uh-huh.  Yeah.

24      Q   Line 21 says:

25          "Specifically she told me that             10:38:03
```

Page 63

```
 1            these documents" --
 2       A    Okay.
 3            "Specifically she told me that
 4            these documents were necessary for a
 5            loan that the debtor was trying to        10:38:14
 6            obtain from CBC Partners."
 7       Q    Stop right there.  That was true, right?  CBC
 8   Partners required that the license agreement --
 9   there would be a license agreement to PDTW and then
10   to a holding company called TW Holdings, LLC; isn't   10:38:39
11   that true?
12       A    I think so.
13       Q    Read on, please.
14       A
15            "For this reason, I signed the            10:38:55
16            license agreement.  I'm not an
17            attorney.  At the time, while I did
18            not think that the license agreement
19            reflected what was fair to the debtor
20            with respect to an alleged oral          10:39:04
21            license to the debtor."
22       Q    Okay.  What oral license are you talking
23   about or oral agreement are you talking about?
24       A    What do you mean?
25       Q    Well, you said:                          10:39:29
```

Page 64

1          "An alleged oral license to the

2      debtor."

3          What are you talking about?

4    A   Well, I thought that everything is -- belongs

5  to the company.  And then all of a sudden, just come     10:39:42

6  up with a document that never existed and asked me

7  to sign because they need me to sign.

8    Q   So does the oral license to the debtor, are

9  you saying that Paula Thomas told you that the

10  copyright and the trademarks were licensed to PDTW?     10:40:11

11  Is that what you're saying?

12    A   It was never -- it was never licensed to the

13  PDTW.  They made that.  They -- they made this

14  document and asked me to sign.

15    Q   Okay.

16    A   That's what I'm referring to.

17    Q   Do you know what the word "oral" means?

18    A   Verbal.

19    Q   Verbal?

20    A   Uh-huh.                                          10:40:39

21    Q   Is that right?

22    A   Uh-huh.

23    Q   Say "yes."

24    A   Yes.

25    Q   Okay.  So I'm just trying to understand what     10:40:42

Page 65

1 you're saying.  Are you saying that it was unfair to

2 have these written agreements when there was a

3 verbal agreement to license the copyrights and

4 trademarks to PDTW?

5  A What I was trying to say here is it's unfair  10:41:01

6 that such agreement was never existed and all of a

7 sudden we are creating a document pretend like it

8 was done that way.

9  Q Okay.

10  A That's what I'm trying to say.  10:41:13

11  Q Okay.  Do you believe this arrangement that

12 you think was unfair, was it illegal?

13  A I don't know if it was illegal.  I just said

14 I thought it was unfair.  I thought it's not truth.

15 So it's unfair because it's not true.  10:41:31

16  Q Why didn't you use the word "untruthful,"

17 then?

18  A What's untruthful?

19  Q You just said it was untrue.  What was

20 untrue?  10:41:40

21  A Untrue the document that it say that Paula

22 licensed to the company.  It was never licensed to

23 the company.  So I'm referring to all of a sudden

24 they were come up with the document and we are

25 backdating like it was happened before.  That's what  10:41:56

Page 66

1   I'm trying to say.

2       Q   What are you talking about?  When were the --

3   when were the trademarks or copyrights previously

4   licensed to the company before the signing of these

5   licensing agreements?                           10:42:11

6       A   It was never -- for me, I never aware it was

7   licensed.

8       Q   Before the signing of the license agreements,

9   the trademarks and the copyrights were not licensed

10  to PDTW in a written or oral agreement, correct?    10:42:25

11      A   Such a license agreement didn't exist.

12      Q   Right.

13      A   Right.

14      Q   Okay.  So what is untruthful -- I don't

15  understand what is untruthful.                     10:42:36

16      A   Because it was not created by her.  It was

17  created by the people work for the company.

18      Q   You're claiming the copyrights --

19      A   To me, it's all the same.

20      Q   Can I please finish my question?           10:42:48

21      A   Sure.

22      Q   You're claiming the copyrights were created

23  by other people, not the trademark.

24      A   If you refer the name itself, no.  But if you

25  refer design, everything, design and all the work,   10:43:03

                                                Page 67

1    it belongs to the company.

2       Q    Do you know what the difference is between a

3    trademark and copyright?

4       A    Trademark, I think it's name.  And I think a

5    trademark is the name itself, name of the brand.        10:43:28

6    Copyright can be also name of the -- name or

7    anything -- anything you create.  Or it can be -- if

8    I'm a songwriter, everything I write can be

9    copyright.  If I'm an artist, everything I draw can

10   be copyright.  That's my understanding.  Like          10:43:57

11   everything you create is copyright.

12      Q    In this case, though, the name is not

13   copyright protected, it's a trademark.

14      A    The Thomas Wylde name?

15      Q    Yes.                                             10:44:09

16      A    Yes.

17      Q    So it's not a copyright.  When you refer to

18   copyrights in your declaration, you're referring to

19   the prints, right?

20      A    And design.                                     10:44:17

21      Q    Design of what?

22      A    All the designs of clothing, all the design

23   of everything.

24      Q    So you're claiming -- where in the copyright

25   registry are the clothings protected by copyright in    10:44:26

                                                    Page 68

```
 1    this case?  Do you know?

 2        A    I'm sorry.  Say that again.  What?

 3        Q    Let's go -- go to Exhibit 4.

 4             Now, on Exhibit 4 there's a list of copyright

 5    protected prints.                                    10:44:58

 6             Do you see that?

 7        A    001918?

 8        Q    Yes.

 9        A    Okay.

10        Q    Do you see that?                            10:45:07

11        A    Yes.

12        Q    Do you see Thomas Wylde protected in that

13    list?

14        A    You mean Thomas Wylde name?

15        Q    Yes.                                        10:45:22

16        A    No.

17        Q    Okay.  So Thomas Wylde is not copyright

18    protected in this case, right?

19             MR. PEDDIE:  Objection.  Calls for a legal

20    conclusion.                                          10:45:28

21             THE WITNESS:  I don't know.  I don't see it.

22    BY MR. BILLER:

23        Q    Well, based on the document that you have

24    before you.

25        A    I don't see it.                             10:45:35
```

Page 69

```
 1      Q    Okay.   Thank you.

 2           Now let's go to the list of trademark

 3    protected items.

 4           Do you see that?

 5      A    Yes.                                    10:45:52

 6      Q    These are the trademark protected items that

 7    Thomas -- Paula Thomas created, correct?

 8      A    Are you referring to 001921?

 9      Q    Yes.

10      A    First mark, she did not create this, no.   10:46:10

11    Second, she did not create this, no.  The third one,

12    the Wylde, I don't know.  Thomas Wylde, yes.  As far

13    as I know, my knowledge, yes.

14           I don't know why have so many Thomas Wylde

15    here.  I don't know --                          10:46:36

16      Q    It doesn't matter.  But she created the name

17    Thomas Wylde.  That's her name, that's her property,

18    right?

19      A    Yes.  So all Thomas Wylde here.

20      Q    So you're claiming she didn't create No. 1   10:46:45

21    and No. 2, right?

22      A    No.

23      Q    Who created them?

24      A    Designers.

25      Q    Designers.  Which designers created the      10:46:55
```

Page 70

1    skulls?

2    A    I think it's either Samsung or Alex or --

3    definitely not Paula.  She can't draw this.

4    Q    Excuse me?

5    A    It's definitely not her.  She didn't draw       10:47:07

6    this.

7    Q    She didn't draw the skull that is her

8    signature item that existed before 2006?  Is that

9    what you're saying?

10    A    She did not draw this.  This is not designed    10:47:20

11    before 2006.

12    Q    Because it has a date of October 2011?

13    A    2011.

14    Q    Do you know what that date means?  Do you

15    think that date means that's the date it was first    10:47:34

16    registered?  Is that what you think it means?

17    A    I don't know what that means.

18    Q    Okay.

19    A    I'm saying this drawing is not done by her.

20    Q    Okay.  You don't know that because you can't    10:47:45

21    identify the person who did the drawing, correct?

22    A    I said -- I gave either Samsung or Alex or --

23    Q    But you don't know who, do you?

24    A    Designers.

25    Q    No.  You don't know who.  You didn't see       10:47:58

Page 71

```
 1  them.

 2      A   I know the fact that she didn't.  That's what

 3  I know.

 4      Q   No.  You're saying that because you hate her

 5  so much.                                        10:48:07

 6      A   No, I don't hate her.

 7      Q   Okay.  You do.  You've -- that's -- you've

 8  always wanted to be her.

 9      A   No.

10      Q   Your entire life you wanted to be her.     10:48:10

11  That's why you always have a blonde --

12      A   No.

13      Q   -- in your advertisements.  That's why you're

14  stealing her company.  You stole -- that's why you

15  stole --                                        10:48:17

16      A   I never steal anybody's company.

17      Q   You're a fraud.

18      A   I'm not.

19          MR. PEDDIE:  Objection.  Objection.  Are

20  you --

21          THE WITNESS:  As you can see, I'm not blonde.

22          MR. PEDDIE:  -- going to harass her or would

23  you like to ask some questions?

24          MR. BILLER:  I'd like to ask some questions.

25  ////
```

                                                    Page 72

BY MR. BILLER:

   Q   I want you to tell me on what basis --

   A   You know what?  Her laughing is --

   Q   On what basis -- on what basis do you believe
that Paula Thomas did not draw these?  On what      10:48:33
basis?

   A   If you're going to keep yelling at me, I'm --
I cannot -- I'm not going to answer it.  Okay?  So
you need to talk to me like a normal human being.

   Q   Yeah, well, you need to stop lying.

   A   Don't yell at me.  And don't start laughing
there because it's very distracting.

   Q   Okay.  Would you please --

   A   So if you keep laughing, you can just go
outside.      10:48:52

   Q   Hey.  She can --

   A   Don't "hey" me.

   Q   She can be here.  Okay?  You don't have a
right to talk to her.  Don't talk to my client.

   A   I'm asking --      10:48:59

   Q   You don't have a right to say anything, okay,
to my client.

   A   I'm asking her.

   Q   No.  You ask me or you ask Richard.  But you
don't talk to her.  You don't have that right.  You      10:49:08

Page 73

```
 1      don't have that privilege.  Okay?

 2              Read the question back, please.

 3              (Record read.)

 4              THE WITNESS:  Because she didn't.

 5      BY MR. BILLER:                                10:49:23

 6          Q   On what basis do you have that belief?

 7          A   Because I know she does not draw.  She told

 8      me many times.

 9          Q   Oh, yeah, she --

10          A   I've seen her -- I've seen her drawing.  Let  10:49:32

11      her draw this right now.  See if she can draw this.

12          Q   When did she tell you she didn't draw?

13          A   Many, many times.

14              THE VIDEOGRAPHER:  Your microphone fell off.

15      BY MR. BILLER:                                10:49:47

16          Q   How many times?

17          A   Many times.

18          Q   How many times?

19          A   Many times.

20          Q   When was the first time she told you that?  10:49:51

21          A   Many years ago.  I know her for --

22          Q   I want to know all the dates she told you

23      that, all the years she told you that.  Okay?  So

24      please tell me.

25          A   I don't remember all the dates.  I don't    10:50:01
```

Page 74

1    remember all the times.

2        Q    Give me one day.  Give me one year.

3        A    2006, 2007, 2008.

4        Q    Okay.  What did she tell you?

5        A    She doesn't draw.  Every time we have a        10:50:11

6    design meeting -- it's not just me.  You can ask any

7    designers, anybody, and that's what one thing she

8    said as to why she described things because she said

9    specifically, "I don't draw.  That's why we have

10   designers who can draw."                              10:50:27

11       Q    You're not a designer, are you?  You can't

12   draw?

13       A    I can draw.

14       Q    No.

15       A    Do you want me to draw something?            10:50:33

16       Q    Why have you taken a company that has been --

17   $20 million has been invested in that company,

18   Thomas Wylde, LLC, and now you're the only employee

19   for the company?  How did that happen?

20            How did you take a company that had an        10:50:49

21   investor who was putting $20 million into the

22   company, now you're the only part-time worker who

23   gets paid one dollar a year?  How did that happen?

24            MR. PEDDIE:  Objection.  Assumes facts.

25            THE WITNESS:  I think that happened -- the    10:51:04

Page 75

```
 1    people that's responsible for that happen is sitting

 2    everywhere else including in front of me and not

 3    here.  So if you ask me a question, I worked my job.

 4    I did my part.  And everybody else didn't do their

 5    part.                                              10:51:22

 6    BY MR. BILLER:

 7        Q    Really?  Let's look at Exhibit 6.

 8             Seen this before?  Huh?  Seen Exhibit 6

 9    before?

10        A    You have to --                            10:51:32

11        Q    Let's mark it --

12        A    You have to give it to me.

13        Q    -- Exhibit 6.  Let's see what the

14    professionals say about you.

15             THE VIDEOGRAPHER:  I think your mic has   10:51:49

16    fallen off again.

17             (Exhibit 6 was marked for identification by

18        the court reporter and is attached hereto.)

19    BY MR. BILLER:

20        Q    Let's see what -- let's see what the      10:51:53

21    professionals say about your competency and your

22    ability to draw, design.  Okay?

23             Have you seen this document before?

24        A    No.

25        Q    Why are you -- Doug Lee testified -- David 10:52:01
```

Page 76

```
 1    Schnider testified he gave you this document and he
 2    sat down and talked to you about this document.  Is
 3    that not true?
 4       A    Obviously no.  There's my name -- wrong name
 5    right here.  That's not me.  I --                      10:52:18
 6       Q    So you're saying you've never seen this
 7    document?
 8       A    No.
 9       Q    Okay.  Well, let's go ahead and go through it
10    anyways.  Every single page.  I'll read.              10:52:24
11       A    Yeah.
12       Q    Okay?  Page 1.  Tell me if I read it wrong.
13            "All employees wear multiple
14            hats.  However, employees are often
15            asked to do many things they do not           10:52:43
16            know how to do or are not qualified to
17            do.  Leadership and managers don't
18            always know who is doing what and
19            when.  Brand is tired and too
20            predictable.  Employees are good and          10:52:56
21            enjoyable to work with.  Leadership,
22            management, departments are
23            miscommunicating.  Poor
24            communication."
25            Did I read that right?                        10:53:09
```

Page 77

1  A  Yeah.

2  Q  That was written about you, wasn't it?

3  A  I don't know if it was written about me.  It

4  says, "all employees"?

5  Q  Okay.  Next page.                        10:53:17

6        "Employees are unclear about

7       their role.  Employees in general do

8       not feel supported by leadership.

9       Creative team doesn't know how to give

10      leadership what they want.  Don't know    10:53:23

11      what they want and leadership keeps

12      changing their mind.  Brand is good,

13      but leadership does not know how to

14      make it successful."

15      Did I read that right?                    10:53:36

16  A  Yes.

17  Q  That talks about you, right?

18  A  Just I don't know if it's me.  It says

19  leadership.  I don't know who leadership.

20  Q  Weren't you in the leadership at Thomas Wylde  10:53:45

21  because you were CEO, COO, CCD?  Weren't you part --

22  weren't you the leadership at Thomas Wylde?

23  A  There was three people.  It was Paula,

24  myself, and --

25  Q  Paula wasn't here at the company when this    10:53:58

Page 78

1   was written --

2        A    Yeah.

3        Q    -- January 8, 2016.

4        A    Yeah, but this was all the employee were at

5   the company were existing employees.                    10:54:09

6        Q    You and John Hanna was management and

7   leadership, right?

8        A    I was designer.

9        Q    Oh, that's interesting.  Let's talk about

10  that.  Next page:                                        10:54:18

11            "Designs are dated.  Fabrics

12            dated.  Don't match price points.

13            Leadership is not on the same page.

14            Sales numbers and goals are

15            unrealistic.  Constant expansion of      10:54:29

16            lines and accessories dilute

17            resources."

18            That refers to you, right?  That refers to

19  you?

20       A    That refers to the company.             10:54:41

21       Q    And you.  You're part of the company, right?

22       A    Yes, I'm part of the company.

23       Q    So next structure.

24            "Environment of constant change.

25            Confusing and stressful for employees.  10:54:49

Page 79

```
1            Company needs more structure, but
2         leadership resists.  Lack of structure
3         leads to confusion.  Multiple people
4         and departments doing the same task.
5         Small things make for craziness.              10:55:02
6         Constant design changes cause budget
7         overage.  Budgets break down."
8            That refers to you, right?  Because you're
9   the CEO, right?
10     A   I'm not the CEO.  I was creative director.   10:55:18
11     Q   Okay.  Oh, you gave up your position as CEO
12  in 2016?
13     A   It was 2016, January 2016.
14            So this seems like John Hanna hired this
15  company and --                                       10:55:32
16     Q   Doug Lee hired the company.
17     A   I don't know who hired.  I asked John
18  Hanna --
19     Q   Okay.
20     A   -- to have outside --                         10:55:41
21     Q   Okay.  There's no question.
22     A   I asked CEO to hire independent HR because
23  Meldy was doing HR and we had many internal issues.
24     Q   Let's read on and see who is really at fault
25  here.                                                10:56:00
```

Page 80

1           "Calendar is clear for everyone,

2       but not followed and deadlines not

3       met.  Only department that is

4       structured and keeps to it is

5       accounting.  Employees crave                    10:56:10

6       structure."

7       Now, who was in accounting?  Did you say

8    Meldy?  She was accounting, right?

9       A    She was doing HR.

10      Q    Okay.  And so you're saying that she is the    10:56:23

11   one who caused the problems?

12      A    No.

13      Q    But it says:

14           "Only department that is

15           structured and keeps to it is          10:56:29

16           accounting."

17      Did I read that right?

18      A    I said --

19      Q    Did I read that right?

20      A    I said -- I'm answering your question.    10:56:36

21      Q    No, you're not.

22      A    If you're going to ask me a question, I --

23      Q    I asked you, did I read that right?

24      A    I asked -- you asked me -- I said Meldy was

25   doing HR.  She was not HR.  I did not say anything    10:56:44

Page 81

1    about her in regard accounting.  I said she was

2    doing HR, and I asked the CEO, we needed outside HR

3    come in and have some structure, have a talk to

4    employees.

5       Q    Okay.  Let's turn the page Bates number Lee        10:57:03

6    000009.  It's two pages.  "Leadership, John and

7    Jenne."

8           Are you saying that's not you?

9       A    My name is spelled wrong here.

10      Q    Yeah, but are you saying that's not referring      10:57:22

11   to you?

12      A    It says referring both me and John.

13      Q    Okay.  This is what it has to say:

14               "Hostile.  Wrong decisions made

15           constantly.  Don't like their                      10:57:34

16           behavior.  Embarrassing.  Can smell

17           the desperation.  Constantly changing

18           mind."

19           Now, that's talking about you, right?

20      A    Talking about me and John.                         10:57:45

21      Q    Okay.  Next page:

22               "Leadership, John and Jenne."

23           "Not realistic.  Not clear direction.

24           Be clear about what they want to do

25           and do it.  No support.  No direction.            10:57:57

1          Be open to the expertise of others.

2          Does manager have the ability to

3          lead," question mark, question mark,

4          question mark, question mark.  "They

5          do not communicate well."                10:58:10

6          That refers to you and John, right?

7     A    It refers to -- yeah, John and Jene.  I don't

8  know which one is me and which one is Jene, but --

9     Q    Are you saying you're not Jene?  Is that what

10  you're saying?                                    10:58:24

11    A    No.  I'm saying I don't know which one refers

12  to me and which one refers to Jene because it was --

13  a lot of it is unfair because I never really had

14  opportunity to read this, obviously.  Had I read

15  this, I would have first been able to correct and I    10:58:39

16  would have say, hey, you name -- you made my name

17  wrong.

18    Q    Okay.  You're more concerned about your name

19  than the behavior that is being described, aren't

20  you?                                              10:58:51

21    A    No, it's not.

22    Q    Are you that narcicisstic --

23    A    No --

24    Q    -- that you're more worried about your name

25  having one N in the middle and not your behavior?    10:58:58

Page 83

1          MR. PEDDIE:  Objection.  Argumentative.

2          THE WITNESS:  I'm saying I never seen this.

3    If I seen this, I would tell them they spell my name

4    wrong.  So obviously they don't know me very well.

5    BY MR. BILLER:                                    10:59:13

6      Q   David Schnider is going to testify that he

7    sat down with you and John and he showed you this

8    and he said you were very, very upset.

9          Okay, let's move on.

10          "Leadership, John and Jenne."              10:59:22

11          "They excuse each other's poor

12          behavior.  Employees are not honest

13          with them because they don't want to

14          get yelled at or in trouble.  Don't

15          meet or follow calendar milestones.        10:59:36

16          Too many expectations -- too many

17          exceptions to the rule."

18          That's referring to you and John, right?

19      A   Yes.

20      Q   Okay.  Let's forget about John.  Let's go to    10:59:47

21    you now.  John has two pages.  You have four pages.

22    There are twice as many criticisms for you over

23    John.

24      A   Sure.

25      Q   First one for Jene.                        11:00:04

                                            Page 84

1                "Is creative director, but still

2           acting as COO."

3      A    Small company.

4      Q    It says:

5                "Is a major bottleneck that keeps          11:00:15

6           things from getting done.  Constantly

7           waiting for her decision to move

8           forward.  Take offense if decisions

9           are made without her being present.

10          Jene needs to make all decisions, but         11:00:29

11          she doesn't come in until 11:00.

12          Things do not get done.  Jene is

13          changing mind.  Everything has to be

14          revised.  Jene knows production" --

15     A    Can you read that again.                       11:00:45

16     Q    Sure.

17               "Jene is changing mind.

18          Everything has to be revised.  Jene

19          knows production and sales, but not

20          design."                                       11:00:54

21          That's referring to you, right?

22     A    Yes.

23     Q    You don't know design, right?  That's what it

24     says.

25     A    That's someone's opinion.                      11:01:00

                                                           Page 85

1    Q    Yeah.  And the sales prove it because your

2  sales are horrible --

3    A    I didn't --

4    Q    -- for the company.

5         MR. PEDDIE:  Objection.  Argumentative.          11:01:08

6         THE WITNESS:  I didn't run sales department.

7  BY MR. BILLER:

8    Q    No.  You just made the designs that couldn't

9  be sold.

10        MR. PEDDIE:  Objection.  Argumentative.          11:01:14

11  BY MR. BILLER:

12    Q    Okay.  Jene continued:

13            "Jenne gets upset with employees.

14         Silent treatment.  Lot of collateral

15         damage.  Constant turnover on the          11:01:21

16         design team.  Jene is hard to

17         communicate with e-mail and text.

18         Doesn't respond.  Can be nasty.  Yells

19         at employees in front of everyone.

20         Screamer, yeller, and curser.  Text          11:01:41

21         and e-mail in the office upset

22         employees.  Public lynching."

23         That's what you do.  You do public lynchings,

24  huh?

25    A    I don't know what "public lynching" means.          11:01:56

Page 86

1    Q    Okay.

2          "Employees feel like they're

3          always in trouble.  No clear design

4          direction.  No brand direction.  Set

5          up to fail."

6          That's referring to you, Jene, isn't it?

7    A    Sure.

8    Q    Yeah, great designer.  "Jene continued."

9          "Employees are aligned, but

10         management is not."                        11:02:14

11         That would be you.  You would be management

12    with John, right?  That would be management, right?

13    A    Yes.

14    Q    Okay.

15         "Employees are not honest with            11:02:20

16         them because they do not want to be

17         yelled at or get in trouble.  If you

18         offend her, you are gone.  Designs are

19         not relevant.  Same old stuff."

20         Meaning Paula's stuff because you don't have  11:02:35

21    a creative bone in your body, right?

22         MR. PEDDIE:  Objection.  Argumentative.

23         THE WITNESS:  Sure.

24    BY MR. BILLER:

25    Q    Okay.

```
 1              "Lot of time, effort and

 2         confusion around fitting models,

 3         samples, sizing, multiple perceived to

 4         be far more expensive than need to

 5         be."                                    11:02:53

 6         That's referring to you, right?

 7    A    Yes, sure.

 8    Q    Okay.

 9              "Too involved in all aspects of

10         business.  Can't and should not be      11:03:03

11         doing it all.  Loses focus.  She works

12         very hard, but her passion translates

13         negatively.  The design team loses

14         confidence, feels berated by

15         leadership.  Very disrespectful to      11:03:18

16         design team."

17         That's you, right?  Referring to you, right?

18    A    Yes.

19    Q    Okay.  This gets into suggestions.  I find

20    these suggestions interesting.                11:03:30

21              "Brand goes away for a while.

22         Launches totally different cutting

23         edge line.  Change name or not,"

24         question mark, question mark, question

25         mark, question mark, question mark.      11:03:45
```

Page 88

1    Paula Thomas; right?

2         A      For different people, yes.

3         Q      Including Paula Thomas?

4         A      Yes.

5         Q      And when you left in June of 2016, was

6    the e-mail folder and the electronic folder in

7    existence?

8         A      Yes, I believe so.

9         Q      Did you produce it as well?

10        MR. PEDDIE:  The Meldy Rafols' e-mail folder?

11        MR. BILLER:  Yeah.

12        MR. PEDDIE:  I don't think so.

13        MR. BILLER:  I didn't think so.  They relate to

14   Paula Thomas.  That's the subject of the request.  You

15   want to produce those, or do I have to go

16   file -- whatever?

17        MR. PEDDIE:  We can discuss specific requests

18   for actual things like that.

19        MR. BILLER:  I want everything that she

20   discussed in this deposition.  It's that simple.

21        MR. PEDDIE:  Well, We can make a list later and

22   discuss it.

23   BY MR. BILLER:

24        Q      Now, when you received this Exhibit 69,

25   what did you think?

                                        Page 87

```
 1                    EXHIBITS CONTINUED
 2      NUMBER              DESCRIPTION                PAGE
 3   Exhibit 13      EMAIL CHAIN RE: "TW OPERATION      165
 4                   AGREEMENT"
 5                   BATES: SCHNIDER_BK004776 - 004836
 6
 7   Exhibit 14      DECEMBER 11, 2014 EMAIL WITH       172
 8                   ATTACHMENT RE: "DOCS"
 9                   BATES: SCHNIDER_BK005163 - 005209
10
11   Exhibit 15      DECEMBER 8, 2014 EMAIL WITH        174
12                   ATTACHMENT RE: "CHOI NOTE"
13                   BATES: SCHNIDER_BK003992 - 003997
14
15   Exhibit 16      NOVEMBER 25, 2014 EMAIL WITH       184
16                   ATTACHMENT RE: "PROMISSORY NOTE"
17                   BATES: SCHNIDER_BK001548 - 001553
18
19   Exhibit 17      RESOLUTION RE TRANSFER OF          190
20                   MEMBERSHIP INTERESTS
21                   BATES: 02217 - 02240
22
23   Exhibit 18      EMAIL CHAIN RE: "EXERCISE OF       193
24                   OPTION"
25                   BATES: LEE004485 - 004487
```

Page 7

1       Q    Objection.  Move to strike.  Unfounded

2   opinion.  Let's go --

3       A    There's many, many other evidence --

4       Q    Never takes excuse.  I mean always making

5   excuses.                                          11:06:08

6       A    I'm not.

7       Q    That's what you're doing right now.  You're

8   just making another excuse about your failures.

9   Because Paula Thomas was gone on April 1, 2015, and

10  you have been there since.  And -- you know what?   11:06:18

11  Let's do this now, actually.

12          MR. PEDDIE:  We're objecting to Exhibit 6

13  just for future purposes.  I don't mind you asking

14  questions about it.  It has no foundation.

15  BY MR. BILLER:                                     11:06:45

16      Q    I'm going to hand you two documents.

17          What number are we up to?

18          THE REPORTER:  7.

19          MR. BILLER:  Okay.  7.  Number 7 I'm handing

20  to the court reporter.                             11:07:18

21          (Exhibit 7 was marked for identification by

22      the court reporter and is attached hereto.)

23          MR. BILLER:  And this is No. 8.

24          (Exhibit 8 was marked for identification by

25      the court reporter and is attached hereto.)    11:08:03

Page 91

1    BY MR. BILLER:

2        Q   Do you have No. 7 and No. 8 in front of you?

3        A   Yes.

4        Q   We'll start with No. 7.  Number 7 appears to

5    be a management organizational chart; is that          11:08:13

6    correct?

7        A   Yes.

8        Q   And the person at the top is the founder,

9    creative director, Paula Thomas, right?

10       A   Yes.                                            11:08:21

11           MR. PEDDIE:  I'm sorry.  What page are you

12   on?

13           MR. BILLER:  It's on 118.  I mean -- I'm

14   sorry.  Bates stamped 6020.

15   BY MR. BILLER:                                          11:08:31

16       Q   Then it has you as the chief operating

17   officer.

18           Do you see that?

19       A   Yes.

20       Q   And it has John Hanna as chief executive        11:08:35

21   officer.

22           Do you see that?

23       A   Yes.

24       Q   Now, how many other employees are with the

25   company at this point in time?                          11:08:46

Page 92

1    A    When was that?

2    Q    On the chart.

3    A    But when -- when was it made?

4    Q    I don't know.  I thought you would be able to

5    help me with this.  It's part of a pamphlet.          11:09:00

6    A    I cannot -- we've been making this for the

7    last ten years.

8    Q    Okay.  So we see who is under you is Yoonsung

9    Bae, Susan Chae, Kristhea Santos, David Schnider --

10   A    Susan Chae?                                       11:09:16

11   Q    -- and Allison Lee, right?  There are five

12   people under you, right?

13   A    There is outside service, two outside

14   professional services.  Two outside professional

15   service.  And three people.                           11:09:39

16   Q    Okay.  The only person left on this day --

17   A    Yes.

18   Q    -- is you, right?

19   A    Yes.

20   Q    All of these other people are gone, right?       11:09:52

21   A    Yes.

22   Q    Okay.  So there's not a chief accountant.

23   There's not a sales manager.  There's not a PR

24   manager.  There's not legal counsel.  There's not a

25   CPA, right?                                            11:10:05

                                             Page 93

1    A    Correct.

2    Q    There's not an import coordinator, associate

3    designer, associate designer, senior designer,

4    right?  They're gone?

5    A    Correct.                                    11:10:16

6    Q    Right?  Then you've got assistant associate,

7    assistant associate, administrative associate.

8    They're gone as well, right?

9    A    Yes.

10    Q    All these people are gone but you, right?    11:10:24

11    A    Yes.

12    Q    So is your testimony that all these people

13    except you are responsible for the downfall of

14    Thomas Wylde as a brand?

15    A    No.                                          11:10:38

16    Q    So what responsibility do you take?

17    A    As management, I take full responsibility.

18    Q    Full responsibility for the destruction of

19    the brand, right?

20    A    The org chart?  Yes.                         11:10:52

21    Q    You take full responsibility for nearly

22    destroying the brand name Thomas Wylde?

23        MR. PEDDIE:  Objection --

24        THE WITNESS:  No, not me.

25    BY MR. BILLER:

1    Q    Okay.  Of course not.

2    A    Done by -- done by John, myself, and Paula.

3    Q    Paula wasn't there.  Okay?

4    A    She was there.

5    Q    Okay.  Let's --                              11:11:13

6         MR. PEDDIE:  I'm objecting to this Exhibit 7.

7    It was pretty clearly created for PDTW.

8         MR. BILLER:  John was never a chief executive

9    officer for PDTW.  So what are you talking about?

10   Do you just talk?  Really?                        11:11:28

11        MR. PEDDIE:  I'm sorry, but on Bates 6020 it

12   says, "Paula Thomas, founder and creative director."

13   She is on the chart.  And on the next page it's

14   listing everybody's start dates, 2009, 2013.  This

15   is not a Thomas Wylde document -- or Thomas Wylde,   11:11:38

16   LLC, document.

17        MR. BILLER:  Okay.  You want to argue

18   whatever you want to argue.

19        MR. PEDDIE:  I'm objecting to it.

20        MR. BILLER:  It's a chart.                    11:11:43

21        MR. PEDDIE:  You're asking why, I'm telling

22   you --

23        MR. BILLER:  On what grounds?

24        MR. PEDDIE:  Because you're conflating PDTW

25   with TW.                                           11:11:48

                                                Page 95

1          MR. BILLER:  What have I said?  I asked her.

2     I gave her a chart.

3          MR. PEDDIE:  About how she is the only one

4     left.  It sounds like you're talking about Thomas

5     Wylde LLC's employees.                              11:11:55

6          MR. BILLER:  She is the only one left.

7          MR. PEDDIE:  This talks about PDTW.

8          MR. BILLER:  Okay.  Let's go to the org chart

9     for TW.

10         MR. PEDDIE:  Okay.

11         MR. BILLER:  Thomas Wylde, No. 8.

12         MR. PEDDIE:  Okay.

13    BY MR. BILLER:

14         Q    Can you review No. 8.

15         A    Yes.  This is really small typing, small    11:12:10

16    writing.

17         Q    I'm sure you can read it.

18         A    At the top it says, "Thomas Wylde, Table of

19    Organization."

20         Q    Right.  You're the only one left, right?    11:12:24

21         A    Yes.

22         Q    So what -- what do you take responsibility

23    for in causing Thomas Wylde, LLC, from going from a

24    company with lots of employees to a company who has

25    a part-time, one-dollar-a-year CEO?                  11:12:45

                                          Page 96

```
 1           MR. PEDDIE:  Objection.  Calls for

 2    speculation.

 3           THE WITNESS:  Are you asking me?

 4    BY MR. BILLER:

 5       Q   Yes.

 6       A   All I know is that I'm getting paid

 7    one-dollar-per-month salary for the last two years

 8    and paid off the company's 2 million dollar debt,

 9    working weekends, working every day, and not getting

10    paid.                                           11:13:21

11    BY MR. BILLER:

12       Q   Because you're working for yourself and

13    you're selling TW's garments and clothes and putting

14    the money in your own pocket, that's why.

15       A   Hundred percent not true.              11:13:33

16           MR. PEDDIE:  Objection.  Argumentative.

17           THE WITNESS:  Hundred percent not true.

18    BY MR. BILLER:

19       Q   We can look at bank records.

20           So you don't take any responsibility for the  11:13:39

21    failure of the company, I take it?

22       A   I think, in my personal opinion, when any

23    company fails, there is a lot of effect involved.

24    For Thomas Wylde particularly, it's three people:

25    myself, John, and Paula.                       11:13:57
```

Page 97

1    Q    Let's get this right.  Thomas Wylde, LLC,

2    started business on January 1, 2015, right?

3    A    What was that?

4    Q    January 1, 2015, right?

5    A    I don't know when it started, but 2015, yes.    11:14:09

6    Q    Okay.  And it is now 2019, four and a half

7    years later, right?

8    A    Yes.

9    Q    Okay?  Paula Thomas left the company -- was

10   fired and terminated by Richard Peddie on April 1,    11:14:24

11   2015, right?

12         MR. PEDDIE:  Objection.  Misstates the facts.

13         THE WITNESS:  Go ahead.

14   BY MR. BILLER:

15   Q    You can answer the question.    11:14:36

16   A    Okay.  I'm waiting.

17   Q    I just asked you.

18   A    Oh.  What did you ask?

19         MR. BILLER:  Read back the question, please.

20         (Record read.)    11:14:53

21         THE WITNESS:  I don't know what date.  But

22   yes.

23   BY MR. BILLER:

24   Q    Okay.  So she was at Thomas Wylde about three

25   months.  John Hanna was with Thomas Wylde for about    11:15:00

Page 98

1    18 months.  And you've been there for four and a

2    half years.

3        A    Yes.

4        Q    So you think they have as much responsibility

5    for the failure of the company as you do?                11:15:10

6        A    So when --

7        Q    It's a yes or no question.

8        A    Well, I'm getting there.  When -- I don't

9    know why you're saying failing, because 2014 company

10   was 2 million dollar debt owed to CBC and currently      11:15:24

11   we have no debt.  So financially the company was in

12   debt and now we are almost debt free.

13       Q    Well, I wouldn't know that because you're not

14   producing your books and records.

15       A    Well, so I'm telling you.                       11:15:46

16       Q    I don't care what you say.  I want to see

17   your books and records.

18       A    Okay.  That's different -- okay.  That's --

19       Q    So will you allow us to look at the books and

20   records?                                                 11:16:00

21           MR. PEDDIE:  Don't take homework assignments.

22           THE WITNESS:  I don't own the company.  I

23   don't own the company.

24   BY MR. BILLER:

25       Q    You're a member, aren't you?

                                                 Page 99

1      A    I work for the company.

2      Q    You're a member, aren't you?

3      A    I'm a member.  I'm a member.  I work for the

4    company.

5      Q    You're a member, aren't you?  You're an          11:16:10

6    owner?

7           MR. PEDDIE:  Objection.  Calls for a legal

8    conclusion.

9           THE WITNESS:  I'm not owner.

10   BY MR. BILLER:                                           11:16:17

11     Q    I want to go back to the topics of computers.

12   Do you have a cloud?

13     A    Personally?

14     Q    Yes.

15     A    Yes.                                              11:16:26

16     Q    Okay.  Did you ever get a cloud for Thomas

17   Wylde, LLC?

18     A    I don't know.  Me?  No.

19     Q    Is there any information from Thomas Wylde,

20   LLC, in your personal cloud?                            11:16:42

21     A    Not in my personal cloud.

22     Q    So --

23     A    It's my e-mail, it could be.  If it's in my

24   e-mail.

25     Q    So when you e-mail to people, don't you have     11:16:53

Page 100

1    attachments?

2        A    Don't I have what?

3        Q    Attachments.  Documents that are attached to

4    your e-mails.

5        A    Oh, attachments.                           11:17:03

6        Q    Yes.

7        A    Yes.

8        Q    So if your e-mails -- if you have e-mails for

9    work, Thomas Wylde, LLC, that have attachments,

10   those attachments will be in your cloud, right?     11:17:14

11       A    It's in the server.

12       Q    It's in the server or cloud?

13       A    Server.  Thomas Wylde does not -- I don't

14   think we have a cloud.  We have --

15       Q    Your personal e-mails.                      11:17:24

16       A    My personal e-mails, yes.

17       Q    Okay.  So you -- are you saying you don't

18   have any business e-mails in the cloud that you have

19   personally?

20       A    In my computer.  I don't know what -- in my  11:17:36

21   computer, it's constantly backed.

22       Q    Let's get this right.  Okay.  You have a

23   laptop?

24       A    I do have a laptop.

25       Q    You travel a lot, don't you?                11:17:50

Page 101

1     A    Yes.

2     Q    You travel a lot to sell clothes and to go to

3    things that designers go to, right?

4     A    Yes.

5     Q    And do you use your laptop when you're out on      11:17:59

6    business?

7     A    Yes.

8     Q    And your laptop -- data on the laptop goes to

9    the cloud, right?

10    A    Yes.  I mean, it goes to backup.      11:18:08

11    Q    What is backup?

12    A    You know that -- the backup, the -- the thing

13   that Apple sells.  You know, the backup.  You never

14   bought that?  It's backup.  It goes to automatically

15   back up everything.      11:18:41

16    Q    In the cloud?

17    A    Yes.  I mean, if you say it's cloud.  But we

18   have machine.

19    Q    Okay.  You have machines for your laptop --

20    A    Backup.  For everything.      11:18:51

21    Q    Let me finish, okay?

22        Describe the back-up machine you're referring

23   to.

24    A    Okay.  So we have a backup and it -- it's

25   from Apple.  It's a white square.      11:19:14

Page 102

1    Q    Are you talking about a server?

2    A    I don't know what that is.

3    Q    Who installed it?

4    A    My husband did.

5    Q    Your husband did?                           11:19:23

6    A    Yes.

7    Q    When did he install it?

8    A    It's been long time.

9    Q    Ed Smith didn't install it?

10   A    No.  It's in my home.  He never been to my    11:19:30

11   home.

12   Q    Okay.  So this backup or server you have at

13   your home, it includes Thomas Wylde information?

14   A    It backs up everything that I back up on my

15   e-mail.                                          11:19:46

16   Q    And you use your laptop when you do business,

17   right?

18   A    Yes.

19   Q    So your personal computer and your server

20   have Thomas Wylde information in them, right?      11:19:56

21   A    Probably.

22   Q    Okay.  When did you buy your laptop?

23   A    Long time ago.  I want to say -- long time

24   ago.  2015, 2014.  I don't know.

25   Q    Okay.  So I'm going to tell you right now      11:20:24

Page 103

1   that I consider the server and your laptop to be

2   evidence.  And that you need to protect data in that

3   evidence.  In fact, you need to probably back it up

4   with a second source so that evidence is not lost.

5   Because I know in your divorce proceedings when they      11:20:42

6   asked for your computer, you said it was stolen or

7   gone.

8      A    My computer was stolen --

9      Q    Yeah.

10     A    -- and that -- Christmastime.  And it was new   11:20:52

11  computer I bought.  Paula know about that.

12     Q    Okay.  I'm telling you --

13     A    Okay.

14     Q    -- don't let anything happen to that laptop

15  and that backup or that server, because I'm going to      11:21:09

16  be getting whatever information out of those devices

17  that are related to Thomas Wylde.  Okay?

18     A    Sure.

19     Q    All right.  Now, let's talk about computers

20  at work.  You have two computers at work, you say,        11:21:23

21  right?

22     A    Yes.

23     Q    And the computer at home, your laptop and the

24  server, that's connected to a cloud, right?

25     A    Yes.  My backup.  I don't know what you call     11:21:32

Page 104

1    cloud, but we have a backup.

2        Q    Do you have a cloud?

3        A    I have a backup.  If you can call it a

4    cloud --

5        Q    Do you know what a cloud is?                    11:21:47

6        A    It's -- I think that is a cloud because it

7    goes back up.

8        Q    There is a server, which is a physical

9    device, and then there is a cloud that is in the sky

10    that's connected to a host company.                     11:22:02

11           Do you know that?

12        A    I have a physical device.

13        Q    Okay.  Do you have a cloud for any computers?

14        A    For me personally?  No, I don't.

15        Q    Thomas Wylde?                                  11:22:17

16        A    Thomas Wylde, I don't think so.

17        Q    Okay.  So right now -- you don't think so?

18        A    No, I don't think so.  I don't know.  I don't

19    think so.  I don't think we ever had a cloud.  If we

20    have, I don't know.                                     11:22:28

21        Q    Okay.  So let's talk about the two computers

22    that you say are still at --

23        A    Office.

24        Q    -- the business at Thomas Wylde.  What kind

25    of computers are they?                                  11:22:41

Page 105

| | | |
|---|---|---|
| 1 | A | I think it's PC. |
| 2 | Q | Two PCs? |
| 3 | A | Yes. |
| 4 | Q | Both PCs? |
| 5 | A | I think so.                                    11:22:49 |
| 6 | Q | What type? |
| 7 | A | I don't know. |
| 8 | Q | Who makes them?  Dell? |
| 9 | A | HP?  I don't know. |
| 10 | Q | HP?                                            11:22:59 |
| 11 | A | I don't know.  I don't know. |
| 12 | Q | Okay.  You have a photocopy machine? |
| 13 | A | I have -- I do have a copy machine, yes. |
| 14 | Q | Okay.  Do you have a scanner? |
| 15 | A | That scans, I believe.                         11:23:12 |
| 16 | Q | Okay.  When did you buy these two computers? |
| 17 | A | I don't know. |
| 18 | Q | Was it within the year? |
| 19 | A | No. |
| 20 | Q | Was it in 2017?                                11:23:21 |
| 21 | A | I don't know. |
| 22 | Q | How old are they? |
| 23 | A | I don't know.  I don't use them. |
| 24 | Q | You don't use them for Thomas Wylde at all? |
| 25 | A | That one is for accounting -- I'm not the one  11:23:32 |

Page 106

1   that using those computers.

2      Q   Who uses those computers?

3      A   The shipping computer is used by the shipping

4   guy, and accounting computer is used by Yoonsung

5   before.                                              11:23:47

6      Q   And she doesn't work at Thomas Wylde anymore,

7   right?

8      A   Nobody.

9      Q   So who is doing the accounting?

10     A   Occasionally she come and help for free.       11:23:55

11     Q   So she just comes in to work for you for

12  free?

13     A   Yeah, when I need help, sure.  I work for

14  free right now.  One dollar per month.

15     Q   I thought it was one dollar per year?         11:24:07

16     A   No, sorry.  One dollar per month.

17     Q   Okay.  All right.  Why -- let's get to the

18  next document.  I'll tell you why I know there are

19  69 computers as of May 2016.

20          MR. BILLER:  Let's mark this as number 9.     11:26:56

21          (Exhibit 9 was marked for identification by

22      the court reporter and is attached hereto.)

23          MR. BILLER:  I'll identify the pages because

24  this thing is very long.

25          THE VIDEOGRAPHER:  Your microphone, please.   11:27:40

                                                    Page 107

1          MR. BILLER:  Oh, sorry.

2     BY MR. BILLER:

3          Q    Okay.  You say there are 10, 15, maybe 20

4     computers in storage?

5          A    Yes.                                         11:27:50

6          Q    And those computers contain information,

7     data, electronically stored information from Thomas

8     Wylde?

9          A    Yes.

10         Q    Are any of those computers from -- were any    11:28:11

11    of those computers used for PDTW?

12         A    I don't know.  I don't think so.

13         Q    Okay.  So are you saying 20 computers were

14    purchased for -- or as many as 20 computers were

15    purchased for Thomas Wylde?                             11:28:34

16         A    I don't know.  I was not the one in charge of

17    buying computers.

18         Q    Who was that?

19         A    It was previous management.

20         Q    Who was that?                                 11:28:47

21         A    Paula and John.

22         Q    I'm talking about Thomas Wylde.

23         A    Paula was part of it too.

24         Q    She was creative director.

25         A    So I don't know who.  So you're asking me,     11:28:58

Page 108

1       I'm guessing -- I'm giving you my guess.

2           Q    Okay.  But I don't want a guess.  But I want

3       to know -- when I open that storage facility, am I

4       going to see computers that contain business

5       information from Thomas Wylde?                    11:29:14

6           A    Yes.

7           Q    Okay.  Do you recognize Exhibit 8 --

8       Exhibit 9?  Sorry.

9           A    No.

10          Q    It's tax returns.                         11:29:40

11          A    Okay.

12          Q    You don't recognize the CPA on the letterhead

13      at the top of the first page?  Do you recognize that

14      name?

15          A    Yes.                                      11:29:50

16          Q    That's a CPA, right?

17          A    Yes.

18          Q    Allison Kim worked for that CPA?

19          A    Yes.

20          Q    Right?                                    11:29:58

21          A    Yes.

22          Q    Okay.  So did Allison Kim ever work in the --

23      on the business premises of Thomas Wylde, LLC?

24          A    Thomas Wylde, LLC, I don't know.  PDTW she

25      came.  For Thomas Wylde, I don't know.            11:30:16

                                                  Page 109

1    Q    Well, this is the tax return for 2015, right?

2    A    Yes.

3    Q    That was --

4    A    Yes, 2015.

5    Q    Okay.  That was Thomas Wylde LLC's first        11:30:33

6  year, right?

7    A    I don't know.  Yes.

8    Q    Okay.  What involvement did you have in

9  preparing the tax return itself or providing any

10  information to the CPA who prepared the tax return?      11:30:54

11    A    None.

12    Q    None whatsoever?

13    A    None.

14    Q    None?  Please explain why the expenses almost

15  doubled from PDTW's expenses.                           11:31:21

16    A    I don't know.

17        MR. PEDDIE:  Objection.  Assumes facts.

18  BY MR. BILLER:

19    Q    Do you have an answer?

20    A    I don't know.  Ask the accountant.              11:31:33

21    Q    The accountant?

22    A    Yeah.

23    Q    Well, you were the COO, weren't you?

24    A    Not in 2015.

25    Q    You told me in your deposition --              11:31:41

Page 110

1    A    Oh, COO.  Okay.

2    Q    You were the COO, right?

3    A    Yes.

4    Q    So you're familiar with some of the documents

5    that are needed to prepare a tax return, right?          11:31:52

6    A    Not for the accounting part.  We always --

7    PDTW, we had a CFO, so they did everything.

8         And for Thomas Wylde, LLC, we had also a

9    chief accountant.  One thing that I don't get

10   involved much is the accounting part, because I          11:32:14

11   don't know much about stuff.

12   Q    As the chief operating officer, you're

13   responsible for getting garments manufactured,

14   right?

15   A    I was responsible for a lot of things.          11:32:28

16   Q    No.  I'm asking is that one of them, though?

17   A    Yes.

18   Q    And you're responsible for getting garments

19   distributed, right?

20   A    Distributed to where?          11:32:42

21   Q    To buyers and wholesalers and retailers.

22   A    Yeah, I was overseeing.

23   Q    Okay.  So you would be responsible for

24   receiving invoices from the manufacturers and the

25   distributors, right?          11:32:54

Page 111

1    A    Our accounting department, yes.

2    Q    Would you be responsible for receiving the

3    invoices?

4    A    No.

5    Q    Okay.  So you wouldn't get any invoices?        11:33:04

6    A    Accounting -- I would get invoices and I

7    normally give it to accounting department.

8    Q    Okay.  Now, you used a company called B2?

9    A    Yes.

10    Q    To be a distributor, right?        11:33:19

11    A    It's pick and pack company, shipping company.

12    Q    I know.  But it's called B2, right?

13    A    Yes.

14    Q    Okay.  You own it, don't you?

15    A    I don't own that company.        11:33:31

16    Q    Really?  Who owns it?

17    A    It is my brother owned the company.

18    Q    Really?

19    A    Yes.

20    Q    I have documents that say you own it.        11:33:37

21    A    That's -- I don't own the company.

22    Q    Okay.  All right.  We'll see.  I'll bring

23    those out.

24    A    Sure.

25    Q    How about Alex Park, who is he?        11:33:47

Page 112

1    A   He is the owner of one of our manufacturers.

2    Q   Which owner?

3    A   What was that?

4    Q   Who?  Owner of what manufacturer?

5    A   Dada Trading.                                    11:34:06

6    Q   You sold Jene Jen to him, right?

7    A   Yes.

8    Q   And you are now -- and you are part owner of

9    Dada, right?

10   A   Not at all.  Dada Trading.                       11:34:21

11   Q   Not at all?

12   A   Not at all.

13   Q   Really?

14   A   Not at all.

15   Q   But you used Dada Tech as a manufacturing of    11:34:29

16   the clothes for Thomas Wylde and PDTW, right?

17   A   Yes.

18   Q   Okay.  Which other manufacturer did you use?

19   A   I'm sorry?

20   Q   Which other manufacturer did you use?          11:34:42

21   A   When I met Paula, I was working for Jene Jen,

22   which was -- we were at the office for Dada Tech.

23   That's how I met Paula.  We had -- I don't know.  We

24   had a lot of accounts.

25   Q   Let's go back to the declaration.               11:35:02

Page 113

1      A    Which declaration?

2      Q    Your declaration.  Exhibit -- what is it?

3  Exhibit 5.  Right there (indicating).

4           I want to show you your previous testimony.

5           I'm handing the court reporter what will be        11:35:26

6  marked as Exhibit 10, the deposition testimony of

7  Jene Park that I took on August 10, 2017.  Ages ago.

8           (Exhibit 10 was marked for identification by

9      the court reporter and is attached hereto.)

10          MR. BILLER:  I don't have another copy.          11:35:51

11  You'll have to share.

12  BY MR. BILLER:

13     Q    Now, turn it page 43.  I really don't have

14  any questions, but we have to do this a specific way

15  because I'm about to impeach you.  Okay?                   11:36:18

16     A    What was that?

17     Q    I don't have any questions, but I'm about to

18  impeach you, so we have to do this a specific way.

19     A    What is --

20     Q    Impeachment I'm about to show you you're a        11:36:31

21  liar.

22     A    Oh.

23     Q    Page 43, line 15.

24     A    Uh-huh.

25     Q    I'm going to read the question and you read       11:36:38

Page 114

1  the answer.

2      A    Uh-huh.

3      Q    Because I read -- I said this question and

4  you gave the answer.

5              "Your testimony -- Paula is                    11:36:48

6          sitting right here, and she is going

7          to testify otherwise.  It's going to

8          be your credibility against her

9          credibility.  She is the creative

10         director of PDTW and Thomas Wylde."            11:36:59

11         And you answer?

12     A    I said "Absolutely."

13     Q    Okay.

14             "QUESTION:  She is the one who

15         came up with the designs.  She's the           11:37:07

16         one who got intellectual property

17         rights for her designs."

18         Answer?

19     A    "Yeah, sure."

20     Q    Okay.                                          11:37:16

21             "You didn't do any of that,

22         right?"

23     A    What?

24     Q    I said:

25             "You did not do any of that,               11:37:20

                                                        Page 115

```
 1              right?"
 2              Answer?
 3     A        "I did not say I did that."
 4     Q        Okay.
 5                  "QUESTION:  Did you do any of          11:37:29
 6              that?  That's a direct question."
 7              Answer?
 8     A        "No."
 9     Q        Okay.
10                  "So now you're claiming that you       11:37:36
11              made suggestions to Paula regarding
12              the shoes and other items?"
13              Answer?
14     A        I say "No."
15     Q
16                  "And design changes.  Is that
17              what your testimony is?"
18     A        "I said I did the tech pack."
19     Q        You actually said:
20                  "No.  I said I did the tech           11:37:56
21              pack."
22              Is that right?
23     A        Yes.
24     Q        What's the tech pack?
25     A        Tech pack is technical design.  That was --   11:38:02
```

                                                      Page 116

Form 1065X (1-2012)  **THOMAS WYLDE LLC**                47-1444612                         Page **3**

## Part II    Amended or Administrative Adjustment Request (AAR) Items for ELPs and REMICs Only

| | (a) Description of Item Being Amended or Adjusted (see instructions) | | (b) As originally reported or as previously adjusted | (c) Net change — increase or (decrease) — explain in Part IV | (d) Correct amount |
|---|---|---|---|---|---|
| 1 | | 1 | | | |
| 2 | | 2 | | | |
| 3 | | 3 | | | |
| 4 | | 4 | | | |
| 5 | | 5 | | | |

### Tax and Payments (see instructions)

| | | | | | |
|---|---|---|---|---|---|
| 6 | ELPs ONLY: Tax and other payments | 6 | | | |
| 7 | REMICs ONLY: Tax on net income from prohibited transactions | 7 | | | |
| 8 | REMICs ONLY: Tax on net income from foreclosure property | 8 | | | |
| 9 | REMICs ONLY: Tax on contributions after the startup day | 9 | | | |
| 10 | Total tax | 10 | | | |
| 11 | Tax paid with Form 7004 | 11 | | | |
| 12 | Tax paid with (or after) the filing of the original return | | | 12 | |
| 13 | Add lines 11 and 12, column (d) | | | 13 | |
| 14 | Overpayment, if any, as shown on original return or as later adjusted | | | 14 | |
| 15 | Subtract line 14 from line 13 | | | 15 | |

### Tax Due or Overpayments (see instructions)

| | | | |
|---|---|---|---|
| 16 | Tax Due. Subtract line 15 from line 10, column (d). For details on how to pay, see instructions | 16 | |
| 17 | Overpayment. Subtract line 10, column (d), from line 15 | 17 | |

**Note.** Amended Schedules K-1 or Schedules Q. File amended Schedules K-1 or Schedules Q with Form 1065X. If the ELP or REMIC is filing Form 1065X for an administrative adjustment request (AAR), do not furnish the amended Schedules K-1 or Schedules Q to the partners or residual interest holders. If the REMIC is not filing for an AAR and is not subject to the rules for consolidated audit proceedings under sections 6221 through 6231 the REMIC must furnish the amended Schedules Q to its residual interest holders. See instructions for details.

**Sign Here**

Under penalties of perjury I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____    _____    ▶ _____
Signature of general partner, limited liability company member manager, or authorized individual          Date                    Title

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name<br>Kyu Hong Kim | Preparer's signature | | Date | Check ☐ if self-employed | PTIN<br>P00288359 |
| | Firm's name ▶ Kyu Hong Kim, CPA, Inc. | | | | Firm's EIN ▶ 20-2861494 |
| | Firm's address ▶ 3435 Wilshire Blvd Ste 1970<br>Los Angeles, CA    90010-1938 | | | | Phone no. 213-381-3557 |

Form **1065X** (1-2012)

DAA

1    You said some other things that were not truthful

2    regarding your familiarity with Exhibit 6; is that

3    right?

4        A    Which part?  I said I didn't -- I don't

5    remember seeing this.  I did not say that I'm not        12:33:42

6    aware of this -- the HR company performed the

7    in-house HR.  It has -- it was presented after the

8    HR the meeting was done.

9            Actually, it wasn't a meeting, it was a

10   lengthy outside HR company come in and interview        12:34:07

11   with everybody.

12       Q    You didn't say that.

13       A    I wasn't asked.

14       Q    Oh, really?  It wasn't asked.  Okay.

15       A    You asked if I remembered this.  I said I      12:34:15

16   don't remember this, but --

17       Q    But you remember having the discussion with

18   the HR people, right?

19       A    Yes.  I actually wrote back about what they

20   presented to me.                                        12:34:26

21       Q    You actually -- but you didn't say that

22   either, did you?

23       A    You didn't ask.

24       Q    So you just strictly interpret my questions,

25   right?  You're not going to volunteer any               12:34:36

Page 118

1    information unless I ask a question precisely,

2    right?  Is that the way you play this game?

3        A   I'm supposed to -- I'm trying to answer your

4    questions --

5        Q   No, you're not.

6        A   -- yes or no.

7        Q   Let me hand you number --

8        A   Sure.

9            MR. BILLER:  What's the next number?

10           THE REPORTER:  11.                        12:34:56

11           MR. BILLER:  11.

12           (Exhibit 11 was marked for identification by

13       the court reporter and is attached hereto.)

14           THE WITNESS:  Uh-huh.

15   BY MR. BILLER:                                   12:35:16

16       Q   Do you know Exhibit 11?

17       A   Yes.

18       Q   And you know Exhibit 11 because you wrote it,

19   right?

20       A   Yes.                                      12:35:22

21       Q   You wrote it regarding the report that you

22   denied knowing about?

23       A   I said I didn't review this with David

24   Schnider, but of course I know about the whole HR

25   exercise and the report.                         12:35:32

                                                    Page 119

1    Q   Oh?  Oh, really?

2    A   Yes.

3    Q   Of course you did.  But you didn't tell me

4    that before.

5    A   But your question was if I've seen this.          12:35:38

6        MR. BILLER:  Let's go for a break.  Okay?

7    Why don't you go back to when I first introduced the

8    document.

9        THE VIDEOGRAPHER:  Are we off the record?

10       MR. BILLER:  No.  I'm speaking to the          12:35:51

11   reporter.

12       Let's go back to when I first introduced the

13   document.  We're not off the record.

14       (The record was read as follows:

15           "QUESTION:  Let's look at

16       Exhibit 6.  Seen this before?  Huh?

17       Have you seen Exhibit 6 before?

18           ANSWER:  You have to --

19           QUESTION:  Let's mark it --

20           ANSWER:  You have to give it

21       to me.

22           QUESTION:  -- Exhibit 6.

23       Let's see what the professionals say

24       about you.  Let's see what -- let's

25       see what the professionals say about

Page 120

1        your competency and your ability to

2        draw, design.  Okay?

3                Have you seen this document

4        before?

5                ANSWER:  No.

6                QUESTION:  Why are you -- Doug

7        Lee testified -- David Schnider

8        testified he gave you this document

9        and he sat down and talked to you

10       about this document.  Is that not

11       true?

12               ANSWER:  Obviously no.

13       There's my name -- wrong name right

14       here.  That's not me.  I --

15               QUESTION:  So you're saying

16       you've never seen this document.

17               ANSWER:  No.

18               QUESTION:  Okay.  Well, let's

19       go ahead and go through it anyways.")

20               MR. BILLER:  I've got enough.  That's good.     12:36:54

21  BY MR. BILLER:

22     Q    So you clearly testified falsely that you had

23  not -- you had not seen the document before?

24     A    Not this particular document, I haven't seen

25  it.  I know about -- of course I requested to the     12:37:03

                                                Page 121

1   BY MR. BILLER:

2       Q   Okay.

3       A   And --

4       Q   I'm not talking about the reports the company

5   did.  I'm talking about the document I'm holding as      12:38:03

6   Exhibit 6 from a professional evaluator.  Are you

7   saying that Mr. Schnider did other documents

8   regarding your evaluation?

9       A   The document was done by the professional HR

10  company.                                                12:38:19

11      Q   Yes.  And you never -- you testified before

12  you never saw it.

13      A   No.  I had the document.  I read the

14  document.  I had a meeting with them.  I had a

15  meeting with HR company.                                12:38:30

16      Q   But in the early morning --

17      A   Not this particular one you're holding.

18      Q   So you're saying there's another document?

19      A   There was -- I had a meeting with them --

20      Q   Describe the other document.  I don't care      12:38:39

21  about meetings.

22      A   Report.

23      Q   I don't care about anything else.

24      A   Report.

25      Q   I want you to describe the report.              12:38:44

Page 123

1      A    There was the report.

2      Q    Describe it.

3      A    There was a report done by this company we

4   hired and they were -- they were giving -- they had

5   interviewed me.                                    12:38:59

6      Q    Describe the report.  I don't care what you

7   think is in there.  I want you to describe the

8   report.  Physically describe it.  What did it look

9   like?  Because I'm going to subpoena this man and

10  I'm going to get all the reports.                  12:39:10

11     A    Yeah.

12     Q    So what did the report look like?

13     A    Report, I don't remember, but report look

14  like report.

15     Q    You're pointing at the document as a report?  12:39:16

16  You're pointing at Exhibit 6 as a report?

17     A    Okay, okay.  It could be this.  I don't

18  remember.  There was a report.  There was a report

19  and there was a meeting.

20     Q    Okay.  So I'm asking you in particular, is    12:39:29

21  there another document regarding your incompetence

22  other than Exhibit 6?

23     A    Could be.

24     Q    You don't know?

25     A    Could be.                                    12:39:39

Page 124

1    Q   Do you know?

2    A   I don't know.  Might be.

3    Q   Okay.  So as you know now --

4    A   Yes.

5    Q   -- the only document that you saw was the          12:39:48

6    document Exhibit 6, correct?

7    A   Yeah.  No.  No, no.  I think there was other

8    documents.

9    Q   But you just said you don't know.  Which is

10   it?  Do you know?  Don't you know?  Are you          12:39:58

11   confused?  Or are you just incompetent?

12   A   No.  What I'm trying to say is we hired HR

13   company --

14   Q   I know you hired an HR -- I'm focusing on the

15   document.  Describe the document you --          12:40:12

16       MR. PEDDIE:  Can you lower your voice,

17   please.

18       MR. BILLER:  If she would stop frustrating me

19   and not being dishonest with me, I would.

20       THE WITNESS:  I'm not trying to be dishonest.   12:40:24

21   I'm trying to answer your questions.

22   BY MR. BILLER:

23   Q   No, you're not.  You're trying to avoid

24   answering my questions.

25   A   I'm trying to answer your question.  We hired   12:40:30

Page 125

PDTW Depreciation schedule

**Equipment**

| Asset# | Date | | Cost | Useful life | AD | 12/31/2013 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 11/30/2008 | Production Equipment Sewing Machine | 4,763.00 | 5 | | | | | | | | | | | | | | | |
| | | | **4,763.00** | | | | | | | | | | | | | | | | . |

**Office Furniture**

| Asset# | Date | | Cost | Useful life | | 12/31/2013 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 2/7/2006 | Office Furniture | 6,525.00 | 7 | | 5,797.00 | | | | | | | | | | | | | . |
| 17 | 5/30/2008 | Office Furniture | 431.00 | 7 | | 384.00 | | | | | | | | | | | | | . |
| 18 | 8/11/2008 | Office Furniture | 10,300.00 | 7 | | 9,151.00 | | | | | | | | | | | | | . |
| 25 | 9/4/2009 | Office Furniture | 251.00 | 7 | | 210.00 | 2.99 | 2.36 | | | | | | | | | | | 5.35 |
| 37 | 9/13/2010 | Office Furniture | 383.00 | 7 | | 383.00 | | | | | | | | | | | | | . |
| 40 | 2/13/2013 | Office Furniture | 3,210.00 | 7 | | 3,210.00 | | | | | | | | | | | | | . |
| 42 | 4/16/2013 | Office Furniture | 2,081.00 | 7 | | 2,081.00 | | | | | | | | | | | | | . |
| 43 | 4/20/2011 | Furniture | 1,409.00 | 7 | | 1,409.00 | | | | | | | | | | | | | . |
| 47 | 8/21/2011 | Furniture | 1,110.00 | 7 | | 1,110.00 | | | | | | | | | | | | | . |
| 48 | 9/20/2011 | Furniture | 1,200.00 | 7 | | 1,200.00 | | | | | | | | | | | | | . |
| 52 | 2/14/2012 | Office Furniture | 392.00 | 7 | | 224.00 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 5.13 | 61.57 |
| 53 | 2/15/2012 | Office Furniture | 3,262.00 | 7 | | 1,864.00 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 122.62 | 1,471.43 |
| 51 | 6/5/2012 | Office Furniture | 5,427.00 | 7 | | 3,101.00 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 77.68 | 932.14 |
| | 9/4/2013 | Furniture | 900.85 | 7 | | . | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 10.72 | 128.69 |
| | 11/18/2013 | Furniture | 2,770.00 | 7 | | . | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 32.98 | 896.72 |
| | 12/4/2013 | Furniture | 868.00 | 7 | | . | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 10.33 | 124.08 |
| | 8/28/2014 | Office chairs | 2,437.41 | ? | | | | | | | | | | | | | | | |
| | 9/2/2014 | Office tables | 1,739.64 | ? | | | | | | | | | | | | | | | |
| | 12/20/2014 | 6 drawers | 877.76 | ? | | | | | | | | | | | | | | | |
| | 1/27/2015 | 2 moroccan cover for pillow | 773.00 | ? | | | | | | | | | | | | | | | |
| | 1/27/2015 | 2 25/75 down pillow | 743.00 | ? | | | | | | | | | | | | | | | |
| | | | **40,519.85** | | | **30,124.00** | **262.45** | **261.62** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **259.46** | **3,218.70** |

**Office Equipment**

| Asset# | Date | | Cost | Useful life | | 12/31/2013 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/14/2006 | Mac Computer | 2,963.00 | 5 | | 2,963.00 | | | | | | | | | | | | | . |
| 7 | 11/9/2006 | Mac Computer | 3,636.00 | 5 | | 3,636.00 | | | | | | | | | | | | | . |
| 11 | 11/30/2006 | Mac Computer | 4,649.00 | 5 | | 4,649.00 | | | | | | | | | | | | | . |
| 12 | 12/27/2006 | Mac Computer | 4,563.00 | 5 | | 4,543.00 | | | | | | | | | | | | | . |
| 14 | 1/1/2007 | Computer Equipment | 21,345.00 | 5 | | 21,345.00 | | | | | | | | | | | | | . |
| 15 | 4/19/2008 | Computer Equipment | 4,559.00 | 5 | | 4,428.00 | | | | | | | | | | | | | . |
| 19 | 4/7/2009 | Computer Equipment | 2,549.00 | 5 | | 2,343.00 | | | | | | | | | | | | | . |
| 20 | 5/2/2009 | Computer Equipment | 1,807.00 | 5 | | 1,661.00 | | | | | | | | | | | | | . |
| 21 | 11/7/2009 | Computer Equipment | 3,377.00 | 5 | | 3,030.00 | | | | | | | | | | | | | . |
| 22 | 11/2/2009 | Computer Equipment | 2,269.00 | 5 | | 2,036.00 | | | | | | | | | | | | | . |
| 23 | 12/3/2009 | Computer Equipment | 3,275.00 | 5 | | 3,144.00 | | | | | | | | | | | | | . |
| 24 | 12/31/2009 | Computer Equipment | 2,646.00 | 5 | | 1,657.00 | | | | | | | | | | | | | . |
| 26 | 2/8/2010 | Computer Equipment | 6,676.00 | 5 | | 5,715.00 | | | | | | | | | | | | | . |
| 27 | 2/8/2010 | Computer Equipment | 74.00 | 5 | | 63.00 | | | | | | | | | | | | | . |
| 28 | 2/17/2010 | Computer Equipment | 4,339.00 | 5 | | 3,697.00 | | | | | | | | | | | | | . |
| 29 | 2/17/2010 | Computer Equipment | 4,556.00 | 5 | | 3,900.00 | | | | | | | | | | | | | . |
| 30 | 2/24/2010 | Computer Equipment | 1,697.00 | 5 | | 1,453.00 | | | | | | | | | | | | | . |
| 31 | 2/27/2010 | Computer Equipment | 1,066.00 | 5 | | 913.00 | | | | | | | | | | | | | . |
| 32 | 5/2/2010 | Computer Equipment | 1,017.00 | 5 | | 871.00 | | | | | | | | | | | | | . |
| 33 | 7/31/2010 | Computer Equipment | 436.00 | 5 | | 373.00 | | | | | | | | | | | | | . |
| 34 | 7/31/2010 | Computer Equipment | 436.00 | 5 | | 373.00 | | | | | | | | | | | | | . |
| 35 | 4/10/2010 | Computer Equipment | 861.00 | 5 | | 737.00 | | | | | | | | | | | | | . |
| 36 | 9/16/2010 | Computer Equipment | 1,332.00 | 5 | | 1,332.00 | | | | | | | | | | | | | . |
| 38 | 1/6/2011 | Computer Equipment | 1,643.00 | 5 | | 1,643.00 | | | | | | | | | | | | | . |
| 39 | 2/25/2011 | Computer Equipment | 3,979.00 | 5 | | 3,979.00 | | | | | | | | | | | | | . |
| 44 | 5/24/2011 | iPad | 668.00 | 5 | | 668.00 | | | | | | | | | | | | | . |
| 45 | 5/25/2011 | iPad | 882.00 | 5 | | 882.00 | | | | | | | | | | | | | . |
| 46 | 7/28/2011 | Computer Equipment | 4,949.00 | 5 | | 4,949.00 | | | | | | | | | | | | | . |
| 49 | 11/3/2011 | Computer Equipment | 3,950.00 | 5 | | 3,950.00 | | | | | | | | | | | | | . |
| 50 | 6/29/2012 | Mac Computer | 2,164.00 | 5 | | 1,299.00 | 49.38 | 49.38 | 49.38 | 49.38 | 49.38 | 49.38 | 49.28 | 49.38 | 49.38 | 49.38 | 49.38 | 48.76 | 592.00 |
| | 8/14/2014 | Apple Store - Computer | 1,309.91 | 5 | | | | | | | | | | | 12.97 | 21.83 | 21.83 | 21.83 | 21.83 | 98.24 |
| | 8/26/2014 | Apple Store - Computer | 1,136.00 | 5 | | | | | | | | | | | 9.47 | 18.91 | 18.93 | 18.93 | 18.93 | 85.20 |
| | 8/26/2014 | Apple Store - Computer | 1,179.11 | 5 | | | | | | | | | | | 9.81 | 19.65 | 19.65 | 19.65 | 19.65 | 88.43 |

```
1        A    No.

2        Q    Oh, yeah, okay.  We'll see what --

3        A    No, I don't need to.

4             MR. PEDDIE:  Don't argue.

5    BY MR. BILLER:                                    12:41:29

6        Q    Why did --

7             MR. PEDDIE:  Don't worry.

8    BY MR. BILLER:

9        Q    Why did B2 give Palliative over $15,000?  Why

10   would that distribution company working for Paula   12:41:41

11   Thomas give B2 -- I mean Palliative over $15,000?

12       A    B2 --

13            MR. PEDDIE:  If you know, answer.

14            THE WITNESS:  B2 is owned by my brother.  And

15   when we had the company -- when we had the         12:41:55

16   internet --

17   BY MR. BILLER:

18       Q    I'm listening.

19       A    Oh.  When we -- when I was opening up that

20   black market -- not black market.  Internet company. 12:42:14

21   Night market company, which I talked about this with

22   Paula.  She helped me to come up with the name too,

23   which I always talked to her everything about I do.

24   So company was --

25       Q    Except when you're stealing her money and her  12:42:33
```

Page 127

1    products --

2       A    I never --

3            MR. PEDDIE:  Objection.  Argumentative.

4    BY MR. BILLER:

5       Q    You don't talk about her about everything.     12:42:36

6       A    I never --

7       Q    You did not talk to her about stealing her

8    creations or IP or copy or her position or anything.

9    You didn't talk about anything.  You didn't talk

10   about the money you embezzled from her when you        12:42:49

11   worked for PDTW.  You didn't talk about that, did

12   you?

13      A    I never --

14           MR. PEDDIE:  Objection.  Don't answer.

15   That's a compound question.  Unintelligible.           12:42:58

16           MR. BILLER:  Let me show you -- let's have

17   the next document marked.  What is the next one?

18           THE REPORTER:  12.

19           MR. BILLER:  12.

20   BY MR. BILLER:                                         12:43:26

21      Q    What is 12?  What is Exhibit 12?

22      A    It's B2 International, LLC.

23           (Exhibit 12 was marked for identification by

24       the court reporter and is attached hereto.)

25   ////

                                                       Page 128

1    BY MR. BILLER:

2        Q    Okay.  And that's your company, right?  B2

3    International, LLC, right?

4        A    It's not my company.

5        Q    Whose company is it?                          12:43:40

6        A    I have no idea.

7        Q    Really?

8        A    Uh-huh.

9        Q    It's funny, because I'm holding here a report

10   that this company was originated by a residence or     12:43:47

11   home or business address of Mr. Peddie.

12            Why don't you look at Exhibit 13.

13            (Exhibit 13 was marked for identification by

14       the court reporter and is attached hereto.)

15   BY MR. BILLER:                                         12:44:25

16       Q    Do you see your name there?

17       A    On top Jene Jen?

18       Q    Yes.

19       A    Yes.

20       Q    And what address is 1601 Fleming Drive,       12:44:32

21   Longmont, Colorado?

22       A    The lawyer's probably address.

23       Q    Whose address?  Who's the lawyer?

24       A    I don't know.

25       Q    You don't know who's at 1601 Fleming Drive,   12:44:50

Page 129

1   Longmont, Colorado?  You don't know who lived there?

2      A   No.

3      Q   You don't think it was Richard Peddie?

4      A   It could be.  I don't know.  I don't know.

5      Q   Okay.  Listen --                          12:45:03

6      A   I don't know his address.

7      Q   Okay.  But do you know if Richard Peddie

8   lived in Fleming -- I mean Longmont, Colorado?

9      A   I don't know.

10     Q   Well, you've known him for 17, 18, 19 years,   12:45:14

11  haven't you?

12     A   I don't remember addresses.

13     Q   Okay.  I'm not asking you for the address.

14  I'm asking for the city.  I'm asking you for the

15  state.                                          12:45:25

16     A   He lives in Colorado.

17     Q   Okay.  And he used to live in Longmont,

18  right?

19     A   I don't know.

20     Q   You don't know?                          12:45:32

21     A   No.

22     Q   Every lie you tell will be another nail in

23  your grave.

24     A   So when I don't know, should I just lie or

25  can I tell you I don't know?                    12:45:42

Page 130

1    Q   I don't think you're being truthful, ma'am,

2    but the jury is going to have to decide that.   The

3    jury of Paula's peers.

4         Let's go back to No. 11, the e-mail that you

5    wrote on a report that you didn't know about.              12:46:01

6    A   I did not say that I didn't know about the

7    report.

8    Q   The record speaks for itself.   Let's go on.

9    Why did you write this e-mail?

10   A   Because it was like -- even though I asked        12:46:09

11   John to conduct the outside HR company to look into

12   a lot of chaos, because the company was going

13   through a lot of chaos, myself was going through a

14   lot of chaos, and there was like a literally --

15       MR. BILLER:  Move to strike.  Nonresponsive.     12:46:33

16   BY MR. BILLER:

17   Q   John didn't order this report to be prepared.

18   You know that.  I know that.  This was ordered by

19   David Schnider on behalf of Stephen Choi who wanted

20   to fire you as a result of this result -- or result     12:46:42

21   of this report.  I'll get to his e-mail.

22   A   Okay.

23   Q   Okay?

24       So why did you write this e-mail, Exhibit 11?

25   A   Because I was really shocked reading the          12:46:51

Page 131

1    report.

2        Q    Really?

3        A    Yes.

4        Q    Anybody meeting you would imagine that you're

5    like this description.                              12:47:00

6        A    What?

7        Q    Anybody meeting you would imagine you have

8    the -- you know, you don't have the qualifications

9    to be the creative -- chief creative designer.

10           MR. PEDDIE:  Objection.  Do you have a        12:47:11

11   question, sir?

12           MR. BILLER:  Yeah.

13           THE WITNESS:  Not about --

14   BY MR. BILLER:

15       Q    Let's read the fourth paragraph down.        12:47:14

16       A    Yes.

17       Q    Why don't you read it.

18       A    Which part?

19       Q    Fourth, the entire paragraph.  It's one

20   sentence, "I have to be honest with you"?             12:47:30

21       A    Oh.

22               "I have to be honest with you

23           that it was not easy to hear all the

24           negative things about myself,

25           especially from the people I spend so         12:47:38

                                        Page 132

```
1          much time with and the people I like a

2          lot."

3      Q   Next paragraph.

4      A

5          "I was disappointed that the team        12:47:45

6          did not say anything directly to me

7          about all the issues and problems that

8          they brought to your attention.  That

9          is not good for the company.  Then I

10         thought, I need to pay more attention    12:47:59

11         to reading people about their

12         struggles dealing with me."

13     Q   Didn't the report or the Exhibit 6 say that

14  people were afraid to approach you about things

15  because you would get angry and yell and scream and   12:48:15

16  be nasty?  Didn't the report say that?

17         MR. PEDDIE:  Objection.  Document speaks for

18  itself.

19  BY MR. BILLER:

20     Q   You can answer.                          12:48:25

21     A   Sure.

22     Q   So why are you writing to him you were

23  shocked?

24     A   I was shocked.

25     Q   Although you're a yeller and a screamer and a   12:48:30
```

Page 133

```
 1    belligerent person who doesn't know what she's

 2    doing, you're shocked that the employees didn't --

 3    the employees didn't like you?

 4         MR. PEDDIE:  Objection.  Compound.

 5         THE WITNESS:  No, obviously I'm not.        12:48:41

 6         MR. PEDDIE:  Harassing.

 7    BY MR. BILLER:

 8      Q   You're not what?

 9      A   Obviously I never thought the people at the

10    company was going through that much struggle.       12:48:50

11      Q   Because you were self-centered, right?

12         MR. PEDDIE:  Objection.  Argumentative.

13    BY MR. BILLER:

14      Q   You can answer the question.

15         MR. PEDDIE:  Harassing.               12:49·00

16         THE WITNESS:  I was doing my job.  I

17    wasn't -- I wasn't there to be liked by everybody.

18    I was doing my job.

19    BY MR. BILLER:

20      Q   So you didn't care whether your employees   12:49:10

21    liked working with you, did you?

22      A   I did not say I did not care.  Of course I

23    do.

24      Q   But you're narcissistic, aren't you?

25         MR. PEDDIE:  Objection.               12:49:18
```

Page 134

1          THE WITNESS:  I'm not narcissistic.

2    BY MR. BILLER:

3       Q   That's why you were oblivious to everything,

4    all your employees had to say about you because you

5    focus on yourself, right?                          12:49:23

6       A   No.  That's why I said I'm disappointed

7    because they never brought this direct to me.

8       Q   Why didn't you see it?  Why didn't you?  Why

9    don't you take responsibility for your failures?

10      A   I --

11      Q   Why didn't you go to your employees and say,

12   "Listen, I have been misbehaving for the last period

13   of time.  I'm sorry.  Help me improve."  Why didn't

14   you do that?

15      A   I had that.                                  12:49:41

16      Q   You did that?

17      A   Uh-huh.  In the meeting.

18      Q   Really?

19      A   Uh-huh.

20      Q   No.  Before the meeting.                     12:49:44

21      A   Because how do I do that?  The things that I

22   didn't know about.

23      Q   You didn't know that you were essentially

24   being a yeller and a screamer at your employees?

25   You didn't know that?                               12:49:54

                                        Page 135

```
 1      A     No.  I'm not a yeller and screamer.

 2      Q     According to the report, you are.

 3      A     Someone else did plenty of that.

 4      Q     Yeah.  You know, you're being sued in three

 5    cases.  Don't cast stones from a glass house.          12:50:05

 6      A     I'm not --

 7            MR. PEDDIE:  Do you have a question, sir?

 8            THE WITNESS:  I'm not casting stones.

 9            MR. PEDDIE:  Objection.  Harassment.

10    BY MR. BILLER:                                          12:50:15

11      Q     I'm not going to sit here and let her insult

12    my client, okay, because you're a crook and thief.

13            MR. PEDDIE:  Objection.  Keep it up,

14    Dimitrios, and we're going to walk out.

15    BY MR. BILLER:                                          12:50:32

16      Q     Did you ever contact Mr. Schnider in person?

17            MR. PEDDIE:  Who is Mr. Schnider?

18            MR. BILLER:  Sniderman.  Sorry.

19            MR. PEDDIE:  Sniderman?

20            MR. BILLER:  Yeah, Sniderman.

21    BY MR. BILLER:

22      Q     Have you ever contacted Mr. Sniderman in

23    person or on the telephone?

24      A     The person who did --

25      Q     The report.                                     12:50:52
```

Page 136

| 47-1444612 | **Federal Statements** |
|---|---|

## Statement 5 - Form 1065, Schedule K, Line 13a - Contributions

| Description | 100% | 50% | 30% | 20% | Total |
|---|---|---|---|---|---|
| CHARITABLE CONTRIBUTION | $ | $ 2,400 | $ | $ | $ 2,400 |
| Total | $ 0 | $ 2,400 | $ 0 | $ 0 | $ 2,400 |

5

1          MR. PEDDIE:  Not relevant.

2     BY MR. BILLER:

3          Q    -- because of incompetence?  Why didn't you

4     do that?

5          MR. BILLER:  Are we on No. 14?                    12:52:27

6          THE REPORTER:  Yes.

7          MR. BILLER:  Okay.  I'm going to have the

8     reporter mark the next document, Exhibit 14.

9          (Exhibit 14 was marked for identification by

10        the court reporter and is attached hereto.)      12:52:50

11        THE VIDEOGRAPHER:  Microphone.

12        MR. BILLER:  Sorry.

13    BY MR. BILLER:

14        Q    Did you read Exhibit 14?

15        A    Yes.                                         12:52:54

16        Q    Why don't you read it into the record from

17    "Hi, Stephen."

18        A

19             "Hope you had a great weekend.

20        I'm sending you the HR report of                 12:53:02

21        Robert Sniderman, an independent HR

22        consultant we hired sometime late last

23        year to address some internal problems

24        that company was facing and to

25        determine what may be the possible              12:53:21

                                                          Page 138

| TAXABLE YEAR | Limited Liability Company | | CALIFORNIA FORM |
|---|---|---|---|
| **2015** | Return of Income | ■ | **568** |

RP

```
201420310399   THOM   47-1444612            15   PBA   315990
TYB  01-01-2015   TYE  12-31-2015
THOMAS WYLDE LLC

235 W 31ST ST
LOS ANGELES        CA   90007


ACCTMETHOD 2   07-22-2014   ASSETS   6292703.
INITIAL 0   FINAL 0   AMENDED 1
```

**J** **(1)** During this taxable year, did another person or legal entity acquire control or majority ownership (more than a 50% interest) of this LLC or any legal entity in which the LLC holds a controlling or majority interest that owned California real property (i.e., land, buildings), leased such property for a term of 35 years or more, or leased such property from a government agency for any term? .................. ● ☐ Yes ☒ No

**(2)** During this taxable year, did this LLC acquire control or majority ownership (more than a 50% interest) in another legal entity that owned California real property (i.e., land, buildings), leased such property for a term of 35 years or more, or leased such property from a government agency for any term? .................. ● ☐ Yes ☒ No

**(3)** During this taxable year, has more than 50% of the LLC's ownership interests cumulatively transferred in one or more transactions after an interest in California real property (i.e., land, buildings) was transferred to it that was excluded from property tax reassessment under Revenue and Taxation Code Section 62(a)(2) and it was not reported on a previous year's tax return? .................. ● ☐ Yes ☒ No

(Yes requires filing of statement, penalties may apply – see instructions.)

Complete Schedule IW, LLC Income Worksheet (on Side 7) first to determine Line 1.

| | | | | Whole dollars only | |
|---|---|---|---|---|---|
| 1 | Total income from Schedule IW  Limited Liability Company Income Worksheet. See instructions | ● | 1 | 4,049,442 | 00 |
| 2 | Limited Liability Company fee. See instructions | ● | 2 | 6,000 | 00 |
| 3 | 2015 annual Limited Liability Company tax. See instructions | ● | 3 | 800 | 00 |
| 4 | Nonconsenting nonresident members' tax liability from Schedule T (Side 4) | ● | 4 | | 00 |
| 5 | Total tax and fee. Add line 2, line 3, and line 4 | ● | 5 | 6,800 | 00 |
| 6 | Amount paid with form FTB 3537 and 2015 form FTB 3522 and form FTB 3536 | ● | 6 | 6,800 | 00 |
| 7 | Overpayment from prior year allowed as a credit | ● | 7 | | 00 |
| 8 | Withholding (Form 592-B and/or 593) | ● | 8 | 0 | 00 |
| 9 | Total payments. Add line 6, line 7, and line 8 | ● | 9 | 6,800 | 00 |
| 10 | Use Tax. This is not a total line. See instructions | ● | 10 | | 00 |
| 11 | Payments balance. If line 9 is more than line 10, subtract line 10 from line 9 | ● | 11 | 6,800 | 00 |
| 12 | Use Tax balance. If line 10 is more than line 9, subtract line 9 from line 10 | ● | 12 | | 00 |

Enclose, but do not staple, any payment.

1          MR. BILLER:  Mark the next document in order

2     as --

3          MR. PEDDIE:  Objecting to No. 14 on

4     relevance.  Because people had a bad review --

5          MR. BILLER:  Bad review?  That wasn't a bad          12:54:25

6     review.  That was a crucifixion.  That was a firing.

7     That was a termination that only Stephen Choi could

8     make.  What did he do?  Because he was making so

9     much money funneling through that company, he

10    decided to make her the CEO.  That's what he did.          12:54:38

11         Can you mark the next document in order.

12         (Exhibit 15 was marked for identification by

13        the court reporter and is attached hereto.)

14    BY MR. BILLER:

15    Q    Do you recognize Exhibit 15?                          12:55:06

16    A    Okay.  I see this.

17    Q    Okay.  You -- in Exhibit 15 recognizes you as

18    the new CEO, right?

19    A    Yes.

20    Q    In July of 2016, right?                               12:55:35

21    A    June 2016?  Yes.

22    Q    And on June 2007 (SIC) Choi wrote:

23        "Reading this does not make me

24        support either person to lead this

25        company."                                             12:55:59

                                               Page 140

```
1          Is that right?

2     A    Yes.

3     Q    Okay.  And this is six months after -- you

4  were made the CEO six months after an independent HR

5  person recommended that you be fired, right?          12:56:11

6     A    Yes.

7     Q    Okay.  So how did that happen?  What did you

8  do to get that position?

9     A    I resigned.

10    Q    No.  You resigned and then Hanna got fired    12:56:21

11 and then you came back.  So did you come back

12 because he was going to make you the CEO?

13    A    I resigned because I shared a different

14 vision than the CEO.  So the company asked me what

15 it takes for me to stay.  And I said I cannot work    12:56:43

16 with current CEO.

17    Q    Okay.  So you had Paula Thomas fired, then

18 you had John Hanna fired so you could become the

19 queen of the bee house, right?

20    A    No.                                           12:57:01

21    Q    Right?

22    A    I didn't fire Paula.  I didn't fire John.  I

23 don't have that power.  The head of the company did.

24 The company -- the person who can make that

25 decision.                                             12:57:16
```

Page 141

1    Q   Stephen Choi is nothing to the company.

2  Nothing.  He is an investor.  He is not an owner.

3  He is nothing.  Okay?  He doesn't make the decisions

4  of the company.  That is supposed to be made by the

5  members of the board.  Okay?  Not by Stephen Choi.       12:57:28

6    A   So member did.

7    Q   Yeah.  Stephen Choi is not a member.

8        And when were there -- were there any minutes

9  of any meeting making you the CEO?  How did you

10  become the CEO?  I want to know.  How did you -- how     12:57:46

11  did somebody with your limited skills become a CEO

12  of a company?

13    A   How I become CEO of any company.  The company

14  was, as I said, lot of debt.  Company was

15  struggling.  The company was not be able to -- not      12:58:06

16  in a position to pay anybody, not in the position to

17  pay and hire all the executives.

18    Q   Okay.  And this was in July of 2016?

19    A   Yes.

20    Q   Okay.  Well, what did you do with the $2.86       12:58:22

21  million that you got on July 31, 2016?

22        Next exhibit, 16, please, or 17.

23        MR. PEDDIE:  Objection.  Assumes facts not in

24  evidence.

25        MR. BILLER:  Is it 16 or --

                                              Page 142

1          THE REPORTER:  16.

2          (Exhibit 16 was marked for identification by the

3     court reporter and is attached hereto.)

4     BY MR. BILLER:

5          Q    What did you do with the $2.686 million that      12:58:54

6     you got in July of 2016 as the CEO?

7          A    When I took over the company, monthly

8     overhead was about half a million.  So it took me a

9     few months to cut that monthly overhead from half a

10    million down to less than 200.  A lot of previous      12:59:21

11    bills was never paid.  A lot of -- there was a lot

12    of debt.

13         Q    I don't believe you because I don't think you

14    have credibility.

15         A    Okay.                                         12:59:37

16         Q    Where are the QuickBooks that show all of

17    this debt and all of this money coming in?  Where

18    are the QuickBooks for back in 2016?

19         A    At the company.

20         Q    At the company?  Really?                      12:59:48

21         A    Yes.

22         Q    Where?  In the storage room?

23         A    In the -- we have a server, QuickBooks

24    server.  We have a QuickBooks separately preserved.

25         Q    Where?  Inside the company at 329?            12:59:59

                                                    Page 143

1    A    In the server, server.

2    Q    There physically?

3    A    Yes.

4    Q    Physically -- so you're saying there is

5    data --                                          01:00:08

6    A    Yes.

7    Q    -- in that server that explains where every

8    penny of this $2.686 million went from July 31,

9    2016, until today?  Is that what you're saying?

10    A    Yes.                                        01:00:22

11    Q    Okay.  Explain the over $2 million in

12    addition that Kata Global, K-A-T-A, Global, gave you

13    in a line of credit.

14        MR. BILLER:  K-A-T-A.  Sorry.

15        (Exhibit 17 was marked for identification by    01:00:58

16    the court reporter and is attached hereto.)

17    BY MR. BILLER:

18    Q    I want you to look at every page because I

19    believe your signature is on every single page.

20    A    Okay.                                       01:01:03

21    Q    Let's mark the next document No. 18, which is

22    a different copy of the same document, but more

23    signatures.

24        (Exhibit 18 was marked for identification by

25    the court reporter and is attached hereto.)       01:01:37

Page 144

BY MR. BILLER:

Q      -- but it took the clothing and the name and the brand of the company and sold those; right?

MR. PEDDIE:  Objection, calls for a legal opinion.

BY MR. BILLER:

Q      The clothes, it sold the clothes.

A      There was a cut-off season.

Q      But they still sold the clothes that were --

A      After the -- when Thomas Wylde was created, it started with its own season.

Q      But what did they do with the clothes that Paula PDTW had already manufactured and had on sale before July 22, 2014?  Did they throw it away?

A      No.  It was invoiced under PDTW.  That's why we have these advances.  So whatever collection is in there it goes to this account, advances to advances from.  And so when that happened, invoices pertaining to PDTW stayed in PDTW books.

Q      So people works on the PDTW books?

A      Yes.

Q      And so those books should show what property was sold; right?

Page 137

```
 1      Q   What did you do run the company for 2.3

 2   million additional dollars?  That's $5 million that

 3   you got, based on the promissory note and the Kata

 4   Global PTE line of credit.  That's $5 million.  What

 5   did you do with that $5 million?                01:03:45

 6      A   Previously the company overhead before I took

 7   over was 6 million per year.  And I think I took --

 8   I took down a lot -- a lot less than what overhead

 9   was.

10      Q   Did you need the additional $3.3 million from  01:04:06

11   Densa?  What did you do with that money?

12      A   From who?

13      Q   Densa, D-E-N-S-A.  What did you do with that

14   money?

15      A   With the company -- me personally?         01:04:20

16      Q   You're the CEO of the company.  What did you

17   do with it?

18      A   I ran the company.

19      Q   You ran the company.  So you spent $8 million

20   in 2016 and '17 running the company?  Is that what  01:04:29

21   you're saying?

22      A   Nope.  That's a wrong number.

23      Q   Isn't it true you stole it or part of it?

24      A   No, of course not.

25      Q   Isn't it true that the money went to B2 that  01:05:00
```

Page 146

1    you own, International, and Dada Tech with your

2    buddies with Alex Park, and then they

3    wire-transferred it to Palliative; isn't that true?

4       A    Absolutely not.  I --

5       Q    Really?  Then why -- how would you explain     01:05:16

6    any money coming from B2 International to

7    Palliative?

8       A    As I said, B2 owned by my brother.  And in

9    2012 and, as Paula knows, I was start a new company

10   that is selling --                                     01:05:33

11      Q    You don't know what my client knows.  Stop

12   referring to as my client knows.

13      A    I have e-mail to her.

14      Q    Okay.  Produce it.  Why don't you produce a

15   document once in a while?  That would be nice.  I've   01:05:41

16   been after the company's documents -- I've been

17   after the company's documents for two years.  You

18   haven't produced anything.

19      A    I have -- I have plenty of document produced.

20   Thank you very much.                                   01:05:51

21      Q    You produced 1,000 pages.

22      A    And -- but you're asking me a question.  I'm

23   trying to answer you your question without you

24   interrupting.

25      Q    I withdraw the question.  I withdraw the       01:06:01

                                          Page 147

1    question.  I withdraw the question.

2         THE VIDEOGRAPHER:  Microphone, please.

3    BY MR. BILLER:

4      Q   So you've never heard of Desna?

5      A   What's Desna?                              01:06:08

6      Q   I'm asking you.  Have you ever heard of

7    Desna?

8      A   How to spell it?

9      Q   D-E-N-S-A.

10         MR. PEDDIE:  Densa?                         01:06:15

11         MR. BILLER:  D-E-N-S-A.

12         MS. THOMAS:  D-E-S-N-A, Desna.  D-E-S-N-A.

13         MR. BILLER:  That's what I said.

14         THE WITNESS:  What is it related to?  I

15    don't -- just out of the blue, Desna --          01:06:27

16    BY MR. BILLER:

17      Q   Because they wire-transferred to you $3.3

18    million, and it was going to replace Hillshore

19    Investment, but you guys blew that, and Choi had to

20    stick with Hillshore, but he wanted to replace it   01:06:40

21    with Desna.

22         You don't know any of that?  As the CEO of

23    the company, you don't know any of that?

24      A   A CEO does not necessarily remember or know

25    everything.                                       01:06:52

Page 148

1    Q    How about $3.3 million, can't you remember

2    that?

3    A    The -- a lot less than what ex-CEO requested

4    to run the company.  Not to me.  To the company.

5    Q    You were the CEO of the company, right?    .    01:07:03

6    A    I was the CEO of the company.  I was

7    salesperson of the company.  I was everything.

8    Company was struggling --

9    Q    So you had access to the bank accounts of the

10   company?                                        01:07:14

11   A    I only --

12   Q    Please don't tell me you're not a signature

13   on the bank accounts.

14   A    I was.  I signed.  But we have accountant.  I

15   never personally wire -- personally write a check    01:07:23

16   and personally.  I -- we have accountant.

17   Q    Okay.  And so are you accusing the accountant

18   of spending the $3.3 million?

19   A    No, the company.  Why accountant?  The

20   company.                                        01:07:39

21   Q    Because you have not produced any documents.

22   The -- I've asked and I've asked and I've asked.

23   A    I --

24   Q    For two years you haven't produced any

25   documents that prove what you're doing with the    01:07:46

Page 149

```
 1   money in this company.

 2          So I'm asking you, since you're not producing

 3   documents, what are you doing with millions and

 4   millions and millions and millions of dollars and

 5   documents when the company now has one person          01:08:04

 6   working for it on a part-time basis?

 7      A   Sure.

 8      Q   What did you do with all the money?

 9      A   Run the company.

10      Q   When you say "run the company," what did you    01:08:10

11   do?

12      A   Company expenses.

13      Q   What company expenses?

14      A   Company overhead.

15      Q   What company overhead?

16      A   Company overhead from payroll, rent,

17   insurance, utility, going to travel, going to

18   market, selling.  For everything.

19      Q   Everything, right?

20      A   Yes.                                             01:08:32

21      Q   And yet when PDTW was in business with a lot

22   more employees, it only had $2 million in expenses.

23   But you managed to spend $8 million --

24          MR. PEDDIE:  Objection.

25   BY MR. BILLER:
```

Page 150

1    Q    -- or $6 million in expenses --

2         MR. PEDDIE:  Assumes facts.

3    BY MR. BILLER:

4    Q    -- over a two-year period?

5    A    Well, that's how that ex- -- ex-structure was    01:08:46

6    done.

7    Q    Okay.  So isn't it true Stephen Choi used

8    Thomas Wylde as a business to launder money?

9    A    Of course not.

10   Q    Isn't that true?  Okay.

11   A    Of course not.  That's the most ridiculous

12   thing I ever heard, actually.  I'm sorry.  That's

13   really funny.

14   Q    Really funny?

15   A    Yes.                                              01:09:07

16   Q    It's not funny when you get thrown behind

17   bars.

18        MR. PEDDIE:  Objection.  Let's not be

19   threatening, argumentative.

20        THE WITNESS:  Why am I going -- why are you      01:09:15

21   throwing me --

22        MR. PEDDIE:  Don't engage him.

23   BY MR. BILLER:

24   Q    Isn't it true Palliative is a money

25   laundering company?                                   01:09:23

Page 151

```
 1        A    Of course not.

 2        Q    Okay.  Isn't it true that you and your

 3    husband live separate lives and are lesbian and

 4    homosexual?  You announced that to the public in

 5    Paris; isn't that true?                          01:09:38

 6        A    Of course not.

 7        Q    No.  You said that in Paris.

 8        A    To who?

 9        Q    Didn't you say that in Paris this year in

10    January?  That it works for you.  That's what you   01:09:48

11    said, it works for you.  Isn't that what you said?

12        A    No.

13        Q    So you're denying the nature of the

14    relationship with your husband?

15        A    What nature?  He is my husband.            01:09:55

16        Q    Okay.  I'm saying you announced in Paris that

17    you and he are gay, but it works for you.  Is that

18    not true?

19        A    Oh, okay.  At my friend's wedding, and my

20    friend was Rosanna, R-O-S-A-N-N-A.  I was -- I was   01:10:10

21    drawing joke.  I invited everybody to come to my

22    house, have a dinner with us, and with my gay

23    husband, meaning metro.

24        Q    But you didn't say metro.

25        A    No, it was a joke as a gay husband.  Of      01:10:37
```

Page 152

```
 1   course we're not --

 2       Q   I'm going to show -- I'm going to show a

 3   document that you wrote proving you did nothing for

 4   the company.

 5           You wrote this e-mail.  Okay?                01:10:48

 6       A   Sure.

 7           MR. BILLER:  Exhibit 19.

 8           (Exhibit 19 was marked for identification by

 9       the court reporter and is attached hereto.)

10   BY MR. BILLER:                                      01:11:19

11       Q   Do you have 19 in front of you?

12       A   Yes.

13       Q   So this was written on June 20, 2016, right?

14       A   Yes.

15       Q   Okay.  You brought in a CPA, Allison Kim, as  01:11:29

16   a part-time employee to replace Meldy, right?

17       A   Yes.

18       Q   Okay.  How long have you known Allison Kim?

19       A   For a long time.

20       Q   How long?                                   01:11:42

21       A   Over ten years.

22       Q   And how long did she -- how long did she work

23   as a CPA for Thomas Wylde?

24       A   After Joel Kaiser, I introduced -- who was

25   our ex-CFO, after he left, I introduced Allison to  01:12:03
```

                                                    Page 153

```
1    Paula.

2        Q   So that was 2012?

3        A   I don't remember exact year.

4        Q   Give me an estimate.

5        A   It could be around that time.            01:12:15

6        Q   Now, Joel Kaiser and you stole money from

7    PDTW.  He has been indicted for embezzlement of

8    $800,000 from Paula Thomas.  Isn't that right?

9        A   I don't know about it.

10           MR. PEDDIE:  Objection.  Misstates.       01:12:30

11   BY MR. BILLER:

12       Q   Okay.  You don't know he is being prosecuted

13   for stealing $800,000 from PDTW?

14       A   I don't know the details of his situation.

15       Q   What do you know, then?                   01:12:40

16       A   I know that -- that he was in trouble,

17   legally in trouble.

18       Q   Criminally?  Criminally in trouble?

19       A   Yes.

20       Q   Okay.  And you knew that he was stealing   01:12:57

21   money from the company, don't you?

22       A   He never stole money from company.

23       Q   Then why is he being prosecuted for being

24   so -- for doing so?

25       A   I don't know.  I don't know the details.   01:13:07
```

                                                    Page 154

1      Q    Okay.  Were you watching him every second of

2    every day to see if he was stealing money from the

3    company?

4      A    That wasn't my job.

5      Q    Okay.  So how do you know he wasn't stealing        01:13:14

6    money from the company?

7      A    Because I think he actually did it the other

8    way around.  I think he used other company's money

9    to pay for PDTW, for Paula's stuff.

10     Q    Okay.  How do you know that?                        01:13:32

11     A    Because we talked about that.

12     Q    Oh, he told you that?

13     A    No.

14     Q    So now you're remembering stuff.  I'm

15   interested.  What else do you remember?                   01:13:37

16     A    No, he did not tell me that.  That was me and

17   Paula went through extensively the -- because we

18   were sued by the company called Cleopatra.

19          MR. PEDDIE:  Cleopatra.

20          THE WITNESS:  So me and Paula looked at            01:13:57

21   details.

22   BY MR. BILLER:

23     Q    Oh, you did?  What details do you remember?

24     A    I remember that when -- PDTW was always in

25   debt, always in financial problems.  We always were      01:14:06

                                                    Page 155

1    trying to borrow money.  I don't remember one single

2    year that PDTW was not in debt.

3        Q    Move to strike everything.  You have no idea

4    what PDTW's financials --

5        A    You're asking me.                    01:14:21

6        Q    No, I'm not asking you what the financial

7    condition.  You were the CEO -- COO of PDTW.  You

8    were nothing else, nothing more.  You were the COO.

9             Are you telling me you looked at all the

10   books and records and financials of PDTW every year   01:14:34

11   to see what its financial condition was?

12       A    No.  I'm answering your question that how do

13   I know about that Joel did what he did because I

14   said I looked at records with Paula.

15       Q    Okay.  So it's your position that Joel Kaiser  01:14:48

16   was stealing from other companies and helping to pay

17   for PDTW?  Is that what you're saying?

18       A    That's -- yes.

19       Q    Okay.  So why isn't PDTW or Paula being

20   prosecuted for receiving stolen property?          01:15:05

21       A    I don't know.

22       Q    You haven't thought about that, did you?  You

23   think you're so smart.  You'll just say anything --

24            MR. PEDDIE:  Objection.

25   BY MR. BILLER:

Page 156

1      Q    -- not realizing that you're going to get

2    yourself in trouble.  If you tell the truth --

3      A    I am telling the truth.

4      Q    -- then you don't have to get into these

5    little problems you're getting into.                    01:15:23

6           So you're saying that the prosecutor didn't

7    prosecute Paula Thomas or PDTW for receiving stolen

8    property, but prosecuted Joel Kaiser for giving the

9    money to PDTW?  Is that what you're saying?

10     A    You are asking me about how I know.              01:15:40

11     Q    No.

12     A    I'm answering --

13     Q    I'm asking a new question.  Read back the

14   question, please.

15     A    Okay.  What is your new question?               01:15:48

16          MR. BILLER:  Read the question back.

17          (Record read.)

18          MR. PEDDIE:  Objection.  Calls for

19   speculation.

20   BY MR. BILLER:                                          01:16:26

21     Q    Answer the question.

22     A    I don't know.

23     Q    Oh.  When did Allison Kim tell you she is not

24   going to do anymore the accounting for Thomas Wylde?

25     A    This year.                                       01:16:39

Page 157

1      Q    When?

2      A    Before -- right before tax return, because I

3    had to do tax return for this year.

4      Q    Who did it?

5      A    What?                                    01:16:49

6      Q    Who did the tax return?

7      A    I have not done it yet.  I have to find a

8    company, inexpensive cost to do the tax returns.  I

9    haven't found it yet.

10     Q    Okay.  Now, in this June 20, 2016 e-mail, you    01:17:02

11   write all of the possible solutions that you've

12   implemented to fix the company, right?

13     A    Yes.

14     Q    Okay?  One is cash flow, right?

15     A    Yes.                                     01:17:21

16     Q    What discussion did you have with Stephen

17   Choi the next day in an e-mail regarding cash flow

18   issues?

19     A    I give them projections.

20     Q    Projections?                             01:17:36

21     A    Uh-huh.

22     Q    Projections of what?

23     A    Projections of sales versus overhead.

24     Q    That's what you gave them?

25     A    I think so.  I don't remember.  I don't    01:17:47

Page 158

1    remember what exactly what day without looking at --

2       Q    Where is that document?  Where is that

3    e-mail?

4       A    What document?

5       Q    The e-mail that you sent to Stephen Choi and    01:17:54

6    the document that you sent to him?  Where is it?

7       A    I have it.

8       Q    Where?

9       A    In the computer, I guess.

10      Q    Why didn't you produce it?  It was asked for.   01:18:05

11      A    I never --

12           MR. PEDDIE:  Objection.  Assumes facts.

13   BY MR. BILLER:

14      Q    Why didn't you produce it?

15      A    You can ask my lawyer.                          01:18:15

16      Q    No.  Your lawyer is an outside counsel.  It's

17   your duty as the CEO to make sure responses to

18   request for production of documents are complied

19   with.  And you are the one who is supposed to sign

20   the verification saying that you've complied with     01:18:32

21   the request.

22      A    Sure.

23      Q    So why -- why didn't you produce that e-mail?

24           MR. PEDDIE:  Objection.  It assumes it has

25   not been produced.                                     01:18:46

                                                    Page 159

1          MR. BILLER:  Richard, please.  Don't -- print

2     out your own index and bring out my index.  Please.

3     Don't even -- don't even go there.

4     BY MR. BILLER:

5        Q   Why didn't you produce it?                    01:18:51

6        A   Produce the --

7        Q   The e-mail and the paperwork with the e-mail.

8        A   The cash flow?

9        Q   Yes.  Why didn't you produce it?

10       A   It wasn't asked.                               01:18:59

11       Q   How do you know it wasn't asked?

12       A   Well, how do you -- what specific -- I'm --

13    you're asking me now.

14       Q   No.  I served you with 195 requests for

15    production of documents.  I know what I asked for.    01:19:14

16    So I'm asking you why didn't you produce that e-mail

17    and the documents attached to the e-mail mentioning

18    this June 20th e-mail to Choi?

19       A   I don't know what --

20          MR. PEDDIE:  Same objection.                    01:19:26

21          THE WITNESS:  I don't know what is produced,

22    not produced.  We can go back and look at what's

23    produced and what --

24    BY MR. BILLER:

25       Q   So will you produce it now?                    01:19:32

                                             Page 160

1     A   I don't remember everything I produced, so --

2     Q   Will you produce the document right now?

3         MR. PEDDIE:  No, she will not.

4   BY MR. BILLER:

5     Q   No, because it doesn't exist, does it?

6         MR. PEDDIE:  You'll talk to me and you won't

7   give her homework assignments.

8         MR. BILLER:  No, no.  It doesn't exist.  It's

9   been destroyed with 69 computers.  It doesn't exist.

10  BY MR. BILLER:                            01:19:51

11    Q   Now, what was your position with Jene Jen?

12    A   My position?

13    Q   Yeah.

14    A   I own the company.

15    Q   What did you do for the company?        01:20:25

16    A   I run the company.

17    Q   How did you run the company?  I said, what

18  was your position with the company?

19    A   I run the company.

20    Q   I understand.  What did you do to run the   01:20:39

21  company?

22    A   I do everything.

23    Q   What does "everything" include?

24    A   Well, paying bills, meet the clients.  Just

25  whatever the company need.                  01:20:57

Page 161

```
 1      Q   Okay.  And when you sold a company to -- that
 2  doesn't mean anything to me, whatever the company
 3  needs.  You know, that doesn't mean nothing.  Okay?
 4      Did you do the sewing?  Did you do the buying
 5  of the fabrics?  Did you do the marketing?  Did you      01:21:10
 6  pay the bills?  Did you do the accounting?  Were you
 7  the CPA?  You know, I'm asking you a simple
 8  question.
 9      If you ran a company as you claim you did for
10  ten years or so --                                       01:21:21
11      A   Uh-huh.
12      Q   -- what did you do for the company?  What
13  work did you perform?
14      A   Just it's a small company, so, yes, I paid
15  the bills.  Yes, I sold -- I design, I sell.             01:21:32
16  Customer meetings.  Sometimes we get into legal
17  issues.  So we just like every day running the
18  company.  We don't really make a product.  We don't
19  have the product because we are the agent.
20      Q   For who?                                         01:21:57
21      A   For the Dada Trading.
22      Q   I'm talking about the period of time before
23  Jene Jen was sold to Dada Trading.
24      A   Yes.
25      Q   Okay?                                            01:22:16
```

Page 162

1     A    Yes.

2     Q    Dada Trading didn't own Jene Jen when Jene

3  Jen became a business, did it?

4     A    No.

5     Q    So what did you do when Jene Jen was its own     01:22:24

6  company?

7     A    Okay.  So we had several companies outside

8  the manufacturer we worked with.  We buy fabrics.

9  So Dada Trading was one of them.  We had a company

10  we worked with out of India.  And we had a company     01:22:40

11  also we worked with -- mainly we worked a lot with

12  Dada Trading.  So we kept -- we sell their product.

13  We were the agent.  We sell their product and the

14  fabric and also finish the garment.  And we ship

15  them.                                                  01:23:06

16     Q    So how much money did you sell Jene Park to

17  Dada Trading for?

18     A    What's Jene -- how much we sell Jene Park?

19     Q    Yeah.  Didn't you sell Jene Park to Dada?

20        MR. PEDDIE:  Jene Park?                          01:23:18

21  BY MR. BILLER:

22     Q    Sorry.  Jene Jen.  Same thing, though.  Jene

23  Jen.

24     A    We -- actually, we closed the company.  So we

25  actually we were -- the orders were in work, so we     01:23:30

Page 163

1    were not -- really we give them the current orders,

2    current customers that we are the pending orders.

3    So we gave them. Some of them were just to give

4    order count to them.

5    Q    Well, let's talk about your companies.    01:23:49

6    Because you didn't include them all, frankly.

7    A    Okay.

8    Q    But I know Richard Peddie was an officer, a

9    direct officer of one of your companies, wasn't he?

10    A    He may have set up the company, because you    01:24:04

11    need -- when you need LLC, usually I'm not the one

12    doing the one, so I don't know.

13    Q    He didn't have an official position as an

14    officer of one of your companies? Is that what

15    you're saying?    01:24:22

16    A    I don't remember, no. I don't think so.

17    Q    Oh, okay. And how many of his companies did

18    he set up?

19    A    What?

20    Q    How many of your companies did he set up?    01:24:30

21    A    I don't remember.

22    Q    Okay. Did he set up Odd People?

23    A    Odd People he looked at the operating

24    agreement.

25    Q    Does it have an operating agreement?    01:24:43

Page 164

1     A   It does have operating agreement.

2     Q   Is it in business?

3     A   Yes, it is in business.

4     Q   And you're selling TW, Thomas Wylde product

5   through Odd People?                                  01:24:55

6     A   No, I'm not.

7     Q   You were in Florida a week or two ago and you

8   were selling Thomas Wylde product, right?

9     A   Yes.

10     Q   Okay.  You know that product -- that does not   01:25:03

11   belong to you.

12         Do you understand that?

13     A   What?

14     Q   You are not allowed to sell Thomas Wylde

15   product with its brand name on it.                   01:25:10

16         Do you understand that?

17         MR. PEDDIE:  Objection.  Calls for a legal

18   conclusion.

19         THE WITNESS:  I am selling Thomas Wylde

20   product.                                             01:25:17

21   BY MR. BILLER:

22     Q   I know you are.  Thank you for the admission.

23     A   Yes.

24     Q   Have you kept track of how much money you

25   collected from selling those products?

                                          Page 165

1      A   Yes.

2      Q   Because I'm going to come get it.

3      A   Yes, absolutely.

4      Q   How much money have you made?

5      A   It's on our QuickBooks.

6      Q   Oh, QuickBooks that you haven't produced?

7      A   We have QuickBooks.

8      Q   But you haven't produced them.

9          MR. PEDDIE:  Yes, we have.

10         MR. BILLER:  From 2015?  Really?  Really,      01:25:35

11   Richard?  Really?

12         MR. PEDDIE:  That's what the court ordered

13   and you have it.

14         MR. BILLER:  No, no.

15   BY MR. BILLER:                                        01:25:42

16     Q   You didn't produce QuickBooks for 2016, '17,

17   or '18, have you?

18     A   We have QuickBooks all the way up to today.

19     Q   Oh, do you?

20     A   Yes.                                            01:25:49

21     Q   Okay.  All right.  And who inputs the

22   money for those -- the data for those QuickBooks?

23     A   Yoonsung does.

24     Q   Okay.  And what is the back-up material?

25     A   What's backup?                                  01:26:01

Page 166

1     Q    The bills, the paper.

2     A    Oh.  We all have it.

3     Q    Where?

4     A    At the company.

5     Q    Where at the company?                    01:26:06

6     A    Where at the company?  At the company --

7     Q    At 329 21st Street -- 31st Street?

8     A    229 -- I mean, some in 229 and some in

9  storage.

10     Q    Okay.  And what type of back-up material do    01:26:18

11  you keep?  Do you keep everything?

12     A    I keep everything, yes.

13     Q    Okay.  Because this is 2019, so you should

14  have every single piece of paper, according to the

15  tax regulations, going back to the beginning of    01:26:33

16  Thomas Wylde.  Do you?

17     A    Yes.

18     Q    Every single piece of paper?

19     A    Yes.

20     Q    But you've never produced it in any    01:26:40

21  litigation, have you?

22        MR. PEDDIE:  Objection.  Misstates facts.

23        THE WITNESS:  We have it.

24  BY MR. BILLER:

25     Q    Okay.  Can I look at it?                01:26:52

Page 167

1          MR. PEDDIE:  Don't take any homework

2    assignments.

3          MR. BILLER:  It's not a homework assignment.

4    BY MR. BILLER:

5      Q   I'm asking you --                        01:26:59

6          MR. PEDDIE:  No, you cannot.

7    BY MR. BILLER:

8      Q   -- can my client --

9          MR. PEDDIE:  You can conduct discovery in --

10   BY MR. BILLER:

11     Q   -- look at it?  Can my client look at it?

12         MR. PEDDIE:  Don't answer that.

13   BY MR. BILLER:

14     Q   She is a member of Thomas Wylde.  She wants

15   to look at it.  Will you let her look at it?     01:27:09

16         MR. PEDDIE:  I'm instructing you not to

17   answer.

18         MR. BILLER:  You're not instructing her not

19   to answer a question --

20         MR. PEDDIE:  It's a future homework

21   assignment.

22         MR. BILLER:  No, it's not.

23   BY MR. BILLER:

24     Q   Will you allow my client to look at the books

25   and records of Thomas Wylde, yes or no?         01:27:18

                                          Page 168

```
 1      A   You can ask the lawyer.

 2      Q   Oh, really?  You're -- you're a member of the

 3  company, you can't make that decision?

 4      A   No.

 5      Q   You're concealing evidence?  Is that what        01:27:25

 6  you're doing?

 7      A   I'm not concealing evidence.

 8      Q   Okay.

 9      A   I said I have everything.  You can ask

10  lawyer.                                                  01:27:33

11      Q   We'll see.

12          Let me go ahead and show you the next

13  document in order.

14          What is it?  What are we up to?

15          THE REPORTER:  20.                               01:28:15

16          MR. BILLER:  20.

17          (Exhibit 20 was marked for identification by

18      the court reporter and is attached hereto.)

19  BY MR. BILLER:

20      Q   What is Exhibit 20?                              01:28:54

21      A   E-mail.

22      Q   This document is not only an e-mail.  What

23  else does it include?

24      A   Looks like accounting stuff.

25      Q   Why don't you read -- this is embarrassing.      01:29:18
```

Page 169

1    You're a CEO, right?

2       A    Yes.

3       Q    So you don't recognize what this material is?

4       A    No.  Looks like it's accounting.  I'm not --

5    I'm not necessarily good in accounting.                    01:29:34

6       Q    Okay.  Are you good at making projections of

7    cash flow?

8       A    I can give projections based on what I know,

9    yes.

10      Q    But you can't produce it in the same format   01:29:44

11   as John Hanna did, right?

12      A    I don't --

13      Q    You're -- you're incapable of producing work

14   product that is in front of you that John Hanna

15   produced as the CEO, aren't you?                           01:29:55

16           MR. PEDDIE:  Objection.  Argumentative.

17           THE WITNESS:  Well, that's why we have

18   accountant.

19   BY MR. BILLER:

20      Q    An accountant didn't do this.                 01:30:02

21      A    I don't know who did, but, yes, I cannot do

22   this.

23      Q    Okay.  Good.  So why are you the CEO if you

24   can't do this?

25           MR. PEDDIE:  Objection.  Argumentative.      01:30:11

                                              Page 170

1            THE WITNESS:  Okay.

2    BY MR. BILLER:

3      Q    Why are you the CEO if you can't do this?

4      A    Why is Paula the CEO?  She can't do this

5    either.                                        01:30:25

6      Q    Paula was not the CEO.  She had a CFO.  You

7    know that.  So stop lying.

8      A    Well, we had an accountant, a chief

9    accountant like a CFO.  I always had accountant.  I

10   always have a CFO.  I always had someone doing      01:30:31

11   accounting.  I don't have to do this and I'm not

12   good at it.

13     Q    Well, you're also not good at meeting

14   projections either.

15            MR. PEDDIE:  Objection.               01:30:42

16            THE WITNESS:  Projection is --

17   BY MR. BILLER:

18     Q    Because this is profit and loss projections

19   until 2016.

20            Do you see that?                      01:30:48

21     A    Yes.

22     Q    Okay.  So according to this, this document

23   was prepared in 2014.  So --

24     A    I don't see the date here.

25     Q    It's on the first -- it's on the e-mail.  01:31:04

                                                Page 171

```
1      A    Oh, it's in the e-mail?  Okay.

2      Q    Now, you see the numbers on the left side?

3           MR. PEDDIE:  Do you have a page number,

4      please?

5           MR. BILLER:  On the left side on each page    01:31:44

6      there are numbers going down the left side.

7           MR. PEDDIE:  All right.

8           THE WITNESS:  A?  Are you talking about A?

9      BY MR. BILLER:

10     Q    No.  On the left side of the paper there are   01:31:52

11     numbers 1 through 51 going down.

12     A    Yes.

13     Q    Do you see that?

14     A    Yes.

15     Q    Okay.  And each number -- well, almost each   01:31:58

16     number is designated with a certain month or

17     definition of what information is contained on that

18     line.

19          Do you see that?

20     A    Yes.                                            01:32:09

21     Q    Okay.  So on line 25 --

22     A    Yes.

23     Q    -- which is the total outflow -- do you see

24     that?

25     A    Yes.                                            01:32:35
```

Page 172

1    Q    Line 25?

2    A    Uh-huh.

3    Q    If you go to page 6336, total outflow would

4    be $25,251,490.

5         Do you see that?                                    01:32:51

6         Third page, line 25, $25,251,490.

7         Do you see that?

8    A    Uh-huh.

9    Q    Is that a yes?

10   A    I see that.                                          01:33:04

11   Q    Okay.  What does that mean?

12   A    I don't know.

13   Q    You don't know.  Okay.

14        On line 27, same page, it says, $2,625,114 --

15   A    What line -- what page --                            01:33:24

16   Q    27, page 3, net cash available.

17   A    I'm sorry.  What page?

18   Q    The same page you were on.

19   A    36?

20   Q    Yeah, 36.                                            01:33:37

21   A    Yes.  And what line?

22   Q    27.

23   A    Okay.

24   Q    Do you know what that entry means?  It's

25   defined as?                                               01:33:45

Page 173

```
1              "Net cash available,

2         requirement."

3         Do you see that?

4     A   Okay.

5     Q   What does that mean?  What does that        01:33:51

6    $2,625,114 mean?

7         MR. PEDDIE:  6336?

8         MR. BILLER:  Yeah.

9         MR. PEDDIE:  Where does it say net cash?

10        MR. BILLER:  You have to look at the        01:34:06

11   definition on the first page.  And then -- it's a

12   continuum.  You know that, Richard.

13        MR. PEDDIE:  I see it now, yeah.  I'm getting

14   the orientation of it.

15   BY MR. BILLER:                                  01:34:21

16    Q   Do you know what that is?

17    A   On 27?

18    Q   Yeah.

19    A   It looks like net cash -- net cash available

20   or requirement, so I don't know.              01:34:31

21    Q   Did you have -- did you have over $2 million

22   in the cash flow in Thomas Wylde in 2016?  Do you

23   have that much cash in Thomas Wylde in 2016 as was

24   projected?

25    A   I have no idea.  We've never had cash.  We   01:34:55
```

Page 174

1    always short.  That, I know.

2        Q    Line 10 -- this is a good one.

3        A    Okay.

4        Q    Line 10 is cash available.

5        A    Yes.                                    01:35:17

6        Q    Okay?  It says by 2016 you should have

7    $27,876,604.

8             Do you see that?

9        A    Okay.  I see the number.

10       Q    Okay.  You see the number?             01:35:46

11       A    Yes.

12       Q    So what does it mean, "cash available"?  What

13   does that mean?

14       A    I have no idea.

15       Q    Oh, okay.                              01:35:53

16       A    You should ask someone who made this.

17       Q    The CEO made this and you're the CEO, so you

18   should be knowing this.

19       A    I did not make this.

20       Q    I know you didn't make it, but the CEO did    01:36:04

21   it, so you should be familiar with it.

22            Now, let's go to page 6338.

23       A    Okay.

24       Q    Do you see where it says "Capital

25   investment"?  It's line 15.                     01:36:30

Page 175

1      A    Yes.

2      Q    Do you see that?

3      A    Yes.

4      Q    So in 2014 the capital investment was over --

5    it was $1.75 million.                                01:36:50

6           Do you see that?

7           Or 1.8 million.

8           Do you see that?

9      A    I see the number here.

10     Q    Okay.  So, in other words, Thomas Wylde        01:36:56

11   received $1.8 million at least in 2014, correct?

12     A    I don't know.

13     Q    You don't know.  Okay.

14          MR. PEDDIE:  Well, help me out.  What page

15   are you on now?                                       01:37:08

16          MR. BILLER:  6338.

17   BY MR. BILLER:

18     Q    By the end of 2015, Thomas Wylde received

19   another $3.1 million, on line 15, page 39; isn't

20   that right?

21     A    Okay, I see the number.  Very confusing.

22     Q    Well, it shouldn't be.  You're a CEO.

23     A    No.

24     Q    So in 2016 -- maybe you can explain this,

25   because you were the CEO back then.  They projected   01:37:45

Page 176

1    of having capital investment of 600,000 --

2       A    What page?

3       Q    Page 39, line 15.

4       A    6339?

5       Q    6339, yes.                                01:37:56

6       A    That's 2015.

7       Q    No, it's not.  I'm looking at 2016, line 15.

8       A    2016.

9       Q    It's the white box.

10      A    Yeah.  What month?                         01:38:08

11      Q    It says January.

12      A    January.  So I took over in June.

13      Q    Okay.  But do you see in June there's no

14   money.  July, there's no money.  There's no money in

15   August.  There's no money in 2016 other than the      01:38:20

16   600,000; isn't that right?

17      A    I don't know.

18      Q    I'm asking you to look at a piece of paper.

19      A    Yeah, I'm looking.  It says numbers.  There's

20   no numbers, so I don't know.                          01:38:32

21      Q    Okay.  But we know that's wrong, don't we?

22      A    I have no idea.

23      Q    You didn't sign that Kata Global lines of

24   credit worth 2.3 million?  You didn't sign that?

25      A    I did sign it.                               01:38:45

Page 177

1    Q    Okay.

2    A    Lawyers may have prepared the document and it

3    all was done through lawyers, and I trust their

4    knowledge and --

5    Q    And Thomas Wylde received the money, right?      01:38:55

6    A    I'm sure.

7    Q    Okay.  And Thomas Wylde received the $2.686

8    million on the promissory note, right?

9    A    I'm not sure exactly what money, how much

10   amount, but yes, yes, we received the money.      01:39:07

11   Q    Okay.  So that's at least -- that doesn't

12   include the Desna money, that -- this 3.3.  I don't

13   have the paperwork with me.

14        So in 2016 Thomas Wylde received more money

15   than combined the previous two years, right?      01:39:25

16   A    No.

17   Q    Read the math.

18   A    I don't know about this document.  I didn't

19   prepare this document, so I don't know.

20        MR. PEDDIE:  I'll object to this document.      01:39:48

21   It's a 2014 projection --

22        MR. BILLER:  That's right.

23        MR. PEDDIE:  -- and 2016 --

24        MR. BILLER:  That's right.  Companies are run

25   by projections.  You know what, Richard.      01:39:56

                                        Page 178

```
1            MR. PEDDIE:  It doesn't mean real money comes
2    in two years later.
3            MR. BILLER:  No, I know.  You know what comes
4    in -- oh, great.  Thank you.
5            I want to give this to the court reporter to        01:40:05
6    be copied.  But I want the original sent back.
7    BY MR. BILLER:
8       Q   I'm going to show you your bank accounts,
9    okay, for Thomas Wylde showing how much money Desna,
10   2016, 2.978,323.29 (SIC) million dollars came into      01:40:22
11   Thomas Wylde.
12           Did you know that?
13      A   I don't remember exact number, but, yes, we
14   received funds.
15      Q   From Desna?                                         01:40:36
16      A   I don't remember which company.  But I'm sure
17   the record is there.
18      Q   What record?  QuickBooks?  Something you
19   won't give us?
20      A   Wire transfer.                                      01:40:49
21      Q   Something you won't give us, right?
22      A   You can ask my lawyer.
23      Q   Yeah, ask your lawyer.
24      A   Yes, please.
25      Q   And Kata, it says, 2016, $1.9 million.             01:40:56
```

Page 179

1    $1,985 -- $1,985,306.

2         MR. PEDDIE:  I'm going to object.  Do you

3    have an exhibit to show us?

4         MR. BILLER:  Yeah, we're going to show it.

5         MR. PEDDIE:  You're reading from something

6    that you made.

7         MR. BILLER:  What we're going to do is I'm

8    going to show you -- I just want to ask if these

9    numbers are right.

10   BY MR. BILLER:                              01:41:16

11     Q   2017, $639,112 from Desna in 2017.

12         Do you remember that?

13     A   We received the money.  I don't remember

14   exactly how much, what date.

15         MR. BILLER:  Okay.  We're going to mark this   01:41:32

16   as -- what are we at now?

17         THE REPORTER:  21.

18         MR. BILLER:  21?  Okay.  We're going to mark

19   this as Exhibit 21.

20         We got this from you.                  01:41:41

21         MR. PEDDIE:  I don't know that.  I'm looking

22   at a blue file that has all kinds of extra pages

23   added and --

24         MR. BILLER:  No, no, no.  This is work

25   product that I'm going to turn over because you know   01:41:51

Page 180

1    what?  I'm proud of that.

2        MR. PEDDIE:  You're that kind of guy, right?

3    BY MR. BILLER:

4        Q    Why don't you look at these bank statements

5    and tell me those are bank statements from Bank of          01:41:59

6    America for Thomas Wylde and --

7        MS. THOMAS:  Two accounts.  Two banking

8    accounts.

9    BY MR. BILLER:

10       Q    Two banking accounts.  Thomas Wylde and --       01:42:09

11   yeah, Thomas Wylde.  Go ahead.  Look at the bank

12   statements.  Let's take a break.

13       MR. PEDDIE:  Well, wait a second.  Why are we

14   taking a break?

15       MR. BILLER:  Okay.  She can look at them.  We       01:42:19

16   don't have to take a break.

17       MR. PEDDIE:  So you're taking this highly

18   confidential AEO stuff and you're going to stick it

19   right in the record?

20       MR. BILLER:  You want to seal it?                   01:42:35

21       MR. PEDDIE:  Well, it's under protective

22   order.

23       MR. BILLER:  Then seal it.  Have it sealed.

24   I don't care.  Seal it.

25       MR. PEDDIE:  It's already under protective          01:42:44

                                                    Page 181

1    order.  I don't have to do anything.

2         MR. BILLER:  Madam Court Reporter, can we

3    have this exhibit sealed?

4         That particular order doesn't apply in this

5    case, though.                                    01:42:58

6         MR. PEDDIE:  You have this evidence from

7    another case.  It's subject to a protective order.

8    You make use of this at your own peril, so --

9         MR. BILLER:  Oh, really?  How am I going to

10   violate the protective order when the only people in   01:43:06

11   this room, you, me, lawyers for TW Holding, and my

12   client?  Really?

13        THE VIDEOGRAPHER:  Microphone, please.

14        MR. PEDDIE:  You're making a public record as

15   part of the transcript here.                     01:43:18

16        MR. BILLER:  I'm not making a public -- I'm

17   going to seal it.

18        THE WITNESS:  So what am I supposed to look

19   at?

20   BY MR. BILLER:

21      Q   I'm asking you --

22      A   Uh-huh.

23      Q   -- didn't you -- didn't -- aren't those the

24   bank statements for Thomas Wylde?

25      A   I don't know when you look at bank statement,   01:43:36

                                                Page 182

1     but it says it's our bank statement.

2        Q    Okay.  And those bank statements include wire

3     transfers from Dada and Desna.  Okay?  And my

4     question to you, isn't it true Thomas Wylde received

5     millions of dollars from Desna and Kata in 2016 and        01:43:55

6     2017?

7        A    We received funds.  I personally don't

8     remember the company name.  So, yes, we received

9     funds.  And if the record say it, then it says it.

10       Q    That's all.                                        01:44:20

11            MR. PEDDIE:  Does it need to be in the

12    record?  She already just said that --

13    BY MR. BILLER:

14       Q    Well, would you agree with the amounts of

15    money that are displayed on the bank statements in        01:44:36

16    Exhibit 20?

17       A    If I'm agree --

18       Q    With the amount of monies identified in

19    the --

20            MR. PEDDIE:  We can't stipulate to that right      01:44:44

21    now.  If you want to approach me --

22            MR. BILLER:  Make it part of the record.

23    Seal it, please.

24            MR. PEDDIE:  It's sealed, then?

25            MR. BILLER:  Yes, it's sealed.

                                                      Page 183

1    MR. PEDDIE:  Well, I still object, but if

2 you're going to do that, it's your problem.

3    MR. BILLER:  Okay.  Are you saying I can't

4 seal the record?

5    MR. PEDDIE:  We don't have any orders to  01:45:01

6 sealing it.  You're just making use of something

7 that is subject to a protective order.

8    MR. BILLER:  I'm sealing it.

9    MR. PEDDIE:  You're using it in a different

10 case and you're saying you're sealing it.  01:45:10

11    MR. BILLER:  Yeah, I'm having it sealed.

12 Okay?  Do you have a problem with that?

13    MR. PEDDIE:  Well, I don't think it should be

14 used.

15    MR. BILLER:  Do you have a problem with me  01:45:18

16 sealing it?

17    MR. PEDDIE:  In accordance with the

18 protective order, I don't think you should be using

19 it right now.

20    MR. BILLER:  What protective order?  Do you  01:45:26

21 have it?

22    MR. PEDDIE:  Well, it's in the original --

23    MR. BILLER:  Do you have it?

24    MR. PEDDIE:  I don't have it with me.

25    MR. BILLER:  Okay.  Then how am I supposed

Page 184

1  to --

2      MR. PEDDIE:  You should, because your client

3  is --

4      MR. BILLER:  No.  I came into the case two

5  years late.  Okay?  And that was according to          01:45:33

6  another case.  Not this case.

7      MR. PEDDIE:  You understand there is a

8  protective order and that's how that evidence was

9  obtained.

10     MR. BILLER:  No, I don't understand that.      01:45:44

11     MR. PEDDIE:  Well, I'm putting you on notice.

12     MR. BILLER:  Okay.  And protective order

13  required it to be sealed.  Not to never be used

14  again.  I'm asking, did it require that it not be

15  used?                                               01:45:52

16     MR. PEDDIE:  You should read it.

17     MR. BILLER:  No.

18     MR. PEDDIE:  It's available online and it's a

19  public document.

20     MR. BILLER:  Richard --

21     MR. PEDDIE:  If you want to make use of it

22  right now, then you should be aware that it's under

23  protective order.  That's why there is a big,

24  diagonal red warning on that stack of documents.

25     MR. BILLER:  And can I ask you a question?      01:46:08

Page 185

1    How is anybody going to see it when it is sealed?

2         MR. PEDDIE:  I don't know.  If you want to

3    seal it and do all that -- I haven't -- I don't know

4    whether what you're doing right now is proper or

5    not.  You're doing it at your own risk.                01:46:19

6         MR. BILLER:  What do you mean at my own risk?

7    What is that supposed to mean?

8         MR. PEDDIE:  I'm not agreeing to it.

9         MR. BILLER:  Will you stipulate to seal it?

10         MR. PEDDIE:  I'm not going to stipulate to it    01:46:28

11    being any part of this deposition.

12         MR. BILLER:  Okay.

13         MR. PEDDIE:  I think it's subject to the

14    protective order and should not be used.

15         MR. BILLER:  Then bring the protective order     01:46:34

16    next time.

17         MR. PEDDIE:  No.  It's your job to know --

18         MR. BILLER:  No, no.  It's not my job.

19         MR. PEDDIE:  Your client is a signatory to

20    that.                                                  01:46:39

21         MR. BILLER:  I was not a signatory to that.

22         MR. PEDDIE:  It's doesn't matter.  Your

23    client was.

24         MR. BILLER:  No.  My client sued them.

25         MR. PEDDIE:  That doesn't matter.               01:46:45

                                                    Page 186

```
1          MR. BILLER:  You're incompetent.

2          MR. PEDDIE:  That doesn't -- that doesn't

3    wipe out a protective order.

4          MR. BILLER:  Yes, it does.

5          MR. PEDDIE:  A protective order is entered by    01:46:48

6    the court.

7          MR. BILLER:  Whatever.

8    BY MR. BILLER:

9      Q   There are certain numbers on these bank

10   statements.  Okay?                                      01:46:53

11     A   Uh-huh.

12     Q   And you agree that the bank statements are

13   from bank accounts that Thomas Wylde has, right?

14     A   Uh-huh.

15     Q   Is that yes?                                      01:47:01

16     A   Yes.

17     Q   Is Bank of America still the bank for Thomas

18   Wylde?

19     A   Yes.

20         MR. PEDDIE:  Objection.  She hasn't looked        01:47:07

21   through every single statement there, and I'm not

22   going to let her --

23         MR. BILLER:  Do an objection.  Don't make a

24   speech.

25         MR. PEDDIE:  I'm making an objection.             01:47:13
```

Page 187

1          MR. BILLER:  What's the objection?  You don't

2    even know objections.  That's your problem.

3          MR. PEDDIE:  Foundation.  Fine.  You want me

4    to spell it out for you.

5    BY MR. BILLER:                                  01:47:22

6      Q    Okay.  So do you have -- do you dispute any

7    of the numbers on the bank statements?  As the CEO

8    of Thomas Wylde, do you dispute any of the numbers?

9      A    I see the Bank of America is Thomas Wylde

10   bank.  I don't remember account number, so I don't   01:47:34

11   know if that account number is our number and all

12   the documents in there I cannot verify it, but we

13   used Bank of America bank.

14     Q    The bank statements say:

15              "Thomas Wylde, LLC, 235 West 31st       01:47:56

16         Street, Los Angeles, California

17         90007."

18         Is that your place of business?

19     A    Not anymore.

20     Q    Because you're now at 239?               01:48:06

21     A    That was two years ago and then we moved to

22   229.

23     Q    So you're at 229 West 31st Street?

24     A    Second floor.

25     Q    Second floor?                            01:48:18

                                                Page 188

**2014 DEPRECIATION AND AMORTIZATION REPORT**

OTHER      1

| Asset No. | Description | Date Acquired | Method | Life | Line No. | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MAC COMPUTER | 081406 | 200DB | 5.00 | 17 | 2,963. | | | 2,963. | 2,963. | | 0. |
| 6 | PRODUCTION EQUIPMENT | 113006 | 200DB | 5.00 | 17 | 4,763. | | | 4,763. | 4,434. | | 0. |
| 7 | MAC COMPUTER | 110906 | 200DB | 5.00 | 17 | 3,636. | | | 3,636. | 3,636. | | 0. |
| 11 | MAC COMPUTER | 113006 | 200DB | 5.00 | 17 | 4,649. | | | 4,649. | 4,649. | | 0. |
| 12 | MAC COMPUTER | 122706 | 200DB | 5.00 | 17 | 4,563. | | | 4,563. | 4,563. | | 0. |
| 14 | COMPUTER EQUIPMENT | 010107 | 200DB | 5.00 | 17 | 21,345. | | | 21,345. | 21,345. | | 0. |
| 15 | COMPUTER EQUIPMENT | 041908 | 200DB | 5.00 | 17 | 4,559. | | | 4,559. | 4,559. | | 0. |
| 16 | OFFICE FURNITURE | 020708 | 200DB | 7.00 | 17 | 6,525. | | | 6,525. | 6,088. | | 437. |
| 17 | OFFICE FURNITURE | 053008 | 200DB | 7.00 | 17 | 431. | | | 431. | 403. | | 28. |
| 18 | OFFICE FURNITURE | 081308 | 200DB | 7.00 | 17 | 10,300. | | | 10,300. | 9,611. | | 689. |
| 19 | COMPUTER EQUIPMENT | 040709 | 200DB | 5.00 | 17 | 2,549. | | | 2,549. | 2,480. | | 69. |
| 20 | COMPUTER EQUIPMENT | 050209 | 200DB | 5.00 | 17 | 1,807. | | | 1,807. | 1,758. | | 49. |
| 21 | COMPUTER EQUIPMENT | 110709 | 200DB | 5.00 | 17 | 3,377. | | | 3,377. | 3,261. | | 116. |
| 22 | COMPUTER EQUIPMENT | 110219 | 200DB | 5.00 | 19B | 2,269. | | | 2,269. | 2,191. | | 0. |
| 23 | COMPUTER EQUIPMENT | 120309 | 200DB | 5.00 | 17 | 1,275. | | | 1,275. | 1,231. | | 44. |
| 24 | COMPUTER EQUIPMENT | 122109 | 200DB | 5.00 | 17 | 1,846. | | | 1,846. | 1,783. | | 63. |
| 25 | OFFICE FURNITURE | 090409 | 200DB | 7.00 | 17 | 251. | | | 251. | 222. | | 22. |
| 26 | COMPUTER EQUIPMENT | 020610 | 200DB | 5.00 | 17 | 6,676. | | | 6,676. | 6,099. | | 577. |

428102
05-01-14

(D)  Asset disposed

\* ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction

9.1

```
 1      A    I don't know if there's a mistake or not.

 2      Q    Okay.  Let's go on.

 3           Now, if you go to page --

 4           THE REPORTER:  Can we take a break when you

 5     get a chance?                                    01:49:31

 6           MR. BILLER:  Oh, yes.  Let's take a break.

 7           THE VIDEOGRAPHER:  We're off the record.  The

 8     time is 1:49 p.m.

 9           (Recess.)

10           THE VIDEOGRAPHER:  We're going back on the   01:49:38

11     record.  The time is 2:00 p.m.  Please continue.

12           MR. BILLER:  Let's have the next document

13     marked as Exhibit 20.

14           THE REPORTER:  21.

15           (Exhibit 21 was marked for identification by

16        the court reporter and is attached hereto.)

17     BY MR. BILLER:

18      Q    You wrote Exhibit 20 -- 21.  Sorry.

19      A    Long time ago, yes.  I see my signature.

20      Q    You were known then as Jene Fuchs?          02:00:57

21      A    Yes.

22      Q    And you resigned from Thomas Wylde, LLC?

23      A    PDTW, LLC.

24      Q    No.  It says:

25                "Jene Fuchs, chief operating           02:01:18
```

Page 190

## Exhibit "A" to Agreement to Purchase Membership Interest

### TRADEMARKS

| Mark | Serial No./ Reg. No. | Status |
|---|---|---|
|  Henna Skull Design | 4,045,284 | Registered 10/25/11 |
| Henna Skull Design | 85/282,535 | Filed 3/31/11 |
| THE WYLDE | 86/003,488 | Filed 7/6/13 |
| THOMAS WYLDE | 3,283,944 | Registered 8/21/07 |
| WYLDE BY THOMAS WYLDE | 85/020,665 | Filed 4/22/10 |
| DOGS GONE WYLDE | 77/737,583 | Abandoned 1/14/13 |
| THOMAS WYLDE | 77/622,486 | Abandoned 1/28/13 |
| THOMAS WYLDE | 78/778,668 | Abandoned 5/15/08 |
| TW FOR THOMAS WYLDE | 77/742,386 | Abandoned 8/2/10 |
| WYLDE | 77/853,330 | Abandoned 7/24/10 |
| WYLDE CHILD | 78/379,441 | Abandoned 3/22/05 |

Secured Promissory Note

1    He was my lawyer for a long time.

2        Q    Did he do any legal work on that case for

3    that company?

4        A    He done legal work for my company.

5        Q    For all your companies?                      02:03:17

6        A    Yes.

7        Q    Is he -- is he your exclusive lawyer, then?

8        A    Well, he was not necessarily exclusive, but

9    he is the lawyer that I trust.

10       Q    Okay.  Did you use any other lawyers?         02:03:27

11       A    My divorce there is other lawyers that I

12   used.

13       Q    Okay.  So when did you first start using

14   Richard Peddie as your attorney?

15       A    Long time ago when -- more than ten years    02:03:41

16   ago.

17       Q    Before 2007?  This e-mail is written in 2007.

18       A    Yes.

19       Q    Okay.  And when did you start using him as

20   your attorney?                                        02:03:56

21       A    Long time ago.

22       Q    I know you keep saying long --

23       A    More than 20 years ago -- I mean, no.  More

24   than ten years -- well, I met him through my

25   ex-husband, so long time ago.                         02:04:06

Page 192

1    Q   We know he was representing you in this Haute

2    Tee situation back in 2007.  Did you represent him

3    before that -- I mean did he represent you before

4    that?

5    A   Jene Jen, yes.                          02:04:19

6    Q   He represented you with Jene Jen?

7    A   Yes.

8    Q   As your lawyer?

9    A   Yes.

10       MR. PEDDIE:  I think I'm going to object to   02:04:27

11   this first e-mail.  It's attorney-client privilege.

12       MR. BILLER:  I represent David Fuchs.

13       MR. PEDDIE:  It's attorney-client privilege

14   and she may invoke the privilege.  Maybe she can't.

15   I don't know.                              02:04:38

16       MR. BILLER:  Whatever.

17       MR. PEDDIE:  What do you want?  Do you want

18   us to say I've been representing her and her company

19   since something like 2004 or whatever?

20       MR. BILLER:  Yeah.                      02:04:46

21       MR. PEDDIE:  Okay.

22       MR. BILLER:  Stipulate to that?

23       MR. PEDDIE:  I think that she has involved me

24   since something like maybe 2004.

25       MR. BILLER:  That's what I thought.      02:04:56

                                            Page 193

```
1              MR. PEDDIE:  Okay.

2       BY MR. BILLER:

3         Q   Let's go back to Exhibit 20, page 6663.

4              THE VIDEOGRAPHER:  Your microphone.

5       BY MR. BILLER:                                    02:05:29

6         Q   6367.

7         A   20?

8         Q   Yeah.

9         A   6367?

10        Q   6367.                                        02:05:54

11        A   Yes.

12        Q   These are organizational charts?

13        A   Uh-huh.

14        Q   Or it says:

15              "Proposed table of organization."          02:06:03

16           Do you see that?

17        A   Yes.

18        Q   Is that a fair and accurate representation of

19      the organization at Thomas Wylde in 2015, January 1,

20      2015?                                              02:06:15

21        A   Yes.

22        Q   Okay.  I just want to -- here they are.

23           I'm going to show you a document that I

24      obtained from another source.  TW did not produce it

25      to me, but it's pretty reliable.  And this is a     02:07:37
```

Page 194

From: "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com>
Subject: RE: Thomas Wylde Equity Investment USD $5.5M and Debt Instrument USD $2.0M
Date: July 10, 2014 at 2:56:27 PM PDT
To: Paula Thomas <paula@thomaswylde.com>
Cc: "David Schnider (david@thomaswylde.com)" <david@thomaswylde.com>

No worries – see you then.

**From:** Paula Thomas [mailto:paula@thomaswylde.com]
**Sent:** Thursday, July 10, 2014 2:36 PM
**To:** Apfelberg, Andrew M.
**Cc:** Paula Thomas
**Subject:** Re: Thomas Wylde Equity Investment USD $5.5M and Debt Instrument USD $2.0M

I am running 15 late
Sorry

Sent from my iPhone

On Jul 9, 2014, at 9:54 PM, "Apfelberg, Andrew M." <aapfelberg@greenbergglusker.com> wrote:

Will review and be ready to discuss when we are together.

**Andrew M. Apfelberg | Attorney at Law | Biography**
D: 310.201.7408 | F: 310.201.2310 | AApfelberg@greenbergglusker.com
**Greenberg Glusker Fields Claman & Machtinger LLP**
1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067
O: 310.553.3610 | GreenbergGlusker.com |

**IRS Circular 230 Disclosure:**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax related penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message is intended solely for the use of the addressee(s) and is intended

```
 1    from 2006.

 2        Q    Okay.

 3        A    All the way seems like from 2006 to 2014.

 4        Q    Right.

 5        A    Yes.  And says:                              02:10:56

 6                  "Mac computer, iPad, and Apple

 7             Store."

 8             It's separated.  And I think you missed one

 9    highlighting in here with HP here (indicating).

10             MR. PEDDIE:  He will ask questions.         02:11:17

11    BY MR. BILLER:

12        Q    Okay.  Anyways, I took the deposition of Ed

13    Smith, and he testified that by 2015, April 2015,

14    there were 30 to 40 computers, and that many other

15    computers were purchased after Thomas Wylde became a   02:11:44

16    business.

17             I just want to ask you, you've been there

18    since 2006, 2007.  You would agree that when you

19    started, at least --

20        A    Yes.

21        Q    -- there were at least four Mac computers, at

22    least?

23        A    Yes.

24        Q    Okay.  But there were other type of computers

25    as well, right?                                       02:12:06
```

1    A    Yes.

2    Q    Okay.  Those other computers were personal

3    computers, PCs, right?

4    A    Yes.

5    Q    So the Mac computers were really used for        02:12:15

6    design purposes?

7    A    Yes.

8    Q    Okay.  And the accounting and the billing and

9    the other issues for running a company were using

10   the PCs, right?                                       02:12:26

11   A    Yes.

12   Q    Okay.  And I have really bad eyesight and I'm

13   dyslexic and tired, but I think there are about 20

14   computer equipments identified from January 1, 2007,

15   to February, 2011.  Those computers are not          02:12:41

16   highlighted because it says "computer equipment."

17        Does that -- does that look like the correct

18   amount of computers in that period of time that were

19   at PDTW?

20        MR. PEDDIE:  Objection.  It's vague.             02:13:00

21        THE WITNESS:  I'm really sorry.  You're

22   asking about computer equipment that you did not

23   highlight?

24   BY MR. BILLER:

25   Q    I wanted to separate that out from computers,    02:13:10

                                                           Page 197

1  because they're two different words.

2  A  Oh.

3  Q  All I'm saying is that between January 2007

4  and February 2011, there were approximately 20

5  computers at PDTW that are not Mac computers or      02:13:24

6  Apple computers?

7  A  It says, "Apple Store." That does not mean

8  it's computer, because some amount is 47.96. It

9  under Apple Store Computer, but it comes to 47.96.

10  The amount seems like maybe the accessory for the    02:13:50

11  computer they just put on the computer.

12  Q  Okay. I'm not talking about the Apple Store.

13  A  Oh, okay.

14  Q  I'm talking about the computer equipment that

15  exists, you know, between January 1, 2007, and       02:14:03

16  February 25, 2011.

17  A  Okay.

18  Q  Those are the computers that were being used

19  at PDTW, correct?

20      MR. PEDDIE: Objection. Mischaracterizes the   02:14:15

21  exhibit.

22      THE WITNESS: Also here you will see there

23  are $74, $436. So looking at the amounts, I'm not

24  sure everything is computer or some of it -- I

25  cannot really tell you what this is, just looking at  02:14:31

Page 198

1    it.

2    BY MR. BILLER:

3        Q    Okay.  How many computers did -- existed at

4    PDTW up until the time TW -- Thomas Wylde came into

5    business?                                            02:14:43

6        A    Well, when we had bankruptcy filed, we left

7    everything -- we left all the computers and we give

8    the exact photos of how many computers we have left

9    and all the list of how many computers we have left,

10   and gave that to trustee.                            02:15:11

11       And later on we actually accidentally took

12   some of the older computers.  We also told the

13   trustee or the list of everything we took.

14       Q    How many computers were on that list?

15       A    I don't remember.  Trustee has that         02:15:27

16   information.  We have information.  So I'm sure that

17   we can pull that information.  I don't remember out

18   of my head right now.

19       Q    Do you know if it was more or less than 20?

20       A    The one we took to our new one was, I want to   02:15:40

21   say, less than 20, because we left a lot of them at

22   the PDTW office.  The one we took to new office, I

23   want to say, less than 20.  But we have the list,

24   which I submitted it.  So I don't remember exactly

25   now how many.                                        02:16:04

Page 199

1    Q    Okay.

2    A    But we can go back.

3    Q    Did you give that list to Richard?

4    A    Richard has them and trustee has them.

5         MR. PEDDIE:  And you have them.                    02:16:13

6         MR. BILLER:  The five computers?

7         MR. PEDDIE:  Whatever it is.

8         MS. THOMAS:  Do you mind if I have a quick

9    break?  I need to talk to you about something.

10        MR. BILLER:  The five computers, Richard, are    02:16:24

11   the Mac computers.  Come on.

12        MS. THOMAS:  I want to talk to you.

13        THE VIDEOGRAPHER:  Are we off the record?

14        MR. BILLER:  Yeah, please.

15        THE VIDEOGRAPHER:  We're off the record.  The    02:16:34

16   time is 2:16 p.m.

17        (Recess.)

18        THE VIDEOGRAPHER:  We're going back on the

19   record.  The time is 2:18 p.m.  Please continue.

20        MR. BILLER:  Let's mark the next document 24.    02:17:51

21        (Exhibit 24 was marked for identification by

22     the court reporter and is attached hereto.)

23   BY MR. BILLER:

24   Q    Are you familiar with Exhibit 24?

25   A    Looks like a QuickBooks report.                   02:18:30

                                                  Page 200

1     Q    Do you know who created this?

2     A    I don't know.  Account department.

3     Q    And did you have any involvement in the

4   creation of this document?

5     A    No.  Usually I give information, but I don't     02:18:46

6   create the QuickBooks.

7     Q    So what information did you give to create

8   this document?

9     A    Any information that come to me that relate

10  to account department.                                   02:19:04

11    Q    And what would that information be?

12    A    It could be anything.  It could be -- it

13  usually goes to account department.

14    Q    I just want to know --

15    A    Yes.                                              02:19:13

16    Q    -- and I don't need you to be, you know -- I

17  just need to the best of your ability, just identify

18  the type of information you would get -- receive and

19  give to the accounting department.

20         MR. PEDDIE:  The categories?                      02:19:29

21  BY MR. BILLER:

22    Q    Yeah, the type.

23    A    The -- it's -- I can see -- I cannot see the

24  first line.

25    Q    I don't want you to read through each item.       02:19:38

                                                        Page 201

1    I just want you to give me a general idea.  And if I

2    need more specific, I'll ask.

3        A    Uh-huh.

4        Q    But you would -- you would receive invoices,

5    for example, and you would give that to the                02:19:49

6    accounting department, right?

7        A    Okay.

8        Q    Is that right?

9        A    The invoices go directly to the account

10   department.                                                 02:19:58

11       Q    What would you receive?

12       A    I would -- I receive -- let's say that my

13   teams reimbursement sometimes, I get a signoff.  I

14   get the signoff of -- mainly like if we have -- if

15   we have payment terms on or certain things like           02:20:31

16   that.

17       Q    What was that?  Say that again.

18       A    Payment terms, like if we cannot pay on time

19   and certain payment terms.  And I work on things

20   like that.  Otherwise, a lot of things go directly        02:20:45

21   to account department.

22            MR. BILLER:  Okay.  Jessica, I don't have any

23   more questions.

24            MS. THOMAS:  Okay.

25            MR. PEDDIE:  I have exactly one question.  Is     02:20:58

                                                        Page 202

1    that all right?

2          MR. BILLER:  Are you talking to me?

3          MR. PEDDIE:  Jessica, are you going to ask

4    questions?

5          MS. BAGDANOV:  I do have some questions, yes.    02:21:07

6    Not too long.

7          MR. BILLER:  Go ahead, Jessica.  Ladies

8    first.

9

10                         EXAMINATION

11   BY MS. BAGDANOV:

12      Q    Okay.  Ms. Park, can you hear me okay?

13      A    Yes.

14      Q    Okay.  Earlier today you were explaining that

15   you knew Paula Thomas prior to 2006 when PDTW was       02:21:28

16   formed; is that correct?

17      A    I don't know exactly when PDTW was formed,

18   but I know Paula very early stage when none of the

19   prints were developed because my ex-designer

20   introduced her to me, and I looked at artwork that     02:21:49

21   wasn't printed as material.

22      Q    Do you remember when you met Paula Thomas

23   first?

24      A    I want to say sometime 2005.

25      Q    Was she working for a company at that time,    02:22:09

                                                    Page 203

1    if you know?

2        A    She was working for a company.  I got

3    introduced through my designer I worked for and she

4    said that her friend Paula was looking for someone

5    can produce -- can help her, can produce fabrics and    02:22:30

6    can produce things.  So that's how I met her.

7        Q    Who was the person?

8        A    Erica Davis.

9            MR. BILLER:  Move to strike the previous

10   answer.  Nonresponsive.                                 02:22:49

11   BY MS. BAGDANOV:

12       Q    And do you know what company she was working

13   for in 2005?

14       A    I want to say --

15       Q    The name of it?                                02:23:04

16       A    I want to say Thomas Wylde, LLC.  Actually, I

17   don't know.

18       Q    Okay.  Did you form Jene Jen in 2005?

19       A    I believe so.

20       Q    Do you remember if you met Paula Thomas after   02:23:19

21   you formed that company or before?

22       A    Yes.  After.

23       Q    You met Paula after you formed Jene Jen?

24       A    Yes.

25       Q    And what was Jene Jen's business?              02:23:31

                                                    Page 204

1    A    We make fabrics.  We worked with fashion

2    companies like -- like 7 Jeans and we work with

3    small and big fashion companies, and we make fabrics

4    for them.

5    Q    And you sold fabrics to Paula Thomas?          02:23:50

6    A    Yes.

7    Q    Do you remember if you sold it to her or to a

8    company that she worked for or both?

9    A    To definitely her company.

10   Q    And you don't remember the name of that        02:24:05

11   company?

12   A    No, I don't.  I mean, to me, I don't know

13   exactly it was Paula Thomas, Paula Thomas, LLC, or

14   PDTW.  I don't remember.

15   Q    Okay.  Earlier today you also testified        02:24:21

16   regarding what I believe was marked as Exhibit 4,

17   the copyright and trademark license agreements.

18        Do you recall?

19   A    Yes.

20   Q    And do you have those agreements in front of   02:24:46

21   you right now?

22   A    Yes.

23   Q    Do you recall that they're dated September

24   2013?

25   A    Yes.                                            02:24:57

Page 205

```
 1        Q    What was the status of PDTW's finances at
 2   that time, if you recall?
 3            MR. BILLER:   Irrelevant.
 4            THE WITNESS:   We were -- all the time that I
 5   worked for the company, we never had money.  We were      02:25:08
 6   always in debt.  Always -- I was always borrowing
 7   money.  Always asking factories give us more time.
 8   We never be able to pay anything on time.  I was
 9   constantly borrowing money.  So we were in debt.  We
10   were in major debt.                                        02:25:26
11   BY MS. BAGDANOV:
12        Q    Were you looking for investors for the
13   company as well?
14        A    Yes.
15            MR. BILLER:   What year?                          02:25:33
16            THE WITNESS:   We were looking for investors
17   early stage, even 2007, all the time.
18   BY MS. BAGDANOV:
19        Q    At the time that the license agreements were
20   signed in fall of 2013, were you also looking for          02:25:45
21   investment into PDTW?
22        A    Yes.
23        Q    Were you personally involved in that?
24        A    We were looking for every possible way that
25   who could help the company.                                02:26:02
```

Page 206

1    Q    Who at PDTW was looking for investors?

2    A    We had -- we had a company that we hired,

3    Vendome.

4        MR. PEDDIE:  It's V-E-N-D-O-M-E.

5        THE WITNESS:  And then we also hired this        02:26:25

6    gentleman named -- I don't know.  I don't remember.

7    Very nice guy.  He was helping us.  I don't remember

8    his name.  But he was hired to help us to raise

9    money.  So we had Vendome and we had another

10   gentleman's name.  I'm sorry, I don't remember his       02:26:51

11   name.

12   BY MS. BAGDANOV:

13   Q    Did you personally talk to this man and to

14   Vendome?

15   A    I was personally, yes, working with Vendome        02:26:59

16   and working with this gentleman.

17   Q    Did you -- excuse me.  Did you and Paula

18   Thomas work on that together?

19   A    Yes.

20   Q    Okay.  And with regard to Exhibit 4, you          02:27:21

21   testified earlier that you signed the license

22   agreements because Ms. Thomas asked you to sign

23   them; is that accurate?

24       MR. BILLER:  Leading.

25       THE WITNESS:  Yes.                                 02:27:30

Page 207

| 1 | BY MS. BAGDANOV: |
|---|---|
| 2 | Q    Who -- when did you first see these |
| 3 | documents, the license agreements? |
| 4 | A    When they asked me to sign. |
| 5 | Q    Who is "they"?                                    02:27:40 |
| 6 | A    Paula and David. |
| 7 | Q    David? |
| 8 | A    Schnider. |
| 9 | Q    Do you remember if they first showed you the |
| 10 | license agreements in September of 2013?           02:27:49 |
| 11 | A    I'm sorry.  If they -- I've never seen |
| 12 | license agreement except -- except that dates.  I'm |
| 13 | sorry.  License agreement?  I don't think I've seen |
| 14 | the license agreement. |
| 15 | Q    I'm talking about Exhibit 4.                 02:28:15 |
| 16 | A    Oh, okay. |
| 17 | Q    And was there any -- did you first see the |
| 18 | document on the day that you signed it? |
| 19 | A    Yes. |
| 20 | Q    You never saw earlier versions of the       02:28:29 |
| 21 | agreement, if there were any? |
| 22 | A    I don't think so. |
| 23 | Q    And what exactly did Ms. Thomas ask you to |
| 24 | do? |
| 25 | A    We have to -- I think something related to   02:28:44 |

Page 208

| | |
|---|---|
| 1 | loan that we going to get. And then it has to be -- |
| 2 | they have to have a separate -- not the -- not the |
| 3 | everything done by company, but put it in separate |
| 4 | holding. And then the separate holding would also |
| 5 | with the license to the company. |
| 6 | Q   You testified earlier that you believed these |
| 7 | license agreements were incorrect; is that correct? |
| 8 | MR. BILLER: Misstates the testimony. |
| 9 | Leading. |
| 10 | THE WITNESS: I felt that it was not fair and |
| 11 | some of what is in there is not correct. Because I |
| 12 | believe that was something created by the company, |
| 13 | by the employees, not really belongs to Paula |
| 14 | personally. |
| 15 | BY MS. BAGDANOV: |
| 16 | Q   Okay. But when you looked at these documents |
| 17 | for the first time, did you argue with Paula Thomas |
| 18 | or David Schnider about those terms in the license |
| 19 | agreement? |
| 20 | MR. BILLER: Leading. |
| 21 | THE WITNESS: Back then I pretty much did |
| 22 | what she asked me to do. I mean, it's good for the |
| 23 | company, I was supporting her. You know, |
| 24 | anything -- |
| 25 | //// |

Timestamps:
5 — 02:29:16
10 — 02:29:26
15 — 02:29:43
20 — 02:29:56

Page 209

1    BY MS. BAGDANOV:

2      Q    So you did not object at the time?

3      A    Well, I --

4           MR. BILLER:  Leading.

5           THE WITNESS:  In my heart, I wasn't agree          02:30:16

6    with everything, but either this or we don't get a

7    loan, which either way the company is not going to

8    survive.

9           MR. BILLER:  Move to strike.  Nonresponsive.

10   BY MS. BAGDANOV:                                          02:30:26

11     Q    Did you say anything to Paula Thomas at the

12   time that you disagreed with it?

13     A    I don't remember.

14          MS. BAGDANOV:  Okay.  I have no further

15   questions.                                                02:30:38

16          MR. BILLER:  One question, Richard.

17          MR. PEDDIE:  Yes, sir.

18

19                       EXAMINATION

20   BY MR. PEDDIE:

21     Q    Jene, would you look at Exhibit 20 once

22   again.  It's the 2014 e-mail from -- it starts from

23   Doug Lee and then has this projection document.

24   It's Exhibit 20.  And would you please turn to

25   page 6367.                                                02:31:04

                                                    Page 210

1      A   Yes.

2      Q   Now, you testified earlier that this is a

3   true and accurate representation of the

4   organizational chart for Thomas Wylde?

5      A   Back then we are proposed making this org      02:31:28

6   chart.

7      Q   I see.  So it's a proposal?

8      A   Proposed.

9      Q   Go down, please, to -- it's about rows 16 to

10   18 and columns C and D.  It talks about VP of      02:31:44

11   operations, Doug, and director of IT, Roger.

12      A   Uh-huh.  Yes.

13      Q   Did they ever come in as a VP on the one hand

14   for Doug or director of IT officially?

15      A   No.      02:32:01

16         MR. PEDDIE:  That's all I have.

17         MR. BILLER:  Okay.  I have some follow-up

18   questions because Jessica asked some questions I

19   need to follow up on.

20

21                  FURTHER EXAMINATION

22   BY MR. BILLER:

23      Q   Did you ever sell any garments to Paula

24   Thomas when she was living in Venice?

25      A   That's a long time ago.  Did I ever sell --      02:32:16

                                          Page 211

1      Q   Jene Jen.  Did Jene Jen ever sell garments --

2   not garments -- but fabrics to Paula Thomas when she

3   was living in Venice?

4      A   I don't know when she -- when was the

5   timeline, but, yes, I did sell fabric to Paula I      02:32:35

6   believe from day one.

7      Q   Okay.  Do you remember Paula Thomas living in

8   Venice?

9      A   Yes.

10      Q   Okay.  And when she was living in Venice,      02:32:48

11   you -- Jene Jen, not you, Jene Jen, the company,

12   sold Paula Thomas fabrics for her to make garments,

13   right?

14      A   I don't -- I don't know it's the -- when she

15   was living there, but, again, I was selling fabric      02:33:04

16   to Paula from day one.

17      Q   Okay.  I'm not --

18      A   I can't relate to when she was living where

19   she was living.  She lived in Venice many times.

20   She lived in Venice one of my friend's house.  So I      02:33:16

21   don't know what year.  If you can tell me maybe the

22   year, I can --

23      Q   Well, Jene Jen started in 2005, right?

24      A   Yes.

25      Q   Okay.  How soon after Jene Jen went into      02:33:26

Page 212

1        Q      Now, identify all the positions you had

2   with Thomas Wylde?

3        A      Financial controller.

4        Q      Human resource?

5        A      Yes.

6        Q      So what did you do as human resource?

7        A      I just got documents and filed their HR

8   files, personnel files, and payroll.

9        Q      You got to walk me through this; okay?

10  Let's talk about the first one.   What documents did you

11  get?

12       A      From the employees?

13       Q      Yes.   Wherever you got them from.   I

14  don't know.

15       A      They're W4, I-9, and offer letter.

16       Q      Anything else?

17       A      And a copy of the ID.

18       Q      And did you get documents from any other

19  source?

20       A      I don't understand.   Like, what source?

21       Q      Whatever source.   It could be anybody.

22  Did you get any documents from any other source in your

23  position as human resource person?

24       A      That's about all I can remember.

25       Q      Were you the manager of human resource?

                                        Page 30

```
 1      A    Because the brand name was Thomas Wylde.

 2      Q    Exactly.  That's the brand name, Thomas

 3    Wylde.  That's not a company, though.  It's a brand

 4    name.

 5      A    Okay.                                          02:34:42

 6      Q    So do you know if it was a company or Paula

 7    Thomas selling her own clothes as written in that

 8    article, L.A. Times article --

 9      A    Yes.

10      Q    -- was it Paula Thomas, the individual, you    02:34:50

11    sold the garments to?

12      A    The company.

13      Q    What company?

14      A    I don't know the LLC name, but the brand name

15    was Thomas Wylde.                                    02:35:02

16      Q    Okay.  So you were selling to Thomas Wylde,

17    that's all you know, right?

18      A    Yes.

19      Q    And you don't know if Thomas Wylde -- you

20    don't know if Paula Thomas was selling those clothes  02:35:10

21    as her -- in her individual capacity or as part of

22    some business called Thomas Wylde, right?

23      A    I don't.

24      Q    Okay.  Thomas Wylde, LLC, has been in debt

25    from day one, right?                                 02:35:38
```

Page 214

```
1      A    The new Thomas Wylde, LLC?  Yes.
2      Q    All those -- Stephen Choi has been pouring
3    millions and millions and millions of dollars into
4    Thomas Wylde from the beginning, and it has always
5    been in debt, correct?                          02:35:56
6      A    Yes.
7      Q    Okay.  And John Hanna was always crying to
8    Stephen Choi every month, give me $700,000, give me
9    $350,000, give me $600,000; isn't that true?
10     A    I cannot answer for him.                  02:36:12
11     Q    Isn't it true that Paula Thomas, however,
12   didn't have investors who were giving her money,
13   millions and millions and millions of dollars for
14   PDTW; isn't that true?
15     A    Different size of company, different --   02:36:25
16          MR. BILLER:  Move to strike.  Nonresponsive.
17   BY MR. BILLER:
18     Q    Answer my question.  My question, did -- was
19   there one or more investors who were pouring
20   millions of dollars into PDTW?                   02:36:39
21     A    Yes.
22     Q    Millions of dollars?  Who?
23     A    Oh, no, PDTW?  No.
24     Q    Yeah, no.  But there were many investors or
25   there was Choi pouring millions of dollars in Thomas  02:36:48
```

Page 215

```
 1   Wylde, right?

 2     A   Yes.

 3     Q   Okay.  Is your husband a lawyer?

 4     A   No.

 5     Q   What does he do?                         02:37:09

 6     A   He's film editor.

 7     Q   What -- Palliative, is that his company or

 8   your company?

 9     A   It's his company.

10     Q   And what does that company do?          02:37:16

11     A   It's producing films and editing films.  It's

12   a film editor.

13     Q   Does he have a college education?

14     A   I believe he has master's degree, yes.

15     Q   In what?                                 02:37:28

16     A   I don't know.

17     Q   Does he have any education in law?

18     A   Law?

19     Q   In law.

20     A   No.                                      02:37:34

21     Q   Does -- okay.  And is it your position that

22   he is the one who helped you write your declaration?

23     A   He helps me to correct my grammars, a lot of

24   grammars.

25     Q   I'm talking about the writing itself.  Who  02:37:49
```

Veritext Legal Solutions
866 299-5127

1     Did -- forget about the grammar.  Who did the

2     writing?

3       A    The writing itself?  Cut and paste and put it

4     on?

5       Q    Who cut and paste?               02:38:00

6       A    I think I got the format from Richard and cut

7     and paste and put it.

8       Q    When you say "format," are you talking about

9     the words that make the sentences and paragraphs or

10    are you talking about the way the words appear on    02:38:24

11    the document?

12      A    I think --

13      Q    There's this ambiguity as to who actually

14    came up with the thoughts and wrote -- wrote --

15    wrote the sentences and wrote the paragraphs --    02:38:38

16      A    Uh-huh.

17      Q    -- and chose the words to be used in the

18    declaration.  Did you do that?

19      A    No.

20      Q    Who did that?                 02:38:50

21      A    I think I asked help to my husband and

22    probably showed Richard to see if that is the right

23    format.  So that's what I probably did.

24      Q    Did Richard change it?

25      A    No, not that I remember.        02:39:09

```
 1      Q   So you came up with the thought -- I keep on
 2   going to this sentence because it's astonishing.
 3          Can you get Exhibit 5, please.
 4      A   Yes.
 5      Q   Okay.  What is a debtor?                    02:40:13
 6      A   Debtor is someone who -- someone who owes
 7   debt.
 8      Q   What is proof of interest?
 9      A   Proof of interest is someone that -- who has
10   interest in the -- the proof of interest is I        02:40:36
11   have -- I'm entitled to certain things, so that's
12   proof of interest.  Like I owned -- I believe I was
13   given 10 percent, so that's -- I call as proof of
14   interest.
15      Q   So the fact that you were given 10 percent    02:40:56
16   you called proof of interest?
17      A   Yes.
18      Q   Okay.  Well, proof of interest is not that.
19   Proof of -- proof of interest is evidence that is
20   submitted to prove you have an interest in property.  02:41:09
21          Do you know that?
22      A   Okay.
23      Q   Okay.  So why would you I write:
24          "I caused to be filed a proof of
25          interest with the court."                    02:41:21
```

Veritext Legal Solutions
866 299-5127

1      A    Because that's what I believed that I have

2    interest, because 10 percent is I was given to.

3      Q    Okay.  But that's what your belief is?

4      A    Yes.

5      Q    But that's not proof.  Just because you have     02:41:32

6    a belief, it's not proof of interest.

7      A    Okay.

8      Q    Okay.  What proceedings were you referring to

9    when you made this declaration?

10     A    What proceedings?                                 02:41:48

11     Q    Yeah.

12     A    Proceeding that I am submitting it.

13     Q    No.  You say:

14            "Defendant TW now controls that

15            brand, claiming ownership to it in            02:42:04

16            these proceedings."

17            What proceedings are you referring to?

18     A    The -- the proceeding over what we're going

19    through.

20     Q    What?  What's that?                              02:42:14

21     A    The claim.

22     Q    Why was your declaration used?

23     A    What?

24     Q    Why did you write your declaration?

25     A    Declaration is -- that's something I say         02:42:25

Page 219

1   certain things.

2       Q   Okay.  Why did you write your declaration?

3   Who asked you to do it?

4       A   I don't understand why -- the court asked me

5   to do it.                                            02:42:40

6       Q   The court did?  Wrong.  Who asked you to do

7   it?

8       A   Well, I think the lawyers asked to do it.

9       Q   Which lawyers?

10      A   I think that was my lawyer and the company   02:42:50

11  lawyers.

12      Q   What company lawyer?

13      A   Thomas Wylde company lawyer.

14      Q   Who is Thomas Wylde's company lawyer?

15      A   Company lawyer is Richard.                   02:43:02

16      Q   So Richard?  Richard asked you to do it?

17      A   Ask write a declaration.

18      Q   And what did he tell you to put in this

19  declaration?

20      A   Whatever I -- what I would believe, what I   02:43:12

21  believe, my story of it.

22      Q   What did he tell you exactly -- what do you

23  mean what story of it?  What did you mean that to

24  mean?  What do you believe that to mean?

25      A   Story is I am, who I am, and I joined the    02:43:25

Page 220

1   company when, and my experience.  This is what

2   happened.  And this is what happened.  And in the

3   normal wording.

4       Q   Okay.  I'm going to -- I'm going to ask you

5   to write something.                              02:43:40

6       A   Okay.

7       Q   Can she -- can the witness have a piece of

8   paper, please, and a pen.

9       A   I have pen.

10          MR. PEDDIE:  Here's a pen.

11          MR. BILLER:  Does anyone have a piece of

12  paper for her?

13  BY MR. BILLER:

14      Q   I want you to write everything you know about

15  Paula Thomas when you met her.                   02:44:17

16          MR. PEDDIE:  I'm going to object to this.

17  This is a silly exercise.

18          MR. BILLER:  No, it's not.

19          MR. PEDDIE:  Ask a question.

20          MR. BILLER:  No, it's not.              02:44:26

21  BY MR. BILLER:

22      Q   You're claiming you wrote this declaration.

23  I don't believe you have the education or the skill

24  or the ability to write this declaration.  I believe

25  a lawyer wrote this declaration for you and you    02:44:34

Page 221

1    signed it; isn't that true?

2        A    I reviewed by lawyer.

3        Q    A lawyer wrote it and you signed it?

4        A    I wrote it.

5        Q    You wrote it?

6        A    I wrote it and then it's reviewed by -- not

7    wrote exact same words I wrote. The content I wrote

8    it. The content of it. Because how does anybody

9    else know this besides me?

10       Q    Lots of people, dear. Because you've lied    02:45:00

11   actually in this declaration.

12            MR. PEDDIE: Do you want to tell her what

13   this was from?

14            MR. BILLER: No, I don't. There's no reason

15   for me to tell her. Because she doesn't know.       02:45:09

16   Somebody wrote this for her. She's not admitting

17   it.

18   BY MR. BILLER:

19       Q    So write how you -- I want you to write a

20   simple story how did you meet Paula Thomas.          02:45:16

21            MR. PEDDIE: She is not going to do that.

22   Ask her questions.

23   BY MR. BILLER:

24       Q    That's perfectly proper. Please write the

25   story how you met Paula Thomas.                      02:45:26

                                                        Page 222

1          MR. PEDDIE:  We're not doing that.

2     BY MR. BILLER:

3       Q    Write, please.

4          MR. PEDDIE:  No.

5     BY MR. BILLER:                                02:45:30

6       Q    I want you to write it.

7       A    So I'm not from this country.  As I said

8     before, I didn't go schooling here.  I can write

9     everything in Korean, and then I can go through

10    Google translate and translate that English.  I can   02:45:44

11    do that.

12      Q    So is that what you did with the declaration?

13      A    Sometimes I do.  And sometimes --

14      Q    No.  Did you do that with the declaration,

15    Exhibit 5?  Is that what you did?              02:45:53

16      A    A lot of time I do that and then I translate

17    in English.  Then I have --

18      Q    I'm asking you, did you do that with regard

19    to the declaration?

20      A    I wrote that declaration and probably --   02:46:04

21      Q    In Korean?

22      A    No.  I -- that's really not that difficult.

23    I mean, writing what I -- not the legal term, but

24    the content is there.  It's not that difficult

25    because I'm telling my story.  My name is this --   02:46:21

                                              Page 223

1      Q    Okay.  I want you to read into the record

2   everything you wrote.

3      A    What?

4      Q    I want you to read --

5           MR. PEDDIE:  No.  The document speaks for        02:46:29

6   itself.

7           MR. BILLER:  No, it doesn't.

8           MR. PEDDIE:  We're not going to do silly

9   circus act things here.

10          MR. BILLER:  I'm trying to figure out what       02:46:35

11  she wrote and what somebody else wrote.

12  BY MR. BILLER:

13     Q    Please start from page 27 --

14     A    Okay.  I'm going to write in Korean.  Okay?

15  So I'm going to write in Korean and then you can do      02:46:45

16  the Google translate.

17          This is why I requested Korean translator,

18  because the legal terms and legal words, I'm not

19  sure even every normal American can understand

20  certain things if they don't have a law degree.        02:47:03

21  This is why going forward, any depositions that I'm

22  going to be in, I need a translator so I can

23  properly answer your questions.

24     Q    No.  You -- I want you to tell me --

25     A    I'm -- I can write exactly what I wrote in       02:47:16

Page  224

1   Korean.

2       Q   Okay.  Do it.

3           MR. PEDDIE:  No, we're not doing this.  We're

4   not doing this.  You can ask questions.

5   BY MR. BILLER:

6       Q   Do it.

7           MR. BILLER:  She agreed to do it.

8           MR. PEDDIE:  Well, I don't care.

9   BY MR. BILLER:

10      Q   Isn't it true you didn't write the          02:47:28

11  declaration?  Isn't it true?

12      A   I said I wrote entire content.  Who is going

13  to come up with it?  I wrote entire content and --

14      Q   Did you write it in English or in Korean?

15      A   Sometimes I write it in English and sometimes  02:47:43

16  I write in Korean.  Sometimes --

17      Q   So this document, Exhibit 5, you wrote in

18  Korean and English?

19      A   No.  This document existed before I cut and

20  paste here and there.                              02:47:56

21      Q   Who did?

22      A   Because this whole -- the whole -- some of

23  them is from my bio.  I mean, this is -- it's very

24  simple thing.

25      Q   Okay.  What did you cut and paste from other  02:48:09

Page 225

1   sources?  Tell me what you cut and paste from other

2   sources.

3     A   What did I oversee the business.

4     Q   What paragraph are you talking about?

5     A   I said I'm familiar with the work done by    02:48:25

6   former employees of the debtors, and familiar with

7   the debtors' design used in the business.

8     Q   Okay.

9     A   Because I oversaw them.

10     Q   Where did you cut and paste that from?    02:48:38

11     A   Here and there.

12     Q   Where is here and where is there?

13     A   Certain languages, like I am COO.  I mean,

14   sometimes I don't even know if I have -- I am a COO

15   or I am the COO or I am COO of Thomas Wylde or I'm    02:49:00

16   COO for the --

17     Q   I don't care about grammar.  I don't care

18   about grammar.

19     A   I do.  So that's what I'm trying to tell

20   you --    02:49:15

21     Q   I want --

22     A   -- is that I write things sometimes in Korean

23   and I go through Google translate, and after that I

24   ask my husband to review certain things.  And he

25   corrects a lot.  He still does it.  And so the legal    02:49:23

1    forms, then I also reviewed by lawyers.

2        Q    Is that what you did in this case with

3    Exhibit 5?

4        A    Did I review this with lawyers?  Yes.

5        Q    No.  That you went through Google.          02:49:35

6        A    I don't remember.  I don't -- that's what I

7    normally do.  I mean, this is not that difficult.

8        Q    So you have that in your computer?

9        A    This in my computer?

10       Q    Yeah.                                        02:49:46

11       A    I probably do so.

12       Q    Okay.  You have -- you have the cut and paste

13   sources and you have the Google translation, you

14   have the Korean portion that you wrote, right?

15       A    I did not say exactly this.  Normally that's   02:49:55

16   what I do.

17       Q    Why didn't you do it in this case on a legal

18   document you were submitting to the court?

19       A    I think I had a very similar declaration

20   before when I was with Kring & Chung.              02:50:07

21       Q    So you're saying you wrote a declaration for

22   Kring & Chung?

23       A    I thought a lot of declaration was the same

24   thing, was pretty much what I'm saying.

25       Q    You're not answering my question.           02:50:29

Page 227



```
 1       A   Okay.

 2       Q   That's why we're getting -- we're not

 3   finished yet.

 4       A   Okay.

 5       Q   Did you write a declaration similar to      02:50:31

 6   Exhibit 5 for Kring & Chung?

 7       A   I believe so.

 8       Q   I have the file for Kring & Chung.

 9       A   Okay.

10       Q   I've never seen your declaration.           02:50:41

11       A   I believe so.  I wrote the declaration.

12       Q   For Kring & Chung?

13       A   I believe so.

14       Q   And it was containing the same information in

15   here?                                               02:50:51

16       A   I don't know exactly same information.  I was

17   giving what I used to do for the company.  Who I am

18   and I used to do.

19       Q   Did you tell them about licensing agreements

20   and trademarks and copyrights and --               02:51:01

21       A   No.

22       Q   Did you talk about that?

23       A   No.

24       Q   Okay.  This whole declaration is about you

25   claiming Paula doesn't own the copyrights and      02:51:09
```

Page 228

1   basically saying nothing about trademarks, but --

2       A   Yeah, I mean, I believe so, she does not own

3   the copyright.

4       Q   Okay.  I'm not asking you a question.  Okay?

5   I'm asking you -- I'm trying to figure out what          02:51:25

6   portion of this document did you write.

7       A   So I write --

8       Q   Let's do it this way.  Let's do it this way.

9   I withdraw my question.

10      A   Yes.

11      Q   Somebody told you to write this document,

12   right?

13      A   Yes.

14      Q   Who?

15      A   I believe the lawyer.                           02:51:41

16      Q   Richard?

17      A   Yes, I believe so.

18      Q   Okay.  And what did he tell you about the

19   document he needed you to write?

20          MR. PEDDIE:  Objection.  Attorney-client        02:51:51

21   privilege.

22          MR. BILLER:  It's been produced.

23          MR. PEDDIE:  She is not going to tell you

24   about how it was produced.

25   ////

Veritext Legal Solutions
866 299-5127

1    BY MR. BILLER:

2       Q   Okay.  So what did you do at that point when

3    he told you what he wanted --

4       A   I write everything I know.

5       Q   How did you write it?  On paper?  On          02:52:03

6    computer?  Where did you write it?

7       A   Most -- most of the time I write it in my

8    computer.

9       Q   Okay.  Your PC?

10      A   No, Mac.                                       02:52:13

11      Q   Your Mac?

12      A   Yeah.

13      Q   What Mac?

14      A   Mac computer.

15      Q   You have a Mac computer?                       02:52:18

16      A   Yes.

17      Q   Where?

18      A   I have a Mac computer -- my laptop is a Mac

19   computer.

20      Q   Okay.  Your laptop -- sorry, my mistake.  Did  02:52:27

21   you create a folder for this document to create it?

22      A   I normally just write on e-mail because it's

23   easy to do spell check.  So I write -- any time I

24   write something, I create an e-mail to myself and

25   then I write something.  That's how I -- how I        02:52:50

                                                  Page 230

1   create.

2      Q   So you have the e-mail that is the basis for

3   this document, Exhibit 5?  Do you have the e-mail

4   for that?

5      A   I said I create -- I do the e-mail form so I          02:53:01

6   can do the spell check.  It's not necessarily I keep

7   it.  Because you say what format did I usually

8   write.  So there is Word that I can write or a lot

9   of time I just write on the e-mail format, pretend

10   like I'm sending someone e-mail so I can --              02:53:18

11      Q   All you're doing is talking.  Please, don't

12   talk.

13      A   I'm trying --

14      Q   Answer my question.  Do you have the e-mail

15   that you wrote this declaration on?  Do you have         02:53:27

16   that e-mail?

17      A   I use e-mail form.  Not necessarily I

18   e-mailed it.  I said --

19      Q   I'm not saying you e-mailed.  I'm asking you

20   if you have the original electronic document that         02:53:37

21   you created to write Exhibit 5.  Yes or no?

22      A   I don't know.  I probably do.

23      Q   Okay.  And you're saying that -- did you

24   create a Word document?

25      A   No.  Normally I don't.                            02:53:53

Page 231

```
 1      Q    You create an e-mail?

 2      A    I just write e-mail.

 3      Q    Okay.  So did you send that e-mail?

 4      A    No.  I write e-mail.  I don't send the

 5   e-mail.  I --                                        02:54:02

 6      Q    So how did the lawyer get your information to

 7   put it into the format that it's in in Exhibit 5?

 8      A    Probably e-mail.

 9      Q    Okay.  So now you are saying you e-mailed it?

10           MR. PEDDIE:  Vague as to "lawyer."  It's      02:54:13

11   vague.

12           THE WITNESS:  I mean, no, when I write it,

13   anything, I'm not particular.  When I write things,

14   I usually write on e-mails so I can do the spell

15   check.                                               02:54:22

16   BY MR. BILLER:

17      Q    Actually, spell check is available for Word

18   as well.

19      A    Well --

20      Q    Okay?  So my question is, after you allegedly  02:54:26

21   wrote this on an e-mail, did you send the e-mail to

22   somebody?

23      A    I believe I sent to my lawyer.

24      Q    Okay.  You're pointing to Richard?

25      A    Yes.                                          02:54:40
```

Page 232

```
 1      Q    Okay.  So you have an e-mail in your laptop
 2   from you to Richard sometime in April or May, 2017;
 3   is that right?  Or 2018; is that right?  Is that
 4   right?
 5      A    I don't know.                            02:54:58
 6      Q    What do you -- did you erase it?
 7      A    No.  I don't know exactly what time.
 8      Q    Did you -- did you delete the e-mail?
 9      A    I don't delete e-mails because Richard told
10   me not to delete e-mails.                        02:55:10
11      Q    Okay.  So you have the e-mail in your
12   computer?
13      A    I don't know.  I'm explain that's what I
14   usually do.  I usually write --
15      Q    I don't care what you usually do.         02:55:17
16      A    My answer is I don't know then.
17      Q    Okay.  So you don't know how this document
18   was created, Exhibit 5?
19      A    I wrote it and I reviewed by lawyer.
20      Q    Okay.  So what form -- did you write it on   02:55:28
21   e-mail or Word?
22      A    I don't usually do Word, so probably e-mail.
23      Q    So now you're giving me a different answer.
24   You said you did e-mail.  Then you said you don't
25   know.  Now you're saying probably e-mail.          02:55:40
```

Page 233

1       A    No, I said --

2       Q    Which is the correct answer?  Pick one.

3       A    No.  I think this is why that I needed a

4   translator again.  I said when I write stuff, I

5   write e-mail instead of Word, so --                      02:55:52

6       Q    I'm going to get to the bottom of this.  You

7   want to stay here all day?  We'll do that.

8           MR. PEDDIE:  What do you want --

9           MR. BILLER:  I want her to tell me exact --

10  Richard --                                                02:56:03

11          MR. PEDDIE:  The lawyers worked on this?  Is

12  that what you want us to say?

13          MR. BILLER:  Yeah, I want --

14          MR. PEDDIE:  I believe lawyers worked on

15  this.                                                     02:56:11

16          MR. BILLER:  Okay.

17          MR. PEDDIE:  Okay?

18          MR. BILLER:  So these are not her original

19  words, correct?

20          THE WITNESS:  The concept --                      02:56:15

21          MR. BILLER:  No.  These are not her original

22  words, correct?

23          MR. PEDDIE:  That, I don't know.

24  BY MR. BILLER:

25      Q    Are these your original words?  "Witness"?       02:56:19

                                                    Page 234

```
1    Are the words on Exhibit 5 your original words?

2        A    Not --

3             MR. PEDDIE:  Objection.  Vague as to what

4    "original words" even means.

5    BY MR. BILLER:                                    02:56:29

6        Q    Go ahead.

7        A    So the concept --

8        Q    Forget the concept.  I've heard you say that

9    12 times.  I don't care about the concept.  I'm

10   asking you, did you select each word in each        02:56:37

11   paragraph on each page?  You personally?

12       A    No.

13       Q    Okay.  Who did?

14       A    My lawyer did.

15       Q    Okay.  Which lawyer?                       02:56:48

16       A    Richard did.

17       Q    Okay.  Thank you.

18            MR. PEDDIE:  I think there was just some

19   semantics there between languages.

20            MR BILLER:  No, Richard.  She finally gave it  02:57:00

21   up.

22            I propose the following stipulation:  That

23   the court reporter and the videographer be relieved

24   of their duties under the Federal Rules of Civil

25   Procedure and California Code of Civil Procedure.  A  02:57:12
```

Page 235

1    transcript be prepared within two weeks -- two

2    weeks, and the transcript be sent to?

3         MR. PEDDIE:  Send it to -- the 239 address?

4         MR. BILLER:  329.

5         MR. PEDDIE:  329, is it?                     02:57:30

6         THE WITNESS:  The Thomas Wylde office?  229.

7    229.

8         MR. BILLER:  229?

9         THE WITNESS:  229 West 31st Street, Second

10   Floor.  Have to put second floor, otherwise it        02:57:45

11   doesn't get to me.  Los Angeles, California 90007.

12        MR. BILLER:  The witness will have two weeks

13   from the date of delivery to read the transcript,

14   make any changes the witness deems necessary to make

15   it as truthful as possible, and then sign the         02:58:05

16   transcript under penalty of perjury.

17        MR. PEDDIE:  Are you asking if we're going to

18   stipulate to that?  You're shortening the period?

19        MR. BILLER:  What period do you want?  Just

20   tell me.                                              02:58:20

21        MR. PEDDIE:  30 days.

22        MR. BILLER:  30 days from receipt?

23        MR. PEDDIE:  Uh-huh.

24        MR. BILLER:  Okay.  That's fine.  30 days

25   from receipt.                                         02:58:25

Page 236

```
 1   BY MR. BILLER:
 2         Q      Can you tell me why Thomas Wylde did not
 3   inform --
 4         MR. PEDDIE:  Objection, calls for speculation.
 5         MR. BILLER:  Let me finish the question.
 6   BY MR. BILLER:
 7         Q      Inform Paula Thomas that, from August
 8   2014 to December 2014, Hillshore invested or loaned
 9   $2.3 million?  Do you know any reason?
10         MR. PEDDIE:  Objection, calls for speculation.
11         THE WITNESS:  I believe she was informed.
12   BY MR. BILLER:
13         Q      How do you know that?
14         A      I don't know, but I believe she was.
15         Q      I'm asking if you know that how do you
16   know?
17         A      I know they are having a meeting.  They
18   discussed these matters.
19         Q      How Doe know that?  How do you know that
20   $2.3 million was discussed?
21         A      I think that was in the agreement that
22   they have.
23         Q      Oh, so it's the agreement?
24         A      It's --
25         Q      The purchase agreement?
```

Page 52

1          MR. BILLER:  Okay.  You know what, I'm about

2      to do it by code, and she can come here and do it.

3          MR. PEDDIE:  I just want to ask -- I just

4      want to be clear about this.

5          MR. BILLER:  Okay.  She will send it -- can     02:59:38

6      you provide the witness with a self-addressed

7      envelope back to you in the --

8          THE REPORTER:  Back to you?

9          MR. BILLER:  Yeah, to me.  Can you do that?

10     Thank you.                                          02:59:50

11          Bye, Jessica.

12          THE VIDEOGRAPHER:  Are we off the record?

13          We are going off the record.  The time is

14     3:00 p.m., and this concludes today's testimony of

15     Jene Park.  The total number of media units used was  03:00:12

16     five and will be retained by Veritext Legal

17     Solutions.

18          (TIME NOTED:  3:00 p.m.)

19

20

21

22

23

24

25

Page 238

```
 1
 2            I, JENE PARK, do hereby declare under
 3    penalty of perjury that I have read the foregoing
 4    transcript; that I have made any corrections as
 5    appear noted, in ink, initialed by me, or attached
 6    hereto; that my testimony as contained herein, as
 7    corrected, is true and correct.
 8            EXECUTED this _____ day of _____,
 9    20____, at _____, _____.
                        (City)                (State)
10
11
12
13    _____
                        JENE PARK
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 239
```

1           I, the undersigned, a Certified Shorthand

2       Reporter of the State of California, do hereby

3       certify:

4               That the foregoing proceedings were taken

5       before me at the time and place herein set forth;

6       that any witnesses in the foregoing proceedings,

7       prior to testifying, were placed under oath; that a

8       record of the proceedings was made by me using

9       machine shorthand which was thereafter transcribed

10      under my direction; further, that the foregoing is

11      an accurate transcription thereof.

12              I further certify that I am neither

13      financially interested in the action nor a relative

14      or employee of any attorney of any of the parties.

15              IN WITNESS WHEREOF, I have this date

16      subscribed my name.

17

18      Dated: May 29, 2019

19

20

21

22              _Kathleen E Barney_

23

24              KATHLEEN E. BARNEY

25              CSR No. 5698

                                        Page 240

                        Veritext Legal Solutions
                            866 299-5127

**[& - 2016]**

| & | | | |
|---|---|---|---|
| **&**  6:17 227:20,22<br>228:6,8,12 | | | |

| 0 |
|---|
| **000009**  82:6 |
| **001918**  69:7 |
| **001920**  52:23 |
| **001921**  70:8 |
| **01200**  1:7 2:9 9:19 |

| 1 |
|---|
| **1**  1:25 5:14 8:15<br>16:1,2,5 20:1<br>70:20 77:12 91:9<br>98:2,4,10 172:11<br>194:19 197:14<br>198:15 |
| **1,000**  15:12 147:21 |
| **1,985**  180:1 |
| **1,985,306**  180:1 |
| **1-10**  1:13 2:15 |
| **1.75**  176:5 |
| **1.8**  176:7,11 |
| **1.9**  179:25 |
| **1/22/16**  6:14 |
| **10**  6:11,11 7:11,22<br>30:5,6 41:19<br>108:3 114:6,7,8<br>175:2,4 218:13,15<br>219:2 |
| **107**  6:8 |
| **10:00**  46:10 |
| **10:27**  63:10 |
| **10:37**  63:13 |
| **11**  5:6,18 6:14<br>58:16 62:15<br>119:10,11,12,16<br>119:18 131:4,24 |
| **114**  6:11 |
| **118**  12:1 92:13 |

| | |
|---|---|
| **119**  6:14 | |
| **11:00**  85:11 | |
| **11:39**  117:9 | |
| **12**  6:15 7:23 15:25<br>28:5 44:3,23<br>128:18,19,21,21<br>128:23 235:9 | |
| **128**  6:15 | |
| **129**  6:17 | |
| **12:32**  117:12 | |
| **13**  6:17 129:12,13 | |
| **138**  6:19 | |
| **14**  6:19 7:24 138:5<br>138:8,9,14 140:3 | |
| **140**  6:21 | |
| **143**  6:25 | |
| **144**  7:2,4 | |
| **15**  6:21 30:1,2<br>108:3 114:23<br>140:12,15,17<br>175:25 176:19<br>177:3,7 | |
| **15,000**  127:9,11 | |
| **15113**  3:8 | |
| **153**  7:6 | |
| **15889**  1:5 2:7 | |
| **15889sy**  8:20 | |
| **16**  5:14 6:25 37:1<br>47:20 48:15<br>142:22,25 143:1,2<br>189:2 211:9 | |
| **1601**  129:20,25 | |
| **168**  7:24 | |
| **169**  7:8 | |
| **17**  7:2 9:19 37:1<br>130:10 142:22<br>144:15 146:20<br>166:16 | |
| **18**  7:4 99:1 130:10<br>144:21,24 166:17<br>211:10 | |

| | |
|---|---|
| **19**  7:6 130:10<br>153:7,8,11 | |
| **190**  7:11 | |
| **191**  7:13 | |
| **195**  7:15 160:14 | |
| **1:49**  190:8 | |

| 2 |
|---|
| **2**  5:16 38:14,18<br>43:3,4,7 48:21<br>52:16 70:21 97:8<br>99:10 144:11<br>150:22 174:21 |
| **2,625,114**  173:14<br>174:6 |
| **2.3**  145:18,20,23<br>146:1 177:24 |
| **2.686**  143:5 144:8<br>178:7 |
| **2.86**  142:20 |
| **2.978,323.29**<br>179:10 |
| **20**  7:6,8 30:5,6<br>36:25 75:17,21<br>108:3,13,14<br>153:13 158:10<br>169:15,16,17,20<br>183:16 190:13,18<br>192:23 194:3,7<br>197:13 198:4<br>199:19,21,23<br>210:21,24 239:9 |
| **200**  7:17 143:10 |
| **2004**  45:18 193:19<br>193:24 |
| **2005**  44:18 45:16<br>45:18 46:7 117:1<br>203:24 204:13,18<br>212:23 |
| **2006**  41:19 43:13<br>43:17,21,24 44:9<br>44:11,18 46:7 |

| | |
|---|---|
| **71:8,11 75:3**<br>117:1 196:1,3,18<br>203:15 | |
| **2007**  7:11,13 75:3<br>140:22 191:21<br>192:17,17 193:2<br>196:18 197:14<br>198:3,15 206:17 | |
| **2008**  75:3 | |
| **2009**  95:14 | |
| **2010**  41:17 | |
| **2011**  71:12,13<br>197:15 198:4,16 | |
| **2012**  147:9 154:2 | |
| **2013**  5:18 47:20<br>48:15 95:14<br>205:24 206:20<br>208:10 | |
| **2014**  7:8 99:9<br>103:24 171:23<br>176:4,11 178:21<br>196:3 210:22 | |
| **2015**  36:25 37:5<br>91:9 98:2,4,5,11<br>103:24 110:1,4,24<br>166:10 176:18<br>177:6 194:19,20<br>196:13,13 | |
| **2016**  6:19 7:6 29:9<br>37:5 38:7,9,10,11<br>79:3 80:12,13,13<br>107:19 140:20,21<br>142:18,21 143:6<br>143:18 144:9<br>145:21,22 146:20<br>153:13 158:10<br>166:16 171:19<br>174:22,23 175:6<br>176:24 177:7,8,15<br>178:14,23 179:10<br>179:25 183:5 | |

Page 1

**[2017 - 91367]**

**2017** 6:11 10:3
  13:1 29:9 36:18
  37:5 38:12 106:20
  114:7 180:11,11
  183:6 189:2 233:2
**2018** 23:11 56:6
  233:3
**2019** 1:19 2:23 8:1
  8:6 98:6 167:13
  240:18
**203** 5:7
**2049** 2:21 8:22
**20th** 160:18
**21** 7:11 63:20,24
  180:17,18,19
  190:14,15,18
**210** 5:8
**211** 5:9
**21650** 3:18
**21st** 167:7
**22** 7:13 191:14,15
**229** 30:16 167:8,8
  188:22,23 236:6,7
  236:8,9
**23** 7:15 195:20,21
**235** 188:15 189:3
**239** 188:20 236:3
**24** 7:17 200:20,21
  200:24
**240** 1:25
**2450** 8:23
**25** 7:22 28:4 43:13
  43:25 44:9 172:21
  173:1,6 198:16
**25,251,490** 173:4,6
**25th** 43:17 44:11
**26** 7:13
**27** 173:14,16,22
  174:17 224:13
**27,876,604** 175:7

**29** 1:19 2:23 7:8
  8:1,5 58:16 63:19
  63:22 240:18
**2:00** 190:11
**2:16** 200:16
**2:18** 200:19
**2nd** 30:16

**3**

**3** 5:18 47:25 48:1
  50:2,10,10 56:24
  173:16
**3.1** 176:19
**3.3** 146:10 148:17
  149:1,18
**3.3.** 178:12
**30** 196:14 236:21
  236:22,24
**303** 4:10
**31** 142:21 144:8
**310** 3:10
**31st** 30:16 167:7
  188:15,23 189:3
  236:9
**3270342** 1:24
**329** 143:25 167:7
  236:4,5
**3430** 27:10
**35** 7:23
**350,000** 215:9
**36** 173:19,20
**39** 176:19 177:3
**3:00** 2:22 238:14
  238:18

**4**

**4** 5:20 51:19,21
  52:2 56:6,24 69:3
  69:4 205:16
  207:20 208:15
**4/26/19** 5:14

**40** 196:14
**43** 5:16 114:13,23
**436** 198:23
**444-5447** 4:10
**459-9870** 3:10
**47.96.** 198:8,9
**48** 5:18

**5**

**5** 5:22 55:2,6,21
  56:21 57:5,11,16
  57:22 60:15 62:13
  63:21 114:3 146:2
  146:4,5 218:3
  223:15 225:17
  227:3 228:6 231:3
  231:21 232:7
  233:18 235:1
**50,000** 33:3,7,10
  34:2,3,4
**5051** 4:8
**51** 5:20 172:11
**55** 5:22
**56** 44:24
**5698** 1:24 2:24
  240:25
**5979** 240:23

**6**

**6** 5:24 38:11 41:17
  58:16 76:7,8,13,17
  91:12 117:15,20
  118:2 120:16,17
  120:22 122:16
  123:6 124:16,22
  125:6 126:9
  133:13 146:7
  151:1
**600,000** 177:1,16
  215:9
**6020** 92:14 95:11

**6336** 173:3 174:7
**6338** 175:22
  176:16
**6339** 177:4,5
**6367** 194:6,9,10
  210:25
**639,112** 180:11
**6663** 194:3
**69** 29:9,10,13
  107:19 161:9
  195:2
**6:16** 1:5 2:7 8:20
**6:17** 1:7 2:9

**7**

**7** 1:6,7 2:8,9 6:3
  6:19 10:14 91:18
  91:19,19,21 92:2,4
  92:4 95:6 205:2
**700,000** 215:8
**74** 198:23
**76** 5:24

**8**

**8** 6:7 79:3 91:23
  91:24 92:2 96:11
  96:14 109:7
  146:19 150:23
**800,000** 154:8,13
**80303-2831** 4:9
**818** 3:20
**827-9212** 3:20

**9**

**9** 6:8 10:2 107:20
  107:21 109:8
**90** 49:10
**90007** 30:17
  188:17 236:11
**90272** 3:9
**91** 6:3,7
**91367** 3:19

**[95,543,000 - answer]**

95,543,000 195:2
9:10 2:22 8:2,5

**a**

a.m. 2:22 8:2,5
63:10,13 117:9
ability 76:22 83:2
121:1 201:17
221:24
able 44:4 83:15
93:4 142:15 206:8
absolutely 51:17
115:12 147:4
166:3
absorb 137:11
accepts 15:8
access 149:9
accessories 79:16
accessory 198:10
accidentally
199:11
account 188:10,11
189:12,15 201:2
201:10,13 202:9
202:21
accountant 93:22
110:20,21 111:9
149:14,16,17,19
170:18,20 171:8,9
171:9
accounting 30:20
81:5,7,8,16 82:1
106:25 107:4,9
111:6,10 112:1,6,7
157:24 162:6
169:24 170:4,5
171:11 197:8
201:19 202:6
accounts 113:24
149:9,13 179:8
181:7,8,10 187:13

accurate 19:19,22
19:24,24 45:12
194:18 207:23
211:3 240:11
accusing 149:17
ache 32:11
act 224:9
acting 85:2
action 6:21 9:3
240:13
actual 19:20
added 180:23
addition 144:12
additional 146:2
146:10
address 26:14,25
27:2,4,5 30:15
129:11,20,22,23
130:6,13 138:23
189:6,9,11 236:3
addressed 238:6
addresses 130:12
administered
10:22
administrative
94:7
admission 165:22
admitting 222:16
admonishments
11:13
adv 1:7 2:9
adversary 9:12,18
10:16 62:8
advertisements
72:13
advice 137:4,5,8
137:13,14
aeo 181:18
affiliations 9:7
afraid 133:14

agent 162:19
163:13
ages 114:7
ago 32:2,23,24
33:21 34:25,25
44:3,23 47:6
74:21 103:23,24
114:7 165:7
188:21 190:19
192:15,16,21,23
192:25 211:25
agree 8:13 13:25
39:2 61:8 183:14
183:17 187:12
196:18 210:5
agreed 50:7 225:7
agreeing 186:8
agreement 5:20
7:2,4 52:3,4,14,15
54:2,7,11 64:8,9
64:16,18,23 66:3,6
67:10,11 164:24
164:25 165:1
208:12,13,14,21
209:19
agreements 50:21
57:2 66:2 67:5,8
205:17,20 206:19
207:22 208:3,10
209:7 228:19
ahead 22:1 25:15
77:9 98:13 121:19
169:12 181:11
203:7 235:6
al 8:18
alex 71:2,22
112:25 147:2
aligned 87:9
alleged 64:20 65:1
allegedly 232:20

allison 23:15 24:6
24:7 93:11 109:18
109:22 153:15,18
153:25 157:23
allow 25:11 99:19
168:24
allowed 24:22
25:5 165:14
ambiguity 217:13
ambiguous 15:17
america 28:2
181:6 187:17
188:9,13
american 224:19
amount 178:10
183:18 197:18
198:8,10
amounts 183:14
198:23
angeles 1:18 2:21
8:1,23 30:16
188:16 236:11
angry 133:15
announced 152:4
152:16
answer 7:20 18:19
19:23 25:14 30:3
34:21 35:25 36:20
40:6 44:19,20
45:8,9,10,12 62:7
73:8 98:15 110:19
115:1,4,11,18
116:2,7,13 119:3
120:18,20 121:5
121:12,17 122:2
125:21,25 127:13
128:14 133:20
134:14 139:23
147:23 157:21
168:12,17,19
191:25 204:10

**[answer - back]**

215:10,18 224:23
231:14 233:16,23
234:2
**answered** 37:21
**answering** 42:22
49:17 81:20 122:4
125:24 156:12
157:12 227:25
**answers** 40:8
**anybody** 49:4,6
75:7 90:21 132:4
132:7 142:16
186:1 222:8
**anybody's** 72:16
**anymore** 23:23
29:5 107:6 157:24
188:19
**anyways** 77:10
121:19 196:12
**ap** 1:7 2:9 9:19
**appear** 217:10
239:5
**appearance** 9:9
**appearances** 3:1
4:1 9:7
**appearing** 10:3,12
**appears** 51:16
92:4
**apple** 102:13,25
196:6 198:6,7,9,12
**applies** 11:22
**apply** 182:4
**approach** 133:14
183:21
**appropriate**
137:17
**approves** 237:21
**approximately**
198:4
**april** 1:19 2:23 8:1
8:5 91:9 98:10

196:13 233:2
**argue** 95:17,18
127:4 209:17
**argumentative**
34:13,15 37:11
84:1 86:5,10
87:22 90:15 97:16
128:3 134:12
151:19 170:16,25
**arrangement**
62:15 66:11
**art** 58:13
**article** 5:16 43:3
43:11,16,24 44:8
214:8,8
**articles** 6:15 43:2
**artist** 68:9
**artwork** 203:20
**asked** 19:6,16 25:7
25:8,8 37:20
49:25 53:12,13,13
53:15 65:6,14
77:15 80:17,22
81:23,24,24 82:2
96:1 98:17 104:6
117:19 118:13,14
118:15 131:10
137:4 139:17
141:14 149:22,22
149:22 159:10
160:10,11,15
207:22 208:4
209:22 211:18
217:21 220:3,4,6,8
220:16
**asking** 11:5 14:12
22:19 25:17,23
26:1 42:2 44:2,6,7
44:21,22 47:23
50:1 55:4 73:20
73:23 91:13 95:21

97:3 108:25
111:16 117:4
124:20 130:13,14
130:14 147:22
148:6 150:2 156:5
156:6 157:10,13
160:13,16 162:7
168:5 177:18
182:21 185:14
189:14 197:22
206:7 223:18
229:4,5 231:19
235:10 236:17
**asks** 25:19
**aspects** 88:9
**assignment** 25:17
168:3,21
**assignments** 14:7
26:1 99:21 161:7
168:2
**assistant** 94:6,7
**associate** 94:2,3,6
94:7,7
**assumes** 75:24
110:17 142:23
151:2 159:12,24
**astonishing** 218:2
**attached** 7:9 16:3
43:5 48:2 51:22
55:7 76:18 91:22
91:25 101:3
107:22 114:9
119:13 128:24
129:14 138:10
140:13 143:3
144:16,25 153:9
160:17 169:18
190:16 191:16
195:22 200:22
239:5

**attachment** 5:14
**attachments** 101:1
101:3,5,9,10
**attending** 9:6 10:9
**attention** 48:22,24
133:8,10
**attorney** 3:7,17
4:7 9:10,25 25:1
64:17 192:14,20
193:11,13 229:20
240:14
**audio** 8:12,12
**august** 6:11 13:1
114:7 177:15
**author** 39:3
**automatically**
102:14
**available** 173:16
174:1,19 175:4,12
185:18 232:17
**avenue** 4:8 27:10
**avoid** 57:20
125:23
**aware** 54:18 60:3
60:18 67:6 118:6
185:22

b

**b2** 31:4 112:8,12
127:9,11,12,14
128:22 129:2
146:25 147:6,8
**back** 13:19 21:14
33:10,15 34:7
63:12 74:2 89:4
89:16,20 90:1
98:19 100:11
102:15,22 103:14
104:3 105:7
113:25 117:11
118:19 120:7,12
131:4 141:11,11

**[back - biller]**

| | | | |
|---|---|---|---|
| 143:18 157:13,16 | **bars** 151:17 | **berated** 88:14 | 128:16,19,20 |
| 160:22 166:24 | **based** 69:23 146:3 | **best** 44:19 45:1 | 129:1,15 131:15 |
| 167:10,15 176:25 | 170:8 | 201:17 | 131:16 132:12,14 |
| 179:6 190:10 | **basically** 229:1 | **better** 137:5 195:4 | 133:19 134:7,13 |
| 193:2 194:3 200:2 | **basis** 73:2,4,4,6 | **bg.law** 3:21 | 134:19 135:2 |
| 200:18 209:21 | 74:6 150:6 231:2 | **big** 27:17 185:23 | 136:10,15,18,20 |
| 211:5 237:18 | **bates** 52:18,21 | 205:3 | 136:21 137:24 |
| 238:7,8 | 82:5 92:14 95:11 | **bigger** 27:21,23,24 | 138:2,5,7,12,13 |
| **backdating** 66:25 | **bathroom** 27:21 | **biller** 3:6,11 5:6,9 | 139:22 140:1,5,14 |
| **backed** 101:21 | 27:22,23 | 9:11,11,20 11:2 | 142:25 143:4 |
| **backs** 103:14 | **bedroom** 27:24,25 | 13:24 14:4,9,13,17 | 144:14,17 145:1 |
| **backup** 102:10,11 | 28:1 | 14:21 15:1,6,10,14 | 145:12,17 148:3 |
| 102:12,13,14,20 | **bee** 141:19 | 15:16 16:4,9 | 148:11,13,16 |
| 102:24 103:12 | **beginning** 2:22 9:9 | 18:21 21:11 22:9 | 150:25 151:3,23 |
| 104:15,25 105:1,3 | 167:15 215:4 | 22:15,21 23:7 | 153:7,10 154:11 |
| 166:25 | **behalf** 2:20 10:3 | 25:4,15,18,21,24 | 155:22 156:25 |
| **bad** 57:19 140:4,5 | 131:19 | 26:2,5 29:14 | 157:16,20 159:13 |
| 140:5 197:12 | **behavior** 82:16 | 34:17 36:2 37:14 | 160:1,4,24 161:4,8 |
| **bae** 93:9 | 83:19,25 84:12 | 37:19,20,22 38:4,6 | 161:10 163:21 |
| **bagdanov** 3:16 5:7 | **belief** 74:6 219:3,6 | 43:6,8,10 44:13 | 165:21 166:10,14 |
| 10:13,14 203:5,11 | **believe** 9:17 10:2 | 46:9,11,12 48:3 | 166:15 167:24 |
| 204:11 206:11,18 | 12:1 13:10,11,12 | 51:23 55:8 61:17 | 168:3,4,7,10,13,18 |
| 207:12 208:1 | 13:14 18:8 39:18 | 61:21 62:2,5,9 | 168:22,23 169:16 |
| 209:15 210:1,10 | 49:8 50:9 52:4 | 63:6,14 69:22 | 169:19 170:19 |
| 210:14 | 66:11 73:4 106:15 | 72:24 73:1 74:5 | 171:2,17 172:5,9 |
| **bank** 21:7 97:19 | 143:13 144:19 | 74:15 76:6,19 | 174:8,10,15 |
| 149:9,13 179:8 | 189:19,22 204:19 | 84:5 86:7,11 | 176:16,17 178:22 |
| 181:4,5,5,11 | 205:16 209:12 | 87:24 90:20 91:15 | 178:24 179:3,7 |
| 182:24,25 183:1,2 | 212:6 216:14 | 91:19,23 92:1,13 | 180:4,7,10,15,18 |
| 183:15 187:9,12 | 218:12 220:20,21 | 92:15 94:25 95:8 | 180:24 181:3,9,15 |
| 187:13,17,17 | 220:24 221:23,24 | 95:17,20,23 96:1,6 | 181:20,23 182:2,9 |
| 188:7,9,10,13,13 | 228:7,11,13 229:2 | 96:8,11,13 97:4,11 | 182:16,20 183:13 |
| 188:14 189:5,7,8 | 229:15,17 232:23 | 97:18 98:14,19,23 | 183:22,25 184:3,8 |
| 189:23 | 234:14 | 99:24 100:10 | 184:11,15,20,23 |
| **banking** 181:7,10 | **believed** 209:6 | 107:20,23 108:1,2 | 184:25 185:4,10 |
| **bankruptcy** 1:1 | 219:1 | 110:18 114:10,12 | 185:12,17,20,25 |
| 2:1 8:18 10:15 | **belligerent** 134:1 | 117:14,18 119:9 | 186:6,9,12,15,18 |
| 199:6 | **belong** 165:11 | 119:11,15 120:6 | 186:21,24 187:1,4 |
| **bare** 89:2 | **belongs** 53:22 | 120:10 121:20,21 | 187:7,8,23 188:1,5 |
| **barney** 1:23 2:23 | 54:19,21 65:4 | 123:1 125:18,22 | 190:6,12,17 |
| 9:1 240:24 | 68:1 209:13 | 127:5,8,17 128:4 | 191:13,17 193:12 |

Veritext Legal Solutions
866 299-5127

**[biller - caused]**

193:16,20,22,25
194:2,5 195:8,11
195:12,19,23
196:11 197:24
199:2 200:6,10,14
200:20,23 201:21
202:22 203:2,7
204:9 206:3,15
207:24 209:8,20
210:4,9,16 211:17
211:22 215:16,17
221:11,13,18,20
221:21 222:14,18
222:23 223:2,5
224:7,10,12 225:5
225:7,9 229:22
230:1 232:16
234:9,13,16,18,21
234:24 235:5,20
236:4,8,12,19,22
236:24 237:5,12
237:15 238:1,5,9
**billing** 197:8
**bills** 143:11
161:24 162:6,15
167:1
**bio** 225:23
**bit** 63:8
**bk** 1:5 2:7 8:20
**black** 127:20,20
**blew** 148:19
**blonde** 72:11,21
**blue** 148:15
180:22
**board** 142:5
**body** 37:16 87:21
**bogus** 62:7
**bold** 89:9
**bone** 37:15,25
38:1 87:21

**booklet** 12:11
**books** 24:23 25:6
25:12 26:6 27:18
99:14,17,19
156:10 168:24
**borrow** 156:1
**borrowing** 206:6,9
**bottleneck** 85:5
**bottom** 52:17
234:6
**bought** 33:7
102:14 104:11
**boulder** 4:9
**boulevard** 3:8
**box** 28:17 177:9
**boxes** 28:9,15,16
**bradstreet** 6:17
**brand** 31:23,25
32:1,2,7,8,8,9,10
32:12,13,22 40:3,5
40:11,25 42:12,14
42:17,19 61:1
68:5 77:19 78:12
87:4 88:21 89:15
94:14,19,22
165:15 214:1,2,3
214:14 219:15
**brands** 32:19,20
**brea** 26:10,11
27:10
**break** 23:6 63:6
80:7 117:7 120:6
181:12,14,16
190:4,6 200:9
**bring** 10:6 112:22
160:2 186:15
**brother** 112:17
127:14 147:8
**brought** 133:8
135:7 153:15

**brutzkus** 3:15
**bs** 122:6
**buddies** 147:2
**budget** 80:6
**budgets** 80:7
**business** 30:23
42:3,8 58:17
59:16,17,18 60:1,4
60:10,14,23 61:2
88:10 98:2 101:18
102:6 103:16
105:24 109:4,23
129:11 150:21
151:8 163:3 165:2
165:3 188:18
196:16 199:5
204:25 213:1
214:22 226:3,7
**butt** 38:17
**buy** 33:11 103:22
106:16 163:8
**buyers** 111:21
**buying** 108:17
162:4
**bye** 238:11
**byron** 4:5,6 9:14

**c**

**c** 32:11 211:10
**cabinet** 28:9,11,12
**calendar** 81:1
84:15
**california** 1:2,11
1:12,18 2:2,13,14
2:21 3:9,19 8:1,19
8:23 30:17 188:16
235:25 236:11
240:2
**call** 26:19 35:25
36:6,8,9 104:25
105:3 137:13
218:13

**called** 12:11 26:17
26:18 27:11 32:8
32:8,9,13,15 64:10
112:8,12 145:10
155:18 213:12
214:22 218:16
**calling** 61:15
137:17,18
**calls** 18:16 24:25
36:1,3,10 69:19
97:1 100:7 139:20
157:18 165:17
**camera** 22:4
**capacity** 214:21
**capital** 175:24
176:4 177:1
**care** 99:16 123:20
123:23 124:6
134:20,22 181:24
225:8 226:17,17
233:15 235:9
237:25
**careful** 122:4
**case** 8:20 11:22,23
11:25 59:23 62:5
68:12 69:1,18
182:5,7 184:10
185:4,6,6 192:2
227:2,17
**cases** 136:5
**cash** 7:9 158:14,17
160:8 170:7
173:16 174:1,9,19
174:19,22,23,25
175:4,12
**cast** 136:5
**casting** 136:8
**categories** 201:20
**cause** 80:6 139:1
**caused** 81:11
218:24

Page 6

[causing - companies]

| | | | |
|---|---|---|---|
| causing 96:23 | changes 12:12 | circus 224:9 | 102:9,16,17 |
| cbc 64:6,7 99:10 | 80:6 116:16 | city 130:14 239:9 | 104:24 105:1,2,4,5 |
| ccd 78:21 | 236:14 | civil 235:24,25 | 105:6,9,13,19 |
| cell 8:10 | changing 61:20 | claim 20:17 30:19 | coaching 25:21 |
| cellular 8:9 | 78:12 82:17 85:13 | 126:15 162:9 | code 12:1 235:25 |
| centered 134:11 | 85:17 | 219:21 | 238:2 |
| central 1:2 2:2 | chaos 131:12,13 | claiming 15:24 | collateral 86:14 |
| 8:19 | 131:14 | 67:18,22 68:24 | collect 34:11 |
| century 2:21 8:22 | chapter 1:6,7 2:8 | 70:20 116:10 | collected 165:25 |
| ceo 16:11,12 17:6 | 2:9 10:14 | 219:15 221:22 | college 216:13 |
| 20:1,4,7,19 21:2,5 | charge 108:16 | 228:25 | colorado 4:9 |
| 37:7 38:7 49:13 | chart 6:3 92:5 | claims 18:14 | 129:21 130:1,8,16 |
| 49:15 78:21 80:9 | 93:2 94:20 95:13 | cleaning 21:3 | columns 211:10 |
| 80:10,11,22 82:2 | 95:20 96:2,8 | clear 16:18 28:17 | combined 178:15 |
| 96:25 122:1 | 211:4,6 | 81:1 82:23,24 | come 23:17 37:9 |
| 140:10,18 141:4 | charts 194:12 | 87:3 238:4 | 55:18 65:5 66:24 |
| 141:12,14,16 | check 149:15 | clearly 12:7 95:7 | 82:3 85:11 107:10 |
| 142:9,10,11,13 | 230:23 231:6 | 121:22 | 118:10 126:3 |
| 143:6 145:23 | 232:15,17 | cleopatra 155:18 | 127:22 141:11 |
| 146:16 148:22,24 | chief 38:23 90.11 | 155:19 | 152:21 166:2 |
| 149:3,5,6 156:7 | 92:16,20 93:22 | client 10:9 24:22 | 200:11 201:9 |
| 159:17 170:1,15 | 95:8 111:9,12 | 25:1,5 73:19,22 | 211:13 225:13 |
| 170:23 171:3,4,6 | 132:9 171:8 | 136:12 147:11,12 | 238:2 |
| 175:17,17,20 | 190:25 | 168:8,11,24 | comes 107:11 |
| 176:22,25 188:7 | choi 18:1,10 19:5 | 182:12 185:2 | 179:1,3 198:9 |
| certain 21:24 | 19:11,21 34:24 | 186:19,23,24 | coming 143:17 |
| 45:13 57:24 | 35:1,20 36:4,6,15 | 193:11,13 229:20 | 147:6 |
| 172:16 187:9 | 36:25 131:19 | clients 161:24 | commerce 58:8,12 |
| 202:15,19 218:11 | 140:7,22 142:1,5,7 | close 37:9 | 58:20 59:9,14,23 |
| 220:1 224:20 | 145:8 148:19 | closed 163:24 | 59:24 60:7,13,13 |
| 226:13,24 | 151:7 158:17 | clothes 40:18,20 | 60:19 61:8 62:6 |
| certified 2:24 | 159:5 160:18 | 40:21 42:9,12,13 | 62:23 |
| 237:2,16 240:1 | 215:2,8,25 | 42:18,25 43:18 | committed 11:24 |
| certify 240:3,12 | choi's 139:7 | 46:5 97:13 102:2 | communicate 83:5 |
| cfo 111:7 153:25 | chose 217:17 | 113:16 213:5,18 | 86:17 |
| 171:6,9,10 | christmastime | 214:7,20 | communication |
| chae 93:9,10 | 104:10 | clothing 68:22 | 77:24 |
| chance 190:5 | chung 227:20,22 | clothings 68:25 | companies 31:10 |
| change 79:24 | 228:6,8,12 | cloud 100:12,16 | 31:13,16 32:20 |
| 88:23 217:24 | cihlar 4:15 8:24 | 100:20,21 101:10 | 38:3 62:1 156:16 |
| | | 101:12,14,18 | 163:7 164:5,9,14 |

**[companies - continued]**

| | | | |
|---|---|---|---|
| 164:17,20 178:24 | 145:11,16,25 | 101:20,21 103:19 | conflating 61:25 |
| 192:5 205:2,3 | 146:1,6,15,16,18 | 104:6,8,11,23 | 95:24 |
| company 1:12 | 146:19,20 147:9 | 107:3,4 159:9 | conflict 9:22,24 |
| 2:14 17:12,13,14 | 148:23 149:4,4,5,6 | 195:15,17 196:6 | 47:22 50:15,23 |
| 17:15,21 19:2,15 | 149:7,8,10,19,20 | 197:14,16,22 | 51:3,5 57:2 |
| 20:16 21:2,4 | 150:1,5,9,10,12,13 | 198:8,9,11,11,14 | conflicts 47:23 |
| 23:25 24:1,2,4,4 | 150:14,15,16 | 198:24 227:8,9 | 51:1 |
| 30:25 32:25 33:11 | 151:25 153:4 | 230:6,8,14,15,18 | confused 125:11 |
| 33:16,20,24 38:2 | 154:21,22 155:3,6 | 230:19 233:12 | confusing 79:25 |
| 38:14,18 39:10,15 | 155:18 158:8,12 | computers 29:5,6 | 176:21 |
| 40:11,15,18 45:23 | 161:14,15,16,17 | 29:7,10,10,13,17 | confusion 80:3 |
| 46:2 49:15,16 | 161:18,19,21,25 | 30:6,18,22 100:11 | 88:2 |
| 50:6,25 53:19,20 | 162:1,2,9,12,14,18 | 104:19,20 105:13 | conjunction 61:3 |
| 53:21,23 54:18,20 | 163:6,9,10,24 | 105:21,25 106:16 | connected 104:24 |
| 61:3,4,5,20 64:10 | 164:10 167:4,5,6,6 | 107:1,2,19 108:4,6 | 105:10 |
| 65:5 66:22,23 | 169:3 179:16 | 108:10,11,13,14 | consent 6:22,23 |
| 67:4,17 68:1 | 183:8 189:18 | 108:17 109:4 | consider 104:1 |
| 72:14,16 75:16,17 | 192:3,4 193:18 | 161:9 195:2 | constant 79:15,24 |
| 75:19,20,22 78:25 | 197:9 203:25 | 196:14,15,21,24 | 80:6 86:15 |
| 79:5,20,21,22 80:1 | 204:2,12,21 205:8 | 197:2,3,5,15,18,25 | constantly 82:15 |
| 80:15,16 85:3 | 205:9,11 206:5,13 | 198:5,5,6,18 199:3 | 82:17 85:6 101:21 |
| 86:4 89:2 90:22 | 206:25 207:2 | 199:7,8,9,12,14 | 206:9 |
| 92:25 96:24,24 | 209:3,5,12,23 | 200:6,10,11 | consultant 138:22 |
| 97:21,23 98:9 | 210:7 212:11 | con 126:22,24 | consulting 3:5 |
| 99:5,9,11,22,23 | 213:6,21,22,23,25 | concealing 169:5,7 | contact 136:16 |
| 100:1,4 105:10 | 214:3,6,12,13 | concept 234:20 | contacted 136:22 |
| 112:8,11,11,15,17 | 215:15 216:7,8,9 | 235:7,8,9 | contain 108:6 |
| 112:21 118:6,10 | 216:10 220:10,12 | concern 117:21 | 109:4 |
| 122:11,24 123:4 | 220:13,14,15 | concerned 83:18 | contained 55:10 |
| 123:10,15 124:3 | 221:1 228:17 | concludes 238:14 | 137:7 172:17 |
| 125:13 126:1 | company's 97:8 | conclusion 18:17 | 239:6 |
| 127:10,15,20,21 | 147:16,17 155:8 | 61:16 69:20 100:8 | containing 228:14 |
| 127:24 129:2,4,5 | competency 76:21 | 139:21 165:18 | content 56:18 |
| 129:10 131:11,12 | 121:1 | condition 156:7,11 | 222:7,8 223:24 |
| 133:9 134:10 | complaint 62:8 | conduct 131:11 | 225:12,13 |
| 137:20,25 138:24 | complied 159:18 | 168:9 | continue 8:13 23:5 |
| 139:12 140:9,25 | 159:20 | conducted 122:24 | 63:13 117:13 |
| 141:14,23,24 | compound 128:15 | confidence 88:14 | 190:11 200:19 |
| 142:1,4,12,13,13 | 134:4 | confidential | continued 4:1 |
| 142:14,15 143:7 | computer 28:23 | 181:18 | 86:12 87:8 |
| 143:19,20,25 | 28:23,24,25 29:1,3 | | |

Page 8

[continuum - dates]

continuum 174:12
control 237:20
controls 219:14
conversation 35:8
  35:10,11,17
  122:23
conversations 8:9
coo 20:25 37:6,7
  49:15 78:21 85:2
  89:20 110:23
  111:1,2 156:7,8
  226:13,14,15,15
  226:16
coordinator 94:2
copied 179:6
copy 16:6 106:13
  114:10 128:8
  144:22 237:2,16
copyright 5:20
  39:8 47:14 52:2
  52:14 54:1,3
  65:10 68:3,6,9,10
  68:11,13,17,24,25
  69:4,17 205:17
  229:3
copyrights 66:3
  67:3,9,18,22 68:18
  228:20,25
cor 22:8,8,14,25
corporation 18:13
  18:20,22
corporations
  31:22,24
correct 11:4,10
  18:15 24:14 33:17
  38:7 39:4,20,25
  40:3,8,15,19 41:1
  41:12 42:3,4
  45:20 47:5,15
  52:5 58:1,2 61:19
  67:10 70:7 71:21

83:15 92:6 94:1,5
125:6 126:9,13
176:11 189:11
191:19 197:17
198:19 203:16
209:7,11 215:5
216:23 234:2,19
234:22 239:7
corrected 58:3
  239:7
corrections 239:4
corrects 58:4
  226:25
cost 158:8
counsel 8:16 9:5
  9:20 93:24 159:16
count 164:4
country 49:12
  223:7
couple 43:2 137:2
course 13:22 29:6
  95:1 119:24 120:3
  121:25 134:22
  146:24 151:9,11
  152:1,6 153:1
court 1:1 2:1 8:18
  8:25 10:18 16:3
  23:4 43:5 48:2
  51:22 55:7 76:18
  91:20,22,25
  107:22 114:5,9
  119:13 128:24
  129:14 138:10
  140:13 143:3
  144:16,25 153:9
  166:12 169:18
  179:5 182:2 187:6
  190:16 191:16
  195:22 200:22
  218:25 220:4,6
  227:18 235:23

cpa 6:9 23:14,16
  23:21 24:2 93:25
  109:12,16,18
  110:10 153:15,23
  162:7
crave 81:5
craziness 80:5
create 43:19 55:10
  68:7,11 70:10,11
  70:20 201:6,7
  213:12 230:21,21
  230:24 231:1,5,24
  232:1
created 39:17,20
  40:10 41:15 42:20
  53:19,22 67:16,17
  67:22 70:7,16,23
  70:25 95:7 201:1
  209:12 231:21
  233:18
creating 66:7
creation 201:4
creations 128:8
creative 21:2 37:7
  37:15,25 38:1,1,2
  38:23,23 78:9
  80:10 85:1 87:21
  89:8,17,21 90:2,3
  90:6,8,11,11 92:9
  95:12 108:24
  115:9 132:9,9
creator 39:2
credibility 61:22
  115:8,9 143:14
credit 7:2,4 144:13
  146:4 177:24
criminally 154:18
  154:18
criticisms 84:22
crook 136:12

crow 31:19 32:16
crucifixion 140:6
crying 215:7
csr 1:24 240:25
current 141:16
  164:1,2
currently 29:18
  38:2 99:10
curser 86:20
customer 162:16
customers 164:2
cut 89:4 143:9
  217:3,5,6 225:19
  225:25 226:1,10
  227:12
cutting 88:22 89:8

**d**

d 32:13,13 146:13
  148:9,11,12,12
  207:4 211:10
dada 31:8 113:5,9
  113:10,15,22
  147:1 162:21,23
  163:2,9,12,17,19
  183:3
damage 86:15
data 102:8 104:2
  108:7 144:5
  166:22
date 44:4,6 46:6
  48:14 53:1 71:12
  71:14,15,15 98:21
  171:24 180:14
  236:13 240:15
dated 43:13,13
  48:12 56:6 79:11
  79:12 205:23
  240:18
dates 45:13 74:22
  74:25 95:14
  208:12

Page 9

[daughter - different]

**daughter** 26:17,23
  27:1,3
**david** 33:1,19,19
  38:21,21 46:13,16
  46:19 47:12,20
  48:20 49:22 50:2
  50:15 51:5 53:13
  76:25 84:6 93:9
  117:25 119:23
  121:7 131:19
  193:12 208:6,7
  209:18
**davis** 204:8
**day** 32:8 42:23,24
  75:2 93:16 97:9
  155:2 158:17
  159:1 162:17
  208:18 212:6,16
  214:25 234:7
  239:8
**days** 236:21,22,24
**deadlines** 81:2
**deal** 33:14
**dealing** 133:12
**dear** 222:10
**debt** 33:24,25
  38:14,14,15,17,18
  97:8 99:10,11,12
  99:12 142:14
  143:12,17 155:25
  156:2 206:6,9,10
  214:24 215:5
  218:7
**debtor** 1:6 2:7
  64:5,19,21 65:2,8
  218:5,6
**debtors** 226:6,7
**decide** 131:2
**decided** 140:10
**decision** 85:7
  141:25 169:3

**decisions** 82:14
  85:8,10 142:3
**declaration** 5:22
  54:24 55:1 61:17
  61:19 62:11,12,13
  62:14,19,19,20
  68:18 113:25
  114:1,2 216:22
  217:18 219:9,22
  219:24,25 220:2
  220:17,19 221:22
  221:24,25 222:11
  223:12,14,19,20
  225:11 227:19,21
  227:23 228:5,10
  228:11,24 231:15
**declare** 34:4 239:2
**decreased** 139:1
**deem** 12:12
**deems** 236:14
**defendant** 9:12
  219:14
**defendants** 1:14
  2:16 35:19
**defending** 10:4
**define** 39:5
**defined** 173:25
**definitely** 71:3,5
  205:9
**definition** 172:17
  174:11
**degree** 216:14
  224:20
**delete** 233:8,9,10
**delivery** 236:13
**dell** 106:8
**denied** 119:22
**densa** 146:11,13
  148:10
**denying** 152:13

**department** 81:3
  81:14 86:6 112:1
  112:7 201:2,10,13
  201:19 202:6,10
  202:21
**departments**
  77:22 80:4
**depend** 28:1
**deponent** 4:3 9:15
  9:23 10:4
**deposed** 12:18,23
  12:24,25
**deposing** 12:3
**deposition** 1:17
  2:19 6:11 8:12,16
  8:21 9:17 10:7
  11:3,9,14 12:2,6
  12:10 13:1,5 15:3
  21:14,18,18 26:20
  110:25 114:6
  186:11 196:12
  237:7
**depositions** 224:21
**depreciation** 7:15
**describe** 102:22
  123:20,25 124:2,6
  124:7,8 125:15
**described** 75:8
  83:19
**description** 5:13
  6:2 7:1 132:5
**descriptions**
  195:14,15
**design** 39:8 67:25
  67:25 68:20,21,22
  75:6 76:22 80:6
  85:20,23 86:16
  87:3 88:13,16
  89:1 116:16,25
  121:2 162:15
  197:6 226:7

**designated** 172:16
**designed** 71:10
**designer** 21:3
  75:11 79:8 87:8
  90:9 94:3,3,3
  132:9 203:19
  204:3
**designers** 39:9
  53:21 70:24,25,25
  71:24 75:7,10
  102:3
**designing** 42:24
  213:18
**designs** 53:21
  68:22 79:11 86:8
  87:18 89:15
  115:15,17
**desna** 148:4,5,7,12
  148:15,21 178:12
  179:9,15 180:11
  183:3,5
**desperation** 82:17
**destroyed** 161:9
  237:1
**destroying** 94:22
**destruction** 94:18
**details** 154:14,25
  155:21,23
**determine** 138:25
**determined** 11:24
**developed** 40:23
  203:19
**device** 105:9,12
**devices** 104:16
**diagonal** 185:24
**difference** 68:2
**different** 38:3
  42:14 88:22 99:18
  141:13 144:22
  184:9 198:1 213:9
  213:13 215:15,15

Veritext Legal Solutions
866 299-5127

[different - e]

233:23
**differentiating**
  195:16
**difficult** 57:24
  223:22,24 227:7
**dilute** 79:16
**dimitrios** 3:6 9:11
  61:25 136:14
  237:9
**dinner** 152:22
**direct** 9:24 116:6
  135:7 164:9
**directed** 11:6
**direction** 82:23,25
  87:4,4 240:10
**directions** 89:16
**directly** 133:6
  202:9,20
**director** 21:2 37:8
  38:1,2,23 80:10
  85:1 89:8,18,21
  90:2,4,6,9,12 92:9
  95:12 108:24
  115:10 211:11,14
**disagreed** 210:12
**disappointed**
  133:5 135:6
**disclose** 195:10
**discovery** 168:9
**discussion** 118:17
  158:16
**discussions** 117:25
**dishonest** 12:2,6,8
  125:19,20
**displayed** 183:15
**dispute** 188:6,8
  189:6
**disqualification**
  10:2
**disrespectful**
  88:15

**distinguishing**
  195:13
**distracting** 73:12
**distributed** 111:19
  111:20
**distribution**
  127:10
**distributor** 112:10
**distributors**
  111:25
**district** 1:2 2:2
  8:19
**division** 1:2 2:2
  8:19
**divorce** 33:13
  104:5 192:11
**document** 47:19
  47:25 48:16 49:4
  49:6,8,9 50:2,9,13
  50:15 51:13,15,19
  51:20 55:4,10,10
  55:19,20,21 56:8
  56:12,13,14,15,20
  57:4,22 59:1,4
  65:6,14 66:7,21,24
  69:23 76:23 77:1
  77:2,7 95:15,16
  107:18 117:25
  120:8,13 121:3,8
  121:10,16,23,24
  122:3,7,8,16,21,22
  123:5,9,13,14,18
  123:20 124:15,21
  125:5,6,15,15
  128:17 133:17
  138:8 140:1,11
  144:21,22 145:3
  147:15,19 153:3
  159:2,4,6 161:2
  169:13,22 171:22
  178:2,18,19,20

185:19 190:12
191:14 194:23
195:1 200:20
201:4,8 208:18
210:23 217:11
224:5 225:17,19
227:18 229:6,11
229:19 230:21
231:3,20,24
233:17
**documents** 6:8
  34:8,9 49:11 52:8
  52:10 53:1,3,5,6
  53:17 56:25 57:1
  59:2 64:1,4 91:16
  101:3 111:4
  112:20 122:9,17
  123:7 125:8
  147:16,17 149:21
  149:25 150:3,5
  159:18 160:15,17
  185:24 188:12
  208:3 209:16
**doing** 14:22 23:13
  33:12 44:19 45:1
  47:17,18 58:17
  77:18 80:4,23
  81:9,25 82:2
  88:11 90:18 91:7
  107:9 134:2,16,18
  149:25 150:3
  154:24 164:12
  169:6 171:10
  186:4,5 223:1
  225:3,4 231:11
**dollar** 17:10 20:18
  38:16 75:23 96:25
  97:7,8 99:10
  107:14,15,16
**dollars** 146:2
  150:4 179:10

183:5 215:3,13,20
215:22,25
**doubled** 110:15
**doug** 18:1,3 76:25
  80:16 121:6
  210:23 211:11,14
**downfall** 94:13
**dr** 33:19
**draw** 39:9 68:9
  71:3,5,7,10 73:5
  74:7,11,11,12 75:5
  75:9,10,12,13,15
  76:22 121:2
**drawing** 71:19,21
  74:10 152:21
**drive** 129:20,25
**due** 24:13
**dummy** 18:13,20
**dun** 6:17
**duties** 235:24
**duty** 159:17
**dyslexic** 197:13

---
**e**
---

**e** 1:23 2:23 5:14
  6:14,19 7:6,8,13
  15:23 19:25 20:10
  20:12 32:4,5,11,11
  32:14,14 86:17,21
  100:23,24,25
  101:4,8,8,15,16,18
  103:15 122:14
  131:4,9,21,24
  137:4,6,15 139:3
  146:13 147:13
  148:9,11,12,12
  153:5 158:10,17
  159:3,5,23 160:7,7
  160:16,17,18
  169:21,22 171:25
  172:1 191:18
  192:17 193:11

| | | | |
|---|---|---|---|
| 207:4,4 210:22 | employee 16:23 | established 41:1 | examined 10:22 |
| 230:22,24 231:2,3 | 17:3 75:18 79:4 | 42:3,8 189:17 | example 202:5 |
| 231:5,9,10,14,16 | 153:16 240:14 | estate 10:15 | exceptions 84:17 |
| 231:17,18,19 | employees 53:22 | estimate 30:4 35:2 | exclusive 192:7,8 |
| 232:1,2,3,4,5,8,9 | 77:13,14,20 78:4,6 | 44:7 154:4 | excuse 71:4 84:11 |
| 232:14,21,21 | 78:7 79:5,25 81:5 | et 8:18 | 91:4,8 207:17 |
| 233:1,8,9,10,11,21 | 82:4 84:12 86:13 | euclid 4:8 | excuses 91:5 |
| 233:22,24,25 | 86:19,22 87:2,9,15 | evaluation 123:8 | execute 50:20 |
| 234:5 240:24 | 92:24 96:5,24 | evaluator 123:6 | executed 239:8 |
| earlier 126:8,13 | 134:2,3,20 135:4 | everybody 76:4 | executive 92:20 |
| 203:14 205:15 | 135:11,24 150:22 | 90:18 118:11 | 95:8 |
| 207:21 208:20 | 209:13 226:6 | 122:2 126:2 | executives 142:17 |
| 209:6 211:2 | employment 17:2 | 134:17 152:21 | exempt 145:11,15 |
| early 123:16 | encourage 38:21 | everybody's 95:14 | exercise 119:25 |
| 203:18 206:17 | engage 151:22 | evidence 91:3 | 221:17 |
| east 2:21 8:22 | english 56:18 | 104:2,3,4 142:24 | exhibit 5:14,16,18 |
| easy 132:23 | 57:23 223:10,17 | 169:5,7 182:6 | 5:20,22,24 6:3,7,8 |
| 230:23 | 225:14,15,18 | 185:8 218:19 | 6:11,14,15,17,19 |
| ed 103:9 196:12 | enjoyable 77:21 | ex 15:24 33:1 | 6:21,25 7:2,4,6,8 |
| edge 88:23 89:9 | entered 187:5 | 34:10,11 149:3 | 7:11,13,15,17 16:1 |
| editing 216:11 | entire 72:10 | 151:5,5 153:25 | 16:2,5 20:1 43:3,4 |
| editor 216:6,12 | 132:19 225:12,13 | 192:25 203:19 | 43:7 47:25 48:1 |
| education 216:13 | entities 62:1 | exact 13:2 27:20 | 50:2,9,10,10 51:19 |
| 216:17 221:23 | entitled 218:11 | 28:7 41:20 44:4,6 | 51:21 52:2,22 |
| effect 97:23 | entries 189:20 | 46:6 90:25 126:4 | 55:2,6,21 56:21,24 |
| effort 88:1 | entry 173:24 | 126:11 154:3 | 56:24 57:5,11,16 |
| either 18:5 58:22 | envelope 238:7 | 179:13 199:8 | 57:22 62:13 63:21 |
| 58:22 71:2,22 | environment | 222:7 234:9 | 69:3,4 76:7,8,13 |
| 118:22 139:11 | 79:24 | exactly 19:12 29:8 | 76:17 91:12,21,24 |
| 140:24 171:5,14 | episode 191:23 | 36:23 41:16 44:1 | 95:6 107:21 109:7 |
| 210:6,7 237:25 | equipment 195:17 | 45:10 122:4 159:1 | 109:8 114:2,3,6,8 |
| electronic 231:20 | 197:16,22 198:14 | 178:9 180:14 | 117:15,20 118:2 |
| electronically | equipments | 199:24 202:25 | 119:12,16,18 |
| 108:7 | 197:14 | 203:17 205:13 | 120:16,17,22 |
| embarrass 57:20 | erase 233:6 | 208:23 214:2 | 122:16 123:6 |
| embarrassing | erica 204:8 | 220:22 224:25 | 124:16,22 125:6 |
| 82:16 169:25 | especially 132:25 | 227:15 228:16 | 126:9 128:21,23 |
| embezzled 128:10 | essential 89:5 | 233:7 | 129:12,13 131:24 |
| embezzlement | essentially 89:20 | examination 5:2 | 133:13 138:8,9,14 |
| 154:7 | 135:23 | 11:1 203:10 | 140:12,15,17 |
| | | 210:19 211:21 | 142:22 143:2 |

Veritext Legal Solutions
866 299-5127

**[exhibit - flow]**

| | | | |
|---|---|---|---|
| 144:15,24 153:7,8 | extensively 155:17 | familiarity 118:2 | finish 67:20 |
| 169:17,20 180:3 | extra 180:22 | family 34:5 | 102:21 137:10 |
| 180:19 182:3 | eyesight 197:12 | fancy 145:13 | 163:14 |
| 183:16 190:13,15 | **f** | far 70:12 88:4 | finished 48:18 |
| 190:18 191:15 | fabric 39:22 40:9 | fashion 49:15,16 | 228:3 |
| 194:3 195:21 | 41:2,9,21 42:18,23 | 205:1,3 | fire 38:22 89:5,7 |
| 198:21 200:21,24 | 43:18 44:12 45:19 | fast 27:8 | 89:10 131:20 |
| 205:16 207:20 | 45:24 46:1 163:14 | fault 80:24 | 139:17 141:22,22 |
| 208:15 210:21,24 | 212:5,15 | february 197:15 | fired 15:25 16:8 |
| 218:3 223:15 | fabrics 40:21,25 | 198:4,16 | 98:10 139:13,15 |
| 225:17 227:3 | 42:9,16 44:14 | federal 35:20 | 139:16 141:5,10 |
| 228:6 231:3,21 | 79:11 162:5 163:8 | 235:24 | 141:17,18 |
| 232:7 233:18 | 204:5 205:1,3,5 | feeding 122:6 | firing 139:21 |
| 235:1 | 212:2,12 213:1 | feel 57:19 78:8 | 140:6 |
| exhibits 5:12 6:1 | facility 27:17 | 87:2 | firm 8:24 9:1 |
| 7:1 | 109:3 | feels 88:14 | 55:16 |
| exist 18:22 30:19 | facing 138:24 | feet 28:4,5 | first 22:15 39:25 |
| 67:11 161:5,8,9 | fact 11:23 72:2 | fell 74:14 | 40:2 41:21 55:18 |
| 191:8 | 104:3 218:15 | felt 137:13 209:10 | 62:7 70:10 71:15 |
| existed 46:2 65:6 | factories 206:7 | fight 61:23 | 74:20 83:15 84:25 |
| 66:6 71:8 90:24 | facts 75:24 98:12 | figure 224:10 | 109:13 110:5 |
| 199:3 225:19 | 110:17 142:23 | 229:5 | 117:20 120:7,12 |
| existing 79:5 | 151:2 159:12 | file 24:12 180:22 | 171:25 174:11 |
| exists 198:15 | 167:22 | 228:8 | 189:8 192:13 |
| expansion 79:15 | factual 25:23 | filed 8:18 199:6 | 193:11 201:24 |
| expectation 33:11 | fail 87:5 | 218:24 | 203:8,23 208:2,9 |
| expectations | failing 99:9 | film 216:6,12 | 208:17 209:17 |
| 84:16 | fails 97:23 | films 216:11,11 | fitting 88:2 |
| expenses 110:14 | failure 97:21 99:5 | finally 235:20 | five 29:22,23 35:9 |
| 110:15 150:12,13 | failures 91:8 135:9 | finances 206:1 | 93:11 200:6,10 |
| 150:22 151:1 | fair 49:9 53:10 | financial 20:15 | 238:16 |
| expensive 88:4 | 64:19 194:18 | 34:5 155:25 156:6 | fix 158:12 |
| experience 221:1 | 209:10 | 156:11 | fleming 129:20,25 |
| expertise 83:1 | fall 206:20 | financially 9:3 | 130:8 |
| explain 58:21 | fallen 76:16 | 99:11 240:13 | floor 30:16 188:24 |
| 110:14 144:11 | false 189:20 | financials 156:4 | 188:25 236:10,10 |
| 147:5 176:24 | falsely 121:22 | 156:10 | florida 165:7 |
| 233:13 | familiar 48:17 | find 88:19 158:7 | flow 7:9 158:14,17 |
| explaining 203:14 | 111:4 175:21 | fine 26:16,23 39:1 | 160:8 170:7 |
| explains 144:7 | 200:24 226:5,6 | 188:3 236:24 | 174:22 |
| | | 237:4,5 | |

Page 13

[focus - going]

| | | | |
|---|---|---|---|
| **focus** 88:11 89:15 | **fraud** 72:17 | **gentleman's** | 120:6,7,12 121:19 |
| 135:5 | **free** 99:12 107:10 | 207:10 | 121:19 131:4,8 |
| **focusing** 41:5 | 107:12,14 | **getting** 27:1 85:6 | 135:11 139:25 |
| 42:17 125:14 | **freely** 53:3 | 97:6,9 99:8 | 160:3,22 169:12 |
| **folder** 230:21 | **french** 32:3,5 | 104:16 111:13,18 | 173:3 175:22 |
| **follow** 84:15 137:6 | **friend** 152:20 | 157:5 174:13 | 181:11 190:2,3 |
| 211:17,19 | 204:4 | 228:2 | 194:3 200:2 202:9 |
| **followed** 81:2 | **friend's** 152:19 | **give** 21:21,24,25 | 202:20 203:7 |
| **following** 235:22 | 212:20 | 22:12 26:14,25 | 211:9 223:8,9 |
| **follows** 10:23 | **front** 20:12 51:24 | 27:4 30:3,4 33:22 | 226:23 235:6 |
| 120:14 | 55:21 76:2 86:19 | 34:1 35:1 36:20 | 237:24 |
| **force** 49:4,6 | 92:2 117:16 | 40:7 43:8 44:18 | **goals** 79:14 |
| **forced** 50:10 | 153:11 170:14 | 45:5,11 55:9 59:7 | **god** 61:21 |
| **foregoing** 239:3 | 205:20 | 61:21 75:2,2 | **goes** 88:21 102:8 |
| 240:4,6,10 | **frustrating** 125:18 | 76:12 78:9 112:7 | 102:10,14 105:7 |
| **forget** 41:25 84:20 | **fuchs** 33:1,19,19 | 120:20 127:9,11 | 201:13 |
| 217:1 235:8 | 190:20,25 193:12 | 154:4 158:19 | **going** 8:4 10:5 |
| **forgive** 33:24 | **full** 16:11,12,17,23 | 161:7 164:1,3 | 14:7,20 15:7,12 |
| **form** 204:18 231:5 | 17:3 20:1 94:17 | 170:8 179:5,19,21 | 21:23 33:11,13 |
| 231:17 233:20 | 94:18,21 | 199:7 200:3 201:5 | 34:20 43:2 44:3 |
| **format** 170:10 | **funds** 179:14 | 201:7,19 202:1,5 | 45:12 46:11 55:2 |
| 217:6,8,23 231:7,9 | 183:7,9 | 206:7 215:8,8,9 | 57:18,21 72:22 |
| 232:7 | **funneling** 140:9 | **given** 13:16 90:13 | 73:7,8 81:22 84:6 |
| **formed** 203:16,17 | **funny** 129:9 | 218:13,15 219:2 | 89:24 91:16 96:23 |
| 204:21,23 | 151:13,14,16 | **giving** 19:22 42:22 | 103:25 104:15 |
| **former** 226:6 | **further** 210:14 | 109:1 124:4 157:8 | 109:4 114:25 |
| **forms** 227:1 | 211:21 240:10,12 | 215:12 228:17 | 115:6,7 117:5 |
| **forth** 240:5 | **future** 25:20 91:13 | 233:23 | 118:25 124:9,10 |
| **forward** 85:8 | 168:20 | **glass** 136:5 | 131:2,12,13 |
| 224:21 | **g** | **global** 144:12,12 | 134:10 136:11,14 |
| **found** 23:14 158:9 | **game** 119:2 | 145:10 146:4 | 138:7 141:12 |
| **foundation** 91:14 | **garment** 163:14 | 177:23 | 148:18 150:17,17 |
| 188:3 | **garments** 41:11 | **go** 8:14 11:12 | 151:20 153:2,2 |
| **founder** 92:8 | 43:18 44:9,10,12 | 13:19 21:12,13 | 157:1,24 166:2 |
| 95:12 | 97:13 111:13,18 | 22:1 25:15 26:14 | 167:15 172:6,11 |
| **four** 84:21 98:6 | 211:23 212:1,2,12 | 28:2 33:14 50:7 | 179:8 180:2,4,7,8 |
| 99:1 196:21 | 214:11 | 69:3,3 70:2 73:14 | 180:15,18,25 |
| **fourth** 132:15,19 | **gay** 152:17,22,25 | 77:9,9 84:20 | 181:18 182:9,17 |
| **frame** 237:19 | **general** 78:7 202:1 | 89:20 91:2 96:8 | 184:2 186:1,10 |
| **frankly** 164:6 | **gentleman** 207:6 | 98:13 100:11 | 187:22 190:10 |
| | 207:16 | 102:2,3 113:25 | 193:10 194:23 |

Page 14

**[going - house]**

| | | | |
|---|---|---|---|
| 195:3,10 200:18 | **guys** 148:19 | **head** 141:23 | **highlighting** |
| 203:3 209:1 210:7 | **h** | 199:18 | 195:14 196:9 |
| 218:2 219:18 | **h** 32:4,5,11,11 | **hear** 45:11 132:23 | **highly** 181:17 |
| 221:4,4,16 222:21 | **half** 98:6 99:2 | 203:12 237:13 | **hills** 3:19 |
| 224:8,14,15,21,22 | 143:8,9 | **heard** 18:25 | **hillshore** 18:13,25 |
| 225:12 229:23 | **hand** 43:2 47:19 | 145:16 148:4,6 | 19:10,15,20 |
| 234:6 236:17 | 91:16 119:7 | 151:12 235:8 | 148:18,20 |
| 238:13 | 211:13 | **hearsay** 14:14 | **hire** 80:22 89:7,17 |
| **good** 8:4 50:6 | **handing** 21:5 | **heart** 189:13 | 90:2,3 122:1 |
| 77:20 78:12 90:17 | 91:19 114:5 | 210:5 | 142:17 |
| 90:17 121:20 | **handwriting** | **held** 8:21 | **hired** 39:10 80:14 |
| 133:9 170:5,6,23 | 48:12 | **hell** 145:12 | 80:16,17 122:11 |
| 171:12,13 175:2 | **hanna** 18:8 37:2 | **help** 93:5 107:10 | 124:4 125:12,14 |
| 209:22 | 38:21 46:23,25 | 107:13 135:13 | 125:25 138:22 |
| **google** 27:16 | 47:1,4,6,10 79:6 | 176:14 204:5 | 207:2,5,8 |
| 223:10 224:16 | 80:14,18 92:20 | 206:25 207:8 | **hold** 20:24 44:3 |
| 226:23 227:5,13 | 98:25 139:5,13,15 | 217:21 | **holding** 64:10 |
| **gotten** 90:25 | 139:16,18 141:10 | **helped** 59:1 | 90:11,12 123:5,17 |
| **gpsla** 32:15 | 141:18 170:11,14 | 127:22 216:22 | 129:9 182:11 |
| **grab** 117:15 | 215:7 | **helping** 156:16 | 209:4,4 |
| **grammar** 57:25 | **happen** 14:7 37:1 | 207:7 | **holdings** 1:12 2:14 |
| 58:2 217:1 226:17 | 75:19,23 76:1 | **helps** 216:23 | 2:20 3:3 9:13 |
| 226:18 | 104:14 141:7 | **hereto** 16:3 43:5 | 64:10 |
| **grammars** 216:23 | 237:8 | 48:2 51:22 55:7 | **home** 103:10,11 |
| 216:24 | **happened** 23:15 | 76:18 91:22,25 | 103:13 104:23 |
| **grammatically** | 44:23,25 66:25 | 107:22 114:9 | 129:11 |
| 57:25 | 75:25 221:2,2 | 119:13 128:24 | **homework** 14:6 |
| **grant** 4:15 8:24 | **happy** 53:24 | 129:14 138:10 | 25:17 26:1 99:21 |
| **grave** 130:23 | **harass** 72:22 | 140:13 143:3 | 161:7 168:1,3,20 |
| **gray** 32:8 | **harassing** 134:6 | 144:16,25 153:9 | **homosexual** 152:4 |
| **great** 56:18 87:8 | 134:15 137:23 | 169:18 190:16 | **honest** 84:12 |
| 138:19 179:4 | **harassment** 136:9 | 191:16 195:22 | 87:15 132:20,22 |
| **grounds** 95:23 | **hard** 86:16 88:12 | 200:22 239:6 | **hong** 6:8 |
| **growth** 6:4 | **hate** 72:4,6 | **hey** 73:16,17 | **hope** 138:19 |
| **gubner** 3:15 | **hats** 77:14 | 83:16 | **horrible** 86:2 |
| **guess** 21:2 48:23 | **haute** 31:6 32:2,3 | **hi** 138:17 | **host** 105:10 |
| 109:1,2 159:9 | 32:4,5,7,9,11,22 | **highlight** 195:3 | **hostile** 82:14 |
| **guessing** 109:1 | 32:22 191:23 | 197:23 | **hour** 46:11 |
| **guy** 107:4 181:2 | 193:1 | **highlighted** | **house** 118:7 136:5 |
| 207:7 | **hauteache** 32:9,11 | 195:25 197:16 | 141:19 152:22 |
| | | | 212:20 |

[hp - investment]

| | | | |
|---|---|---|---|
| hp 106:9,10 196:9 | 91:24 107:21 | incorrect 209:7 | interest 9:22,24 |
| hr 80:22,23 81:9 | 114:8 119:12 | independent 80:22 | 17:24 47:22,24 |
| 81:25,25 82:2,2 | 128:23 129:13 | 138:21 141:4 | 51:1,3,5 218:8,9 |
| 118:6,7,8,10,18 | 138:9 140:12 | index 5:1 160:2,2 | 218:10,10,12,14 |
| 119:24 122:1,1 | 143:2 144:15,24 | india 163:10 | 218:16,18,19,20 |
| 123:9,15 125:12 | 153:8 169:17 | indicating 52:18 | 218:25 219:2,6 |
| 125:14 126:3 | 190:15 191:15 | 52:19 114:3 196:9 | interested 9:3 |
| 131:11 138:20,21 | 195:21 200:21 | indicted 154:7 | 155:15 240:13 |
| 141:4 | identified 30:9 | individual 1:10 | interesting 54:22 |
| huh 26:12 39:24 | 183:18 189:10 | 2:12 214:10,21 | 79:9 88:20 |
| 42:5 50:17,19,22 | 197:14 | inexpensive 158:8 | interfere 8:11 |
| 55:13 56:3 63:23 | identify 31:16 | information 25:1 | interference 8:9 |
| 65:20,22 76:8 | 52:21 71:21 | 55:9 100:19 | internal 80:23 |
| 86:24 89:11 | 107:23 145:2 | 103:13,20 104:16 | 138:23 |
| 114:24 115:2 | 201:17 | 108:6,7 109:5 | international |
| 119:14 120:16 | identifying 195:1 | 110:10 119:1 | 49:14 128:22 |
| 129:8 135:17,19 | illegal 66:12,13 | 172:17 199:16,16 | 129:3 147:1,6 |
| 145:14 158:21 | imagine 132:4,7 | 199:17 201:5,7,9 | internet 127:16,20 |
| 162:11 173:2,8 | impeach 114:15 | 201:11,18 228:14 | interpret 118:24 |
| 182:22 187:11,14 | 114:18 117:6 | 228:16 232:6 | interrupt 14:18,20 |
| 194:13 195:5 | impeachment | informing 47:21 | interrupting |
| 202:3 211:12 | 114:20 | inherit 38:18 | 147:24 |
| 217:16 236:23 | implemented | initialed 239:5 | interview 118:10 |
| human 73:9 | 158:12 | ink 239:5 | interviewed 122:2 |
| hundred 97:15,17 | import 94:2 | inputs 166:21 | 124:5 |
| husband 15:24 | improve 135:13 | insert 60:22 62:6 | introduce 47:10 |
| 33:1,5,16,18 34:10 | incapable 170:13 | inside 28:11 | introduced 46:16 |
| 34:11 58:1,3,22,25 | include 161:23 | 143:25 | 46:20,23,25 47:1,4 |
| 59:5 103:4,5 | 164:6 169:23 | install 103:7,9 | 120:7,12 153:24 |
| 152:3,14,15,23,25 | 178:12 183:2 | installed 103:3 | 153:25 203:20 |
| 192:25 216:3 | 189:8 | instruct 25:13 | 204:3 |
| 217:21 226:24 | includes 52:2 | 35:24 | invest 34:3 |
| **i** | 103:13 | instructing 168:16 | invested 36:12 |
| idea 47:16 129:6 | including 76:2 | 168:18 | 75:17 |
| 156:3 174:25 | inclusive 1:13 2:15 | instruction 7:20 | investment 18:13 |
| 175:14 177:22 | incompetence | insult 136:11 | 18:25 19:10,15 |
| 202:1 | 122:8,17,18 | insulting 37:18 | 33:23 34:2,4,12 |
| ideas 89:9 | 124:21 138:3 | insurance 150:17 | 148:19 175:25 |
| identification 16:2 | incompetent | intellectual 39:6,7 | 176:4 177:1 |
| 43:4 48:1 51:21 | 125:11 187:1 | 47:13 115:16 | 206:21 |
| 55:6 76:17 91:21 | | | |

[investor - know]

| investor 33:4,10 | 113:21 129:17 | john 18:8 37:2 | keeps 78:11 81:4 |
|---|---|---|---|
| 34:6 75:21 142:2 | 161:11 162:23 | 38:20 46:23,25 | 81:15 85:5 |
| investors 206:12 | 163:2,3,5,22,23 | 47:1,4,6,10 79:6 | kept 163:12 |
| 206:16 207:1 | 193:5,6 204:18,23 | 80:14,17 82:6,12 | 165:24 |
| 215:12,19,24 | 212:1,1,11,11,23 | 82:20,22 83:6,7 | kim 6:8 23:15 |
| invited 152:21 | 212:25 | 84:7,10,18,20,21 | 109:18,22 153:15 |
| invoices 111:24 | jen's 204:25 | 84:23 87:12 92:20 | 153:18 157:23 |
| 112:3,5,6 202:4,9 | jene 1:17 2:19 5:3 | 95:2,8 97:25 | kind 58:3 105:24 |
| invoke 193:14 | 5:22 8:16 9:16,20 | 98:25 108:21 | 181:2 |
| involved 23:18 | 10:1,21 31:18,18 | 131:11,17 139:5 | kinds 180:22 |
| 88:9 97:23 111:10 | 31:19 32:16,21 | 139:13,15,16,18 | knew 39:19 40:2 |
| 191:23,25 193:23 | 39:22,22 40:22 | 141:18,22 170:11 | 40:14,17,24 41:14 |
| 206:23 | 45:15,19,23,25 | 170:14 215:7 | 47:12 54:14,20 |
| involvement 110:8 | 46:4 83:7,8,9,12 | joined 39:15 54:18 | 154:20 203:15 |
| 201:3 | 84:25 85:10,12,14 | 220:25 | know 14:1,1 15:9 |
| ip 39:3,5 128:8 | 85:17,18 86:12,16 | joke 152:21,25 | 15:18 18:12,23 |
| ipad 196:6 | 87:6,8 89:10 | jspp 31:20 | 19:12,15,17,19,20 |
| irrelevant 14:14 | 113:6,21 114:7 | july 140:20 142:18 | 19:22,23,23 20:6 |
| 206:3 | 117:22 129:17 | 142:21 143:6 | 20:13,14 21:15 |
| issue 59:24 60:17 | 161:11 162:23 | 144:8 177:14 | 22:11,14 23:19 |
| 61:23 62:5 | 163:2,2,5,16,18,18 | june 6:19 7:6,13 | 24:14,15,19,21 |
| issues 80:23 133:7 | 163:19,20,22,22 | 140:21,22 153:13 | 25:2 26:17,24 |
| 158:18 162:17 | 190:20,25 193:5,6 | 158:10 160:18 | 27:7,20 28:1,6,6 |
| 197:9 | 204:18,23,25 | 177:12,13 | 32:20 35:13,14 |
| item 71:8 89:24,25 | 210:21 212:1,1,11 | jury 131:2,3 | 39:6 40:5 41:16 |
| 201:25 | 212:11,23,25 | **k** | 41:20,23,23 42:21 |
| items 43:20 70:3,6 | 238:15 239:2,13 | k 144:12,14 | 44:1 46:21 47:6 |
| 116:12 | jenne 82:7,22 | kaiser 153:24 | 50:3,12,13,14 |
| **j** | 84:10 86:13 89:5 | 154:6 156:15 | 51:25 52:11,12 |
| january 43:17,25 | 89:7,16 90:1 | 157:8 | 58:13 61:22 65:17 |
| 44:9,11 79:3 | jessica 3:16 10:13 | kata 144:12 | 66:13 68:2 69:1 |
| 80:13 98:2,4 | 202:22 203:3,7 | 145:10 146:3 | 69:21 70:12,13,14 |
| 152:10 177:11,12 | 211:18 238:11 | 177:23 179:25 | 70:15 71:14,17,20 |
| 194:19 197:14 | job 1:24 15:25 | 183:5 | 71:23,25 72:2,3 |
| 198:3,15 | 16:7,10,11,12,20 | kathleen 1:23 2:23 | 73:3 74:7,21,22 |
| jbagdanov 3:21 | 16:22 17:2,4,5,6 | 240:24 | 77:16,18 78:3,9,10 |
| jeans 205:2 | 20:1 76:3 90:18 | kathy 9:1 | 78:13,18,19 80:17 |
| jen 31:18,18,19 | 90:18 134:16,18 | keep 73:7,14 | 83:8,11 84:4 |
| 32:16,21 39:22,22 | 155:4 186:17,18 | 136:13 167:11,11 | 85:23 86:25 91:10 |
| 40:22 45:15,19,23 | joel 153:24 154:6 | 167:12 192:22 | 93:4 97:6 98:5,21 |
| 45:25 46:4 113:6 | 156:13,15 157:8 | 218:1 231:6 | 99:9,13 100:18 |

Page 17

**[know - letter]**

| | | | |
|---|---|---|---|
| 101:20 102:12,13 | 190:1 191:24 | lack 80:2 | lawyers 36:5,7,10 |
| 103:2,24 104:5,11 | 192:22 193:1,15 | ladies 203:7 | 58:22,24 59:1 |
| 104:25 105:5,11 | 195:18,24 198:15 | lady 21:3 | 178:2,3 182:11 |
| 105:18,20 106:7,9 | 199:19 201:1,2,14 | language 53:6 | 192:10,11 220:8,9 |
| 106:11,11,17,21 | 201:16 203:17,18 | languages 226:13 | 220:11 227:1,4 |
| 106:23 107:18 | 204:1,12,17 | 235:19 | 234:11,14 |
| 108:12,16,25 | 205:12 207:6 | laptop 101:23,24 | ldt 3:5 |
| 109:3,24,25 110:7 | 209:23 212:4,14 | 102:5,8,8,19 | ldtconsulting 3:11 |
| 110:16,20 111:11 | 212:21 213:4,20 | 103:16,22 104:1 | lead 83:3 122:13 |
| 112:12 113:23 | 213:24 214:6,14 | 104:14,23 230:18 | 139:11,24 140:24 |
| 119:16,18,24 | 214:17,19,20 | 230:20 233:1 | leadership 77:17 |
| 121:25 124:24 | 216:16 218:21 | larry 1:7 2:9 3:13 | 77:21 78:8,10,11 |
| 125:1,2,3,9,10,10 | 221:14 222:9,15 | 8:17 10:14 | 78:13,19,19,20,22 |
| 125:14 126:17 | 226:14 228:16 | late 138:22 185:5 | 79:7,13 80:2 82:6 |
| 127:13 129:24,25 | 230:4 231:22 | laughing 73:3,11 | 82:22 84:10 88:15 |
| 130:1,4,4,6,7,9,19 | 233:5,7,13,16,17 | 73:14 | leading 207:24 |
| 130:20,24,25 | 233:25 234:23 | launches 88:22 | 209:9,20 210:4 |
| 131:5,6,18,18 | 237:9 238:1 | launder 151:8 | leads 80:3 |
| 132:8 134:1 | knowing 119:22 | laundering 151:25 | leave 22:4 |
| 135:22,23,25 | 175:18 | law 3:7,17 4:7 | lee 18:3 76:25 |
| 136:4 137:16,16 | knowledge 61:1 | 34:5 216:17,18,19 | 80:16 82:5 93:11 |
| 139:14,15,16,24 | 70:13 178:4 | 224:20 | 121:7 210:23 |
| 142:10 147:11 | known 130:10 | lawstudios 4:5 | left 93:16 96:4,6 |
| 148:22,23,24 | 153:18 190:20 | lawsuit 23:4 54:15 | 96:20 98:9 153:25 |
| 154:9,12,14,15,16 | knows 85:14,19 | lawsuits 35:11 | 172:2,5,6,10 199:6 |
| 154:25,25 155:5 | 147:9,11,12 | lawyer 12:20 | 199:7,8,9,21 |
| 155:10 156:13,21 | korean 223:9,21 | 22:10,18 25:8,9 | legal 18:16 19:14 |
| 157:10,22 160:11 | 224:14,15,17 | 35:14 47:21 55:14 | 24:21 49:11,17 |
| 160:15,19,21 | 225:1,14,16,18 | 55:14,15 59:4 | 58:13 61:16 69:19 |
| 162:3,7 164:8,12 | 226:22 227:14 | 129:23 159:15,16 | 93:24 100:7 |
| 165:10,22 170:8 | kring 227:20,22 | 169:1,10 179:22 | 139:20 162:16 |
| 170:21 171:7 | 228:6,8,12 | 179:23 191:24 | 165:17 192:2,4 |
| 173:12,13,24 | kristhea 93:9 | 192:1,7,9 193:8 | 223:23 224:18,18 |
| 174:12,16,20 | kuo 18:6,7 | 216:3 220:10,12 | 226:25 227:17 |
| 175:1,20 176:12 | kyu 6:8 | 220:13,14,15 | 238:16 |
| 176:13 177:17,20 | | 221:25 222:2,3 | legally 19:12,13 |
| 177:21 178:18,19 | **l** | 229:15 232:6,10 | 154:17 |
| 178:25 179:3,3,12 | l 32:14 | 232:23 233:19 | lengthy 118:10 |
| 180:21,25 182:25 | l.a. 5:16 214:8 | 235:14,15 | lesbian 152:3 |
| 186:2,3,17 188:2 | la 26:10,11 27:10 | lawyer's 129:22 | letter 5:18 7:11 |
| 188:11 189:24,25 | label 89:1 213:12 | | 15:23 |

Page 18

Veritext Legal Solutions
866 299-5127

[letterhead - mac]

letterhead 109:12
liability 1:11,13
2:13,15
liar 114:21
license 5:20 52:3,4
52:14,14 64:8,9,16
64:18,21,22 65:1,8
66:3 67:8,11
205:17 206:19
207:21 208:3,10
208:12,13,14
209:5,7,18
licensed 65:10,12
66:22,22 67:4,7,9
licensing 50:20
54:2,7 57:2 67:5
228:19
lie 130:22,24
lied 222:10
lieu 237:2
life 72:10
liked 90:18 134:17
134:21
limited 1:11,13
2:13,15 142:11
145:11,11,15
line 7:2,4,21 35:14
35:23 58:16 60:15
63:20,24 88:23
89:3 114:23
144:13 145:7
146:4 172:18,21
173:1,6,14,15,21
175:2,4,25 176:19
177:3,7 201:24
lines 79:16 177:23
list 69:4,13 70:2
199:9,13,14,23
200:3
listen 23:3 130:5
135:12

listening 127:18
listing 95:14
literally 131:14
litigation 60:17
167:21 213:11
little 38:17 63:8
157:5
live 130:17 152:3
lived 130:1,8
212:19,20
lives 130:16 152:3
living 211:24
212:3,7,10,15,18
212:19
llc 1:5,11,12 2:6,13
2:14 4:3 9:15
10:15 16:14 17:2
17:16,17,18 19:3,9
20:2,4,7,18 21:7
22:17,23 24:24
25:6,12 26:7
31:20,23 32:1,15
32:15,22 36:13
37:5 64:10 75:18
95:16 96:23 98:1
100:17,20 101:9
109:23,24 111:8
128:22 129:3
164:11 188:15
190:22,23 191:1,8
204:16 205:13
214:14,24 215:1
llc's 96:5 110:5
llcs 31:25 32:6
llp 3:15
loan 64:5 209:1
210:7
located 8:22 189:3
location 26:13
long 32:2,23 33:9
33:21 34:25,25

35:8 36:9 47:6,7
103:8,23,23
107:24 153:18,19
153:20,22,22
190:19 192:1,15
192:21,22,25
203:6 211:25
longmont 129:21
130:1,8,17
look 13:20 21:15
21:17,18,23,24,25
22:2 24:23 25:5
25:11 55:25 76:7
97:19 99:19
120:15 124:8,12
124:13 129:12
131:11 144:18
145:2 160:22
167:25 168:11,11
168:15,15,24
174:10 177:18
181:4,11,15
182:18,25 197:17
210:21
looked 155:20
156:9,14 164:23
187:20 203:20
209:16
looking 159:1
177:7,19 180:21
195:25 198:23,25
204:4 206:12,16
206:20,24 207:1
looks 169:24 170:4
174:19 200:25
los 1:18 2:21 8:1
8:23 30:16 188:16
236:11
lose 16:10,20,22
17:1 38:11 61:24

loses 88:11,13
losing 20:2
loss 33:6 171:18
lost 16:7,11,12
20:1 104:4 237:1
lot 24:21 31:10,13
33:6,12 44:25
49:11 50:5 57:23
58:4,21 83:13
86:14 88:1 90:22
97:23 101:25
102:2 111:15
113:24 117:19
122:9,23,23
131:12,13,14
133:2 137:8,12
142:14 143:10,11
143:11 146:8,8
149:3 150:21
163:11 199:21
202:20 216:23
223:16 226:25
227:23 231:8
lots 33:24 96:24
222:10
loud 63:19
low 139:1
lower 125:16
lunch 117:7,10
lying 73:10 171:7
lynching 86:22,25
lynchings 86:23

m

m 207:4
ma'am 131:1
mac 196:6,21
197:5 198:5
200:11 230:10,11
230:13,14,15,18
230:18

Page 19

[machine - microphone]

machine  102:18
  102:22 106:12,13
  240:9
machines  102:19
madam  182:2
mail  5:14 6:14,19
  7:6,8,13 15:23
  19:25 20:10,12
  86:17,21 100:23
  100:24,25 103:15
  122:14 131:4,9,21
  131:24 137:4,6,15
  139:3 147:13
  153:5 158:10,17
  159:3,5,23 160:7,7
  160:16,17,18
  169:21,22 171:25
  172:1 191:18
  192:17 193:11
  210:22 230:22,24
  231:2,3,5,9,10,14
  231:16,17 232:1,2
  232:3,4,5,8,21,21
  233:1,8,11,21,22
  233:24,25 234:5
mailed  231:18,19
  232:9
malls  101:4,8,8,15
  101:16,18 232:14
  233:9,10
maintain  28:19
maintenance
  237:20
major  85:5 206:10
maker  39:3
making  91:4,8
  93:6 140:8 142:9
  170:6 182:14,16
  184:6 187:25
  211:5

malicious  62:8
man  33:3 124:9
  207:13
manage  36:24
  38:11
managed  150:23
management  5:24
  6:3 77:22 79:6
  87:10,11,12 92:5
  94:17 108:19
manager  83:2
  93:23,24 145:10
managers  77:17
managing  47:13
manufactured
  111:13
manufacturer
  113:4,18,20 163:8
manufacturers
  111:24 113:1
manufacturing
  113:15
mark  15:25 43:3
  55:2 70:10 76:11
  83:3,3,4,4 88:24
  88:24,25,25,25
  107:20 120:19
  138:8 140:1,11
  144:21 180:15,18
  191:13 200:20
marked  16:2 43:4
  47:25 48:1 51:19
  51:21 55:6 76:17
  91:21,24 107:21
  114:6,8 119:12
  122:16 128:17,23
  129:13 138:9
  140:12 143:2
  144:15,24 153:8
  169:17 190:13,15
  191:15 195:21

200:21 205:16
market  127:20,20
  127:21 150:18
  213:13
marketing  40:18
  162:5
master  27:24,25
  28:1
master's  216:14
match  79:12
material  166:24
  167:10 170:3
  203:21
math  178:17
matter  8:17 70:16
  186:22,25
mean  17:22,22
  19:24 20:23 44:17
  49:16 54:8,24
  56:11,17 57:6
  58:8,10,12,20
  59:12,13,17,21,25
  63:21 64:24 69:14
  91:4 92:13 102:10
  102:17 127:11
  130:8 145:13,14
  145:15 162:2,3
  167:8 173:11
  174:5,6 175:12,13
  179:1 186:6,7
  192:23 193:3
  198:7 205:12
  209:22 220:23,23
  220:24,24 223:23
  225:23 226:13
  227:7 229:2
  232:12
meaning  22:14
  42:24 87:20
  152:23

means  36:23 38:4
  50:14 58:14 60:8
  65:17 71:14,15,16
  71:17 86:25
  173:24 235:4
media  8:15 238:15
meet  46:22,22
  84:15 161:24
  222:20
meeting  75:6
  118:8,9 123:14,15
  123:19 124:19
  132:4,7 135:17,20
  142:9 171:13
meetings  38:20
  123:21 126:6
  162:16
meldy  80:23 81:8
  81:24 139:4,6
  153:16
member  18:11,14
  19:3,5 25:10,10,11
  25:11 32:15 99:25
  100:2,3,3,5 142:6
  142:7 168:14
  169:2
members  17:20
  142:5
mentioning
  160:17
met  20:14 40:4,4,5
  46:3,13 47:1,4,6
  47:12,17 81:3
  113:21,23 192:24
  203:22 204:6,20
  204:23 221:15
  222:25
metro  152:23,24
mic  76:15
microphone  74:14
  107:25 117:17

[microphone - never]

138:11 148:2
182:13 194:4
**microphones** 8:7
8:11
**middle** 26:19
83:25
**milestones** 84:15
**million** 36:25
38:11,14,18 75:17
75:21 97:8 99:10
142:21 143:5,8,10
144:8,11 145:18
145:20,23 146:2,2
146:4,5,7,10,19
148:18 149:1,18
150:22,23 151:1
174:21 176:5,7,11
176:19 177:24
178:8 179:10,25
**millions** 150:3,4,4
150:4 183:5 215:3
215:3,3,13,13,13
215:20,22,25
**mind** 26:18 78:12
82:18 85:13,17
91:13 200:8
**minimum** 89:3
**minute** 29:15
**minutes** 35:9
142:8
**misbehaving**
135:12
**mischaracterizes**
122:20 198:20
**miscommunicati...**
77:23
**misleading** 17:4
**misplaced** 237:1
**missed** 196:8
**misstates** 98:12
154:10 167:22

209:8
**mistake** 19:13
45:14 189:23,25
190:1 230:20
**mode** 21:9
**models** 88:2
**monday** 1:19 2:23
8:1
**money** 12:3 23:8
33:5,14 36:12
97:14 127:25
128:10 140:9
143:17 146:11,14
146:25 147:6
150:1,8 151:8,24
154:6,21,22 155:2
155:6,8 156:1
157:9 163:16
165:24 166:4,22
177:14,14,14,15
178:5,9,10,12,14
179:1,9 180:13
183:15 206:5,7,9
207:9 215:12
**monies** 183:18
**month** 16:22
17:10 44:7,25
97:7 107:14,16
126:2 172:16
177:10 215:8
**monthly** 143:7,9
**months** 37:5 45:13
98:25 99:1 137:3
141:3,4 143:9
**morale** 139:1
**morning** 8:4
117:19 123:16
126:9
**motion** 10:1,6
**move** 34:18,20
38:4 47:8 49:20

84:9 85:7 89:16
90:1 91:1 131:15
156:3 204:9 210:9
215:16
**moved** 188:21
**moving** 62:2
**multiple** 77:13
80:3 88:3

**n**

**n** 83:25 146:13
148:9,11,12,12
152:20,20 207:4
**nail** 130:22
**name** 8:24 9:11
10:13 18:2,5,7,8
31:23,25 32:1,2
39:13,16,17 40:3
40:25 42:12,17,19
54:8,13,16,17,20
61:2 67:24 68:4,5
68:5,6,6,12,14
69:14 70:16,17
77:4,4 82:9 83:16
83:16,18,24 84:3
88:23 94:22
109:14 117:22
121:13,13 127:22
129:16 165:15
183:8 189:6,9,11
189:18 204:15
205:10 207:8,10
207:11 213:14
214:1,2,4,14,14
223:25 240:16
**named** 207:6
**names** 42:14
**nancy** 20:6,14
**narcicisstic** 83:22
**narcissistic** 134:24
135:1

**nasty** 86:18
133:16
**nature** 152:13,15
**nearly** 36:25 94:21
**necessarily** 148:24
170:5 192:8 231:6
231:17
**necessary** 12:12
64:4 236:14
**need** 24:18 37:25
65:7 73:9,10 88:4
89:1 104:2,3
107:13 127:3
133:10 137:13
146:10 161:25
164:11,11 183:11
200:9 201:16,17
202:2 211:19
224:22
**needed** 50:25 82:2
111:5 229:19
234:3
**needs** 80:1 85:10
162:3
**negative** 132:24
**negatively** 88:13
**neither** 240:12
**net** 173:16 174:1,9
174:19,19
**never** 12:6 20:14
25:7 29:11,13
33:4,4 39:8 48:22
65:6,12,12 66:6,22
67:6,6 72:16 77:6
83:13 84:2 91:4
95:8 102:13
103:10 117:23
121:16 123:11,12
126:9,24 128:2,6
128:13 134:9
135:7 143:11

1          A    It's more of a lecture.

2          Q    It's a leading question; okay?

3               MR. SILVER:  A leading question is fine.

4     BY MR. BILLER:

5          Q    You committed fraud on Paula Thomas so you could

6     get extra money from Stephan Choi; is that not right?

7          A    No.

8          Q    You, in fact, received $26,000, in a three-month

9     period, from Stephan Choi, didn't you?

10         A    No.

11         Q    Where did you get it from?

12         A    Well, one, I don't know if it's true, what I got.

13    So I'm assuming your represent -- representation is true,

14    that Thomas Wylde paid me $26,000 in a three-month period.

15    It was based on invoices for legal work performed, that

16    the company paid me that money.

17         Q    Which company?

18         A    Thomas Wylde.

19         Q    Thomas Wylde wasn't formed.  It only had an

20    operating agreement, and it didn't have an officer, it

21    didn't have anybody there.

22         A    What period are you talking about?

23         Q    August, September, and October.

24         A    Of 20...

25         Q    '14.

Page 286

**[okay - owner]**

| | | | |
|---|---|---|---|
| 76:22 77:9,12 | 162:25 163:7 | 230:2,9,20 231:23 | **organization** 6:7 |
| 78:5 80:11,19,21 | 164:7,17,22 | 232:3,9,20,24 | 6:15 96:19 194:15 |
| 81:10 82:5,13,21 | 165:10 166:21,24 | 233:1,11,17,20 | 194:19 |
| 83:18 84:9,20 | 167:10,13,25 | 234:16,17 235:13 | **organizational** 6:3 |
| 86:12 87:1,14,25 | 169:8 170:6,23 | 235:15,17 236:24 | 92:5 194:12 211:4 |
| 88:8,19 89:14 | 171:1,22 172:1,15 | 237:5,12,17,22 | **orientation** 174:14 |
| 91:19 93:8,16,22 | 172:21 173:11,13 | 238:1,5 | **original** 179:6 |
| 95:1,3,5,17 96:8 | 173:23 174:4 | **old** 44:24 87:19 | 184:22 231:20 |
| 96:10,12 98:6,9,16 | 175:3,6,9,10,15,23 | 106:22 | 234:18,21,25 |
| 98:24 99:18,18 | 176:10,13,21 | **older** 199:12 | 235:1,4 237:1,3,6 |
| 100:16 101:17,22 | 177:13,21 178:1,7 | **once** 147:15 | 237:15,16,19 |
| 102:19,21,24 | 178:11 179:9 | 210:21 | **originated** 129:10 |
| 103:12,22,25 | 180:15,18 181:15 | **online** 185:18 | **outcome** 9:4 |
| 104:12,13,17 | 183:2,3 184:3,12 | **open** 83:1 109:3 | **outflow** 172:23 |
| 105:13,17,21 | 184:25 185:5,12 | **opening** 127:19 | 173:3 |
| 106:12,14,16 | 186:12 187:10 | **operating** 92:16 | **outside** 73:15 |
| 107:17 108:3,13 | 188:6 189:2,5,14 | 111:12 164:23,25 | 80:20 82:2 93:13 |
| 109:2,7,11,22 | 189:16 190:2 | 165:1 190:25 | 93:13,14 118:10 |
| 110:5,8 111:1,23 | 191:2,5,13 192:10 | **operations** 211:11 | 122:1 131:11 |
| 112:5,8,14,22 | 192:13,19 193:21 | **opinion** 85:25 91:2 | 159:16 163:7 |
| 113:18 114:15 | 194:1,22 195:6,8 | 97:22 | **overage** 80:7 |
| 115:13,20 116:4,9 | 195:14,17 196:2 | **opportunities** 6:5 | **overhead** 143:8,9 |
| 118:14 120:6 | 196:12,24 197:2,8 | **opportunity** 49:22 | 146:6,8 150:14,15 |
| 121:2,18 122:6,15 | 197:12 198:12,13 | 83:14 | 150:16 158:23 |
| 123:2 124:17,17 | 198:17 199:3 | **opposed** 20:2,3 | **overruling** 37:7 |
| 124:20 125:3 | 200:1 202:7,22,24 | **oral** 64:20,22,23 | **oversaw** 226:9 |
| 126:5,19 127:2 | 203:12,12,14 | 65:1,8,17 67:10 | **oversee** 226:3 |
| 129:2 130:5,7,13 | 204:18 205:15 | **order** 51:19 | **overseeing** 111:22 |
| 130:17 131:22,23 | 207:20 208:16 | 131:17 140:1,11 | **owed** 99:10 |
| 136:12 138:7 | 209:16 210:14 | 164:4 169:13 | **owes** 218:6 |
| 139:5,7,17 140:16 | 211:17 212:7,10 | 181:22 182:1,4,7 | **owned** 31:10,13 |
| 140:17 141:3,7,17 | 212:17,25 213:4 | 182:10 184:7,18 | 31:17,18 32:6,20 |
| 142:3,5,18,20 | 213:24 214:5,16 | 184:20 185:8,12 | 32:21,22 33:16,19 |
| 143:15 144:11,20 | 214:24 215:7 | 185:23 186:14,15 | 47:14 112:17 |
| 145:18,19 147:14 | 216:3,21 218:5,18 | 187:3,5 191:14 | 127:14 147:8 |
| 149:17 151:7,10 | 218:22,23 219:3,7 | **ordered** 131:18 | 218:12 |
| 152:2,16,19 153:5 | 219:8 220:2 221:4 | 166:12 | **owner** 17:15,17 |
| 153:15,18 154:12 | 221:6 224:1,14,14 | **orders** 163:25 | 18:11,14 19:2,21 |
| 154:20 155:1,5,10 | 225:2,25 226:8 | 164:1,2 184:5 | 100:6,9 113:1,2,4 |
| 156:15,19 157:15 | 227:12 228:1,4,9 | **org** 94:20 96:8 | 113:8 142:2 |
| 158:10,14 162:1,3 | 228:24 229:4,4,18 | 211:5 | |

[owners - pdtw]

**owners** 18:9
**ownership** 219:15
**owns** 17:13 112:16
**oxnard** 3:18

**p**

**p** 3:6 32:14,14
**p.c.** 4:5
**p.m.** 2:22 117:12
  190:8,11 200:16
  200:19 238:14,18
**pacific** 3:9
**pack** 112:11
  116:18,21,24,25
**page** 5:13 6:2 7:1
  7:21 48:4,6,7,10
  48:21 52:16,16
  55:25 58:16 63:19
  63:22 77:10,12
  78:5 79:10,13
  82:5,21 89:24
  92:11 95:13
  109:13 114:13,23
  144:18,19 145:2
  172:3,5 173:3,6,14
  173:15,16,17,18
  174:11 175:22
  176:14,19 177:2,3
  189:8 190:3 194:3
  210:25 224:13
  235:11
**pages** 1:25 82:6
  84:21,21 107:23
  147:21 180:22
**paid** 16:11,12,17
  16:23 20:15 33:15
  38:15,16,17 48:24
  75:23 97:6,8,10
  143:11 162:14
**palisades** 3:9
**palliative** 127:9,11
  147:3,7 151:24

216:7
**pamphlet** 93:5
**paper** 28:14 167:1
  167:14,18 172:10
  177:18 221:8,12
  230:5
**papers** 58:4
**paperwork** 160:7
  178:13
**paragraph** 58:16
  62:15 132:15,19
  133:3 226:4
  235:11
**paragraphs** 217:9
  217:15
**paris** 47:4 152:5,7
  152:9,16
**park** 1:17 2:19,21
  5:3,22 8:16,22
  9:16,21 10:1,21
  112:25 114:7
  147:2 163:16,18
  163:19,20 203:12
  238:15 239:2,13
**part** 17:6 20:3,7
  20:19 21:5 32:15
  33:22 34:1,12
  75:22 76:4,5
  78:21 79:21,22
  93:5 96:25 108:23
  111:6,10 113:8
  118:4 132:18
  146:23 150:6
  153:16 182:15
  183:22 186:11
  195:25 214:21
**partially** 16:25
**participates** 10:7
**participating**
  35:20,21

**particular** 35:25
  59:2 62:17 121:24
  122:3,7 123:17
  124:20 126:14
  182:4 232:13
**particularly** 51:14
  97:24 122:2
**parties** 8:13
  240:14
**partners** 64:6,8
**party** 9:2
**passion** 88:12
**paste** 217:3,5,7
  225:20,25 226:1
  226:10 227:12
**paula** 1:10 2:12,20
  3:3 4:19 8:17 9:13
  10:9 18:8 24:23
  37:2,4 38:22 39:2
  39:19,22 40:4,4,5
  40:9,14,24 41:9
  42:9,15 43:17,19
  44:10 45:20 46:1
  46:5,13,16,20,22
  46:23,25 47:2,5,10
  47:14,22 48:24
  49:25 50:1,16,24
  50:25 51:4,4,8
  53:12,13,15,20,23
  54:15 61:1 62:6
  62:23 65:9 66:21
  70:7 71:3 73:5
  78:23,25 90:24,25
  91:9 92:9 95:2,3
  95:12 97:25 98:9
  104:11 108:21,23
  113:21,23 115:5
  116:11 127:10,22
  141:17,22 147:9
  154:1,8 155:17,20
  156:14,19 157:7

171:4,6 203:15,18
  203:22 204:4,20
  204:23 205:5,13
  205:13 207:17
  208:6 209:13,17
  210:11 211:23
  212:2,5,7,12,16
  213:1,5,7,8,9,12
  213:17 214:6,10
  214:20 215:11
  221:15 222:20,25
  228:25
**paula's** 87:20
  131:3 155:9
**pay** 48:22 133:10
  142:16,17 155:9
  156:16 162:6
  202:18 206:8
**paying** 17:11 45:6
  161:24
**payment** 202:15
  202:18,19
**payroll** 150:16
**pc** 106:1 230:9
**pcs** 106:2,4 197:3
  197:10
**pdtw** 1:5 2:6 7:15
  39:20 40:10,11,15
  40:18 41:1,15,16
  41:24 42:2,20
  47:21,22 50:16,24
  51:4,8 53:23
  55:16 61:9,11,20
  62:4 64:9 65:10
  65:13 66:4 67:10
  95:7,9,24 96:7
  108:11 109:24
  111:7 113:16
  115:10 128:11
  150:21 154:7,13
  155:9,24 156:2,7

**[pdtw - please]**

| | | | |
|---|---|---|---|
| 156:10,17,19 | 151:22 154:10 | **pen** 221:8,9,10 | 137:17 139:11 |
| 157:7,9 190:23 | 155:19 156:24 | **penal** 11:25 | 140:24 141:5,24 |
| 191:6 197:19 | 157:18 159:12,24 | **penalty** 11:22 | 150:5 204:7 |
| 198:5,19 199:4,22 | 160:20 161:3,6 | 12:13,19 236:16 | **personal** 61:1 |
| 203:15,17 205:14 | 163:20 164:8 | 239:3 | 97:22 100:20,21 |
| 206:21 207:1 | 165:17 166:9,12 | **pending** 164:2 | 101:15,16 103:19 |
| 215:14,20,23 | 167:22 168:1,6,9 | **penny** 144:8 | 197:2 |
| **pdtw's** 110:15 | 168:12,16,20 | **people** 17:22,24 | **personally** 29:4 |
| 156:4 206:1 | 170:16,25 171:15 | 19:17 31:2 32:4 | 53:20,23 60:3,18 |
| **peddie** 4:5,6 5:8 | 172:3,7 174:7,9,13 | 32:13,14 67:17,23 | 61:3 100:13 |
| 9:14,14 13:23,25 | 176:14 178:20,23 | 76:1 78:23 80:3 | 101:19 105:14 |
| 14:3,5,11,15,19,23 | 179:1 180:2,5,21 | 93:12,15,20 94:10 | 146:15 149:15,15 |
| 15:5,8,13,15 16:6 | 181:2,13,17,21,25 | 94:12 97:24 | 149:16 183:7 |
| 18:16 21:8 22:7 | 182:6,14 183:11 | 100:25 118:18 | 206:23 207:13,15 |
| 22:24 23:1,3 | 183:20,24 184:1,5 | 132:25 133:1,11 | 209:14 235:11 |
| 24:25 25:13,16,19 | 184:9,13,17,22,24 | 133:14 134:9 | **phone** 35:7 36:3 |
| 25:23,25 26:4 | 185:2,7,11,16,18 | 140:4 164:22,23 | 36:10 |
| 29:12 34:13,15 | 185:21 186:2,8,10 | 165:5 182:10 | **phones** 8:10 |
| 35:16,19,24 37:11 | 186:13,17,19,22 | 222:10 | **photocopy** 106:12 |
| 37:18 43:9 44:12 | 186:25 187:2,5,20 | **perceived** 88:3 | **photos** 199:8 |
| 55:15 61:15,18,25 | 187:25 188:3 | **percent** 49:10 | **phrase** 59:20 |
| 62:4 69:19 72:19 | 191:19 192:14 | 97:15,17 218:13 | **physical** 105:8,12 |
| 72:22 75:24 84:1 | 193:10,13,17,21 | 218:15 219:2 | **physically** 124:8 |
| 86:5,10 87:22 | 193:23 194:1 | **perfected** 58:22 | 144:2,4 |
| 90:15 91:12 92:11 | 195:9 196:10 | **perfectly** 222:24 | **pick** 8:8 112:11 |
| 94:23 95:6,11,19 | 197:20 198:20 | **perform** 162:13 | 234:2 |
| 95:21,24 96:3,7,10 | 200:5,7 201:20 | **performed** 118:6 | **piece** 167:14,18 |
| 96:12 97:1,16 | 202:25 203:3 | **peril** 182:8 | 177:18 221:7,11 |
| 98:10,12 99:21 | 207:4 210:17,20 | **period** 135:12 | **pieces** 89:3 |
| 100:7 110:17 | 211:16 221:10,16 | 151:4 162:22 | **place** 8:10,13 |
| 122:20 125:16 | 221:19 222:12,21 | 197:18 236:18,19 | 188:18 240:5 |
| 127:4,7,13 128:3 | 223:1,4 224:5,8 | **perjury** 11:22,24 | **placed** 240:7 |
| 128:14 129:11 | 225:3,8 229:20,23 | 12:13,20 236:16 | **plaintiff** 1:8 2:10 |
| 130:3,7 132:10 | 232:10 234:8,11 | 239:3 | 8:17 10:16 |
| 133:17 134:4,6,12 | 234:14,17,23 | **person** 15:20 | **plastic** 28:17 |
| 134:15,25 136:7,9 | 235:3,18 236:3,5 | 20:13,13 21:1,4 | **play** 119:2 |
| 136:13,17,19 | 236:17,21,23 | 24:4 35:6 61:23 | **please** 8:7,9 9:8 |
| 137:23 138:1 | 237:4,9,13,23 | 71:21 89:19,22 | 10:18 13:21 16:5 |
| 139:20 140:3 | 238:3 | 92:8 93:16 122:10 | 26:25 27:2,4 37:9 |
| 142:23 148:10 | **peers** 131:3 | 122:12 134:1 | 43:7 45:4 48:7 |
| 150:24 151:2,18 | | 136:16,23,24 | 61:21 63:13 64:13 |

Page 25

[please - property]

67:20 73:13 74:2
74:24 98:19
107:25 110:14
117:13,15,17
125:17 142:22
145:2 148:2
149:12 157:14
160:1,2 172:4
179:24 182:13
183:23 190:11
200:14,19 210:24
211:9 218:3 221:8
222:24 223:3
224:13 231:11
plenty  136:3
137:15 147:19
pocket  97:14
point  42:3 92:25
230:2
pointing  124:15
124:16 232:24
points  79:12
poor  77:23 84:11
portion  227:14
229:6
position  20:3
38:13 80:11 90:11
90:12,13 128:8
141:8 142:16,16
156:15 161:11,12
161:18 164:13
216:21
positions  20:21,24
possible  138:25
158:11 206:24
236:15
potential  50:23
pouring  215:2,19
215:25
power  141:23

pr  93:23
precisely  119:1
predictable  77:20
premises  109:23
prepare  111:5
178:19
prepared  52:10,12
55:1,3 110:10
131:17 171:23
178:2 236:1
preparing  110:9
presence  36:7
present  4:17 9:5
85:9
presentation  5:24
presented  118:7
118:20
preserved  143:24
pretend  66:7
231:9
pretty  95:7 194:25
209:21 213:3,4
227:24
previous  12:2
108:19 114:4
143:10 178:15
204:9
previously  54:16
67:3 146:6
price  27:11,12,13
79:12
print  39:8,9 53:18
160:1
printed  203:21
prints  54:4 68:19
69:5 203:19
prior  203:15 240:7
private  8:8 145:11
145:15
privilege  35:13
74:1 193:11,13,14

229:21
privileged  25:1
probably  34:10
36:18 43:23 45:16
46:6 58:3 103:21
104:3 129:22
217:22,23 223:20
227:11 231:22
232:8 233:22,25
problem  20:15
184:2,12,15 188:2
problems  54:6
81:11 90:23 133:7
138:23 155:25
157:5
procedure  235:25
235:25
proceeding  9:8,12
9:18 10:16 62:8
219:12,18
proceedings  104:5
219:8,10,16,17
240:4,6,8
process  11:14
produce  147:14,14
159:10,14,23
160:5,6,9,16,25
161:2 166:16
170:10 194:24
204:5,5,6
produced  147:18
147:19,21 149:21
149:24 159:25
160:21,22,23
161:1 166:6,8
167:20 170:15
229:22,24
producing  99:14
150:2 170:13
216:11

product  162:18,19
163:12,13 165:4,8
165:10,15,20
170:14 180:25
production  85:14
85:19 89:17 90:1
159:18 160:15
productivity
139:2
products  128:1
165:25
professional  93:14
93:14 123:6,9
professionals
76:14,21 120:23
120:25
profit  171:18
projected  174:24
176:25
projection  171:16
178:21 210:23
projections  7:9
158:19,20,22,23
170:6,8 171:14,18
178:25
prolonged  10:8
promissory  6:25
146:3 178:8
pronounced  32:3
proof  29:15 218:8
218:9,10,12,13,16
218:18,19,19,24
219:5,6
proper  186:4
222:24
properly  224:23
property  39:6,7
47:13 70:17
115:16 156:20
157:8 218:20

Page 26

[proposal – received]

proposal 211:7
propose 235:22
proposed 6:21
    194:15 211:5,8
prosecute 157:7
prosecuted 154:12
    154:23 156:20
    157:8
prosecutor 157:6
protect 104:2
protected 68:13
    68:25 69:5,12,18
    70:3,6
protective 181:21
    181:25 182:7,10
    184:7,18,20 185:8
    185:12,23 186:14
    186:15 187:3,5
proud 181:1
prove 34:8 86:1
    149:25 218:20
provide 238:6
providing 110:9
proving 153:3
ptdw 10:15
pte 145:10 146:4
public 9:2 86:22
    86:23,25 152:4
    182:14,16 185:19
published 43:16
    44:8
pull 199:17
purchased 108:14
    108:15 196:15
purposes 30:23
    91:13 197:6
put 42:19 54:16
    61:17 117:15
    198:11 209:3
    217:3,7 220:18
    232:7 236:10

237:19
putting 21:20
    75:21 97:13
    185:11

q

qualifications
    132:8
qualified 77:16
queen 141:19
question 11:6
    15:17 16:24 17:1
    18:19 20:5,9
    22:19,20 25:16
    29:2 37:2,21 42:1
    44:20 49:18 57:21
    60:6 67:20 74:2
    76:3 80:21 81:20
    81:22 83:3,3,4,4
    88:24,24,24,25,25
    98:15,19 99:7
    114:25 115:3,14
    116:5,6 119:1
    120:5,15,19,22
    121:6,15,18
    125:25 128:15
    132:11 134:14
    136:7 137:10
    139:17 147:22,23
    147:25 148:1,1
    156:12 157:13,14
    157:15,16,21
    162:8 168:19
    183:4 185:25
    202:25 210:16
    215:18,18 221:19
    227:25 229:4,9
    231:14 232:20
questions 14:16,24
    18:19 23:5 25:25
    40:6 44:23 45:8
    57:19 72:23,24

91:14 114:14,17
    117:2,4,5,20
    118:24 119:4
    122:5 125:21,24
    196:10 202:23
    203:4,5 210:15
    211:18,18 222:22
    224:23 225:4
quick 200:8
quickbooks 7:17
    143:16,18,23,24
    166:5,6,7,16,18,22
    179:18 200:25
    201:6
quite 17:1
quote 38:23

r

r 152:20
raise 207:8
ran 146:18,19
    162:9
read 12:12 15:3,6
    16:5 43:7,11
    48:16 49:21,24
    57:14,16 60:20
    63:15,16,16,17,18
    63:19 64:13 74:2
    74:3 77:10,12,25
    78:15 80:24 81:17
    81:19,23 83:14,14
    85:15 89:24 96:17
    98:19,20 114:25
    114:25 115:3
    120:14 123:13
    132:15,17 137:7
    137:11 138:14,16
    139:7 157:13,16
    157:17 169:25
    178:17 185:16
    201:25 224:1,4
    236:13 239:3

reading 131:25
    133:11 139:10
    140:23 180:5
reads 60:15
    237:21
ready 90:14,16,17
    195:24
real 179:1
realistic 82:23
realizing 157:1
really 15:7 18:22
    19:14 25:22,24
    44:19,22 49:12
    55:12 56:17 57:20
    58:5 76:7 80:24
    83:13 95:10 96:15
    112:16,18 113:13
    114:13 118:14
    120:1 126:25
    129:7 131:25
    132:2 135:18
    137:14 143:20
    147:5 151:13,14
    162:18 164:1
    166:10,10,11
    169:2 182:9,12
    197:5,12,21
    198:25 209:13
    223:22 237:25
reason 64:15
    189:19,22 222:14
recall 13:3 205:18
    205:23 206:2
receipt 236:22,25
receive 12:10
    55:23 145:21
    201:18 202:4,11
    202:12
received 12:18
    15:23 176:11,18
    178:5,7,10,14

Veritext Legal Solutions
866 299-5127

**[received - request]**

| | | | |
|---|---|---|---|
| 179:14 180:13 | 65:16 66:23 68:18 | 18:2,4,7 24:10 | 123:22,24,25 |
| 183:4,7,8 | 70:8 82:10,12 | 26:14 29:8,19,25 | 124:1,3,6,8,12,13 |
| receiving 55:19,20 | 84:18 85:21 87:6 | 30:2 32:21,23 | 124:13,14,15,16 |
| 111:24 112:2 | 88:6,17 102:22 | 33:6,9 35:5,22 | 124:18,18 126:3,4 |
| 145:22 156:20 | 147:12 219:8,17 | 36:3,16,23,23 | 126:6 129:9 131:5 |
| 157:7 | refers 79:18,18,20 | 44:17,25 45:16,18 | 131:7,17,21 132:1 |
| recess 63:11 | 80:8 83:6,7,11,12 | 46:6,21 47:16,17 | 133:13,16 136:2 |
| 117:10 190:9 | reflected 19:25 | 49:24 51:12,14,20 | 136:25 137:1,7,11 |
| 200:17 | 64:19 | 52:7 55:5,11,12,17 | 137:12 138:20 |
| recognize 48:20 | refused 23:16,20 | 56:8,22 57:8,9 | 200:25 |
| 109:7,12,13 | regard 60:16 82:1 | 59:2,11 74:25 | reported 1:23 |
| 140:15 170:3 | 207:20 223:18 | 75:1 118:5,16,17 | reporter 2:24 9:1 |
| 189:12,14,18 | regarding 11:13 | 124:13,18 126:4 | 10:18 16:3 43:5 |
| recognizes 140:17 | 11:23 22:16 54:1 | 126:10,10,12 | 48:2 51:22 55:7 |
| recommended | 116:11 118:2 | 130:12 148:24 | 76:18 91:18,20,22 |
| 141:5 | 119:21 122:8 | 149:1 154:3 | 91:25 107:22 |
| record 8:5,14 9:7 | 123:8 124:21 | 155:15,23,24 | 114:5,9 119:10,13 |
| 63:9,12,17 74:3 | 158:17 205:16 | 156:1 158:25 | 120:11 128:18,24 |
| 98:20 117:8,11 | registered 71:16 | 159:1 161:1 | 129:14 138:6,8,10 |
| 120:9,13,14 131:8 | registry 68:25 | 164:16,21 179:13 | 140:13 143:1,3 |
| 138:16 157:17 | regulations 167:15 | 179:16 180:12,13 | 144:16,25 153:9 |
| 179:17,18 181:19 | reimbursement | 183:8 188:10 | 169:15,18 179:5 |
| 182:14 183:9,12 | 202:13 | 199:15,17,24 | 180:17 182:2 |
| 183:22 184:4 | relate 117:22 | 203:22 204:20 | 190:4,14,16 |
| 190:7,11 200:13 | 201:9 212:18 | 205:7,10,14 207:6 | 191:16 195:22 |
| 200:15,19 224:1 | related 9:2 104:17 | 207:7,10 208:9 | 200:22 235:23 |
| 238:12,13 240:8 | 148:14 208:25 | 210:13 212:7 | 238:8 240:2 |
| recorded 8:15 | relates 13:7 | 213:23 217:25 | reports 122:23 |
| recording 8:12 | relating 22:20,22 | 227:6 | 123:4 124:10 |
| records 21:7 22:16 | 50:5 | remembered | represent 9:12,15 |
| 24:23 25:6,12 | relationship | 118:15 | 9:22 10:14 193:2 |
| 26:6 27:18 28:8 | 152:14 | remembering | 193:3,12 |
| 28:18,20 97:19 | relative 240:13 | 155:14 | representation |
| 99:14,17,20 | relevance 140:4 | remotely 9:6 | 9:21 194:18 211:3 |
| 156:10,14 168:25 | relevant 87:19 | rent 150:16 | represented 50:24 |
| red 31:19 32:16 | 138:1 | rented 27:18 | 193:6 |
| 185:24 | reliable 194:25 | repeat 20:5 | representing 9:20 |
| refer 52:20 67:24 | relieved 235:23 | replace 148:18,20 | 10:1 50:16 55:16 |
| 67:25 68:17 | relying 195:1 | 153:16 | 193:1,18 |
| referring 12:21,22 | remember 13:2,10 | report 6:17 7:17 | request 6:22 |
| 16:15 20:10,12 | 13:12,13,15,19 | 119:21,25 122:19 | 159:18,21 |

Page 28

Veritext Legal Solutions
866 299-5127

1           MR. PEDDIE:  Objection, relevance.

2           THE WITNESS:  I just thought that it was an

3    instruction.

4    BY MR. BILLER:

5           Q      And that's it; right?

6           A      Yes.

7           Q      Did you think it was a termination

8    letter?

9           A      No.

10          Q      Did you think Paula Thomas was being

11   threatened she was going to be terminated if her

12   behavior did not change?

13          A      Not that I believe so.  It's an

14   instruction about function.

15          Q      Right.  Thank you.  Now at some

16   point -- let me show you another e-mail.

17                 (Exhibit 70 was marked for

18                 identification by the Certified Shorthand

19                 Reporter and is attached hereto.)

20   BY MR. BILLER:

21          Q      Please read Exhibit 70.

22          A      (Witness complies.)

23          Q      Why was the salaries cut by a third as

24   indicated in Exhibit 70?

25          A      I believe it's because of the financial

                                              Page 88

**[santos - share]**

| | | | |
|---|---|---|---|
| santos 93:9 | schneider 38:21 | 112:22 120:23,24 | sells 102:13 |
| sat 77:2 84:7 121:9 | 38:22 | 120:25 127:2 | semantics 235:19 |
| saw 117:23 123:12 | schnider 46:13,16 | 129:16 135:8 | send 232:3,4,21 |
| 125:5 126:9 | 46:19 47:12,20 | 140:16 155:2 | 236:3 238:5 |
| 208:20 | 49:22 50:2,16 | 156:11 169:11 | sending 138:20 |
| saying 14:5 37:9 | 51:6 53:13 77:1 | 171:20,24 172:2 | 231:10 |
| 45:23 56:16 57:10 | 84:6 93:9 117:25 | 172:13,19,23 | senior 94:3 |
| 58:25 59:3 60:2,5 | 119:24 121:7 | 173:5,7,10 174:3 | sensitive 8:8 |
| 60:25 61:2 65:9 | 123:7 131:19 | 174:13 175:8,9,10 | sent 159:5,6 179:6 |
| 65:11 66:1,1 71:9 | 136:16,17 208:8 | 175:24 176:2,6,8,9 | 232:23 236:2 |
| 71:19 72:4 77:6 | 209:18 | 176:21 177:13 | sentence 60:12,15 |
| 81:10 82:8,10 | schnider's 48:20 | 186:1 188:9 | 132:20 218:2 |
| 83:9,10,11 84:2 | schooling 223:8 | 190:19 191:3,20 | sentences 217:9,15 |
| 90:7 99:9 101:17 | scream 133:15 | 194:16 195:4 | separate 152:3 |
| 108:13 121:15 | screamer 86:20 | 198:22 201:23,23 | 197:25 209:2,3,4 |
| 122:15,22 123:7 | 133:25 135:24 | 208:2,17 211:7 | separated 196:8 |
| 123:18 126:3,12 | 136:1 | 217:22 | separately 51:9 |
| 126:20 137:12 | seal 181:20,23,24 | seeing 118:5 | 143:24 |
| 144:4,9 146:21 | 182:17 183:23 | seek 15:12 | september 5:18 |
| 152:16 156:17 | 184:4 186:3,9 | seen 74:10,10 76:8 | 7:11 47:20 48:15 |
| 157:6,9 159:20 | sealed 181:23 | 76:8,23 77:6 84:2 | 48:15 205:23 |
| 164:15 184:3,10 | 182:3 183:24,25 | 84:3 120:5,16,17 | 208:10 |
| 189:12 192:22 | 184:11 185:13 | 121:3,16,23,24 | seror 3:15 |
| 198:3 227:21,24 | 186:1 | 208:11,13 228:10 | served 21:6 |
| 229:1 231:19,23 | sealing 184:6,8,10 | select 235:10 | 160:14 |
| 232:9 233:25 | 184:16 | self 27:9,11,12,13 | server 101:11,12 |
| says 43:15 63:24 | season 213:10 | 134:11 238:6 | 101:13 103:1,12 |
| 78:4,18 81:13 | second 32:19 | sell 43:18 44:10 | 103:19 104:1,15 |
| 82:12 85:4,24 | 39:11 48:4,6,7,10 | 46:1,2 102:2 | 104:24 105:8 |
| 89:6,10,20,22 90:3 | 70:11 104:4 155:1 | 162:15 163:12,13 | 143:23,24 144:1,1 |
| 95:12 96:18 | 181:13 188:24,25 | 163:16,18,19 | 144:7 |
| 137:15 139:4,6 | 236:9,10 | 165:14 211:23,25 | service 21:9 93:13 |
| 173:14 175:6,24 | section 12:1 | 212:1,5 | 93:15 |
| 177:11,19 179:25 | secured 6:25 | selling 40:9,20,21 | services 93:14 |
| 183:1,9 190:24 | see 16:8,8 21:10 | 42:9 45:19,24 | session 117:19 |
| 194:14 196:5 | 22:4,7 27:6 52:17 | 46:4 97:13 147:10 | 126:8,13 |
| 197:16 198:7 | 69:6,10,12,21,25 | 150:18 165:4,8,19 | set 87:4 164:10,18 |
| scanner 106:14 | 70:4 71:25 72:21 | 165:25 212:15 | 164:20,22 240:5 |
| scans 106:15 | 74:11 76:13,20,20 | 213:1,5,18 214:7 | sewing 162:4 |
| schedule 7:15 | 80:24 92:18,22 | 214:16,20 | share 114:11 |
| | 93:8 99:16 109:4 | | |

[shared - square]

shared 141:13
shareholders 18:9
  19:7,7,16,18
shares 17:23
ship 163:14
shipping 30:21
  107:3,3 112:11
shocked 131:25
  133:23,24 134:2
shoes 116:12
short 175:1
shortening 236:18
shorthand 2:24
  240:1,9
show 29:15 114:4
  114:20 128:16
  143:16 153:2,2
  169:12 179:8
  180:3,4,8 194:23
showed 84:7 208:9
  217:22
showing 122:16,17
  179:9
shrink 89:2
sic 140:22 179:10
side 172:2,5,6,10
sign 12:13,19 13:3
  13:4,16,18,21 15:3
  15:7,8 21:12 49:4
  49:6,9,25,25 50:1
  50:3,3,4,7,11,20
  53:3,11,12,14,15
  56:13 65:7,7,14
  159:19 177:23,24
  177:25 207:22
  208:4 236:15
signatory 186:19
  186:21
signature 21:10
  48:8,21,22,23,25
  49:2 51:16 52:3

52:13 56:2,9,22,24
  71:8 144:19 145:3
  145:5,7 149:12
  190:19 237:7
  240:23
signatures 52:21
  144:23
signed 9:25 13:15
  13:17 47:19 50:7
  53:5 55:2 56:9,11
  64:15 149:14
  206:20 207:21
  208:18 222:1,3
significance 59:19
signing 51:13,14
  52:7 56:8 67:4,8
signoff 202:13,14
signs 50:4 237:21
silent 86:14
silly 221:17 224:8
similar 227:19
  228:5
simons 1:7 2:9
  3:13 8:17 10:14
simple 17:1 22:19
  57:21 162:7
  222:20 225:24
simply 189:12
simultaneously
  50:18
singapore 145:11
  145:15
single 57:13 77:10
  144:19 156:1
  167:14,18 187:21
sir 132:11 136:7
  210:17
sit 136:11
sitting 76:1 115:6
situation 19:14
  41:14 154:14

193:2
six 141:3,4
size 27:20 28:7
  215:15
sizing 88:3
skill 221:23
skills 142:11
skull 71:7
skulls 71:1
sky 105:9
small 80:5 85:3
  89:3 96:15,15
  162:14 205:3
smaller 27:21,24
  28:2,7 89:3
smart 126:19,21
  156:23
smell 82:16
smith 103:9
  196:13
sniderman 136:18
  136:19,20,22
  138:21
sold 39:22 40:22
  40:25 41:7 42:18
  86:9 113:6 162:1
  162:15,23 205:5,7
  212:12 214:11
solutions 158:11
  238:17
somebody 142:11
  222:16 224:11
  229:11 232:22
someone's 85:25
songwriter 68:8
soon 212:25 213:3
  213:4
sorry 22:18 27:7,9
  34:16 39:21 41:19
  44:4,24 45:10
  48:5 50:12 69:2

92:11,14 95:11
  107:16 108:1
  109:8 113:19
  135:13 136:18
  138:12 144:14
  151:12 163:22
  173:17 190:18
  197:21 207:10
  208:11,13 230:20
sounds 90:21 96:4
source 104:4
  194:24 195:10
sources 226:1,2
  227:13
south 27:10
speak 14:4 15:20
  24:4 26:2,3 55:9
speaking 14:5
  120:10
speaks 24:5 131:8
  133:17 224:5
special 37:25
specific 114:14,18
  160:12 202:2
specifically 63:20
  63:25 64:3 75:9
speculation 97:2
  157:19
speech 187:24
spell 84:3 148:8
  188:4 230:23
  231:6 232:14,17
spelled 32:4 82:9
  117:23
spelling 32:10
spend 36:25
  132:25 150:23
spending 149:18
spent 146:19
square 102:25

**[stack - table]**

| | | | |
|---|---|---|---|
| stack 185:24 | stephen 18:1,10 | strategies 6:4 | suggestions 88:19 |
| staff 139:2 | 19:5,11,21 34:23 | street 3:18 30:16 | 88:20 116:11 |
| stage 203:18 | 35:1,20 36:4,6,15 | 167:7,7 188:16,23 | suit 35:20 |
| 206:17 | 36:25 131:19 | 189:3 236:9 | suite 8:22 |
| stamp 52:18,21 | 138:17 139:7 | stressful 79:25 | sunset 3:8 |
| stamped 92:14 | 140:7 142:1,5,7 | strictly 118:24 | support 82:25 |
| start 45:15 46:4 | 145:7 151:7 | strike 38:5 47:8 | 139:11 140:24 |
| 73:11 89:1 92:4 | 158:16 159:5 | 91:1 131:15 156:3 | supported 78:8 |
| 95:14 147:9 | 215:2,8 | 204:9 210:9 | supporting 209:23 |
| 192:13,19 213:1 | steps 11:25 | 215:16 | supposed 15:6,11 |
| 224:13 | stick 148:20 | structure 79:23 | 15:13,20 22:13 |
| started 32:25 | 181:18 | 80:1,2 81:6 82:3 | 119:3 142:4 |
| 39:25 40:2,14,18 | stipulate 183:20 | 151:5 | 145:13 159:19 |
| 42:24 45:19,23 | 186:9,10 193:22 | structured 81:4,15 | 182:18 184:25 |
| 46:1,1,2 98:2,5 | 236:18 237:22 | struggle 134:10 | 186:7 |
| 145:21 196:19 | stipulation 235:22 | struggles 133:12 | sure 11:15 15:19 |
| 212:23 213:17 | stole 72:14,15 | struggling 142:15 | 16:19 19:1 22:6 |
| starting 63:20 | 146:23 154:6 | 149:8 | 23:2 26:21 28:22 |
| starts 210:22 | stolen 104:6,8 | stuff 87:19,20 | 48:7 49:15 52:1 |
| state 9:6,8 23:4 | 156:20 157:7 | 111:11 155:9,14 | 67:21 84:24 85:16 |
| 130:15 239:9 | stones 136:5,8 | 169:24 181:18 | 87:7,23 88:7 |
| 240:2 | stop 45:2,2,4 64:7 | 234:4 | 89:23 90:16 96:17 |
| statement 57:6 | 73:10 122:6 | subject 182:7 | 104:18 107:13 |
| 182:25 183:1 | 125:18 147:11 | 184:7 186:13 | 112:24 115:19 |
| 187:21 189:9,18 | 171:7 | submit 12:25 | 119:8 133:21 |
| statements 34:5 | stopped 145:21 | submitted 199:24 | 150:7 153:6 |
| 181:4,5,12 182:24 | storage 26:8,9,10 | 218:20 | 159:17,22 178:6,9 |
| 183:2,15 187:10 | 27:9,11,11,12,13 | submitting 219:12 | 179:16 198:24 |
| 187:12 188:7,14 | 27:17 28:19 29:4 | 227:18 | 199:16 224:19 |
| 189:5,7,8,23 | 30:8,9 108:4 | subpoena 124:9 | surprised 237:13 |
| states 1:1 2:1 | 109:3 143:22 | subpoenas 21:6 | survey 90:23 |
| status 206:1 | 167:9 | subscribed 240:16 | survive 210:8 |
| stay 53:19 141:15 | store 27:18 196:7 | substitute 60:12 | susan 93:9,10 |
| 234:7 | 198:7,9,12 | substitution 9:25 | swear 10:18 |
| steal 72:16 | stored 28:8 30:7 | successful 78:14 | sy 1:5,7 2:7 9:19 |
| stealed 154:22 | 108:7 | sudden 65:5 66:7 | |
| stealing 72:14 | story 59:6,7 | 66:23 | **t** |
| 127:25 128:7 | 220:21,23,25 | sued 24:14,16,17 | t 32:4,5,11 144:12 |
| 154:13,20 155:2,5 | 222:20,25 223:25 | 136:4 155:18 | 144:14 |
| 156:16 | straight 34:21 | 186:24 | table 6:7 96:18 |
| | | | 194:15 |

[take - thomas]

take 8:13 13:19
21:22 22:2 63:6
75:20 85:8 94:16
94:17,21 96:22
97:20,21 99:21
117:7 135:9 168:1
181:12,16 190:4,6
taken 2:20 8:16
9:18 11:16,25
75:16 240:4
takes 91:4 141:15
talented 90:6,8
talk 15:11 20:8
22:9,9 23:3,6 35:1
35:6 49:22 63:7
73:9,19,19,25 79:9
82:3 95:10 104:19
105:21 128:5,7,9,9
128:11 161:6
164:5 200:9,13
207:13 228:22
231:12
talked 34:23 36:9
77:2 121:9 126:2
127:21,23 155:11
talking 14:2,10,22
25:3 35:16 44:9
62:18 64:22,23
65:3 67:2 82:19
82:20 95:9 96:4
103:1 108:22
117:1 123:4,5
162:22 172:8
198:12,14 203:2
208:15 213:17
216:25 217:8,10
226:4 231:11
talks 43:17 78:17
96:7 211:10
task 80:4

tax 6:8 23:12,13
24:12 28:21,22,23
109:10 110:1,9,10
111:5 158:2,3,6,8
167:15
team 78:9 86:16
88:13,16 133:5
teams 202:13
tech 31:8 113:15
113:22 116:18,20
116:24,25 147:1
technical 116:25
tee 31:6 32:2,4,7,9
32:22,22 191:23
193:2
telephone 10:12
27:14,15 136:23
telephonically
3:16
tell 11:17,18,20
23:20 24:9,20
35:12 41:20 58:7
59:22 73:2 74:12
74:24 75:4 77:12
84:3 103:25
107:18 120:3
130:22,25 149:12
155:16 157:2,23
181:5 198:25
212:21 220:18,22
222:12,15 224:24
226:1,19 228:19
229:18,23 234:9
236:20
telling 14:18 58:19
90:5 95:21 99:15
104:12 156:9
157:3 223:25
ten 29:24,25 32:24
93:7 153:21
162:10 192:15,24

term 58:13 223:23
terminated 98:10
termination 140:7
terms 202:15,18
202:19 209:18
224:18
testified 10:23
46:19 76:25 77:1
121:7,8,22 123:11
126:8 196:13
205:15 207:21
209:6 211:2
testify 84:6 115:7
testifying 240:7
testimony 13:7
94:12 114:4,6
115:5 116:17
137:14 209:8
238:14 239:6
text 86:17,20
texting 27:1,3
thank 10:11,13,17
22:2 43:9 63:5
70:1 147:20
165:22 179:4
235:17 238:10
thereof 240:11
thief 136:12
thing 54:17 75:7
102:12 107:24
111:9 137:17
151:12 163:22
225:24 227:24
things 21:24 24:21
27:6 43:18 44:25
49:17 50:5,6
57:24 75:8 77:15
80:5 85:6,12
102:3 111:15
118:1 132:24
133:14 135:21

202:15,19,20
204:6 218:11
220:1 224:9,20
226:22,24 232:13
think 28:3,22
36:21 38:10 44:15
44:17 46:18 50:10
53:9 54:11 58:14
61:19 62:24 64:12
64:18 66:12 68:4
68:4 71:2,15,16
75:25 76:15 90:23
97:22 99:4 101:14
105:6,16,17,18,19
105:19 106:1,5
108:12 124:7
125:7 126:19,22
126:22 130:3
131:1 137:1,1,3,4
137:6,15 143:13
146:7 155:7,8
156:23 158:25
164:16 184:13,18
186:13 193:10,23
196:8 197:13
208:13,22,25
213:3,10,14 217:6
217:12,21 220:8
220:10 227:19
234:3 235:18
third 70:11 173:6
213:10
thomas 1:10,11,12
2:12,13,14,20 3:3
4:3,19 8:18 9:13
9:15 10:10 16:14
17:2,7,16,17,17
18:14 19:3,9 20:2
20:4,7,18,22 21:7
22:16,22 23:8,22
24:23,24 25:6,12

[thomas - transcript]

26:6 27:5,19 29:3
29:5,17 30:23
36:13,24 37:3,4,4
38:12,22 39:2,3,20
39:23 40:3,10,11
40:14,24 41:9,12
41:24 42:9,12,14
42:15,17,18,19
43:19 44:10 45:20
46:1,5,10,14,17,20
46:23 47:5,10,14
47:22 50:16,24,25
54:8,13,14 60:3,18
61:1,6,7,11 62:23
63:7 65:9 68:14
69:12,14,17 70:7,7
70:12,14,17,19
73:5 75:18 78:20
78:22 91:9 92:9
94:14,22 95:12,15
95:15 96:4,11,18
96:23 97:24 98:1
98:9,24,25 100:16
100:19 101:9,13
103:13,20 104:17
105:15,16,24
106:24 107:6
108:7,15,22 109:5
109:23,24,25
110:5 111:8
113:16 115:10
127:11 141:17
145:23 148:12
151:8 153:23
154:8 157:7,24
165:4,8,14,19
167:16 168:14,25
174:22,23 176:10
176:18 178:5,7,14
179:9,11 181:6,7
181:10,11 182:24

183:4 187:13,17
188:8,9,15 189:2,9
189:11 190:22
191:1,8 194:19
196:15 199:4
200:8,12 202:24
203:15,22 204:16
204:20 205:5,13
205:13 207:18,22
208:23 209:17
210:11 211:4,24
212:2,7,12 213:2,6
213:7,7,8,9,12,13
213:17 214:1,2,7
214:10,15,16,19
214:20,22,24
215:1,4,11,25
220:13,14 221:15
222:20,25 226:15
236:6
**thomas's** 43:17
48:25
**thoroughly** 126:1
**thought** 46:22
53:18,23 54:13,18
62:10 65:4 66:14
66:14 89:19 93:4
107:15 133:10
134:9 156:22
193:25 218:1
227:23 237:10
**thoughts** 217:14
**threatening**
151:19
**three** 21:6 78:23
90:3 93:15 97:24
98:24 136:4
**throwing** 151:21
**thrown** 151:16
**time** 8:5 9:9,23
11:3,9,13 12:16,17

12:18,22,24 13:2
15:2,21 16:11,12
16:17,23 17:3,6
20:1,3,7,19 21:5
21:17 22:2,4 32:2
32:23 33:9,21
34:23,25,25 36:9
36:12 40:19 42:4
43:19 45:7 46:9
47:6,7 49:21,24
57:23 63:10,13
64:17 74:20 75:5
75:22 88:1 92:25
96:25 103:8,23,23
117:9,12 133:1
135:13 150:6
153:16,19 154:5
162:22 186:16
190:8,11,19 191:5
191:9 192:1,15,21
192:25 197:18
199:4 200:16,19
202:18 203:25
206:2,4,7,8,17,19
209:17 210:2,12
211:25 223:16
230:7,23 231:9
233:7 237:18
238:13,18 240:5
**timeline** 212:5
**times** 5:16 25:9
74:8,13,16,17,18
74:19 75:1 90:3
137:2 212:19
214:8 235:9
**tired** 77:19 197:13
**titles** 145:14
**today** 9:15 10:4
14:8 144:9 166:18
203:14 205:15

**today's** 15:3
238:14
**told** 23:24 24:3,5,7
54:15,16 63:25
64:3 65:9 74:7,20
74:22,23 110:25
117:4 155:12
199:12 229:11
230:3 233:9
**top** 92:8 96:18
109:13 129:17
**topics** 100:11
**total** 172:23 173:3
238:15
**totally** 88:22
**track** 165:24
237:11
**trademark** 39:12
39:13 41:5 47:14
52:4,13 54:7 58:7
58:11,11,17,19
59:14,16,17,18,23
59:24 60:1,7,10,13
60:13,14,22 61:8
62:6,21 67:23
68:3,4,5,13 70:2,6
205:17
**trademarks** 58:12
59:9 60:4,16,19
62:25 65:10 66:4
67:3,9 228:20
229:1
**trading** 113:5,10
162:21,23 163:2,9
163:12,17
**transcribed** 240:9
**transcript** 6:12
12:11,19 13:4,17
15:2 182:15 236:1
236:2,13,16 237:7
239:4

Veritext Legal Solutions
866 299-5127

[transcription - veritext]

| | | | |
|---|---|---|---|
| transcription 240:11 | 65:25 66:5,10 | uh 26:12 39:24 | unrealistic 79:15 |
| transfer 179:20 | 67:1 119:3 125:12 | 42:5 50:17,19,22 | untrue 66:19,20 |
| transferred 147:3 | 125:20,21,23,25 | 55:13 56:3 63:23 | 66:21 |
| 148:17 | 147:23 156:1 | 65:20,22 89:11 | untruthful 53:17 |
| transfers 183:3 | 224:10 226:19 | 114:24 115:2 | 53:24 54:24,25 |
| translate 223:10 | 229:5 231:13 | 119:14 129:8 | 66:16,18 67:14,15 |
| 223:10,16 224:16 | turn 8:10 48:4,6,7 | 135:17,19 158:21 | upset 53:6,8 84:8 |
| 226:23 | 82:5 114:13 | 162:11 173:2,8 | 86:13,21 |
| translates 88:12 | 180:25 210:24 | 182:22 187:11,14 | use 54:22,23,25 |
| translation 227:13 | turnover 86:15 | 194:13 195:5 | 58:17 59:18 60:1 |
| translator 224:17 | turns 33:12 | 202:3 211:12 | 62:6 66:16 102:5 |
| 224:22 234:4 | tw 2:20 3:3 9:13 | 217:16 236:23 | 103:16 106:23,24 |
| travel 101:25 | 9:22 16:13,14 | unclear 78:6 | 113:18,20 182:8 |
| 102:2 150:17 | 21:5,7 42:15 | undersigned 240:1 | 184:6 185:21 |
| treatment 86:14 | 64:10 95:25 96:9 | understand 12:5,7 | 192:10 195:15,16 |
| trouble 84:14 87:3 | 165:4 182:11 | 12:14,21 15:22 | 213:11 231:17 |
| 87:17 154:16,17 | 194:24 199:4 | 18:18,20 20:8 | uses 107:2 |
| 154:18 157:2 | 213:13 219:14 | 22:12,13 24:17,18 | usually 13:16 |
| true 18:10,11 | tw's 97:13 | 24:19 27:7 29:2 | 49:25 59:18 |
| 38:25 64:7,11 | twice 84:22 89:20 | 32:1 39:21 41:3 | 164:11 201:5,13 |
| 66:15 77:3 97:15 | two 30:12,18 38:2 | 49:10,17,23 51:2 | 231:7 232:14 |
| 97:17 121:11 | 42:14 82:6 84:21 | 51:11,12 56:14 | 233:14,14,15,22 |
| 146:23,25 147:3 | 91:16 93:13,14 | 59:21 60:6 65:25 | utility 150:17 |
| 151:7,10,24 152:2 | 97:7 104:20 | 67:15 161:20 | |
| 152:5,18 183:4 | 105:21 106:2,16 | 165:12,16 185:7 | **v** |
| 211:3 215:9,11,14 | 147:17 149:24 | 185:10 220:4 | v 207:4 |
| 222:1 225:10,11 | 151:4 165:7 | 224:19 | vague 15:17 |
| 239:7 | 178:15 179:2 | understanding | 197:20 232:10,11 |
| trust 178:3 192:9 | 181:7,7,10 185:4 | 68:10 | 235:3 |
| trustee 1:7 2:9 | 188:21 198:1 | unfair 54:12,13,19 | value 195:2 |
| 3:13 10:15 199:10 | 236:1,1,12 | 54:23 55:1 62:11 | vendome 207:3,9 |
| 199:13,15 200:4 | type 28:18 57:7 | 62:15,20,24 63:2,4 | 207:14,15 |
| truth 11:17,18,20 | 106:6 167:10 | 66:1,5,12,14,15 | venice 211:24 |
| 66:14 157:2,3 | 196:24 201:18,22 | 83:13 | 212:3,8,10,19,20 |
| truthful 45:11 | typed 55:4,5 | unfounded 91:1 | verbal 65:18,19 |
| 53:9 118:1 131:1 | typing 27:5,8 | unintelligible | 66:3 |
| 236:15 | 96:15 | 128:15 | verification |
| try 44:19 | | unit 8:15 | 159:20 |
| trying 32:18 40:7 | **u** | united 1:1 2:1 | verify 188:12 |
| 40:7 45:3,8 64:5 | u 32:4,5,11 | units 17:24 238:15 | veritext 8:21,25 |
| | u.s. 8:18 | | 9:1 238:16 |

Page 35

**[verizon.net - work]**

verizon.net  3:11
versions  208:20
versus  8:17 158:23
video  8:12,15
videographer  4:13
    8:4,25 10:11,17
    63:9,12 74:14
    76:15 107:25
    117:8,11,17 120:9
    138:11 148:2
    182:13 190:7,10
    194:4 200:13,15
    200:18 235:23
    238:12
videotaped  1:17
    2:19
violate  182:10
vision  141:14
voice  125:16
volume  1:20 2:19
    5:4
volunteer  118:25
vp  211:10,13
vs  1:9 2:11

**w**

wait  181:13
waiting  85:7 98:16
waive  47:23 50:25
waiver  50:15 57:3
waiving  51:3,5
walk  136:14
want  11:12 12:3
    15:15 19:13,13
    23:18,22 24:19,20
    26:21 30:2,4
    32:20 36:19,19
    44:18 45:11,11,14
    48:6,16 57:18
    63:7,15,16,16,17
    73:2 74:22 75:15
    78:10,11 82:24

84:13 87:16 90:19
95:17,18 99:16
100:11 103:23
109:2,2 114:4
123:25 124:7
142:10 144:18
179:5,6 180:8
181:20 183:21
185:21 186:2
188:3 193:17,17
194:22 195:17
196:17 199:20,23
200:12 201:14,25
202:1 203:24
204:14,16 221:14
222:12,19 223:6
224:1,4,24 226:21
234:7,8,9,12,13
236:19 237:19,23
237:24 238:3,4
wanted  72:8,10
    117:5 131:19
    148:20 197:25
    230:3
wants  10:5 168:14
warning  185:24
waste  12:3
wasting  22:5 45:6
    45:7
watching  155:1
way  59:6,7 66:8
    114:14,18 119:2
    155:8 166:18
    191:25 196:3
    206:24 210:7
    213:5 217:10
    229:8,8 237:2,25
we've  46:11 93:6
    174:25 189:17
wear  77:13

weber  3:15
wedding  152:19
week  165:7 237:21
weekend  138:19
weekends  97:9
weeks  236:1,2,12
went  144:8 146:25
    155:17 212:25
    213:13 227:5
west  3:8,18 30:16
    188:15,23 189:3
    236:9
whatsoever
    110:12
whereof  240:15
whispering  8:8
white  102:25
    177:9
wholesalers
    111:21
wipe  187:3
wire  147:3 148:17
    149:15 179:20
    183:2
wise  57:25
withdraw  147:25
    147:25 148:1
    229:9
withdrew  9:21
witness  5:2 10:19
    14:1 16:7 18:18
    21:10 22:5,8,11,18
    22:25 23:2 25:2
    25:22 29:13 34:14
    34:16 35:18,22
    37:13,24 69:21
    72:21 74:4 75:25
    84:2 86:6 87:23
    90:16 94:24 97:3
    97:17 98:13,21
    99:22 100:9

119:14 122:22
125:20 127:14
132:13 134:5,16
135:1 136:8
148:14 151:20
155:20 160:21
165:19 167:23
170:17 171:1,16
172:8 182:18
195:20 197:21
198:22 206:4,16
207:5,25 209:10
209:21 210:5
221:7 232:12
234:20,25 236:6,9
236:12,14 237:21
238:6 240:15
witnesses  240:6
woodland  3:19
word  15:10 16:8
    32:5 54:22,25,25
    57:10,11,13 59:20
    65:17 66:16
    195:15 231:8,24
    232:17 233:21,22
    234:5 235:10
wording  221:3
words  58:7,18
    59:9,10,12 60:12
    60:22 176:10
    195:16 198:1
    217:9,10,17 222:7
    224:18 234:19,22
    234:25 235:1,1,4
work  18:23 51:8
    67:17,25 77:21
    100:1,3 101:9
    104:20,20 107:6
    107:11,13 109:22
    141:15 153:22
    162:13 163:25

1    Q    Over 90.  Now, I'm going back to

2  Exhibit 65 and ask you whether Exhibit 65, without any

3  entries in 2015, is consistent with 72 where there is a

4  capital account balance of $9,000,013 for Hillshore.

5  Are those two documents consistent?

6         MR. PEDDIE:  Objection, lacks foundation;

7  assumes facts.

8         THE WITNESS:  In numbers.  But again, there

9  could be other account that supports this.

10 BY MR. BILLER:

11        Q    I understand.  But in purely numbers,

12 are they consistent?

13        A    Again, not in numbers.

14        Q    So can you explain the inconsistencies?

15        A    It could be on another account.

16        Q    I want to know if you have personal

17 knowledge of any facts that explain the

18 inconsistencies?

19        A    It could be in QuickBooks.  I don't

20 remember, but if it's in QuickBooks it would generate

21 the account.

22        Q    Okay.  I don't want you to think where

23 the inconsistency can be found.  I want to know if you

24 have any personal knowledge of any facts that you know

25 about that can explain the inconsistency?

Page 97

**[years - yoonsung]**

**years**  15:25 31:11
  31:14 32:24 44:3
  44:23,24 74:21,23
  93:7 97:7 98:7
  99:2 130:10
  147:17 149:24
  153:21 162:10
  178:15 179:2
  185:5 188:21
  192:15,23,24
**yell**  73:11 133:15
**yelled**  84:14 87:17
**yeller**  86:20
  133:25 135:24
  136:1
**yelling**  73:7
**yells**  86:18
**yoonsung**  93:8
  107:4 166:23

## Federal Rules of Civil Procedure

### Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.